# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Patrick Berry, Henrietta Brown, Nadine Little, Dennis Barrow, Virginia Roy, Joel Westvig, Emmett Williams, *on behalf of themselves and a class of similarly-situated individuals*; and ZACAH, | Civil Action No. 20-cv-02189 WMW/KMM |
| Plaintiffs, | |
| vs. | |
| Hennepin County; Hennepin County Sheriff David Hutchinson, *in his individual and official capacity*; City of Minneapolis; Minneapolis Mayor Jacob Frey, *in his individual and official capacity*; Minneapolis Chief of Police Medaria Arradondo, *in his individual and official capacity*; Superintendent of the Minneapolis Park and Recreation Board Al Bangoura, *in his individual and official capacity*; Park Police Chief at the Minneapolis Park and Recreation Board Jason Ohotto, *in his individual and official capacity*; Police Officers John Does; and Police Officers Jane Does, | **MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER** |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES………………………………..…………….……….....III

INTRODUCTION……………………………………………………………………...1

FACTUAL BACKGROUND…………..……………………….……......................3

ARGUMENT …………………..……………………………………….……...8

    I.    Plaintiffs Are Likely to Succeed on their Claim That Defendants' Practice of Forcefully Evicting Plaintiffs and Destroying Their Property from Public Spaces Violates Their Rights Under Federal and Minnesota Law………..……...…………..……..……….…………………9

        a.    Claim 1: Defendants Unlawfully Seized Plaintiff's Property in Violation of the Fourth Amendment of the United States Constitution and Article I, Section 10 of the Minnesota Constitution……………………………………………..………9

        b.    Claim 2: Defendants Violated Plaintiff's Rights to Privacy Under the Fourth Amendment of the United States Constitution and Article I, Section 10, of the Minnesota Constitution….…...…………………12

        c.    Claim 3: Defendants Provided Plaintiffs No Procedural Due Process In Violation of the Fourteenth Amendments of the United States Constitution and Article I, Section 7 of the Minnesota Constitution………………….……..…………………14

        d.    Claim 4: Defendants Violated Plaintiffs' Substantive Due Process Rights Under the United States and Minnesota Constitutions...............17

            1.    Privacy……………………...…………………..…………17

            2.    State-Created Danger………………………………………19

        e.    Claim 5: Defendants Committed Theft By Conversion In Violation of Minnesota Common Law…………...……………………………23

    II.    Plaintiffs Will Suffer Irreparable Harm if Defendants Are Not Enjoined from Sweeping Encampments……..……..………….……………..……24

I

III.    The Balance of Equities Is In Plaintiffs' Favor……………………...………27

IV.    A Temporary Restraining Order Is In the Public Interest…………………27

V.    A Temporary Restraining Order Should Apply Throughout Hennepin
        County……………………………………………………………………...28

VI.    The Requirement of Security Should be Waived…………………………30

CONCLUSION……………………………………………………………….…………….30

# TABLE OF AUTHORITIES

Page

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. IV………………………………………….…………….9-10, 12

U.S. Const. amend. XIV……………………………………………...………….14

Minn. Const. art. I, §7……………………………………………...…………...15

Minn. Const. art. I, §10……………………………………………….…………10

## STATUTES

Minn. Stat. § 504B.271…………………………………………………………...12

## FEDERAL RULES OF CIVIL PROCEDURE

Federal Rule of Civil Procedure 65………………………………………...8, 30

## SUPREME COURT COURT CASES

*Califano v. Yamasaki*, 442 U.S. 682 (1979)…………………………...……………28, 29

*Coolidge v. New Hampshire*, 403 U.S. 443 (1971)………………………...………….10

*Cty. of Sacramento v. Lewis*, 523 U.S. 833 (1998)………………………...…………...20

*Griswold v. Connecticut*, 381 U.S. 479 (1965)…………………………………………...17

*Katz v. United States*, 389 U.S. 347 (1967)…………………………………………...12-13

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982)…………………………………16

*Mathews v. Eldridge*, 424 U.S. 319 (1976)……………………………………….14, 15

*Palko v. Connecticut*, 302 U.S. 319 (1937)…………………………...…………17

*Soldal v. Cook County, Ill.*, 506 U.S. 56 (1992)……………………………...…………..10

*Twining v. New Jersey*, 211 U.S. 78 (1908)…………………….…………….17

III

*United States v. Jacobsen*, 466 U.S. 109 (1984)……………………..………..10, 11, 15

*United States v. Place*, 462 U.S. 696 (1983)……………………...………………..10

*Washington v. Glucksberg*, 521 U.S. 702 (1997)…………..………………………18

**EIGHTH CIRCUIT CASES**

*Barrett v. Claycomb*, 705 F.3d 315 (8th Cir. 2013)…………………………………9

*Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981)………..…...8, 9, 27

*Fields v. Abbott*, 652 F.3d 886 (8th Cir. 2011)…………………….…….…………20

*Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312 (8th Cir. 2009)…..………..24

*Hart v. City of Little Rock*, 432 F.3d 801 (8th Cir. 2005)………………….…………20

*Higbee v. Starr*, 698 F.2d 945 (8th Cir. 1983)…………………………..…………24

*Novus Franchising, Inc. v. Dawson*, 725 F.3d 885 (8th Cir. 2013)………...………..24, 26

*Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724 (8th Cir. 2008)………………………………………...……………………27

*Quigley v. Winter*, 598 F.3d 938 (8th Cir. 2010)…………………………..…………13

*Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Engineers*, 826 F.3d 1030 (8th Cir. 2016)………………………………………….………………..30

*Senty-Haugen v. Goodno*, 462 F.3d 876 (8th Cir. 2006)……………………………14, 15

*S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707 (8th Cir. 1989)…..8

*S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771 (8th Cir. 2012)..........9

*United States v. Lewis*, 864 F.3d 937 (8th Cir. 2017)……………………..……………10

*Walters v. Wolf*, 660 F.3d 307 (8th Cir. 2011)………………………….…………..16

*Watkins Inc. v. Lewis*, 346 F.3d 841 (8th Cir. 2003)…………………………...………9

IV

## DISTRICT OF MINNESOTA CASES

*Bixby v. Lifespace Cmty., Inc.*, No. 18-cv-817-JRT/KMM, 2018 WL 3218697 (D. Minn. July 2, 2018)……………………………………………..…..……………………24

*Colvin v. Parker's Lake Apartments*, No. 19-cv-1045-SRN/DTS, 2019 WL 3292075 (D. Minn. June 14, 2019)………………………………………………………………….24

*Hruby v. Larsen*, No. 05-cv-894-DSD/SRN, 2005 WL 1540130 (D. Minn. June 30, 2005)……………………………………………………………………………..24

