UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Patrick Berry, Henrietta Brown, Nadine Little, Dennis Barrow, Virginia Roy, Joel Westvig, Emmett Williams, *on behalf of themselves and a class of similarly-situated individuals*; and ZACAH,<br><br>Plaintiffs,<br><br>vs.<br><br>Hennepin County; Hennepin County Sheriff David Hutchinson, *in his individual and official capacity*; City of Minneapolis; Minneapolis Mayor Jacob Frey, *in his individual and official capacity*; Medaria Arradondo, *in his individual and official capacity*; Superintendent of the Minneapolis Park and Recreation Board Al Bangoura, *in his individual and official capacity*; Park Police Chief at the Minneapolis Park and Recreation Board Jason Ohotto, *in his individual and official capacity*; Police Officers John Does; and Police Officer Jane Does,<br><br>Defendants. | Case No. 20-CV-02189-WMW-LIB<br><br>District Judge Wilhelmina Wright<br>Magistrate Judge Leo I. Brisbois<br><br>**HENNEPIN COUNTY DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER** |

## INTRODUCTION

Plaintiffs are seven unsheltered individuals who have stayed in encampments in Minneapolis parks this year, along with a nonprofit organization that has funded housing for many of the Plaintiffs. Plaintiffs claim that Defendants—including Hennepin County and Hennepin County Sheriff David Hutchinson (the "Hennepin County Defendants")—improperly seized their personal belongings when the encampments they resided in were

closed and that law enforcement that closed the encampments "forceful[ly] eject[ed]" Plaintiffs using bulldozers and chemical irritants. Plaintiffs seek a temporary restraining order enjoining this claimed conduct and prohibiting law enforcement from clearing *any* encampment *anywhere* in Hennepin County at *any* time in the future. In essence, Plaintiffs seek this Court's permission to stay on public land for as long as they would like.

But the Hennepin County Defendants *did not* participate in the conduct Plaintiffs complain of. Hennepin County's involvement during the sweeps of these encampments was in a limited "transport and support" capacity. No employee of either Hennepin County or the Hennepin County Sheriff's Office ("HCSO") used any force with encampment residents, operated heavy equipment inside the encampments, or removed or seized the personal possessions of any encampment resident. Plaintiffs make no plausible factual claim to the contrary. As a result, Plaintiffs cannot prove that they are likely to succeed on the merits of their claims against the Hennepin County Defendants.

Accordingly, and as further explained in the Minneapolis Defendants' brief in opposition to the Plaintiffs' motion for a temporary restraining order, the Court should deny Plaintiffs' motion.

## FACTUAL BACKGROUND

### I. Plaintiffs' Claims

Plaintiffs are seven unsheltered individuals who have lived in tents in encampments in Minneapolis, Hennepin County, Minnesota, over the past several months, and ZACAH, a private nonprofit organization.

Dennis Barrow lived at Powderhorn Park in Minneapolis for "a couple of months before the police forced him out." (ECF 7, Barrow Decl. ¶ 6.) He claims that he lost his tent, sleeping bag, clothes, medication, and court documents when police cleared Powderhorn West. (*Id.* ¶ 9.) He claims he "tried to get into a couple shelters but was never successful," and he does not want to stay in a shelter due to concern about COVID-19. (*Id.* ¶ 14.) Barrow is now staying in a camper van. (*Id.* ¶ 12.) Barrow makes no claims about the Hennepin County Defendants.

Henrietta Brown lived at Peavey Park in Minneapolis for about a month. (ECF 8, Brown Decl. ¶ 8.) She claims that on September 24, 2020, police forced her to leave the park, stating: "I think the parks police, Minneapolis Police Department, and Hennepin County Sheriff were all there." (*Id.* ¶¶ 9-10.) She claims she lost her tent, documents, and family photos, but does not make any claim that the Hennepin County Sheriff's deputies took or destroyed those belongings. (*Id.* ¶¶ 13-14.) Brown claims she called a shelter and left a voicemail, but no one called her back. (*Id.* ¶ 17.) She also states that she could not go to a shelter because "you need an ID or some other form of identification to get in," and her documents were destroyed. (*Id.* ¶ 18.) Brown is now staying at a hotel paid for by ZACAH. (*Id.* ¶ 19.)

