# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Patrick Berry, Henrietta Brown, Nadine Little, Dennis Barrow, Virginia Roy, Joel Westvig, Emmett Williams, on behalf of themselves and a class of similarly situated individuals, and ZACAH, | Case No. 20-cv-02189<br>Judge Wilhelmina M. Wright<br>Magistrate Judge Leo I. Brisbois |
| Plaintiffs, | |
| vs. | |
| Hennepin County; Hennepin County Sheriff David Hutchinson, in his individual and official capacity; City of Minneapolis; Minneapolis Mayor Jacob Frey, in his individual and official capacity; Minneapolis Chief of Police Medaria Arradondo, in his individual and official capacity; Superintendent of the Minneapolis Park and Recreation Board Al Bangoura, in his individual and official capacity; Park Police Chief at the Minneapolis Park and Recreation Board Jason Ohotto, in his individual and official capacity; Police Officers John Does; and Police Officers Jane Does, | **DECLARATION OF DONALD W. RYAN IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER** |
| Defendants. | |

I, Donald W. Ryan, make this declaration pursuant to 28 U.S.C. § 1746.

1.    I am a Program Manager with the Hennepin County Initial Contact and Access team, which is part of the Hennepin County Human Services Department. I currently act as the Hennepin County lead on unsheltered homelessness, a role I began

serving in since March 2020. I have been a Hennepin County employee since December 2000 and have done work relating to unsheltered people for 6 years.

2.      In my role, I manage Hennepin County's Homeless Access team, consisting of nine professionals doing outreach to individuals experiencing homelessness.  The team works towards getting unsheltered people into safe and secure housing, and include professionals experienced in dealing with individuals who have mental health issues, chemical dependency issues, and those who have experienced trauma.

3.      Hennepin County has long been focused on the needs of unsheltered individuals. Our efforts intensified with the onset of the COVID-19 pandemic.

4.      Beginning in March 2020, we identified those homeless individuals at greatest risk of death from COVID-19—the elderly and medically-fragile individuals— and acted to establish alternative accommodations for those individuals at area hotels. We also worked to find rooms in separate hotels for unsheltered people who tested positive for COVID or who were awaiting test results and were unable to safely self-isolate. Part of our purpose in trying to move unsheltered individuals into hotels was to "deconcentrate" the populations of shelters. We also made the decision, beginning in April and May, to operate all Hennepin County shelters 24 hours a day, 7 days a week, so that individuals experiencing homelessness would not be required to leave the shelters during the day. Currently, all Hennepin County shelters are open 24/7.

5.      My understanding is that there are, and have been since the onset of COVID, significant numbers of open beds in Hennepin County shelters for people experiencing homelessness. We regularly informed the community and unsheltered people that we had

2

available beds through many avenues, including community outreach teams that communicated with unsheltered individuals. Moreover, Hennepin County has allocated tens of millions of dollars to create new shelter locations.

6.     Not only have we worked to find beds in shelters for individuals experiencing homelessness, we have also worked to find permanent housing solutions for some of these individuals.

7.     These efforts have helped to stem the transmission of COVID-19 among individuals experiencing homelessness in Hennepin County. In fact, the rates of infection and death from COVID-19 among individuals in Hennepin County shelters is lower than that of the general population in Hennepin County.

8.     All this time, I and my colleagues at Hennepin County closely monitored the various encampments of unsheltered people in sites across the County. In my role, I coordinate with the State of Minnesota, the City of Minneapolis, and the Minneapolis Parks Department regarding the encampments. My colleagues and I provide subject matter expertise about homelessness in Hennepin County to these municipal entities as they made decisions about how to respond to encampments within their borders.

9.     I have spent significant amounts of time over the past seven months in the encampments. During some periods of time, I was in the encampments daily.

10.     Over time, I and my colleagues became aware that several of the encampments posed significant public health and safety threats to both unsheltered individuals camping as well as the community surrounding certain encampments. Among other things, there were many incidences of violent crime—including assaults, sexual

3

assaults, and sex trafficking (including sex trafficking of minors)—in encampments, and particularly in larger encampments. One encampment resident was sexually assaulted and, once she reported her assault to law enforcement, received death threats from others in the camp for that report. Drug dealers had moved into some of the encampments and were dealing from their tents. Gangs were active in some of the encampments and, on one occasion, a fight in an encampment culminated in a gun battle on a residential street close to the encampment.

11.    As the encampments became more dangerous, I participated in conversations with staff at the Minneapolis Parks Department, the City of Minneapolis, and State agencies about risk and liabilities within the encampments.  It was the decision of the public entity responsible for each respective property to make decisions about whether, and when, to close any encampment.

12.    Once those decisions were made, I worked with outreach teams and staff from nonprofit organizations to assist public entities in notifying encampment residents that the encampments would be closed with the goal of getting them to safe and secure housing outside of an encampment. These efforts included law enforcement on some occasions as well as attempts to work without law enforcement to encourage people to relocate to safer locations, whether those be shelter, smaller encampments which didn't often have the public safety and health concerns that larger encampments frequently did, or other options. We worked to secure transportation for encampment residents, including trailers for their belongings by various public entities for different encampments, with the intent of allowing individuals to bring belongings with them. I, as part of an overall

4

outreach effort, spent over 100 hours over the last five months encouraging residents in encampments to find safe and secure shelter outside of an encampment. The amount of time that the collective outreach teams have spent working to encourage individuals to find more suitable locations to shelter far exceeds what I did.  Some of the assistance provided to individuals occurred at the time of a clearing as well, since some individuals choose to wait until the last minute to leave and have assisted other people to getting to shelters and other locations.  As residents began to pack up their belongings, I often observed them telling law enforcement that they had taken the possessions they wanted and that law enforcement should dispose of anything they left behind as they did not wish to retain anything else. I heard such statements made even at times when residents were offered transportation and the use of trailers to move their belongings.

13.     I am aware that Plaintiffs have filed this case—which relates to the encampments—against a number of defendants, including Hennepin County and Hennepin County Sheriff David Hutchinson. In this case, Plaintiffs claim that Defendants violated Plaintiffs' constitutional rights when they cleared several encampments of unsheltered people. I am also aware that Plaintiffs are seeking an order prohibiting all Defendants from sweeping encampments of unsheltered people from public land anywhere in Hennepin County, confiscating Plaintiffs' property until they have adopted certain policies, and destroying property belonging to Plaintiffs.

14.     I was present on a few occasions when the Minneapolis Park Police closed these encampments. On these occasions, I did not see any Hennepin County employee use force with encampment residents and did not see any Hennepin County employee remove

5

or seize any resident's tent or other personal property. Indeed, I have never seen any Hennepin County employee engage in any such behavior.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 21, 2020.

_s/ Donald W. Ryan_
Donald W. Ryan