## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Patrick Berry, Henrietta Brown,
Nadine Little, Dennis Barrow,
Virginia Roy, Joel Westvig,
Emmett Williams, *on behalf of*
*themselves and a class of similarly-situated*
*individuals;* and ZACAH,

                Plaintiffs,

v.

Hennepin County; Hennepin County Sheriff
David Hutchinson, *in his individual and official*
*Capacity*; City of Minneapolis; Minneapolis Mayor
Jacob Frey, *in his individual and official capacity;*
Minneapolis Chief of Police Medaria Arradondo,
*in his individual and official capacity;* Superintendent
Al Bangoura, *in his individual and official capacity*;
Park Police Chief Jason Ohotto, *in his individual and*
*official capacity;* Police Officers John Does;
and Police Officers Jane Does,

                Defendants.

Civil File No. 20-cv-02189 (WMW/KMM)

**MEMORANDUM OF DEFENDANTS CITY OF MINNEAPOLIS, MAYOR FREY, CHIEF MEDARIA ARRADONDO, AL BANGOURA, AND CHIEF JASON OHOTTO IN OPPOSITION TO THE MOTION FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION**

## **INTRODUCTION**

    Defendants, City of Minneapolis ("City"), Mayor Jacob Frey, Minneapolis Police

Chief Medaria Arradondo, and Superintendent Alfred Bangoura and Park Police Chief

Jason Ohotto of the Minneapolis Park and Recreation Board ("MPRB"),[1] oppose Plaintiffs'
motion for a temporary restraining order or preliminary injunction.[2]

Under its charter, the City of Minneapolis operates through its "boards,
commissions, committees, departments, and officers." (Declaration of Sarah McLaren
("McLaren Decl.") Ex. 1 (Charter § 1.4(a)).))  The charter establishes the Minneapolis
Park and Recreation Board ("Park Board") as a unique department of the City, which
reports to its own elected board of commissioners.  (McLaren Decl., Exs. 2-3 (Charter
§§ 6.2, 6.3).) "The [Park] Board establishes, governs, administers, and maintains, and
may design, develop, and improve . . . the parks, parkways, and recreational opportunities
in and adjacent to the City." (McLaren Decl., Ex. 2 (Charter § 6.2(a)(1)(A)).)

The Park Board enjoys broad powers to effect its mandate, including "all the
powers for which any general law, special law, or ordinance provides, including any
power necessary and proper for exercising its enumerated powers or for performing its
lawful functions." (McLaren Decl., Ex. 2 (Charter § 6.2(a)(2).) These powers include the
power to tax property and borrow money.  (McLaren Decl., Ex. 4 (Charter § 6.5(a)–(b).)
The Park Board enacts its own ordinances, maintains and disciplines its own police force,
and has its own attorney.  (McLaren Decl., Ex. 2-3 (Charter §§ 6.2(c), 6.2(e), 6.3(e)).)

---

[1] The MPRB is not a listed Defendant in this case, and it still has not been served. It
would be a necessary party to this case.
[2] ZACAH does not have standing.

## FACT SUMMARY

**A.   MPRB Facts**

The MPRB is a unique, semi-autonomous department of the City of Minneapolis headed by a superintendent who reports to an elected board of commissioners. The MPRB owns and maintains 6,800-acre park system made up of 180 park properties, including playgrounds, golf courses, gardens, biking and walking paths, nature sanctuaries, lakes, and a 55-mile roadway system. *See generally* Declaration of Chief Jason Ohotto ("Ohotto Declaration"), at ¶ 3.   Its Park Police officers enforce MPRB ordinances and rules throughout the park system. *Id.* at ¶ 5.

