UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Patrick Berry, Henrietta Brown,
Nadine Little, Dennis Barrow, Virginia Roy,
Joel Westvig, Emmett Williams, *on behalf of
themselves and a class of similarly-situated
individuals;* and ZACAH,

     Plaintiffs,

v.

Hennepin County; Hennepin County Sheriff
David Hutchinson, *in his individual and official
Capacity*; City of Minneapolis; Minneapolis Mayor
Jacob Frey, *in his individual and official capacity;*
Minneapolis Chief of Police Medaria Arradondo,
*in his individual and official capacity;* Superintendent
Al Bangoura, *in his individual and official capacity*;
Park Police Chief at the Minneapolis Park and
Recreation Board Jason Ohotto, *in his individual and official capacity;*
Police Officers John Does; and Police Officers
Jane Does,
     Defendants.

Civil File No. 20-cv-02189 WMW/KMM

**DECLARATION OF ALFRED
BANGOURA IN OPPOSITION TO
MOTION FOR A TEMPORARY
RESTRAINING ORDER**

Your Declarant, Albert Bangoura, states and affirms as follows :

 1. I am employed by the Minneapolis Park and Recreation Board (MPRB) as its

Superintendent. I was appointed to this office by the Board of Park Commissioners in

January 2019. I report to the Park Board and act as the chief executive of the

organization.

 2. Attached hereto as Exhibit A is a true and correct copy of Governor Walz's

Executive Order 2020-55 dealing with protecting the rights of at-risk populations during the Covid-19 peacetime emergency.

3.   Attached hereto as Exhibit B is the draft State of Minnesota's Guidance Related to Homeless Encampments dated June 26, 2020.

4.   I have carefully reviewed and relied upon Exhibits A and B throughout the last several months as I have dealt with homeless encampments in Minneapolis parks.

5.   Attached hereto as Exhibit C is the Minneapolis Park and Recreation Board Resolution 2020-253 relating to the MPRB's commitment to provide refuge space in Minneapolis parks.

6.   Attached as Exhibit D to this affidavit is the Minneapolis Park and Recreation Board Resolution 2020-267 amending Resolution 2020-253 to limit the total number of temporary encampments in Minneapolis parks to support health and safety of persons in the encampments and to provide access of the public to the parks.

7.   I have carefully reviewed and adhered to exhibits C and D while dealing with the issues that have arisen relating to encampments in Minneapolis parks.

8.   I have worked for Minneapolis Park and Recreation for almost 22 years in several leadership roles such as Recreation Center Director, Community Service Area Lead and Director of Recreation Centers and Programs.   Prior to my appointment  as the Superintendent of the Minneapolis parks system, I was the Superintendent of Recreation Programs in Mecklenburg County, North Carolina.

9.   Since March 2020, I have spent a significant portion of my working days addressing the Covid-19 crisis.  From early June through the present, the homeless issues

2

in the City of Minneapolis and Hennepin County consumed the majority of my time. Homelessness is not a specialty of my profession and I have had no prior experience in dealing with these issues during the time of a global pandemic.

10. In early June after Governor Walz issued Executive Order 20-55 we started to see a number of people entering the Minneapolis parks. MPRB Ordinance 2-33 does not allow people to permanently reside in parks as no person can be in the parks between 10 p.m. until 6 a.m. without a permit. On June 10, 2020 a number of people began moving into Powderhorn Park to establish a camp. In discussion with Minneapolis Park Police Chief Jason Ohotto we made the determination to advise people that they could not permanently stay in the park. On June 12, 2020, a 72 hour vacate notice was served. On that same day, I received a call from Erik Grumdahl, Deputy Director of MN State Interagency Council on Homelessness advising me that under Executive Order 20-55 the Park Board could not prevent homeless people from residing in parks. Based upon this advice we rescinded the 72 hour notice.

11. Subsequently on June 17, 2020, the Board of Park Commissioners enacted Resolution 2020-253, which decreed that parks could be used as refuge space for homeless individuals. That action led to a huge influx of people moving into the Minneapolis park system, including upon information and belief, homeless persons who did not previously reside in Minneapolis.

12. On June 26th and 27th 2020 I attended zoom calls with City, County, and State decisionmakers in a meeting entitled "Homelessness Response - Multi-Jurisdictional Meeting". Notable attendees were: Governor Walz, Lieutenant Governor Flannigan,

Commissioner of Housing Jennifer Ho, Mayor of Minneapolis Jacob Frey, and various other state and city level elected officials, as well as several members of my team. On the June 27th meeting, members representing the MPRB were told by Commissioner Ho, that we had sufficient authority to disband encampments and that Executive Order 20-55 was interpreted by the park board in a correct manner prior to June 12th. The difference in interpretation guidance between Grumdahl and Ho was characterized as a "misunderstanding." The two weeks in which we were precluded from taking any action were a critical time, as encampments had grown significantly. By the time the resolution had passed, and the encampments had already grown across the system. At all times I followed what was told to me by the state about the executive orders.

13. By late June and early July there were over 40 homeless encampments in the Minneapolis park system, ranging from 1-2 tents to well over 300 tents in Powderhorn Park.

14. The Powderhorn Park encampment consisted of two distinct areas--Powderhorn East and Powderhorn West. Each had well over 100 tents. The situation at Powderhorn Park became very dangerous almost immediately. There was an attempt by the Minneapolis Park and Recreation Board at the July 1, 2020 meeting to limit the number of encampments throughout the park system to 10 parks with 10 tents allowed in each designated park. That effort failed. However, problems developing in the parks as a result of people moving into them grew exponentially. On July 15, 2020 at its next meeting, the Minneapolis Park Board enacted Resolution 2020-267 (Exhibit D), which placed a limit of no more than 20 parks that could be refuge sites. Each refuge site could host one

or more encampments with no more than 25 people at each encampment. Encampments

could not be in more than 10 % of the usable area within any one park (refuge site) and

could not be in or near a school safety zone. It required a permit for each encampment

location. This resolution passed unanimously.

