# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| PATRICK BERRY, HENRIETTA BROWN, NADINE LITTLE, DENNIS BARROW, VIRGINIA ROY, JOEL WESTVIG, EMMETT WILLIAMS, GINA MALLEK, DANIEL HUITING, *on behalf of themselves and a class of similarly-situated individuals*; and ZACAH, | Civil Action No**.** 20-cv-02189-WMW-LIB |
| Plaintiffs, | **CLASS ACTION AMENDED COMPLAINT** |
| vs. | |
| HENNEPIN COUNTY; HENNEPIN COUNTY SHERIFF DAVID HUTCHINSON, *in his individual and official capacity*; CITY OF MINNEAPOLIS; MINNEAPOLIS MAYOR JACOB FREY, *in his individual and official capacity*; MINNEAPOLIS CHIEF OF POLICE MEDARIA ARRADONDO, *in his individual and official capacity*; MINNEAPOLIS PARK AND RECREATION BOARD; SUPERINTENDENT OF THE MINNEAPOLIS PARK AND RECREATION BOARD AL BANGOURA, *in his individual and official capacity*; PARK POLICE CHIEF AT THE MINNEAPOLIS PARK AND RECREATION BOARD JASON OHOTTO, *in his individual and official capacity*; POLICE OFFICERS JOHN DOES; AND POLICE OFFICERS JANE DOES, | |
| Defendants. | |

Plaintiffs in this class action are people experiencing homelessness living in public parks in the City of Minneapolis ("City"). Plaintiffs bring this suit on behalf of themselves and similarly-situated individuals for declaratory and injunctive relief (preliminary and permanent thereafter) to enjoin the Defendants' pattern, practice, custom, and policy of conducting "sweeps" of encampments—groups of tents where homeless people live. Plaintiffs also seek damages, costs, and attorneys' fees.

These sweeps, conducted by Defendants, eject Plaintiffs from the public parks where they have been living, sometimes forcing them to move into crowded shelter spaces in spite of the severe public health danger posed by the COVID-19 pandemic. Oftentimes, these sweeps displace homeless people who have nowhere else to go due to the lack of affordable housing and adequate shelter space in Minneapolis and Hennepin County. In sweeping these encampments, Defendants' employees, including Defendant police officers, unlawfully seize and destroy personal property without adequate notice, just compensation, or other requisite procedural due process protections. These actions violate the Fourth and Fourteenth Amendments to the United States Constitution, as well as the Minnesota Constitution and common law.

## JURISDICTION

1.      Plaintiffs' claims arise under 42 U.S.C. § 1983, the Fourth and Fourteenth Amendment to the United States Constitution, as incorporated against the States, their agencies, and their municipal divisions through the Fourteenth Amendment.

2.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the United States Constitution and federal law.

2

3.      Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the state law and state constitutional claims because Plaintiffs' state claims are related to Plaintiffs' federal claims, arise out of a common nucleus of operative facts, and form part of the same case or controversy under Article III of the U.S. Constitution.

## PARTIES

### *Organizational Plaintiff*

#### ZACAH

4.      Zakat, Aid and Charity Assisting Humanity (ZACAH), is a private, non-profit organization staffed only by unpaid volunteers.  The entire board is comprised of full-time professionals in healthcare and education, and one student, all of whom dedicate their limited free time to ZACAH.

5.      ZACAH's mission is to provide financial assistance to residents of Minnesota on the verge of experiencing homelessness.  ZACAH seeks to help people transition from a state of vulnerability and get them on a path of sustainability.  ZACAH was not established, nor is it sustained, to assist people experiencing chronic homelessness.

6.      ZACAH fulfills its mission by providing funds for rent, utilities, car payments, childcare and other vital needs to keep people from becoming homeless. Approximately 95% of ZACAH's budget prior to March of 2020 was spent on this part of ZACAH's mission.  The remaining 5% of ZACAH's budget was allocated to operating a transitional home to serve women waiting for permanent housing.

7.     Defendants' displacement of encampment residents and destruction of their property has frustrated and diverted money and resources from ZACAH's mission to keep people from becoming homeless.

8.     As Defendants' sweeps ejected residents from public parks with nowhere else to go, volunteers contacted ZACAH and asked for donations to pay for hotel rooms for people on an emergency basis.  Although providing such emergency and temporary relief is not part of ZACAH's mission or purpose, ZACAH began diverting its funds to pay for hotel rooms.

9.     As of October 13, 2020, ZACAH received $155,715 in donations with the initial intention of paying first-month's rent and security deposit for individuals who needed it, to help them transition to permanent housing.  Instead of using those funds to further its core mission, ZACAH has spent approximately $113,000, primarily to pay for hotel rooms for displaced people on an emergency basis.  ZACAH has sponsored over 200 nights for approximately 500 people.

10.     To manage all of the emergency assistance ZACAH is providing to displaced encampment residents, ZACAH has had to establish an entirely new system to organize referrals, process applications, negotiate with hotels, and manage numerous other tasks to ensure people are not out on the streets.

11.     As a result, ZACAH's volunteers and board members have dedicated countless hours to this work.  For example, one board member and one volunteer estimate that collectively, they spend 50-60 hours a week working with more than 25 volunteers and placing people in emergency hotel rooms.  All of that time could be spent to further

ZACAH's mission of preventing people from becoming homeless were it not for Defendants' conduct.

*Named Plaintiffs*

### Dennis Barrow

12.    Dennis Barrow is a resident of Minneapolis. He is 42-year-old African American man.

13.    Around May 25, 2020, he became homeless. He had been living with his mother, but left her house because it was too crowded, and he was concerned he was at risk of contracting COVID-19. After briefly staying with his son's mother and being accused of domestic violence (he was not convicted of any such offense), he went to stay with a friend at the former Sheraton Hotel in Minneapolis, which had effectively been converted into an emergency shelter. The owner of the hotel soon after evicted everyone staying there, including Mr. Barrow.

14.    Mr. Barrow went to Powderhorn Park and set up a tent in the West encampment. He lived in the tent for a couple of months before law enforcement showed up and forced him out. He and others at the encampment received notices that they had to leave the park in 72 hours. But officers showed up with bulldozers only 24 hours later.

15.    Mr. Barrow began collecting his belongings from his tent as officers, employed by Defendants, began taping off the perimeter of the encampment. Officers told him that he had to clear out his tent by the time they finished taping off the perimeter.

16.    Mr. Barrow hurried to collect as much of his property as he could, because he knew the bulldozer looming nearby would run over everything. He worried that he and

his belongings would be trapped inside the taped area as the bulldozer began to clear its path.

17.     The police officers' aggression scared Mr. Barrow.  He quickly got everything he could carry.  But it was impossible for him to gather all his belongings.  The following items were destroyed by a bulldozer:  his tent; sleeping bag; almost all of his clothes, including winter boots and a winter coat; hygiene supplies; medications; and court documents.

18.     Mr. Barrow has not been able to replace the items that were destroyed. Watching his property destroyed by a bulldozer was traumatizing for Mr. Barrow.  He realized, while watching the bulldozer roll over his tent, that he would have to start all over again.

19.     After he left Powderhorn Park, an organization paid for him to stay in a hotel for a few days.  He also stayed on a friend's couch for one night.  Around that same time, he happened to be walking by a church where people were handing out tents.  With his new tent, he moved to the Logan Park encampment.  He was there for only a couple weeks when threats of eviction began again.

20.     Mr. Barrow is now living in a van—not a permanent solution to his housing crisis.  He has to move it every three days, or it will get towed.  Losing the van would mean that once again, he would have to pitch a tent outside, continuing a cycle of homelessness.

21.     Mr. Barrow has called shelters to see whether there is a bed for him.  When he calls, he is told they are full, or the shelters never return his voicemail.  Even if there

were space, however, Mr. Barrow is worried about staying in a shelter because of the increased risk of contracting COVID-19 in such a crowded place.

22.     Since February 2020, Mr. Barrow has received a steady income of $783 in social security disability benefits for ADHD and epilepsy.  He wants to find an apartment but had to stop applying because the applications were too expensive, and he was not getting any responses.  He suspects the silence is due to an old drug possession charge and his inability to show three times more monthly income than rent.  Some landlords have even told him that they will not accept county money to help cover the rent or security deposit.

23.     The stress of this summer negatively affected Mr. Barrow's mental health.  Being forced to move frequently makes it difficult to find a caseworker or establish friendships.  He is always worried about where he is going to go, and whether he will have somewhere to stay.  He cannot maintain appointments with his therapist because his schedule is inconsistent, revolving around finding resources and places to store his property.

**Patrick Berry**

24.     Patrick Berry is a resident of Hennepin County.  He is 41 years old and a member of the Ho Chunk Nation.

25.     Mr. Berry became homeless in November 2019 after deciding to leave the apartment he shared with his violent roommate.  After both of his parents died and he tried unsuccessfully to move to Portland, where he was robbed, Mr. Berry made his way back to Minneapolis.  Without any place to go, he decided to pitch a tent in Powderhorn Park in

the East encampment.  He soon relocated to the encampment at Minnehaha Park, where he was a camp facilitator.  In that role, he helped residents obtain medical care and worked with volunteers to organize supplies.

26.     Due to the extreme heat at the time he was staying at Minnehaha Park, Mr. Berry left to stay with different friends, sleeping on their couches.  He also slept in a van in Peavey Park, and under the pavilion there.

