**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Patrick Berry, Henrietta Brown, Nadine Little, Dennis Barrow, Virginia Roy, Joel Westvig, Emmett Williams, Gina Mallek, Daniel Huiting, *on behalf of themselves and a class of similarly-situated individuals*; and ZACAH,

Plaintiffs,

vs.

Hennepin County; Hennepin County Sheriff David Hutchinson, *in his individual and official capacity*; City of Minneapolis; Minneapolis Mayor Jacob Frey, *in his individual and official capacity*; Medaria Arradondo, *in his individual and official capacity*; Minneapolis Park and Recreation Board, Superintendent of the Minneapolis Park and Recreation Board Al Bangoura, *in his individual and official capacity*; Park Police Chief at the Minneapolis Park and Recreation Board Jason Ohotto, *in his individual and official capacity*; Police Officers John Does; and Police Officer Jane Does,

Defendants.

Case No. 20-CV-02189-WMW-LIB

District Judge Wilhelmina Wright
Magistrate Judge Leo I. Brisbois

**HENNEPIN COUNTY DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

## INTRODUCTION

Plaintiffs are nine unsheltered individuals who have stayed outside in encampments in Minneapolis parks during the past year, and a nonprofit that has funded hotel stays for many Plaintiffs. Plaintiffs' Amended Complaint claims that Defendants—including Hennepin County and Hennepin County Sheriff David Hutchinson (the "County

Defendants")—(1) "forceful[ly] eject[ed]" Plaintiffs from park encampments when those encampments were closed and (2) seized or destroyed their personal belongings. Plaintiffs seek damages for the alleged loss of their property and more consequentially, ask this Court to enjoin the City of Minneapolis, the Minneapolis Parks and Recreation Board (the "MPRB"), and the County from closing encampments of unsheltered people staying on public land that these entities own.

In support of their claims, Plaintiffs make sweeping allegations about the behavior of all "Defendants," lumping the County Defendants in with all other defendants. Digging past their overstatements, though, Plaintiffs do not plausibly allege that the County Defendants participated in the conduct they complain of (and indeed, the evidence shows that the opposite is true). Moreover, most Plaintiffs (at least six of the nine) are not currently staying in encampments, and any Plaintiffs that might be in an encampment do not sufficiently allege that they will suffer an "imminent" or "certainly impending" injury. Plaintiffs thus lack standing to sue the County Defendants.

In addition, the Amended Complaint fails to state a claim for relief against the County Defendants. For example, Plaintiffs do not plausibly claim that Hutchinson was personally involved in any constitutional violation or plead any facts about specific County policies or customs, as required to support a claim under *Monell*. Since the Amended Complaint fails to support its conclusory allegations with even the most basic of facts, it fails to meet the federal "plausibility" standard.

The Court should dismiss Plaintiffs' claims against the County Defendants.

## FACTUAL BACKGROUND

Plaintiffs' Amended Complaint (ECF 70) alleges the following:

### I. The Encampments

In 2020, people experiencing homelessness lived in encampments on public land in Minneapolis, particularly in parks. (*See generally* Am. Compl.) The MPRB manages the City of Minneapolis park system. (*Id.* ¶ 139.)

On April 8, 2020, Governor Walz issued Emergency Executive Order 20-33 ("EEO 20-33") in response to the COVID-19 pandemic. (Am. Compl. ¶ 168; Ex. 6.[1]) EEO 20-33, the first of Walz's "stay home" orders, exempted "[i]ndividuals without a home" from its stay-home requirements and provided that encampments of unsheltered people "should not be subject to sweeps or disbandment by state or local governments." (Ex. 6 ¶ 5(g).) Walz changed this restriction on April 29, 2020 in Emergency Executive Order 20-47 ("EEO 20-47"), which stated that "state or local governments may restrict, limit, or close encampment sites" if *either* of two conditions existed:

> 1. "If a local government entity is providing sufficient alternate housing, shelter, or encampment space that complies with" federal and state COVID-19-related guidance; *or*
>
> 2. "[I]f an encampment has reached a size or status that is a documented threat to the health, safety, or security of residents."

(Am. Compl. ¶ 169; Ex. 7 ¶ 1(ii).) On May 13, 2020, Walz issued Emergency Executive Order 20-55 ("EEO 20-55"), which repeated that local governments could close

---

[1] Unless otherwise noted, "Ex." refers to an exhibit to Plaintiffs' Amended Complaint. (*See* ECF 70-1 through 70-3.)

encampment sites if there was either "sufficient alternate housing, shelter, or encampment space" or "a documented threat to the health, safety, or security of residents." (Am. Compl. ¶ 171; Ex. 9 ¶ 5.)

In June and July 2020, the MPRB adopted resolutions stating its commitment to offer people experiencing homelessness "refuge space in Minneapolis parks" and adopting a temporary permitting process for park encampments. (Am. Compl. ¶¶ 173, 191-95; Exs. 13, 24.) MPRB Resolution 2020-267 also limited the size and locations of encampments, and stated that the MPRB could restrict, limit, or close encampments pursuant to EEO 20-55. (Ex. 24.) On July 17, 2020, the MPRB sent a letter to Hutchinson that stated: "[W]e are requesting your assistance and to cooperate with us should the need arise to implement the terms of Resolution 2020-267." (Am. Compl. ¶ 196; Ex. 25.) Plaintiffs do not allege that Hutchinson (or anyone else from Hennepin County) requested the letter or responded to it.

On July 18, 2020, MPRB Superintendent Bangoura called for enforcement of Resolution 2020-267 regarding the location, size, and spacing of tents. (*Id.* ¶ 197; Ex. 26.) On August 7, 2020, Chief Ohotto emailed Park Police officers about demobilization of certain encampments in Minneapolis parks, stating:

> With the approval of the Board of Commissioners and MPRB legal, Superintendent Bangoura has authorized and ordered the demobilization of encampments within parks over the next several weeks. <u>Large demobilizations will be part of a planned and coordinated effort.</u> Some of these operations will require additional staffing resources and overtime will be authorized. I'm hopeful we can fill the OT with volunteers.

(Am. Compl. ¶ 198; Ex. 27.) One County employee was copied on this email. (Ex. 27.)

In July and August, the MPRB issued written notices to residents of encampments in certain Minneapolis parks. (Am. Compl. ¶¶ 203-04; Exs. 30, 31.) Some notices stated that the MPRB had "documented significant health and safety concerns," advised residents that they would "need to leave the park," and provided information about alternative shelter. (Ex. 30.) Other notices stated that "this camp/shelter is in violation of Minneapolis Park and Recreation Board rules and ordinances" and would be "subject to removal" and provided information about shelter resources. (Ex. 31.) On September 2, 2020, Bangoura stated that the MPRB had successfully disbanded multiple encampments and that the MPRB would likely disband additional encampments in Minneapolis parks sometime in October. (Am. Compl. ¶ 214; Ex. 33.)

