**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Patrick Berry, *et al.*,

Plaintiffs,

vs.

Hennepin County, *et al.*,

Defendants.

Civil Action No. 20-cv-02189 WMW/KMM

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO COUNTY DEFENDANTS' MOTION TO DISMISS**

---

# TABLE OF CONTENTS

**Page**

INTRODUCTION……………………………………………………………………...1

FACTS……………………..…………..……………………….……….........................2

ARGUMENT ……………………….…………………………………………….……...9

I. This Court Has Subject-Matter Jurisdiction Over Plaintiffs' Claims………9

A. County Defendants' conduct is fairly traceable to Plaintiffs' injuries...10

B. Plaintiffs Westvig, Williams, and Mallek have standing to seek injunctive relief……………………………………………………………..17

C. ZACAH has standing…………………………………………………….20

II. The Court Should Deny the County Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6)……………………………………………………22

A. Plaintiffs plead plausible claims for relief against County Defendants on all counts of the Complaint……………………………………………23

1. County Defendants unlawfully seized Plaintiffs' property (Count I)…………………………………………………………..23

2. County Defendants violated Plaintiffs' right to privacy (Count II)………………………………………………………….25

3. County Defendants provided Plaintiffs no procedural due process (County III)………………………………………………………..26

4. County Defendants violated Plaintiffs' substantive due process rights (Count IV)…………………………………………………27

a. Plaintiffs have federal- and state-protected rights to privacy in their homes…………………………………………...28

b. County Defendants repeatedly subject Plaintiffs to significant danger of Defendants' own making……………32

5. The County Defendants converted Plaintiffs' property (Count V)……35

B. The County Defendants' asserted defenses are unavailing……35

1. Minn. Stat. § 466.02 is not an adequate post-deprivation remedy to bar relief for Counts I-III of the Complaint……35

2. Plaintiffs adequately plead a *Monell* claim against Defendant Hennepin County……37

3. Plaintiffs adequately plead claims against Defendant Hutchinson in his individual capacity……39

4. Defendant Hutchinson is not entitled to qualified immunity……40

C. Plaintiffs sufficiently plead a claim for punitive damages……41

CONCLUSION……44

## INTRODUCTION

After the devastating and unexpected death of her daughter, Henrietta Brown's life began to spiral. Dkt. 70 ("Compl."), ¶ 39.[1] She abandoned stable housing, battled addiction, and bounced from one friend's couch to another, until finally Henrietta found herself homeless and forced to sleep outside. *Id.*, ¶¶ 40, 41. Henrietta made her home in Peavey Park, until her world was once again turned upside down. *Id.*, ¶ 43. On September 24, 2020, Henrietta woke to her tent being shaken, bright lights in her eyes, and law enforcement yelling that she had 30 minutes to get out of the park. *Id.*, ¶ 44. It was between 4:00 and 5:00 AM, pouring rain, and the walls of her home were literally collapsing in on her, as the officers started tearing down her tent with Henrietta still inside. *Id.*, ¶¶ 44–45. She only managed to grab her blanket and her purse before the officers taped off the area, with her home still inside the perimeter. *Id.*, ¶ 47. Henrietta asked a Hennepin County Sheriff's deputy if she could go back for the things left in her tent. *Id.* He refused, and threatened to arrest Henrietta. *Id.* Henrietta stood in the rain, purse and blanket in hand, watching as her home was ransacked and thrown into a garbage truck——and with it, everything she owned. *Id.*, ¶¶ 48–49. With nowhere else to go, Henrietta sought refuge from the rain under a bridge. *Id.*, ¶ 51. She was once again left truly homeless.

Henrietta's story, and those of her eight co-Plaintiffs, represents a snapshot of the experiences of the estimated 3,049 Hennepin County residents who lack permanent housing. *Id.*, ¶ 167. That number has only grown due to the pandemic and the unrest

---

[1] Hereinafter, "Complaint" refers to Plaintiffs' Amended Complaint, Dkt. 70.

following the killing of George Floyd. *Id.*, ¶ 208. And what we know about homelessness paints a grim picture: it is cyclical, and exceptionally difficult to break free of without access to safe temporary shelter and affordable housing. *Id.*, ¶ 208. Hennepin County lacks both. *Id.*, ¶ 174 (showing insufficient shelter space to house all homeless people in Hennepin County); *id.*, ¶ 184 (showing insufficient affordable housing in Hennepin County).

Plaintiffs—the nine individuals and ZACAH—filed this lawsuit to allow them, and those similarly-situated homeless individuals, to remain in the homes they have made for themselves on public property in Hennepin County, free from eviction and summary destruction of their personal belongings, until Defendants can provide adequate shelter space and/or affordable housing in Hennepin County. Rather than focus on remedying the lack of resources available to homeless residents, Defendants Hennepin County and Sheriff David Hutchinson ("County Defendants") move to dismiss Plaintiffs' Amended Complaint. The Court should deny their motion, as they, along with the other Defendants, are the responsible parties in the premeditated, merciless, and repeated upending of the lives of some of Hennepin County's most vulnerable residents.

## FACTS

In early 2020, the COVID-19 pandemic brought Minnesota, and the rest of the world, to a halt. On April 8, 2020, Governor Tim Walz issued a "Stay at Home Order" requiring all Minnesotans to shelter in place, but exempted homeless people and banned

the sweeping or disbandment of homeless encampments. Compl., ¶ 168; Exh. 6.[2] Governor Walz later clarified this order, permitting local governments to "restrict, limit, or close encampment spaces," but only in two scenarios: (1) if there was "sufficient alternate housing, shelter, or encampment space;" or (2) if an encampment reached a size or status that "is a documented threat to the health, safety, or security of residents." *Id.*, ¶ 169; Exh. 7. On May 13, 2020, Governor Walz issued another order, reiterating that, absent the two exceptions above, "Homeless encampments . . . should not be subject to sweeps or disbandment by state or local governments, as such sweeps or disbandments increase the potential risk and spread of COVID-19." *Id.*, ¶ 171; Exh. 9. Within days, Defendants Minneapolis Park & Recreation Board ("MPRB"), Ohotto, and Bangoura (collectively "the Park Defendants") partnered with the City and County Defendants to create a "cross-jurisdictional encampment response framework" intended to last for the duration of the executive order. Exh. 8.

On June 19, 2020, Defendant MPRB passed a resolution to provide "people currently experiencing homelessness refuge space in Minneapolis parks." *Id.*, ¶ 173; Exh. 13. The resolution acknowledged Defendant MPRB's "partner[ship] with the [C]ity, [C]ounty" and others, and called on these partners to increase funding to address homelessness. *Id.* But that goodwill was short-lived. On July 15, 2020, Defendant MPRB officially rescinded its resolution to provide refuge, outlining its plan to target

2 Unless otherwise noted, "Exh." means an exhibit to Plaintiffs' Complaint. *See* Dkts. 70-1, 70-2, 70-3.

encampments for removal. *Id.*, ¶ 191; Exh. 24. The new resolution—Resolution 2020-267—stated that encampments could only be "reduc[ed]" with the help of City, County, and State agencies. Exh. 24, at 2, 4. Two days later, Defendant MPRB sent a letter to Defendant Hutchinson, explaining the resolution's purpose in restricting the locations for encampments and the number of tents at each, and requiring permits. Exh. 25. The letter then asked Defendant Hutchinson for authorization to implement the resolution: "*If you approve this action*, the Park Board will immediately begin the process of requiring permits for overnight stays by homeless individuals in the city of Minneapolis." *Id.* (emphasis added). The letter again made clear that Defendant MPRB could not sweep encampments alone, calling on County Defendants for assistance in implementing the resolution. *Id.*

Defendant Hutchinson heeded the call: the Park Defendants moved forward with the "planned and coordinated effort" to "demobilize[]" the encampments and sheriff's deputies were dispatched to assist. *Id.*, ¶¶ 198, 201, 204; Exh. 1 (documenting Elliot and Kenwood Park encampments evicted August 12, 2020, Powderhorn Park on August 14, 2020, and Peavey Park on September 24, 2020); Exh. 28 ("Park police, *with cooperation from . . . the Hennepin County sheriff*, cleared two [camps] on Wednesday, and some tents in Loring Park were taken down early Thursday." (emphasis added)). Plaintiffs, who were all encampment residents, suffered the results of Defendants' coordinated actions.

Plaintiffs Barrow, Berry, Williams, and Mallek were all evicted from Powderhorn Park, Compl., ¶¶ 14, 28, 29, 101, 102, 113, 115, where deputies corralled encampment residents and protestors into a confined space, surrounding ("kettling") them, so Park Police could mace them and where deputies guarded the bulldozers used to destroy resident

belongings. Multiple photographs taken at the Powderhorn Park sweep reveal the deputies' involvement.



*Deputies (rightmost and leftmost individuals) kettle encampment residents and protesters as Park Police tear gas them during the Powderhorn Park sweep*, Compl., ¶¶ 206-207 & n.55; Exh. 32 (Image 1).



*Deputy guards the Bobcats used to destroy and throw out encampment residents' belongings*, Compl., ¶¶ 206-207 & n.55; Exh. 32 (Image 8).

During the Powderhorn Park eviction, Barrow grabbed as many of his belongings as he could, but was forced to leave his tent, sleeping bag, almost all of his clothes, including his winter boots and coat, hygiene supplies, medications, and court documents, all of which were bulldozed by Defendants. *Id.*, ¶ 17.

