### UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

| | |
|---|---|
| PATRICK BERRY, HENRIETTA BROWN, NADINE LITTLE, DENNIS BARROW, VIRGINIA ROY, JOEL WESTVIG, GINA MALLEK, DANIEL HUITING, *on behalf of themselves and a class of similarly-situated individuals*; and ZACAH, | Civil Action No. 20-cv-02189-WMW-JFD |
| Plaintiffs, | **CLASS ACTION** |
| vs. | **SECOND AMENDED COMPLAINT**[1] |
| HENNEPIN COUNTY; HENNEPIN COUNTY SHERIFF DAWANNA WITT, *in her official capacity*; CITY OF MINNEAPOLIS; MINNEAPOLIS MAYOR JACOB FREY, *in his individual and official capacity*; current MINNEAPOLIS CHIEF OF POLICE BRIAN O'HARA, *in his official capacity*; former MINNEAPOLIS CHIEF OF POLICE MEDARIA ARRADONDO, *in his individual capacity*; MINNEAPOLIS PARK AND RECREATION BOARD; POLICE OFFICERS JOHN DOES; AND POLICE OFFICERS JANE DOES, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs in this class action are people experiencing homelessness living in public parks in the City of Minneapolis ("City"). Plaintiffs bring this suit on behalf of themselves

---

[1] Plaintiffs herein conform this Second Amended Complaint to the Court's orders on the County and MPRB Defendants' Rule 12 motions. *See* ECF Nos. 104, 181. By doing so, however, Plaintiffs do not waive and expressly reserve all rights to appeal or otherwise challenge the rulings therein.

and similarly-situated individuals for declaratory and injunctive relief (preliminary and permanent thereafter) to enjoin the Defendants' pattern, practice, custom, and policy of conducting "sweeps" of encampments—groups of tents where homeless people live. Plaintiffs also seek damages, costs, and attorneys' fees.

These sweeps, conducted by Defendants, eject Plaintiffs and putative class members from the public parks where they have been living, sometimes forcing them to move into crowded shelter spaces in spite of the severe public health danger posed by the COVID-19 pandemic. Oftentimes, these sweeps displace homeless people who have nowhere else to go due to the lack of affordable housing and adequate shelter space in Minneapolis and Hennepin County. In sweeping these encampments, Defendants' employees, including Defendant law enforcement officers, unlawfully seize and destroy personal property without adequate notice, just compensation, or other requisite procedural due process protections. These actions violate the Fourth and Fourteenth Amendments to the United States Constitution, as well as the Minnesota Constitution and common law.

## JURISDICTION

1.     Plaintiffs' claims arise under 42 U.S.C. § 1983, the Fourth and Fourteenth Amendment to the United States Constitution, as incorporated against the States, their agencies, and their municipal divisions through the Fourteenth Amendment.

2.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the United States Constitution and federal law.

3.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the state law and state constitutional claims because Plaintiffs' state claims are related to

Plaintiffs' federal claims, arise out of a common nucleus of operative facts, and form part of the same case or controversy under Article III of the U.S. Constitution.

## PARTIES

*Organizational Plaintiff*

### ZACAH

4.     Zakat, Aid and Charity Assisting Humanity (ZACAH), is a private, non-profit organization staffed only by unpaid volunteers.  The entire board is comprised of full-time professionals in healthcare and education, and one student, all of whom dedicate their limited free time to ZACAH.

5.     ZACAH's mission is to provide financial assistance to residents of Minnesota on the verge of experiencing homelessness.  ZACAH seeks to help people transition from a state of vulnerability and get them on a path of sustainability.  ZACAH was not established, nor is it sustained, to assist people experiencing chronic homelessness.

6.     ZACAH fulfills its mission by providing funds for rent, utilities, car payments, childcare and other vital needs to keep people from becoming homeless. Approximately 95% of ZACAH's budget prior to March of 2020 was spent on this part of ZACAH's mission.  The remaining 5% of ZACAH's budget was allocated to operating a transitional home to serve women waiting for permanent housing.

7.     Defendants' displacement of encampment residents and destruction of their property has frustrated and diverted money and resources from ZACAH's mission to keep people from becoming homeless.

8.      As Defendants' sweeps ejected residents from public parks with nowhere else to go, volunteers contacted ZACAH and asked for donations to pay for hotel rooms for people on an emergency basis.  Although providing such emergency and temporary relief is not part of ZACAH's mission or purpose, ZACAH began diverting its funds to pay for hotel rooms.

9.      As of October 13, 2020, ZACAH had received $155,715 in donations with the initial intention of paying first-month's rent and security deposit for individuals who needed it, to help them transition to permanent housing.  Instead of using those funds to further its core mission, ZACAH spent approximately $113,000, primarily to pay for hotel rooms for displaced people on an emergency basis.  ZACAH sponsored over 200 nights for approximately 500 people.

10.      When ZACAH reached out to Hennepin County to ask for funding or reimbursement for placing displaced encampment residents in emergency hotel spaces, Hennepin County refused. (**Exhibit 47**). When ZACAH reached out to Hennepin County to ask whether they would assist ZACAH in negotiating lower rates for hotel room for displaced encampment residents, Hennepin County ignored the request. (***Id.***).

11.      When ZACAH obtained a monetary grant from the State to pay a non-profit to provide social workers to help displaced encampment residents find housing and apply for public benefits, Hennepin County interfered, telling the non-profit, which was not a County entity, that its social workers should not work with ZACAH to help displaced encampment residents find housing. (**Exhibit 48**).

4

12.     To manage all of the emergency assistance ZACAH provided to displaced encampment residents, ZACAH had to establish an entirely new system to organize referrals, process applications, negotiate with hotels, and manage numerous other tasks to ensure people are not out on the streets.

13.     As a result, ZACAH's volunteers and board members dedicated countless hours to this work.  For example, one board member and one volunteer estimate that collectively, they spent 50-60 hours a week working with more than 25 volunteers and placing people in emergency hotel rooms.  All of that time could and would have been spent to further ZACAH's mission of preventing people from becoming homeless were it not for Defendants' conduct.

*Named Plaintiffs*

### Dennis Barrow

14.     Dennis Barrow is a resident of Hennepin County.  At the time he joined this lawsuit, he was 42-year-old African American man.

15.     Around May 25, 2020, he became homeless.  He had been living with his mother, but left her house because it was too crowded, and he was concerned he was at risk of contracting COVID-19.  After briefly staying with his son's mother and being accused of domestic violence (he was not convicted of any such offense), he went to stay with a friend at the former Sheraton Hotel in Minneapolis, which had effectively been converted into an emergency shelter.  The owner of the hotel soon after evicted everyone staying there, including Mr. Barrow.

16.     Mr. Barrow went to Powderhorn Park and set up a tent in the West encampment.  He lived in the tent for a couple of months before law enforcement showed up and forced him out.  He and others at the encampment received notices that they had to leave the park in 72 hours.  But officers showed up with what he thought were bulldozers only 24 hours later.

17.     Mr. Barrow began collecting his belongings from his tent as officers, employed by Defendants, began taping off the perimeter of the encampment.  Officers told him that he had to clear out his tent by the time they finished taping off the perimeter.

18.     Mr. Barrow hurried to collect as much of his property as he could, because he knew the bulldozer looming nearby would run over everything.  He worried that he and his belongings would be trapped inside the taped area as the bulldozer began to clear its path.

19.     The police officers' aggression scared Mr. Barrow.  He quickly got everything he could carry.  But it was impossible for him to gather all his belongings.  The following items were destroyed by a bulldozer:  his tent; sleeping bag; almost all of his clothes, including winter boots and a winter coat; hygiene supplies; medications; and court documents.

20.     Mr. Barrow was unable to replace the items that were destroyed.  Watching his property destroyed by a bulldozer was traumatizing for Mr. Barrow.  He realized, while watching the bulldozer roll over his tent, that he would have to start all over again.

21.     After he left Powderhorn Park, an organization paid for him to stay in a hotel for a few days.  He also stayed on a friend's couch for one night.  Around that same time,

he happened to be walking by a church where people were handing out tents. With his new tent, he moved to the Logan Park encampment. He was there for only a couple weeks when threats of eviction began again.

22.     Mr. Barrow then moved into a van—not a permanent solution to his housing crisis. He had to move it every three days, or it would get towed. Losing the van would mean that once again, he would have to pitch a tent outside, continuing a cycle of homelessness.

23.     Mr. Barrow called shelters to see whether there is a bed for him. When he called, he was told they are full, or the shelters never returned his voicemail. Even if there had been space, however, Mr. Barrow was worried about staying in a shelter because of the increased risk of contracting COVID-19 in such a crowded place.

24.     Since February 2020, Mr. Barrow received a steady income of $783 in social security disability benefits for ADHD and epilepsy. He wanted to find an apartment but had to stop applying for a time because the applications were too expensive, and he was not getting any responses. He suspected the silence was due to an old drug possession charge and his inability to show three times more monthly income than rent. Some landlords even told him that they would not accept county money to help cover the rent or security deposit.

25.     The stress of the summer negatively affected Mr. Barrow's mental health. Being forced to move frequently made it difficult to find a caseworker or establish friendships. He was always worried about where he was going to go, and whether he would have somewhere to stay. He could not maintain appointments with his therapist because

his schedule was inconsistent, revolving around finding resources and places to store his property.

26.     Since December 2020, Mr. Barrow moved several times until securing his current living situation in Brooklyn Park, Minnesota, where he is currently housed.

**Patrick Berry**

27.     Patrick Berry is a resident of Hennepin County.  At the time they joined this lawsuit, they were 41 years old and a member of the Ho Chunk Nation.

28.     Mx. Berry became homeless in November 2019 after deciding to leave the apartment they shared with their violent roommate.  After both of their parents died and they tried unsuccessfully to move to Portland, where they were robbed, Mx. Berry made their way back to Minneapolis.  Without any place to go, they decided to pitch a tent in Powderhorn Park in the East encampment.  They soon relocated to the encampment at Minnehaha Park, where they were a camp facilitator.  In that role, they helped residents obtain medical care and worked with volunteers to organize supplies.

29.     Due to the extreme heat at the time they were staying at Minnehaha Park, Mx. Berry left to stay with different friends, sleeping on their couches.  They also slept in a van in Peavey Park, and under the pavilion there.

30.     Once while they were staying at Peavey Park, a truck pulling what they believed a bulldozer arrived.  Mx. Berry was angry when they saw the bulldozer.  They knew that the Minneapolis Park and Recreation Board ("MPRB") had invested significant sums to provide sanitary stations and porta potties at many of the parks, and they thought

it was a waste for a bulldozer to come and destroy everything.  They also thought that the use of bulldozers to clear the encampments was cruel and an unnecessary show of force.

31.     Eventually, Mx. Berry moved near the Powderhorn West encampment and set up their tent by a baseball diamond.  They were there for one week.

32.     Then, on or about August 10, 2020, at 7:00 A.M., a friend of Mx. Berry's woke them up to tell them that the police were there to clear the park.  Mx. Berry had not been provided any eviction notice.  Nor were they aware of a specific time Defendants would clear the park.

33.     When they came out of their tent and ran up to the main part of the encampment, they saw officers from the Minneapolis Police Department and the Minneapolis Park Police.  Officers were using yellow CAUTION tape to make a perimeter around the encampment, with bulldozers at the ready.

34.     The next thing Mx. Berry saw was officers detaining their friend, placing him in handcuffs, and shoving him in a police car.  This harsh treatment took place simply because their friend had used a bullhorn to communicate to the residents.  Worried that all of their friend's property would be destroyed, Mx. Berry ran to their friend's tent to collect his property.  Mx. Berry also ran to grab their backpack from their own tent.  They did not know where they would go.  And they could not carry everything with them.  But they ran. They ran to a friend's house nearby to store some property, and they put additional items in another friend's car.

