# EXHIBIT 102

## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

| | |
|---|---|
| Patrick Berry, Henrietta Brown, Nadine Little, Dennis Barrow, Virginia Roy, Joel Westvig, Gina Mallek, Daniel Huiting, *on behalf of themselves and a class of similarly-situated individuals*; and ZACAH, | Case No. 20-CV-02189-WMW-JFD<br><br>District Judge Wilhelmina Wright<br>Magistrate Judge John F. Docherty |
| Plaintiffs, | |
| vs. | **HENNEPIN COUNTY DEFENDANTS'** |
| Hennepin County; Hennepin County Sheriff David Hutchinson, *in his individual and official capacity*; City of Minneapolis; Minneapolis Mayor Jacob Frey, *in his individual and official capacity*; Medaria Arradondo, *in his individual and official capacity*; Minneapolis Park and Recreation Board; Superintendent of the Minneapolis Park and Recreation Board Al Bangoura, *in his individual and official capacity*; Park Police Chief at the Minneapolis Park and Recreation Board Jason Ohotto, *in his individual and official capacity*; Police Officers John Does; and Police Officer Jane Does, | **RESPONSE TO PLAINTIFFS' SECOND AND THIRD SETS OF REQUESTS FOR ADMISSION** |
| Defendants. | |

TO:   Plaintiffs, through their attorneys, Justin Perl, Dorinda Wider, Rebecca Stillman, and Luke Grundman, Mid-Minnesota Legal Aid; Teresa Nelson, Clare Diegel, and Ian Bratlie, American Civil Liberties Union of Minnesota; and Isabella Salomão Nascimento, Ballard Spahr LLP; Defendants City of Minneapolis, Mayor Jacob Frey, and Police Chief Medaria Arradondo, through their attorneys, Sharda Enslin and Brian Carter, Minneapolis City Attorney's Office; and Defendants Minneapolis Park and Recreation Board, Superintendent Al Bangoura, and Park Police Chief Jason Ohotto, through their attorneys, Ann Walther, Brian Rice, and Alana Mosley, Rice, Walther & Mosley LLP.

Defendants Hennepin County and Hennepin County Sheriff David Hutchinson (together, the "Hennepin County Defendants"), for their Response to Plaintiffs' Second Set of Requests for Admission to Defendant Hennepin County and Plaintiffs' Third Set of Requests for Admission to Defendant Hennepin County (together, "Second and Third Sets of Requests for Admission"), state and object as follows:

## GENERAL OBJECTIONS

The Hennepin County Defendants object to the Second and Third Sets of Requests for Admission to the extent that they seek information protected by the attorney-client privilege, attorney work-product doctrine, or Fed. R. Civ. P. 26(b). The Hennepin County Defendants will not produce communications or information protected from disclosure by the attorney-client privilege or attorney work-product doctrine.

The Hennepin County Defendants also object to the definitions in the Second and Third Sets of Requests for Admission. Specifically, the Hennepin County Defendants object to the definition of "Defendants," you," or "your" as meaning "Hennepin County, Hennepin County Sheriff Hutchinson, and any of their agents, or other representatives." This definition does not define the terms "agents" or "representatives." In answering these Requests, the Hennepin County Defendants will understand the terms "Defendants," you," or "your" to mean Hennepin County, Sheriff Hutchinson, or any employee of Hennepin County.

By responding to the Second and Third Sets of Requests for Admission in whole or in part, the Hennepin County Defendants do not waive the general and specific objections made herein. Each Response is made subject to these general objections and any specific objection(s) made during the course of such Response. Investigation by the Hennepin County Defendants is ongoing, and the Hennepin County Defendants reserve the right to withdraw or amend these Responses consistent with the Federal Rules of Civil Procedure.

## RESPONSES TO REQUESTS FOR ADMISSION

**REQUEST NO. 9:** Admit that, when an encampment sits on the property of another municipality and a sweep of the encampment is conducted, the justification(s) for the sweep are not determined by Hennepin County, even if its agents, employees, or representatives are present at the sweep.

**Response:** The Hennepin County Defendants object to Request No. 9 as vague. The terms "encampment," "sweep," "justification," and "determined" are either undefined or improperly defined, and the Request encompasses a period of more than two years and does not limit "encampment sweeps" by location. For example, the definitions of "sweep" and "encampment," if read literally, could include the *voluntary* disbandment of even a group of two tents of individuals experiencing homelessness in any location (other than

2

Hennepin County land) at any time over more than two years. The Hennepin County Defendants further object to Request No. 9 as compound. It asks the Hennepin County Defendants to admit multiple facts about the existence of an "encampment," the occurrence of a "sweep," the presence of Hennepin County "agents, employees, or representatives," Hennepin County's "determination" of the "justification" for a "sweep," and the ownership and management of "property" over a multi-year period. The Hennepin County Defendants further object to Request No. 9 as overly broad, unduly burdensome, and seeking information that is not relevant to any claim, defense, or fact at issue in this case, because the Request seeks an admission about any "sweep" for a period of more than two years at any location in the world other than Hennepin County land. Moreover, Judge Wright's September 27, 2021 order limited Plaintiffs' claims against the Hennepin County Defendants to state-law claims about alleged seizure of personal property in connection with encampment closures. The Hennepin County Defendants also object to Request No. 9 as premature and as seeking information more appropriately sought under other discovery rules.

Subject to and without waiving any objections, the Hennepin County Defendants admit only that from May 1, 2020 through September 7, 2022, Hennepin County did not make the final decision to close encampments that were not located on Hennepin County land and therefore did not decide the reasons for closing such encampments.

The Hennepin County Defendants further state that they have made a reasonable inquiry, and the information they know or can readily obtain is insufficient to enable them to admit or deny the remainder of Request No. 9, because the Request is vague and compound, as explained above.

**REQUEST NO. 10:** Admit that, when an encampment sits on the property of another municipality and a sweep of the encampment is conducted, the justification(s) for the sweep are not known to Hennepin County, even if its agents, employees, or representatives are present at the sweep.

**Response**: The Hennepin County Defendants object to Request No. 10 as vague. The terms "encampment," "sweep," "justification," and "known" are either undefined or improperly defined, and the Request encompasses a period of more than two years and does not limit "encampment sweeps" by location. For example, the definitions of "sweep" and "encampment," if read literally, could include the *voluntary* disbandment of even a group of two tents of individuals experiencing homelessness in any location (other than Hennepin County land) at any time over more than two years. The Hennepin County Defendants further object to Request No. 10 as compound. It asks the Hennepin County Defendants to admit multiple facts about the existence of an "encampment," the occurrence of a "sweep," the presence of Hennepin County "agents, employees, or representatives," Hennepin County's knowledge of the "justification" for a "sweep," and the ownership and management of "property" over a multi-year period. The Hennepin County Defendants

further object to Request No. 10 as overly broad, unduly burdensome, and seeking information that is not relevant to any claim, defense, or fact at issue in this case, because the Request seeks an admission about any "sweep" for a period of more than two years at any location in the world other than Hennepin County land. Moreover, Judge Wright's September 27, 2021 order limited Plaintiffs' claims against the Hennepin County Defendants to state-law claims about alleged seizure of personal property in connection with encampment closures. The Hennepin County Defendants also object to Request No. 10 as premature and as seeking information more appropriately sought under other discovery rules.

Subject to and without waiving any objections, the Hennepin County Defendants admit only that from May 1, 2020, through September 7, 2022: (1) Hennepin County did not make the final decision to close encampments that were not located on Hennepin County land and therefore did not decide the reasons for closing such encampments; and (2) Hennepin County lacked knowledge of the exact thinking of another municipality's decisionmakers when those decisionmakers decided to close an encampment on that municipality's land. The Hennepin County Defendants deny that that from May 1, 2020, through September 7, 2022, Hennepin County's employees knew nothing about the reasons a municipality may have decided to close an encampment.

The Hennepin County Defendants further state that they have made a reasonable inquiry, and the information they know or can readily obtain is insufficient to enable them to admit or deny the remainder of Request No. 10, because the Request is vague and compound, as explained above.

**REQUEST NO. 11:** Admit that, while Governor Tim Walz's Executive Order 20-47 was in effect, when an encampment sat on the property of another municipality and a sweep of the encampment was conducted, Hennepin County did not do its own assessment of whether the sweep is allowable under Executive Order 20-47, even if its agents, employees, or representatives were present at the sweep.

**Response**: The Hennepin County Defendants object to Request No. 11 as vague. The terms "encampment," "sweep," "assessment," and "allowable" are either undefined or improperly defined, and the Request does not limit "encampment sweeps" by location or a definite period of time. For example, the definitions of "sweep" and "encampment," if read literally, could include the *voluntary* disbandment of even a group of two tents of individuals experiencing homelessness in any location (other than Hennepin County land) at any time over a period of weeks or months. The Hennepin County Defendants further object to Request No. 11 as compound. It asks the Hennepin County Defendants to admit multiple facts, and application of law to facts, about the time when Executive Order 20-47 "was in effect," the existence of an "encampment," the occurrence of a "sweep," the presence of Hennepin County "agents, employees, or representatives," Hennepin County's assessment of the "allowability" of a "sweep," and the ownership and management of

"property" over a period of weeks or months. The Hennepin County Defendants further object to Request No. 11 as overly broad, unduly burdensome, and seeking information that is not relevant to any claim, defense, or fact at issue in this case, because the Request seeks an admission about any "sweep" for an undefined period at any location in the world other than Hennepin County land. Moreover, Judge Wright's September 27, 2021 order limited Plaintiffs' claims against the Hennepin County Defendants to state-law claims about alleged seizure of personal property in connection with encampment closures. The Hennepin County Defendants also object to Request No. 11 as premature and as seeking information more appropriately sought under other discovery rules.

Subject to and without waiving any objections, the Hennepin County Defendants deny Request No. 11.

**REQUEST NO. 12:** Admit that, while Governor Tim Walz's Executive Order 20-55 was in effect, when an encampment sat on the property of another municipality and a sweep of the encampment was conducted, Hennepin County did not do its own assessment of whether the sweep was allowable under Executive Order 20-55, even if its agents, employees, or representatives were present at the sweep.

**Response:** The Hennepin County Defendants object to Request No. 12 as vague. The terms "encampment," "sweep," "assessment," and "allowable" are either undefined or improperly defined, and the Request does not limit "encampment sweeps" by location or a definite period of time. For example, the definitions of "sweep" and "encampment," if read literally, could include the *voluntary* disbandment of even a group of two tents of individuals experiencing homelessness in any location (other than Hennepin County land) at any time over a period of weeks or months. The Hennepin County Defendants further object to Request No. 12 as compound. It asks the Hennepin County Defendants to admit multiple facts, and application of law to facts, about the time when Executive Order 20-55 "was in effect," the existence of an "encampment," the occurrence of a "sweep," the presence of Hennepin County "agents, employees, or representatives," Hennepin County's assessment of the "allowability" of a "sweep," and the ownership and management of "property" over a period of weeks or months. The Hennepin County Defendants further object to Request No. 12 as overly broad, unduly burdensome, and seeking information that is not relevant to any claim, defense, or fact at issue in this case, because the Request seeks an admission about any "sweep" for an undefined period at any location in the world other than Hennepin County land. Moreover, Judge Wright's September 27, 2021 order limited Plaintiffs' claims against the Hennepin County Defendants to state-law claims about alleged seizure of personal property in connection with encampment closures. The Hennepin County Defendants also object to Request No. 12 as premature and as seeking information more appropriately sought under other discovery rules.

Subject to and without waiving any objections, the Hennepin County Defendants deny Request No. 12.

**REQUEST NO. 13:** Admit that, when an encampment sits on the property of another municipality and a sweep of the encampment is conducted, Hennepin County does not determine whether shelter space exists elsewhere for the residents of the encampment, even if Hennepin County agents, employees, or representatives are present at the sweep.

**Response:** The Hennepin County Defendants object to Request No. 13 as vague. The terms "encampment," "sweep," "determine," "shelter space," "elsewhere," and "residents" are either undefined or improperly defined, and the Request encompasses a period of more than two years and does not limit "encampment sweeps" or "shelter space" by location. For example, the definitions of "sweep" and "encampment," if read literally, could include the *voluntary* disbandment of even a group of two tents of individuals experiencing homelessness in any location (other than Hennepin County land) at any time over more than two years. Moreover, Request No. 13 does not define the point in time when a "determination" of "shelter space" might be made. The Hennepin County Defendants further object to Request No. 13 as compound. It asks the Hennepin County Defendants to admit multiple facts about the existence of an "encampment," the occurrence of a "sweep," the presence of Hennepin County "agents, employees, or representatives," the ownership and management of "property," and Hennepin County's "determination" of the existence of "shelter space . . . for residents" at any location over a multi-year period. The Hennepin County Defendants further object to Request No. 13 as overly broad, unduly burdensome, and seeking information that is not relevant to any claim, defense, or fact at issue in this case, because the Request seeks an admission about any "sweep" for a period of more than two years at any location in the world other than Hennepin County land. Moreover, Judge Wright's September 27, 2021 order limited Plaintiffs' claims against the Hennepin County Defendants to state-law claims about alleged seizure of personal property in connection with encampment closures. The Hennepin County Defendants also object to Request No. 13 as premature and as seeking information more appropriately sought under other discovery rules.

Subject to and without waiving any objections, the Hennepin County Defendants deny Request No. 13.

**REQUEST NO. 14:** Admit that, when an encampment sits on the property of another municipality and a sweep of the encampment is conducted, whether shelter space exists elsewhere for the residents of the encampment is not known to Hennepin County, even if Hennepin County agents, employees, or representatives are present at the sweep.

**Response:** The Hennepin County Defendants object to Request No. 14 as vague. The terms "encampment," "sweep," "shelter space," "elsewhere," "residents," and "known" are either undefined or improperly defined, and the Request encompasses a period of more than two years and does not limit "encampment sweeps" or "shelter space" by location. For example, the definitions of "sweep" and "encampment," if read literally, could include the *voluntary* disbandment of even a group of two tents of individuals

6

experiencing homelessness in any location (other than Hennepin County land) at any time over more than two years. Moreover, Request No. 14 does not define the point in time when "shelter space" might exist for individuals camping in an encampment. The Hennepin County Defendants further object to Request No. 14 as compound. It asks the Hennepin County Defendants to admit multiple facts about the existence of an "encampment," the occurrence of a "sweep," the presence of Hennepin County "agents, employees, or representatives," the ownership and management of "property," and Hennepin County's "knowledge" of the existence of "shelter space . . . for residents" at any location over a multi-year period. The Hennepin County Defendants further object to Request No. 14 as overly broad, unduly burdensome, and seeking information that is not relevant to any claim, defense, or fact at issue in this case, because the Request seeks an admission about any "sweep" for a period of more than two years at any location in the world other than Hennepin County land. Moreover, Judge Wright's September 27, 2021 order limited Plaintiffs' claims against the Hennepin County Defendants to state-law claims about alleged seizure of personal property in connection with encampment closures. The Hennepin County Defendants also object to Request No. 14 as premature and as seeking information more appropriately sought under other discovery rules.

Subject to and without waiving any objections, the Hennepin County Defendants deny Request No. 14.

**REQUEST NO. 15:** Admit that, under Executive Order 20-47, the existence of an encampment was itself a negative factor in Hennepin County's determination whether an encampment had reached a status that threatened health, safety or security of residents.

**Response:** The Hennepin County Defendants object to Request No. 15 as vague. The terms "encampment," "negative factor," "determination," and "residents" are either undefined or improperly defined, and the Request encompasses a period of more than two years and does not limit "encampments" by location. The Hennepin County Defendants further object to Request No. 15 as compound. It asks the Hennepin County Defendants to admit multiple facts, and application of law to facts, about the meaning of Executive Order 20-47, the existence of an "encampment," Hennepin County's "determination" of the "status" of an "encampment," and "threats" to "health, safety, or security of residents" at any location over a multi-year period. The Hennepin County Defendants further object to Request No. 15 as overly broad, unduly burdensome, and seeking information that is not relevant to any claim, defense, or fact at issue in this case, because the Request seeks an admission about any "encampment" for a period of more than two years at any location, including encampments that were not located Hennepin County land. Moreover, Judge Wright's September 27, 2021 order limited Plaintiffs' claims against the Hennepin County Defendants to state-law claims about alleged seizure of personal property in connection with encampment closures. The Hennepin County Defendants also object to Request No. 15 as premature and as seeking information more appropriately sought under other discovery rules.

Subject to and without waiving any objections, the Hennepin County Defendants admit only that from May 1, 2020, through September 7, 2022, Hennepin County considered encampments of individuals experiencing homelessness in Hennepin County to be inherently unsafe to the individuals camping in the encampments, but did not consider that inherent unsafety to be equivalent to "reach[ing] a size or status that is a documented threat to the health, safety or security of residents" under Executive Order 20-47, paragraph 1(ii).

The Hennepin County Defendants further state that they have made a reasonable inquiry, and the information they know or can readily obtain is insufficient to enable them to admit or deny the remainder of Request No. 15, because the Request is vague and compound, as explained above.

**REQUEST NO. 16:** Admit that, under Executive Order 20-55, the existence of an encampment was itself a negative factor in Hennepin County's determination whether an encampment had reached a status that threatened health, safety or security of residents.

**Response:** The Hennepin County Defendants object to Request No. 16 as vague. The terms "encampment," "negative factor," "determination," and "residents" are either undefined or improperly defined, and the Request encompasses a period of more than two years and does not limit "encampments" by location. The Hennepin County Defendants further object to Request No. 16 as compound. It asks the Hennepin County Defendants to admit multiple facts, and application of law to facts, about the meaning of Executive Order 20-55, the existence of an "encampment," Hennepin County's "determination" of the "status" of an "encampment," and "threats" to "health, safety, or security of residents" at any location over a multi-year period. The Hennepin County Defendants further object to Request No. 16 as overly broad, unduly burdensome, and seeking information that is not relevant to any claim, defense, or fact at issue in this case, because the Request seeks an admission about any "encampment" for a period of more than two years at any location, including encampments that were not located Hennepin County land. Moreover, Judge Wright's September 27, 2021 order limited Plaintiffs' claims against the Hennepin County Defendants to state-law claims about alleged seizure of personal property in connection with encampment closures. The Hennepin County Defendants also object to Request No. 16 as premature and as seeking information more appropriately sought under other discovery rules.

Subject to and without waiving any objections, the Hennepin County Defendants admit only that from May 1, 2020, through September 7, 2022, Hennepin County considered encampments of individuals experiencing homelessness in Hennepin County to be inherently unsafe to the individuals camping in the encampments, but did not consider that inherent unsafety to be equivalent to "reach[ing] a size or status that is a documented threat to the health, safety or security of residents" under Executive Order 20-55, paragraph 5.

8

The Hennepin County Defendants further state that they have made a reasonable inquiry, and the information they know or can readily obtain is insufficient to enable them to admit or deny the remainder of Request No. 16, because the Request is vague and compound, as explained above.

**REQUEST NO. 17:** Admit that Hennepin County did not provide Plaintiff Patrick Berry notice of the forthcoming sweep before the sweep of the encampment at Powderhorn Park on or about August 14, 2020.

**Response:** The Hennepin County Defendants object to Request No. 17 as vague. The terms "encampment," "sweep," and "notice" are either undefined or improperly defined. The Hennepin County Defendants also object to Request No. 17 as seeking information out of their possession, custody, and control. Specifically, the Hennepin County Defendants spoke to individuals located in encampments about encampment closures, but they cannot determine exactly who received that notice, since individuals located in the encampments did not always identify themselves by name to the Hennepin County Defendants, and the closure of the Powderhorn Park West encampment occurred more than two years ago. The Hennepin County Defendants also object to Request No. 17 as premature and as seeking information more appropriately sought under other discovery rules.

Subject to and without waiving any objections, the Hennepin County Defendants state that they have made a reasonable inquiry, and the information they know or can readily obtain is insufficient to enable them to admit or deny Request No. 17, because, as described above, it is impossible for the Hennepin County Defendants to identify each and every individual with whom they spoke about the closure of the Powderhorn Park West encampment more than two years after that closure occurred. In addition, Exhibit 1 to Plaintiffs' Amended Class Action Complaint indicates that, on July 31, 2020, the Minneapolis Park and Recreation Board ("MPRB") gave individuals camping at the Powderhorn Park West encampment "notices to transition" out of the encampment and made other efforts to move those individuals to other locations. As to Berry specifically, Berry testified that they were aware of "rumors" before the Powderhorn Park West encampment was closed that the MPRB would close the encampment. Further, Request No. 17 is vague, as described above.

**REQUEST NO. 18:** Admit that Hennepin County does not know whether Plaintiff Patrick Berry was provided notice of the forthcoming sweep by any other government entity before the sweep of the encampment at Powderhorn Park on or about August 14, 2020.

**Response:** The Hennepin County Defendants object to Request No. 18 as vague. The terms "encampment," "sweep," "notice," and "know" are either undefined or improperly defined. The Hennepin County Defendants also object to Request No. 18 as

premature and as seeking information more appropriately sought under other discovery rules.

Subject to and without waiving any objections, the Hennepin County Defendants admit only that whether another government entity provided "notice" of the closure of the Powderhorn Park West encampment to Plaintiff Patrick Berry is outside of their possession, custody, and control, because it is impossible for the Hennepin County Defendants to identify each and every individual whom they may have witnessed receiving notice of the encampment closure from another government entity—particularly since individuals located in the encampments did not always identify themselves by name to the Hennepin County Defendants, and the closure occurred more than two years ago. In addition, Exhibit 1 to Plaintiffs' Amended Class Action Complaint indicates that, on July 31, 2020, the MPRB gave individuals camping at the Powderhorn Park West encampment "notices to transition" out of the encampment and made other efforts to move those individuals to other locations. As to Berry specifically, Berry testified that they were aware of "rumors" before the Powderhorn Park West encampment was closed that the MPRB would close the encampment.

The Hennepin County Defendants further state that they have made a reasonable inquiry, and the information they know or can readily obtain is insufficient to enable them to admit or deny the remainder of Request No. 18, because the Request is vague, as explained above.

**REQUEST NO. 19:** Admit that Hennepin County did not provide Plaintiff Henrietta Brown notice of the forthcoming sweep before the sweep of the encampment at Peavey Park on or about September 24, 2020.

**Response:** The Hennepin County Defendants object to Request No. 19 as vague. The terms "encampment," "sweep," and "notice" are either undefined or improperly defined. The Hennepin County Defendants also object to Request No. 19 as seeking information out of their possession, custody, and control. Specifically, the Hennepin County Defendants spoke to individuals located in encampments about encampment closures, but they cannot determine exactly who received that notice, since individuals located in the encampments did not always identify themselves by name to the Hennepin County Defendants, and the closure of the Peavey Park encampment occurred approximately two years ago. The Hennepin County Defendants also object to Request No. 19 as premature and as seeking information more appropriately sought under other discovery rules.

Subject to and without waiving any objections, the Hennepin County Defendants state that they have made a reasonable inquiry, and the information they know or can readily obtain is insufficient to enable them to admit or deny Request No. 19, because, as described above, it is impossible for the Hennepin County Defendants to identify each and

every individual with whom they spoke about the closure of the Peavey Park encampment approximately two years after that closure occurred. In addition, Exhibit 1 to Plaintiffs' Amended Class Action Complaint indicates that, on August 10, 2020, the "MPRB issued notices to vacate" to the individuals camping in Peavey Park. Further, Request No. 19 is vague, as described above.

**REQUEST NO. 20:** Admit that Hennepin County does not know whether Plaintiff Henrietta Brown was provided notice of the forthcoming sweep by any other government entity before the sweep of the encampment at Peavey Park on or about September 24, 2020.

**Response:** The Hennepin County Defendants object to Request No. 20 as vague. The terms "encampment," "sweep," "notice," and "know" are either undefined or improperly defined. The Hennepin County Defendants also object to Request No. 20 as premature and as seeking information more appropriately sought under other discovery rules.

Subject to and without waiving any objections, the Hennepin County Defendants admit only that whether another government entity provided "notice" of the closure of the Peavey Park encampment to Plaintiff Henrietta Brown is outside of their possession, custody, and control, because it is impossible for the Hennepin County Defendants to identify each and every individual whom they may have witnessed receiving notice of the encampment closure from another government entity—particularly since individuals located in the encampments did not always identify themselves by name to the Hennepin County Defendants, and the closure occurred more than two years ago. In addition, Exhibit 1 to Plaintiffs' Amended Class Action Complaint indicates that, on August 10, 2020, the "MPRB issued notices to vacate" to the individuals camping in Peavey Park.

The Hennepin County Defendants further state that they have made a reasonable inquiry, and the information they know or can readily obtain is insufficient to enable them to admit or deny the remainder of Request No. 20, because the Request is vague, as explained above.

**REQUEST NO. 21:** Admit that Hennepin County did not provide Plaintiff Nadine Little notice of the forthcoming sweep before the sweep of the encampment at Kenwood Park on or about August 12, 2020.

**Response:** The Hennepin County Defendants object to Request No. 21 as vague. The terms "encampment," "sweep," and "notice" are either undefined or improperly defined. The Hennepin County Defendants also object to Request No. 21 as seeking information out of their possession, custody, and control. Specifically, the Hennepin County Defendants spoke to individuals located in encampments about encampment closures, but they cannot determine exactly who received that notice, since individuals located in the encampments did not always identify themselves by name to the Hennepin

County Defendants, and the closure of the Kenwood Park encampment occurred more than two years ago. The Hennepin County Defendants also object to Request No. 21 as premature and as seeking information more appropriately sought under other discovery rules.

Subject to and without waiving any objections, the Hennepin County Defendants state that they have made a reasonable inquiry, and the information they know or can readily obtain is insufficient to enable them to admit or deny Request No. 21, because, as described above, it is impossible for the Hennepin County Defendants to identify each and every individual with whom they spoke about the closure of the Kenwood Park encampment more than two years after that closure occurred. In addition, Exhibit 1 to Plaintiffs' Amended Class Action Complaint indicates that, on August 11, 2020, the MPRB issued "notices to vacate" to the individuals camping in Kenwood Park. As to Little specifically, the Amended Class Action Complaint pleads, and Little testified, that she "received an eviction notice" before the MPRB closed the Kenwood encampment. Further, Request No. 21 is vague, as described above.

**REQUEST NO. 22:** Admit that Hennepin County does not know whether Plaintiff Nadine Little was provided notice of the forthcoming sweep by any other government entity before the sweep of the encampment at Kenwood Park on or about August 12, 2020.

**Response:** The Hennepin County Defendants object to Request No. 22 as vague. The terms "encampment," "sweep," "notice," and "know" are either undefined or improperly defined. The Hennepin County Defendants also object to Request No. 22 as premature and as seeking information more appropriately sought under other discovery rules.

Subject to and without waiving any objections, the Hennepin County Defendants deny Request No. 22.

**REQUEST NO. 23:** Admit that Hennepin County did not provide Plaintiff Joel Westvig notice of the forthcoming sweep before the sweep of the encampment at B.F. Nelson Park in 2020.

**Response:** The Hennepin County Defendants object to Request No. 23 as vague. The terms "encampment," "sweep," and "notice" are either undefined or improperly defined. Among other things, the Hennepin County Defendants understand that the MPRB did not close the encampment at B.F. Nelson Park, but that this encampment voluntarily disbanded. The Hennepin County Defendants also object to Request No. 23 as seeking information out of their possession, custody, and control. Specifically, the Hennepin County Defendants spoke to individuals located in encampments about encampment closures, but they cannot determine exactly who received that notice, since individuals located in the encampments did not always identify themselves by name to the Hennepin

County Defendants, and the voluntary disbandment of the B.F. Nelson Park encampment occurred more than two years ago. The Hennepin County Defendants also object to Request No. 23 as premature and as seeking information more appropriately sought under other discovery rules. The Hennepin County Defendants further object to Request No. 23 as seeking information that is not relevant to any claim, defense, or fact at issue in this case, because the claims against the Hennepin County Defendants are limited to claims about alleged seizure of personal property, and Plaintiff Joel Westvig does not claim that he lost any personal property.

Subject to and without waiving any objections, the Hennepin County Defendants state that they have made a reasonable inquiry, and the information they know or can readily obtain is insufficient to enable them to admit or deny Request No. 23, because, as described above, it is impossible for the Hennepin County Defendants to identify each and every individual with whom they spoke about the voluntary disbandment of the B.F. Nelson Park encampment more than two years after that closure occurred. In addition, the Amended Class Action Complaint pleads, and Westvig testified, that an MPRB employee told "all of the encampment residents that they had to leave" the B.F. Nelson Park encampment. Further, Request No. 23 is vague, as described above.

**REQUEST NO. 24:** Admit that Hennepin County does not know whether Plaintiff Joel Westvig was provided notice of the forthcoming sweep by any other government entity before the sweep of the encampment at B.F. Nelson Park in 2020.

**Response:** The Hennepin County Defendants object to Request No. 24 as vague. The terms "encampment," "sweep," "notice," and "know" are either undefined or improperly defined. Among other things, the Hennepin County Defendants understand that the MPRB did not close the encampment at B.F. Nelson Park, but that this encampment voluntarily disbanded. The Hennepin County Defendants also object to Request No. 24 as premature and as seeking information more appropriately sought under other discovery rules. The Hennepin County Defendants further object to Request No. 24 as seeking information that is not relevant to any claim, defense, or fact at issue in this case, because the claims against the Hennepin County Defendants are limited to claims about alleged seizure of personal property, and Plaintiff Joel Westvig does not claim that he lost any personal property.

Subject to and without waiving any objections, the Hennepin County Defendants deny Request No. 24.

**REQUEST NO. 25:** Admit that Hennepin County did not provide Plaintiff Gina Mallek notice of the forthcoming sweep before the sweep of the encampment at Powderhorn Park on or about July 20, 2020.

**Response:** The Hennepin County Defendants object to Request No. 25 as vague. The terms "encampment," "sweep," and "notice" are either undefined or improperly defined. The Hennepin County Defendants also object to Request No. 25 as seeking information out of their possession, custody, and control. Specifically, the Hennepin County Defendants spoke to individuals located in encampments about encampment closures, but they cannot determine exactly who received that notice, since individuals located in the encampments did not always identify themselves by name to the Hennepin County Defendants, and the closure of the Powderhorn Park East encampment occurred more than two years ago. The Hennepin County Defendants also object to Request No. 25 as premature and as seeking information more appropriately sought under other discovery rules.

Subject to and without waiving any objections, the Hennepin County Defendants state that they have made a reasonable inquiry, and the information they know or can readily obtain is insufficient to enable them to admit or deny Request No. 25, because, as described above, it is impossible for the Hennepin County Defendants to identify each and every individual with whom they spoke about the closure of the Powderhorn Park East encampment more than two years after that closure occurred. In addition, Exhibit 1 to Plaintiffs' Amended Class Action Complaint indicates that, on July 18, 2020, the MPRB issued notices to individuals camping in the Powderhorn Park East encampment that they needed to leave the encampment within 72 hours. Mallek also testified that she was only at the Powderhorn Park East encampment for one night before the MPRB's closure of that encampment, but it seemed like individuals located in the encampment "kind of knew" the encampment would be closed. Further, Request No. 25 is vague, as described above.

**REQUEST NO. 26:** Admit that Hennepin County does not know whether Plaintiff Gina Mallek was provided notice of the forthcoming sweep by any other government entity before the sweep of the encampment at Kenwood Park on or about July 20, 2020.

**Response:** The Hennepin County Defendants object to Request No. 26 as vague. The terms "encampment," "sweep," "notice," and "know" are either undefined or improperly defined. The Hennepin County Defendants also object to Request No. 26 as premature and as seeking information more appropriately sought under other discovery rules. The Hennepin County Defendants further object to Request No. 26 because it relies on erroneous factual premises, including that the Kenwood Park encampment was closed on July 20, 2020. The Hennepin County Defendants further object to Request No. 26 as seeking information that is not relevant to any claim, defense, or fact at issue in this case, because Plaintiff Gina Mallek does not claim that she was at the Kenwood Park encampment when it was closed or that she lost any personal property as part of that closure.

Subject to and without waiving any objections, the Hennepin County Defendants admit only that whether another government entity provided "notice" of the closure of the

Kenwood Park encampment to Plaintiff Gina Mallek is outside of their possession, custody, and control, because it is impossible for the Hennepin County Defendants to identify each and every individual whom they may have witnessed receiving notice of the encampment closure from another government entity—particularly since individuals camping in the encampments did not always identify themselves by name to the Hennepin County Defendants, and the closure occurred more than two years ago.

The Hennepin County Defendants further state that they have made a reasonable inquiry, and the information they know or can readily obtain is insufficient to enable them to admit or deny the remainder of Request No. 26, because the Request is vague, as explained above.

**REQUEST NO. 27:** Admit that Hennepin County did not provide notice of the forthcoming sweep to any resident before the sweep of the encampment at Powderhorn Park on or about July 20, 2020.

**Response:** The Hennepin County Defendants object to Request No. 27 as vague. The terms "encampment," "sweep," "notice," and "resident" are either undefined or improperly defined. The Hennepin County Defendants also object to Request No. 27 as premature and as seeking information more appropriately sought under other discovery rules.

Subject to and without waiving any objections, the Hennepin County Defendants deny Request No. 27.

**REQUEST NO. 28:** Admit that Hennepin County did not provide notice of the forthcoming sweep to any resident before the sweep of the encampment at Elliot Park on or about August 12, 2020.

**Response:** The Hennepin County Defendants object to Request No. 28 as vague. The terms "encampment," "sweep," "notice," and "resident" are either undefined or improperly defined. The Hennepin County Defendants also object to Request No. 28 as premature and as seeking information more appropriately sought under other discovery rules.

Subject to and without waiving any objections, the Hennepin County Defendants deny Request No. 28.

**REQUEST NO. 29:** Admit that Hennepin County did not provide notice of the forthcoming sweep to any resident before the sweep of the encampment at Kenwood Park on or about August 12, 2020.

**Response:** The Hennepin County Defendants object to Request No. 29 as vague. The terms "encampment," "sweep," "notice," and "resident" are either undefined or improperly defined. The Hennepin County Defendants also object to Request No. 29 as premature and as seeking information more appropriately sought under other discovery rules.

Subject to and without waiving any objections, the Hennepin County Defendants deny Request No. 29.

**REQUEST NO. 30:** Admit that Hennepin County did not provide notice of the forthcoming sweep to any resident before the sweep of the encampment at Peavey Park on or about September 24, 2020.

**Response:** The Hennepin County Defendants object to Request No. 30 as vague. The terms "encampment," "sweep," "notice," and "resident" are either undefined or improperly defined. The Hennepin County Defendants also object to Request No. 30 as premature and as seeking information more appropriately sought under other discovery rules.

Subject to and without waiving any objections, the Hennepin County Defendants deny Request No. 30.

**REQUEST NO. 31:** Admit that Hennepin County did not provide notice of the forthcoming sweep to any resident before the sweep of the encampment at 17th and Cedar in Minneapolis on or about May 29, 2020.

**Response:** The Hennepin County Defendants object to Request No. 31 as vague. The terms "encampment," "sweep," "notice," and "resident" are either undefined or improperly defined. The Hennepin County Defendants also object to Request No. 31 as premature and as seeking information more appropriately sought under other discovery rules.

Subject to and without waiving any objections, the Hennepin County Defendants deny Request No. 31.

**REQUEST NO. 32:** Admit that Hennepin County did not provide notice of the forthcoming sweep to any resident before the sweep of the encampment at the Sabo Bridge on or about May 28 or 29, 2020.

**Response:** The Hennepin County Defendants object to Request No. 32 as vague. The terms "encampment," "sweep," "notice," and "resident" are either undefined or improperly defined. The Hennepin County Defendants also object to Request No. 32 as

premature and as seeking information more appropriately sought under other discovery rules.

Subject to and without waiving any objections, the Hennepin County Defendants deny Request No. 32.

**REQUEST NO. 33:** Admit that Hennepin County did not provide notice of the forthcoming sweep to any resident before the sweep of the encampment at Stevens Avenue on or about May 29, 2020.

**Response:** The Hennepin County Defendants object to Request No. 33 as vague. The terms "encampment," "sweep," "notice," and "resident" are either undefined or improperly defined. The Hennepin County Defendants also object to Request No. 33 as premature and as seeking information more appropriately sought under other discovery rules.

Subject to and without waiving any objections, the Hennepin County Defendants deny Request No. 33.

**REQUEST NO. 34:** Admit that Hennepin County did not provide notice of the forthcoming sweep to any resident before the sweep of the encampment at Powderhorn Park on or about August 14, 2020.

**Response:** The Hennepin County Defendants object to Request No. 34 as vague. The terms "encampment," "sweep," "notice," and "resident" are either undefined or improperly defined. The Hennepin County Defendants also object to Request No. 34 as premature and as seeking information more appropriately sought under other discovery rules.

Subject to and without waiving any objections, the Hennepin County Defendants deny Request No. 34.

**REQUEST NO. 35:** Admit that Hennepin County did not provide notice of the forthcoming sweep to any resident before the sweep of the encampment at the Wall of Forgotten Natives in or around September or October, 2020.

**Response:** The Hennepin County Defendants object to Request No. 35 as vague. The terms "encampment," "sweep," "notice," and "resident" are either undefined or improperly defined. The Hennepin County Defendants also object to Request No. 35 as premature and as seeking information more appropriately sought under other discovery rules.

17

Subject to and without waiving any objections, the Hennepin County Defendants deny Request No. 35.

**REQUEST NO. 36:** Admit that Hennepin County did not provide notice of the forthcoming sweep to any resident before the sweep of the encampment at the Mall on or about December 10, 2020.

   **Response:** The Hennepin County Defendants object to Request No. 36 as vague. The terms "encampment," "sweep," "notice," and "resident" are either undefined or improperly defined. The Hennepin County Defendants also object to Request No. 36 as premature and as seeking information more appropriately sought under other discovery rules.

   Subject to and without waiving any objections, the Hennepin County Defendants state that they have made a reasonable inquiry, and the information they know or can readily obtain is insufficient to enable them to admit or deny Request No. 36, because the Request is vague, as described above, and the closure of the Mall encampment occurred nearly two years ago. In addition, the MPRB's current "Encampments" webpage, available at https://www.minneapolisparks.org/encampments/ (an earlier version of which is Exhibit 1 to Plaintiffs' Amended Class Action Complaint), indicates that, on November 30 and December 7, 2020, the MPRB issued notices to individuals camping in the Mall encampment that they needed to leave the encampment within 72 hours.

**REQUEST NO. 37:** Admit that Hennepin did not provide notice of the forthcoming sweep to any resident before the sweep of the encampment at B.F. Nelson Park in 2020.

   **Response:** The Hennepin County Defendants object to Request No. 37 as vague. The terms "encampment," "sweep," "notice," and "resident" are either undefined or improperly defined. Among other things, the Hennepin County Defendants understand that the MPRB did not close the encampment at B.F. Nelson Park, but that this encampment voluntarily disbanded. The Hennepin County Defendants also object to Request No. 37 as premature and as seeking information more appropriately sought under other discovery rules.

   Subject to and without waiving any objections, the Hennepin County Defendants deny Request No. 37.

**REQUEST NO. 38:** Admit that Hennepin County did not provide notice of the forthcoming sweep to any resident before the sweep of the encampment at the Nicollet Avenue Bridge in 2020.

   **Response:** The Hennepin County Defendants object to Request No. 38 as vague. The terms "encampment," "sweep," "notice," and "resident" are either undefined or improperly defined. The Hennepin County Defendants also object to Request No. 38 as

premature and as seeking information more appropriately sought under other discovery rules.

Subject to and without waiving any objections, the Hennepin County Defendants deny Request No. 38.

MICHAEL O. FREEMAN
Hennepin County Attorney

Dated:  October 6, 2022                By: *s/ Christiana M. Martenson*
Kelly K. Pierce (0340716)
Assistant County Attorney
Christiana M. Martenson (0395513)
Assistant County Attorney
A2000 Government Center, MC200
300 South Sixth Street
Minneapolis, MN  55487
Telephone: (612) 348-5488
Fax: (612) 348-8299
kelly.pierce@hennepin.us
christiana.martenson@hennepin.us

*Attorneys for Defendants Hennepin County and*
*Hennepin County Sheriff David Hutchinson*

# EXHIBIT 103

Page 1

1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MINNESOTA
2    _____
3                      Civil File No. 20-cv-02189 WMW/JFD
4    Patrick Berry, Henrietta Brown,
     Nadine Little, Dennis Barrow, Virginia Roy,
5    Joel Westvig, Emmett Williams, Gina Mallek,
     Daniel Huiting, on behalf of themselves
6    and a class of similarly-situated individuals;
     and ZACAH,
7
             Plaintiffs,
8    vs.
9    Hennepin County; Hennepin County Sheriff
     David Hutchinson, in his individual and official
10   capacity; City of Minneapolis; Minneapolis Mayor
     Jacob Frey, in his individual and official capacity;
11   Minneapolis Chief of Police Medaria Arradondo,
     in his individual and official capacity;
12   Superintendent Al Bangoura, in his individual and
     official capacity; Park Police Chief at the
13   Minneapolis Park and Recreation Board Jason Ohotto,
     in his individual and official capacity;
14   Police Officers John Does; and Police Officers
     Jane Does,
15
             Defendants.
16   _____
17              VIDEOTAPED DEPOSITION OF
18                    DAVID HEWITT
19
20   DATE:  February 13, 2023
21   TIME:  9:00 a.m.
22   PLACE:  Ballard Spahr, LLP
             2000 IDS Center
23           80 South Eighth Street
             Minneapolis, Minnesota
24
25   REPORTED BY:  Christine K. Herman, RPR, CRR

```
 1                 A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFFS:
 4   MID-MINNESOTA LEGAL AID
     By: Rebecca Stillman, Esq.
 5       111 North Fifth Street, Suite 100
         Minneapolis, Minnesota 55403
 6       Phone: (612)332-1441
         Email: rstillman@mylegalaid.org
 7
 8   - and -
 9   AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA
     By:  Clare Diegel, Esq.
10       Box 14720
         Minneapolis, Minnesota 55414
11       Phone: (651)274-7791
         Email: cdiegel@aclu-mn.org
12
13   ON BEHALF OF HENNEPIN COUNTY, HENNEPIN COUNTY SHERIFF
     DAVID HUTCHINSON, AND THE WITNESS:
14
     HENNEPIN COUNTY ATTORNEY'S OFFICE
15   By:  Kelly K. Pierce, Esquire
         Christiana Martenson, Esquire
16       Hennepin County Government Center
         300 South 6th Street
17       Minneapolis, Minnesota 55487
         Phone: (612)348-5550
18       Email: kelly.pierce@hennepin.us
                christiana.martenson@hennepin.us
19
20   ON BEHALF OF THE CITY OF MINNEAPOLIS, MINNEAPOLIS MAYOR
     JACOB FREY, AND MINNEAPOLIS CHIEF OF POLICE
21   MEDARIA ARRADONDO:
22   MINNEAPOLIS CITY ATTORNEY'S OFFICE:
     By:  Sharda Enslin, Esquire
23       Municipal Building
         350 South 5th Street, Room 210
24       Minneapolis, Minnesota 55415
         Phone: (612)673-2010
25       Email: sharda.enslin@minneapolismn.gov
```

Page 3

1    ON BEHALF OF THE MINNEAPOLIS PARK AND RECREATION BOARD,

     SUPERINTENDENT AL BANGOURA AND PARK POLICE CHIEF

2    JASON OHOTTO:

3    RICE, WALTHER & MOSLEY, LLP

     By:  Ann E. Walther, Esquire

4         10 Second Street NE, Suite 206

          Minneapolis, Minnesota 55413

5         Phone: (612)676-2300

          Email: awalther@ricemichels.com

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1   INDEX:

2                                                    PAGE:

3   WITNESS:  DAVID HEWITT

4   Examination by Ms. Stillman  . . . . . . . . .   9

5

6   EXHIBITS MARKED:

7   NUMBER 205 . . . . . . . . . . . . . . . . . .   77

8     Email String

9     Subject: FW: [EXTERNAL] Please keep confidential

10     MPLS_BERRY075298

11   NUMBER 206  . . . . . . . . . . . . . . . . .   77

12     Attachment to Exhibit 205

13     Encampment_Response Process DRAFT332 1_JRO

14     edits AEWjbr.docx

15     MPLS-BERRY075299 - 75303

16   NUMBER 207 . . . . . . . . . . . . . . . . . .   143

17     Email String

18     RE: [External] FW: Logan Park Encampment Updates

19     HC00028407 - 28418

20   NUMBER 208 . . . . . . . . . . . . . . . . . .   148

21     Talking points - Midtown Greenway encampment 12/15

22   NUMBER 209 . . . . . . . . . . . . . . . . . .   183

23     Email String,  Subject: FW: [External]

24     RE: Names I had received on Tuesday when at

25     Powderhorn, NHC00012482 - 12488

Page 5

1    NUMBER 210 . . . . . . . . . . . . . . . . . 188

2       Email String

3       Subject: FW: [External] Re: Hello

4       HC00038855 - 38857

5    NUMBER 211 . . . . . . . . . . . . . . . . . 191

6       Email String

7       Subject: RE: [External] Updates on Hotel

8       HC00033851 - 33852

9    NUMBER 212 . . . . . . . . . . . . . . . . . 198

10      Email String

11      Subject: Re: [External] mission of Rescue Now

12      Strong Tower Parish / Freedom from the Streets

13      HC00014605 - 14608

14   NUMBER 213 . . . . . . . . . . . . . . . . . 203

15      Email String

16      Subject: RE: [External] Fwd: Fw: Respite Stay

17      HC00033813 - 33816

18

19   NUMBER 214 . . . . . . . . . . . . . . . . . 208

20      Email String

21      Subject: Re: [External] Thank you and a question

22      HC00040377 - 40384

23

24

25

Page 6

1   NUMBER 215 . . . . . . . . . . . . . . . . . . 219

2     Email String

3     Subject: RE: [External] SSHS Street Outreach

4     Summary 10/5 - 11

5     HC00019269 - 19275

6   NUMBER 216 . . . . . . . . . . . . . . . . . . 228

7     Email String

8     Subject: Fwd: [External] Follow up to LTH Housing

9     discussion (1/4) & Coordinated Entry

10    No Bates

11  NUMBER 217 . . . . . . . . . . . . . . . . . . 241

12    Email

13    Subject: [EXTERNAL] Encampment Response

14    MPLS_BERRY059616

15  NUMBER 218 . . . . . . . . . . . . . . . . . . 242

16    Attachment to Exhibit 217

17    Street Outreach and Responding to Encampments

18    4.16.21

19    MPLS_BERRY059617 - 59624

20  NUMBER 219 . . . . . . . . . . . . . . . . . . 242

21    Attachment to Exhibits 217

22    Necessary Entities in Responding to Encampments

23    MPLS_BERRY059627 - 59631

24

25

Page 7

1    PREVIOUSLY MARKED EXHIBITS REFERENCED:

2    NUMBER 137 . . . . . . . . . . . . . . . .    106

3    NUMBER 174 . . . . . . . . . . . . . . . .    129

4    NUMBER 200 . . . . . . . . . . . . . . . .    145

5

6

7

8

9    Certificate of Witness . . . . . . . . . . .    277

10    Certificate of Court Reporter  . . . . . . .    279

11

12

13    REPORTER'S NOTE:  All quotations from exhibits are

14    reflected in the manner in which they were read into

15    the record and do not necessarily indicate an exact

16    quote from the document.

17

18

19

20

21

22

23

24

25

Page 8

1                    P R O C E E D I N G S

2

3                THE VIDEOGRAPHER:  We are going on the

4     record at 9:02 a.m. Central time on February 16th,

5     2023.

6                This is Media Unit Number 1 of the

7     video-recorded deposition of David Hewitt, taken in

8     the matter of Berry, et al., vs. Hennepin County,

9     et al., filed in the U.S. District Court, District

10    of Minnesota, Case No. 20-cv-02189 WMW/JFD.

11                The location of this deposition is

12    Ballard Spahr law firm in Minneapolis, Minnesota.

13                My name is Kraig Hildahl, representing

14    Veritext Legal Solutions, and I'm the videographer.

15    The court reporter today is Christine Herman, also

16    with Veritext.

17                Will counsel please identify themselves

18    for the record.

19                MS. STILLMAN:  Rebecca Stillman, counsel

20    for plaintiffs.

21                MS. DIEGEL:  Clare Diegel, counsel for

22    plaintiffs.

23                MS. PIERCE:  Kelly Pierce on behalf of the

24    Hennepin County defendants and the witness.

25                MS. MARTENSON:  Christiana Martenson, on

Page 9

1   behalf of the Hennepin County defendants.

2          MS. ENSLIN:  Sharda Enslin on behalf of

3   the City defendants.

4          MS. WALTHER:  Ann Walther on behalf of the

5   Minneapolis Park and Recreation Board.

6          THE VIDEOGRAPHER:  Will the court reporter

7   please swear in the witness, and then we can

8   proceed.

9   Whereupon,

10                      DAVID HEWITT,

11        a witness in the above-entitled matter,

12          after having been first duly sworn,

13              deposes and says as follows:

14                       EXAMINATION

15   BY MS. STILLMAN:

16       Q.   Good morning, Mr. Hewitt.

17       A.   Good morning.

18       Q.   My name is Rebecca Stillman.  As we just

19   said, I am counsel for plaintiffs in this matter.  I

20   just wanted to go over a few basic things with you

21   before we get started.

22          Do you understand that your answers are

23   under oath today as if given in a court of law?

24       A.   I do.

25       Q.   And do you understand that, under certain

Page 10

1   circumstances, this testimony could be shown to a

2   jury?

3        A.   I do.

4        Q.   And it is your responsibility to answer

5   truthfully and as completely as possible?

6        A.   I do.

7        Q.   And you must respond audibly, not by

8   shaking your head or nodding, as there's a court

9   reporter taking down everything we're saying today?

10       A.   I understand that.  Remind me if I forget.

11       Q.   We will.  Well, the court reporter

12  probably will.  Or Ms. Pierce.

13            If you -- I ask you a question that you do

14  not understand, please let me know, and I will

15  rephrase it for you.

16            Can you do that?

17       A.   Sure.

18       Q.   And if you answer a question without

19  asking me to rephrase it, can I assume you

20  understand the question?

21       A.   Yes.

22       Q.   If you have to take a break for any

23  reason, that's not a problem, so long as there's no

24  question pending.  If you need to take a break,

25  answer the question, and then, after you answer,

Page 11

```
 1   we'll take the break.
 2        A.   Understood.
 3        Q.   Are there any circumstances that would
 4   affect your ability to testify completely and
 5   truthfully today?
 6        A.   No.
 7        Q.   Are you on any medications that would
 8   affect your memory or your ability to testify
 9   truthfully?
10        A.   No.
11        Q.   Any alcohol or drugs that would affect
12   your memory or your ability to testify truthfully?
13        A.   No.
14        Q.   All right.  What did you do to prepare for
15   your deposition today?
16        A.   I met with Kelly and the team on a couple
17   of occasions.
18        Q.   Okay.  And just as a reminder, don't tell
19   me anything that you've discussed with your attorney
20   when I ask this at all during the deposition.
21             How many times did you meet with your
22   attorneys?
23        A.   Twice.
24        Q.   How long each time?
25        A.   Three hours-ish.  Perhaps a little less.
```

Page 12

1       Q.    Did you discuss this deposition with
2   anyone other than counsel?
3       A.    Not in preparation.  I mean, the -- the
4   fact that I would be participating in this
5   deposition, I informed my line manager, for
6   instance.
7       Q.    Okay.  Did you review any documents when
8   you were meeting with counsel to prepare for this
9   deposition?
10      A.    Yes.
11      Q.    What documents?
12      A.    I would not be able to give you a -- a
13  comprehensive list.
14      Q.    Did you review emails?
15      A.    We did review some emails.
16      Q.    Did you review answers to interrogatories?
17      A.    Yes.
18      Q.    Did you bring anything with you today?
19      A.    This coffee mug.
20      Q.    Did any of the documents you reviewed in
21  preparation for this deposition refresh your
22  recollection about any facts?
23      A.    Yes.  I mean, we're looking at material
24  from two and a half years ago, so -- three years,
25  almost, in some cases.

Page 13

```
 1        Q.    And what -- what were those documents?
 2        A.    As you've described, emails, the
 3   interrogatories.
 4        Q.    You signed the interrogatories on behalf
 5   of Hennepin County, correct?
 6        A.    Yes.
 7        Q.    And when did you sign those?
 8        A.    I couldn't tell you the date off the top
 9   of my head.
10        Q.    Was it approximately last week?
11        A.    I don't think so.
12        Q.    Was it approximately two weeks ago?
13        A.    I don't think so.
14        Q.    When do you think it was?
15        A.    I honestly would be guessing at a date.
16   I -- I don't feel comfortable doing that.
17        Q.    Okay.  Where are you from?  I'm guessing
18   somewhere in the UK.
19        A.    Well, thank you for that, because
20   sometimes people say Australia.
21              Yes.  I'm from the outskirts of London
22   originally.
23        Q.    When did you move to Minnesota?
24        A.    Early 2016 is when I took up residency
25   here.
```

Page 14

1     Q.   What is your highest level of education?

2     A.   I have a master's degree.

3     Q.   When did you graduate?

4     A.   With the master's degree, I graduated

5 right before moving here.  So I forget what the

6 actual date of my graduation is, but I finished my

7 master's degree in 2015.

8     Q.   And what was your degree in?

9     A.   Public policy and management.

10     Q.   Where did you -- from where is the

11 master's degree?

12     A.   University of London.

13     Q.   Where did you get your undergraduate

14 degree?

15     A.   University of Kingston, which is in

16 west London.

17     Q.   And what was your undergraduate degree in?

18     A.   Psychology and sociology.

19     Q.   And what year did you graduate with your

20 undergraduate degree?

21     A.   I believe it was 1999.  Last Millennium.

22     Q.   What did you plan to do when you went to

23 get your master's degree?

24     A.   So I was living and working in Cambodia at

25 the time I began my master's degree.  At that point

Page 15

1    I knew it was likely that we would -- well, we

2    certainly knew we weren't going to stay in Cambodia

3    forever, and we knew there was a possibility that we

4    would relocate to the United States.

5              My wife is from Singapore, if you're

6    wondering why we end up where we end up.

7              In preparation for that -- and I'd kind of

8    always been interested to go back to school and

9    study in -- in this particular area.  It seemed

10   prudent to get a master's degree.  I had already

11   been through the experience once of starting

12   essentially a new career in a different continent,

13   and I thought having those credentials would be

14   potentially helpful, as I would be looking for work

15   in a new continent again.

16        Q.   And just to clarify, when you were talking

17   about "we were living in Cambodia," do you mean you

18   and your wife?

19        A.   Yes.

20        Q.   Okay.  And you started a new career when

21   you moved to Minnesota?

22        A.   Essentially.  I mean, you could argue it

23   was a continuation of previous work.  But I started

24   working with Hennepin County in August of 2016.

25        Q.    And what was your role when you started

Page 16

1    working with Hennepin County?

2        A.    I was recruited as principal planning

3    analyst.

4        Q.    What was your -- what were your duties as

5    a principal planning analyst?

6            MS. PIERCE:  Everybody -- Let's go off the

7    record just for a second.  I'm sorry.

8            THE VIDEOGRAPHER:  We are going off the

9    record at 9:11 a.m.

10           (Whereupon, a short recess was taken.)

11           THE VIDEOGRAPHER:  We're going back on the

12   record at 9:12 a.m.

13           MS. PIERCE:  I -- I just want to state for

14   the record that we went off to accommodate someone

15   who just needed a moment because of a coughing fit.

16           So let's have counsel's question read

17   back.

18           THE WITNESS:  Yes.

19           (Whereupon, the court reporter read back

20   the requested portion of the record.)

21       A.    So I was recruited to work in The Office

22   to End Homelessness in Hennepin County.  My duties

23   related to working with our partner organizations

24   to -- to coordinate homeless services in a way that

25   would better meet the needs of people experiencing

Page 17

1    homelessness.

2           I can add more detail if you would like.

3        Q.    Yes, please.

4        A.    Specifically, so I -- I did a lot of

5    project-based work during that period.

6    Specifically, I supported the implementation of the

7    redesign of the shelter intake processes, adding a

8    bed reservation system to the -- the system that our

9    nonprofits would use, adding the Adult Shelter

10   Connect service through Simpson Housing Services,

11   and this whole process of being in the shelters,

12   helping people get into the -- get a record set up

13   within the bed reservation system, getting them

14   community cards that they could use to make those

15   reservation.  So that was one project that somebody

16   else was the lead on it, but I supported that

17   project.

18          Another project, for instance, was

19   applying to HUD for a federal grant for youth

20   homelessness, which we were not successful in that

21   realm.  But we did get it in the end, a couple of

22   years later.

23       Q.    Who were your partner organizations that

24   you were coordinating with?

25       A.    So Hennepin County is a funder of and

Page 18

1    coordinates with a number of independent nonprofits

2    who provide services to people experiencing

3    homelessness or at risk of homelessness.  I could

4    give you a list of some examples.  I will say, I

5    mean, we estimate the list at -- standing at about

6    50 different agencies that we work with.  So I -- I

7    wouldn't want to try and give you a fully

8    comprehensive list 'cause I would miss someone.

9         Q.   Could you give me a few examples?

10        A.   Sure.  Simpson Housing Services; Catholic

11   Charities; the American Indian Community Development

12   Corporation; Salvation Army; St. Stephen's Human

13   Services; Simpson House of Charity, who would be

14   another one on that list, and now they are both

15   combined, known as Agate Housing and Services.

16             Would you like more?

17        Q.   No.  That's fine.

18             Could you explain a bit more about the

19   reservations, shelter reservation system --

20        A.   Sure.

21        Q.   -- you helped develop?

22             MS. PIERCE:  Objection.  Vague.

23        Q.   (BY MS. STILLMAN) You can answer.

24        A.   Absolutely I can speak a little bit to the

25   shelter reservation system.  Tell me if you want me

1    to hone in on a particular piece of this.

2            So before the project that I have

3    described, there were essentially two ways of

4    obtaining a shelter bed through the nonprofit

5    agencies that operated shelter.  You had the likes

6    of Catholic Charities, Higher Ground, and Salvation

7    Army Harbor Light Center that operated every night

8    on a first-come-first-served basis.

9            So you would see a queue of people every

10   night.  And in the case of Higher Ground, the first

11   171 men would get a bed.  And then, 172, no more

12   room here, go and walk around for a couple of hours

13   until the Salvation Army line opens up.  The first

14   130 there get a bed, and do it all again tomorrow.

15           That was one method of obtaining a shelter

16   bed.

17           The smaller church-based shelters, as we

18   commonly refer to them, actually operated by three

19   nonprofits, with their roots in the faith community:

20   Simpson Housing Services, St. Stephen's Human

21   Services, and Our Saviour's Housing.

22           Each operated an independent shelter, but

23   they collectively held a lottery in a church

24   basement once a month.  People would show up, take a

25   ticket, the lottery balls would go around -- a

Page 20

 1    literal lottery -- and if your number came up, you

 2    got to choose from wherever there might be a bed,

 3    until they ran out of beds to reserve that way.  And

 4    they would do that once a month.

 5            So that was the historic model by which

 6    shelter beds were allocated.

 7            I think it's safe to say, certainly, what

 8    I heard coming in --

 9            THE WITNESS:  Excuse me.  I touch -- I do

10    this a lot (putting hand to chest).  I really

11    shouldn't have put the microphone there.  I found

12    that before with presentations.

13    A.    There was a consensus within the community

14    providers and service users alike that this was not

15    a -- a process that people felt good about,

16    comfortable about.  It was not person-centered.

17            So we were working with those providers

18    to -- to come up with an alternative process that

19    would better -- give people more certainty about

20    where they would be able to stay ahead of time,

21    reduce the amount of, kind of, daily labor that went

22    into seeking shelter, and better support goals

23    around kind of dignity and respect for people

24    experiencing homelessness.

25            Do you want me to say more about the

Page 21

1    mechanics?

2          Q.    (BY MS. STILLMAN) So how does somebody --

3    would somebody reserve a bed?

4          A.    Yeah.

5                MS. PIERCE:  Do you mean today?

6          Q.    (BY MS. STILLMAN) At the time the plan was

7    implemented.

8                I'll -- I'll retract that question.

9                What year was this plan implemented?

10         A.    So I started August 2016.  This was well

11   underway at that time.  So I came in late in the

12   process.  I came in and really supported some of the

13   logistics around implementation.

14               And, sorry.  Did you want me to jump to

15   one of the other -- the other question?

16         Q.    No.  So this shelter reservation system,

17   an unsheltered person could use it in 2016 at some

18   point?

19         A.    I believe October 2016 is when it went

20   live.

21         Q.    Do you -- Does Hennepin County still use

22   this same shelter reservation system?

23               MS. PIERCE:  Objection.  Vague.

24         A.    The shelter reservation system I'm

25   describing is more or less the same today as it was

Page 22

1   at the end of 2016.

2           I will say, your question said, does

3   Hennepin County use it?  The partners that operate

4   our shelter system are actually the ones

5   implementing, operating shelter, managing the

6   reservation system.  It would be true to say that

7   residents of Hennepin County can use a system that

8   looks much like the one at the end of 2016.

9       Q.   (BY MS. STILLMAN) So Hennepin County

10  doesn't play a role in operating the system; is that

11  correct?

12          MS. PIERCE:  Objection.  Misstates the

13  witness's testimony.

14      A.   Hennepin County funds the partners that

15  both operate the shelters.  And I should say, to be

16  clear, we are not a -- while we are a significant

17  funder, each of these agencies also raises money

18  from other sources privately, as they have always

19  done, to operate shelter services.

20          So Hennepin County does provide funding to

21  them for the shelters they operate.  We also provide

22  funding to Simpson Housing Services.  In addition to

23  their shelter funding, they get funding to operate

24  the Adult Shelter Connect service.  So they have the

25  staff that are at the physical location and on the

Page 23

1    phone lines for people seeking shelter.

2         Q.    (BY MS. STILLMAN) When this shelter

3    reservation system was initially implemented in

4    approximately October 2016, how would somebody

5    reserve a shelter bed?

6         A.    There are two principal ways in which

7    people reserve a shelter bed.  The first, which is

8    how the majority of shelter beds are reserved each

9    day, is the -- the individual can simply, without --

10   without needing to go back through the intake, in

11   general, it's a swiping of a community card to say,

12   I'm coming back tonight.

13        So the principle there is, once you are in

14   that shelter, you do not need to come back and queue

15   up again and take a risk again, and queue up again

16   and take a risk again, and every day wonder if

17   you're going to get back in the shelter.  Once you

18   have your shelter bed, you can continue reserving it

19   at the shelter that you are staying at for as long

20   as you need it.

21        The other way in which people can reserve

22   a bed, people who are not in shelter last night, so

23   who are not able to do it at the shelter itself, was

24   to contact the Adult Shelter Connect service, either

25   by phone or in person.  They have an office out at

Page 24

1    St. Olaf church.

2            And the Simpson Housing Services' staff

3    that, like I say, manage and deliver that service

4    would do some intake questions with the individual

5    seeking shelter, and then would be able to see,

6    within that data system, which shelters have which

7    beds available and make a reservation for an

8    individual at a bed of their choice, if there is

9    more than one available.

10           That individual would then have until a

11   certain time to claim that reservation.

12           Let me stop there.

13   Q.    What was the time by which a person had to

14   claim that reservation?

15           MS. PIERCE:  Objection.  Compound.

16   A.    Each shelter operates independently and

17   set their own processes and protocols, which may

18   change over time.

19           The job, essentially, of Simpson Housing

20   Services in this system was to coordinate with each

21   individual shelter and communicate to residents what

22   the check-in time would be for the specific shelter

23   they were making a reservation for them at.

24   Q.    (BY MS. STILLMAN) Can you use the

25   community card to re-reserve a shelter bed at every

Page 25

1   shelter in Hennepin County?

2           MS. PIERCE:  Objection.  Compound, vague,

3   time frame.

4       A.   I probably wouldn't describe it as use the

5   community card to do this.  What I can say is that

6   each shelter that was participating in that system

7   allows people to re-reserve their beds each day.

8           Now, I'm not present there every morning.

9   Is it possible that shelters took some of the labor

10  off their clients rather than saying, Show us your

11  card?  Sure.  So that's why I -- I just pulled out

12  that piece about the community card.  But each of

13  the shelters participating in the system allowed

14  people to re-reserve their shelter beds, yes.

15      Q.   (BY MS. STILLMAN) And do each of the

16  shelters participating in this system allow you to

17  stay for as long as you need?

18          MS. PIERCE:  Objection.  Compound, vague,

19  time frame.

20      A.   Our nonprofit partners that operate

21  shelter, again, each having their own process,

22  protocol, and being managed by an independent

23  entity, do not set maximum time limits on stays in

24  shelter.

25      Q.   (BY MS. STILLMAN) You said the shelter

Page 26

1    reservation system operates today, more or less, as

2    it did in approximately October 2016, correct?

3         A.    I -- Yes.  That is correct.

4         Q.    What are some of the -- what are the

5    differences between how it operates today and how it

6    operated in 2016?

7              MS. PIERCE:  Objection.  Compound.

8         A.    There has been a huge amount of

9    transformation over the last six and a half years in

10   terms of the number of shelter programs in our

11   community, how they operate.  And so along those

12   changes, the Adult Shelter Connect still acts as a

13   first point of call, still places reservations with

14   a number of the shelters, but the programs

15   themselves have shifted.  Hours of intake might have

16   shifted.  Staffing might have shifted.

17        Q.    (BY MS. STILLMAN) Who was your supervisor

18   when you started working for Hennepin County?

19        A.    Mikkel Beckmen.  Mikkel Beckmen.

20             MS. PIERCE:  Do you want that spelled?

21             MS. STILLMAN:  Yes, please.

22        A.    M-i-k-k-e-l, B-e-c-k-m-e-n.

23        Q.    (BY MS. STILLMAN) Did you supervise anyone

24   when you started at Hennepin County in 2016?

25        A.    No.

Page 27

1      Q.    After your first position at Hennepin
2   County, what was your next role?
3      A.    The job classification within Hennepin
4   County was a senior administrative manager.  And
5   without consulting my LinkedIn page, I believe
6   February of 2017 is when I stepped into that
7   position.
8            This position was more commonly referred
9   to and was known in the community as the director of
10   The Office to End Homelessness.  But like I say,
11   within Hennepin County structure, it was actually a
12   senior administrative manager position.
13      Q.    Is the -- is there still an Office to End
14   Homelessness in Hennepin County?
15      A.    We still use that name as one of the
16   descriptors of a part of the -- the area that I lead
17   now, yes.
18      Q.    And what is the area that you lead now?
19      A.    The area that I lead now is known as
20   Housing Stability.
21      Q.    How long did you work as a senior
22   administrative manager?
23      A.    I believe my period in that role was two
24   years and about two months.
25      Q.    So approximately March 2019 --

Page 28

1      A.   Yep.

2      Q.   -- you switched to a new role?

3           And what role did you begin in

4  approximately March 2019?

5      A.   At that point I became a senior department

6  administrator.

7           You gotta love these county job titles,

8  right?

9      Q.   What department?

10     A.   At that point we had merged a few

11 different teams within the county, whose work was

12 all broadly in the area of housing and homelessness.

13 And that was the point at which the area as a whole

14 that I was responsible with, what was known as

15 Housing Stability, including, but not limited to,

16 The Office to End Homelessness.

17     Q.   Why did this merger occur?

18          MS. PIERCE:  Objection.  Foundation.

19     A.    I will say that, while I said we merged

20 teams, I think merger has a particular kind of

21 connotation, which isn't quite how I think of this.

22          We had staff within different areas of

23 Hennepin County Human Services whose work was better

24 organized under -- under one leadership.  We made

25 these kind of adjustments within the organizational

Page 29

1    structure on a frequent basis.

2         Q.    (BY MS. STILLMAN) Is the Housing Stability

3    unit within the Hennepin County Department of Human

4    Services?

5         A.    Yes.

6         Q.    What was your role as the -- or are you

7    still -- still the senior department administrator

8    in the Housing Stability unit?

9         A.    No.   There's one more change to go in

10   there.

11        Q.    Okay.

12        A.    I am the director of the Housing Stability

13   unit.   On this occasion, I am a director as a job

14   classification at Hennepin County as well.

15        Q.    And when did you start as the director of

16   Housing Stability?

17        A.    I believe April of 2021.

18        Q.    What was your role as a senior department

19   administrator?

20             MS. PIERCE:  Objection.  Vague.

21        A.    It was to lead a number of staff whose

22   work was broadly around making homelessness rare,

23   brief and nonrecurrent.

24        Q    (BY MS. STILLMAN) How many staff?

25             MS. PIERCE:  Do you mean at that time?

Page 30

1          MS. STILLMAN:  Yes.

2      A.    As a senior department administrator, the

3  Housing Stability area was roughly 25 to 30 staff at

4  any time.

5      Q    (BY MS. STILLMAN) So when you were the

6  senior department administrator, were you a

7  supervisor for all of the staff in the Housing

8  Stability unit?

9      A.    I did not directly supervise 25 to 30

10  people.  However, I did directly supervise a -- a

11  subset of that, of that area, yes.

12      Q.    How many people did you supervise at that

13  time?

14      A.    Give me a second.  Approximately eight.

15      Q.    Was it the same eight people for the

16  entire time you were in the senior department

17  administrator role?

18      A.    To the best of my recollection, yes.

19      Q.    And what are their names?

20      A.    So this is where, as I read them out, I'll

21  realize I've missed someone and it will become nine,

22  go down the seven.

23          Mikkel Beckmen, Markus Klimenko --

24          Do you want me to spell these as well?

25      Q.    Definitely Markus Klimenko.

Page 31

1        A.    All right.  M-a-r-k-u-s, K-l-i-m-e-n-k-o.

2              Allan Henden, Tracy Schumacher.  Here's

3    one:  Sarah Hunt, who left during that time and was

4    replaced by Amy Donahue.  So I apologize.  As we

5    walk through this, I realize there is that one

6    change in there.  Reneea Stewart, Katie DeSantis.

7    With that one swapping out, it does add up to eight.

8        Q.    How many employees does the Housing

9    Stability unit have now?

10       A.    Approximately 90.

11             THE COURT REPORTER:  Nine zero?

12             THE WITNESS:  Yes.

13             THE COURT REPORTER:  Thank you.

14       Q.    (BY MS. STILLMAN) So it's approximately

15   three times bigger than it was in -- when you

16   started that role?

17       A.    When I started the director role, it

18   was -- it's approximately three times larger than

19   when I was in the senior department administrator

20   role, is what I was just sharing previously.

21       Q.    Yeah, okay.  Thank you.  And how big was

22   the Housing Stability unit when you started the --

23   as the director of Housing Stability?

24       A.    So as I stepped into the director

25   position, we were -- we had a number of

Page 32

1    limited-duration staff leading a pandemic project,

2    and we were also about to grow other parts of our

3    work.

4              So there was a lot in flux at that.

5    I would estimate we were about 60 people at that

6    time.  But as I think you can tell from my answers,

7    we had a lot of change over this period.

8         Q.   What are your duties as the director of

9    Housing Stability?

10              MS. PIERCE:  Objection.  Vague.

11         A.   I lead the county's efforts to make

12    homelessness rare, brief and nonrecurrent.

13         Q    (BY MS. STILLMAN) How do you do that?

14         A.   I set the vision and direction for the

15    team of approximately 90 people.  I directly line

16    manage two area managers and a senior department

17    administrator, who oversee sections of that work.

18         Q.   What is your vision --

19         A.   To make --

20         Q.   -- that you --

21         A.   To make homelessness rare, brief and

22    nonrecurrent.

23         Q.   And what is your direction that you just

24    referenced in your answer, previous answer?

25         A.   To make homelessness rare, brief and

1   nonrecurrent.  You may be picking up this is my

2   mantra, and it is how we organize our team.  I can

3   say more about it, but that is our goal, our vision

4   at North Star.

5       Q.    Yeah.  Could you say a bit more about it?

6       A.    Certainly.  Making homelessness rare means

7   preventing it before it happens.  There's a variety

8   of different pieces of work, both through funded

9   partners and direct service delivery, that we

10  undertake in that area, focused on preventing

11  evictions and helping people stabilize in housing

12  when we identify them as being at risk of

13  homelessness.

14          Making homelessness brief is the -- the

15  kind of body of work that includes our funding for

16  crisis response services, such as shelter, outreach.

17  And, also, a large part of that, FTE, full-time

18  employee, count, at this time our direct service

19  work is the work with individuals experiencing

20  homelessness to get them out and into housing.

21  Making homelessness brief is our goal for people who

22  fall through the safety net or who are already

23  experiencing homelessness.

24          And making homelessness nonrecurrent, once

25  people exit, we want to make sure that they stay

Page 34

1   out, that they don't move back around.  That area of

2   our work is really where we channel a lot of

3   funding, in some cases directly through the county,

4   but often leveraging state and federal funding to

5   supportive housing projects in the community.

6          In all three areas of work, much of the --

7   much of our role is as a funder of nonprofit

8   partners.  In that nonrecurring area, around

9   supportive housing, particularly, it is exclusively

10  funding of our nonprofit partners and -- and other

11  partners that deliver those housing projects.

12     Q.   How many direct service workers do you

13  currently have employed in the department of Housing

14  Stability?

15     A.   We have approximately 40 people in the

16  making homelessness brief section.  So they are

17  doing housing-focused case management and other

18  direct service with people experiencing

19  homelessness.

20          We have approximately 10 to 15 people in

21  the Making Homelessness Rare team.  And this is

22  where I'll kind of provide a little detail, because

23  I don't know if this would apply to your definition

24  of direct service.  So to call it out, I'm including

25  there people who are processing rental assistance

Page 35

1    payments and getting that out the door to individual

2    households.  It also includes a few workers who are

3    based at housing core and work directly with

4    families and individuals who are facing eviction.

5         Q.   How many direct service workers did you

6    have in the Housing Stability unit in 2020?  Do you

7    know?

8         A.   I do.  Zero.

9         Q.   How many direct service workers did you

10   have in the Housing Stability department in 2021?

11        A.   In 2021, we were operating a pandemic

12   shelter directly.  And I am struggling to recollect

13   the exact staffing complement that we had to -- to

14   manage that operation.  The program manager that was

15   over it, of course, reported to me.  She then

16   managed teams that were supporting that -- that

17   work.  But I would estimate that operation was

18   probably 15 people at that time.

19             And then, sorry, remind me of the date you

20   are asking me again, as I think about who else might

21   apply here?

22        Q.   2020 -- 2021.

23        A.   I was going to say, I don't think that's

24   right, because 2020 was zero.

25             2021?  So that's when I become -- so it

Page 36

1    changes through 2021, is the other thing to

2    highlight here.  It wasn't a constant number from

3    January through to December.

4              When I stepped into the director position,

5    an existing unit of primarily social workers within

6    Hennepin County, known as the homeless access team,

7    came into my area.  That was approximately 12

8    people.

9              At the same time we began hiring, and

10   hired through 2021 for the new Homeless to Housing

11   teams, which essentially was what I was kind of just

12   describing.  And that added an extra 26 direct

13   service positions by the end of the year.

14        Q.   Does the department of Housing Stability

15   currently employ any people who do outreach work at

16   homeless encampments?

17        A.   We currently have a team of five people

18   who do -- known as Streets to Housing, who

19   specifically work with people in unsheltered

20   settings, including, but not limited to,

21   encampments.

22              In addition to that, the Homeless to

23   Housing team I described -- similar names, I know --

24   that do housing-focused case management, they are

25   not location-specific, but rather work with a

Page 37

```
 1   caseload of clients who may be experiencing
 2   sheltered or unsheltered homelessness.  Those
 3   experiencing unsheltered homelessness may be, at
 4   some point, staying in encampments, but it's not
 5   limited to that.
 6        Q.   So the Streets to Housing outreach
 7   workers, those five people, you said work at
 8   locations including, but not limited to,
 9   encampments?
10        A.   Correct.
11        Q.   What -- what are the -- Oh.  I apologize.
12        A.   One thing in that statement, however, that
13   I would -- and this is a very technical thing coming
14   from me, so I apologize.  But I do not and would not
15   describe them as outreach workers.
16        Q.   How would you describe them?
17        A.   I -- I describe them as our Streets to
18   Housing, who engage with people experiencing
19   homelessness in unsheltered settings, including, but
20   not limited to, encampments.
21        Q.   What other settings do they engage with
22   unsheltered individuals?
23        A.   Yeah.  So it's -- it's a great program.
24   I'm really proud of how we designed it.  We worked
25   with people who had experienced or are experiencing
```

Page 38

1   homelessness to structure their schedule.

2           And what we heard was that there were

3   particular events and locations that people

4   experiencing homelessness use at which it would be

5   beneficial for our team to be present to engage

6   them.  This includes events such as the Street

7   Voices of Change advocacy group's weekly meeting at

8   the Central Lutheran Church.  And then, like I say,

9   others are encampments or other locations that --

10  that, yeah, are of a similar nature.

11      Q.   When was the Streets to Housing created?

12      A.   The Streets to Housing was created in

13  2022.  We were hiring in the summer.  They began

14  working around October.

15      Q.   Did the department of Housing Stability

16  employ anyone who did outreach to homeless

17  encampments in 2020?

18      A.   A couple of things I want to note here.

19  One, we're not a department.  We're within the Human

20  Services department.

21          Second -- and you'll probably pick this up

22  from me a little bit -- I would not describe anyone

23  that we employ as an outreach worker.

24          So, no.

25      Q.   How would you describe somebody who went

1   to a homeless encampment to interact with residents?

2           MS. PIERCE:  Objection.  Vague, compound,

3   time frame.

4           Do you -- you mean Hennepin County

5   employee?

6           MS. STILLMAN:  Yeah.  In the -- in Housing

7   Stability.

8       A.   There are a variety of reasons why

9   somebody within my team might engage with people who

10  are staying at encampments.

11      Q    (BY MS. STILLMAN) But who go -- within

12  your team, who go to homeless encampments in 2020?

13          MS. PIERCE:  Objection.  Vague, compound.

14      Q    (BY MS. STILLMAN) I'll rephrase the

15  question.

16      A.   Thank you.

17      Q.   How many people did the department of

18  Housing Stability employ in 2020 who went physically

19  to homeless encampments?

20          MS. PIERCE:  Objection.  Vague, compound.

21      A.   In 2020, there was one person reporting to

22  me who was -- frequently interacted with people on

23  the ground at encampments.  Of course, this is Don

24  Ryan.  This is a familiar name.

25          There is just one technicality here, which

Page 40

1    is that Don Ryan was not technically in the Housing

2    Stability area, but was rather, essentially, within

3    our response to the pandemic, took on additional

4    duties to his kind of normal role within our initial

5    contact and access team, which is where he was

6    housed out of, reporting to me to be a lead on

7    unsheltered homelessness.

8        Q    (BY MS. STILLMAN) When did Don Ryan stop

9    being the lead on unsheltered homelessness?

10            MS. PIERCE:  Objection.  Foundation.

11       A.   In terms of Don Ryan reporting to me and

12   being kind of our -- I'm okay with the term being

13   our lead in unsheltered homelessness for that

14   period, that -- that arrangement concluded at the

15   end of 2020.  I couldn't say for certain, you know,

16   that it was a -- a specific date, but essentially at

17   the end of 2020.

18       Q    (BY MS. STILLMAN) Was there a lead on

19   unsheltered homelessness that reported to you after

20   Mr. Ryan no longer reported to you in that role?

21       A.   Yes.  At the end of 2020 we began

22   recruiting for a principal planning analyst position

23   who would be the lead on unsheltered homelessness

24   for our team moving forwards.

25       Q.   After Mr. Ryan no longer reported to you

Page 41

1  in that role at the end of 2020, did Housing

2  Stability employ anyone who visited homeless

3  encampments?

4          MS. PIERCE:  Objection.  Misstates the

5  witness's testimony.

6      A.   We recruited to a principal planning

7  analyst position, with the goal that person would be

8  our lead around unsheltered homelessness.  That was

9  a planning position rather than a direct service

10  position.

11          So the intent was, as has been the case

12  historically with our team, that they would be

13  working more with our partners in the field and --

14  but after coming into that position, there were

15  occasions where they were in the field themselves.

16          So, yes.

17      Q    (BY MS. STILLMAN) Who currently holds that

18  position?

19      A.   That principal planning analyst position

20  focused on unsheltered homelessness is Erin Wixsten,

21  W-i-x-s-t-e-n.

22      Q.   And when did Ms. -- is that -- is it

23  Mr. Wixsten?

24      A.   Erin.  Right.

25      Q.   Erin?

1      A.   I -- I -- actually, I do not know whether

2    she prefers Ms. or --

3      Q.   When did Erin Wixsten start in that role?

4      A.   Approximately April of 2021.

5      Q.   And who was in that role prior to

6    Erin Wixsten?

7      A.   That was a new position.

8      Q.   Who is your current supervisor?

9      A.   I report to Jodi Wentland, the deputy

10   county administrator.

11     Q.   Do you report to the Hennepin County

12   commissioners?

13          MS. PIERCE:  Objection.  Vague.

14     A.   I report to Jodi Wentland, the deputy

15   county administrator.

16     Q    (BY MS. STILLMAN) Does Jodi Wentland

17   report to David Hough?

18          MS. PIERCE:  Objection.  Foundation.

19     A.   I -- Yes.  I believe so.

20     Q    (BY MS. STILLMAN) When you started in your

21   role as a principal planning analyst in 2016, were

22   you given any policies regarding the closure of

23   homeless encampments?

24          MS. PIERCE:  Objection.  Vague, compound.

25     A.   No.

Page 43

1     Q     (BY MS. STILLMAN) In 2017 were you
2   provided with any policies from Hennepin County
3   regarding the closure of homeless encampments?
4           MS. PIERCE:  Objection.  Vague.
5     A.    No.
6     Q     (BY MS. STILLMAN) In 2018 were you
7   provided with any policies from Hennepin County
8   regarding the closure of homeless encampments?
9           MS. PIERCE:  Objection.  Vague.
10    A.    No.
11    Q     (BY MS. STILLMAN) In 2019 were you
12  provided any policies from someone in Hennepin
13  County regarding the closure of homeless
14  encampments?
15          MS. PIERCE:  Objection.  Vague.
16    A.    No.
17    Q     (BY MS. STILLMAN) In 2020 were you
18  provided with any policies from anyone in Hennepin
19  County regarding the closure of homeless
20  encampments?
21          MS. PIERCE:  Objection.  Vague.
22    A.    Not to the best of my recollection.
23    Q     (BY MS. STILLMAN) In 2021 were you
24  provided policies regarding the closure of homeless
25  encampments from anybody in Hennepin County?

Page 44

1      A.    Sorry.  What year are we up to?

2      Q.    2021.

3            MS. PIERCE:  Objection.  Vague.

4      A.    I would not describe myself as having been

5  provided with policies, no.

6      Q    (BY MS. STILLMAN) What do you mean you

7  wouldn't describe it as being provided?

8      A.    Hennepin County has a administrative

9  manual that includes a policy around encampments

10  specifically on Hennepin County property.  And I'm

11  trying to recall the exact chronology of its

12  development, but it wouldn't be accurate to say that

13  somebody provided it to me.

14     Q.    When did somebody provide it to you?

15            MS. PIERCE:  Objection.  He was told he

16  can't use that word, so you may need to rephrase.

17     Q    (BY MS. STILLMAN) When did you first see

18  this manual?

19     A.    The administrative manual is a large

20  document, and I have not necessarily consumed the

21  whole thing.

22            With regards to this specific piece of it,

23  there was an interim policy developed probably late

24  2020 and a policy adopted in 2021, to the best of my

25  recollection.

Page 45

1      Q.   Had you read the policy on homeless

2  encampments contained in the administrative manual

3  prior to the interim policy being developed?

4           MS. PIERCE:  Can I have that question read

5  back?

6           (Whereupon, the court reporter read back

7  the requested portion of the record.)

8           MS. PIERCE:  Objection.  Confusion as to

9  the difference between policy and interim policy,

10  and mis-describes the policy and the admin manual.

11           MS. STILLMAN:  Well, Mr. Hewitt said there

12  was an interim policy developed late in 2020 and

13  adopted in 2021.

14      Q.   (BY MS. STILLMAN) Correct?

15      A.   The interim policy, to the best of my

16  recollection, was included in the administrative

17  manual at some point.  I would guess late 2020.

18      Q.   Was there a policy regarding encampments

19  in the administrative manual prior to this interim

20  policy that was developed in approximately late

21  2020?

22      A.   Not to the best of my knowledge.

23      Q.   Are you aware of any other Hennepin County

24  policies regarding homeless encampments other than

25  this one in the administrative manual that you just

Page 46

1    mentioned?

2         A.    Nothing that I would describe as a

3    Hennepin County policy.

4         Q.    What would you describe it as?

5         A.    Well, I can't think of anything that I

6    would describe as a policy to the -- but there isn't

7    a thing that I can think of to describe in another

8    term for you, either.

9         Q.    Were you consulted in the development of

10   this policy regarding homeless encampments?

11        A.    I was.  And one thing that I should

12   highlight -- I'm trying to recollect the exact

13   language used in it, but we act specifically to a

14   policy around unsheltered homelessness.  And I just

15   say that because we differentiate between that and

16   encampments.

17        Q.    So does Hennepin County have separate

18   policies regarding encampments and unsheltered

19   homelessness?

20        A.    No.  What I'm introducing is, the

21   unsheltered homelessness is broader than

22   encampments, and so, in my world, we are more

23   typically talking about unsheltered homelessness,

24   which may include but is not limited to encampments.

25        Q.    What is your definition of unsheltered

Page 47

1  homelessness?

2      A.   Staying in a place not fit for human

3  habitation.

4      Q.   Can you give me some examples of what that

5  would include?

6      A.   Absolutely.  An encampment, staying on

7  transit, staying in an abandoned building, staying

8  in a shop doorway.

9      Q.   How do you define encampment?

10          MS. PIERCE:  Objection to the extent it

11  calls for a legal conclusion.

12      A.   As a kind of a working practice -- I mean,

13  I would say that the term is used a little bit

14  broadly, and sometimes we have to ask ourselves

15  exactly these questions when -- when we're talking

16  about a specific, okay, well, what do we mean in

17  this instance?

18          Some people use encampment to mean a

19  single tent.  Others believe there should be a

20  threshold and -- and wouldn't consider a single tent

21  an encampment.  I've seen it used, and I've probably

22  used it myself, in -- in all of those ways at

23  different times.

24      Q    (BY MS. STILLMAN) And just to make sure

25  that I am correct in -- in what you've been saying,

Page 48

1   so when we were talking about this interim policy

2   that was developed in late 2020 and adopted in 2021,

3   is that the policy on unsheltered homelessness?

4           MS. PIERCE:  Objection.  Misstates the

5   witness's testimony as to the chronology of

6   adoption.

7       A.   The policy that we're speaking to

8   specifically relates to unsheltered homelessness,

9   including, but not limited to, the possibility of

10  encampments on Hennepin County property.

11      Q    (BY MS. STILLMAN) Has that policy changed

12  since it was adopted?

13      A.   It was an interim policy.  Later became

14  the policy.

15      Q.   Were there any changes to the policy

16  between when it was an interim policy and when it

17  was formally adopted as a policy?

18      A.   Yes.

19      Q.   And what were those changes?

20      A.   The interim policy was adopted while the

21  Minnesota executive order relating to encampments

22  was in place, and there's language in it reflecting

23  that.  That language needed to be updated when the

24  full policy was developed.

25      Q.   Were there any other changes?

Page 49

1        A.    I would imagine there were, perhaps,
2   semantic changes.  I do not believe there would have
3   been significant changes in content.
4              I would hope generally that, whenever we
5   do a document the second time around, we find little
6   things we can tweak and improve.
7        Q.    Do you have a copy of this policy?
8        A.    Not -- not on me.
9        Q.    Do you have a copy generally?  Not on you,
10  just on you, but do you have a copy?
11       A.    It exists within the administrative
12  manual.
13       Q.    And do you have a copy of the
14  administrative manual?
15       A.    I do not have a copy of the administrative
16  manual, no.
17       Q.    At all?
18       A.    We do a lot of things electronically these
19  days.
20       Q.    It can be an electronic copy.
21       A.    The administrative manual exists
22  electronically, and I can access it, if that's what
23  you're asking me.
24       Q.    That -- that is what I'm asking you.
25              Do all of your staff have access to the

Page 50

1    administrative manual?

2              MS. PIERCE:  Objection.  Foundation.

3         A.   I don't know.

4              (Reporter clarification.)

5         Q    (BY MS. STILLMAN) Have you provided your

6    staff with the policy on unsheltered homelessness?

7              MS. PIERCE:  Objection.  Vague.

8         A.   The policy on unsheltered homelessness

9    particularly relates to Hennepin County property.

10   To be clear, my staff are not responsible for

11   property management.  We're in the Human Services

12   department.

13             So our staff are aware of our approach and

14   our vision and our work around unsheltered

15   homelessness, but they're not responsible for the

16   functions of other parts of the county which the

17   policy touches upon.

18             (Reporter clarification.)

19        Q    (BY MS. STILLMAN) So is that a no?

20             MS. PIERCE:  Objection.

21             Can I have the question read back, please?

22   The first one.

23             (Whereupon, the court reporter read back

24   the requested portion of the record.)

25        A.   I would say our staff have been provided

Page 51

```
 1    with the policy that's needed from a Human Services
 2    perspective.  I couldn't say exactly in what format
 3    I have provided that.
 4        Q   (BY MS. STILLMAN) So you don't know if it
 5    has been -- you have provided that specific policy
 6    to your staff?
 7        A.  One other piece here, of course, is that,
 8    as I've already described, I currently manage
 9    90 staff, including, say, three people who work
10    exclusively in housing core and eviction prevention.
11    It would not be relevant for their work.
12            In actual fact, unsheltered homelessness
13    is not relevant to a lot of my staff's work, because
14    the vast majority of people experiencing
15    homelessness and certainly the vast majority of
16    people experiencing housing instability will not at
17    any point stay at an encampment.
18        Q.  So you don't know, as you sit here today,
19    whether you've provided that policy to your staff?
20            MS. PIERCE:  Objection.  Asked and
21    answered.
22        A.  The staff that specifically focuses on
23    unsheltered homelessness, in particular the
24    principal planning analyst that I earlier described,
25    we have certainly discussed the policy.  Exactly
```

Page 52

1    what I provided and when, in terms of the -- the

2    format, I cannot answer.

3              MS. PIERCE:  We've been going about an

4    hour.  Do you want to take a break?

5              MS. STILLMAN:  Sure.

6              MS. PIERCE:  Okay.

7              THE VIDEOGRAPHER:  We are going off the

8    record at 10:04 a.m.

9              (Whereupon, a recess was taken.)

10             THE VIDEOGRAPHER:  This is Media Number 2

11   in the deposition of David Hewitt.  Today is

12   February 16th, 2023.  We're going back on the record

13   at 10:19 a.m.

14        Q.   (BY MS. STILLMAN) So you mentioned earlier

15   that one of the changes to the interim policy and

16   adopted policy in the administrative manual were

17   changes regarding the executive order, correct?

18        A.   Yes, as I recollect.

19        Q.   Okay.  What changes to the policy were

20   made because of the executive order being rescinded?

21        A.   Well, the context in which the policy was

22   written had changed, so that needed to be reflected

23   in the document.

24        Q.   Could you explain that?

25        A.   There had been an executive order that set

Page 53

1   certain parameters.  That executive order no longer

2   existed.

3        Q.   So were those -- the parameters set forth

4   in the executive order no longer included in the

5   adopted policy?

6        A.   Well, the executive order no longer

7   existed, so that wasn't included in the adopted

8   policy.

9        Q.   Did the policy include any of the language

10  that was used in the executive order?

11       A.   I do not recall.  I mean, we wouldn't have

12  specifically looked to lift policy language out of a

13  policy that no longer applied.

14       Q.   Does the current policy for -- when you

15  would -- Strike that.

16            When you adopted this policy in -- in

17  2021, did it include language regarding CDC guidance

18  on homeless encampments?

19            MS. PIERCE:  Objection.  Vague as to "you

20  adopted."

21       A.   I was going to mention that.  But, yeah.

22            I do not recall.

23       Q.   (BY MS. STILLMAN) Does the -- did the

24  policy -- the policy that was adopted in

25  approximately 2021 include any language -- any

Page 54

1    language about what circumstances needed to exist in

2    order to close a homeless encampment?

3       A.   The policy specifically related to

4    Hennepin County-owned property, and camping is not

5    permitted on Hennepin County-owned property.  I

6    believe that is reflected in the policy.

7       Q.   Anything else regarding the closure of

8    encampments?

9            MS. PIERCE:  Objection.  Subject to his

10   clarification about county-owned land?

11      A.   So as I recollect the policy, the -- the

12   leading passages around having a person-centered

13   response to unsheltered homelessness and that our

14   immediate priority, when being notified of or

15   encountering somebody experiencing unsheltered

16   homelessness anywhere, but in this context

17   specifically on Hennepin County property, our -- our

18   focus and our goal is to connect them to safer

19   alternatives.

20           So if that is a relevant answer to your

21   question.

22      Q    (BY MS. STILLMAN) Has the policy changed

23   at all since it was first adopted?

24      A.   Not substantively, to the best of my

25   knowledge.  As I said earlier, there may have been

Page 55

1   occasion to make tweaks to language, clarifications,

2   but -- but I don't recall.

3       Q.   Does Hennepin County have a policy

4   regarding the closure of encampments on property

5   that's not owned by Hennepin County?

6       A.   No.  That would be completely outside of

7   our remit.

8       Q.   Has Hennepin County ever had a policy on

9   the closure of encampments not on Hennepin County

10  property?

11      A.   I've worked for Hennepin County since late

12  2016, so ever, I can't answer.  But I can't imagine

13  why we would, because it would be completely outside

14  of our arena.

15      Q.   So you don't know of one that's existed?

16      A.   Correct.

17      Q.   Okay.  Does Hennepin County have any

18  procedures regarding encampments on Hennepin County

19  property aside from what's in the administrative

20  manual?

21           MS. PIERCE:  Objection.  Vague.

22      A.   So the administrative manual sets out a

23  policy position.  Of course, in operation, when I

24  talk about our first response being to connect

25  people to safer alternatives, that calls for some

Page 56

1   procedures, whether formal or informal, involving my

2   team, typically members from my team, getting out to

3   engage with people, communicate with them about

4   alternatives.

5           So I don't believe pieces like that -- I

6   don't believe the policy goes into that level of

7   detail, of the who goes out and exactly what

8   conversations they have.  So there are pieces

9   that -- that we operationalize, yeah.

10      Q    (BY MS. STILLMAN) Are those procedures

11  that you just mentioned in writing?

12      A    We have done some work between our team

13  and other involved county departments to kind of set

14  out, this is how we will approach a situation like

15  this, ensuring that we are being person-sensitive

16  and leading with Human Services.

17      Q    And is -- are those procedures in writing?

18      A    There's been written documentation shared

19  between parties that set out pieces of this.

20      Q    How have those written pieces been shared?

21      A    Typically by email.

22      Q    Have they been compiled into one document?

23          MS. PIERCE:  Objection.  Foundation.

24      A    Yeah, I'm not sure.

25      Q    (BY MS. STILLMAN) So to the best of your

Page 57

 1    knowledge, there currently isn't a -- one document

 2    that lays out the procedures regarding encampments

 3    on Hennepin County property?

 4            MS. PIERCE:  Objection.  Misstates

 5    witness's testimony.

 6        A.    The administrative manual sets out the

 7    policy.  Procedures and operationalization fills in

 8    behind that.  I'm not aware of a formal document

 9    that compiles all of that, but pieces of practice

10    have been put into writing.

11        Q    (BY MS. STILLMAN) Where are those written

12    pieces and practices located?

13        A.    Where I have seen them has been emails

14    between the parties working on process pieces.

15        Q.    Have you provided those written procedures

16    to your staff?

17            MS. PIERCE:  Objection.  Misstates

18    witness's testimony.

19        A.    I'll reference the point that I made

20    earlier, which is that the vast majority of my staff

21    have no involvement in encampments.  So it would be

22    completely inappropriate to provide them with

23    materials that doesn't pertain to their jobs.

24            The specific individuals on my team who do

25    work in this space are the people involved in the

Page 58

1   operational -- operationalization of processes.  So

2   it would not be accurate to say that I provide to

3   them.

4       Q    (BY MS. STILLMAN) Have you helped develop

5   these procedures?

6       A.   I look to the subject matter experts on my

7   team to develop the best, most person-centered way

8   to operationalize this.  I may have provided input,

9   feedback.

10      Q.   Who are the individuals on your team that

11  you -- have developed the procedures?

12           MS. PIERCE:  Objection.  Vague.

13      A.   I'm not sure that I would say that I have

14  had them develop these procedures.  But putting that

15  to one side, Erin Wixsten, as the principal planning

16  analyst, is the person I look to to be the subject

17  matter expert in our response to unsheltered

18  homelessness generally, and then specifically to

19  work with our team on the best response in

20  situations on Hennepin County-owned property.

21      Q    (BY MS. STILLMAN) Who do you mean by "our

22  team"?

23      A.   Thank you.  Good question.  Because, as

24  I've said, most of my team don't work in this space.

25  The people that specifically have a role around

Page 59

1   responding to unsheltered homelessness are the

2   aforementioned Streets to Housing.

3           There is potentially also a role for

4   social workers in the homeless access team.  They

5   have expertise and may -- may be called in to assist

6   with individuals.

7       Q.   Did you ask Erin Wixsten to write

8   procedures regarding encampments on Hennepin County

9   land?

10      A.   I am not sure if I would have made a

11  request in exactly those words.  It's Erin's

12  position to be our subject matter expert; develop

13  our response on unsheltered homelessness, including,

14  but not limited to, encampments; including, but not

15  limited to, encampments on Hennepin County-owned

16  property.

17          So whether I directed or it emerged

18  otherwise, potentially from her bringing forward

19  work, I couldn't say at this point.

20      Q.   Does Hennepin County have any procedures

21  regarding encampments on property owned by an entity

22  other than Hennepin County?

23      A.   Essentially, no.  That would be completely

24  outside our remit, except that, as the Human

25  Services -- in our Human Services capacity, our

Page 60

1   Streets to Housing will serve people in terms of

2   connecting them to services in any unsheltered

3   setting.  It does not have to be on Hennepin County

4   property.

5        Q.   Did Hennepin County have any procedures

6   regarding encampments separate from what's included

7   in the administrative policy in 2018?

8             MS. PIERCE:  Can I have the question read

9   back, please?

10            (Whereupon, the court reporter read back

11   the requested portion of the record.)

12       A.   I thought I had already answered this.

13   But, no, not to the best of my knowledge.

14       Q    (BY MS. STILLMAN) You answered regarding

15   policies.

16       A.   I see.

17            Can you restate this question?  Sorry.

18       Q.   Yes.  Does Hennepin County have any

19   procedures -- Did Hennepin County have any

20   procedures regarding encampments separate from what

21   was included in the administrative manual in 2018?

22       A.   And I think part of what confuses me here

23   is, of course, that policy and the administrative

24   manual didn't exist in 2018.  So the "aside from" is

25   kind of irrelevant.  But putting that to one side,

Page 61

1    we did not have formal procedures, no.

2        Q.   Did Hennepin County have any procedures

3    regarding encampments in 2019?

4            MS. PIERCE:  Encampments on Hennepin

5    County property, off Hennepin County, or all

6    encampments?

7        Q    (BY MS. STILLMAN) All encampments.

8        A.   So -- and without kind of -- I'm a little

9    tempted to ask you to define "procedures."

10           Look.  We work with community partners in

11   response to homelessness.  So, for instance, we

12   would have a meeting with outreach teams around what

13   they were seeing in encampments and how service

14   delivery was going.  I don't know if that qualifies

15   as a procedure that we would have a recurring

16   meeting, but we would do things like that.

17       Q.   When did you start doing things like that?

18           MS. PIERCE:  Objection as to "you."

19   Objection as to time frame, vague, compound.

20       A.   It seems that you are asking when did we

21   start having meetings at which situations at

22   encampments were discussed.

23           That practice predates my arrival at

24   Hennepin County.  Of course, as with meetings, there

25   are various iterations over the years.

Page 62

1      Q.   (BY MS. STILLMAN) Do you attend any

2  meetings at which encampments are discussed

3  currently?

4      A.   So I attend some days seven, eight

5  meetings in a row.  My role is around homelessness.

6  And although, as I've said, the vast majority of

7  people experiencing homelessness will never be in an

8  encampment, and it becomes even more the case when

9  we span out to people at risk of homelessness or

10  people who are formerly experiencing homelessness,

11  and yet, yes, encampments crop up in my meetings

12  disproportionately.

13      Q.   Did you have meetings at which encampments

14  were -- during which encampments were discussed in

15  2020?

16      A.   Yes.

17      Q.   Who were at those meetings?

18           MS. PIERCE:  Objection.  Compound.

19      A.   So I've just described my current life,

20  which is kinda seven hours of straight meetings.  In

21  20- -- in 2020, frankly, it was more like 10 to 12

22  hours of straight meetings on a daily basis all

23  year round.

24           I was in so many meetings.  There were

25  various compositions in those meetings.  I met with

Page 63

1   people experiencing homelessness, outreach workers,

2   residents, other government entities, nonprofit

3   partners.  I met with a lot, a lot of people in

4   2020.

5        Q    (BY MS. STILLMAN) So you just used the

6   term outreach worker.

7        A.    Uh-huh.

8        Q.    What do you mean when you say outreach

9   worker?

10        A.    So outreach is a specific service

11   component in the homeless response system.  And

12   specifically there are agencies that have been

13   funded to deliver kind of, quote/unquote, outreach

14   services in our community.

15             Traditionally, a lot of that work is going

16   to the location of people experiencing unsheltered

17   homelessness or otherwise in public spaces,

18   interacting with them nominally, connecting them to

19   services; perhaps assisting with basic needs:

20   Providing water, socks, and the suchlike.

21        Q.    And you don't consider the staff in the

22   Streets to Housing to be outreach workers, correct?

23        A.    So I think it's important to distinguish

24   their focus from that of traditional outreach.  And

25   it's in the name as well.  Our Streets to Housing

Page 64

1    are focused on getting people out of unsheltered

2    homelessness as quickly as possible and into housing

3    as quickly as possible, not meeting basic needs,

4    providing water, socks, and the suchlike.

5         Q.   Did Hennepin County have any guidance

6    regarding homeless encampments -- or let's -- does

7    Hennepin County have any guidance regarding homeless

8    encampments currently?

9              MS. PIERCE:  Objection.  Vague as to

10   location of encampments.  Vague as to the meaning of

11   guidance.

12        A.   And, sorry, that was going to be my

13   question.  Can you explain what you mean by

14   guidance?  To whom and in what --

15        Q    (BY MS. STILLMAN) I mean, generally, do

16   you have guidance that you provide to your staff on

17   homeless encampments?

18             MS. PIERCE:  Same objections.  I mean,

19   vague to as to guidance, vague as to encampments,

20   vague as to location of encampments.  Vague.

21        A.   I know a lot of it depends on staff,

22   because their roles -- many do not interact with

23   encampments.  To all of those that do, they may have

24   different functions.

25        Q    (BY MS. STILLMAN) So the ones who do

Page 65

1    interact with encampments, do you provide them with
2    any guidance regarding encampments?
3              MS. PIERCE:  Same objections.
4        A.    Yeah, I am not exactly sure still what you
5    mean by "guidance."  Their direction, their role,
6    their remit provided by myself, and then through the
7    management and leadership structure is, your
8    function is to help people get into safer
9    alternatives, specifically housing, as quickly as
10   possible.  That is your job.
11       Q     (BY MS. STILLMAN) Is that direction in
12   writing?
13       A.    I mean, it's in job descriptions.
14       Q.    Anything other than job descriptions?
15             MS. PIERCE:  Objection, vague.  Objection,
16   compound.  Objection, time period.
17       A.    It may appear in emails.  It may appear in
18   minutes of that unit meeting.  But I am speculating,
19   because I am not necessarily in those unit meetings
20   and I don't necessarily see all emails.
21       Q     (BY MS. STILLMAN) Was there written
22   direction for Hennepin County staff regarding
23   homeless encampments in 2018?
24             MS. PIERCE:  Objection.  Vague as to
25   direction, vague as to staff, vague as to

Page 66

1    encampments.

2         A.    Yeah.

3              MS. PIERCE:   Irrelevant as to 2018.

4         A.    I -- I'm not sure what that would mean or

5    look like.

6         Q    (BY MS. STILLMAN) Written instructions

7    that were provided to Hennepin County staff

8    regarding encampments.

9              MS. PIERCE:   Objection, vague.  Objection,

10   asked and answered.  Objection, irrelevant.

11        A.    Not that I am aware of.

12             I will note that there are Hennepin County

13   staff who interact with encampments that were not

14   directly under my supervision, particularly in 2018.

15   And so I cannot speak to written direction that they

16   may have developed or received from other parties.

17        Q    (BY MS. STILLMAN) Did your staff have any

18   written direction regarding -- or did anyone on your

19   staff have any written direction regarding

20   encampments in 2019?

21             MS. PIERCE:   Objection, vague.  Objection,

22   foundation.  Objection, relevance.

23        A.    I -- I really don't -- I really don't know

24   what you mean by "written direction."  I'm still

25   struggling to understand what that would look like,

Page 67

1   what -- what it is that you're kind of asking about

2   here.

3            People experiencing unsheltered

4   homelessness, in some occasions, stay at

5   encampments.  These are things that get discussed.

6   Written materials -- emails, particularly -- may

7   occur.  But I -- I don't know that I qualify this as

8   guidance.  I don't really know what you're -- what

9   you're looking for.

10       Q    (BY MS. STILLMAN) Okay.  I'll try to

11  clarify.

12           We'll start with currently.  Currently, do

13  you provide your staff who interact with homeless

14  encampments any written instructions for what to do

15  with residents of a homeless encampment?

16           MS. PIERCE:  Objection.  Vague.

17           Do you mean in any form?

18           MS. STILLMAN:  Yeah.

19       Q    (BY MS. STILLMAN) So let's say one of your

20  staff were to go to a homeless encampment.

21       A    Uh-huh.

22       Q    Are there written instructions as to what

23  they're supposed to do there?

24           MS. PIERCE:  Objection.  Vague.

25           Does that include emails?

Page 68

1      Q     (BY MS. STILLMAN) Anything other than

2  emails.

3      A.    So the structure of my department, the

4  Streets to Housing have a supervisor who reports up

5  through a chain, ultimately to myself.  I have not

6  seen written direction to that staff.  But, of

7  course, it is my assumption and understanding that

8  that supervisor is providing them with the direction

9  they need to carry out their jobs effectively, their

10  jobs being, as I've described, help people in

11  unsheltered settings get to safer alternatives.

12      Q.    Who's the supervisor of the Streets to

13  Housing team currently?

14      A.    Lisa Gustner.

15      Q.    Could you spell that last name, please?

16      A.    Yeah, but with some risk that I'm going to

17  misspell her surname, and I don't want to insult

18  anybody.  I believe it's G-u-s-t-n-e-r.

19          THE WITNESS:  My apologies, Lisa, if I've

20  got it wrong.

21      Q.    (BY MS. STILLMAN) Was there anybody in

22  that role prior to Lisa?

23      A.    No.  The team didn't exist.

24      Q.    Okay.  Before you started working with

25  Hennepin County in 2016, did you have any experience

Page 69

1    working with the homeless population?

2         A.   Yes, though I would never use that term.

3         Q.   What term would you use?

4         A.   People experiencing homelessness.

5         Q.   What was your experience?

6         A.   I worked for one month short of a decade

7    for a national homelessness nonprofit in the UK.  I

8    also worked for a local nonprofit in Phnom Penh,

9    Cambodia that worked with young people and children

10   who were living and working on the streets.

11        Q.   What did you do at that nonprofit that you

12   worked at for approximately a decade?

13             MS. PIERCE:  Objection.  Vague.

14        A.   A decade's a long time.

15             I started as an administrative assistant

16   supporting projects around the country, one of which

17   was helping people getting into private rented

18   accommodation, the other of which was providing

19   mental health services in settings where people

20   experiencing homelessness were -- were present.

21             Over the course of a decade, I fulfilled

22   many other functions, which I'm happy to describe if

23   you want me to go down that road.

24        Q    (BY MS. STILLMAN) Yeah.  That would be

25   helpful.

Page 70

1        A.    Sure.   I worked as -- Let me see.   What
2   was the title?  Support worker in our -- I will call
3   it a drop-in center, because I think that will be an
4   easier point of reference here that we would not --
5   a little bit like my distinction with the outreach
6   workers earlier.  We would very deliberately not
7   have called it a drop-in center at the time.   It was
8   our Skylight center in east London.  It's a
9   beautiful building in which we offered engagement,
10  education and employment services for people
11  experiencing homelessness.

12            This included a beautiful art room, a yoga
13  studio, karate classes, as well as being a support
14  work, which meant I got to run around with a big
15  ball of keys and just kind of attend to people's
16  needs.  I volunteered teaching in the guitar class,
17  for instance.

18            So I did that for a spell.  I did
19  administrative work on these projects around the
20  country for a spell.

21            I became a project manager in 2004.  At
22  that point I was primarily responsible for providing
23  funding to community-based organizations around the
24  country that were helping people exit homelessness
25  and enter housing.  I built out that program to add

Page 71

1   an education and engagement component that worked on

2   strengths-based life skills for people exiting

3   homelessness.

4           I then became a development manager.  We

5   were doing consultancy and training services for

6   organizations around the UK with funding from the

7   national government.

8           And, finally, I managed a three-year

9   development program with central government funding,

10  through which we worked with community-based

11  agencies all over the country to help 8,000 people

12  exit homelessness or being at risk of homelessness

13  into housing.  And I managed and designed that

14  program.

15          I left with a nine-month notice period to

16  make sure there was a smooth transition about

17  halfway through that period, but I was very proud

18  when they hit the 8,000 mark ahead of the three-year

19  mark.

20      Q.   And during approximately what years were

21  you working at this nonprofit?

22      A.   January 2002 to November 2011.

23      Q.   And did you move to Cambodia in 2011,

24  then?

25      A.   Yes.  I arrived in Cambodia on the 11th of

Page 72

1    the 11th, 2011, I believe.  I must be right about

2    that.  I can't have just made it up.

3        Q.   And were you working with people

4    experiencing homelessness the entire time you were

5    in Cambodia?

6        A.   No.

7        Q.   When were you working with people

8    experiencing homelessness when you were in Cambodia?

9        A.   So I had two jobs during my time in

10   Cambodia, the first of which is the one that I

11   alluded to earlier.  And this was a nonprofit

12   working with children and young people who were

13   living and working on the streets of Phnom Penh.

14            Now, I will say, in Cambodia, experiencing

15   homelessness is conceived of, thought of, very

16   differently.  It's a very different context.  The

17   organization would not have defined itself as a

18   homelessness organization per se, but in my mind, we

19   were working with a population that was living and

20   working on the streets, including people who had

21   nowhere to stay.

22       Q.   And then what was your other job?

23       A.   So I was in Cambodia for a total of about

24   four years.  The first two years I was with that

25   nonprofit.  The second half of my time -- actually,

Page 73

1  a little under two years -- I worked for an

2  international development organization known as VSO.

3      Q.   And -- oh, I apologize.

4      A.   It's one of these things where like the

5  acronym used to stand for something, and they

6  decided they didn't want it to stand for that thing

7  anymore, but they didn't want to change the brand so

8  they kept the letters, which is always super

9  confusing.

10          It originally stood for Volunteer --

11  Voluntary Services Overseas, I think.  But, like I

12  say, they -- they had kind of dropped that title and

13  still going by VSO while I was there.

14      Q.   And what did you do for that organization?

15      A.   I was the education program manager.

16      Q.   And what did you do as the education

17  program manager?

18      A.   I managed a team of international experts

19  who were doing capacity building work within the

20  education system in Cambodia.

21      Q.   When you started working for Hennepin

22  County, did you receive any training regarding

23  issues experienced by the -- by people experiencing

24  homelessness?

25      A.   No.

Page 74

1      Q.   Have you ever received any training from

2   Hennepin County regarding issues experienced by

3   people experiencing homelessness?

4      A.   No.

5      Q.   Since you started at Hennepin County, have

6   you attended any conferences regarding issues

7   relating to people experiencing homelessness?

8      A.   Yes.

9      Q.   Which conferences?

10     A.   I have attended the National Alliance to

11  End Homelessness conference on more than one

12  occasion.  I can tell you that I was there in 2017,

13  because that was how I spent my 40th birthday.

14          I can tell you that I was at the

15  conference on the West Coast, also -- that was in

16  D.C., the 2017 one.  On the West Coast, I was at the

17  conference -- it must have been early 2019.  Or was

18  it early 2020?  I honestly forget which.  Before the

19  pandemic.

20          I think I went to the Washington

21  conference twice and one conference on the

22  West Coast through the National Alliance to End

23  Homelessness.

24          I also attended a conference organized by

25  an organization called C4, formerly known as the

Page 75

1   Center for Social Innovation, I believe.  They

2   changed their name somewhere around this time.  And

3   that was part of their supporting partnerships for

4   Anti-Racist Communities' work, in which Hennepin

5   County was a participant.

6           Oh.  And Baltimore, the 100-day challenge

7   on youth homelessness, was another event that I

8   attended.  I'm sure there's a couple of others that

9   I'm not thinking of.

10      Q.   Since you started working for Hennepin

11  County in 2016, have you attended any trainings

12  regarding issues experienced by people experiencing

13  homelessness that were put on by an organization or

14  entity other than Hennepin County?

15          MS. PIERCE:  Objection.  Asked and

16  answered.

17      A.   One clarification.  I have -- there's a --

18  there used to be an event put on, I think it was by

19  MESH.  I've been asked to come and speak at some

20  events, some of which may have been considered

21  training, for other parties.

22      Q    (BY MS. STILLMAN) But you haven't attended

23  any trainings specifically?

24          MS. PIERCE:  Objection.  Misstates the

25  witness's testimony.

Page 76

1      A.   Right.  Actually, yes, because you used

2   "attended."

3           Sorry.  Yes.  Carry on.

4      Q   (BY MS. STILLMAN) Did you attend in a

5   nonpresentation fashion?

6           MS. PIERCE:  Objection.  Misstates the

7   witness's testimony.

8      A.   I cannot recall being a trainee at a

9   formal training on issues related to homelessness.

10     Q   (BY MS. STILLMAN) Can you recall being a

11  trainee in an informal fashion on issues related to

12  homelessness?

13          MS. PIERCE:  Objection. Vague.

14     A.   I consider myself a lifelong learner.  I

15  consider everything I do informal training.

16     Q   (BY MS. STILLMAN) When Erin Wixsten began

17  working for house -- Housing Stability, did Erin

18  Wixsten have any experiencing -- experience working

19  with people experiencing homelessness?

20          MS. PIERCE:  Objection.  Foundation.

21     A.   When we hire staff, of course experience

22  is one of the things that we're looking for.  It so

23  happens that, yes, Erin Wixsten has significant

24  experience working in this field.

25     Q   (BY MS. STILLMAN) What experience is that?

Page 77

1           MS. PIERCE:  Objection.  Foundation.

2        A.   Not going to claim to be the best person

3    to reel off the -- the highlights of somebody's

4    résumé.  What I can share from my recollection is

5    she had spent time as a technical assistant for HUD,

6    working for an organization called OrgCode, and that

7    she had a significant career with a youth

8    homelessness nonprofit in the community.

9        Q    (BY MS. STILLMAN) And how do you know

10   that?

11       A.   I mean, I know Erin, and we have spoken

12   about what she did before and -- yeah.

13           MS. STILLMAN:  I am marking document Bates

14   stamped MPLS_BERRY075298 as Exhibit 205.

15           (Deposition Exhibit Number 205 marked for

16   identification.)

17           MS. STILLMAN:  And then I'll -- I'll hand

18   these both to you.  But just marking document Bates

19   stamped MPLS_BERRY075299 as Exhibit 206, which I'll

20   represent is the attachment to Exhibit 205.

21           (Deposition Exhibit Number 206 marked for

22   identification.)

23       Q.   (BY MS. STILLMAN) Do you recognize this

24   document?  Well, do you recognize document

25   Exhibit 205?

Page 78

1      A.   That's related to the email, right?

2      Q.   Yes.

3      A.   A little bit like my comment about the

4  meetings earlier.  I do send and receive hundreds of

5  emails a week, sometimes a day.  And this is from --

6  when is this from?  Two years ago.

7           Oh, I don't recall this specific email,

8  no.

9      Q.   Is your email address

10 David.Hewitt@Hennepin.us?

11     A.   Yes.

12     Q.   Has that been your email address since you

13 started working for Hennepin County?

14     A.   Yes.

15     Q.   Okay.  Do you recognize the document

16 that's been marked as Exhibit 206?

17     A.   Hmm.  I can't say that I recall this

18 specific document, no.

19     Q.   Do you remember working on an encampment

20 response process with Katie Topinka in 2021?

21          MS. PIERCE:  Objection.  Vague.

22     A.   Katie and I worked closely in terms of

23 communication.  We need -- felt we needed to be in

24 regular communication.  This was one of the main

25 issues in which we did communicate.

1          Honestly, this document itself I do not

2     recall.  But, I mean, it -- it follows a structure

3     that I'm somewhat familiar with, I guess.

4          Q    (BY MS. STILLMAN) What do you mean by it

5     follows a structure you're somewhat familiar with?

6          A.   I mean the sharing of draft documents,

7     specifically the piece Foundational Principles, is

8     very close to my heart.  And these foundational

9     principles had been discussed at meetings prior to

10    the pandemic.  And there was a general consensus

11    that these were reasonable foundational principles

12    for this work.

13         Q.   If you'd turn to page 3.  The top comment

14    says, RJB13.

15         Do you see that?

16         A.   Yes.

17         Q.   Okay.  And then the fourth comment is,

18    commented DH16R16?  Is that you, David Hewitt?

19         MS. PIERCE:  Objection.  Foundation.  Not

20    his document.

21         A.   Those are my initials.  I am not sure

22    beyond that.

23         Q    (BY MS. STILLMAN) If -- when you receive

24    an email from Katie Topinka with an attachment, what

25    do you do with that email?

Page 80

```
 1              MS. PIERCE:  Objection.  Compound,
 2    incomplete hypothetical, calls for speculation.
 3         A.   I can say, as a general principle, if I
 4    receive an email from Katie, I'm going to read it
 5    and respond accordingly.
 6         Q    (BY MS. STILLMAN) Is it your practice to
 7    delete emails from Katie Topinka that include
 8    attachments?
 9         A.   No.
10              MS. PIERCE:  Object.
11              THE WITNESS:  Sorry.
12              MS. PIERCE:  Same objections.
13         Q    (BY MS. STILLMAN) Did you help draft
14    document marked as Exhibit 206?
15              MS. PIERCE:  Objection.  Vague.
16         A.   Not to the best of my recollection.  Like
17    I say, there is material in here that is familiar to
18    me, in particular Foundational Principles.  So
19    it's -- and, like I say, I send and receive hundreds
20    of emails daily, if not weekly -- well, other way
21    around -- weekly, if not daily, so --
22         Q    (BY MS. STILLMAN) Do you know if there's a
23    final version of this encampment response process
24    document?
25              MS. PIERCE:  Objection.  Vague.
```

Page 81

1      A.    Not to the best of my knowledge.  I would

2   be surprised.

3      Q.    (BY MS. STILLMAN) In 2021 did you work

4   with employees of the City of Minneapolis to develop

5   encampment response processes?

6            MS. PIERCE:  Objection.  Vague, compound.

7      A.    That's not how I would describe our work

8   together.  We were certainly in regular

9   communication.  They looked to us as subject matter

10  experts with regards to homelessness.

11     Q    (BY MS. STILLMAN) How would you describe

12  your work with them?

13           MS. PIERCE:  Objection.  Misstates the

14  witness's testimony.

15           MS. ENSLIN:  Objection.  Vague.

16     A.    So I will repeat the point that we were

17  looked to as the subject matter experts to provide

18  guidance around homelessness.  A lot of our work

19  between myself and Katie pertained to funding

20  mechanisms that were coming through the City and

21  County that enabled us to stand up services for

22  people experiencing homelessness.

23     Q    (BY MS. STILLMAN) So if you look at the

24  introduction, it says, The City, County, MPRB and

25  State? are responsible for maintaining public land

Page 82

1    within the City of Minneapolis.  Each entity has a

2    shared responsibility for ensuring the health and

3    safety of those who use public land and for the

4    health and safety of neighboring residents,

5    homeowners and businesses.

6           Correct?  Do you see that?

7       A.   I see it, yes.

8       Q.   Yeah.  In recent -- and then the next

9    paragraph starts, In recent years, there has been an

10   increase in the use of public land for encampments

11   by -- residents is crossed out, and added persons

12   experiencing unsheltered homelessness in our

13   community.  In response to this increase in

14   unsheltered homelessness, the City, County, State

15   and MPRB have made significant investments in the

16   homeless response system.

17           Do you see that?

18      A.   I do.

19      Q.   Do you agree that, in response to the

20   increase in unsheltered homelessness, the City,

21   County, State and MPRB have made significant

22   investments in the homeless response system?

23           MS. PIERCE:  Objection.  Vague.

24      A.   And speaking for the County, we have

25   certainly made significant investments in the

Page 83

1    homeless response system during this period, both in
2    relation to addressing unsheltered homelessness and
3    in relation to addressing homelessness more broadly.
4        Q    (BY MS. STILLMAN) The last sentence reads,
5    The City and County have increased funding to
6    contracted outreach providers to provide services
7    and connections to housing and shelter for those who
8    are staying outdoors.
9             Do you see that?
10       A.   I do.
11       Q.   Did the County increase funding to
12   contracted outreach providers to provide services in
13   connection to housing and shelter for those who are
14   staying outdoors?
15            MS. PIERCE:  Objection, vague, including
16   as to time period.
17       A.   Early in the pandemic in 2020, we
18   allocated funding to the American Indian Community
19   Development Corporation and the Minnesota Indian
20   Women's Resource Center to add outreach capacity to
21   both their organizations in order to serve residents
22   in -- in these capacities, yeah.
23       Q    (BY MS. STILLMAN) In that next section,
24   Overview of Encampment Response Principles and
25   Procedures, it starts, Each entity will approach

Page 84

1    response to encampments with a shared set of

2    principles and procedures.  The purpose of sharing a

3    set of principles and procedures is to provide

4    clarity to residents of encampments, outreach teams

5    and the public about how encampments will be

6    addressed uniformly across jurisdictions.

7              Do you see that?

8         A.   I do.

9         Q.   Does Hennepin County have a shared set of

10   principles and procedures with the City of

11   Minneapolis regarding encampments?

12             MS. PIERCE:  Objection, foundation.

13   Objection, vague.

14        A.   No.

15        Q    (BY MS. STILLMAN) Why not?

16             MS. ENSLIN:  Objection.  Calls for

17   speculation.

18        A.   Hennepin County has a specific remit which

19   we carry out.  We have a Human Services remit to try

20   and support the needs of people experiencing

21   homelessness.  And with regards to Hennepin County

22   property, we have a property management remit.  And

23   these aren't shared remits.

24             (Reporter clarification.)

25        Q    (BY MS. STILLMAN) So, again, the second

Page 85

1   sentence reads, The purpose of sharing a set of

2   principles and procedures is to provide clarity to

3   residents of encampments, outreach teams and the

4   public about how encampments will be addressed

5   uniformly across jurisdictions.

6          Do you think it's important to have a

7   shared set of principles to provide clarity to

8   residents of encampments about how encampments will

9   be addressed uniformly across jurisdictions?

10          MS. PIERCE:  Objection.  Vague, calls for

11   speculation.

12      A.   I think my answer is, no, but there was a

13   lot in the question.

14      Q   (BY MS. STILLMAN) Do you think it's

15   important for government entities to have a shared

16   set of principles and procedures to provide clarity

17   to outreach teams about how encampments will be

18   addressed uniformly across jurisdictions?

19          MS. PIERCE:  Objection, vague, including

20   as to municipal entities and outreach workers; calls

21   for speculation.

22      A.   Yeah.  I think my answer is, no.

23      Q   (BY MS. STILLMAN) Do you think it's

24   important to -- for governmental entities to have a

25   shared set of principles and procedures to provide

Page 86

1   clarity to -- to the public about how encampments

2   will be addressed uniformly across jurisdictions?

3              MS. PIERCE:  Including -- Vague, including

4   as to government entities.  And calls for

5   speculation.

6         A.   I will repeat that I think my answer is,

7   no.

8              I will, for this one, add one extra piece,

9   which is, you're asking me to speculate as to the

10  value of policies and procedures shared or otherwise

11  that are not in discussion here, so I -- I don't --

12  I don't have a way of saying whether this is

13  important or not.  So I think my answer remains, no.

14        Q    (BY MS. STILLMAN) Do you think generally

15  it's -- in your opinion, is it important to provide

16  residents of encampments with clarity about how

17  encampments will be addressed uniformly across

18  jurisdictions?

19             MS. PIERCE:  Objection.  Vague as to

20  across jurisdictions, residents; calls for

21  speculation; incomplete hypothetical; and possibly

22  calls for expert opinion.

23             MS. ENSLIN:  Also, objection, asked and

24  answered.

25        A.   I -- I think my answer remains the same.

Page 87

1    I --

2        Q    (BY MS. STILLMAN) Do you think it's

3    helpful to provide clarity to residents of

4    encampments about how encampments will be addressed

5    uniformly across jurisdictions?

6            MS. PIERCE:  Objection.  Vague, including

7    as to residents, across jurisdictions, encampments;

8    calls for speculation; and possibly expert opinion.

9        A.   And for me it's that last piece.  Yeah,

10   I -- the question has multiple components in it.  I

11   find it hard to give an answer other than, no.

12       Q    (BY MS. STILLMAN) If you go down to the

13   Foundational Principles, the first principle says,

14   Everyone experiencing unsheltered homelessness is

15   vulnerable and deserving of being treated with

16   dignity and respect.

17           What does dignity mean to you as used in

18   this foundational principle?

19           MS. PIERCE:  Objection.  Foundation, as he

20   did not author the document, and calls for

21   speculation and vague.

22       A.   I am not sure that I have a specific

23   definition for dignity for you, but I believe it's a

24   central principle in all of our work.  Quite

25   frankly, I think it's central in how we interact

Page 88

1    with other human beings all of the time, that we

2    treat each other with dignity and respect.

3          But I have not provided, to the best of my

4    recollection, a specific definition of what it means

5    or what steps you must take to treat somebody with

6    dignity.  I kinda feel like you know it when you see

7    it.

8          Q    (BY MS. STILLMAN) In your opinion, what

9    does treating somebody with -- somebody experiencing

10   unsheltered homelessness with respect mean?

11         MS. PIERCE:  Objection.  Vague, compound,

12   calls for speculation.

13         A.   I will say that it includes a lot of the

14   things that you would expect it to include:  Making

15   eye contact, remembering somebody's name,

16   interacting with them in a warm and friendly manner

17   whenever possible.

18         Q    (BY MS. STILLMAN) Do you think it involves

19   listening to them?

20         MS. PIERCE:  Same objections.

21         A.   I think it's a good thing to listen to

22   people.

23         Q    (BY MS. STILLMAN) If you look at the third

24   foundational principle, it says, Encampment --

25   Encampments represent a serious health and safety

Page 89

```
 1   risk, particularly for those staying within the
 2   encampment, and do not represent a dignified form of
 3   shelter.
 4          Do you see that?
 5       A.   Yes.
 6       Q.   What do you think constitutes a dignified
 7   form of shelter?
 8          MS. PIERCE:  Do you mean as used in this
 9   document, which he didn't author?
10          MS. STILLMAN:  No.  I'm asking generally.
11          MS. PIERCE:  Okay.
12       A.   I believe everybody should have a home, a
13   place that is theirs, where they can close the door
14   behind them.
15       Q    (BY MS. STILLMAN) And that's your
16   definition of dignified form of shelter?
17       A.   I mean, it was more a statement of belief,
18   to be honest.  Of course, this particular document
19   doesn't call out what is a dignified form of
20   shelter.  What it states, which I certainly agree
21   with, is that encampments do not represent a
22   dignified form of shelter.
23       Q.   And I'm asking, what do you think
24   constitutes a dignified form of shelter?
25          MS. PIERCE:  I'm going to -- Objection.
```

Page 90

1    Asked and answered.

2         A.    I think there are a variety of ways that

3    that can look, depending on the person and -- yeah.

4              I mean, at a very minimum, a place where

5    you are not at risk from fire, infectious disease,

6    violence and exploitation, at a very, very high

7    level, might be a starting point.

8         Q    (BY MS. STILLMAN) Go to the next page.  It

9    says -- starts with Cross-Jurisdictional Teams and

10   Roles, and then says, Cross-Agency Policy Team.

11             Do you see that?

12        A.    Uh-huh.  Yes, I do.

13        Q.    Is there a cross-agency policy team

14   regarding encampment response that -- in which

15   Hennepin County participates?

16        A.    No.

17        Q.    Why not?

18             MS. PIERCE:  Objection.  Foundation.

19        A.    We have two very specific remits, delivery

20   of human services, management of Hennepin County

21   property.  Those are functions that we carry out.

22   We discuss those functions with partners.  But there

23   is no -- no cross-policy team, no call for a

24   cross-agency policy team.

25        Q    (BY MS. STILLMAN) Did you discuss this

Page 91

1    document for -- with Ms. Topinka?

2        A.   As I said, I don't recall this specific

3    document.  But I discussed many things with

4    Ms. Topinka.  And this email may well have been one

5    of them two years ago, or whenever this was from.

6        Q.   So if you look at document 205, in that

7    top email, the second paragraph says that -- or this

8    top email is addressed to David, correct?

9        A.   Yes.

10       Q.   And the email it's addressed to is your

11   email?

12       A.   Yes.

13       Q.   So in that second paragraph it says, Since

14   we've already shared our draft with the group we're

15   meeting with today, I think we proceed as planned

16   and perhaps schedule a follow-up call with Parks for

17   early next week to discuss.  What do you think?

18       A.   I see that.

19       Q.   Did you respond to this email?

20       A.   I honestly don't know.  I tend to be

21   responsive.  So I'd be very surprised if I just

22   blanked Katie.  But I do not recall.

23       Q.   Did you discuss this document,

24   Exhibit 206, with Parks?

25       A.   I honestly don't know.

Page 92

1      Q.   It says, Since we've already shared our

2  draft with the group we're meeting with today, I

3  think we proceed as planned and perhaps schedule a

4  follow-up call with Parks for early next week to

5  discuss.

6           Did you develop a draft of this with Katie

7  Topinka?

8           MS. PIERCE:  Objection.  Vague, asked and

9  answered.

10      A.   I don't know.

11      Q    (BY MS. STILLMAN) If you go to page 3, the

12  top --

13           MS. PIERCE:  Do you mean of the --

14           MS. STILLMAN:  Of Exhibit 206.  Sorry.

15           MS. PIERCE:  Yep.

16      Q    (BY MS. STILLMAN) The top says, The

17  assessment information will go into a shared online

18  tracking/mapping tool and shared with the

19  responsible jurisdictions.

20           Is there a shared online tracking and

21  mapping tool of encampments that's used by Hennepin

22  County and the City of Minneapolis?

23           MS. PIERCE:  Objection.  Vague,

24  foundation.

25      A.   No.

Page 93

1     Q    (BY MS. STILLMAN) How do you know that?

2     A.   Can you repeat the question?

3     Q.   I'll withdraw the question.

4          If there was an -- shared online

5    tracking/mapping tool of encampments that Hennepin

6    County used with another entity, would you know if

7    it existed?

8          MS. PIERCE:  Objection.  Foundation.

9          MS. ENSLIN:  Calls for speculation.

10         MS. PIERCE:  Yeah.

11    A.   I -- I think it's likely -- I mean, I -- I

12   should call out, I mean, what is a shared online

13   tracking/mapping tool?  Does that include an email

14   that says we're aware of an encampment over here, or

15   are you -- so -- so I'm just aware that we haven't

16   defined this term.

17    Q    (BY MS. STILLMAN) If you received a

18   document from Ms. Topinka and didn't understand the

19   language that was used in the document, do you think

20   you would have followed up and asked?

21         MS. PIERCE:  Objection.  Vague, compound,

22   incomplete hypothetical, calls for speculation.

23    A.   It would have depended how important I

24   thought it was.  Yeah.  I -- I can't recall.

25    Q    (BY MS. STILLMAN) Do you think having an

Page 94

1    encampment response process is important?

2           MS. PIERCE:  Objection.  Vague, compound,

3    calls for speculation, possibly calls for expert

4    testimony.

5           A.   I think it's important that we, as Human

6    Services, have -- have a sense of our focus and

7    remit, which may well be written up.  But when you

8    are saying a process, you know, we've already seen

9    documents here and in discussion that that could be

10   far, far broader than what I am describing.

11          So it's hard for me to say that

12   something's important or not when I don't have a

13   definition of exactly what we're talking about.

14          Q    (BY MS. STILLMAN) If you to down, the last

15   bolded section on page 3 says, Engage with Street

16   Outreach.  The City/County will designate which

17   contacted street outreach team will respond to the

18   encampment.

19          Does the County designate which contracted

20   street outreach team will respond to each individual

21   encampment?

22          A.   No.

23          MS. PIERCE:  Objection, vague.  Objection,

24   assumes facts not in evidence.

25          A.   No.

Page 95

1        Q     (BY MS. STILLMAN) Have you ever used track

2    changes in a Word document before?

3        A.    Yes.

4              MS. PIERCE:   Object --

5              THE WITNESS:   Oh, sorry.

6              MS. PIERCE:   Objection.   Compound.

7        Q     (BY MS. STILLMAN) Have you ever used track

8    changes to comment on a Word document before?

9              MS. PIERCE:   Same objection.

10       A.    Yes.

11       Q     (BY MS. STILLMAN) And when you've used

12   track changes to comment on a Word document, do the

13   initial -- your initials DH appear in the comment

14   box?

15             MS. PIERCE:   Objection.   Vague, compound,

16   foundation.

17       A.    I'm not 100 percent sure that is always

18   the way that they appear.   Could be my name, could

19   be my initials, could be something else.

20       Q     (BY MS. STILLMAN) Does it sometimes appear

21   as your initials?

22             MS. PIERCE:   Same objections, including as

23   to foundation.

24       A.    I can believe that could be the case.

25             MS. PIERCE:   We've been going for about an

1  hour.  Are you -- are you close to a stopping spot,

2  Counsel?

3             MS. STILLMAN:  I -- Can I ask like three

4  more questions?

5             MS. PIERCE:  Absolutely.

6             MS. STILLMAN:  Okay.

7     Q    (BY MS. STILLMAN) If you go to page 4 of

8  Exhibit 206, under Closure, it says, When the

9  decision is taken that an encampment should be

10  closed, this will be communicated immediately to the

11  cross-agent policy team who will then be responsible

12  for escalating to administration and key leaders

13  within their respective agency.

14             Who in Hennepin County makes the final

15  decision about whether an encampment on Hennepin

16  County property should be closed?

17             MS. PIERCE:  Objection.  Assumes facts not

18  in evidence, calls for speculation, foundation.

19     A.    Ultimately, authority with regard to

20  Hennepin County property would flow up to the county

21  administrator, I believe.

22     Q    (BY MS. STILLMAN) And who's the current

23  county administrator?

24     A.    David Hough.

25     Q.    And when did David Hough start in that

Page 97

1   role?

2           MS. PIERCE:   Objection.   Foundation.

3       A.    Before my time.

4       Q    (BY MS. STILLMAN) In your opinion, do you

5   think residents of an encampment should be given

6   notice that an encampment is going to be closed?

7           MS. PIERCE:   Objection.   Foundation,

8   incomplete hypothetical, calls for speculation,

9   possibly calls for expert testimony, and vague as to

10  the meaning of the word resident and encampment.

11      A.    I was going to say, we would never use the

12  term resident, to the best of my knowledge.

13          With regards to -- to notice, I think

14  there are certainly instances where it's desirable.

15  But, also, there are a huge range of circumstances

16  and situations that emerge within encampments, so

17  I -- I wouldn't want to speculate as to something

18  that would apply to all potential circumstances and

19  situations.

20      Q    (BY MS. STILLMAN) Why don't you use the

21  term resident for someone living in a homeless

22  encampment?

23          MS. PIERCE:   Objection.   Vague as to the

24  meaning of the term living or -- and encampment.

25      A.    I believe homelessness is unacceptable.

Page 98

1    That's why I do the work I do.  I don't believe we

2    should normalize or talk about people living in

3    unsheltered situations or being residents in

4    unsheltered situations.

5         Q    (BY MS. STILLMAN) So what word would you

6    use instead of resident?

7         A.   I would typically say something like

8    people staying in encampments, spending time in an

9    encampment.

10        Q.   In what circumstances do you think

11   somebody living in an encampment should be notified

12   that the encampment will be closed?

13             MS. PIERCE:  Objection.  Vague as to the

14   meaning of encampment and living, calls for

15   speculation, incomplete hypothetical, possibly calls

16   for expert testimony.

17        A.   Can you repeat the question?

18             MS. STILLMAN:  Can you read the question

19   back, please?

20             (Whereupon, the court reporter read back

21   the requested portion of the record.)

22             MS. PIERCE:  My objections remain,

23   particularly as to speculation.

24        A.   Well -- and I'm trying to think of, like,

25   do I list out circumstances that -- there's a lot of

Page 99

1   hypotheticals in here.  Like I say, the -- the

2   variation across -- I mean, as we said earlier when

3   we talked about kind of potential definitions of

4   encampment being a single tent to something like

5   Powderhorn Park, where you have 281 people living

6   there with 600 plus tents.  So it's hard for me

7   to -- to provide kind of the blanket response that

8   you're looking for here.

9        Q    (BY MS. STILLMAN) Let's do it the reverse

10  way.  When do you think somebody living in an

11  encampment shouldn't get notice that the

12  encampment's going to be closed?

13            MS. PIERCE:  Objection.  Vague,

14  particularly as to the meaning of the words living

15  and encampment; incomplete hypothetical; calls for

16  speculation; and asked and answered, essentially.

17       A    And those aren't the words that I would

18  use.  But with regards to occasions in which notice

19  might not occur, extremely serious health and safety

20  issues emerge in encampments that, on occasion, may

21  require extremely urgent response.

22       Q    (BY MS. STILLMAN) And why don't you think

23  notice should be given in those situations?

24            MS. PIERCE:  Objection.  Misstates the

25  witness's testimony, vague, compound, calls for

Page 100

1   speculation, incomplete hypothetical, calls for

2   expert testimony.

3       A.   Yeah.  Not how I would word, or I think

4   not how I did word my answer at all.  But I am

5   willing to share an example.  For instance, if an

6   encampment is ravaged by fire, as has happened in

7   the past, and is then hazardous for people to live

8   in, that is a situation that changes dramatically

9   time scales around -- around any potential response.

10      Q   (BY MS. STILLMAN) So it changes time

11  scales around the response, correct?

12          MS. PIERCE:  Same objections, including as

13  to -- vague as to the word notice.

14      A.   A situation like that creates a very, very

15  constrained time-limited crisis.

16      Q   (BY MS. STILLMAN) Can you think of other

17  examples of when encampment residents shouldn't be

18  given notice that the encampment in which they're

19  living is going to be closed?

20          MS. PIERCE:  Vague as to the meaning of

21  the term resident, living, encampment, notice.

22  Incomplete hypothetical, calls for speculation, and

23  possibly expert testimony.

24      A.   And I am certainly not using the language

25  of "shouldn't be provided."

Page 101

1              How many hypotheticals are you looking for

2     me to kind of think up here?

3          Q    (BY MS. STILLMAN) Give me a couple

4     examples.

5              MS. PIERCE:  Same objections.

6          A.   So I've provided one already.

7          Q    (BY MS. STILLMAN) Uh-huh.

8          A.   And another one could be serious violence,

9     up to and including gunfire and homicide on the

10    site.

11         Q.   How do you define immediate health and

12    safety concern --

13             MS. PIERCE:  Objection.  Vague, compound.

14         Q    (BY MS. STILLMAN) -- as it relates to an

15    encampment?

16             MS. PIERCE:  Objection.  Vague, compound.

17         A.   For what it's worth, by leaning very

18    heavily on other people who are experts, such as my

19    colleagues in public health.

20         Q    (BY MS. STILLMAN) If there isn't an

21    immediate health and safety concern, do you think

22    people living in an encampment should be given

23    notice that the encampment is going to close?

24             MS. PIERCE:  Objection.  Vague as to

25    resident, encampment, notice; incomplete

Page 102

1   hypothetical; calls for speculation; vague.

2        A.    I agree with all of that.

3              What I will say is, I think there can be

4   benefit to providing a notice period --

5        Q    (BY MS. STILLMAN) What are --

6        A.    -- if circumstances allow.

7        Q.    What is the benefit to providing a notice

8   period?

9              MS. PIERCE:  Objection.  Vague, compound.

10       A.    I'm generally a fan of providing clarity.

11       Q    (BY MS. STILLMAN) Why are you a fan of

12  providing clarity?

13             MS. PIERCE:  Objection.  Vague, compound.

14       A.    So the people can make decisions with the

15  best information available.

16       Q    (BY MS. STILLMAN) I'm sorry.  Can you

17  repeat that answer?

18             MS. PIERCE:  Why don't we have the court

19  reporter read it back.

20             MS. STILLMAN:  Sure.

21             (Whereupon, the court reporter read back

22  the requested portion of the record.)

23       Q    (BY MS. STILLMAN) Why do you think it's

24  important that people be able to make decisions with

25  the best information available?

Page 103

1          MS. PIERCE:  Objection.  Vague, compound.

2      A.    This feels a little bit like the dignity

3   question.  I mean, I think that all of us in our

4   life, when we're making decisions -- and you are --

5          Can you frame the question another way?

6          MS. PIERCE:  Or we're -- we're coming up

7   at an hour and a half, so I'd like to take a break

8   after your next question, Counsel.

9      Q    (BY MS. STILLMAN) Do you think it's

10   beneficial for encampment -- for people living in

11   encampments to receive notice of when an encampment

12   is going to close so they can plan where they need

13   to go?

14          MS. PIERCE:  Objection.  Vague as to the

15   meaning of the words encampment, resident, notice;

16   incomplete hypothetical; calls for speculation;

17   calls for expert testimony; and asked and answered.

18      A.    Not the words I would use.  As I say,

19   depending on circumstances, of which, as we've

20   already discussed, there are a huge range and

21   variation, I think there can be benefit to providing

22   people with clarity so they can make decisions based

23   on the best information available.

24          MS. PIERCE:  Let's take that break.

25          MS. STILLMAN:  Okay.

```
                                        Page 104

 1           THE VIDEOGRAPHER:  We're going off the

 2    record at 11:29 a.m.

 3           (Whereupon, a recess was taken.)

 4           THE VIDEOGRAPHER:  This is Media Number 3

 5    in the deposition of David Hewitt.  Today is

 6    February 16th, 2023.  We're going back on the record

 7    at 11:50 a.m.

 8       Q    (BY MS. STILLMAN) So before I get into the

 9    next set of questions, I just wanted to give you a

10    definition.  So when I say encampment, I am

11    referring to a -- two or more tents where people

12    live.  Okay?

13           MS. PIERCE:  And we object to the -- the

14    use of the word live.  We --

15           THE WITNESS:  Yeah.

16           MS. PIERCE:  I mean, we don't agree to

17    that definition, but I appreciate your -- your

18    telling us at least how you're using it.

19       A    Tents, two or more people, I hear.

20       Q    (BY MS. STILLMAN) Sorry.  What was that?

21       A    So you're saying tents, two or more people

22    as -- yeah.  Yeah.  The other part of the

23    definition --

24       Q    (BY MS. STILLMAN) Two or more tents where

25    people live.
```

Page 105

1          A.   I -- I would agree -- argue with.

2               Yeah.  Carry on.

3          Q.   Okay.  You are aware that there were

4     encampments on property owned by the Minneapolis

5     Park and Recreation Board, correct?

6               MS. PIERCE:  Objection. Vague.

7          Q.   (BY MS. STILLMAN) In 2020?

8          A.   Over the course of 2020, I am aware that

9     there were encampments on Park Board property, yes.

10         Q.   Did you ever visit any of those

11    encampments?

12         A.   I had very little business reason to

13    actually be physically present at encampments at any

14    point in 2020 and -- and generally.

15              You're asking specifically about sites

16    that were on Park property?

17         Q.   Yes.

18         A.   So the only one that I recall -- and even

19    here I was kind of tangentially present -- would

20    have been the park in North Minneapolis, Logan.  And

21    I was actually there to -- for a meeting in a church

22    on the north side of the park.

23              But stretching the -- the question to

24    physical presence, I was there.  And, of course,

25    otherwise I live in the city of Minneapolis, so --

Page 106

1        Q.    Which church?

2        A.    Oh.   What is its name?   The -- the actual

3    event I was there for was, there's an -- or a

4    community group called Envision who had a model tiny

5    home in the parking lot out back.   And I was

6    visiting that and meeting with the people who were

7    involved in it.   I couldn't tell you the name of the

8    church, though.

9              Oh, was it Elim?   Anyway.   It might have

10   been Elim.   We deal with a lot of different

11   faith-based agencies, and this is a while back, so

12   I'm searching my memory a little bit.

13             MS. STILLMAN:   We're going to be going to

14   a document that was previously marked as

15   Exhibit 137.

16             (Previously Marked Exhibit Number 137

17   introduced to the witness.)

18        A.    Do you want this one back?

19        Q.    (BY MS. STILLMAN) No.   You keep them.

20        A.    I see.

21             MS. PIERCE:   And then you hand them to the

22   court reporter.

23             THE WITNESS:   I see.

24             MS. PIERCE:   Rebecca, from exhibits

25   already marked, do you get those back or does

Page 107

```
 1   Christine get those?
 2            MS. STILLMAN:  I think the -- I haven't
 3   been taking them back.
 4            MS. PIERCE:  Great.
 5            MS. STILLMAN:  I'm sorry.  What exhibit
 6   number?  137.
 7            And if everyone could let me know when
 8   they've located 137.
 9            Okay.  So --
10            MS. ENSLIN:  I do not have it.  Sorry.
11            MS. STILLMAN:  Can we go off the record
12   while the phone finishes ringing, please?
13            (Discussion held off the record.)
14       Q.   (BY MS. STILLMAN) Okay.  You agree that
15   this is an email from Kat Purcell to you and a list
16   of other people dated July 20th, 2020, correct?
17       A.   It appears to be, yep.
18       Q.   And the email reads, Hello.  Which of you
19   was involved in the decision to spend 300K in
20   contracts on bulldoze people's tents today?
21            Correct?
22       A.   That's what I read in the first line, yep.
23       Q.   So as early as July 20th, 2020, you were
24   hearing the concern that encampment residents'
25   property was being destroyed at encampment closures,
```

Page 108

1    correct?

2          MS. PIERCE:  Objection.  Misstates the

3    document, assumes facts not in evidence,

4    argumentative.

5       A.   Yeah.  I'm not sure where you're referring

6    to on this document.

7       Q    (BY MS. STILLMAN) Well, Kat Purcell said,

8    Which of you was involved in the decision to spend

9    300K in contracts on bulldoze people's tents today?

10          MS. PIERCE:  Same objections.  Also, the

11   document speaks for itself.

12      A.   What is the question?  Sorry?

13      Q    (BY MS. STILLMAN) So on July 20th, 2020,

14   you got an e-mail from Kat Purcell asking about the

15   decision to bulldoze people's tents.

16      A.   I mean, I can see that that's the question

17   that she has written in this email, as we look at it

18   here today, yes.

19      Q.   Did you receive other emails from members

20   of the public expressing concerns -- or did you

21   receive other emails from the public expressing that

22   people's property was bulldozed at an encampment

23   closure on July 20th of 2020?

24          MS. PIERCE:  Objection.  Compound.

25      A.   I can believe that I did.  And I do not

Page 109

1   have a photographic recall of emails I received on

2   July 20 of 2020.

3       Q    (BY MS. STILLMAN) Did you see -- receive

4   other emails from the public expressing concerns

5   about how sweeps were conducted in 2020?

6           MS. PIERCE:  Objection.  Vague, including

7   as to the use of the word sweep.  And compound.

8       A.   Sorry.  Can you repeat the question?  Or

9   can I get the question again?

10          MS. PIERCE:  Let's have the question read

11  back.

12          THE WITNESS:  Yeah.

13          (Whereupon, the court reporter read back

14  the requested portion of the record.)

15          MS. PIERCE:  Same objections.

16      A.   Again, noting that I do receive hundreds

17  of emails every week, indeed sometimes throughout a

18  day.  But, yes, I can believe that I received emails

19  to that effect from some quarters.

20      Q    (BY MS. STILLMAN) Would you have read

21  them?

22          MS. PIERCE:  Objection.  Compound, calls

23  for speculation.

24      A.   I can say that I read my emails.

25      Q.   (BY MS. STILLMAN) Would you have saved

Page 110

1    them?

2            MS. PIERCE:  Objection.  Compound, calls

3    for speculation.

4        A.   My general practice, when receiving

5    emails, is to file them in a subfolder in Outlook,

6    for what that is worth.

7        Q    (BY MS. STILLMAN) Subfolder based on email

8    topic?

9        A.   You know, the filing kind of evolves over

10   time.  And at some point I regret that I structured

11   it the way I did, and I try and change it.  But, you

12   know, I have various headings that I put things

13   under.

14       Q.   I think we all probably understand that.

15            When you received emails from the public

16   expressing concern about encampment closures, did

17   you discuss them with anyone?

18            MS. PIERCE:  Objection.  Vague, compound,

19   calls for speculation.

20       A.   You're asking if I discussed the emails.

21       Q    (BY MS. STILLMAN) Emails from the public

22   expressing concern about how sweeps were conducted

23   in 2020.

24            MS. PIERCE:  Objection.  Vague, compound.

25       A.   I may well have discussed the content of

Page 111

1   emails I received in 2020 with other people.  I --
2   to get more specific, I would need more specifics.
3        Q    (BY MS. STILLMAN) You acknowledge there
4   were homeless people living in encampments on park
5   property in 2020?
6             MS. PIERCE:  Objection as to the use of
7   the word living.
8        A.   I would never describe the situation as
9   living in encampments.  I agree that there were
10  people experiencing homelessness in parks during
11  2020.
12       Q    (BY MS. STILLMAN) And staying overnight in
13  the parks?
14       A.   In some cases staying overnight, yes.
15       Q.   And in some cases staying overnight in the
16  parks in tents?
17       A.   Yes.  I agree with that.
18       Q.   And in some cases using those tents in
19  which they were staying as their primary form of
20  shelter?
21            MS. PIERCE:  Objection.  Vague, and calls
22  for a legal conclusion.
23       A.   Insofar as somebody staying in that tent
24  overnight, that is clearly where they stayed on that
25  night, yes.

Page 112

1       Q    (BY MS. STILLMAN) And that tent would have
2   been their primary form of shelter --
3            MS. PIERCE:  Objection.
4       Q    (BY MS. STILLMAN) -- that night?
5            MS. PIERCE:  Sorry.
6            Objection.  Vague, calls for a legal
7   conclusion.
8       A    I would agree that, if they stayed in that
9   tent overnight, that is where they stayed overnight.
10      Q    (BY MS. STILLMAN) Many individuals
11  experiencing homelessness living in encampments
12  in -- on property owned by the Minneapolis Park and
13  Recreation Board in 2020 had most, if not all, of
14  their belongings with them in tents, correct?
15           MS. PIERCE:  Objection.  Vague, compound,
16  calls for speculation, assumes facts not in
17  evidence, incomplete hypothetical.
18      A    I have no way of knowing what belongings
19  people had or where they were storing them.
20      Q    (BY MS. STILLMAN) Just going forward, if I
21  say MPRB, do you -- can we agree that I'm referring
22  to the Minneapolis and Park and Recreation Board?
23      A    Yes.
24      Q    Okay.  Do you agree that, if an encampment
25  closure date is not provided to people living in an

Page 113

1    encampment, an encampment closure may happen when a

2    resident has left their tent and property to get

3    food or run errands?

4          MS. PIERCE:  Objection.  Vague, compound,

5    incomplete hypothetical, calls for speculation,

6    possibly calls for expert testimony, and calls for a

7    legal conclusion.

8        A.   You are calling for a lot of speculation.

9    Probably something that is important for me to note

10   here is that I was not physically present at any

11   encampment closure.

12       Q    (BY MS. STILLMAN) But you -- do you agree

13   that, if an encampment closure date is not told to

14   residents of an encampment, that the sweep could

15   happen when the --

16          I'm going to rephrase that question.

17          If someone living in an encampment doesn't

18   know the date of the encampment closure, they

19   wouldn't know to be at the encampment in order to

20   gather their property, correct?

21          MS. PIERCE:  Objection.  Vague, compound,

22   calls for speculation, incomplete hypothetical,

23   foundation.

24       A.   I agree with all of that.  And I think it

25   is reasonable --

                                        Page 114

1           Wait.  Repeat the question for me.  Sorry.

2           MS. PIERCE:  Let's have her read it back.

3           THE WITNESS:  Oh, yes.  Sorry.  I'll do

4    that more often.

5           (Whereupon, the court reporter read back

6    the requested portion of the record.)

7           MS. PIERCE:  Same objections.

8      A.   So I have problems with speculating on

9    what people would or wouldn't know to do, because

10   there are a whole bunch of factors that go into

11   risks around encampments and the potential loss of

12   property.

13          I'm -- I'm struggling to -- to speculate

14   for you here.  I mean, I gave my opinion earlier on

15   on where I think there can be some benefit in

16   providing clarity in advance.

17          MS. STILLMAN:  Christine, could you repeat

18   his answer for me, please?

19          (Whereupon, the court reporter read back

20   the requested portion of the record.)

21     Q.   (BY MS. STILLMAN) What did you mean when

22   you said risks involving property?

23     A.   One of the things that we have heard --

24   and I go back to a certain encampment, which I was

25   often present, predates all of this, which is the

Page 115

1    Hiawatha/Franklin encampment in the second half of

2    20- -- 2018.  And there was a hygiene service area

3    set up over the road by the American Indian

4    Community Development Corporation.

5              I was often present there.  And one of the

6    things that we were looking to do was identify folks

7    who had housing referrals in the encampment in order

8    to -- to make sure we were able to expedite those

9    arrangements and then get connected to those options

10   when they existed.

11             One of the things that we heard very

12   consistently was people were unwilling to leave

13   their tents even to cross the road to come and speak

14   to us about a potential housing option.  And,

15   indeed, we would find kind of trusted communicators

16   to go in and have the conversation with them on the

17   basis that they were concerned that their -- their

18   belongings would be stolen if they departed their

19   tent for any length of time.

20             And I give that as one example.  As I

21   said, lots of different factors here, and there's

22   a -- you know, you're calling for a lot of

23   speculation.

24        Q.   Do you acknowledge that the MPRB, during

25   encampment closures in 2020, did destroy people's

1   unabandoned property when quickly clearing

2   encampments in 2020?

3            MS. PIERCE:  Objection.  Vague, compound,

4   foundation, calls for speculation, incomplete

5   hypothetical, and vague as to the definition of lots

6   of words.

7        A.   I wasn't present at any encampment

8   closure, including those organized by MPRB.

9        Q    (BY MS. STILLMAN) Have you watched videos

10  of any of the encampment closures in 2020?

11           MS. PIERCE:  Objection.  Vague.

12       A.   I don't think so.

13       Q    (BY MS. STILLMAN) Have you read any

14  newspaper articles about any of the encampment

15  closures in 2020?

16       A.   Yes.

17           MS. PIERCE:  Objection.  Vague.

18           Sorry.

19       A.   Yes.  I read newspaper articles about

20  homelessness in the Twin Cities.  Not every single

21  one, but I would have read newspaper articles in

22  2020.

23       Q    (BY MS. STILLMAN) Including at least some

24  articles in the Star Tribune?

25       A.   I do read the Star Tribune.  Uh-huh.  Not

                                        Page 117

1    every single time, but, sure.

2         Q.   Is it your practice to try to read

3    newspaper articles regarding homelessness?

4              MS. PIERCE:  Objection.  Vague, compound.

5         A.   While agreeing with that, it's an

6    interesting question.  I have mixed feelings about

7    it.

8              I -- I don't know if people share this

9    kind of experience, but when you are deeply involved

10   in a subject, reading news articles about it can be

11   very frustrating in the way that certain facts are

12   represented.

13             And I go all the way back to my experience

14   in the UK with this.  I remember The Guardian, which

15   is a newspaper I have huge respect for, still have

16   it on my phone today, read the football on there

17   every single day.  We, as crisis, published a report

18   about homelessness during the financial crisis of

19   2008.  Buried in like page 58 was a piece about how,

20   you know what?  The repercussions of this could get

21   to the point where even relatively well-off middle

22   class folks could be impacted.  Front page of

23   The Guardian:  Financial collapse is going to make

24   middle class people homeless.

25             That's not what the report was about.

Page 118

1            I give that as an example.  And for sure I

2    can pick others from the Star Tribune and elsewhere,

3    where pieces of information I see, sometimes that we

4    cannot publicly disclose because it relates to

5    private client information that we can't talk about,

6    where I simply know that this is not the case or

7    that things are not being represented in a way that

8    I consider to be full and accurate.

9            So to answer your question, yeah, I tend

10   to read them.  Sometimes, to be honest, I just can't

11   face it.  I have a similar relationship with the

12   Comments section.

13       Q    (BY MS. STILLMAN) If there's something you

14   believe to be inaccurate in an article published by

15   the Star Tribune, would you contact the Star Tribune

16   to have that fact corrected?

17            MS. PIERCE:  Objection.  Compound, calls

18   for speculation, incomplete hypothetical.

19       A    It depends.  There are occasions when I

20   have spoken to my colleagues in communications and

21   said, you know, This, this and this is wrong.  How

22   do we feel about it?

23            In some cases we may reach out to a news

24   outlet to ask for a correction.  In other cases, for

25   instance, giving the example I did earlier, where it

Page 119

1   relates to a description of a specific individual's

2   circumstances, even if we know it's wrong, we

3   actually can't do anything about that because we

4   can't share that information.

5       Q    (BY MS. STILLMAN) Do you track the

6   availability of shelter beds in Hennepin County?

7           MS. PIERCE:  Objection.  Vague.

8       A.   We receive PDFs each day from Simpson

9   Housing Services that detail the number of shelter

10  beds that they were aware of the availability of

11  through the nonprofits that run shelter in the

12  morning.  There's some information about how quickly

13  they were reserved, if reserved, how many more

14  became available in the evening, how many were

15  reserved.

16          So we receive those two PDFs each day.

17  They go to somebody else in my team.  They often are

18  shared with me.  I often take a look.

19          I should, as a clarifying point, note that

20  that is only the single adult shelters that

21  participate in the Adult Shelter Connect system that

22  that information pertains to.

23          With regards to family shelter, I do not

24  receive reports.  That said, Hennepin County is

25  unique in the state of Minnesota in having a shelter

Page 120

1   all policy for Hennepin County families with

2   children.  Indeed, we are one of only four

3   communities in the United States that has such

4   policy, I believe:  Us, D.C., New York and Boston.

5   What that means is that there is no shelter capacity

6   limit for families with children.

7            So to some extent the information is

8   redundant because of that shelter all commitment.

9            There are also youth shelters who

10  historically have not participated in that bed

11  reservation system, manage their own intake.  And

12  shelter being kind of organized the way it is, there

13  are, on occasion, individual nonprofits that may

14  stand up their own shelter arrangements with

15  independent funding, often, and they may have their

16  own intake processes.  And we do not necessarily

17  have visibility on openings in those programs.

18       Q    (BY MS. STILLMAN) You said we receive the

19  PDFs.  Who's the "we?"

20       A.   They generally come in to the individual

21  on my team who we consider our service area lead for

22  single adult shelter.  So they -- so as -- as I

23  mentioned earlier on, we -- we are a funder of

24  shelters.  We provide funding to them, which they

25  then raise additional money alongside, to deliver

Page 121

1      the services they do.

2              We have a service area lead who supports

3      those contracted providers.  That is the individual

4      who receives those PDFs.

5          Q.   Who is -- what is the name of the service

6      area lead?

7          A.   Today that is Lauren Schwerzler.  You're

8      going to do it to me again with the spelling here.

9      Do you want it?  As best that I can do it?

10         Q.   I believe the court reporter probably

11     wants it.

12         A.   Okay.  S-c-h-w-e-r-zed, by which I mean z,

13     l-e-r, I believe.

14              Same apologies to Lauren as Lisa earlier

15     if I'm wrong.

16         Q.   Who was it before Lauren S?

17         A.   Before Lauren Schwerzler, it would have

18     been Danielle Werder, W-e-r-d-e-r.

19         Q.   How is it determined -- how are the number

20     of shelter beds available for people experiencing

21     homelessness in Hennepin County determined?

22              MS. PIERCE:  Objection.  Foundation.

23         A.   With regards to the information the -- the

24     Simpson Housing Services provides from the Adult

25     Shelter Connect, I mean, essentially we fund Simpson

Page 122

```
1    Housing Services to play this coordinating role and
2    manage this intake role on behalf of the specific
3    network of other nonprofits that operate shelters.
4             So it is the Simpson staff coordinating
5    with the staff of the other nonprofits who operate
6    those shelters to understand how many beds are made
7    available each morning, to make reservations to
8    those beds throughout the day, to understand how
9    many more beds become available in each in the
10   evening, to allocate those to people throughout the
11   evening, and to do the same again the next day.
12        Q    (BY MS. STILLMAN) New shelters were built
13   in Hennepin County in 2020, correct?
14        A.   Yes.
15        Q.   How many?
16        A.   In 2020, Avivo Village, AICDC Homeward
17   Bound.  We opened the women's shelter in an interim
18   site, so your phrase "built" would not apply, but it
19   was a new shelter that opened.  Similarly, new
20   shelters opened in a variety of hotel-based sites.
21   Again, they were not built.  They were preexisting
22   buildings.
23        Q.   Were you involved in the decision to --
24   Did Hennepin County help fund any of these shelters
25   that opened in 2020?
```

Page 123

1        A.    Yes.

2        Q.    Which ones?

3        A.    The ones that I just listed:   American

4    Indian Community Development Corporation, Homeward

5    Bound, Avivo Village.   The Salvation Army operated

6    women's-only shelter.   I've been asking them for

7    years to come up with a snappier name.   We provided

8    funding toward three of those.

9             We were also the funder of hotel-based

10   shelters that were stood up as part of the pandemic

11   crisis response.

12       Q.    And does Housing Stability determine how

13   much funding goes -- went to each of those projects?

14       A.    Not unilaterally.   So typically -- and

15   there were some things in 2020 that were not

16   entirely typical.   But, typically, the way that we

17   allocate funding in Housing Stability is through an

18   open competitive request for proposals.   We receive

19   those proposals, and our team then convene an

20   evaluation panel to select the projects and how much

21   funding they will receive from those that are

22   proposed to us.

23             That evaluation panel will include a

24   subject matter expert from my team, but also should

25   include people who had lived the experience of

Page 124

1   homelessness and other relevant subject matter

2   experts and stakeholders, such as our colleagues in

3   public health.

4        Q.   More shelter beds were needed in 2020

5   because the homeless population in Hennepin County

6   increased in 2020, correct?

7             MS. PIERCE:  Objection.  Foundation.

8        A.   I -- I'm not entirely sure.  That's

9   certainly not how I would describe it.  The addition

10  of shelter beds initially was to create -- and,

11  actually -- and this kind of applies throughout --

12  was not simply to add numbers, even though overall

13  that was a net effect.  It was to add different

14  kinds of shelters for specific purposes and to meet

15  the needs of specific individuals.

16            So, in particular, we did not stand up the

17  hotel-based shelters that I mentioned in order to

18  have more shelter beds, even though that was a net

19  effect.  We stood them up, and we were amongst the

20  first in the country, I believe the second in the

21  country, to do this, recognizing the -- that people

22  who were age 60 and above were at the highest

23  medical risk from the impending pandemic.

24            And so we took the step to move folks to

25  noncongregate shelter spaces where we could reduce

Page 125

1    the likelihood of infection, knowing that these

2    specific individuals in congregate spaces, if they

3    were to come into contact with the pandemic, would

4    be at the greatest risk of medical complications.

5    So that was why we were standing that program up.

6            Isolation beds, which were also based out

7    of hotels, but completely separate for reasons that

8    will become apparent, were set up so that people who

9    tested positive for COVID, or back in those early

10   days, we were presuming, because we didn't

11   necessarily have testing, that they could be

12   isolated, where they could rest and recuperate, and

13   we could minimize the risk of transmission to

14   others.  So, again, they were additional beds, but

15   for a very specific purpose.

16           Through the rest of the year we took steps

17   to deconcentrate the larger shelters and to hold

18   their census at lower numbers so that they could

19   meet guidelines that were emerging around social

20   distancing.  So some of the addition of new shelters

21   was to allow us to maintain that deconcentration

22   while having a portfolio of shelter that would help

23   us stay ahead of demand.

24           Whenever we add shelters, whatever the

25   reason, whether it's to support deconcentration or

Page 126

 1   anything else, we also looked at, what are the --
 2   what are the ways that we can develop models that
 3   are not currently within our portfolio.
 4         So the women's-only shelter was the first
 5   ever small-scale women-only shelter in our
 6   community.  The American Indian Community
 7   Development Corporation was the first ever
 8   culturally-specific shelter run by a Native agency.
 9   Avivo Village was its own very specific model.
10         Many of those shelters kind of were
11   aligned with earlier strategies that we developed
12   around shelter.
13      Q    (BY MS. STILLMAN) How do you determine if
14   there's enough shelter beds available for the
15   population of people experiencing homelessness in
16   Hennepin County?
17         MS. PIERCE:  Objection.  Foundation.
18      A.   And I will argue that -- I'll -- I'll
19   certainly answer your question to the -- in the best
20   way I -- I can.  But I generally contest the notion
21   that the response to homelessness is shelter beds,
22   for a very specific reason, which is that I see
23   shelter as an emergency response to homelessness,
24   not its solution.  Housing is its solution.
25         The role of a shelter should be to provide

1    somebody an alternative to sleeping outside for the

2    duration of a housing crisis, but the focus should

3    be on ending that housing crisis as soon as

4    possible.  Being in a shelter does not end your

5    housing crisis.

6              And the reality is, for a lot of people

7    experiencing homelessness, formal shelter isn't

8    necessarily the thing they're going to take up,

9    either.  We've been doing work with the Catholic

10   Charities more recently around diversion.  Can we

11   help you find safe alternatives to being outside

12   that do not involve coming into formal shelters?

13   And that's an emerging national best practice.

14             So we don't look at it as a calculation of

15   X number of people experiencing homelessness, so we

16   need Y shelter beds.  We don't look at it that way,

17   one, because it's not the solution; and, two,

18   because we also know that not everybody experiencing

19   homelessness will opt into a shelter system.  And so

20   shelter demand tells us one thing, but it's a little

21   bit different to, you know, an overall sense that

22   people are experiencing homelessness.

23             What we do do, to come back to your

24   question, is, we work with our partners at Simpson

25   and the nonprofits to try and stay ahead of demand

Page 128

1    as best they are able to do so.

2        Q    (BY MS. STILLMAN) Do you use the

3    point-in-time count as part of that analysis?

4        A.   The point-in-time count is part of our

5    analysis generally around trends and trajectories on

6    homelessness.  It does not inform shelter bed need

7    because it doesn't reflect shelter bed demand.

8             Our best proxy for shelter bed demand is

9    how many people are actually requesting it.  And

10   that information, to the best that we have it, comes

11   through the family shelter team and the Adult

12   Shelter Connect.

13       Q.   Available shelter -- the number of

14   available shelter beds varies daily, correct?

15       A.   Yes.

16            MS. PIERCE:  Objection.  Vague.

17       A.   Yes.  There is variation in the

18   availability daily.  People leave every day, people

19   come in every day, and those numbers vary, so

20   inherently the availability varies.

21       Q    (BY MS. STILLMAN) And on any given day

22   there may be not be sufficient shelter beds for

23   single adult males, correct?

24            MS. PIERCE:  Objection.  Vague,

25   foundation, calls for speculation, assumes facts not

Page 129

1    in evidence.

2         A.   Every single day shelter beds become newly

3    available for people to reserve them throughout the

4    day.  There may come a point during the day at which

5    no further reservations are going to be made based

6    on projected capacity, but even then people will be

7    advised to call back in the evening, because every

8    single evening more shelter beds become available.

9              There may come a point in the evening,

10   though -- I mean, if we look at some of the time

11   frames you're talking about, certainly not always

12   the case, but generally the case, but there may come

13   a time in the evening when no longer can shelter

14   beds be offered then.  But people can call back the

15   next day, at which point there are always new

16   shelter beds available.

17        Q    (BY MS. STILLMAN) I'm going to go to

18   the -- okay -- a document that I previously -- has

19   previously been marked as Exhibit 174.

20              (Previously Marked Exhibit Number 174

21   introduced to the witness.)

22              (Discussion held off the record.)

23        Q.   And this document is titled City and

24   County Response to Homelessness, Presentation to

25   Committee of the Whole, dated April 26th of 2022.

Page 130

1    Correct?

2          A.    Yes.

3          Q.    And if you go to the third page, ending in

4    2811, it's entitled Hennepin County Homelessness

5    Response, David Hewitt, Director, Housing Stability.

6                Correct?

7          A.    Yes.

8          Q.    And you made this presentation, correct?

9          A.    I did.

10               MS. PIERCE:  Objection.

11               THE WITNESS:  Sorry.

12               MS. PIERCE:  Vague as to the word "made."

13         A.    I recall this presentation very well.

14   Certainly I provided content, and I spoke to that

15   content.  I haven't had a chance to flip through the

16   whole thing.  But now that I do, I see that there

17   are parts in here that were developed by people from

18   the City.  So I did not develop the whole

19   presentation.

20         Q     (BY MS. STILLMAN) And I -- Sorry.  I

21   should have clarified that.  I noticed it being a

22   portion from the County.

23               If you go to page 10, which ends in 2818,

24   in that third bullet point, the presentation says,

25   Support approximately 11,000 "beds" across emergency

```
                                          Page 131
 1    shelter, rapid rehousing, transitional housing and

 2    permanent supportive housing.  And beds is in

 3    quotation marks.

 4         A.   Yes.

 5         Q.   Why is beds in quotation marks?

 6         A.   These different kinds of components --

 7              (Reporter clarification.)

 8              THE WITNESS:  Sorry.  I was reading off

 9    the document, but -- All right.  Slowing down.

10         A.   There are different ways of calculating

11    capacity in these different kinds of programs.  As

12    an example, rapid rehousing is not a -- a physical

13    program, a physical structure with rooms in it.

14    Rapid rehousing is time-limited support services and

15    renter subsidies to help people exit homelessness.

16    But those support services and those dollars are

17    used in the private rental market in pursuit of

18    units.  This is actually often where the beds in

19    quotation marks come up.

20              You'll also see things like beds/units,

21    because in some of these programs we talk about

22    beds.  In others we talk about units.  In others we

23    may talk about households being served, where we are

24    providing them with a dollar amount to help them pay

25    for the cost of their housing.
```

1        So beds is used as kind of a catchall for

2    how many people are served across all of these

3    programs.  But when we talk about these programs

4    specifically, we may use terminology other than beds

5    to describe them.

6        Q.   (BY MS. STILLMAN) So if you go to the next

7    page, the title is Homeless Response System.  And

8    the first blue box is, Risk of Homelessness, with a

9    gray arrow saying, Prevention to Households Avoid

10   Homelessness.  And above that is One, Rare.

11        Is it -- what do you mean by "rare"?

12        A.   So I will recall my -- from earlier my

13   mantra.  Make homelessness rare, brief, and

14   nonrecurring.

15        When we talk about making homelessness

16   rare, what we're doing is exactly -- and this is a

17   HUD diagram, I believe, that I modified for the

18   purpose of presentations that I've been using for a

19   few years.  But what we're talking about is that

20   first part of the mantra.

21        Wherever possible for folks at risk of

22   homelessness, we want to prevent homelessness before

23   it occurs.  And you see here in this dotted box,

24   Household Avoids Homelessness.  That is the work of

25   making homelessness rare.

Page 133

1      Q.   Do you consider encampments to be

2    temporary shelter?

3           MS. PIERCE:  Objection.  Vague, calls for

4    speculation, calls for expert testimony.

5      A.   It's not a term that I would use, no.

6      Q    (BY MS. STILLMAN) Okay.  So in this

7    diagram, encampments isn't written anywhere,

8    correct?

9      A.   Correct.

10     Q.   So where would people -- people

11   experiencing in homeless -- people experiencing

12   homelessness who are staying in encampments fall

13   into this diagram?

14     A.   Yeah.  Thank you.

15          So you see the two boxes above Making

16   Homelessness Brief.  You have the Temporary Shelter

17   box, and then beneath it the Street Outreach box.

18   And the sizing of these boxes is deliberate.

19          You mentioned the point-in-time count

20   earlier on as a data point.  As per our most recent

21   point-in-time counts, when we look at who's

22   experiencing homelessness in Hennepin County on a

23   given night, about 80 percent of people experiencing

24   homelessness are in shelters.  The Temporary Shelter

25   box here is to represent those foremost shelter

Page 134

1   programs operated by our nonprofit partners.

2           The smaller box below, Street Outreach --

3   and I probably don't have it at a perfect 80/20

4   split, but is intended to denote the 20 percent of

5   people experiencing homelessness who are staying in

6   places not fit for human habitation, or unsheltered

7   homelessness, and the response to them, which

8   historically has been a street outreach service.

9           Within people staying in places not fit

10  for human habitation, approximately it's about

11  20 percent again, as per our last point-in-time

12  count data of staying in encampments.  So it'll be

13  one-fifth of that blue box, if you're looking for it

14  in this -- in this diagram.

15      Q.   And street outreach has arrows going to

16  rapid rehousing, transitional housing, and permanent

17  supportive housing.  Is that because street outreach

18  helps people living in places not suitable for human

19  habitation get into those spaces?

20           MS. PIERCE:  Objection.  Vague.

21      A.   The street outreach providers with whom we

22  have historically coordinated in Hennepin County are

23  able to conduct Coordinated Entry assessments with

24  people experiencing homelessness, which assess their

25  eligibility and priority for rapid rehousing,

Page 135

1    transitional housing, and permanent supportive

2    housing.  So, yes, that is a possibility.

3           As I said earlier, street outreach have

4    other functions particularly around basic needs.

5       Q    (BY MS. STILLMAN) What is Coordinated

6    Entry?

7           MS. PIERCE:  Objection.  Asked and

8    answered.

9       A.    Oh, I'd love to expand, though.

10          MS. PIERCE:  You can answer the question.

11      A.    And I'll have to be careful to go slow on

12   this one.

13          Coordinated Entry, or Coordinated Entry

14   System, originates as a HUD requirement for housing

15   programs, permanent supportive housing, rapid

16   rehousing, transitional housing, that receive HUD

17   continuum of care funds.

18          Within Hennepin County, we as Hennepin

19   County, apply to HUD for continuum of care funds on

20   behalf of our community.  And then HUD directly

21   contracts with -- it's currently a portfolio of

22   about 40 projects offering those kind of housing

23   projects.

24          HUD requires that any vacancies in those

25   programs be filled through a transparent, consistent

                                        Page 136

1    and equitable process.  And Coordinated Entry System

2    is their kind of model for how you do that.

3            It has four components.  Access.  And this

4    is where it cuts across both these blue boxes.

5    Effort should be made to ensure that people

6    experiencing homelessness have access to a

7    Coordinated Entry System.

8            Second component: Assessment.  There

9    should be a universal assessment -- there may be

10   some tweaking for specific programs, but a universal

11   assessment so that people are only doing one

12   assessment for all the housing programs.

13           Third:  Prioritization.  And this is

14   probably the key piece to understand.  Inherently,

15   the demand for those housing programs -- and I can

16   take you back to the earlier side about housing

17   scarcity in our community -- exceeds supply.  So we

18   believe, and HUD believes, that you need a

19   consistent, transparent, equitable process for

20   allocating resources when demand exceeds supply.

21           Within our community -- and we have a -- a

22   nonconflicting kind of community board that sets

23   these priorities and reviews them.  Within our

24   community, we focus on things like veteran status,

25   disability status, length of time homeless and

Page 137

1   medical fragility as the basis for prioritizing an

2   individual from among all of those experiencing

3   homelessness for an opening in, say, a permanent

4   supportive housing program.

5           So that's the principle of it.  But people

6   shouldn't be -- there shouldn't be kind of

7   subjective, arbitrary decisions being made around

8   who gets resources.  There should be that

9   consistent, transparent, equitable process.

10          Like I say, it originates as a HUD

11  mandate.  It has been adopted by state programs.  So

12  state programs require the vacancies be filled

13  through Coordinated Entry.  It has been adopted at a

14  local level.

15          So where we as the County are funding

16  programs, we also require, typically, if they are

17  homeless designated -- and I could get more into

18  that -- but if they are homeless designated, that

19  they take their referrals through that process.

20          I can go further, but --

21      Q.   No.  That's fine.

22          How does it -- how long does it usually

23  take someone to get housing through Coordinated

24  Entry?

25          MS. PIERCE:  Objection.  Compound, vague,

Page 138

1    calls for speculation.

2         A.    There is no typical time because it's not

3    a wait list.  It's a prioritization process.  So to

4    take the examples of some of the priorities that I

5    shared earlier, if you are a veteran with a

6    disability, you come into that prioritization port

7    at a very high level, meaning that you could be

8    housed extremely quickly.

9         Q    (BY MS. STILLMAN) Could it take somebody

10   weeks to get housing after they do a Coordinated

11   Entry intake?

12             MS. PIERCE:  Objection.  Vague, calls for

13   speculation, incomplete hypothetical.

14        A.    Demand exceeds supply, which is why we

15   have a process for equitably allocating the supply

16   that exists.  What that means is that there is no

17   guarantee of housing just because you do a

18   Coordinated Entry assessment.  And, again, we can

19   refer back to our more general figures around

20   housing affordability and scarcity here, across the

21   state, across the United States.

22        Q    (BY MS. STILLMAN) Was the Coordinated

23   Entry intake system ever suspended during the

24   pandemic?

25             MS. PIERCE:  Objection.  Foundation.

Page 139

1    And -- and vague as to -- as to where.

2         A.    We did not --

3         Q     (BY MS. STILLMAN) Hennepin County.

4              MS. PIERCE:  Okay.  Then ask that.

5         A.    So we did not stop receiving vacancy

6    reports from housing providers.  And I say "we" here

7    because it is a unit within my team that manages

8    only the prioritization and referral.  That was

9    actually the fourth component that I didn't get to,

10   referral.

11             So we did not stop receiving vacancy

12   reports from housing providers, and we did not stop

13   making referrals to those providers based on the

14   prioritization and the -- the priority list.

15        Q     (BY MS. STILLMAN) Why do you --

16        A.    For what it's worth, I -- it never entered

17   my mind that we would abandon equity because there

18   was a pandemic happening.

19        Q.    Why do you think that this process should

20   be consistent, transparent and equitable but not be

21   closure of encampments?

22             MS. PIERCE:  Objection.  Argumentative,

23   misstates the record and the evidence, misstates the

24   witness's testimony, misstates the document.

25        A.    Yeah, I -- I don't recognize the statement

                                        Page 140

1    you just made as reflecting anything that I've said.

2          Q    (BY MS. STILLMAN) Well, you said it

3    depends for a lot of my questions regarding

4    providing notice.

5          A.    Uh-huh.

6          Q.    Correct?

7               MS. PIERCE:   Objection.   Asked and

8    answered.

9          A.    Yes.  I said that I wasn't going to

10   speculate with a wide variety of factors.

11   Unspecified.

12         Q    (BY MS. STILLMAN) Okay.  So do you think

13   the process of closing an encampment should be

14   consistent for encampments in Hennepin County?

15              MS. PIERCE:   Objection, foundation.

16   Objection, incomplete hypothetical, calls for

17   speculation, calls for witness testimony.

18         A.    And if I can throw it out there, I think

19   you're comparing apples with bicycles.

20         Q    (BY MS. STILLMAN) Okay.  So do you think

21   it should be -- the process for closing encampments

22   should be consistent throughout Hennepin County?

23              MS. PIERCE:   Objection.   Calls for

24   speculation, incomplete hypothetical, calls for

25   expert testimony, argumentative, and asked and

Page 141

1    answered.

2         A.   I -- I -- I do not feel able to answer

3    that question, because I don't know consistently

4    what, I mean, is the other piece here.

5         Q    (BY MS. STILLMAN) What did you mean by

6    consistent when you were discussing the Coordinated

7    Entry System?

8         A.   That there should be -- it -- it plays

9    into that part of equity of allocation of resources.

10   So that's what I'm talking about here, is the

11   allocation of publicly-funded resources.

12        The consistency is about, we're not doing

13   veterans one day and former firefighters another day

14   and the next day just whoever we bumped into in the

15   street.

16        Q.   Does a staff member of the -- of -- within

17   Housing Stability provide information on shelter

18   availability to anyone within the City of

19   Minneapolis?

20        MS. PIERCE:  Objection.  Vague, compound,

21   foundation.

22        A.   I described the process earlier by which

23   we receive information on what shelter availability

24   is looking like via Simpson Housing Services.  If we

25   were asked about that by parties, including, but not

```
                                        Page 142
 1   limited to, the City of Minneapolis, we would share
 2   that information.
 3       Q    (BY MS. STILLMAN) Have you ever personally
 4   been asked for information on shelter availability
 5   by someone in the City of Minneapolis?
 6       A.    Surely, yes.
 7       Q.    Have you ever been asked personally about
 8   shelter availability by somebody who worked for the
 9   MPRB?
10       A.    I would expect so.
11       Q.    To the best of your recollection, was
12   there ever a time in 2020 when there were not any
13   available shelter beds for single men in Hennepin
14   County?
15             MS. PIERCE:  Objection.  Foundation,
16   vague.
17       A.    I believe that there were times at which,
18   during the day, the Adult Shelter Connect was no
19   longer able to offer reservations.  They would have
20   directed to call back in the evening.  More beds
21   would have become available.
22             I believe there were times during the
23   evening in which no more beds could be issued.
24   People calling after that time would have been
25   advised to call back the next morning, at which
```

Page 143

1    point more beds would have been available.

2         Q    (BY MS. STILLMAN) I'm going to mark

3    document Bates stamped HC00028407 as Exhibit 207.

4              (Deposition Exhibit Number 207 marked for

5    identification.)

6         Q.   And this is an email from you to Stephanie

7    Abel, Kaade Wallace and Kevin Dockry, dated

8    August 26th, 2020, correct?

9         A.   It's pronounced Kaade, but, otherwise,

10   yes, that's what it appears to be.

11        Q.   Who is Kaade Wallace?

12        A.   Kaade Wallace was on the intergovernmental

13   relations team at Hennepin County.

14        Q.   And the subject is, Re:  [External]

15   Forward Logan Park Encampments.

16             Correct?

17        A.   Yeah.

18             MS. PIERCE:  Objection.  That's not the --

19   that was not the title of the email.  You missed the

20   word "updates."

21        Q    (BY MS. STILLMAN) Updates.  Sorry.

22        A.   With that amendment, yes.

23        Q.   In the third paragraph you write, For

24   single adults, capacity is more constrained.

25             And then at the last sentence you write,

Page 144

1   We have some beds that go unused every night.  For

2   the first time in almost two months, we used every

3   men's bed last night but still had unused women's

4   beds.

5            Correct?

6        A.   Yes.

7        Q.   If every bed was used the night of

8   August 25th, does that mean there were no single men

9   experiencing unsheltered homelessness sleeping

10  outside on the night of August 25th, 2020?

11           MS. PIERCE:  Objection.  Foundation,

12  argumentative, vague.

13       A.   It does not mean that, nor when there were

14  beds that went unused does that mean that there was

15  nobody sleeping outside.

16       Q    (BY MS. STILLMAN) So a single man could

17  have called Adult Shelter Connect the night of

18  August 25th, 2020, and they would have been turned

19  away, correct?

20           MS. PIERCE:  Objection.  Lack of

21  foundation, calls for speculation, incomplete

22  hypothetical.

23       A.   They would have been advised to call back

24  the next morning, at which point there would have

25  been more beds available.  And, of course, if they

Page 145

1    had called on any night, any day for two months

2    running up to that, they would have been offered a

3    bed.

4         Q    (BY MS. STILLMAN) I'm going to go to the

5    document that was previously marked as Exhibit 196.

6              (Discussion held off the record.)

7         Q.   I'm not going to that document.  Never

8    mind.

9              MS. PIERCE:  So we're not doing 196?

10             MS. STILLMAN:  No.  It does not appear to

11   be in my folder.  Yeah.  I can't give Mr. Hewitt a

12   copy.

13             Okay.  But in the meantime, can you hand

14   me 200?

15             Let's go to Exhibit 200, previously marked

16   as Exhibit 200.

17             (Previously Marked Exhibit Number 200

18   introduced to the witness.)

19             MS. PIERCE:  Which is this?

20             MS. STILLMAN:  200.

21        Q.   (BY MS. STILLMAN) And this is an email

22   thread from Kate -- with Katie Topinka, Don Ryan,

23   and Amber Turnquest, dated November 10th, 2020,

24   correct?

25        A.   Yep.  That appears to be correct.

Page 146

1      Q.   So in the first email, under Original

2   Message, Amber Turnquest writes, You covered it,

3   Don.  The concern was primarily about where people

4   would go since the shelters were full and the new

5   beds aren't online yet.

6           Did Don Ryan ever talk to you, in November

7   of 2020, about outreach workers being concerned that

8   there weren't enough shelter beds available?

9           MS. PIERCE:  Objection.  Vague, misstates

10  witness's testimony.  And misconstrues the document.

11     A.   Yeah.  I -- I do not recall conversations

12  of the kind you are describing, nor do I exactly see

13  how they're linked to this document.

14     Q    (BY MS. STILLMAN) Did Amber Turnquest talk

15  to you about outreach workers being concerned about

16  shelters being full in November of 2020?

17          MS. PIERCE:  Objection.  Vague, misstates

18  the record and this document.

19     A.   I mean, I see that I am not on this

20  thread.  I have a vague recollection of Amber.  I do

21  not recall the conversations that I would have had

22  with her.

23     Q    (BY MS. STILLMAN) If there was a concern

24  about shelters being full, would Don Ryan -- would

25  that be a conversation that you and Don Ryan

Page 147

1   normally would have?

2          MS. PIERCE:  Objection.  Vague, incomplete

3   hypothetical, calls for speculation.

4       A.   And, I mean, I can say more on this.  I

5   personally dislike the language.  I think it's

6   unhelpful and potentially counterproductive when

7   people talk about shelters being full, because it is

8   always a -- a temporary condition that they are

9   unable to issue new space to new people.  That, as

10  I've already said, changes a couple of times every

11  single day.  New beds become available every single

12  morning.  New beds become available every single

13  evening.

14          Theoretically, I guess there are

15  circumstances under which that wouldn't happen, but

16  it has happened every single day since the Adult

17  Shelter Connects started doing this, to the best of

18  my recollection, which was October 2016.  So we say,

19  with a high degree of certainty, that there will

20  always be new beds available in the morning and

21  again in the evening.

22          I find the language of the shelters being

23  full to generally be unhelpful, because if it

24  prevents one single person who would have liked to

25  get in shelter from calling in to get that shelter

Page 148

1   and leads them to stay outside, I think that's

2   unconscionable, so -- but, anyway, I'm kind of

3   editorializing around the sides of your question,

4   which I think I've already answered.

5       Q    (BY MS. STILLMAN) I'm going to mark a

6   document Bates stamped HC00040304 as Exhibit 208.

7           (Deposition Exhibit Number 208 marked for

8   identification.)

9       Q.   And I'll state that the first page is the

10  metadata associated with this document.

11          MS. PIERCE:  Can we go off the record?

12          MS. STILLMAN:  Sure.

13          THE VIDEOGRAPHER:  We are going off the

14  record at 12:52 p.m.

15          (Discussion held off the record.)

16          THE VIDEOGRAPHER:  We're going back on the

17  record at 12:52 p.m.

18      Q    (BY MS. STILLMAN) Who is Maria Baca?

19      A.   Maria Baca works communications for

20  Hennepin County Human Services.

21      Q.   If you go to the actual document, right in

22  the middle there, she writes, We don't have capacity

23  to always shelter everyone, but Hennepin County and

24  our partners are able to offer 1,200 shelter spaces,

25  more than any other time in our history.  More are

Page 149

1    coming on board this year.

2           Do you see that?

3       A.   I do.

4       Q.   And do you agree that Hennepin County does

5    not always have capacity to shelter everyone?

6           MS. PIERCE:  Objection.  Misstates the

7    document, vague.

8       A.   And I would add that it talks about

9    Hennepin County and our partners.  As we've already

10   discussed, the majority of our shelter system,

11   normally all of it, is operated by our nonprofit

12   partners who are independent from us.

13          But, yes, I mean, this is simply

14   reflecting what I have already shared, that there

15   can be a time in the day when no further

16   reservations can be issued and more beds will open

17   up that evening.  And there can be a time in the

18   evening when no more beds can be offered and more

19   beds will open up the next morning.  And this is

20   what Maria is referring to here, in my opinion.

21      Q    (BY MS. STILLMAN) And if you just go to

22   that first page with the metadata, the family date

23   says 12/15/2020.

24          Do you see that?

25      A.   I see it.

                                        Page 150

1        Q.   So this was three days before the

2   encampment on the Midtown Greenway was closed,

3   correct?

4             MS. PIERCE:  Objection.  Foundation.

5        A.   That sounds about right for the timeline

6   that I recall.

7        Q    (BY MS. STILLMAN) Is there a --

8             Even if there is an open bed at a homeless

9   shelter in Hennepin County, there are reasons a

10  person might not be able to access that shelter,

11  correct?

12            MS. PIERCE:  Objection.  Vague, compound,

13  incomplete hypothetical, calls for speculation.

14       A.   Can you share what kind of reasons you're

15  thinking about?

16       Q    (BY MS. STILLMAN) How do you get in touch

17  with Adult Shelter Connect?

18            MS. PIERCE:  Objection.  Vague.

19       A.   By phone or in person at St. Olaf Church.

20       Q    (BY MS. STILLMAN) So you would neither

21  have to -- you would either have to have access to

22  transportation or a phone to get a shelter bed in

23  Hennepin County, correct?

24            MS. PIERCE:  Objection.  Misstates the

25  record, misstates witness's testimony.

```
                                        Page 151
```

1    A.   Or somebody assisting you would have to

2    provide those things.

3    Q    (BY MS. STILLMAN) Many people experiencing

4    homelessness don't have phones, correct?

5         MS. PIERCE:  Objection.  Foundation,

6    compound, calls for speculation.

7    A.   It is known to us that there are times

8    when individuals do not have phones.  Many do.  But

9    there are occasions, certainly.

10   Q    (BY MS. STILLMAN) There are occasions

11   where people don't have phones, people experiencing

12   homelessness don't have phones?

13        MS. PIERCE:  Same objections.

14   A.   (No answer.)

15   Q    (BY MS. STILLMAN) Are there occasions

16   where someone experiencing homelessness might not

17   have a phone that's charged?

18        MS. PIERCE:  Objection.  Vague, compound,

19   foundation, calls for speculation.

20   A.   My phone ran out of battery last night,

21   which actually I was worried about, because I would

22   have missed my alarm.  So I caught it just in time.

23   So, of course.

24   Q    (BY MS. STILLMAN) And is it more likely

25   that somebody experiencing homelessness would -- and

Page 152

1    is living in a place not fit for human habitation to

2    not have a charged phone?

3              MS. PIERCE:  Vague, compound, incomplete

4    hypothetical, calls for speculation.

5         A.    You are asking me to speculate.

6              An individual who does not have access to

7    an outlet is less likely to use an outlet.  I can

8    imagine a circumstance in which that could be true

9    for an individual, but I can't say that

10   categorically for everybody in a -- in a very broad

11   category that you're offering.

12        Q    (BY MS. STILLMAN) So for those

13   individuals, they might not be able to get in touch

14   with Adult Shelter Connect to reserve a bed; is that

15   correct?

16             MS. PIERCE:  Objection.  Vague, compound,

17   incomplete hypothetical, calls for speculation,

18   misstates the witness's previous testimony.

19        A.    And to an earlier point, it's not the only

20   way to contact the Adult Shelter Connect.  For

21   instance, anybody else with access to a phone -- an

22   outreach worker, a community volunteer, a friend, a

23   peer -- could also assist with that function.

24             Indeed, when it comes to outreach

25   services -- you asked earlier kind of how would we

Page 153

1  define outreach services, and one of the things that

2  I -- I think of generally is that we put

3  professionals into the field to help people navigate

4  systems, recognizing that there can be challenges in

5  doing so.

6      Q    (BY MS. STILLMAN) Do outreach workers go

7  to every encampment in Hennepin County every day?

8          MS. PIERCE:  Objection.  Vague as to which

9  outreach workers, compound.

10     A.    Outreach providers, similar to shelters,

11 independent nonprofit agencies.  So we don't set

12 their schedule or direct them.  We do look to them

13 to be the experts on where they need to be and

14 providing resources to folks in those settings.

15     Q    (BY MS. STILLMAN) Some of the shelters in

16 Hennepin County have rules for entry, correct?

17         MS. PIERCE:  Objection.  Foundation,

18 compound.

19     A.    We are talking about independent,

20 nonprofit agencies.  Programs tend to have some

21 rules attached to them.  Can you be more specific?

22     Q    (BY MS. STILLMAN) Some shelters don't

23 allow people to bring pets, correct?

24         Some shelters in Hennepin County don't

25 allow people to bring pets, correct?

Page 154

1           MS. PIERCE:  Objection.  Vague, compound,

2    foundation.

3      A.    Yes.  I understand that to be the case,

4    that there are shelters that do not accommodate pets

5    within Hennepin County.

6      Q.   And some shelters in Hennepin County don't

7    allow people to bring their partners, correct?

8           MS. PIERCE:  Objection.  Vague, compound,

9    foundation.

10     A.    There are shelters that do not accommodate

11   couples as partners together.  And there is a

12   specific shelter that was set up for that specific

13   purpose, with funding from Hennepin County through

14   what was then St. Stephen's Human Services, as we

15   worked with St. Stephen's Human Services to bring

16   about the creation of a partner-specific shelter in

17   2019.

18     Q    (BY MS. STILLMAN) And there are some

19   shelters in Hennepin County that don't allow

20   individuals to use illegal substances on the

21   property, correct?

22          MS. PIERCE:  Objection.  Vague, compound,

23   foundation.

24     A.    Neither Hennepin County nor our nonprofit

25   partners set the law around controlled substances.

Page 155

1      Q    (BY MS. STILLMAN) So I understand that you

2  don't -- Hennepin County and your partners don't set

3  the law regarding controlled substances, but -- so

4  are there some shelters in Hennepin County who don't

5  allow people to use controlled substances on the

6  shelter's property?

7           MS. PIERCE:  Objection.  Vague, compound,

8  foundation.

9      A.   I am not going to somewhat speculate and

10 answer on behalf of a third party as to how they

11 deal with criminal behavior on their premises.

12     Q    (BY MS. STILLMAN) Do you think, if you are

13 directing people to -- who are experiencing

14 homelessness to Adult Shelter Connect to reserve a

15 bed, you should be aware of the rules and

16 restrictions regarding those shelters?

17          MS. PIERCE:  Objection.  Argumentative,

18 vague, incomplete hypothetical, calls for

19 speculation.

20     A.   So the funding that we provide to Simpson

21 Housing Services to operate that Adult Shelter

22 Connect service, it is our expectation that they are

23 able to help people navigate to the shelter that is

24 the best fit for their needs and that they have

25 those understandings and can share that information

Page 156

1    with people at intake.

2         Q    (BY MS. STILLMAN) Do some shelters in

3    Hennepin County require people to have a photo ID?

4              MS. PIERCE:  Objection.  Vague, compound,

5    foundation.

6         A.   With regards to the single adult shelters

7    that we're talking about through the Adult Shelter

8    Connect, to my knowledge, none of them require a

9    photo ID.

10        Q    (BY MS. STILLMAN) Do some of the shelters

11   in Hennepin County require that you arrive at a --

12   at the shelter at a certain time in order to claim

13   your bed?

14             MS. PIERCE:  Objection.  Vague, compound,

15   foundation.

16        A.   The shelters that are accessed through the

17   Adult Shelter Connect typically do set a time by

18   which you are expected to claim your bed.  The

19   reason for doing this is simple.  Every single day a

20   lot of people don't show up to claim their bed.  We

21   want to make sure that those beds are made available

22   to other people that might need them.

23        Q    (BY MS. STILLMAN) So just because a bed

24   became available within the Hennepin County shelter

25   system doesn't mean that a person could necessarily

Page 157

1    access that bed, correct?

2           MS. PIERCE:   Objection.  Vague, compound,

3    foundation, incomplete hypothetical, calls for

4    speculation.

5        A.   Yeah.  Which -- which other question does

6    this tie back to?

7        Q    (BY MS. STILLMAN) So you said that beds

8    open every morning, correct?

9        A.   Correct.

10       Q.   So that bed could be at a shelter in

11   Hennepin County that somebody couldn't access,

12   correct?

13          MS. PIERCE:  Objection.  Vague, compound,

14   foundation, incomplete hypothetical, calls for

15   speculation.

16       A.   You've set out a number of different

17   pieces that you asked me to speak to around phones

18   and chargers and electricity and pets.  Which piece

19   are we speaking about here?

20       Q    (BY MS. STILLMAN) A pet.  So I'm using

21   Salvation Army as an example.  I'm not saying this

22   is their rule.

23       A.   Sure.

24       Q.   Just as a -- So let's say a bed opened at

25   Salvation Army in the morning.  Somebody called

Page 158

1  Adult Shelter Connect, who said they had a bed

2  available at Salvation Army.

3          If the person had a pet that they weren't

4  able to bring with them to Salvation Army, would you

5  consider that bed to be available for that person?

6          MS. PIERCE:  Objection.  Vague, calls for

7  speculation, incomplete hypothetical.

8      A.   I would consider that bed available to

9  people seeking shelter.  Obviously, that

10  individual -- there are specific shelters that are

11  able to accommodate pets, others that are not.  If

12  the only shelter bed available in that moment cannot

13  accommodate that pet, then that is going to be a

14  barrier for that individual.

15          MS. PIERCE:  Counsel, how much longer on

16  this line of questioning?  It's after 1.

17          MS. STILLMAN:  We can take a break.

18          MS. PIERCE:  Okay.

19          MS. STILLMAN:  Or we can break for lunch,

20  I mean.

21          THE VIDEOGRAPHER:  We are going off the

22  record at 1:05 p.m.

23          (Whereupon, a lunch recess was taken.)

24          THE VIDEOGRAPHER:  This is Media Number 4

25  in the deposition of David Hewitt.  Today is

```
                                          Page 159
 1   February 16th, 2023.  We're going back on the record

 2   at 1:52 p.m.

 3        Q.   (BY MS. STILLMAN) So, Mr. Hewitt, I have a

 4   few --

 5             THE VIDEOGRAPHER:  Rebecca, your mic.

 6        Q    (BY MS. STILLMAN) I have a few follow-up

 7   questions on the Coordinated Entry System we were

 8   talking about earlier.

 9             So during the pandemic, did anything about

10   the Coordinated Entry System change?

11             MS. PIERCE:  Objection.  Vague.

12        A.   The most significant change I can recall

13   in the Coordinated Entry System, coincidentally,

14   coincides with the beginning of the pandemic, which

15   is that I talked about it being a universal

16   assessment used to identify eligibility and

17   prioritization.

18             Hennepin County, as the rest of the state

19   of Minnesota and other communities around the

20   country, have been using a tool referred to as the

21   VI-SPDAT.  And this is one where I would go really

22   quickly.  I think it stands for something like

23   Vulnerability Index-Service Prioritization

24   Diagnostic Assessment Tool.  Also, none of that --

25   it's not important.  VI-SPDAT is what it's known as.
```

Page 160

1          There was research that came out at the
2   end of 2019 that looked at a large data set,
3   predominantly on the West Coast, suggesting that the
4   VI-SPDAT did not produce equitable outcomes.  So the
5   VI-SPDAT looked to criteria that was basically risk
6   factors resulting from homelessness.  But what they
7   found was that the risk factors that it focused on,
8   which included things like staying in an encampment,
9   tended to weight the scores more towards white
10  people experiencing homelessness as against people
11  of color experiencing homelessness, where the root
12  of homelessness was more likely to be economic, you
13  know, African-American families in shelter, that
14  kind of thing.
15          So what they found was that white folks
16  were more likely to get prioritized for the most
17  intensive, long-lasting forms of homeless-designated
18  housing programs as against African-American
19  households in particular.
20          Once that data was out in the world, we
21  were very clear -- and we were the first community
22  in the state of Minnesota to take this step -- we
23  are not going to use this tool for prioritizing the
24  Coordinated Entry System.  It so happened that that
25  was March of 2020.  And I say this with a slight

Page 161

1    smile on my face, because going into 2020, I thought

2    this was going to be the most significant thing that

3    we dealt with in the homeless response system.  Of

4    course, that was not how 2020 played out.

5            So that change was implemented around that

6    time.

7            I cannot think of another significant

8    change during that period, particularly.  We made

9    some process tweaks early on to make sure that

10   referrals were as effective as possible.  I was

11   asking my team to do a little bit more kind of

12   direct phone calls to providers, just knowing how

13   much everybody was juggling in the early days of the

14   pandemic.  And being a little bit more intentional

15   around communication was something that we stressed.

16           I think those are very minor tweaks and

17   kind of weren't significant shifts from existing

18   practice.

19       Q    (BY MS. STILLMAN) So you were talking

20   about a -- a referral in this process.  What is a

21   referral?

22       A    So housing provider, let's all choose one

23   for the sake of whatever.  Let's say it's Catholic

24   Charities' permanent supportive housing project.

25   When they are able to take on additional people,

Page 162

1   they have a free unit, or to the point that some of

2   these programs don't come with physical units, they

3   have the staff capacity and the available dollars to

4   provide rental assistance, they report that vacancy

5   to the team in my unit.

6          What the team in my unit then does is,

7   they have the priority list, populated by data from

8   all of the shelters and outreach teams and some

9   other folks in our community that are interacting

10  with people experiencing homelessness --

11          (Reporter clarification.)

12  A.    That are interacting with people

13  experiencing homelessness who have been trained and

14  appointed as a -- Coordinated Entry assessors.  So

15  that data is getting populated all of the time.

16          When the vacancy gets reported, our team

17  go to the priority list that pulls out of that data.

18  This is hosted within the Homeless Management

19  Information System.  They will then filter that list

20  by eligibility criteria.  Let's say this Catholic

21  Charities' program has a specific requirement around

22  a person meeting the standard for chronic

23  homelessness.  Perhaps they're getting HUD funding

24  that requires them to meet the standard for chronic

25  homelessness, in which case they would filter the

Page 163

1    list, because we don't want to refer someone to a

2    program that can't be served there.

3           Then the list is in priority order,

4    starting with, as I say, things like veteran,

5    disability status, length of time homeless, and they

6    would go to the first person off the list that meets

7    the eligibility criteria.  There are some client

8    choice questions in there as well and a notes

9    section.

10          Let's say, for example, this is a physical

11   unit in North Minneapolis, for the sake of argument.

12   A client may say, I do not wish to live in North

13   Minneapolis, in which case that's not going to be a

14   great fit for them, and you go to the next person.

15   You're using that uniform prioritization, overlaying

16   it with eligibility and client choice information,

17   to identify the highest-priority person for that

18   unit or opening.

19          And then the referral is essentially --

20   and it's all generated within the Homeless

21   Management Information System -- when you go back to

22   the housing provider and say, Here's your person,

23   this is the person for your unit, often if that

24   person is engaged with street outreach or at a

25   particular shelter, we're also communicating with

Page 164

1   them, we're asking these parties to communicate

2   together, so that that person gets into that program

3   as quickly as possible.

4        Q.   Do people only get referred to programs,

5   or can they get referred to an individual landlord?

6           MS. PIERCE:  Objection.  Compound, calls

7   for speculation.

8        A.   So participating in the Coordinated Entry

9   System, you have about 50 different independent

10  agencies that run housing programs, running about --

11  my last estimate -- about 150 different programs.

12  There are what we call site-based programs and

13  scattered site programs.

14          Site-based programs, there's a physical

15  building attached to it.  A nearby example to here

16  would be Park7, which is run by Agate Housing and

17  Service.  So in that case it's a physical property.

18  It has property management, a landlord, et cetera,

19  attached to it.

20          Scattered site programs -- and the

21  majority of programs in our community are scattered

22  site programs -- either time-limited, rapid

23  rehousing, or non-time-limited scattered site

24  permanent supportive housing, they provide a rental

25  subsidy and support services.  But the search is for

Page 165

1   a unit in the private market, and so they don't

2   necessarily come with a specific unit attached.

3   Part of the program is to help you find that unit.

4        Q    (BY MS. STILLMAN) Okay.  And I just want

5   to make sure I'm understanding the entire process

6   correctly.

7             So an outreach worker can do a Coordinated

8   Entry assessment, correct?

9        A.   Correct.

10       Q.   And then where would they send that

11  assessment?

12       A.   Yeah.  Thank you.  So they don't send the

13  assessment anywhere.  The assessment is entered into

14  the Homeless Management Information System.  So

15  depending on the specific worker, you have to be

16  trained to do this.  You have to have a license to

17  use the Homeless Management Information System.  I

18  mean, that's a basic requirement of most contracted

19  outreach providers.  They would enter it directly

20  into the Homeless Management Information System, and

21  that is a shared database, so then we can see that

22  information in our priority list.  The housing

23  provider can see the information in there as well.

24       Q.   What is the average time it takes to get a

25  housing referral after getting an assessment?

```
                                            Page 166

1           MS. PIERCE:  Objection.  Vague, compound,

2    calls for speculation, incomplete hypothetical.

3        A.    And I think I've spoke to this earlier on

4    as well.  There are a range of circumstances, and

5    because we are talking about a program area where

6    demand exceeds supply, there are people who will

7    never receive a referral.  So that, obviously,

8    impacts any kind of calculation of average.

9           It depends on the individual's

10   eligibility, their client choice, and their

11   prioritization.  And those things -- and then it

12   depends on the openings in the programs and who they

13   are best fit for.

14          So there is potential for huge variation.

15   It can happen very quickly.  It can happen after

16   more time.

17       Q    (BY MS. STILLMAN) Does Housing Stability

18   track that information?

19          MS. PIERCE:  Objection.  Vague.

20       A.   This process is managed in the Homeless

21   Management Information System.  So we pull data from

22   that.  We do some Power BI work.  I have a person on

23   the Coordinated Entry team that looks at pieces of

24   data to look at where there's potential for

25   efficiency gains to -- to speed up pieces of the
```

Page 167

1    process, so -- but I don't have a number off the top

2    of my head of, like, average days.  And like I say,

3    there are some difficulties in -- in providing that.

4        Q    (BY MS. STILLMAN) Are there people

5    experiencing homelessness who get housing through

6    systems other than the Coordinated Entry System?

7            MS. PIERCE:  Objection.  Vague, compound,

8    incomplete hypothetical, calls for speculation.

9        A    The Coordinated Entry System only applies

10   to a set of homeless-designated housing programs

11   that have federal, state and local funding.  It does

12   not control the housing market.  It does not control

13   the public housing authorities.  It does not control

14   a whole bunch of other resources that people might

15   use to seek housing.

16       Q    (BY MS. STILLMAN) Is the Minneapolis

17   Public Housing Authority a provider to whom somebody

18   who goes through the Coordinated Entry System could

19   get a referral?

20           MS. PIERCE:  Objection.  Vague, calls for

21   speculation, incomplete hypothetical, foundation.

22       A    And the answer is, not really in the sense

23   that you mean.  We don't have -- the Coordinated

24   Entry System is for homeless-designated housing

25   programs.  That is different from public housing.

Page 168

1    That is different from Section 8 vouchers.  Those

2    are not homeless designated.

3           The only reason I even give that caveat at

4    the beginning is, I can think of Minnehaha

5    Townhomes, which is 16 townhome units for families,

6    but Minneapolis public housing was the developer,

7    and there are permanent supports in those properties

8    funded by Hennepin County, and those properties do

9    take families through the Coordinated Entry System

10   into them because they have that support component

11   funded through Hennepin County to be homeless

12   designated.  But that's an usual arrangement.  The

13   vast majority of Minneapolis public housing is

14   operated through Minneapolis public housing

15   processes.

16         Q    (BY MS. STILLMAN) Okay.  So other than

17   that one program, if somebody wanted to get housing

18   with the Minneapolis Public Housing Authority, they

19   would have to do an entirely separate application

20   with Minnesota Public Housing Authority?

21         MS. PIERCE:  Objection.  Foundation,

22   vague, compound, assumes -- calls for speculation,

23   incomplete hypothetical.

24         A    Just as with many, many, many other

25   landlords and housing developers, yes, public

Page 169

1   housing operates its own intakes.

2        Q    (BY MS. STILLMAN) Have you heard of the

3   organization Start Today Hennepin?

4        A.   Yes.

5        Q.   What is Start Today Hennepin?

6        A.   It's one of the service providers that we

7   interact with.  They operate housing programs,

8   including permanent supportive housing programs.

9        Q.   How is it -- how is Start Today -- how is

10  Start Today Hennepin funded?

11            MS. PIERCE:  Objection.  Foundation.

12       A.   I do not have insight into all of the

13  financials of what is a -- an independent agency.

14  There are pieces of funding that Hennepin County has

15  a role in that pertain to Start Today.  In

16  particular, we have a housing support agreement with

17  Start Today that allows them to access state funding

18  to provide permanent supportive housing.

19       Q    (BY MS. STILLMAN) Is that county funding

20  to Start Today Hennepin restricted in how it can be

21  used?

22            MS. PIERCE:  Objection.  Vague,

23  foundation.

24       A.   The agreement that I'm thinking of is for

25  serving people coming out of long-term homelessness

Page 170

1    specifically, which means as per some -- well,

2    there's both a state piece to this and a local piece

3    to this.  But the long and the short of it is that

4    they are required to take their referrals through

5    that consistent, transparent, equitable, Coordinated

6    Entry process for that program.

7        Q    (BY MS. STILLMAN) Was that how the

8    County's -- was the County -- County's funding to

9    Start Today Hennepin restricted in that same way in

10   2020?

11            MS. PIERCE:  Objection -- same objections.

12       A.   For that program, that same requirement

13   would have applied in 2020.

14       Q    (BY MS. STILLMAN) Can Start Today Hennepin

15   place individuals experiencing homelessness in

16   housing outside of the Coordinated Entry System?

17            MS. PIERCE:  Objection.  Foundation,

18   vague.

19       A.   Start Today are an independent agency.  If

20   they obtain other funding or run other programs that

21   are separate from what I am describing, the rules

22   and -- and constraints and requirements for those

23   may differ.  But for a long-term homeless housing

24   support-funded program, they would be required to

25   take the referrals through the Coordinated Entry

Page 171

1    System to ensure that those resources are being used

2    consistently and transparently and equitably.

3        Q.   Do you track how many individuals Start

4    Today Hennepin gets housing for with your funding?

5            MS. PIERCE:  Objection as to you, your and

6    track.  Vague.

7            Pardon me.

8        A.   Within my area we have a team, the housing

9    support quality assurance team, a little bit like I

10   was describing earlier with service area leads, who

11   are responsible for monitoring compliance of the

12   housing support portfolio.  So they have tracking

13   mechanisms, monitoring mechanisms.

14       Q    (BY MS. STILLMAN) Where is that

15   information stored?

16           MS. PIERCE:  Objection.  Foundation.

17       A.   I'm not entirely clear what exact

18   information you are referring to.

19           I actually just had a presentation from

20   that housing support team this week in which they

21   showed me a dashboard where they showed how many

22   clients are being served in the various programs,

23   which is a roll-up from not just Start Today but all

24   of the other providers that are part of that program

25   as well.

Page 172

1      Q    (BY MS. STILLMAN) Where would that program
2  be stored?
3           MS. PIERCE:  Objection.  Vague.
4      A.   What I was viewing was a Power BI report.
5  I'm not entirely sure what we're talking about the
6  storage of.
7      Q    (BY MS. STILLMAN) Where would that
8  information be kept?
9      A.   Which information?  Sorry.
10     Q.   That -- that program you just mentioned.
11          MS. PIERCE:  Object.
12     Q.   (BY MS. STILLMAN) Presentation you just
13  mentioned.
14     A.   Online.  It's a Power BI dashboard.
15     Q.   Okay.  So it's -- is it
16  publicly-accessible information?
17     A.   That is not a publicly-visible Power BI
18  dashboard.  That's an internal dashboard.
19     Q.   And so you would have to have a login to
20  access that information, the dashboard information?
21     A.   If you wanted to see how many people were
22  being supported in those housing support programs on
23  that dashboard, yes, you would need access to them.
24     Q.   Does everyone who does an entry or an
25  assessment with Coordinated Entry get put on the

Page 173

1   wait list?

2          MS. PIERCE:  Objection.  Vague, asked and

3   answered.

4      A.   And it's not a wait list.  It's a priority

5   list.  And that's an important distinction for us,

6   because it is not a question of -- nor do we want

7   people to assume that you wait on this for a length

8   of time and you will rise to the top, because we use

9   those other criteria around veteran status,

10  disability status, length of time homeless, medical

11  fragility.  So we refer to it as a priority list.

12         With regards to people getting placed on

13  it, that is a function of shelter workers, the

14  outreach workers and others doing that direct

15  service.  People get placed on the list all the

16  time.  People also disappear, find their own

17  housing, leave the state and get taken off the list

18  on that basis as well.  So the list is dynamic.

19     Q    (BY MS. STILLMAN) How many people are on

20  the list right now?

21         MS. PIERCE:  Objection.  Misstates the

22  witness's previous testimony about the existence on

23  a list.

24     A.   I believe the single adult priority

25  list -- I actually haven't looked at its length in

Page 174

1    some time.  Historically it has been anywhere

2    between 600 and 1,000 people on the list, to the

3    best of my recollection.

4         Q.   (BY MS. STILLMAN) Did Hennepin County's

5    hotel program have requirements for admission in

6    2020?

7              MS. PIERCE:  Objection.  Vague, compound.

8         A.   Hennepin County established two, in some

9    senses three, programs that made use of hotels as

10   sites for shelter.  I believe that's what you're

11   referring to.

12             To start with, there are two different

13   programs.  One is isolation for people who are

14   confirmed or presumptive COVID cases.  The

15   eligibility criteria for those programs was the

16   person be experiencing homelessness, unsheltered or

17   sheltered, and either have confirmed or presumptive

18   COVID.  And their stay would be for the duration of

19   the -- the period during which they were a

20   transmission risk.

21             So that's one set of programs.

22             The second set of programs we sometimes

23   refer to as protective shelter.  And these programs

24   were focused on really bringing down the level of

25   risk for those people who were most likely to suffer

Page 175

1    severe medical consequences from the pandemic.

2            So the initial focus, at the direction of

3    our public health colleagues, was to concentrate on

4    people aged 60 and above, based on what we knew

5    about the pandemic and who was at greatest risk.  We

6    added to that criteria people who had other

7    underlying medical conditions that the CDC had

8    identified as putting them as risk.

9            As those programs ramped up, I would say

10   there was also a secondary goal here, which was to

11   reduce the number of people in, in particular, the

12   larger shelters, to support social distancing in

13   those congregate sites.

14       Q    (BY MS. STILLMAN) For that second set of

15   hotels that you were just talking about, was there a

16   time limit on how long somebody could stay there?

17            MS. PIERCE:  Objection.  Vague, compound.

18       A    Not as such.  As with, I believe, all

19   shelters, the goal was not to have people living in

20   homelessness in a shelter because it happens to be

21   in a hotel.  I both don't see that as desirable for

22   the individual, on top of which there were serious

23   concerns as to whether it was financially

24   sustainable or otherwise sustainable, knowing that

25   at some point hotels may choose to shift their

Page 176

```
 1   business model away from where we were.  And we
 2   didn't want to be in a position ever where people
 3   would be returning to homelessness and returning to
 4   the streets.
 5          So we set a -- I think a very -- it's
 6   probably some of the work I'm most proud of.  We set
 7   a very clear target and goal that we were going to
 8   wind down the use of those sites beginning from when
 9   vaccination became widely available for COVID, and
10   that became our best defense against medical
11   complication.  We were going to wind down these --
12   these sites by helping access permanent housing,
13   which we did over the course of a 12-month period.
14      Q    (BY MS. STILLMAN) Did everyone who was
15   staying in that second group of hotels access
16   permanent housing?
17          MS. PIERCE:  Objection.  Vague, compound,
18   foundation.
19      A    Our count is that 464 people from those
20   hotel sites accessed permanent accommodation, as we
21   wound down from the largest portfolio we had, which
22   was 540 rooms.
23          So there are people who left, we know not
24   where, and there were some circumstances in which
25   people who were not engaging with the program, were
```

Page 177

1  not working towards housing or otherwise working

2  within the program, may have been unable to continue

3  in the program, in which case our, kind of,

4  fall-back response was to set up a referral to a

5  shelter if that's what they wished.

6      Q    (BY MS. STILLMAN) How did you determine

7  who was medically qualified to get one of those

8  hotel rooms?

9      A.   Yeah.

10         MS. PIERCE:  Objection.  Vague as to you

11  and medically qualified.

12     A.   And I didn't, because that's -- that

13  wouldn't be my role.

14         We looked to the leadership of our Health

15  Care for the Homeless team.  They set the initial

16  guideline that we should focus on people aged over

17  60.  That's a pretty easy one; we looked at people's

18  birth dates.  But for the other categories, we then

19  asked Health Care for the Homeless to take the list

20  on -- to take the lead on prioritizing for any

21  available openings.

22     Q    (BY MS. STILLMAN) Was the individual --

23  the information on those individuals gathered

24  through the HMIS system?

25     A.   We used the HMIS system, because this was

Page 178

1   a homeless shelter.  So information on these

2   individuals was within them.

3        You seem to be asking about medical

4   information there, potentially.  We do not use HMIS

5   for tracking medical information.  Our Health Care

6   for the Homeless team, as a public health team, have

7   other -- other mechanisms they use for -- for

8   storing and collecting health data.  And I'm not

9   very familiar with those systems.

10       Q.   So would someone from Hennepin County

11  Health Care for the Homeless do a referral for

12  someone to get into the hotel space for people who

13  were medically vulnerable?

14            MS. PIERCE:  Objection.  Vague, compound.

15            Do you mean during COVID?

16            MS. STILLMAN:  During COVID.

17       A.   They were certainly the ones that we were

18  looking to to identify the people who were moving

19  in.  I -- I don't recall the exact referral

20  mechanisms that we used.  You had situations where

21  hotels were opening up anew, and there were mass

22  movements in.  And then you had situations, prior to

23  vaccination becoming available, where rooms might

24  become available.  Health Care for the Homeless were

25  responsible for prioritizing in those cases.  But I

Page 179

1  do not recall exactly how that mechanism worked.

2      Q    (BY MS. STILLMAN) If a volunteer was at

3  a -- at a homeless encampment in Hennepin County in

4  2021 and they encountered someone who was high risk

5  for COVID-19, what would be the process by which

6  they would go through to help get that person into a

7  hotel for them?

8          MS. PIERCE:  Objection.  Vague, including

9  a time frame.  Did you say 2021?

10         MS. STILLMAN:  2020.

11         THE WITNESS:  I thought you said 2021.

12         MS. PIERCE:  I heard 2021.

13         MS. STILLMAN:  2020.

14         MS. PIERCE:  And calls for speculation,

15 incomplete hypothetical, foundation.

16     Q    (BY MS. STILLMAN) I apologize.  I meant

17 2020.

18         MS. PIERCE:  Same objections, then.

19         MS. STILLMAN:  Yeah.

20     A    With regards to 2020, like I say, we were

21 looking to Health Care for the Homeless for

22 prioritization beyond initial intakes, which often

23 happened -- like I say, when it came to everybody

24 aged over 60, that first week was really focused on

25 congregate shelter and people who were aged over 60

Page 180

1     in those settings and getting them out.

2           Beyond that, we looked to Health Care for

3     the Homeless to prioritize.  They were active in

4     encampments, as well as in our shelter system, and

5     we were looking to them through that prioritization.

6     And I don't recall the exact mechanics of that.

7           Q    (BY MS. STILLMAN) For people who were

8     staying in the COVID isolation rooms because they

9     had contracted COVID in -- during the 12 months that

10    these hotels were operational -- you said they were

11    operational for approximately 12 months; is that

12    correct?

13          A    No.  I said -- my statement about

14    12 months was from the point at which vaccination

15    became available in February of 2021, when we

16    stopped new intakes, because vaccination became our

17    primary mechanism for preventing medical

18    complications from COVID.  At that point we stopped

19    new intakes.  And it was a further 12 months from

20    there until we ended the program, because we were

21    focused on exiting everybody that we could to

22    permanent housing, and that took time.

23          Extending backwards, the first programs

24    that we stood up were in March of 2020, in the first

25    weeks of -- I mean, actually, it was the very last

Page 181

1   in-person board meeting where I went in front of the
2   board and said, We have these two strategies.  It's
3   protective shelter, it's isolation shelter, and an
4   allocation of 3 million dollars from general funds
5   made.  Because at that point there was no federal or
6   state funding available for these kind of things.
7   And nobody else was doing this kind of thing.  But
8   we took that step on March 17th of 2020.
9        Q.   So if somebody was in an isolation shelter
10   in April 2020, where were they sent after their
11   isolation period ended?
12        MS. PIERCE:  Objection.  Vague,
13   foundation, compound, calls for speculation,
14   incomplete hypothetical.
15        A.   At the point at which that -- an
16   individual who was confirmed or presumptive COVID
17   was deemed to no longer be a transmission risk, they
18   would have the option of accessing a regular shelter
19   bed, or they had freedom of choice, of course.  So
20   they wouldn't be sent anywhere, but options would be
21   provided, primarily shelter.
22        Q    (BY MS. STILLMAN) Have you observed
23   encampment residents be more willing to go indoors
24   if they are offered a hotel room versus being
25   offered a shelter bed?

Page 182

1          MS. PIERCE:  Objection.  Foundation,
2   vague, compound.
3          A.   I cannot make that statement.  No.
4          Q    (BY MS. STILLMAN) Are there any benefits
5   to getting an individual who's experiencing
6   homelessness indoors versus staying in an encampment
7   outside?
8          MS. PIERCE:  Can you repeat that question
9   for me, please?
10         (Whereupon, the court reporter read back
11   the requested portion of the record.)
12         MS. PIERCE:  Objection.  Vague, compound,
13   foundation, assumes facts not in evidence,
14   incomplete hypothetical, calls for speculation.
15         A.   I am clear that all efforts should be made
16   to help individuals exiting encampments where the
17   risks from fire, infectious disease, violence and
18   exploitation are significant.  I do not think that
19   all indoor options are automatically safe and
20   dignified, either.  And, indeed, I think there is
21   evidence of that from 2020, if we look at a
22   situation like the Sheraton Hotel, which itself
23   became deeply unsafe.
24         Q    (BY MS. STILLMAN) Did you ever go to the
25   Sheraton Hotel while -- in June of 2020, while it

Page 183

1    was being used to temporarily house homeless

2    individuals?

3         A.   No.

4         Q.   Are there currently nonprofit

5    organizations helping people who are

6    experiencingly -- experiencing homelessness in

7    Hennepin County?

8              MS. PIERCE:  Objection.  Vague.

9         A.   I mentioned earlier on, of course, that we

10   estimate kind of 50 nonprofit partners, agencies,

11   participating in various aspects of -- of homeless

12   response activities, so I -- I think the answer is,

13   yes, but I also think it's been covered.

14        Q    (BY MS. STILLMAN) I am marking document

15   Bates stamped HC00012482 as Exhibit 209.

16             (Deposition Exhibit Number 209 marked for

17   identification.)

18             (Discussion held off the record.)

19        Q.   So at the top of this document it says,

20   From David Hewitt to Katie Topinka, Donald Ryan and

21   Andrea Brennan, dated June 23rd, 2020.  Correct?

22        A.   Yes.  Looks like it.

23        Q.   And this is an email thread between you,

24   Katie Topinka, Don Ryan and Andrea Brennan that goes

25   through multiple emails, correct?

Page 184

1       A.   Appears to be.  Yes.

2       Q.   So if you go to page -- the page that ends

3   in 12484, there is that number 6, Long-Term Planning

4   and Visioning.

5            Do you see that?

6       A.   I do.

7       Q.   And it says, I think we need to be really

8   upfront that the ideas of increased housing shelter

9   capacity is not something we are likely to be able

10  to do at a significant scale in response to this.  I

11  think we say for the County and the City we reported

12  we have no capacity to safely stand up additional

13  sites to the State on May 13th, before this latest

14  crisis and the situation.

15           In June 2020, did Hennepin County have the

16  capacity to significantly increase housing and

17  shelter capacity?

18           MS. PIERCE:  Objection.  Vague,

19  foundation.

20      A.   I referenced in one of my recent answers

21  that we were amongst the first to stand up

22  non-congregate shelter for the people at highest

23  risk of COVID.  And we did that out of

24  Hennepin County existing capacity, essentially.  We

25  were begging, borrowing staff from across every

Page 185

1    department.

2             As I recall, around June of 2020, we made

3    several requests to the State for assistance.  We

4    were struggling to staff sites on a weekly basis.

5             So this email was immediately preceded by

6    a very, very significant increase in shelter

7    capacity.  And, yes, we had hit a point where it was

8    not foreseeable that we were going to add to that

9    significantly again in the near future, given the

10   constraints we were facing and the lack of

11   assistance we were receiving.

12      Q    (BY MS. STILLMAN) The bottom of that

13   section says, If nonprofit partners see

14   opportunities to safely operate more shelter and

15   housing, we are happy to support them, and there

16   will be opportunities through ESG funding.

17            Otherwise, we are going to be reliant on

18   resources already in our community and the ability

19   of outreach teams to connect people to those

20   opportunities, whether they be programmatic through

21   CES or in Board and Lodge, or informal connecting

22   people to family and friends.

23            Correct?

24      A    Yes.

25      Q    Did you think it was important to safely

Page 186

1  operate more shelter and housing in June of 2020 --

2          MS. PIERCE:  Objection.

3      Q    (BY MS. STILLMAN) -- in Hennepin County?

4          MS. PIERCE:  Oh, sorry.

5          MS. STILLMAN:  Sorry.

6          MS. PIERCE:  Objection.  Vague, incomplete

7  hypothetical, calls for speculation.

8      A.   I think it is always important that

9  anything being stood up be safe, as a partial answer

10  to -- to your question.

11          I also believed, as this kind of alludes

12  to, that there were more opportunities to be made of

13  existing capacity, both in terms of speeding up

14  housing connections through the Coordinated Entry

15  System, making better use of Board and Lodge

16  programs.  We haven't spoken about those, but those

17  are not homeless-specific, and so do not go through

18  that same Coordinated Entry System process,

19  site-based programs that were reporting significant

20  numbers of vacancies at this time and were available

21  to house people with disabilities.

22          And, of course, there is always the

23  informal connection piece.  And I can say more on

24  that.

25          But we also have the ESG reference in

Page 187

```
 1   here, so we were about to release a request for
 2   proposals for Emergency Solution Grant COVID funding
 3   that the federal government had provided to city and
 4   county, and so were interested in what proposals
 5   others might bring forward.
 6            And, of course, we're always interested in
 7   what the market can deliver that would lead to a
 8   better system.  And that was kind of where we were,
 9   to the best of my recollection, in June of 2020.
10       Q    (BY MS. STILLMAN) So you said Board and
11   Lodges serve people with disabilities, correct?
12       A.   Correct.
13       Q.   How do Board and Lodges define disability?
14            MS. PIERCE:  Objection, foundation.
15   Objection, compound.
16       A.   These programs also access state housing
17   support, so we lean on state definitions.  I don't
18   have that off the top of my head.
19       Q    (BY MS. STILLMAN) Do Board and Lodges
20   sometimes have other restrictions in addition to
21   requiring that a resident be disabled?
22            MS. PIERCE:  Objection, vague.  Objection,
23   foundation.
24       A.   We have approximately 2,000 units of
25   Board and Lodge housing across the portfolio in
```

Page 188

1    Hennepin County.  These are run by an array of

2    independent agencies that, much like our discussion

3    around shelter earlier on, have their own

4    programmatic design and requirements.

5            So, in short, yes.  Different Board and

6    Lodges may have different focuses, different

7    programming that will be a fit for specific groups

8    of people.

9            Our position was, as long as there are

10   vacancies here, let's at least make sure that people

11   are aware of those options and we're making the most

12   of them for anyone that's a good fit.

13       Q    (BY MS. STILLMAN) I am marking document

14   that's been Bates stamped HC00038855 as Exhibit 210.

15           (Deposition Exhibit Number 210 marked for

16   identification.)

17       Q.   And this is an email -- the top page is an

18   email from Jodi Wentland to you and Michael Herzing

19   on October 17th, 2020, correct?

20       A.   Yes.  It appears to be.

21       Q.   And this is a forward of an email from

22   Yusra Murad, dated October 16th of 2020, to Jodi

23   Wentland that's located on page 2.

24       A.   I see that.

25       Q.   So in -- Do you know who Yusra Murad is?

Page 189

1     A.   Yes.

2     Q.   Who is she?

3     A.   To my recollection, Yusra was involved in,

4  alternately, the Sanctuary Movement and a nonprofit

5  known as ZACAH.

6     Q.   What's your knowledge about ZACAH?

7     A.   My knowledge about ZACAH is fairly

8  limited.

9     Q.   What is it?

10     A.   I am aware that they are a 501(c)(3).  Or

11  at least that's how it was presented to me.  I am

12  aware that there is a -- that they have stated

13  publicly that they had been doing work around

14  housing prior to 2020, though -- neither I nor

15  anyone I know had ever heard of them prior to this

16  point.  I am aware at this point they started acting

17  as kind of a fiscal agent for some of the activities

18  happening that seemed to coincide with the Sanctuary

19  Movement.  I couldn't speak exactly to the alignment

20  of those two things.

21     Q.   What is your understanding of ZACAH's

22  mission?

23     A.   I -- Everything I just said is as much as

24  I could say with regards to their mission.  Like I

25  say, we had literally never heard of them until this

Page 190

1    point.

2        Q.    Have you ever spoken to Yusra -- Yusra

3    Murad on the phone?

4        A.    It's only possible.  I spoke to an awful

5    lot of people on the phone, well, all the time, but

6    especially in 2020.  Yeah.  I -- I can believe that

7    I have.

8        Q.    So going back to this document, on the

9    second page, ending in 38856, Yusra Murad writes,

10   Please do send me that information on how to apply

11   for the requested 18K ZACAH spent to house the Logan

12   Park residents at the Extended Stay.  I am hoping at

13   the very least we qualify for reimbursement.

14            Do you see that?

15       A.    Yes.

16       Q.    And then she writes, Total collections are

17   dwindling, and we are petrified that after two more

18   weeks we won't have enough for any hotels left,

19   leaving our current guests with nowhere to go and no

20   option for the hundreds of people still outside.

21            Do you see that?

22       A.    Yes.

23       Q.    And then Ms. Wentland forwarded this to

24   you and Michael Herzing and wrote -- asked you to

25   look at the below draft response, correct?

Page 191

1       A.   It appears so.

2       Q.   Did you respond to this email?

3       A.   As I said earlier, I believe I am

4   responsive to emails, so I would assume so.  I

5   couldn't tell you exactly what I said.

6       Q.   Okay.  And in this email Jodi Wentland

7   writes, There are about 30 to 40 single adult

8   shelter beds -- or about 30 to 40 single adult

9   shelter beds are going unused every night.

10           Correct?

11      A.   I see that written there.  Yep.

12      Q.   Okay.

13           MS. STILLMAN:  I'm marking a document

14   that's been Bates stamped HC00033851 as Exhibit

15   Number 211.

16           (Deposition Exhibit Number 211 marked for

17   identification.)

18      Q    (BY MS. STILLMAN) So --

19           MS. PIERCE:  And, Counsel, for the record,

20   I'm going to indicate that the top-most email is

21   most likely a draft, because it doesn't include a

22   From line.

23      Q    (BY MS. STILLMAN) If you look in the

24   middle section, there is in -- on the first page,

25   there is an email from Don Ryan to you, dated

Page 192

1    November 12th, 2020, correct?

2         A.    I see that.

3         Q.    And it's a forward, [External] Updates on

4    Hotel.

5               Correct?

6         A.    Yes.

7         Q.    And it's a forward of this email below

8    from John Tribbett to Don Ryan dated November 12th,

9    2020, correct?

10        A.    I see that as well.

11        Q.    Okay.  And in this Mr. Tribbett writes,

12   Essie and I spoke with individuals involved with

13   ZACAH and the Sanctuary Movement that have been

14   putting folks up in hotels.  Here's what we -- is

15   what we were told:  In regards to the Extended Stay,

16   that Hennepin was going to purchase but the deal

17   fell through; 50 individuals who will be leaving the

18   hotel by 11/13; ZACAH's out of money and can't

19   realistically handle the caseload from out there.

20              Do you see that?

21              MS. PIERCE:  From?

22              MS. STILLMAN:  From there on out.

23              MS. PIERCE:  There you go.

24        Q     (BY MS. STILLMAN) Do you see that?

25        A.    I do see that, with that amendment.  Yes.

Page 193

1        Q.    And Don Ryan wanted to discuss this with
2    you, correct?
3        A.    That's how it looks from his email.
4        Q.    And in either this draft or sent email
5    that's on the top, you said, Yes.  You might want to
6    relay to John that the plan I am aware of was for
7    them to go to Strong Tower shelter (not Elim) and
8    they are planning to open.  I believe they got
9    approval from the fire marshal this week, but I'm
10   not sure how close they are to opening.  That is a
11   private effort (we're providing some capital for
12   showers).
13            And the contact there is LaTonya Whitley.
14   Correct?
15       A.    Yep.  I see that written there.
16       Q.    Did the Strong Tower shelter open?
17            MS. PIERCE:  Objection.  Foundation.
18       A.    This -- the Strong Tower shelter did open,
19   though not on this timeline, not at this point.
20       Q    (BY MS. STILLMAN) When did it open?
21            MS. PIERCE:  Objection.  Foundation.
22       A.    I'm not entirely sure.  I feel like it
23   opened the following winter.
24       Q    (BY MS. STILLMAN) Was the Strong Tower
25   shelter open in February of 2020?

1          MS. PIERCE:  Objection.  Foundation, asked

2     and answered.

3          A.   Yes.  When I speak -- when I say the --

4     the winter, the following winter, that's certainly

5     not February 2020.

6          My belief, and, again to the best of my

7     recollection, is that it opened the winter spanning

8     the end of 2021, coming into 2202.

9          Q.   Would Housing Stability have a record of

10    whether the Strong Tower shelter opened?

11         MS. PIERCE:  Objection.  Foundation.

12         A.   Depends a little bit what you mean by

13    "record."  We -- as in this email, the funding that

14    we had provided to that operation was through a

15    competitive process for capital.  To support

16    improvements to shelter programs, they applied

17    through that.

18         We were not providing them with

19    operational funding.  So we didn't have a contract

20    with them for that winter.  They did have funding, I

21    believe, from other governmental entities who,

22    therefore, may have contractual documents.

23         We would have emails from the time, no

24    doubt, between staff, saying, yes, this is opening

25    on such and such a date, I would imagine.

Page 195

```
 1       Q    (BY MS. STILLMAN) Is it your practice to
 2   track whether a shelter opens if you are going to be
 3   providing that shelter with money?
 4             MS. PIERCE:  Objection.
 5             By "you" do you mean Hennepin County or
 6   the witness?
 7             MS. STILLMAN:  The witness.
 8             MS. PIERCE:  The witness individually
 9   providing capital?
10             MS. STILLMAN:  The -- Hennepin County
11   providing capital.
12       Q    (BY MS. STILLMAN) Is it your --
13       A    Yeah.
14       Q    -- practice to track if a shelter opens if
15   Hennepin County, specifically the Housing Stability,
16   provides capital to a shelter?
17             MS. PIERCE:  Objection.  Assumes facts not
18   in evidence, calls for speculation, incomplete
19   hypothetical, vague.
20       A    Additionally, the vast majority of
21   capitals that we provided which do exist in
22   shelters -- this is kind of an unusual circumstance.
23   But, yes, we were -- I -- I mean, again, define
24   track, define record.  But, of course, we were keen
25   to see that opened, and when it did the following
```

Page 196

1   winter, glad to see the resources that we provided

2   being used to provide people with shelter.

3        Q     (BY MS. STILLMAN) Is it your understanding

4   that Strong Tower shelter and Elim shelter are two

5   separate shelters?

6             MS. PIERCE:  Objection.  Foundation.

7        A.   I believe they refer to two separate

8   buildings.  So I guess I would say, yes.

9        Q     (BY MS. STILLMAN) How many people could

10  stay in the Strong Tower shelter at one time?

11            MS. PIERCE:  Objection.  Foundation.

12       A.   Strong Tower is operating as a shelter

13  right now.  I believe they have set their capacity

14  at 50 people.

15       Q     (BY MS. STILLMAN) And how many -- what was

16  the capacity for the Strong Tower shelter in

17  November of 2020?

18            MS. PIERCE:  Objection.  Misstates

19  previous testimony about when it was opened.

20       A.   Yeah.  I've already said that it didn't

21  open in November 2020.

22       Q     (BY MS. STILLMAN) What was the capacity at

23  Strong Tower shelter when it opened?

24            MS. PIERCE:  Objection.  Foundation.

25       A.   To the best of my recollection, 50 has

Page 197

1   been the capacity there.

2           I mean, for what it's worth, when shelters

3   open, it sometimes takes a little bit of time to get

4   up to capacity.  You do kind of a phased launch.

5   But 50 in terms of the maximum capacity is what I

6   recall.

7       Q    (BY MS. STILLMAN) Do you know for -- do

8   you know if Strong Tower shelter is supported by the

9   group MICAH?

10          MS. PIERCE:  Objection.  Foundation.

11      A    That is not who we provided funding to.

12  Rescue Now is the 501(c)(3) that operates that

13  shelter right now.

14      Q    (BY MS. STILLMAN) Who operated it when it

15  opened?

16          MS. PIERCE:  Objection.  Foundation.

17      A    I believe it has been Rescue Now.  Since

18  opening, at least post this email that you're

19  sharing, there was a history of that building having

20  opened as a shelter prior to the pandemic.  We were

21  not involved in those operations.  That predated

22  Rescue Now.

23      Q    (BY MS. STILLMAN) Did the people who were

24  staying at the Extended Stay in rooms funded by

25  ZACAH go to the Strong Tower shelter?

1          MS. PIERCE:  Objection.  Foundation,

2   compound.

3       A.   As Strong Tower didn't open in that time

4   frame, they could not have done, to the best of my

5   knowledge.

6       Q    (BY MS. STILLMAN) Where did they go?

7          MS. PIERCE:  Objection.  Foundation,

8   compound.

9       A.   I do not have that information.

10          MS. PIERCE:  Counsel, you've been going

11   about an hour.  Do you want to take a break, or do

12   you want to finish what you're on?

13          MS. STILLMAN:  I only -- I think I only

14   have a few more questions in this.

15          MS. PIERCE:  Okay.

16          MS. STILLMAN:  I'm going to mark a

17   document that's been Bates stamped HC00014605 as

18   Exhibit 212.

19          (Deposition Exhibit Number 212 marked for

20   identification.)

21       Q.   (BY MS. STILLMAN) And this is an email

22   from you to LaTonya Whitley dated September 25th,

23   2020, correct?

24       A.   Yep.  I see that.

25       Q.   And then below that, on September 25th,

Page 199

1   2020, you wrote, Thanks for your email.  I tracked

2   down the State ESP funding page.

3            And then you provide the link.

4            MS. PIERCE:  Counsel, I'm sorry.  Where

5   are you?

6            MS. STILLMAN:  On the bottom of the first

7   page.

8            THE WITNESS:  First page.

9            MS. PIERCE:  I'm sorry.  Thank you.

10       Q.   (BY MS. STILLMAN) Thanks for your email.

11   I tracked down the State ESP funding page.  It is

12   at -- and then you provide a link.

13       A.   Yeah.  I see that.

14       Q.   So you helped Strong Tower parish get

15   funding for a shelter, correct?

16            MS. PIERCE:  Objection.  The document

17   speaks for itself, vague.

18       A.   As I've already explained, through a

19   competitive process, we issued capital funding for

20   them to help prepare the building.

21            This email here -- I sent an email letter

22   to a provider yesterday.  If somebody is asking me

23   where they can get funding, I am providing a link to

24   a separate governmental entity that's offering

25   funding.  I don't feel like I'm doing anything more

Page 200

1   than telling them where to look for funding through

2   another entity.

3          Q    (BY MS. STILLMAN) In the email on top from

4   LaTonya Whitley, LaTonya Whitley writes in the last

5   sentence, We are moving forward and expecting a way

6   to shelter the individuals at Logan Park encampment.

7   They are counting on us.

8               Correct?

9          A.   I read that.

10         Q.   Were the Logan Park encampment residents

11  who ZACAH was paying to have stay in hotel rooms?

12              MS. PIERCE:  Have that -- Can I have that

13  question read back?

14              (Whereupon, the court reporter read back

15  the requested portion of the record.)

16              MS. PIERCE:  Is that your complete

17  question?

18              MS. STILLMAN:  Yeah.

19              MS. PIERCE:  Objection.  Vague, hard to

20  understand.

21         A.   You said residents as well.

22              MS. PIERCE:  Yes.  Use of residents.

23         A.   I did not personally know who was staying

24  at the Logan Park encampment, nor who was in the

25  Extended Stay, but I do recollect there was some --

Page 201

1   there was some relationship here.  But I couldn't

2   say more than that.

3            I mean, by definition, if they're being

4   described here as people staying in the Logan Park,

5   they're not in the Extended Stay, but --

6       Q    (BY MS. STILLMAN) If you go to the third

7   page of this document, the top part is a

8   continuation from your email.  And you wrote, I'm

9   also copying in Katie Topinka from the City of

10  Minneapolis and would suggest that we have a

11  follow-up call with Katie as well as we try to

12  identify what sources of support might be available.

13           MS. PIERCE:  Do you mean the second page?

14           MS. STILLMAN:  Yes.

15      A.   Sorry.  Okay.

16      Q    (BY MS. STILLMAN) Do you see that?

17      A.   Yes, I do.

18      Q.   Was it your practice to set up calls with

19  people who emailed you to request funding to

20  identify sources of support?

21           MS. PIERCE:  Objection.  Foundation,

22  compound, incomplete hypothetical, calls for

23  speculation.

24      A.   It would depend on the specific

25  circumstances, what they're proposing, what I was

Page 202

1    aware of at that time.  Yeah.  There's a lot of
2    variables.
3        Q    (BY MS. STILLMAN) Why did you want to set
4    up a phone call with Katie Topinka and LaTonya
5    Whitley --
6            MS. PIERCE:  Objection.  Misstates the
7    document.
8            MS. STILLMAN:  Can I finish my question?
9            MS. PIERCE:  Oh, sorry.  I thought you
10   were done.
11       Q    (BY MS. STILLMAN) Why did you want to set
12   up a phone call with Katie Topinka and LaTonya
13   Whitley in September of 2020 to identify what
14   sources of support might be available to LaTonya
15   Whitley?
16           MS. PIERCE:  Objection.  Misstates the
17   document.
18       A.   Without providing any commentary at all on
19   this specific incident, there is a difference
20   between me wanting a meeting and suggesting a
21   meeting.  And I'm doing the latter, from what I can
22   see here.
23           I mean, in this specific incidence, I can
24   only assume that I was aware that the City of
25   Minneapolis potentially did have funding for

Page 203

1   something like this, and so it was logical for me

2   to -- to offer that connection.

3        Q    (BY MS. STILLMAN) Did you have a call with

4   Katie Topinka and LaTonya Whitley to identify what

5   sources of support might be available?

6        A.   I don't recall.

7             MS. PIERCE:  If you're going to a new

8   document, I'd suggest taking the break now.

9             MS. STILLMAN:  How long have we been

10  going?

11            MS. PIERCE:  More than an hour.

12            MS. STILLMAN:  Okay.  We can take a break.

13            THE VIDEOGRAPHER:  We are going off the

14  record at 2:55 p.m.

15            (Whereupon, a recess was taken.)

16            THE VIDEOGRAPHER:  This is Media Number 5

17  in the deposition of David Hewitt.  Today is

18  February -- February 16th, 2023.  We're going back

19  on the record at 3:12 p.m.

20       Q.   (BY MS. STILLMAN) Okay.  I just marked

21  document Bates stamped HC00033813 as Exhibit 213.

22            (Deposition Exhibit Number 213 marked for

23  identification.)

24       Q.   And this top email is an email from you to

25  Don Ryan, dated November 4th, 2020, correct?

Page 204

1          A.   I see that.

2          Q.   And in that email you say that you should

3    not be referring anyone to ZACAH and ZACAH should

4    not be referring anyone to us.  If people have

5    nowhere to stay, we need to direct them to the ASC.

6               Correct?

7          A.   I see that.

8          Q.   By ASC do you -- did you mean Adult

9    Shelter Connect?

10         A.   Yes.  Exactly.

11         Q.   Why didn't you want anyone referring --

12   being referred to ZACAH?

13              MS. PIERCE:  Objection.  Misstates the

14   document.

15         A.   I -- I was going to say, I say "we,"

16   referring to, in this case, myself and Don Ryan.

17   But essentially we had no oversight or knowledge of

18   the quality of service being provided by ZACAH.  We

19   had no funding relationship or other relationship

20   with them.

21              When we are referring people to -- to

22   shelter units, what we set Simpson Housing Services

23   up to do, operating the Adult Shelter Connect, so we

24   wanted to make use of those existing systems, which

25   also are connected to a wider portfolio of shelter

Page 205

1   providers with whom we did have relationship.

2       Q.   (BY MS. STILLMAN) So this "we" that you're

3   referring to in this email is just you and Don Ryan?

4       A.   I mean, this email is from two and a half

5   years ago, so I am -- I don't recall the email.  But

6   as I read it here, that seems a likely

7   interpretation to me, yes.

8       Q.   Did you instruct other Hennepin County

9   employees to not make referrals to ZACAH?

10          MS. PIERCE:  Objection.  Misstates the

11  document.

12      A.   I don't recall that question being asked

13  in that way.  But if I had been asked, should we do

14  this, I would have had extreme reservations, for all

15  the reasons I just shared.

16      Q.   (BY MS. STILLMAN) The email below that top

17  one is from Don Ryan to you, on November 4th, 2020,

18  correct?

19      A.   Appears to be.  Yep.

20      Q.   And he wrote, I have now received two

21  requests for hotel -- hotels for people with case

22  managers from Pinnacle Service.  The first person

23  was not homeless.  They were looking for a respite

24  period and have waiver dollars to cover the period

25  of the time they are getting construction done to

Page 206

1   their home.

2           The first suggestion for Pinnacle to email

3   ZACAH directly requesting a room for this person

4   came from a Hennepin -- HC social worker.  Are you

5   okay with me informing this unit that they should

6   not be making referrals to ZACAH for hotels?

7           Do you see that?

8       A.  I do.

9       Q.  And the second bullet point is, Since the

10  second request came from a Pinnacle Services social

11  worker also, is it okay to contact a supervisor

12  there asking Pinnacle to refrain from making

13  requests to ZACAH, since Yusra has informed me that

14  they are currently down to a limited amount of

15  funding?  What is happening is ZACAH is then sending

16  an email to me asking to find a hotel room for the

17  requested person.

18          Anticipating that both of these will

19  continue, I would like to address this now, as long

20  as you are fine with it.

21          And you respond, Yes.

22          Correct?

23          MS. PIERCE:  Objection.  Misconstrues the

24  document.

25      A.  I see the email from Don Ryan.  I see that

Page 207

```
1    in the email above it, the first word I have written
2    is, Yes.
3        Q    (BY MS. STILLMAN) So you were okay with
4    Don Ryan informing that Hennepin County social
5    workers unit that they should not be making
6    referrals to ZACAH for hotels?
7            MS. PIERCE:  Objection.  Misstates the
8    document.
9        A    I'm -- I -- For all of the reasons I
10   shared earlier, I would be comfortable with that
11   suggestion:  We have no knowledge of the quality of
12   service being provided, we had no relationship with
13   that agency, and we should be referring people in
14   need of shelter to the Adult Shelter Connect.
15       Q    (BY MS. STILLMAN) What do you consider a
16   relationship with an agency?
17           MS. PIERCE:  Objection.  Vague.
18       A    I think that could take a couple of
19   different forms, but the clearest one is a
20   contractual relationship, some kind of funding
21   mechanism or a -- otherwise an agreement that gives
22   us a role in the oversight of that -- that work.
23       Q    (BY MS. STILLMAN) What are some other
24   forms of relationship you have with -- could have
25   with an agency?
```

Page 208

1           MS. PIERCE:  Objection.  Vague.

2      A.   I can imagine different ones, but as an

3  example, there could be an agency or a program

4  participating in the Coordinated Entry System that

5  doesn't receive County funding, but rather receives

6  federal or state funding, requiring it to take its

7  referrals through the Coordinated Entry System.

8      Q.   (BY MS. STILLMAN) So I'm going to mark a

9  document Bates stamped HC00040377 as Exhibit 214.

10          (Deposition Exhibit Number 214 marked for

11  identification.)

12     Q.   And this is -- top -- the first page is an

13  email from Yursa Murad to Bilal Murad, Naheed Murad,

14  Sheila Delaney, and then cc'ed are you and a couple

15  of other individuals.  And this email is dated

16  October 31st, 2020, correct?

17     A.   I believe so.  Yes.  Sorry.  I was trying

18  to read the document at the same time as you were

19  asking the question.

20          MS. PIERCE:  Take your time.  Take your

21  time.  And when you're ready, we can have the

22  question reread.

23     A.   Okay.  Go ahead.

24          MS. PIERCE:  Can you -- will you reread

25  her question?

Page 209

1            (Whereupon, the court reporter read back

2      the requested portion of the record.)

3            A.    Yes.  Appears to be.

4            Q     (BY MS. STILLMAN) So in this email, in

5      that third paragraph, Yusra stated that she reached

6      out to Commissioner Conley on 10/9/2020 asking for

7      help with a group at Extended Stay.  Jodi Wentland

8      and I had an extensive conversation to discuss the

9      need for support.  Since then I have been in

10     constant communication with the corporate offices at

11     Extended Stay; Don Ryan; case workers with

12     St. Stephen's, Simpson Housing, Breaking Fee --

13     Breaking Free; Avivo; and more.

14            Correct?

15            A.    I read that.

16            Q.    Margaret King was working with us to

17     transport folks from Logan Park to the hotel on

18     10/13/2020, though it never came to fruition.

19            Correct?

20            A.    I read that, too.

21            Q.    And then, Don and I spoke yesterday,

22     10/29/2020, to discuss County workers coming on

23     Sunday, 11/1/2020, to support residents in moving.

24     Apparently that cannot happen.

25            Would you consider a person at a nonprofit

Page 210

1    having numerous conversations with Hennepin County

2    employees to have a relationship with Hennepin

3    County?

4             MS. PIERCE:  Objection.  Vague and --

5    yeah.

6        A.    Yeah.  I mean, you asked me about

7    relationship previously.  I talked about a

8    contractual arrangement, an oversight arrangement,

9    an agreement arrangement.  Clearly, it doesn't

10   constitute that.

11            The other example I got was -- I gave was

12   participating in the Coordinated Entry System.

13   Clearly, that is not the case here, either.

14            I mean, if you want to stretch, you know,

15   what constitutes a relationship as far as you like,

16   we have a relationship now, I guess.

17            But with regards to my earlier comments

18   around relationship, no, I do not think emailing a

19   commissioner or indeed meeting with a member of

20   Hennepin County staff denotes a relationship of the

21   kind that I was alluding to when I talked about

22   contracts, agreements, participation and

23   programming.

24       Q    (BY MS. STILLMAN) Yusra then writes, We

25   are working with Start Today Hennepin to ensure our

Page 211

1    residents at the Hampton Inn are on a path to

2    housing.

3              See that?

4         A.   I do.

5         Q.   And you said before that Start Today

6    Hennepin was an independent agency, correct?

7         A.   Correct.

8         Q.   So Hennepin County can't control every

9    individual that Start Today Hennepin chooses to work

10   with, correct?

11             MS. PIERCE:  Objection.  Vague as to

12   control.

13        A.   I believe, as I shared earlier on when we

14   were discussing the subject, Start Today, depending

15   on what funding they're using, of course, as an

16   independent agency, can deliver services and go

17   about business as they choose.

18             That said, when they have an agreement

19   with Hennepin County or are accepting funding

20   through a public entity, that often comes with

21   requirements.  So the programs that come with those

22   funding and requirements we would have some

23   involvement in.

24        Q    (BY MS. STILLMAN) Down in the

25   third-to-last paragraph Yusra writes, Don and I have

Page 212

1   a relationship of trust and communication, and he

2   knows there are not enough shelter beds.  The County

3   will not provide an alternate space.  Residents are

4   devastated and infuriated and know the County has

5   CARES money and have nowhere to go.

6          Do you see that?

7      A.   I do.

8      Q.   Is it your understanding that ZACAH funded

9   hotel rooms to people who had been staying in

10  encampments that didn't want to go to shelters?

11         MS. PIERCE:  Objection, foundation.

12  Objection, misstates the record.

13     A.   I do not have knowledge of the specific

14  individuals that they were supporting in hotel

15  rooms.  I have seen emails of this like that present

16  the information in -- in ways that align with what

17  you're saying, but I don't have anything more than

18  that to go on.

19     Q    (BY MS. STILLMAN) Did the County ever

20  provide funding to ZACAH to pay for hotels for

21  people who were experience -- hotel rooms for people

22  experiencing homeless -- homelessness?

23     A.   No.

24     Q.   Why not?

25         MS. PIERCE:  Objection.  Foundation.

Page 213

1      A.   That is not a thing we were doing.  I've

2  already outlined the very specific strategy the

3  County deployed using hotel sites for protective and

4  isolation shelter.

5           My understanding with regards to what

6  ZACAH were offering was not either protective or

7  isolation shelter.  But, also, we weren't

8  necessarily funding other agencies to -- to deliver

9  those kind of at their request, anyway.

10          So we received other requests from people

11  saying, Will you pay for my hotel stay?  The answer

12  was generally that that was not something we were

13  going to do, with the exception of those specific

14  programs that we were funding to operate as

15  protective shelter, for those at highest risk of

16  medical complication from COVID, as prioritized in

17  partnership with our public health colleagues; or

18  those who were either confirmed or presumptive COVID

19  cases, for isolation to prevent the risk of

20  transmission.

21      Q    (BY MS. STILLMAN) Why did you agree to

22  provide funding to Strong Tower parish?

23          MS. PIERCE:  Objection.  Misstates the

24  record.

25      A.   Well -- and I believe it was, as I say,

Page 214

1    Rescue Now, the 501(c)(3) that applied for the

2    funding.  They applied through a competitive

3    process.  They were selected along with a number of

4    other 501(c)(3)s that were looking for capital

5    funding for shelter, to be able to operate shelter

6    in COVID environments.

7            What is being presented here is certainly

8    not coming through a competitive process, is not

9    capital funding, is a completely different ball of

10   wax.

11       Q    (BY MS. STILLMAN) How long does that

12   competitive process usually take?

13           MS. PIERCE:  Objection.  Vague, compound,

14   calls for speculation, incomplete hypothetical.

15       A    Typically we have the request for

16   proposals out in community for at least a few weeks.

17   Can be longer.  I could not recall exactly how long

18   that one was open for.

19           Obviously we were moving at great speed in

20   2020, not least because -- and I see the reference

21   to CARES funding here.  At this point the CARES

22   funding that Hennepin County had received from the

23   federal government was due to expire and could not

24   be expended beyond the end of December of that year.

25       Q    (BY MS. STILLMAN) So if somebody -- that

Page 215

1    RFP process wouldn't be able to assist individuals

2    who were in immediate need of a shelter option in

3    Hennepin County, correct?

4           MS. PIERCE:  Objection.  Vague as to the

5    meaning of individuals.

6           Do you mean individual people or

7    individual organizations?

8           MS. STILLMAN:  Individual people.

9       A.    Individual people needing shelter in

10   Hennepin County we direct to contact the Adult

11   Shelter Connect in order to reserve an available

12   bed.

13          Our request for proposals were not for

14   individuals, no.  They were for nonprofits who were

15   operating a shelter to seek capital funding to help

16   adapt their buildings to be more conducive to

17   providing a shelter in a pandemic environment, which

18   we thought was a suitable use of CARES funding.

19   Also, a suitable use of CARES funding given not only

20   its focus on pandemic mitigation, but also the fact

21   that it was one-time funding, due to expire at the

22   end of December.  As a capital fund, it was a

23   logical way to use one-time funding.

24      Q    (BY MS. STILLMAN) But there isn't a --

25   always a shelter bed available for somebody,

Page 216

1   correct?

2           MS. PIERCE:  Objection.  Asked --

3       A.   I really feel like we've been around this

4   a fair amount.

5           MS. PIERCE:  Objection, asked and

6   answered.  Objection, vague.  Objection, calls for

7   speculation.  Objection, incomplete hypothetical.

8           And -- and we did spend significant time

9   on that question already, Counsel.

10      Q    (BY MS. STILLMAN) Well, I'm just asking

11  again because you said that, if somebody needed

12  immediate assistance, you would have them call Adult

13  Shelter Connect.

14      A.   Correct.

15          MS. PIERCE:  Same objections.

16      A.   New -- new beds open up every single day

17  through the Adult Shelter Connect.  People calling

18  in during the day would be able to reserve a bed,

19  until the point at which no further reservations

20  could be made.

21          At that point the Adult Shelter Connect

22  would direct them to call back in the evening, when

23  every single evening new shelter beds became

24  available.  People calling in then would be able to

25  claim one of those beds, up until the point, should

Page 217

1  it happen, that no further beds can be offered at

2  that time.  They would then be directed to call back

3  in the next morning.

4      Q    (BY MS. STILLMAN) But it has happened in

5  20- -- but it did happen in 2020 that there were

6  nights when there were no available shelter beds?

7          MS. PIERCE:  Objection.  Asked and

8  answered, misstates the witness's previous

9  testimony, calls for speculation, incomplete

10 hypothetical.

11     A.   There would have been single occasions

12 when somebody calling in would be told to call back

13 tomorrow, if there was nothing available to them

14 right in that moment, yes.

15     Q    (BY MS. STILLMAN) So, then, what were

16 those individuals who were told to call back the

17 next day -- where were they supposed to go --

18         MS. PIERCE:  Objection.

19     Q    (BY MS. STILLMAN) -- if they wanted indoor

20 shelter?

21         MS. PIERCE:  Pardon me.

22         Objection.  Compound, vague, incomplete

23 hypothetical, calls for speculation, asked and

24 answered.

25     A.   I don't given direction on where people

1   are supposed to go.  Our goal is to try and make

2   sure that shelter is available.  That's what we seek

3   to do, in partnership with our nonprofit partners,

4   as far as possible.

5        Q    (BY MS. STILLMAN) So nonprofits like ZACAH

6   could offer people experiencing homelessness an

7   indoor location in that situation to stay?

8             MS. PIERCE:  Objection.  Misstates

9   previous testimony.

10       A.   We had no influence over the activities of

11  ZACAH or what they were doing, that I'm aware of.

12       Q    (BY MS. STILLMAN) Does Housing Stability

13  provide funding to any organizations that don't

14  require --

15            Well, I'm going to take back that

16  question.

17            Shelters -- homeless shelters in Hennepin

18  County aren't necessarily an appropriate resource

19  for every person experiencing homelessness in

20  Hennepin County, correct?

21            MS. PIERCE:  Objection.  Vague, compound,

22  calls for speculation, incomplete hypothetical,

23  potentially calls for expert testimony.

24       A.   Yeah.  I -- I'm not sure exactly what's

25  being asked.  I think -- I mean, I'll refer to

Page 219

1   earlier answers that I've given around the purpose

2   of shelter, which is that the goal is to make space

3   available so that people can find an alternative to

4   staying outside, as far as is practically possible.

5          I don't think shelters end homelessness.

6   I think housing does.  And that's all I will say.

7      Q    (BY MS. STILLMAN) I am marking a document

8   that's been Bates stamped HC00019269 as Exhibit 215.

9          (Deposition Exhibit Number 215 marked for

10  identification.)

11     Q.   If you go to the third page, that ends in

12  19271 --

13     A.   Could I just take a second with this one?

14  It's another long one.

15     Q.   Absolutely.

16     A.   Okay.  Yeah.  Go ahead.  Thank you.

17     Q.   So if you look at page 3, that ends in

18  19271, above that Caution:  External line, it says,

19  From:  David Hewitt.  To:  John Tribbett, Andrea

20  Brennan, Michael Huffman, Don Ryan and Monique

21  Moore, dated October 13th of 2020, correct?

22          MS. PIERCE:  Objection.  Misstates the

23  document.

24     A.   You missed Katie Topinka's name.  But,

25  yes, otherwise, I think so.

Page 220

1      Q    (BY MS. STILLMAN) In the second paragraph,

2   at the end, you write, I'm assume -- or I'll just --

3   in that second paragraph, For the other five, do you

4   have a breakout of how many actually were in shelter

5   but visiting (noting that is one explanation

6   provided) and, for those who are not, the reasons

7   for declining outright?

8           I'm assuming some combination of (a) don't

9   want to contribute to cost of shelter, (b) don't

10  want rules (though knowing which rule is useful

11  information if provided), and (c) advantages of

12  encampment (i.e. access to resources and/or meeting

13  chemical dependency needs) but it is good for us to

14  know which of these are coming up and why and any

15  other reasons that might be provided.

16          Do you see that?

17     A.   Yes.

18     Q.   Do you agree that there are reasons that,

19  (a), shelter -- that people might not want to go to

20  a shelter in Hennepin County?

21          MS. PIERCE:  Objection.  Vague, compound,

22  incomplete hypothetical, calls for speculation,

23  asked and answered this morning.

24     A.   I will add on this one, in case it's not

25  apparent, that these questions specifically relate

Page 221

1    to families with children.  As I referenced earlier,

2    and it is unique in the state of Minnesota, one of

3    only four communities in the entire country that has

4    a right to shelter policy of families.  What that

5    means is that capacity should never be a reason for

6    any family with children not being able to access

7    shelter.

8             What that also, therefore, means, is, we

9    really want to know if there are families who are

10   staying outside, and we want to understand the

11   reasons why, in large part because, of course,

12   minor-aged children are particularly vulnerable in

13   those settings.

14             So seeing the earlier email in which John

15   alludes to interacting with families not interested

16   in shelter, we want to know why.

17             I have hypothesized in this email as to

18   what some of those reasons might be.  And, yes, over

19   my years at Hennepin County, these are reasons that

20   we have heard.

21             It's pretty rare, to be honest.  Our

22   point-in-time count, unsheltered count, we typically

23   see of the unsheltered count the number of -- the

24   proportion that is families with children is between

25   like 1 and 5 percent of the count.  So it's very

Page 222

1    rare in our community, but we're really concerned

2    about it when it happens, because, I think we can

3    all agree -- I mean, obviously, nobody should be

4    sleeping outside.  One person outside is one too

5    many.  But kids sleeping outside brings with it an

6    extra consideration.  So we really wanted to

7    understand the reasons.

8         Frankly -- I will add to that -- I really

9    want to make sure that this outreach team were

10   asking the questions and they weren't making

11   assumptions about families making choices to be

12   outside, when, perhaps, those families weren't in --

13   weren't fully aware of both the availability of

14   shelter, and, for instance, as I mention here, that,

15   when it comes to things like paperwork, there are

16   exception processes that can be put in place to make

17   sure that families can be brought inside quickly.

18        I wanted to make sure that there wasn't

19   a -- a child sleeping outside unnecessarily, and

20   that's why I was pushing John on this to understand

21   the root of what he was describing.

22        Q    (BY MS. STILLMAN) Do you think these three

23   things you mentioned might also be reasons that

24   single adults might not want to go to a shelter?

25        MS. PIERCE:  Objection.  Vague, compound,

Page 223

1  calls for speculation, incomplete hypothetical,

2  asked and answered this morning.

3       A.   Taking the (a, (b, (c) from my email, (a),

4  don't want to contribute to cost of shelter, no, I

5  do not think that that is a reason.  All single

6  adult shelters were free to use at this period in

7  2020 and are still free to use today.

8            For what it's worth, family shelter is

9  also now free to use.  We eliminated the self-pay

10 policy in 2021.

11           (b), don't want rules.  Yes.  We hear

12 that.

13           (c), advantages of encampment (i.e. access

14 to resources and/or meeting chemical dependency

15 needs).  Yes.  We have heard that people stay in

16 encampments.

17           And, again, I am providing information

18 that, as I say -- I'm saying, we have heard.  Means

19 that somebody has told me this at some point, that

20 that has occurred with regards to people are there

21 because they have access to the chemicals of their

22 choice.

23           And, yes, I mean, something that we heard

24 along the way is that, where a perception arose that

25 people might get a better outcome from staying at an

Page 224

1    encampment from a shelter, specifying that they

2    might be provided with, say, a free hotel room or

3    quicker housing by being there, that for some that

4    can act as an incentive for them to leave a safer

5    shelter environment and move to a more dangerous,

6    unsheltered environment, putting themselves at risk

7    from fire, infectious disease, violence and

8    exploitation.

9        Q    (BY MS. STILLMAN) Have you ever heard that

10   people experiencing homelessness don't feel safe at

11   shelters in Hennepin County?

12            MS. PIERCE:  Objection.  Compound, vague.

13       A.   Yes.  I've worked very closely since I

14   started in my second position at Hennepin County

15   with Street Voices of Change advocacy group, made up

16   of people who have experienced or are experiencing

17   homelessness.

18            They formed in early 2017, which happened

19   to be when I started in that role.  One of my first

20   meetings with them was to discuss conditions of

21   Harbor Light Center.

22            We have worked closely alongside them to

23   make reforms that they saw as vital to improving the

24   shelter experience for people experiencing

25   homelessness, including, but not limited to,

Page 225

1    incorporating their shelter bill of rights into our

2    funding contracts in 2019, funding their highest

3    priority in shelters and adding case management,

4    and, invariously, through particularly pandemic

5    resources, adding the other things that they saw as

6    a priority around storage, additional staff -- well,

7    24/7 opening, so on and so forth.

8         So, yes, we have heard that perception,

9    and we've worked hard with our nonprofit partners

10   and people experiencing homelessness to improve the

11   experience there.

12        I will add that, in my time -- let me just

13   take the end of 2018 as an example, when I was

14   regularly present at the Hiawatha/Franklin

15   encampment -- that the levels of danger, the

16   incidence of -- and this was certainly reported at

17   Hiawatha/Franklin.  Indeed, there were two incidents

18   of this reported at Powderhorn Park -- of, for

19   instance, sexual violence against minor-aged

20   children.  These were things being reported at

21   encampments, not shelters.

22        Q    (BY MS. STILLMAN) Would it surprise you to

23   hear that some people find encampments safer than

24   shelters?

25             MS. PIERCE:  Objection.  Vague, compound,

1  calls for speculation.

2      A.   It would not surprise me that people would

3  make such a statement.

4          I'm going to add that people may not be

5  the best judge of risk.  There are plenty of people

6  who will tell me that vaccination is more dangerous

7  than the -- than the diseases it's intended to

8  prevent.  I personally don't believe that.

9      Q   (BY MS. STILLMAN) Do you think you're a

10  better judge of what a safe situation for a person

11  experiencing homelessness is than that person

12  themself?

13         MS. PIERCE:  Objection.  Misstates the

14  witness's testimony.

15     A.   I believe that sexual assaults on

16  minor-aged children are a real problem, and that's

17  what I have seen reporting occurring in encampment

18  settings.

19         MS. STILLMAN:  Christine, could you reread

20  my question?

21         (Whereupon, the court reporter read back

22  the requested portion of the record.)

23         MS. PIERCE:  Same objection.

24         Are you repeating your question?

25         MS. STILLMAN:  Yes.

Page 227

1          MS. PIERCE:  Then asked and answered, too.

2     A.    People make risk judgments in their own

3  life.  And they get to do so, whether it's around

4  vaccination or, indeed, encampments.  And we

5  disagree about things.

6          I am not claiming to be a better judge of

7  things than other people.  I am reporting what I

8  have heard and what we have seen people go through

9  over the last few years in encampments:  Homicides,

10  infectious disease outbreaks, the fire at

11  Hiawatha/Franklin -- it was a miracle nobody died --

12  overdoses.

13          And at the same time we have been funding

14  shelters.  And, yes we have responded to occasional

15  grievances raised.  And, yes, I have worked closely

16  with the Street Voices of Change group on the

17  experiences that they had historically had in

18  shelter, and, indeed, as -- as other things arose.

19          I -- across the six years that I've been

20  here, six and a bit years, the two do not compare in

21  terms of the level of danger and the -- the truly

22  awful outcomes that we have seen emerge from, in

23  particular, large encampments, in my opinion.

24          MS. STILLMAN:  Can we take a quick break?

25          MS. PIERCE:  Yeah.  Do you want to take

Page 228

1  your 10 right now?

2          MS. STILLMAN:  Yeah.

3          MS. PIERCE:  Okay.  Absolutely.

4          THE VIDEOGRAPHER:  We are going off the

5  record at 3:46 p.m.

6          (Whereupon, a recess was taken.)

7          THE VIDEOGRAPHER:  We're back on the

8  record at 4 p.m.

9          MS. STILLMAN:  I'm introducing document

10 that's been Bates stamped ZACAH0005105 as

11 Exhibit 216.

12         (Deposition Exhibit Number 216 marked for

13 identification.)

14    Q    (BY MS. STILLMAN) And did you want to take

15 a moment to look over this document, Mr. Hewitt?

16    A.   Yeah.  Please give me a minute.

17    Q.   Okay.

18    A.   Thank you.

19         (Discussion held off the record.)

20    A.   Okay.

21    Q.   You became aware that ZACAH contracted

22 with Start Today Hennepin to provide housing

23 services, correct?

24         MS. PIERCE:  Objection.  Misstates the

25 document.

Page 229

1     A.    I can see in this document and in my

2   response to Nolan, I think it is, that we had had a

3   conversation with DHS through which an understanding

4   had been achieved that they had funded housing

5   navigators through that OEO program.

6           That's my read of this, and that vaguely

7   rings a bell.

8     Q    (BY MS. STILLMAN) And you intervened to

9   stop Start Today Hennepin from working with ZACAH,

10  correct?

11          MS. PIERCE:  Objection.  Misstates the

12  record, argumentative.

13    A.    Yeah.  That's not at all how I would

14  describe this.

15          As you'll see, if I can refer to the

16  document, in the top paragraph on the second page,

17  We are very clear that, to the extent that they have

18  new funding from DHS through housing navigation, we

19  are pleased that there are people there to provide

20  that help.

21          Where the issue was, for us, and as

22  described in this email, was the assumption that had

23  been made that that would automatically allow their

24  clients to jump the queue of that equitable,

25  transparent process that I described earlier on.

Page 230

1          Q     (BY MS. STILLMAN) Did you contact anybody
2     at Start Today Hennepin about their work with ZACAH?
3          A.    To the best of my recollection, it was
4     other folks from my team who oversee the housing
5     support agreements and the compliance and monitoring
6     of those who had a conversation with Start Today
7     about the program.
8               And to the best of my recollection, what
9     they did was remind Start Today of the existing
10    parameters of the existing housing support agreement
11    they had in place.  We certainly would not have
12    provided direction with regards to a new program
13    that was being funded independently of our existing
14    programs.
15         Q.    You were told Start Today Hennepin hired
16    additional staff, correct?
17              MS. PIERCE:  Objection.  You mean in this
18    email?
19         Q     (BY MS. STILLMAN) At some point in -- at
20    some point.
21         A.    So I believe what I see from this email
22    and the -- the interaction contained within was that
23    we understood from a conversation with DHS that
24    OEO -- the Office of Economic Opportunity, if you
25    were wondering -- provided funding for housing

Page 231

1    navigators, and that was additional but separate to

2    the existing Start Today permanent supportive

3    housing program that was operating through a housing

4    support agreement with Hennepin County.

5              And, again, the existence of those

6    navigators did not mean that this other program that

7    Start Today were operating that was an existing

8    program under an agreement with Hennepin County

9    would now -- was now kind of no longer required to

10   pursue equity and should allow these clients on this

11   other side of their work to jump the queue.

12       Q.   Is it true that Start Today Hennepin staff

13   could have helped place people experiencing

14   homelessness helped by ZACAH into housing outside of

15   the Coordinated Entry System?

16             MS. PIERCE:  Objection.  Vague, compound,

17   incomplete hypothetical, calls for speculation,

18   foundation.

19       A.   The scattered site permanent supportive

20   housing program that Start Today operated under the

21   housing support agreement with Hennepin County

22   requires that referrals to that program come through

23   the Coordinated Entry System in order to ensure that

24   that scarce resource is allocated on the basis of

25   transparent, consistent and equitable priorities,

Page 232

1  such as those I've described through the -- the day:

2  Veteran status, disability status, length of time

3  homeless, medical fragility.

4        There is no provision in that housing

5  support agreement that says Start -- the -- for

6  ZACAH simply to jump the queue and place whoever

7  they happen to be interacting with into those

8  program openings, denying access to those veterans

9  with disabilities, who have been homeless longer, or

10  who are more medically fragile.

11    Q    (BY MS. STILLMAN) But that's, I thought --

12  my understanding, based on what you said earlier,

13  was that Start Today Hennepin had to go through

14  Coordinated Entry -- the Coordinated Entry System

15  for individuals they were funding through Hennepin

16  County dollars.  Correct?

17    A.   The housing support program is an

18  agreement with Hennepin County.  The dollars

19  originate with the Department of Human Services, but

20  there has to be an agreement with Hennepin County,

21  and we are responsible for the compliance and

22  monitoring.

23        And, yes, that program is required to take

24  referrals through that Coordinated Entry System.  It

25  is not something that's -- that a provider can --

Page 233

1   can simply dismiss that prioritization, dismiss

2   equity, and say, Well, I know this guy over here and

3   I'm going to work with him instead, because that

4   denies access to the people who have been

5   prioritized and keeps them homeless.

6       Q.   But Start Today Hennepin is an independent

7   organization, correct?

8            MS. PIERCE:  Objection.  Foundation.

9       A.   Start Today is an independent

10  organization.  When they, like other agencies, enter

11  into funding agreements with public entities, such

12  as Hennepin County, it is typical for those

13  agreements to come with requirements to ensure that

14  the service delivered aligns with our priorities.

15      Q    (BY MS. STILLMAN) So does that mean

16  Hennepin County had the authority to block Start

17  Today's efforts to work with ZACAH?

18           MS. PIERCE:  Objection.  Foundation,

19  misstates the record, argumentative.

20      A.   Start Today were entirely free to work

21  with ZACAH, and indeed did through this DHS OEO

22  grant.

23           And as far as the activities of that DHS

24  OEO grant go, I don't have knowledge of what they

25  are.  We were not involved in them.

Page 234

1          But to the extent that they wanted to

2     leverage that activity to be able to disregard

3     commitments and requirements of existing programs,

4     such as the permanent supportive housing program

5     funded through the housing support agreement with

6     Hennepin County, that -- that doesn't follow.  There

7     was never dispensation given to Start Today to

8     abandon their commitment to equity, consistency and

9     transparency in order to prioritize the people that

10    ZACAH were handpicking over and above veterans,

11    people with disabilities, those with the longest

12    experiences of homelessness.

13        Q    (BY MS. STILLMAN) How do you know who the

14    individuals who ZACAH was handpicking were?

15             MS. PIERCE:  Objection.  Misstates the

16    witness's testimony.

17        A    As I've said earlier, we do not.  And that

18    becomes part of the question here, of course:  On

19    what basis are these people being put to the top of

20    the queue ahead of veterans, people with

21    disabilities, and those with the longest experience

22    of homelessness?

23             I mean, if it's helpful for me to restate

24    something about the Coordinated Entry System, there

25    is a managing of scarcity here.  So when one person

Page 235

1   gets provided with that resource, it denies it to

2   somebody else.

3        Q.   So if you look at page 3 -- well, if you

4   look at page 2 on the bottom, there is an email from

5   Nolan Ferlic to you, Donald Ryan, Katelyn Warburton,

6   Andrea Simonett, and Jeremy Galley, dated January 6,

7   2021, correct?

8        A.   Yep.  Appears to be.

9        Q.   And then if you go to the next page, in

10  the body of that email, in the third paragraph,

11  third sentence -- fourth sentence, Nolan writes, By

12  contracting with Start Today Hennepin and utilizing

13  ESP-CV funding for a partnership, this process

14  created housing placements which would otherwise be

15  nonexistent in Hennepin County's system.

16  Additionally, the vast majority of individuals who

17  access Housing Support through Start Today Hennepin

18  were unsheltered in parks throughout Minneapolis.

19           Do you disagree that, by contracting with

20  Start Today Hennepin and utilizing ESP-CV funding

21  for a partnership, that process created housing

22  placements which would have otherwise been

23  nonexistent in Hennepin County?

24           MS. PIERCE:  Objection.  Foundation.

25       A.   I mean, interestingly enough, if you'll

Page 236

1   indulge me here, I think I've responded to this in
2   the front page of this piece of -- of documentation.
3   I call out that specific assertion made in -- in the
4   prior email. And my response is that the Start
5   Today long-term homeless housing support program is
6   an existing program. The number of clients they can
7   work with is constrained by staffing, management,
8   the housing market, and other factors.
9          It is not my understanding that they have
10  staff available for this project that do not have
11  other duties at this time, nor that there is excess
12  housing available such that taking on clients from
13  outside an equitable, transparent referral process
14  will have no impact on their ability to serve the
15  same number of clients from that equitable,
16  consistent referral process.
17     Q    (BY MS. STILLMAN) So you wrote, It is not
18  my understanding that they have staff available for
19  this project.
20         Correct?
21         MS. PIERCE:  That's what he just -- well,
22  asked and answered.
23     A    What I said is, it is not my understanding
24  that they have staff available for this project that
25  do not have other duties at this time, nor that

Page 237

1  there is excess housing available, et cetera,

2  et cetera, that I just stated.

3       Q    (BY MS. STILLMAN) Were you aware of the

4  additional staffing that Start Today hired for --

5  with this funding for this project?

6            MS. PIERCE:  Objection.  Misstates the

7  document, and asked and answered.

8       A.   In the final paragraph of my email I

9  state, In our conversation with DHS, Department of

10 Human Services, it was my understanding that the

11 partnership funded through DHS OEO was for housing

12 navigators and did not include a guarantee of

13 priority for other existing housing programs,

14 irrespective of those programs' existing

15 requirements, such as the requirement they take the

16 referrals through an equitable, consistent,

17 community-wide process.  We are pleased for there to

18 be more people helping folks navigate the housing

19 that is available to them.

20      Q    (BY MS. STILLMAN) Is staffing a capacity a

21 concern at multiple entities with which Hennepin

22 County contracts to participate in the Coordinated

23 Entry System?

24           MS. PIERCE:  Objection.  Vague, compound,

25 confusing.

Page 238

1      A.   As I shared earlier on, we work with about

2   50 agencies, 150 different programs.  Staffing

3   capacity is a constraint of those programs.  How

4   much can any member of staff do?  But if you can be

5   more specific, perhaps I can -- I can provide more.

6      Q    (BY MS. STILLMAN) In 2020 did participants

7   of the -- or participants in the long-term homeless

8   housing support program generally have a staffing --

9   issues with staffing capacity?

10          MS. PIERCE:  Can I have the question read

11  back, please?

12          (Whereupon, the court reporter read back

13  the requested portion of the record.)

14          MS. PIERCE:  Participants as in

15  individuals or as in organizations?

16          MS. STILLMAN:  Organizations.

17          MS. PIERCE:  Then vague, compound,

18  foundation.

19     A.   Hmm.  I'm trying to cast my mind back to

20  2020 here.

21          It's true that, today, of course, there

22  staffing issues are impacting a number of programs.

23          In 2020 I'm trying to remember if the

24  pandemic had a particular impact on staffing of

25  these programs.  I do not recall there being a

1   special challenge, one that kind of rose to concern

2   above many other concerns at the time.

3           But, as I say, it's always a constraint.

4   You only have so many people.  They can only do so

5   much.  They can only work with so many people.

6   That's why we have that process to ensure that we're

7   allocating those resources in a way that is

8   effective, efficient, and equitable.

9       Q    (BY MS. STILLMAN) If the Start Today

10  Hennepin housing navigators worked with ZACAH, could

11  those navigators still do an assessment for

12  Coordinated Entry?

13          MS. PIERCE:  Objection.  Vague, incomplete

14  hypothetical, assumes facts not in evidence, calls

15  for speculation, foundation.

16      A    Again, if you'll indulge me, there was

17  this first question that Nolan posed around

18  guarantees for individuals to get connected to the

19  Coordinated Entry System.  And what I've said in

20  response to that is the same work that's from

21  St. Stephen's and People's, Inc., that you

22  reference, or for that matter anyone with an HMIS,

23  Housing Management Information System, license,

24  which includes staff at most homeless agencies, can

25  look this up on their behalf.

Page 240

1            With regards to the assessment, again,

2    these agencies I'm referring, St. Stephen's and

3    People, Inc., can carry out assessments.  If Start

4    Today, hiring their new housing navigators, wished

5    for them to become coordinated entry assessors,

6    there would be a process by which they would apply

7    for that assessment access, go through a training.

8            I do not recall if they did.  I wouldn't

9    have been aware if they did, in all likelihood.

10       Q    (BY MS. STILLMAN) If you look at Nolan's

11   email on page 3, the fourth paragraph, Nolan writes,

12   Further, under DHS guidelines and State statute,

13   direct access to LTH supportive housing outside of

14   the HUD CES system is permissible.

15           Do you agree with that statement?

16           MS. PIERCE:  Objection.  Foundation.

17       A    The DHS guidelines and State statute has

18   undergone some modifications in recent years, so

19   I -- to -- to look at exactly what it said at this

20   point in time, I would have to go back.

21           I mean, I'll highlight, of course, that

22   the next line is, It is the jurisdiction of the

23   County and DHS to approve the process.

24           And we believe in an equitable,

25   transparent, consistent process by which these

Page 241

1    scarce resources should be allocated to people based

2    on veteran status, disability status, length of time

3    homeless.

4             MS. PIERCE:  I'll add to my previous

5    objection that that called for a legal conclusion,

6    too.

7             MS. STILLMAN:  I'm done with that

8    document.

9             I'm marking document that's been Bates

10   stamped MPLS_BERRY059616 as Exhibit Number 217.

11            (Discussion off the record.)

12            (Deposition Exhibit Number 217 marked for

13   identification.)

14        Q    (BY MS. STILLMAN) And this is an email

15   from Erin Wixsten to Katie Topinka, Maikao Vue, and

16   you, dated April 23rd of 2021, correct?

17        A    Appears to be.  Yep.

18            MS. PIERCE:  Counsel, do you have the

19   attachments to this document?

20            MS. STILLMAN:  I'm about to produce them.

21            MS. PIERCE:  Okay.  All of them?

22            MS. STILLMAN:  I have the Bates stamps

23   number for two that I'm not using.

24            MS. PIERCE:  We would strongly prefer any

25   document being presented to him as the complete

Page 242

1    document.  So I'm going to put a continuing

2    objection on the record to his answering any

3    questions when you won't show him a complete

4    document.

5              MS. STILLMAN:  I am marking

6    MPLS_BERRY059617 as Exhibit Number 218.

7              (Deposition Exhibit Number 218 marked for

8    identification.)

9              MS. STILLMAN:  Marking document Bates

10   stamped MPLS_BERRY059627 as Exhibit 219.

11             (Deposition Exhibit Number 219 marked for

12   identification.)

13             MS. PIERCE:  Is this related to the

14   document we're seeing, or is it a new -- is it --

15             MS. STILLMAN:  No.  These are -- both of

16   the exhibits have -- are attachments to the

17   document.

18             MS. PIERCE:  Thank you.

19             So just to be clear, we have the two --

20   from the -- from the originating email, we have the

21   two documents but not the Excel sheet; is that

22   right?

23             MS. STILLMAN:  Not the Excel spreadsheet.

24             MS. PIERCE:  Okay.  So, I -- I mean, I --

25   I'll note our continuing objection, but I just

Page 243

1    wanted to be clear about what was not there.

2            MS. ENSLIN:  I just would note on the

3    record, too, it looks like there's two Excel

4    spreadsheets that should be -- that are also

5    attachments to this, so --

6            MS. PIERCE:  Oh, good call.  Thank you.

7    I -- I saw only one.  But Ms. Enslin is right.

8    There's two missing spreadsheets.

9            So note our continuing objection to the

10   use of these documents as incomplete, and so unfair

11   to ask the witness about.

12       Q    (BY MS. STILLMAN) Erin Wixsten works for

13   Housing Stability, correct?

14           MS. PIERCE:  Objection.  Asked and

15   answered.

16       A    That is correct.

17       Q    (BY MS. STILLMAN) Why is Housing Stability

18   working with the City of Minneapolis to develop a

19   policy on street outreach and responding to

20   encampments?

21           MS. PIERCE:  Objection.  Misstates the

22   documents and the record, foundation.

23           MS. ENSLIN:  Also, objection, vague.

24       A    So what I see here from April of 2021 is

25   an exchange of documents between Erin Wixsten and

Page 244

1    the people we work with at the City of Minneapolis.

2    I -- I don't recognize the description that you just

3    provided, though.

4         Q    (BY MS. STILLMAN) If you go to the next

5    document that's been marked as Exhibit 218.

6         A.   Okay.

7         Q.   Which I'll represent is an attachment to

8    Exhibit 217, at the bottom of the first page, on the

9    left side of page 1 of 8, it says, Street Outreach

10   and Responding to Encampments 4.16.21.

11             Do you see that?

12        A.   I do.

13        Q.   Why was Housing Stability working with --

14             Well, I'm going to start a new question.

15             Do you see, in the middle of page 1, it

16   says, The Role of Street Outreach in a Community's

17   Response to an Encampment?

18        A.   I do.

19        Q.   Why was Housing Stability working with the

20   City of Minneapolis to create a document about the

21   role of street outreach in a community's response to

22   an encampment?

23             MS. PIERCE:  Objection.  Misstates the

24   document and the context, vague, foundation, and

25   calls for speculation.

Page 245

1       A.   Hennepin County, and the Housing Stability

2  area specifically, and more specifically Erin

3  Wixsten, subject matter experts on working with

4  people experiencing homelessness, the City of

5  Minneapolis is the recipient of Emergency Solution

6  Grant funding from the federal government, the

7  department of HUD, which is used to fund street

8  outreach within the City of Minneapolis.

9            So we have a long-standing coordination

10  around providing our subject matter expertise to the

11  City as they contract for those street outreach

12  functions.

13            Erin Wixsten, if I remember correctly,

14  we're talking kind of her first month in the role

15  here.  I see her referencing to CSH resources.

16  That's the Corporation for Supportive Housing, for

17  what it's worth.

18            Erin was coming from a background of, as I

19  mentioned earlier, HUD technical assistance.  So she

20  was coming into a space, looking to make herself

21  useful, drawing on the expertise that she had in

22  other spaces, sharing that expertise with our

23  partners who contract for street outreach.

24       Q    (BY MS. STILLMAN) In addition to the City

25  of Minneapolis, did Housing Stability work on a

Page 246

1   document about the role of street outreach in a

2   community's response to an encampment with any other

3   entities?

4           MS. PIERCE:  Objection.  Misstates the

5   document and the witness's testimony, foundation,

6   calls for speculation.

7       A.   I do not recall, looking at this specific

8   document, other parties being involved in its

9   development.  But I also don't have a very clear

10  memory of this specific document to start with.

11      Q    (BY MS. STILLMAN) Is your practice -- Is

12  it your practice to read emails from Erin Wixsten?

13          MS. PIERCE:  Objection.  Asked and

14  answered.

15      A.   It is my practice to receive emails that

16  I -- to read emails that I receive from Erin and

17  others.

18      Q    (BY MS. STILLMAN) Is it your practice to

19  read the attachments to emails that you receive?

20          MS. PIERCE:  Objection.  Asked and

21  answered and -- and at this point irrelevant.

22      A.   In most cases, yes.  The depth with which

23  I read them will depend on the perceived importance

24  of them and the importance of my input or feedback.

25          As I've said, I receive literally hundreds

Page 247

1    of emails and hundreds of attachments every week.

2         Q    (BY MS. STILLMAN) Why was this document

3    created?

4              MS. PIERCE:  Objection.  Foundation.

5         A.   So I have already speculated, which,

6    frankly, I am not hugely comfortable doing, so I'm

7    trying to cast my mind back to how Erin was

8    approaching the first few weeks in the job.

9              As I've already said, she had expertise.

10   She was bringing it to bear.  She was trying to

11   formulate thoughts on how best to organize a

12   response on unsheltered homelessness.

13             MS. PIERCE:  Also, I'll indicate for the

14   record that there's no indication of who the author

15   of Exhibit 218 is, or 219, for that matter.

16        Q    (BY MS. STILLMAN) Is there a final version

17   of this document?

18             MS. PIERCE:  Objection.  Foundation, calls

19   for speculation.

20        A.   Not to the best of my knowledge.

21        Q    (BY MS. STILLMAN) If you go to page 3,

22   there is a chart with an encampment-wide assessment.

23             Does Hennepin County use any sort of chart

24   like this when assessing encampments?

25             MS. PIERCE:  Objection.  Vague.

Page 248

1      A.   No.  If my memory on this serves

2   correctly -- because I do remember Erin sharing this

3   with me.  Whether it was in this document or

4   elsewhere, I don't recall.  But I believe this was

5   lifted from a good practice guidance that she had

6   seen elsewhere.

7           But, no, we have not, to the best of my

8   knowledge, implemented a chart that looks like this.

9      Q   (BY MS. STILLMAN) If you go to page 5, the

10  bottom says, Trauma Informed.  A trauma informed,

11  person-centered approach ensures that consumers are

12  engaged in the process and do not feel like the

13  support is being done to them.  It also ensures that

14  all services and interventions intentionally resist

15  processes that exacerbate homelessness, abuse,

16  neglect, exploitation, or that may in any way

17  retraumatize them.  All processes related to

18  responding to encampments will be viewed through a

19  trauma-informed lens.

20          In your opinion, can an encampment closure

21  be traumatizing for a resident of the encampment?

22          MS. PIERCE:  Objection.  Vague, compound,

23  calls for speculation, incomplete hypothetical.

24  Also calls for expert testimony.

25      A.   And I will add once more that I was not

                                                    Page 249

1    personally present at encampment closures.

2         Q    (BY MS. STILLMAN) So you don't know?

3              MS. PIERCE:  Objection.  Same objections.

4         A.   Would you repeat the question?

5              THE WITNESS:  Oh, sorry.  Can I get the

6    question repeated?

7              MS. STILLMAN:  Christine, can you read the

8    question back?

9              (Whereupon, the court reporter read back

10   the requested portion of the record.)

11             MS. PIERCE:  Same objections.

12        A.   Yeah.  I mean, this is calling for me to

13   speculate individual experiences.  I will say that,

14   to this document -- and, actually, it's now kind of

15   strategic plan for my area -- that, yes, we believe

16   in taking a trauma lens in all of our work.

17        Q    (BY MS. STILLMAN) Do you attend meetings

18   with employees of the City of Minneapolis to discuss

19   the closure of homeless encampments in Hennepin

20   County?

21             MS. PIERCE:  Objection.  Asked and

22   answered, vague, compound.

23        A.   I've already referenced the sheer number

24   of meetings that I attend.  Yes, some of them

25   include employees of the City of Minneapolis.

Page 250

1          As I've already referenced, encampments is

2     a subject that comes up in some -- not all spaces,

3     not relevant in all spaces.  Encampment closures in

4     one way, shape or form is a subject that may have

5     come up in some of those meetings over whatever

6     period of time we're talking about.

7          Q    (BY MS. STILLMAN) In any of these meetings

8     in which encampments are discussed, has there been a

9     discussion about how closing encampments might be

10    traumatizing for the residents?

11          MS. PIERCE:  Can I have that question read

12    back, please?

13          (Whereupon, the court reporter read back

14    the requested portion of the record.)

15          MS. PIERCE:  Same objections.

16          A.   I am speculating about hundreds of

17    meetings.  And as I said, we do bring a trauma lens

18    to our work.  So whether the closure, or indeed any

19    other aspect of encampment, then, yes, a potential

20    discussion of trauma could potentially be a part of

21    a discussion.  But as you can tell by the amount of

22    times I'm saying "potentially," I'm kind of

23    speculating here over a huge universe of meetings

24    that we could be talking about.

25          Q    (BY MS. STILLMAN) Are you consulted by

Page 251

1   City employees about how to close an encampment on

2   Hennepin County property -- or in Hennepin County?

3   Sorry.

4               MS. PIERCE:  Objection.  Vague, time

5   period.  So compound.

6        A.   So I would say that we are consulted as

7   subject matter experts on homelessness around

8   encampment issues and other homelessness issues.

9               Again, I feel like I'm getting drawn into

10  speculation over a huge -- multi-years, thousands of

11  potential meetings.  So can you be a bit more

12  specific?

13       Q    (BY MS. STILLMAN) Yeah.  Has anybody from

14  the City of Minneapolis consulted you -- did anyone

15  from the City of Minneapolis consult you about how

16  to close an encampment in 2021?

17              MS. PIERCE:  In 2021?

18              MS. STILLMAN:  2021.

19              MS. PIERCE:  Objection.  Vague, compound.

20       A.   Yeah.  And I'm struggling with the

21  language of consulting me on how to close.

22              To be clear, I work in Human Services, and

23  that's not the work of my team.  My team do not

24  close encampments.  They provide Human Services to

25  people, including people who may be staying in

Page 252

1    encampments.

2           We may be able to bring expertise in terms

3    of what that can look like leading up to and on the

4    day of closure, but we would not provide guidance on

5    how to close.  That is not our area of -- of

6    expertise or our remit.

7        Q    (BY MS. STILLMAN) Has -- in -- we'll go

8    with, in 2020, did anybody from the City of

9    Minneapolis consult you about Human Services

10   expertise in closing encampments?

11          MS. PIERCE:  Objection.  Vague, time

12   frame, compound.

13       A.   As Human Services, we do not have

14   expertise in closing encampments per se.

15          Were we consulted around human service

16   aspects of working with people in encampments?  I

17   would imagine so.

18       Q    (BY MS. STILLMAN) What do you consider

19   human service aspects of working with people in

20   encampments?

21       A.   Connections to shelter, connections to

22   housing.  Those are the big two, frankly.

23       Q.   Anything else that you can think of?

24       A.   As I said earlier, if you expand out to

25   consider kind of outreach services, then basic

Page 253

1   needs:  Providing water, socks, transportation, you

2   know, assisting with communication back to family

3   members.  It can look very different.  It's a

4   person-centered business.

5         Q.   Did you provide advice on any of those

6   Human Services-related activities within encampments

7   to anybody from the City of Minneapolis in 2020?

8             MS. PIERCE:  Objection.  Vague, compound.

9         A.   I imagine what I -- and, again, even the

10  fact that I'm saying "I imagine" tells us that

11  we're -- I'm kind of speculating as to what meetings

12  I might have been in two, three years ago and what

13  might have been discussed and how I might have

14  approached it.

15            But following that thread, the most likely

16  content that I would be providing in a meeting of

17  that ilk would be about how to use the Adult Shelter

18  Connect to access shelter beds, make reservations on

19  people's behalf in the lead-up to and at the point

20  of any activity around encampment, as an example,

21  the most obvious one that leaps to my mind.

22        Q    (BY MS. STILLMAN) Did you advise anybody

23  from the City of Minneapolis about what Human

24  Services should be provided at the closure of an

25  encampment in 2021?

Page 254

1           MS. PIERCE:  Objection.  Asked and
2    answered, vague, compound.
3           A.   Yeah.  That -- that's not a description
4    of -- of my activity in 2021 that I recognize.
5           I mean, again, we would advise on how to
6    connect people to shelter.  We might talk about the
7    role of outreach teams in advance of any kind of
8    closure event and -- and activities that could be
9    there.  But, again, I -- yeah.  I'm speculating a
10   little bit.
11          Q.   (BY MS. STILLMAN) Were you consulted by
12   anybody from the MPRB about how to close an
13   encampment in 2020?
14          MS. PIERCE:  Objection.  Vague, compound.
15          A.   We would not be consulted on how to close
16   an encampment.  That's not our area of expertise.
17          We might provide information on
18   connections to shelter, how to access shelter and
19   work with outreach, those kind of human service
20   pieces that I've already described.
21          Q    (BY MS. STILLMAN) Were you consulted by
22   anybody in the MPRB about those services that you
23   just described in 2020?
24          MS. PIERCE:  Objection.  Vague, compound.
25          A.   In all likelihood -- I mean, I'm pretty

Page 255

1  sure, yes.  I'm trying to think of exact

2  conversations.

3          But, yes, I mean, if -- if we're talking

4  about, like, how to access shelter, you know, the

5  Adult Shelter Connect number, here are the -- here's

6  how to make that phone call and here's what they

7  offer, yes, I surely would have provided that to --

8  to people who work for MPRB or one of my colleagues

9  would have done that.

10      Q    (BY MS. STILLMAN) I'm going to go to a

11  document that's been marked as Exhibit 2019 -- or

12  219 -- sorry -- that's titled Necessary Entities in

13  Responding to Encampments.  And I'll represent that

14  this is also an attachment to the email that's been

15  marked as Exhibit 217.

16          So on the first page of this document, in

17  the fifth row, it says, Street Outreach Service

18  Providers.

19          Is it your understanding that street

20  outreach providers lead case planning with

21  encampment occupants to focus on housing and other

22  service options?

23          MS. PIERCE:  Objection.  Vague,

24  foundation.

25      A    So it would be our -- so it is a function

Page 256

1    of street outreach, as I've mentioned earlier, to

2    potentially conduct Coordinated Entry assessments.

3    It would be our hope that they work with people to

4    find safer alternatives, recognizing that they have

5    other duties around basic needs as well.

6          I mean, this description in this document,

7    to my eye, is likely pulled from perhaps the

8    Corporation for Supportive Housing, or HUD, or

9    adapted from something like that.  It looks more of

10   a -- kind of a theoretical document that can kinda

11   be taken and considered for any community, rather

12   than a -- kind of a literal description of Hennepin

13   County.

14        Q    (BY MS. STILLMAN) Go to page 4.

15        A.   Yep.

16        Q.   The third row says, Addiction Specialists

17   and Harm Reduction Worker.

18          Do you think it's -- in your opinion,

19   should harm reduction workers be present at homeless

20   encampment closures in Hennepin County?

21          MS. PIERCE:  Objection.  Misstates the

22   document, misstates the record, incomplete

23   hypothetical, calls for speculation, expert

24   testimony, vague, foundation.

25        A.   And I will add that the kind of services

Page 257

1    being described in this section of this document are

2    not services that fall under the Housing Stability

3    area.  This would be through public health

4    colleagues.

5             With regards to, should these services be

6    present at closure, I think that would very much

7    depend on what the closure was going to look like.

8    I can see a lot of reasons why that wouldn't be the

9    case.

10        Q    (BY MS. STILLMAN) Do you think it's

11    important that people experiencing homelessness have

12    access to harm reduction resources?

13             MS. PIERCE:  Objection.  Vague,

14    foundation, calls for expert testimony, incomplete

15    hypothetical, calls for speculation.

16        A    And, obviously, a couple of things on

17    that, which I -- I like to make sure I'm -- I'm

18    framing this issue appropriately, which is that the

19    vast majority of people struggling with chemical

20    dependency are not experiencing homelessness, and

21    the vast majority of people experiencing

22    homelessness are not struggling with chemical

23    dependency.

24             So, no, I do not think it is a given that

25    people experiencing homelessness need harm reduction

Page 258

1    services, because I do not think it is a given that

2    they are struggling with chemical dependency.

3         Q    (BY MS. STILLMAN) I didn't say that

4    everybody who is experiencing homelessness is

5    experiencing chemical dependency.

6              I'm asking if harm reduction resources --

7    if it's important for harm reduction resources to be

8    available to people experiencing homelessness.

9              MS. PIERCE:  Objection.  Vague, incomplete

10   hypothetical, calls for speculation, calls for

11   expert testimony, asked and answered.

12        A.   I can imagine instances when harm

13   reduction services are appropriate, and I can

14   imagine instances when they are not, because not

15   everybody experiencing homelessness needs harm

16   reduction services, because not everybody

17   experiencing homelessness is struggling with

18   chemical dependency.  Indeed, the vast majority are

19   not.

20        Q    (BY MS. STILLMAN) The fifth row down says,

21   Lawyers.  And, Providing legal representation to

22   encampment occupants for encampment or other related

23   matters that may be preventing the encampment

24   occupant from accessing housing.

25              In your opinion, do you believe that

Page 259

1    people experiencing homelessness should have access
2    to legal representation?
3              MS. PIERCE:  Objection.  Calls for
4    speculation, incomplete hypothetical, vague, calls
5    for expert testimony, foundation.
6         A.   We have a really fruitful partnership with
7    internal colleagues within Hennepin County to
8    support people where legal barriers are getting in
9    the way of housing outcomes.  So in those instances
10   and for that purpose, yes, I think there can be
11   value in terms of helping get people into housing,
12   if there is a barrier that can be overcome.
13        Q    (BY MS. STILLMAN) What about for other
14   legal rights that people experiencing homelessness
15   might have?
16             MS. PIERCE:  Can I have that question read
17   back, please?
18             (Whereupon, the court reporter read back
19   the requested portion of the record.)
20             MS. PIERCE:  Same objections.  So,
21   compound, vague, call for expert testimony,
22   incomplete hypothetical, calls for speculation,
23   foundation.
24             MS. ENSLIN:  Also, I'm just going to
25   object to the extent that this is a -- represented

Page 260

 1    to be a document about responding to encampments,

 2    not about homeless -- responding to homelessness in

 3    general.

 4         A.   And I will add, I do not have a strong

 5    opinion with regards to such a broad question about

 6    legal representation.  I've already described one

 7    instance in which we do have a very fruitful

 8    partnership.

 9              The other, we work very closely with our

10    colleagues in adult representation services to

11    ensure legal representation for households facing

12    eviction in housing court, and believe that's a

13    really valuable service.  That's for people who are

14    at risk of homelessness rather than people

15    experiencing homelessness, though.

16         Q    (BY MS. STILLMAN) Were you involved in the

17    decision to sweep the Greenway encampment in --

18              MS. PIERCE:  Objection -- I'm sorry.

19         Q    (BY MS. STILLMAN) -- December of 2020?

20              MS. PIERCE:  Objection to the use of the

21    word "sweep."

22         A.   Yeah.  I would never describe the activity

23    on the Greenway in those terms.

24              If you are asking me if I was a

25    participant in the decision-making process that led

                                        Page 261

1   to the closure of the encampment on the Greenway, I

2   was a participant in discussions along those lines,

3   yes.

4        Q     (BY MS. STILLMAN) Who else participated in

5   those discussions?

6        A.    To the best of my recollection, County

7   administration, the Regional Railroad Authority, and

8   sheriff's office.

9        Q.    Did Michael Herzing participate in those

10  conversations?

11       A.    So I would have been reporting to Michael

12  Herzing at that time.  I might have -- I -- I don't

13  recall if he was in those meetings or part of those

14  discussions.

15       Q.    Who is county administration?

16       A.    As shared earlier, the county

17  administrator, David Hough.  But when I talk about

18  administration more broadly, I'm including in

19  this -- in this instance, but I do not know actually

20  if -- if Jodi was part of those discussions, but

21  Jodi is the deputy county administrator.  Lisa

22  Cerne, the -- the assistant county administrator, I

23  think --

24            THE WITNESS:  Lisa, please, I hope I got

25  your job title right.

Page 262

1        A.   -- would have been part of those
2    discussions, because the Regional Railroad Authority
3    was such a crucial part.
4        Q.   (BY MS. STILLMAN) As the county
5    administrator, is David Hough the person who adopts
6    the policies in the administrative manual we
7    discussed at the beginning of your deposition?
8             MS. PIERCE:  Objection.  Vague,
9    foundation.
10       A.   I -- I'm not 100 percent sure of the exact
11   process through which adoption occurs within that
12   manual.
13       Q    (BY MS. STILLMAN) I think I forgot to ask
14   this earlier.  You reported to Michael Herzing in
15   2020, correct?
16       A.   Correct.
17       Q.   What was Michael Herzing's role in 2020?
18            MS. PIERCE:  Objection.  Vague.
19       A.   Michael Herzing was a director in the
20   Human Services Department.  In addition to myself,
21   and therefore the Housing Stability area, he had
22   long-term support services, aging and disability
23   services, because he still has both of those now,
24   reporting up to him.
25       Q    (BY MS. STILLMAN) Has there been a shift

Page 263

1    in how those -- like who reports to who within those

2    units, that he still has some of those services

3    report to him and some don't?  Sorry.

4            MS. PIERCE:  Objection.  Vague.

5        A.   So in April of 2021, as we discussed way

6    back, my position changed to being a director of

7    Human Services myself, reporting directly to Jodi

8    Wentland.

9            To the best of my knowledge, Mike

10   Herzing's portfolio today looks not dissimilar to

11   the way it looked in 2020, absent the Housing

12   Stability area portfolio, which is now separated out

13   and led by me.

14       Q    (BY MS. STILLMAN) Did you have --

15       A.   And I'm sure there have been changes

16   within his area.  It's a big area.  Things change.

17       Q.   Sure.  Did you have to apply for the

18   position of director of Housing Stability?

19       A.   This is a position in which the

20   administrator makes a recommendation to the board of

21   commissioners, who then approve or do not.

22       Q.   So David Hough recommended you for the

23   position?

24       A.   Correct.

25       Q.   Okay.  What was discussed in those

Page 264

1    conversations about the decision to sweep the

2    Greenway encampment in December of 2020?

3            MS. PIERCE:  Objection as to the use of

4    the word "sweep", and compound and vague.

5        A.    Yeah.  I would not characterize

6    discussions in the way that you just did.

7            With regards to meetings in which the

8    eventual closure of the encampment on the Greenway

9    were being discussed, the kinds of matters being

10   discussed were a lot around health and safety

11   concerns, mitigating those concerns, and working

12   towards an orderly transition, and ultimately

13   closure.

14       Q    (BY MS. STILLMAN) Did you discuss if

15   residents should be given a notice of the closure?

16           MS. PIERCE:  Objection.  Vague as to the

17   use of the word resident and notice.

18       A.    Yeah.  I wouldn't describe things thus.

19           But -- but part of our discussion was

20   about what information we were -- we would be able

21   to share in order to give people that clarity to --

22   to make informed decisions and how to best do that,

23   yes.

24       Q    (BY MS. STILLMAN) Why did you want to give

25   the people staying in the Greenway encampment that

Page 265

1   clarity?

2        A.   I think, as I shared rather many hours

3   ago, I think clarity is -- is helpful when it can be

4   provided, so that people can make good decisions,

5   based on having more information, about what

6   their -- their options look like.

7        Q.   Did you discuss storing the residents'

8   property?

9             MS. PIERCE:  Objection.  Vague and calls

10   for a legal conclusion as to the definition of the

11   word property.

12       A.   I wouldn't describe it thus.  And, yes, we

13   did discuss ways in which storage could be offered

14   for -- for certain belongings.

15       Q    (BY MS. STILLMAN) Did you offer storage?

16            MS. PIERCE:  Objection.  Vague as to the

17   definition of the word storage.

18       A.   And to the "you" -- so, again, I was not

19   present at encampment closures, including the

20   activity on the Greenway leading up to or on the day

21   of.  But working closely with both Don Ryan from my

22   team and our colleagues in the Regional Railroad

23   Authority, yes, there was a concrete plan to ensure

24   that people who had belongings they wanted preserved

25   and were not able to store or take with them

Page 266

1    themselves, that we would be able to provide them
2    with some storage capacity.
3        Q   (BY MS. STILLMAN) Do you know if that plan
4    came to fruition?
5            MS. PIERCE:  Objection.  Vague.
6        A.   I am aware that we did store some
7    belongings on behalf of some people.  I do not have
8    intimate knowledge of the details.
9            MS. STILLMAN:  Kraig, can we have a time
10   check?
11           (Discussion off the record.)
12           THE VIDEOGRAPHER:  Just short of six
13   hours.
14           MS. STILLMAN:  Okay.  Do you want to take
15   one last break?
16           MS. PIERCE:  Sure.
17           THE VIDEOGRAPHER:  We are going off the
18   record at 4:56 p.m.
19           (Whereupon, a recess was taken.)
20           THE VIDEOGRAPHER:  This is Media Number 6
21   in the deposition of David Hewitt.  Today is
22   February 16th, 2023.  We're going back on the record
23   at 5:05 p.m.
24       Q   (BY MS. STILLMAN) Why were you involved in
25   the discussions about the decision to close the

Page 267

1    Greenway encampment in December of 2020?

2        A.    As the, at the time, senior department

3    administrator of the Housing Stability, I was the --

4    would be considered the subject matter expertise on

5    homelessness.

6        Q.    Did you give input about anything to do

7    with the process of how the homeless encampment

8    should be closed?

9              MS. PIERCE:  Objection.  Vague, and object

10    to the definition of encampment.

11        A.    Notwithstanding, I participated in the

12    discussion.  I couldn't recall for you exactly which

13    pieces I may have brought to the table as opposed to

14    responded to.  But I participated in the

15    discussions.

16        Q     (BY MS. STILLMAN) Did you ever express

17    concerns with the plan of how the Greenway was --

18    encampment was going to be closed in December of

19    2020?

20              MS. PIERCE:  Objection.  Vague, including

21    as to the word concern.

22        A.    So as I recall, with regards to

23    discussions around the Greenway encampment, there

24    were -- there were discussions over a period of time

25    related to the health and safety risks and

Page 268

1   mitigation thereof, leading up to ultimately

2   discussions around closure.

3          Within that discussion -- I mean, I don't

4   recall kind of highlighting a specific concern, but

5   part of the discussion, of course, is, you know,

6   reacting to concepts about how things are going to

7   be done and which are the better or less worse ways

8   of doing things.  I would have been part of a

9   discussion like that.

10     Q    (BY MS. STILLMAN) What are some of the

11  worst ways of doing things?

12          MS. PIERCE:  Objection.  Vague.

13     A.   With regards to this specific discussion,

14  I really don't recall those -- those specifics.

15  Like I say, I can't even recall what I brought to

16  the table as opposed to what I was reacting to.

17          But some of the pieces that we talked

18  about through that process were, managing the risks

19  from fire; managing the risks of speeding vehicles,

20  which was a real issue down there; a belief that, if

21  we were able to do a better job of managing some of

22  these extreme risks, concerns around trafficking and

23  other pieces that antisocial behavior would reduce,

24  that fewer people would use the Greenway as -- as an

25  encampment site.

Page 269

1          That did turn out to be the case over

2    time.

3          So a less -- a worse way of doing this

4    would have been to not worry about the fires, not

5    worry about the speeding vehicles, not worry about

6    how to reduce risks over time.

7     Q    (BY MS. STILLMAN) What would happen if an

8    encampment was established on the Greenway today?

9          MS. PIERCE:  Objection.  Foundation, calls

10   for speculation, incomplete hypothetical.

11    A    To the -- so you are asking me to

12   speculate.  But, I mean, clearly you're aware of the

13   administrative manual, which we have discussed

14   already, which very clearly states that camping is

15   not permitted on Hennepin County-owned property, and

16   also that we have a person-sensitive approach and

17   how first response would be a Human Services

18   response to help people identify alternative

19   shelter.

20          So that is what would happen.  We would be

21   notified, and somebody from my team, in all

22   likelihood, would be out to make contact with people

23   and identify alternatives.

24    Q    (BY MS. STILLMAN) Were you consulted in

25   the drafting of the policy regarding people

Page 270

1    experiencing unsheltered homelessness that's in the

2    administrative manual?

3              MS. PIERCE:  Objection.  Misstates the

4    policy, and asked and answered this morning.

5         A.   I was going to say, I don't think that's

6    the title.  The policy in the administrative manual

7    that we've already discussed, as I've already said,

8    I was involved in the discussions around that

9    policy, yes.

10        Q    (BY MS. STILLMAN) Who else was involved in

11   those discussions?

12             MS. PIERCE:  Objection.  Foundation.

13        A.   The other people I could recall would be

14   the same people I've highlighted being involved in

15   this discussion around the Greenway, so the Regional

16   Railroad Authority and county administration.  I'm

17   actually not sure if it went beyond that, but, I

18   mean, there may have been other parties that had

19   eyes on it outside of my own feedback.

20        Q    (BY MS. STILLMAN) What is the title of the

21   policy?

22        A.   I can't remember.

23        Q.   Is there a way that you refer to the

24   policy?

25        A.   It's not something I'm often called on to

Page 271

1  do outside of this event today, honestly.

2      Q.   So if someone were -- or if people were to

3  set up an encampment on the Greenway today, someone

4  from your office would be contacted, correct?

5          MS. PIERCE:  Objection.  Asked and

6  answered, and incomplete hypothetical, and calls for

7  speculation and foundation.

8      A.   Yeah.  I mean, I was going to add, yeah,

9  speculation.  There are a number of variables that

10  could be in play here.  But in a number of

11  circumstances, I can imagine that that would be the

12  response, yes.

13     Q    (BY MS. STILLMAN) What if an encampment

14  was set up on the Greenway and the residents didn't

15  want to go to shelter?  Would they be removed?

16         MS. PIERCE:  Objection.  Objection to the

17  meaning of -- the use of the word residents.  Vague,

18  foundation, calls for speculation, incomplete

19  hypothetical.

20     A.   People would be informed that they would

21  not be able to remain here.  In our experience,

22  outside of the events of 2020, that is normally

23  sufficient.

24     Q    (BY MS. STILLMAN) What do you mean, that's

25  normally sufficient?

Page 272

1      A.   Generally, if we've been out and made

2    contact -- and I can think of a specific case where

3    this happened last year -- our team goes out, tells

4    people they won't be able to remain here.  This

5    wasn't on the Greenway.  But in that case, I believe

6    four of the five did accept an offer of shelter.

7    The fifth transported to another site.  There were a

8    couple of other people.  They were told they

9    wouldn't be able to remain here.  When people went

10   back the next day, they had relocated.

11     Q.   But that doesn't always happen, right?

12          MS. PIERCE:  Objection.  Foundation,

13   compound, calls for speculation, incomplete

14   hypothetical.

15     A.   I am racking my brain to think of

16   specifics.  Like I say, there's a whole number of

17   variables in here.  It's reasonable to assume that

18   that may not always happen.  But, like I say,

19   that's -- that's pretty much our experience, outside

20   of the events of 2020 and the Greenway, which we're

21   already discussing.

22     Q    (BY MS. STILLMAN) Do you know if there are

23   currently any encampments in Hennepin County?

24          MS. PIERCE:  Objection.

25          Do you mean on county land or anywhere in

Page 273

1    Hennepin County?

2            MS. STILLMAN:   Anywhere in Hennepin

3    County.

4            MS. PIERCE:   Objection.   Foundation.

5        A.    Within the geographic area of Hennepin

6    County, yes, I am aware that there are encampments.

7        Q     (BY MS. STILLMAN) Do you know

8    approximately how many?

9        A.    I would be estimating, which I am loath to

10   do, a subject that becomes very contentious when --

11   when numbers start bouncing around, because people

12   have different interpretations of them.

13           My understanding right now would be that I

14   would estimate fewer than a hundred people.   And

15   most of the encampments are one, two, three people.

16   Oh, except in that if we're going off your

17   definition of encampments earlier, notwithstanding

18   the living bit that I disagree with, you said two

19   and above, that would reduce the number, because a

20   number of the encampments that I'm thinking of are a

21   single person.

22       Q.    Are you aware of any encampments that

23   currently exist on property owned by Hennepin

24   County?

25           MS. PIERCE:   Objection to the use of the

Page 274

1   word encampment. And foundation.  Objection.

2          Pardon me.

3      A.    I am not aware of any encampment on

4   Hennepin County-managed property as of today, the

5   information I have to date.

6      Q    (BY MS. STILLMAN) In -- in 2020 did you

7   ever tell somebody from the MPRB that you had

8   concerns with the way in which a homeless encampment

9   was closed?

10         MS. PIERCE:  Objection.  Asked and

11  answered, vague, including as to the use of the word

12  encampment and concern.

13     A.    I don't recall a conversation that I would

14  describe in that way.  And, again, I was not present

15  at any MPRB closure.

16     Q    (BY MS. STILLMAN) Have you been at the

17  closures of any encampments in Hennepin County since

18  January 1st of 2020?

19         MS. PIERCE:  Objection.  Asked and

20  answered.  Already testified on that.

21     A.    No, I haven't.

22     Q    (BY MS. STILLMAN) Are you able to propose

23  policies that -- to be implemented within Hennepin

24  County?

25         MS. PIERCE:  Objection.  Vague, compound,

Page 275

1    and by -- and -- and adapted by whom?  The board?

2         Well --

3         A.   To what kind of policies are you

4    referring?

5         Q    (BY MS. STILLMAN) Are you able to propose

6    a policy to be included in the administrative

7    manual?

8              MS. PIERCE:  Objection.  Vague, compound.

9         A.   I never have, nor would I think to do so.

10   I can't imagine the circumstances in which I would

11   do that.

12        Q    (BY MS. STILLMAN) Are you able to?

13             MS. PIERCE:  Objection.  Foundation,

14   vague.

15        A.   Having never done so, and never imagined

16   circumstances under which I would wish to do so, I

17   have never tested that, so I do not know.

18             MS. STILLMAN:  I have no further

19   questions.

20             MS. PIERCE:  Okay.  We reserve the right

21   to read and sign.  Thanks.

22             THE VIDEOGRAPHER:  We are going off the

23   record at 5:18 p.m.

24             (Whereupon, at 5:18 p.m., Thursday,

25   February 16, 2023, the taking of the Deposition of

Page 276

1   DAVID HEWITT was adjourned.)

2                           *   *   *

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 277

```
 1   STATE OF MINNESOTA:   )
                          ) ss.            CERTIFICATE
 2   COUNTY OF ANOKA:      )
 3           Be it known that I took the deposition of
     DAVID HEWITT on the 16th day of February, 2023;
 4
 5           That I was then and there a Notary Public
     in and for the County of Anoka, State of
 6   Minnesota, and that by virtue thereof, I was duly
     authorized to administer an oath;
 7
             That the witness, before testifying, was
 8   by me first duly sworn to testify the whole truth
     and nothing but the truth relative to said cause;
 9
             That the testimony of said witness was
10   recorded in shorthand by me and was reduced to
     typewriting under my direction;
11
             That the cost of the original transcript
12   has been charged to the party noticing the
     deposition, unless otherwise agreed upon by Counsel,
13   and that copies have been made available to all
     parties at the same cost, unless otherwise agreed
14   upon by Counsel;
15           That I am not related to any of the parties
     hereto nor interested in the outcome of the action;
16
             That the reading and signing of the
17   deposition by the witness and the Notice of Filing
     were reserved.
18
             WITNESS MY HAND AND SEAL this 1st day of
19   March, 2023.
20
21
22           Christine K. Herman, RPR, CRR
23
24
25
```

Page 280

1              DEPOSITION REVIEW
             CERTIFICATION OF WITNESS
2

        ASSIGNMENT REFERENCE NO: 5672378
3       CASE NAME: Berry, Patricks, et al. v. Hennepin County, et al.
        DATE OF DEPOSITION: 2/16/2023
4       WITNESS' NAME: David Hewitt
5           In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7           I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
8    well as the reason(s) for the change(s).
9           I request that these changes be entered
     as part of the record of my testimony.
10
            I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   3/21/2023_____     _____
     Date                    David Hewitt
14
            Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18             in the appended Errata Sheet;
          They signed the foregoing Sworn
19             Statement; and
          Their execution of this Statement is of
20             their free act and deed.
21        I have affixed my name and official seal
22   this _____ day of_____, 20____.
23        _____
          Notary Public
24
          _____
25        Commission Expiration Date

Veritext Legal Solutions

**Errata Sheet**

**Deposition of David Hewitt, 2/16/2023**

**Assignment Reference No. 5672378**

**Statement of Changes Under Fed. R. Civ. P. 30(e)**

| Page | Line | Change | Reason |
|------|------|--------|--------|
| 15 | 5 | Change "Singapore" to "St. Paul" | Transcription error |
| 18 | 13 | Change "Simpson House of Charity" to "House of Charity" | Misspoke |
| 29 | 23 | Change "nonrecurrent" to "nonrecurring" | Transcription error |
| 32 | 12 | Change "nonrecurrent" to "nonrecurring" | Transcription error |
| 32 | 22 | Change "nonrecurrent" to "nonrecurring" | Transcription error |
| 33 | 1 | Change "nonrecurrent" to "nonrecurring" | Transcription error |
| 33 | 4 | Change "at" to "and" | Transcription error |
| 33 | 24 | Change "nonrecurrent" to "nonrecurring" | Transcription error |
| 60 | 23 | Change "and" to "in" | Transcription error |
| 159 | 24 | Change "Diagnostic Assessment" to "Decision Assistance" | Misremembered |
| 168 | 12 | Change "usual" to "unusual" | Transcription error |
| 194 | 8 | Change "2202" to "2022" | Transcription error |
| 261 | 22 | Change "Cerne" to "Cerney" | Spelling error |

_____

David Hewitt

3/21/2023 _____

Date