# EXHIBIT 104

Page 1

```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF MINNESOTA
 2    _____
 3                      Civil File No. 20-CV-02189 WMW/JFD
 4    Patrick Berry, Henrietta Brown,
      Nadine Little, Dennis Barrow, Virginia Roy,
 5    Joel Westvig, Emmett Williams, Gina Mallek,
      Daniel Huiting, on behalf of themselves
 6    and a class of similarly-situated individuals;
      and ZACAH,
 7
               Plaintiffs,
 8    vs.
 9    Hennepin County; Hennepin County Sheriff
      David Hutchinson, in his individual and official
10    capacity; City of Minneapolis; Minneapolis Mayor
      Jacob Frey, in his individual and official capacity;
11    Minneapolis Chief of Police Medaria Arradondo,
      in his individual and official capacity;
12    Superintendent Al Bangoura, in his individual and
      official capacity; Park Police Chief at the
13    Minneapolis Park and Recreation Board Jason Ohotto,
      in his individual and official capacity;
14    Police Officers John Does; and Police Officers
      Jane Does,
15
               Defendants.
16    _____
17                VIDEOTAPED DEPOSITION OF
18                      DONALD RYAN
19
20    DATE:  February 13, 2023
21    TIME:  9:00 a.m.
22    PLACE:  Ballard Spahr, LLP
                2000 IDS Center
23              80 South Eighth Street
                Minneapolis, Minnesota
24
25    REPORTED BY:  Christine K. Herman, RPR, CRR
```

```
 1                    A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFFS:
 4   AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA
     By:  Rebecca Stillman, Esquire
 5        Box 14720
          Minneapolis, Minnesota 55414
 6        Phone:  (651)645-4097
          Email:  rstillman@mylegalaid.org
 7
 8   -and-
 9   MID-MINNESOTA LEGAL AID:
     By:  Luke Grundman, Esq.
10        Teresa Nelson, Esq.
          111 North Fifth Street, Suite 100
11        Minneapolis MN 55403
          Phone: (612)332-1441
12        Email: lgrundman@mylegalaid.org
13   ON BEHALF OF HENNEPIN COUNTY, HENNEPIN COUNTY SHERIFF
     DAVID HUTCHINSON, AND THE WITNESS:
14
     HENNEPIN COUNTY ATTORNEY'S OFFICE
15   By:  Kelly K. Pierce, Esquire
          Christiana Martenson, Esquire
16        Hennepin County Government Center
          300 South 6th Street
17        Minneapolis, Minnesota 55487
          Phone:  (612)348-5550
18        Email: kelly.pierce@hennepin.us
               christiana.martenson@hennepin.us
19
20   ON BEHALF OF THE CITY OF MINNEAPOLIS, MINNEAPOLIS MAYOR
     JACOB FREY, AND MINNEAPOLIS CHIEF OF POLICE
21   MEDARIA ARRADONDO:
22   MINNEAPOLIS CITY ATTORNEY'S OFFICE:
     By:  Kristin Sarff, Esquire
23        Municipal Building
          350 South 5th Street, Room 210
24        Minneapolis, Minnesota 55415
          Phone:  (612)673-2010
25        Email:  kristin.sarff@minneapolismn.gov
```

Page 3

1    ON BEHALF OF THE MINNEAPOLIS PARK AND RECREATION BOARD,

     SUPERINTENDENT AL BANGOURA AND PARK POLICE CHIEF

2    JASON OHOTTO:

3    RICE, WALTHER & MOSLEY, LLP

     By:  Ann E. Walther, Esquire

4         10 Second Street NE, Suite 206

          Minneapolis, Minnesota 55413

5         Phone:  (612)676-2300

          Email:  awalther@ricemichels.com

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                        Page 4
1    INDEX:

2                                        PAGE:

3    WITNESS:  DONALD RYAN

4    Examination by Ms. Stillman  . . . . . . . . .  11

5

6    EXHIBITS MARKED:

7    NUMBER 180 . . . . . . . . . . . . . . . . . .  34

8       Email string

9       Update on encampments from 8:00 daily meeting

10      HC00020219 - 20220

11   NUMBER 181 . . . . . . . . . . . . . . . . . .  38

12      Email string

13      FW: [External] Fw: Powderhorn transition

14      HC00039367 - 39368

15   NUMBER 182 . . . . . . . . . . . . . . . . . .  38

16      Encampment Transition Plan

17      HC00039369 - 39371

18   NUMBER 183 . . . . . . . . . . . . . . . . . .  60

19      Email String

20      RE: Greenway Camps 12/5/2020

21      HC00015115 - 15117

22   NUMBER 184 *CONFIDENTIAL*  . . . . . . . . . .  60

23      Summary of Tents with Occupants 120420 Interested

24      in Shelter JRG.jg.xlxs

25      HC00015118 and spreadsheet
```

Page 5

```
 1   NUMBER 185 . . . . . . . . . . . . . . . . .  100
 2     Email string
 3     RE: [External] Park Encampments
 4     HC00028963 - 28964
 5   NUMBER 186 . . . . . . . . . . . . . . . . .  107
 6     Email string
 7     RE: [External] Logan Park
 8     HC00029505 - 29506
 9   NUMBER 187 . . . . . . . . . . . . . . . . .  113
10     Email string
11     RE: [EXTERNAL] Nicollet Ave bridge deck
12     MPLS_BERRY073548 - 073550
13   NUMBER 188 . . . . . . . . . . . . . . . . .  119
14     Email string
15     RE: HC Sheriffs - anyone available for an
16     immediate call?
17   HC00037746 - 37749
18     NUMBER 189 . . . . . . . . . . . . . . . .  121
19     Email string
20     Nicollet Bridge Encampment
21     HC00037637
22   NUMBER 190 . . . . . . . . . . . . . . . . .  121
23     Cleanout Notice Nicollet Bridge site 100220.docx
24     HC00037638 and attachment
25
```

Page 6

1   NUMBER 191 . . . . . . . . . . . . . . . . . 125

2     Email string

3     RE: greenway - talking points

4     HC00022695 - 22698

5   NUMBER 192 . . . . . . . . . . . . . . . . . 147

6     Email string

7     FW: [EXTERNAL] Fwd: Greenway Encampment Sweep

8     and EVICTION PLANNED for Thursday AM

9   HC00019692 - 19693

10  NUMBER 193 . . . . . . . . . . . . . . . . . 147

11    Notice of Removal

12    HC00019694

13  NUMBER 194 . . . . . . . . . . . . . . . . . 147

14    Notice of Removal

15    HC00019695

16  NUMBER 195 . . . . . . . . . . . . . . . . . 147

17    Photo, HC00019696

18  NUMBER 196 . . . . . . . . . . . . . . . . . 163

19    Email string

20    RE: [External] help with statistics

21    MPLS_BERRY067466 - 67467

22  NUMBER 197 . . . . . . . . . . . . . . . . . 173

23    Email string

24    FW: [External] RE: Meeting

25    HC00032302 - 32311

Page 7

1    NUMBER 198 . . . . . . . . . . . . . . . . . 177

2      Email string

3      RE: Powderhorn update

4      HC00039757 - 39763

5    NUMBER 199 . . . . . . . . . . . . . . . . . 180

6      Email string

7      RE: [EXTERNAL] Encampments clearings with no

8      destination

9      HC00029458 - 29459

10   NUMBER 200 . . . . . . . . . . . . . . . . . 184

11     Email string

12     FW: [EXTERNAL] update on the street outreach meeting

13     HC00029980 - 29982

14   NUMBER 201 . . . . . . . . . . . . . . . . . 191

15     Outreach Meeting Minutes 8.17.20.docx

16     HC00038115

17   NUMBER 202 . . . . . . . . . . . . . . . . . 212

18     Email string

19     FW: ZACAH referrals

20     HC00033832 - 33833

21   NUMBER 203 . . . . . . . . . . . . . . . . . 215

22     Email from David Hewitt

23     Summary of the meeting with Bloomington and ZACAH

24     HC00034306

25

Page 8

1    NUMBER 204 . . . . . . . . . . . . . . . . .    224

2    Don Ryan LinkedIn Profile

3

4    PREVIOUSLY MARKED EXHIBITS REFERENCED:

5    NUMBER 23  . . . . . . . . . . . . . . . . .     84

6    NUMBER 55  . . . . . . . . . . . . . . . . .     87

7    NUMBER 60  . . . . . . . . . . . . . . . . .     20

8    NUMBER 61  . . . . . . . . . . . . . . . . .     21

9    NUMBER 76  . . . . . . . . . . . . . . . . .     99

10   NUMBER 88  . . . . . . . . . . . . . . . . .     75

11   NUMBER 129 . . . . . . . . . . . . . . . . .     33

12   NUMBER 130 . . . . . . . . . . . . . . . . .     48

13   NUMBER 146 . . . . . . . . . . . . . . . . .     54

14   NUMBER 165 . . . . . . . . . . . . . . . . .    116

15

16

17   Certificate of Witness . . . . . . . . . . .    228

18   Certificate of Court Reporter  . . . . . . .    230

19

20

21   REPORTER'S NOTE:  All quotations from exhibits are

22   reflected in the manner in which they were read into

23   the record and do not necessarily indicate an exact

24   quote from the document.

25

Page 9

1                  P R O C E E D I N G S

2

3             THE VIDEOGRAPHER:  Good morning.  We're

4    going on the record at 9:02 a.m. on February 13th,

5    2023.

6             Please note that the microphones are

7    sensitive and may pick up whispering and private

8    conversations.  Please mute your phones at this

9    time.  Audio and video recording will continue to

10   take place unless all parties agree to go off the

11   record.

12            This is Media Unit 1 of the video-recorded

13   deposition of Donald Ryan, taken by counsel for the

14   plaintiffs, in the matter of Berry, et al., vs.

15   Hennepin County, et al., filed in the United States

16   District Court, District of Minnesota, Case

17   No. 20-CV-02189.

18            This deposition is being happening at the

19   law offices of Ballard Spahr, located in

20   Minneapolis, Minnesota.

21            My name is Dave Young.  I'm the

22   videographer.  Our court reporter today is Christine

23   Herman.  We are both representing Veritext Legal

24   Solutions.

25            I am not related to any party in this

Page 10

1    action, nor am I financially interested in the

2    outcome.

3          If there are any objections to this

4    proceeding, please state them at the time of your

5    appearance.

6          Will counsel now state their appearances

7    and affiliations for the record, beginning with the

8    noticing attorney.

9          MS. STILLMAN:  Rebecca Stillman, counsel

10   for plaintiffs.

11         MR. GRUNDMAN:  Luke Grundman, counsel for

12   plaintiffs.

13         MS. PIERCE:  Kelly Pierce, counsel for

14   Hennepin County and the witness, Don Ryan.

15         MS. MARTENSON:  Christy Martenson,

16   representing Hennepin County.

17         MS. WALTHER:  Ann Walther, representing

18   the Minneapolis Park and Recreation Board.

19         MS. SARFF:  Kristin Sarff, representing

20   the City defendants.

21         THE VIDEOGRAPHER:  Will the court reporter

22   please swear in the witness, and then we can

23   proceed.

24   Whereupon,

25                    DONALD RYAN,

Page 11

1          a witness in the above-entitled matter,

2             after having been first duly sworn,

3               deposes and says as follows:

4                          EXAMINATION

5    BY MS. STILLMAN:

6          Q.   Good morning, Mr. Ryan.

7          A.   Good morning.

8          Q.   My name is Rebecca.  I'm counsel for the

9    plaintiffs.

10              Could you please state and spell your

11   name?

12         A.   My legal name is Donald Ryan, R-y-a-n.

13         Q.   Okay.  And you understand that your

14   answers are under oath as if given in a court of

15   law?

16         A.   I do.

17         Q.   And you understand that, under certain

18   circumstances, this testimony could be shown to a

19   jury?

20         A.   I do.

21         Q.   And you understand it is your

22   responsibility to answer truthfully and as

23   completely as possible?

24         A.   I do.

25         Q.   You must respond audibly, not by shaking

Page 12

1    your head or nodding, as we have a court reporter

2    taking everything down.

3         A.   Yes.

4         Q.   If I ask you a question that you do not

5    understand, please let me know, and I will rephrase

6    it for you.  Can you do that?

7         A.   Yes.

8         Q.   If you have to take a break for any

9    reason, that's not a problem, so long as there is

10   not a question pending.  If there is a question

11   pending, we ask that you answer the question and

12   then we take the break.  Does that work?

13        A.   That's fine.

14        Q.   Okay.  Are there any circumstances that

15   would affect your ability to testify completely and

16   truthfully today?

17        A.   No.

18        Q.   You're not on any medication or alcohol

19   and drugs that might affect your memory?

20        A.   No.

21        Q.   All right.  What did you do to prepare for

22   your deposition today?

23             MS. PIERCE:  I'm just going to object here

24   and instruct the witness not to reveal the content

25   of any privileged communication.

Page 13

1          A.    I spent a couple hours with the county

2     attorney prepping for this deposition last week.

3          Q.    (BY MS. STILLMAN)  With Ms. Pierce and

4     Ms. Martenson or only one of them?

5          A.    On two different occasions, with both of

6     these attorneys, and on another occasion with Devona

7     Wells being part of that group.

8          Q.    So how many times did you meet with them?

9          A.    Twice.

10         Q.    Okay.  And how long each time?

11         A.    I would say an average of four hours.

12         Q.    Okay.  Did you review any documents?

13         A.    Yes.

14         Q.    Which documents?

15         A.    There were a number of emails that were

16    produced that we reviewed.

17         Q.    Did any of those documents refresh your

18    recollection?

19         A.    No.  I don't believe that I learned

20    anything new from reviewing those documents.

21         Q.    And did you bring anything with you today?

22         A.    I did not.

23         Q.    All right.  Are you currently employed

24    with the county?

25         A.    Yes.

Page 14

1       Q.     What is your current role?

2       A.     I'm a program manager in an area called

3    safe communities.

4       Q.     When did you start in that role?

5       A.     January 1st, 2023.

6       Q.     And what is your -- what are your duties

7    in that role?

8       A.     I manage a number of lines of business,

9    with the goal being violence reduction in the

10   communities.

11      Q.     And what do you mean by violence

12   reduction?

13      A.     Safe communities is a new department,

14   developed by Hennepin County, with the goal of

15   taking a public health perspective into reducing

16   violence, so there is a line of business for illegal

17   gun, getting guns off the street, sex trafficking,

18   anti-hate.

19             I'm responsible for the domestic violence

20   contracts that Hennepin County has with a program

21   called the Youth Connection Center and with a

22   program called the Joint Community Police

23   Partnership.

24      Q.     And is that a partnership between

25   Hennepin County and the City of Minneapolis?

Page 15

1          A.    No.   The City of Minneapolis does not
2    participate in the JCPP.
3          Q.    Who's your current supervisor?
4          A.    The director of safe communities is Lisa
5    Bayley, and I report to her directly.
6          Q.    Could you spell her last name, please?
7          A.    B-a-y-l-e-y.
8          Q.    What was your role prior to your current
9    role?
10         A.    I was a program manager in the department
11   called initial contact and access, and I'd --
12         Q.    How long -- I apologize.
13               How long were you in that role?
14         A.    2015, until the end of 2022.
15         Q.    Who was your supervisor while you were in
16   that role?
17         A.    Margaret Thunder, T-h-u-n-d-e-r.
18         Q.    And who was her supervisor?
19         A.    For the majority of that time it was
20   Louella Kaufer, K-a-u-f-e-r.
21         Q.    Is the initial contact and access program
22   within a Hennepin County department?
23         A.    Yes.
24         Q.    Which department?
25         A.    Human services.

1        Q.    And who's in charge of the Hennepin County

2    Department of Human Services?

3        A.    Are you looking for ultimate

4    responsibility?

5        Q.    Yeah.

6        A.    Jodi Wentland is the assistant to David

7    Hough.

8              THE WITNESS:    Thank you.

9        Q.    (BY MS. STILLMAN) And is Hough spelled

10   H-o-u-g-h?

11       A.    Yes.

12       Q.    Okay.  What were your duties as a program

13   manager for the initial contact and access team?

14       A.    I had a number of units that did different

15   kinds of work.  During that time I had the Joint

16   Community Police Partnership.  I had an area called

17   adult access, which did a lot of mental health

18   provision work for residents, and I also had the

19   homeless access team, from 2015 until the end of

20   2021.

21       Q.    Who took over the role of managing the

22   homeless access team at the end of -- when you

23   stepped away from that role?

24       A.    The reason that I stopped working with

25   them is, the unit was moved to an area called

Page 17

 1    housing stability, in order to provide as much

 2    continuity of care for residents.  The program

 3    manager who took over those responsibilities is Lynn

 4    Shefer, S-h-e-f-e-r.

 5         Q.   And who's the director of the housing

 6    stability unit?

 7         A.   David Hewitt.

 8         Q.   What does the housing stability unit do?

 9         A.   I have never worked directly in that unit,

10    so I don't know that I am best able to describe it,

11    but they have a comprehensive plan for trying to

12    assist people who are either unhoused or at risk of

13    being unhoused, to improve their living situation.

14         Q.   When you worked as the program manager for

15    initial contact and access, did you supervise

16    anyone?

17         A.   Yes.

18         Q.   Approximately how many people?

19         A.   There were two supervisors and about 20 to

20    21 staff.

21         Q.   And both of those supervisors and the

22    approximately 21 to 28 staff all reported directly

23    to you?

24              MS. PIERCE:  Objection.  Misstates

25    witness' testimony.

Page 18

1          A.    It was 20 to 21 staff.

2          Q.    (BY MS. STILLMAN)  20 to 21.  I apologize.

3          A.    That's okay.  And I'm sorry.  What was

4     your question?

5          Q.    Did those two supervisors and 20 to 21

6     staff report directly to you?

7          A.    The two supervisors reported directly to

8     me.  I was working in a support capacity for all of

9     the staff who were doing the work.

10         Q.    And what were the names of those two

11    supervisors?

12         A.    Lynn Shefer and Ann Norton, N-o-r-t-o-n.

13         Q.    Did Lynn Shefer supervise the homeless

14    access team at that time?

15              MS. PIERCE:  Objection.  Vague.

16         A.    I don't know what that time is.  I'm

17    sorry.

18         Q.    (BY MS. STILLMAN) While you were the

19    program manager with initial contact and access, did

20    Lynn Shefer supervise a specific unit?

21         A.    I -- I don't recall what date Lynn was

22    brought into working with the homeless access team,

23    but I would approximate it would be the beginning of

24    2020.  So I would say around January 2020 she joined

25    that team.

1       Q.   And when you were the program manager for

2   initial contact and access, what unit did Ann Norton

3   supervise?

4       A.   I'm hesitating because the homeless access

5   team was merged with the other unit I mentioned

6   called adult access.  We separated those units.  So

7   during the period of 2015 to when they moved over to

8   housing stability, in September 2021, there were

9   times where Ann Norton did work with the adult

10  access team as well as the homeless access team.

11      Q.   Okay.  And you mentioned earlier that

12  you -- while you were in the program manager for

13  initial contact and access you supervised the Joint

14  Community Police Partnership?  Is that correct?

15      A.   Yes.

16      Q.   And is that the same Joint Community

17  Police Partnership that you currently supervise in

18  your current role?

19      A.   Yes.

20      Q.   Okay.  And do you work with the

21  Minneapolis Police Department at all for that

22  project?

23      A.   No.

24           MS. PIERCE:  Objection.  Objection.

25  Vague.

Page 20

1      A.    No.

2      Q.    (BY MS. STILLMAN) No?

3            Why is it called the Joint Community

4   Police Partnership?

5            MS. PIERCE:  Objection.  Foundation.

6      A.    The program began in 2005, as an effort to

7   assist newly immigrated folks, mostly from Liberia,

8   to develop positive relationships with the police

9   departments of Brooklyn Park and Brooklyn Center.

10  It has now developed into working with nine

11  Hennepin County cities, and the goal is to improve

12  relationships between community and law enforcement.

13     Q.    (BY MS. STILLMAN) Is one of those cities

14  Minneapolis?

15     A.    No.

16           MS. STILLMAN:  I'm going to show the

17  witness a document that was previously marked as

18  Exhibit 60.

19           (Previously Marked Exhibit Number 60

20  introduced to the witness.)

21           MS. PIERCE:  Do you have copies for

22  counsel?

23           MS. STILLMAN:  No.  It's an email -- and

24  I'm going to be using 61 as well.

25           MS. MARTENSON:  Do you want a copy?

Page 21

1           MS. STILLMAN:  And then I'm also going to

2    present the witness with Exhibit -- a document

3    that's previously been marked as Exhibit 61.

4           Actually, this is the witness copy.  I'll

5    trade you.

6           (Previously Marked Exhibit Number 61

7    introduced to the witness.)

8           (Discussion held off the record.)

9           MS. STILLMAN:  Has all counsel found the

10   document?

11          (Affirmative responses.)

12          MS. STILLMAN:  Okay.

13      Q.   (BY MS. STILLMAN) Going to Exhibit 60, do

14   you recognize this document?

15      A.   I recognize that this is an email chain.

16      Q.   And is your email address on this

17   document?

18      A.   Yes, it is.

19      Q.   Okay.  And is your email address

20   donald.ryan@hennepin.us?

21      A.   Yes.

22      Q.   And is that still your email address?

23      A.   Yes.

24      Q.   Okay.  Has your email address changed

25   since 2015?

Page 22

1      A.    No.

2      Q.    Okay.  And I'm going to go to Exhibit 61.

3  And I'll represent that this is the document that

4  was attached to the email in Exhibit 60.

5            Have you seen this document before?

6      A.    I don't recall, but I can review it right

7  now --

8      Q.    Okay.

9      A.    -- if you would like.

10     Q.    Yes.  Take your time.

11     A.    Okay.

12           I have not read the entire document, but I

13  do recognize this document.

14     Q.    Okay.  Did you help draft this document?

15     A.    I did not.

16     Q.    Do you know who drafted this document?

17     A.    I am not sure of all the parties who

18  participated in drafting this document.

19     Q.    Do you know why this document was created?

20     A.    I believe that this document was created

21  to create continuity and consistency in the work

22  that Hennepin County was doing with persons

23  experiencing homelessness.

24     Q.    Continuity with other governmental

25  entities?

Page 23

1        A.   I appear -- this appears to be an internal

2    document, to me.

3        Q.   If you go back to page -- or Exhibit 60,

4    on the first page it says that this -- at the top it

5    says that this document was from David Hewitt to

6    Katie Topinka, with you and Andrea Brennan both

7    cc'ed on the email.

8             Do you see that?

9        A.   Yes.

10       Q.   Okay.  And did you discuss this document

11   with Ms. Topinka and Ms. Brennan?

12       A.   I don't recall.

13       Q.   I'm going to go back to Exhibit 61.

14            Does this document accurately describe the

15   joint homeless response during the pandemic?

16            MS. PIERCE:  Objection.  Foundation.

17       A.   When you say joint homeless response, can

18   you describe what you mean?

19       Q.   (BY MS. STILLMAN) Well, let's rephrase

20   this.

21            Does this draft document -- draft and

22   encampment response during COVID-19 pandemic

23   accurately describe the cross-jurisdictional

24   framework that was used for encampment response?

25            MS. PIERCE:  Objection.  Vague,

Page 24

1    foundation.

2         A.    Thanks for giving me time to review that.

3               I'm sorry.  The question, again, was?

4         Q.    (BY MS. STILLMAN) Sure.  So if you go to

5    the first page of the document -- we'll start --

6    we'll start over.

7               If you go to the first page of the

8    document, it says, Draft Encampment Response During

9    COVID-19 Pandemic.  This is a framework for a

10   cross-jurisdictional response to encampments during

11   the COVID-19 pandemic.

12              During the COVID-19 pandemic, was this the

13   framework you used to respond to encampments?

14              MS. PIERCE:  Objection.  Vague,

15   foundation, misstates the record.

16        A.    This is a document we used when --

17   considering how we wanted to provide service, yes.

18        Q.    (BY MS. STILLMAN) Who is "we"?

19        A.    Hennepin County has a number of teams,

20   including the homeless access team, and Healthcare

21   for the Homeless, and public health, and we,

22   Hennepin County, units use this as -- as a model for

23   the work we were doing.

24        Q.    What is your understanding of

25   cross-jurisdictional response?

Page 25

1          MS. PIERCE:  Objection.  Do you mean as
2  used in the document?
3          Q.   (BY MS. STILLMAN) As used in the document.
4          A.   I haven't seen this document in a while,
5  but I -- the way that I read this, it would be not
6  only Hennepin County personnel.
7          Q.   Did you create a response plan for
8  encampments during the COVID-19 pandemic with
9  anybody from the City of Minneapolis?
10          MS. PIERCE:  Objection.  Vague.
11          A.   I don't recall.
12          It's important to know that the work that
13  we did didn't begin with this period of time, that
14  some of these foundational principles were taken
15  from other documents that we used.  So when I
16  consider what we started doing as a result of
17  changes in 2020, it's not clear to me what we
18  started at that time and what occurred before that.
19          Q.   (BY MS. STILLMAN) You mentioned other
20  documents.  What other documents?
21          A.   There were documents from the Office to
22  End Homelessness that we used as a -- as a guide for
23  the work we did as well.
24          Q.   What were these documents specifically?
25          A.   I did not prepare any of those documents,

1   so I don't know that I'm in the best position to

2   discuss those.

3        Q.   Which documents are you referring to?

4        A.   I believe you were asking about the Office

5   to End Homelessness documents, and include

6   foundation principles, philosophy, et cetera.

7        Q.   Yes.  And you said that you used those

8   documents to help create this framework, correct?

9        A.   Nope.  No, I didn't --

10            MS. PIERCE:  Objection.  Objection.

11   Misstates the witness's testimony.

12        A.   No.  I didn't say that.

13        Q.   (BY MS. STILLMAN) In your previous answer

14   you mentioned other documents that you, what, used

15   to --

16        A.   Used as a model for the work that we were

17   doing.

18        Q.   Okay.  So I'm asking what other

19   documents -- what were those documents that you used

20   as a model?

21        A.   There were documents created by the Office

22   to End Homelessness to give all staff the

23   opportunity to consider the work we were doing from

24   Hennepin County's model perspective.

25        Q.   Do you remember specifically the names of

Page 27

1    those documents?

2         A.    I do not.

3         Q.    Do you remember generally what information

4    those documents contained?

5         A.    Yes.  There was a strong emphasis on

6    treating all people with dignity, with respect,

7    with -- there's a philosophy Hennepin County has,

8    where we look at trying to serve the person and what

9    they need at that time.  I -- I recall all of those

10   being the focus of those documents.

11        Q.    What does treating somebody with dignity

12   mean to you?

13        A.    I would say listening to someone's

14   opinion, treating them with respect, trying to offer

15   them options that are good for them and that they

16   believe may improve their own lives are all examples

17   of working with someone with dignity.

18        Q.    When you get emails with attachments, what

19   do you generally do with the attachments?

20              MS. PIERCE:  Objection.  Vague, compound,

21   time frame.

22        A.    It depends on the document.  If this is a

23   document that I received that I felt was applicable

24   to the work of people who I work with in the

25   homeless access team, for example, I may forward

Page 28

1  that to them.  If it's a document that I think I'll

2  be referencing in the future, I may save that

3  document so I can access it later.

4           It all depends on what the email and the

5  document is.

6       Q.   (BY MS. STILLMAN) Where would you save it

7  if you chose to save a document?

8           MS. PIERCE:  Objection.  Vague, compound,

9  time frame.

10      A.   Hennepin County offers electronic ways to

11  store documents, and I've only used Hennepin County

12  internal data systems to do that.

13      Q.   (BY MS. STILLMAN) Does Hennepin County use

14  SharePoint?

15      A.   Yes.

16      Q.   Okay.  Any other online -- does

17  Hennepin County use any other online storage

18  systems?

19           MS. PIERCE:  Objection.  Vague.

20      A.   In the last couple years we have used

21  Microsoft Teams.  In years before that it was a --

22  an opportunity to store a document on a -- in a

23  private work file.

24      Q.   (BY MS. STILLMAN) I'm going to go back to

25  document 60 for a second.

Page 29

1          So as we said earlier, this was an email

2     from David Hewitt to Katie Topinka, with you and

3     Andrea Brennan cc'ed.

4          Do you remember that?

5     A.   I'm looking at it now.

6     Q.   Okay.  Did the four of you have many

7     conversations about encampment issues?

8     A.   Yes.

9          MS. PIERCE:  Objection.  Time frame.

10    Q.   (BY MS. STILLMAN) During 2020 do you think

11    you emailed with Katie Topinka and Andrea Brennan

12    every day of the workweek?

13         MS. SARFF:  Objection.  Lack of

14    foundation, calls for speculation and relevance.

15    A.   I don't believe that I emailed them every

16    day of the workweek.

17    Q.   (BY MS. STILLMAN) During 2020 how

18    frequently do you think you talked to Katie Topinka?

19         MS. SARFF:  Same objections.

20    A.   It would not be uncommon to have

21    communication with Katie Topinka two to three times

22    a week.

23    Q.   (BY MS. STILLMAN) During 2020 how

24    frequently would you say you communicated with

25    Andrea Brennan?

Page 30

1      A.   Much --

2           MS. SARFF:   Same objections.

3      A.   Much less frequently.

4      Q.   (BY MS. STILLMAN) Approximately once per

5 week?

6      A.   No.  Not -- the average would be much less

7 than once a week.

8      Q.   Approximately once per month?

9      A.   It is hard to recall, but those

10 communications may be two to three times a month.

11     Q.   In 2021 how frequently would you say you

12 spoke to Katie Topinka?

13          MS. SARFF:   Objection.  Relevance, lack of

14 foundation, calls for speculation.

15     A.   Are you asking me for the totality of

16 2020?

17     Q.   (BY MS. STILLMAN) 2021.

18     A.   2021.  I apologize.

19          Infrequently.

20     Q.   Okay.

21     A.   Katie and I may have communicated briefly

22 in January of 2021, but there was a new person who

23 was hired by Hennepin County at that time who

24 assumed the roles that I had in 2020, which limited

25 my interactions with Katie Topinka in 2021.

Page 31

1      Q.   Is that person you just mentioned that was

2   hired by Hennepin County Lynn Shefer?

3      A.   No.

4      Q.   Who was it?

5      A.   Erin Wixsten, W-i-x-o-n -- s-o-n.

6   W-i-x-s-o-n [sic].

7      Q.   Does Erin Wixsten still work for

8   Hennepin County?

9      A.   Yes.

10      Q.   In what role?

11      A.   I don't know what her job description is,

12   but she works in housing stability, working with

13   persons experiencing homelessness.

14      Q.   How frequently did you speak with Andrea

15   Brennan in 2021?

16           MS. SARFF:  Objection.  Relevance, lack of

17   foundation, calls for speculation.

18      A.   Less frequently than I spoke with her in

19   2020.

20      Q.   (BY MS. STILLMAN) This email only includes

21   you and David Hewitt from the county, correct?

22      A.   The --

23      Q.   The top email.

24      A.   Yes.  Correct.

25      Q.   Okay.  Was it common for only you and

Page 32

1    Mr. Hewitt to be -- you and Mr. Hewitt to be

2    emailing with Ms. Topinka and Ms. Brennan?

3              MS. PIERCE:  Objection.  Foundation,

4    vague, compound, time period.

5              MS. SARFF:  Objection.  Relevance as to

6    subject matter.

7         A.   It was not uncommon for us to email, as

8    email was a -- a convenient and timely way to

9    communicate about issues that we were working on.

10        Q.   (BY MS. STILLMAN) What was your work

11   relationship with Mr. Hewitt while you were the

12   initial -- while you were the program manager for

13   initial contact and access?

14             MS. PIERCE:  Objection.  Vague.

15        A.   He was the director in another area, and

16   we worked together on this work.  He is a director,

17   so he's levels above me in terms of senior -- not

18   seniority -- of hierarchy.  But I would say we

19   worked together in this work.

20        Q.   (BY MS. STILLMAN) What do you mean by

21   "this work"?

22        A.   The work of attempting to serve persons

23   experiencing homelessness.

24             MS. STILLMAN:  I'm going to present the

25   witness with Exhibit -- an exhibit that was

Page 33

1   previously marked as 129.

2           (Previously Marked Exhibit Number 129

3   introduced to the witness.)

4           MS. STILLMAN:  And if all counsel could

5   just let me know once they've found the document.

6           MS. MARTENSON:  What was the number again?

7           MS. STILLMAN:  129.

8           (Discussion held off the record.)

9           MS. STILLMAN:  All right.  Has all counsel

10  found 129?

11          (Affirmative responses.)

12          MS. STILLMAN:  Okay.

13      Q.   (BY MS. STILLMAN) And if you look at the

14  document, this is a Microsoft Teams meeting invite

15  from Katie Topinka and you to others, correct?

16      A.   Yes.

17      Q.   And it's dated October 5th, 2020?

18      A.   No.

19      Q.   What's the date?

20      A.   October 1st, 2020.

21          Just to clarify, it was sent on

22  October 1st, for a meeting time on October 5th.

23      Q.   Okay.  And the body of the email states

24  that the recurrence of the meeting was changing

25  from -- or was changing to once per week; is that

Page 34

1   correct?

2        A.    That's what this says.  Yes.

3        Q.    And that you will leave it on the calendar

4   for Mondays but will cancel if not needed.  Correct?

5        A.    That's what I'm reading.

6        Q.    Okay.  How often were you and the

7   individuals listed on that invite meeting?

8             MS. PIERCE:  Objection.  Vague, compound

9   as to individuals.

10            MS. SARFF:  Objection.  Relevance as to

11   topic.

12       A.    I don't recall.  There were many meetings

13   that we had with multiple groups of people.  This

14   appears to be focused on the response policy and

15   communication, but I -- I don't recall how often

16   this group of people met.

17            MS. STILLMAN:  I'm marking Bates stamp

18   number HC00020219 as Exhibit 80 [sic].

19            (Deposition Exhibit Number 180 marked for

20   identification.)

21            MS. WALTHER:  Number 180?

22            MS. STILLMAN:  Exhibit 180.

23            MS. WALTHER:  Yes.  You said 80.

24       Q.    (BY MS. STILLMAN) And do you recognize

25   this document?

Page 35

1        A.    I recognize this as an email from me.

2        Q.    And both the top email and the lower email

3   are from you, correct?

4        A.    Correct.

5        Q.    Okay.  And the subject of the -- And you

6   sent this top email and the bottom email on

7   August 13th of 2020, correct?

8        A.    Correct.

9        Q.    And the subject line is Update on

10  Encampments from 8:00 Daily Meeting?

11       A.    Correct.

12       Q.    Were you -- and on the bottom email, it's

13  to David Hewitt and Katie Topinka, correct?

14       A.    Correct.

15       Q.    Were you meeting with Mr. Hewitt and Katie

16  Topinka daily for a period of time in 2020?

17       A.    It appears so, from this email.

18       Q.    What was the purpose of those meetings?

19             MS. PIERCE:  Objection.  Foundation.

20       A.    This is a difficult question for me to

21  answer, because I had multiple meetings with people

22  on a daily basis.  I don't want to surmise, but I do

23  recall that we were meeting more frequently, given

24  the number of encampments that had been founded.

25  And given the growth and the activity in those

Page 36

1   encampments, I know we were meeting more frequently

2   to make sure we were aware of what was happening.

3        Q.   (BY MS. STILLMAN) Who's "we"?

4        A.   You just asked me about whether or not

5   Katie Topinka and David Hewitt were meeting, and

6   that was one of the reasons why the three of us were

7   meeting.

8        Q.   Did anyone other than David Hewitt and

9   Katie Topinka attend these daily meetings?

10       A.   I am sure that other people joined us.  I

11  don't recall all of the players who may have joined

12  us in those meetings.

13       Q.   So if you look at that bottom email -- or

14  the bottom email, the fourth bullet point states,

15  Peavey Park was planned to be demobilized yesterday,

16  but a group of 100 activists showed up at Peavey and

17  Parks Police made a decision to alter their plans to

18  avoid conflicts and to demobilize in a different way

19  in the future.

20            Do you see that?

21       A.   I do.

22       Q.   In 2020 did you ever speak with David

23  Hewitt about what date an encampment sweep would

24  occur?

25            MS. PIERCE:  Objection.  Compound, vague.

Page 37

1          A.    Yes.

2          Q.    (BY MS. STILLMAN) Did you ever speak to

3    David Hewitt in 2021 about what date an encampment

4    sweep would occur?

5          A.    No.

6          Q.    In 2020 did you ever speak with Katie

7    Topinka about what day an encampment sweep would

8    occur?

9                MS. PIERCE:   Objection.   Vague, compound.

10         A.    I am sure that I did.

11         Q.    (BY MS. STILLMAN) Did you speak to Katie

12   Topinka in 2021 about what date an encampment sweep

13   would occur?

14               MS. PIERCE:   Same objections.

15         A.    No.

16         Q.    (BY MS. STILLMAN) So it says, Parks Police

17   made a decision to alter their plans to avoid

18   conflicts and to demobilize in a different way in

19   the future.

20               Did you help Park -- Parks Police decide

21   how to demobilize in a different way?

22               MS. PIERCE:   Objection.   Vague.

23         A.    No.

24               MS. STILLMAN:   I'm marking HC00039367 as

25   Exhibit 181.

Page 38

1          (Deposition Exhibit Number 181 marked for
2   identification.)
3          Q.   (BY MS. STILLMAN) And do you recognize
4   this document?
5          A.   I recognize this as an email string.  I
6   have not seen this since 2020.
7          Q.   And is the top email string between you,
8   David Hewitt, Andrea Brennan and Katie Topinka?
9          A.   Yes.
10         Q.   And it is dated July 30th, 2020, correct?
11         A.   Yes.
12         Q.   And the subject is, Forward:  External
13   forward:  Powderhorn Transition?
14         A.   Yes.
15         Q.   Okay.
16              MS. STILLMAN:  I'm marking document Bates
17   stamped HC00039369 as Exhibit Number 82 [sic].
18              (Deposition Exhibit Number 182 marked for
19   identification.)
20         Q.   (BY MS. STILLMAN) And I will represent
21   that this document was the attachment to the email
22   previously marked as Exhibit 181.
23              Do you recognize this document?
24         A.   I've not seen this document since 2020,
25   but I recognize this as an encampment transition

Page 39

1    plan.

2         Q.    Okay.  So if you go back to Exhibit 181,

3    the second email says, from Michael Schroeder -- or

4    is it Schroeder or Schroeder?

5         A.    I believe his name is Schroeder.

6         Q.    Schroeder?  Okay.

7               From Michael Schroeder to you, correct?

8         A.    Yes.

9         Q.    Okay.  And that email was dated July 30th

10   of 2020?

11        A.    Yes.

12        Q.    Okay.  And in that email he says, It has

13   been shared only internally with the Park Board's

14   exec team, park police chief and communications

15   director, correct?

16             MS. PIERCE:  Objection.  Vague.

17        A.    That's what it reports.

18        Q.    (BY MS. STILLMAN) And in the email above

19   that you -- to -- from you to Mr. Hewitt,

20   Ms. Brennan and Ms. Topinka, you write, Here's what

21   I would like to discuss with you.  Correct?

22        A.    That's what the email states.

23        Q.    Why did you want to discuss this plan for

24   transitioning Powderhorn with Mr. Hewitt,

25   Ms. Brennan and Ms. Topinka?

Page 40

1          A.    I don't recall at this time.

2          Q.    Did you ever talk with Mr. Hewitt about an

3     encampment transition plan for Powderhorn Park in

4     2020?

5          A.    Frequently.

6          Q.    Did you ever talk to Andrea Brennan about

7     a Powderhorn Park encampment transition plan in

8     2020?

9          A.    It is -- Yes.  I believe that Katie

10    Topinka was part of conversations regarding

11    Powderhorn and the transition.

12              MS. PIERCE:  Can you read back that

13    question, please?

14              (Whereupon, the court reporter read back

15    the requested portion of the record.)

16         A.    I apologize.  I misheard you.  So I

17    thought you were referencing Katie Topinka.  And the

18    answer is, no, I don't believe that I spoke directly

19    with Andrea Brennan about any transition plan

20    regarding Powderhorn Park.

21         Q.    (BY MS. STILLMAN) And just to make sure

22    that we're clear, in 2020 did you speak with Katie

23    Topinka about a transition plan for Powderhorn Park?

24         A.    When I answered that Katie Topinka was

25    likely part of some conversations regarding this,

Page 41