## MINNESOTA STATE COURT CASES

*Hodge v. Eastern Ry. Co. of Minnesota*, 72 N.W. 1074 (Minn. 1897)………..………...23

*Larson v. Archer-Daniels-Midland Co.*, 32 N.W.2d 649 (Minn. 1948)…………………23

*Sawh v. City of Lino Lakes*, 823 N.W.2d 627 (Minn. 2012)………………………………15

*State v. Gray*, 413 N.W.2d 107 (Minn. 1987)…………………………………..………...17

*State v. Leonard*, 943 N.W.2d 149 (Minn. 2020)……………………………………..10

## OUT OF CIRCUIT AUTHORITY

*Bass v. Richardson*, 338 F. Supp. 478 (S.D.N.Y. 1991)…………..…………………….30

*Beliveau v. Caras*, 873 F. Supp. 1393 (C.D. Cal. 1995)………………..….……………..13

*Bresgal v. Brock*, 843 F.2d 1163 (9th Cir. 1987)………………………….…….............28

*Carmichael v. Birmingham Saw Works*, 738 F.2d 1126 (11th Cir. 1984)…..…...............29

*Lavan v. City of Los Angeles*, 797 F. Supp. 2d 1005 (C.D. Cal. 2011)…..….…………12

*McNeill v. New York City Hous. Auth.*, 719 F. Supp. 233 (S.D.N.Y. 1989)…..….………25

*Meyer v. Brown & Root Const. Co.*, 661 F.2d 369 (5th Cir. 1981)…………..….………28

*Park Village Apartment Tenant Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150 (9th Cir. 2011)…………………………………………………………………………......25

*Pottinger v. City of Miami*, 810 F. Supp. 1551 (S.D. Fla. 1992)…………..……………12

*Propert v. District of Columbia*, 948 F.2d 1327 (D.C. Cir. 1991)………...……………..16

*Salisbury v. Hickman*, 974 F. Supp. 2d 1282 (E.D. Cal. 2013)……………..…………...13

*Wayne Chem., Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692 (7th Cir. 1977)……30

**SECONDARY SOURCES**

D. Benjamin Barros, Home as a Legal Concept, 46 Santa Clara L. Rev. 255 (2006)……………………………………………………………………………13

## INTRODUCTION

Defendants Hennepin County, Sheriff David Hutchinson, the City of Minneapolis, Mayor Jacob Frey, Minneapolis Chief of Police Medaria Arradondo, Superintendent Al Bangoura, Park Police Chief Jason Ohotto, and John and Jane Doe Police Officers have been conducting sweeps of homeless communities unchecked, forcibly displacing Hennepin County residents, who often have nowhere else to go, and destroying their homes and personal belongings in the process.

This practice is particularly troubling now, when, in the words of Defendant Jacob Frey, Mayor of Minneapolis, this is an "unprecedented time" for the City of Minneapolis ("the City").[1]  The world is being ravaged by a global pandemic, and the Twin Cities are reeling from the police killing of one of their community members, George Floyd.  In combination, these events have left hundreds of people displaced from the places they lived, increasing exponentially the number of homeless individuals in Minneapolis.  The lack of adequate shelter space or affordable housing is on full display, as residents join encampments throughout Hennepin County, in hopes of finding a safe place to rest their heads each night.

In light of the COVID-19 pandemic, Governor Walz issued an executive order directing local governments not to conduct "sweeps" of homeless encampments, absent specific circumstances.[2]  Even that did not stop Defendants, who continue clearing

---

[1]     Declaration of Clare Diegel ("Diegel Decl."). Exh. 1

[2]     Diegel Decl., Exhs. 2, 3.

encampments, displacing an already vulnerable group of people in the middle of a deadly pandemic and depriving them of the few possessions they have.  What is worse, Defendants do so by force and without constitutionally required notice, warrant, probable cause, opportunity to be heard, or a meaningful way to reclaim any property.

Defendants' continued constitutional violations deprive these individuals of what is necessary for their health, safety, and survival.  The harm caused to them—particularly, the loss of their homes—far outweighs any speculative health or safety grounds Defendants could conjure to justify their actions.  As the Minnesota winter approaches, allowing Defendants to continue sweeping encampments and depriving encampment residents of their shelter, bedding, or other cover against the elements, when they have nowhere else to go, is truly a matter of life or death.  If neither a pandemic nor a governor's order could stop them, Defendants will continue to engage in this unlawful conduct, unless the Court issues a restraining order.

Plaintiffs Virginia Roy, Henrietta Brown, Nadine Little, Dennis Barrow, Patrick Berry, Emmett Williams, and Joel Westvig represent a putative class of the hundreds of homeless people who are living in or have lived in tents in parks throughout Hennepin County over the past several months and have suffered Defendants' unconstitutional practices.  Plaintiff ZACAH is a private non-profit organization that has stepped in to help people like Plaintiffs when the Defendants have not.  Plaintiffs seek a temporary restraining order to stop Defendants from forcefully ejecting Plaintiffs and members of the proposed class from the tents in which they live, and from seizing and destroying their property

2

without adequate and effective notice, plus just compensation, an opportunity to be heard, or a mechanism by which to reclaim their belongings.

## FACTUAL BACKGROUND

The City and the other Defendants are engaged in an ongoing practice of forcefully displacing people living outside in public parks and other publicly-owned green space[3] in the City, with little to no notice, and destroying their shelters and personal possessions.[4] Using bulldozers and armed law enforcement officers, Defendants arrive at public parks and indiscriminately destroy tents and any property inside. Whether they show up at 4 A.M. or 7 A.M., they always come determined to clear the public park of its residents, most of whom have nowhere else to go.[5] In Defendants' own words, their plan is to "demobiliz[e]" the encampments.[6]

As a result, people like the Plaintiffs, who are living in the parks, lose their homes and some or all of their few possessions, including items necessary for their survival or that have irreplaceable personal value. Examples of such property include tents—Plaintiffs' homes and only form of shelter—sleeping bags, beds and blankets, Berry Decl. ¶ 15; family photographs or heirlooms, Brown Decl. ¶ 14, Williams Decl. ¶ 9; prescription medication,

---

[3]     All further references to "public parks" in this memorandum will mean "public parks and other publicly-owned green space."

[4]     Diegel Decl., Exh. 4.

[5]     Diegel Decl., Exh. 5.

[6]     Diegel Decl., Exh. 4.

Barrow Decl. ¶ 9; important court documents, *id*.; identification cards, Brown Decl. ¶ 14; birth certificates, *id*.; winter boots, Barrow Decl. ¶ 9; and clothing, *id*., Williams Decl. ¶ 9.

The "sweeps" also require the ejected encampment residents—now without tents or all of their possessions—to find a new and safe place to live by nightfall. For many, shelters are not an option: they are either full,[7] Barrow Decl. ¶ 14, Roy Decl. ¶ 11, Williams Decl. ¶ 15, Westvig Decl. ¶ 13; hazardous due to the threat of COVID-19,[8] Berry Decl. ¶ 22, Roy Decl. ¶ 10; too dangerous, Berry Decl. ¶ 21, Roy Decl. ¶¶ 9, 15, Little Decl. ¶ 22; or unavailable for other reasons. *See* Brown Decl. ¶¶ 17–18 (contacted shelter but received no answer); *id*. ¶ 18 (cannot stay in a shelter because ID was destroyed during encampment raid). And some would rather live in their tents than be forced to cycle through a shelter temporarily, even if space were to become available. Williams Decl. ¶ 15 (going to a shelter would end the donations and medical support he currently receives); Westvig Decl. ¶ 14 (going to a shelter would mean being out in the cold all day until he could return to sleep at night).