In July, Emmett Williams moved with his fiancée to Powderhorn Park, where he lived for about two and a half weeks. (ECF 9, Williams Decl. ¶ 8.) He claims that he lost some clothing when police cleared Powderhorn East. (*Id.* ¶ 9.) He is now staying at Martin Luther King, Jr. Park in Minneapolis. (*Id.* ¶ 12.) He states, "I've been told that the shelters

3

are all full," and "I'd prefer to stay in a camp." (*Id.* ¶ 15.) Williams makes no claims about the Hennepin County Defendants.

Since March 2020, Nadine Little has lived outside in various locations in Minneapolis, including Powderhorn Park, Kenwood Park, and Brackett Park. (ECF 10, Little Decl. ¶¶ 8-21.) She is now living in a hotel. (*Id.* ¶ 21.) Little states that she would rather be in a camp than in a shelter, because shelters "feel more unsafe," "take your money," and "give you curfews." (*Id.* ¶ 23.) Little makes no claims about the Hennepin County Defendants.

Patrick Berry has lived outside or in a van in various parks in Minneapolis, including Powderhorn Park and Peavey Park. (ECF 11, Berry Decl. ¶¶ 5-10.) He claims that on August 10, 2020, the Park Police and the Minneapolis Police Department cleared Powderhorn West, and his tent, sleeping mattress, and sleeping bags were destroyed. (*Id.* ¶¶ 10-15.) He states he has not gone to a shelter "because they aren't safe," and he was afraid of COVID-19 at the shelter. (*Id.* ¶¶ 21-22.) He now lives in his own apartment. (*Id.* ¶ 23.) Berry makes no claims about the Hennepin County Defendants.

This summer, Virginia Roy lived at Powderhorn Park and Brackett Park in Minneapolis. (ECF 12, Roy Decl. ¶ 12.) Since October 1, she has been living in a hotel room provided by ZACAH. (*Id.* ¶ 14.) She claims that she has been turned away from multiple shelters "because they were full." (*Id.* ¶ 11.) However, she states: "I don't want to go to a shelter," because being in a shelter with men "scares me," and "[s]ome shelters make you pay nearly your entire income to stay there." (*Id.* ¶ 9.) Roy makes no claims about the Hennepin County Defendants.

Joel Westvig briefly lived in Loring Park in Minneapolis before moving to B.F. Nelson Park (also in Minneapolis), where he now lives. (ECF 13, Westvig Decl. ¶¶ 5-9.) He claims he has called Shelter Connect but was told the shelters are full. (*Id.* ¶ 13.) He states, "Even if I did get into a shelter I don't necessarily want to go," and he claims "the shelters kick us out during the day." (*Id.* ¶¶ 13-14.)) Westvig makes no claims about the Hennepin County Defendants.

ZACAH is a "volunteer-run, privately-funded charitable organization" that supports people facing poverty and the threat of unsheltered homelessness. (ECF 14, Murad Decl. ¶ 3.) ZACAH claims that it has spent most of its budget "funding emergency hotel stays for displaced encampments residents." (*Id.* ¶ 10.)

In sum, of the seven individual named Plaintiffs, four claim they lost property when police cleared encampments (Barrow, Brown, Williams, and Berry), and only two currently live in an encampment (Williams and Westvig). Six claim they do not want to live in a shelter or would prefer to camp in a park (Barrow, Williams, Little, Berry, Roy, and Westvig). Only one individual Plaintiff mentions the Hennepin County Sheriff at all (Brown); the remaining individual Plaintiffs make no claims about the Hennepin County Defendants.