On May 13, 2020, Governor Walz issued Executive Order 20-55, which, in relevant part, states:

> **Encampments.** Homeless encampments, including both new and existing encampments, should not be subject to sweeps or disbandment by state or local governments, as such sweeps or disbandments increase the potential risk and spread of COVID-19. Law enforcement is not prohibited from addressing trespassing or exigent circumstances (i.e., those requiring immediate action to protect life, prevent injury, or preserve evidence) that occur within encampments or among or including people staying outdoors. Law enforcement and other first responders should respond to trespassing and exigent circumstances as those situations require. If a local government entity is providing sufficient alternate housing, shelter, or encampment space that complies with the MDH guidance, Homeless Services Settings: Interim Guidance for Providers, and the CDC guidance, Responding to COVID-19 Among People Experiencing Unsheltered Homelessness, or if an encampment has reached a size or status that is a documented threat to the health, safety, or security of residents, state or local governments may restrict, limit, or close encampment spaces. I authorize the Commissioners of the Minnesota Housing Finance Agency and Human Services, as co-chairs of the Minnesota Interagency Council on Homelessness, to issue further guidance as needed to clarify this provision or further address the issue of homeless encampments.

3

EO 20-55, at ¶ 5 (May 13, 2020).

Following the governor's executive order, a number of tents began popping up in Minneapolis parks. Declaration of Al Bangoura ("Bangoura Declaration"), at ¶ 10. However, Park Board Ordinance 2-33 does not allow people to live in parks, since it limits park hours to set times— unless an individual has a permit. On June 10, 2020, more people began moving into Powderhorn Park to establish an encampment. *See* Ohotto Declaration, at ¶ 6; *accord* Bangoura Declaration, at ¶ 10.

Superintendent Bangoura and Chief Ohotto made the determination to advise the unsheltered people that they could not permanently stay in the park. Bangoura Declaration, at ¶ 10. On June 12, 2020, Park Police served a seventy-two-hour notice on people camping in the parks. *Id.* Later that day, Bangoura received a call from Erik Grumdahl, Deputy Director of Minnesota State Interagency Council on Homelessness, stating that under the governor's Executive Order 20-55 the MPRB was prohibited from preventing homeless people from residing in its parks. *Id.* Based on this counsel, the MPRB rescinded its notice. *Id.*

Then, on June 17, 2020, based on Governor Walz's Executive Order 20-55, and the governor's office's interpretation of that order, the Board of Park Commissioners passed Resolution 2020-253 declaring Minneapolis parks as a refuge space for homeless people. *Id.* at ¶ 11; *accord* Resolution 2020-253. By late June and early July, there were over 300 tents in Powderhorn Park, and 40 other homeless encampments within the Minneapolis park system. *Id.* at 13. Soon after the development of the Powderhorn encampments, the

situation immediately grew dangerous for both the homeless occupants and the surrounding residents. *Id.* at 14.

Powdernhorn Park received constant 911 calls from the surrounding community; there has been documented use of hypodermic needles—with thousands of discarded needles found in Powdernhorn Park alone; there were multiple reports of fights, domestic disputes, documented sexual assaults, shootings, and late night disputes. *Id.* at 16. Accord Ohotto Dec. ¶ 11.

Besides the numerous public safety concerns, those residing in Powderhorn Park were living in very unsanitary conditions. *Id.* The MPRB was sued by an adjacent property owner who stated that the conditions at Powderhorn amounted to a public and private nuisance. Violent crime in the park system increased dramatically due to the encampments—with an increase of 91% for rapes and 200% for aggravated assaults. Ohotto Dec., ¶ 11.

On July 15, 2020, the Board of Park Commissioners enacted Resolution 2020-267, which limited the number of parks that could be refuge sites to twenty. Bangoura Declaration, ¶ 14 (Exhibit D). Each site was limited to no more than twenty-five people at each encampment, and no encampment could be in or near a school safety zone. *Id.*

Due to the growing public health and safety concerns, Superintendent Bangoura issued a directive in July 2020 to remove one of the two encampments at Powderhorn Park. *Id.* at ¶ 16-20. The MPRB only disbanded encampments that had multiple documented public health and safety issues arise or that did not comply with the terms of Resolution 2020-267. *Id.*  In each case of disbandment, Superintendent Bangoura, Park Police Chief

5

Ohotto, and the executive staff would assess the situation at an encampment in terms of documented safety and sanitary hazards. *Id.* Accord Ohotto Declaration ¶ 13 (stating that he worked extensively with City and County partners to ensure they were adhering to Executive Order 20-055).