15. Since that date I have spent a majority of my time attempting to manage as many

as 40 encampments in the park system totaling well over 400 tents dealing with literally

hundreds of people. This has required that I work with public servants at the city, county

and state level, nonprofit entities and volunteers to provide services to people who have

been living in the parks under both Governor Walz's Executive 20-55 and the

Minneapolis Park Board Resolution 2020-267. Current Park Board Ordinances prohibit

staying overnight in a park , however, because of the passage of Resolution 2020-267

they are permitted to stay overnight in the parks, given the encampments conform with

the guidelines in the resolution, with the permission of the Board of Commissioners and a

permit approved by me. It has been my duty to adhere to Governor Walz's Executive

Order and follow the Park Board resolutions. I have issued a number of permits to

persons seeking to have an authorized encampment. I have also had the authority to

decide if an encampment has become too dangerous to remain as outlined in resolution

2020-267, given the guidelines set forth by the Governor's Office.

16. The encampment at Powderhorn Park was clearly a dangerous situation with

constant 911 calls from the surrounding community, documented use of hypodermic

needles, and discarded needles which exposed people and pets to danger. There were

multiple reports of domestic disputes and fights and documented sexual assaults and

shootings. There were many late-night disturbances. Unsafe and unsanitary conditions existed within Powderhorn park. There were multiple pleas from the residents, City Council members and other elected officials on the need to take action at Powderhorn Park. In fact, many residents from the Powderhorn Park neighborhood who supported the initial Park Board refuge resolution came forth at subsequent Park Board meetings to ask that the encampments end. The MPRB was sued by an adjacent property owner who asserted that the conditions at Powderhorn amounted to a public and private nuisance. Given the severity of the situation at Powderhorn, I issued a directive to remove the encampment at East Powderhorn.

17. Subsequently, I issued directives to remove encampments that were a threat to public health and safety, were in school safe zones and where there was adequate housing available to persons who needed a home or could be moved to permitted locations. I remained in constant communication with Don Ryan from Hennepin County, who is a leading expert on homelessness. I also remained in constant communication with a team from the city of Minneapolis lead by Peter Ebnet from Mayor Frey's office, and City of Minneapolis Health Department officials. At all times I tried to understand what housing was available to person in need of homes. I never gave a direction to close an encampment when there was not adequate housing available or where a permitted location was not available.

18. In each of these cases in order to justify physical removal of an encampment it had to be shown to me that there were public health and safety issues at the encampments, or that the encampments did not comply with the terms of Resolution 2020-267. The Park

Board gave me authority to take certain action, as did Governor Walz's Executive Order 20-55.

19. In each case I asked Park Police Chief Jason Ohotto or my staff members to document the public health and safety concerns at each encampment location. I would individually look at each of these circumstances and try to assess the situation and determine whether or not the encampment could stay and be compatible with park use or whether the encampment had created such a safety hazard to the individuals in the camp and/or surrounding residents that it required removal. There were occasions where encampment removal was required by the Park Police Department, with assistance from the Hennepin County Sheriff's office and the Minneapolis Police Department. They were at both Powderhorn East and Powderhorn West, Kenwood and Peavey Park.

20. As the summer progressed, I directed the Community Outreach team to coordinate the permit process and address the needs of the homeless people living in the parks. Director Cordell Wiseman lead this effort with a team consisting of several park employees. This group of employees would visit the encampments regularly and get to know the residents of the encampment and persons who were assisting those living at the encampments. The purpose of this Community Outreach team was to establish some form of communication with people residing in the encampments and to inventory the number of tents in the park on a twice weekly basis. Communication would occur either written or verbally with residents of the parks on a regular basis. Cordell Wiseman was a key part of our team. Mr. Wiseman dealt with several situations where people in the encampments sought to have disruptive and even violent people individually removed

7

from the encampment.  Mr. Wiseman would help make that happen through negotiation

or police presence if necessary.

21. Assistant Superintendent of Environmental Operations, Jeremy Barrick was also a

key member of my team. Mr. Barrick oversees a very large group of park board

employees who mow the grass, trim trees, remove trash and maintain the parks.  In

essence, Mr. Barrick is responsible for the physical care of parks, park playgrounds,

fields, trees, and facilities. The MPRB decided to provide persons encamped in the parks

with porta potties and handwashing stations to improve sanitation.  The MPRB also

opened certain  permanent restroom facilities to persons camping in the parks.  This

decision was difficult.  During a pandemic and a highly transmittal disease, as Park

Superintendent I needed to take into consideration the health and safety of hundreds of

park board employees who are being asked to assist the homeless.

22. Mr. Barrick and his staff provided porta-potties, portable handwashing stations,

trash removal and other sanitary measures for each large encampment. Park Board staff

were engaged to clean up the parks in general and instructed to pay special attention to

the encampment areas. The presence of campers brought a large amount of trash, some

exposure to human excrement and urine, mattresses, tents, food preparation equipment,

food of all types, plastic bottles, and other general living supplies. Mr. Barrick and his

staff worked to keep the encampments as sanitary as possible. We also worked with Jolyn

Crum, who is the MPRB's Risk and Safety Administrator. Ms. Crum advised Mr. Barrick

and his staff as to potential risks to MRPB employees when dealing with refuse from

encampment residents on a regular basis. As I said, none of our Park Board employees

have been trained to deal with encampments as the Park Board has not allowed for decades, if not longer, encampments in the parks.