27.     Once while he was staying at Peavey Park, a truck pulling a bulldozer arrived.  Mr. Berry was angry when he saw the bulldozer.  He knew that the Minneapolis Park and Recreation Board ("MPRB") had invested significant sums to provide sanitary stations and porta potties at many of the parks, and he thought it was a waste for a bulldozer to come and destroy everything.  He also thought that the use of bulldozers to clear the encampments was cruel and an unnecessary show of force.

28.     Eventually, Mr. Berry moved near the Powderhorn West encampment and set up his tent by a baseball diamond.  He was there for one week.

29.     Then, on August 10, 2020, at 7:00 A.M., a friend of Mr. Berry's woke him up to tell him that the police were there to clear the park.  Mr. Berry had not been provided any eviction notice.  Nor was he aware of a specific time Defendants would clear the park.

30.      When he came out of his tent and ran up to the main part of the encampment, he saw officers from the Minneapolis Police Department and the Minneapolis Park Police. Officers were using yellow CAUTION tape to make a perimeter around the encampment, with bulldozers at the ready.

31.     The next thing Mr. Berry saw was officers detaining his friend, placing him in handcuffs, and shoving him in a police car.  This harsh treatment took place simply because his friend had used a bullhorn to communicate to the residents.  Worried that all of his friend's property would be destroyed, Mr. Berry ran to his friend's tent to collect his property.  He also ran to grab his backpack from his own tent.  He did not know where he would go.  And he could not carry everything with him.  But he ran.  He ran to a friend's house nearby to store some property, and he put additional items in another friend's car.

32.     When he returned to the encampment, he faced a chaotic scene.  Officers were spraying large numbers of peacefully protesting people with chemical irritants.  He saw officers handcuff other friends of his who were not crossing the yellow CAUTION boundaries officers had established.

33.     What happened next can only be described as horrible and cruel.  Mr. Berry saw the bulldozers rev up and start to clear everything in their paths.  The officers gave people only a few minutes to collect their property and leave.  Mr. Berry later saw a dumpster in the park that was full of tents and other items belonging to camp residents.

34.     When Mr. Berry was evicted from Powderhorn Park, he lost the following belongings: his tent; sleeping bag; and a mattress.

35.     Eventually, Mr. Berry was given another tent by a volunteer.  Over the next several weeks, he pitched that tent at random places around the city, and occasionally slept on someone's couch.  Sometimes, with donations from ZACAH or some friends, he could spend a night or two in a hotel.

36.    Mr. Berry did not try to go to a shelter at any point since returning to Minneapolis because he was afraid of contracting COVID-19 in an enclosed and crowded space.  He had also heard that staff at shelters exploited and even assaulted people who stay there.  And he worried about dangerous and predatory people milling around at shelters without proper security.

37.    ZACAH provided Mr. Berry with a security deposit and first month's rent for an apartment into which he moved on October 1, 2020.  He has enough income from his tribe to pay rent for the next couple months.  He also plans to re-enroll in Minnesota Community Technical College, where he previously completed some classes.  But until Mr. Berry is able to obtain stable employment, he remains at high risk of becoming homeless again.

**Henrietta Brown**

38.    Henrietta Brown is a resident of Minneapolis.  She is enrolled in the Oglala Sioux Tribe and has lived in Minnesota since 1986.

39.    Ms. Brown previously had an apartment in Little Earth, an affordable housing complex in Minneapolis.  But after her daughter died in an emergency room when doctors gave her the wrong medication, she became extremely depressed and left her apartment.

40.    Ms. Brown had bouts of sobriety but struggled with addiction.  She stayed with friends, on their couches, or with her boyfriend.  She eventually had to leave her boyfriend's home because it became a hostile place.

41.     Ms. Brown then briefly slept on the Midtown Greenway in Minneapolis before moving to Peavey Park.  It was the first time she was unsheltered and sleeping outside.

42.     Ms. Brown signed up for housing programs with MADDADS and went to two shelters—Lutheran Social Services and Harbor Lights.  Both shelters turned her away because they were full.

43.     Ms. Brown was at Peavey Park for one month before the bulldozers arrived.

44.     On September 24, 2020, between 4:00 AM and 5:00 AM, police officers started shaking Ms. Brown's tent, shining a bright light in her face, and yelling that she had only 30 minutes to get out.

45.     It was pouring rain and Ms. Brown was disoriented.  Officers started removing the stakes of her tent even before she got out of it.

46.     Ms. Brown believes she saw officers from the Park Police, and Minneapolis Police Department, and deputy sheriffs from the Hennepin County Sheriff's Office participating in the expulsion.

47.     Because Ms. Brown never received an eviction notice, she was not prepared to leave.  She managed to grab her blanket and her purse.  She attempted to collect more of her belongings, but police officers told her to get away from her tent as they erected a boundary line around the area with yellow tape.  When Ms. Brown told a deputy sheriff that she needed to get important papers from her tent, he told her that she could not do that and threatened to arrest her.

48.     Everything happened so quickly.  Officers were shaking tents to see if anyone was in them.  Ms. Brown also saw officers shake her own tent and throw it into a garbage truck.

49.     When Ms. Brown was evicted from Peavey Park, she lost the following belongings: her birth certificate; her application for medical assistance; a photocopy of her ID and other identification paperwork; and family photographs.

50.     The entire experience was traumatizing for Ms. Brown.

51.     After the sweep of Peavey Park, Ms. Brown was driven to the Midtown Greenway by someone.  She went there to go under a bridge to get out of the rain.

52.     Ms. Brown was on the street for a week.  She called 311 to ask about shelter availability and obtained the phone number for the Simpson shelter.  She called the number and left a voicemail, but never received a call back.

53.     She would have been unable to go to shelter, however, because shelters require a form of ID and her identification paperwork was destroyed in the sweep of the park.

54.     Ms. Brown started staying at a hotel on October 1.  ZACAH is paying for her room.  She does not know where she will go when ZACAH's donations for the room runs out.  Without adequate shelter, she is at high risk of again becoming unsheltered and sleeping outside.

**Nadine Little**

55.     Nadine Little is a nearly lifelong resident of Minneapolis.  She is enrolled in the Red Lake Band of Chippewa.

56.     A series of injuries after a serious car accident that occurred seven years ago makes it difficult for Ms. Little to work.  After staying with different friends, she became homeless for the first time in March of 2020.  She had only the clothes she was wearing, and no idea where to go.

57.     Due to COVID-19 closures, there was nowhere for her to go.  She wandered around the city for three to four days, looking for her stepdaughter whom she believed was living in an encampment.  As a single female on the streets, she was terrified to sleep at night.  One cold night, she was so tired that she tried to sleep in a doorway near Bloomington and 26th Street.  A helpful stranger gave her a coat and two blankets.

58.     Ms. Little eventually found her stepdaughter at the Hiawatha and Lake encampment.  She moved to the Midtown Greenway and then the former Sheraton Hotel. After the mass eviction at the former Sheraton, an organization funded a room for her at a Days Inn for two weeks.  When the funding ran out, she went back to the Midtown Greenway.

59.     One day, she went to Powderhorn Park to charge her phone.  While she was there, someone gave her a tent, pillows, and blankets.  She set up a tent—first in the East encampment and then in the West encampment.

60.     One night at Powderhorn, Ms. Little lost consciousness and stopped breathing.  Medics at the camp were able to resuscitate her.  She thinks the incident was caused by her severe asthma, which was aggravated by police officers tear gassing her twice this year.

61.     After that incident, volunteers moved Ms. Little to Kenwood Park.  She was there until she received an eviction notice and had to leave when Defendants cleared it.

62.     Thanks to temporary funding from ZACAH, Ms. Little was able to stay at a hotel for about three weeks.  She became depressed while she was there.  The depression had started when she became homeless but worsened when she learned from volunteers that her tent had been destroyed when Defendants cleared Kenwood Park.  She felt like she had lost her home and felt hopeless about the fate of the encampments and the way the City treated homeless people.

63.     Ms. Little wanted to seek psychiatric care to help her handle her depression, but it was too difficult to find professional assistance due to COVID-19 closures.  The difficulty in getting help is exacerbated by the fact that she does not have a stable place to live where she can charge her phone and easily schedule and keep appointments.

64.      When the funding for the hotel ran out, Ms. Little moved to the Brackett Park encampment.  She felt safer there than in the other encampments because all of the residents were women.  After Brackett Park was emptied on October 1, Ms. Little went back to a hotel with temporary donations from ZACAH.  She does not know where she will go when that funding ends.

65.     Ms. Little would prefer to be in an encampment than a shelter.  Shelters, according to Ms. Little, take her money and restrict your movements.  For example, shelters impose curfews, and if someone is late, the shelter surrenders their room.  Ms. Little reports that such rules make it difficult for people to leave to get things done.

66.     The instability of being homeless and having to move around all the time makes it difficult for Ms. Little to get her life together.  She believes that being housed would make it easier for her to access services.  She needs affordable housing.  And she is scared that she will be homeless for the rest of her life.

**Virginia Roy**

67.     Virginia Roy is a Minneapolis resident.  She is enrolled in the White Earth Nation.

68.     Ms. Roy has been homeless on and off since 1999, when she was released from prison.  Although she has not been to prison since that time, her criminal record makes it difficult for her to find housing.  For most of the last 20 years, Ms. Roy has lived under a bridge, along a highway, and at the encampment at the Wall of Forgotten Natives ("The Wall").  She was at The Wall for a year, the longest she has stayed in one place.  She also stays at times with family or friends.