The Amended Complaint alleges that since July 2020, Defendants cleared four encampments in Minneapolis parks and in clearing the encampments destroyed residents' personal property. (Am. Compl. ¶ 200.) It alleges—"[u]pon information and belief"—that Hutchinson directed Hennepin County Sheriff's Office ("HCSO") deputies "to assist the Park Police in clearing the encampments in Minneapolis Parks." (*Id.* ¶ 201.) It also vaguely asserts that HCSO deputies "arrived at various encampments in July, August, and September to rid them of people and their property." (*Id.* ¶ 204.)

The Amended Complaint also alleges that "Defendants" used bulldozers and chemical irritants to clear encampments in Minneapolis parks. (*Id.* ¶¶ 206-07, 212.) It includes photographs of an encampment clearing, which are of Park Police and do not reflect the presence of Hutchinson or any other HCSO personnel. (*See id.* ¶¶ 206-07.) Indeed, a *Star Tribune* article attached to the Amended Complaint states that "Minneapolis

park police and Park Board staffers … cleared the remaining encampment in Powderhorn Park" and does not suggest that Hutchinson or County personnel were actively involved in the disbandment. (Ex. 32.) Further, the Amended Complaint alleges that the alleged "sweeps … were ordered by Superintendent Al Bangoura and/or other final City policymakers," not by the County Defendants. (Am. Compl. ¶ 205.)

## II. The Plaintiffs

Plaintiffs are Zakat, Aid and Charity Assisting Humanity ("ZACAH"), a private nonprofit, and nine unsheltered individuals who lived in encampments in Minneapolis during the past year.

ZACAH: According to Plaintiffs, ZACAH's mission is to assist people "on the verge of experiencing homelessness" by providing financial assistance "to keep people from becoming homeless." (*Id.* ¶¶ 5-6.) Plaintiffs allege that "Defendants' sweeps" caused ZACAH to spend approximately $113,000.00 to pay for hotel rooms "for displaced people on an emergency basis." (*Id.* ¶¶ 8-9.) Plaintiffs do not allege that Defendants forced ZACAH from any encampment or seized or destroyed any of ZACAH's property.

Dennis Barrow: Plaintiffs allege that Barrow lived in Powderhorn Park in Minneapolis for "a couple of months before law enforcement showed up and forced him out." (*Id.* ¶ 14.) According to Plaintiffs, Barrow received notice that he had to leave Powderhorn in 72 hours, but "officers showed up with bulldozers only 24 hours later." (*Id.*) They allege that Barrow lost his tent, sleeping bag, clothes, medication, and court documents when police cleared Powderhorn West. (*Id.* ¶ 7.) Plaintiffs acknowledge that Barrow is worried about staying in a shelter, and he is now staying in a camper van. (*Id.*

¶¶ 20-21.) The Amended Complaint does not allege that the County Defendants forced Barrow from Powderhorn or seized or destroyed his property.

Patrick Berry: Plaintiffs allege that Berry has stayed in various parks in Minneapolis in 2020, including Powderhorn. (*Id.* ¶¶ 25-28.) They allege that on August 10, 2020, Park Police and Minneapolis Police cleared Powderhorn West; that officers used chemical irritants and bulldozers; and that Berry's tent, sleeping mattress, and sleeping bag were lost. (*Id.* ¶¶ 29-34.) They also allege that Berry was not "provided any eviction notice." (*Id.* ¶ 29.) Plaintiffs acknowledge that Berry has not tried to go to a shelter. (*Id.* ¶ 36.) Plaintiffs also acknowledge that Berry now lives in his own apartment, and that ZACAH provided Berry with a security deposit and first month's rent. (*Id.* ¶ 37.) The Amended Complaint does not allege that the County Defendants forced Berry from Powderhorn or seized or destroyed his property.

Henrietta Brown: Plaintiffs allege that Brown slept on the Midtown Greenway[2] in Minneapolis before moving to Peavey Park and staying there for one month. (*Id.* ¶¶ 41-43.) They allege that on September 24, 2020, police forced Brown to leave Peavey, and that Brown lost her tent, documents, and family photos. (*Id.* ¶¶ 44-49.) They also allege that Brown "believes she saw officers from the Park Police, and Minneapolis Police Department, and deputy sheriffs from the Hennepin County Sheriff's Office participating in the expulsion," and that a deputy sheriff told Brown she could not retrieve documents

---

[2] The Amended Complaint alleges that the Midtown Greenway is operated by the Hennepin County Regional Railroad Authority, a non-party. (Am. Compl. ¶ 92 n.1.)

from her tent and threatened to arrest her. (*Id.* ¶¶ 46-47.) Plaintiffs also allege that Brown "never received an eviction notice." (*Id.* ¶ 47.) According to the Amended Complaint, Brown is now staying at a hotel funded by ZACAH. (*Id.* ¶ 54.) The Amended Complaint does not allege that the County Defendants destroyed any of Brown's property.

Nadine Little: Plaintiffs allege that Little has stayed outside in various locations in Minneapolis since March 2020, including Kenwood and Brackett Parks. (*Id.* ¶¶ 56-64.) They allege that Little left Kenwood after receiving an eviction notice, but that Little's tent was destroyed by someone while she was away. (*Id.* ¶ 62.) According to the Amended Complaint, Little moved to Brackett until it "was emptied on October 1," and she is now living in a hotel funded by ZACAH. (*Id.* ¶ 64.) Plaintiffs acknowledge that Little would rather be in a camp than in a shelter. (*Id.* ¶ 65.) The Amended Complaint does not allege that the County Defendants forced Little from any encampment or seized or destroyed any of her personal property.

Virginia Roy: Plaintiffs allege that Roy stayed at Powderhorn and Brackett Parks during 2020. (*Id.* ¶ 73.) They further allege that since October 1, Roy has been living in a hotel room provided by ZACAH. (*Id.* ¶ 77.) Plaintiffs alleges that Roy has been turned away from multiple shelters "because they were full." (*Id.* ¶ 72.) Plaintiffs acknowledge, however, that Roy has lived outside for most of the last 20 years and "does not want to go to shelters." (*Id.* ¶¶ 68, 71.) The Amended Complaint does not allege that the County Defendants forced Roy from any encampment or seized or destroyed any of her personal property.

Joel Westvig: Plaintiffs alleges that Westvig stayed for two months in Loring Park in Minneapolis before moving to B.F. Nelson Park, also in Minneapolis, where they allege he now stays.[3] (*Id.* ¶¶ 82-88.) They allege that Westvig "heard rumors that the police were going to clear [Loring], but he never received any written notice about it." (*Id.* ¶ 86.) According to Plaintiffs, a volunteer helped Westvig move to B.F. Nelson. (*Id.* ¶ 88.) Plaintiffs allege that on October 15, 2020, an MPRB employee told residents at B.F. Nelson that they had to leave because the encampment's permit would expire on October 19. (*Id.* ¶ 89.) The Amended Complaint does not allege that the County Defendants forced Westvig from any encampment or seized or destroyed any of his personal property.