Berry managed to grab his backpack from his tent, but could not carry his tent, sleeping bag, and mattress—all of which were bulldozed. *Id.*, ¶¶ 31, 33–34.

Williams took what he could from his tent, and told officers that he still had belongings inside the taped perimeter, but he was ignored. *Id.*, ¶ 106. As a result, his clothes were tossed. *Id*.

Mallek, too, was prevented from gathering her remaining belongings and threatened with arrest. *Id.*, ¶ 118. Her photographs, homemade gifts from her children, birth certificate, social security card, W-2 form, clothes, cot, hygiene products, shoes, chairs, and other furniture were destroyed. *Id.*, ¶ 119.

Little and Brown had their property destroyed during the sweeps of Kenwood and Peavey Parks, which County Defendants assisted in clearing. *Id.*, ¶ 201; Exhs. 1, 28 (establishing eviction dates where County participated).

Plaintiffs Westvig, Roy, and Huiting were also forced to move as Defendants continued their "planned and coordinated effort" to rid Minneapolis parks of encampment residents. Westvig was forced to move from Loring Park, and at the filing of the Complaint, was residing at B.F. Nelson Park. *Id.*, ¶¶ 82, 89-94. Roy was similarly told she had to leave Brackett Park, the only place in ages where she felt safe. *Id.*, ¶¶ 73-78. And Huiting's property was destroyed *twice*. *Id.*, ¶¶ 127-133.

When Defendants evicted residents from these encampments, there was not sufficient shelter space available to accommodate them all. *Id.*, ¶¶ 21, 52, 53, 65, 71-72, 93-95, 110, 123, 173-185. With Defendants' collective failure to provide displaced residents safe space to live, ZACAH stepped in to help.

ZACAH is a private, non-profit organization, with a mission to provide financial assistance to Minnesota residents on the verge of homelessness. *Id.*, ¶¶ 4, 5. It usually provides funds for rent, utilities, and other vital needs to keep people from *becoming* homeless. *Id.*, ¶ 6. But Defendants' sweeps forced ZACAH to divert its resources away from its founding mission to pay for hotel rooms for displaced encampment residents on an emergency basis. *Id.*, ¶¶ 7, 8. As of October 19, 2020, ZACAH had spent approximately $113,000 on hotel rooms, sponsoring over 200 nights for approximately 500 people. *Id.*, ¶ 9.

Plaintiffs sued Defendants on October 19, 2020, Dkt. 1, and moved for a temporary restraining order, Dkt. 4, to prevent Defendants from inflicting further irreparable injury on this population. The Court denied Plaintiffs' motion, Dkt. 59, in part relying on Defendants' representations that "encampments [would] not be removed unless three conditions [we]re met:" "a health and safety risk to the encampment residents exists, a health and safety risk to the public exists, *and* adequate shelter exists elsewhere." *Id.*, at 10-11.

Defendants conducted no less than *five* encampment sweeps between October 21, 2020, and January 7, 2021, *see* Dkt. 74 ("Motion"), at 9 n.3 (citing Pierce Decl., Exhs. 1, 2; MPRB Encampment Website). They uprooted homeless people mid-pandemic, when

COVID-19 cases in shelters were on the rise comparative to encampments. Compl., ¶¶ 171, 182 (noting increased risk of COVID-19 from sweeps and in shelters), 214 (stating Defendants would carry out future sweeps in the same manner, forcibly displacing residents, giving no or inadequate notice, destroying belongings, and leaving residents without anywhere else to go). Minnesota Department of Health data corroborates this, showing that a homeless individual in Hennepin County is nearly four times more likely to test positive for COVID-19 in a shelter than an encampment. Smith Decl., Exh. 1 (reflecting 196 cases in sheltered, homeless Hennepin County residents versus only 52 cases of COVID-19 in unsheltered, homeless residents); Smith Decl., Exh. 2 (reflecting a homeless person in Ramsey County is six times more likely to test positive for COVID-19 if sheltered than unsheltered, with 66 positive cases compared to only 11, respectively).[3]

Despite this, Defendants closed *all* encampments by January 7, 2021, Motion, at 9 n.3, while their own data reflected that shelters regularly reach capacity, *id*., ¶¶ 174-75; Exhs. 15, 16, leaving residents no option *but* to sleep outside, unprotected and with average temperatures in the mid-to-low 20s.[4]

---

[3] Plaintiffs respectfully request the Court take judicial notice of these facts, which are not subject to reasonable dispute and are matters of public record. FED. R. EVID. 201(b)(2), (c)(2). If the Court believes consideration of these facts would convert the Motion into one for summary judgment, however, Plaintiffs respectfully withdraw their request for judicial notice.

[4] The average temperatures in the Twin Cities area by month were: 43.6°F in October 2020, 38.6°F in November 2020, 25.3°F in December 2020, and 22.1°F in January 2021. Nascimento Decl., Exh. 1. *See* Facts, at 8 note 3, *supra*.

Plaintiffs filed the Amended Complaint on December 14, 2020, Dkt. 70, which County Defendants now move to dismiss. Because this Court has jurisdiction and Petitioners adequately state claims against County Defendants, the Court should deny the motion.

**ARGUMENT**

County Defendants have moved the Court to dismiss them from the case, arguing that (1) Plaintiffs lack standing to sue the County Defendants, FED. R. CIV. P. 12(b)(1); and (2) Plaintiffs' Complaint fails to state a claim against them, FED. R. CIV. P. 12(b)(6). The County Defendants are wrong on both counts.

First, despite County Defendants' factual attack, Plaintiffs have standing: Plaintiffs' injuries are fairly traceable to County Defendants' actions; and Plaintiffs' threat of future injury is "real and immediate" such that they may seek injunctive relief. Additionally, ZACAH has organizational standing.

Second, Plaintiffs' Complaint provides sufficient facts, which the Court must accept as true, with all reasonable inferences drawn in Plaintiffs' favor, to support plausible claims for relief on all counts. Plaintiffs have also sufficiently pled a claim for punitive damages.

Accordingly, the Court should deny County Defendants' motion to dismiss.

**I. <u>This Court Has Subject-Matter Jurisdiction Over Plaintiffs' Claims.</u>**

This Court has subject-matter jurisdiction because Plaintiffs have standing. To prove standing, a plaintiff must: (1) have suffered an injury in fact; (2) established a causal relationship between the conduct and the alleged injury; (3) demonstrated that a favorable decision would redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

County Defendants launch a "factual attack" on jurisdiction, challenging the "fairly traceable" requirement and Plaintiffs' request for injunctive relief. Motion, at 13-14. They challenge the "existence of subject-matter jurisdiction" in fact, allowing the Court to consider matters outside of the pleadings, "such as testimony and affidavits." *Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914-15 (8th Cir. 2015). During such review, the Court "inquires into and resolves factual disputes." *Faibisch v. Univ. of Minnesota*, 304 F.3d 797, 801 (8th Cir. 2002). The Court should rule on jurisdiction "unless it is so bound up with the merits that a full trial on the merits may be necessary to resolve the issue." *Buckler v. U.S.*, 919 F.3d 1038, 1044 (8th Cir. 2019) (internal quotation marks and alterations omitted).

The Eighth Circuit has repeatedly held that "[i]f the defendant thinks the court lacks jurisdiction, the proper course is to request an evidentiary hearing on the issue." *Osborn v. U.S.*, 918 F.2d 724, 730 (8th Cir. 1990); *accord Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993). Rather than seek an evidentiary hearing on this important issue, however, County Defendants rely on only two declarants—neither of whom affirmatively state they were present during the sweeps of Powderhorn, Peavey, Elliot, and Kenwood Parks. *See* Motion, at 16-17 nn.7-8. These two declarants do not and cannot refute Plaintiffs' evidence showing that this Court has jurisdiction.

**A. County Defendants' conduct is fairly traceable to Plaintiffs' injuries.**

To show an injury is "fairly traceable" to County Defendants, Plaintiffs must demonstrate a "causal connection between the injury and the conduct complained of" such that the injury is "not . . . th[e] result [of] the independent action of some third party not

before the court." *Lujan*, 504 U.S. at 560-61 (internal quotation marks omitted). The evidence before the Court shows that County Defendants are one of the parties responsible for Plaintiffs' injuries.

County Defendants partnered with Park Police and the Minneapolis Police Department to sweep encampments. Defendant MPRB not only asked Defendant Hutchinson for "assistance" in implementing Resolution 2020-267 to demobilize encampments—it asked for his "approval." Exh. 25. Approval was clearly given: As County Defendants admit, deputies provided "support" during the sweeps at Elliot, Kenwood, Powderhorn, and Peavey Parks. Dkt. 45, ¶¶ 5-7, 11; *see also* Exh. 28 ("Park police, *with cooperation from . . . the Hennepin County sheriff*, cleared two [encampments] on Wednesday[.]" (emphasis added)).