35.     When Mx. Berry returned to the encampment, they faced a chaotic scene. Officers were spraying large numbers of peacefully protesting people with chemical

irritants.  They saw officers handcuff other friends of theirs who were not crossing the yellow CAUTION boundaries officers had established.

36.    What happened next can only be described as horrible and cruel.  Mx. Berry saw the bulldozers rev up and start to clear everything in their paths.  The officers gave people only a few minutes to collect their property and leave.  Mx. Berry later saw a dumpster in the park that was full of tents and other items belonging to camp residents.

37.    When Mx. Berry was evicted from Powderhorn Park, they lost the following belongings: their tent; sleeping bag; and a mattress.

38.    Eventually, Mx. Berry was given another tent by a volunteer.  Over the next several weeks, they pitched that tent at random places around the city, and occasionally slept on someone's couch.  Sometimes, with donations from ZACAH or some friends, Mx. Berry could spend a night or two in a hotel.

39.    Mx. Berry did not try to go to a shelter at any point since returning to Minneapolis because they were afraid of contracting COVID-19 in an enclosed and crowded space.  They had also heard that staff at shelters exploited and even assaulted people who stay there.  And they worried about dangerous and predatory people milling around at shelters without proper security.

40.    ZACAH provided Mx. Berry with a security deposit and first month's rent for an apartment into which Mx. Berry moved on October 1, 2020.  Mx. Berry had enough income from their tribe to pay rent for the next couple months.  Mx. Berry also planned to re-enroll in Minnesota Community Technical College, where they previously completed

some classes.  But without stable employment, they remained at high risk of becoming homeless again, which is exactly what happened.

41.   Since December 2020, Mx. Berry has slept overnight outside at the Quarry, the Near North encampment, near the Mississippi River bank in Minneapolis, near Minnehaha Creek, and near Lake Nokomis.

42.   They bounced between different residences, slept on couches, various motels throughout Hennepin County, and at one point, even moved out to Seattle.

43.   Mx. Berry is now back in Hennepin County, and though currently housed, remains housing insecure and vulnerable to becoming homeless again.

### Henrietta Brown

44.   Henrietta Brown is a resident of Hennepin County.  She is enrolled in the Oglala Sioux Tribe and has lived in Minnesota since 1986.

45.   Ms. Brown previously had an apartment in Little Earth, an affordable housing complex in Minneapolis.  But after her daughter died in an emergency room when doctors gave her the wrong medication, she became extremely depressed and left her apartment.

46.   Ms. Brown had bouts of sobriety but struggled with addiction.  She stayed with friends, on their couches, or with her boyfriend.  She eventually had to leave her boyfriend's home because it became a hostile place.

47.   Ms. Brown then briefly slept on the Midtown Greenway in Minneapolis before moving to Peavey Park.  It was the first time she was unsheltered and sleeping outside.

48.     Ms. Brown signed up for housing programs with MADDADS and went to two shelters—Lutheran Social Services and Harbor Lights.  Both shelters turned her away because they were full.

49.     Ms. Brown was at Peavey Park for one month before the bulldozers or other heavy machinery and equipment arrived.

50.     On September 24, 2020, between 4:00 AM and 5:00 AM, police officers started shaking Ms. Brown's tent, shining a bright light in her face, and yelling that she had only 30 minutes to get out.

51.     It was pouring rain and Ms. Brown was disoriented.   Officers started removing the stakes of her tent even before she got out of it.

52.     Ms. Brown believes she saw officers from the Park Police, and Minneapolis Police Department, and deputy sheriffs from the Hennepin County Sheriff's Office participating in the expulsion.

53.     Because Ms. Brown never received an eviction notice, she was not prepared to leave.  She managed to grab her blanket and her purse.  She attempted to collect more of her belongings, but police officers told her to get away from her tent as they erected a boundary line around the area with yellow tape.  When Ms. Brown told a deputy sheriff that she needed to get important papers from her tent, he told her that she could not do that and threatened to arrest her.

54.     Everything happened so quickly.  Officers were shaking tents to see if anyone was in them.  Ms. Brown also saw officers shake her own tent and throw it into a garbage truck.

55.     When Ms. Brown was evicted from Peavey Park, she lost the following belongings: her birth certificate; her application for medical assistance; a photocopy of her ID and other identification paperwork; and family photographs.

56.     The entire experience was traumatizing for Ms. Brown.

57.     After the sweep of Peavey Park, Ms. Brown was driven to the Midtown Greenway by someone.  She went there to go under a bridge to get out of the rain.

58.     Ms. Brown was on the street for a week.  She called 311 to ask about shelter availability and obtained the phone number for the Simpson shelter.  She called the number and left a voicemail, but never received a call back.

59.     She would have been unable to go to shelter, however, because shelters require a form of ID and her identification paperwork was destroyed in the sweep of the park.

60.     Ms. Brown started staying at a hotel on October 1.  ZACAH paid for her room.  She did not know where she would go when ZACAH's donations for the room ran out.  Without adequate shelter, she was at high risk of again becoming unsheltered and sleeping outside.

61.     Since December 2020, Ms. Brown moved multiple times until securing her current apartment in Hennepin County.  She remains currently housed.

**Nadine Little**

62.     Nadine Little is a nearly lifelong resident of Hennepin County.  She is enrolled in the Red Lake Band of Chippewa.

13

63.     A series of injuries after a serious car accident that occurred seven years ago makes it difficult for Ms. Little to work.  After staying with different friends, she became homeless for the first time in March of 2020.  She had only the clothes she was wearing, and no idea where to go.

64.     Due to COVID-19 closures, there was nowhere for her to go.  She wandered around the city for three to four days, looking for her stepdaughter whom she believed was living in an encampment.  As a single female on the streets, she was terrified to sleep at night.  One cold night, she was so tired that she tried to sleep in a doorway near Bloomington and 26th Street.  A helpful stranger gave her a coat and two blankets.

65.     Ms. Little eventually found her stepdaughter at the Hiawatha and Lake encampment.  She moved to the Midtown Greenway and then the former Sheraton Hotel. After the mass eviction at the former Sheraton, an organization funded a room for her at a Days Inn for two weeks.  When the funding ran out, she went back to the Midtown Greenway.

66.     One day, she went to Powderhorn Park to charge her phone.  While she was there, someone gave her a tent, pillows, and blankets.  She set up a tent—first in the East encampment and then in the West encampment.

67.     One night at Powderhorn, Ms. Little lost consciousness and stopped breathing.  Medics at the camp were able to resuscitate her.  She thinks the incident was caused by her severe asthma, which was aggravated by police officers tear gassing her twice this year.

68.   After that incident, volunteers moved Ms. Little to Kenwood Park.  She was there until she received an eviction notice and had to leave when Defendants cleared it.

69.   Thanks to temporary funding from ZACAH, Ms. Little was able to stay at a hotel for about three weeks.  She became depressed while she was there.  The depression had started when she became homeless but worsened when she learned from volunteers that her tent had been destroyed when Defendants cleared Kenwood Park.  She felt like she had lost her home and felt hopeless about the fate of the encampments and the way the City treated homeless people.

70.   Ms. Little wanted to seek psychiatric care to help her handle her depression, but it was too difficult to find professional assistance due to COVID-19 closures.  The difficulty in getting help is exacerbated by the fact that she does not have a stable place to live where she can charge her phone and easily schedule and keep appointments.

71.    When the funding for the hotel ran out, Ms. Little moved to the Brackett Park encampment.  She felt safer there than in the other encampments because all of the residents were women.  After Brackett Park was emptied on October 1, Ms. Little went back to a hotel with temporary donations from ZACAH.  She did not know where she would go when that funding ended.

72.   Ms. Little preferred to be in an encampment than a shelter.  Shelters, according to Ms. Little, take her money and restrict your movements.  For example, shelters impose curfews, and if someone is late, the shelter surrenders their room.  Ms. Little reports that such rules make it difficult for people to leave to get things done.

15

73.     The instability of being homeless and having to move around all the time made it difficult for Ms. Little to get her life together.  She believed that being housed would make it easier for her to access services.  She needed affordable housing.  And she was scared that she would be homeless for the rest of her life.

74.     Since December 2020, Ms. Little moved several times until finally securing her current living situation, at which she remains housed.

**Virginia Roy**

75.     Virginia Roy is a Minneapolis resident.  She is enrolled in the White Earth Nation.

76.     Ms. Roy was homeless on and off since 1999, when she was released from prison.  Although she has not been to prison since that time, her criminal record makes it difficult for her to find housing.  For most of the last 20 years, Ms. Roy has lived under a bridge, along a highway, and at the encampment at the Wall of Forgotten Natives ("The Wall") in 2018.  She was at The Wall for a year, the longest she has stayed in one place. She also would stay at times with family or friends.

77.     Police officers forced her to move multiple times.  Once, Ms. Roy was staying in a garage on Franklin Avenue because it was really cold.  The police cited her for trespassing and told her to get out.  Ms. Roy did not have anywhere to go.  Another time, officers forced her out from under a bridge.  Again, Ms. Roy had no other options.

78.     Officers have also removed Ms. Roy from the light rail and bus for sleeping. And police officers evicted her from The Wall.

79.     For many reasons Ms. Roy did and does not want to go to shelters.  As a victim of domestic violence and sexual assault, she is uncomfortable at shelters where men are watching her.  Additionally, she cannot afford the shelters that cost money.  And she was particularly wary of shelters because of the risk of contracting COVID-19.

80.     Despite her discomfort with shelters, she sought them out, only to be turned away because they were full.  This happened at Simpson Shelter, Harbor Lights, and Our Saviors Housing.

81.     Ms. Roy lived at two encampments since June of 2020.  She lived in a tent at Powderhorn Park before moving to the encampment at Brackett Park in early July of 2020.  She was there until the end of September when residents were evicted.

82.     Ms. Roy felt safe at Brackett Park.  All of the residents were female and were involved in making decisions on how the encampment operated.

83.     Ms. Roy took pride in her tent.  It felt like a home because she could safely keep her property there.  She felt safe inside of her tent and that made it easier for her to maintain her sobriety.  She decorated her tent and kept a special rock and sage outside of her door for cleansing.

84.     Volunteers moved Ms. Roy and other residents out of Brackett Park to avoid the police bulldozing their property.  Ms. Roy was upset about having to leave Brackett Park because she felt cared for and safe there.

85.     After October 1, 2020, Ms. Roy stayed in a hotel room temporarily paid for by ZACAH.  She did not know where she would go when the funding ended.

86.     Ms. Roy reports that it was scary to move around so much.  She found that leaving one camp and moving to another created a harmful cycle she did not want to repeat. The stability that the Brackett Park encampment provided allowed Ms. Roy to start an outpatient treatment program and seek sober activities.  She worried that effort would be put in jeopardy, and she was getting depressed.  She considered staying with her sister but did not want to explore that option because she believed her nephew was using drugs, and Ms. Roy wanted to stay in recovery.

87.     Since December 2020, Ms. Roy moved between various hotels and motels before finally securing a more stable, permanent residence at which she currently resides.

**Joel Westvig**

88.     Joel Westvig, who is 40 years old, lived in Minneapolis since he was four.

89.     Years ago, he lost his job.  Not able to pay the rent, he then lost his apartment and was left homeless.

90.     Mr. Westvig was on a waiting list for an apartment through the Minneapolis Public Housing Authority for at least five years.

91.     At the time he joined this lawsuit, he was living in a tent at the encampment at B.F. Nelson Park in Minneapolis.