```
 1   it's important to remember that we had multiple
 2   groups working with people in Powderhorn Park.
 3            Katie, as a staff person from the City of
 4   Minneapolis, was oftentimes part of those meetings.
 5   And it would not be uncommon for her to be
 6   participating in a conversation with outreach teams,
 7   for example, regarding Powderhorn Park.  I bring
 8   this up because there are different opportunities
 9   where we may have had those conversations.
10       Q.   You just mentioned that you would
11   attend -- or you attended multiple meetings to
12   discuss the transition of Powderhorn Park.  Is that
13   correct?
14       A.   I was --
15            MS. PIERCE:  Objection.  Vague as to
16   transition.
17       A.   I was part of many conversations during
18   that time with City of Minneapolis, the Park Board,
19   the State.
20       Q.   (BY MS. STILLMAN) When you participated in
21   these conversations, was it your practice to take
22   notes?
23       A.   I don't recall taking notes in these
24   meetings.
25       Q.   Going to go to Exhibit 182.  If you go
```

Page 42

1   down to paragraph h), subparagraph b., it says, A

2   one-day period will be provided for the removal of

3   any property abandoned during the first transition

4   period; remove infrastructure commensurate with

5   departures.

6           Do you see that?

7       A.   I do.

8       Q.   Do you know if a one-day period was

9   provided for the removal of any property abandoned

10  during the first transition period?

11          MS. PIERCE:   Objection.   Vague,

12  foundation.

13      A.   I know that there were multiple staff from

14  different organizations, whether that be a

15  government agency or a community agency, that spoke

16  with people about what belongings they had at the

17  time and what they wanted to do with them.   Part of

18  what we wanted to do was to work with people to make

19  sure they retained the items that they had with them

20  if they wished to do so.

21          I do not recall that there were any

22  situation at Powderhorn where someone requested more

23  than a day or a day's period to do that.   In all of

24  the situations that I witnessed, I know that people

25  either asked us to dispose of what they considered

Page 43

1   trash, or they brought those belongings with them at

2   the time.

3        Q.   (BY MS. STILLMAN) How did you work with

4   people to ensure that they retained their property?

5             MS. PIERCE:  Objection.  Vague, compound,

6   time frame.

7             Do you mean with respect to Powderhorn?

8             MS. STILLMAN:  Sure.  With respect to

9   Powderhorn.

10       A.   The first thing we did is had direct

11  conversations with people, asked them what they

12  wanted, if they needed assistance with anything.

13  Part of this was transportation.  Part of this was

14  engagement to try and see if we can partner with

15  them, in the hope that they may work with someone to

16  accept services in the future.  But the goal was to

17  work with people in the most respectful way that we

18  could, and assist them in the ways that they

19  requested we do that.

20       Q.   (BY MS. STILLMAN) Was that your standard

21  practice for working with residents of an encampment

22  that was going to be swept in 2020?

23            MS. PIERCE:  Objection.  Vague, compound,

24  time frame.

25       A.   I can report that, when I spoke with

Page 44

1   people, I felt it was important to be up front and

2   honest and transparent, and I encouraged people from

3   the Hennepin County homeless access team to do the

4   same.

5        Q.   (BY MS. STILLMAN) What were you up front

6   about?

7        A.   If people asked me a question, I tried to

8   answer that question honestly.

9        Q.   In 2020 did any resident of a homeless

10  encampment ever ask you what would happen to their

11  property if they didn't remove it prior to a sweep?

12            MS. PIERCE:  Objection.  Vague, compound,

13  time frame.

14       A.   No.  I don't recall ever getting that

15  question.

16       Q.   (BY MS. STILLMAN) If you look at the

17  bottom of this same page, in sub -- in paragraph I,

18  subparagraph (b) --

19       A.   Just to be clear, we're talking about

20  Exhibit 182?

21       Q.   182.  Correct.  It's the last -- last

22  sentence on the page -- on page 39370.

23       A.   Thank you.

24       Q.   It says, Within one hour but not less than

25  three hours of the termination of the notice to

Page 45

1    vacate, MPRB staff and contractors will begin

2    removing remaining tents and personal property.

3            Do you see that?

4        A.    I do.

5        Q.    As you sit here today, do you think within

6    one hour but not less than three hours of the

7    termination of the notice to vacate was sufficient

8    time for the residents of Powderhorn Park in 2020 to

9    pack and remove their belongings?

10           MS. PIERCE:  Objection.  Vague, calls for

11   speculation.

12       A.    Well, there's two parts to that answer.

13   The first is, this says it will begin removing

14   remaining tents, so -- so that's -- that's the first

15   thing that I see.

16           The second is, the answer is, yes, because

17   we had worked with residents of Minneapolis who were

18   temporarily staying at that encampment to transition

19   for a long period of time prior to that.

20           So as far as I am aware, there was not one

21   person who was surprised that an encampment -- or

22   Powderhorn was demobilized, because we had spent so

23   many hours working with people directly, offering

24   them options in shelter, talking with them about

25   other options, including family and seeing what

Page 46

1    other things they were eligible for.

2            So there was ample time for people to

3    begin packing and moving their belongings prior to

4    any conversations on that day.

5            MS. PIERCE:  We've been going about an

6    hour.  Do you want to take a break?  Is this a good

7    time, or --

8            MS. STILLMAN:  I have like two more

9    questions.  Then can we take a break?

10           MS. PIERCE:  Let's do that.

11       Q.   (BY MS. STILLMAN) You said you spent many

12   hours at Powderhorn Park working with residents

13   prior to the vacate date, correct?

14       A.   Yes.

15       Q.   Do you know approximately how many hours?

16       A.   I don't know that I could give you a

17   totality of those, but it was not uncommon for me to

18   be at Powderhorn four days a week for a period of

19   more than a month.

20       Q.   When did you learn the date that -- the

21   date of the -- we'll say Powderhorn East sweep was

22   going to happen?

23           MS. PIERCE:  Can you read that question

24   back?

25           (Whereupon, the court reporter read back

Page 47

1   the requested portion of the record.)

2       A.   I don't recall the date.  It was two and a

3   half years ago.

4       Q.   (BY MS. STILLMAN) When did you learn the

5   date that the Powderhorn West encampment sweep was

6   going to happen?

7       A.   I don't recall the -- learning the date

8   for either of those demobilizations at this time.

9       Q.   Is there anything that would help you

10  refresh your recollection of when you learned the

11  date of the Powderhorn West encampment sweep?

12      A.   If you had an email saying that I was

13  notified at this time, that would tell me that I was

14  notified at this time.  It's just too long a period

15  of time for me to recall any date.

16          MS. STILLMAN:  Okay.  We can take a break.

17          MS. PIERCE:  Thanks.

18          THE VIDEOGRAPHER:  We are going off the

19  record.  The time now is 10:06.

20          (Whereupon, a recess was taken.)

21          THE VIDEOGRAPHER:  We are back on the

22  record.  This is the start to Media Number 2.  The

23  time is 10:20.

24      Q.   (BY MS. STILLMAN) Mr. Ryan, I'm going to

25  present you what -- what has been previously marked

Page 48

1    as Exhibit 130.

2              (Previously Marked Exhibit Number 130

3    introduced to the witness.)

4         Q.   And this is an email from Katie Topinka to

5    Amber Turnquest, correct?

6         A.   Yes.

7         Q.   Okay.  And it's providing meeting notes of

8    the same group -- well -- if you go under Notes --

9    do you see Notes, kind of in the middle of the

10   email?

11        A.   Yes.

12        Q.   Okay.  And it says, Clearing of the Wall

13   will happen tomorrow, followed by Peavey.

14              Do you see that?

15        A.   They appear to be two separate headings,

16   but yes.

17        Q.   Okay.  Sorry.

18              So -- and then it says, Park Police

19   started at 6 a.m. and prevented some confrontation.

20              Were you at the Peavey Park encampment

21   sweep?

22        A.   Yes.

23        Q.   Did that sweep start at 6 a.m.?

24        A.   Approximately, yes.

25        Q.   All right.  And then right below that it

Page 49

1    says, Were able to move the people to better

2    situations, relocate -- relocating a married couple

3    and finding support for a 71-year-old woman.

4              Do you see that?

5         A.   Yes.

6         Q.   That woman's name was Mary, right?

7         A.   I don't recall her name, but I spent a lot

8    of time directly with her, and I brought her to a

9    shelter.

10        Q.   Okay.  She wasn't able to bring all of her

11   property with her, right?

12             MS. PIERCE:  Objection.  Vague.

13        A.   I don't recall that's true.  I assisted

14   her with packing her belongings, and I understood

15   she had everything she wanted to bring with her.

16        Q.   (BY MS. STILLMAN) And you said you took

17   her to a shelter, correct?

18        A.   Correct.

19        Q.   Which shelter?

20        A.   Sorry.  I'm picturing it right now.

21             Simpson.  Simpson housing shelter.

22        Q.   How long did she have to pack that

23   morning?

24        A.   I don't recall.  I know that she needed

25   extra time, and we tried to give her as much as

Page 50

1    we could, to assist her in packing and talking to
2    her about resources that she had.  She asked us to
3    call a couple people, I believe.  We were looking
4    for the best options for her.
5         Q.   Did she have more than an hour to pack her
6    belongings that morning?
7         A.   I don't recall.  I do know there was a lot
8    of pressure at that time, given some overt and
9    publicized threats of aggression from folks at the
10   Sanctuary Movement towards law enforcement and
11   social workers and park staff, that happened over a
12   period of weeks prior to this date.  So there was an
13   added emphasis on safety being a concern for this --
14   this situation.
15        Q.   Did Mary bring her tent with her to
16   Simpson housing shelter?
17        A.   I do not recall.
18        Q.   Did you drive her to Simpson housing
19   shelter?
20        A.   I don't remember who drove her.  I don't
21   believe she came in my vehicle.
22        Q.   Did you drive anyone to -- any encampment
23   resident of Peavey Park to a different location that
24   morning?
25        A.   I don't --

Page 51

1           MS. PIERCE:  Objection.  Vague.

2       A.   I don't believe so.

3       Q.   (BY MS. STILLMAN) If you look at that last

4   sentence on the bottom of the page that starts, Don.

5           Do you see that?

6       A.   Yes.

7       Q.   Okay.  Don, single adult beds are filling

8   up.  Single adult female beds have some room.

9   Twenty shelter beds have been added.  Some family

10  spots are available.  Roughly 35.  Beds will start

11  filling the colder it gets.

12          Do you see that?

13      A.   I'm reading that now.  Yes.

14      Q.   Were single adults -- single adult beds

15  filling up on September 28th, 2020?

16          MS. PIERCE:  Objection.  Foundation.

17      A.   This is an email from Amber Turnquest to

18  Katie Topinka, so I don't know that I'm able to

19  respond on what she's inferring [sic] to, but it

20  appears that she may have gotten this information

21  from me, o.r maybe I reported this in this meeting.

22  And if that is the case, then it looks like that's

23  possible.

24          We had ample shelter beds going into

25  mid-fall, so it would not surprise me if that was

Page 52

1    accurate.

2         Q.   (BY MS. STILLMAN) Approximately how many

3    people were living in encampments in September of

4    2020?

5              MS. PIERCE:  Objection.  Foundation.  And

6    vague.

7         A.   We do not have exact numbers for that,

8    specifically because we learned that there were

9    one -- many tents that were put up to make

10   encampments look larger than they were by members of

11   the Sanctuary Movement; and, two, we learned that

12   there were members of the Sanctuary Movement who,

13   while they were housed, chose to stay in the

14   encampments, what was reported to me, to make them

15   look larger than they were.  So we were unable to

16   determine how many people were staying in several

17   encampments.

18        Q.   (BY MS. STILLMAN) How did you learn that

19   members of the Sanctuary Movement were putting up

20   extra tents to make encampments look larger than

21   they were?

22        A.   Well, in the case of Peavey, which I have

23   in front of me, there were only about five

24   unsheltered people there, and most of the people

25   there were people who were staying there.  What was

Page 53

1   reported to me is, they were there as a way to

2   protect Peavey Park.

3        Q.   Who reported that to you?

4        A.   Many people.  Mostly people who were

5   unsheltered.

6        Q.   Do you have names?

7        A.   I do not.

8        Q.   When you say "mostly people who were

9   unsheltered," do you mean residents of Peavey Park?

10       MS. PIERCE:  Objection.  Vague.

11       A.   I heard it more at Powderhorn.  There were

12  many people experiencing homelessness that were

13  really upset that there were people who were not

14  homeless staying in the encampment, and reported

15  that on a regular basis to me.

16       Q.   (BY MS. STILLMAN) And I should backtrack

17  for a section -- second.

18            What is the Sanctuary Movement?

19       A.   Sanctuary Movement is a group of people

20  who advocated for persons experiencing homelessness

21  to be able to stay anywhere they wanted to stay.

22            My first interactions with them was when

23  they took over a hotel in South Minneapolis, right

24  on or off Chicago.  My understanding is, they set up

25  several GoFundMe accounts, collecting hundreds of

Page 54

```
 1    thousands of dollars, and they did this in an
 2    attempt to further their cause.
 3        Q.    You said they took over a hotel off
 4    Chicago.  Is that the Sheraton Hotel?
 5        A.    Yes.
 6        Q.    Okay.
 7              MS. STILLMAN:  I'm going to go to
 8    Exhibit 146, exhibit that's previously been marked
 9    as 146.
10              (Previously Marked Exhibit Number 146
11    introduced to the witness.)
12              MS. STILLMAN:  And does all counsel have a
13    copy of that document?
14              (Affirmative responses.)
15        Q.    (BY MS. STILLMAN) Mr. Ryan, do you
16    recognize this document?
17        A.    I am looking at this document at this
18    time.  I don't recall what this is.  It appears to
19    be an invitation to a meeting by the Metro Urban
20    Indian Directors, otherwise known as MUID.
21        Q.    And if you look at the top, it says,
22    Event, external updated invitation, unsheltered
23    opioid crisis response at weekly from 11:30 a.m. to
24    1:30 p.m. on Wednesday, from April 28th, to Tuesday,
25    May 4th.
```

Page 55

1          Do you see that?

2     A.   Yes.

3     Q.   In your time as the program manager of the

4 initial contact access team, did you ever go to a

5 meeting on unsheltered opioid crisis response?

6     A.   I don't recall the specific meeting, but

7 it would not surprise me if I was present at one or

8 more of those meetings.

9     Q.   And if you go to the page 104813.  That's

10 the second page of the document.  The 10th line up,

11 you'll see donald.ryan@hennepin.us, followed by

12 donald.ryan@hennepin.us.

13          Do you see that?

14     A.   Yes.

15     Q.   Okay.  So you were emailed this

16 invitation, correct?

17     A.   Yes.

18     Q.   Okay.  In your opinion, was there an

19 unsheltered opioid crisis in 2020 among the homeless

20 population?

21          MS. PIERCE:  Objection.  Vague, calls for

22 speculation.

23     A.   Yes.

24     Q.   (BY MS. STILLMAN) In your opinion, does

25 sweeping encampments affect the opioid crisis among

Page 56

1   the homeless population?

2          MS. PIERCE:  Objection.  Vague, calls for

3   speculation.

4      A.   The only reason we would deconcentrate a

5   temporary homeless encampment is if we had health or

6   safety issues.  The opioid crisis is extensive

7   enough that it was occurring within and outside of

8   encampments.

9      Q.   (BY MS. STILLMAN) Was it occurring in

10  homeless shelters in 2020?

11         MS. PIERCE:  Objection.  Vague, calls for

12  speculation.

13     A.   I have no knowledge, not working in a

14  homeless shelter, whether or not there was opioid

15  use in a homeless shelter.

16     Q.   (BY MS. STILLMAN) Did you ever ask anyone

17  if there was opioid use in a homeless shelter in

18  2020?

19         MS. PIERCE:  Objection.  Vague.

20     A.   I had many conversations with people.  It

21  was not uncommon for someone to use different

22  substances and then go into a homeless shelter.  But

23  there are strict rules in most shelters that, for

24  safety reasons, illicit drug use is not allowed.

25     Q.   (BY MS. STILLMAN) Do you know how many

Page 57

1  encampments are currently on Hennepin County land?

2       A.   No.

3       Q.   Do you know how many encampments were on

4  Hennepin County land in 2018?

5       A.   No.

6       Q.   Do you know how many encampments were on

7  Hennepin County land in 2019?

8       A.   I don't have that number.

9       Q.   Do you know how many encampments were on

10 Hennepin County land in 2020?

11      A.   I know there was at least one.

12      Q.   What's that one?

13      A.   The Greenway.

14      Q.   Do you know how many encampments were on

15 Hennepin County land in 2020 -- I'm sorry -- in

16 2021?

17      A.   I think you asked that.  But the answer

18 is, no, I wouldn't have that information.

19      Q.   And to clarify, you said you knew of at

20 least one, the Greenway.  Was that referring to the

21 year 2020?

22      A.   Yes.

23      Q.   Okay.  And do you know how many

24 encampments were on Hennepin County land in 2022?

25      A.   No.

Page 58

1      Q.   Okay.  When you were --

2           MS. STILLMAN:  Can we go off the record

3  for a second?

4           THE VIDEOGRAPHER:  We are going off the

5  record.  The time now is 10:37.

6           (Whereupon, a short recess was taken.)

7           THE VIDEOGRAPHER:  We are back on the

8  record.  The time now is 10:37.

9      Q.   (BY MS. STILLMAN) When you were the

10  program manager of the initial contact and access

11  team, how did you track encampments on Hennepin

12  County land?

13           MS. PIERCE:  Objection.  Vague.

14      A.   Our homeless access team was not focused

15  on tracking encampments.  We worked mostly with

16  people within shelters, drop-in centers.  We set up

17  opportunities, like at the public library, to meet

18  people where they were.

19           It was not until -- there were other

20  entities that were tracking, including Healthcare

21  for the Homeless, and I saw those documents every

22  once in a while, but I was not -- that was not part

23  of the work of the homeless access team.

24      Q.   (BY MS. STILLMAN) When -- while -- while

25  you -- Sorry.  I'll start over.

Page 59

1          When did you start going to homeless

2     encampments as part of your role as the program

3     manager of initial contact and access?

4          A.   2020.

5          Q.   When in 2020?

6          A.   I would estimate April 2020.

7          Q.   Why did you start going to encampments in

8     April of 2020?

9          A.   My role changed.  At -- at that time, the

10    homeless access team had just set up a number of

11    hotels, to deconcentrate the shelter system and try

12    and bring as many people into private spaces, to

13    control COVID as much as possible.  The homeless

14    access team did that.  Started that between February

15    and beginning of April.  I was involved in that

16    work.  Around that time I was asked to focus my

17    efforts on unsheltered populations, and did so at

18    that time.

19         Q.   Why were you asked to focus your efforts

20    on unsheltered populations?

21              MS. PIERCE:  Objection.  Foundation.

22         A.   It had come to the attention that more

23    encampments were starting to pop up, and we were

24    trying to be as proactive as possible.

25         Q.   (BY MS. STILLMAN) Had you been to homeless

Page 60

1   encampments as part of your role as the program

2   manager of initial contact and access prior to April

3   of 2020?

4           MS. PIERCE:  Objection.  Asked and

5   answered.

6       A.   I have been working in the field of social

7   work for about 30 years and have been in encampments

8   in Philadelphia, in Phoenix, in Minneapolis, and

9   other locations.

10          MS. STILLMAN:  I am marking HC00015115 as

11  Exhibit Number 183.

12          (Deposition Exhibit Number 183 marked for

13  identification.)

14      Q.   (BY MS. STILLMAN) And do you recognize

15  this document?

16      A.   This is an email string that I am included

17  on.

18      Q.   Who's Joseph Gladke?

19      A.   Joseph Gladke is a Hennepin County

20  director.

21      Q.   Hennepin County director of what?

22      A.   He works in Public Works.

23          MS. STILLMAN:  I'm going to be marking

24  Bates number HC00015118 as Exhibit 184.

25          (Deposition Exhibit Number 184 marked for

Page 61

1  identification.)

2       Q.   (BY MS. STILLMAN) And I'll represent that

3  this document is the attachment to Exhibit

4  Number 183.

5            Do you recognize this document?

6       A.   I do not recognize this document.

7       Q.   So if you look at Exhibit 183, you'll see

8  that the underlined name of the attachment is

9  Summary of Tents with Occupants 120420 Interested in

10 Shelter JRG.jg.xlxs.

11           Do you see that?

12      A.   Yes.

13      Q.   Have you seen a document like this before?

14           MS. PIERCE:  Objection.  By "this," do you

15 mean the email or the spreadsheet?

16           MS. STILLMAN:  I apologize.  Thank you.

17      Q.   (BY MS. STILLMAN) Have you seen a document

18 like Exhibit 184 before?

19      A.   Yes.  I've seen many documents that look

20 like this.

21      Q.   Are they usually -- Are documents like

22 Exhibit 184 usually emailed to you?

23           MS. PIERCE:  Objection.  Vague, time

24 period.

25      A.   I have had documents like this emailed to

Page 62