Constantly roaming to find a new place to simply exist after being evicted from their homes, Barrow Decl. ¶ 12, Roy Decl. ¶ 17, means that Plaintiffs cannot focus on their health or even their near futures—such as maintaining sobriety, Roy Decl. ¶ 15, or meeting with a therapist to manage mental health issues, Barrow Decl. ¶ 13, Little Decl. ¶ 20, Westvig Decl. ¶ 4. In addition, as Governor Walz recognized in one of his Executive

---

[7]     Diegel Decl., Exh. 6.

[8]     Diegel Decl., Exh. 7.

4

Orders, "sweeps or disbandment" of encampments "increase the potential risk and spread of COVID-19."[9]

Defendants give little or no actual notice of their impending sweeps to the encampment residents. Berry Decl. ¶ 10; Brown Decl. ¶ 11; Williams Decl. ¶ 11; Westvig Decl. ¶¶ 6-7. The rumors of a possible sweep are often inaccurate.[10] Berry Decl. ¶ 10; Westvig Decl. ¶ 10. And what little notice Defendants may provide is not enough to allow Plaintiffs to remove and safeguard their belongings. Barrow Decl. ¶¶ 6-10; Berry Decl. ¶¶ 10-11, 13; Brown ¶¶ 9-15. When Plaintiffs do manage to pack up their homes before a sweep, they only take with them what they can physically carry in their arms or on their backs, unless they are lucky enough to have help. Berry Decl. ¶ 11; Little Decl. ¶¶ 18-19; Roy Decl. ¶ 14; Westvig Decl. ¶¶ 7-8, 18

Defendants make no apparent effort to retain or preserve any of the property they seize and destroy at the parks, even though Plaintiffs beg for time to retrieve it, the belongings are obviously valuable to Plaintiffs, and likely comprise everything they own. Barrow Decl. ¶ 9; Berry Decl. ¶¶ 11, 13-14; Brown Decl. ¶¶ 12-15. Instead, Defendants appear without warning and immediately destroy all of the property they come across, using bulldozers, armed law enforcement officers, and police tape—many times while Plaintiffs watch, powerless to stop them. Barrow Decl. ¶¶ 7-8; Berry Decl. ¶¶ 12-14;

---

[9]      Diegel Decl., Exh. 2 at 4.

[10]     Diegel Decl., Exhs. 8, 9 (demonstrating that encampment residents were originally told that certain camps would be swept on the specified dates, but new information is that *all* encampments will be cleared in the coming days).

Brown Decl. ¶¶ 12-15; Williams Decl. ¶¶ 9-11.  And Plaintiffs who protest or try to save their property from the bulldozers are threatened with arrest or indiscriminately sprayed with chemical irritants.  Barrow Decl. ¶¶ 7-8; Berry Decl. ¶¶ 11-13; Brown Decl. ¶ 12; Williams Decl. ¶ 10.

Since mid-August of 2020, Defendants have "cleared" at least four encampments in Minneapolis parks—each time confiscating and nearly immediately destroying the personal property they found.[11]  As of October 15, 2020, there were an estimated 222 tents in 14 Minneapolis parks.[12]  Minneapolis Park Police Chief Jason Ohotto has expressed to the other Defendants his desire to rid the City of encampments and their residents, writing in an email that "[i]t is time to return parks to their intended purpose."[13]  Minneapolis Park and Recreation Board Superintendent Al Bangoura has announced that the remaining encampments will be "disbanded likely sometime in October."[14]  In fact, it appears that Defendants intend to clear all encampments no later than Friday, October 23, 2020.[15]

With shelters full and housing unaffordable, Defendants have no plan for where residents of encampments will go when the temperatures drop and the sweeps continue.  *See* Westvig Decl. ¶¶ 10-14 (explaining that MPRB staff recommended he leave B.F. Nelson Park and move to the Midtown Greenway while also giving him a short list of

---

[11]   Diegel Decl., Exh. 10.

[12]   Diegel Decl., Exh. 10.

[13]   Diegel Decl., Exh. 4; *see also* Williams Decl. ¶ 14 ("It feels like the parks board is trying to shut us down.  They keep coming up with rules we never knew about.").

[14]   Diegel Decl., Exh. 9.

[15]   Diegel Decl., Exh. 8.

shelter resources).  Organizations like ZACAH are seeking to fill the gap left by this governmental inaction by paying for hotel rooms as emergency and temporary shelter. ZACAH Decl. ¶ 11 ("ZACAH has sponsored over 2000 nights for approximately 500 people.").  But ZACAH was not sustained to work with individuals who are chronically homeless.  ZACAH Decl. ¶ 14.  And the funds ZACAH has had to divert from its mission to *prevent* homelessness are drying up:  $113,000 of the $155,715 collected by ZACAH has been spent on emergency hotel rooms.  ZACAH Decl. ¶ 11.

Even with the charity of organizations like ZACAH, Plaintiffs are caught in an unending cycle of poverty, and Defendants' actions only serve to keep them there.  Because of the City's lack of affordable housing and insufficient shelter space, Plaintiffs are constantly rotating between sleeping at an encampment, until Defendants violently sweep it; they may then jump between friends' or relatives' couches, sleeping in cars, staying a few nights in a shelter bed or hotel room paid by an organization like ZACAH, until they inevitably wind up at another camp, until the next sweep.  *See, e.g.*, Brown Decl. ¶¶ 6, 8, 16, 19 (stayed with her boyfriend, then the Midtown Greenway, then Peavey Park, until it was bulldozed, back to the Greenway, currently in Super 8 paid by ZACAH); Berry Decl. ¶¶ 6-11, 17, 23, 25 (lived at Powderhorn, then Minnehaha, slept on people's couches, then in a van, then Powderhorn West until it was bulldozed, stayed in a hotel for a few days paid by ZACAH, and is now in his own apartment thanks to ZACAH; if he cannot get a job to afford rent, he will be back at a camp); Williams Decl. ¶¶ 7, 8-9, 12 (became homeless when landlord refused to renew his lease, started staying with friends and relatives, moved to Powderhorn East camp, until it was swept, then moved to MLK park); Westvig Decl.

¶¶ 3, 5, 9, 12 (became homeless after inability to pay rent due to job loss; moved to Loring Park; then B.F. Nelson after warned of upcoming sweep; would move next to the Midtown Greenway). Defendants' sweeps do nothing more than upend Plaintiffs' lives, destabilizing them further rather than helping them break free of this cycle.

The exhibits and declarations filed with this Motion establish ongoing unconstitutional practices, policies, and customs of the Defendants: (1) displacing people who have nowhere else to live; and (2) seizing and destroying property of the homeless people living in encampments without due process. The evidence leaves no doubt that Defendants will continue to engage in this conduct, and plaintiffs will continue to be victimized by this conduct unless an Order from this Court stops them.

## ARGUMENT

This Court has the power to stop Defendants' imminent, continuous, and illegal actions. Federal Rule of Civil Procedure 65 authorizes a court to grant injunctive relief in the form of either a temporary restraining order or a preliminary injunction. The same legal standard applies to both. *See S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 708 (8th Cir. 1989).