## II. The Hennepin County Sheriff's Office's Presence at Minneapolis Encampments

The HCSO has provided transport and support at encampments of people experiencing homelessness in Minneapolis parks on only three recent occasions: July 20, August 12, and September 24, 2020. (Strongitharm Decl. ¶ 5.) Hennepin County's

5

involvement during the sweeps of these encampments was in a "transport and support" capacity. (*Id.*)

On July 20, the HCSO provided two uniformed transport deputies at Powderhorn Park. (*Id.* ¶ 6.) Minneapolis Park and Recreation Board ("MPRB") police officers arrested sixteen people and brought them to the HCSO deputies, who were standing next to the transport van on a street adjacent to the park. (*Id.* ¶ 7.) The deputies transported the arrestees to the Hennepin County Adult Detention Center ("ADC"), also known as the Hennepin County Jail. (*Id.* ¶ 6.) HCSO deputies did not enter Powderhorn Park, make any arrests, remove tents, seize property, use force, or operate any heavy equipment inside the park. (*Id.* ¶¶ 7-8.)

On August 12, the HCSO again provided two uniformed transport deputies, this time at Elliot Park and Kenwood Park. (*Id.* ¶ 9.) On that day, HCSO deputies did not transport any arrestees. (*Id.*) They made no arrests, did not use force, did not remove tents, did not seize property, and did not operate any heavy equipment inside the parks. (*Id.* ¶ 10.)

On September 24, the HCSO provided one uniformed sergeant, three uniformed deputies, and two uniformed transport deputies at Peavey Park. (*Id.* ¶ 11.) HCSO personnel were in a parking lot outside of a fenced area of the park. (*Id.*) MPRB police officers were escorting a woman to the transport van when two men became disruptive, one of whom blocked the officers' path and placed his hands on one of the MPRB officers. (*Id.* ¶ 13.) HCSO deputies intervened by physically restraining the men, while MPRB officers placed them under arrest. (*Id.*) HCSO deputies then transported the two men, as well as three other people arrested by MPRB officers, to the ADC. (*Id.*) Other than assisting with taking the

6

two men into custody, HCSO deputies made no arrests, and they did not use any chemical irritants or Tasers, remove any tents, seize any property, or operate any heavy equipment in the park. (*Id.* ¶ 15.)

### III. Hennepin County's Efforts to Combat Homelessness During the COVID-19 Pandemic

Hennepin County has long been focused on the needs of unsheltered individuals, and its efforts intensified with the onset of the COVID-19 pandemic. (Ryan Decl. ¶ 3.) Beginning in March 2020, Hennepin County identified those unsheltered individuals at greatest risk of death from COVID-19—the elderly and medically-fragile individuals—and acted to establish alternative accommodations for those individuals at area hotels. (*Id.* ¶ 4; Hewitt Decl. ¶ 8; Abel Decl. ¶ 6; Herzing Decl. ¶ 3.) The County also worked to find rooms in separate hotels for unsheltered people who tested positive for COVID-19 or who were awaiting test results and were unable to safely self-isolate. (Ryan Decl. ¶ 4; Hewitt Decl. ¶ 8; Abel Decl. ¶ 6; Herzing Decl. ¶ 3.) Part of the purpose of moving unsheltered individuals into hotels was to "deconcentrate" the populations of shelters. (Ryan Decl. ¶ 4; Herzing Decl. ¶ 3.)

In addition, the County made the decision, beginning in April and May, to operate all Hennepin County shelters 24 hours a day, 7 days a week, so that individuals experiencing homelessness would not be required to leave the shelters during the day. (Ryan Decl. ¶ 4; Herzing Decl. ¶ 3; Hewitt Decl. ¶ 4.) Currently, all Hennepin County shelters are open 24/7. (Ryan Decl. ¶ 4; Herzing Decl. ¶ 3; Hewitt Decl. ¶ 4.) Shelters in Hennepin County are also operating at fifty-percent capacity, in compliance with CDC

guidelines, and they enforce social distancing (Hewitt Decl. ¶ 8.) The County's efforts have been successful, as the rate of COVID-19 infection among individuals in Hennepin County shelters is lower than for the general population. (Abel Decl. ¶ 6.)