To coordinate a disbandment, Superintendent Bangoura remained in constant communication with Don Ryan, a leading expert on homelessness, from Hennepin County, Peter Ebnet from Mayor Frey's office with the City of Minneapolis, and the City of Minneapolis Health Department officials. *Id.* at ¶ 17. The MPRB never disbanded an encampment when there was not adequate housing available or where a permitted location was not available. *Id.* Moreover, notice was and is always provided prior to seeking to disband an encampment, usually significantly more than 48 hours. Ohotto Declaration, ¶¶ 14-20.

The MPRB's Community Outreach team, lead by Cordell Wiseman, coordinated the permit process. *Id.* at ¶ 20. This team would visit encampments regularly and get to know the residents for the purpose of establishing some form of communication with the people residing in the encampments, to monitor encampments, and to inventory the number of tents in each park twice weekly. *Id*; *accord* Declaration of Cordell Wiseman ("Wiseman Declaration"), at ¶ 2. The Outreach team also provided encampment residents with information regarding shelters and housing. Wiseman Declaration, ¶ 2. Moreover, when encampments chose to voluntarily vacate, the Outreach team would work closely with encampment occupants to ensure that any property left behind was abandoned. *Id.* at ¶ 4.

6

Property was never disposed of before Community Outreach was certain that it was abandoned. *Id.* at 4; see also Declaration of Jeremy Barrick, ¶ 3.

## B.    City Defendants' Facts.

### 1.    The City of Minneapolis and Its Partners Are Working Diligently to Support Individuals Experiencing Homelessness, Especially with the Arrival of Winter Weather.

Partners from the City of Minneapolis, Hennepin County and State of Minnesota are working together to provide new options for housing and shelter for people experiencing homelessness in Hennepin County.  (Declaration of Katie Topinka ("Topinka Decl.") at ¶ 3.)

A broad coalition of government agencies, nonprofit and philanthropic partners are currently operating the largest and safest emergency shelter system that has ever existed in Hennepin County as a response to the COVID-19 pandemic. These collective efforts have thus far allowed us to avoid the devastating impacts COVID-19 has had on people experiencing homelessness in other cities.  (Topinka Decl. at ¶ 4.)

There is existing emergency shelter capacity, especially for women, children and families. Emergency shelters continue to see beds becoming newly available each day, and some go unused each night. There are also around 200 current vacancies in board and lodge facilities, which provide another housing option for people experiencing homelessness.  (Topinka Decl. at ¶ 5.)

The City and its partners are also working to open new spaces that meet the individual needs of people sleeping outside before the end of the year, and to make permanent improvements to ensure COVID-19 safety guidelines continue to be met at

existing and new shelter spaces, as they have since the beginning of the pandemic. (Topinka Decl. at ¶ 6.)

By the end of 2020, governmental and non-governmental partners, including city, county, state and philanthropic individuals and organizations, plan to invest $55 million to open at least seven sites to provide emergency shelter, low-barrier housing and protective housing for people experiencing homelessness, as well as enhance existing shelters and expand support services and street outreach. An additional 670 units of very affordable housing designated for people experiencing homelessness will have opened or begun construction by the end of this year. (Topinka Decl. at ¶ 7.)

The City and its partners recognize that emergency shelter may not meet everyone's individual needs. They are committed to working directly with individuals to find the best solutions available. One person sleeping outside is too many. The City and its partners are committed to making full use of the options available right now, even as more options become available. (Topinka Decl. at ¶ 8.) So far in 2020, 1,300 people experiencing homelessness have found permanent housing with help from city, county, state and nonprofit partners. (Topinka Decl. at ¶ 9.)

New safe spaces, enhanced shelter and expanded supports are expected by year's end, specifically four new emergency shelter locations totaling investment of $15.2 million for 200 total beds. (Topinka Decl. at ¶ 10.) Specifically, Homeward Bound will include 50 beds for Native American adults and represents a $7.5 million total investment. (*Id.*) Its planned opening is December 1, 2020. (*Id.*) The Lerner Building will include 100 separate units in an "indoor village" for people currently experiencing

unsheltered homelessness. (*Id.*) It represents a $6 million total investment and has a planned opening end of December 2020. (*Id.*) The Salvation Army emergency shelter will include 30 beds for women experiencing unsheltered homelessness. (*Id.*) This represents a $1.3 million total investment and has a planned opening of December 1, 2020. (*Id.*) The Simpson Housing emergency shelter now includes 20 beds for women experiencing unsheltered homelessness on a separate floor of Simpson Housing's existing emergency shelter location. (*Id.*) This involves a $400,000 total investment, and it opened in October. (*Id.*)

New protective housing sites are also being acquired to replace hotel rooms currently leased by Hennepin County for people at high risk of COVID-19 complications due to age or underlying health conditions. (Topinka Decl. at ¶ 11.)