23. I also worked with Peter Ebnet from Mayor Frey's office, Gretchen Musicant from the Minneapolis Public Health Department, Don Ryan from Hennepin County's Homeless Prevention office, representatives from Governor Walz's office including Kathleen tenBroeke from the Minnesota State Interagency Council on Homelessness. I remain in regular communication with each of these people about the continuing homelessness situation in the Minneapolis park system.

24. Prior to taking any action to remove homeless people from parks due to health and safety concerns I would contact Mr. Ryan from Hennepin County to check that there were adequate spaces where homeless individuals could move into. At no time were any encampment removal actions taken when there was not available space and accommodations for individuals experiencing homelessness. I did this pursuant to Governor Walz's Executive Order 20-55 which required that prior to the disbandment of any encampment it had to be documented that there were encampment removal orders.

25. In each of these cases, prior to signing the order for encampment removal, I checked with Chief Ohotto and he documented public safety concerns which required encampment removal, or if the encampments encroached on school safety zones.

26. In all matters I was carrying out the directive of Park Board Resolution 2020-267. I made sure my actions and the actions of the Park Board would be consistent with Governor Walz's Executive Order 20-55.

27. Under Resolution 2020-267, the Park Board gave me the authority to grant permits

9

in up to 20 parks for encampments with up to 25 tents in each encampment. Working with our community engagement team we have secured at least one application for each park that received a temporary encampment permit. Our permit application process is new. To date we have authorized 15 encampments through the temporary encampment permit process and one additional temporary encampment was issued pursuant to Resolution 2020-299 for Brackett Park.  Ms. Jennifer Ringold, the Deputy Superintendent, has been charged with handling the application and approval process under my direction.

28. I have found that these permits for encampments have brought some order to the situation in our parks. Particularly I would note that the Park Board gave special exemption from Resolution 2020-267 to allow a permit for an encampment at Brackett Park pursuant to Resolution 2020-299. The organizers of that park encampment requested and were granted approval by the Park Commissioners to permit me to give a special permit for an encampment through October 1, 2020. This encampment was voluntarily disbanded on that day pursuant to the terms of the permit granted by the Park Board. Throughout the Brackett Park encampment matter we worked to ensure that personal property was respected, that there were clear boundaries for the encampment and that the encampment complied with Park Board requirements.

29. Likewise, we did the same with the permit that was issued for  Logan Park. That encampment disbanded on October 14, 2020 pursuant to the terms of the permit granted and homes were provided for individuals as best as possible working with nonprofit entities.

30. We continue to work with other groups that have had encampments. We are down from about 40 encampments to about nine encampments. Each day we are working with other entities to find alternative living locations for these campers.

31. The Minneapolis Park System consists of nearly 7,000 acres of park land and open space. In addition, we run 180 parks in and adjacent to the City of Minneapolis. Prior to this pandemic we have had no expertise dealing with large encampments. Even with our efforts over the last five months we are not up to the task of managing as the host to these encampments, particularly as winter is coming. The Park Board has no expertise to deal with the mental and physical health of homeless persons. We do not fully understand requirements of homeless encampments. We do know already that fires have broken out at encampments. We have seen three people die in our parks at encampments this year and numerous sexual and physical assaults and drug overdoses. None of these occurrences are commonly happening in our parks.

32. The Minneapolis park system has over 20 million visits a year in the regional and neighborhood park system. Parks are designed to be the place of leisure, recreation and restoration for the urban population. Minneapolis has been recognized as the best urban park system in America in seven of the last ten years. There is good reason for this. The Minneapolis park system is an expert at maintaining urban public landscapes, mowing grass, cutting trees, providing recreation opportunities for people young and old and creating a safe environment where people can enjoy the outdoors and seek respite from their daily concerns. Providing homeless encampments is not part of the mission or charter of the Minneapolis park and recreation system. It is not funded to house people in

the park system, and we are not capable of meeting their basic needs.

33. I also recognize we are in extraordinary times due to the pandemic but we are working through those issues in the context of Governor Walz's executive orders and the limited action that the Park Board has passed under Resolution 2020-267 to deal with that situation.

34. Minneapolis Parks are public spaces and we are familiar operating in those spaces under state and local laws as well as the constitutional requirements of the Minnesota and United States Constitutions on issues like free speech and assembly. To my knowledge, as a park and recreation professional, the parks have never been declared to be a home for any one person. They have always been a park and recreation resource for every person. As park professional I have been taught that it is my job to make these parks accessible to all people and to not limit the access to these parks in any permanent way.

35. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed pursuant to 28 U.S.C. § 1746 on today's date, October 21, 2020.

s/Alfred Bangoura

# Exhibit A

# STATE OF MINNESOTA
## Executive Department



# Governor Tim Walz

### Emergency Executive Order 20-55

### Protecting the Rights and Health of At-Risk Populations during the COVID-19 Peacetime Emergency

**I, Tim Walz, Governor of the State of Minnesota,** by the authority vested in me by the Constitution and applicable statutes, issue the following Executive Order:

The COVID-19 pandemic presents an unprecedented challenge to our State. Minnesota has taken proactive steps to ensure that we are ahead of the curve on COVID-19 prevention and response. On March 13, 2020, I issued Executive Order 20-01 and declared a peacetime emergency because this pandemic, an act of nature, threatens the lives of Minnesotans, and local resources are inadequate to address the threat. In Executive Order 20-01, I directed all state agencies to submit proposed orders and rules to protect and preserve public health and safety. After notifying the Legislature, on April 13, 2020 and again on May 13, 2020, I issued Executive Orders extending the peacetime emergency declared in Executive Order 20-01.