69.     Police officers have forced her to move multiple times.  Once, Ms. Roy was staying in a garage on Franklin Avenue because it was really cold.  The police cited her for trespassing and told her to get out.  Ms. Roy did not have anywhere to go.  Another time, officers forced her out from under a bridge.  Again, Ms. Roy had no other options.

70.     Officers have also removed Ms. Roy from the light rail and bus for sleeping.  And police officers evicted her from The Wall.

71.     For many reasons Ms. Roy does not want to go to shelters.  As a victim of domestic violence and sexual assault, she is uncomfortable at shelters where men are

watching her.  Additionally, she cannot afford the shelters that cost money.  But right now she is particularly wary of shelters because of the risk of contracting COVID-19.

72.     Despite her discomfort with shelters, she has sought them out before, only to be turned away because they were full.  This happened at Simpson Shelter, Harbor Lights, and Our Saviors Housing.

73.     Ms. Roy has lived at two encampments since June of 2020.  She lived in a tent at Powderhorn Park before moving to the encampment at Brackett Park in early July of 2020.  She was there until the end of September when residents were evicted.

74.     Ms. Roy felt safe at Brackett Park.  All of the residents were female and were involved in making decisions on how the encampment operated.

75.     Ms. Roy took pride in her tent.  It felt like a home because she could safely keep her property there.  She felt safe inside of her tent and that made it easier for her to maintain her sobriety.  She decorated her tent and kept a special rock and sage outside of her door for cleansing.

76.     Volunteers moved Ms. Roy and other residents out of Brackett Park to avoid the police bulldozing their property.  Ms. Roy was upset about having to leave Brackett Park because she felt cared for and safe there.

77.     Since October 1, 2020, Ms. Roy has been staying in a hotel room temporarily paid for by ZACAH.  She does not know where she will go when the funding ends.

78.     Ms. Roy reports that it is scary to move around so much.  She found that leaving one camp and moving to another created a harmful cycle she does not want to repeat.  The stability that the Brackett Park encampment provided allowed Ms. Roy to start

an outpatient treatment program and seek sober activities.  She worries that effort will be put in jeopardy, and she is getting depressed.  She has considered staying with her sister but does not want to explore that option because she believes her nephew is using drugs, and Ms. Roy wants to stay in recovery.

### Joel Westvig

79.     Joel Westvig, who is 40 years old, has lived in Minneapolis since he was four.

80.     A few years ago, he lost his job.  Not able to pay the rent, he then lost his apartment.  He has been homeless ever since.

81.     Mr. Westvig has been on a waiting list for an apartment through the Minneapolis Public Housing Authority for at least the past five years.

82.     He lives in a tent at the encampment at B.F. Nelson Park in Minneapolis.

83.     Mr. Westvig is disabled by anxiety and depression.  His doctor has advised him to work only part time due to his disabilities, but his anxiety and depression disorders keep him from finding even a part-time job.

84.     He has been unable to apply for Social Security disability benefits.  He has been unable to continue his health care from his psychologist or psychiatrist because clinics are closed due to COVID-19, and he does not know how to use the video function for tele-med services on his phone.  Even if he could use the tele-med option, he cannot keep his phone charged without consistent access to a power source.

85.     Mr. Westvig's first experience living outside started three or fourth months ago in Loring Park in Minneapolis.  Two months after moving there, he was forced out.

17

86.     Mr. Westvig heard rumors that the police were going to clear the park, but he never received any written notice about it.

87.      Then, one night, a community volunteer came to Loring Park and told him the police were coming the next day to sweep it.  Mr. Westvig did not know where he would go.  He also did not know where he would put his possessions, or how he would move them.

88.     The next day, the volunteer came to Logan Park and helped Mr. Westvig move everything he had, including his tent, to B.F. Nelson Park.  The MPRB had granted a permit to encampment residents at B.F. Nelson Park on September 2, 2020.

89.     On October 15, 2020, an MPRB employee came to B.F. Nelson Park and told all of the encampment residents that they had to leave.  The MPRB employee said that the encampment's permit would expire on October 19, 2020, and that the MPRB would not renew it.  She said Mr. Westvig and the other residents would receive a notice from the MPRB giving them 24 hours to vacate.  But she could not tell them when that 24-hour notice would arrive.

90.     Instead of giving him a notice with a timeline, the MPRB employee gave him information about the risk of cold weather and a list with some shelter resources.

91.     Mr. Westvig does not understand how forcing him to leave his tent—his home—will make him safer.  If he must leave, he does not know how he will move his possessions without a car, or where he will move to set up a new home.  If he is allowed to remain in his current tent in B.F. Nelson Park, Mr. Westvig believes he will be able to stay warm in his tent with his clothing, blankets, and possessions.

92.     The MPRB employee gave Mr. Westvig and the residents an option for where they could go: the Midtown Greenway—another outdoor space.[1]  Mr. Westvig did not understand why he would be safer from the cold living under a Greenway bridge than living in his tent in B.F. Nelson Park.  If he moved to the Greenway, he would still be outside, but without his tent, blanket, and extra clothes—all of which keep him warm.

93.     Mr. Westvig did not find the list of resources helpful either.  When he has previously tried to find shelter by calling Shelter Connect, which places single adults in Hennepin County shelters, he was always told the shelters were full.

94.     Additionally, the shelters do not have a place for him to store his personal possessions.  Nor do they always provide shelter for him during the day because most are closed.  And that is an issue because the places Mr. Westvig would otherwise go to find warmth during the day, like public libraries or coffee shops, are closed to visitors because of COVID-19.

95.     Another issue with a temporary or emergency shelter is that Mr. Westvig has to continuously call Shelter Connect for placement.  And without a consistent source of power, his phone is not always charged.

96.     Nothing the MPRB employee told Mr. Westvig on October 15, 2020 about being forced to leave B.F. Nelson Park was useful.  The thought of an unclear deadline and no place to go has greatly increased Mr. Westvig's anxiety.  He does not know when he

---

[1]     The Midtown Greenway is operated by the Hennepin County Regional Railroad Authority, not the MPRB.  *See Regional Railroad Authority*, Hennepin County, *available at* https://www.hennepin.us/your-government/leadership/rra (last visited Oct. 18, 2020).

must move.  He does not know where he can move.  He does not know what other public space he will be allowed to live in.  He does not know if he will have the time and ability to move his possessions safely, or if Defendants will take or destroy them when he is ordered out of the park.

97.     The potential loss of his home and community at B.F. Nelson Park has greatly increased his depression.

### Emmett Williams

98.     Emmett Williams is a 39-year-old African American man who has lived in the Minneapolis metro area since he was 11.

99.     Before the COVID-19 pandemic, Mr. Williams had multiple regular jobs. His primary employment was working at the Target Center during basketball season. When everything shut down, Mr. Williams was unable to work.

100.    After months of being unemployed, in June 2020, Mr. Williams's landlord did not renew his lease.  Mr. Williams became homeless for the first time.

101.    Mr. Williams initially stayed with friends and relatives while he called other landlords to try to get a new place.  He never received a call back or a lead.  Not wanting to burden others, he and his fiancée moved to the East encampment in Powderhorn Park in July.

102.    After only two-a-half weeks, the police forced them out.

103.    Mr. Williams received no notice that the police were going to come and remove him from his home and destroy his property.

104.    When the police and bulldozers arrived, the officers started putting tape around the camp.  The police told everyone that if they did not leave, the police would arrest them.

105.    The scene was intense.  The police were aggressive and started spraying people with chemical irritants.  To Mr. Williams, it seems like the police were taunting the encampment residents.

106.    Mr. Williams and his fiancée quickly grabbed what they could from their tent.  He told the police that they still had possessions inside the taped perimeter.  The police ignored him.  Mr. Williams lost clothing and his fiancée lost possessions from her grandmother.

107.    Mr. Williams felt the sweep violated him and that it was unjust because he was living on public land.

108.    While bulldozers were levelling the Powderhorn Park encampment, a bus arrived, and Mr. Williams was told it would take them—not to a hotel or a safe place inside—but to another park, Martin Luther King Jr. ("MLK") Park.

109.    Mr. Williams and his fiancée have been living at MLK Park ever since. They have found a sense of community there with the other encampment residents.  And Mr. Williams gets support through donations from the community, and even medical assistance from Healthcare for the Homeless.  If Defendants force Mr. Williams out of MLK Park without providing stable housing, he will have to search for similar resources all over again.

**110.**   Mr. Williams feels like the MPRB is creating arbitrary rules to try to close the MLK Park encampment.  He does not want to be forced out again.  He has been told that the shelters are full, and he does not know where he would live if he has to leave MLK Park.

## Gina Mallek

111.   For most of the past four years, Gina Mallek has not had a consistent or safe place to live.

112.   In February 2020, Ms. Mallek was evicted from an apartment she had leased for a few months because her controlling ex-boyfriend would squander her paychecks and leave her without money for rent.