Emmett Williams: Plaintiffs allege that Williams moved with his fiancé to Powderhorn in July 2020, where he lived for about two and a half weeks. (*Id.* ¶¶ 101-02.) They allege that Williams lost some clothing when police cleared Powderhorn East, and that "police were aggressive and started spraying people with chemical irritants." (*Id.* ¶¶ 105-06.) They also allege that Williams received no notice that Powderhorn East would be disbanded. (*Id.* ¶ 103.) According to Plaintiffs, Williams is now staying at Martin Luther

---

3 Although the Amended Complaint pleads that Westvig is staying at B.F. Nelson, that encampment closed between October 21, 2020 and November 4, 2020. *Compare* Pierce Decl. Ex. 1 (October 21, 2020 MPRB update listing B.F. Nelson encampment as having an active permit) *with* Pierce Decl. Ex. 2 (November 4, 2020 MPRB update listing then-existing encampments at the Mall, Franklin Steele, Minnehaha, and Martin Luther King, Jr. Parks only); *see also* Minneapolis Park and Recreation Board, Encampments, https://www.minneapolisparks.org/encampments/ (last visited Jan. 11, 2021) ("MBRB Encampments Website") (stating that there are "0" encampments in MPRB parks "as of January 7").

King, Jr. ("MLK") Park in Minneapolis. (*Id.* ¶ 109.)[4] The Amended Complaint does not allege that the County Defendants forced Williams from any encampment or seized or destroyed any of his personal property.

Gina Mallek: Plaintiffs allege that Mallek stayed in a tent at Powderhorn until July 20, 2020, when "Park Police" told Mallek she had to leave. (*Id.* ¶ 113-15, 117.) According to Plaintiffs, Mallek had received no notice that the encampment would be closed. (*Id.* ¶ 116.) They further claim that as Mallek was trying to gather her belongings, "police and/or other MPRB employees came and started throwing everything away," and that Mallek lost items including photographs, documents, and furniture. (*Id.* ¶¶ 118-19.) After leaving Powderhorn, Plaintiffs allege that Mallek went to B.F. Nelson, only to learn that that encampment also was to be closed. (*Id.* ¶¶ 120-21.) Plaintiffs allege that Mallek then went to a "lot in North Minneapolis owned by the City," but that Mallek was told by City employees, a Minneapolis Police officer, and a County employee that she "would have to leave in December because of 'unsafe soil.'" (*Id.* at ¶¶ 121-22.) Plaintiffs do not allege that any Defendants forced Mallek to leave or even where Mallek is currently staying. The Amended Complaint also does not allege that the County Defendants forced Mallek from any encampment or seized or destroyed any of her personal property.

---

[4] Although the Amended Complaint pleads that Williams is staying at MLK Park, that encampment closed between December 16, 2020 and January 6, 2021. *Compare* Pierce Decl. Ex. 3 (December 16, 2020 MBRB update listing then-existing encampments at MLK and Minnehaha Parks only) *with* Pierce Decl. Ex. 4 (January 6, 2021 MBRB update listing Minnehaha as only then-existing encampment); *see also* MBRB Encampments Website.

Daniel Huiting: Plaintiffs allege that Huiting stayed in encampments at Mathews and Riverside Parks during 2020. (*Id.* ¶ 127.) They allege that Huiting was staying at Mathews in August or September when he "found an eviction notice on his tent." (*Id.* ¶ 129.) According to Plaintiffs, four or five days later Park Police threw away Huiting's tent and its contents—including his passport, phone, and prescription medication. (*Id.* ¶ 130.) Plaintiffs allege that Huiting then moved to Riverside, where he stayed for 1.5 months before Park Police "swept" the park. (*Id.* ¶ 132.) They also allege that Huiting had no notice that the park would be swept and that he again lost personal property during the sweep. (*Id.*) According to Plaintiffs, Williams is now staying in "temporary housing" in St. Paul. (*Id.* ¶ 133.) The Amended Complaint does not allege that the County Defendants forced Huiting from any encampment or seized or destroyed any of his personal property.

## PROCEDURAL BACKGROUND

Plaintiffs filed their Complaint on October 19, 2020, asserting five claims:

- Count I: Violation of Plaintiffs' right to be free from unreasonable seizures under the U.S. Constitution's Fourth Amendment and the Minnesota Constitution (ECF 1, ¶¶ 183-86);

- Count II: Violation of Plaintiffs' right to privacy under the U.S. Constitution's Fourth Amendment and the Minnesota Constitution (*id.* ¶¶ 187-89);

- Count III: Violation of Plaintiffs' right to procedural due process under the U.S. Constitution's Fourteenth Amendment and the Minnesota Constitution (*id.* ¶¶ 190-93);

- Count IV: Violation of Plaintiffs' right to substantive due process under the U.S. Constitution's Fourteenth Amendment and the Minnesota Constitution (*id.* ¶¶ 194-205); and

- Count V: Conversion of property in violation of Minnesota common law (*id.* ¶¶ 206-10).

Plaintiffs made the same five claims in their Amended Complaint, filed on December 14, 2020. (Am. Compl. ¶¶ 216-43.)

The Amended Complaint names both individuals and entities as defendants: Hennepin County; Sheriff Hutchinson; the City of Minneapolis, its Mayor, and Chief of Police; the Minneapolis Park and Recreation Board, its Superintendent, and Park Police Chief; and John and Jane Does, police officers whose identities are unknown. (*Id.* ¶¶ 134-44.) Sheriff Hutchinson, Mayor Frey, Police Chief Arradondo, Superintendent Bangoura, and Park Police Chief Ohotto are all named in their individual and official capacities. (*Id.* ¶ 1.) Plaintiffs seek injunctive and declaratory relief, compensatory and punitive damages, and attorneys' fees and costs. (*Id.* ¶¶ I-V.)

On the same day that Plaintiffs filed their Complaint, they moved for a temporary restraining order. (ECF 4.) They sought a broad injunction that would prohibit Defendants from:

- Clearing encampments from public land anywhere in Hennepin County;
- Confiscating Plaintiffs' property, unless Defendants adopted a policy that includes: (1) providing advance notice before an encampment is cleared; (2) inventorying and storing property for at least 90 days; and (3) processes for retrieving confiscated property; and
- Destroying property "reasonably appearing to belong" to Plaintiffs.

(*Id.* at 2.) On October 29, 2020, the Court denied Plaintiffs' motion, concluding that Plaintiffs failed to demonstrate that they would suffer irreparable harm absent an injunction. (ECF 59 at 11.)

The County Defendants now move to dismiss the Amended Complaint under Fed. R. Civ. P. 12(b)(1) and (6).

## ARGUMENT

### I. The Court lacks subject-matter jurisdiction over Plaintiffs' claims against the County Defendants because Plaintiffs lack standing.

The Court should dismiss the claims against the County Defendants because Plaintiffs lack standing to sue these defendants. The Court therefore lacks subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1).

#### A. Legal standard

"Federal jurisdiction is limited by Article III of the Constitution to cases or controversies; if a plaintiff lacks standing to sue, the district court has no subject-matter jurisdiction." *ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 958 (8th Cir. 2011). "Subject-matter jurisdiction is a threshold requirement which must be assured in every federal case." *Kronholm v. F.D.I.C.*, 915 F.2d 1171, 1174 (8th Cir. 1990). "If the asserted basis of federal jurisdiction is patently meritless, then dismissal for lack of jurisdiction is appropriate." *Biscanin v. Merrill Lynch & Co., Int'l.*, 407 F.3d 905, 907 (8th Cir. 2005).