County Defendants argue about the *details* of what that "support" entailed, but cannot deny the *fact* of their participation. Instead, they seek to minimize their involvement to simply driving vans and protecting Park Police and MPD officers. Dkt. 45, ¶¶ 5-15. But they were not just drivers and bodyguards. Indeed, by seeking Defendant Hutchinson's "approval" in sweeping the encampments, Defendant MPRB made known it could not effectively rid the parks of homeless people and their property without County Defendants' help. County Defendants were an indispensable part of the demobilization team. Evidence submitted by Plaintiffs, and even County Defendants, establishes that sheriff's deputies engaged in *at least* the following actions:

| County Defendants' Actions | Supporting Evidence |
|---|---|
| Forcefully ejected residents from the encampment at Peavey Park | Fahlstrom Decl., ¶ 3 ("The deputies from the Hennepin County Sheriff's Department participated as much as the MPD and Park Police officers in forcibly ejecting people from the encampment at Peavey Park.");<br><br>*Id.*, ¶ 4 ("I saw deputies enforcing the perimeter that had been established around the encampment by grabbing people who were both refusing to leave the encampment and those who were trying to get back into the encampment. I saw deputies pull these people to the ground and handcuff them."));<br><br>Dkt. 8, ¶ 12 ("I tried to tell the sheriff who was [at Peavey Park] that I had important papers in my tent, but he told me that I couldn't get my stuff and if I tried I'd be arrested.") |
| Arrived at encampments without providing Plaintiffs and other encampment residents adequate notice of eviction | *Compare* Dkt. 45, ¶¶ 5-6, 9-11 (admitting deputies were present at Powderhorn, Kenwood, Elliot, and Peavey Parks sweeps)<br><br>*With* Compl., ¶¶ 14, 29, 47, 89-90, 103, 202, 204, 214, 226 (inadequate notice); Dkt. 7, ¶ 6; Dkt. 8, ¶¶ 8-11; Dkt. 11, ¶ 10 (inadequate notice at Powderhorn and Peavey Parks); Compl., ¶ 202 n.52; Exh. 29 (MPRB seeking to keep eviction dates secret). |
| Enforced the cordoned off area containing Plaintiffs' belongings, preventing them from returning to encampments at Powderhorn and Peavey Parks to collect their property | Fahlstrom Decl., ¶ 4; Dkt. 8, ¶ 12; Compl., ¶¶ 206-207 & n.55; Exhs. 32 (Images 1, 8) |
| Kettled encampment residents and protestors at Powderhorn Park so Park Police could mace them | Compl., ¶¶ 206-207 & n.55; Exhs. 32 (Images 1, 8) |
| Guarded heavy machinery used to destroy encampment residents' belongings and tear down the camp infrastructure at Peavey and Powderhorn Parks | Compl., ¶¶ 206-207 & n.55; Exhs. 32 (Images 1, 8) |

| | |
|---|---|
| Threatened encampment residents like Brown with arrest when they asked to go back for their belongings at Peavey Park | Dkt. 8, ¶ 12 |
| Transported residents away from Powderhorn, Kenwood, Elliot, and Peavey Parks | Dkt. 45, ¶¶ 5-6, 7-13 |

These actions are fairly traceable to the harms suffered by Plaintiffs. Specifically, Plaintiffs Barrow, Berry, Williams, and Mallek were all evicted from Powderhorn Park and forced to leave behind property that was eventually destroyed. *See* Facts, at 4, *supra*. At the sweep, County Defendants were not sitting idly on the sidelines. The foregoing evidence shows that they: (1) kettled residents and protestors; (2) enforced cordoned-off areas containing Plaintiffs' belongings; (3) guarded the bulldozers used to destroy Plaintiffs' belongings; and (4) hauled away residents and protestors to jail. These actions prevented Plaintiffs from staying in the park (Counts II, IV) and deprived them of the use and possession of their property (Counts I-V).

Similarly, as described above, at Peavey Park, County Defendants engaged in the same conduct—and actively pulled residents to the ground, handcuffed them, and prevented them from gathering their belongings. Fahlstrom Decl., ¶¶ 3-4. When Plaintiff Brown told a deputy she needed to return to her tent inside the perimeter to gather her belongings, the deputy prevented her from doing so and threatened to arrest her. Compl., ¶ 47. As a result of this deputy's actions, Brown was forced to leave the park (Counts II, IV), and her property was destroyed (Counts I-V). Plaintiff Little's loss of property and

ejection from Kenwood is also fairly traceable to County Defendants, who admit sheriff's deputies assisted in the sweep. Dkt. 45, ¶ 9.

The above detailed, substantiated facts show a causal connection between the County Defendants' actions and Plaintiffs' injuries that form the basis of all five counts of the Complaint. The evidence in the record establishes that Plaintiffs have standing to sue County Defendants.[5]

In a weak attempt to refute this evidence, County Defendants point only to the declarations of Donald Ryan, a County employee, and Lieutenant Patty Strongitharm. Neither of these declarations suffice to rebut the foregoing facts.

Ryan states he "was present on a few occasions" when the encampments were "closed," and did not see any County employee "use force" or "remove or seize any resident's tent or other personal property." Dkt. 44, ¶ 14. Even if true, these vague statements do not defeat jurisdiction. He offers no information—no dates, location, participants, or details—that rebut the salient, concrete evidence Plaintiffs have presented. His statement only proves that he did not see what Brown, Fahlstrom, and Star Tribune reporters and photographers recorded.

[5] County Defendants are wrong to label the present pleading a "kitchen-sink" or "shotgun complaint." Motion, at 16. Take *Tully v. Bank of Am., N.A.*, No. CIV. 10-4734 DWF/JSM, 2011 WL 1882665 (D. Minn. May 17, 2011), for example, where the "kitchen sink" complaint alleged "fourteen causes of action involving fourteen different mortgage loans against nine separate Bank Defendants." *Id.*, at *6. There, defendants and the court were left only to "guess which [p]laintiffs [were] asserting which claims against which Defendants." *Id*. There is no guessing here.

Strongitharm's declaration fares no better, having no first-hand knowledge of *anything* described in Plaintiffs' Complaint. Instead, Strongitharm read an unknown number of undisclosed reports from unknown deputies, transport deputies, and/or sergeants. *See* Dkt. 45, ¶ 4. She then concluded that "HCSO deputies" did nothing wrong, failing to mention *anything* about the sergeants on scene. *See, e.g.*, *id.*, ¶ 10 ("HSCO deputies made no arrests, did not use force, did not remove any tents or seize any property, and did not operate any heavy equipment inside the parks."). This self-serving declaration, with no basis in personal knowledge, cannot "dispute" Plaintiffs' first-hand accounts of County Defendants' involvement in the sweeps—especially not at this early stage.

These declarations come nowhere close to the showing other defendants have made in successful factual attacks against a complaint. For example, in *T.L. ex rel. Ingram v. U.S.*, the defendant argued that the statute of limitations had expired on a plaintiff's medical-malpractice claim. 443 F.3d 956, 961-63 (8th Cir. 2006). As support, the defendant produced the plaintiff's medical records to show the date of relevant diagnoses, the continuing notice of injury, and its likely cause. *Id.*; *see also Flores v. U.S.*, 689 F.3d 894, 900-02 (8th Cir. 2012) (affirming dismissal of tort claim for failure to properly file requisite administrative claim based on medical documents and correspondence between parties). Similarly in *Branson Label*, the court found, based on the "substantially developed . . . record," that a six-factor "fact-intensive" test for diversity jurisdiction favored defendants and required dismissal of the complaint. 793 F.3d at 914-15; *see also Smith v. Bradley Pizza, Inc.*, 314 F. Supp. 3d 1017, 1023-25 (D. Minn. 2018), *aff'd* 821 F.

App'x 656 (8th Cir. 2020) (finding jurisdiction existed based on record that included expert and third-party declarations).

Even were the Court to find the two declarations worthy of consideration, it should only take one of two actions—either: (1) order an evidentiary hearing, considering this Plaintiffs' request for one, *see Buckler*, 919 F.3d at 1044 (8th Cir. 2019) (stating that "parties" may request an evidentiary hearing); or (2) find the question of whether County Defendants forcibly ejected encampment residents and aided in the destruction and deprivation of their property "so bound up with the merits that a full trial on the merits may be necessary." *Buckler*, 919 F.3d at 1044.

Declining to resolve these issues now is the preferred approach. In *Buckler*, a plaintiff injured at a gravel mine alleged, *inter alia*, that his injuries were caused by a mine inspector's failure to review training manuals. Finding that "the evidence [did] more than cast a vague suspicion" on the defendant's argument that the inspector reviewed the manuals, the Eighth Circuit reversed the district court's dismissal for lack of jurisdiction. 919 F.3d at 1054. "[T]he jurisdictional inquiry" was "'so bound up' with the merits of the case," the court stated, that "further factual development of this threshold jurisdictional question" was required. *Id*. (citing *Osborn*, 918 F.2d at 730).

Plaintiffs have shown through the foregoing evidence that their injuries are fairly traceable to County Defendants. And County Defendants have not properly disputed that. At the very least Plaintiffs' evidence "more than cast[s] a vague suspicion" on County Defendants' unsubstantiated claims that their employees are faultless. *Buckler*, 919 F.3d

at 1054. Accordingly, this Court should allow Plaintiffs' claims to go forward because County Defendants' conduct is so bound up in the merits of Plaintiffs' injuries.

**B. Plaintiffs Westvig, Williams, and Mallek have standing to seek injunctive relief.**

County Defendants also factually attack whether Plaintiffs have standing to seek injunctive relief, Motion, at 17-18, and distinguish between Plaintiffs Westvig, Williams, and Mallek—all living outside when the Complaint was filed—and the rest.