92.     Mr. Westvig is disabled by anxiety and depression.  His doctor has advised him to work only part time due to his disabilities, but his anxiety and depression disorders keep him from finding even a part-time job.

93.     He had been unable to apply for Social Security disability benefits.  He had been unable to continue his health care from his psychologist or psychiatrist because clinics

18

are closed due to COVID-19, and he did not know how to use the video function for tele-med services on his phone.  Even if he could use the tele-med option, he could not keep his phone charged without consistent access to a power source.

94.     Mr. Westvig's first experience living outside started three or fourth months prior in Loring Park in Minneapolis.  Two months after moving there, he was forced out.

95.     Mr. Westvig heard rumors that the police were going to clear the park, but he never received any written notice about it.

96.     Then, one night, a community volunteer came to Loring Park and told him the police were coming the next day to sweep it.  Mr. Westvig did not know where he would go.  He also did not know where he would put his possessions, or how he would move them.

97.     The next day, the volunteer came to Loring Park and helped Mr. Westvig move everything he had, including his tent, to B.F. Nelson Park.  The MPRB had granted a permit to encampment residents at B.F. Nelson Park on September 2, 2020.

98.     On October 15, 2020, an MPRB employee came to B.F. Nelson Park and told all of the encampment residents that they had to leave.  The MPRB employee said that the encampment's permit would expire on October 19, 2020, and that the MPRB would not renew it.  She said Mr. Westvig and the other residents would receive a notice from the MPRB giving them 24 hours to vacate.  But she could not tell them when that 24-hour notice would arrive.

99.     Instead of giving him a notice with a timeline, the MPRB employee gave him information about the risk of cold weather and a list with some shelter resources.

100.    Mr. Westvig does not understand how forcing him to leave his tent—his home—made him safer.  He did not know how he would move his possessions, such as his tent, clothing, blankets, and other possessions, without a car, or where he would move to set up a new home.

101.    The MPRB employee gave Mr. Westvig and the residents an option for where they could go: the Midtown Greenway—another outdoor space.[2]  Mr. Westvig did not understand why he would be safer from the cold living under a Greenway bridge than living in his tent in B.F. Nelson Park.  If he moved to the Greenway, he would still have been outside, but without his tent, blanket, and extra clothes—all of which keep him warm.

102.    Mr. Westvig did not find the list of resources helpful either.  When he previously tried to find shelter by calling Shelter Connect, which places single adults in Hennepin County shelters, he was always told the shelters were full.

103.    Additionally, the shelters do not have a place for him to store his personal possessions.  Nor do they always provide shelter for him during the day because most are closed.  And that is an issue because the places Mr. Westvig would otherwise go to find warmth during the day, like public libraries or coffee shops, are closed to visitors because of COVID-19.

---

[2]      The Midtown Greenway is operated by the Hennepin County Regional Railroad Authority, not the MPRB.  *See Regional Railroad Authority*, Hennepin County, *available at* https://www.hennepin.us/your-government/leadership/rra (last visited Oct. 18, 2020).

104.     Another issue with a temporary or emergency shelter is that Mr. Westvig was having to continuously call Shelter Connect for placement.  And without a consistent source of power, his phone was not always charged.

105.     Nothing the MPRB employee told Mr. Westvig on October 15, 2020 about being forced to leave B.F. Nelson Park was useful.  The thought of an unclear deadline and no place to go greatly increased Mr. Westvig's anxiety.  He did not know when he would have move.  He did not know where he could move to.  He did not know what other public space he would be allowed to live in.  He did not know if he would have the time and ability to move his possessions safely, or if Defendants would take or destroy them when he was inevitably ordered out of the park.

106.      The potential loss of his home and community at B.F. Nelson Park greatly increased his depression.

107.     Mr. Westvig was eventually evicted from his encampment, and then moved to the Near North encampment. He later moved out of state in search of housing stability and security, where he found his current permanent residence.

**Gina Mallek**

108.     For most of the past four years, Gina Mallek has not had a consistent or safe place to live.

109.     In February 2020, Ms. Mallek was evicted from an apartment she had leased for a few months because her controlling ex-boyfriend would squander her paychecks and leave her without money for rent.

21

110.    Ms. Mallek eventually found her way to the Dorothy Day Shelter in St. Paul, where she stayed for approximately six weeks.  At the shelter, Ms. Mallek was relieved to meet someone who helped protect her from men who were sexually harassing her.  He even loaned her money for gas and food.  This friend, however, soon turned violent.  He began stalking Ms. Mallek.  She had to leave the shelter.  She sought refuge at another shelter and at a park, but he found her.  Eventually, a volunteer brought her to Powderhorn Park, where she was finally able to escape him.

111.    Ms. Mallek had never lived at an encampment before she arrived at Powderhorn Park.  She lived in a tent and slowly started to meet encampment residents she could trust.  Ms. Mallek even got a job washing dishes at a restaurant two blocks from Powderhorn Park.

112.    Soon after securing that job, Ms. Mallek was evicted from Powderhorn Park.  The eviction traumatized Ms. Mallek.

113.    Either MRPB, the City, or County Staff had told encampment residents that they would receive a warning before the police would evict them from the park.  But no warning came to Ms. Mallek.

114.    On or about July 20, 2020, at 8 A.M. in the morning, Park Police arrived at the Powderhorn Park and told Ms. Mallek and other residents that they had an hour to pack up and leave.  But as she frantically tried to pack up her belongings, police continued to drive by, telling her and other encampment residents that they had to go immediately.

115.    Ms. Mallek was placing her belongings outside of her tent to organize everything she needed to pack.  But before she could complete the process of gathering her

belongings, police and/or other MPRB employees came and started throwing everything away.  They would not allow the volunteers, who were standing by to help, to pack or even bring the residents water.  Police then threatened to arrest Ms. Mallek if she didn't get out before the hour was over.  As the Park Police cleared the camp, Ms. Mallek watched them pepper spray people.

116.    Ms. Mallek's property destroyed in the sweep included: photographs, items her children had made for her, her birth certificate, social security card, W-2 forms, clothes, a cot, hygiene products, shoes, chairs, and other furniture.

117.    Ms. Mallek and her friends did not know where to go next.  She heard there was a bus that was taking encampment residents to other parks, but then Ms. Mallek was told the bus was going to take people to jail rather than the parks.  Finally, a concerned volunteer offered to drive her to B.F. Nelson with the little property she still had.

118.    Nearly as soon as Ms. Mallek and her friends arrived at B.F. Nelson Park, they received notices that they would have to leave.  Employees from the MPRB gave the group a piece of paper that had shelter numbers to call.  No other services were offered.  Then one day, a big dumpster was dropped off at the park.  Ms. Mallek and her friends knew that meant an eviction was imminent.  Volunteers soon arrived to help Ms. Mallek move to a lot in North Minneapolis owned by the City.

119.    But once again, Ms. Mallek was told she had to leave the lot nearly as soon as she arrived.  Don Ryan, a Hennepin County employee, Lieutenant Grant Snyder of the Minneapolis Police Department, and other employees of the City arrived at the lot to tell residents they would have to leave in December because of "unsafe soil."  People living at

the lot were given the option of moving to the Midtown Greenway or other outdoor locations. But there was no guarantee how long they could stay at these new proposed outdoor locations.

120. In an effort to avoid another sweep due to "safety concerns," the residents moved to a lot across the street, and established an encampment known as "Near North," where she was threatened with eviction on multiple occasions.

121. Ms. Mallek has been told multiple times by Adult Shelter Connect, shelter employees, and City and County employees that the shelters are full. She has shown up to shelters multiple times seeking access to bathroom facilities and has been turned away because they are at capacity. She was told that the closest all-women's shelter that had openings was Duluth, more than two hours away by car.

122. Ms. Mallek met several times with a Hennepin County employee about securing housing. She was told that housing could take anywhere between 4 months to 1 year because there were over 1,000 people on the list ahead of her.

123. Constantly moving took a toll on Ms. Mallek, triggering her PTSD and increasing her anxiety. Every time she moved, she had to find resources like food shelves and places to get clean water. She had to stop looking for work because, without a permanent address, she could guarantee that she could actually get to the job. Indeed, she was unable to start her job that was near Powderhorn Park because she could not afford the bus fare from B.F. Nelson Park. All of this effort and all of this time being shuffled around prevent her from focusing on finding a therapist to address her serious mental health issues.

124.   Since December 2020, Ms. Mallek moved several times until securing housing at her last known residence.

### Daniel Huiting

125.   At the time he joined this lawsuit, Daniel Huiting was a 41-year-old man currently living in St. Paul.

126.   His property was twice destroyed during encampment sweeps in Minneapolis—at Mathews Park and Riverside Park.

127.   Before February 2020, Daniel Huiting had a successful career as a filmmaker and video music producer.  That work dried up during the COVID-19 pandemic, and a divorce had left him without his house and most of his belongings.  Without steady income, Mr. Huiting found himself homeless for the first time in his life.

128.   In around May or June, Mr. Huiting was sleeping outside using a tent he obtained at St. Steven's.  He was living at the encampment known as The Wall before moving to Mathews Park in late June.  In late August or early September, Mr. Huiting found an eviction notice on his tent.  The notice didn't provide a date or time by which he had to leave.  Nor did it have any information about sanctuary parks.

129.   Four or five days after receiving the eviction notice, Mr. Huiting left the park to run some errands on a Monday morning.  He was gone for less than two hours.  When he got back, he saw an empty plot of grass where his tent had been.  He also saw police— he believes they were Park Police—putting property into dumpsters.  Park Police had thrown away his tent and everything inside of it.  Mr. Huiting's destroyed property included: two Eureka 6-person tents, a new bike, his U.S. passport, his phone, prescription

medication, all of his clothes, food, a cooler, a chair, a really nice sleeping bag, a mattress, blankets, and tarps.

130.    Without anywhere to go and with most of his property destroyed, Mr. Huiting went to a nearby Taco Bell, where he stood outside with a sign asking people for help.  By coincidence, his Hennepin County caseworker spotted him, got him a tent, and drove him to Riverside Park, which the caseworker told him was a sanctuary park.

131.    Mr. Huiting lived at Riverside Park for about 1.5 months.  Then, during the last week of October, Park Police swept the park, which at that time had 12 to 20 tents. Once again, Mr. Huiting was shocked by the sweep.  He had not received any notice that it would occur.  The day of the sweep, Mr. Huiting had again briefly left the park.  When he returned, everything—all 12 to 20 tents, including his—were gone.  His destroyed property this time included: his replacement tent, a replacement bike, his bed, clothes, food, refilled prescription medications, and other property.

132.    Mr. Huiting then moved to temporary housing in St. Paul until February 2021.

133.    After that, Mr. Huiting slept or sheltered overnight at no less than 7 other locations, until finding his current apartment.

134.    Mr. Huiting is now currently housed.

***Putative Class Members***

## Emmett Williams

135.    At the time he joined this lawsuit, Emmett Williams was a 39-year-old African American man who has lived in the Minneapolis metro area since he was 11.

26

136.   Before the COVID-19 pandemic, Mr. Williams had multiple regular jobs. His primary employment was working at the Target Center during basketball season. When everything shut down, Mr. Williams was unable to work.

137.   After months of being unemployed, in June 2020, Mr. Williams's landlord did not renew his lease.  Mr. Williams became homeless for the first time.

138.   Mr. Williams initially stayed with friends and relatives while he called other landlords to try to get a new place.  He never received a call back or a lead.  Not wanting to burden others, he and his fiancée moved to the East encampment in Powderhorn Park in July.