```
 1   me.
 2           MS. PIERCE:  Can we go off the record for
 3   a second?
 4           MS. STILLMAN:  Yeah.
 5           THE VIDEOGRAPHER:  We are going off the
 6   record.  The time now is 10:45.
 7           (Discussion held off the record.)
 8           THE VIDEOGRAPHER:  We are back on the
 9   record.  The time now is 10:46.
10           MS. PIERCE:  This is counsel for
11   Hennepin County.  I'm going to state on the record
12   that Exhibit 184 Hennepin County is going to
13   designate as confidential, as it contains unique
14   identifying information of people experiencing
15   homelessness.
16           Thanks.
17       Q.   (BY MS. STILLMAN) Who is Jessica Galatz,
18   or Galatz?
19       A.   Jessica Galatz worked or works in Public
20   Work and had an assistant-like role to Joseph
21   Gladke.  I do not recall her specific job
22   classification.
23       Q.   In 2020 did you get weekly updates of the
24   number of tents with occupants on the Greenway
25   camps?
```

Page 63

1      A.   I don't know that they were weekly.  They

2   could have been more frequently than weekly.  We

3   made concerted efforts to try to get to know every

4   single person who was staying down in the Greenway

5   area, so we had -- we had many updates, trying to

6   focus on specific people.

7      Q.   When you say we were making concerted

8   efforts to get to know everyone on the Greenway, who

9   is "we"?

10      A.   I apologize for not being clear about

11   that.

12           So Hennepin County homeless access team

13   had folks that were at the Greenway.  There was a

14   social worker by the name of Edward Weily, Weibye,

15   who is with Healthcare for the Homeless.  He spent

16   time there.  There were a number of nurses from

17   Healthcare for the Homeless, Hennepin County's

18   Healthcare for the Homeless; there were staff from

19   Public Work; and there was Hennepin County security

20   all present.  And that was the collective "we" that

21   I was referring to.  I apologize for not being more

22   specific.

23      Q.   No.  Not a problem.

24           So when you were program manager of the

25   initial contact access team, you said you supervised

Page 64

1   two supervisors and 20 to 21 staff, correct?

2        A.   Yes.  So that number changed as time went

3   on, given the needs of the community and what upper

4   administration asked us to do.  But, in general,

5   that is accurate.

6        Q.   How many of your staff did outreach at

7   homeless encampments in 2020?

8        A.    In 2019 and 2020 our work changed

9   significantly.  So our focus was to be at places

10  like the Minneapolis library, every homeless

11  shelter, drop-in centers, mental health centers,

12  et cetera.

13            I mention this because of COVID.  COVID

14  changed the way that we did our work.  So there was

15  a -- there was a period of time where we were not

16  going to some shelters, given the requests from

17  shelters, given the needs of the community.  So that

18  was a -- that was a time of change for the homeless

19  access team.

20            So knowing that, we had certain people who

21  had experience -- more experience working with

22  unsheltered individuals, given their -- their

23  professional work experience, and those folks were

24  designated to do more work in encampments.

25       Q.   And about how many -- when you say "those

Page 65

1    folks," about how many of them were there?

2           MS. PIERCE:  Objection.  "Them."

3       A.    So it was possible that anyone who was a

4    social worker or a CMA from the homeless access team

5    could have been at any encampment, given the needs

6    of the community.  But there were probably a smaller

7    number that were there more frequently.

8           So if you're asking me for a number, I

9    would say that there were less than five that maybe

10   spent a lot of time in encampments.  Those five

11   coupled their work with nurses and social workers

12   from Healthcare from the Homeless and community

13   agencies that Hennepin County had contracts with to

14   do outreach work.

15          Prior to 2019, the majority of homeless

16   outreach work was done by community agencies through

17   contracts with Hennepin County and other public

18   entities.

19      Q.    (BY MS. STILLMAN) Who are the community

20   agencies that did outreach in 2020?

21          MS. PIERCE:  Objection.  Foundation.

22      A.    A number of agencies, included

23   St. Stephen's, Avivo, AICDC.  There were some

24   members of the Minnesota Indian Women's Resource

25   Center.  Those are four or five agencies of a larger

Page 66

```
1    group of agencies with which we worked.

2         Q.    (BY MS. STILLMAN) Do you know the names of

3    any of the other agencies with whom you worked?

4         A.    Yes.  They aren't coming to mind now, but

5    if you gave me agency names I could tell you whether

6    or not we worked with them at that time.

7         Q.    Did you work with MAD DADS in 2020?

8         A.    Hennepin County did not work with

9    MAD DADS.

10        Q.    Okay.

11        A.    MAD DADS worked with the Minneapolis Park

12   Board, so we did have some interaction with them in

13   that effort.

14        Q.    So if you go to Exhibit 183, in that

15   second email, the third line, it says, I think we

16   need to save in the same spot so we can both make

17   updates.

18        A.    I'm really sorry.  The second email is

19   7:15 a.m.?

20        Q.    Yes.  From Joseph Gladke.  And it's in the

21   third line.  I think we need to save in the same

22   spot so we can both make updates.

23             Do you see that?

24        A.    I see that sentence, yes.

25        Q.    And, I anticipate we will be making
```

Page 67

1   updates multiple times per week?

2        A.   Yes.

3        Q.   Did you have access to this document to

4   make changes?

5        A.   I believe that I did.

6        Q.   Do you know where it was saved?

7        A.   I don't recall.

8        Q.   Did you ever update documents that had

9   information about the number of tents in an

10  encampment in 2020?

11            MS. PIERCE:  Objection.  Vague, compound,

12  time frame.

13       A.   I don't recall doing that.

14       Q.   (BY MS. STILLMAN) What about in 2021?

15            MS. PIERCE:  Same objections.

16       A.   I don't believe that I would have the --

17  that was not my role in 2021, so I doubt that would

18  occur.

19       Q.   (BY MS. STILLMAN) Did you share

20  information about the number of tents on the

21  Greenway with anybody who worked for the City of

22  Minneapolis in 2020?

23       A.   I don't recall.

24       Q.   Did you share information about the number

25  of the tents on the Greenway with anybody from the

Page 68

1   Hennepin County Sheriff's Office in 2020?

2        A.   Yes.   I'm sure that I did, though I don't

3   recall who that would be.

4        Q.   Okay.   In 2020 did anybody from the City

5   share information about the number of tents on city

6   property?

7             MS. PIERCE:   Objection.   Vague.

8             Do you mean with him?

9        Q.   (BY MS. STILLMAN) With you.   Yes.   Sorry.

10       A.   Can you repeat the question, please?

11       Q.   Yeah.   In 2020 did anybody share

12  information about the number of tents in encampments

13  on city property with you?

14       A.   Yes.

15       Q.   Who shared that information?

16       A.   I was involved in multiple meetings with

17  community and public entity partners regarding all

18  encampments in Minneapolis -- excuse me -- in

19  Hennepin County, so that information may have come

20  from any number of people in a variety of different

21  meetings.

22       Q.   What are the names of the people who

23  attended these meetings with you?

24             MS. PIERCE:   Objection.   Misstates the

25  witness' testimony.

Page 69

1          MS. SARFF:  Objection.  Vague.

2      A.   Are you looking for a list of people who

3  were participating in those meetings?

4      Q.   (BY MS. STILLMAN) Yes.

5      A.   I don't know that I would be able to

6  provide a comprehensive list at that time of all

7  those people.  I can tell you that they included a

8  number of community agencies in which I have already

9  noted.

10      Q.   Was anybody from the City of Minneapolis

11  at these meetings?

12      A.   Yes.

13      Q.   Who?

14      A.   Katie Topinka was one person who was at

15  these meetings.  She was facilitating at least one

16  of these meetings.

17      Q.   Anyone else from the City?

18      A.   Amber Turnquest is on one of these emails.

19  She began work around the end of the summer, if I

20  recall correctly.  There was also a representative

21  from Minneapolis Police, Sergeant Grant Snyder, who

22  was also present during many of these meetings.

23      Q.   So you've said there were -- well, to

24  clarify, there were a number of different meetings

25  with different people attending each meeting?

Page 70

1          MS. PIERCE:  Objection.  Vague, compound,

2    time frame.

3          A.   Yes.

4          Q.   (BY MS. STILLMAN) In 2020 did anyone from

5    the Minneapolis Park and Recreation Board share

6    information with you about how many tents were

7    located on Minneapolis Park and Recreation Board

8    property?

9          MS. PIERCE:  Objection.  Vague, compound.

10         A.   Yes.  Depending on the park, that was not

11   uncommon information to share.

12         The reason it was important to share that

13   information is, we wanted to make sure we could

14   offer options of shelter, resources, mental health

15   services, substance abuse services to the people

16   that were temporarily staying in those locations.

17   So as our role was that, it was important to get

18   that information.

19         Q.   (BY MS. STILLMAN) Okay.  And who from

20   the -- if I say -- I'll back up.

21         If I say MPRB, do you know who I'm talking

22   about?

23         A.   Yes.

24         Q.   Okay.  Who from the MPRB shared the

25   information about the number of tents with you in

Page 71

1    2020?

2         A.   I spoke with numerous people over the

3    course of eight, nine months.  Some of those people

4    included Park Police Chief Jason Ohotto, Park

5    Superintendent Al Bangoura.  There were other people

6    on the Park Board staff that I had irregular contact

7    with.

8         Q.   Do you remember any of those people's

9    names?

10        A.   Yes.  Michael Schroeder was one of those

11   people.

12        Q.   So there was an encampment on the Greenway

13   in 2020, correct?

14        A.   Yes.

15        Q.   Is the -- When you talk about an

16   encampment on the Greenway, does the -- do you

17   consider the entire Greenway to be one big

18   encampment?

19             MS. PIERCE:  Objection.  Vague, calls for

20   speculation.

21        A.   We had so many encampments at that time,

22   it was important to be able to distinguish different

23   encampments, so we identified those people who were

24   staying on the Greenway at that time to be one

25   encampment for purposes of planning.

Page 72

1           It's also true that there were different
2   groups of people that knew each other and supported
3   each other at different locations on the Greenway.
4           I hope that fully answers your question.
5       Q.   (BY MS. STILLMAN) Yes.   That's helpful.
6           The encampment on the Greenway was swept
7   on December 8 -- an encampment on the Greenway was
8   swept on December 18th of 2020, correct?
9       A.   Correct.   We would not use the word swept,
10  but, yes, that's correct.
11      Q.   What term would you use?
12      A.   Deconcentrated might be a term we might
13  use.
14      Q.   Would you use the term demobilized?
15      A.   Demobilized is one that others have used.
16      Q.   Would you use the term closed?
17      A.   Closed might be -- might be a term that
18  others might use as well, yes.   Especially when we
19  are talking to people who are staying in an
20  encampment, it's important for them to understand
21  that, when an encampment is closed, that they
22  understand that it is closed.   And the idea is, we
23  do not want people to return to that area, which is
24  why we offer different options for shelter at
25  different locations for people.

Page 73

1              So using the word closed is a term that is

2      very clear, so closed would be one that -- that I

3      might use.

4         Q.   (BY MS. STILLMAN) Why do you want -- why

5      don't you want residents of an encampment to return

6      to that encampment site after it is closed?

7              MS. PIERCE:  Objection.  Vague.

8         A.   Because we have learned that encampments

9      that grow to a certain size oftentimes become areas

10     where unsafe, unhealthy, illegal activity occurs,

11     and we do not believe that people should have to

12     live in an encampment in those unsafe, unhealthy

13     conditions, when there are other options available

14     to them.

15        Q.   (BY MS. STILLMAN) What are those other

16     options available to them?

17             MS. PIERCE:  Objection.  Vague, compound,

18     time frame.

19        A.   Shelter is one option.  Hennepin County

20     has a commitment to families to make sure that,

21     regardless of shelter options, if a family is

22     needing a place to stay, that that will be

23     coordinated, regardless of shelter options.

24             But Hennepin County's made a commitment to

25     work with shelters, and we have found that that is a

Page 74

1    safer place than encampments, and we want people to
2    be safe and healthy.
3         Q.   (BY MS. STILLMAN) So, in your opinion, is
4    it better for someone to be indoors than in an
5    encampment?
6              MS. PIERCE:  Objection.  Calls for
7    speculation, vague.
8         A.   I didn't repeat that.  Excuse me.  I
9    didn't state that.
10             In fact, since you brought up the Sheraton
11   before, that was an indoor space that I found to be
12   extremely dangerous and unhealthy for people.  So I
13   would not say that any indoor location was better
14   than an external location.  But when we have staff
15   that are used to working with people experiencing
16   homelessness, in a shelter setting, where we have
17   rules that are there to provide safety for
18   residents, those places are certainly safer than
19   staying outside, where we have found lots of sex
20   trafficking, drug dealing, assaultive behavior
21   happening on a regular basis.  We do not find those
22   things happening in shelters, so I would say yes.
23             MS. STILLMAN:  I'm going to go to what was
24   previously marked as Exhibit 88, which is Defendant
25   City of Minneapolis, Jacob Frey and Madaria

Page 75

1   Arradondo Supplemental Answer to Plaintiffs'
2   Interrogatory No. 2.
3            (Previously Marked Exhibit Number 88
4   introduced to the witness.)
5       Q.   (BY MS. STILLMAN) All right.  If you could
6   go to page 4.  And I'm just going to go through this
7   list with you.
8            I'll say this is a list provided by the
9   City of Minneapolis defendants identifying the dates
10  and locations of sweeps of encampments on public
11  property in Minneapolis since January 1st, 2016, in
12  which any city employees or agents were present.
13           Were you at the sweep of the 29th Street
14  and 12th Avenue South encampment in August of 2016?
15           MS. PIERCE:  Objection.  Vague.  I'll also
16  state for the record that they have an objection to
17  the use of the word sweep.
18      A.   No.
19      Q.   (BY MS. STILLMAN) Were you at the closure
20  of the Bloomington Avenue and 25th Avenue South
21  encampment in January of 2018?
22      A.   No.
23      Q.   Were you at the closure of the Franklin
24  Avenue and Hiawatha Avenue encampment in December of
25  2018?

Page 76

1          A.    No.

2          Q.    Were you at the closure of the 17th Avenue

3    and Cedar Avenue encampment in December of 2018?

4          A.    No.

5          Q.    Were you at the closure of the encampment

6    on 29th Avenue and Nicollet Avenue in June 2019?

7          A.    No.

8          Q.    Were you at the closure of the encampment

9    on 26th Avenue and Nicollet Avenue in September of

10   2019?

11         A.    No.

12         Q.    Were you at the closure of the Sabo Bridge

13   encampment in May of 2020?

14               MS. PIERCE:   Is that on this --

15         A.    That's not on this list, but the answer

16   is, yes.

17         Q.    (BY MS. STILLMAN) I apologize.

18         A.    I will also say that that closing took

19   more than one day, so that was not one day where

20   that occurred.   That was a couple days.   But, yes, I

21   was present there.

22         Q.    Were you at the closing of the encampment

23   at 2601 14th Avenue South encampment in August of

24   2020?

25         A.    I may have been.   I don't -- I don't

Page 77

1    recall where this location is, but I -- I believe
2    that I was.
3         Q.   Were you at the closure of the encampment
4    at 2313 13th Avenue South in September of 2020?
5         A.   I believe so.
6         Q.   Were you at the closure of the encampment
7    located at -- located at 2600 Minnehaha in June of
8    2021?
9         A.   No.
10        Q.   Were you at the closure of the encampment
11   located at Elliot Park in July of 2021?
12        A.   No.  And if we're looking at the list of
13   all these, I was not present in any -- closing of
14   any encampment in 2021.
15        Q.   Any of the -- to clarify, do you mean any
16   of the encampments' closures that are listed as in
17   2021 on this list, or were you not at a single
18   encampment closure at all in 2021?
19        A.   Correct.  I was not present in any single
20   encampment closure in 2021.
21        Q.   All right.  Were -- so were you present at
22   the -- and I'm -- You can put this document away for
23   a second.
24             Were you at the closure of the encampment
25   located at 17th and Cedar in May of 2020?

Page 78

1      A.   Yes.

2      Q.   Were you at the closure of the encampment

3  located on Stevens Avenue in May of 2020?

4      A.   Yes.

5      Q.   Were you at the closure of the encampment

6  located at East 26th Street on July 28th of 2020?

7      A.   It would be a helpful reference if that

8  was a park.  Is there a park you're referring to or

9  a different location that I can reference besides an

10 address?

11     Q.   It is -- was located on city property.

12     A.   I believe that I was present.

13     Q.   Okay.  Was notice provided to the

14 residents of the 2601 14th Avenue South encampment

15 prior to the closure?

16          MS. PIERCE:  Objection.  Foundation and --

17 and -- well --

18     A.   I -- I believe that it was, but that -- if

19 that's a city property, that would be a City of

20 Minneapolis' decision and action, and I -- I don't

21 have those details.

22     Q.   (BY MS. STILLMAN) If an encampment on city

23 property was closed, you wouldn't know if notice was

24 provided to the residents?

25          MS. PIERCE:  Objection.  Vague, compound,

Page 79

1    misstates the record, misstates the witness'

2    testimony.

3           MS. SARFF:   Objection.   Lack of

4    foundation, calls for speculation, and incomplete

5    hypothetical.

6        A.    I think it's very possible that I was

7    given that information.   One, I don't recall it now.

8    Two, our role -- "our" being Hennepin County

9    Healthcare for the Homeless, the homeless access

10   team.   Our role was to try to provide options for

11   shelter and services.   So when there was a closing

12   scheduled, it was important for the staff we worked

13   with to know this so we can be present and we can

14   have a response that is as much of a social work

15   response, when, possible as a decision just to close

16   a camp.

17       Q.    (BY MS. STILLMAN) Was notice provided to

18   the residents of the 2013 13th Avenue South

19   encampment prior to the closure in September of

20   2020?

21           MS. PIERCE:   Objection.   Vague, compound,

22   speculation, incomplete hypothetical, foundation.

23       A.    As I stated, I believe that all closings

24   were given notice.   And I don't recall the date of

25   when that location was noticed.

Page 80

1      Q.   (BY MS. STILLMAN) Have you been to the

2   closure of any encampments in Hennepin County since

3   January 1st of 2021?

4           MS. PIERCE:  Objection.  Asked and

5   answered.

6      A.   I don't believe so.

7           MS. PIERCE:  Before you move, it's been

8   about an hour.  Should we take a break?

9           MS. STILLMAN:  Sure.

10          THE VIDEOGRAPHER:  We are going off the

11   record.  The time now is 11:19.

12          (Whereupon, a recess was taken.)

13          THE VIDEOGRAPHER:  We are back on the

14   record.  This is the start to Media Number 3.  The

15   time is 11:30.

16      Q.   (BY MS. STILLMAN) Were you at the closure

17   of the Powderhorn East encampment in the summer of

18   2020?

19      A.   Yes.

20      Q.   Were you at the closure of the Powderhorn

21   West encampment in the summer of 2020?

22      A.   Yes.

23      Q.   Were you -- And you said you were at the

24   closure of the Peavey Park encampment in September

25   of 2020, correct?

Page 81

1        A.   Yes.

2        Q.   Were you at the closure of the Elliot Park

3   encampment in August of 2020?

4        A.   Yes.

5        Q.   Were you at the closure of the Kenwood

6   Park encampment in August of 2020?

7        A.   I am not sure if I was at that

8   encampment -- at the closing of that encampment.

9        Q.   Were you at the closing of the Matthews

10   Park encampment in August of 2020?

11        MS. PIERCE:  Objection.  Misstates the

12   record.

13        A.   I don't recall being present at Matthews

14   closing.

15        Q.   (BY MS. STILLMAN) Were you at the closure

16   of the mall -- the mall encampment on December 10th,

17   2020?

18        A.   Yes.

19        Q.   What was your role at the closure of these

20   encampments?

21        MS. PIERCE:  Objection.  Vague, compound,

22   time frame.

23        A.   My role was to provide resources to

24   residents experiencing homelessness.  Those could

25   include any number of references -- services,

Page 82

1    including trying to locate shelter space for people

2    who chose to go there.

3              I was also there as a support system for

4    the Park Board, the State, the City of Minneapolis,

5    since -- especially for Park, they were -- they

6    didn't have an expertise in working with

7    homelessness.  Their focus is on recreation.  So I

8    was there to support them.

9              So those would be the two roles.

10       Q.   (BY MS. STILLMAN) How did you provide

11   support to the Minneapolis Park and Recreation

12   Board?

13             MS. PIERCE:  Objection.  Vague, compound,

14   time period.

15       A.   In many ways, including giving staff an

16   understanding of the difficulties that people who

17   were experiencing unsheltered homelessness go

18   through on a daily basis, having those staff

19   understand that there are many trust issues that

20   occur with people who have experienced homelessness.

21   This was an attempt to try to work with people in

22   the most respectful way that we could, and this led

23   to many conversations about how different entities

24   could do this.

25       Q.   (BY MS. STILLMAN) Did these conversations

Page 83

1   happen in person?

2       A.   Sometimes in person.   Lots of times in

3   Teams meetings or phone calls.

4       Q.   Did -- In 2020 did anybody from the

5   Minneapolis Park and Recreation Board ask you to

6   help provide property storage for residents of an

7   encampment that was going to be closed?

8           MS. PIERCE:   Objection.   Vague, compound,

9   time frame.

10      A.   I don't recall that.

11      Q.   (BY MS. STILLMAN) In 2020 did anybody from

12  the Minneapolis Park and Recreation Board ask you to

13  help provide residents of an encampment that was

14  going to be closed with packing assistance?

15          MS. PIERCE:   Objection.   Vague, compound,

16  time frame.

17      A.   I don't remember getting a request to do

18  that.   That is something that different outreach

19  agencies may do as a course of wanting to help

20  someone, but I don't recall the Park Board making

21  that request, no.

22      Q.   (BY MS. STILLMAN) Did anybody from the

23  Minneapolis Park and Recreation Board ask you to

24  help provide transportation to residents of an

25  encampment that was going to be closed in 2020?

Page 84

1          MS. PIERCE:  Objection.  Vague, compound,

2     time frame.

3          A.    Yes.  So the State provided buses for a

4     period of time over that summer.  By the end of the

5     summer they made a decision not to do that, but that

6     was transportation that was availed to residents.

7               We also had members of community agencies,

8     including AICDC, who assisted in moving folks so

9     they weren't just picking up their belongings and

10    walking down the street; they were able to get

11    transportation to go somewhere.

12              We also had members of the Sanctuary

13    Movement that would show up at a closing and assist

14    people in moving to wherever they wish to go.

15              MS. STILLMAN:  I'm going to go to what was

16    previously marked as Exhibit 23.  It's in the

17    binder, Tab 33.

18              (Previously Marked Exhibit Number 23

19    introduced to the witness.)

20              MS. STILLMAN:  And the Bates number is

21    MPRB0014069.

22              MS. SARFF:  Are we going to Tab 33 but

23    it's Exhibit 32?

24              MS. STILLMAN:  Exhibit 23, at Tab 33.

25              Has everybody found it?

Page 85

1           (Affirmative responses.)

2           MS. STILLMAN:   Okay.

3      Q.   (BY MS. STILLMAN) Do you recognize this

4  document?

5      A.   I'm looking at this document now.

6           Can I get a second to confer with my

7  attorney, please?

8           MS. PIERCE:   Nope.   Not on the record.

9  Nope.

10     A.   I -- I am looking at this document now.

11 Yes.

12     Q.   (BY MS. STILLMAN) Okay.   Have you seen

13 this document prior to today?

14     A.   I believe that I have.

15     Q.   When would that have been?

16     A.   I -- I -- if I saw this document, it would

17 have been close to the date of the demobilization,

18 but I -- I don't know that I've seen this document

19 before today.

20     Q.   And if you go to page 3, that ends in

21 14071 --

22     A.   Yes.

23     Q.   -- you see your name is listed under

24 Hennepin County Social Services, correct?

25     A.   Yes.

Page 86

1      Q.   And you are the primary point of contact

2   for outreach?

3      A.   Yes.

4           MS. PIERCE:  Objection.  Do you mean as

5   listed on this document?

6           MS. STILLMAN:  As listed on this document.

7      A.   Yes.

8      Q.   (BY MS. STILLMAN) Did you act as the

9   primary point of contact for outreach at the

10   Powderhorn Park encampment closure in July of 2020?

11          MS. PIERCE:  Objection.  Vague.

12     A.   I think most people would consider that I

13   had that role.

14     Q.   (BY MS. STILLMAN) Did you consider

15   yourself to have that role?

16          MS. PIERCE:  Objection.  Vague.

17     A.   I considered that most people saw me in

18   that role.

19     Q.   (BY MS. STILLMAN) What did you do as the

20   primary point of contract -- of contact for outreach

21   at the Powderhorn Park encampment closure in

22   July 2020?

23          MS. PIERCE:  Objection.  Misstates the

24   record.

25     A.   I had regular meetings with community

Page 87