A district court considers four factors when evaluating whether a temporary restraining order is warranted: (1) the threat of irreparable harm to the movant; (2) the balance between this harm and the injury that the injunction will inflict on other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (*en banc*). "At base, the question is whether the balance of equities so favors the movant that justice

requires the court to intervene to preserve the status quo until the merits are determined." *Id*. at 113. The burden rests with the moving party to establish the propriety of injunctive relief. *See Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). Plaintiffs meet all four factors here.

**I.** **Plaintiffs Are Likely to Succeed on Their Claim that Defendants' Practice of Forcefully Evicting Plaintiffs from Public Land and Destroying Their Property Violates Their Rights Under Federal and Minnesota Law.**

In the Complaint, Plaintiffs assert that Defendants: (1) violated their right to be free from unreasonable seizures under the federal and state constitutions; (2) violated their right to privacy under the Fourth Amendment; (3) failed to provide Plaintiffs procedural due process as required by the Fourteenth Amendment; (4) violated their rights to privacy and to be free of state-created danger, as guaranteed by the Fourteenth Amendment; and (5) converted their personal property in violation of state law by destroying their belongings. This Court should issue a temporary restraining order prohibiting Defendants from conducting sweeps of the encampments, because Plaintiffs can show a likelihood of success on the merits of each claim.[16]

**A. Claim 1: Defendants Unlawfully Seized Plaintiffs' Property in Violation of the Fourth Amendment of the United States Constitution and Article I, Section 10 of the Minnesota Constitution.**

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable

---

[16] Plaintiffs begin with the third *Dataphase* factor—likelihood of success on the merits—because courts consider this factor the most significant. *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013); *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir. 2012).

searches and seizures." U.S. Const. amend. IV.  "A 'seizure' of property . . . occurs when 'there is some meaningful interference with an individual's possessory interest in that property.'"  *Soldal v. Cook County, Ill.*, 506 U.S. 56, 61 (1992).  A seizure without a warrant is "per se unreasonable." *United States v. Lewis*, 864 F.3d 937, 943 (8th Cir. 2017). It is Defendants' burden to show that a warrantless search or seizure falls within an exception to the Fourth Amendment's warrant requirement.  *See Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971).  And even if a search or seizure is lawful at its inception, the seizure "can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'"  *United States v. Jacobsen*, 466 U.S. 109, 124 (1984).

Article I, Section 10 of the Minnesota Constitution contains identical language, and provides at least the same—and in some cases, more—protection against government interference with an individual's possessory interest in property.  *See State v. Leonard*, 943 N.W.2d 149, 156 (Minn. 2020) (*"Article I, Section 10 of the Minnesota Constitution provides greater protection against suspicionless law enforcement conduct than the Fourth Amendment to the United States Constitution."*).

There can be no dispute that homeless individuals have a property interest in their personal belongings—their tents, blankets, tarps, clothes, medications, personal papers and documents, and other items—and that individuals enjoy state and federal constitutional protection over these items. *United States v. Place*, 462 U.S. 696, 700–01 (1983) (defining personal property as "effects" under the Fourth Amendment).  The summary taking and

destruction of Plaintiffs' property certainly constitutes a meaningful interference with their possessory interest in their property. *Jacobsen*, 466 U.S. at 124–25 (explaining that destroying property is a permanent deprivation and is a meaningful interference with an individual's possessory property interest). As such, the sweeps of the encampments of homeless individuals are seizures, under both the federal and state constitutions.

The question remaining is whether those warrantless seizures are unreasonable. They are. There is no reason why Defendants must destroy—not simply take and hold—the personal property of encampment residents.

For example, officers told Plaintiff Dennis Barrow that if he was not finished clearing out his tent by the time they finished taping a barrier around the camp, he would not be able to gather the rest of his things, forcing him to leave many of his belongings behind. Barrow Decl. ¶¶ 7-9 (losing his clothes, including winter boots and winter coat, court documents, and essential medication in the raid). Plaintiff Emmett Williams suffered a near identical experience. Williams Decl. ¶¶ 9-10 (being threatened with arrest and losing his clothes and his fiancée's family heirlooms). Similarly, without notice, officers started removing the stakes from Henrietta Brown's tent even before she was able to get out of it. Brown Decl. ¶¶ 10-12. When she tried to rescue her items from inside, officers threatened to arrest her if she did not get away from her tent. Brown Decl. ¶¶ 12, 14 (losing birth certificate, state Medicaid application, ID, and irreplaceable family photos in the raid). Law enforcement only gave Plaintiff Patrick Berry minutes to save his belonging and his tent. Berry Decl. ¶ 14. Like Plaintiffs Barrow and Brown, he could not collect all

of his belongings before the bulldozers destroyed his tent and everything left inside it. Berry Decl. ¶ 15.

There is no legitimate reason for Defendants to seize and destroy the property without adequate notice, a warrant or probable cause, an opportunity to be heard, or a meaningful way to reclaim the property.  Although there may be an inherent interest in keeping public areas clean, this interest is far outweighed by the government's own interest in keeping its residents—including the people living in the encampments—safe and healthy.[17]  For these reasons, Plaintiffs are likely to succeed on their claim that Defendants' actions constitute an unconstitutional seizure in violation of the federal and state constitutions.

### B. Claim 2:  Defendants Violated Plaintiffs' Right to Privacy Under the Fourth Amendment of the United States Constitution and Article I, Section 10, of the Minnesota Constitution.

Plaintiffs are also likely to prevail on their claim that Defendants have violated their right to privacy protected under the Fourth Amendment of the United States Constitution. As the Supreme Court recognized in *Katz v. United States*, "[t]he Fourth Amendment protects people, not places."  389 U.S. 347, 348 (1967).  Thus, "what [a person] seeks to preserve as private, even in an area accessible to the public, may be constitutionally

---

[17]    Other courts have expressly held as much.  *See Pottinger v. City of Miami*, 810 F. Supp. 1551, 1573 (S.D. Fla. 1992) ("[T]he City's interest in having clean parks is outweighed by the more immediate interest of the plaintiffs in not having their personal belongings destroyed."); *Lavan v. City of Los Angeles*, 797 F. Supp. 2d 1005, 1015 (C.D. Cal. 2011) (same) (collecting cases).  *See also* Minn. Stat. § 504B.271 (requiring that, when a tenant's personal property remains on the property after eviction, a landlord must hold it for a minimum of 28 days before sale or other disposal may begin).  Here, Plaintiffs are being dispossessed of their property without *any* process.

protected." *Id*. at 351.  "Wherever a man may be, he is entitled to know that he will remain free from unreasonable [government intrusion]." *Id*. at 359.

The Supreme Court delineated a two-step analysis to determine whether an individual's privacy right was violated under the Fourth Amendment.  First, the person must have "exhibited an actual (subjective) expectation of privacy." *Id*. at 361 (Harlan, J. concurring).  Second, that expectation must be a reasonable one. *Id*.