Despite the difficulties of providing shelter during a pandemic, Hennepin County shelters have beds available—including beds for single men, single women, and families with children—and Hennepin County regularly informs the community and unsheltered people that beds are available. (Ryan Decl. ¶ 5; Herzing Decl. ¶ 6; Hewitt Decl. ¶ 6.) Indeed, a broad coalition of government agencies, nonprofit organizations, and philanthropic partners are currently operating the largest and safest emergency shelter system that has ever existed in Hennepin County. (Hewitt Decl. ¶ 2.) And, there are currently more than 1,000 single adults in shelter in Hennepin County each night, as well as more than 200 people in family shelters. (*Id.*)

There are no ID requirements for single adult shelters in Hennepin County, and in fact it is common for people living in single adult shelters to lack a form of legal identification, such as a driver's license or government ID card. (*Id.* ¶ 3.) Almost no shelters for single adults require payment from a resident. (*Id.* ¶ 5.) Further, the County provides services to individuals experiencing homelessness, both those in shelters and those living outside. (*Id.* ¶ 7; Abel Decl. ¶¶ 3-5.) Finally, to protect shelter residents' safety and security, shelters control who may enter their facilities, and they have trained staff on site at all times. (Hewitt Decl. ¶ 9.) Larger shelters and hotel sites have security staff, and shelters have rules designed to protect residents and staff, including rules banning weapons and drug use. (*Id.*)

In addition to providing shelter beds, Hennepin County has worked to find long-term housing solutions for individuals experiencing homelessness. (Herzing Decl. ¶¶ 4-5; Ryan Decl. ¶ 6; Hewitt Decl. ¶ 10.) For example, the County has worked with the Minneapolis Public Housing Authority to find long-term public housing units that could be occupied by unsheltered people; with other supportive housing programs, such as Board and Lodges; and with private landlords to house unsheltered people—including those who might not be attractive tenants, due to their previous rental history or a criminal record. (Herzing Decl. ¶ 4.) So far in 2020, approximately 1,300 people experiencing homelessness have found permanent housing with help from government, nonprofit, and philanthropic partners. (Hewitt Decl. ¶ 10.)

## IV. Significant Safety Concerns at the Minneapolis Encampments and Encampment Closures

Since the pandemic began, Hennepin County's Homeless Access team has been closely monitoring the various encampments of unsheltered people in sites across Minneapolis, including going to the encampments on a regular basis. (Ryan Decl. ¶¶ 8-9.) In addition, Health Care for the Homeless, a Hennepin County program, has provided medical outreach and services to individuals living in encampments. (Abel Decl. ¶¶ 3-5.)

Over time, Hennepin County became aware that some of the encampments posed significant public health and safety threats. (Ryan Decl. ¶ 10.) Among other things, there were many incidences of violent crime—including assaults, sexual assaults, and sex trafficking (including sex trafficking of minors)—in encampments, and particularly in larger encampments. (*Id.*; *see also* Abel Decl. ¶ 5.) An encampment resident was sexually

assaulted and, once she reported her assault to law enforcement, received death threats from others in the camp for that report. (Ryan Decl. ¶ 10.) Drug dealers had moved into some of the encampments and were dealing from their tents. (*Id.*) Gangs were active in some of the encampments and, on one occasion, a fight in an encampment culminated in a gun battle on a neighborhood street close to the encampment. (*Id.*) In fact, on two or three days over the summer, Healthcare for the Homeless's concerns about safety led staff to stop providing services in the Powderhorn Park encampments. (Abel Decl. ¶ 5.)

As the encampments became more dangerous, Hennepin County participated in conversations with the MPRB, the City of Minneapolis, and agencies of the State of Minnesota about risk within the encampments. (Ryan Decl. ¶ 11.) Decisions about closing any encampments were made by the government entity responsible for the property where each encampment was located. (*Id.*) Accordingly, the Hennepin County Defendants did not make the decision about whether to close any encampment in a Minneapolis park. (*See id.*)

Once a decision to close a Minneapolis park encampment was made, Hennepin County worked with outreach teams and staff from nonprofit organizations to notify encampment residents that the encampment would be closed and to try to get them to safe and secure housing outside of an encampment. (*Id.* ¶ 12.) The County secured transportation for encampment residents, including trailers for their belongings, and encouraged residents to find safe and secure shelter outside of an encampment. (*Id.*)