Enhancements are also being made to all existing shelters to improve safety and meet CDC COVID-19 guidelines, representing a $5.7 million total investment. (Topinka Decl. at ¶ 12.) These enhancements include $3.2 million to make physical improvements to existing shelter sites such as air flow systems, partitions, etc. and $2.5 million to ensure all existing shelters continue to provide 24/7 accommodations. (*Id.*)

The City and its governmental partners have also invested $17.4 million in expanded support services, including: (1) $675,000 to expand homeless diversion services at Simpson Housing to help people find alternatives to shelter; (2) $700,000 to add seven new street outreach workers; and (3) $16 million in state ESP-CV and CARES Act funding to expand shelter capacity at hotels/motels and shelters, extend shelter hours, increase staffing, support outreach workers and food provision. (Topinka Decl. at ¶ 13.)

9

In addition to these investments, city, county, state, nonprofit and philanthropic partners continue to work together to develop and preserve permanent affordable housing and to create policies that support a variety of housing options.  (Topinka Decl. at ¶ 14.) Twelve projects with 670 units of new housing designated for people experiencing homelessness will have opened or begun construction by the end of this year, including:

a.      Catholic Charities Exodus 2.0 (construction beginning soon): 203 units for people experiencing chronic homelessness.

b.      Park 7 (open now): 61 units for people experiencing homelessness.

c.      Mino-Bimaadiziwin (opening December 2020): 17 units for people experiencing homelessness. Maya Commons (opened July 2020):  12 units for people experiencing homelessness.

d.      Maya Commons (opened July 2020): 12 units for people experiencing homelessness.

e.      Penn Avenue Union (opened August 2020): 4 units for people experiencing homelessness.

f.      Lake Street Phase 1 (opening late 2020): 6 units for people experiencing homelessness.

g.      Franklin Avenue AICDC site (opening soon): 20 beds for Native American residents experiencing homelessness with chemical dependency.

h.      Gateway NE (opening early 2021): 10 units for people experiencing homelessness.

     i.      Scattered site opportunities (opening soon): 200 new units for people experiencing homelessness, including 100 permanent and 100 time-limited, at various sites around the county with subsidies and support services.

     j.      Amber Apartments (construction beginning soon) – 17 units for people experiencing homelessness.

     k.      Lydia Apartments (construction beginning soon) – 80 units for people experiencing homelessness.

     l.      Anishinabe III (construction beginning soon) – 40 units for people experiencing homelessness.

(Topinka Decl. at ¶ 15.)

In addition to the above-listed efforts, the City of Minneapolis is also working on an ordinance to allow shared housing in the city, which would create additional low-barrier, affordable housing options. Zoning requirements related to emergency shelters are also under review to make sure the city can continue to provide adequate shelter space for those who need it. (Topinka Decl. at ¶ 16.)

**2.    The City of Minneapolis and the Minneapolis Police Department Did Not Clear or Demobilize the Encampments at Issue.**

While officers with the Minneapolis Park Police and the Minneapolis Police Department wear identical uniforms, the Minneapolis Park Police and the Minneapolis Police Department are two separate law enforcement agencies.  (Declaration of Grant Snyder ("Snyder Decl.") at ¶ 4.)  They report through two separate chains of command to two different police chiefs.  (*Id.*)  The Minneapolis Park Police is the primary law

enforcement agency for Minneapolis Parks, which are under the jurisdiction of the Minneapolis Park and Recreation Board.  (*Id.*)