As businesses reopen and some restrictions on movement have been relaxed, we must continue efforts to contain the spread of COVID-19 and to protect the most vulnerable Minnesotans, including the nearly 10,000 Minnesotans experiencing homelessness who are living outside or in a temporary shelter, the over 110,000 Minnesotans living in or receiving services from residential settings, the 778,000 Minnesotans under age 65 with an underlying health condition, and the 888,000 Minnesotans who are over age 65. Many Minnesotans at risk of serious illness due to COVID-19, including older adults and people with disabilities, whether they live in their own homes, a shelter, outdoors, in long-term care facilities, treatment centers, or a temporary location due to a COVID-19 infection, are in need of protections to support their health and safety during the COVID-19 pandemic.

We recognize that our communities of color and indigenous communities are disproportionately represented among populations with underlying conditions and co-morbidities that increase the risk of becoming severely ill if they contract COVID-19. These communities also make up a large percentage of the direct service caregivers working on the frontlines of this pandemic, and because of their interactions through their work, have increased chances to encounter and contract COVID-19. Taking action to protect vulnerable populations will help ensure we do not exacerbate these disparities.

Individuals experiencing homelessness face unique hurdles given the health and safety risks posed by COVID-19. All Minnesotans need safe and sanitary places to reside, to protect their own health and the health of those around them, and if they become sick, to obtain needed care and to recover. In particular, finding a safe and comfortable space to isolate when sick with COVID-19 is especially difficult for individuals experiencing homelessness and for those who cannot live in their own home. As a matter of public health and safety, it is important to provide assistance when possible to isolate these individuals.

Another subset of vulnerable Minnesotans are those losing essential community support or being transferred or displaced from their homes due to COVID-19. There is significant risk of hardship to individuals taken out of assisted living and placed in a new location that does not have necessary supports. Protections and guidelines are needed to provide assistance to government entities when evacuation of an individual who tested positive for COVID-19 is required.

Finally, vulnerable Minnesotans need to be able to protect themselves when they are engaged in activities of daily living. Like everyone, at-risk persons need to acquire groceries and other vital supplies and may require repairs or other services that cause workers to enter their living space. Being in close proximity to other individuals increases the chances of contracting COVID-19 and it is helpful to reduce instances of interaction and to take other mitigating steps to reduce the spread of COVID-19 to at-risk persons. Similarly, it is vital for at-risk persons to have access to personal protective equipment ("PPE") and other supplies and to be made aware if a personal care assistant is no longer available to work with them.

In Minnesota Statutes 2019, section 12.02, subdivision 1, the Minnesota Legislature recognized the "existing and increasing possibility of the occurrence of natural and other disasters of major size and destructiveness" and conferred upon the Governor the emergency and disaster powers provided in Chapter 12 to "ensure the preparations of this state will be adequate to deal with disasters," to "generally protect the public peace, health, and safety," and to "preserve the lives and property of the people of the state." Pursuant to Minnesota Statutes 2019, section 12.21, subdivision 1, the Governor has general authority to control the State's emergency management as well as carry out the provisions of Minnesota's Emergency Management Act. Pursuant to subdivision 3 of that same section, the Governor may "make, amend, and rescind the necessary orders and rules to carry out the provisions" of Minnesota Statutes 2019, Chapter 12. When approved by the Executive Council and filed in the Office of the Secretary of State, such orders and rules have the force and effect of law during the pendency of a peacetime emergency. Any inconsistent rules or ordinances of any agency or political subdivision of the state are suspended during the pendency of the emergency.

For these reasons, I order as follows:

1. **At-risk persons strongly urged to stay at home.** Beginning on Sunday, May 17, 2020 at 11:59 pm and continuing for the duration of the peacetime emergency declared in Executive Order 20-01 or until this Executive Order is rescinded, all at-risk persons currently living within the State of Minnesota are strongly urged to stay at home or in their place of residence except to engage in necessary activities for health and wellbeing (including, but not limited to, visiting medical professionals, picking up prescriptions and other medical equipment, grocery shopping, outdoor

exercise, child care, caring for family members or pets) and work, if it is not possible to work from home. People who can work from home must do so.

2. **At-risk persons defined**. Consistent with guidance issued by the Centers for Disease Control and Prevention ("CDC"), "at-risk persons" include people who are:

   a. 65 years and older.

   b. Living in a nursing home or a long-term care facility, as defined by the Commissioner of Health.

   c. Any age with underlying medical conditions, particularly if not well controlled, including:

      i. People with chronic lung disease or moderate to severe asthma.

      ii. People who have serious heart conditions.

      iii. People who are immunocompromised (caused by cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, or prolonged use of corticosteroids and other immune weakening medications).

      iv. People with severe obesity (body mass index (BMI) of 40 or higher).

      v. People with diabetes.

      vi. People with chronic kidney disease undergoing dialysis.

      vii. People with liver disease.

3. **"Homes" and "residences" defined**. For purposes of this Executive Order, "homes" and "residences" include mobile homes, hotels, motels, shared rental units, shelters, and similar facilities, to the extent they are used for lodging.

4. **Homeless population**. All persons who, either chronically or temporarily, lack a permanent residence may move freely, including to receive supports and services, but are strongly urged to obtain shelter or other safe spaces. Governmental and other entities are strongly urged to make 24-hour shelter or other safe spaces available as soon as possible and to the maximum extent practicable, and to use COVID-19 risk mitigation practices recommended by the CDC and the Minnesota Department of Health ("MDH").

5. **Encampments**. Homeless encampments, including both new and existing encampments, should not be subject to sweeps or disbandment by state or local governments, as such sweeps or disbandments increase the potential risk and spread of COVID-19. Law enforcement is not prohibited from addressing trespassing or exigent circumstances (*i.e.,* those requiring immediate action to protect life, prevent

injury, or preserve evidence) that occur within encampments or among or including people staying outdoors. Law enforcement and other first responders should respond to trespassing and exigent circumstances as those situations require. If a local government entity is providing sufficient alternate housing, shelter, or encampment space that complies with the MDH guidance, *Homeless Services Settings: Interim Guidance for Providers,* and the CDC guidance, *Responding to COVID-19 Among People Experiencing Unsheltered Homelessness,* or if an encampment has reached a size or status that is a documented threat to the health, safety, or security of residents, state or local governments may restrict, limit, or close encampment spaces. I authorize the Commissioners of the Minnesota Housing Finance Agency and Human Services, as co-chairs of the Minnesota Interagency Council on Homelessness, to issue further guidance as needed to clarify this provision or further address the issue of homeless encampments.