113.   Ms. Mallek eventually found her way to the Dorothy Day Shelter in St. Paul, where she stayed for approximately six weeks.  At the shelter, Ms. Mallek was relieved to meet someone who helped protect her from men who were sexually harassing her.  He even loaned her money for gas and food.  This friend, however, soon turned violent.  He began stalking Ms. Mallek.  She had to leave the shelter.  She sought refuge at another shelter and at a park, but he found her.  Eventually, a volunteer brought her to Powderhorn Park, where she was finally able to escape him.

114.   Ms. Mallek had never lived at an encampment before she arrived at Powderhorn Park.  She lived in a tent and slowly started to meet encampment residents she could trust.  Ms. Mallek even got a job washing dishes at a restaurant two blocks from Powderhorn Park.

115.     Soon after securing that job, Ms. Mallek was evicted from Powderhorn Park. The eviction traumatized Ms. Mallek.

116.     Either MRPB, the City, or County Staff had told encampment residents that they would receive a warning before the police would evict them from the park.  But no warning came to Ms. Mallek.

117.     On or about July 20, 2020, at 8 A.M. in the morning, Park Police arrived at the Powderhorn Park and told Ms. Mallek and other residents that they had an hour to pack up and leave.  But as she frantically tried to pack up her belongings, police continued to drive by, telling her and other encampment residents that they had to go immediately.

118.     Ms. Mallek was placing her belongings outside of her tent to organize everything she needed to pack.  But before she could complete the process of gathering her belongings, police and/or other MPRB employees came and started throwing everything away.  They would not allow the volunteers, who were standing by to help, to pack or even bring the residents water.  Police then threatened to arrest Ms. Mallek if she didn't get out before the hour was over.  As the Park Police cleared the camp, Ms. Mallek watched them pepper spray people.

119.     Ms. Mallek's property destroyed in the sweep included: photographs, items her children had made for her, her birth certificate, social security card, W-2 forms, clothes, a cot, hygiene products, shoes, chairs, and other furniture.

120.     Ms. Mallek and her friends did not know where to go next.  She heard there was a bus that was taking encampment residents to other parks, but then Ms. Mallek was

told the bus was going to take people to jail rather than the parks.  Finally, a concerned volunteer offered to drive her to B.F. Nelson with the little property she still had.

121.   Nearly as soon as Ms. Mallek and her friends arrived at B.F. Nelson Park, they received notices that they would have to leave.  Employees from the MPRB gave the group a piece of paper that had shelter numbers to call.  No other services were offered.  Then one day, a big dumpster was dropped off at the park.  Ms. Mallek and her friends knew that meant an eviction was imminent.  Volunteers soon arrived to help Ms. Mallek move to a lot in North Minneapolis owned by the City.

122.   But once again, Ms. Mallek was told she had to leave the lot nearly as soon as she arrived.  Don Ryan, a Hennepin County employee, Lieutenant Grant Snyder of the Minneapolis Police Department, and other employees of the City arrived at the lot to tell residents they would have to leave in December because of "unsafe soil."  People living at the lot were given the option of moving to the Midtown Greenway or other outdoor locations.  But there was no guarantee how long they could stay at these new proposed outdoor locations.

123.   Ms. Mallek has been told multiple times by Adult Shelter Connect, shelter employees, and City and County employees that the shelters are full.  She has shown up to shelters multiple times seeking access to bathroom facilities and has been turned away because they are at capacity.  She was told that the closest all-women's shelter that had openings was Duluth, more than two hours away by car.

24

124. Ms. Mallek has met with a Hennepin County employee about securing housing. She was told that housing could take anywhere between 4 months to 1 year because there were over 1,000 people on the list ahead of her.

125. Constantly moving has taken a toll on Ms. Mallek, triggering her PTSD and increasing her anxiety. Every time she moves, she must find resources like food shelves and places to get clean water. She has had to stop looking for work because, without a permanent address, she cannot guarantee that she could actually get to the job. Indeed, she was unable to start her job that was near Powderhorn Park because she could not afford the bus fare from B.F. Nelson Park. All of this effort and all of this time being shuffled around prevent her from focusing on finding a therapist to address her serious mental health issues.

### Daniel Huiting

126. Daniel Huiting is a 41-year-old man currently living in St. Paul.

127. His property was twice destroyed during encampment sweeps in Minneapolis—at Mathews Park and Riverside Park.

128. Before February 2020, Daniel Huiting had a successful career as a filmmaker and video music producer. That work dried up during the COVID-19 pandemic, and a divorce had left him without his house and most of his belongings. Without steady income, Mr. Huiting found himself homeless for the first time in his life.

129. In around May or June, Mr. Huiting was sleeping outside using a tent he obtained at St. Steven's. He was living at the encampment known as The Wall before moving to Mathews Park in late June. In late August or early September, Mr. Huiting

found an eviction notice on his tent.  The notice didn't provide a date or time by which he had to leave.  Nor did it have any information about sanctuary parks.

130.    Four or five days after receiving the eviction notice, Mr. Huiting left the park to run some errands on a Monday morning.  He was gone for less than two hours.  When he got back, he saw an empty plot of grass where his tent had been.  He also saw police— he believes they were Park Police—putting property into dumpsters.  Park Police had thrown away his tent and everything inside of it.  Mr. Huiting's destroyed property included: two Eureka 6-person tents, a new bike, his U.S. passport, his phone, prescription medication, all of his clothes, food, a cooler, a chair, a really nice sleeping bag, a mattress, blankets, and tarps.

131.    Without anywhere to go and with most of his property destroyed, Mr. Huiting went to a nearby Taco Bell, where he stood outside with a sign asking people for help.  By coincidence, his Hennepin County caseworker spotted him, got him a tent, and drove him to Riverside Park, which the caseworker told him was a sanctuary park.

132.    Mr. Huiting lived at Riverside Park for about 1.5 months.  Then, during the last week of October, Park Police swept the park, which at that time had 12 to 20 tents. Once again, Mr. Huiting was shocked by the sweep.  He had not received any notice that it would occur.  The day of the sweep, Mr. Huiting had again briefly left the park.  When he returned, everything—all 12 to 20 tents, including his—were gone.  His destroyed property this time included: his replacement tent, a replacement bike, his bed, clothes, food, refilled prescription medications, and other property.

133.     Mr. Huiting is living in temporary housing in St. Paul until February 23, 2021.

***Defendants***

### Hennepin County

134.     Defendant Hennepin County is a political subdivision of the State of Minnesota, a legal entity with the capacity to be sued.  Defendant Hennepin County is sued in its own right and (1) on the basis of acts and omissions of its officials, agents and employees following Hennepin County policies and practices, and (2) on the basis of Hennepin County's practice of authorizing its officials, agents and employees to violate written policies designed to protect people without permanent housing.

### Hennepin County Sheriff David Hutchinson

135.     Defendant Sheriff David Hutchinson is a resident of Minnesota.  He was elected Sheriff of the Hennepin County Sheriff's Office in 2018.  The Hennepin County Sheriff's Office provides law enforcement and public safety services throughout Hennepin County.

### City of Minneapolis

136.     Defendant City of Minneapolis is a political subdivision of Hennepin County and a municipal corporation under home-rule charter pursuant to the Minnesota Constitution, Article XII, section 4, with the capacity to be sued.  Defendant City of Minneapolis is sued in its own right and (1) on the basis of acts and omissions of officials, agents, and employees following City of Minneapolis policies, customs, and practices, and (2) on the basis of Defendant City of Minneapolis' custom and practice of authorizing its

officials, agents, and employees to violate written policies designed to protect people without permanent housing.

### Mayor Jacob Frey

137.     Defendant Jacob Frey is the Mayor and a resident of Minneapolis.  He has a duty to see that all laws and ordinances are faithfully observed and enforced within the City and that each City officer performs their duties.  The Mayor has the complete power over the establishment, maintenance, and command of the Minneapolis Police Department.

### Minneapolis Police Chief Medaria Arradondo

138.     Defendant Medaria Arradondo is Chief of the Minneapolis Police Department and a resident of Minnesota.  He was appointed by former Minneapolis Mayor Betsy Hodges.  He enforces Minnesota's criminal laws and Minneapolis ordinances in the City and oversees the actions of the individual peace officers he employs.  On information and belief, he is a final policymaker on all issues related to Minneapolis Police Department policies, customs, and practices.

### Minneapolis Park and Recreation Board

139.     Defendant Minneapolis Park and Recreation Board ("MPRB") is an independently-elected, semi-autonomous body, with its principal place of business in Minneapolis, Minnesota.  The MPRB is responsible for maintaining and developing the Minneapolis Park system to meet the needs of citizens of Minneapolis.

### Minneapolis Park and Recreation Board Superintendent Al Bangoura

140.     Defendant Superintendent Al Bangoura is a resident of Minneapolis.  He is appointed by the MPRB.  He directs the MPRB's service areas and implements MPRB

policy.   His office oversees the Park Police and Communications and Marketing departments.

### Park Police Chief Jason Ohotto

141.    Defendant Park Police Chief Jason Ohotto is a resident of Minnesota.  He is appointed by the Mayor of Minneapolis at the request of the MPRB.   He enforces Minnesota's criminal laws and the MPRB's resolutions and ordinances on Minneapolis park land.  He is a final policymaker on all issues related to the MPRB Police Department policies, customs, and practices.

### Officers John and Jane Does

142.    Defendants Officers John and Jane Does are unidentified individuals who committed the acts and omissions set forth below as agents of Defendants City of Minneapolis, Hennepin County, Hennepin County Sheriff, and the MPRB.