Where a defendant's 12(b)(1) motion makes a "factual attack," as here, the court "may look outside the pleadings to affidavits or other documents," *Moss v. United States*,

895 F.3d 1091, 1097 (8th Cir. 2018), and "the nonmoving party does not have the benefit of 12(b)(6) safeguards," *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990); *see also Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016).

**B. Plaintiffs lack standing to sue the County Defendants.**

To demonstrate Article III standing, Plaintiffs bear the burden to show that: (1) they have "suffered an injury-in-fact"; (2) the injury is "fairly traceable to the challenged action of the defendant"; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (quotation marks, alterations, citations omitted). To establish that an injury is "fairly traceable" to a defendant's conduct, the "causal connection between the injury and the conduct complained of" must "be alleged with sufficient 'factual matter, accepted as true, to state a claim for relief that is plausible on its face.'" *Pederson v. Donald J. Trump for President, Inc.*, 465 F. Supp. 3d 929, 934 (D. Minn. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

To establish "injury-in-fact," plaintiffs must show that there has been "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (quotation marks, citations omitted). To be particularized, the injury must be "*certainly* impending"—allegations of possible future injuries are insufficient. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). If a plaintiff raises only "hypothetical or abstract" challenges, her claims must be dismissed. *Zanders v. Swanson*, 573 F.3d 591, 593 (8th Cir. 2009).

Plaintiffs' Amended Complaint does not meet these standards.

1. Plaintiffs lack standing because they do not plausibly allege that their alleged past injuries are "fairly traceable" to the challenged actions of the County Defendants.

Rather than specifying what harm is fairly traceable to the County Defendants, Plaintiffs' Amended Complaint makes sweeping allegations aimed at all Defendants. For example, Plaintiffs make the conclusory allegations that *all* Defendants displaced encampment residents, swept residents from public parks, and destroyed residents' property. (*E.g.*, Am. Compl. at 2 (discussing the "sweeps[] conducted by Defendants" and alleging that "Defendants' employees, including Defendant police officers, unlawfully seize and destroy personal property without adequate notice [or] just compensation"), ¶¶ 7-8, 15, 29, 61-62, 142-43, 178, 200, 202, 206.) And even where Plaintiffs acknowledge that it was the MPRB and Park Police who took action to close the encampments in which Plaintiffs stayed or to remove their property (*id.* ¶¶ 30, 117-18, 130, 132, 170, 191-99), Plaintiffs lump the County Defendants into these actions as well. Plaintiffs allege, on "information and belief," that Hutchison directed HCSO deputies to "assist the Park Police in clearing the encampments in Minneapolis Parks and arrest individuals who fail to comply with MPD and Park Police orders." (*Id.* ¶ 201.)

But examining Plaintiffs' actual allegations shows these conclusory claims to be unsupported as to the County Defendants. No Plaintiffs claim that they were removed from an encampment on County property, or that the County Defendants decided whether to close any encampment in a Minneapolis park.[5] No Plaintiffs claim that the County

5 The evidence shows that decisions about closing encampments were made by the government entity responsible for the property where an encampment was located.

Defendants took possession of or destroyed their property.[6] No Plaintiffs claim that Hutchinson or any County employee used bulldozers, chemical irritants, or other physical force to make Plaintiffs leave Minneapolis parks.[7]

Courts in this District have "repeatedly criticized the filing of 'kitchen-sink' or 'shotgun' complaints—complaints in which a plaintiff brings every conceivable claim against every conceivable defendant." *Jackson v. Dayton*, Civ. No. 17-00880 (WMW/TNL), 2018 WL 4473403, at *7 (D. Minn. Apr. 2, 2018), *report and recommendation adopted*, 2018 WL 3696600 (D. Minn. Aug. 3, 2018) (citing *Gurman v. Metro Hous. & Redev. Auth.*, 842 F. Supp. 2d 1151, 1153 (D. Minn. 2011)). Indeed, a complaint that "lumps all defendants together and does not sufficiently allege who did what to whom, fails to state a claim for relief because it does not provide fair notice of the grounds for the claims made against a particular defendant." *Tatone v. SunTrust Mortg., Inc.*, 857 F. Supp. 2d 821, 831 (D. Minn. 2012).

Under these principles, Plaintiffs may not keep the County Defendants in this case by making conclusory allegations about what "Defendants" did. Since Plaintiffs do not

---

(ECF 44 ¶ 11.) Accordingly, the County Defendants did not decide whether to close any encampment in a Minneapolis park. (*Id.*)

6 Plaintiffs Roy and Westvig do not claim to have lost any property at all.

7 Only one Plaintiff even alleges that she interacted with a County employee at the time an encampment was closed. Brown claims that she "believes she saw … deputy sheriffs from the Hennepin County Sheriff's Office participating in the expulsion" from Peavey Park, and that a deputy sheriff told her she could not retrieve documents from her tent. (*Id.* ¶¶ 46, 47.) Again, the evidence is to the contrary. (ECF 45 ¶¶ 5, 11-15.) And Brown does not allege that the County Defendants seized her property or forcefully ejected her from Peavey.

sufficiently plead that the County Defendants did either of the core things they complain of—(1) seizing Plaintiffs' personal possessions and (2) forcefully ejecting Plaintiffs from encampments[8]—Plaintiffs have not demonstrated that any alleged injury they suffered is "fairly traceable" to the County Defendants. They thus lack standing to sue these Defendants.[9]

2. Plaintiffs lack standing to pursue claims for prospective relief against the County Defendants.

Likewise, Plaintiffs lack standing to sue the County Defendants for relief from hypothetical future harm.

According to the Amended Complaint, six plaintiffs are not currently staying in an encampment. (Am. Compl. ¶¶ 20 (Barrow), 37 (Berry), 54 (Brown), 64 (Little), 77 (Roy), 133 (Huiting).) When denying Plaintiffs' motion for injunctive relief, this Court found that while these Plaintiffs "might resume living in an encampment in Hennepin County at some point, they presently are not subject to possible removal from encampments." (ECF 59 at 7.) The Court also observed that any future harm alleged by these Plaintiffs is "speculative because they currently do not live in encampments." (*Id.* at 8.) For this same reason, these

---

8 Moreover, the evidence shows that no County employee participated in those activities. (ECF 44 ¶ 11; ECF 45 at ¶¶ 5, 7-8, 10, 15.))

9 In addition, ZACAH lacks standing because the Amended Complaint does not allege that any Defendants violated *ZACAH's* rights. ZACAH does not claim to have lost its own personal property in encampments or that it or its staff were removed from encampments, and it has no standing to sue for alleged harm to the individual Plaintiffs. *Glickert v. Loop Trolley Transp. Dev. Dist.*, 792 F.3d 876, 881 (8th Cir. 2015) ("[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." (citation omitted)).