When plaintiffs seek declaratory and injunctive relief, they must show either "an ongoing injury" or "an immediate threat of injury." *Frost v. Sioux City*, 920 F.3d 1158, 1162 (8th Cir. 2019) (internal citations omitted). Such threat must be both "real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983) (internal quotation marks omitted).

In *Lyons*, the plaintiff lacked standing when he failed to allege "a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer . . . who would illegally choke him into unconsciousness without any provocation or resistance on his part." *Id*. at 105. That is, plaintiff had not shown that he was likely to engage in illegal conduct in the future, and that the defendants had a *practice* of using chokeholds on individuals acting illegally. *Id*. at 105-10 & nn.7, 9. Accordingly, the chain of events was too speculative, so plaintiff lacked standing. Similarly, in *Brazil v. Arkansas Dep't of Human Servs.*, a plaintiff challenging her supervisors' conduct lacked standing after moving to a different division because "only a far-fetched sequence of events could

lead to additional harm of the sort the injunction seeks to prevent." 892 F.3d 957, 960 (8th Cir. 2018).

County Defendants fail to present evidence refuting that Plaintiff Mallek is living on City property in North Minneapolis. *See* Motion, at 18. The fact that she does not live on County property, *id*., is of no import because County Defendants' policing is not limited to only their property; rather, Defendants acted in concert to clear homeless people from public spaces belonging to other entities too. Plaintiff Mallek therefore is at imminent risk of injury while living outside on public property in Hennepin County. Compl., ¶¶ 171-72.[6]

County Defendants also argue that, because Defendants closed all encampments, Plaintiffs Westvig and Williams cannot show a threat sufficient to justify injunctive relief. Motion, at 18. But Plaintiffs' declarations show that, if their encampments were destroyed, they would move to another outdoor space. Dkt. 9, ¶ 15; Dkt. 13, ¶¶ 3, 16; Compl., ¶¶ 173-76; *see, e.g.* Dkt. 12, ¶¶ 4, 8 (Roy was previously evicted from The Wall encampment and was back to living in encampments in 2020). While living outside, they are at risk of County Defendants' unconstitutional, coordinated practice of evicting homeless people from public property and destroying their belongings in the process. This is not the speculative chain of events in *Lyons* and *Brazil* that were fatal to those requests for

---

6 County Defendants fault Plaintiffs for "not alleg[ing] where Mallek is currently staying." Motion, at 18. But standing generally "depends on the facts as they existed when the lawsuit . . . was filed." *Boitnott v. Border Foods, Inc.*, 361 F. Supp. 3d 858, 863-65 (D. Minn. 2019) (citing *Harley v. Zoesch*, 413 F.3d 866, 872 (8th Cir. 2005)). Absent contrary evidence, the Court must rely on the facts in the Complaint about Mallek's living situation. *See Branson Label*, 793 F.3d at 914-15.

injunctive relief. The record before this Court shows that Defendants, collectively, do not permit homeless people to live in public spaces, even though Plaintiffs Westvig, Williams, and Mallek have nowhere else to go.

Finally, County Defendants contend that the remaining Plaintiffs lack standing for injunctive relief because, at time of filing, they did not live outside. Motion, at 17. While these Plaintiffs' future injuries may not be as obvious as those above, it is nothing like the speculative claims the courts found problematic in *Lyons* and *Brazil*.[7]

The record shows that Plaintiffs Barrow, Brown, Little, and Roy are trapped in a cycle of homelessness. Barrow, who has lacked permanent shelter since June 2020, has lived in a hotel, friend's apartment, and Powderhorn and Loring Parks. Dkt. 7, ¶¶ 1-4, 11-12. At the filing of the Complaint, he was living in a van. The police had "chalked his tires" and were forcing him to continuously move the van around. Dkt. 7, ¶ 12. This is just one step from living outside.

Similarly, it is not so "far-fetched" that funding for emergency hotel rooms would run out for Plaintiffs Brown, Little, and Roy, forcing them back outside. Dkt. 8 (documenting Brown's homelessness for approximately two years, staying sporadically in shelters, then Peavey Park, then hotel paid by ZACAH); Dkt. 10 (stating that for seven years, Little has lived with friends and, as of March 2020, was living outside or at a hotel when donations could pay for it); Dkt. 12 (documenting Roy's homelessness on and off

---

7 Plaintiffs agree Plaintiffs Berry and Huiting lack standing to seek injunctive relief. However, both have standing to seek redress for their forceful eviction and property loss, and County Defendants do not argue otherwise.

since 1999, most recently living outside, then hotel paid by ZACAH). All these Plaintiffs stated they would not know where to go once hotel funding ran out. Dkt. 8, ¶ 19; Dkt. 10, ¶ 21; Dkt. 12, ¶ 16. Once again, there is one step—no sequence of unlikely events—between Plaintiffs having shelter and sleeping outside.[8]

**C. ZACAH has standing.**

County Defendants half-heartedly challenge ZACAH's standing, relegating their argument to a two-sentence footnote. Motion, at 17 n.9. They assert ZACAH lacks an injury. But the Complaint shows the sweeps, which County Defendants perpetrated, *see* Facts, at 3-7, *supra*, caused ZACAH a concrete and demonstrable injury; thus, ZACAH has standing.

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), is instructive and controlling. In *Havens*, HOME, a non-profit organization, alleged that defendants were violating the Fair Housing Act ("FHA") by directing prospective buyers to buildings and neighborhoods inhabited by people of the buyers' race or ethnicity (a practice known as "racial steering"). HOME alleged defendants' practices "frustrated . . . its efforts to assist equal access to housing" and forced it "to devote significant resources to identify and counteract the defendant's [sic] racially discriminatory practices." *Id*. at 379.

The Supreme Court held there was "no question" HOME alleged an "injury in fact" and had standing. *Id*. "Such a concrete and demonstrable injury to the organization's

[8] Indeed, that funding has likely already run out: ZACAH, which paid for rooms for Plaintiffs Brown and Roy, stated it could not provide emergency hotel rooms indefinitely. Dkt. 14, ¶¶ 13-14.

activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests[.]" *Id.*; *see also Arkansas ACORN Fair Hous., Inc. v. Greystone Dev. Co.*, 160 F.3d 433, 435 (8th Cir. 1998) (citing *Havens*, finding non-profit showed actual injury, but lacked standing because injury not "fairly traceable" to defendants' actions); *Granville House, Inc. v. Dep't of Health & Human Servs.*, 715 F.2d 1292, 1298-99 (8th Cir. 1983) (citing *Havens*, finding standing to challenge law that frustrated non-profit's purpose of serving indigent, minority clients).

Based on *Havens* and its Eighth Circuit progeny, ZACAH has standing. The Complaint establishes that the sweeps—in which County Defendants played an indispensable role—forced ZACAH to divert funds (over $100,000) and hundreds of volunteer hours meant to *prevent* homelessness to, instead, providing emergency hotel rooms for displaced residents. Compl., ¶ 5-7, 9, 11. This is a cognizable injury—a "drain on the organization's resources," *Havens*, 455 U.S. at 369, and a "frustration" of ZACAH's homelessness-prevention mission, *Granville House*, 715 F.2d at 1298-99. The Complaint also shows that these injuries are traceable directly to the sweeps conducted by County Defendants. Compl., ¶¶ 7-11; *see Havens*, 455 U.S. at 377; *Arkansas ACORN*, 160 F.3d at 435. A court order enjoining all Defendants from sweeping encampments and displacing residents would remedy ZACAH's injury by allowing it to re-focus on its mission. *See Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 869 (8th Cir. 2013).

## II. <u>The Court Should Deny the County Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6).</u>

At the pleadings stage, Plaintiffs must provide a "short and plain statement" of its claims. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Under this standard, the Complaint survives a motion to dismiss if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[9]

The Court must construe the complaint liberally "in the light most favorable to Plaintiffs," *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1070 (8th Cir. 2017) (internal quotation marks omitted), "draw[ing] all reasonable inferences" in Plaintiffs' favor, *McDonough v. Anoka Cnty.*, 799 F.3d 931, 945 (8th Cir. 2015). While there must be more than "[t]hreadbare recitals of the elements of a cause of action," factual allegations need not contain "direct evidence" or a showing that success on the merits is more likely than not. *Id.* Plaintiffs' Complaint meets this pleading standard.

---

[9] "While courts primarily consider the allegations in the complaint in determining whether to grant a Rule 12(b)(6) motion, courts additionally consider matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned, without converting the motion into one for summary judgment." *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (internal quotation marks omitted).

### A. Plaintiffs plead plausible claims for relief against County Defendants on all counts of the Complaint.

1. County Defendants unlawfully seized Plaintiffs' property (Count I).

The Fourth Amendment to the United States Constitution, applied to the states by the Fourteenth Amendment, protects "[t]he right of the people to be secure in their . . . effects, against unreasonable searches and seizures."[10] "A 'seizure' of property . . . occurs when 'there is some meaningful interference with an individual's possessory interest in that property.'" *Soldal v. Cook Cnty.*, 506 U.S. 56, 61 (1992). Destroying property constitutes a permanent deprivation and meaningful interference with a person's possessory property interest. *U.S. v. Jacobsen*, 466 U.S. 109, 124-25 (1984); *see U.S. v. Place*, 462 U.S. 696, 700-01 (1983) (defining personal property as "effects" under Fourth Amendment).