139.   After only two-a-half weeks, the police forced them out.

140.   Mr. Williams received no notice that the police were going to come and remove him from his home and destroy his property.

141.   When the police and what he believed were bulldozers arrived, the officers started putting tape around the camp.  The police told everyone that if they did not leave, the police would arrest them.

142.   The scene was intense.  The police were aggressive and started spraying people with chemical irritants.  To Mr. Williams, it seems like the police were taunting the encampment residents.

143.   Mr. Williams and his fiancée quickly grabbed what they could from their tent.  He told the police that they still had possessions inside the taped perimeter.  The police ignored him.  Mr. Williams lost clothing and his fiancée lost possessions from her grandmother.

144.    Mr. Williams felt the sweep violated him and that it was unjust because he was living on public land.

145.    While bulldozers were levelling the Powderhorn Park encampment, a bus arrived, and Mr. Williams was told it would take them—not to a hotel or a safe place inside—but to another park, Martin Luther King Jr. ("MLK") Park.

146.    After that, Mr. Williams and his fiancée had been living at MLK Park.  They found a sense of community there with the other encampment residents.  And Mr. Williams got support through donations from the community, and even medical assistance from Healthcare for the Homeless.  While living there, Ms. Williams was concerned that, if Defendants forced him out of MLK Park without providing stable housing, he would have to search for similar resources all over again.

147.    Mr. Williams felt like the MPRB was creating arbitrary rules to try to close the MLK Park encampment.  He did not want to be forced out again.  He had been told that the shelters were full, and he did not know where he would live if he had to leave MLK Park.

148.    That day eventually came.  Mr. Williams was evicted from MLK Park, and was housing insecure for a period of time thereafter.

***Defendants***

## Hennepin County

149.    Defendant Hennepin County is a political subdivision of the State of Minnesota, a legal entity with the capacity to be sued.  Defendant Hennepin County is sued in its own right and (1) on the basis of acts and omissions of its officials, agents and

employees following Hennepin County policies and practices, and (2) on the basis of Hennepin County's practice or custom of authorizing its officials, agents and employees to violate written policies designed to protect people without permanent housing.  Hennepin County Administrator David Hough implements county board policies, promotes interests with other government agencies and partners, and provides direction to departments to achieve the County's overarching goals. Mr. Hough made the final decisions about closing encampments on land owned and/or operated by Hennepin County.

### Hennepin County Sheriff Dawanna Witt

150.   Defendant Sheriff Dawanna Witt is a resident of Minnesota.  She was elected Sheriff of the Hennepin County Sheriff's Office ("HCSO"), and started in office in January 2022.  The Hennepin County Sheriff's Office provides law enforcement and public safety services throughout Hennepin County.  *See* Minn. Stat. §§ 387.03, 387.04.  The Hennepin County Sheriff is a final policymaker on all issues related to HCSO policies, customs, and practices.  *Id*.

### City of Minneapolis

151.   Defendant City of Minneapolis is a political subdivision of Hennepin County and a municipal corporation under home-rule charter pursuant to the Minnesota Constitution, Article XII, section 4, with the capacity to be sued.  Defendant City of Minneapolis is sued in its own right and (1) on the basis of acts and omissions of officials, agents, and employees following City of Minneapolis policies, customs, and practices, and (2) on the basis of Defendant City of Minneapolis' custom and practice of authorizing its

officials, agents, and employees to violate written policies designed to protect people without permanent housing.

### Mayor Jacob Frey

152.    Defendant Jacob Frey is the Mayor and a resident of Minneapolis.  He has a duty to see that all laws and ordinances are faithfully observed and enforced within the City and that each City officer performs their duties. Minneapolis, Minn. City Charter, § The Mayor or his designee has the complete power over the establishment, maintenance, and command of the Minneapolis Police Department.  The Mayor has ultimate authority to make final decisions on any and all of the following:  whether to close an encampment on City property, other than park property; when to close such encampment; whether officers from the Minneapolis Police Department would be present at an encampment closure; whether notice would be given to encampment residents prior to a sweep on City property; and the duration of any notice posting to encampment residents prior to such sweep.

### Current Minneapolis Police Chief Brian O'Hara

153.    Defendant Brian O'Hara is the current Chief of the Minneapolis Police Department and resident of Minnesota.  He was appointed by Minneapolis Mayor Jacob Frey.  He enforces Minnesota's criminal laws and Minneapolis ordinances in the City and oversees the actions of the individual peace officers he employs.  On information and belief, the Chief of the Minneapolis Police Department is a final policymaker on all issues related to Minneapolis Police Department policies, customs, and practices.

### Former Minneapolis Police Chief Medaria Arradondo

154.    Defendant Medaria Arradondo was Chief of the Minneapolis Police Department.  He is a resident of Minnesota.  He was appointed by former Minneapolis Mayor Betsy Hodges.  During the relevant period, through January 15, 2022, he served as Chief of Police, enforcing Minnesota's criminal laws and Minneapolis ordinances in the City and overseeing the actions of the individual peace officers under his employ.  On information and belief, until stepping down as Chief, he was a final policymaker on all issues related to Minneapolis Police Department policies, customs, and practices.

### Minneapolis Park and Recreation Board

155.    Defendant Minneapolis Park and Recreation Board ("MPRB") is an independently-elected, semi-autonomous, legislative body, with its principal place of business in Minneapolis, Minnesota.  The MPRB is responsible for maintaining and developing the Minneapolis Park system to meet the needs of citizens of Minneapolis. *See* Minneapolis, Minn. City Charter, art. 6.1. Al Bangoura is the Superintendent of the MPRB. He directs the MPRB's service areas and implements MPRB policy. He is ex officio of the Park Police and approves policies of the Park Police. Superintendent Bangoura's office also oversees the Communications and Marketing Departments of the MPRB. Park Police Chief Jason Ohottos is appointed by the Mayor of Minneapolis at the request of the MPRB. He enforces Minnesota's criminal laws and the MPRB's resolutions and ordinances on Minneapolis park land. Chief Ohotto implements policies of the Park Police.

### Officers John and Jane Does

156.    Defendants Officers John and Jane Does are unidentified individuals who committed the acts and omissions set forth below as agents of the City of Minneapolis Defendants, Hennepin County, Hennepin County Sheriff, and the MPRB.

157.    The acts and omissions complained of were done by Defendants or Defendants' officials, agents, and/or employees within the scope of their employment or agency and under color of state law.  The acts and omissions complained of were official acts of Defendants and caused by policies of Defendants or ratified by Defendants.

158.    The acts and omissions complained of were intentional and will continue unless restrained by the Court.

### CLASS ALLEGATIONS

159.    Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3) the named Plaintiffs bring this class action on their own behalf and on behalf of all other persons similarly situated.

160.    The plaintiff class consists of all homeless persons living within Hennepin County who have been, are now, or will in the future be living on public property.

*Numerosity*

161.    The defined class is so numerous that joinder of all Plaintiffs is impracticable. As of October 15, 2020, the MPRB estimated that the number of tents in all parks was

222.[3]  Because more than one person may stay in a tent, upon information and belief, the number of class members exceeds 300 people.

162.    Additionally, as Defendants Hennepin County and the City have recognized, this is a transient and changing population, locked in a cycle of homelessness,[4] making it particularly difficult to find and identify all class members.

163.    All members of the class are subject to Defendants' policies, practices, and procedures in prohibiting living outdoors in public spaces, and seizing and removing their homes and possessions.   The class is united in its interests with respect to proof of Defendants' conduct, and the effects caused by Defendants' actions.

***Predominance of Common Issues***

164.    There are questions of fact and law common to the class, and those questions predominate over all other questions affecting individual class members.

165.    All plaintiff class members have the same federal rights, including but not limited to:

---

[3]    *Encampment- Numbers at a Glance*, Minneapolis Park and Recreation Board, *available at* https://www.minneapolisparks.org/encampments/ (last visited on Oct. 18, 2020) (**Exhibit 1**).

[4]    *See The Ten-Year Plan to End Homelessness in Minneapolis and Hennepin County*, Heading Home Hennepin – Presented by the Hennepin County and City of Minneapolis Commission to End Homelessness at 3 (December 2006) ("Progress made over the years has not been enough to end the cycle of homelessness in Minneapolis and Hennepin County. . . . Too many people continue to cycle through the doors of our public institutions, from shelter to hospital to jail and back again."), *available at* https://www.hennepin.us/-/media/hennepinus/your-government/projects-initiatives/end-homelessness/end-homelessness-10-year-plan.ashx (last visited Oct. 18, 2020).

166.    The right to be free from unreasonable property seizures under the Fourth Amendment to the United States Constitution and Article I, Section 10 of the Minnesota Constitution;

167.    The right to receive adequate notice and other procedural due process protections whenever Defendants' actions deprive them of their personal property, as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 7 of the Minnesota Constitution;

168.    The right to privacy under the Fourteenth Amendment to the United States Constitution;

169.    The right to be free from state-created danger under the Fourteenth Amendment to the United States Constitution;

170.    The right to possession of their personal property as guaranteed by Minnesota law.

171.    Common questions of fact and law include, but are not limited to, the following:

172.    Whether Defendants have a policy, practice or custom of seizing and destroying homeless people's property;

173.    Whether Defendants have a policy, practice or custom of seizing and destroying homeless people's property without adequate procedural due process protections;

174.    Whether Defendants' policy, practice, or custom of seizing and destroying homeless people's property is an unreasonable, warrantless property seizure under the Fourth Amendment to the U. S. Constitution; and

175.    Whether the procedural due process protections provided under Defendants' policy, practice or custom of seizing and destroying homeless people's property satisfies Fourteenth Amendment due process requirements; and

176.    Whether Defendants have a policy, practice or custom of placing homeless people in danger when carrying out clearing or sweeps of encampments on public land.

***Typicality***

177.    The claims of the named Plaintiffs are typical of the claims of the class.  The named Plaintiffs' claims arise from the same conduct—Defendants' displacement of encampment residents and the seizure and destruction of their personal property without a warrant or procedural due process—that give rise to absentee members' claims.

***Adequacy***

178.    The named Plaintiffs will fairly and adequately represent the interests of the class, and they have no interests antagonistic to the interests of the class.  The named Plaintiffs and class members seek to assure that Defendants do not illegally displace homeless people and seize and destroy their personal property.

179.    Plaintiffs' attorneys are experienced public interest and trial lawyers with extensive experience litigating civil rights and class action lawsuits.

***Superiority***

180.    A class action is preferable and superior to other available methods for the fair and efficient adjudication of this controversy. Class treatment will permit the adjudication of claims by many class members who could not afford to individually litigate their claims or vindicate their rights against Defendants.  There are no difficulties likely to be encountered in the management of this case that might preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this matter.