```
 1   outreach agencies to discuss the needs of people who
 2   were staying in that encampment, how to offer
 3   support to them, what options were available for
 4   shelter in other locations, and discuss specifically
 5   if there were individual situations where we needed
 6   to work in a special way with someone.
 7        Q.    (BY MS. STILLMAN) What was your general
 8   impression of the Powderhorn Park East encampment
 9   closure in July of 2020?
10             MS. PIERCE:  Objection.  Vague, lack of
11   specificity in the question.  I mean --
12        A.    That's a very vague question.
13             I would say that there appeared to be a
14   multitude of reasons why we had such a large number
15   of people confer together at Powderhorn.  And that
16   was -- that was one of my -- my strongest takeaways.
17             MS. STILLMAN:  I'm going to go to an
18   exhibit that was previously marked as 55.
19             (Previously Marked Exhibit Number 55
20   introduced to the witness.)
21             MS. STILLMAN:  And I don't know if this
22   one is in the binder, so here's four copies.
23             MS. PIERCE:  Thank you.
24             MS. STILLMAN:  I don't -- I don't think it
25   was.
```

Page 88

1          (Discussion held off the record.)

2      Q.    (BY MS. STILLMAN) Do you recognize this

3  document?

4      A.    Similar to documents, Exhibit 23, I -- I

5  don't recall seeing this document before.  But I'm

6  looking at it now.

7      Q.    Did anybody from the Minneapolis Park and

8  Recreation Board discuss a plan for how the Peavey

9  Park encampment was going to be closed in September

10  of 2020?

11          MS. PIERCE:  Objection.  Vague as to

12  "how."

13      A.    I'm assuming you meant with me, or do you

14  mean was it discussed?

15      Q.    (BY MS. STILLMAN) With you.

16      A.    I was not part of the planning of the

17  closing of Peavey Park.  I was notified the night

18  before that that would occur.  So, no, I was not

19  part of the planning, otherwise than identifying

20  that we needed to have a presence for the small

21  number of people.

22          I want to say there were only five -- of

23  the more than 30 people that were there, there were

24  only five that we knew to be homeless at that time.

25  We wanted to make sure we were providing services to

Page 89

1    them.   Other than that, we were not part of the

2    planning of the -- of the demobilization of this

3    encampment.

4         Q.   (BY MS. STILLMAN) Who do you mean by "we"?

5         A.   I apologize.  When I talk about "we," I'm

6    talking about Hennepin County and the staff that we

7    have.

8              So in this occasion, it would be Edward

9    Weibye from the Hennepin County Healthcare for the

10   Homeless, who was a social worker and worked with me

11   at that time, and myself.  We were the -- we were

12   the only two people from social services who were

13   present at this -- at this event.  And that was the

14   "we" that I was referring to.

15        Q.   So you said that you and Edward Weibye

16   were the only employees of Hennepin County Social

17   Services at the Peavey Park encampment closure.

18   Were there employees from Hennepin County from other

19   departments at the Peavey Park encampment closure in

20   September of 2020?

21             MS. PIERCE:  Objection.  Foundation.

22        A.   Yes.  I believe that there were members of

23   the Hennepin County sheriffs that may have been

24   present, also.

25        Q.   (BY MS. STILLMAN) Did you meet with MPRB

Page 90

1    staff the morning of the closure of Peavey Park, the

2    Peavey Park encampment?

3        A.   I would not constitute it meeting with the

4    staff.  I was present at a roll call immediately

5    before, and I was introduced, with Edward, as the

6    people who would be interacting with residents

7    staying there so Park Police knew who we were.

8        Q.   Did you speak at that roll call?

9        A.   I may or may not have.  If I -- if I did,

10   it was very minor in answer to a question.  I did

11   not present in any way.

12       Q.   Did you go to Park Police roll calls prior

13   to any other encampments' closures on MPRB land in

14   2020?

15            MS. PIERCE:  Objection.  Compound, time

16   frame.

17       A.   I believe that I had been in at least one

18   other.

19       Q.   (BY MS. STILLMAN) Do you --

20       A.   No -- no more than three.

21       Q.   Do you remember which encampment closures

22   those were?

23       A.   I do not.

24       Q.   Was it dark outside when you arrived at

25   Peavey Park on September 21st -- 24th of 2020?

Page 91

1    A.    Yes.  The sun was just coming up.  Yes.

2    Q.    Was it raining?

3    A.    It was rainy.  Yes.

4    Q.    How much time were the residents of the

5  Peavey Park encampment given to pack from the time

6  you got there to the time they had to be out?

7         MS. PIERCE:  Objection.  Vague.

8    A.    I don't recall any person experiencing

9  homelessness that was given a specific time.  I

10 recall one married couple that was able to collect

11 their belongings very quickly and leave in a time

12 period that was much quicker than the elderly

13 resident that you mentioned earlier.  You referred

14 to her as Mary.  She took more time, so we took more

15 time with her.

16         So we were looking at what each individual

17 person needed.

18    Q.    (BY MS. STILLMAN) Did you speak with every

19 resident of the Peavey Park encampment on

20 September 24th of 2020?

21         MS. PIERCE:  Objection.  Vague,

22 foundation.

23    A.    I -- I can't say with any certainty that I

24 spoke with everyone.  It's very possible that

25 someone was staying there and left as soon as people

Page 92

1   showed up and I never spoke with them.  So I

2   can't -- I can't say that I spoke with everyone.

3           I made an intention to speak with

4   everyone.  Everyone who wished to speak with me I

5   spoke with.

6       Q.   (BY MS. STILLMAN) Had you been to the

7   Peavey Park encampment prior to its closure on

8   September 24th of 2020?

9       A.   Yes.  On numerous times.

10      Q.   More than five times?

11      A.   No.  I think about five times is correct.

12      Q.   Were those all in September of 2020?

13      A.   Either August or September of 2020.

14      Q.   So how did you know who the residents of

15  the Peavey Park encampment were?

16           MS. PIERCE:  Objection.  Vague.

17      A.   We had conversations with people.  We

18  talked to them.

19      Q.   (BY MS. STILLMAN) On September 24th, 2020?

20      A.   On every occasion that we went to Peavey

21  Park, we made efforts to speak with people who were

22  there.

23      Q.   What was the last day you went to the

24  Peavey Park encampment prior to its closure on

25  September 24th, 2020?

Page 93

1       A.   I do not recall what date.  I would

2    estimate that it was a week to 10 days before, but

3    that -- that's an estimation, given that this

4    happened two and a half years ago.

5       Q.   So there might have been a resident that

6    moved into the Peavey Park encampment after you were

7    last at the encampment?

8            MS. PIERCE:  Objection.  Vague.

9            MS. SARFF:  Objection.  Calls for

10   speculation.

11      A.   Anything is possible.  Yes.

12      Q.   (BY MS. STILLMAN) Was a perimeter

13   established at the Peavey Park encampment during the

14   closure?

15           MS. PIERCE:  Objection.  Vague,

16   foundation.

17      A.   Yes.  I recall that law enforcement from

18   Park Board established a perimeter with caution

19   tape.

20      Q.   (BY MS. STILLMAN) What was your impression

21   of how the Peavey Park encampment closure went?  Was

22   it successful?

23           MS. PIERCE:  Objection.  Vague as to

24   successful and impression.

25      A.   I would say that different people would

Page 94

```
 1   have different opinions of what they would consider
 2   successful to be.
 3            In the role that I had, I was able to
 4   connect with people there and offer them places to
 5   be, that some people took us up on, and services
 6   which some people took us up on.  And there was
 7   little to no violence, given the unfortunate method,
 8   decision that Park Board had to take to do it early
 9   in the morning.  But they avoided that violence.
10            So given those two aspects, that people
11   weren't hurt and we were able to move people into
12   different locations, I would say, yes, the goal that
13   we had -- "we" being Hennepin County staff -- that
14   Edward and I had to offer those options to people,
15   we were successful in our role.
16       Q.   (BY MS. STILLMAN) Was there anything you
17   would wish would have happened differently at the
18   Peavey Park encampment closure?
19            MS. PIERCE:  Objection.  Vague as to the
20   meaning of differently, and wish, I suppose.
21            MS. SARFF:  Objection.  Calls for
22   speculation, and incomplete hypothetical.
23       A.   I was there in a support role and not as a
24   decision-maker who was planning the closure of this
25   camp, so I wouldn't be able to answer that question.
```

Page 95

1      Q.   (BY MS. STILLMAN) In your opinion, were

2   residents of the encampment given enough time to

3   pack?

4           MS. PIERCE:  Objection.  Vague, incomplete

5   hypothetical, calls for speculation.

6           MS. SARFF:   Objection to the extent it

7   calls for a legal conclusion and expert opinion.

8      A.   Yes, because we, specifically with Mary,

9   spent time with her and helped her in -- in the most

10  respectful way we could to -- to accomplish her

11  goal.

12     Q.   (BY MS. STILLMAN) Did you ask for any of

13  the other encampment residents to be given

14  additional time to pack?

15          MS. PIERCE:  Objection.  Vague, assumes

16  facts not in evidence, misstates the record

17  testimony.

18     A.   Prior to the -- any documents being put

19  together, our emphasis was that people need time to

20  pack, and that giving people time to pack was really

21  important.  I believe that the Park Board and the

22  police there gave people time to do that, based on

23  what I saw.

24          Of course we only had five to seven people

25  who were actually staying there and homeless, so it

Page 96

1    was -- it was easier and more quicker than

2    deconcentrating a camp that was much larger.

3        Q.   (BY MS. STILLMAN) If you had seen a

4    resident who wasn't being given enough time to pack,

5    what would you have done?

6            MS. PIERCE:  Objection.  Vague, incomplete

7    hypothetical, calls for speculation.

8        A.   That's a hypothetical situation.  But I

9    would, one, encourage that person have the necessary

10   time they need.  And if they needed assistance, I

11   would help them.  And the way I would determine

12   whether they would need assistance is by asking them

13   if they would like help and following their

14   direction.

15       Q.   (BY MS. STILLMAN) So you were at multiple

16   encampment sweeps in 2020, correct?

17           MS. PIERCE:  Objection.  We object to the

18   use of the word sweep rather than closure.

19       A.   I was in multiple closures of encampments

20   in 2020.

21       Q.   (BY MS. STILLMAN) At any of those closures

22   did you witness a resident of that -- of the

23   encampment ask for more time to pack and not be

24   given it?

25           MS. PIERCE:  Objection.  Compound, vague.

Page 97

1           Can I have the question read back?

2           (Whereupon, the court reporter read back

3    the requested portion of the record.)

4       A.   I don't believe so.

5           It's hard to distinguish, sometimes, who

6    was homeless and who was there to -- with a

7    different agenda than someone who was camping

8    outside.

9           So I don't recall any time when someone

10   said, I don't have enough time to pack and I'm

11   leaving my belongings, and they were forced to

12   leave.  I don't have that recollection.

13      Q.   (BY MS. STILLMAN) Going back to Peavey

14   Park encampment, did you witness any of the

15   residents of the encampment getting arrested?

16           MS. PIERCE:  Objection.  Vague,

17   foundation, particularly as to resident.

18           MS. WALTHER:  Objection.  Speculation.

19      A.   I witnessed an arrest occur, at least a

20   person being detained occur, and I do not believe

21   that person was unsheltered.

22      Q.   (BY MS. STILLMAN) Did you only -- did you

23   witness only one person being arrested at the Peavey

24   Park encampment closure?

25      A.   I don't recall.  But I know there was at

Page 98

1    least one.

2            It was -- my focus at that time was not on

3    those interactions.  It was assisting people in

4    packing and leaving.

5            So my -- my effort was not focused on --

6    on that -- anybody being detained.  But I do recall

7    that there were a couple people who were disruptive,

8    and I recall at least one of them being detained.

9        Q.   So if it was a resident of the Peavey Park

10   encampment being detained you would have known?

11           MS. PIERCE:  Objection.  Vague as to

12   resident.

13       A.   I know that we had contact with people and

14   that we had people who are in multiple systems in

15   which we work.  And I was not aware that any person

16   who we were serving as a person who needed

17   assistance in -- in housing stability was arrested.

18       Q.   (BY MS. STILLMAN) After the Peavey Park

19   encampment closure, did you hear that any of the

20   residents of the Peavey Park encampment had had

21   their property destroyed?

22           MS. PIERCE:  Objection.  Vague as to

23   resident, and time frame, so compound.

24       A.   I heard that -- in accounts on social

25   media that described that people's belongings were

Page 99

1   destroyed and taken.  That was not my account of

2   what I witnessed.  What I heard described in

3   multiple social media settings is not what I

4   witnessed in real life.

5         Q.   (BY MS. STILLMAN) Have you read the

6   Complaint in this lawsuit?

7         A.   No.

8         Q.   Have you read the First Amended Complaint

9   in this lawsuit?

10        A.   No.

11        Q.   Have you heard the name Henrietta Brown

12   before?

13        A.   I don't recall.

14        Q.   And I apologize if I already asked you

15   this.  Were you at the Loring Park encampment

16   closure in August of 2020?

17             MS. PIERCE:  Objection.  Misstates the

18   record.

19        A.   I was at Loring Park many times, but I

20   don't recall being at any encampment closure there.

21             MS. STILLMAN:  I'm going to go to what has

22   been previously marked as Exhibit 76.

23             (Previously Marked Exhibit Number 76

24   introduced to the witness.)

25             MS. STILLMAN:  Has counsel been able to

Page 100

1    locate it?

2         (Affirmative responses.)

3         Q.   (BY MS. STILLMAN) If you go to page 3 of

4    the document, your name is listed as a social

5    services contact.

6         A.   I'm sorry.  I'm not seeing that.

7              Oh, yes.  I see that.  Yes.

8         Q.   Why would your name have been listed as

9    the social services contact if you weren't there?

10             MS. PIERCE:  Objection.  Foundation,

11   misstates record -- the record.

12        A.   The first answer is, I don't recall being

13   there.  The second is that, if I was there, my role

14   was to have the same role that I had in other

15   situations, which is offering people shelter options

16   and services that the county can offer.

17        Q.   (BY MS. STILLMAN) And have you seen

18   Exhibit 76 prior to today?

19        A.   I don't think so.  I don't recall this

20   document at all.

21             MS. STILLMAN:  I'm marking Exhibit --

22   Bates stamp number HC00028963 as Exhibit Number 185.

23             (Deposition Exhibit Number 185 marked for

24   identification.)

25        Q.   (BY MS. STILLMAN) Okay.  So if you'll go

Page 101

1    to Exhibit 185 --

2         A.    Yes.

3         Q.    -- do you recognize this document?

4         A.    This is an email string.

5         Q.    And on the top, that email is from Jason

6    Ohotto to you, dated July 16th, 2020, correct?

7         A.    Correct.

8         Q.    And the email below that is an email from

9    you to Jason Ohotto, MPRB Police Sworn Group, Grant

10   Snyder, David O'Connor, Kathy Waite, Amelia Huffman,

11   Sean McGinty, Todd Loining, Kelvin Pulphus, and

12   Billy Peterson, correct?

13        A.    Yes.

14        Q.    All right.  And in that second email

15   that's from you, on July 15th, 2020, you write,

16   Thanks, Chief.  The interagency task force will

17   continue to work with the organizers to continue to

18   demobilize.  I will discuss with the team at our

19   8:00 meeting, and I am available to discuss details

20   as we have them.  Appreciate the partnership.  Don.

21             Did I read that correctly?

22        A.    Yes.

23        Q.    Okay.  Who was part of the interagency

24   task force?

25        A.    So as I mentioned before, there are a

Page 102

1    number of community-based agencies and others that

2    were focused on how we can serve people in

3    encampments.  So part of this, as I read this, is,

4    we wanted to give people as much time to prepare for

5    that closure as possible.  And that is one of the

6    roles that those community agencies asked for

7    frequently.  They wanted to know when the closures

8    are happening so they were able to help people plan

9    and get their belongings and transition plan

10   together.

11       Q.   Which interagency task force are you

12   referring to in this email?

13       A.   I don't recall.  There were numerous

14   meetings that occurred at times throughout the

15   entire day, so I don't recall who was at this

16   8:00 meeting.

17       Q.   And you say, The interagency task force

18   will continue to work with the organizers to

19   continue to demobilize.

20            Who are the organizers?

21       A.   I don't -- I don't know specifically who I

22   was referring to there.  That -- that could be the

23   Sanctuary Movement.  We made an attempt to work with

24   those -- those people who, at different occasions,

25   reported that they were in charge or representing

Page 103

1    the Sanctuary Movement.  The way that I read this is

2    that we were working with them to help them be part

3    of the solution.

4        Q.   And you agreed to work with Chief Ohotto

5    to demobilize encampments, correct?

6             MS. PIERCE:  Objection.  Vague, misstates

7    testimony.

8        A.   No.  I worked with Chief Ohotto to be a

9    support subject matter expert, since the Park Board

10   didn't have a lot of expertise working with people

11   who were experiencing homelessness, and as a person

12   who is offering both shelter and services to people

13   who were temporarily staying there.

14       Q.   (BY MS. STILLMAN) You say, at the end of

15   that email, Appreciate the partnership.

16            What was your partnership with Chief

17   Ohotto?

18            MS. PIERCE:  Objection.  Time frame,

19   compound.

20       A.   I -- I think I just described it, but I'll

21   try to describe it again.

22            We had partnerships with the State of

23   Minneapolis -- with the City of Minneapolis --

24   excuse me -- the State of Minnesota, the City of

25   Minneapolis, the Park Board, all with the same

Page 104

1    intention, and that was to be a support to people

2    who were camping at different locations, provide

3    those services; and if there was a need for a

4    subject matter expert, to discuss whatever it is

5    that they needed to get more information on so they

6    could do that in the right way.  That was our goal.

7    I would consider that to be our partnership.

8         Q.   (BY MS. STILLMAN) Why did you appreciate

9    that partnership?

10        A.   Because, if we didn't have a partnership,

11   we would not have been able to be as thoughtful in

12   how this -- how any transition or working with any

13   encampment on any public land could be.

14             I'm glad that the State and the City and

15   the Park Board wanted to work together, because, in

16   the end, we were able to have thoughtful dialogue

17   about how -- what was needed in different

18   situations.

19        Q.   Did you ever give Chief Ohotto advice on

20   how to facilitate an encampment closure in 2020?

21             MS. PIERCE:  Objection.  Vague.

22        A.   No.

23        Q.   (BY MS. STILLMAN) Did Chief Ohotto ever

24   ask you for advice on how to facilitate an

25   encampment closure in 2020?

Page 105

1           MS. PIERCE:  Objection.  Vague.

2      A.   No.  The decision to close and to prepare

3  for that closing and the process of closing was

4  subject to the discretion of whatever public entity

5  owned that land.

6      Q.   (BY MS. STILLMAN) If you were going to be

7  at an encampment closure that was on the property of

8  an entity other than Hennepin County, did you ask to

9  see a plan for what would happen the day of the

10  closure prior to the day of the closure?

11           MS. PIERCE:  Objection.  Vague, compound,

12  time frame.

13      A.   I don't know that I would have asked for a

14  written plan.  Instead, there was communication that

15  occurred verbally, often, that I was able to relay

16  to our partners in these community agencies and to

17  other social workers working for Hennepin County.

18      Q.   (BY MS. STILLMAN) So you were still the

19  program manager of initial contact and access in

20  2021, correct?

21      A.   Correct.

22      Q.   Did you send any of your staff to

23  encampment closures in 2021?

24           MS. PIERCE:  Objection.  Vague.

25      A.   No.

Page 106

1        Q.    (BY MS. STILLMAN) Did any of your staff go

2    to encampment closures in 2021 as part of their role

3    working for Hennepin County?

4             MS. PIERCE:  Objection.  Vague,

5    foundation.

6        A.    I don't think so.  I can tell you that

7    there were members of the homeless access team who

8    focused on certain encampments, including Powderhorn

9    and Peavey and others.  But their role was to

10   develop an ongoing relationship with people, find

11   out what they needed, find out what kind of medical,

12   substance abuse support, shelter options they were

13   interested in.  When the decision was made to close

14   that camp, there was not a need for them to be there

15   at that time.

16            MS. PIERCE:  Can you read that question

17   back, please?

18            (Whereupon, the court reporter read back

19   the requested portion of the record.)

20       Q.    (BY MS. STILLMAN) Okay.  At any point in

21   202020 did MPRB staff stop consulting you about --

22   I'll rephrase this question.

23            At any point in 202020 did the MPRB --

24            THE COURT REPORTER:  Can you clarify the

25   year, please?

Page 107

1          MS. PIERCE:  You said 202020 a couple

2     times.

3          Q.   (BY MS. STILLMAN) At any time in 2020 did

4     the MPRB stop telling you the date they were going

5     to close an encampment?

6          MS. PIERCE:  Objection.  Vague,

7     foundation.

8          A.   I do not recall a specific intention not

9     to tell us when there was a play to close an

10    encampment.

11         MS. STILLMAN:  I'm going to introduce

12    document Bates stamped HC00029505 as Exhibit 185.

13         Is the copy I gave you single-sided?

14         MS. SARFF:  186.

15         MS. PIERCE:  186.

16         (Deposition Exhibit Number 186 marked for

17    identification.)

18         MS. STILLMAN:  Are you comfortable with me

19    giving Mr. Ryan a double-sided copy?

20         MS. PIERCE:  That's fine with me.

21         But, Don, they're double-sided, so look

22    front and back if you need.

23         THE WITNESS:  Thank you.

24         Q.   (BY MS. STILLMAN) And do you recognize

25    this document?

Page 108

1      A.    I recognize this is an email string from
2   October 2020.
3      Q.    And if you go to the bottom of that first
4   page --
5      A.    Sorry.  Do you mind giving me a second to
6   read it?
7      Q.    Yeah.  Of course.  Take your time.
8      A.    Thank you very much.  I appreciate it.
9            Thank you for giving me time.
10           Yes.  What -- what's the question?
11     Q.    Yeah.  So if you look on the bottom of
12  that first page, that ends in 505 -- Do you see
13  that?  It's an email from you to Margaret King and
14  Josh Leopold?
15     A.    Yes.
16     Q.    And the subject is Re: External Logan
17  Park, dated October 13th of 2020.  Correct?
18     A.    Yes.
19     Q.    And then if you turn to the next page,
20  there is an email from Margaret King to you and Josh
21  Leopold, also dated October 13th.  And in the first
22  sentence -- And she says, Hi Don.  Just wondering if
23  you are going to be up at Logan today to help with
24  their moves?  I can be, but have a conflict from 2
25  to 3.  I heard from Juneil yesterday that they're

Page 109

```
 1    moving to the Extended Stay in Bloomington today,

 2    and we got a request from ZACAH (who is funding the

 3    hotels) to provide transportation and are talking

 4    through that internally.

 5              Do you see that?

 6         A.   I do.

 7         Q.   And then she said, Wondering whether

 8    you're expecting to be around up there today.

 9              Do you see that?

10         A.   Yes.  And the sentence in between that

11    was, I think Eric is going to call David shortly.

12              And I'm assuming that's Eric Grumdahl

13    from the State and David Hewitt from Hennepin

14    County.

15         Q.   So, then, if you look at your response

16    email, it says, I didn't know they were moving out

17    of Logan today.  This is the first I'm hearing about

18    this.  I have had much less communication with

19    Parks.  I'm not sure what to do, since I wasn't

20    invited to participate in whatever they are doing.

21    Did they reach out to you?

22              Did you end up going to the Logan Park

23    encampment closure?