Without question, Plaintiffs and members of the proposed class have actual, subjective expectations of privacy in their homes (i.e., their tents where they live), in which they stored most, if not all, of their belongings.  Barrow Decl. ¶¶ 7-9; Berry Decl. ¶¶ 11-15; Brown Decl. ¶¶ 12, 14, 15; Roy Decl. ¶ 1; Westvig Decl. ¶ 18.  And that expectation is reasonable.  Certainly, if, according to the Supreme Court, Mr. Katz had a reasonable expectation of privacy in conversations held in a public phone booth, *id*. at 348, Plaintiffs have even firmer ground to believe their tents—their homes, either by necessity or by choice—would be free from government intrusion, let alone total destruction.[18]

---

[18]     Courts have repeatedly emphasized the importance of the right to privacy in one's own home, which is meant to be a source of security and refuge. *See Quigley v. Winter*, 598 F.3d 938, 947 (8th Cir. 2010) (emphasizing that defendant's harassing conduct was made "even more egregious" because it occurred in plaintiff's "own home, a place where [plaintiff] was entitled to feel safe and secure and need not flee"); *Salisbury v. Hickman*, 974 F. Supp. 2d 1282, 1292 (E.D. Cal. 2013) ("Courts have recognized that harassment in one's own home is particularly egregious and is a factor that must be considered in determining the seriousness of the alleged [conduct]."); *Beliveau v. Caras*, 873 F. Supp. 1393, 1397 n.1 (C.D. Cal. 1995) ("[W]hen the harassment occurs in a [person]'s home, it is a complete invasion of her life.  Ideally, home is the haven from the troubles of the day. When home is not a safe place, a [person] may feel distressed and, often, immobile." (internal quotation marks omitted)); *see also* D. Benjamin Barros, *Home as a Legal Concept*, 46 Santa Clara L. Rev. 255, 256, 259 (2006) (discussing home as sources of

Given that Plaintiffs' tents are or were their homes, i.e., constitutionally-protected zones of privacy, the government interference with that right through the sweeps constituted a violation, unless the action was reasonable according to the Fourth Amendment.  It was not.  Defendants had no warrant, did not conduct the sweeps based on probable cause to believe a crime had been committed, and no exigent circumstances existed.  As such, Plaintiffs are likely to succeed on the merits of this claim.

### C. Claim 3:  Defendants Provided Plaintiffs No Procedural Due Process in Violation of the Fourteenth Amendments of the United States Constitution and Article I, Section 7 of the Minnesota Constitution.

Under the Fourteenth Amendment, "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  To determine whether there has been a due process violation, the Court follows a two-step analysis:  the first question is whether Plaintiffs have been deprived of a protected liberty or property interest; second, the Court considers what process is due, which depends on a balance of factors outlined in *Mathews v. Eldridge*, 424 U.S. 319 (1976).  *See also Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006) (applying *Mathews*).  Those factors are:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335.

---

"personal security, freedom, and privacy" that are generally given "favored legal status in many circumstances").

14

The Minnesota Constitution provides "No person shall . . . be deprived of life, liberty or property without due process of law." Minn. Const. art. I, § 7. The analysis under the state constitution for whether a procedural due process violation has occurred is equivalent to the federal standard. *See Sawh v. City of Lino Lakes*, 823 N.W.2d 627, 632 (Minn. 2012).

Plaintiffs easily meet the first *Mathews* factor. As set out above, tents, blankets, clothes, medication, personal papers and documents, and other items enclosed in Plaintiffs' homes are entitled to protection by the Fourteenth Amendment and the Minnesota Constitution. Defendants' bulldozing and dumping of this property clearly "affect[s]" Plaintiffs' interest in that property. *Mathews*, 424 U.S. at 335; *see also Jacobsen*, 466 U.S. at 124–25 (explaining that destroying property is a permanent deprivation and is a meaningful interference with an individual's possessory property interest). *See* Barrow Decl. ¶¶ 8-9; Berry Decl. ¶ 15; Brown Decl. ¶¶ 12-16; Williams Decl. ¶ 9.

Because Plaintiffs have been deprived of a protected property interest, this Court next considers what process is due by balancing the risk of Defendants' erroneously depriving Plaintiffs of their property and the value of additional safeguards. *See Mathews*, 424 U.S. at 335; *Senty-Haugen*, 462 F.3d at 886. Defendants' procedures in conducting sweeps of the encampments—giving very short and inadequate notice to vacate, Barrow Decl. ¶ 6 (told raid would happen in 72 hours, but police showed up 24 hours later), Williams Decl. ¶ 11 (given no notice), Westvig Decl. ¶ 10 (told to expect only 24 hours' notice); bulldozing tents and all belongings therein, Berry Decl. ¶ 14, Williams Decl. ¶ 9; throwing property in the trash, *id*.; and providing no procedures to store property and

ensure a process to recover that property—ignore clearly established procedural due process standards.

The summary and unilateral destruction or disposal of property affords no process by which the owner of the property can challenge its destruction or disposal before "the owner is finally deprived of a protected property interest." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982). Such state action is anathema to the concept of due process. "To put it as plainly as possible, the State may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement." *Id*. at 434. "Applying this test, the [Supreme] Court usually has held that the Constitution requires some kind of hearing *before* the State deprives a person of liberty or property." *Walters v. Wolf*, 660 F.3d 307, 312 (8th Cir. 2011). But "however weighty the governmental interest may be in a given case, the amount of process required can never be reduced to zero—that is, the government is never relieved of its duty to provide *some* notice and *some* opportunity to be heard prior to final deprivation of a property interest." *Propert v. District of Columbia*, 948 F.2d 1327, 1333 (D.C. Cir. 1991) (emphasis in original).

Here, Defendants destroy and dispose of property without providing adequate, and sometimes *any,* opportunity to challenge the property destruction, before or after the deprivation of people's property. Indeed, Plaintiffs Barrow and Brown were specifically told they could *not* rescue their property before it was destroyed. Barrow Decl. ¶ 7; Brown Decl. ¶ 12. This clearly runs afoul of the Constitution. *See Walters*, 660 F.3d at 312; *Propert*, 948 F.2d at 1333.

16

Defendants' failure to provide any pre-sweep or post-sweep process makes an erroneous deprivation of Plaintiffs' constitutionally-protected property interest a near certainty. This outweighs any minor additional administrative cost or burden on Defendants to provide some form of process to Plaintiffs. As such, Plaintiffs are likely to succeed on the merits of this claim.

### D. Claim 4: Defendants Violated Plaintiffs' Substantive Due Process Rights Under the United States and Minnesota Constitutions.

#### 1. Privacy

A core principle in this case is the right to privacy in one's personal affairs and effects—a right fundamental to the Constitution of the United States. Privacy has been recognized time and again as a fundamental right, one inherent "in the very idea of free government," *Twining v. New Jersey*, 211 U.S. 78, 106 (1908), and "of the very essence of a scheme of ordered liberty," *Palko v. Connecticut*, 302 U.S. 319, 325 (1937). As the Supreme Court of the United States has explained, "[S]pecific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance. Various guarantees create zones of privacy." *Griswold v. Connecticut*, 381 U.S. 479, 484 (1965) (internal citation omitted). "We have had many controversies over these penumbral rights of 'privacy and repose.' . . . These cases bear witness that the right of privacy which presses for recognition here is a legitimate one." *Id*. at 485.