Don Ryan—who supervises Hennepin County's outreach efforts at the Minneapolis encampments—observed encampment residents telling law enforcement officers that they

had taken the possessions they wanted and that law enforcement should dispose of the anything they left behind. (*Id.*) In addition, Ryan was present on a few occasions when MPRB police officers closed encampments. (*Id.* ¶ 14.) He did not see any Hennepin County employee use force with encampment residents and did not see any Hennepin County employee remove or seize any resident's tent or other personal property. (*Id.*) In fact, Ryan has never seen any Hennepin County employee engage in any such behavior. (*Id.*)

## PROCEDURAL BACKGROUND

On October 19, 2020, Plaintiff filed their putative Class Action Complaint. (ECF 1.) The Complaint asserts four causes of action under the U.S Constitution and Minnesota Constitution: (1) unlawful seizure of personal property; (2) violation of the right to privacy; (3) violation of procedural due process rights; and (4) violation of substantive due process rights. (*Id.* ¶¶ 183-205.) They also assert a cause of action for common law conversion. (*Id.* ¶¶ 206-10.) Plaintiffs' claims are based on their allegations that Defendants forced them to leave encampments in Minneapolis parks on little or no notice, destroyed their personal property, and used bulldozers and chemical irritants. (*Id.* ¶¶ 183-210.) The Complaint seeks injunctive relief, declaratory relief, compensatory damages, punitive damages, and attorney's fees and costs. (*Id.* ¶¶ I-V.)

On the same day, Plaintiffs moved for a temporary restraining order. (ECF 4.) Plaintiffs ask the Court for a broad injunction that would prohibit Defendants and "all those working in concert" with them from:

- Clearing encampments from public parks and green space anywhere in Hennepin County;

- Confiscating Plaintiffs' property, unless Defendants adopt a policy that includes: (1) providing at least five day's advance notice before an encampment is cleared; (2) inventorying and storing encampment residents' personal property for at least 90 days; and (3) processes for encampment residents to retrieve confiscated property; and

- Destroying property reasonably appearing to belong to Plaintiffs.

(*Id.* at 2.) The Hennepin County Defendants oppose Plaintiffs' motion.

## ARGUMENT[1]

I. Since the Hennepin County Defendants did not participate in the conduct that Plaintiffs complain of, Plaintiffs cannot prove that they are likely to succeed on the merits of their claims.

The Court should deny Plaintiffs' motion for a temporary restraining order. Injunctive relief "is an extraordinary remedy never awarded as a matter of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). In ruling on a motion for a temporary restraining order, a court must consider four factors: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys. Inc. v. C L Sys. Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (*en banc*). The party requesting the injunctive relief bears the

---

[1] To avoid duplicative briefing, the Hennepin County Defendants refer the Court to the joint brief of the Minneapolis Defendants in opposition to Plaintiffs' motion for a temporary restraining order. The Hennepin County Defendants join in and adopt the legal arguments in that brief.

"complete burden" of proving that an injunction should be granted. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

The most important factor of the four *Dataphase* factors is likelihood of success on the merits. *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013). This requires that Plaintiffs establish a substantial probability of success on the merits of their claims. *See Dataphase*, 640 F.2d at 114. Plaintiffs cannot meet this burden as to the Hennepin County Defendants.

Broadly, Plaintiffs' five counts involve two core complaints: about (1) the loss of their personal possessions when the encampments they resided in were swept, and (2) that the law enforcement officers sweeping those encampments "forceful[ly] eject[ed]" Plaintiffs from the encampments using bulldozers and chemical irritants. (*E.g.*, Compl. ¶¶ 184-86, 188-89, 191-93, 196-205, 207-10.) But no employee of Hennepin County or the Hennepin County Sheriff's Office participated in either of those activities. (Strongitharm Decl. ¶¶ 7-8, 10, 25; Ryan Decl. ¶ 15.) Hennepin County employees did not use any force with encampment residents, operate heavy equipment inside the encampments, or remove or seize the personal possessions of any encampment resident. (Strongitharm Decl. ¶¶ 7-8, 10, 25; Ryan Decl. at ¶ 15.) Indeed, Hennepin County's only involvement during the sweeps of the encampments was in a "transport and support" capacity. (*E.g.*, Strongitharm Decl. ¶ 5.)