The Minneapolis Police Department has a Homelessness and Vulnerable Populations Initiative ("MPD Homelessness Outreach Unit").  (Snyder Decl. at ¶ 2.)  The MPD Homelessness Outreach Unit was created in 2018 to act as a liaison between people experiencing homelessness and various governmental and non-governmental partners. (Snyder Decl. at ¶ 3.)  These partners include schools, state and local agencies, non-profits and city residents.  (*Id.*)  The MPD Homelessness Outreach Unit also provides resources and referrals to people experiencing homelessness including food, clothing and referrals to housing and medical providers.  (*Id.*)  Since its inception in 2018, Lieutenant Grant Snyder has been working with the MPD Homelessness Outreach Unit.  (*Id.*)

In the spring of 2020, Lt. Snyder was contacted by the Minneapolis Park Police. (Snyder Decl. at ¶ 5.)  The Minneapolis Park Police requested that Lt. Snyder consult with them regarding their response to the growing and expanding encampments on park property.  (*Id.*)

Lt. Snyder, along David O'Connor, another officer in the MPD Homelessness Outreach Unit, provided consultation to the Minneapolis Park Police on these issues. (Snyder Decl. at ¶ 6.)  Using the knowledge and expertise they had developed as members of the MPD Homelessness Outreach Unit, they advised Minneapolis Park Police on strategies and approaches to responding to health and safety issues arising in the encampments while also treating those individuals in the encampments with dignity. (*Id.*)

12

While Lt. Snyder provided general input to the Park Police regarding their response to encampments, it was not Lt. Snyder's, or any other member of the Minneapolis Police Department's, role to advise the Park Police regarding if or when a camp should be demobilized, or cleared.  (Snyder Decl. ¶ 7.)

In his role as a consultant to the Minneapolis Park Police, Lt. Snyder was present when Minneapolis Park Police undertook the demobilization efforts at the Park Board properties mentioned in the Complaint: Powderhorn Park, Peavey Park, Kenwood Park, and Elliot Park.  (Snyder Decl. ¶ 8-9.)  At each of these demobilizations Lt. Snyder was wearing plain clothes and did not direct the actions of Park Police or engage in the removal of any persons or property.  (Snyder Decl. ¶ 9.)

Lt. Snyder was in charge of any Minneapolis Police Department response during the demobilization efforts at these encampments.  (Snyder Decl. ¶ 10.)  No member of the Minneapolis Police Department directed the actions of Park Police or engaged in the removal of any persons or property from these encampments.  (*Id.*)  No Minneapolis Police Department Officer sprayed chemical irritant or otherwise engaged in use of force when these encampments were being cleared.  (*Id.*)  The officers pictured in the photographs in the Complaint are members of the Minneapolis Park Police, not the Minneapolis Police Department.  (*Id.*)

## ARGUMENT

### I.   STANDARD FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION.

Plaintiffs are seeking a temporary restraining order to halt Defendants from removing encampments currently located at parks and also to prospectively halt Defendants from ever removing any future camper camping anywhere on public property in Hennepin County.

As Plaintiffs properly assert, in determining whether to issue a temporary restraining order or preliminary injunction, the court considers the *Dataphase* factors:  (1) the movant's probability of success on the merits; (2) the threat of irreparable harm or injury to the movant absent the injunction, (3) the balance between the harm to the movant and the harm that the injunction's issuance would inflict on other interested parties; and (4) the public interest.  *Rogers v. Bryant*, 942 F.3d 451, 455 (8th Cir. 2019).  "The party seeking injunctive relief bears the burden of proving these factors."  *Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006).  "The court has broad discretion when ruling on preliminary injunctions."  *Id.*

### II.  PLAINTIFFS ARE NOT ENTITLED TO INJUNCTIVE RELIEF FOR THE LOSS OF THEIR PROPERTY.

Plaintiffs assert five claims against Defendants.  The bulk of Plaintiffs' respective claims are that the alleged seizure and destruction of their personal property violated the Federal and State Constitutions, and state common law.  *See*, Claims 1-3 and 5; *Memorandum of Law in Support of Motion for Temporary Restraining Order;* pps. 9-17, 23.