6. **Protection and isolation spaces**. I order the Commissioners of Health, Human Services, and Public Safety to coordinate and issue guidance regarding the development and availability of increased protection and isolation spaces for at-risk populations and persons experiencing homelessness, including populations in or out of shelter, those experiencing homelessness due to being victims of crime, and individuals who do not need hospital-level care and do not have a home or other appropriate space where they can safely isolate.

7. **At-risk persons transferred or displaced**. I order the Commissioners of Human Services and Health to develop and implement guidelines to protect at-risk persons who are transferred or displaced from their home due to the state or local government's determination that the person requires a safer location to prevent future COVID-19 infections. The guidelines should provide special consideration for the needs of at-risk persons living with dementia, behavioral health conditions, substance use disorders, or any other condition or co-morbidity that increases the risk of non-COVID-19 harm, injury, or death as a result of transfer or displacement. The guidelines issued under this section should be consistent with Executive Order 20-14 and temporary waivers and program modifications implemented by the Commissioners of Human Services and Health, including those pursuant to Executive Orders 20-11 and 20-12.

8. **Unlicensed agency providers of services necessary for health and safety**. Beginning no later than May 18, 2020 at 5:00 pm, and continuing for the duration of the peacetime emergency declared in Executive Order 20-01 or until this Executive Order is rescinded, all unlicensed agency providers of services that are necessary for activities of daily living, as defined in Minnesota Statutes 2019, section 256B.0659 ("'activities of daily living' means grooming, dressing, bathing, transferring, mobility, positioning, eating, and toileting"), must provide notice to local county human services or tribal human services, to the managed care organization from which the provider agency has received payment, and to all persons they serve under Minnesota Statutes 2019, section 256B.0659, at least 72 hours prior to suspension or termination of services (*i.e.*, agency closure) if the closure is due to COVID-19. Agency providers retain their responsibilities as mandated reporters to the Minnesota

4

Adult Abuse Reporting Center. The Commissioner of Human Services may use the recipient protection provisions in Minnesota Statutes 2019, section 256B.0651, subdivision 17(b), to assist recipients and notify lead agencies.

9. **Accommodations for at-risk persons**. I order the Commissioner of Employment and Economic Development to issue such guidance as necessary for private and public businesses to provide accommodations to at-risk customers by adjusting times, services, and manner of delivering goods and services to minimize the risk of COVID-19 infection.

10. **Staffing, services, and PPE**. I order the Commissioners of Administration, Health, and Human Services to coordinate and provide proposals to support best-effort responses to allocate and distribute, as resources become available, appropriate staffing, services, and PPE to support at-risk and homeless populations and staff serving those populations in the following kinds of settings, where over 200,000 at-risk Minnesotans are living or receiving services: encampments, shelters, isolation settings, group homes, licensed residential settings for people with mental illness, licensed residential settings for people with substance use disorders, locations where personal care assistants provide services, affordable housing development, housing with services, boarding care, board and lodges, site-based supportive housing, skilled nursing facilities, child foster care (family and corporate), child residential facilities, and county and tribal child and adult protection.

Pursuant to Minnesota Statutes 2019, section 4.035, subdivision 2, and section 12.32, this Executive Order is effective immediately upon approval by the Executive Council. It remains in effect until the peacetime emergency declared in Executive Order 20-01 is terminated or until it is rescinded by proper authority.

A determination that any provision of this Executive Order is invalid will not affect the enforceability of any other provision of this Executive Order. Rather, the invalid provision will be modified to the extent necessary so that it is enforceable.

Signed on May 13, 2020.

**Tim Walz**
Governor

Filed According to Law:

**Steve Simon**
Secretary of State

5

Approved by the Executive Council on May 13, 2020:

**Alice Roberts-Davis**
Secretary, Executive Council

Filed May 13, 2020
Office of the Minnesota
Secretary of State,
Steve Simon

Exhibit B

**State of Minnesota Guidance Related to Homeless Encampments**

**June 26, 2020**

Emergency Executive Order 20-55 (EO 20-55), Protecting the Risk and Health of At-Risk Populations during the COVID-19 Peacetime Emergency, provided certain protections related to homeless encampments. Those protections recognized that sweeps or disbandments of homeless encampments increased the potential risk and spread of COVID-19. EO 20-55 also recognized that there are times when local governments may find it necessary to restrict, limit, or close encampment spaces in order to protect the health, safety or security of residents. EO 20-55 authorized the Commissioners of the Minnesota Housing Finance Agency and Human Services, as co-chairs of the Minnesota Interagency Council on Homelessness, to issue further guidance as needed to clarify the applicable provisions of EO 20-55 or to further address the issue of homeless encampments. Pursuant to EO 20-55, the Commissioners of Minnesota Housing and Human Services issue the following guidance.