143.    The acts and omissions complained of were done by Defendants or Defendants' officials, agents, and/or employees within the scope of their employment or agency and under color of state law.  The acts and omissions complained of were official acts of Defendants and caused by policies of Defendants or ratified by Defendants.

144.    The acts and omissions complained of were intentional and will continue unless restrained by the Court.

**CLASS ALLEGATIONS**

145.     Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3) the named Plaintiffs bring this class action on their own behalf and on behalf of all other persons similarly situated.

146.     The plaintiff class consists of all homeless persons living within Hennepin County who have been, are now, or will in the future be living on public property.

*Numerosity*

147.     The defined class is so numerous that joinder of all Plaintiffs is impracticable. As of October 15, 2020, the MPRB estimated that the number of tents in all parks was 222.[2]  Because more than one person may stay in a tent, upon information and belief, the number of class members exceeds 300 people.

148.     Additionally, as Defendants Hennepin County and the City have recognized, this is a transient and changing population, locked in a cycle of homelessness,[3] making it particularly difficult to find and identify all class members.

---

[2]     *Encampment- Numbers at a Glance*, Minneapolis Park and Recreation Board, *available at* https://www.minneapolisparks.org/encampments/ (last visited on Oct. 18, 2020) (**Exhibit 1**).

[3]     *See The Ten-Year Plan to End Homelessness in Minneapolis and Hennepin County*, Heading Home Hennepin – Presented by the Hennepin County and City of Minneapolis Commission to End Homelessness at 3 (December 2006) ("Progress made over the years has not been enough to end the cycle of homelessness in Minneapolis and Hennepin County. . . . Too many people continue to cycle through the doors of our public institutions, from shelter to hospital to jail and back again."), *available at* https://www.hennepin.us/-/media/hennepinus/your-government/projects-initiatives/end-homelessness/end-homelessness-10-year-plan.ashx (last visited Oct. 18, 2020).

149.     All members of the class are subject to Defendants' policies, practices, and procedures in prohibiting living outdoors in public spaces, and seizing and removing their homes and possessions.  The class is united in its interests with respect to proof of Defendants' conduct, and the effects caused by Defendants' actions.

***Predominance of Common Issues***

150.     There are questions of fact and law common to the class, and those questions predominate over all other questions affecting individual class members.

151.     All plaintiff class members have the same federal rights, including but not limited to:

152.     The right to be free from unreasonable property seizures under the Fourth Amendment to the United States Constitution and Article I, Section 10 of the Minnesota Constitution;

153.     The right to receive adequate notice and other procedural due process protections whenever Defendants' actions deprive them of their personal property, as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 7 of the Minnesota Constitution;

154.     The right to privacy under the Fourteenth Amendment to the United States Constitution;

155.     The right to be free from state-created danger under the Fourteenth Amendment to the United States Constitution;

156.     The right to possession of their personal property as guaranteed by Minnesota law.

157.     Common questions of fact and law include, but are not limited to, the following:

158.     Whether Defendants have a policy, practice or custom of seizing and destroying homeless people's property;

159.     Whether Defendants have a policy, practice or custom of seizing and destroying homeless people's property without adequate procedural due process protections;

160.     Whether Defendants' policy, practice or custom of seizing and destroying homeless people's property is an unreasonable, warrantless property seizure under the Fourth Amendment to the U. S. Constitution; and

161.     Whether the procedural due process protections provided under Defendants' policy, practice or custom of seizing and destroying homeless people's property satisfies Fourteenth Amendment due process requirements; and

162.     Whether Defendants have a policy, practice or custom of placing homeless people in danger when carrying out clearing or sweeps of encampments on public land.

*Typicality*

163.     The claims of the named Plaintiffs are typical of the claims of the class.  The named Plaintiffs' claims arise from the same conduct—Defendants' displacement of encampment residents and the seizure and destruction of their personal property without a warrant or procedural due process—that give rise to absentee members' claims.

*Adequacy*

164.    The named Plaintiffs will fairly and adequately represent the interests of the class, and they have no interests antagonistic to the interests of the class.  The named Plaintiffs and class members seek to assure that Defendants do not illegally displace homeless people and seize and destroy their personal property.

165.    Plaintiffs' attorneys are experienced public interest and trial lawyers with extensive experience litigating civil rights and class action lawsuits.

*Superiority*

166.    A class action is preferable and superior to other available methods for the fair and efficient adjudication of this controversy. Class treatment will permit the adjudication of claims by many class members who could not afford to individually litigate their claims or vindicate their rights against Defendants.  There are no difficulties likely to be encountered in the management of this case that might preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this matter.

## ADDITIONAL FACTUAL ALLEGATIONS

167.    Named Plaintiffs are among the estimated 3,049 of Hennepin County's residents who lack permanent housing.  Of those estimated 3,049 people, an alarming 40% (1,220) reported they were part of families with at least one child, and 77% identified as

33

people of color.[4]  Since those numbers were collected in January of 2020, the COVID-19

pandemic and the civil unrest following George Floyd's killing by police on May 25, 2020,

have pushed even more people out of stable housing and onto the streets.[5]

168.    In response to the outbreak of COVID-19 in Minnesota, Governor Tim Walz

declared a public health emergency and issued a "Stay At Home Order" that closed bars,

restaurants, and other places of public accommodation.[6]  Governor Walz also ordered that

---

[4]    2020 Point-in-Time County MN-500 Minneapolis/Hennepin County CoC at 1, 7-8, *available at* https://www.hennepin.us/-/media/hennepinus/your-government/projects-initiatives/end-homelessness/coc-point-in-time-count-minneapolis-hennepin.pdf (**Exhibit 2**).  While these numbers are alarming, they are likely an *underestimate* of the number of Hennepin County residents who lack permanent housing.  *See* National Law Center on Homelessness & Poverty, *DON'T COUNT ON IT: How the HUD Point-in-Time Count Underestimates the Homelessness Crisis in America* at 6 (2017) ("Unfortunately, the methods used . . . to conduct the PIT counts produce a significant undercount of the homeless population at a given point in time."), *available at* https://nlchp.org/wp-content/uploads/2018/10/HUD-PIT-report2017.pdf; *see also Working Together to Conduct the Point-In-Time County*, ST. STEPHEN'S ("We know these counts serve as an underestimate of people experiencing homelessness in our communities."), *available at* https://ststephensmpls.org/latest/working-together-conduct-point-time-count.  (**Exhibit 3**).

[5]    *See 6-17-20 Supt Remarks*, *available at* https://www.minneapolisparks.org/wp-content/uploads/2020/06/2020-06-17-Supt-Remarks-Discussion-Item-MPRB-Response-to-Homelessness-in-Minneapolis-Parks.pdf (**Exhibit 4**); *Trump appointee visits Twin Cities homeless encampments, shelters*, STAR TRIBUNE (Oct. 6, 2020, 11:14 PM) ("The number of homeless Minnesotans has surged in the pandemic. Encampments have grown in Minneapolis and in St. Paul last month, officials counted nearly 400 people in makeshift camps, the highest number on record."), *available at* https://www.startribune.com/trump-appointee-visits-twin-cities-homeless-encampments-shelters/572658212/; Chris Serres, *Coronavirus fears push more area homeless to the streets*, STAR TRIBUNE (Apr. 13, 2020, 5:40 AM), *available at* https://www.startribune.com/coronavirus-fears-push-more-area-homeless-to-the-streets/569580842/ (**Exhibit 5**).

[6]    Emergency Executive Order 20-33, *Extending Stay at Home Order and Temporary Closure of Bars, Restaurants, and Other Places of Public Accommodation* (Apr. 8, 2020),

"all persons currently living within the State of Minnesota are ordered to stay at home or in their place of residence" unless certain exemptions applied.[7]   One of those exemptions was for homeless people: "Individuals without a home are exempt from the restrictions in this Executive Order, and they may move between emergency shelters, drop in centers, and encampments."[8]   Recognizing that "sweeps or disbandment" of encampments "increase the potential risk and spread of COVID-19," the governor ordered that "encampments should not be subject to sweeps or disbandment."[9]

169.    Weeks later, on April 29, 2020, Governor Walz issued an order clarifying the rules with respect to homeless encampments.[10]   The order stated that law enforcement could "address [] trespassing and exigent circumstances (i.e., those requiring immediate action to protect life, prevent injury, or preserve evidence)" in encampments.[11]   The order also permitted local government entities to "restrict, limit, or close encampment spaces" only when either:

---

available   at   https://mn.gov/governor/assets/2a.%20EO%2020-33%20Final_tcm1055-427370.pdf (**Exhibit 6**).

[7]     *Id.* at 2.

[8]     *Id.* at 4.

[9]     *Id.*

[10]    Emergency Executive Order 20-47, *Clarifying Application of Executive Order 20-33   to   Homeless   Encampments*   (Apr.   29,   2020),   *available   at* https://www.leg.mn.gov/archive/execorders/20-47.pdf (**Exhibit 7**).