Plaintiffs cannot show that they have an injury that is "actual or imminent, not conjectural or hypothetical," *Lujan*, 504 U.S. at 560, or that is "certainly impending," *Clapper*, 568 U.S. at 409. Since Plaintiffs raise only "hypothetical or abstract" challenges about any claims to future relief against the County Defendants, these claims must be dismissed. *See id.* at 410 ("mere speculation" that injury might occur does not satisfy the "injury in fact" requirement); *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1030 (8th Cir. 2014); *Zanders*, 573 F.3d at 593.

As to the remaining three Plaintiffs: The Amended Complaint pleads that Westvig is staying at B.F. Nelson Park, but that encampment disbanded by November 4, 2020. (*See supra* n.3.) Likewise, although the Amended Complaint pleads that Williams is staying at MLK Park, that encampment closed between December 16 and January 6. (*See supra* n.4.) Plaintiffs do not allege where Mallek is currently staying, pleading only that she stayed at a "lot in North Minneapolis owned by the City" at some point after July 20, 2020. (Am. Compl. ¶¶ 117, 121-22.) None of these Plaintiffs claim that they are staying in an encampment on County property, and none plausibly claim that they will suffer an "actual," "imminent," or "certainly impending" future injury. So, they too lack standing to pursue claims for their future, hypothetical, injuries against the County Defendants. *Lujan*, 504 U.S. at 560; *Clapper*, 568 U.S. at 409; *Wallace*, 747 F.3d at 1030; *Zanders*, 573 F.3d at 593.[10]

---

[10] For similar reasons, the Court should decline to issue any declaratory relief about the scope of Plaintiffs' future rights as to Plaintiffs not currently staying in an encampment, since doing so would constitute an advisory opinion. *E.g.*, *Pub. Water Supply Dist. No. 8 v. City of Kearney*, 401 F.3d 930, 932 (8th Cir. 2005) (Article III limits courts to deciding

## II. The Amended Complaint fails to state a claim.

### A. Legal standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Gallagher v. City of Clayton*, 699 F.3d 1013, 1016 (8th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). But "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). A court may properly set aside legal conclusions, bare recitations of the elements of a claim, and indeterminate factual allegations. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).

### B. The Amended Complaint fails to state a claim that the County Defendants seized Plaintiffs' personal property unreasonably or without procedural due process (Counts I-III).

In Counts I through III, Plaintiffs allege that the County Defendants violated the Fourth and Fourteenth Amendments, as well as the Minnesota Constitution,[11] by seizing and destroying Plaintiffs' personal property unreasonably or without procedural due process. Both the Fourth Amendment and the Minnesota Constitution protect against

---

actual "Cases" and "Controversies" and thus precludes courts from "advising what the law would be upon a hypothetical set of facts" (citation omitted)).

[11] There is no private right of action for damages under the Minnesota Constitution. *Riehm v. Engelking*, 538 F.3d 952, 969 (8th Cir. 2008); *Bishop v. Jesson*, Civ. No. 14-01898, 2016 WL 906422, at *2 (D. Minn. Mar. 9, 2016).

"unreasonable searches and seizures." U.S. Const. amend. IV; Minn. Const. Art. I, § 10. "Ordinarily, [courts] analyze federal and state protections guaranteed by the Fourth Amendment to the United States Constitution and Article I, Section 10 of the Minnesota Constitution as co-extensive." *In re Welfare of M.L.M.*, 781 N.W.2d 381, 384 (Minn. Ct. App. 2010).

Likewise, both the Fourteenth Amendment and the Minnesota Constitution protect against deprivation of property without procedural due process. U.S. Const. amend. XIV, § 1; Minn. Const. Art. I, § 7. "The due process protection provided under the Minnesota Constitution is identical to the due process guaranteed under the Constitution of the United States." *McDonald v. City of St. Paul*, 679 F.3d 698, 703 n.3 (8th Cir. 2012) (quotation omitted). Procedural due process typically requires notice and the opportunity to be heard. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

In similar cases involving seizure of property from homeless encampments, courts have concluded that a municipality complies with the Fourth and Fourteenth Amendments when it provides notice and an opportunity to reclaim seized property. *Murray v. City of Philadelphia*, --- F. Supp. 3d ----, 2020 WL 5006046, at *5-7 (E.D. Pa. Aug. 25, 2020); *Proctor v. District of Columbia*, 310 F. Supp. 3d 107, 114-16 (D.D.C. 2018); *Miralle v. City of Oakland*, Civ. No. 18-06823, 2018 WL 6199929, at *3 (N.D. Cal. Nov. 28, 2018); *Hooper v. City of Seattle*, Civ. No. 17-00077, 2017 WL 591112, at *5 (W.D. Wash. Feb. 14, 2017); *cf. Lavan v. City of Los Angeles*, 693 F.3d 1022, 1027-33 (9th Cir. 2012).

In *Proctor*, for example, the court explained that "a warrantless seizure of property that has been abandoned is reasonable and consistent with the Fourth Amendment." 310 F.

Supp. 3d at 114 (quotation marks, alterations, citation omitted). The court held that the plaintiffs were unlikely to succeed on their Fourth Amendment claim because the municipality took reasonable precautions to avoid destruction of property that was not abandoned, including providing notice of encampment clean-ups, conducting outreach, storing property, and allowing individuals to reclaim stored property. *Id.* at 114-16. Similarly, in *Murray*, the court held that the plaintiffs were unlikely to succeed on their Fourth and Fourteenth Amendment claims because the municipality provided notice of planned property removal, stored non-hazardous items, and gave encampment residents an opportunity to reclaim seized property. 2020 WL 5006046, at *5-6.

In short, Counts I through III all present the Court with the same question—whether the Amended Complaint plausibly alleges that the County Defendants seized and destroyed Plaintiffs' personal property, without notice or an opportunity for Plaintiffs to reclaim it, and are therefore constitutionally liable.[12] The answer is no.

1. <u>A meaningful post-deprivation remedy exists and bars Counts I-III.</u>

A government official's deprivation of an individual's property rights does not violate the Fourth or Fourteenth Amendment when state law provides a meaningful post-deprivation remedy. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Ali v. Ramsdell*, 423

---

[12] Count II alleges that the County Defendants violated a Fourth Amendment "right to privacy." But there is no "general constitutional 'right to privacy'" under the Fourth Amendment. *Katz v. United States*, 389 U.S. 347, 350 (1967). Rather, when considering whether a "search" has occurred, courts ask whether the person had a reasonable expectation of privacy upon which the government infringed. *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

F.3d 810, 814 (8th Cir. 2005); *Hubenthal v. Winona Cty.*, 751 F.2d 243, 246 (8th Cir. 1984); *Burns v. Office of Attorney General*, Civ. No. 05-00858, 2009 WL 825778, at *20 (D. Minn. Mar. 27, 2009); *McKinney v. State*, Civ. No. 08-03769, 2008 WL 4831762, at *4 (D. Minn. Nov. 3, 2008). The Eighth Circuit has held that Minn. Stat. § 466.02, which provides that municipalities are subject to liability for their torts and those of their employees, therefore provides an adequate remedy that bars constitutional claims based on property deprivation. *Hubenthal*, 751 F.2d at 246; *see also Ali*, 423 F.3d at 814. Since Minnesota law provides a meaningful post-deprivation remedy, the Court should dismiss Counts I through III.