Homeless individuals have a constitutionally-protected interest in their belongings. *Place*, 462 U.S. at 700-01; *Johnson v. Bd. of Police Comm'rs*, 351 F. Supp. 2d 929, 935 (E.D. Mo. 2004) (granting preliminary injunction for homeless plaintiffs removed by police without warrant or probable cause and whose property was destroyed); *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1030 (9th Cir. 2012) ("[B]y seizing and destroying [residents'] unabandoned legal papers, shelters, and personal effects, the City meaningfully interfered with [their] possessory interest in that property.").

---

10 Article I, Section 10 of the Minnesota Constitution provides the same or more protection against government interference with an individual's possessory interest in property. *See State v. Leonard*, 943 N.W.2d 149, 156 (Minn. 2020).

The Complaint establishes that Defendant Hutchinson dispatched his deputies at Defendant MPRB's request, Compl., ¶¶ 196, 201, and that their responsibilities at the sweeps included abruptly waking residents, dismantling tents, enforcing perimeters, making arrests, kettling people, and guarding the bulldozers destroying the camps, *id.*, ¶¶ 43-44, 46, 47, 206; Exhs. 28, 32 (Images 1, 8). The County Defendants cannot distance themselves from the unconstitutional manner of the sweeps they perpetrated in concert with their co-defendants against Plaintiffs and other residents. They are as responsible for the warrantless seizure and destruction of Plaintiffs' belongings as the drivers of the Bobcats. Indeed, County Defendants' conduct—arriving at the encampments without providing residents notice, enforcing taped perimeters containing Plaintiffs' belongings, threatening residents with arrest if they went back for their belongings, guarding the bulldozers demolishing the camp and the residents' belongings along with it—deprived Plaintiffs of their property, constituting a permanent deprivation and meaningful interference with their possessory interest therein. *Jacobsen*, 466 U.S. at 124-25.

County Defendants' suggestion that Plaintiffs' property was abandoned, Motion, at 21, is inconsistent with the facts in the Complaint, which establish the opposite and must be accepted as true. The very nature of the property that was destroyed is proof positive Plaintiffs' belongings were not abandoned: tents and mattresses, clothes, medications, court documents, birth certificates, forms of identification, and family photographs and heirlooms. *See, e.g.*, Compl., ¶¶ 17, 34, 49, 106, 119. Indeed, many Plaintiffs were frantically packing as Defendants were destroying the camps and denying Plaintiffs the opportunity to go back for their remaining belongings. *See, e.g.*, Compl., ¶¶ 47 (Brown

threatened with arrest by deputy, prevented from getting belongings), 118 (Mallek threatened with arrest while packing if she did not leave within the hour), 129-32 (Huiting's property *twice* destroyed while he was briefly away).

Nor can County Defendants rely on case law that relieved defendants from Fourth-Amendment liability due to adequate notice or opportunities to reclaim property. Motion, at 20. As discussed below, Part II.A.3, at 26-27, *infra*, Plaintiffs allege they were *not* given adequate notice and could *not* reclaim their property. Compl. ¶¶ 14, 29, 47, 89-90, 103, 202, 204, 214, 226. And this Court must accept those facts as true under Rule 12(b)(6).

2. County Defendants violated Plaintiffs' right to privacy (Count II).

Plaintiffs also have a right to privacy under the Fourth Amendment to the United States Constitution and Article I, Section 10 of the Minnesota Constitution. "The Fourth Amendment protects people, not places." *Katz v. U.S.*, 389 U.S. 347, 348 (1967). Thus, "what [a person] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Id*. at 351. To establish a privacy-right violation under the Fourth Amendment, a person must have "exhibited an actual (subjective) expectation of privacy" and that expectation must be reasonable. *Id*. at 361 (Harlan, J. concurring).

Plaintiffs have an actual, subjective expectation of privacy in their tents—their homes—where their belongings are kept. *See, e.g.*, *U.S. v. Voice*, 622 F.3d 870, 877-78 (8th Cir. 2010); *U.S. v. Sandoval*, 200 F.3d 659, 660 (9th Cir. 2000); *State v. Larsen*, 650 N.W.2d 144, 148 (Minn. 2002) (finding privacy right in fish house on public lake, relying on Fourth Amendment and Minn. Const. Art. I, § 10); *State v. Mooney*, 588 A.2d 145, 160-61 (Conn. 1991) (finding homeless plaintiff had privacy interest in closed containers;

defendants' warrantless search violated privacy). To reject that homeless persons have reasonable expectations of privacy in their tents because they do not have four solid walls

> would be to read millions of homeless citizens out of the text of the Fourth Amendment. . . . [which supports] the unremarkable proposition that a person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable government intrusion into that place. Thus, the Constitution does not contemplate a society in which millions of citizens have no place where they can go in order to avail themselves of the protections provided by the Fourth Amendment.

*Cmty. for Creative Non-Violence v. Unknown Agents of U.S. Marshals Serv.*, 791 F. Supp. 1, 6 (D.D.C. 1992) (internal citations omitted).

Given that Plaintiffs' tents are their homes, government interference with their right to privacy in those spaces is a unconstitutional unless it was reasonable under the Fourth Amendment. Here, as alleged in the Complaint, it was not. County Defendants' actions, Part II.A.1, at 24, *supra*, coupled with the lack of warrant, probable cause, or exigent circumstances, makes the intrusion unreasonable and therefore unconstitutional. And it resulted in serious injuries to Plaintiffs. Plaintiffs Berry and Brown were violently awoken by the sweeps, scrambled to gather their things, but ultimately lost many of their personal possessions in the sweeps. Compl., ¶¶ 28, 29, 31, 33-34, 43-44, 46, 47, 49. These are gross violations of Plaintiffs' privacy, and the Court should deny the motion to dismiss this claim.

3. County Defendants provided Plaintiffs no procedural due process (Count III).

Under the Fourteenth Amendment, "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. To determine

whether a due-process violation occurred, a court analyzes (1) whether Plaintiffs were deprived of a protected liberty or property interest and, if so, (2) what process is due, balancing factors outlined in *Mathews v. Eldridge*, 424 U.S. 319 (1976).[11]

Cases addressing the destruction of homeless persons' property have consistently found notice, storage, and the ability to reclaim property to be essential to due process. *Lavan*, 693 F.3d at 1030 (finding property seizure would have been reasonable if City held it for "return to its owner instead of immediately destroying it" (citing *Jacobsen*, 466 U.S. at 124-25); *Murray v. City of Philadelphia*, -- F. Supp. 3d --, 2020 WL 5006046, at *6 (E.D. Penn. Aug. 25, 2020); *Proctor v. District of Columbia*, 310 F. Supp. 3d 107, 110 (D.D.C. 2018).

The Complaint establishes that County Defendants provided Plaintiffs *no* process before destroying their property, Compl., ¶¶ 14-17, 29, 34, 47-48, 103, 106, 116, 118-19, 129-30, 132—no pre-sweep packing assistance, post-eviction collection-and-storage, or later opportunity to retrieve property. *Id.*, ¶¶ 202 & n.52. Indeed, many Plaintiffs were threatened with arrest when they asked to gather the rest of their belongings. *Id.*, ¶¶ 15, 16, 33, 46, 47, 104. Accordingly, the Court should deny the motion as to this claim.

4. <u>County Defendants violated Plaintiffs' substantive due process rights (Count IV).</u>

"The substantive component of the Due Process Clause protects those rights that are 'fundamental,' that is, rights that are 'implicit in the concept of ordered liberty.'"

[11] The analysis under the Minnesota Constitution for a possible procedural due process violation is the same. *See Sawh v. City of Lino Lakes*, 823 N.W.2d 627, 632 (Minn. 2012).

*McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) (quoting *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)). The Fourteenth Amendment forbids government intrusion on "fundamental liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (internal quotation marks omitted); *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (internal quotation marks omitted).[12]

*a. Plaintiffs have federal- and state-protected rights to privacy in their homes.*

Under both the United States and Minnesota Constitutions, privacy has long been recognized as a fundamental right, one inherent "in the very idea of free government," *Twining v. New Jersey*, 211 U.S. 78, 106 (1908), and "ordered liberty," *Palko*, 302 U.S. at 325. *Griswold v. Connecticut*, 381 U.S. 479, 484 (1965); *State v. Gray*, 413 N.W.2d 107, 111 (Minn. 1987).

When it first recognized a federal right to privacy, the Supreme Court explained: "Specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance. Various guarantees create zones of privacy." *Griswold*, 381 U.S. at 484 (1965). Minnesota later recognized a similar right of privacy protected by the Minnesota Constitution, *Gray*, 413 N.W.2d 107, rooted in

---

12 County Defendants' mischaracterize these claims as only "property-related." Motion, at 29. However, Plaintiffs' Fourteenth-Amendment claim relies on the nature of the forceful evictions, *see* Compl., ¶¶ 230-36; this is materially different than claims under the Fourth Amendment, which only protects against unreasonable searches and seizures. *See* Parts II.A.1 & 2, *supra*.