## ADDITIONAL FACTUAL ALLEGATIONS

181.    Named Plaintiffs are among the estimated 3,049 of Hennepin County's residents who lack permanent housing.  Of those estimated 3,049 people, an alarming 40% (1,220) reported they were part of families with at least one child, and 77% identified as people of color.[5]  Since those numbers were collected in January of 2020, the COVID-19

---

[5]    2020 Point-in-Time County MN-500 Minneapolis/Hennepin County CoC at 1, 7-8, *available at* https://www.hennepin.us/-/media/hennepinus/your-government/projects-initiatives/end-homelessness/coc-point-in-time-count-minneapolis-hennepin.pdf (**Exhibit 2**).  While these numbers are alarming, they are likely an *underestimate* of the number of Hennepin County residents who lack permanent housing.  *See* National Law Center on Homelessness & Poverty, *DON'T COUNT ON IT: How the HUD Point-in-Time Count Underestimates the Homelessness Crisis in America* at 6 (2017) ("Unfortunately, the methods used . . . to conduct the PIT counts produce a significant undercount of the homeless population at a given point in time."), *available at* https://nlchp.org/wp-content/uploads/2018/10/HUD-PIT-report2017.pdf; *see also Working Together to Conduct the Point-In-Time County*, St. Stephen's ("We know these counts serve as an underestimate of people experiencing homelessness in our communities."), *available at* https://ststephensmpls.org/latest/working-together-conduct-point-time-count. (**Exhibit 3**).

pandemic and the civil unrest following George Floyd's killing by police on May 25, 2020, have pushed even more people out of stable housing and onto the streets.[6]

182.    In response to the outbreak of COVID-19 in Minnesota, Governor Tim Walz declared a public health emergency and issued a "Stay At Home Order" that closed bars, restaurants, and other places of public accommodation.[7]   Governor Walz also ordered that "all persons currently living within the State of Minnesota are ordered to stay at home or in their place of residence" unless certain exemptions applied.[8]   One of those exemptions was for homeless people: "Individuals without a home are exempt from the restrictions in this Executive Order, and they may move between emergency shelters, drop in centers, and encampments."[9]   Recognizing that "sweeps or disbandment" of encampments "increase

---

[6]    *See 6-17-20 Supt Remarks*, *available at* https://www.minneapolisparks.org/wp-content/uploads/2020/06/2020-06-17-Supt-Remarks-Discussion-Item-MPRB-Response-to-Homelessness-in-Minneapolis-Parks.pdf (**Exhibit 4**); *Trump appointee visits Twin Cities homeless encampments, shelters*, STAR TRIBUNE (Oct. 6, 2020, 11:14 PM) ("The number of homeless Minnesotans has surged in the pandemic. Encampments have grown in Minneapolis and in St. Paul last month, officials counted nearly 400 people in makeshift camps, the highest number on record."), *available at* https://www.startribune.com/trump-appointee-visits-twin-cities-homeless-encampments-shelters/572658212/; Chris Serres, *Coronavirus fears push more area homeless to the streets*, STAR TRIBUNE (Apr. 13, 2020, 5:40 AM), *available at* https://www.startribune.com/coronavirus-fears-push-more-area-homeless-to-the-streets/569580842/ (**Exhibit 5**).

[7]    Emergency Executive Order 20-33, *Extending Stay at Home Order and Temporary Closure of Bars, Restaurants, and Other Places of Public Accommodation* (Apr. 8, 2020), *available at* https://mn.gov/governor/assets/2a.%20EO%2020-33%20Final_tcm1055-427370.pdf (**Exhibit 6**).

[8]    *Id.* at 2.

[9]    *Id.* at 4.

the potential risk and spread of COVID-19," the governor ordered that "encampments should not be subject to sweeps or disbandment."[10]

183.    Weeks later, on April 29, 2020, Governor Walz issued an order clarifying the rules with respect to homeless encampments.[11]   The order stated that law enforcement could "address [] trespassing and exigent circumstances (i.e., those requiring immediate action to protect life, prevent injury, or preserve evidence)" in encampments.[12]   The order also permitted local government entities to "restrict, limit, or close encampment spaces" only when either:

> (1) a local government entity is providing sufficient alternate housing, shelter, or encampment space that complies with the [Minnesota Department of Health] guidance, . . . and the [Center for Disease Control] guidance, . . . or

> (2)  if an encampment has reached a size or status that is a documented threat to the health, safety, or security of residents . . . .[13]

---

[10]     *Id.*

[11]     Emergency Executive Order 20-47, *Clarifying Application of Executive Order 20-33 to Homeless Encampments* (Apr. 29, 2020), *available at* https://www.leg.mn.gov/archive/execorders/20-47.pdf (**Exhibit 7**).

[12]     *Id.* at 2

[13]     *Id.* at 2.

184.    Despite the governor's clear order, on May 12, 2020, Minneapolis Park Police Chief Jason Ohotto instructed his "staff to begin prioritizing park encampments for disbandment consideration."[14]

185.    On May 13, 2020, Governor Walz issued an order titled, "Protecting the Rights and Health of At-Risk Populations during the COVID19 Peacetime Emergency."[15] The "Homeless Population" was one of the populations identified.[16]  The order reiterated that absent the previously-mentioned exceptions, "Homeless encampments, including both new and existing encampments, should not be subject to sweeps or disbandment by state or local governments, as such sweeps or disbandments increase the potential risk and spread of COVID-19."[17]

186.    In the midst of the COVID-19 chaos, Minneapolis police murdered George Floyd on May 25, 2020.  Civil unrest followed and thousands of buildings in Minneapolis were damaged or destroyed, displacing hundreds of people.[18]  The empty and former

---

[14]    *See* E-mail from Jason Ohotto to Al Bangoura (May 12, 2020) (**Exhibit 8**)

[15]    Emergency Order 20-55, *Protecting the Rights and Health of At-Risk Populations during the COVID19 Peacetime Emergency*, May 13, 2020, *available at* https://mn.gov/governor/assets/EO%2020-55%20Final_tcm1055-432233.pdf. (**Exhibit 9**).

[16]    *Id.* at 3.

[17]    *Id.*

[18]    *Buildings damaged in Minneapolis, St. Paul after riots*, STAR TRIBUNE (July 13, 2020, 2:45 PM), *available at* https://www.startribune.com/minneapolis-st-paul-buildings-are-damaged-looted-after-george-floyd-protests-riots/569930671/ (last visited Oct. 18, 2020).

Sheraton Hotel opened as an ad hoc shelter to temporarily house two to three hundred people.[19]  On June 9, the hotel owner evicted everyone, further exacerbating an already dire homeless crisis.[20]  The number of tents in public spaces in Minneapolis soon exploded: less than two weeks after the eviction, there were more than 200 tents in Powderhorn Park alone.[21]

187.    On June 19, 2020, the MPRB passed a resolution to provide "people currently experiencing homelessness refuge space in Minneapolis parks."[22]  In speaking about the resolution, former MPRB President Jono Cowgill recognized that residents of encampments "have nowhere else to go" but public parks.[23]

---

[19]    *See Volunteers turned former Sheraton Hotel in Minneapolis into sanctuary for homeless*, STAR TRIBUNE (June 4, 2020 11:36 PM), *available at* https://www.startribune.com/volunteers-turned-former-sheraton-hotel-in-minneapolis-into-sanctuary-for-homeless/571018842/ (**Exhibit 10**).

[20]    *See Homeless evicted from former Minneapolis hotel after drug overdose*, STAR TRIBUNE (June 9, 2020 at 10:50 PM), *available at* https://www.startribune.com/homeless-evicted-from-former-mpls-hotel-after-drug-overdose/571135962/ (**Exhibit 11**).

[21]    *See Minneapolis parks leaders to homeless: You can stay in our parks*, (June 19, 2020, 5:06 AM), *available at* https://www.startribune.com/mpls-park-leaders-to-homeless-you-can-stay-in-our-parks/571355602/ (**Exhibit 12**).

[22]    Resolution 2020-253, *Resolution Declaring the Minneapolis Park & Recreation Board's Commitment to Provide Refuge Space to People Currently Experiencing Homelessness While Continuing to Work with the State, County, City, Non-Profit Organizations and Other Interested Parties to Identify Long Term Housing Solutions for People at the Powderhorn Encampment and Others Throughout the City* (June 17, 2020), *available at* https://minneapolisparksmn.iqm2.com/Citizens/Detail_LegiFile.aspx?Frame=&MeetingID=2085&MediaPosition=&ID=5078&CssClass=Information (**Exhibit 13**).

[23]    Exhibit 12, *supra* note 20.

188.    He is right.  There are not enough beds in Hennepin County shelters to house all of the people residing in encampments.  On September 16, 2020, Superintendent Al Bangoura described the lack of shelter space available for those living in the 347 tents in Minneapolis parks:

> On September 8, following the first cold weather of the season, Hennepin County reported that there were no beds of single adult males, 12 beds available for single adult women, and 21 family shelter rooms available.  Numbers vary from day to day.[24]

189.    The lack of space on September 8 was not an anomaly.  On September 22, 2020, nearly every adult male bed available at shelters funded by Hennepin County was full.[25]  Hennepin County's weekly Shelter Reports from July 7, 2020, to October 6, 2020, show that the number of people staying in shelters has remained relatively consistent.[26] And four of the Named Plaintiffs have been turned away from shelters due to lack of space. Accordingly, since the Governor's first order on encampments in April of 2020, there have not been enough beds to house the hundreds of people living in tents in public spaces.

190.    The limited available shelter space is often too restrictive to sufficiently house those in need of shelter.  Many shelters have limited hours, no right of return, and

---

[24]    *9-16-20 Superintendent Bangoura Encampment Remarks*, Minneapolis Park & Recreation Board at 2, https://www.minneapolisparks.org/encampments/9-16-20-superintendent-bangoura-encampment-remarks/ (**Exhibit 14**).

[25]    *Subpopulation Numbers*, Single Adults, Shelter Report 9-22-20, *Tuesday Census* (**Exhibit 15**).

[26]    *Subpopulation Numbers*, Single Adults, Shelter Report 10-6-20, *Subpopulation Numbers* (**Exhibit 16**).

no place to store belongings.  Some do not allow couples or families to stay together. Homeless individuals, like Plaintiff Virginia Roy, may not be eligible for a shelter due to criminal records.  Others may be turned away from a shelter because they have a pet, or, like putative class member Emmett Williams, a significant other.[27]

191.    Other reasons shelters are not accessible include the lack of privacy, limited mobility, and being located far from services the person was regularly accessing.

192.    Many shelters require a photo ID from occupants—yet Defendants seize and destroy the IDs and other supporting documentation of homeless people—like Plaintiff Henrietta Brown—in sweeps.

193.    Furthermore, many shelters are inaccessible for people with disabilities, who are more likely to be homeless.[28]  Some shelters offer only a mat on the floor to sleep on,[29] which can exacerbate physical disabilities or chronic pain.

---

[27]    Hennepin County and others were aware that shelters were not available to some because of their unique or non-traditional family structures.  (**Exhibit 45** (noting that at least two families were not engaged by St. Stephen's in finding temporary shelter for their families based on stated "reason of 'partner not verified as father'")).

[28]    *See* Pittman, Brian; Nelson-Dusek Stephanie; Decker Gerrard, Michelle; Shelton, Ellen, *Homelessness in Minnesota – Detailed Findings from the 2018 Minnesota Homeless Study* at 5, Wilder Research (March 2020), *available at* https://www.wilder.org/sites/default/files/imports/2018_HomelessnessInMinnesota_3-20.pdf (last visited Oct. 18, 2020) ("Wilder Study") ("Most adults experiencing homelessness (81%) have either a chronic physical health condition (57%), serious mental illness (64%), or substance use disorder (24%), and 50% have co-occurrences of these conditions.").

[29]    *See Hundreds of Minnesota homeless move to area hotels to prevent coronavirus from spreading at shelters*, STAR TRIBUNE (May 5, 2020, 8:59 AM), *available at* https://www.startribune.com/hundreds-of-homeles-minnesotans-move-to-area-hotels-as-

194.    People with substance abuse disorders are also disproportionately affected by homelessness and cannot satisfy the sobriety requirements many shelters impose.[30]

195.    Crowds of strangers present in shelters can also trigger mental health conditions or crises in individuals like Plaintiff Virginia Roy.