24         A.   I don't recall.

25         Q.   When did you start -- start having less
```

Page 110

1    communication with Parks?

2        A.   I -- I don't recall that, either.  From --

3    from this email, I am guessing it was soon before

4    October 13th, but I -- I don't have a better answer

5    than that.

6        Q.   Do you think it would have been helpful if

7    Parks had told you that Logan -- the Logan Park

8    encampment was going to be closed?

9            MS. PIERCE:  Objection.  Misstates the

10   record, calls for speculation, incomplete

11   hypothetical, foundation.

12       A.   Margaret King was acting in a role for the

13   State of Minneapolis -- State of Minnesota.  And it

14   appears that she and the two other people from the

15   State had conversations with ZACAH and the Park

16   Board about this.  And that is all I can report.

17   I -- I -- I can't give any speculation other than

18   that.

19       Q.   (BY MS. STILLMAN) And then if you go up to

20   the top.

21           MS. PIERCE:  And I'm just going to object

22   here that that doesn't appear to be a sent email, to

23   me, because it doesn't include from.  It's probably

24   a draft.

25           MS. STILLMAN:  This is how it was produced

Page 111

1  to us.

2           MS. PIERCE:  I'm just -- I'm just, for the

3  record, clarifying, I don't believe that it appears

4  to be a sent email, so --

5           MS. STILLMAN:  Well, if it was produced in

6  an incomplete fashion, this is what we were given.

7      Q.   (BY MS. STILLMAN) It says, The only thing

8  that I will ask is that the State not transport

9  people to the Greenway.

10           MS. PIERCE:  Same objection.

11      Q.   (BY MS. STILLMAN) After an encampment

12  closure in 2020, did you not want residents of

13  the -- of that encampment transported to the

14  Greenway?

15           MS. PIERCE:  Objection.  Vague, compound,

16  calls for speculation.

17      A.   This was in reference to the State's

18  response to people leaving that block of land at

19  23rd and 13th and walking to what was known to be

20  The Wall of Forgotten Natives.

21           As they were coming up on that scene,

22  State officials had directed that people should not

23  be able to stay there.  Once a -- once a decision

24  was made that the State was going to close that

25  land, they directed people to the Greenway, without

Page 112

1   having conversations with Hennepin about that.  And

2   it appears that is what I am referring to here.

3        Q.   (BY MS. STILLMAN) Were you upset that the

4   State transported people to the Greenway after that

5   closure without discussing it with you?

6             MS. PIERCE:  Objection.  Misstates the

7   record, vague.

8        A.   This is a professional role that I had, so

9   I wasn't upset.  I did find it inconsistent with

10  what the State was asking other public entities to

11  do.

12       Q.   (BY MS. STILLMAN) In what way?

13       A.   Well, the State was asking for public

14  entities to have specific locations and

15  transportation and locations for people to go.  That

16  did not occur when they made the decision to clear

17  that encampment.

18       Q.   Do you think it's important that there be

19  a location for residents of an encampment to go if

20  an encampment is going to be closed?

21            MS. PIERCE:  Objection.  Vague, incomplete

22  hypothetical, calls for speculation.

23            MS. SARFF:  Objection to the extent it

24  calls for an expert opinion.

25       A.   I'm not able to answer that question,

Page 113

1    mostly because people will choose where they want to

2    go, regardless of whether there's a location

3    designated for them to go.  I am aware there are

4    times where designated places were offered and

5    people chose to go to other places.

6              Our hope is that people will stay with

7    friends and family, and if that's not an option,

8    that shelter is available, and we make -- we,

9    Hennepin County, make extended efforts to try to get

10   people into temporary and permanent housing

11   locations.

12             MS. PIERCE:  Can we go off the record,

13   please?

14             MS. STILLMAN:  Yes.

15             THE VIDEOGRAPHER:  We are going off the

16   record.  The time now is 12:32.

17             (Whereupon, a short recess was taken.)

18             THE VIDEOGRAPHER:  We are back on the

19   record.  The time now is 12:34.

20             MS. STILLMAN:  I am introducing document

21   Bates stamped MPLS_BERRY073548 as Exhibit 187.

22             (Deposition Exhibit Number 187 marked for

23   identification.)

24        Q.   (BY MS. STILLMAN) And if you go to the

25   second page, that ends in 3549, you'll see there's

Page 114

1    an email from you dated September 29th to Katie

2    Topinka, Andrea Brennan, David Hewitt and Joseph

3    Gladke.

4            Do you see that?

5        A.   Yes.

6        Q.   And it's about the Nicollet Avenue bridge

7    deck.  And in that first bullet point you say, David

8    Hough would like to speak with Mark Ruff and confirm

9    that this makes sense for the City and the County.

10           Did you -- for the -- this Nicollet Avenue

11   Bridge -- I'll back up.

12           Was there an encampment closed on the

13   Nicollet Avenue Bridge in the fall of 2020?

14       A.   Yes.

15       Q.   Okay.  Do you remember the date of that

16   closure?

17       A.   I do not.

18       Q.   Okay.  Did you facilitate conversations

19   between the City of Minneapolis and Hennepin County

20   regarding the closure of the encampment on the

21   Nicollet Avenue Bridge in 2020?

22           MS. PIERCE:  Object -- Sorry.  Objection.

23   Vague.

24       A.   Facilitate is not a word I would use.  I

25   would say that I participated in a number of

Page 115

1    conversations regarding this encampment.

2        Q.   (BY MS. STILLMAN) With -- conversations --

3    were some of those conversations with Minneapolis

4    city employees?

5        A.   Yes.

6        Q.   Were one of those city employees Katie

7    Topinka?

8        A.   Yes.

9        Q.   Was one of those employees -- city

10   employees Andrea Brennan?

11       A.   I don't recall.

12       Q.   Do you recall the names of any other city

13   employees you spoke to about the Nicollet Avenue

14   Bridge encampment closure?

15       A.   Yes.  Grant Snyder from the Minneapolis

16   Police.

17       Q.   Okay.  And that third bullet point there

18   says, Make sure that we have MPD support for the

19   clearing.

20            Do you see that?

21       A.   I do.

22       Q.   Would you have talked to Grant Snyder

23   about getting MPD support for the clearing of the

24   Nicollet Avenue Bridge encampment?

25       A.   Yes.

Page 116

1            MS. PIERCE:  Object.

2            THE WITNESS:  I apologize.

3            MS. PIERCE:  Objection.  Vague.

4       A.   Yes.

5       Q.   (BY MS. STILLMAN) Did you get support from

6  the MPD for the clearing of the Nicollet Avenue

7  Bridge encampment in the fall of 2020?

8            MS. PIERCE:  Objection.  Vague.

9       A.   There was a Minneapolis Police presence on

10  the street outside of this bridge.

11            MS. STILLMAN:  I'm going to go to a

12  document that was previously marked as Exhibit 165.

13  It ends in 18370.  Produced by Hennepin County.

14            (Previously Marked Exhibit Number 165

15  introduced to the witness.)

16       A.   Thank you.

17       Q.   (BY MS. STILLMAN) And can you tell me if

18  you recognize this document?

19       A.   This is an email string that I initially

20  wrote on September 24th, and was later responded to

21  by David Hewitt on the same day.

22       Q.   Okay.  And in that top email you say that

23  you received an offer from the mayor's office

24  regarding the bridge this morning.  They are

25  concerned enough about it that, if it helped

Page 117

1   Hennepin to receive a letter from Mayor Frey

2   requesting that this lot be cleared given safety

3   concerns, this can be arranged quickly.  Just wanted

4   to make sure David was aware of that Minneapolis

5   offer as he is considering this.

6          Is that correct?

7      A.   I'm reading that, yes.

8      Q.   Okay.  And in that bottom email in that

9   last paragraph you say, Given the proximity to the

10  Greenway, I'll add concerns of the Nicollet bridge

11  deck.

12         Do you see that?

13     A.   Yes.

14     Q.   And you have discussed the safety issues

15  regarding the structure, and there are more people

16  there as of the last two days.  Correct?

17     A.   Yes.

18     Q.   So up top it says you received an offer

19  from the mayor's office regarding this bridge this

20  morning.  Who from the mayor's office gave you that

21  offer?

22     A.   I don't recall.

23     Q.   Was there anybody from the mayor's office

24  you usually spoke with in 2020?

25         MS. PIERCE:  Objection.  Vague, compound,

Page 118

1    time frame.

2         A.   Most of my interactions with the mayor's

3    office went through other City of Minneapolis staff,

4    though there was a person whose name escapes me now

5    who worked with Mayor Frey, and he participated in

6    some of our meetings.

7         Q.   (BY MS. STILLMAN) Could you explain what

8    you mean by most of your conversations went through

9    other city staff?

10        A.   Yes.  Katie Topinka was my primary

11   contact.

12        Q.   Okay.  Did you receive any other offers

13   from the mayor's office to provide assistance to

14   expedite an encampment sweep?

15             MS. PIERCE:  Objection to the use of the

16   word sweep.

17             MS. SARFF:  Objection.  Vague.

18        A.   Could you ask the question again, please?

19        Q.   (BY MS. STILLMAN) Sure.  Were there any

20   other occasions on which the Minneapolis mayor's

21   office offered you assistance to expedite an

22   encampment closure?

23             MS. PIERCE:  Objection.  Vague, compound,

24   time frame.

25             MS. SARFF:  And objection to the extent it

Page 119

1    misstates his testimony regarding expediting.

2         A.   I -- I don't recall another situation.

3    This was unique, given that the City was responsible

4    for the street right up until the bridge, so this

5    was a unique situation.

6         Q.   (BY MS. STILLMAN) Did anybody from the

7    City of Minneapolis offer you assistance in closing

8    the Nicollet Avenue Bridge encampment other than

9    this letter from the mayor?

10             MS. PIERCE:  Objection.  Vague, compound,

11   time frame.

12             MS. SARFF:  Objection to the extent

13   misstates facts in evidence.

14        A.   No.  I don't recall.

15             MS. STILLMAN:  I am going to mark Bates

16   stamp number HC00037746 as Exhibit Number 188.

17             (Deposition Exhibit Number 188 marked for

18   identification.)

19        Q.   (BY MS. STILLMAN) And if you turn to the

20   last page of this document, which ends in 37749,

21   that's an email from you to Joseph Gladke and

22   Jessica Galatz dated Wednesday, September 16th of

23   2020.

24             Do you see that?

25        A.   Yes.

Page 120

1          Q.   All right.  And that email reads, HC

2     Sheriffs are saying as 15 minutes ago that they want

3     this bridge cleared today and it's coming from high

4     above.  Know anything about this?  They called Grant

5     asking for his assistance.  We have not even noticed

6     the camp.  Can either of you LMK? ████████████

7               By LMK did you mean let me know?

8          A.   Yes.

9          Q.   All right.  Do you know which bridge

10    you're referring to in this email?

11         A.   I -- Can you give me one second to read

12    the whole document, please?

13         Q.   Absolutely.

14         A.   Thank you.

15               Thank you for giving me that time.

16               The answer to your question is, I believe

17    this is the Nicollet Avenue Bridge that we are

18    referring to.

19         Q.   Was it common for you to talk to the

20    Hennepin County Sheriff's Office prior to the

21    closure of an encampment, homeless encampment, in

22    2020?

23               MS. PIERCE:  Objection.  Vague, compound,

24    time frame.

25         A.   No.  This was not common.

Page 121

1        Q.   (BY MS. STILLMAN) Why did you talk to the

2   sheriff's office about -- in this occasion?

3        A.   I don't have recollection of who reached

4   out to me to say that the sheriff's office were

5   looking to clear the bridge that day.

6        Q.   Did you have a primary contact -- Well,

7   never mind.  I'm going to retract that question.

8             MS. STILLMAN:  I am going to introduce

9   document Bates stamped HC00037637 as Exhibit 189,

10  and then document Bates stamped HC00037638 as 190.

11            (Deposition Exhibit Numbers 189 and 190

12  marked for identification.)

13            MS. PIERCE:  Counsel, again for

14  Exhibit 189, I'm going to indicate that that's a

15  draft document that was not sent because it doesn't

16  have a from, which also explains why it's -- well,

17  yeah.  It's a draft, which I assume explains the

18  date, so --

19            MS. STILLMAN:  And I'll just say, this is

20  how the document was produced to us.

21       Q.   (BY MS. STILLMAN) So I'll represent that

22  document HC00037638 was attached to that email

23  marked as Exhibit 189.  If you go to HC00037638,

24  have you seen this document before?

25       A.   I believe that I have seen it in a

Page 122

1    different format, yes.

2        Q.   In what format did you see it?

3        A.   I believe it was on a orange -- a bright

4    orange piece of paper that was posted at the

5    Nicollet Bridge encampment.

6        Q.   Did that orange -- when did you -- when

7    did you see that piece of paper at the Nicollet

8    Avenue Bridge encampment?

9        A.   I don't recall the date.

10       Q.   Would it have been around the time of the

11   Nicollet Avenue Bridge encampment closure in 2020?

12       A.   Yes.  I was at that encampment on numerous

13   occasions for the 10 days prior to that encampment

14   being closed.

15       Q.   Did you help draft the notice that was

16   posted at the Nicollet Avenue Bridge encampment?

17       A.   No.

18       Q.   Who did draft the notice?

19            MS. PIERCE:  Objection.  Foundation.

20       A.   I don't know specifically who drafted it,

21   but I believe that would have been someone from the

22   Public Works department from Hennepin County.

23       Q.   (BY MS. STILLMAN) The notice that you saw

24   at the Nicollet Avenue Bridge encampment, did that

25   notice provide anything about property storage being

Page 123

1   provided?

2         MS. PIERCE:  Objection.  Foundation.

3     A.    I don't recall.

4     Q.    (BY MS. STILLMAN) Were packing materials

5   provided by Hennepin County prior to the closure of

6   the Nicollet Avenue Bridge encampment in 2020?

7         MS. PIERCE:  Objection.  Foundation.  And

8   vague.

9     A.    It was not uncommon for outreach teams to

10  bring especially sturdy, heavy-weight garbage bags

11  so people could transport their belongings.  So I do

12  not know whether that happened on this occasion, but

13  I know that was -- that was a frequent ask of people

14  and follow-through from community agencies.

15    Q.    (BY MS. STILLMAN) If -- Did Hennepin

16  County provide property storage for the residents of

17  the Nicollet Avenue Bridge encampment in 2020?

18        MS. PIERCE:  Objection.  Vague, misstates

19  the record, foundation.

20    A.    I am not aware of whether or not anyone

21  stored belongings from this encampment.

22    Q.    (BY MS. STILLMAN) If residents did store

23  their belongings with Hennepin County, would there

24  be a written record of it?

25    A.    Yes.

```
                                           Page 124

 1              THE WITNESS:  Excuse me.  Excuse me.

 2              MS. PIERCE:  Foundation, incomplete

 3   hypothetical, calls for speculation.

 4        Q.   (BY MS. STILLMAN) Where would that written

 5   record be?

 6              MS. PIERCE:  Objection.  Foundation,

 7   incomplete hypothetical, calls for speculation.

 8        A.    That record was kept with the Public Works

 9   department.

10        Q.   (BY MS. STILLMAN) Have you ever

11   transported the property of an encampment resident

12   to a Hennepin County storage space?

13              MS. PIERCE:  Objection.  Vague, compound,

14   time period.

15        A.   No.

16        Q.   (BY MS. STILLMAN) Have any of your staff

17   ever transported an encampment resident's property

18   to a Hennepin County storage space?

19              MS. PIERCE:  Foundation, vague, compound,

20   time frame.

21        A.   No.

22        Q.   (BY MS. STILLMAN) If they had would they

23   have told you?

24              MS. PIERCE:  Objection.  Incomplete

25   hypothetical, calls for speculation, foundation.
```

Page 125

1       A.   I would have been aware, because the staff

2   from the homeless access team was not present during

3   closures.

4       Q.   (BY MS. STILLMAN) Okay.  Was anyone from

5   the Hennepin County Sheriff's Office at the closure

6   of the Nicollet Avenue Bridge encampment in 2020?

7       A.   I believe so, but I can't recall.

8       Q.   What is your understanding of the Hennepin

9   County Sheriff's Office's role at encampment

10  closures?

11          MS. PIERCE:  Objection.  Vague, compound,

12  time frame, foundation.

13      A.   My understanding is, to provide a safe

14  environment so that the clearing or closure could

15  occur.

16          MS. STILLMAN:  I'm going to introduce

17  document Bates stamped HC00022695 as Exhibit 191.

18          (Deposition Exhibit Number 191 marked for

19  identification.)

20          MS. STILLMAN:  Sorry.  Does that say

21  22695?

22          MS. PIERCE:  Uh-huh.  Yes.

23          MS. STILLMAN:  Okay.

24      Q.   (BY MS. STILLMAN) And do you recognize

25  this document?

Page 126

1          A.    This appears to be an email chain.

2          Q.    If you go to page 2 of the document that

3    ends in 22696, there is, at -- at the top there is

4    an email from you to David Hewitt, dated Tuesday,

5    June 2nd of 2020.

6                Do you see that?

7          A.    Yes.

8          Q.    And if you look below that, there is an

9    email from David Hewitt to you, also dated June 2nd

10   of 2020.

11               Do you see that?

12         A.    Yes.

13         Q.    And in that email Mr. Hewitt said, Just

14   connected with Margo on this.  She's a little

15   concerned about security staff's ability to have

16   these conversations, especially in light of recent

17   developments and how they might be received.

18               And, Would you be able to provide some

19   guidance and support on how to do this in light of

20   all that's gone on?  Wondering if you might be able

21   to accompany to the Greenway to help with the

22   communication (or advise on who best could)?

23               Do you see that?

24         A.    Yes.

25         Q.    Do you think -- and then -- I apologize.

Page 127

1          Then, in your top email on that page, on

2    page 2, to David Hewitt, you say, It would be better

3    for community outreach team to go do this, but I am

4    certainly willing to do that.

5          Do you think it's better for street

6    outreach teams to communicate with homeless

7    encampment residents than law enforcement officers?

8          MS. PIERCE:  Objection.  Vague, compound,

9    time frame, incomplete hypothetical, calls for

10   speculation.

11         MS. SARFF:  Objection to the extent it

12   calls for an expert opinion.

13   A.   I think most of the time that is true.

14   One, there isn't a level of threat that some people

15   residing in an encampment may feel if they are

16   working with someone other than law enforcement.

17   Second, those folks have experience and training to

18   do just that.

19         But with that said, there are always

20   exceptions.  I can give you exceptions including

21   veterans on Hennepin County security and law

22   enforcement who did an outstanding job interacting

23   with other veterans that were only able to accept

24   more trust because they were veterans.

25         So every situation is different.  If

Page 128

1    you're asking me to generalize, I would say, yes,

2    that is more likely true than not.

3         Q.   (BY MS. STILLMAN) And you see in that

4    email you say, And the obvious question for me is,

5    what do we do if they refuse to move their tent?

6    What is our response?

7              Do you see that?

8         A.   Can you direct me to where in this

9    document that is?

10        Q.   Oh.  So in that same email body, on

11   page 2.

12        A.   Page 2.  4:03?

13        Q.   Yes.  4:03 p.m. email.

14        A.   Okay.

15        Q.   What do you do if you ask a resident of a

16   homeless encampment to move their tent and they

17   refuse?

18             MS. PIERCE:  Objection.  Vague, compound,

19   time frame, incomplete hypothetical, calls for

20   speculation.  Possibly calls for expert opinion.

21        A.   The answer is, very little.  We were

22   encouraging people to move, given the COVID

23   pandemic, and we would encourage people to do that,

24   but we -- we -- excuse me -- "we" being Hennepin

25   County social service staff and those doing the same

```
                                           Page 129
 1   role from Healthcare for the Homeless, would not
 2   force people to move their tents.  But we would
 3   encourage people to do it for social distancing.
 4           MS. PIERCE:  I think his tape is about to
 5   run out, Rebecca, so we should take a break.
 6           MS. STILLMAN:  Okay.  Do we want to take a
 7   lunch break?
 8           MS. PIERCE:  Let's do it.
 9           MS. STILLMAN:  Okay.
10           THE VIDEOGRAPHER:  We are going off the
11   record.  The time now is 1:03.
12           (Whereupon, a recess was taken.)
13           THE VIDEOGRAPHER:  We are back on the
14   record.  This is the start to Media Number 4.  The
15   time is 1:56.
16           MS. STILLMAN:  All right.  And we'll just
17   note for the record that Luke Grundman has left, and
18   Teresa Nelson from the ACLU, counsel for plaintiffs,
19   is now present.
20       Q.   (BY MS. STILLMAN) You were at the closure
21   of the encampment on the Greenway in December of
22   2020, correct?
23       A.   Yes.
24       Q.   Were you involved in the decision to close
25   that encampment?
```

Page 130

1        A.   I was in meetings where that was
2   discussed.  I was not part of the decision to close
3   it.
4        Q.   Who else was at those meetings?
5             MS. PIERCE:  Objection.  Vague, compound,
6   time frame.
7        A.   My guess is there were many meetings
8   without me being present, but I was in meetings with
9   David Hough and David Hewitt when that subject
10  matter was discussed.
11       Q.   (BY MS. STILLMAN) Was David Hough the one
12  who made the final decision to close the Greenway
13  encampment?
14            MS. PIERCE:  Objection.  Sorry.
15  Foundation.
16       A.   I would imagine he made the ultimate
17  decision after receiving feedback and
18  recommendations from others.
19       Q.   (BY MS. STILLMAN) Were you one of the
20  others from whom he received feedback and
21  recommendations?
22            MS. PIERCE:  Objection.  Foundation.
23       A.   I was part of those meetings.  I did not
24  provide advice about whether or not the encampment
25  should be closed.

Page 131

1        Q.    (BY MS. STILLMAN) Why not?

2        A.    I wasn't asked to do so.  It wasn't my

3    role.

4        Q.    Did you go to the Greenway encampment in

5    2020, prior to the closure in December of 2020?

6            MS. PIERCE:  Objection.  Asked and

7    answered.

8        A.    I was at the Greenway encampment numerous

9    times a week for weeks prior to its closure.

10       Q.    (BY MS. STILLMAN) Were any of your staff

11   at the Greenway encampment prior to its closure?

12           MS. PIERCE:  Objection.  Foundation,

13   vague, compound.

14       A.    There were Hennepin County staff from the

15   homeless access team, Healthcare for the Homeless,

16   and multiple contracted community agencies who were

17   present on the Greenway during that time.

18       Q.    (BY MS. STILLMAN) At the meetings where

19   you were present when you were discussing the

20   possible closure of the Greenway encampment, who

21   gave recommendations that it should be closed?

22       A.    I believe those conversations happened in

23   meetings when I wasn't present.

24       Q.    So you weren't present at any meetings

25   where they were -- there was a discussion about

Page 132

1   whether or not to close the Greenway encampment in

2   2020?

3          MS. PIERCE:  Objection.  Misstates

4   previous testimony.

5      A.   No.  I didn't say that.  I said that I

6   think there were meetings that I was present at and

7   other meetings I was not present at.  I do not

8   recall who suggested in a meeting, we need to close

9   the Greenway.

10     Q.   (BY MS. STILLMAN) Who else attended these

11  meetings at which you were present in which there

12  were discussions about closing the Greenway in 2020?

13         MS. PIERCE:  Objection.  Asked and

14  answered, vague, compound, time frame.

15     A.   In addition to the two people that I

16  mentioned, there were others who participated in a

17  as-needed basis.  There were some people, including

18  Joe Gladke, who we've talked about, Lisa Cerney,

19  C-e-r-n-e-y, who were present at some of those

20  meetings as well.

21     Q.   (BY MS. STILLMAN)  Can you think of anyone

22  else?

23     A.   I can't at this time.

24     Q.   Was Sheriff Hutchinson present at any of

25  those meetings?

Page 133

1          A.    No.

2          Q.    Were you consulted as to what date the

3     Greenway encampment should be closed in 2020?

4               MS. PIERCE:  Objection.  Vague.

5          A.    Consulted.  No, I would say I was not

6     consulted on what day we should close.

7          Q.    (BY MS. STILLMAN) Did you have discussions

8     with anybody about what day you should close the

9     encampment on the Greenway in 2020?

10         A.    I received information that we were going

11    to close on a certain day, and I followed through

12    with that direction.

13         Q.    From whom did you receive that

14    information?

15         A.    As I said, I think there were many people

16    who participated in those conversations, and I think

17    the ultimate decision was made by David Hough.

18         Q.    Yeah.  From whom did you receive the

19    information about the date of the closure?

20         A.    I don't recall.

21         Q.    Prior to the closure of the Greenway

22    encampment in December 2020, did you provide any of

23    the residents with packing materials?

24               MS. PIERCE:  Objection.  Vague, time

25    frame, compound.

Page 134

1        A.    I did not directly.   I did have

2    conversations with community partners, including

3    those community agencies we already discussed, that

4    there would be people who may need that, and those

5    community agency partners I know were part of that

6    providing of moving materials.

7        Q.    (BY MS. STILLMAN) Did you witness any of

8    these community agency partners giving residents

9    packing materials?

10            MS. PIERCE:   Objection.   Vague, compound,

11    time frame.

12        A.    I was with community agencies all the

13    time.   I don't recall if I was there when they were

14    asked or offered for packing material.

15        Q.    (BY MS. STILLMAN) And just to clarify,

16    when you say community agencies we discussed

17    earlier, you're referring to St. Stephen's, Avivo,

18    AICDC, Minnesota Indian Women's Resource Center?

19        A.    Amongst others, yes.

20        Q.    Amongst others.

21            Since we discussed that last, have you

22    thought of any other community organizations that

23    were part of that group?

24        A.    I haven't considered that question since

25    we broke for lunch.   I apologize.

Page 135

1      Q.    Not a problem.  Just thought I would

2   check.

3            Did you offer residents of the Greenway

4   encampment any options for property storage prior to

5   the closure of the encampment in 2020?

6            MS. PIERCE:  Objection.  Vague, compound,

7   time frame.

8      A.    We discussed that, if -- Excuse me.  When

9   I say "we," I mean the folks from Hennepin County

10  who were responsible for individual interactions

11  with people who were temporarily camping there.  We

12  wanted people to be aware that the closure was going

13  to happen at sometime in the future.  We had those

14  conversations on a regular and frequent basis.

15     Q.    (BY MS. STILLMAN) With the residents?

16     A.    With the residents.

17           MS. PIERCE:  Objection.  Vague as to

18  resident.

19     A.    With the residents of Hennepin County who

20  were temporarily camping at that encampment.

21     Q.    (BY MS. STILLMAN) Where was the property

22  storage location that you offered?

23           MS. PIERCE:  Objection.  Vague.

24     A.    I was not part of that process of storing

25  belongings, so I'm not clear where that storage

Page 136

1    facility was.

2        Q.   (BY MS. STILLMAN) Who was part of that

3    process of storing belongings?

4            MS. PIERCE:  Objection.  Foundation.

5        A.   My best knowledge is that it was a

6    partnership between Public Works and the Hennepin

7    County security team.

8        Q.   (BY MS. STILLMAN) If an -- a resident of

9    the Greenway encampment, in December of 2020, told

10   you that they wanted their property stored, what

11   would you have done?

12           MS. PIERCE:  Objection.  Incomplete

13   hypothetical, calls for speculation, assumes facts

14   not in evidence.

15       A.   The good news about us partnering with

16   numerous Hennepin County departments is, we had good

17   lines of communication open, so we were able to

18   relay -- we would have been able to relay that to

19   someone in security, someone in Joe Gladke's area,

20   to ensure that that happened.

21       Q.   (BY MS. STILLMAN) Did you make any

22   referrals for property storage for any of the

23   residents of the Greenway encampment in December of

24   2020?

25           MS. PIERCE:  Objection.  Vague.

Page 137

1      A.    I was never asked for that.

2      Q.    (BY MS. STILLMAN) Were any of your staff

3  ever asked for that?

4          MS. PIERCE:  Objection.  Foundation,

5  vague.

6      A.    I'm not aware that they were.

7      Q.    (BY MS. STILLMAN) If a resident of a -- of

8  the Greenway encampment had property stored by

9  Hennepin County in December of 2020, would there be

10  a written record of that?

11          MS. PIERCE:  Objection.  Foundation,

12  incomplete hypothetical, assumes facts not in

13  evidence, calls for speculation.

14      A.    I believe that there was a tracking method

15  for all belongings that were to be stored for

16  someone.

17      Q.    (BY MS. STILLMAN) Why do you believe that?

18      A.    Because we had a detailed plan about how

19  this would happen -- Excuse me.  I said "we" again.

20          Because I was present at meetings where

21  we -- the team that was working on the Greenway

22  response wanted to make sure to follow the

23  procedure, and I know that was part of the

24  procedure, of tracking what belongings belonged to

25  what person.

Page 138

1      Q.   Have you ever seen a document that tracked

2   the belongings of Greenway encampment residents?

3      A.   I don't recall that I did.  It was not

4   part of my role.

5      Q.   Was part of your role to help residents of

6   the Greenway encampment pack their belongings on the

7   day of the closure?

8           MS. PIERCE:  Objection.  Vague.

9      A.   No.  If someone asked me for help

10  specifically, of course I would help, if someone

11  wished me to do that.  But that was not part of the

12  role I was assigned to.

13     Q.   (BY MS. STILLMAN) What role were you

14  assigned for that day?

15     A.   I was assigned to interact with people who

16  I had developed relationships with, to allow them to

17  be aware that the closing was happening at that

18  time; to, again, offer them shelter space and any

19  other services they may feel they need at that time,

20  whether that be medical, substance-related.

21  Whatever it is that they felt they needed.

22     Q.   Were there people from Hennepin County

23  there who were assigned to help residents pack?

24          MS. PIERCE:  Objection.  Foundation,

25  vague.

Page 139

1        A.    No.   What we intentionally did was meet

2    with people on a daily basis and remind them that

3    this closure was imminent, even if we didn't have

4    that date.  So going back three to four weeks, we

5    had been encouraging people to find other places to

6    be, to encourage people to -- we offered to help

7    numerous people move into other locations.  We went

8    from well over a hundred people down to in the teens

9    by the time the Greenway had closed, by moving

10   people into temporary and permanent housing

11   situations.

12           So there was a small number of people

13   there at the actual time of the closure.  As a

14   result, it didn't appear that we needed someone

15   there to assist people in packing.

16           The next part of that answer is, there

17   were numerous people from the Sanctuary Movement who

18   were there with trucks.  And they knew we were

19   moving down the Greenway.  They were going ahead of

20   us and assisting people in packing up before

21   Hennepin County staff even got to certain locations.

22       Q.    (BY MS. STILLMAN) So you said part of your

23   role the day of the closure was to talk to people

24   about shelter options, correct?

25       A.    Yes.  I was a familiar face.  People knew

Page 140

1     who I was.  We wanted people to have interaction

2     with me before law enforcement, if possible.

3          Q.   Why is that?

4          A.   We wanted it to be as safe and calm of a

5     process as we could.

6          Q.   Would -- How did talking to you before

7     having residents talk to law enforcement make it a

8     safer and calmer process?

9               MS. PIERCE:  Objection.  Vague.

10         A.   Well, my experience is that there are a

11    number of people in the Hennepin County security

12    team and the Hennepin County Sheriff's Office that

13    do an excellent job of de-escalation and working

14    with people.  But a lot of those folks may not have

15    had previous interaction with those camping at the

16    Greenway.  So having a familiar face who's able to

17    give the same information that I had provided for

18    the last three to four weeks made a difference in

19    understanding that this was happening.

20         Q.   (BY MS. STILLMAN) Why do you use the term

21    camping for -- when you're discussing the residents

22    who were living on the Greenway?

23              MS. PIERCE:  Objection.  Vague.

24         A.   Mostly because people that I work with who

25    are experiencing homelessness and they're staying

Page 141

1    outside, they call it camping, so I'm using their

2    language.

3        Q.   (BY MS. STILLMAN) Did all of the residents

4    of the Greenway encampment that you spoke with the

5    day of the encampment closure choose to go to a

6    shelter, homeless shelter?

7             MS. PIERCE:  Objection.  Foundation,

8    compound.

9        A.   No.  There were many people that chose to

10   leave and we were not aware of where they went.  So

11   of the -- I don't have exact numbers in my head

12   right now, but of the nine or ten people that were

13   still there and packing up as the closure was

14   happening, more than half I was not aware of where

15   they ended up moving to.

16       Q.   (BY MS. STILLMAN) Did you confirm that

17   there was adequate, safe alternative shelter for all

18   of the residents of the Greenway encampment for the

19   day it was closed?

20            MS. PIERCE:  Objection.  Vague, compound.

21   Calls for a legal conclusion as to adequate, safe.

22       A.   I know that we did that, and I don't

23   recall what availability we had on that day.

24       Q.   (BY MS. STILLMAN) Who would have that

25   information?

Page 142

1      A.   Just to accurately answer your question,

2  are you asking me who would have the historical data

3  about what shelter availability was open on the 18th

4  of December, 2020?

5      Q.   Yes.

6      A.   Unless it's in an email, I'm not sure who

7  would track that information.

8      Q.   Did you know the number of available

9  shelter beds on December 18th of 2020?

10         MS. PIERCE:  Objection.  Asked and

11  answered.

12     A.   I don't recall what those dates -- what

13  those numbers were at the time.

14     Q.   (BY MS. STILLMAN) Would you have checked

15  about shelter availability before you got to the

16  encampment that day?

17         MS. PIERCE:  Objection.  Asked and

18  answered.

19     A.   That is a common thing that I have done in

20  situations like that, so I would not be surprised if

21  I did that.

22     Q.   (BY MS. STILLMAN) How do you find out

23  about the number of available shelter beds?

24         MS. PIERCE:  Objection.  Vague, compound,

25  time frame.

Page 143

1      A.   We work with shelter providers who have a

2   system of letting us know -- "us" being Hennepin

3   County -- what availability is open for each

4   morning.  That's communicated and available for

5   people to get that information on that day.  There's

6   a second -- a second group of numbers that come out

7   once -- whether reservations are --

8           Excuse me.  Let me restate that.

9           If a reservation was not followed through

10  with and an open bed existed, later in the day they

11  would have a different set of numbers about who they

12  could offer that bed to, so if there were people

13  looking for a place to stay in shelter, we wouldn't

14  have an open bed held open by someone who didn't

15  show up for a reservation.

16          So there were two different times during

17  the day where we might have those numbers for

18  shelter availability.

19      Q.   (BY MS. STILLMAN) How was this information

20  communicated to you?

21          MS. PIERCE:  Objection.  Foundation.

22      A.   I may make a phone call.  I might send an

23  email.  I might talk to a colleague who may provide

24  this information to me.

25      Q.   (BY MS. STILLMAN) So you weren't getting

Page 144

1    this information emailed to you every day?

2        A.   There were times where I definitely

3    received email information about shelter

4    availability.  I did not receive it every day.  And

5    I worked with other people who I know knew those

6    numbers every day.

7        Q.   Who sent you the emails with the shelter

8    availability?

9        A.   I don't recall.

10       Q.   Who are the people you worked with who had

11   those numbers every day?

12       A.   There were a number of people from the

13   office to end homelessness that moved into the

14   housing stability department.  Again, our focus was

15   working directly with residents.  So that

16   information came from different people at different

17   times.

18       Q.   So you wouldn't necessarily know the

19   number of shelter beds available the day of an

20   encampment sweep?

21            MS. PIERCE:  Objection.  Misstates prior

22   testimony.

23       A.   I think I had mentioned on multiple

24   occasions I would learn what that availability was

25   in the morning and communicate that out to partners

Page 145

1    that we had, whether those be internal community

2    partners or government agencies.  And any time

3    someone asked me for that information I was able to

4    gather it.

5        Q.   (BY MS. STILLMAN) How would you gather it

6    if somebody asked you for that information?

7             MS. PIERCE:  Objection.  Compound.

8        A.   As I stated before, there were multiple

9    ways to do that, but I would call somebody who would

10   be able to check on the numbers and get back to me

11   and let me know.

12       Q.   (BY MS. STILLMAN) Did you ever call Adult

13   Shelter Connect?

14       A.   Yes.

15       Q.   Did you call Adult Shelter Connect on

16   December 18th of 2020?

17            MS. PIERCE:  Objection.  Asked and

18   answered.

19       A.   I don't recall.

20       Q.   (BY MS. STILLMAN) You mentioned shelter

21   providers communicated availability.  Is that

22   correct?

23       A.   Can you repeat the question, please?

24       Q.   Is it -- You mentioned that shelter

25   providers communicated bed availability; is that

Page 146

1    correct?

2            MS. PIERCE:  Objection.  Foundation.

3        A.   We would -- Hennepin County would get the

4    numbers from shelter providers, so that's how we got

5    that information.

6        Q.   (BY MS. STILLMAN) Who are those shelter

7    providers?

8        A.   There's a multitude of shelter

9    availability in Minneapolis.  Some are larger

10   shelters, like Salvation Army, that can house up to

11   hundreds of people.  Some are smaller, like Simpson

12   Housing.  Some are church-based.  If you're looking

13   for a couple examples of shelters, those are two

14   examples of shelters we use regularly.

15   St. Stephen's had a shelter for a long period of

16   time.

17       Q.   Do you know the names of any of the

18   church-based shelters?

19       A.   I don't have that information with me

20   right now.  I do know that, during the winter

21   months, we expand those shelter availability so we

22   can offer as much shelter options to people as

23   possible.

24           MS. STILLMAN:  I'm going to enter document

25   Bates stamped HC00019692 as Exhibit 192.

Page 147

```
 1              I got ahead of myself.