This fundamental right to privacy exists too in the Minnesota Constitution. *State v. Gray*, 413 N.W.2d 107, 111 (Minn. 1987) ("[I]t is our opinion that there does exist a right of privacy guaranteed under and protected by the Minnesota Bill of Rights.").

Plaintiffs are likely to prevail on their due process claim that Defendants' violated Plaintiffs' fundamental right to privacy.  "Our established method of substantive-due-process analysis has two primary features:  First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed[.]'"  *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (internal citations omitted).  "Second, we have required in substantive-due-process cases a 'careful description' of the asserted fundamental liberty interest."  *Id*. at 721.  "As we recently stated in *Flores*, the Fourteenth Amendment 'forbids the government to infringe . . . "fundamental" liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'"  *Id*.

As set out above, the right to privacy has been granted the strictest protection under the Due Process Clause.  Not only does the right to privacy here protect Plaintiffs' belongings; more importantly, it protects their decision as to where they safely sleep. Plaintiff Virginia Roy felt safer in her tent at the Brackett Park encampment than in a shelter, because she could more easily maintain her sobriety in the privacy of her own tent and because, as a survivor of domestic abuse, she does not want to be in a shelter that also allows men to stay there.  Roy Decl. ¶¶ 9, 15.  Similarly, Plaintiff Nadine Little felt safer in an encampment than at a shelter, where she had always been scared to leave her belongings.  Little Decl. ¶ 22.  Shelters, Plaintiff Little explained, have taken her money and imposed strict rules like a curfew that make it difficult for her to leave to "make sure

the things in [her] life that need to get done are able to get done."  Little Decl. ¶ 22. Plaintiffs' privacy rights are entitled to constitutional protection, and infringement upon them must pass strict scrutiny.

The manner in which Defendants conduct the sweeps, thus, must survive strict scrutiny in order to pass constitutional muster.  The burden is on Defendants to so prove, and they cannot.  Even assuming *arguendo* that Defendants are conducting the sweeps to serve a compelling state interest, the sweeps are not conducted in a narrowly tailored way. Defendants employ bulldozers, armed officers, chemical irritants, and threats of arrest to coerce compliance with their unconstitutional encampment raids and destruction of property.  But less violative means exist:  Defendants could stop disbanding encampments and instead work with encampment residents to ensure their health and safety. And to the extent that a sweep is necessary, Defendants could, for example, directly help residents to find replacement shelter, tag and collect belongings left behind, safeguarding them in a warehouse for a set time period, and offer residents a mechanism to reclaim them. Defendants, instead, treat residents and their belongings with no regard—signaling to encampment residents that, to Defendants, they are as disposable as their belongings. Because Defendants' sweeps cannot pass strict scrutiny, Plaintiffs are likely to succeed on this claim.

## 2.  State-Created Danger

Plaintiffs are also likely to succeed on the claim that Defendants violated their substantive due process rights by creating the danger to which Plaintiffs are being subjected.  "[T]he state owes a duty to protect individuals if it created the danger to which

the individuals are subjected." *Hart v. City of Little Rock*, 432 F.3d 801, 805 (8th Cir. 2005). To succeed on a state-created-danger theory, Plaintiffs must prove (1) that they were members of a "limited, precisely definable group," (2) that the municipality's conduct put them at "significant risk of serious, immediate, and proximate harm," (3) that the risk was "obvious or known" to the municipality, (4) that the municipality "acted recklessly in conscious disregard of the risk," and (5) that in total, the municipality's conduct "shocks the conscience." *Fields v. Abbott*, 652 F.3d 886, 891 (8th Cir. 2011). The Supreme Court has explained that official behavior "that would most probably support a substantive due process claim" is "conduct intended to injure in some way unjustifiable by any government interest;" *that* "is the sort of official action most likely to rise to the conscience-shocking level." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).

Plaintiffs are members of a limited, precisely definable group: homeless persons living in Hennepin County who have been, are now, or will in the future be living on public property. Complaint, ECF No. 1, ¶ 123. Defendants' forceful ejection of Plaintiffs from their homes in public-park encampments, without proper notice and with bulldozers, have placed Plaintiffs at "significant risk of serious, immediate, and proximate harm"—in other words, the Plaintiffs can demonstrate that they will suffer irreparable harm if a temporary restraining order preventing the camp evictions does not issue. *See* Section II, *infra*; Barrow Decl. ¶¶ 6-8; Berry Decl. ¶¶ 8-14; Brown Decl. ¶¶ 8, 11. Furthermore, Defendants' knew of the risk to Plaintiffs. As Plaintiff Brown recalled, the officers that arrived at Peavey Park shook her tent to see whether there was someone inside. Brown Decl. ¶ 9. Such an act shows that Defendants were aware that residents of encampments could be

seriously injured by the destruction that was about to occur.  Past experience would also inform them:  It was reported in April of 2020 that a homeless woman in St. Paul was seriously injured while sitting in her tent when a city employee driving a Bobcat utility vehicle picked up her tent in an attempt to destroy it.[19]

Despite their awareness of the substantial risk Defendants' actions pose to Plaintiffs, they act recklessly in conscious disregard of that risk.  By repeatedly subjecting encampments to sweeps, Defendants upend the lives of Plaintiffs and proposed class members, making it more difficult for them to simply exist, much less to avoid becoming seriously ill from COVID-19, and push them deeper into the cycle of poverty.  Defendants' sweeps do nothing more than to further victimize Plaintiffs, evicting them from their homes when the City has a shortage of both shelter space and affordable housing.  It merely results in Plaintiffs jumping from place to place—couch, car, shelter, hotel room—until they inevitably end up back at another encampment, waiting for the next sweep.  *See, e.g.*, Brown Decl. ¶¶ 6, 8, 16, 19 (stayed with her boyfriend, then the Midtown Greenway, then Peavey Park, until it was bulldozed, back to the Greenway, currently in Super 8 paid by ZACAH); Berry Decl. ¶¶ 6-11, 18, 24-26 (lived at Powderhorn, then Minnehaha, slept on people's couches, then in a van, then Powderhorn West until it was bulldozed, stayed in a hotel for a few days paid by ZACAH, and is now in his own apartment thanks to ZACAH; if he cannot get a job to afford rent, he will be back at a camp); Williams Decl. ¶¶ 7, 8-9, 12 (became homeless when landlord refused to renew his lease, started staying with friends

---

[19]    Diegel Decl., Exh. 11.

and relatives, moved to Powderhorn East camp, until it was swept, then moved to MLK Park); Westvig Decl. ¶¶ 3, 5, 9, 12 (became homeless after inability to pay rent due to job loss; moved to Loring Park; then B.F. Nelson after warned of upcoming sweep; would move next to the Midtown Greenway).  Defendants know this, and yet they continue to bulldoze the camps, evicting Plaintiffs from their homes, leaving them destitute and truly "home"-less; this demonstrates conscious disregard of a substantial risk.  Defendants should not be permitted to do this to Plaintiffs any longer, until and unless they are able to provide Plaintiffs with a more permanent housing solution.