Notably, Plaintiffs have not made any plausible factual allegations to the contrary. Of the 212-plus paragraphs in their Complaint, only four paragraphs even make specific factual allegations about the Hennepin County Defendants. (Compl. ¶¶ 46, 163, 167, 170.)

13

*None* of these paragraphs claim that the Hennepin County Defendants participated in seizing residents' personal possessions or took any action to "forcefully eject" residents from the encampments. Since Plaintiffs have not alleged that the Hennepin County Defendants participated in the conduct they complain of, they have not shown that they are likely to succeed on the merits of their claims against the Hennepin County Defendants. Their motion for a temporary restraining order thus fails.

Moreover, Plaintiffs' Complaint and motion are premised on the notion that the Hennepin County Defendants and others have not done enough to support individuals experiencing homelessness, that there are insufficient beds to house unsheltered people, and that shelters in Hennepin County are unsafe, force people to leave during the day, and require payment and personal identification. (*E.g.*, Barrow Decl. ¶ 14; Brown Decl. ¶ 18; Williams Decl. ¶ 15; Little Decl. ¶ 23; Berry Decl. ¶¶ 21-22; Roy Decl. ¶¶ 9-11; Westvig Decl. ¶¶ 13-14.) This is grossly inaccurate. As detailed in the declarations filed in support, Hennepin County has long been focused on the needs of unsheltered individuals, and its efforts intensified with the onset of the COVID-19 pandemic. (Ryan Decl. ¶ 3.) Currently, Hennepin County shelters have beds available. (Ryan Decl. ¶ 5; Herzing Decl. ¶ 6; Hewitt Decl. ¶ 6.) There are no ID requirements for single adult shelters, almost no single adult shelters require payment from a resident, and all shelters are currently open 24/7. (Hewitt Decl. ¶¶ 3-5, Ryan Decl. ¶ 4; Herzing Decl. ¶ 3.)

Unlike encampments, shelters control who may enter their facilities, have trained staff on site (including security staff in larger shelters and hotel sites), and ban weapons and drug use on site. (Hewitt Decl. ¶ 9.) Shelters have also implemented extensive

measures to protect against the spread of COVID-19, including reducing the capacity of shelters, and adding hotel sites for individuals at high risk for COVID-19 complications and individuals who have tested positive. (*Id.* ¶ 8; Ryan Decl. ¶ 4; Abel Decl. ¶ 6; Herzing Decl. ¶ 3.) As a result, rates of COVID-19 among Hennepin County shelter residents are lower than in the general population. (Abel Decl. ¶ 6; Ryan Decl. ¶ 7.)

Finally, Hennepin County works to find long-term housing solutions for individuals experiencing homelessness, including working with the Minneapolis Public Housing Authority, supportive housing programs, and private landlords. (Herzing Decl. ¶¶ 4-5; Ryan Decl. ¶ 6; Hewitt Decl. ¶ 10.)

## CONCLUSION

For these reasons, and the reasons stated in the joint brief of the Minneapolis Defendants, this Court should deny Plaintiffs' motion for a temporary restraining order.

**MICHAEL O. FREEMAN**
**Hennepin County Attorney**

Dated: October 21, 2020

By: *s/ Kelly K. Pierce*
Kelly K. Pierce (0340716)
Assistant County Attorney
Christiana M. Martenson (0395513)
Assistant County Attorney
A2000 Government Center
300 South Sixth Street
Minneapolis, MN 55487
Telephone: (612) 348-5488
Fax: (612) 348-8299
kelly.pierce@hennepin.us
christiana.martenson@hennepin.us

*Attorneys for Defendants Hennepin County and Hennepin County Sheriff David Hutchinson*