Plaintiffs "must first establish that harm will result without injunctive relief and the harm will not be compensable by money damages."  *Ben-Yonatan v. Concordia College Corp.*, 863 F.Supp. 983, 986 (D. Minn. 1994).  Plaintiffs have not shown this. According to the complaint, Plaintiff Dennis Barrow is living in a van, not within a park encampment, so no harm will result to him without injunctive relief. Plaintiffs' Compl. ¶ 20. Similarly, as of October 1, 2020, Plaintiff Patrick Berry is living in an apartment, so he will not face any resulting harm if injunctive relief is denied.[3] *Id.* at ¶ 37. Moreover, Plaintiffs Henrietta Brown, Nadine Little, and Virginia Roy are staying in hotels, so they will not suffer any resulting harm if Plaintiffs' motion for injunctive relief is denied.[4] *Id.* at ¶¶ 54, 64.

Only Plaintiffs Joel Westvig and Emmett Williams are still living in park encampments. *Id.* at ¶¶ 89, 108-09. Both allege there is no available shelter space, but that is not the case. Topinka Declaration, ¶¶ 9, 12.  *See also* Declaration of Hewitt filed on behalf of Hennepin County. Plaintiffs Westvig and Williams are likely to suffer worse harm if they are permitted to continue to camp in Minneapolis parks during the winter months.

In addition, courts have consistently held that Minnesota Statute § 466.02, which permits recovery for property loss due to municipal agents, is an adequate remedy that bars constitutional claims. *Hubenthal v. Winona County*, 751 F.2d 243, 246 (8th Cir. 1984)

---

[3] Plaintiffs' complaint does not allege that ZACAH will suffer harm resulting from the court's denial of its motion for injunctive relief. Plaintiffs' Compl. ¶¶ 4-11.

[4] Note that Plaintiffs' complaint alleges that occupants of the Brackett Park encampment were evicted by the MPRB, but that is false—encampment occupants disbanded that encampment on their own. *See* Ohotto's Declaration ¶ 24(k); *contra* Plaintiffs' Compl. ¶¶ 73-76.

(holding Section 466.02 to be an adequate remedy for loss of property); *Burns v. Office of Attorney General*, 2009 WL 825778, at \*20 (D. Minn. Mar. 27, 2009) (Fourth Amendment claim for loss of and damage to property during inventory search barred by Section 466.02); *McKinney v. Minnesota*, 2008 WL 4831762, at \*4 (D. Minn. Nov. 3, 2008) (claim for damage to residence during execution of search warrant barred by Section 466.02); *Randle v. City of Minneapolis*, 2007 WL 2580568, at \*7 (D. Minn. Sept. 5, 2007) (dismissing claim for damage to and loss of property during execution of warrant due to plaintiff's failure to pursue relief under Section 466.02); *Giddens v. Porras*, 2006 WL 2502261, at \*7 (D. Minn. Aug. 29, 2006) (dismissing claim for loss of property, namely killing of pet, during execution of search warrant for failure to pursue relief under Section 466.02). Accordingly, as for the alleged loss of their property, Plaintiffs have an adequate remedy at law—they can sue Defendants for damages.  Therefore, a TRO is not appropriate for Claims 1-3 and 5.

## IV. PLAINTIFFS ARE NOT ENTITLED TO A TEMPORARY INJUNCTION BARRING THEIR REMOVAL FROM PUBLIC LANDS IN HENNEPIN COUNTY.

### A. Plaintiffs are not reasonably likely to succeed on the merits of their claim that they have a constitutional right to establish a "home" on public land.

#### 1. The Park Board provides adequate due process to persons before removing encampments and disposing of abandoned property.

The Fourth Amendment, applicable to the states via the Fourteenth Amendment, requires that any seizure of property be conducted reasonably. U.S. Const. amend. IV. A seizure is a "meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook Cty.*, 506 U.S. 56, 71 (1992). The seizure of abandoned property

16

does not implicate the Fourth Amendment. *See Abel v. United States*, 362 U.S. 217, 241 (1960) (holding that there was no Fourth Amendment violation from the warrantless seizure of abandoned items found in a hotel room trashcan); *accord Phillips v. City of Cincinnati*, No. 1:18-CV-541, 2020 WL 4698800, at *20 (S.D. Ohio Aug. 13, 2020).