EO 20-55 provides as follows:

5.　　**Encampments**. Homeless encampments, including both new and existing encampments, should not be subject to sweeps or disbandment by state or local governments, as such sweeps or disbandments increase the potential risk and spread of COVID-19. Law enforcement is not prohibited from addressing trespassing or exigent circumstances (i.e., those requiring immediate action to protect life, prevent injury, or preserve evidence) that occur within encampments or among or including people staying outdoors. Law enforcement and other first responders should respond to trespassing and exigent circumstances as those situations require. If a local government entity is providing sufficient alternate housing, shelter, or encampment space that complies with the MDH guidance, Homeless Services Settings: Interim Guidance for Providers, and the CDC guidance, Responding to COVID-19 Among People Experiencing Unsheltered Homelessness, or if an encampment has reached a size or status that is a documented threat to the health, safety, or security of residents, state or local governments may restrict, limit, or close encampment spaces. I authorize the Commissioners of the Minnesota Housing Finance Agency and Human Services, as co-chairs of the Minnesota Interagency Council on Homelessness, to issue further guidance as needed to clarify this provision or further address the issue of homeless encampments.

The general recommendation is that homeless encampments, including both new and existing encampments, should not be subject to sweeps or disbandment by state or local governments, as such sweeps or disbandments increase the potential risk and spread of COVID-19. This is in line with applicable CDC guidance, *Responding to COVID-19 Among People Experiencing Unsheltered Homelessness*. Sweeps and disbandment of encampments also disrupt connections between homeless individuals and service providers and should be undertaken as rarely as possible.

The state recognizes that there are times when a local government may find it necessary to restrict, limit, or close encampment spaces.  EO 20-55 allowed local governments to do so under certain circumstances.

- **Sufficient Alternate Housing, Shelter, or Encampment Space**.  If a local government entity is providing sufficient alternate housing, shelter or encampment space that complies with applicable MDH and CDC guidance, the local government may restrict, limit, or close encampment spaces.

Public health guidance related to sufficient housing, shelter or encampment spaces are available from the CDC and MDH.  If a local government is providing sufficient space for unsheltered populations that complies with that guidance, EO 20-55 permits the local government to restrict, limit or close unauthorized encampment spaces.

- **Documented Threat to Residents**.  If an encampment has reached a size or status that it is a documented threat to the health, safety, or security of residents, state or local governments may restrict, limit or close encampment spaces.

The local government must make a determination that either the size or status of an encampment is a threat to the health, safety, or security of residents and document that determination.  This is necessarily a case-by-case determination, and could include, but is not limited to factors such an encampment location in an inherently unsafe location, an inability of health and safety workers to access or serve encampments residents, or an encampment population density making it impossible to maintain safe distancing or other public health protections at a specific location. **As permitted by EO 20-55, a local government may use encampment size as a factor in determining whether to restrict, limit, or close an encampment**, to the extent that the size creates or contributes to a documented threat to the health, safety, and security of residents.  A local government may also establish a limit on the size of an encampment, regardless of its current size, if it makes a documented determination that an encampment above a certain size in a specific location is a threat to the health, safety, and security of residents.

If the conditions above are met, local government may facilitate movement to alternate available housing, shelter or encampment locations and if a local government makes a determination that it is appropriate to restrict, limit, or close encampment spaces, actions taken as a result should give due care to the health and safety of any homeless individuals being displaced.

The state does not expect to review or approve a local government's documented determination about actions related to encampments but may ask about documentation to help inform further refinement of this guidance. This guidance may be modified as necessary and updated versions of the guidance will be posted here [link to: http://www.mnhousing.gov/sites/np/covid-19].

Exhibit C



**Minneapolis**
**Park & Recreation Board**

## Resolution 2020-253

Resolution Declaring the Minneapolis Park & Recreation Board's Commitment to Provide Refuge Space to People Currently Experiencing Homelessness While Continuing to Work with the State, County, City, Non-Profit Organizations and Other Interested Parties to Identify Long Term Housing Solutions for People at the Powderhorn Encampment and Others Throughout the City

Whereas, the Minneapolis Park & Recreation Board (MPRB) is the steward of the Minneapolis Parks.

Whereas, the mission of the MPRB states that the MPRB exists to provide places and recreational opportunities for all people to gather, celebrate, contemplate, and engage in activities to promote health, well-being, community, and the environment;

Whereas, the city of Minneapolis has been experiencing unsheltered homelessness as a result of a variety of economic factors all during the time of a pandemic and at a time when the Governor of Minnesota has declared a public health emergency under powers granted to him under the laws of Minnesota;

Whereas, in recent days the Minneapolis park system has seen a tremendous influx of individuals without homes occupying nearly 200 tents in different parts of Powderhorn Park and other people without homes seeking space in other Minneapolis parks and at other locations throughout the city;

Whereas, Governor Walz pursuant to Executive Orders 20-33 and 20-55 has declared a peacetime emergency that prevents the removal of homeless people from locations except in certain specific cases subject to certain specific requirements;

Whereas, every effort should be made to address the health and basic human needs during the COVID-19 and economic crises and the MPRB has worked with a number of partners to develop a protocol to address homeless encampments in an appropriate manner in terms of social distancing, providing medical response to those who display symptoms, and providing for the hygienic, housing, and health needs of people in need;

Whereas, there are serious health and safety risks for those people staying within the encampments and those encampments frequently do not represent a dignified form of shelter, and those public health and safety concerns also extend to the community at large and to MPRB employees; and



**Minneapolis**
**Park & Recreation Board**

Whereas, the Minneapolis Park and Recreation Board seeks to be a partner with the city, county, state of Minnesota, health agencies, private nonprofit partners and other citizens who are seeking to aid those who are homeless and the MPRB has had a long-standing partnership with St. Stephens Human Services to address homelessness in our parks;

Whereas, while the MPRB is not equipped to support all the needs of our homeless citizens and the core mission of the MPRB is to provide parks and recreation to all citizens, the MPRB will continue to provide all possible support under the leadership of the Superintendent and within funding allocated by the Board for Homelessness Services;

Whereas, the MPRB is working with the City of Minneapolis Health Department experts to monitor and assess the public health conditions of encampments sites and will make changes as needed to ensure the health and safety of those experiencing homelessness in the context of mission of the MPRB;

Be It Resolved, that the MPRB is committed to providing people currently experiencing homelessness refuge space in Minneapolis parks;

Resolved, the MPRB will continue to work with agency partners to identify housing solutions for those individuals at Powderhorn Park encampment and throughout the city;

Resolved, that the Park Board will adhere to the encampment response protocol developed with agency partners (attached hereto) and to all applicable Executive Orders of Governor Walz and directs staff to make every effort to abide by those terms and to work with partners to provide humane care to people in parks;

Resolved, that the Park Board calls on the City, County, State, Federal Governments and Organizations that are raising funds on behalf of individuals at encampments to substantially increase funding to address the homeless crisis; and

Resolved that the President and Secretary of the Board are authorized to take all necessary administrative actions to implement this resolution.