[11]    *Id.* at 2

> (1) a local government entity is providing sufficient alternate housing, shelter, or encampment space that complies with the [Minnesota Department of Health] guidance, . . . and the [Center for Disease Control] guidance, . . . or
>
> (2) if an encampment has reached a size or status that is a documented threat to the health, safety, or security of residents . . . .[12]

170.    Despite the governor's clear order, on May 12, 2020, Minneapolis Park Police Chief Jason Ohotto instructed his "staff to begin prioritizing park encampments for disbandment consideration."[13]

171.    On May 13, 2020, Governor Walz issued an order titled, "Protecting the Rights and Health of At-Risk Populations during the COVID19 Peacetime Emergency."[14] The "Homeless Population" was one of the populations identified.[15]  The order reiterated that absent the previously-mentioned exceptions, "Homeless encampments, including both new and existing encampments, should not be subject to sweeps or disbandment by state

---

[12]    *Id.* at 2.

[13]    *See* E-mail from Jason Ohotto to Al Bangoura (May 12, 2020) (**Exhibit 8**)

[14]    Emergency Order 20-55, *Protecting the Rights and Health of At-Risk Populations during the COVID19 Peacetime Emergency*, May 13, 2020, *available at* https://mn.gov/governor/assets/EO%2020-55%20Final_tcm1055-432233.pdf. (**Exhibit 9**).

[15]    *Id.* at 3.

or local governments, as such sweeps or disbandments increase the potential risk and spread of COVID-19."[16]

172.     In the midst of the COVID-19 chaos, police killed George Floyd on May 25, 2020.  Civil unrest followed and thousands of buildings in Minneapolis were damaged or destroyed, displacing hundreds of people.[17]  The empty and former Sheraton Hotel opened as an ad hoc shelter to temporarily house two to three hundred people.[18]  On June 9, the hotel owner evicted everyone, further exacerbating an already dire homeless crisis.[19]  The number of tents in public spaces in Minneapolis soon exploded: less than two weeks after the eviction, there were more than 200 tents in Powderhorn Park alone.[20]

---

[16]     *Id.*

[17]     *Buildings damaged in Minneapolis, St. Paul after riots*, STAR TRIBUNE (July 13, 2020, 2:45 PM), *available at* https://www.startribune.com/minneapolis-st-paul-buildings-are-damaged-looted-after-george-floyd-protests-riots/569930671/ (last visited Oct. 18, 2020).

[18]     *See Volunteers turned former Sheraton Hotel in Minneapolis into sanctuary for homeless*, STAR TRIBUNE (June 4, 2020 11:36 PM), *available at* https://www.startribune.com/volunteers-turned-former-sheraton-hotel-in-minneapolis-into-sanctuary-for-homeless/571018842/ (**Exhibit 10**).

[19]     *See Homeless evicted from former Minneapolis hotel after drug overdose*, STAR TRIBUNE (June 9, 2020 at 10:50 PM), *available at* https://www.startribune.com/homeless-evicted-from-former-mpls-hotel-after-drug-overdose/571135962/ (**Exhibit 11**).

[20]     *See Minneapolis parks leaders to homeless: You can stay in our parks*, (June 19, 2020, 5:06 AM), *available at* https://www.startribune.com/mpls-park-leaders-to-homeless-you-can-stay-in-our-parks/571355602/ (**Exhibit 12**).

173.   On June 19, 2020, the MPRB passed a resolution to provide "people currently experiencing homelessness refuge space in Minneapolis parks."[21]   In speaking about the resolution, MPRB President Jono Cowgill recognized that residents of encampments "have nowhere else to go" but public parks.[22]

174.   He is right.  There are not enough beds in Hennepin County shelters to house all of the people residing in encampments.  On September 16, 2020, Superintendent Al Bangoura described the lack of shelter space available for those living in the 347 tents in Minneapolis parks:

> On September 8, following the first cold weather of the season, Hennepin County reported that there were no beds of single adult males, 12 beds available for single adult women, and 21 family shelter rooms available.  Numbers vary from day to day.[23]

175.   The lack of space on September 8 was not an anomaly.  On September 22, 2020, nearly every adult male bed available at shelters funded by Hennepin County was

---

[21]   Resolution 2020-253, *Resolution Declaring the Minneapolis Park & Recreation Board's Commitment to Provide Refuge Space to People Currently Experiencing Homelessness While Continuing to Work with the State, County, City, Non-Profit Organizations and Other Interested Parties to Identify Long Term Housing Solutions for People at the Powderhorn Encampment and Others Throughout the City* (June 17, 2020), *available                                                                                                    at* https://minneapolisparksmn.iqm2.com/Citizens/Detail_LegiFile.aspx?Frame=&MeetingID=2085&MediaPosition=&ID=5078&CssClass=Information (**Exhibit 13**).

[22]   Exhibit 12, *supra* note 20.

[23]   *9-16-20 Superintendent Bangoura Encampment Remarks*, Minneapolis Park & Recreation Board at 2, https://www.minneapolisparks.org/encampments/9-16-20-superintendent-bangoura-encampment-remarks/ (**Exhibit 14**).

full.[24]  Hennepin County's weekly Shelter Reports from July 7, 2020, to October 6, 2020, show that the number of people staying in shelters has remained relatively consistent.[25] And four of the Named Plaintiffs have been turned away from shelters due to lack of space. Accordingly, since the governor's first order on encampments in April of 2020, there have not been enough beds to house the hundreds of people living in tents in public spaces.

176.   The limited available shelter space is often too restrictive to sufficiently house those in need of shelter.  Many shelters have limited hours, no right of return, and no place to store belongings.  Some do not allow couples or families to stay together. Homeless individuals, like Plaintiff Virginia Roy, may not be eligible for a shelter due to criminal records.  Others may be turned away from a shelter because they have a pet, or, like Plaintiff Emmett Williams, a significant other.

177.   Other reasons shelters are not accessible include the lack of privacy, limited mobility, and being located far from services the person was regularly accessing.

178.   Many shelters require a photo ID from occupants—yet Defendants seize and destroy the IDs and other supporting documentation of homeless people–like Plaintiff Henrietta Brown–in sweeps.

---

[24]   *Subpopulation Numbers*, Single Adults, Shelter Report 9-22-20, *Tuesday Census* (**Exhibit 15**).

[25]   *Subpopulation Numbers*, Single Adults, Shelter Report 10-6-20, *Subpopulation Numbers* (**Exhibit 16**).

179.    Furthermore, many shelters are inaccessible for people with disabilities, who are more likely to be homeless.[26]  Some shelters offer only a mat on the floor to sleep on,[27] which can exacerbate physical disabilities or chronic pain.

180.    People with substance abuse disorders are also disproportionately affected by homelessness and cannot satisfy the sobriety requirements many shelters impose.[28]

181.    Crowds of strangers present in shelters can also trigger mental health conditions or crises in individuals like Plaintiff Virginia Roy.

182.    Shelters may place Plaintiffs at risk of contracting COVID-19, due to their inability to implement precautions like social distancing,[29] or to isolate guests who are sick

---

[26]    *See* Pittman, Brian; Nelson-Dusek Stephanie; Decker Gerrard, Michelle; Shelton, Ellen, *Homelessness in Minnesota – Detailed Findings from the 2018 Minnesota Homeless Study* at 5, Wilder Research (March 2020), *available at* https://www.wilder.org/sites/default/files/imports/2018_HomelessnessInMinnesota_3-20.pdf (last visited Oct. 18, 2020) ("Wilder Study") ("Most adults experiencing homelessness (81%) have either a chronic physical health condition (57%), serious mental illness (64%), or substance use disorder (24%), and 50% have co-occurrences of these conditions.").

[27]    *See Hundreds of Minnesota homeless move to area hotels to prevent coronavirus from spreading at shelters*, STAR TRIBUNE (May 5, 2020, 8:59 AM), *available at* https://www.startribune.com/hundreds-of-homeles-minnesotans-move-to-area-hotels-as-officials-race-to-prevent-coronavirus-from-spreading-in-shelters/570183632/ (**Exhibit 17**) ("About a dozen mats lay strewn about the floor [at Higher Ground Shelter in Minneapolis]; residents stake out any open space to avoid getting infected [with COVID-19].")

[28]    *Id.*

[29]    *See* Minnesota Department of Health, *Homeless Service Settings: Interim Guidance for Providers* (May 10, 2020), *available at* https://www.health.state.mn.us/diseases/coronavirus/guideshelter.pdf (**Exhibit 18**); Center for Disease Control (CDC), *Interim guidance for homeless service providers to plan*

or test positive for COVID-19.[30]   In the words of Tim Marx, the Chief Executive of Catholic Charities, which operates the Higher Ground Shelter in Minneapolis: "Social distancing and shelter have become an oxymoron."[31]

183.    These concerns are not hypothetical.  A CDC study published in May of 2020 shows how quickly COVID-19 can spread through shelters: among 19 shelters in Seattle, Boston, San Francisco, and Atlanta, 25% of the residents tested positive for COVID-19 between March 27, 2020 and April 15, 2020.[32]

184.    Nor is there adequate affordable housing available in the City or Hennepin County.   In July of 2020, the median monthly rent for a one-bedroom apartment in Minneapolis was $1,051.[33]   And only 5.4% of listings for 1-bedroom apartments in Hennepin County are considered "affordable," where rent is less than $540.[34]

---

*and respond to coronavirus disease 2019 (COVID-19)* (Aug. 5, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/plan-prepare-respond.html (**Exhibit 19**).

[30]    Exhibit 17, *supra* 27.