2. <u>Plaintiffs do not plausibly allege any constitutional violation by Hutchinson.</u>

In addition, this Court should dismiss Counts I through III because the Amended Complaint fails to plausibly allege that Hutchinson seized or destroyed Plaintiffs' property in violation of the U.S. or Minnesota Constitution.

To state an individual-capacity claim under § 1983, a complaint must set forth specific factual allegations showing what each named defendant allegedly did, or failed to do, that allegedly violated the plaintiff's federal constitutional rights. *Iqbal*, 556 U.S. at 676 (in § 1983 suits, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"); *Ellis v. Norris*, 179 F.3d 1078, 1079 (8th Cir. 1999) (affirming dismissal of § 1983 complaint where plaintiff "failed to allege facts supporting any individual defendant's personal involvement or responsibility for the violations"); *Madewell v. Roberts*, 909 F.2d 1203,

1208 (8th Cir. 1990) ("Liability under § 1983 requires a causal link to, and direct responsibility for, the deprivation of rights.").

Further, "[a] supervisor cannot be held liable, on a theory of respondeat superior, for an employee's unconstitutional actions." *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995); *see also Iqbal*, 556 U.S. at 677 ("[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct."). Rather, a supervisor can only be liable when: (1) the supervisor was personally involved in the violation; or (2) there was a pattern of unconstitutional conduct by subordinates, and the supervisor exhibited deliberate indifference to or tacit authorization of the conduct. *See Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014); *Parrish v. Ball*, 594 F.3d 993, 1002 (8th Cir. 2010); *Boyd*, 47 F.3d at 968.

Here, the Amended Complaint first fails to plausibly allege that Hutchinson was personally involved in any constitutional violation. *See Iqbal*, 556 U.S. at 676 (requiring § 1983 plaintiff to plead that an official violated the Constitution "through the official's own individual actions"). Only three paragraphs in the Amended Complaint even mention Hutchinson, and none alleges he was present when the Park Police cleared encampments, much less that he personally seized or destroyed Plaintiffs' property without providing notice or an opportunity for Plaintiffs to reclaim their property. (Am. Compl. ¶¶ 135, 196, 201.)

Second, the Amended Complaint fails to plausibly allege that Hutchinson authorized or was deliberately indifferent to unconstitutional conduct by subordinates. *See Boyd*, 47 F.3d at 968 (supervisor not individually liable under § 1983, unless supervisor

was personally involved or was deliberately indifferent to subordinates' pattern of unconstitutional conduct). To begin, the Amended Complaint does not plausibly allege that any HCSO personnel seized Plaintiffs' property, so it cannot plausibly allege that Hutchinson is liable for such conduct. It alleges that a single Plaintiff "believes" she saw HCSO deputies "participating in the expulsion" from Peavey Park, and that a deputy sheriff told her she could not retrieve her documents. (Am. Compl. ¶¶ 46-47.) It also vaguely asserts that HCSO deputies "arrived at various encampments in July, August, and September to rid them of people and their property." (*Id.* ¶ 201.) But apart from vague and conclusory allegations aimed at all Defendants, the Complaint does not allege that HCSO personnel took possession of or destroyed any property belonging to any Plaintiff. (*See id.* ¶¶ 200, 209-13.)

Further, even if the Amended Complaint plausibly alleged that HCSO personnel seized Plaintiffs' property (it does not), it still does not plausibly allege that Hutchinson is responsible. Plaintiffs do not allege that Hutchinson directed any employee to seize or destroy Plaintiffs' property, that he knew of employees seizing or destroying property, or that he chose to ignore such conduct.

3. Qualified immunity shields Hutchinson from individual-capacity liability under § 1983.

Hutchinson is also entitled to qualified immunity with respect to Plaintiffs' individual-capacity claim under § 1983. Qualified immunity requires a court to dismiss an individual-capacity claim for damages against a government official if the complaint "fails to state a claim for violation of clearly established statutory or constitutional rights of which

a reasonable person would have known." *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013) (quotation marks, citation omitted). In other words, a defendant is entitled to qualified immunity unless: (1) the complaint states a plausible claim for violation of a constitutional right, *and* (2) the right was clearly established at the time of the alleged violation. *Id.*

A right is clearly established if its "contours were sufficiently definite that any reasonable official in [the defendant's] shoes would have understood that he was violating it, meaning that existing precedent placed the statutory or constitutional question beyond debate." *City & Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (quotation marks, citations, alterations omitted). The plaintiff must "point to existing circuit precedent that involves sufficiently similar facts to squarely govern the officers' conduct in the specific circumstances at issue, or, in the absence of binding precedent, to present a robust consensus of cases of persuasive authority constituting settled law." *Graham v. Barnette*, 970 F.3d 1075, 1090 (8th Cir. 2020) (quotations marks, citations omitted). This exacting standard "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (citation omitted).

First, as explained above, the Amended Complaint fails to plausibly allege that Hutchinson violated Plaintiffs' constitutional rights. For this reason alone, Hutchinson is entitled to qualified immunity.

Second, Hutchinson is immune from liability under § 1983 because there was (and is) no clearly established constitutional right prohibiting government officials from removing people or their personal property from unauthorized encampments in public parks. Although the Ninth Circuit and several out-of-circuit District Courts have issued rulings related to government seizure of personal property belonging to residents of encampments, the County Defendants are aware of no Eighth Circuit cases with "sufficiently similar facts to squarely govern" Hutchinson's conduct here. *See Graham*, 970 F.3d at 1090.

4. The Amended Complaint fails to plausibly allege any constitutional violation by Hennepin County.

This Court should also dismiss Counts I through III because the Amended Complaint fails to plausibly allege that Hennepin County unconstitutionally seized or destroyed Plaintiffs' property. First, as explained above, the Amended Complaint fails to plausibly allege that any County personnel seized Plaintiffs' property. Instead, the Amended Complaint relies on a single Plaintiff's claim that an unidentified HCSO deputy told her she could not retrieve her property, as well as vague assertions aimed at all Defendants. (Am. Compl. ¶¶ 46-47, 200, 204, 209-13.) Without sufficient factual allegations that a County official seized or destroyed Plaintiffs' property, Hennepin County cannot be liable for seizure and destruction of Plaintiffs' property.

Similarly, the Complaint fails to satisfy the requirements for pleading municipal-liability under § 1983.[13] A municipality is not liable under § 1983 for the actions of its employees unless the municipality had an unconstitutional policy or custom that caused the injury alleged. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). To survive a motion to dismiss, a plaintiff must allege specific facts that support the conclusion that an unconstitutional policy or custom existed. *Gherity v. Pfaff*, 216 F. Supp. 3d 975, 979 (D. Minn. 2016); *Triemert v. Washington Cty.*, Civ. No. 13-01312, 2013 WL 6729260, at *12 (D. Minn. Dec. 19, 2013). Official policy involves "a deliberate choice to follow a course of action made from among various alternatives by an official who has the final authority to establish governmental policy." *Jane Doe A v. Special Sch. Dist. of St. Louis Cty.*, 901 F.2d 642, 645 (8th Cir. 1990) (quotation marks, ellipses omitted).