Article I, Sections 1, 2, 7, and 10, *Jarvis v. Levine*, 418 N.W.2d 139, 148 (Minn. 1988). The Minnesota Supreme Court has interpreted the Minnesota Constitution to provide "more [privacy] protection than accorded under the federal constitution." *Doe v. Gomez*, 542 N.W.2d 17, 30. It did "not do so lightly," but explained that "Minnesota possesses a long tradition of affording persons on the periphery of society a greater measure of government protection and support than may be available elsewhere." *Id*. It is against this robust backdrop that Plaintiffs bring this claim that Defendants infringed upon their right to privacy in their homes, regardless of whether those homes have four solid walls.

Plaintiffs' fundamental right to privacy emanates from the Fourth Amendment, as discussed above. *Silverman v. U.S.*, 365 U.S. 505, 511 n.4 (1961) ("A man can still control a small part of his environment, his house; he can retreat thence from outsiders, secure in the knowledge that they cannot get at him without disobeying the Constitution. That is still a sizable hunk of liberty—worth protecting from encroachment. A sane, decent, civilized society must provide some such oasis, some shelter from public scrutiny, some insulated enclosure, some enclave, some inviolate place which is a man's castle." (internal quotation marks omitted)); *see also Sandoval*, 200 F.3d at 660-61 (finding privacy right in tent on federal land) (collecting cases).

That right to privacy in one's home is even stronger under the Minnesota Constitution, Article I, Section 10. *Larsen*, 650 N.W.2d at 148 ("The right to be free from unauthorized entry into one's abode is ancient and venerable."). Indeed, in *Larsen*, the Minnesota Supreme Court recognized that appellant had a constitutional right to privacy in a fish house, despite its nature as a temporary shelter, its presence on public land (a lake),

and the requirement of a fishing license. *Id*. at 150; *accord State v. Pippin*, 403 P.3d 907, 914-15 (Wash. Ct. App. 2017).

County Defendants interfere with Plaintiffs' fundamental privacy right when they appear at all hours of the day or night, without notice, forcibly eject residents from their homes, threaten them with arrest, ransack tents and the belongings therein, and destroy residents' property, including their homes, when Plaintiffs have nowhere else to go. Compl., ¶¶ 14-17, 28, 29, 31-34, 43-47, 118-19, 103-04, 106, 116. But even if the Court disagrees there is a cognizable federal right at stake here, Plaintiffs certainly have a fundamental privacy right in their homes under the Minnesota Constitution under *Larsen*. On par with the fish house, Plaintiffs' homes are on public property and, at the time they were living outside, Plaintiffs were permitted to be there—under Defendant MPRB's "refuge" resolution, then the encampment permitting scheme, and even now, under Governor Walz's executive orders. Compl., ¶¶ 168-69, 171, 173, 192. Ultimately, Plaintiffs want only for their homes and belongings to be afforded the dignity and respect they deserve.[13]

---

[13] Plaintiffs are *not* asserting an unqualified right to sleep in public. Rather, Plaintiffs contend the right to privacy protects their ability to safely sleep on public land when no alternative exists.

County Defendants rely on distinguishable cases to support their mischaracterization of Plaintiffs' argument. *See* Motion, at 30-31; *Clark v. Cmty. For Creative Non-Violence*, 468 U.S. 288, 290-93 (1984) (First Amendment case where government denied permits for protesters to camp overnight in parks, though permits granted for same expressive conduct during daytime); *Minneapolis v. Cnty. of Hennepin*, 866 F. Supp. 2d 1062, 1071 (D. Minn. 2011) (same); *Lubavitch Chabad House, Inc. v. City of Chicago*, 917 F.2d 341, 347 (7th Cir. 1990) (First Amendment and religious

But this does not end the inquiry. When the government interferes with a fundamental right, it must do so in the least restrictive manner and only to serve a compelling interest. *Glucksberg*, 521 U.S. at 721; *Skeen v. State*, 505 N.W.2d 299, 312 (Minn. 1993). Defendants' sweeps do not pass strict scrutiny. Even assuming a compelling interest, less restrictive means exist. For example, as has been found necessary in other cases, adequate notice of an impending sweep (precise date/time, at least 72-hours notice), pre-sweep packing assistance, guaranteed shelter on the day of eviction, and post-sweep

---

discrimination case where plaintiff sought to erect menorah at O'Hare Airport to contrast erected symbols of Christianity). In those cases, *housed* people sought permission to erect structures as a form of protest under the First Amendment.

The other cases on which County Defendants rely were not brought under claims Plaintiffs bring here. But the cases actually *support* Plaintiffs' position that Defendants' sweeps are illegal. *See Miralle v. City of Oakland*, No. 18-CV-06823-HSG, 2018 WL 6199929, at *2 (N.D. Cal. Nov. 28, 2018) (denying plaintiffs able to obtain alternative shelter, and city had policies requiring notice, storage and property-retrieval processes, offers for shelter placement and moving assistance); *Winslow v. City of Oakland*, No. 20-CV-01510-CRB, 2020 WL 1031759, at *3 (N.D. Cal. Mar. 3, 2020) (no allegation that plaintiffs had nowhere else to go, and court issued order requiring defendants' compliance with policies requiring 72-hours notice, "collect[ion], bag[ging], and label[ing] personal belongings" left onsite, and property-retrieval process and storage for "at least" 90 days); *Cobine v. City of Eureka*, 250 F. Supp. 3d 423, 437 (N.D. Cal. 2017) (dismissing claim because plaintiffs failed to allege state actor—rather than privately-run shelter—infringed on privacy right, never addressing whether plaintiffs otherwise asserted cognizable Fourteenth Amendment claim); *Martin v. City of Boise*, 920 F.3d 584, 617 (9th Cir.) ("We hold only that 'so long as there is a greater number of homeless individuals in [a jurisdiction] than the number of available beds [in shelters],' the jurisdiction cannot prosecute homeless individuals for 'involuntarily sitting, lying, and sleeping in public.'"); *Pottinger v. City of Miami*, 810 F. Supp. 1551, 1574 (S.D. Fla. 1992) (finding privacy right under Florida law does not protect specific activities, but finding Fourth and Eighth Amendment violations, declaring unconstitutional ordinances prohibiting sleeping in public, being in park after hours, loitering, and trespassing).

collection, temporary storage of resident property, and a process to reclaim it could all be implemented, while still achieving any purported compelling interest.

*b. County Defendants repeatedly subject Plaintiffs to significant danger of Defendants' own making.*

Substantive due process also requires the government "to [affirmatively] protect individuals if it created the danger to which the individuals are subjected."[14] *Hart v. City of Little Rock*, 432 F.3d 801, 805 (8th Cir. 2005). To succeed on a state-created-danger theory at this juncture, Plaintiffs must allege that: (1) they were members of a "limited, precisely definable group;" (2) the municipality's conduct put them at "significant risk of serious, immediate, and proximate harm;" (3) the risk was "obvious or known" to the municipality;" (4) the municipality "acted recklessly in conscious disregard of the risk;" and (5) in total, the municipality's conduct "shocks the conscience." *Fields v. Abbott*, 652 F.3d 886, 891 (8th Cir. 2011). Official behavior "most likely to rise to the conscience-shocking level" is "conduct intended to injure in some way unjustifiable by any government interest." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998). Deliberate indifference satisfies the shock-the-conscience threshold. *Terrell v. Larson*, 396 F.3d 975, 978 (8th Cir. 2005).

[14] Although governments "have no affirmative obligation to protect individuals against private violence," *Hart*, 432 F.3d at 805, this is not Plaintiffs' claim. Rather, Defendants forced Plaintiffs into dangerous situations *Defendants* created—destroying Plaintiffs' homes and belongings, throwing residents out with no alternative shelter, leaving them to brave winter without essential possessions, like winter gear, and, on the rare occasion shelter space was available, subjecting them to their unsafe conditions and increased COVID-19 risk.

*First*, Plaintiffs are members of a "limited, precisely definable group": homeless persons in Hennepin County who have been, are, or will be living on public property. Compl., ¶ 146.

*Second*, the conduct of *all* defendants—forcefully ejecting Plaintiffs from their homes using bulldozers and threats of arrest—put Plaintiffs at "significant risk of serious, immediate, and proximate harm." The evictions forced Plaintiffs to bounce between camps and hotel rooms, *id.*, ¶ 208, interfering with their ability to access resources like food, water, or medical care, *id.*, ¶ 109, maintain employment, *id.*, ¶ 125, keep phones charged, *id.*, ¶ 64, or set appointments, *id.*, ¶¶ 23. For Plaintiff Roy, Brackett Park camp enabled her to participate in outpatient addiction treatment; she now worries her sobriety "will be put in jeopardy" because she moves so frequently. *Id.*, ¶ 78. Constantly moving also increases Plaintiffs' risk of contracting COVID-19. *Id.*, ¶ 171; *see* Facts, at 7-8, *supra*.

Additionally, destroying a homeless person's property is inherently endangering. As the Ninth Circuit noted in *Lavan*, the practice of destroying property can be "devastating for the homeless." 693 F.3d at 1032. Residents like Plaintiff Westvig are trapped outside without protective items like tents, blankets, and winter clothes. Compl., ¶¶ 91-92. Still, Defendants conduct sweeps without offering safe, alternative living spaces. Shelters are routinely full, *id.*, ¶¶ 174-81, but even when a bed is available, there is approximately a four-fold risk of COVID-19 than at an encampment, *see* Facts, at 8, *supra*.