196.    Shelters may place Plaintiffs at risk of contracting COVID-19, due to their inability to implement precautions like social distancing,[31] or to isolate guests who are sick or test positive for COVID-19.[32]   In the words of Tim Marx, the Chief Executive of Catholic Charities, which operates the Higher Ground Shelter in Minneapolis: "Social distancing and shelter have become an oxymoron."[33]

197.    These concerns are not hypothetical.  A CDC study published in May of 2020 shows how quickly COVID-19 can spread through shelters: among 19 shelters in Seattle,

---

[30]    officials-race-to-prevent-coronavirus-from-spreading-in-shelters/570183632/ (**Exhibit 17**)  ("About a dozen mats lay strewn about the floor [at Higher Ground Shelter in Minneapolis]; residents stake out any open space to avoid getting infected [with COVID-19].")

[30]    *Id.*

[31]    *See* Minnesota Department of Health, *Homeless Service Settings: Interim Guidance for Providers* (May 10, 2020), *available at* https://www.health.state.mn.us/diseases/coronavirus/guideshelter.pdf (**Exhibit 18**); Center for Disease Control (CDC), *Interim guidance for homeless service providers to plan and respond to coronavirus disease 2019 (COVID-19)* (Aug. 5, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/plan-prepare-respond.html (**Exhibit 19**).

[32]    Exhibit 17, *supra* 27.

[33]    *Id.*

Boston, San Francisco, and Atlanta, 25% of the residents tested positive for COVID-19 between March 27, 2020 and April 15, 2020.[34]

198.    Nor is there adequate affordable housing available in the City or Hennepin County.   In July of 2020, the median monthly rent for a one-bedroom apartment in Minneapolis was $1,051.[35]   And only 5.4% of listings for 1-bedroom apartments in Hennepin County are considered "affordable," where rent is less than $540.[36]

199.    Without open shelter space and adequate affordable housing, people with low or no incomes like the named Plaintiffs have nowhere else to go— they have to live outside.[37]

200.    The tents Plaintiffs and putative class members pitch in Minneapolis parks become their homes.  Inside those tents, Plaintiffs generally keep all of their possessions.

201.    These possessions include life's necessities, such as blankets, a sleeping bag to sleep in and stay warm, clothing, and medication.

---

[34]    *See* Mosites E, Parker EM, Clarke KE, et al. Assessment of SARS-CoV-2 Infection Prevalence in Homeless Shelters — Four U.S. Cities, March 27–April 15, 2020. MMWR Morb Mortal Wkly Rep 2020; 69:521–522, *available at* https://www.cdc.gov/mmwr/volumes/69/wr/mm6917e1.htm?s_cid=mm6917e1_w (**Exhibit 20**).

[35]    *Minneapolis Rental Housing Brief*, HousingLink (July 2020) (**Exhibit 21**).

[36]    *Affordable Listings Report*, HousingLink (July 2020) (**Exhibit 22**).

[37]    Wilder Study at 2, *supra* note 26. ("In addition to a shortage of shelter beds for those experiencing homelessness, there is a gap between the incomes of people experiencing homelessness and the affordability and availability of rental units, a finding that is consistent with previous study reports.").

202.    Plaintiffs also possess valuable items, such as court documents, identification documents, and family photographs and other keepsakes.

203.    In some instances, losing these possessions—such as medications, or the tents that provide shelter—imperil Plaintiffs' health and safety.

### **Defendants' Municipal Liability for Their Unconstitutional Sweeps**

*Defendants' Official Policies*

204.    Despite the known shortage of shelter space and affordable housing, by late June 2020, employees of the MPRB began to strategize ways to "rescind" MPRB Resolution 2020-253 that declared parks as refuge spaces for the homeless.[38]

205.    On July 15, 2020, the MPRB passed Resolution 2020-267, which rescinded Resolution 2020-253 and outlined how the MPRB would begin to target encampments for "removal."[39]  Mayor Frey approved Resolution 2020-267 on July 20, 2020.[40]

---

[38]    Email from Michael Schroeder, Assistant Superintendent for Planning Services, to Jennifer Ringold, Deputy Superintendent (June 28, 2020) (**Exhibit 23**).

[39]    Resolution 2020-267, MINNEAPOLIS PARK & RECREATION BOARD, *Resolution Amending Adopted Resolution 2020-253 to Limit the Total Number Parks Available for Temporary Encampments and Provide Direction for the Design and Facilitation of Temporary Encampments in Parks that Supports the Health and Safety of Individuals Experiencing Homelessness and Preserves Access to Recreation Features for Park Visitors* (July 15, 2020), *available at* https://minneapolisparksmn.iqm2.com/Citizens/Detail_LegiFile.aspx?Frame=&MeetingID=2087&MediaPosition=&ID=5115&CssClass= (**Exhibit 24**).

[40]    *Id.* Indeed, the Mayor's Office was also directly involved in the drafting and editing of proposed MPRB resolutions, including Resolution 2020-253.  (**Exhibit 34**).

206.    The new resolution, Resolution 2020-267, established a process by which the MPRB required encampments to secure 14-day permits.[41]   It directed MPRB staff to identify which parks could host encampments and capped the number of tents allowed in each permitted encampment.[42]   According to the resolution, the MPRB would supply permitted parks with restrooms or portable toilets, hand washing stations, and trash and recycling containers.[43]

207.    Resolution 2020-267 stated that "any encampment that does not have a necessary permit pursuant to this resolution will be subject to removal from park property."[44]

208.    Resolution 2020-267 stated that two large encampments at Powderhorn Park had 282 occupants on July 9, 2020, and that the encampments there and "at other parks" did not conform to COVID-19-related health guidance and were a purported threat to public health and human safety.[45]

209.    The resolution also recognized that the "City, County, and State agencies" were needed to "reduc[e]" the size of encampments."[46]

---

[41]    *See* **Exhibit 24**.

[42]    *Id.*

[43]    *Id.*

[44]    *Id.*

[45]    *Id.*

[46]    *Id.*

**Defendants' Unofficial Customs & Their Deliberate Indifference to or Tacit Authorization of their Employees' Misconduct**

210.   The next day, on July 17, 2020, the MPRB asked Sheriff Hutchinson, who was at that time the Sheriff of the Hennepin County Sheriff's Office, for his "approv[al]," "assistance" and "cooper[ation]" to "implement the terms of Resolution 2020-267."[47]   In the request to the Sheriff, the MPRB also stated that it would send a formal request to the "state of Minnesota, Hennepin County, and city of Minneapolis for assistance in managing encampments and serving the encampments occupants." Park Police Chief Jason Ohotto also met with Sheriff Hutchinson and requested the assistance of the Hennepin County Sheriff's Office with the encampment sweeps.

211.   Defendants City of Minneapolis and Hennepin County heeded the MPRB's call.  Defendant Sheriff Hutchinson approved Chief Ohotto's request for the Hennepin County Sheriff's Office to assist the MPRB with clearing encampments. Pursuant to that approval, the Hennepin County Sheriff's Office sent deputies to assist the Park Police in clearing the encampments in Minneapolis Parks and Minneapolis-owned public property and arrest individuals who fail to comply with MPD and Park Police orders.[48]

---

[47]   Email from Jono Cowgill, Commissioner, Park Board District 4 to "Sheriff Hutch," David Hutchinson (July 17, 2020) (**Exhibit 25**).

[48]   *See Tent camps put homeless, others at risk* (Aug. 14, 2020, 11:41 AM), STAR TRIBUNE, *available at https://www.startribune.com/tent-camps-put-homeless-others-at-risk/572103582/* (**Exhibit 28**) ("Park police, with cooperation from the Minneapolis Police Department and the Hennepin County sheriff, cleared two on Wednesday, and some tents in Loring Park were taken down early Thursday.").

212.    For example, at the direction of Chief Deputy Tracey Martin—who was, upon information and belief, acting at the express delegation of authority by Sheriff Hutchinson—the County sent its sheriff's deputies to the sweeps of Powderhorn Park East on or about July 20, 2020; Elliot Park on or about August 12, 2020; Kenwood Park on or about August 12, 2020; Peavey Park on or about September 24, 2020; East 29th Street & 14th Avenue South on or about July 20, 2022; and the Mall on or about December 10, 2020.[49] It also sent its human services and other County staff to each of those sweeps, as well as the sweeps at 17th and Cedar in Minneapolis on or about May 29, 2020; Sabo Bridge on or about May 28-29, 2020; Stevens Avenue on or about May 29, 2020; Powderhorn Park West on or about August 14, 2020; B.F. Nelson Park in or around September 2020; the Wall of Forgotten Natives in or around September or October 2020; the Mall on or about December 10, 2020; the Nicollet Avenue Bridge in 2020; and East Lake Street & South 5th Avenue on or about April 19, 2022.

213.    And according to Donald Ryan, who, upon information and belief is a policymaker, at least as of September 25, 2020, "I have been involved in clearing of *every encampment* since March and I have seen detailed planning that resulted in well executed clearing of encampments.  The goals of these have been different . . . [including] one [that] has been to clear a camp without a location for campers to go . . . .  The planning for all of

---

[49]    Although the County disclaims sending deputies to the sweep of the Mall encampment on December 10, 2020, there is ample evidence that HSCO deputies were present at the sweep, guarded the perimeter during the eviction, provided transport detail at the express approval of Sheriff Hutchinson, and intentionally precluded displaced residents from moving to the Midtown Greenway. (**Exhibits 36, 37**).

these [sweeps] involved several public agencies ***working together and the partnership has worked well***." (**Exhibit 35** (emphasis added)). Defendants swept at least eight encampments between March 1, 2020, and September 25, 2020.

214. In fact, according to MPRB Lieutenant Calvin Noble, Don Ryan would even attend MPRB pre-sweep roll calls, at which he was not only made aware of all of the MPRB's plans to unconstitutional evict encampment residents, but serve as the Defendants' source of information for "whether or not" there was shelter space availability for the residents that were about to be displaced. Ryan would then be onsite at the sweeps to provide "up-to-the-minute [ ] information for shelter beds" because Defendants knew whether space was available was "ever changing by the minute." In other words, Defendants neither ensured nor guaranteed all evicted residents would have shelter space placement; nor did they hold space available for residents, in coordination with the shelters, in advance of the sweeps.

215. Meanwhile, the City sent its employees to conduct, assist, and/or participate in the following sweeps: Powderhorn Park East on or about July 20, 2020; East 26th Street on or about July 28, 2020; Kenwood Park on or about August 12, 2020; Powderhorn Park West on or about August 14, 2020; 2601 14th Avenue South in August 2020; Peavey Park on or about September 24, 2020; 2313 13th Avenue South in September 2020; 2600 Minnehaha in June 2021; Elliot Park in July 2021; 3601 44th Street in September 2021; 10 Lake Street in September 2021; Franklin Camps (Median, Right of Way, Peace Garden) in October 2021; Penn & Lowry in October 2021; and Technology Drive in November 2021; the sweep at 1913 on or about December 14, 2021; South 5th Avenue & E Lake Street on

or about April 19, 2022; North Loop on or about May 16, 2022; 14th Ave South & East 29th Street on or about July 20, 2022; 29th & Bloomington on or about September 30, 2022; Near North, Van White, and Cedar Franklin on or about October 6, 2022; the Quarry on or about December 30, 2022.[50]

216. The MPRB's permitting process became the primary mechanism Defendants, in coordination, used to target encampments for sweeps on park property.[51] On July 18, 2020, Superintendent Bangoura called for "immediate enforcement of locations, size and spacing" of unpermitted parks after expressing of concerns about tents appearing at McRae and Lyndale Parks.[52]

217. Chief Jason Ohotto wrote in August of 2020 that "[l]arge demobilizations will be part of a planned and coordinated effort" between the MPRB, City, and Hennepin County.[53] Despite the governor's Order prohibiting sweeps absent certain circumstances,

---

[50]    The City's history of conducting violent sweeps of homeless encampments pre-dates 2020, though, including at least (but not limited to): 29th Street & 12th Avenue South in August 2016; Bloomington Avenue & 25th Ave S in January 2018; Franklin Avenue & Hiawatha Avenue in December 2018; 17th Avenue & Cedar Avenue in December 2018; and 29th Avenue & Nicollet Avenue in September 2019.