 2              (Deposition Exhibit Number 192 marked for

 3    identification.).

 4              MS. STILLMAN:  And then enter document

 5    Bates stamped HC00019694 as Exhibit 193.

 6              (Deposition Exhibit Number 193 marked for

 7    identification.)

 8              MS. PIERCE:  Are you going to show him all

 9    the attachments to the email or just the one?

10              MS. STILLMAN:  I had printed all the

11    attachments in case you wanted them.

12              MS. PIERCE:  Yeah.  We'd like them.  If

13    you're going to show him a document, let's show him

14    a complete document.

15              (Discussion held off the record.)

16              MS. STILLMAN:  I'm marking document Bates

17    stamped HC0001965 as Exhibit 194, and then marking

18    document Bates stamped HC00019696 as Exhibit 195.

19              (Deposition Exhibit Numbers 194 and 195

20    marked for identification.)

21              MS. STILLMAN:  And I will represent that

22    documents marked Exhibit 193, 194 and 195 are the

23    attachments to the email that's been marked as

24    Exhibit 192.

25         Q.   (BY MS. STILLMAN) Do you recognize this
```

Page 148

1    email that's been marked as Exhibit 192?

2         A.   Yes.

3         Q.   Okay.  What is this email?

4         A.   This is an email from an individual in the

5    community who were informing elected persons about

6    his perception of what was happening on that day.

7         Q.   And if you go to Exhibit 193, do you know

8    what this is a picture of?

9         A.   This is a notice by the Hennepin County

10   Regional Railroad Authority.

11        Q.   Have you seen this notice before?

12        A.   Yes.

13        Q.   Where did you see it?

14        A.   I've seen it in person down on the

15   Greenway.

16        Q.   When?

17        A.   In the month of December 2020.

18        Q.   And this notice was posted on

19   December 15th of 2020, correct?

20        A.   That is what is documented here.

21        Q.   And it says that, if tents and belongings

22   aren't removed by December 17th, they will be

23   removed by the -- by HCRRA staff.  Correct?

24        A.   Yes.

25        Q.   And HCRRA stands for Hennepin County and

Page 149

1   the Regional Railroad Authority, correct?

2          A.   Yes.

3          Q.   Okay.  So encampment residents were given

4   approximately 48 hours' written notice that they had

5   to vacate the Greenway encampment, correct?

6               MS. PIERCE:  Objection.  Vague as to the

7   meaning of resident.  And misstates -- and misstates

8   the document.  Pardon me.

9          A.   If the document is accurate, they had more

10  than 72 hours' notice, because Exhibit 194 says that

11  this is posted at 6:49 a.m. on the 15th.  And I

12  understand that the official closing of the Greenway

13  occurred after this time on the 18th, so that would

14  be over 72 hours.

15         Q.   (BY MS. STILLMAN) But the notice said the

16  17th, correct?

17         A.   I'm sorry?

18         Q.   The notice said December 17th, correct?

19         A.   They were -- yes.  That's exactly right.

20  They were informing people that they needed to

21  remove their belongings because the next morning

22  that was -- that was the plan, the closure was

23  planned for that day.

24         Q.   And then the notice also says any garbage,

25  refuse or debris is subject to immediate disposal,

Page 150

1    correct?

2         A.    Correct.

3         Q.    How do you determine what is garbage,

4    refuse or debris?

5              MS. PIERCE:  Objection.  Vague, compound,

6    calls for speculation, incomplete hypothetical.

7              MS. SARFF:  Objection to the extent it

8    calls for a legal conclusion.

9         A.    I think that's a multi-example answer.

10             The first is that we communicated with the

11   people who were temporarily staying on the Greenway

12   and asking them what was garbage and what was not

13   garbage.

14             So one of the efforts that Hennepin County

15   took was to do cleanups on a periodic basis where

16   they removed enormous amounts of garbage.  By

17   mid-December we had reports of rat infestations, and

18   the attempt to remove garbage on a regular basis was

19   something that camp -- people who were camping there

20   told us they really appreciated.  So the first thing

21   we did was, we talked to people to find out what

22   they considered to be their belongings, what they

23   considered to be trash.  And as we were doing those

24   periodic trash removals, we did not throw anything

25   away that someone said was their property and they

Page 151

1    considered to be their belonging.

2         The second was, we had to make some

3    judgment calls about that.  As people were on the

4    Greenway, every single day -- I'm going to use an

5    obvious answer -- example here.  But if there's a

6    bottle that's empty and just sitting on a corner,

7    where there's the same amount of liquid that's been

8    there for three days, I think the reasonable person

9    would consider that would be garbage.

10        So were there -- were there times where

11   belongings were removed, Hennepin County said it was

12   garbage?  No, I'm not aware that that occurred

13   during those times we did those cleanups.

14        Q.   (BY MS. STILLMAN) Are you aware of a

15   written policy that Hennepin County has that

16   describes how to identify whether something's

17   garbage, refuse or debris?

18        MS. PIERCE:  Objection.  Assumes facts not

19   in evidence, calls for a legal conclusion.

20        A.   I don't recall that description of that

21   document.  If that existed, I could review it, but I

22   don't recall what that is at this time.

23        Q.   (BY MS. STILLMAN) But you're not aware if

24   one existed?

25        A.   I could --

Page 152

1            MS. PIERCE:  Same objections.

2       A.   I could not describe it now, because I

3   can't recall what that said, if it exists.

4       Q.   (BY MS. STILLMAN) So to the best of your

5   knowledge, was it up to the discretion of the

6   Hennepin County employees who were present at the

7   encampment closure to determine whether something

8   was garbage, refuse or debris?

9            MS. PIERCE:  Objection.

10      A.   No.  Sorry.

11           MS. PIERCE:  Objection.  Compound,

12   foundation.

13           MS. SARFF:  Objection to the extent it

14   calls for a legal conclusion.

15      A.   No.  As I stated, we always went to those

16   people who were camping at the time, and we always

17   asked them first what was considered to be their

18   property, if they wanted to retain it, or if they

19   wanted to have it stored or thrown away.  So the

20   person who was camping there were the people telling

21   us whether it was garbage or not garbage.

22      Q.   (BY MS. STILLMAN) And are you aware if

23   that instruction to ask a resident if it's garbage

24   or not is written down anywhere?

25           MS. PIERCE:  Objection.  Foundation.

Page 153

1    A.   I don't recall.  It is something we talked

2   about frequently.

3    Q.   (BY MS. STILLMAN) Who is "we"?

4    A.   Thank you for asking me to clarify that.

5         So those are discussions that I had with

6   people at Hennepin County, working on the Greenway

7   efforts.  Those would include Jessica Galatz, Joe

8   Gladke, Hennepin County security officers,

9   et cetera.  Healthcare for the Homeless, social

10  workers.  They would have been -- all of them could

11  have been part of that conversation to make sure

12  we're asking residents who were temporarily camping

13  there that -- whether or not those were their

14  belongings.

15   Q.   Do you remember the names of any of those

16  Hennepin County Healthcare for the Homeless social

17  workers?

18   A.   Edward Weibye is one of them.

19   Q.   Do you remember any other names?

20   A.   No.

21   Q.   Was anyone from the Minneapolis Police

22  Department present at the closure of the Greenway

23  encampment on December 18th of 2020?

24        MS. PIERCE:  Objection.  Foundation.

25   A.   I don't believe so.

Page 154

1      Q.   (BY MS. STILLMAN) What would happen to an
2  encampment if a homeless encampment was established
3  on the Greenway tomorrow?
4           MS. PIERCE:  Objection.  Foundation,
5  vague.
6           What do you mean what would happen?
7      Q.   (BY MS. STILLMAN) So if an encampment was
8  established on the Greenway tomorrow, would it be
9  cleared?
10          MS. PIERCE:  Objection.  Foundation,
11 speculative, incomplete hypothetical.
12     A.   I would not be able to answer that
13 question, for two reasons:  One, I am not in that
14 role currently; and, two, that's a hypothetical
15 situation I can't assume an answer about.
16     Q.   (BY MS. STILLMAN) Did you discuss the
17 closure of the Greenway encampment on December 18th,
18 2020 with anyone after it occurred?
19     A.   Yes.
20     Q.   Who did you discuss it with?
21     A.   I know there were Hennepin County staff --
22          MS. PIERCE:  And, Don, I want to caution
23 you, again, not to reveal the contents of any
24 privileged conversation you may have had.
25     A.   -- but no one outside of Hennepin County.

Page 155

1      Q.   (BY MS. STILLMAN) Who at Hennepin County
2  did you discuss it with?
3           MS. PIERCE:  Same qualification, Don.
4      A.   I believe that there were Hennepin County
5  attorneys that were present during that meeting.
6           MS. PIERCE:  You can tell them who
7  attended the meeting, just not the content of the
8  conversation, if you remember.
9      A.   We had a follow-up review of how the
10 process went, whether it was successful --
11          MS. PIERCE:  I don't want you to reveal
12 the content of the communication in any way.  Just
13 if there were lawyers present, just who was there.
14     Q.   (BY MS. STILLMAN) Yep.
15     A.   There were people, including David Hough,
16 David Hewitt, Lisa Cerney, Joe Gladke, who were all
17 present during that meeting.
18     Q.   Do you remember the date that meeting
19 occurred?
20     A.   I do not.
21     Q.   Do you remember if it was within a week of
22 the Greenway closure?
23     A.   I believe it was.
24     Q.   Okay.  Did you have any other discussions
25 about the closure of the Greenway after it happened

Page 156

1   with anyone other than that one you just mentioned?

2       A.   No.

3       Q.   Do you know what Hennepin County Housing

4   Key is?

5            MS. PIERCE:  Housing Key?

6            MS. STILLMAN:  Yeah.

7       A.   Yes.

8       Q.   (BY MS. STILLMAN) What is it?

9       A.   Are you referring to the availability of

10  locations where people could stay?

11      Q.   I'm asking you what it is.

12      A.   Yeah.  I haven't worked in this field for

13  more than two years, two and a half years, so I

14  don't recall the Hennepin County Housing Key at this

15  time.

16      Q.   To clarify, though, you were still the

17  initial -- or the program manager for the initial

18  contact and access team in 2021, correct?

19      A.   I was the program manager in initial

20  contact and access for the homeless access team.

21      Q.   And you had that role in 2022?

22      A.   I had that role until September 2021.

23      Q.   What was your role after September of

24  2021?

25            MS. PIERCE:  Objection.  Asked and

Page 157

1    answered.

2         A.    The Hennepin County homeless access team

3    was moved from a different area in initial contact

4    and access to the homeless -- excuse me -- to the

5    housing stability department in order to provide

6    continuity of care for people experiencing

7    homelessness.

8         Q.    (BY MS. STILLMAN) Were you still working

9    with the homeless population in Hennepin County in

10   2021?

11        A.    I stopped doing any work with the Hennepin

12   County -- with homeless individuals in this capacity

13   from probably around August 2021.

14        Q.    What do you mean "in this capacity"?

15        A.    Well, I also oversaw an area called adult

16   access, and there are times where we may have people

17   who were homeless, but that was a really rare

18   occasion.  Those folks were providing services to

19   try to keep people from becoming homeless, so it was

20   more of a preventative situation.

21             So I continued working with them until

22   December 2021.  Excuse me.  I'm sorry.

23   December 2022.

24        Q.    So let's ask this a different way.  What

25   was your understanding of what Hennepin County

Page 158

1   Housing Key was in 2020?

2          MS. PIERCE:  Objection.  Foundation.

3      A.   We had a number of different options to

4   look at availability for residents who wished to

5   consider different housing options.

6      Q.   (BY MS. STILLMAN) And Hennepin County

7   Housing Key was one of those resources?

8      A.   Yes.

9      Q.   What were the other resources?

10          MS. PIERCE:  Objection.  Vague.

11      A.   Well, we had -- Again, please understand

12   that I haven't worked in this field since August or

13   September of 2021, so my professional focus has not

14   been there for more than a year and a half.

15          With that said, there are options outside

16   of shelter that are available to residents if they

17   wish to -- to take those options to them.

18          Another reason I'm having difficulty

19   recalling this is, while I was managing this area, I

20   had supervisors and staff that were using these

21   tools on a daily basis, where I was not using the

22   tools on a daily basis, so that wasn't my role to

23   tap in and to look for that for individual people.

24          So, but we had numerous tools that we used

25   to make sure that we had regular and accurate

Page 159

1   availability for where people could stay at each

2   time, at each day.

3       Q.   (BY MS. STILLMAN) So you had one-on-one

4   conversations with residents of homeless encampments

5   in 2020, correct?

6       A.   In 2020 I did.

7            MS. PIERCE:  Objection.  Vague as to the

8   meaning of the word resident.

9       Q.   (BY MS. STILLMAN) If a resident of a

10  homeless encampment that you spoke with in 2020 told

11  you that they wanted to get an apartment, what would

12  be the next step you would take?

13           MS. PIERCE:  Objection.  Vague as to the

14  meaning of the word resident; compound, incomplete

15  hypothetical, calls for speculation, foundation.

16      A.   If a person who is camping in an

17  encampment said they wished to get an apartment,

18  then I would connect them with a social worker who

19  would work with them, and we would get that social

20  worker out to meet with them as soon as possible.

21  If it wasn't that day, it was always -- oftentimes

22  the next day.

23           I was also able to talk to them about

24  immediate shelter options, if they wished to accept

25  those.  But we wanted to make sure we get somebody

Page 160

1    out to talk to somebody about financial, medical

2    needs, mental health needs, what kind of resident --

3    what kind of residence, with a c-e, that they were

4    hoping to acquire.  That might mean a certain area

5    of the city, because their family lives in a certain

6    area or they have a job and they want to be able to

7    easily access that job.  So it could be proximity,

8    it could be size of the apartment; it could be what

9    kind of support systems they need, because they need

10   someplace to address their mental health issues,

11   et cetera.

12        So I would talk with them about all that

13   information and then relay it off to a social worker

14   who can work with them on a -- on an individual

15   basis.

16        Q.   (BY MS. STILLMAN) How would you relay that

17   information to the social worker?

18        MS. PIERCE:  Objection.  Incomplete

19   hypothetical, calls for speculation.

20        A.   It depends on if they wanted to work with

21   a community agency or if they wanted to work with a

22   Hennepin County social worker.  I could make a

23   referral off to a community agency like AICDC, or I

24   could communicate with a supervisor who would be

25   able to get a social worker from Hennepin County out

Page 161

1    to talk to that person as soon as possible.

2         Q.   (BY MS. STILLMAN) Would you email those

3    referrals?

4              MS. PIERCE:  Objection.  Hypothetical,

5    incomplete hypothetical, calls for speculation.

6         A.   Every situation was different.  Lots of

7    times I was on the scene with someone from AICDC, so

8    I could -- if a resident wanted to work with that

9    particular agency, for example, I could call that

10   person and they could come right over.  There may be

11   times where I would email or call the supervisor if

12   they wished to have a Hennepin County social worker

13   working with them.

14        Q.   (BY MS. STILLMAN) And you mentioned

15   immediate shelter options.  What's an immediate

16   shelter option?

17        A.   I'm trying not to repeat myself, but we

18   would get numbers and locations of shelter

19   availability, and if someone wanted to go to a

20   certain shelter -- for example, maybe they knew

21   staff at Salvation Army so they appreciated being

22   there, or they didn't want to go to such a large

23   shelter and would rather go to a smaller one, we

24   would take that into consideration.  We would try to

25   make a reservation for them.  Once we identified

Page 162

1   where that person could go, we'd make that

2   reservation, and they could get there that day.

3        Q.   Was there ever a time in 2020 when there

4   were no available shelter beds for single men in

5   Hennepin County?

6             MS. PIERCE:  Objection.  Foundation.

7        A.   I cannot accurately answer for every day

8   in 2020.

9             I can tell you, for the majority of time

10  that I was doing this work, between April 2020 and

11  December 2020, there was shelter space available for

12  the great majority of that time, for men and women.

13            MS. PIERCE:  If you're marking a new

14  thing, do you want to take -- well, we've been going

15  about an hour.

16            MS. STILLMAN:  Sure.  We can take a

17  five-minute break.

18            THE VIDEOGRAPHER:  We are going off the

19  record.  The time now is 2:50.

20            (Whereupon, a recess was taken.)

21            THE VIDEOGRAPHER:  We are back on the

22  record.  This is the start to Media Number 5.  The

23  time is 3:00.

24            MS. STILLMAN:  I am marking document Bates

25  stamped MPLS_BERRY067466 as Exhibit 196.

```
                                          Page 163

 1            (Deposition Exhibit Number 196 marked for

 2    identification.)

 3            Q.    (BY MS. STILLMAN) And do you recognize

 4    this document?

 5            A.    I recognize this as an email string

 6    between David Hewitt, Katie Topinka, and myself.

 7            Q.    Okay.  And if you look at the second email

 8    down, it's from you to Katie Topinka, David Hewitt,

 9    dated Monday, September 14th at 2020 -- or

10    September 14th, 2020.

11            Do you see that?

12            A.    Yes.

13            Q.    And you wrote, We had a change in family

14    shelter last week, clearly given the weather change.

15    So, it's accurate for the first time in a couple

16    months now, we were full for adult shelter beds.