Finally, Defendants conduct here shocks the conscience.  The COVID-19 pandemic caused Governor Walz to prohibit local governments from disbanding homeless encampments, absent certain circumstances.[20]  Defendants were aware of this Order.[21] While recognizing that shelter space was limited—at times even full—Defendants went forward with their plans to clear tents using bulldozers and armed officers, as helpless residents watched.[22]  Barrow Decl. ¶¶ 7-8; Berry Decl. ¶¶ 11-14; Brown Decl. ¶¶ 12-15. Residents who dared ask for a little more time to remove their personal belongings were threatened with arrest.  Barrow Decl. ¶¶ 7-8; Brown Decl. ¶¶ 12-15; Williams Decl. ¶ 10. They were forced to scatter, carrying what few items they could grab and hold in their arms, with no plan on where they would sleep that night or where they would live the next day.  Barrow Decl. ¶¶ 7-8, 10 (bouncing from place to place every few days, after being

---

[20]   Diegel Decl., Exh. 3.

[21]   Diegel Decl., Exh. 10.

[22]   Diegel Decl., Exh. 13.

evicted from Powderhorn camp); Berry Decl. ¶ 11 ("I didn't know where I was going to go."); Brown Decl. ¶¶ 12-16 (accepting a ride to the Midtown Greenway and sheltering from the rain under a bridge because she had nowhere else to go). They describe the experience as "traumatizing," Brown Decl. ¶ 15, and "cruel," Berry Decl. ¶ 14. The manner in which they raid the encampments—treating residents, like Plaintiffs, as if they are garbage and destroying their belongings as if worthless—is unconscionable and unjustifiable.

Homelessness is an ill of Defendants' own making, as is the danger in which they place Plaintiffs and members of the proposed class during each of the sweeps. This is particularly true in light of the pandemic and the descent of winter. For these reasons, Plaintiffs are likely to succeed on the merits of this claim as well.

### E. Claim 5: Defendants Committed Theft by Conversion in Violation of Minnesota Common Law.

Plaintiffs will succeed on their conversion claim, as Defendants' sweeps deprived them of their personal property, constituting a theft by conversion in violation of Minnesota common law. "[T]o entitle a plaintiff to recover in an action for conversion, two points are essential to be proved: First, property, general or special, in the plaintiff, and a right of possession at the time of the conversion; and, second, a conversion of the thing by the defendant." *Hodge v. Eastern Ry. Co. of Minnesota*, 72 N.W. 1074, 1075 (Minn. 1897). "Conversion has been defined as an act of willful interference with a chattel, done without lawful justification, by which any person entitled thereto is deprived of use and possession." *Larson v. Archer-Daniels-Midland Co.*, 32 N.W.2d 649, 650 (Minn. 1948).

Given Plaintiffs' ability to show a seizure of property in violation of the Fourth Amendment and deprivation of property without due process in violation of the Fourteenth Amendment, the taking, disposal, and destruction of Plaintiffs' property constituted conversion, such that Plaintiffs are entitled to damages. Plaintiffs will prevail on this claim.

## II.   Plaintiffs Will Suffer Irreparable Harm if Defendants Are Not Enjoined from Sweeping Encampments.

Absent the Court's intervention, Plaintiffs and members of the Class will continue to suffer irreparable harm from Defendants' sweep practices that violate guaranteed constitutional rights. Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages. *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). "In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013).

The irreparable harm factor is generally satisfied when the consequence of denying an injunction results in eviction from one's home. *Hruby v. Larsen*, No. 05-cv-894-DSD/SRN, 2005 WL 1540130, at *4 (D. Minn. June 30, 2005) (citing *Higbee v. Starr*, 698 F.2d 945, 947 (8th Cir. 1983)); *Colvin v. Parker's Lake Apartments*, No. 19-cv-1045-SRN/DTS, 2019 WL 3292075, at *3 (D. Minn. June 14, 2019) ("Deprivation of housing may constitute an irreparable harm."); *Bixby v. Lifespace Cmty., Inc.*, No. 18-cv-817-JRT/KMM, 2018 WL 3218697, at *5 (D. Minn. July 2, 2018) (finding that the threat of eviction, in combination with the fact that "it is unlikely that Plaintiffs would be able to

find comparable housing at an affordable price," constitutes irreparable harm); *Park Village Apartment Tenant Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1159 (9th Cir. 2011) ("It is well-established that the loss of an interest in [housing] constitutes an irreparable injury."); *McNeill v. New York City Hous. Auth.*, 719 F. Supp. 233, 254 (S.D.N.Y. 1989) (determining the threat of eviction and the prospect of being left without alternative housing constitutes a threat of irreparable injury, and collecting cases concluding the same).[23]

The actions of Defendants have dire impacts on Plaintiffs and members of the proposed class, who are without permanent housing and live outside even during the most severe weather here in Minnesota. Though commonly referred to as "homeless," Plaintiffs and class members are actually "unhoused"—they are not homeless, in that they have created homes in their tents. The coming sweeps, likely occurring on or before October 23, 2020, threaten to leave Plaintiffs utterly destitute. Williams Decl. ¶ 15 ("I don't know where I'd go if I had to leave MLK."); Westvig Decl. ¶ 16 ("There are rumors we might have to leave B.F. Nelson. I have no idea where I'd go if I was forced to leave."). There is no guarantee any of Plaintiffs will find shelter space (an already scarce resource), receive charity from ZACAH or another source to be able to stay in a hotel temporarily, or find affordable housing (another already scarce resource). The threat to Plaintiffs' already precarious existence is real, and it is imminent. The impending evictions from their encampments should, standing alone, constitute irreparable harm.

---

[23]    Though courts have most often applied this principle to evictions from traditional housing, such as Section 8 units, there is no reason why it should be limited to that context.

If that is not sufficient, however, the totality of the circumstances satisfies this factor.   The loss of essential possessions—tents, blankets, medications, sources of identification, to name a few—is devastating and "traumatizing," Brown Decl. ¶ 15, not merely "great," *Novus Franchising*, 725 F.3d at 895.  *See also* Berry Decl. ¶ 15; Barrow Decl. ¶ 9; Westvig Decl. ¶ 18 ("If I were forced to move now, I would lose all of my belongings unless I could find help.  I don't have a car or even a trailer for my bike."). Further, these harms are certain:   Superintendent Al Bangoura has announced that encampments will be "disbanded sometime in October," though his own Park and Recreation Board has acknowledged there are hundreds of tents pitched around the City.[24] And the method of disbandment using officers and bulldozers will be the same as it has been throughout the summer.  Finally, there is a clear and present need for equitable relief because, while encampment residents are being told conflicting dates of when the camps will be swept,[25] Superintendent Bangoura has made one thing abundantly clear:  As of November, tents will not be tolerated in Minneapolis parks.[26] Even after the existing encampments are disbanded, new encampments will inevitably arise and the cycle of unconstitutional conduct will continue.  If the Court does not act now, Plaintiffs will be left truly homeless, with no place to go just as the weather is turning frigid.