The reasonableness of a seizure depends on the context. *New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985). To determine reasonableness, the court must balance both the private and governmental interests. *Soldal*, at 71. Here, any seizure related to the Park Board's disbandment of a park encampment was reasonable, because encampment occupants and permit holders were given notice of planned removal efforts usually forty-eight hours[5] or more prior to any seizures of personal property and procedural safeguards were established to protect against property loss. Ohotto Declaration, ¶ 19.

### 2. Plaintiffs do not have a privacy right to establish a "home" on public land.

Minnesota law prohibits acquiring title to public land by adverse possession. Minn. Stat. § 541.01; *accord Heuer v. Cty. of Aitkin*, 645 N.W.2d 753, 757 (Minn. Ct. App. 2002) (holding that the statute prohibited acquisition by adverse possession or prescriptive easement).

Plaintiffs assert that they would rather camp outside than transition to a shelter ("[the right to privacy] protects their decision as to where they safely sleep." Plaintiffs' brief, p. 18. This is, of course, patently ridiculous. Under Plaintiffs' theory, if they wanted to

---

[5] Kenwood encampment was removed 24 hours after notice was given. Ohotto Declaration, ¶ 17.

establish their "home" in a federal courthouse or the White House, they have a constitutional right to do so and that the government must show a compelling state interest to bar them.  Perhaps that is why they cite no case law to support their theory.

### 3.  Plaintiffs are unlikely to succeed on the merits of their claim that Defendants "create danger" by removing encampments.

Under the state-created danger theory, the plaintiff must prove (1) that he was a member of a limited, precisely definable group; (2) that the state actor's conduct put him at a significant risk of serious, immediate, and proximate harm; (3) that the risk was obvious or known to the state actor; (4) that the state actor acted recklessly in conscious disregard of the risk; and (5) that in total, the state actor's conduct shocks the conscience. *Montgomery v. City of Ames*, 749 F.3d 689, 694 (8th Cir. 2014), *citing DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989).  To shock the conscience,

> an official's action must either be motivated by an intent to harm or, where deliberation is practical, demonstrate deliberate indifference.  Deliberate indifference requires both that the official 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists' and that official actually draw the inference.

*Montgomery* at 695.

Plaintiffs make generalized claims that they will be placed at significant risk of serious, immediate and proximate harm by being evicted from public land, but they cannot succeed on the merits of this claim.  Indeed, five of the seven Plaintiffs are currently sheltered from the weather in vans, apartments or hotels. Only two are currently housed in parks.  To say that they will be placed at significant risk of serious, immediate

and proximate harm if they are required to leave those parks is disingenuous.[6]   Moreover, requiring persons to vacate encampments that have become violent and public health hazards does not "demonstrate deliberate indifference."  Rather, the removal of encampments has been done in a safe and methodical manner to protect those in the encampments as well as the public.  Plaintiffs cannot succeed on the merits of their "state created danger" claim and therefore, a TRO should not issue.

**B.   Plaintiffs cannot show that there is a threat of irreparable harm to them if the TRO does not issue.**

As discussed above, five of the seven Plaintiffs have already transitioned to shelter outside of the elements. Only two remain in parks.  Should the Park Board determine that those encampments should be removed, they will do so in the same manner as they have with the other encampment: making a determination that the encampments have become health and safety risks to the campers and the public and that there is adequate shelter elsewhere.  Notice will be provided, as will outreach services.  *See*, Ohotto Declaration, ¶ 19; Wiseman Declaration ¶ 3, 4.

Moreover, as discussed at length in the Topinka Declaration, a broad coalition of government agencies, nonprofit and philanthropic partners are currently operating the largest and safest emergency shelter system that has ever existed in Hennepin County as a response to the COVID-19 pandemic. These collective efforts have thus far allowed us to

---

[6] As the Court is no doubt aware, the Twin Cities received a record snow fall on October 20, 2020.  Certainly, a person who is housed indoors is far more protected from the elements that one in a tent who risks having their tent collapse under the weight of the early snow and, worse, hypothermia or death.

avoid the devastating impacts COVID-19 has had on people experiencing homelessness in other cities.  (Topinka Decl. at ¶ 4.)  Moreover, shelter space is available and the coalition is working towards continuing to provide shelter for the homeless.  *See generally,* Topinka Declaration.  Not only is there no threat of irreparable harm to the two remaining Plaintiffs who reside in parks if the TRO does not issue, finding shelter from the elements for them with the assistance of the all of the partners working to house persons will have a positive effect on the currently homeless.