**Minneapolis**
**Park & Recreation Board**

TO:            Minneapolis Park and Recreation Board

FROM:        Al Bangoura, Superintendent

DATE:         June 17, 2020

SUBJECT:     Resolution Declaring the Minneapolis Park & Recreation Board's Commitment to
              Provide Refuge Space to People Currently Experiencing Homelessness While Continuing
              to Work with the State, County, City, Non-Profit Organizations and Other Interested
              Parties to Identify Long Term Housing Solutions for People at the Powderhorn
              Encampment and Others Throughout the City

**BACKGROUND**

Resolution added at the request of President Cowgill.

**ATTACHMENTS:**

- Attachment A: cross-jurisdiction encampment response framework        (PDF)

Prepared By: Al Bangoura, Superintendent, Superintendent's Office
Review:
Jennifer Ringold         Skipped        06/18/2020 11:01 AM
Al Bangoura    Skipped        06/18/2020 11:01 AM
Minneapolis Park and Recreation Board        Pending        06/17/2020 5:00 PM

Exhibit D



**Minneapolis**
**Park & Recreation Board**

**Resolution 2020-267**

Resolution Amending Adopted Resolution 2020-253 to Limit the Total Number Parks Available for Temporary Encampments and Provide Direction for the Design and Facilitation of Temporary Encampments in Parks that Supports the Health and Safety of Individuals Experiencing Homelessness and Preserves Access to Recreation Features for Park Visitors

Whereas, The Minneapolis Park & Recreation Board (MPRB) is the steward of the Minneapolis Parks;

Whereas, The mission of the MPRB states that the MPRB exists to provide places and recreational opportunities for all people to gather, celebrate, contemplate, and engage in activities to promote health, well-being, community, and the environment;

Whereas, COVID-19 has created a health, economic and unemployment crisis that has resulted in an increase in the intensity and severity of homelessness;

Whereas, The MPRB recognizes that sheltering homeless people in Minneapolis parks is not a safe, proper or dignified form of housing and is, at best, a temporary solution for encampment individuals before cold weather arrives;

Whereas, The Board of Commissioners adopted Resolution 2020-253 during its regular meeting of June 17, 2020 to provide refuge for individuals experiencing homelessness and, now, seeks to provide guidelines upon its commitment to provide refuge as well as guidance on design and facilitation supporting health and safety, and formally request assistance from agencies and organizations that have clear and defined responsibility for addressing homelessness;

Whereas, Governor Walz pursuant to Executive Orders 20-33 and 20-55  declared a peacetime emergency that prevented the removal of homeless people from locations except in certain specific cases subject to certain specific requirements and, as part of a meeting conducted on June 27, 2020, the Executive Branch of the State of Minnesota clarified the directives of Executive Order 20-55  and the state provided subsequent explicit guidelines that local jurisdictions shall have the sole responsibility for determining the size of encampments allowed under Executive Order 20-55 and that limitations on encampment size, when documented by the local jurisdiction, would be considered aligned with Executive Order 20-55;

Whereas, Encampments allowed under Resolution 2020-253 have been established at 38 Minneapolis parks as of July 8, 2020, with 25 of those encampments having one to three tents,  and two large encampments at Powderhorn Park where the population of those persons who provided no permanent address and were deemed homeless was established at 282 occupants on July 9, 2020;

Whereas, City of Minneapolis Public Health Department and the Hennepin County Office to End Homelessness noted the size of the Powderhorn Park encampment and some newly emerging



**Minneapolis**
Park & Recreation Board

encampments at other parks are not consistent with the health guidance related to the COVID-19 pandemic and therefore fail to conform to best practices for public health and human safety;

Whereas, Staff of MPRB, City of Minneapolis, and Hennepin County have observed conditions of encampments, and based on observations of conditions of encampments and clarification of certain Executive Orders, the Superintendent and park staff believe it is necessary based on the public health and safety of camp residents and neighborhood residents to receive further guidance related Resolution 2020-253:

Whereas, The MPRB requires assistance from City, County and State agencies to serve the basic public and mental health needs and other necessary social service needs of encampment populations;

Whereas, The MPRB requires assistance from those City, County and State agencies to assure encampment occupants can be provided safe and dignified shelter or housing upon leaving an encampment in a Minneapolis park;

Whereas, The MPRB requires assistance from those City, County and State agencies to assist in a process of reducing the size of encampments as needed to ensure remaining occupants are afforded necessary, proper and sustainable public health services and human safety conditions;

Whereas, The MPRB recognizes, with gratitude, encampments in Minneapolis parks are being serviced in whole or in part, by non-profit entities and volunteers, and that the services offered by those non-profit entities and volunteers will be critical to the continued service to encampments in Minneapolis parks;

Whereas, The MPRB lacks the critical physical, financial and infrastructure resources necessary to serve occupants of encampments in parks with physical and mental health needs and other necessary social services associated with the unique populations of the encampments;

Whereas, The Board determines that establishing a limit on the number of encampments in Minneapolis parks is necessary to allow the MPRB and other providers to best deliver needed services to each encampment;