[31]    *Id.*

[32]    *See* Mosites E, Parker EM, Clarke KE, et al. Assessment of SARS-CoV-2 Infection Prevalence in Homeless Shelters — Four U.S. Cities, March 27–April 15, 2020. MMWR Morb Mortal Wkly Rep 2020; 69:521–522, *available at* https://www.cdc.gov/mmwr/volumes/69/wr/mm6917e1.htm?s_cid=mm6917e1_w (**Exhibit 20**).

[33]    *Minneapolis Rental Housing Brief*, HousingLink (July 2020) (**Exhibit 21**).

[34]    *Affordable Listings Report*, HousingLink (July 2020) (**Exhibit 22**).

185.     Without open shelter space and adequate affordable housing, people with low or no incomes like the named Plaintiffs have nowhere else to go – they have to live outside.[35]

186.     The tents Plaintiffs pitch in Minneapolis parks become their homes.  Inside those tents, Plaintiffs generally keep all of their possessions.

187.     These possessions include life's necessities, such as blankets, a sleeping bag to sleep in and stay warm, clothing, and medication.

188.     Plaintiffs also possess valuable items, such as court documents, identification documents, and family photographs and other keepsakes.

189.     In some instances, losing these possessions—such as medications, or the tents that provide shelter—imperil Plaintiffs' health and safety.

190.     Despite the known shortage of shelter space and affordable housing, by late June 2020, employees of the MPRB began to strategize ways to "rescind" MPRB Resolution 2020-253 that declared parks as refuge spaces for the homeless.[36]

---

[35]     Wilder Study at 2, *supra* note 26. ("In addition to a shortage of shelter beds for those experiencing homelessness, there is a gap between the incomes of people experiencing homelessness and the affordability and availability of rental units, a finding that is consistent with previous study reports.").

[36]     Email from Michael Schroeder, Assistant Superintendent for Planning Services, to Jennifer Ringold, Deputy Superintendent (June 28, 2020) (**Exhibit 23**).

191.    On July 15, 2020, the MPRB passed Resolution 2020-267, which rescinded the previous resolution and outlined how the MPRB would begin to target encampments for "removal."[37]   Mayor Frey approved the resolution on July 20, 2020.[38]

192.    The new resolution established a process by which the MPRB required encampments to secure 14-day permits.[39]   It directed MPRB staff to identify which parks could host encampments and capped the number of tents allowed in each permitted encampment.[40]   According to the resolution, the MPRB would supply permitted parks with restrooms or portable toilets, hand washing stations, and trash and recycling containers.[41]

193.    Resolution 2020-267 stated that "any encampment that does not have a necessary permit pursuant to this resolution will be subject to removal from park property."[42]

---

[37]    Resolution 2020-267, MINNEAPOLIS PARK & RECREATION BOARD, *Resolution Amending Adopted Resolution 2020-253 to Limit the Total Number Parks Available for Temporary Encampments and Provide Direction for the Design and Facilitation of Temporary Encampments in Parks that Supports the Health and Safety of Individuals Experiencing Homelessness and Preserves Access to Recreation Features for Park Visitors* (July 15, 2020), *available at* https://minneapolisparksmn.iqm2.com/Citizens/Detail_LegiFile.aspx?Frame=&MeetingID=2087&MediaPosition=&ID=5115&CssClass= (**Exhibit 24**).

[38]    *Id.*

[39]    *Id.*

[40]    *Id.*

[41]    *Id.*

[42]    *Id.*

194.     Resolution 2020-267 stated that two large encampments at Powderhorn Park had 282 occupants on July 9, 2020, and that the encampments there and "at other parks" did not conform to COVID-19-related health guidance and were a purported threat to public health and human safety.[43]

195.     The resolution also recognized that the "City, County, and State agencies" were needed to "reduc[]" the size of encampments."[44]

196.     The next day, on July 17, 2020, the MPRB asked Sheriff Hutchinson, subject to his "approv[al]," for his "assistance" and "cooper[ation]" to "implement the terms of Resolution 2020-267."[45]   In the request to the Sheriff, the MPRB also stated that it would send a formal request to the "state of Minnesota, Hennepin County, and city of Minneapolis for assistance in managing encampments and serving the encampments occupants."

197.     The permitting process became the primary mechanism Defendants used to target encampments for sweeps.  On July 18, 2020, Superintendent Bangoura called for "immediate enforcement of locations, size and spacing" of unpermitted parks after expressing of concerns about tents appearing at McRae and Lyndale Parks.[46]

---

[43]     *Id.*

[44]     *Id.*

[45]     Email from Jono Cowgill, Commissioner, Park Board District 4 to "Sheriff Hutch," David Hutchinson (July 17, 2020) (**Exhibit 25**).

[46]     Email from Al Bangoura, Superintendent of MPRB to Michael Schroeder, Assistant Superintendent for Planning Services (July 18, 2020) (**Exhibit 26**).

198.    Chief Jason Ohotto wrote in August of 2020 that "[l]arge demobilizations will be part of a planned and coordinated effort" between the MPRB, City, and Hennepin County.[47]  Despite the governor's Order prohibiting sweeps absent certain circumstances, in an email to employees of the MPRB, City, and Hennepin County about this coordinated effort to clear encampments, Chief Ohotto ended with a call to action: "It is time to return parks to their intended purpose."[48]

199.    Chief Ohotto acted with haste, seeking to immediately clear any tents that appeared.  For example, on August 18, 2020, at 5:33 PM, Chief Ohotto was informed via email that a Minneapolis resident had spotted three tents on the South side of Minnehaha Creek, between 34th and 32nd Avenue South.  Only four minutes after receiving this information, and without any further details about the tents' residents, the availability of shelter space at the time, or the conditions in that area, Chief Ohotto told his subordinates to "issue notices."[49]

200.    Despite the lack of sufficient shelter space or affordable shelter, since July of 2020, Defendants have "cleared" at least four encampments in Minneapolis parks—each

---

[47]    Email from Jason Ohotto, Chief of Park Police Department, to, among others, Al Bangroura, Superintendent of the MPRB, Donald W. Ryan –an employee of Hennepin County, and David G. O'Connor-an employee of the City (Aug. 7, 2020) (**Exhibit 27**).

[48]    *Id.*

[49]    Email from Jason Ohotto to PoliceSupervisors@minneapolisparks.org (Aug. 18, 2020) (**Exhibit 27-A**).

time confiscating and nearly immediately destroying all of the personal property they found and displacing residents who had nowhere else to go.[50]

201.    Upon information and belief, Defendant Sheriff Hutchinson has directed his deputies, and Defendant Police Chief Arradondo has directed his officers, to assist the Park Police in clearing the encampments in Minneapolis Parks and arrest individuals who fail to comply with MPD and Park Police orders.[51]

202.    Defendants failed to provide any or adequate notice to residents of encampments that Defendants would forcefully remove them from their homes located in the encampments.[52]

---

[50]    Exhibit 1, *supra* note 2 (Aug. 10-12, 2020 – Kenwood and Elliot Parks) (Aug. 14, 2020 – Powderhorn Park (Sept. 24, 2020 – Peavey Park).

[51]    *See Tent camps put homeless, others at risk* (Aug. 14, 2020, 11:41 AM), STAR TRIBUNE, *available at https://www.startribune.com/tent-camps-put-homeless-others-at-risk/572103582/* (**Exhibit 28**) ("Park police, with cooperation from the Minneapolis Police Department and the Hennepin County sheriff, cleared two on Wednesday, and some tents in Loring Park were taken down early Thursday.").

[52]    In fact, internal MPRB emails show that the MPRB wanted to keep proposed dates of upcoming sweeps private, possibly to avoid giving protestors time to mobilize.  In an email to Chief Ohotto and others on August 11, 2020, one MPRB employee wrote the dates of mobilization for five different parks and stated: "I don't know how public [sweeps] at Loring and [Powderhorn West] are, so keep the info within."  Email Jenna Tuma to Nicholas Gerold, and others (Aug. 11, 2020) (**Exhibit 29**).

203.    MPRB "Notices of Transition" or "Notices to Vacate" allegedly served to residents of Powderhorn, Loring, and Matthews Parks did not contain deadlines by which residents had to vacate the parks.[53]

204.    Park Police were also allegedly dispersed to give notices to individual residents at various parks, but some of these notices likewise contained no deadline.[54] Regardless, when officers from the Park Police, Minneapolis Police Department, and deputies from the Hennepin County Sheriff's Office arrived at various encampments in July, August, and September to rid them of people and their property, and arrest those who interfere or refuse to leave, some encampment residents like Named Plaintiffs were taken by surprise.

205.    Upon information and belief, the sweeps described above were ordered by Superintendent Al Bangoura and/or other final City policymakers.

206.    During the sweeps, Defendants ensured that heavy construction equipment was present to dispose of residents' personal property and clear people from the encampment.  Below are photographs taken by STAR TRIBUNE photographer David Joles

---

[53]    Notice of Transition regarding Powderhorn Park (July 31, 2020); Notice to Vacate regarding Loring Park (Aug.18, 2020); Notice to Vacate regarding Mathews Park (Aug. 19, 2020) (**Exhibit 30**).