A governmental custom may also be the basis for liability, but a plaintiff must ultimately prove: (1) "[t]he existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees"; (2) "[d]eliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct"; and (3) "[t]he plaintiff's injury by acts pursuant to the governmental entity's custom[.]" *Ware v. Jackson Cty.*, 150 F.3d 873, 880 (8th Cir. 1998) (alterations, citation omitted). To prove an

---

[13] "A suit against a public employee in his or her official capacity is merely a suit against the public employer." *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999). As such, the Amended Complaint's official-capacity claim against Hutchinson should be treated as a claim against Hennepin County.

unconstitutional custom, a plaintiff must show that "officials had notice of prior incidents of … misconduct and had deliberately failed to act on this knowledge." *Harris v. City of Pagedale*, 821 F.2d 499, 504 (8th Cir. 1987). "Generally, an isolated incident … cannot, as a matter of law, establish a municipal policy or custom creating liability under § 1983." *Ulrich v. Pope Cty.*, 715 F.3d 1054, 1061 (8th Cir. 2013).

Here, the Amended Complaint fails to allege specific facts that support the conclusion that Hennepin County had an unconstitutional policy or custom that caused the alleged seizure and destruction of Plaintiffs' property. *See Gherity*, 216 F. Supp. 3d at 979; *Triemert*, 2013 WL 6729260, at *12. The Amended Complaint alleges *no* facts related to any County policy. Likewise, it fails to plausibly allege that a County custom caused the alleged seizure or destruction of Plaintiffs' property. For example, the Amended Complaint does not allege that County officials knew that HCSO deputies had seized or destroyed property belonging to encampment residents, that they deliberately failed to act on this knowledge; or that such deliberate indifference caused Plaintiffs' alleged constitutional injuries. *See Harris*, 821 F.2d at 504. In short, the Amended Complaint's bald assertions about "Defendants' policy, pattern, and custom of seizing and destroying Plaintiffs' property" are insufficient. (Am. Compl. ¶¶ 222, 226; *see also id.* ¶¶ 219, 245.)

### C. The Amended Complaint fails to state a claim that the County Defendants violated Plaintiffs' substantive due process rights (Count IV).

In Count IV, Plaintiffs allege that the County Defendants violated substantive due process protections under the Fourteenth Amendment and Minnesota Constitution,[14] by forcing Plaintiffs from encampments and seizing or destroying their property. The Amended Complaint asserts two theories: (1) that the County Defendants violated Plaintiffs' right to privacy; and (2) that the County Defendants failed to protect Plaintiffs from a state-created danger. Both fail.

#### 1. The Court should decline to apply substantive due process analysis to Plaintiff's property-related claims.

As an initial matter, Plaintiffs' property-related claims should be analyzed under the Fourth Amendment and the Fourteenth Amendment's procedural due process protections—not substantive due process. "[I]f a constitutional claim is covered by a specific constitutional provision … the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997); *see also Cty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998). Since Plaintiffs assert their property-related claims as Fourth Amendment and procedural due process violations in Counts I through III, this Court should dismiss the same claims asserted as substantive due process violations in Count IV.

---

[14] As noted above, the due process protections of the U.S. Constitution and the Minnesota Constitution are co-extensive. *See State v. Rey*, 905 N.W.2d 490, 493-94 (Minn. 2018).

2. Plaintiffs' privacy claim fails, because there is no fundamental right to sleep or erect structures in a public place.

Further, the Court should dismiss Plaintiffs' claim that the County Defendants violated Plaintiffs' privacy rights by disbanding encampments. "[O]nly personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty' … are included in this guarantee of personal privacy." *Roe v. Wade*, 410 U.S. 113, 152 (1973); *see also State v. Gray*, 413 N.W.2d 107, 111 (Minn. 1987) ("[T]he right of privacy protects only fundamental rights."). Further, courts are "reluctant to expand the concept of substantive due process." *Lewis*, 523 U.S. at 842.

In support of their motion for a temporary restraining order, Plaintiffs asserted that a constitutionally protected fundamental right "protects their decision as to where they safely sleep." (ECF 5 at 25.) The County Defendants have located no legal authority in support of this novel idea. To the contrary, courts have repeatedly stated that there is no constitutional right to sleep or erect structures in public places. *Clark v. Cmty. For Creative Non-Violence*, 468 U.S. 288, 298-99 (1984) ("No one contends that aside from its impact on speech a rule against camping or overnight sleeping in public parks is beyond the constitutional power of the Government to enforce."); *Martin v. City of Boise*, 920 F.3d 584, 617 (9th Cir. 2019) ("[W]e in no way dictate to the City that it must provide sufficient shelter for the homeless, or allow anyone who wishes to sit, lie, or sleep on the streets at any time and at any place." (ellipses, citation omitted)); *Lubavitch Chabad House, Inc. v. City of Chicago*, 917 F.2d 341, 347 (7th Cir. 1990) ("[T]he Constitution neither provides, nor has it ever been construed to mandate, that any person or group be allowed to erect

structures at will [in public parks].”); *Winslow v. City of Oakland*, Civ. No. 20-01510, 2020 WL 1031759, at *4 (N.D. Cal. Mar. 3, 2020) (no “right for homeless residents to occupy indefinitely any public space of their choosing”); *Miralle*, 2018 WL 6199929, at *2 (no “constitutional right to occupy public property indefinitely at Plaintiffs’ option”); *Occupy Minneapolis v. Cty. of Hennepin*, 866 F. Supp. 2d 1062, 1071 (D. Minn. 2011) (no “private constitutional right to erect a structure on public property” (citation omitted)).

And, at least one court has specifically rejected a claim that enforcement of a city’s anti-camping ordinance violated the Fourteenth Amendment privacy rights of encampment residents. *Cobine v. City of Eureka*, 250 F. Supp. 3d 423, 436-38 (N.D. Cal. 2017); *see also Pottinger v. City of Miami*, 810 F. Supp. 1551, 1573-75 (S.D. Fla. 1992) (under Fourteenth Amendment and Florida Constitution, no privacy right that prohibits government from interfering with sleeping and eating in public). Because Plaintiffs have no fundamental right to sleep or erect tents on public land in Hennepin County, their privacy claim fails.

3. <u>The Amended Complaint fails to plausibly allege a claim under the state-created danger theory.</u>

The Court should also dismiss Plaintiffs’ claim that the County Defendants failed to protect Plaintiffs from a state-created danger. In general, governments “have no affirmative obligation to protect individuals against private violence.” *Hart v. City of Little Rock*, 432 F.3d 801, 805 (8th Cir. 2005). Substantive due process, however, requires two exceptions to this rule: (1) “the state owes a duty to protect those in its custody”; and (2) “the states owes a duty to protect individuals if it created the danger to which the

individuals are subjected." *Id.* Plaintiffs rely on the second exception, the state-created danger theory.