*Third*, the County knew of the obvious risk of harm of the sweeps to encampment residents. For example, the risk of COVID-19 was documented repeatedly in Governor Walz's emergency orders. *Id.*, ¶¶ 168, 171. The County tracks and knows the rate of

COVID-19 infections in its shelters. *See* Facts, at 7-8, *supra*. The life-threatening nature of evicting the homeless and destroying their belongings during winter was both obvious and known, given Defendants' rush to close all encampments by November 1, 2020. *Id.*, ¶ 214. What is worse, they closed all encampments by January 7, 2021, Motion, at 9 n.3, despite their own data reflecting that shelters regularly reach capacity, *id.*, ¶¶ 174-75; Exhs. 15, 16, leaving residents no option *but* to sleep outside, unprotected and with average temperatures in the mid-to-low 20s. *See* Facts, at 8 & note 4, *supra*.

*Fourth*, the County acted recklessly, in conscious disregard of the risk to Plaintiffs. Despite knowing the increased risk of COVID-19, that shelters are consistently full, and that residents would likely still need to live outside, the County continually participated in the sweeps, guarded the machinery used to destroy property, and presented shelters as residents' only option. *See* Facts, at 3-8, *supra*.

Fifth, this disregard for Plaintiffs' safety and wellbeing is conscience-shocking. Defendants repeatedly, premeditatedly targeted a highly-vulnerable population, removing them from their homes, destroying essential possessions, many of which keep them alive, and separating them from necessary resources, like access to outreach workers, medical care, employment, and more. Part II.A.4.b, at 33, *supra*. The danger Plaintiffs face during *every* sweep, as alleged in the Complaint, is created and perpetuated by County Defendants.

As Plaintiffs' Complaint contains support for each of these elements, the Court should deny the motion as to this claim.

5. The County Defendants converted Plaintiffs' property (Count V).

To show conversion, Plaintiffs must allege: (1) that they had a possessory interest in the property; and (2) that defendants deprived them of that interest. *Williamson v. Prasciunas*, 661 N.W.2d 645, 649 (Minn. Ct. App. 2003). Defendants here challenge only the second element—i.e., causation). Motion, at 35.

"Causation exists if a defendant's tortious conduct was a substantial factor in bringing about the injury." *Gits v. Northwest Bank Minneapolis*, 390 N.W.2d 835, 837 (Minn. Ct. App. 1986). The same facts and reasonable inferences which support that County Defendants unconstitutionally seized Plaintiffs' property, Part II.A.1, at 24-25, *supra*, necessarily support Plaintiffs' conversion claim, as do Defendants MPRB's repeated admissions that they could not demobilize encampments without County Defendants' help, Exh. 24 at 2, 4; Exh. 25. Accordingly, County Defendants' actions were a substantial factor in depriving Plaintiffs of the use and possession their property. The Court should deny the motion to dismiss this claim.

**B. The County Defendants' asserted defenses are unavailing.**

1. Minn. Stat. § 466.02 is not an adequate post-deprivation remedy to bar relief for Counts I–III of the Complaint.

Minnesota Statute § 466.02 provides constitutionally-inadequate process for the repeated, premeditated property deprivation by County Defendants in concert with their co-defendants. The government cannot destroy property—even that of homeless people—without *some* process. *Propert v. District of Columbia*, 948 F.3d 1327, 1333 (D.D.C. 1991) ("[H]owever weighty the governmental interest . . . , the amount of process required can

never be reduced to zero."). But that is what is alleged that Defendants are doing, while hiding behind Minn. Stat. § 466.02.

The Supreme Court held in *Hudson v. Palmer* that post-deprivation process for property loss by municipal employees satisfies the Due Process Clause only "when [such] deprivations of property are effected through *random* and *unauthorized* conduct of a [municipal] employee, [and] predeprivation procedures are simply impracticable since the [municipality] cannot know when such deprivations will occur." 468 U.S. 517, 533 (1984) (emphasis added). "The controlling inquiry is whether the [municipality] is in a position to provide for predeprivation process." *Id*. at 534.

Minn. Stat. § 466.02 provides County Defendants no shield because meaningful pre-deprivation procedures for encampment sweeps are available. The cases involving the seizure of property from homeless encampments County Defendants cite exemplify as much: In all of those cases, courts held the municipality complied with the Fourth and Fourteenth Amendments when it provided "notice *and* an opportunity to reclaim seized property." Motion, at 20 (emphasis added). For instance, in *Murray*, the court found no constitutional violation because the City provided notice of the sweeps *and* stored residents' personal property for 30 days. 2020 WL 5006046, at *2, *6. Similarly, in *Proctor*, prior to a sweep, government employees provided packing materials, and afterwards would store belongings for 60 days, or longer if they learned the property owner had been detained or hospitalized. 310 F. Supp. 3d at 110, 112.

Here, Plaintiffs receive no such process, despite Defendants' ability to provide it. Nor were Defendants' actions spontaneous; indeed, they were the very opposite of random

and unauthorized, *Hudson*, 468 U.S. at 533. They were planned well in advance, coordinated with co-defendants, and involved amassing heavy machinery and dumpsters to arrive onsite at a predetermined time and date. Exh. 29 (emailing dates for planned demobilizations, in which County Defendants participated).

Finally, other cases County Defendants cite regarding Minn. Stat. § 466.02 are inapplicable because they involve one-time, spontaneous, unauthorized property destruction by municipal agents while carrying out search warrants or court orders. *Ali v. Ramsdell*, 423 F.3d 810, 813-14 (8th Cir. 2005); *Hubenthal v. Winona Cnty.*, 751 F.2d 243, 246 (8th Cir. 1984); *Burns v. Office of Att'y Gen.*, Civ. No. 05-00858, 2009 WL 825778, at *20 (D. Minn. Mar. 27, 2009); *McKinney v. State*, Civ. No. 08-03769, 2008 WL 4831762, at *4 (D. Minn. Nov. 3, 2008). None of those plaintiffs alleged repeated actions of property deprivation, as Plaintiffs do here. Minn. Stat. § 466.02 thus does not bar Count I-III.

2. Plaintiffs adequately plead a *Monell* claim against Defendant Hennepin County.

Plaintiffs properly plead the County's municipal liability. A municipality is liable for its employees' actions where it had an unconstitutional policy or custom that caused plaintiff's injury. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). To establish a "custom," Plaintiffs must demonstrate:

1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the municipality's employees;

2) Deliberate indifference to or tacit authorization of such conduct by the municipality's policymaking officials after notice of the misconduct; and

3) That plaintiffs were injured by acts pursuant to the custom, i.e., that the custom was a moving force behind the constitutional violation.

*Johnson v. Douglas Cnty. Med. Dep't*, 725 F.3d 825, 828 (8th Cir. 2013).

Plaintiffs' Complaint sufficiently alleges the County's unconstitutional custom of evicting homeless encampment residents, without adequate notice, and intentionally destroying their property without providing them due process. And this practice resulted in Plaintiffs' injuries. Specifically, the County answered Defendant MPRB's call for help in disbanding the encampments, Compl., ¶¶ 196, 201, dispatching deputies to no fewer than four sweeps, *id.*, ¶ 206, Exhs. 1, 28, 29, 32. There, deputies woke residents, began tearing down tents, enforced taped perimeters, threatened to arrest residents, kettled people, and guarded bulldozers as they razed the camps, *id.*; that this happened no fewer than *four* times establishes the existence of a continuing, widespread, and persistent pattern of unconstitutional conduct. It defies logic that Defendant Hutchinson's deputies did this without either his tacit or explicit authorization. Indeed, after learning of his deputies' conduct at the first sweep, all of which have been heavily reported, *see, e.g.*, Exhs. 28, 32, he dispatched them to assist in at least three more, carried out in essentially the same manner. And this unconstitutional custom of premeditated evictions (yet providing residents practically no notice) and intentional property destruction directly resulted in Plaintiffs' injuries. Compl., ¶¶ 14, 15, 17, 28, 29, 31, 33-34, 43-44, 46, 47, 61-62, 73-78, 82, 89-94, 101, 102, 106, 113, 115, 118, 119, 127-133.

Accordingly, the Court should reject the County's argument that Plaintiffs do not sufficiently allege its *Monell* liability under § 1983.

3. Plaintiffs adequately plead claims against Defendant Hutchinson in his individual capacity.

Plaintiffs properly plead individual-capacity claims against Defendant Hutchinson. "[A] supervisor may [ ] be liable under § 1983 if either his direct action or his failure to properly supervise and train the offending employee caused the constitutional violation." *Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014) (internal quotation marks omitted). Plaintiffs need not plead that Defendant Hutchinson was "personally involved." Rather, a supervisor is liable if he knew about the conduct and "facilitate[d] it, approve[d] it, [and] condone[d] it," *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995), as Defendant Hutchinson did here.