[51]    Email from Jason Ohotto to individuals from the City of Minneapolis and Hennepin County (July 15, 2020) (**Exhibit 43**).

[52]    Email from Al Bangoura, Superintendent of MPRB to Michael Schroeder, Assistant Superintendent    for    Planning    Services    (July    18,    2020)    (**Exhibit    26**).

[53]    Email from Jason Ohotto, Chief of Park Police Department, to, among others, Al Bangroura, Superintendent of the MPRB, Donald W. Ryan –an employee of Hennepin County, and David G. O'Connor-an employee of the City (Aug. 7, 2020) (**Exhibit 27**).

in an email to employees of the MPRB, City, and Hennepin County about this coordinated effort to clear encampments, Chief Ohotto ended with a call to action: "It is time to return parks to their intended purpose."[54]

218.   Chief Ohotto acted with haste, seeking to immediately clear any tents that appeared.  For example, on August 18, 2020, at 5:33 PM, Chief Ohotto was informed via email that a Minneapolis resident had spotted three tents on the South side of Minnehaha Creek, between 34th and 32nd Avenue South.  Only four minutes after receiving this information, and without any further details about the tents' residents, the availability of shelter space at the time, or the conditions in that area, Chief Ohotto told his subordinates to "issue notices."[55]

219.   This decision to sweep encampments without first confirming any legal justification therefore was deliberate, it was not a one-off event, and it was not limited to just the MPRB.

220.   Rather, according to the County itself, for any sweep to which it sent its employees between May 2020 to September 2022 not located on County property, it (1) did not make the final decision to close the encampment, so it did not decide the reasons for the closure *and* (2) lacked knowledge of exactly the bases for that other municipality's decision.  In other words, the County dispatched its employees under a "no questions asked" custom.  But the County's deliberate indifference to and tacit authorization of the

---

[54]     *Id.*

[55]     Email from Jason Ohotto to PoliceSupervisors@minneapolisparks.org (Aug. 18, 2020) (**Exhibit 27-A**).

unconstitutionality of the sweeps ordered by other municipalities, in which it then actively participated, is no excuse under the law.

221.   Meanwhile, the County was well aware that there was not adequate shelter space available for all of the residents Defendants were displacing during these sweeps. According to David Hewitt, the Director of Hennepin County's Office to End Homelessness, the County knew that shelters would only be able to accommodate "some" displaced residents, whereas there would be "others of you who we cannot shelter," particularly in the case of single adults.  (**Exhibit 38**).  This did not stop Defendants from conducting their unconstitutional sweeps.

222.   In other words, despite the lack of sufficient shelter space or affordable shelter, between July of 2020 and January of 2021, Defendants "cleared" at least seven encampments in Minneapolis parks—each time confiscating and nearly immediately destroying all of the personal property they found and displacing residents who had nowhere else to go.[56]

223.   Defendants, together and acting in concert, failed to provide any or adequate notice to residents of encampments that Defendants would forcefully remove them from their homes located in the encampments.[57]

---

[56]   Exhibit 1, *supra* note 2 (Aug. 10-12, 2020 – Kenwood and Elliot Parks) (Aug. 14, 2020 – Powderhorn Park (Sept. 24, 2020 – Peavey Park).

224.    MPRB "Notices of Transition" or "Notices to Vacate" allegedly served to residents of Powderhorn, Loring, and Matthews Parks did not contain deadlines by which residents had to vacate the parks.[58]  Indeed, the MPRB deliberately left dates off of the "Notice of Transition" for Powderhorn West, and expressly informed both the City and the County of its decision to do so.[59]

225.    Park Police were also allegedly dispersed to give notices to individual residents at various parks, but some of these notices likewise contained no deadline.[60] Regardless, when officers from the Park Police, Minneapolis Police Department, and deputies from the Hennepin County Sheriff's Office arrived at various encampments in July, August, September, October, November, and December to rid them of people and their property, and arrest those who interfere or refuse to leave, some encampment residents like Named Plaintiffs were taken by surprise.

226.    And what definite notice Defendants did provide proved to be faulty information or deliberately unreliable.  For example, on August 10, 2020, MPRB issued notices of an impending sweep on August 12 to the encampment residents of Peavey Park. But on August 12, no such sweep of Peavey Park ever came.  Meanwhile, Defendants— the MPRB, City and County—instead swept Elliot and Kenwood Parks on that date.  The

---

[58]    Notice of Transition regarding Powderhorn Park (July 31, 2020); Notice to Vacate regarding Loring Park (Aug.18, 2020); Notice to Vacate regarding Mathews Park (Aug. 19, 2020) (**Exhibit 30**).

[59]    Email from MPRB staff to individuals from the City of Minneapolis and Hennepin County (July 31, 2020) (**Exhibit 42**).

[60]    *See, e.g.*, Notices from July 17, 2020 and August 8, 2020 (**Exhibit 31**)

residents at Peavey Park were never reissued notice of a forthcoming sweep.  Then, over one month later, on September 24, Defendants—the MPRB, the City, and the County— showed up before dawn to evict the residents of Peavey Park from their homes.

227.   The sweeps described above were ordered by Superintendent Al Bangoura and/or other final City policymakers, with "critical assistance" provided by the County, whose deputies played a "critical role" in the sweeps. (**Exhibits 39, 40**).

228.   The MPRB acknowledged that it could not have swept encampments without the County's assistance.[61] And in response to this acknowledgement, Deputy Chief Tracey Martin told the MPRB that "We are always happy to be of assistance."

229.   Nor was this abnormal or errant practice for the County, which aided in the MPRB's sweeps and which conducted sweeps on its own properties without providing sufficient notice of the sweep or time for residents to pack.

230.   For example, the County swept the Midtown Greenway on December 18, 2020.  It, however, informed Greenway residents that the sweep would occur on December 17, not the 18th.  What's more, it did not issue notice of the impending sweep until December 15, at or around 8:00 a.m. (i.e., with less than 72 hours' notice of the (inaccurate) date it provided residents).  And what notice the County *did* provide stated expressly that residents would not have time on the day of the sweep to collect belongings or make arrangements to get themselves or their property out of the encampment, and that some

---

[61]    *See* Exhibit 39.

property may be collected and inventoried—at the County's discretion—but for an unknown and unspecified amount of time. (**Exhibit 41**).[62]

231.  When the county implemented its own encampment operation plans for law enforcement, it did not include anything about helping individuals pack or give notices. Instead, the operation plan required HCSO and Hennepin Security to provide "necessary interventions" against homeless and protestors and "provide security."

232.  During the sweeps, Defendants ensured that heavy equipment was present to dispose of residents' personal property and clear people from the encampment. Below are photographs taken by STAR TRIBUNE photographer David Joles and photographer Ben Hovland at the clearing of Powderhorn Park on August 14, 2020:

---

[62]   The County moved forward with its sweep of the Greenway despite its awareness (information which it then provided several policymaking officials from the City of Minneapolis) that the demand for shelter space was so high that "beds are being allocated quickly each day . . . ," (**Exhibit 44**), such that there may not be sufficient shelter or alternative housing space for the evicted residents. In fact, in the same email, it recounted that just days before the Greenway eviction, on Wednesday, December 16, 2020 "men's beds were [completely] allocated by noon." *Id*.



63



64

---

56

233.    Residents of encampments and protestors have been arrested and tear gassed during sweeps of encampments.    Below are photographs taken by STAR TRIBUNE photographer David Joles at the clearing of Powderhorn Park on August 14, 2020:





234.    Witnesses recount similar treatment by Defendants' employees—including HCSO sheriff's deputies—at other sweeps.    For example, Andrew Fahlstrom describes

---

deputies participating just "as much" as MPD and Park Police officers in "forcibly ejecting people from the encampment at Peavey Park."  He recalls seeing them establishing and enforcing a perimeter around the encampment; grabbing people when they refused to leave or residents who were trying to get back into the encampment; and pulling people to the ground, handcuffing, and arresting them.

235.    When Named Plaintiffs and putative class members are cleared from a public park, they have to relocate to another public space, or rely on the charity of organizations like ZACAH or family and friends for temporary shelter.  Without adequate shelter space or affordable housing, this cycle of homelessness between sleeping in public spaces, in cars, on friend's couches, or in inexpensive hotels, repeats indefinitely.

236.    Defendants did not have a warrant or probable cause to seize Plaintiffs' property during these sweeps.

237.    Finally, Defendants knew, and were on notice, of the unconstitutional misconduct of their employees.

238.    Policymaking officials for the City, including but not limited to Barrett Lane, Director of the Department of Emergency Management for the City and one of the authors of the City's encampment demobilization plans, watched sweeps to which they dispatched personnel from the Office of Emergency Management ("OEM") as they were occurring.

239.    Policymaking officials from the County, including but not limited to Don Ryan, were on the ground and present during the sweeps to which they sent County personnel.[66]

240.    And policymaking officials for the MPRB, including but not limited to Superintendent Bangoura and Park Police Chief Ohotto were also on the ground and present during the sweeps.  Despite watching the unconstitutional misconduct of their employees unfold in real time, Defendants continued sending their employees to conduct other, future sweeps.

241.    What's more, several of Defendants' policymaking officials were alerted to the unconstitutional misconduct of their employees.  Individuals such as Park Police Chief Ohotto heard protestors at encampment sweeps decrying the destruction of residents' property. Days after the sweep of the Kenwood Park encampment in late August, Don Ryan of Hennepin County learned that a resident of the Kenwood Park encampment had his unabandoned property destroyed during the sweep, and Don Ryan told Chief Ohotto about it. And after receiving the initial Complaint in this case in October of 2020, Chief Ohotto read the allegations of property destruction asserted by the Named Plaintiffs and believed them. MPRB President (then Commissioner-at-Large) Meg Forney received dozens of such emails, to which she set up an automatic response of "I am llistening [sic]," and

---

[66]    In addition to the listed City and County policymaking officials, Hennepin County Commissioners Angela Conley and Binta Kanteh, as well as City of Minneapolis councilmembers, were told two days in advance of the County's sweep of the Greenway that County "[c]rews were out this morning [of December 16] throwing away people's property that was outside of the tents." (**Exhibit 46**).

County official David Hewitt received hundreds of such emails, to which he would reply with the same copied-and-pasted generic response. Lastly, all Defendants' were on notice of these unconstitutional activities through extensive media coverage and this very lawsuit, filed in October 2020.