17            Do you see that?

18            A.    Yes.

19            Q.    I don't know what it is now, but a Monday,

20    Tuesday and Wednesday I know those were filled.  We

21    had a handful of single adult women's beds open last

22    week, fluctuating b/w 7 to 12 several days last

23    week.  For family rooms, we had about 40 open b/w

24    PSP in St. Anne's most of last week.  Let me know if

25    you want more.
```

Page 164

1          Do you see that?

2      A.   Yes.

3      Q.   So there were times in 2020 that shelters

4  in Hennepin County were full, correct?

5          MS. PIERCE:  Objection.  That misconstrues

6  the rest of the document.

7      A.   Yes.  I think I reported that already,

8  that -- otherwise I would have said we had available

9  beds every day in 2020.

10     Q.   (BY MS. STILLMAN) Okay.  And then in that

11 email above from David Hewitt, in that second

12 paragraph, Mr. Hewitt writes, That said, that is

13 unused capacity at the end of the night.  We still

14 have a lot of daily turnover and new people

15 accessing shelter every day, so we continue to

16 encourage everyone to contact the Adult Shelter

17 Connect, the earlier in the day the better.

18         Do you see that?

19     A.   Yes.

20     Q.   So you mentioned earlier that you would

21 sometimes receive information about shelter

22 availability twice per day, correct?

23         MS. PIERCE:  Objection.  Misconstrues

24 testimony.

25     A.   No.  Oftentimes I received it once a day

Page 165

1    and would communicate that.  What others might

2    receive is in the morning, knowing what the

3    availability is.  And then there was a second time,

4    later in the afternoon, that was communicated for

5    those people who didn't show up for reservations, in

6    the effort to try and fill those beds.

7              So those -- those end-of-the-day numbers,

8    I did not receive those.  It was the morning

9    numbers, and then it was -- it was individual social

10   work staff that was following up on those late

11   afternoon availability numbers.

12        Q.   (BY MS. STILLMAN) So the availability of

13   shelter beds in Hennepin County could be different

14   at 8 a.m. than it was -- than it would be at

15   10 p.m.?

16             MS. PIERCE:  Objection.  Compound,

17   incomplete hypothetical, asks for speculation,

18   foundation.

19        A.   It is hard, sometimes -- as someone who

20   doesn't work in a shelter, I understand that it is

21   hard, sometimes, to gauge how many people will show

22   up for reservations.  So the intent of this

23   to-moment-in-time effort during the day is to try to

24   get as many people in as possible.  I -- I'm not

25   sure how else to answer that.

Page 166

1        Q.   (BY MS. STILLMAN) We'll take the Salvation

2   Army shelter.

3        A.   Okay.

4        Q.   In 2020 -- Were you able to reserve a bed

5   at the Salvation Army shelter in 2020?

6        A.   I could do that through the Adult Shelter

7   Connect.  Yes.

8        Q.   Okay.  And what time did a person have to

9   be at Salvation Army in order to claim their

10  reserved bed there?

11             MS. PIERCE:  Objection.  Foundation.

12       A.   I don't recall what the time is.  And I

13  think that they were all relatively close for each

14  shelter.  But I think it was midway through the

15  afternoon, maybe, closer to what some might consider

16  the dinner hour.  But I don't have that exact time

17  when someone would have to be there.

18       Q.   (BY MS. STILLMAN) So someone has a bed

19  reserved -- so it could be possible that, at 8 a.m.,

20  there was a bed reserved for someone who then didn't

21  show up, so that afternoon, later in the day, second

22  round of data that you've mentioned would show that

23  bed as available even though it wouldn't have been

24  available in the morning?

25             MS. PIERCE:  Objection.  Incomplete

Page 167

1    hypothetical, calls for speculation, foundation.

2         A.    I'm not sure I understand the question.

3    Can you just repeat it or rephrase it?

4         Q.    (BY MS. STILLMAN) Sure.  So there's a bed

5    reserved at 8 a.m., it wouldn't show up as an

6    available bed, correct?

7         A.    Correct.

8               THE WITNESS:  Sorry.

9               MS. PIERCE:  That's okay.

10        Q.    (BY MS. STILLMAN) This person who had the

11   bed reserved doesn't show up to the -- to the

12   Salvation Army by the deadline by which they have to

13   show up.

14        A.    Yes.  And I apologize.  I don't know if

15   that deadline -- let's say it's 4:00 in the

16   afternoon.

17        Q.    Sure.  We'll use 4:00 as a -- as an

18   example --

19        A.    Arbitrary, yes, understanding that I don't

20   know what that time is.

21        Q.    Yes.

22        A.    Thank you.

23        Q.    So it's 4:15.  That person hasn't shown up

24   for the bed.  In this second report, would that bed

25   now show up as available?

Page 168

1        A.    Yes.

2              MS. PIERCE:  Objection.  Foundation,

3    incomplete hypothetical, calls for speculation.

4        A.    Yes.

5              Now, were there some reasons why that

6    might not happen?  We could have staff that know a

7    person who has been staying there for a while and

8    knows that that person has a job that keeps them

9    there longer, or maybe that resident staying in the

10   shelter, we're aware that they were visiting their

11   sister.  There are always exceptions.

12             But if the person communicates to the

13   shelter that they can't be there at that time --

14   Excuse me.  If they communicate that they will be at

15   that time, let's just say the arbitrary 4:00

16   date [sic], and they don't show up and there's no

17   communication as to why, that bed will be opened for

18   another person who is interested in using it.

19       Q.    (BY MS. STILLMAN) So did you communicate

20   to residents of homeless encampments that you spoke

21   to in 2020 to call for a shelter bed in Hennepin

22   County multiple times a day?

23             MS. PIERCE:  Objection.  Vague, compound,

24   time frame.

25       A.    Every day was different.  It depended on

Page 169

1    the weather.  It depended on whether or not it was a

2    more violent day or night before.  So each day was

3    different.

4              But in those -- on those occasions I would

5    call with that resident, so the resident was on the

6    phone with me and someone from the Adult Shelter

7    Connect, so we had -- and we provided -- "we"

8    meaning me and other Hennepin County staff or

9    community agencies who were there -- the phone

10   number.  So if that person had a cell phone, they'd

11   be able to call Adult Shelter Connect themselves as

12   well.

13        Q.   (BY MS. STILLMAN) How would a person who

14   didn't have a cell phone get in touch with Adult

15   Shelter Connect?

16             MS. PIERCE:  Objection.  Vague, incomplete

17   hypothetical, calls for speculation.

18        A.   A number of different ways.  There are a

19   lot of people who are in shelter that have cell

20   phones.  And my experience is that, if someone

21   wanted to call Adult Shelter Connect, that another

22   person that they have a relationship would let them

23   use their phone.  There were also staff around all

24   the time, and facilitating phone calls to Adult

25   Shelter Connect was a common practice.

Page 170

1            The Sanctuary Movement folks were also
2      present, and if someone wished to use their phone,
3      my hope would be that they would allow them to use
4      their phone as well.
5            Q.   (BY MS. STILLMAN) Were you ever at a
6      homeless encampment in 2020 after 5 p.m.?
7            A.   Yes.
8            Q.   How often?
9            A.   Much less frequently than on the normal
10     day.
11           Q.   Sorry.  What do you mean by that?
12           A.   I mean, most of the time I was not there
13     after 5:00.
14           Q.   Most of the time what time did you leave?
15           MS. PIERCE:  Objection.  Compound.
16           A.   Depending on who I was meeting and where I
17     was going and what I was doing, it wasn't uncommon
18     for me to be in an encampment between 7:30 and 4:00
19     each day, at different times.
20           Now, I also had meetings that I was either
21     facilitating or participating in.  There were --
22     most days I had to plan my day out where I knew I
23     was able to go to a certain location.
24           Q.   (BY MS. STILLMAN) You're aware that, after
25     an encampment closure, not all residents of the

Page 171

1  closed encampment go to a homeless shelter, correct?

2          MS. PIERCE:  Objection.  Vague, compound.

3      A.   I'm not sure.  Is that a question?

4      Q.   (BY MS. STILLMAN) Yeah.

5          MS. SARFF:  Objection.  Lack of

6  foundation, calls for speculation.

7      A.   I -- I don't know how frequently people

8  will choose to use shelter or to move to a different

9  location, but in my experience, the people who are

10  choosing to be in an encampment don't want to go to

11  a shelter, for whatever reason that is.  And if

12  they're choosing to go somewhere other than a

13  shelter, lots of times they will find another place

14  to camp.

15      Q.   (BY MS. STILLMAN) What are some reasons

16  people wouldn't want to go to a shelter?

17          MS. PIERCE:  Objection.  Vague,

18  foundation, calls for speculation.

19      A.   It has been reported to me by people who

20  are experiencing homelessness that they find

21  shelters to be more restrictive than they would like

22  to be.  That includes timing of when they have to be

23  present.  That includes some shelters saying that

24  they have to be sober or presenting as sober.

25          There are some people that appreciate

Page 172

1    having a lot of people around and wish to be in a

2    shelter, and then there are some people that would

3    rather be far away from people, given their own

4    personality or mental health issues, and they choose

5    to not go to a shelter.

6            I think all three of those reasons are

7    common reasons I have heard from people who are

8    experiencing homelessness.

9        Q.   (BY MS. STILLMAN) Have you ever heard from

10   a person experiencing homelessness that they didn't

11   want to go to a shelter in Hennepin County because

12   they weren't going to be able to stay with their

13   partner?

14       A.   Yes.

15       Q.   Have you ever heard from a person

16   experiencing homelessness that they didn't want to

17   go to a shelter in Hennepin County because they

18   wouldn't be able to bring all of their belongings

19   with them?

20       A.   No.

21       Q.   Have you ever heard from a person

22   experiencing homelessness that they didn't want to

23   go to a shelter in Hennepin County because they

24   weren't able to bring their pet with them?

25       A.   Yes.

Page 173

1      Q.   Do you know if any of the homeless

2  shelters in Hennepin County require somebody to have

3  a photo ID in order to stay there?

4           MS. PIERCE:  Objection.  Compound,

5  foundation.  And time frame.

6      A.   I know that one of the common activities

7  that social workers will do with folks is to get an

8  ID for themselves.  It's beneficial for lots and

9  lots of reasons.  I do not believe it's something

10 that they have to have to be at all Hennepin County

11 shelters.

12     Q.   (BY MS. STILLMAN) In --

13     A.   I would not be surprised if some shelters

14 ask for that.  Sorry to cut you off.

15     Q.   No.  That's fine.

16          MS. STILLMAN:  I am marking Bates stamp

17 document HC00032302 as Exhibit 197.

18          (Deposition Exhibit Number 197 marked for

19 identification.)

20     Q.   (BY MS. STILLMAN) And do you recognize

21 this document?

22     A.   This is either one large email string or a

23 group of emails.  If you're asking me if I've seen

24 this document since June 2020, the answer is, no.

25     Q.   So if we go to page 5, that ends in 306 --

Page 174

1     well, actually, let's go to the bottom of page 4,

2     that ends in 305.  And you'll see on the bottom

3     there it's an email from you to Margaret King,

4     J. Weissman, Ciara Kunert, David Hewitt, and Katie

5     Topinka, dated June 20 -- June 2nd, 2020.

6              Do you see that?

7        A.   Yes.

8        Q.   Okay.  And then the body of the email is

9     on the next -- top of the next page.  And the third

10    sentence starts, in the third line, and says, We

11    would just like to offer hotels in any situation

12    that we can, especially with this group today.

13             Correct?

14       A.   Yes.

15       Q.   Why did you like offering hotels to

16    residents of homeless encampments?

17             MS. PIERCE:  Objection.  Misconstrues the

18    document and the record.

19       A.   Because this is days after George Floyd

20    was killed, and this was a crisis situation that we

21    were all following in, and given this unique and

22    immediate situation that we were all addressing, we

23    wanted to get people into any place they could get

24    into.

25             This was immediately after -- I would say

Page 175

1  during the riots that were occurring in Minneapolis.

2  And we had information from the FBI that three

3  encampments may have people there that may be in

4  danger from people that were coming from out of

5  state, and we were trying to get as many people to

6  safe situations as possible.

7      Q.   (BY MS. STILLMAN) If a resident of a

8  homeless campment -- encampment was offered a hotel

9  room in October of 2020, would you encourage them to

10  take it?

11          MS. PIERCE:  Objection.  Vague, incomplete

12  hypothetical, calls for speculation.  And offered by

13  whom?

14     A.   Hennepin County made efforts to try to

15  deconcentrate the shelter system at the beginning of

16  the COVID pandemic.  Part of this was offering hotel

17  rooms to people who had previously been staying in

18  shelters.  This was seen by some people as a way to

19  address homelessness, when the real intention was to

20  address the COVID crisis.

21          I bring this up because our focus for

22  offering hotel rooms was to limit the spread, the

23  possible spread of COVID at that time.

24          There were organizations, including the

25  Sanctuary Movement, that saw this and wanted to get

Page 176

1  people into hotels themselves.  My experience is

2  that some of those hotels, not run by Hennepin

3  County staff, were not as desirable as other places

4  could be, and I would not encourage someone to go to

5  a hotel in October of 2020 with a different

6  organization.

7          I would encourage people to go to shelter,

8  and if they chose to go to a hotel during that month

9  that you mentioned, that was their choice, and they

10  were happy -- they were free to do that.

11      Q.   (BY MS. STILLMAN) Is it your opinion that

12  it would have been safer for a resident of a

13  homeless encampment to remain in the homeless

14  encampment where they were living instead of going

15  to a hotel in October 2020?  And by hotel, I mean a

16  hotel not run by Hennepin County.

17          MS. PIERCE:  Objection.  Vague, incomplete

18  hypothetical, calls for speculation.

19          MS. SARFF:  Objection to the extent it

20  calls for an expert opinion.

21      A.   I want to make sure I'm answering your

22  question.  Can you repeat it, please?

23      Q.   (BY MS. STILLMAN) Yeah.  So you said that

24  you felt that some hotels not operated by Hennepin

25  County staff were unsafe for residents.  Is that

1    correct?

2            MS. PIERCE:  Objection.  Misstates the

3    witness' testimony.

4       A.    I don't believe that I stated it that way.

5    We had some contracted providers, including Avivo,

6    who did an outstanding job working with some of our

7    residents experiencing homelessness.  There were

8    other groups that provided less supervision and

9    structure in these unique situations, that I would

10   not have recommended people go to in October 2020.

11      Q.    (BY MS. STILLMAN) What were those other

12   groups?

13      A.    There were -- there was one hotel

14   specifically in Bloomington that was run by a group

15   of people through the Sanctuary Movement that I

16   heard from residents may not have been the best

17   place for people to be.

18           MS. STILLMAN:  I'm marking document Bates

19   stamped HC00039757 as Exhibit 198.

20           (Deposition Exhibit Number 198 marked for

21   identification.)

22      Q.    (BY MS. STILLMAN) Did I give you two

23   copies, Mr. Ryan?

24      A.    You gave me -- it looks like one copy

25   with --

Page 178

1        Q.   Okay.

2        A.   I think this -- Yes.  This is one copy,

3   ending in 9763, the last page.

4        Q.   Do you recognize this document?

5        A.   I recognize this as an email that I have

6   not seen since June 2020, yes.

7        Q.   So if you go to page 3, which ends in 759,

8   in the middle there, there is an email from you to

9   Michael Herzing, Stephanie Abel, Jodi Wentland, and

10   David Hewitt, dated June 15th, 2020, and the subject

11   line is, RE: Powderhorn update.

12             Do you see that?

13        A.   Yes.

14        Q.   And that first full paragraph starts, I

15   have not yet discussed this with Parks (call into Al

16   Bangoura, but not a call back yet), but as we

17   discussed, we don't have an emergency and there is

18   nowhere to move people, so we want to make good long

19   term decisions.

20             Do you see that?

21        A.   Yes.

22        Q.   Did you have concerns, in June of 2020,

23   that, if the Powderhorn Park encampment was closed,

24   there wouldn't be a place for people to move?

25             MS. PIERCE:  Objection.  Misstates the

Page 179

1    document.
2        A.    Could I have time to read this entire
3    document?
4        Q.    (BY MS. STILLMAN) Yeah.
5        A.    Thank you.
6              Okay.  Thank you.
7        Q.    Yeah.
8        A.    So your question was, did I have concerns
9    whether or not we didn't have a place to move people
10   if we closed the encampment?
11             MS. PIERCE:  That wasn't the question.
12   Will you read back the question?
13             (Whereupon, the court reporter read back
14   the requested portion of the record.)
15             MS. SARFF:  I'm going to object.  Vague as
16   to time frame for the entire month.
17       A.    I'm hesitating because it's difficult to
18   answer this question, thinking about timing and
19   whether or not we offered resources to people by
20   this time.
21             In this conversation today, we've jumped
22   back and forth between May, June, and September, so
23   it's difficult in one day when not considering this
24   for more than two years.  So I'm trying to place
25   myself back into when I wrote this email.

Page 180

1          Obviously we want people to have a place

2    to go.  I wonder if this is a reference to an entity

3    saying we have to have a designated encampment space

4    that some people were asking for at that time.  It's

5    hard for me to accurately describe, when looking

6    back and in the method that we've been having this

7    deposition about this year, to think about this

8    moment on June 15th and 16th.

9          What we never want to do is just move

10   people from a location and tell them to walk down

11   the street.  We always want to try to figure out

12   places for them to go.

13         With the large numbers of people at

14   Powderhorn, and with our inability to know how many

15   people we were actually talking about who were truly

16   homeless and not staying in that encampment, I am --

17   I am thinking that we didn't have accurate numbers

18   and we didn't know how we were going to plan on that

19   day.

20        Q.   (BY MS. STILLMAN) Okay.

21             MS. STILLMAN:  I'm going to mark document

22   Bates stamp HC00029458 as Exhibit 199.

23             (Deposition Exhibit Number 199 marked for

24   identification.)

25        Q.   (BY MS. STILLMAN) And do you recognize

                                        Page 181

1    this document?

2         A.   I recognize this as an email chain between

3    me, David Hewitt, Andrea Brennan and Katie Topinka,

4    on August 25th.  And I have not seen this document

5    since then.

6         Q.   All right.  And in the middle there, there

7    is an email from you to Andrea Brennan, Katie

8    Topinka and David Hewitt, dated August 21st, 2020.

9              Do you see that?

10        A.   Yes.

11        Q.   And the subject is External Encampments,

12   clearings with no destination.

13             Do you see that?

14        A.   Yes.

15        Q.   You wrote, in that first full paragraph,

16   or in the full paragraph, The perfect -- the

17   purpose -- well, I'll just start from the beginning.

18             I just scheduled a meeting for us on

19   Tuesday afternoon.  Please let us know if this does

20   not work.  The purpose of the conversation is to be

21   strategic about how to use partners like the state

22   to identify a location for encampments to move to

23   when there is not a place like another park for

24   campers to go to.  I had a conversation with

25   Al Bangoura today about his opinion that parks are

Page 182

1    filled, and that Peavey, Loring and Matthews will be

2    cleared with no buses and nowhere identified to

3    people.

4              Do you see that?

5        A.   Yes.

6        Q.   And, Mike Goze is concerned that we will

7    have people end up on Franklin or Bloomington, which

8    is going to affect that community.  I think we need

9    to have this discuss in terms of solutions and

10   optics.

11             So you discussed with Superintendent

12   Bangoura that there was nowhere for residents to go

13   if Peavey, Loring and Matthews Parks got cleared,

14   correct?

15             MS. PIERCE:  Objection.  Misstates the

16   document and the record.

17       A.   This states his opinion that parks are

18   filled, with no buses and no identified place to go.

19       Q    (BY MS. STILLMAN) Was that your opinion as

20   well?

21             MS. SARFF:  Objection.  Misstates the

22   document, misstates testimony, and to the extent it

23   calls for an expert opinion.

24       A.   I could only report that, in this

25   document, I was talking to Superintendent Bangoura

Page 183

1   about his concern about parks being filled and where

2   people would go.

3          I think the context of time is important

4   here, as we consider what's not in this email, and

5   that is that there was an effort to have government

6   entities sanction and run an encampment during this

7   general period of time of August 2020.

8      Q    (BY MS. STILLMAN) Did you ever have a

9   conversation with Superintendent Bangoura about the

10  availability of shelter beds in Hennepin County

11  prior to an encampment closure on property owned by

12  the MPRB?

13         MS. PIERCE:  Objection.  Asked and

14  answered, vague, compound, time frame.

15     A.   Yes.  I think I testified that I had

16  regular conversations with him that often included

17  shelter availability.

18     Q    (BY MS. STILLMAN) Okay.  So this email was

19  sent to Andrea Brennan, Katie Topinka and David

20  Hewitt.  Why did you want to talk to them about the

21  contents of this email?

22     A.   Because we had trusted partners, a

23  community partner in Mike Goze, who oversees AICDC,

24  and is an advocate for American Indian people in

25  Minneapolis, and Superintendent Bangoura, that had

Page 184

1   specific concerns about this.

2          The other part of the recent history here

3   is that the State had previously provided buses and

4   moved people to different locations from Powderhorn,

5   for example.  Those resources were not available at

6   this time.  I think that's another part of this

7   that's not in the email.

8          What I wanted to do was relay to the three

9   people that I was emailing that this was the concern

10  from Superintendent Bangoura and our community

11  partner, Mike Goze.

12      Q.   Did you ever have this meeting to discuss

13  this email with Ms. Topinka, Ms. Brennan and

14  Mr. Hewitt?

15      A.   I don't recall this meeting.  I am

16  assuming, based on this email, that a meeting took

17  place.  But given that some people were tied up, as

18  you can see in the other email, at 3:30, I don't

19  know whether it happened that day or the next day

20  or -- I -- I can't accurately answer that question.

21          MS. STILLMAN:  I'm marking document Bates

22  stamped HC00029980 as Exhibit 200.

23          (Deposition Exhibit Number 200 marked for

24  identification.)

25      Q    (BY MS. STILLMAN) And do you recognize

Page 185

1    this document?

2         A.   I remember -- I recognize this document as

3    an email string between Katie Topinka, Amber

4    Turnquest and myself, from November 2020.

5         Q.   All right.  And the subject from that

6    email at the top says, Forward: [EXTERNAL] update on

7    the street outreach meeting.

8              What is the street outreach meeting?

9         A.   That's a meeting that Katie Topinka had

10   been facilitating, that later facilitated, that

11   included community agency outreach staff and

12   advocates working with unsheltered people.

13        Q.   Were notes taken at these meetings?

14        A.   I don't -- I don't know who would have

15   taken notes at this meeting.  This was an ongoing

16   meeting that started years prior, and that I started

17   participating in in the spring of 2020.

18        Q.   How frequently did the street outreach

19   meeting take place?

20        A.   We met a minimum once a week.

21        Q.   Sometimes more than once a week?

22        A.   Depending on the situation and what was

23   happening, there were times we met more than that.

24        Q.   When would you -- In what situations would

25   you meet more than once a week?

Page 186

1          MS. PIERCE:  Objection.  Compound, time

2     frame, vague.

3          A.   Two examples are the riots that were

4     occurring in Minneapolis as a result of the murder

5     of George Floyd, where people were concerned about

6     safety issues for residents who were currently

7     homeless.

8               Another example is, the entirety of this

9     time we are discussing where Hennepin County had an

10    unprecedented growth in encampments, and this growth

11    was not gradual or foreseen.

12              Both of these are specific reasons why,

13    when something happened during the week, they seemed

14    more critical, and there was a quick, sometimes

15    crisis-oriented response.  And we were listening to

16    our partners in these community agencies who wanted

17    to meet more often, and we tried to do that as often

18    as we could.

19         Q    (BY MS. STILLMAN) If you go to the second

20    page, that ends in 981, there is an email from you,

21    dated November 10th, 2020, to Katie Topinka and

22    Amber Turnquest.  And in that email you write about

23    what you covered at the street outreach meeting that

24    day, correct?

25         A.   Yes.

Page 187

1        Q.    Okay.  On the first page there is an email

2   from you to Katie Topinka and Amber Turnquest, dated

3   11/10/20, sent at 10:47 a.m.

4              Do you see that?

5        A.    Yes.

6        Q.    And you wrote, The feedback was mostly

7   that, when we close the camp, we are forcing people

8   to move to other locations.  I emphasized that

9   Minneapolis and Hennepin don't want to clear

10   anywhere citing the Greenway and that we didn't want

11   to clear the lot at Van White until it felt like a

12   forced decision given disinformation.

13              Do you see that?

14        A.    Yes.

15        Q.    Why did you cite the Greenway as an

16   example to emphasize that Minneapolis and Hennepin

17   didn't want to clear anywhere?

18              MS. PIERCE:  Objection.  Misstates the

19   document and the record.

20              MS. SARFF:  Objection.  Lack of foundation

21   as to Minneapolis.

22        A.    I can only surmise that, given that it was

23   October 2020, many of the encampments that existed

24   prior to this date were no longer present, and the

25   Greenway and several other locations were part of a

Page 188

1  few locations left at this time, and that is likely

2  the reason that I specifically noted the Greenway.

3       Q    (BY MS. STILLMAN) And just to clarify,

4  this email was dated November 2020, not

5  October 2020.

6       A.   If I said October, I apologize.  I meant

7  to say November.

8       Q.   Not a problem.

9            In that email above it, from Amber

10  Turnquest to you, she writes, You covered it, Don.

11  The concern was primarily about where people would

12  go since the shelters were full and the new beds

13  aren't online yet.

14            Do you see that?

15       A.   Yes.

16       Q.   Did outreach workers ever raise -- ever

17  tell you, at these meetings, that shelters were

18  full?

19            MS. PIERCE:  Objection.  Vague, compound,

20  time frame.

21       A.   There were times where outreach staff

22  expressed concerns that shelter was full.  This was

23  going back several months and was part of the reason

24  that Hennepin County made an effort to create more

25  shelter space, and contracted with numerous

Page 189

1   community agencies in order to do that, including

2   Avivo.

3        Q    (BY MS. STILLMAN) So when you say, this is

4   why Hennepin County made an effort to create more

5   shelter space, what do you mean?

6             MS. PIERCE:  Objection.  Misstates the

7   testimony, I think.

8        A.   If you'd like me to answer the question

9   again, I'm happy to.

10            We heard from community providers that

11  there wasn't enough shelter space available for

12  everyone that was staying outside.  We also know

13  that some of those people continued to refuse to go

14  to shelter.  With that said, we wanted -- Hennepin

15  County wanted to have more shelter space and made an

16  investment in contracting with community agencies to

17  create more shelter space.

18            When Amber Turnquest states in this email,

19  those new beds are not online yet, by November 10th

20  we were wondering whether some of these new

21  locations that Hennepin County took the initiative

22  to create were not available yet.

23       Q    (BY MS. STILLMAN) What was your -- What is

24  your understanding of why Hennepin County wanted to

25  create more shelter space?

Page 190

1          MS. PIERCE:  Objection.  Foundation.

2     A.   There was an investment made by Hennepin

3  County to not just deconcentrate the shelters over

4  the summer but to provide funding to those shelters

5  so they can reformat those shelters, creating space

6  for less people, given more distancing.

7          We also had this unprecedented encampment

8  explosion that happened in Minneapolis at that time,

9  and there was an effort made to increase the number

10  of shelter availability placements possible, so if

11  people said they wanted to get a bed, we were able

12  to offer that to them.

13          MS. STILLMAN:  Can we take a break?

14          MS. PIERCE:  I was going to say, I think

15  it's about an hour.

16          THE VIDEOGRAPHER:  We are going off the

17  record.  The time now is 3:50.

18          (Whereupon, a recess was taken.)

19          THE VIDEOGRAPHER:  We are back on the

20  record.  This is the start to Media Number 6.  The

21  time is 4:00.

22          MS. STILLMAN:  And then before we start,

23  Mr. Ryan, if you could just put down your phone.

24          Thank you.

25          MS. PIERCE:  Do you want me to take the

Page 191

1   phone?

2       Q    (BY MS. STILLMAN) Do you know somebody

3   named Susannah King?

4       A.   Yes.

5       Q.   Who is she?

6       A.   Susannah King is a supervisor for a unit

7   in Hennepin County called the Healthcare for the

8   Homeless.

9       Q.   Did you attend homeless outreach meetings

10  with Susannah King in the summer of 2020?

11      A.   Yes.

12      Q.   How frequently?

13      A.   Susannah King had different meetings, so I

14  was not at all of the meetings that she facilitated.

15  But she was regularly part of a number of meetings I

16  was in, including that outreach meeting that we

17  discussed earlier.

18           It was not uncommon to meet with her a

19  couple times a week.

20           MS. STILLMAN:  I'm marking document Bates

21  stamped HC00038115 as Exhibit 201.

22           (Deposition Exhibit Number 201 marked for

23  identification.)

24           MS. STILLMAN:  And I'll state that the top

25  page is the metadata for the document that's been

Page 192

1   printed out.

2           MS. PIERCE:  This is 201.

3           MS. STILLMAN:  Yes.

4      Q    (BY MS. STILLMAN) So if you look at that

5   top page that the -- that is the metadata that

6   accompanied this document.  The filename is Outreach

7   Meeting Minutes 8.17.20.docx, and the app author is

8   Susannah King.

9           Ms. King wrote, in this document, There

10  has been some discussion among other outreach

11  workers that incident command is not listening to

12  public health information.  When can we push back?

13  Sense that Don Ryan and incident command are keeping

14  us in the dark on purpose and not listening to

15  guidance from public health.  Is there a formal

16  process within the county to address these problems?

17          McKenzie has talked to someone from the

18  civil rights board from the city of Minneapolis who

19  is questioning if the civil rights board should get

20  involved.  Staff feel like incident command is not

21  following a public health perspective.

22          Do you see that?

23     A.   I see that.

24     Q.   Who is incident command?

25          MS. PIERCE:  You mean as referenced in

Page 193

1   this document?

2           MS. STILLMAN:  Yes.  As referenced in this

3   document.

4           MS. PIERCE:  Objection.  Foundation.

5           MS. SARFF:  Objection.  Calls for

6   speculation.

7       A.   Incident command is a term that I think

8   some people would use for people managing a crisis

9   situation.

10      Q   (BY MS. STILLMAN) Have you ever used

11  incident command in that way?

12          MS. PIERCE:  Objection.  Vague as to the

13  meaning of the term incident command.

14      A.   No.

15      Q   (BY MS. STILLMAN) Have you ever used the

16  term incident command to refer to any entity at

17  Hennepin County?

18      A.   Yes.

19      Q.   What entity is that?

20      A.   When there's an emergency situation and

21  the county has involved the emergency management

22  teams to address that.  We've done that in numerous

23  situations, including the measles outbreak several

24  years ago.

25      Q.   Who's part of incident command?

1      A.    That would be a team determined by the

2  emergency management branch of Hennepin County.

3      Q.    Who is part of the emergency management

4  branch at Hennepin County?

5      A.    I don't know the answer to that.

6      Q.    Okay.  Have you ever talked to anybody

7  from the emergency management branch at Hennepin

8  County about encampment closures?

9          MS. PIERCE:  Objection.  Vague, compound,

10  time frame.

11      A.    I don't believe so.

12      Q    (BY MS. STILLMAN) Is there somebody named

13  McKenzie who works for Hennepin County healthcare --

14  Or I'll rephrase that question.

15          Is there somebody named McKenzie who

16  worked for Hennepin County Healthcare for the

17  Homeless in 2020?

18      A.    Yes.

19          MS. PIERCE:  Objection.

20          THE WITNESS:  I apologize.

21          MS. PIERCE:  It's okay.  You're fine.  Go.

22      A.    The answer is, yes.

23      Q    (BY MS. STILLMAN) Is there a formal

24  process within the county to address problems such

25  as incident command not listening to public health

Page 195

1    information?

2          MS. PIERCE:  Objection.  Misstates the

3    document, foundation, assumes facts not in evidence.

4       A.   I am assuming that incident command would

5    have that information.  I do not have that

6    information.

7       Q    (BY MS. STILLMAN) If someone had concerns

8    that you weren't following public health guidance on

9    encampment closures, was there a process with which

10   they -- by which that person could report their

11   concerns?

12      A.   Yes.

13          MS. PIERCE:  Objection.  Vague, incomplete

14   hypothetical, calls for speculation.

15          MS. SARFF:  Objection to the extent it

16   calls for a legal conclusion.

17      Q    (BY MS. STILLMAN) What was that process?

18          MS. PIERCE:  Same objections.

19      A.   The normal protocol would be, the person

20   would go to their manager, who would -- who would

21   connect with a manager in that other department and

22   have conversations about those concerns.

23      Q    (BY MS. STILLMAN) Did anyone from the City

24   of Minneapolis Civil Rights Board ever talk to you

25   about encampment closures in 2020?

Page 196

1          MS. PIERCE:  Objection.

2          MS. SARFF:  Objection.  Vague as to Civil

3    Rights Board from Minneapolis.

4      A.   No.

5      Q    (BY MS. STILLMAN) Did anybody from the

6    City of Minneapolis Department of Civil Rights ever

7    talk to you about encampment closures in 2020?

8          MS. SARFF:  Objection.  Vague.

9      A.   No.

10     Q    (BY MS. STILLMAN) Did anyone talk to you

11   about the possibility of the Minneapolis

12   Department of Civil Rights getting involved in

13   investigating encampment closures in 2020?

14         MS. PIERCE:  Objection.  Vague, compound.

15     A.   No.

16     Q    (BY MS. STILLMAN) Did you ever keep a date

17   of an encampment sweep -- I'll rephrase the

18   question.

19         Were there encampment closures in 2020

20   that -- for which you did not share the date of the

21   closure with outreach staff?

22         MS. PIERCE:  Objection.  Vague, compound.

23     A.   I don't recall not communicating a date of

24   a closure, when I was able to do that, to community

25   agencies serving people in the encampment.

Page 197

1      Q     (BY MS. STILLMAN) Were there times when

2  you weren't able to do that?

3            MS. PIERCE:  Objection.  Vague, compound,

4  calls for speculation.

5      A.    If there was a time, it would be the

6  direction of the entity that was closing the

7  encampment that would make that decision.

8            During this time there were safety

9  concerns, as we discussed in the Peavey Park

10 encampment, that people had concerns about violent

11 situations arising out of a closure.  This would be

12 the only time I can imagine that there was concern

13 about not sharing information.

14           With that said, everyone who participated

15 in these meetings was aware every time an encampment

16 was noticed to be closed, so if there was a notice

17 to close an encampment, everyone in that meeting was

18 aware of that.  And as far as I'm concerned, as far

19 as I'm aware, all encampments were noticed ahead of

20 time, which means all people in this meeting would

21 have been aware that an encampment was planned to be

22 closed.

23     Q     (BY MS. STILLMAN) You said all -- as far

24 as you're aware, all encampments were noticed ahead

25 of time.  As far as you are aware, were all of those

Page 198

1    encampments noticed with specific dates of a

2    closure?

3              MS. PIERCE:  Objection.  Compound, time

4    frame.

5              MS. SARFF:  Objection.  Lack of

6    foundation.

7              MS. WALTHER:  Objection.  Calls for a

8    legal conclusion.

9         A.   Are you asking that there was a closure

10   date that was associated with a notice to close?

11        Q    (BY MS. STILLMAN) I'll rephrase.

12        A.   Thank you.

13        Q.   Are you aware of any notices of encampment

14   closures in 2020 that were -- that did not include a

15   specific date of closure?

16             MS. PIERCE:  Can I have that read back

17   again?  It's certainly compound.  So object as

18   compound.

19             MS. SARFF:  I apologize.  I didn't hear if

20   you said, objection, lack of foundation, but I'll

21   add it in case you didn't.  But you may have.

22             (Whereupon, the court reporter read back

23   the requested portion of the record.)

24             MS. PIERCE:  Yeah.  Compound, time frame,

25   lack of foundation.

Page 199

1      A.   I am aware that the date for Peavey Park

2  had to change based on explicit public communication

3  of plans to assault professional staff, including

4  law enforcement and social workers.  As a result,

5  that date changed.  I'm not aware of any other time.

6      Q    (BY MS. STILLMAN) What do you know about

7  these threats of assault?

8           MS. PIERCE:  Objection.

9           MS. WALTHER:  Can I hear that question?

10     Q    (BY MS. STILLMAN) What do you know about

11  the threats of assault?

12           MS. PIERCE:  Objection.  Vague.

13     A.   I saw flyers provided to the community in

14  paper form and on social media that described

15  building slingshots, to have rocks thrown from the

16  slingshots at law enforcement, that included

17  descriptions of when planning meetings were.  Those

18  planning meetings included trainings on how to

19  protect Peavey Park and assault professionals.

20     Q    (BY MS. STILLMAN) How do you know that's

21  what the trainings were about?

22     A.   They were on the flyer.

23     Q.   Where did you see these flyers?

24     A.   On social media and in -- and in person.

25     Q.   Where in person?

Page 200

1      A.    They were at Peavey Park, for one.

2      Q.    Any other places?

3      A.    I don't recall seeing them at other places

4  other than Peavey Park.

5      Q.    Did you ever go to one of the trainings?

6      A.    No.  I would not have been welcomed at

7  that training.

8      Q.    Did you see who placed those flyers in

9  Peavey Park?

10      A.    I did not.

11      Q.    Did you give one of those flyers to

12  anybody in the Minneapolis Police Department?

13      A.    I do not recall giving one to anyone.  I

14  do know that I had a conversation with Sergeant

15  Grant Snyder, who was our representative from the

16  Minneapolis Police Department.  He was aware of

17  this.

18      Q.    Did you give one of those flyers to anyone

19  from the Hennepin County Sheriff's Office?

20      A.    I don't recall.

21      Q.    Did you give one of those flyers to

22  anybody from -- anyone from Minneapolis Park Police?

23      A.    As far as I'm aware, all of the entities

24  you just mentioned were aware of these flyers.  I

25  did not provide them to them.

Page 201

1      Q.    How do you know they were aware of them?

2      A.    It was a conversation that occurred in

3  safety meetings regarding Peavey Park.

4      Q.    Who attended these safety meetings

5  regarding Peavey Park?

6      A.    There were numerous meetings over the

7  course of weeks preparing for a safe closure of

8  Peavey Park.  Multiple different people participated

9  in these meetings.

10     Q.    Did you ever participate in these

11  meetings?

12     A.    I was present in meetings where this was

13  discussed.

14     Q.    Who else was present in meetings where

15  this was discussed?

16     A.    Grant Snyder was present.  Chief Ohotto

17  was present.

18     Q.    Was anybody from the Hennepin County

19  Sheriff's Office present?

20     A.    I don't recall.

21     Q.    Do you recall anybody else who was at

22  these meetings?

23     A.    I don't recall.

24     Q.    Other than these flyers that you

25  mentioned, were there other threats of assault that

Page 202

1    you were aware of?

2         A.   Yes.

3         Q.   What were those?

4         A.   I had people threatening me in person,

5    telling me they knew where I lived, telling me

6    they'd be at my house.  This was a common occurrence

7    with people who were working in encampments, in an

8    attempt to either threaten or intimidate them.

9              This included Hennepin County Healthcare

10   for the Homeless nurses, social workers, law

11   enforcement.  This included park staff who were

12   doing maintenance in the park.  Had nothing to do

13   with the homeless encampment.

14        Q.   Did you report these threats to anyone?

15        A.   Minneapolis Police was present, and I had

16   conversations with whether or not I would need to

17   reach out to my local law enforcement agency.

18        Q.   Were you advised to reach out to your

19   local law enforcement agency?

20        A.   No.

21        Q.   Why not?

22             MS. PIERCE:  Objection.  Foundation.

23        A.   There were reasons that were given to me

24   at the time.  Mostly had to do with whether or not

25   they'd be able to do anything with the information

Page 203

1    they had.

2        Q    (BY MS. STILLMAN) Do you know the names of

3    any of the people who threatened you?

4        A.    I do not.

5        Q.    Do you know the dates on which you

6    received threats?

7        A.    I could go back and find them.  And they

8    included a mob -- a group of 25 to 30 people who

9    were present as we were working with people at a

10   specific encampment in Minneapolis.

11       Q.    Which encampment?

12       A.    I don't recall, but I -- I can picture the

13   encampment in my head right now.  I don't recall

14   where it is, what the location was.

15       Q.    Where would you go back to find the

16   information?

17       A.    I would probably ask people that I knew

18   were present, people who had witnessed the threats

19   to do that by this group of people.

20       Q.    So there was the group of people at the

21   encampment.  And you don't recall which encampment

22   that was?

23       A.    Yes.  These are not people who were

24   camping at the encampment.  These were people who

25   represented themselves as being part of the

Page 204

1    Sanctuary Movement.

2        Q.    Other than the flyers and this incident

3    that you were just talking about, are there any

4    other times that -- dates where you remember -- you

5    remember being threatened?

6              MS. PIERCE:  Objection.  Misstates

7    testimony about a single incident.

8        A.    Dates, no.  I cannot give dates of when

9    this happened.  This was an ongoing tactic that was

10   used with many people.

11       Q    (BY MS. STILLMAN) What did you do when you

12   were threatened by somebody from the Sanctuary

13   Movement?

14             MS. PIERCE:  Objection, compound, since he

15   testified to multiple incidents.

16             MS. SARFF:  Objection.  Harassment.

17       A.    I walked away.

18       Q    (BY MS. STILLMAN) Okay.  Were you ever

19   threatened with a weapon at an encampment closure?

20       A.    No.

21       Q.    In 2020 did anyone discuss concerns with

22   you about whether or not the county was following

23   public health guidance when closing encampments?

24             MS. PIERCE:  Objection, vague.  Objection,

25   compound.  Objection, time frame.

Page 205

1       A.    There were different levels of opinions

2   within the public health department about what

3   should take place at encampments and at closures.

4   There was no consistent message from public health

5   or from Healthcare for the Homeless that was a

6   direction that we should follow.

7            What I am seeing in this Exhibit 201 is a

8   question from one or a couple people who

9   participated in this meeting I was not present at,

10  asking why their opinion was not being followed.

11  That was not the opinion from public health as an

12  entity.

13      Q    (BY MS. STILLMAN) So did public health

14  have a consistent opinion on whether or not

15  encampments should be closed?

16           MS. PIERCE:  Objection as to opinion.  Or

17  pardon me.  Vague as to opinion, consistent, and

18  public health.

19      A.    I did not receive information from leaders

20  in public health that we were not following guidance

21  or direction that they were recommending.

22      Q    (BY MS. STILLMAN) Did you receive --

23      A.    Again, that does not mean there were not

24  independent -- Excuse me.  The word independent is

25  incorrect.

Page 206

1          There were not individual nurses or staff

2     who may believed that we should not close

3     encampments.  I am sure that happened.

4          As a public health entity, we did not

5     receive direction we were not following public

6     health guidelines.

7          Q.   At any of the meetings that you attended

8     in 2020 regarding encampment closures, did anyone

9     ever raise the issue that closing encampments wasn't

10    in line with guidelines from the Center for Disease

11    Control regarding the COVID-19 pandemic?

12          MS. PIERCE:  Objection, vague.  Objection,

13    compound.  Objection, time frame.

14          MS. SARFF:  Objection to the extent it

15    calls for a legal conclusion.

16          A.   You asked me about two different entities

17    there.  I will tell you that we followed guidance

18    from the CDC and from public health, and the

19    guidance that we received from both of them as we

20    looked at the totality of the environment in the

21    encampments, especially those encampments that got

22    to be more than 15 tents, for example, showed that

23    there was both health and safety issues in those

24    encampments.

25          Q    (BY MS. STILLMAN) Did you discuss the

Page 207

1  health and safety issues at those -- at encampments

2  at the outreach meetings?

3           MS. PIERCE:  Objection, vague.  Objection,

4  compound.  Objection, time frame.

5       A.   I just want to reiterate that these were

6  meetings that occurred several times a week over a

7  period of nine months, so answering that question is

8  difficult.

9           With that caveat, yes, we would regularly

10 talk about health and safety issues within the

11 encampment with community agencies and outreach

12 staff.  Some individuals agreed with this, and some

13 individuals did not agree with this.

14      Q.   (BY MS. STILLMAN) Do you --

15      A.   And, yes, it was discussed.

16      Q.   And I apologize for interrupting.

17           Do you remember the names of the

18 individuals who did not agree?

19      A.   I -- I recall some names of people who did

20 not agree.

21      Q.   And what are --

22           MS. PIERCE:  Objection.  Did not agree

23 with?  With what, Counsel?

24           MS. STILLMAN:  He said did not agree

25 with -- I was using his language.

Page 208