---

[24]     Diegel Decl., Exhs. 9, 10.

[25]     Diegel Decl., Exhs. 8, 9 (demonstrating the conflicting dates).

[26]     Diegel Decl., Exh. 9.

## III.     The Balance of Equities Is in Plaintiffs' Favor.

The balance of equities tips sharply in favor of Plaintiffs.   In considering an application for injunctive relief, the Court must identify the harm that an injunction might cause a defendant and weigh it against the injury to a plaintiff if the status quo is not preserved.  *Dataphase Sys.*, 640 F.2d at 113.  It is indisputable that any amorphous claims of health and safety concerns by Defendants or an interest in clean public spaces is vastly outweighed by Plaintiffs' interest in maintaining their homes and the few but necessary personal belongings they might have.  Nor does issuing the requested temporary restraining order preclude the Defendants from *lawfully* seizing and detaining property, provided the manner in doing so is constitutionally compliant with the Plaintiffs' rights to privacy and procedural and substantive due process.

## IV.     A Temporary Restraining Order Is in the Public Interest.

It is in the public interest to ensure that the government does not deprive people of their constitutional rights—the right to be secure in their homes, to be free of unreasonable seizure, to privacy, and to procedural and substantive due process.  *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 752 (8th Cir. 2008) ("[T]he protection of constitutional rights is always in in the public interest.").   Any pretextual health and safety concerns the Defendants may assert about the encampments are belied by the fact that sweeps of encampments directly place the health and safety of encampment residents in peril[27]—destroying their homes, leaving them with no guarantee

---

[27]     Diegel Decl., Exh. 11.

of alternative shelter, bulldozing the only means of protection they may have against frigid Minnesota winters, and trashing forms of identification and necessary medications.[28]  It is further belied by the fact that Defendants are currently justifying their unconstitutional conduct on the basis of the drop in temperature; but, in July, Defendants rescinded their resolution to provide park space for the encampments[29] and, in August, Defendant Ohotto made clear the purpose of the sweeps was "to return parks to their intended purpose."[30] The Court should not let them now hide behind a pretextual justification to evict Plaintiffs from their homes.

## V.   A Temporary Restraining Order Should Apply Throughout Hennepin County.

Plaintiffs have brought an action for class-wide relief.  Even before the class is certified, however, the Court is within its right to issue an injunction that extends beyond the named plaintiffs to ensure the prevailing parties are granted the relief to which they are entitled.  *Cf. Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Meyer v. Brown & Root Const. Co.*, 661 F.2d 369, 374 (5th Cir. 1981) ("Injunctive relief which benefits non-parties may sometimes be proper even where the suit is not brought as a Rule 23 class action."); *Bresgal v. Brock*, 843 F.2d 1163, 1171 (9th Cir. 1987) ("Class-wide relief may

---

[28]    The public interest would be better served if Defendants actually addressed the chronic ills which are known to result in higher numbers of homeless individuals—such as a lack of mental health access, affordable housing, or shelter space—than simply seizing or destroying people's belongings and ordering them away from an encampment with little, if any, notice.  Until such time as Defendants adequately address these systemic issues, Plaintiffs should be allowed to remain in public parks as they have nowhere else to go.

[29]    Diegel Decl., Exh. 14.

[30]    Diegel Decl., Exh. 4.

be appropriate even in an individual action."); *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1136 (11th Cir. 1984) ("The plaintiff correctly states that injunctive relief may benefit individuals not party to the action, and that classwide injunctive relief may be appropriate in an individual action."). The district court has the power to order as broad of relief as necessary—including nationwide—where it is required. *Yamasaki*, 442 U.S. at 702.

The Court should issue an injunction extending to all people living in public parks within Hennepin County because it is not possible, practical, or effective to limit the relief to only certain individuals. A survey of just the Plaintiffs shows why; between the seven individual plaintiffs, they have stayed at thirteen encampments: Peavey Park, Powderhorn West, the Wall of Forgotten Natives, Brackett Park, Powderhorn East, MLK Park, the Greenway, Logan Park, Loring Park, B.F. Nelson, Hiawatha & Lake, Kenwood, and Minnehaha. *See, e.g.*, Barrow Decl. ¶¶ 7, 11; Brown Decl. ¶¶ 8, 16; Little Decl. ¶¶ 13, 15, 19; Roy Decl. ¶¶ 4, 12-13; Westvig Decl. ¶¶ 5, 9; Williams Decl.¶ 12; Berry Decl. ¶ 6. Plaintiffs are constantly being shuffled from place to place—predominantly because Defendants continue ejecting them from their homes, without offering Plaintiffs any support and when Plaintiffs have nowhere else to go other than to another camp. The Court should not permit Defendants to continue perpetuating this cycle of homelessness and should instead only permit the sweeps to resume once Defendants can offer Plaintiffs and the putative class members a more permanent, guaranteed housing option upon evicting them from the camps. The injunction should cover Hennepin County in its entirety.

## VI.   The Requirement of Security Should Be Waived.

While courts in this circuit generally require a bond before issuing injunctive relief under Federal Rule of Civil Procedure 65(c), it is within the discretion of the district court to waive the security requirement. *See Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016).   Waiver of a bond is especially appropriate when applicants are indigent, as Plaintiffs are here. *See Wayne Chem., Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977) (finding waiver of a bond appropriate because of plaintiff's indigency); *Bass v. Richardson*, 338 F. Supp. 478, 489-91 (S.D.N.Y. 1991) (holding that "indigents, suing individually or as class plaintiffs, ordinarily should not be required to post a bond under Rule 65(c)").   Because important constitutional rights of public interest are at stake, Plaintiffs' indigency, and damage to Defendants resulting from a wrongful issuance of a temporary restraining order cannot be shown, this Court should waive the bond requirement here.

## CONCLUSION

This action challenges an ongoing practice of the Defendants to conduct "sweeps" of encampments of people who are homeless and living in public parks in Minneapolis, violating many fundamental constitutional guarantees in the process.   For the aforementioned reasons, Plaintiffs and members of the proposed class are entitled to injunctive relief enjoining Defendants from clearing the encampments in Hennepin County and from seizing and destroying the property of Plaintiffs and the putative class members.

Dated: October 19, 2020         **MID-MINNESOTA LEGAL AID**


*s/ Justin H. Perl*
Justin H. Perl, #0151397
Telephone: 612/746-3727
jperl@mylegalaid.org
Dorinda Wider, #0162334
Telephone: 612/746-3726
dwider@mylegalaid.org
Rebecca Stillman, #0398550
rstillman@mylegalaid.org
111 Fifth Street North, Suite 100
Minneapolis, MN 55403
Fax: 612/334-5755

Dated: October 19, 2020         **AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA**

s/ Teresa Nelson
Teresa Nelson (No. 0269736)
Clare Diegel (No. 0400758)
Isabella Salomão Nascimento (No. 0401408)
P.O. Box 14720
Minneapolis, MN 55414
Tel:  (651) 645-4097
Fax: (651) 647-5948
tnelson@aclu-mn.org
cdiegel@aclu-mn.org
inascimento@aclu-mn.org

*Attorneys for Plaintiffs*