**C.    The balance of harm and the public interest weighs in favor of the public.**

Plaintiffs assert that the balance of harm weighs in their favor because "it is indisputable that any amorphous claims of health and safety concerns by Defendants or an interest in clean public spaces is vastly outweighed by Plaintiffs' interest in maintaining their home."  (Plaintiffs' brief, p. 27).

Defendants claims of health and safety concerns are not "amorphous."  As is set forth in the Declarations of Alfred Bangoura and Jason Ohotto, the encampments had become magnets for significant crime and sites containing human feces and used needles. The health and safety concerns that lead to the disbandment of the encampments instead weigh in the favor of the public, who have a right to expect clean and safe parks that they can use for recreational purposes.  Bangoura Declaration ¶¶ 14, 16; Ohotto Declaration ¶¶ 10, 11.

The balance of harms and the public interest weigh against Plaintiffs and therefore, the TRO should not issue.

Because the *Dataphase* factors weigh against Plaintiffs, they are not entitled to a TRO entitling them camp on public land.

## IV. This Court Should Reject Plaintiffs' Request to Create a Right to Establish Residence on Any Public Green Space in Hennepin County.

As discussed above, Plaintiffs have no legal right to establish residence in public parks. Nevertheless, Plaintiffs ask this Court to enjoin Defendants from clearing or demobilizing encampments of homeless individuals living in "public parks and other publicly-owned green space within Hennepin County." (Plaintiffs' Proposed Order.)

Plaintiffs' requested injunction would effectively enable individuals to establish residence on any public green space in Hennepin County. In addition to lacking any basis in law, such an order would contradict the guidance provided by Governor Walz. Governor Walz recognized that local governments may need to restrict, limit or close encampment spaces "if an encampment has reached a size or status that is a documented threat to the health, safety, or security of residents." (Declaration of Clare Diegel (Doc. 6), Ex. 3 (Emergency Executive Order 20-47).) Plaintiffs ask this Court to ignore state and local authorities' real public health and safety concerns and creates federal rights where none exist. As is detailed above, the City and its governmental partners are engaged in extensive efforts to provide all individuals with safe housing, especially as winter weather arrives. Plaintiffs' requested relief would in fact work against these efforts by keeping individuals in unsafe living conditions with the accompanying public health and safety concerns especially given the fact that winter in Minnesota arrived.

## <u>CONCLUSION</u>

Winter has arrived early in Minnesota. It defies common sense and the law to order that homeless persons have a constitutionally protected right to occupy Park Board, and public land in freezing winter conditions.  The Defendants in this case have all worked hard and are continuing to work diligently to help people experiencing homelessness.  An order granting the relief the Plaintiffs seek will not assist those persons and is not consistent with the law.

For all of the above-mentioned reasons, Defendants request that the court deny Plaintiffs' motion for a temporary restraining order or preliminary injunction.


Date:  October 21, 2020                    RICE, WALTHER & MOSLEY, LLP

                                           s/ *Ann E. Walther*
                                           Ann E. Walther (# 21369X)
                                           Brian F. Rice (# 14468X)
                                           Alana M. Mosley (#400188)
                                           10 Second Street Northeast, Suite 206
                                           Minneapolis, Minnesota 55413
                                           (612) 676-2300

                                           ***Attorneys for Defendants Al Bangoura,
                                           Jason Ohotto and the Minneapolis Park
                                           and Recreation Board***

Dated: <u>October 21, 2020</u>                                       JAMES R. ROWADER, JR.
City Attorney
By

*/s/ Sarah McLaren*
SARAH McLAREN (#0345878)
Assistant City Attorney
Minneapolis City Attorney's Office
350 S. Fifth Street, Room 210
Minneapolis, MN  55415
(612) 673-2183
sarah.mclaren@minneapolismn.gov

***Attorneys for Defendants City of
Minneapolis, Mayor Jacob Frey, and
Chief of Police Medaria Arradondo***