Whereas, Some Minneapolis parks are capable of accommodating more than a single encampment, but each such encampment is best organized according to guidance aligned with best practices for public health and human safety;

Whereas, MPRB staff have developed design criteria for encampments recognizing distancing requirements related to COVID-19 and access for emergency and service vehicles while not impeding use of recreational facilities by park visitors and are organizing this information in an Encampment Management Plan for Minneapolis parks;

Whereas, The MPRB recognizes that movements between encampments may best occur using volunteer resources guided by staff of various agencies;



**Minneapolis**
**Park & Recreation Board**

Whereas, The MPRB recognizes that while in effect Executive Orders 20-33 and 20-55 supersede Park Board Ordinance PB2-33 which does not allow a person to remain in any park between the hours of 12:00 midnight and 6:00 a.m., unless taking part in an activity conducted by, or pursuant to a permit issued by, the Park Board, and for some parks this restriction starts at 10 p.m.; and

Whereas, The Board of Commissioners understands that formal requests for assistance from the State of Minnesota, Hennepin County, and the City of Minneapolis may be submitted, and that staff is preparing such formal requests in alignment with a plan for managing encampments;

Resolved, That that Board of Commissioners amends adopted Resolution 2020-253 to require a temporary Encampment Permit for no more than 25 tents at a given site, and limits the number of Minneapolis parks with encampments to a quantity not greater than 20, and furthermore allowing for consolidation of encampment locations to accommodate existing encampment occupants;

Resolved, MPRB directs staff to analyze parks for their capacity to support encampments while preserving safe and comfortable access to recreation features for park visitors, and to conform to state law regarding the proximity of encampments to school safe zones and to not locate encampments near those school zones, and communicate publicly those parks so designated as capable of accommodating encampments (Refuge Sites);

Resolved, That the Board of Commissioners directs staff to prepare, execute and update as necessary an Encampment Management Plan for managing Refuge Sites and permitted encampments in Minneapolis parks supporting the health and safety of encampment occupants and access to recreation features for park visitors;

Resolved, The Board of Commissioners directs staff to implement design criteria for encampments that provides adequate distancing for COVID-19, access for emergency vehicles, and does not impede use of designated recreational facilities by park visitors consistent with the Encampment Management Plan through an Encampment Permit;

Resolved, The Board of Commissioners establishes that no more than 10% of usable (non-water or natural area) acreage of any designated Refuge Site can be allocated to use for encampments;

Resolved, That the Board of Commissioners directs staff to establish a temporary Encampment Permit by July 16, 2020, with terms and conditions relevant to oversight of an encampment, that can be issued to an individual volunteer, volunteers, non-profit corporation, legal entity, government or non-governmental partner or agency who agrees to be responsible for the day-to-day oversight and regulation of an encampment that includes up to 25 tents per permit based on a park capacity analysis and including tents dedicated to providing services and storage within the encampment;

Resolved, That any encampment that does not have a necessary permit pursuant to this resolution will be subject to removal from park property;

Resolved, That the Board of Commissioners establishes that there can be multiple encampments within a Refuge Site, but that the number of tents at any one Refuge Site or within a permitted encampment can only increase per guidance of the Encampment Management Plan;



**Minneapolis**
**Park & Recreation Board**

Resolved, That the Board of Commissioners directs staff to work with its agency partners and volunteers supporting encampments in Minneapolis parks to move encampment occupants to parks designated for encampments and, especially, to work with encampment volunteers to move people to parks designated for encampments as a means of deconcentrating large existing encampments;

Resolved, The Board of Commissioners sets the expectation that Park Board ordinances apply to encampments and requires as a condition of a permit that the permit holder(s) and encampment occupants reinforce Park Board ordinances within an encampment;

Resolved, That the Board of Commissioners directs staff to provide restrooms or portable toilets, hand washing stations (as vendor supplies allow), and trash/recycling containers to a permitted encampment within 48 hours of issuing an Encampment Permit, and will provide fencing as funding allows if requested by the permit holder;

Resolved, That the Board of Commissioners sets a goal of September 15, 2020 for staff to provide an update on progress toward moving encampment occupants into shelter and housing suitable for winter conditions;

Resolved, The Board of Commissioners requests that the State of Minnesota increase funds to address the homelessness crisis;

Resolved, That the Board of Commissioners directs staff to submit formal written requests to the State of Minnesota, Hennepin County, and the City of Minneapolis, as appropriate, for assistance in managing encampments and serving encampment occupants aligned with the Encampment Management Plan;

Resolved, Notwithstanding the foregoing if any condition under Executive Order 20-55 exists wherein the in the judgement of the Superintendent that there exists a documented threat to the to the health, safety, or security of residents the Superintendent may restrict, limit, or close encampments based on exigent circumstance; and

Resolved, That the President and Secretary of the Board are authorized to take all necessary administrative actions to implement this resolution.



**Minneapolis**
**Park & Recreation Board**

TO:            Minneapolis Park and Recreation Board

FROM:        Al Bangoura, Superintendent

DATE:         July 15, 2020

SUBJECT:     Resolution Amending Adopted Resolution 2020-253 to Limit the Total Number Parks
             Available for Temporary Encampments and Provide Direction for the Design and
             Facilitation of Temporary Encampments in Parks that Supports the Health and Safety of
             Individuals Experiencing Homelessness and Preserves Access to Recreation Features for
             Park Visitors

**BACKGROUND**

Resolution added at the request of President Cowgill.

Prepared By: Al Bangoura, Superintendent, Superintendent's Office
Review:
Jennifer Ringold          Skipped          07/10/2020 5:54 PM
Al Bangoura    Skipped          07/10/2020 5:56 PM
Minneapolis Park and Recreation Board          Pending          07/15/2020 5:00 PM