[54]    *See, e.g.*, Notices from July 17, 2020 and August 8, 2020 (**Exhibit 31**)

and photographer Ben Hovland at the clearing of Powderhorn Park on August 14, 2020:



[55]



[56]

---

[55]     Tim Harlow, *Minneapolis officials clear Powderhorn Park of last campers*, STAR TRIBUNE (Aug. 14, 2020, 11:11PM), *available at* https://www.startribune.com/officials-clear-powderhorn-park-in-minneapolis-of-last-campers/572113042/?refresh=true#1 (**Exhibit 32**).  Photographs by David Joles.

[56]     Photograph by Ben Harlow (Aug. 14, 2020).

207.    Residents of encampments and protestors have been arrested and tear gassed during sweeps of encampments.   Below are photographs taken by STAR TRIBUNE photographer David Joles at the clearing of Powderhorn Park on August 14, 2020:





208.    When Named Plaintiffs and putative class members are cleared from a public park, they have to relocate to another public space, or rely on the charity of organizations

---

57      Exhibit 32, *supra* note 54.

like ZACAH or family and friends for temporary shelter.  Without adequate shelter space or affordable housing, this cycle of homelessness between sleeping in public spaces, in cars, on friend's couches, or in inexpensive hotels, repeats indefinitely.

209.    Defendants did not have a warrant or probable cause to seize Plaintiffs' property during these sweeps.

210.    Defendants' actions in these sweeps deprived Plaintiffs of valuable property in violation of their Fourth and Fourteenth Amendment rights.

211.    Upon information and belief, Defendants do not have a policy to inventory and safeguard seized property, but simply discard and destroy it.

212.    Defendants' actions in these sweeps, including but not limited to the use of bulldozers, armed officers, chemical irritants, and threats of arrest, subjected Named Plaintiffs to danger of Defendants' own making.

213.    Upon information and belief, Defendants have conducted other unannounced property sweeps of homeless encampments without adequate due process of law, where they have ejected people from public parks and seized and destroyed property without legal justification.

214.    As of October 15, 2020, there were an estimated 222 tents in 14 Minneapolis parks.[58]  Defendant Superintendent Al Bangoura has announced that these remaining

---

[58]    Exhibit 1, *supra* note 2.

encampments will be "disbanded likely sometime in October."[59]  Upon information and belief, Defendants' planned sweeps will be carried out in the same fashion as previous ones, whereby Defendants will displace Plaintiffs and the putative class members and destroy their property with no or inadequate notice.

215.     Injunctive relief is necessary as Plaintiffs are without adequate remedy at law.

## CAUSES OF ACTION

## COUNT I:

### Unlawful Seizure in Violation of the Fourth Amendment of the United States Constitution and Article I, Section 10 of the Minnesota Constitution

216.     Plaintiffs reallege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

217.     Plaintiffs have a constitutionally-protected property interest in their personal belongings.

218.     Defendants' destruction of Plaintiffs' property constitutes a meaningful interference with Plaintiffs' possessory interest in their property, a seizure.

219.     Defendants' policies, practices, and custom of seizing Plaintiffs' property without a valid warrant, probable cause, or exigent circumstances is unreasonable and contrary to the Fourth Amendment of the United States Constitution, as applied to the states

---

[59]    9-2-2020 *Superintendent Bangoura Encampment Remarks*, Minneapolis Park & Recreation Board, https://www.minneapolisparks.org/encampments/9-2-2020-superintendent-bangoura-encampment-remarks/ (**Exhibit 33**).

by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, and Article I, Section 10 of the Minnesota Constitution.

## COUNT II:

### Violation of the Right to Privacy Under the Fourth Amendment of the United States Constitution and Article I, Section 10 of the Minnesota Constitution

220.    Plaintiffs reallege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

221.    Plaintiffs had an actual, subjective expectation of privacy in their personal property, and that privacy expectation was reasonable.

222.    Defendants' policy, pattern, and custom of seizing and destroying Plaintiffs' property without a valid warrant, probable cause, or exigent circumstances violated their right under the Fourth Amendment of the United States Constitution, as applied to the states by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, and Article I, Section 10 of the Minnesota Constitution to be free from disturbance in their private affairs and invasion of their homes without authority of law.

## COUNT III:

### Procedural Due Process Violation Under the Fourteenth Amendments of the United States Constitution and Article I, Section 7 of the Minnesota Constitution

223.    Plaintiffs reallege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

224.    Plaintiffs have a constitutionally-protected property interest in their personal belongings.

225.     Defendants' destruction of Plaintiffs' property deprives Plaintiffs' of a protected possessory interest in their property.

226.     Defendants' policy, pattern, and custom of seizing and destroying Plaintiffs' property without adequate and effective notice, opportunity to be heard, or pre- or post-deprivation mechanism to challenge and reclaim their property violates Plaintiffs' right to due process of law protected by the Fourteenth Amendment to the United States Constitution, through 42 U.S.C. § 1983, and Article I, Section 7 of the Minnesota Constitution.

### COUNT IV:

**Substantive Due Process Violations Under the Fourteenth Amendment of the United States Constitution and the Minnesota Constitution**

227.     Plaintiffs reallege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

### *Privacy*

228.     Plaintiffs have a constitutionally-protected right to privacy, in their private affairs and in their personal property.

229.     Defendants' destruction of Plaintiffs' property constitutes an unlawful disturbance in Plaintiffs' private affairs and an invasion of privacy in their belongings.

230.     Defendants' forceful ejection of Plaintiffs from their shelters and summary and unilateral destruction of Plaintiffs' property infringes on Plaintiffs' fundamental liberty interest, Plaintiffs' right to privacy.

231.    Defendants' use of bulldozers, armed officers, chemical irritants, and threats of arrest is not narrowly tailored to serve a compelling state interest.

232.    Defendants' policy, pattern, and custom violates Plaintiffs' substantive due process right to privacy protected by the Fourteenth Amendment, through 42 U.S.C. § 1983, and the Minnesota Constitution.

### *State-Created Danger*

233.    Plaintiffs are members of a limited, precisely definable group.

234.    Defendants' use of bulldozers, armed law enforcement officers, and chemical irritants when forcefully, and without notice, ejecting Plaintiffs from their shelters, places Plaintiffs at significant risk of serious, immediate, and proximate harm that Plaintiffs would not otherwise have faced without Defendants' actions.

235.    The risk to Plaintiffs created by Defendants' conduct was obvious and known to Defendants.

236.    Defendants acted recklessly in conscious disregard of the risk they created because of the forceful manner in which Defendants ejected Plaintiffs from their shelters and destroyed their vital personal property.

237.    Defendants' conduct, as above described, shocks the conscience.

238.    As a direct and proximate consequence of Defendants' above-described policy, pattern, and custom, Plaintiffs were subjected to danger of Defendants' own making in violation of the Fourteenth Amendment to the United States Constitution, through 42 U.S.C. § 1983, and the Minnesota Constitution.

## COUNT 5:

### Conversion in Violation of Minnesota Common Law

239.    Plaintiffs reallege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

240.    Plaintiffs were in possession of their personal property at the time Defendants' intentionally seized and destroyed their property without notice, an opportunity to retrieve it, or adequate compensation, depriving the Plaintiffs of their possessory interest in the property.

241.    Defendants had no lawful authority to seize or destroy Plaintiffs' property.

242.    As a direct and proximate consequence of the Defendants' acts, Plaintiffs suffered and continue to suffer the loss of their personal property.

243.    Plaintiffs are entitled to compensatory damages for the loss of their property.

### DECLARATORY RELIEF

244.    Plaintiffs reallege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

245.    An actual controversy exists between Plaintiffs and Defendants in that Defendants have engaged in the unlawful and unconstitutional acts set forth herein. Plaintiffs have suffered actual harm as a result of Defendants' unlawful acts and will continue to suffer harm if Defendants' unlawful acts are permitted to continue.  Plaintiffs seek a declaration of their rights with regard to this controversy and a declaration that Defendants' policies, practices, and customs as set forth herein violate those rights under the United States and Minnesota Constitutions.

55

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

I. For preliminary and permanent injunctive relief enjoining Defendants from continuing its unlawful policies, practices, and customs as set forth herein;

II. For declaratory relief, pursuant to 28 U.S.C. §§ 2201, 2202, and Rule 57 of the Federal Rules of Civil Procedure, as requested above;

III. For compensatory and punitive damages, in amounts to be determined at trial, against Defendants;

IV. For an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

V. For such additional relief as the Court deems just and appropriate.

**MID-MINNESOTA LEGAL AID**

Dated: <u>December 14, 2020</u>

BY: <u>s/ Justin H. Perl</u>
Justin H. Perl (No. 0151397)
Dorinda L. Wider (No. 0162334)
Rebecca Stillman (No. 039855)
111 North Fifth Street, Suite #100
Minneapolis, MN 55403-1604
Tel. and Fax: (612) 746-3727
Tel. and Fax: (612) 746-3624
Tel. and Fax: (612) 746-3759
Email: jperl@mylegalaid.org
dlwider@mylegalaid.org
rstillman@mylegalaid.org

and

**AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA**

BY: <u>s/ Teresa Nelson</u>
Teresa Nelson (No. 0269736)
Clare Diegel (No. 0400758)
Isabella Salomão Nascimento (No. 0401408)

American Civil Liberties Union of Minnesota
P.O. Box 14720
Minneapolis, MN 55414
Tel: (651) 645-4097
Fax: (651) 647-5948
Email:    tnelson@aclu-mn.org
             cdiegel@aclu-mn.org
             inascimento@aclu-mn.org

***Attorneys for Plaintiffs***