Under this theory, "[i]f the state acts affirmatively to place someone in a position of danger that he or she would not otherwise have faced, the state actor, *depending on his or her state of mind*, may have committed a constitutional tort." *Id.* (citation omitted). Here, Plaintiffs must plausibly allege each of five elements: (1) that "they were members of a limited, precisely definable group"; (2) that the County Defendants' conduct "put them at significant risk of serious, immediate, and proximate harm" by a third party; (3) that "the risk was obvious or known" to the County Defendants; (4) that the County Defendants "acted recklessly in conscious disregard of the risk"; and (5) in total, the County Defendants' conduct "shocks the conscience." *Id.* The Amended Complaint fails to make such allegations.

First, the Amended Complaint fails to identify the "private violence" that allegedly injured Plaintiffs as a result of the County Defendants' conduct. *See id.* Without identifying an injury allegedly inflicted by someone or something other than the government, a failure-to-protect theory makes little sense.

Second, the Amended Complaint fails to plausibly allege that Plaintiffs are members of a "limited, precisely definable group." *See id.* It does the opposite, asserting that Plaintiffs are members of a broad class of "all homeless persons living within Hennepin County who have been, are now, or will in the future be living on public property." (Am. Compl. ¶ 146; *see also* ECF 5 at 20.)

Third, the Amended Complaint fails to plausibly allege that the County Defendants were not "merely negligent or even grossly negligent," but rather "acted intentionally or wrongfully in disregarding a known danger." *Hart*, 432 F.3d at 806. For example, the Amended Complaint does not allege that Hutchinson *knew* that Plaintiffs would be injured by a third party if Plaintiffs left the encampments or that Hutchinson unreasonably ignored that risk.

Fourth, courts have repeatedly rejected the state-created danger theory in cases involving encampments on public property. *Murray*, 2020 WL 5006046, at *7-8 (no likelihood of success on state-created-danger claim that encampment disbandment exposed encampment residents to sleeping outside or in dangerous shelter conditions); *Housing is a Human Right Orange Cty. v. Cty. of Orange*, Civ. No. 19-00388, 2019 WL 6481311, at *12 (C.D. Cal. Aug. 12, 2019) (granting motion to dismiss where complaint failed to plausibly allege that city "took affirmative steps to place an individual in a known and likely danger to satisfy the deliberate indifference standard"); *Cobine*, 25 F. Supp. 3d at 432-33 (granting motion to dismiss where complaint failed to plausibly allege that state action put plaintiffs in an inherently dangerous situation and finding that "generalized dangers of living on the street preexisted" disbandment of encampment). This Court should likewise dismiss Count IV's state-created danger claim.

4. <u>The Amended Complaint fails to plausibly allege any constitutional violation by Hutchinson or Hennepin County.</u>

Finally, the Court should dismiss Count IV, because the Amended Complaint fails to plausibly allege that any County Defendant did anything to violate Plaintiffs' substantive

due process rights, under either the U.S. or Minnesota Constitution. First, the Amended Complaint fails to state a claim against Hutchinson. The Amended Complaint does not allege that Hutchinson was present when the Park Police disbanded encampments or personally forced any Plaintiff from any encampment, much less did so in violation of Plaintiffs' constitutional rights. *See Iqbal*, 556 U.S. at 676. Further, it does not allege that Hutchinson authorized or was deliberately indifferent to unconstitutional conduct by HCSO personnel. *See Boyd*, 47 F.3d at 986. Indeed, the Amended Complaint does not plausibly allege that HCSO or County personnel engaged in a pattern of forcefully removing Plaintiffs from encampments, that such removal was a constitutional violation, or that Hutchinson knew about this pattern of conduct and did nothing to stop it.

Second, with respect to Plaintiff's individual-capacity claim under § 1983, Hutchinson is entitled to qualified immunity. *See Hager*, 735 F.3d at 1013. As explained above, Plaintiffs fail to state a plausible claim for a constitutional violation. Further, there was (and is) no clearly established constitutional right prohibiting government officials from disbanding unauthorized encampments in public parks.

Third, Plaintiffs fail to plausibly allege that Hennepin County unconstitutionally forced Plaintiffs to leave their encampments. Again, setting aside vague allegations about all Defendants, the Amended Complaint does not allege that any County official used bulldozers, chemical irritants, or other physical force to make Plaintiffs leave Minneapolis parks. Further, with respect to Plaintiffs' municipal-liability claims under § 1983, the Amended Complaint does not allege any facts related to any County policy about disbanding encampments, and it fails to plausibly allege that a County custom caused

Plaintiffs to suffer constitutional violations. *See Harris*, 821 F.2d at 504; *Gherity*, 216 F. Supp. 3d at 979.

**D. The Amended Complaint fails to state a claim for conversion.**

In Count V, Plaintiffs allege that the County Defendants converted Plaintiffs' personal property in violation of Minnesota common law. Conversion is an intentional tort that "occurs where one willfully interferes with the personal property of another 'without lawful justification,' depriving the lawful possessor of 'use and possession.'" *Williamson v. Prasciunas*, 661 N.W.2d 645, 649 (Minn. Ct. App. 2003) (citation omitted).

Here, the Amended Complaint fails to plausibly allege that any County Defendant deprived any Plaintiffs of use or possession of their personal property. As explained above, the Amended Complaint includes no allegations that Hutchinson or County personnel seized or destroyed any of Plaintiff's personal property. Vague allegations aimed at all Defendants are not enough to satisfy the federal plausibility standard. So, Plaintiffs' conversion claim against the County Defendants fails.

**E. The Amended Complaint fails to state a claim for punitive damages.**

Finally, the Amended Complaint fails to state a claim for punitive damages. First, both federal and state law bar an award of punitive damages against Hennepin County. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981); *Herrman v. Fossum*, 270 N.W.2d 18, 21 (Minn. 1978).

Second, Plaintiffs fail to plausibly allege entitlement to punitive damages against Hutchinson. Punitive damages are only appropriate for a § 1983 individual-capacity claim "when the defendant's conduct is shown to be motivated by evil motive or intent, or when

it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). The Amended Complaint fails to plausibly allege any facts that support the conclusion that Hutchinson acted in a way that meets this standard.

As to their state law claims, Plaintiffs also do not meet the requirements of Minn. Stat. §§ 549.191 and 549.20. *See Bercyk v. Emerson Tool Co.*, 291 F. Supp. 2d 1004, 1008 (D. Minn. 2003). Among other things, § 549.191 requires a plaintiff to move the court for leave to amend the complaint to add a punitive damages claim, which Plaintiffs have not done.

## CONCLUSION

Accordingly, the Court should dismiss all claims against the County Defendants.

**MICHAEL O. FREEMAN**
**Hennepin County Attorney**

Dated: January 11, 2020

By: *s/ Kelly K. Pierce*

Kelly K. Pierce (0340716)
Assistant County Attorney
Christiana M. Martenson (0395513)
Assistant County Attorney
A2000 Government Center
300 South Sixth Street
Minneapolis, MN 55487
Telephone: (612) 348-5488
Fax: (612) 348-8299
kelly.pierce@hennepin.us
christiana.martenson@hennepin.us

*Attorneys for Defendants Hennepin County and Hennepin County Sheriff David Hutchinson*