The Complaint belies any claim that Defendant Hutchinson did not tacitly authorize the unconstitutional conduct of his deputies. County personnel actively participated in no fewer than four encampment sweeps: Elliot, Kenwood, Peavey, and Powderhorn Parks. Compl., ¶ 47; Exhs. 28, 29, 32. Deputies threatened at least one Plaintiff with arrest during the Peavey eviction, *id.*, ¶ 47, and were photographed at Powderhorn kettling residents and protesters, Exh. 32 (Image 1), and standing guard of Bobcats used to destroy residents' property, *id*. (Image 8), a sweep which resulted in the eviction of four other Plaintiffs. Defendant Hutchinson is responsible for the natural and foreseeable—indeed, intended—consequences of his deputies' conduct, the violent eviction of Plaintiffs from their homes and summary destruction of their property in violation of the Constitution.

That Defendant Hutchinson knew what was transpiring and ratified it is easily inferable from the failure to abate the conduct of his deputies over the span of the sweeps.

The Court should reject his argument that Plaintiffs do not sufficiently allege individual-capacity liability under § 1983.

4. Defendant Hutchinson is not entitled to qualified immunity.

Defendant Hutchinson moves to dismiss the claims against him based on qualified immunity. Motion, at 24-26, 34. As a threshold matter, qualified immunity applies only to damages claims. *Pearson v. Callahan*, 555 U.S. 223, 242-43 (2009). Plaintiffs' claims include requests for declaratory and injunctive relief. For that reason alone, the Court should reject the argument.

Additionally, "qualified immunity is an affirmative defense . . . [that]will be upheld on a 12(b)(6) motion *only* when the immunity is established on the face of the complaint." *Weaver v. Clarke*, 45 F.3d 1253, 1255 (8th Cir. 1995) (emphasis added). Because Defendant Hutchinson cannot meet this exacting burden, the Court should find he is not entitled to qualified immunity at this stage.

The qualified-immunity two-prong inquiry requires a court to determine whether the plaintiff alleged the violation of a clearly-established constitutional right on the face of the complaint. *Id*. "To be clearly established, the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id*. at 1256. "Put another way, the specific acts alleged need not have been previously held unlawful, but the unlawfulness of the acts must have been apparent in light of pre-existing law." *Id*.

Under the lenient 12(b)(6) standard, Plaintiffs satisfy both prongs. First, on the face of the Complaint, Plaintiffs have sufficiently pled numerous constitutional violations. *See*

Parts II.A.1-4, at 23-34 (establishing multiple violations of Fourth and Fourteenth Amendments), *supra*.

Second, County Defendants violated clearly-established rights, the contours of which have been long recognized both in the Eighth Circuit and around the country:

- A person has the right to be free from unreasonable government seizure of property, *Robbins v. City of Des Moines*, 984 F.3d 673, 681 (8th Cir. 2021) (citing *Place*, 462 U.S. at 707-10); *see also Brown v. City of Bloomington*, Civ. No. 15-11 (DSD/DTS), 2018 WL 3614125, at *9 (D. Minn. July 27, 2018) ("It is clearly established that the warrantless seizure of property is a per se violation of the Fourth Amendment.")

- A person has a reasonable expectation of privacy in his home and belongings under the Fourth Amendment, *Silverman*, 365 U.S. at 511 n.4; *Larsen*, 650 N.W.2d at 149;

- The government cannot summarily destroy property without first giving the owner notice and an opportunity to challenge its disposal, *Walters v. Wolf*, 660 F.3d 307, 313 (8th Cir. 2011) (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982));

- There is a substantive due process right to privacy in one's home and personal belongings, *Silverman*, 365 U.S. at 511 n.4; *Rakas*, 439 U.S. at 142-43; *Larsen*, 650 N.W.2d at 150; *Gomez*, 542 N.W.2d at 30; and

- The government must protect a person when it created the danger to which the individual is subjected, *Fields*, 652 F.3d at 891 (citing *Hart*, 432 F.3d at 805); *Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995) (citing *Collins*, 503 U.S. 126-30).

Accordingly, Plaintiffs' Complaint states plausible claims that Defendant Hutchinson deprived them of constitutional rights that were clearly established at the time of the violation. This Court should find that Defendant Hutchinson is not entitled to dismissal based on qualified immunity at this stage.

**C. Plaintiffs sufficiently plead a claim for punitive damages.**

County Defendants move to dismiss Plaintiffs' claim for punitive damages on three grounds: (1) Plaintiffs have failed to comply with the motion requirements of Minn. Stat.

§§ 549.191 and 549.20; (2) under state and federal law, punitive damages cannot be awarded against Hennepin County; and (3) Plaintiffs have failed to allege sufficiently egregious conduct by Defendant Hutchinson to subject him to punitive damages. Motion, at 35-36. None of these grounds warrants dismissal of the punitive-damages claim.

First, the motion requirements of Minn. Stat. §§ 549.19 and 549.20 do not apply unless the basis for federal jurisdiction is diversity of citizenship, *Benner v. St. Paul Public Schools, I.S.D. #625*, 380 F.Supp.3d 869, 910 (D. Minn. 2019) ("Section 549.191 is inapplicable to the present action because Benner's [ ] claims are premised on federal question jurisdiction and on supplemental jurisdiction, *not* on diversity jurisdiction.") (collecting cases), which is not the case here. *See* Compl. ¶¶ 1-3.

Second, although the County may not be subject to punitive damages under Plaintiffs' federal claims, *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981), it can still face punitive damages under Plaintiffs' Minnesota law claims. Minn. Stat. § 466.04, subd. 1(b), generally bars an award of punitive damages against a municipality; however, § 466.06 provides that the "the procurement of such insurance" beyond the statutorily-imposed maximum—here, zero—"constitutes a waiver of the limits of governmental liability under section 466.04." To the extent the County has any insurance to cover punitive damages, the County has waived its immunity.[15]

---

[15] To date, the parties have not exchanged information of "any insurance agreement under which an insurance business may be liable to satisfy . . . the judgment." FED. R. CIV. P. 26(a)(1)(A)(iv). Before the Court rules, it should require this disclosure from the County, since it is likely dispositive of its immunity argument as to Plaintiffs' state-law claims.

Third, Plaintiffs have plausibly alleged that Defendant Hutchinson acted with reckless indifference for the rights of others such that Plaintiffs' punitive-damages claim against him should go forward.

A defendant faces exposure to punitive damages for federal claims "when [his] conduct is shown to be motived by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Under Minnesota law, a defendant, who is a supervisor, faces exposure to punitive damages for his subordinate's actions if he "authorized the doing and the manner of the [unlawful] act" or "ratified or approved the act while knowing of its character and probable consequences." Minn. Stat. § 549.20, subd. 2.

Here, the pleadings are replete with examples of Defendant Hutchinson's ratification and authorization—tantamount to, at least, reckless indifference towards—his deputies' deliberate disregard for the rights and safety of encampment residents. Plaintiffs have established Defendant Hutchinson heeded Defendant MPRB's call for assistance, Exh. 24, dispatching his deputies to the "planned and coordinated" camp demobilizations. Compl., ¶¶ 198, 201 & n.51, 204; Exhs. 1, 28. The sweeps were conducted in particularly cruel manner: The deputies Defendant Hutchinson turned loose on Plaintiffs and the other unfortunate residents aided in heartlessly throwing homeless people on the streets of Minneapolis, showing up at all hours of the day or night to evict them, standing guard as residents' meager worldly possessions were deliberately destroyed, often as residents watched, rather than collected and stored; threatening residents with arrest; kettling them to be maced; and too often leaving them without anywhere else to go due to inadequate

shelter space and housing. Defendant Hutchinson knew it, ratified it, and sent his deputies there to do it again and again. Compl., ¶¶ 172 & nn.17-20; 179 & nn.27-28; 201 & n.51; 206 & nn.55-56; 207 & n.57; Exhs. 5, 10-12, 17, 28, 32. And all this was committed during a raging, unprecedented pandemic, with COVID-19 cases in shelters outpacing those in encampments. *See* Compl., ¶ 171 (noting increased risk of COVID-19 from sweeps); *see* Facts, at 7-8, *supra*.

The U.S. Supreme Court has made clear that *Twombly* does "not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal" activity. 550 U.S. at 556. This is certainly true regarding Defendant Hutchinson's liability for punitive damages based on knowledge and ratification of the egregious conduct of his deputies, amounting to his own reckless or callous indifference. This Court should therefore deny County Defendants' motion to dismiss Plaintiffs' claim for punitive damages.

## CONCLUSION

Accordingly, the Court should deny County Defendants' motion to dismiss.

Respectfully submitted,

**MID-MINNESOTA LEGAL AID**

Dated: February 17, 2021

BY: s/ Justin H. Perl
Justin H. Perl (No. 0151397)
Dorinda L. Wider (No. 0162334)
Rebecca Stillman (No. 039855)
111 North Fifth Street, Suite #100
Minneapolis, MN 55403-1604

Tel. and Fax: (612) 746-3727
Tel. and Fax: (612) 746-3624
Tel. and Fax: (612) 746-3759
Email: jperl@mylegalaid.org
dlwider@mylegalaid.org
rstillman@mylegalaid.org

and

**AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA**

BY: s/ Teresa Nelson
Teresa Nelson (No. 0269736)
Clare Diegel (No. 0400758)
Isabella Salomão Nascimento (No. 0401408)
American Civil Liberties Union of Minnesota
P.O. Box 14720
Minneapolis, MN 55414
Tel: (651) 645-4097
Fax: (651) 647-5948
Email: tnelson@aclu-mn.org
cdiegel@aclu-mn.org
inascimento@aclu-mn.org

***Attorneys for Plaintiffs***