***Defendants' Unconstitutional Policies & Continuing, Widespread, Persistent Customs of Unconstitutional Misconduct Were the Moving Force Behind Plaintiffs' Injuries***

242.   In 2020, 2021, and 2022 alone, Defendants swept, disbanded, or otherwise forcibly ejected at least, the following encampments employing the unconstitutional policies, practices, and customs alleged above:

| Date | Location | Municipal Owner | Other Municipalities Participating In Active Concert |
|------|----------|-----------------|----------------------------------------------------|
| May 28-29, 2020 | Sabo Bridge | City | County |
| May 29, 2020 | 17th & Cedar Avenue | City | County |
| May 29, 2020 | Stevens Avenue | City | County |
| July 20, 2020 | Powderhorn Park East | MPRB | City, County |
| July 28, 2020 | East 26th Street | City | |
| August 10, 2020 | Powderhorn Park West | MPRB | City, County |
| August 12, 2020 | Kenwood Park | MPRB | City, County |
| August 12, 2020 | Elliot Park | MPRB | County |
| August 22, 2020 | Columbia Park | MPRB | City, County |
| August 24, 2020 | Matthews Park | MPRB | County |
| August 2020 | 2601 14th Ave S | City | County |
| September 24, 2020 | Peavey Park | MPRB | City, County |
| September 2020 | 2313 13th Ave S | City | |
| October 1, 2020 | Brackett Park | MPRB | |
| October 2020 | B.F. Nelson Park | MPRB | County |
| October 2020 | Riverside Park | MPRB | |
| December 10, 2020 | The Mall | MPRB | County |
| December 18, 2020 | The Greenway | County | |
| December 22, 2020 | Martin Luther King, Jr. Park | MPRB | |

| January 7, 2021 | Minnehaha Falls Regional Park | MPRB | |
|---|---|---|---|
| June 2021 | 2600 Minnehaha | City | |
| July 2021 | Elliot Park | City | |
| September 2021 | 3601 44th Street | City | |
| September 2021 | 10 Lake Street | City | |
| October 5, 2021 | Franklin Camps (Median, Right of Way, Peace Garden) | City | |
| October 2021 | Penn and Lowry | City | |
| November 2021 | Technology Drive | City | |
| December 2021 | 1913 Sweep | City | MPRB |
| April 19, 2022 | 5th & Lake | City | County |
| May 16, 2022 | North Loop Encampment | Private Property | City |
| July 20, 2022 | 29th & 14th | City | County |
| September 30, 2022 | 29th & Bloomington | City | |
| October 6, 2022 | Cedar Franklin | City/Metro Transit | |
| October 6, 2022 | Near North Encampment | City | |
| October 6, 2022 | Van White Encampment | City | |
| December 30, 2022 | Quarry Encampment | City | |

[67]

243.    Defendants' actions in these and other sweeps deprived Plaintiffs of valuable property in violation of their Fourth and Fourteenth Amendment rights.

244.    Defendants have an unconstitutional custom and practice of discarding and destroying unabandoned personal property, and disregarding any policies they have regarding properly inventorying and safeguarding seized property.

245.    Defendants' actions in these sweeps, including but not limited to the use of heavy machinery and equipment, armed officers, chemical irritants, and threats of arrest,

---

[67]    Omitted from the chart above are Defendants' attempts to conduct sweeps, which failed for various reasons.

subjected Named Plaintiffs and putative class members to danger of Defendants' own making.

246.   Defendants have conducted and continue to conduct other unannounced property sweeps of homeless encampments without adequate due process of law, where they have ejected people from public parks or other public property and seized and destroyed property without legal justification.

### Plaintiffs' Need for Continuing, Prospective Injunctive Relief

247.   As of October 15, 2020, there were an estimated 222 tents in 14 Minneapolis parks.[68]   Defendant Superintendent Al Bangoura announced that these remaining encampments would be "disbanded likely sometime in October."[69]   Defendants' then carried out the planned sweeps in the same fashion as previous ones, whereby Defendants displaced Plaintiffs and the putative class members and destroyed their property with no or inadequate notice.

248.   As of January 31, 2023, there are still several encampments within Hennepin County, a significant portion of which are on public property owned by the City of Minneapolis. Upon information and belief, Defendants City of Minneapolis and Hennepin County intend to sweep these encampments, and will do so in the same fashion as the previous ones, employing their unconstitutional policies and customs, whereby putative

---

[68]   Exhibit 1, *supra* note 2.

[69]   9-2-2020 *Superintendent Bangoura Encampment Remarks*, Minneapolis Park & Recreation Board, https://www.minneapolisparks.org/encampments/9-2-2020-superintendent-bangoura-encampment-remarks/ (**Exhibit 33**).

class members will be displaced and their property destroyed, all without adequate—or, at times, any—notice and insufficient alternative shelter or housing space available for displaced residents to go.

249.    Injunctive relief is necessary as Plaintiffs are without other adequate remedy at law.

## CAUSES OF ACTION
## COUNT I:

**Unlawful Seizure in Violation of the Fourth Amendment of the United States Constitution and Article I, Section 10 of the Minnesota Constitution**

250.    Plaintiffs reallege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

251.    Plaintiffs have a constitutionally-protected property interest in their personal belongings.

252.    Defendants' destruction of Plaintiffs' property constitutes a meaningful interference with Plaintiffs' possessory interest in their property, a seizure.

253.    Defendants' policies, practices, and custom of seizing Plaintiffs' property without a valid warrant, probable cause, or exigent circumstances is unreasonable and contrary to the Fourth Amendment of the United States Constitution, as applied to the states by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, and Article I, Section 10 of the Minnesota Constitution.

**COUNT II:**

**Violation of the Right to Privacy Under the Fourth Amendment of the United States Constitution and Article I, Section 10 of the Minnesota Constitution**

254.    Plaintiffs reallege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

255.    Plaintiffs had an actual, subjective expectation of privacy in their personal property, and that privacy expectation was reasonable.

256.    Defendants' policy, pattern, and custom of seizing and destroying Plaintiffs' property without a valid warrant, probable cause, or exigent circumstances violated their right under the Fourth Amendment of the United States Constitution, as applied to the states by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, and Article I, Section 10 of the Minnesota Constitution to be free from disturbance in their private affairs and invasion of their homes without authority of law.

**COUNT III:**

**Procedural Due Process Violation Under the Fourteenth Amendments of the United States Constitution and Article I, Section 7 of the Minnesota Constitution**

257.    Plaintiffs reallege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

258.    Plaintiffs have a constitutionally-protected property interest in their personal belongings.

259.    Defendants' destruction of Plaintiffs' property deprives Plaintiffs' of a protected possessory interest in their property.

260.    Defendants' policy, pattern, and custom of seizing and destroying Plaintiffs' property without adequate and effective notice, opportunity to be heard, or pre- or post-deprivation mechanism to challenge and reclaim their property violates Plaintiffs' right to due process of law protected by the Fourteenth Amendment to the United States Constitution, through 42 U.S.C. § 1983, and Article I, Section 7 of the Minnesota Constitution.

## COUNT IV:

### Conversion in Violation of Minnesota Common Law

261.    Plaintiffs reallege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

262.    Plaintiffs were in possession of their personal property at the time Defendants' intentionally seized and destroyed their property without notice, an opportunity to retrieve it, or adequate compensation, depriving the Plaintiffs of their possessory interest in the property.

263.    Defendants had no lawful authority to seize or destroy Plaintiffs' property.

264.    As a direct and proximate consequence of the Defendants' acts, Plaintiffs suffered and continue to suffer the loss of their personal property.

265.    Plaintiffs are entitled to compensatory damages for the loss of their property.

## COUNT V:

### Civil Conspiracy Pursuant to 42 U.S.C. § 1983 and Minnesota Law

266.    Plaintiffs reallege and incorporate the allegations of the preceding paragraphs as if full set forth herein.

### *Conspiracy to Deprive Plaintiffs of Their Constitutional Rights*

267.   Defendants conspired, under color of law, to deprive Plaintiffs of their constitutional rights as set forth in Counts I, II, and III.

268.   Defendants reached an agreement to form a conspiracy, and acted in concert in furtherance of the conspiracy.

269.   Defendants committed overt acts—including but not limited to giving inadequate or not notice to encampment residents of forthcoming sweeps, conducting sweeps knowing displaced residents had no place else to go, abruptly waking encampment residents, dismantling tents, putting up police tape and enforcing perimeters, threatening residents with arrest, making arrests, kettling people, razing encampments and property contained therein with heavy machinery and equipment, unlawfully seizing property, and irreparably destroying and disposing of unabandoned personal property—in furtherance of the conspiracy.

270.   As a direct and proximate consequence of Defendants' conspiracy and those overt acts above, Plaintiffs suffered actual violations of their constitutional rights under the Fourth and Fourteenth Amendments of the United States Constitution, through 42 U.S.C. § 1983, and the Minnesota Constitution.

### *Conspiracy to Commit Conversion*

271.   Defendants conspired to willfully interfere and deprive Plaintiffs of their interest, use, and possession in their personal property without lawful justification as set forth in Count IV.

272.    Defendants reached an agreement to form a conspiracy, and acted in concert (i.e., were motivated by community of purpose or a common understanding) in furtherance of the conspiracy.

273.    Defendants committed overt acts—including but not limited to abruptly waking encampment residents, dismantling tents, putting up police tape and enforcing perimeters, threatening residents with arrest, making arrests, kettling people, razing encampments and property contained therein with heavy machinery and equipment, unlawfully seizing and keeping property, and irreparably destroying and disposing of unabandoned personal property—in furtherance of the conspiracy.

274.    As a direct and proximate consequence of Defendants' conspiracy to commit conversion and the overt acts above, Plaintiffs suffered and continue to suffer the actual loss of use, possession, and enjoyment of their personal property.

**DECLARATORY RELIEF**

275.    Plaintiffs reallege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

276.    An actual controversy exists between Plaintiffs and Defendants in that Defendants have engaged in the unlawful and unconstitutional acts set forth herein. Plaintiffs have suffered actual harm as a result of Defendants' unlawful acts and will continue to suffer harm if Defendants' unlawful acts are permitted to continue.  Plaintiffs seek a declaration of their rights with regard to this controversy and a declaration that Defendants' policies, practices, and customs as set forth herein violate those rights under the United States and Minnesota Constitutions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

I.   For preliminary and permanent injunctive relief enjoining Defendants from continuing its unlawful policies, practices, and customs as set forth herein;

II.   For declaratory relief, pursuant to 28 U.S.C. §§ 2201, 2202, and Rule 57 of the Federal Rules of Civil Procedure, as requested above;

III.   For compensatory and punitive damages, in amounts to be determined at trial, against Defendants;

IV.   For an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

V.   For such additional relief as the Court deems just and appropriate.

MID-MINNESOTA LEGAL AID

Dated: May 11, 2023             BY:  s/ Rebecca Stillman
                                Justin H. Perl (No. 0151397)
                                Dorinda L. Wider (No. 0162334)
                                Rebecca Stillman (No. 039855)
                                Luke Grundman (No. 0390565)
                                111 North Fifth Street, Suite #100
                                Minneapolis, MN 55403-1604
                                Tel. and Fax: (612) 746-3727
                                Tel. and Fax: (612) 746-3624
                                Tel. and Fax: (612) 746-3759
                                Email: jperl@mylegalaid.org
                                        dlwider@mylegalaid.org
                                        rstillman@mylegalaid.org
                                        lgrundman@mylegalaid.org

AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA

BY:  s/ Teresa Nelson
Teresa Nelson (No. 0269736)
Clare Diegel (No. 0400758)

Ian Bratlie (No. 0319454)
American Civil Liberties Union of Minnesota
P.O. Box 14720
Minneapolis, MN 55414
Tel: (651) 645-4097
Fax: (651) 647-5948
Email: tnelson@aclu-mn.org
       cdiegel@aclu-mn.org
       ibratlie@aclu-mn.org


**BALLARD SPAHR LLP**

BY:   s/ Wallace Hilke
Wallace Hilke (No. 0175857)
Jennell K. Shannon (No. 0398672)
Ballard Spahr LLP
2000 IDS Center 80 South 8th Street
Minneapolis, MN 55402
Tel: (612) 371-3281
Fax: (612) 371-3207
Email: hilkew@ballardspahr.com
       shannonjk@ballardspahr.com


Hannah Welsh (Pennsylvania No. 327454)
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Tel: (610) 764-0540
Fax: (215) 864-8999
Email: welshh@ballardspahr.com

*Attorneys for Plaintiffs*