```
 1              MS. PIERCE:  So did not agree with what?
 2              MS. STILLMAN:  Can you read back his
 3    answer?
 4              MS. PIERCE:  Why don't you go two
 5    questions back.
 6              (Whereupon, the court reporter read back
 7    the requested portion of the record.)
 8              MS. PIERCE:  Yeah.  Objection.  Vague as
 9    to form.
10        Q    (BY MS. STILLMAN) Okay.  Do you recall the
11    names of the people who did not agree with "this,"
12    as you were using it in your answer to that
13    question?
14              MS. PIERCE:  Objection.  Vague as to form.
15        A    Yes.  I recall some individuals who did
16    not agree that encampments should be closed for any
17    reason.
18        Q    (BY MS. STILLMAN) And what are those
19    individuals' names?
20        A    I would need some time to consider names.
21    I have not thought about this since -- for --
22    since -- for two and a half years.
23              I can tell you there are staff from
24    St. Stephen's and staff from Hennepin County
25    Healthcare for the Homeless that did not always
```

1  agree with overall decisions that were made.

2      Q.   What nonprofit organizations were helping

3  the homeless population in Hennepin County in 2020?

4          MS. PIERCE:  Objection.  Foundation,

5  vague, time period, compound.

6          MS. SARFF:  Objection.  Relevance.

7      A.   Examples of some of these organizations

8  are St. Stephen's, Avivo, AICDC, the Minnesota

9  Indian Women's Resource Center.  Those are four

10  examples of many agencies we worked with.

11     Q    (BY MS. STILLMAN) Can you think of any

12  other examples?

13         MS. PIERCE:  Objection.  Asked and

14  answered several times.

15     A.   If you gave me time to compile a list, I

16  could do that.  I don't recall all of the agencies

17  we work with at this time.

18     Q    (BY MS. STILLMAN) All right.  Are you

19  familiar with an organization named ZACAH Aid and

20  Charity Assisting Humanity?

21     A.   I'm aware of an organization called ZACAH.

22     Q.   Okay.  And what's your knowledge about

23  ZACAH?

24         MS. PIERCE:  Objection.  Compound, vague.

25     A.   My understanding is that there were some

Page 210

1    people who were leaders in the Sanctuary Movement

2    that began working with family members to create an

3    organization called ZACAH.  This organization used

4    people who were working in the Sanctuary Movement

5    with the same philosophy, with a different name.

6            There were at least one physician, maybe

7    two -- I -- I don't know if the one physician's

8    spouse was also a doctor, but I think she could have

9    been -- who led this organization.  His daughter,

10   whose name is Yusra, who was an active member of the

11   Sanctuary Movement, and her father, whose name I

12   can't recall, started this organization called

13   ZACAH.

14       Q    (BY MS. STILLMAN) Had you heard about

15   ZACAH before 2020?

16       A    No.

17       Q    And you mentioned them having the same

18   philosophy, but I'm not clear.  Who did they -- who

19   do you think they had the same philosophy as?

20            MS. PIERCE:  Is "they" the Murads or ZACAH

21   as an organization?

22            MS. STILLMAN:   ZACAH.

23            MS. PIERCE:  Then foundation.

24       A    As I stated before, the leaders of the

25   Sanctuary Movement appeared to be the same leaders

```
                                                     Page 211
 1   who started this organization called ZACAH.

 2         Q     (BY MS. STILLMAN) Have you ever spoken to

 3   Yusra Murad on the phone?

 4         A.    Yes.

 5         Q.    Approximately how many times?

 6         A.    I don't know the answer to that.

 7         Q.    More than 10?

 8         A.    Yes.

 9         Q.    More than 20?

10         A.    Possibly.  Yes.

11         Q.    More than 50?

12         A.    I doubt it was 50.

13         Q.    Okay.  Are you aware that ZACAH funded

14   approximately 4,000 hotel rooms for displaced

15   encampment residents in 2020?

16            MS. PIERCE:  Objection.  States facts not

17   in evidence, foundation.

18         A.    I was not aware how many hotel rooms they

19   provided.

20         Q     (BY MS. STILLMAN) Do you think it's

21   beneficial to have homeless persons staying in one

22   consistent location?

23            MS. PIERCE:  Objection.  Incomplete

24   hypothetical, calls for speculation, relevance.

25            MS. SARFF:  Objection to the extent it
```

Page 212

1    calls for an expert opinion.

2            MS. PIERCE:  Or a legal conclusion.

3        A.    I think the best place for a person to be

4    is in permanent housing.  Hennepin County's goal is

5    to work with individuals and families to get them to

6    permanent housing.  And those individuals who wish

7    to work with us to obtain permanent housing, we have

8    been successful in doing that on a large scale.

9            MS. PIERCE:  Rebecca, can we break before

10   you go on to another topic?

11           MS. STILLMAN:  Yeah.

12           MS. PIERCE:  How long have we been on the

13   record?

14           THE VIDEOGRAPHER:  We are going off the

15   record.  The time now is 4:37.

16           (Whereupon, a recess was taken.)

17           THE VIDEOGRAPHER:  We are back on the

18   record.  This is the start to Media Number 7.  The

19   time is 4:46.

20           MS. STILLMAN:  I'm going to mark document

21   Bates stamped HC00033832 as Exhibit Number 202.

22           (Deposition Exhibit Number 202 marked for

23   identification.)

24       A.    Thank you.

25       Q    (BY MS. STILLMAN) And do you recognize

Page 213

1   this document?

2          A.    This is an email string from

3   November 2020.

4          Q.    And you're on this email string, correct?

5          A.    Yes.

6          Q.    Okay.  And on the bottom of the first

7   page there is an email from Kelsey Myers to you,

8   dated November 5th, 2020, with the subject,

9   RE: ZACAH referrals.

10              Do you see that?

11         A.    Yes.

12         Q.    And in that email she writes, My apologies

13  for the error and referring case managers to a

14  resource I myself did not know anything about.  I

15  contacted the Hennepin County case management

16  supervisor at Pinnacle yesterday and asked her to

17  please not make any more referrals.

18              And if you turn to the next page, she's

19  responding to an email from you dated November 4th

20  of 2020, in which you say, Wondering if we can

21  discuss the suggestion to refer a client to a ZACAH

22  hotel.

23              Do you see that?

24         A.    Yes.

25         Q.    Did you tell Kelsey Myers not to refer

Page 214

1    someone to a ZACAH hotel?

2            MS. PIERCE:  Objection.  Vague.

3        A.    I'm not recalling this exact situation.

4    But what I recall is that someone who is in Kelsey

5    Myers' unit had made a decision to make a referral

6    to ZACAH for one of her clients.  The unit that

7    we're talking about is long-term services and

8    supports.

9            Long-term services and supports is an area

10   that does assessments and looks at things like

11   waivers for specific things, including brain injury,

12   elderly care, and is not -- it's not a common

13   situation where they find themselves working with

14   homeless individuals.

15           Most of their services in long-term

16   services and supports is to keep people outside of

17   institutional settings and in permanent housing, and

18   to figure out how to do this.

19           I don't recall the exact situation, but I

20   do remember there was a social worker that made a

21   referral to a ZACAH hotel, not knowing everything

22   about the history of the last six months and how

23   things could have gone differently.

24           The purpose of reaching out to Kelsey was

25   to let her know of all options that this client who

Page 215

1  is already working with a social worker in LTSS

2  could access.

3      Q    (BY MS. STILLMAN) Did you ask Kelsey Myers

4  to contact Pinnacle and recommend that they not

5  refer any of their clients to ZACAH hotels?

6          MS. PIERCE:  Objection.  Vague.

7      A.   I don't know that I specifically asked her

8  to not make the referral to any ZACAH hotels.  No.

9      Q    (BY MS. STILLMAN) You mentioned the -- not

10 having all of the information from the six months

11 prior to this email.  What did you mean by that?

12     A.   Well, Pinnacle is a contracted agency that

13 we work with to try and keep people in homes.

14 They're not, typically, familiar with working with

15 homeless individuals or encampments.

16         My understanding was, the social worker

17 from this agency just didn't have the information,

18 and that information appeared to be helpful for them

19 when we had that conversation.

20         MS. STILLMAN:  I'm marking document Bates

21 stamped HC00034306 as Exhibit Number 203.

22         (Deposition Exhibit Number 203 marked for

23 identification.)

24     Q.   (BY MS. STILLMAN) And do you recognize

25 this document?

                                              Page 216

1        A.    It appears to be a document.  It's not --

2    it's not clear that it was sent.

3             MS. PIERCE:  Yeah.  My objection is this

4    does not appear to be a sent email.  There's not a

5    from line, which is the case on all sent emails, so

6    my strong suspicion is that this is a draft, unsent

7    draft.

8        Q    (BY MS. STILLMAN) Did you attend a meeting

9    with Bloomington and ZACAH in November of 2020?

10       A.    There was a meeting that included members

11   of the City of Bloomington and members of ZACAH that

12   I recall.

13       Q.    And did you attend that meeting?

14       A.    I attended at least one, maybe two

15   meetings with members from those groups.  I think it

16   was just one meeting.

17       Q.    And that first sentence says, Meeting

18   began with a description of ZACAH:  Established 7

19   years ago by 7 volunteers to assist people who

20   needed financial assistance to prevent homelessness.

21             Do you see that?

22       A.    I see that is what is written here.  But I

23   also don't know that this was sent as an email.

24             This looks like notes that I may have

25   taken during the meeting.  So someone reported that

Page 217

1   it was established seven years ago by seven

2   volunteers.  I don't know that that's accurate or

3   not.  This looks like notes that I took during that

4   meeting of Friday the 20th.

5        Q.   And that second bullet point starts,

6   Service providers:  Start Today is working with them

7   linking people into permanent housing.  Case

8   management is done through funding through the State

9   for this contract with Start Today.  They have 7

10  people transitioning into permanent housing.  Start

11  Today started working with them 2 weeks ago.  No

12  service provision for people staying into the

13  hotels.  ZACAH would like to have another group

14  provide services to the residents staying in the

15  hotels.  They do not have the resources to do that.

16       Do you see that?

17       A.   Yes.

18       Q.   What is Start Today?

19       A.   Start Today is a community agency that

20  Hennepin County and I believe the State had

21  contracted with.  And my understanding is, they

22  stopped working with ZACAH within two to three weeks

23  of this meeting.

24       Q.   Why is that your understanding?

25       A.   My understanding is they had some

Page 218

1      philosophical differences.

2            Q.    Why is that your understanding?

3            A.    I heard this about staff from Start Today.

4            Q.    Who did you hear that from?

5            A.    I don't recall who it was.

6            Q.    That last bullet point says, ZACAH is

7      working outside of the Coordinated Entry or Adult

8      Shelter Connect because they do not believe there

9      isn't capacity.  Start Today is not working through

10     Coordinated Entry because we are working under the

11     peace time emergency orders.  We discussed the

12     availability currently in shelters and Board and

13     Lodges from the Hennepin perspective and the number

14     of openings in the next two to four weeks for

15     additional shelter.

16               Do you see that?

17           A.    Yes.

18           Q.    What is Coordinated Entry?

19           A.    Coordinated Entry is -- is a -- is a unit,

20     but it's a process to get people with the most need

21     into permanent housing first.

22               So what had happened years and years ago

23     is, you might have an advocate or a social worker

24     who, by the luck of the draw, may be more motivated

25     or experienced than another.  That person who is

Page 219

1   experiencing homelessness may get housing before
2   someone who needed it more, based on their cognitive
3   ability or physical abilities.
4           Coordinated Entry is modeled after a
5   national approach, where we look at the strengths
6   and the needs of individuals, and prioritize those
7   people who are most needing housing and work to
8   house those people first.
9           There are people who believe that we
10  should just get people into housing as quickly as
11  possible as they arrive and don't agree with this
12  model that Hennepin County has committed to.
13      Q.   Does -- Is Coordinated Entry a process
14  that's run by Hennepin County?
15          MS. PIERCE:  Objection.  Foundation.
16      A.   Yes.  The Coordinated Entry program is --
17  is contracted by Hennepin County through a community
18  agency to look at the needs and the strengths of
19  individuals, to determine what that priority should
20  be.
21      Q    (BY MS. STILLMAN) And what community
22  agency are they contracted with?
23      A.   I believe that it's still Simpson Housing.
24  It was Simpson Housing when -- when I worked with
25  them several years ago.

Page 220

1       Q.   And how does a homeless individual get

2    entered into the Coordinated Entry system?

3            MS. PIERCE:  Objection.  Foundation.

4       A.   They would meet with a -- either a

5    Hennepin County staff or a community advocate or

6    someone from a shelter.  Any shelter staff could

7    work with them, complete a -- an assessment with

8    them, and then the results of that assessment would

9    go to the Coordinated Entry staff at Simpson

10   Housing.

11      Q    (BY MS. STILLMAN) Why is it important that

12   people go through that system?

13           MS. PIERCE:  Objection.  Vague as to the

14   word foundation -- pardon me -- important.  And

15   foundation.

16           MS. SARFF:  Objection to the extent it

17   calls for an expert opinion.

18      A.   My understanding is, it's important to

19   make sure that our most marginalized and most

20   vulnerable populations are prioritized in finding

21   housing for them.  That's not an easy thing to

22   determine, because everybody who is homeless is

23   needing housing.  But to determine those people that

24   are most vulnerable based on their medical or their

25   cognitive situation, mental health situation, is the

Page 221

1   goal, is to make sure we look at the most

2   vulnerable, marginalized folks first and house them

3   first.

4       Q    (BY MS. STILLMAN) Did you try to get your

5   clients housing through any systems other than

6   Coordinated Entry in 2020?

7           MS. PIERCE:  Objection.  Vague, compound.

8       A.   All of the social workers through the

9   homeless access team worked through the Coordinated

10  Entry system.

11      Q    (BY MS. STILLMAN) When you were doing

12  homeless outreach in 2020 at homeless encampments --

13          Well, I'm going to take back that

14  question.

15          So to clarify, when you were doing

16  homeless outreach at encampments in 2020, you didn't

17  refer residents to any housing assistance options

18  other than Coordinated Entry?

19          MS. PIERCE:  Can you read that question

20  back to me, please?

21          (Whereupon, the court reporter read back

22  the requested portion of the record.)

23      A.   My job was more crisis-oriented, and that

24  was to offer shelter options to residents and to

25  have the shelter staff do those Coordinated Entry

Page 222

1    assessments with people once they got there.

2           For those people who chose not to go to

3    shelter, and someone says, yes, I want to work with

4    a social worker -- and it could be someone from a

5    community agency or someone from Hennepin County --

6    there were persons designated to do those

7    assessments, and they could do those with those

8    persons from an encampment.

9      Q     (BY MS. STILLMAN) Did you ever deter a

10   resident of a homeless encampment from going to a

11   hotel that was funded by ZACAH?

12          MS. PIERCE:  Objection.  Vague, compound.

13     A.    No.  I don't recall ever doing that.

14     Q     (BY MS. STILLMAN) Did you ever tell any

15   outreach workers not to refer homeless individuals

16   to hotels funded by ZACAH?

17          MS. PIERCE:  Objection.  Vague, asked and

18   answered.

19          MS. SARFF:  Objection.  Relevance.

20     A.    If a -- if a -- there were many outreach

21   staff that were working with both Sanctuary Movement

22   and ZACAH, and they regularly made referrals to

23   those hotels through those organizations.  If that

24   was their choice to do that, I was not someone who

25   would tell them not to do it.

Page 223

1      Q    (BY MS. STILLMAN) I'm going to backtrack a

2  little and just go over some more routine questions.

3           Where are you from?

4      A.   I'm wondering about the relevance of the

5  question to the topic.

6      Q.   Just answer the question.

7           MS. SARFF:  Objection.  Relevance,

8  harassment.

9      A.   I grew up on the East Coast.

10     Q    (BY MS. STILLMAN) Okay.  What's your

11 highest level of education?

12     A.   I have two graduate degrees.

13     Q.   And what are those in?

14     A.   Master's in social work and master's in

15 business administration.

16     Q.   When did you get the master's in social

17 work?

18     A.   2007, I believe, from University of

19 Michigan, Ann Arbor.

20     Q.   And what did -- when did you get the

21 master's in the business degree?

22     A.   2000 -- Excuse me.  1991, from Mount

23 St. Mary's University, Emmitsburg, Maryland.

24     Q.   And what were your -- was your undergrad

25 degree in?

Page 224

1      A.    Sociology.

2      Q.    Have you obtained any other degrees or

3  certificates since 2007?

4      A.    No.

5            MS. STILLMAN:  I'll mark this as

6  Exhibit 204.

7            (Deposition Exhibit Number 204 marked for

8  identification.)

9      Q.    (BY MS. STILLMAN) Is this an accurate

10  depiction of your LinkedIn profile?

11           MS. PIERCE:  Why don't you give him a

12  minute to look at it.

13           MS. STILLMAN:  Sure.

14     A.    This appears to be, yes.  Yes.

15     Q     (BY MS. STILLMAN) Do you --

16     A.    I'm recalling now that I may have said

17  2007 when I was talking about my master's of social

18  work graduation.  It was 1997.  So I apologize for

19  that, that inaccuracy.

20     Q.    Thank you for the clarification.

21     A.    Yep.

22     Q.    Do you read the news?

23     A.    Yes.

24     Q.    What news sources do you read?

25     A.    There are times where I read the

Page 225

1   Star Tribune.  There are times I read CNN.  There

2   are many different news sources that I receive news

3   from.

4        Q.   Did you read any articles about homeless

5   encampments in Hennepin County in the Star Tribune

6   in 2020?

7        A.   Yes.

8        Q.   Do you recall the contents of those

9   articles?

10       A.   I read many articles in 2020.  I don't

11  recall those -- the subject of each one.

12       Q.   Do you recall if any of them included

13  statements about residents of homeless encampments'

14  property being destroyed during an encampment

15  closure?

16            MS. PIERCE:  Can I have that question read

17  back, please?

18            (Whereupon, the court reporter read back

19  the requested portion of the record.)

20            MS. PIERCE:  Objection.  Assumes facts not

21  in evidence, foundation, vague.

22       A.   This was a subject that had come up in

23  different places, so it's possible.  I do not recall

24  any specific article regarding items being thrown

25  out in a Star Tribune article in 2020.

Page 226

1          Q     (BY MS. STILLMAN) When was the last time
2     you had communication with somebody from ZACAH?
3          A.    December 2020.
4          Q.    And who was that communication with?
5          A.    I believe it was with Yusra.
6          Q.    And do you remember what that conversation
7     was about?
8          A.    I believe that it was my informing her
9     that a different person would be taking over the
10    work of -- working with unsheltered residents of
11    Hennepin County.  And I gave her that person's name
12    and contact information, and I thanked her for
13    working with me.
14              MS. STILLMAN:  Can we take like a
15    two-minute break?
16              MS. PIERCE:  Sure.
17              THE VIDEOGRAPHER:  We are going off the
18    record.  The time now is 5:15.
19              (Whereupon, a short recess was taken.)
20              THE VIDEOGRAPHER:  We are back on the
21    record.  The time now is 5:21.
22              MS. STILLMAN:  No further questions.
23              MS. PIERCE:  We'll read and sign.
24              And I want to reiterate that
25    confidentiality designation for that one document on

Page 227

1    the record.

2              But, other than that, we'll read and sign.

3    Thanks so much.

4              MS. STILLMAN:  Great.  Thank you.

5              THE VIDEOGRAPHER:  This concludes today's

6    deposition.  The time now is 5:21 p.m.

7              (Whereupon, at 5:21 p.m., Monday,

8    February 13, 2023, the taking of the Deposition of

9    DONALD RYAN was adjourned.)

10                          *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 228

1    STATE OF MINNESOTA:  )
                          ) ss.            CERTIFICATE
2    COUNTY OF ANOKA:     )
3            Be it known that I took the deposition of
     DONALD RYAN on the 13th day of February, 2023;
4
5            That I was then and there a Notary Public
     in and for the County of Anoka, State of
6    Minnesota, and that by virtue thereof, I was duly
     authorized to administer an oath;
7
8            That the witness, before testifying, was
     by me first duly sworn to testify the whole truth
     and nothing but the truth relative to said cause;
9
10           That the testimony of said witness was
     recorded in shorthand by me and was reduced to
     typewriting under my direction;
11
12           That the cost of the original transcript
     has been charged to the party noticing the
     deposition, unless otherwise agreed upon by Counsel,
13   and that copies have been made available to all
     parties at the same cost, unless otherwise agreed
14   upon by Counsel;
15           That I am not related to any of the parties
     hereto nor interested in the outcome of the action;
16
17           That the reading and signing of the
     deposition by the witness and the Notice of Filing
     were reserved.
18
19           WITNESS MY HAND AND SEAL this 24th day of
     February, 2023.
20
21
22           Christine K. Herman, RPR, CRR
23
24
25

### Errata Sheet

**Deposition of Don Ryan, 2/13/2023**

**Assignment Reference No. 5672429**

**Statement of Changes Under Fed. R. Civ. P. 30(e)**

| Page | Line | Change | Reason |
|------|------|--------|--------|
| 16 | 6-7 | Change "is the assistant to David Hough" to "is the Deputy County Administrator under David Hough" | Misspoke |
| 51 | 21 | Change "o.r" to "or" | Transcription error |
| 63 | 19 | Change "Public Work" to "Public Works" | Transcription error |
| 120 | 6 | Designate "(612)791-3434" as confidential | Confidentiality |
| 185 | 10 | Change "that later facilitated" to "that I later facilitated" | Transcription error |
| 206 | 2 | Change "may believed" to "may have believed" | Transcription error |
|  |  |  |  |

Don Ryan

_____

Don Ryan

03/24/23

_____

Date