# EXHIBIT 105

Page 1

1           UNITED STATES DISTRICT COURT

2              DISTRICT OF MINNESOTA

3               Case No.: 20-CV-02189-WMW-JFD

4    --------------------------------

5    Patrick Berry, et al.,

6          Plaintiffs,

7       vs.

8    Hennepin County, et al.,

9

            Defendants.

10

    ----------------------------------

11

12

13       VIDEOTAPED 30(b)(6) DEPOSITION OF

14              DAVID HEWITT

15          Taken on MARCH 28, 2023

16          Commencing at 9:01 A.M.

17

18

19

20

21

22

23   REPORTED BY:  Mari Skalicky, RMR, CRR

24

25

Page 2

1       VIDEOTAPED 30(b)(6) DEPOSITION of DAVID

2    HEWITT, taken on MARCH 28, 2023, commencing at

3    9:01 A.M. at 2000 IDS Center, Minneapolis,

4    Minnesota, before Mari Skalicky, a Certified

5    Realtime Reporter and Notary Public of and for

6    the State of Minnesota.

7                        * * * * * * * * * * *

8                        APPEARANCES

9

10   ON BEHALF OF THE PLAINTIFFS:

11       MID-MINNSOTA LEGAL AID

12       BY:  REBECCA STILLMAN, ESQUIRE

13       111 North Fifth Street, Suite 100

14       Minneapolis, MN  55402

15       rstillman@mylegalaid.org

16

17   AMERICAN CIVIL LIBERTIES UNION

18       OF MINNESOTA

19       BY:  CLARE DIEGEL, ESQUIRE

20       PO Box 14720

21       Minneapolis, MN  55414

22       cdiegel@aclu-mn.org

23

24

25

Page 3

```
 1   APPEARANCES (Continued):

 2

 3   On BEHALF OF HENNEPIN COUNTY AND HENNEPIN

 4   COUNTY SHERIFF:

 5        HENNEPIN COUNTY ATTORNEY'S OFFICE

 6        BY:  CHRISTIANA MARTENSON, ESQUIRE

 7        BY:  DEVONA WELLS, ESQUIRE

 8        A-2000 Government Center

 9        300 South Sixth Street

10        Minneapolis, MN  55402

11        devonawells@hennepin.us

12

13   ON BEHALF OF THE CITY OF MINNEAPOLIS,

14   MINNEAPOLIS MAYOR JACOB FREY, AND

15   MINNEAPOLIS CHIEF OF POLICE:

16        MINNEAPOLIS CITY ATTORNEY'S OFFICE:

17        BY:  SHARDA ENSLIN, ESQUIRE

18        BY:  KRISTIN SARFF, ESQUIRE

19        350 South 5th Street, Suite 210

20        Minneapolis, MN  55402

21        sharda.enslin@minneapolismn.gov

22        kristin.sarff@minneapolismn.gov

23

24

25
```

Page 4

1   APPEARANCES (Continued):

2

3   ON BEHALF OF THE MINNEAPOLIS PARK AND

4   RECREATION BOARD:

5        RICE, WALTHER & MOSLEY, LLP

6        BY:  ANN E. WALTHER, ESQUIRE

7        BY:  ALANA MOSELY, ESQUIRE

8        330 South Second Avenue, Suite 360

9        Minneapolis, MN 55402

10       awalther@ricemichels.com

11       amosely@ricemichels.com

12

13

14  Videographer:  Mr. Kraig Hildahl

15

16

17

18

19

20  NOTE:  The original transcript will be filed

21  with the ACLU Minnesota, pursuant to the

22  applicable Rules of Civil Procedure.

23

24

25

Page 5

1                    I   N   D   E   X
2
3  WITNESS:  DAVID HEWITT                        PAGE
4  Examination by MS. STILLMAN ............ 11
5
6
7                 E X H I B I T S
8  EXHIBITS INTRODUCED:                          PAGE

9  Exhibit 311 ........................... 13
       Second Amended Notice of Rule
10      30(b)(6)Deposition and Topics to
       Defendant Hennepin County
11
   Exhibit 312 ........................... 21
12      Hennepin County Defendants' Response
       to Plaintiffs' First Set of
13      Interrogatories
14  Exhibit 313 ........................... 26
       Hennepin County's Response to
15      Plaintiffs' Second Set of
       Interrogatories
16
   Exhibit 314 ........................... 30
17      Hennepin County Defendants' Response
       to Plaintiffs' First Set of Requests
18      for Admission
19  Exhibit 315 ........................... 30
       Hennepin County Defendants' Response
20      to Plaintiffs' Second and Third
       Sets of Requests for Admission
21
   Exhibit 316 ........................... 56
22      Email correspondence
23  Exhibit 317 ........................... 64
       Email correspondence
24
25

Page 6

1  EXHIBITS (Continued):
2

Exhibit 318 ........................... 94
3      Adult Shelter Connect 9/23/20
       document
4

Exhibit 319 ........................... 106
5      Email correspondence
6  Exhibit 320 ........................... 109
       Email correspondence
7

Exhibit 321 ........................... 112
8      Email correspondence
9  Exhibit 322 ........................... 112
       Midtown Greenway Draft Plan
10

Exhibit 323 ........................... 112
11      Map entitled "Midtown Greenway trail
       access"
12

Exhibit 324 ........................... 117
13      Email correspondence
14  Exhibit 325 ........................... 117
       Map titled "Midtown Greenway trail
15      access"
16  Exhibit 326 ........................... 117
       Document titled "DRAFT for executive
17      review"
18  Exhibit 327 ........................... 143
       Email correspondence
19

Exhibit 328 ........................... 143
20      Notice of Removal
21  Exhibit 329 ........................... 143
       Notice of Removal
22

Exhibit 330 ........................... 143
23      Photograph, black and white
24
25

1   EXHIBITS (Continued):
2

    Exhibit 331 ........................... 161
3       Email correspondence
4   Exhibit 332 ........................... 161
        Map, Midtown Greenway area
5

    Exhibit 333 ........................... 161
6       Midtown encampment field map
7   Exhibit 334 ........................... 180
        Email correspondence
8

    Exhibit 335 ........................... 180
9       Notice of Removal
10  Exhibit 336 ........................... 180
        Notice of Removal
11

    Exhibit 337 ........................... 190
12      Email correspondence
13  Exhibit 338 ........................... 218
        City of Minneapolis, Request for
14      Committee Action
15  Exhibit 339 ........................... 239
        Temporary Policy
16

    Exhibit 340 ........................... 239
17      Hennepin County Administration
        Manual, Policy Regarding Camping in
18      Public Space
19  Exhibit 341 ........................... 245
        Adult Shelter Connect, 8/18/20
20      document
21  Exhibit 342 ........................... 246
        File record
22

    Exhibit 343 ........................... 266
23      Email correspondence
24
25

Page 8

1   EXHIBITS (Continued):

2   Exhibit 344 .......................... 282

         Adult Shelter Connect, 8/18/20

3       documents

4

5   PREVIOUS EXHIBITS INTRODUCED:          PAGE

6   Exhibit 83 ........................... 212

7   Exhibit 102 .......................... 130

8   Exhibit 103 .......................... 130

9   Exhibit 115 .......................... 173

10  Exhibit 116 .......................... 173

11  Exhibit 121 .......................... 109

12  Exhibit 187 .......................... 217

13  Exhibit 192 .......................... 124

14  Exhibit 193 .......................... 124

15  Exhibit 194 .......................... 124

16  Exhibit 195 .......................... 124

17  Exhibit 309 .......................... 149

18

19

20

21  (Original exhibits attached to original

    transcript; copies to counsel as requested.)

22

23

24

25

```
                                           Page 9

 1              P R O C E E D I N G S

 2          Whereupon, the deposition of DAVID

 3      HEWITT was commenced at 9:01 A.M. as

 4      follows:

 5                       - - -

 6          THE VIDEO OPERATOR:  We are going on

 7      the record at 9:01 a.m. Central time on

 8      March 28th, 2023.

 9          This is Media Unit No. 1 of the

10      video-recorded deposition of 30(b)(6)

11      designee David Hewitt, taken in the matter

12      of Berry, et al. versus Hennepin County,

13      et al., filed in the U.S. District Court,

14      District of Minnesota, Case No.

15      20-CV-02189-WMW-JFD.

16          Location of this deposition is the

17      Ballard Spahr law firm in Minneapolis,

18      Minnesota.

19          My name is Kraig Hildahl,

20      representing Veritext Legal Solutions, and

21      I'm the videographer.  The court reporter

22      today is Mari Skalicky, also with

23      Veritext.

24          Will counsel please identify

25      themselves for the record.
```

1          MS. STILLMAN:  Rebecca Stillman here

2      on behalf of plaintiffs.

3          MS. DIEGEL:  Clare Diegel on behalf

4      of plaintiffs.

5          MS. WELLS:  Devona Wells representing

6      Hennepin County defendants, Assistant

7      Hennepin County Attorney with the County

8      Attorney's Office.

9          MS. MARTENSON:  Christiana Martenson,

10      Assistant Hennepin County Attorney, here

11      on behalf of the County.

12          MS. WALTHER:  Ann Walther on

13      behalf of the Park Board defendants.

14          MS. MOSELY:  Alana Mosely on behalf

15      of the Minneapolis Park and Recreation

16      Board.

17          MS. ENSLIN:  Sharda Enslin here on

18      behalf of the City defendants.

19          MS. SARFF:  Kristin Sarff with the

20      Minneapolis City Attorney's Office on

21      behalf of the City defendants.

22          THE VIDEO OPERATOR:  Will the court

23      reporter please swear in the witness, and

24      then we can proceed.

25                      - - -

Page 11

```
 1                    DAVID HEWITT,
 2          after having been first duly sworn,
 3        Deposes and says under oath as follows:
 4                        - - -
 5                     EXAMINATION
 6   BY MS. STILLMAN:
 7   Q.  Good morning, Mr. Hewitt.
 8   A.  Good morning.
 9   Q.  My name is Rebecca.  We met a few weeks
10       ago now.
11   A.  I recall.
12   Q.  I don't remember the exact date.  I am
13       counsel for plaintiffs in this matter.
14             Could you please state and spell your
15        name?
16   A.  Yeah.  David Hewitt, D-A-V-I-D,
17       H-E-W-I-T-T.
18   Q.  And you understand that your answers today
19       are under oath, as if taken in a court of
20       law?
21   A.  I do.
22   Q.  And you are understand that under certain
23       circumstances, this testimony could be
24       shown to a jury?
25   A.  I do.
```

1    Q.  And it is your responsibility to answer

2        truthfully and as completely as possible.

3    A.  Understood.

4    Q.  And you must respond audibly, not by

5        shaking your head or nodding, as the court

6        reporter is taking down what we say today.

7    A.  Understood.  Remind any me if I slip.

8    Q.  I will or Mari will.

9            If I ask you a question that you do

10        not understand, please let me know, and I

11        will rephrase it for you.  Can you do

12        that?

13    A.  I certainly will.

14    Q.  If you answer a question without me asking

15        to rephrase it, I will assume you

16        understood the question.  Is that

17        understood?

18    A.  Understood.

19    Q.  If you have to take a break for any

20        reason, that's not a problem, so long as

21        there's not a question pending.  If

22        there's a question pending, answer the

23        question, and then we can take a break.

24            Are there any circumstances that

25        would affect your ability to testify

Page 13

```
 1        completely and truthfully today?
 2   A.   No.
 3   Q.   And you're not on any medication, alcohol,
 4        or drugs that would affect your ability to
 5        answer completely and truthfully today?
 6   A.   I am not.
 7   Q.   What is your job with Hennepin County?
 8   A.   I'm the Director of Housing Stability in
 9        the Human Services Department.
10   Q.   Do you understand that we served a
11        deposition notice on Hennepin County
12        asking them to produce a witness with
13        knowledge of certain topics?
14   A.   Yes.
15   Q.   Do you understand that you have been
16        designated by Hennepin County to testify
17        on its behalf regarding the topics listed
18        in the notice?
19   A.   I do.
20             (Deposition Exhibit No. 311 was
21         introduced.)
22   BY MS. STILLMAN:
23   Q.   I am going to be showing you what I've
24        marked as Exhibit 311.
25             MS. STILLMAN:  Could you pass these
```

```
 1     down?
 2             MS. WELLS:  (Complying.)
 3             MS. STILLMAN:  Thank you.
 4  BY MS. STILLMAN:
 5  Q.  Have you seen this document before?
 6  A.  I'm not sure that I've seen this document
 7      in this exact format, with all of this
 8      crossing-out, but I'm aware of this
 9      document's existence broadly.
10  Q.  Have you seen a list of the deposition
11      topics included in this document?
12  A.  I am aware of a number of those topics.
13      I'm not sure that I've seen a
14      comprehensive list.
15  Q.  Okay.  And just to confirm, Hennepin
16      County has designated you to testify on
17      its behalf regarding any of the matters
18      listed in Exhibit 311 at today's 30(b)(6)
19      deposition.  Correct?
20  A.  Yes.
21  Q.  Do you have full authority to speak on
22      behalf of Hennepin County today?
23  A.  Yes.
24             MS. WELLS:  Object.  I just want
25      to --
```

Page 15

1           THE WITNESS:  Excuse me.

2           MS. WELLS:  That's okay.  Object as

3       vague.

4           THE WITNESS:  I'm sorry.

5   A.   To the best of my understanding of the

6        30(b)(6), kind of a structure that we're

7        operating under, which is somewhat

8        abstract, but, yes, I believe I

9        understand, yeah.

10  BY MS. STILLMAN:

11  Q.   Who designated you to testify today?

12  A.   Ultimately, I guess the Hennepin County

13       Administrator.  The decision was made that

14       I would be the designee, and I'm happy to

15       do so.

16  Q.   And that's David Hough, is the County

17       Administrator?

18  A.   That is correct.

19  Q.   Are you aware that the answers you give to

20       my questions today will be binding upon

21       Hennepin County?

22           MS. WELLS:  Object.  Calls for a

23        legal conclusion, vague.

24           MS. SARFF:  I'm going to object to

25        the extent it calls for a legal

Page 16

1      conclusion.

2  A.   I'm aware that I'm speaking on behalf of

3       Hennepin County.

4  BY MS. STILLMAN:

5  Q.   How did you do -- what did you do to

6       prepare for today's deposition?

7  A.   Put in time with the team here, county

8       attorneys, with other key personnel from

9       Hennepin County, reviewing materials and

10      discussing, as you say, the -- the

11      specific questions that were agreed upon

12      in terms of the scope of today.

13  Q.   Who were the other Hennepin county

14      personnel that you met with to prepare for

15      today's deposition?

16  A.   Specifically to prepare for today's

17      deposition, we met with Commissioner

18      Marion Greene, Commissioner Angela Conley,

19      Joe Gladke of the Hennepin County Regional

20      Railroad Authority, Don Ryan of Hennepin

21      County Human Services Department, Chief

22      Deputy Tracey Martin of the Hennepin

23      County Sheriff's Office, and Deputy Mike

24      Jerde--am I getting the name and job title

25      correct there?--of the Hennepin County

```
 1      Sheriff's Office.
 2           I also have comprehensive and
 3       exclusive access to David Hewitt of the
 4       Hennepin County Human Service Department's
 5       knowledge and insights.
 6  Q.   Approximately how long did you spend
 7       meeting with the Hennepin County attorneys
 8       preparing for today's deposition?
 9  A.   Cumulatively?  So as you referenced
10       earlier, of course, I was here earlier for
11       my personal deposition.  I would estimate
12       approximately fifteen hours.
13  Q.   And did you review documents to prepare
14       for today's deposition?
15  A.   We did look at some documents, yes.  I did
16       look at some documents.
17  Q.   Did any of those documents refresh your
18       recollection?
19  A.   Yes.
20  Q.   Which documents were those?
21  A.   We looked at operation plans.  We looked
22       at emails.  We looked at policies.
23  Q.   Which operation plans did you look at?
24  A.   Specifically we looked at operation plans
25       relating to the Greenway site and the
```

```
1        closure of the encampment there in 2020;
2        looked at other operation plans developed
3        by the Hennepin County Sheriff's Office
4        department in relation to encampments in
5        2022.
6   Q.   Do you remember the titles of those?
7   A.   I believe the titles were along the lines
8        of "operation plan."  I can't remember if
9        they specifically cited the location in
10       the title of the document.
11  Q.   And which policies did you review?
12  A.   I looked at the interim policy regarding
13       encampments that was developed in 2020,
14       and then the policy regarding camping in
15       public spaces that was finalized in 2021.
16  Q.   And what emails did you review?
17  A.   Oh, across the cumulative fifteen hours,
18       including my personal deposition, we
19       looked at an array of emails over the last
20       couple of years.
21            For what it's worth, I know I
22        referenced previously that I receive
23        hundreds of emails a week, sometimes a
24        day.
25            When I was here last time, of course,
```

1       I had my email off all day, so I'm able to
2       confirm that I received 150 emails in a
3       single day, and that is not unusual.
4           I've looked at a lot of emails
5       generated over the last couple of years.
6       I couldn't give you an exact number.
7   Q.  Do you remember the contents of any of
8       those emails?
9   A.  There were emails communicating between --
10      internal communications between my office
11      in human services and commissioners.
12      There were emails across departments with
13      some of the other Hennepin County
14      departments that I've referenced.  There
15      were emails with external parties,
16      nonprofit organizations and the suchlike.
17  Q.  Did you review the complaint that was
18      filed in October of 2020 to prepare for
19      today's deposition?
20  A.  I do not recall looking at a specific
21      complaint document.
22  Q.  Have you ever read the complaint in this
23      matter that was filed in October of 2020?
24  A.  I may well have read it in October of
25      2020.  It's a pretty long time ago.

```
 1            Well, this is one of these things
 2        where I say I kind of understand the
 3        abstract nature of my position here today.
 4        I, David Hewitt, would have read it about
 5        then.  Obviously, I was within Hennepin
 6        County and read it.
 7   Q.   Have you read the amended complaint that
 8        was filed in December of 2020 in this
 9        matter?
10   A.   I would say the same thing.  I probably
11        would have looked at it or at least been
12        apprised as to kind of the nature of it
13        back in December of 2020.
14            A lot has occurred in my work life
15         since then.  It's not something I recall
16         the detail of.
17   Q.   Have you read the proposed second amended
18        complaint that was filed in January of
19        2023 in this matter?
20   A.   I do not recall seeing that specifically,
21        yeah.
22   Q.   Just to go back to Exhibit 311 really
23        quickly, if you turn to page 2, on page 2
24        and 3, there are a list of definitions.
25   A.   Okay.
```

Page 21

```
 1   Q.   These are the definitions we are going to

 2        be using during today's depositions -- or

 3        today's deposition.

 4             So if you'll look at number 6, we

 5         define "encampment" as "a group of two or

 6        more tents where homeless people live."

 7             And number 7, "homeless individuals"

 8        means "people who lack permanent housing."

 9             And number 9, "sweep or eviction" and

10        all of their derivative forms have the

11        same meaning, the "breaking up, clearing,

12        closing, demobilization, dissolution or

13        disbandment of an encampment."

14             MS. WELLS:  Counsel, I, for the sake

15        of efficiency, would like to make a

16        standing objection as to "encampment" as

17        defined, and "sweep" or "eviction" as

18        calling for a legal conclusion and vague.

19   BY MS. STILLMAN:

20   Q.   I am marking the Hennepin County

21        Defendants' Response to Plaintiffs' First

22        Set of Interrogatories as Exhibit 312.

23             (Deposition Exhibit No. 312 was

24         introduced.)

25   BY MS. STILLMAN:
```

Page 22

```
 1   Q.   Are you familiar with this document?
 2   A.   Yes.
 3   Q.   And what is it?
 4   A.   This is the answer provided to
 5        interrogatories, if I'm pronouncing that
 6        correctly, that I provided as David Hewitt
 7        and signed on behalf of Hennepin County
 8        defendants.
 9   Q.   If you go to the bottom of page 10, is
10        that your signature?
11   A.   Yes.
12   Q.   Did you review this document before
13        signing it?
14   A.   Yes.
15   Q.   When did you first review this document?
16   A.   I couldn't give you a exact date.  I see
17        9th of February, 2023, on the bottom of
18        the page.  I have no reason to believe
19        that's not right.
20   Q.   If you turn -- so if you turn to the top
21        of the second page, in the first
22        paragraph, it says, "Defendants Hennepin
23        County and Hennepin County Sheriff David
24        Hutchinson (together, the 'Hennepin County
25        Defendants')."  Do you see that?
```

1   A.   Yes.

2   Q.   And do you understand that the answers to

3        these interrogatories were on behalf of

4        both of those parties?

5   A.   On behalf of Hennepin County defendants,

6        signed by me, yes.

7   Q.   How do you know that Hennepin County

8        Sheriff Hutchinson, or former Hennepin

9        County Sheriff Hutchinson, agreed to the

10       interrogatory answers?

11           MS. WELLS:  Objection.  Foundation,

12       calls for a legal conclusion.

13  A.   I have not spoken to Hennepin County

14       former Sheriff Hutchinson.

15  BY MS. STILLMAN:

16  Q.   Did you ask Hennepin County Sheriff Witt

17       if she agreed to the answers in -- to

18       these interrogatories?

19           MS. WELLS:  Objection.  Vague, calls

20       for a legal conclusion.

21  A.   I have not spoken to Hennepin County

22       Sheriff Witt, no.

23  Q.   Did you help prepare the answers to these

24       interrogatories?

25  A.   Yes, I provided information for these.

Page 24

1   Q.   Did anyone tell you how to respond to
2        these interrogatories?
3   A.   No.  I provided the information.
4   Q.   Did anyone delegate to you the task of
5        swearing to these interrogatory responses?
6            MS. WELLS:  Objection.  Vague.
7   A.   I'm not quite sure I understand the
8        delegating of the task here.  I provided
9        information.  The information I provided
10       was accurate.  I was comfortable signing
11       on behalf of Hennepin County defendants.
12  BY MS. STILLMAN:
13  Q.   Who asked you to sign on behalf of the
14       Hennepin County defendants?
15  A.   This would have been in coordination with
16       the Hennepin County Attorney's Office.  I
17       don't recall a specific individual
18       discussing the signature piece of it.
19  Q.   What authority do you have to sign on
20       behalf of the Hennepin County defendants?
21            MS. WELLS:  Objection.  Vague, calls
22        for a legal conclusion.
23  A.   I'm the Director of the Human Services
24       area in the -- the housing stability area
25       in the Human Services Department.  Excuse

Page 25

```
 1        me.  Therefore, possess a lot of the
 2        knowledge and information that needed to
 3        go into these answers.  Provided that.  I
 4        was comfortable signing on behalf of
 5        Hennepin County defendants.
 6   BY MS. STILLMAN:
 7   Q.   If you go to the answer to the
 8        interrogatory number 1, it's on page 2.
 9        In the last paragraph, it identifies a
10        list of Hennepin County employees.  Who is
11        Shane Magnuson?
12   A.   I am not familiar with Shane Magnuson
13        specifically.
14   Q.   Who is Stephanie Snell?
15   A.   I'm not familiar with Stephanie Snell
16        specifically.
17   Q.   If you go to page 11, which is the last
18        page, you'll see that it reads, "As to
19        form and objections:  Michael O. Freeman,
20        Hennepin County Attorney," dated December
21        1st, 2021, and there's a e-signature by
22        Christiana M. Martenson.
23             Do you see that?
24   A.   Yes.
25   Q.   And you signed these on February 9th of
```

Page 26

1      2023.  Correct?

2   A.  I see that that's the date on the page,

3      which is what I said previously.  Like I

4      say, I do not recall the specific date on

5      which I signed this.

6   Q.  And this is a notarized signature.

7      Correct?

8   A.  That's what it appears to me, yes.

9   Q.  Why did it take you over a year to sign

10      the interrogatory answers after the

11      Hennepin County Attorney served and signed

12      as to the form and objections?

13   A.  Like I say, I signed these when it was

14      provided to me to sign.  I see the

15      notarized date on there.  There certainly

16      was no specific reason that I'm aware of

17      for that time lag beyond that's when it

18      was presented to me for signature.

19   Q.  I am marking Hennepin County's Response to

20      Plaintiffs' Second Set of Interrogatories

21      as Exhibit 313.

22          (Deposition Exhibit No. 313 was

23       introduced.)

24   BY MS. STILLMAN:

25   Q.  Are you familiar with this document?

Page 27

```
 1            MS. SARFF:  Ms. Stillman, just before
 2       you ask questions, would you kindly wait
 3       until all the exhibits are coming around
 4       to all the counsel?  And if you wouldn't
 5       mind, I'd appreciate it if you just keep
 6       your voice up a little bit, given the size
 7       of the room and the conference table.
 8            MS. STILLMAN:  Yeah, not a problem.
 9       If you can't hear me, just let me know.
10            MS. SARFF:  I appreciate that.
11       That's already much better for down here.
12  BY MS. STILLMAN:
13  Q.  So are you familiar with this document?
14  A.  Yes.
15  Q.  Is that your signature on the bottom of
16       page 13?
17  A.  Yes.
18  Q.  And this was -- you signed in front of a
19       notary.  Correct?
20  A.  That's how it appears on this page, yes.
21  Q.  Did you review this document before
22       signing?
23  A.  I would have done, yes.
24  Q.  If you go to the top of page 2, it says,
25       "Defendant Hennepin County and Hennepin
```

Page 28

```
 1        County Sheriff David Hutchinson (together,

 2        the 'Hennepin County Defendants'), for

 3        their responses to Plaintiffs' Second Set

 4        of Interrogatories to Defendant Hennepin

 5        County ('Second Set of Interrogatories')."

 6             Do you see that?

 7   A.   I see that.

 8   Q.   Who helped you prepare the answers to

 9        these interrogatories?

10   A.   Again, this would have been work in

11        coordination with the County Attorney's

12        Office.  I provided information for them.

13   Q.   Did anyone tell you how to respond to

14        these interrogatories?

15   A.   No.

16   Q.   Who asked you to sign these answers to

17        interrogatories?

18   A.   Again, I do not recall the specific

19        individual, but this was -- this document

20        was put together in coordination with the

21        County Attorney's Office.

22             I was signing on behalf of Hennepin

23        County defendants.  I'm happy to do so in

24        my capacity as Housing Stability Director

25        in the Human Services area, with lead
```

Page 29

```
 1          responsibility, at least, for a large
 2          portion of our response to end
 3          homelessness and housing.
 4     Q.   If you go to the last page, which is page
 5          14, and it reads, "As to form and
 6          objections:  Michael O. Freeman, Hennepin
 7          County Attorney," dated October 21, 2022,
 8          and then there's an e-signature by Kelly
 9          K. Pierce.
10               Do you see that?
11     A.   I do see that, yes.
12     Q.   Why did you not sign the interrogatories
13          as to the answers until February 9th,
14          2023?
15     A.   Again, I signed this as of when it was
16          requested of me on behalf of Hennepin
17          county defendants.
18               I see that 9th of February, 2023, is
19          when the notarized signature gets added.
20               No specific reason aside from just
21          the time it took in which, you know, the
22          document came in front of me.
23     Q.   I am marking "Hennepin County Defendants'
24          Response to Plaintiffs' First Set of
25          Requests for Admission" as Exhibit 314.
```

Page 30

1           (Deposition Exhibit No. 314 was

2       introduced.)

3   BY MS. STILLMAN:

4   Q.   Are you familiar with this document?

5   A.   I believe so.  Not one that I have

6        reviewed as recently as the others.

7   Q.   Did you review this document in

8        preparation for this deposition?

9   A.   I did not look at this specific document

10       in preparation for this specific

11       deposition.

12   Q.   I'm marking "Hennepin County Defendants'

13       Response to Plaintiffs' Second and Third

14       Set of Requests for Admissions" as Exhibit

15       315.

16           (Deposition Exhibit No. 315 was

17       introduced.)

18   BY MS. STILLMAN:

19   Q.   Are you familiar with this document?

20   A.   I'm familiar with the back and forth that

21       has been occurring on this specific

22       subject.

23           It is not unlikely that I may have

24        seen this document around the time it was

25        developed in some iteration.

Page 31

1        This is not a document that I have
2     specifically reviewed recently.
3  Q.  What did you mean when you said "the back
4     and forth"?
5  A.  Well, I note that this is the second and
6     third set of requests for admission, so
7     that's at least three sets of back and
8     forth.
9  Q.  Okay.  So when you say back and forth,
10     just to clarify, do you mean the number of
11     sets of requests for admissions that the
12     plaintiffs have requested from Hennepin
13     County?
14  A.  I mean there's clearly a process in which
15     communication was happening between two
16     parties over time.
17  Q.  When did you first review this document?
18  A.  Like I say, I am broadly aware of this
19     correspondence.  I don't specifically
20     remember reviewing this exact version of
21     the document, though if I did, I would
22     guess that it was in the time frame around
23     when it was provided, though I hate to
24     guess such things.
25  Q.  You can put that away.

Page 32

1      What was Hennepin County's main
2      source of information about encampments in
3      Hennepin County in 2020?
4           MS. WELLS:  Objection.  Vague.
5  A.  Could you be more specific as to what you
6      mean, "information about encampments"?
7  BY MS. STILLMAN:
8  Q.  Sure.  Was Don Ryan Hennepin County's main
9      contact person on the ground for
10     encampments in Hennepin County in 2020?
11          MS. WELLS:  Objection.  Vague.
12 A.  Don Ryan was the lead person for the Human
13     Services Department with regards to
14     unsheltered homelessness during that
15     period.  That meant he was often closest
16     to the ground, as you say, in terms of
17     people who may be staying in encampments
18     and other unsheltered settings.  That
19     much, I can say.
20 BY MS. STILLMAN:
21 Q.  Was Don Ryan Hennepin County's main
22     contact person on the ground for
23     encampment sweeps in Hennepin County from
24     March 2020 through December 31st of 2020?
25 A.  Simply put, I would say the answer is no.

1      Aside from, I know we've already kind of

2      registered the legal objection to the term

3      "sweeps," I personally think it's an

4      evocative term lacking in definition that

5      is problematic.

6            Putting that to one side, Don Ryan's

7       role was as the human services lead, which

8       was around connecting people in

9       unsheltered settings to services and

10      shelter.  It did not directly relate to

11      the closure of encampments.  So, anyway, I

12      can say more, but please.

13   Q.  Who was Hennepin County's main source of

14      information about what occurred during

15      encampment sweeps in Hennepin County from

16      March 2020 through December 31st, 2020?

17   A.  Objections to the term "knowledge"

18      notwithstanding, what you are asking about

19      are a huge range of different

20      circumstances across different

21      jurisdictions and different entities.

22            There may be different people from

23       one occasion to another who would have

24       more information than the other.

25            Don Ryan, as the lead person from the

1      Human Services Department, was our key

2      point of contact with regards to the human

3      services needs of people experiencing

4      unsheltered homelessness during that

5      period, including those in encampments,

6      but depending on the specific instance and

7      the specific kind of gist of what you're

8      driving at, there may be somebody else

9      that would have more information,

10     depending on the circumstance.

11  Q.  Were you in regular communication with Don

12     Ryan between March 2020 and December 31st,

13     2020?

14  A.  Yes.

15  Q.  Was David Hough in regular communication

16     with Don Ryan between March 2020 and

17     December 31st, 2020?

18         MS. WELLS:  Objection.  Foundation,

19      vague.

20  A.  Not to the best of my knowledge.

21  BY MS. STILLMAN:

22  Q.  Would Don Ryan provide you with updates

23     about what was happening at encampments in

24     Hennepin County in 2020?

25  A.  Don would share his experiences, his

Page 35

```
 1        insights, his perspective on what was
 2        happening with regards to unsheltered
 3        homelessness and encampment settings and
 4        the people within them where he was
 5        engaged, yes.
 6   Q.   Would Don Ryan provide you with what --
 7        with updates about what happened during
 8        encampment closures in 2020?
 9   A.   He may well provide me with his insights,
10        experience, and perspective on what
11        happened in the lead-up to a closure, and
12        at the event, if he was present and
13        depending on the perspective and how much
14        of it was evident to him, yes.
15   Q.   Would you update Hennepin County
16        administration with the information that
17        Don Ryan provided you about encampment
18        sweeps in Hennepin County?
19             MS. WELLS:  Objection.  Vague.
20   A.   Notwithstanding the terminology piece
21        again, I would provide updates with
22        administration on a range of issues
23        throughout 2020.
24             We had huge undertakings in my area,
25         as you know, around pandemic shelter,
```

1       pandemic response, so there was a lot

2       going on in our world outside of this

3       specific subject.  I may well have

4       provided updates around encampment

5       situations.  More specifically, those

6       where there were very serious health and

7       safety concerns for our residents.

8              A smaller situation -- I know that

9       you at this time have the definition of

10      encampments as two tents or more, which I

11      remember discussing last time.  An

12      encampment of two tents is not something

13      that I would be likely to update

14      administration on.

15  Q.  Did you update Hennepin County

16      administration about what happened during

17      encampment closures in Hennepin County in

18      2020?

19  A.  Again, we're talking about a number of

20      different instances across different

21      jurisdictions, different circumstances.

22             I would have been likely and have

23      some recollection of communicating with

24      County administration around specific

25      events where there were serious health and

Page 37

1          safety risks or other kind of a reason
2          that it should raise to their attention.
3               Again, if we take the definition of
4          two tents, not every incident involving
5          two tents would be reported to
6          administration, no.
7   Q.    Did Don Ryan host meetings with homeless
8          outreach workers in the spring and summer
9          of 2020?
10              MS. WELLS:  Objection.  Vague,
11          foundation.
12  A.    Define "host" in a virtual age.  Don Ryan
13          attended many, many meetings with
14          nonprofits, outreach agencies, and other
15          stakeholders around the situation.  Some,
16          he would be a participant.  Some, he may
17          facilitate.
18              For those meetings -- meetings of
19          that nature were occurring, and Don Ryan
20          was a participant.
21  Q.    Does Hennepin County administration rely
22          on people in housing stability or in the
23          office to end homelessness, now the office
24          of housing stability, to have general
25          knowledge of the unsheltered homeless

Page 38

1      population?

2            MS. WELLS:  Objection.  Vague,

3        foundation.

4   A.   I'm not sure that I would use the term

5        "rely," but I think it's reasonable to say

6        there's an expectation that the housing

7        stability area is knowledgeable with

8        regards to issues around homelessness,

9        including but not limited to unsheltered

10       homelessness, which includes but is not

11       limited to encampments, which I know we

12       discussed last time actually represents a

13       very, very small proportion of those

14       experiencing homelessness, and an even

15       smaller proportion of those experiencing

16       housing risk, which is which is actually

17       our remit.

18   BY MS. STILLMAN:

19   Q.   Does Hennepin County administration rely

20       on people in the office to end

21       homelessness, now the office of housing

22       stability, to have general knowledge of

23       best practice related to the unsheltered

24       homeless population?

25            MS. WELLS:  Objection.  Vague,

Page 39

```
 1        foundation.
 2   A.   Again, I would question the use of the
 3        term "rely" because I'm not sure what that
 4        kind of implies.  Rely on for what
 5        purpose?
 6             I think it's reasonable to say that
 7        there's an expectation that the housing
 8        stability area is knowledgeable around
 9        best practices with regards to the housing
10        instability and homelessness at large, a
11        subset of which is unsheltered
12        homelessness, a subset of which is these
13        encampments.
14   Q.   Does Hennepin County have general
15        knowledge of recommendations from experts
16        on issues related to people experiencing
17        unsheltered homelessness?
18             MS. WELLS:  Objection.  Vague.
19   A.   I am not sure how you are defining
20        "experts" here, but it is reasonable to
21        say that members of our team have attended
22        events put on by the National Alliance to
23        End Homelessness.  We have presented at
24        events at the National Alliance to End
25        Homelessness.  I am on the leadership
```

Page 40

1      council of the National Alliance to End
2      Homelessness.
3              We are often looked to, to provide
4       best practice to other communities, and,
5       yes, in discussion, we also look to what
6       other communities are doing that we can
7       learn from.
8  BY MS. STILLMAN:
9  Q.   In your individual deposition, you said
10     the City of Minneapolis looked to Hennepin
11     County as subject matter experts with
12     regards to homelessness and encampments.
13     Do you remember that?
14 A.   I don't recall the specific wording, but
15     certainly we are -- we are the subject
16     matter experts for the local community
17     and, actually, as I say, at a broader
18     level we are seen as leaders in the field
19     nationally, specifically with regard to
20     homelessness, and that includes
21     unsheltered homelessness.
22              Again, encampments are a small subset
23      of that population.
24              And almost to come back to a previous
25      piece around who was the lead on

Page 41

```
 1         encampments, there are issues pertaining
 2          to encampments that are about more than
 3          homelessness.
 4    Q.   Did you review Don Ryan's deposition
 5         transcript in preparation for today's
 6         deposition?
 7    A.   I did not review his transcript.
 8    Q.   Did you review excerpts from Don Ryan's
 9         deposition transcript to prepare for
10         today's deposition?
11    A.   I do not look at the transcript of Don
12         Ryan's deposition, either in full or in
13         part.
14    Q.   Did you review a summary of Don Ryan's
15         deposition at all in preparation for
16         today's deposition?
17    A.   So I met with Don Ryan and discussed his
18         testimony.  I don't want to be too
19         pedantic because I was going to say no, I
20         wouldn't count that as looking at a
21         summary.
22              But to cut to kind of the point, I
23          did meet with Don Ryan and we discussed
24          his deposition and today's event more
25          broadly.
```

Page 42

1   Q.   Well, in Don -- in Don Ryan's deposition,
2        he said he worked with Park Police Chief
3        Ohotto as a subject matter expert on
4        homelessness.
5             Did the MPRB work with Hennepin
6         County as a subject matter expert on
7         homelessness in 2020?
8             MS. WELLS:  Object.  Vague.
9   A.   As with the previous answer regarding the
10       City, yes, I think that Hennepin County
11       has subject matter expertise with regards
12       to homelessness that we provided to
13       stakeholders, including, but not limited
14       to, the City and the Park Board at their
15       request.
16  BY MS. STILLMAN:
17  Q.   Why is Hennepin County considered to be
18       the local subject matter expert on
19       homelessness?
20            MS. WELLS:  Object.  Vague.
21  A.   Our area within the Human Services
22       Department is the single largest funder of
23       homeless shelters in the State of
24       Minnesota, I believe actually including
25       the State of Minnesota, but putting that

1    to one side, and a funder of other

2    homeless services and a deliverer of

3    direct services to people experiencing

4    homelessness.

5         Those are functions that, for the

6     most part, other local government entities

7     do not have, and they provide with us

8     insight and expertise.

9    Q.  What resources does Hennepin County

10    consult to learn about issues pertaining

11    to people experiencing unsheltered

12    homelessness?

13   A.  So I struggle a little bit with this

14    question in that we are not a -- it is not

15    an academic exercise for us.  We are not

16    sat around learning about it.

17         We have staff in the field directly

18     providing services to help people exit

19     homelessness.

20         We fund an array of nonprofit

21     partners who provide a mixture of homeless

22     prevention, crisis response, and housing

23     projects.

24         Through that work, we gain a lot of

25     insight, experience, and knowledge, and we

Page 44

```
 1        hire people with insight, experience, and
 2        knowledge to deploy those various
 3        functions.
 4   Q.   In your role as the Director of the Office
 5        of Housing Stability, do you review
 6        publications from the U.S. Department of
 7        Housing and Urban Development related to
 8        unsheltered homelessness?
 9   A.   Occasionally.  When I have time, I will
10        review documents that come out of federal
11        agencies and other areas.
12   Q.   In your role as the Director of the Office
13        of Housing Stability, do you review
14        publications by the National Healthcare
15        for the Homeless Council?
16   A.   Far less frequently, if at all.  Those
17        publications tend to be focused more on
18        the health side of business.
19             I meet weekly with the administrator
20        over our Healthcare for the Homeless team.
21        I look to them to be the experts on public
22        health.  I don't try to duplicate that
23        knowledge myself.
24   Q.   Who is the head of the -- I'm sorry.  What
25        did you call it?  Healthcare --
```

1   A.   Healthcare for the Homeless.

2   Q.   -- for the -- team?

3   A.   So I meet regularly with Stephanie Abel,

4        who is in the leadership of our Public

5        Health Department, and within her range of

6        duties, Healthcare for the Homeless falls.

7   Q.   In your role as the Director of the Office

8        of Housing Stability, do you review

9        publications from the National Coalition

10       for the Homeless?

11  A.   I may have done on occasion.  It's not --

12       I mean, again, to my earlier point, we are

13       not an academic entity, sat around

14       reading.  And in actual fact, we are

15       responsible for a lot of the best

16       practices that have emerged.

17            We've had papers published on our

18        work through federal and the national

19        entities around the use of single room

20        occupancy housing.

21            Indeed, the CDC guidance to use

22        protective shelter, nonpermanent shelter

23        for people experiencing homelessness, that

24        guidance came out after we'd already been

25        doing it for a month or so.  We believe we

1      were the second in the country to take

2      that step.

3              So I review periodicals if they leap

4      out as perhaps shedding a light or having

5      an insight that I haven't come across

6      before if they come to my attention, but

7      it is not something where I carve out time

8      in my day to read.

9              (Comments off the record.)

10   BY MS. STILLMAN:

11   Q.   Do you review other cities in the

12      country's policies regarding unsheltered

13      homelessness?

14   A.   I may have at times looked at policies

15      from other cities.  I certainly track how

16      cities and other communities are

17      performing relative to Hennepin County and

18      the space.

19   Q.   Do you recall what cities that you might

20      have looked at?

21   A.   Yes.  I have been citing them recently.

22              I have looked at Seattle, where

23      during the period we've experienced a 24

24      percent decrease in unsheltered

25      homelessness, they've experienced a 38

Page 47

1        percent increase.

2              I looked at Denver, who, over that

3        same period, experienced a 33 percent

4        increase.

5              I looked at Portland and Oakland, and

6        I compared that point in time count data

7        and their census data to ours and saw that

8        they have rates of unsheltered

9        homelessness between 8-1/2 and 10 times

10       those experienced by residents of Hennepin

11       County.

12   Q.  Does Hennepin County have knowledge about

13       the negative impacts of encampment sweeps?

14   A.  As I said earlier on, it's not a

15       terminology I would ever use.

16             I see in your definition you're using

17       interchangeably with as number of other

18       words, so if I -- I take the word of

19       encampment closures, my perspective on

20       this broadly is I am aware of the very

21       serious health and safety concerns that

22       emanate out of encampments.

23             I'm aware that there are concerns

24       that closures can negatively impact

25       people.

Page 48

1          I am also aware of instances in which

2       closures have directly led to people

3       actually accessing safer indoor sites such

4       as shelters.

5   Q.  What are some of the negative impacts of

6       encampment sweeps?

7          MS. WELLS:  Objection.  Foundation,

8        vague.

9   A.  Ultimately, if we're talking about an

10      encampment closure, to some extent the

11      negative effect is somebody being required

12      to do so something that they are not

13      voluntarily choosing to do.

14         I cannot speak to the wide array of

15       ways in which that may impact people.

16  Q.  Can you think of any other negative

17      impacts of encampment sweeps?

18         MS. WELLS:  Objection.  Foundation,

19       vague.

20  A.  So we build programming around the concept

21      that people experiencing homelessness are

22      highly mobile, because that is a fact of

23      our world.

24         I can't remember if I spoke about

25       this last time, but somehow the

Page 49

```
 1        homeless -- the housing team do case
 2        management to help people move from
 3        homelessness to permanent housing; in just
 4        over a year, 429 people, as of Friday,
 5        about half going directly from the streets
 6        into housing.
 7             So they will provide people with
 8        things like burner phones, contact
 9        details.
10             We have what we call the lottery
11        question.  If you won the lottery, how
12        would we get hold of you?
13             So we build a lot of programming in
14        around the idea that people are highly
15        mobile and we lose contact with them
16        often.  That happens irrespective of
17        encampment closures, but an encampment
18        closure could be one among many reasons
19        that somebody may move from one location
20        to another, necessitating us to take steps
21        around making sure that we can maintain
22        contact with them should a housing offer
23        be in the offing or something that we're
24        working on with them.
25   BY MS. STILLMAN:
```

1   Q.   So would you consider losing track of

2        somebody who might be on a waiting list

3        for housing to be a negative impact of an

4        encampment sweep?

5   A.   What you are describing there happens

6        frequently when encampments are left in

7        place also, and it doesn't automatically

8        follow that because somebody moves from

9        one location to another we lose contact

10       with them.

11            Losing contact is a risk in the work

12        that we do.  We put in place a number of

13        measures to mitigate that risk.  That risk

14        exists irrespective of encampment closure,

15        but encampment closure can play a part in

16        it.

17            Other things that can play a part in

18        it, somebody's tent catches fire and they

19        move of their own volition.

20            I remember being in the

21        Hiawatha/Franklin encampment with a list

22        of people who had housing program

23        offerings for them, and the whole time it

24        was open, every single day, we would have

25        trusted people go into the encampment to

Page 51

1        find them, and they would come back

2        saying, "We don't know where these people

3        are."

4             People would disappear for two weeks,

5        reappear, or disappear altogether.  That

6        is a factor.  That is just a feature of

7        our work.

8    Q.  Can you think of any other negative

9        impacts of encampment sweeps?

10            MS. WELLS:  Objection.  Vague,

11       foundation.

12   A.  You are asking people, directing them, to

13       relocate.  That can be an undertaking.

14            It can, as we've seen, result in some

15       positive consequences, but in the people

16       having to make choices, you know, that's

17       an impact.

18   BY MS. STILLMAN:

19   Q.  Could you expand upon what you mean by

20       "people having to make choices" as an

21       impact?

22   A.  People having to consider where they go

23       next and then having to make arrangements

24       to go there.  Depending on where they then

25       go, and like I say, I can think of -- I

1      can think of instances in which people

2      with extremely serious health conditions

3      move to safer locations, and so that's a

4      positive, but we don't know where

5      everybody goes.  And that's true

6      irrespective of encampment closures, again

7      because people are highly mobile and

8      people may move from one situation to

9      another, and we can't always say that that

10     will be positive or negative.  Yeah,

11     there's potential either way.

12          But we do work with our service

13      providers to at least make sure that

14      positive options and destinations are

15      available to the fullest extent possible.

16          Just while we're on the subject,

17      there was a phone call I had before

18      leaving the house today.  Avivo Village

19      reversed four overdoses yesterday.  I sure

20      am glad those are people are in Avivo

21      Village, not an encampment.

22          MS. STILLMAN:  Objection.

23      Nonresponsive.

24          MS. WELLS:  I object to the strike.

25  BY MS. STILLMAN:

1   Q.   Do you think people having to make choices

2        is a negative impact?

3   A.   Not in and of itself.  I mean, we all have

4        to make choices all the time.

5   Q.   So you've been very vague with your

6        answers.  I just want to be very clear.

7        Do you think there are any negative

8        impacts of encampment sweeps?

9             MS. WELLS:  Objection.  Asked and

10        answered, argumentative.

11            MS. SARFF:  Objection.  Vague.

12  A.   I think a person who moves from one

13       encampment to another encampment, which

14       sadly does happen, is a negative impact

15       because that person is still at serious

16       risk.

17  BY MS. STILLMAN:

18  Q.   Nothing else serious?

19            MS. WELLS:  Objection.  Vague,

20        foundation.

21  A.   I think if that person moves to an indoor

22       setting that does not provide for basic

23       health and safety and that is in some ways

24       dangerous.  There are examples from 2020,

25       such as the Sheraton.  I think that person

Page 54

```
 1        is putting themselves at risk.
 2              So to there being a negative
 3        consequence, I do think a lot depends on
 4        where the individual then chooses to move
 5        to.
 6              Again, I can think of an examples in
 7        which that's actually been a positive
 8        outcome.  But, yes, other encampments are
 9        the dangerous settings.  If that is the
10        choice that people make, then that is a
11        challenge.  Again, that happens
12        irrespective of closures.
13   BY MS. STILLMAN:
14   Q.   Hennepin County is aware that, as a
15        general matter, unsheltered people may
16        have property destroyed in encampment
17        sweeps.  Correct?
18              MS. WELLS:  Objection.  Vague,
19         foundation.
20   A.   I wouldn't say that, no.
21   BY MS. STILLMAN:
22   Q.   What would you say?
23   A.   I would say that, after encampment
24        closures, if we go back to the
25        Hiawatha/Franklin encampment, huge amounts
```

Page 55

```
 1        of waste are left behind.

 2             In the case of large encampments,

 3         hundreds and hundreds of used needles,

 4         piles of rotting food, tents full of

 5         rotting clothing that has become damp in

 6         the case of Hiawatha/Franklin, I remember,

 7         bike parts, other debris that is -- that I

 8         would not define as somebody's property at

 9         that point, and those items being

10         hazardous and waste, are often removed and

11         disposed of.

12    Q.   Hennepin County is aware that encampment

13         sweeps often cause the loss of encampment

14         residents' personal property that includes

15         medication and other life-sustaining

16         items.  Correct?

17             MS. WELLS:  Objection.  I'm going to

18         make a standing objection to the term

19         "resident" as vague, and to the extent it

20         calls for a legal conclusion, and to the

21         rest of the question, objecting as vague.

22    A.   Notwithstanding legal objections, I would

23         like to make a somewhat semantic objection

24         that I don't believe that anybody should

25         live in unsafe, undignified outdoor
```

Page 56

1      settings, so I also object at least to the

2      term "resident" on those grounds.

3              (Request to slow down by the court

4       reporter.)

5   A.  All right.  No, I would not say that.

6   BY MS. STILLMAN:

7   Q.  I'm marking a document that's been

8      Bates-stamped as Minneapolis Berry 069535

9      as Exhibit 316.

10             (Deposition Exhibit No. 316 was

11      introduced.)

12  BY MS. STILLMAN:

13  Q.  Dawn Petroskas is the medical director of

14     Hennepin County Healthcare for the

15     Homeless.  Correct?

16  A.  I don't know that that's her job title,

17     but Dawn Petroskas works for Healthcare

18     for the Homeless.

19  Q.  If you go to page -- the page ending in

20     69537, the last email -- or the second

21     email on the page, sorry, on the top,

22     says, "From:  Dawn Petroskas," and she's

23     forwarding an email to Danielle Werder,

24     Anne Semenak, Danielle Robertshaw,

25     Stephanie Abel, Susannah King, Martha

1     Trevey, Erica Bagstad.

2          Do you see that?

3   A.  I do.

4   Q.  And does Daniel Werder work for the Office

5       of Housing Stability?

6   A.  Yes.

7   Q.  Did she work for the Office to End

8       Homelessness in March of 2020?

9   A.  Yes.

10  Q.  So Dawn Petroskas writes, "FYI - I put my

11      husband in charge of researching best

12      practices for encampments during COVID.

13      See below if you're interested."

14          Did you -- do you see that?

15  A.  Yes.

16  Q.  And if you go down to that email from John

17      Petroskas on March 17th, 2020, the third

18      website link, she writes, "The National

19      Coalition for the Homeless says there

20      should be a moratorium on encampment

21      sweeps that displace already displaced

22      households and that often cause the loss

23      of personal property that includes

24      medication and other life-sustaining

25      items."

1          Do you see that?

2          MS. WELLS:  I'm going to object to

3      the extent that you represented that Dawn

4      wrote what you just read into the record.

5          MS. STILLMAN:  I apologize.  It was

6      written by John.

7          MS. WELLS:  I'm going to object.  I

8      don't know that we know that he wrote

9      that.

10  A.   I -- I see what you're referring to on

11      this document.

12  BY MS. STILLMAN:

13  Q.   So I'm not asking about the moratorium on

14      encampment sweeps, but does the County

15      disagree that encampment sweeps displace

16      already displaced households and that

17      often caused the loss of personal property

18      that includes medication and other

19      life-sustaining items?

20          MS. WELLS:  Object.  Vague, compound.

21  A.   I do not believe that those are

22      automatically the result of the closure of

23      an encampment.

24          I do not believe that those are

25      things that necessarily need to or will

1        happen in the case -- in the case of an
2        encampment closure.
3            I am aware that people raise that as
4        a concern often, and that concern is often
5        taken into account by those
6        operationalizing any kind of closure.
7   Q.  Do you agree that it's possible that it
8        can happen?
9            MS. WELLS:  Objection.  Vague.
10  A.  I think many things are possible.  I am
11       not aware of this occurring with regards
12       to any of the specific pieces that I
13       assume we're going to get on to at some
14       point.
15  BY MS. STILLMAN:
16  Q.  So we've talked about this a little, but
17       encampment sweeps cause people to disperse
18       throughout the community and break contact
19       with service providers.  Correct?
20           MS. WELLS:  Objection.  Vague.
21  A.  Not necessarily.
22  BY MS. STILLMAN:
23  Q.  What do you mean, "not necessarily"?
24  A.  I already described a number of the ways
25       that our services seek to stay in touch

Page 60

```
 1        with people, knowing that they are highly
 2        mobile, irrespective of camp closures.
 3             Part of that, of course, which we
 4         haven't spoken about as much, is providing
 5         ways for the individual to stay in contact
 6         with us, wherever they move, whether that
 7         is to their brothers, their cousins, out
 8         of state, a shelter, and other unsheltered
 9         settings.
10             We always see it as a -- as a
11         partnership between our staff and the
12         individual experiencing homelessness
13         working towards housing together.
14             So, no, I do not necessarily think
15         that because somebody moves from one
16         location to another, it is impossible for
17         them to stay in touch with another human
18         being.
19   BY MS. STILLMAN:
20   Q.  Can encampment sweeps cause people to
21        disperse throughout the community and
22        break contact with service providers?
23             MS. WELLS:  Objection.  Compound.
24             MS SARFF:  Objection.  Calls for
25         speculation, incomplete hypothetical.
```

Page 61

1    A.   Inherently, people are moving from one
2         location to another.  I'm not sure if
3         "disperse" is the right word, but people
4         are moving.
5              As I say, people move for a lot of
6         reasons, and people sometimes break
7         contact with their service providers.
8              I do not necessarily think it is a
9         given that that will occur in the case of
10        a closure, and I think it happens in a lot
11        of other occasions as well when people
12        relocate from an encampment for other
13        reasons.
14             MS. STILLMAN:  And I object as
15        nonresponsive.
16             MS. WELLS:  Object to the strike.
17             MS. STILLMAN:  Mari, can you repeat
18        my question?
19             (Record read back.)
20             MS. WELLS:  Oh, if we're repeating
21        the question, I object as vague and
22        compound.
23    A.   And having repeated the question, I will
24        center in on the word "cause" and say no,
25        I think there are ways to stay in touch

Page 62

1          with service providers even when you move

2          from one location to another.  It doesn't

3          always happen.

4                But does it cause?  I would have to

5           say the answer is no, because it is

6           possible to stay in contact with human

7           beings even when you move location.

8                MS. WELLS:  We've been going for over

9           an hour.  Can we take a break?

10                MS. STILLMAN:  I have about three

11           more questions and then we can take a

12           break.

13                MS. WELLS:  Sure.

14     BY MS. STILLMAN:

15     Q.  Can encampment sweeps -- well, can

16          encampment sweeps cause people to disperse

17          throughout the community?

18     A.  They -- people move because they are no

19          longer in that location, so they move to

20          other locations.  They may not all move as

21          one to the same location.  Some will move

22          to a brother or cousin, to a shelter.

23          Some may move to other unsheltered

24          settings.

25                If you're categorizing that as

Page 63

1       "disperse," that is, people moving to more
2       than one location, yes.
3   Q.  And that increases the risk of spreading
4       infectious disease.  Correct?
5               MS. WELLS:  Objection.  Foundation,
6        vague.
7               MS. SARFF:  Objection to the extent
8        it calls for an expert opinion.
9   A.  It's an interesting question.  Of course,
10      we're aware of the CDC guidance that
11      came -- came around encampments in the
12      pandemic, and a central premise of that
13      was the more that people are moving in our
14      community, the more risk there is of COVID
15      transmission.
16              I think that is a general principle.
17       You know, I have no reason to disagree
18       with it.  Again, I look to public health
19       experts on that.
20              That said, in discussion with our
21       public health experts, what was seen as a
22       huge risk in terms of transmission across
23       the community were the hundreds of people
24       visiting encampments and then dispersing
25       each day that they were in existence.

Page 64

1   Q.   I'm going to be marking a document that's

2        been Bates-stamped HC 00027552 as Exhibit

3        317.

4             (Deposition Exhibit No. 317 was

5         introduced.)

6   BY MS. STILLMAN:

7   Q.   So this is an email from you to Chris

8        Meyer, dated August 24, 2020.  Do you see

9        that?

10  A.   I do see that.

11  Q.   And the subject is, "RE: [External] CDC

12       guidelines."  Do you see that?

13  A.   I do.

14  Q.   And do you see that you quoted the CDC in

15       this document?

16  A.   Yes.

17  Q.   If you go to the -- do you see that bullet

18       point?

19             MS. WELLS:  Objection.  Vague.

20  A.   You're referring to the bullet point that

21       begins "If individual"?

22  BY MS. STILLMAN:

23  Q.   Yeah.

24  A.   Yes.

25  Q.   And it says, "If individual housing

Page 65

1        options are not available, allow people
2        who are living unsheltered or in
3        encampments to remain where they are," and
4        then there's a subbullet point saying,
5        "Clearing encampments can cause people to
6        disperse throughout the community and
7        break connections with service providers.
8        This increases the potential for
9        infectious disease spread."
10              Do you see that?
11   A.   I do see that.
12   Q.   Does Hennepin County disagree with the
13        CDC's assessments of the health risks of
14        encampment sweeps?
15              MS. WELLS:  Objection.  Vague.
16   A.   I'd like to make two points.  One, the
17        inclusion of this email here, as you'll
18        see before that bullet point, says, "Most
19        likely the people you are contacting you
20        are referring to" dot, dot, dot.
21              This is a copy-and-paste from a
22        document.  It's trying to illuminate the
23        commissioner as to what people are
24        reaching out to him about.
25              It is not in any way a statement that

Page 66

1    I support or agree with this, but rather

2    just a clarification for the commissioner

3    in this case.

4         With regards to that bullet point,

5    again, we are aware that during the

6    pandemic, people moving within the

7    community was a transmission risk broadly.

8         What I would add to it, which

9    actually even the piece below that refers

10   to the Governor's executive order, starts

11   to add to it, is that that risk is not the

12   only risk.

13        The risk of people moving after an

14   encampment closure is not the only way in

15   which encampments may contribute to the

16   transmission of COVID in this case.

17        Again, one of the biggest things that

18   we saw, especially with the large

19   encampments in parks, and this is the Park

20   Board commissioner, of course, were that

21   there were hundreds upon hundreds of

22   people congregating in these spaces and

23   then disbursing throughout the course of

24   the day, every single day, and that was a

25   huge transmission risk in addition to

Page 67

1          anything that the CDC might have been

2          highlighting here.

3     BY MS. STILLMAN:

4     Q.   So does Hennepin County disagree with the

5          CDC's assessment of the health risks of

6          encampment sweeps?

7               MS. WELLS:  Objection.  Vague,

8          foundation, asked and answered.

9     A.   We would agree that people moving in the

10         community during the COVID pandemic create

11         a transmission risk, for whatever reason.

12              I've already said that when

13         encampments are closed, people move.  That

14         creates some transmission risk.

15              Whenever looking at risk, there are a

16         balance of risks.

17              Was the risk of encampment closure

18         greater or less than the risk of the

19         hundreds of people congregating and

20         dispersing every day through that

21         encampment?  And, of course, there are

22         risks in encampments that are -- I don't

23         want to necessarily say over and above,

24         but that are extremely serious as well,

25         that have to be taken into consideration,

Page 68

```
 1          and they include fire, other infectious
 2          diseases--we do have an encampment-linked
 3          HIV outbreak in our community right now,
 4          and it's been ongoing since late
 5          2018--violence and exploitation.
 6               So it is not that we disagree that
 7          there is risk in people moving during a
 8          pandemic and that could transmit COVID.
 9          It is that in the matter of encampments,
10          there are many, many, many risks, of which
11          that is one.
12    Q.   Are you aware that FEMA made similar
13          assessments of the health risks of
14          encampment sweeps?
15               MS. WELLS:  Objection.  Vague.
16    A.   I don't recall seeing a FEMA assessment.
17          My familiarity with FEMA is predominantly
18          through when they eventually and partially
19          made funding available for noncongregate
20          shelter.  They still owe us quite a lot of
21          money.
22               MS. STILLMAN:  And I'll object and
23          strike that last part as nonresponsive.
24               MS. WELLS:  Object to the strike.
25          We've been going another ten minutes.
```

Page 69

```
 1              MS. STILLMAN:  Yeah, we can take a
 2         break.
 3              THE VIDEO OPERATOR:  We're going off
 4         the record at 10:10 a.m.
 5              (Break taken.)
 6              THE VIDEO OPERATOR:  This is Media
 7         No. 2 in the deposition of David Hewitt.
 8         Today is March 28th, 2023.  Going back on
 9         the record at 10:23 a.m.
10    BY MS. STILLMAN:
11    Q.  Does the County agree that depriving
12         people of tents would limit their ability
13         to self-quarantine if they are sick?
14              MS. WELLS:  Object to form, vague.
15    A.  An interesting question that I've not had
16         before.  Deprive people of tents?
17              Sorry.  Could you -- could I get you
18          to repeat it back?
19              (Record read back.)
20    A.  Assuming this is specifically referring to
21         the pandemic, given that's what we were
22         discussing before, the CDC guidance and
23         suchlike, Hennepin County made quarantine
24         isolation space available for anyone
25         experiencing homelessness for the period
```

Page 70

```
 1        of their sickness.
 2              And so, no, I do not believe that
 3         their ability to isolate would be
 4         conditional on their ownership of a tent,
 5         irrespective of the use of the word
 6         "deprive."
 7   BY MS. STILLMAN:
 8   Q.   Not limited to the COVID-19 pandemic, does
 9        the County agree that depriving people of
10        their tents would limit their ability to
11        self-quarantine if they are sick?
12              MS. WELLS:  Objection.  Vague.
13   A.   I don't feel like I'd be able to make that
14        statement.  I own a tent.  Depriving me of
15        it would make no difference whatsoever,
16        but understanding that's not what you're
17        driving at, it would surely depend on the
18        options available to the person.  And our
19        goal, as the County, notwithstanding the
20        isolation for COVID, is to work with our
21        nonprofit partners to make available other
22        alternatives, and that would be where our
23        focus is.
24              Frankly, I don't think anyone who's
25         sick should be staying in a tent.  I don't
```

Page 71

```
 1        think anyone should be staying in a tent,
 2        but that's another matter.
 3   BY MS. STILLMAN:
 4   Q.  And I understand that the County made
 5        efforts to make isolation hotels and that
 6        it is not the County's preference that are
 7        people living in tents.
 8             But does the County agree that
 9        depriving people of tents could limit
10        their ability to recover from illness?
11             MS. WELLS:  Objection.  Vague, asked
12        and answered.
13   A.  Yeah, and I don't think that a tent is a
14        good place to recover from illness, so I
15        don't -- I don't feel able to affirm what
16        you're saying.
17   BY MS. STILLMAN:
18   Q.  If you could go back to Exhibit 316, to
19        the page ending in 69537?
20   A.  One second.  537?
21             I have 537.
22   Q.  Correct.
23   A.  I have that in front of me.  I think I
24        have the right one.
25   Q.  So I'm going to go back to that paragraph
```

Page 72

```
 1        that we were talking about earlier in John

 2        Petroskas's email that says that the

 3        National Coalition for the Homeless says

 4        there should be a moratorium on encampment

 5        sweeps that displace already displaced

 6        households and that often cause the loss

 7        of personal property that includes

 8        medication and other life-sustaining

 9        items.

10             Do you see that?

11   A.   As discussed before, I see where that is

12        written on the page, yes.

13   Q.   Does the County believe that depriving

14        people -- or I'm going to strike that and

15        start over.

16             Does the County agree that depriving

17        people of their belongings, including

18        medication, would limit their ability to

19        recover from illness?

20             MS. WELLS:  Objection.  Vague,

21        foundation.

22   A.   This is a very vague, broad question.  I

23        think depriving people of medication is

24        probably a bad thing.  Could you be more

25        specific?
```

Page 73

1   BY MS. STILLMAN:

2   Q.   Do you think not -- a person who does not

3        have their prescribed medication would be

4        more limited in their ability to recover

5        from an illness?

6            MS. WELLS:  Objection.  Vague, calls

7         for speculation.

8   A.   Again, although myself I am not on the

9        health side, yes, I think that if people

10       have been prescribed medication, it's

11       probably a good thing that they take it,

12       if that's what you're asking.

13   BY MS. STILLMAN:

14   Q.   Did the County discuss the National

15       Coalition for the Homeless statement that

16       there should be a moratorium on encampment

17       sweeps that displace already displaced

18       households and that often cause the loss

19       of personal property that includes

20       medication and other life-sustaining items

21       with anyone from the City of Minneapolis

22       in 2020?

23   A.   Well, I don't know have a photographic

24       memory of every discussion.  We discussed

25       before the many, many hundreds of hours

Page 74

1   that would have involved.

2        I would say it's highly unlikely that

3   the National Coalition for Homelessness's

4   statement would have been something that

5   we discussed.

6   Q.  Did Hennepin County have discussions about

7   the fact that encampment sweeps can often

8   cause the loss of personal property with

9   anybody from the City of Minneapolis in

10  2020 generally?

11  A.  We certainly would not have framed any

12  such discussion in the way that you just

13  did.

14       We, going back to the earlier point

15  about subject matter expertise around

16  homelessness, may have discussed the

17  belongings that people may have with them

18  in unsheltered settings.

19  Q.  But Hennepin County didn't discuss that

20  encampment sweeps often cause the loss of

21  personal property with the City of

22  Minneapolis in 2020?

23       MS. WELLS:  Objection.  Vague, asked

24  and answered.

25  A.  And, again, because the language you're

```
 1      using is language I would never use, my
 2      answer has to be no.
 3            So I'm trying to provide some
 4       information that I think is responsive,
 5       but, no, we would not have used the words
 6       that you used in any meeting.
 7   BY MS. STILLMAN:
 8   Q.   What words would you have used?
 9   A.   Words along the lines that I just
10       described, that in our capacity as subject
11       matter experts on homelessness, we may
12       have advised on the kinds of possessions
13       that people may have while experiencing
14       homelessness in encampments and other
15       settings.
16   Q.   But you wouldn't have advised that
17       encampment sweeps often cause the loss of
18       those possessions?
19   A.   We would not have used a phrase like that,
20       as I've already said.
21   Q.   Is there any phrase that you would have
22       used that equates to the words "often
23       cause" -- that "encampment sweeps often
24       cause the loss of personal property"?
25             MS. WELLS:  Objection.  Vague.
```

Page 76

1    A.   I have no idea how to answer that.

2    BY MS. STILLMAN:

3    Q.   Wouldn't Hennepin County use the words

4         "encampment sweeps often cause the loss of

5         personal property"?

6    A.   We would never use the term "encampment

7         sweep."  As I mentioned earlier, those

8         words lack any technical definition or

9         common understanding and are evocative and

10        potentially hyperbolic.

11             I would categorize it a little bit,

12         as I read the English press a lot, with

13         phrases like "floods of migrants."  I

14         think there's something -- there's

15         something that just really rankles around

16         that phrase, which is used across a wide

17         variety of different circumstances and

18         actions, and that wide variety is

19         important because the closure of an

20         encampment need not necessarily result in

21         the kinds of consequence that you're

22         talking about.

23    Q.   I agree that the closure of an encampment

24         need not result in these types of

25         consequences.

Page 77

1          I am asking if the closure of an
2      encampment often causes the loss of
3      personal property was discussed with the
4      City of Minneapolis in 2020.
5          MS. WELLS:  Objection.  Form, vague,
6      asked and answered, argumentative.
7          MS. STILLMAN:  He hasn't answered the
8      question.
9          MS. WELLS:  He has answered multiple
10      times in fact.
11  A.  To rely on other words, of the words that
12      you're used there, that again means that I
13      cannot say yes, we would say that.
14          You used the phrase "often."  We
15      can't say that, because that is not our
16      experience.  We wouldn't be saying that to
17      our partners at the City or elsewhere.
18  BY MS. STILLMAN:
19  Q.  So you also wouldn't have said that to the
20      MPRB in 2020.  Correct?
21          MS. WELLS:  Objection.  Vague.
22  A.  I don't believe that I would personally
23      have said that.
24          As you shared here, you know, if
25      we're copying and pasting from other

Page 78

1    documents.  But, yeah, not to the best of

2    my recollection.

3 Q.  Would Hennepin County have said to the

4    MPRB in 2020 that encampment sweeps often

5    cause the loss of personal property?

6         MS. WELLS:  Objection.  Vague.

7 A.  Don't think we would say "sweeps."  I

8    don't think we would say "often."

9         I think in our capacity as subject

10    matter experts on homelessness, we might

11    discuss with them "people's possessions"

12    and -- and provide advice around that, but

13    that's as much as I can really offer here.

14 BY MS. STILLMAN:

15 Q.  Did Hennepin County discuss with the City

16    of Minneapolis the risk of property

17    discussion (sic) during encampment sweeps

18    in 2020?

19 A.  Was that "property discussion" or

20    "destruction"?  Sorry.

21 Q.  The risk of property destruction during

22    encampment sweeps in 2020.

23         MS. SARFF:  Objection.  Vague, and to

24    the extent it calls for a legal

25    conclusion.

Page 79

1   A.   And, again, you're asking us if we had

2        discussed the subject, and then the

3        subject that you're proposing is one that

4        we would never discuss because we would

5        never use those terms.

6             Do you see what I mean?

7   Q.   You wouldn't -- how would Hennepin County

8        talk about property destruction of

9        encampment residents?

10            MS. WELLS:  Objection.  Vague, calls

11       for a legal conclusion.

12            MS. STILLMAN:  Remember, we're using

13       the definitions that are in the notice.

14            MS. WELLS:  I understand, but you're

15       talking about property destruction, which

16       I think calls for a legal conclusion.

17  A.   Discussions around property would involve

18       an acknowledgement that people may well

19       have things with them that they wish to

20       retain.

21            Potentially, measures around, you

22       know, some of the steps that we took at

23       the Greenway around how do we -- how do we

24       provide people with the opportunity to

25       make sure that they can keep important

Page 80

```
 1        belongings with them.  That's how we would
 2        discuss it, I would think.
 3   BY MS. STILLMAN:
 4   Q.  Did Hennepin County talk to the MPRB about
 5        the risk of property destruction during
 6        encampment sweeps in 2020?
 7             MS. WELLS:  Objection.  Vague, calls
 8         for a legal conclusion.
 9   A.  I would think we would have talked about
10        the fact that people may have things with
11        them and ways in which people may be
12        afforded the opportunity to keep those
13        things with them as they move to another
14        location.
15   BY MS. STILLMAN:
16   Q.  Does Hennepin County think it's important
17        that people be able to keep their things
18        with them as they move to another
19        location?
20   A.  Notwithstanding the earlier discussion
21        around used needles, waste, and other
22        products, affording people the opportunity
23        to keep important items with them is
24        something that we would want to make
25        possible, you know, in most circumstances.
```

Page 81

1   Q.   In what circumstances wouldn't you want to

2        make that possible?

3             MS. WELLS:   Objection.   Vague.

4   A.   It's not that we wouldn't want to, but

5        there are circumstances in

6        encampments--shootings, fires--that may

7        not always afford people the options they

8        would like.

9   BY MS. STILLMAN:

10  Q.   Would those options include taking their

11       property with them to a new location?

12  A.   You're talking about in the case of a

13       shooter or a fire?

14            MS. STILLMAN:   Mari, could you please

15        read back his answer, the previous answer,

16        and my question?

17            (Record read back.)

18            MS. STILLMAN:   And then, sorry, could

19        you read my question after that?

20            (Record read back.)

21  A.   We are getting pretty hypothetical now.

22       It's calling for a lot of speculation,

23       which I don't love, but I can imagine, in

24       an instance of a huge fire in an

25       encampment, people may not have the

1        opportunity to take all their things with
2        them, just as we are all advised not to
3        take all of our things with us when a fire
4        alarm goes off.
5     BY MS. STILLMAN:
6     Q.   If the circumstances allow, does Hennepin
7          County agree that it's important that
8          residents of an encampment are able to
9          take their belongings with them to
10         wherever they move?
11              MS. WELLS:   Objection.   Vague.
12    A.   I think people's important belongings,
13         again notwithstanding property that is
14         often found left behind in encampments,
15         which I've already discussed, affording
16         people the opportunity to retain important
17         material that is important to them when
18         they move, whatever reason they move, is
19         something that I would say is desirable,
20         yes.
21    BY MS. STILLMAN:
22    Q.   Why is that desirable?
23    A.   Well, I care about people being able to
24         keep things that are important to them.   I
25         mean, are you looking for more than that?

Page 83

1   Q.   Why does Hennepin County think that it's

2        desirable that people be able to keep

3        their belongings?

4   A.   Again, I haven't suggested all belongings,

5        because there's a lot of things -- well,

6        inside the definition of belongings, all

7        of those other things at encampments that

8        actually may not be desirable are --

9             (Request for clarity by the court

10         reporter.)

11  A.   People should be able to keep things that

12       are important to them.  We all should.

13  BY MS. STILLMAN:

14  Q.   In 2020 there were not enough shelter beds

15       in Hennepin County for every person

16       experiencing unsheltered homelessness in

17       Hennepin County.  Correct?

18            MS. WELLS:  Objection.  Foundation,

19        vague.

20  A.   It is true to say that there were more

21       people in encampments than there were

22       available beds certainly in the summer of

23       2020.

24            It is also true to say that there

25        were available beds every single day and

Page 84

```
 1        every single evening, so every single
 2        individuals in those encampments, had they
 3        so wished, could have access to a shelter
 4        bed.
 5   BY MS. STILLMAN:
 6   Q.   So sweeping an encampment could force
 7        someone who was positive for COVID-19 into
 8        a new community that hadn't previously
 9        been exposed to that person.  Correct?
10             MS. WELLS:  Objection.  Vague, calls
11         for speculation.
12   A.   As we all know, people moving with
13        COVID-19 risk transmitting COVID to other
14        people, for whatever the reason.
15             And I do think there's potentially a
16         false assumption here that people in an
17         encampment are like a closed-off ecosystem
18         who never leave and nobody else comes in,
19         WHICH could not be further from the truth.
20   BY MS. STILLMAN:
21   Q.   Who was eligible for Hennepin County's
22        isolation hotel spaces?
23   A.   The isolation shelter programs was
24        specifically to allow people who were
25        COVID-positive or -presumptive,
```

Page 85

1     remembering we set these up before testing

2     even began, so that they could recuperate

3     and avoid transmission to other

4     individuals.

5  Q.  Did Hennepin County put any other single

6     adults, in addition to those who were

7     COVID-positive or presumptive

8     COVID-positive, in hotels in 2020?

9           MS. WELLS:  Objection.  Vague.

10  A.  Well, I wouldn't say that we put anyone

11     anywhere.  People have autonomy.

12           We also certainly did not have people

13      who were not COVID-positive inhabiting

14      those same isolation programs at the same

15      time.  The whole purpose of the isolation

16      programs was to avoid transmission.

17           We did lease and ultimately buy

18      additional hotels that were used for a

19      separate population in a separate model.

20      This we often refer to as protective

21      shelter.

22           So these placements were offered

23      to -- certainly nobody was put, but were

24      offered to initially anyone who was age 60

25      and above.  That would have been around

Page 86

```
 1        March 18th of 2020, a couple of days after
 2        the stay-at-home order was issued, in
 3        order to bring down their risk of ever
 4        contracting COVID, given the evidence that
 5        was emerging from around the world of the
 6        heightened risk, medical complications and
 7        even fatality, for people who were senior
 8        at that time.
 9             As the pandemic moved on and
10        eventually the CDC guidance caught up with
11        what we were doing, we added to the
12        prioritization for those programs people
13        who were under 60 but had other medical
14        conditions that put them at heightened
15        medical risk from the COVID pandemic.
16   BY MS. STILLMAN:
17   Q.   How long could individuals stay in the
18        protective shelter?
19   A.   The protective shelter that I've just
20        described for the seniors and people who
21        were medically high risk from COVID, there
22        were no time limits set on their stay, and
23        we recognized that people were still
24        homeless in that setting.  It still was
25        not their home.  That is not our goal for
```

Page 87

1      anyone.

2           So the goal was to then work with

3      those folks to help them move to permanent

4      housing so that at whatever point we run

5      out of money, the hotels wanted their

6      business back, the executive order were

7      over, whatever reason, but whatever point

8      we were not returning folks to shelter on

9      the streets, but we had taken this

10     opportunity to move this vulnerable group

11     to permanent housing.

12  Q.  How long could someone stay in one of the

13     County's isolation hotel spaces?

14  A.  Isolation was specifically to reduce the

15     risk of transmission, so people were --

16     people's stays were limited that the point

17     of transmission was no longer a risk.

18     That determination was made by our public

19     health colleagues.

20  Q.  What happened once a person had to leave

21     an isolation hotel space?  Did they have

22     to go back out to an encampment?

23           MS. WELLS:  Objection.  Vague,

24     speculative.

25  A.  The first response, if people had nowhere

Page 88

1        else to go, would be to look at reserving

2        them a space back in a regular shelter,

3        which themselves had been deconcentrated,

4        converted to 24/7, a number of risk

5        mitigation measures put in.

6              Again, we do not put people places.

7        We do not control their movements.  We do

8        not compel them to go anywhere.  We would

9        never make somebody go to an encampment

10       where we consider their risks from --

11       risks other than COVID, fire, infectious

12       disease, violence, and exploitation, are

13       elevated.

14             But during that period when

15       encampments were allowed under the

16       executive order, people may have chosen

17       that step.

18   BY MS. STILLMAN:

19   Q.  Is Hennepin County aware that best

20       practices for encampment sweeps include

21       providing residents with sufficient

22       notice?

23             MS. WELLS:  Objection.  Vague.

24             I'm going to make a standing

25        objection as to notice for being vague and

1        calling for a legal conclusion.

2  A.   Sorry.  Can I get the question back?

3            (Record read back.)

4  A.   Again, it's not language we would use.

5            I am aware that providing notice to

6        people is desirable, again noting there

7        are a broad range of circumstances that

8        can occur in encampments and around

9        encampment closures, and notwithstanding

10       all of those potential circumstances, yes,

11       I can see merit in providing notice and

12       that clarity to people ahead of time.

13 Q.   Is Hennepin County aware that best

14       practices for encampment sweeps include

15       offering encampment residents storage for

16       their property?

17            MS. WELLS:  Objection.  Vague.

18 A.   I'm not really sure what you're talking

19       about when you say best practices, kind of

20       just hanging in the air there.  I mean,

21       whose best practices?

22            I mean, again, we recognize that

23       people have belongings.  We have in the

24       past urged outreach teams, in particular,

25       to kind of take up that mission.  You

Page 90

```
 1        know, these folks are out in the

 2        encampments regularly.  Can you work with

 3        people to identify what is important to

 4        them and help them arrange for storage,

 5        help them arrange to get important

 6        documents copied, that kind of thing, not

 7        even necessarily related to closure, but

 8        because things get lost and, frankly,

 9        stolen all of the time.

10             So, yes, we're -- so in that sense,

11        yes, but I'm not sure which best practice

12        you're referring to.

13  BY MS. STILLMAN:

14  Q.  Is Hennepin County aware that best

15        practices for encampment sweeps include

16        providing residents with alternative

17        shelter options?

18             MS. WELLS:   Objection.  Vague.

19  A.  It is my hope that every time an outreach

20        worker engages with somebody in an

21        encampment, they are making sure that, if

22        they wish to access shelter, they are

23        supporting them to do so as new shelter

24        becomes available every single day.

25             So irrespective of closure, I believe
```

```
 1        it's best practice to make sure that
 2        people in encampments are being offered
 3        shelter and connected to it if they wish
 4        it, yes.
 5   BY MS. STILLMAN:
 6   Q.   How long has Hennepin County been aware of
 7        these best practices?
 8              MS. WELLS:   Objection.   Vague.
 9   A.   I don't know what best practices you are
10        referring to.   I'm giving my opinion on a
11        number of items that you've suggested of
12        best practices related to encampment
13        closures or sweeps, as you call them.
14   BY MS. STILLMAN:
15   Q.   Does Hennepin County believe that it is a
16        best practice for encampment sweeps to
17        include sufficient notice to residents?
18   A.   I wouldn't use the language.   I don't know
19        that I would say it's our place to say,
20        "This is the best practice."
21              But, as I've already said, we believe
22        there is merit in giving people notice
23        ahead of time when circumstances allow,
24        yes.
25   Q.   Does Hennepin County believe that it is a
```

1    best practice for encampment sweeps to

2    include the offer to store residents'

3    property?

4         MS. WELLS:  Objection.  Vague.

5  A.  Again, I'm not sure anyone has asked us to

6    define the best practices as Hennepin

7    County, but we see merit in providing

8    people experiencing unsheltered

9    homelessness with storage options at all

10   times, and, yes, that would include in

11   advance of a closure event, if possible.

12 BY MS. STILLMAN:

13 Q.  How long has Hennepin County thought it

14   was appropriate to offer encampment

15   residents property storage prior to an

16   encampment closure?

17        MS. WELLS:  Objection.  Vague.

18 A.  So I can recall -- I referenced outreach

19   providers earlier.  I can recall meeting

20   with a variety of outreach providers in

21   early 2019 and us collectively discussing

22   encampment response in the wake of the

23   Hiawatha/Franklin encampment of late 2018,

24   and I remember discussing at that meeting

25   the importance of, which I believe

1        everybody agreed with, outreach providers

2        supporting people in storing or making

3        copies of important documents at all

4        times, but including in advance of

5        closures.

6    BY MS. STILLMAN:

7    Q.   Who else was in attendance of that

8         meeting?

9    A.   That meeting, there were representatives

10        of -- is it okay if I give you the

11        agencies rather than the individuals?  I

12        can do a mix, if you like, but ...

13   Q.   If you could do a mix, that would be

14        great, to the best of your ability.

15   A.   All right.

16             St. Stephen's Human Services, now

17        known as Agate.  I believe John Tribbett

18        and Mike Huffman.

19             People, Incorporated; David

20        Katzenmeyer, I think, is his name.

21             American Indian Community

22        Development -- no, they weren't.  I met

23        with them separately because they couldn't

24        attend.  Please strike that.

25             There were some youth outreach

Page 94

1      providers.  I do not recall exactly who.

2           There would have been representation

3      from Healthcare for the Homeless, the

4      Homeless and Vulnerable Person Liaison

5      from MPD, then Lieutenant, now Commander

6      Snyder, I think.

7           There may have been a couple of

8      others.

9   Q.  I'm marking a document that's been

10      Bates-stamped HC 00010004 as Exhibit 318.

11           (Deposition Exhibit No. 318 was

12      introduced.)

13   BY MS. STILLMAN:

14   Q.  Are you aware what Adult Shelter Connect

15      is?

16   A.  Yes.

17   Q.  Have you seen an Adult Shelter Connect

18      "After-Hours Stats" document before?

19   A.  Oh, yes.

20   Q.  If you look at this, towards the top,

21      there's a big area that says "Notes."

22           Do you see that?

23   A.  I do.

24   Q.  And then it says "Ineligible" and a

25      number?

1   A.   Yes.

2   Q.   Is that number somebody's HMIS number?

3   A.   I would assume so.

4   Q.   Why would somebody be ineligible for a

5        shelter?

6   A.   To be ineligible, especially for all the

7        shelters, which isn't necessarily the case

8        here, but would be my assumption, would

9        generally involve some kind of action of

10       violence against other guests or staff.

11            It could involve other serious -- I

12        mean, essentially activity that puts the

13        health and safety of other guests and/or

14        staff at risk in such a way as it is not

15        deemed safe for that person to be present.

16   Q.   Now, if you go to the column on the right,

17        it says "Turned Away."  Do you see that?

18   A.   Yes.

19   Q.   And if you go down, "Men TA tallies/IDs."

20        Do you see that?

21   A.   I do.

22   Q.   And there are four numbers?

23   A.   Yes.

24   Q.   Why would someone be turned away from a

25        shelter?

Page 96

1            MS. WELLS:  Objection.  Vague.

2    A.   So the Adult Shelter Connect PM, people

3         are calling in and requesting a shelter

4         bed.  And Simpson Housing Services, who

5         operated the Adult Shelter Connect, their

6         staff would look up within the system

7         which shelters, if any, have availability

8         capacity to take those folks in and would

9         make a reservation on their behalf.

10            At the point at which there was not

11         available capacity in an existing shelter

12         for an individual, they would be advised

13         to call back the next day when new -- more

14         shelter would become available and would

15         be recorded on this document as a

16         turn-away.  It's not a phrase I love, but

17         it is the phrase that they use.

18    BY MS. STILLMAN:

19    Q.   Does Simpson Housing collect this

20         information?

21            MS. WELLS:  Objection.  Form, vague,

22         speculation.

23    A.   We receive this document, along with the

24         AM equivalent, from somebody at Simpson

25         Housing.  I was going to say every day.

1        Probably most days is a fairer assessment.

2              So our information comes from the

3         Simpson staff who provide this.

4    BY MS. STILLMAN:

5    Q.   Why does Hennepin County collect Adult

6         Shelter Connect statistics?

7    A.   To understand both the performance of

8         Simpson Housing Services in the Adult

9         Shelter Connect operations and to

10        understand supply and demand and their

11        daily fluctuation across the shelter

12        network, in short.

13   Q.   Does Hennepin County rely on this

14        information to provide accurate

15        representations of shelter bed

16        availability in Hennepin County?

17              MS. WELLS:   Objection.   Vague.

18   A.   So the report that we are looking at right

19        now, if that is the information you are

20        referring to, does not represent shelter

21        availability.

22              It represents the situation at the

23         end of the evening and what were kind of

24         the outcomes of shelter supply and demand

25         through the evening period.

1        Shelter availability is broader than
2        this document, so, no, we would not rely
3        on it, again to use that term.
4            We would be looking at what shelter
5        was available during the day through
6        Simpson in the first place; then, yes,
7        what shelter came available in the
8        evening.
9            This document does not include family
10       shelter, so that is something that we
11       review separately.  At this time, it did
12       not include youth shelters, also something
13       we review separately, and at
14       times--indeed, it is true today--there
15       have been private shelters that operate
16       their own intake processes.
17           So this is not a comprehensive record
18       of shelter availability, but it would show
19       how much -- how many shelter bed openings
20       were available for those shelters that
21       participate in the Adult Shelter Connect
22       coordination at the opening of the
23       after-hours, which is typically around
24       7:30.
25           And we see there, 28 beds at Sally's,

Page 99

```
 1        6 at SafeBay, one at Simpson.  So on the
 2        evening of the 23rd of September, 2020, we
 3        had 35 beds become available in the
 4        evening.  We see that each of those men's
 5        beds was taken up.  22 of those women's
 6        beds were left unused.
 7             The next day, more shelter would have
 8        become available, and that would have been
 9        represented in the AM report from the
10        Adult Shelter Connect for 9/24.
11   BY MS. STILLMAN:
12   Q.  Are there reasons a person might be turned
13        away, other -- from a shelter in Hennepin
14        County other than the shelter being full?
15             MS. WELLS:  Objection.  Vague.
16   A.  In terms of that person being told that
17        they cannot access this shelter by
18        somebody, say, at Simpson, the reasons
19        would be capacity, or that they are banned
20        from that shelter or all shelters, which,
21        as I've said, would typically be based on
22        past behaviors that put the safety of
23        other guests or staff at risk.
24   BY MS. STILLMAN:
25   Q.  If someone is turned away at the time
```

Page 100

```
 1      Adult Shelter Connect closes, where does
 2      Hennepin County recommend they go?
 3            MS. WELLS:  Objection.  Vague.
 4   A.  The interaction for that individual would
 5      be between them and a Simpson Housing
 6      service member of staff.
 7            Hennepin County does not make
 8       recommendations as to where that Simpson
 9       Housing member of staff would direct them.
10            We would expect that they would be
11       directed to call back the next day if they
12       still needed shelter then, or -- knowing
13       that more shelter beds would become
14       available then.
15   BY MS. STILLMAN:
16   Q.  So Hennepin County doesn't have a place
17      for an individual to go if a Hennepin
18      County shelter is full -- if Hennepin
19      County shelters are full?
20            MS. WELLS:  Objection.  Vague.
21   A.  Essentially, if somebody is calling in in
22      the evening and all the shelter is
23      allocated for that night, there is not an
24      alternative place offered.  These are the
25      places offered.
```

```
                                          Page 101

 1            They would be directed to call back

 2        or contact the next day and access a

 3        shelter bed then.

 4   Q.   Was that true in 2020?

 5            MS. WELLS:  Objection.  Vague.

 6   A.   The basic process and system that I am

 7        outlining is much the same in 2020 as it

 8        is today, yes.

 9   BY MS. STILLMAN:

10   Q.   Is that -- was it the same process in

11        2021?

12   A.   Exactly as I just said, much the same,

13        yes.

14   Q.   And in 2022?

15   A.   Much the same, yes.

16   Q.   And now?

17   A.   In 2023, much the same, yes.

18   Q.   Why are the ideas of people -- or, sorry,

19        why are the ID of people who are turned

20        away tracked?

21            MS. WELLS:  Objection.  Vague,

22        foundation.

23   A.   We want to understand who is interacting

24        with our system, how they are moving

25        through it, and the shared homeless
```

Page 102

1        management information system is a key

2        tool for that.

3               One of the things that I know folks

4         on my team have spent time with Simpson on

5         in recent years is looking at these IDs,

6         and how do we make sure that if somebody

7         has nowhere else to stay and is seeking

8         shelter that we get them in at the next

9         available opportunity.

10              That is not always possible.  It's

11        not always requested.  But we want to

12        understand who is being served, how

13        they're being served, and strategize

14        around how to serve people better.

15   BY MS. STILLMAN:

16   Q.  Are there any shelters available through

17        Adult Shelter Connect that are not listed

18        in this document?

19   A.  The participating shelters change over

20        time, so there are a different -- there is

21        a different portfolio of shelters today in

22        some ways than there was on 9-23-2020,

23        yes.

24              For instance, Elim Church has not

25         operated as a shelter through the Adult

Page 103

1       Shelter Connect for the last couple of

2       years.

3              St. Stephen's is now know as Agate.

4       So is First Covenant.  You know, it's part

5       of the same thing.

6              (Request to speak clearly by the

7       court reporter.)

8              THE WITNESS:  Oh, sorry.

9    A.  Rescue Now has been added this winter and

10      last.

11             I'm trying to think if there's

12      anything else.

13             Oh, the women's only shelter operated

14      by the Salvation Army is not on here.

15             And in actual fact, just because

16      we're looking at this PM after-hours

17      stats, there are a couple of shelters that

18      existed on 9-23 that do not appear in the

19      PM numbers, but would have appeared if

20      they were looking at the AM numbers.  They

21      are what have historically been known as

22      the emergency housing beds at Salvation

23      Army, which are for people with

24      disabilities.  Before the pandemic, they

25      were the only shelter beds that were 24/7.

Page 104

```
 1      They would have been on the AM stats for

 2      this day, but not the PM, as they

 3      typically don't do intakes in the evening.

 4          The same is true for pay-for-stay at

 5      Higher Ground.  So you see Higher Ground

 6      here, which is the ground floor of the

 7      Catholic Charity shelter.  The floor above

 8      it, which I was going to call the first

 9      floor, but you would all call the second

10      floor, is known as the pay-for-stay

11      shelter targeted towards working men.

12      And, again, they don't do intakes in the

13      evenings.  They don't appear in the PM

14      stats.

15          So this is not a comprehensive list

16      of all of the shelters that have ever gone

17      through the Adult Shelter Connect.  It's

18      simply those that would have done intakes

19      potentially if availability allowed on

20      9/23/2020.

21  Q.  When did that women's only shelter you

22      mentioned open?

23          (Sneezing.)

24          THE WITNESS:  Bless you.

25  A.  The women's only shelter opened, I want to
```

Page 105

```
 1      say, December of 2020 in a temporary
 2      location, moving to its permanent location
 3      early 2022.
 4   BY MS. STILLMAN:
 5   Q.  Is "HLC" Harbor Lights Center?
 6   A.  Yes.
 7   Q.  How much was the cost of a pay-for-stay
 8      shelter in 2020?
 9           MS. WELLS:  Objection.  Vague.
10   A.  I think it was $40 a week, to the best of
11      my recollection.  I could be off on that,
12      but it's something in that range, I
13      believe.
14   BY MS. STILLMAN:
15   Q.  Did it change at all -- did the cost
16      change at all in 2020?
17   A.  So to be clear, I am talking about -- when
18      I say "pay-for-stay," I'm talking about
19      the Catholic Charities pay-for-stay
20      shelter on the second floor of Higher
21      Ground.  Nothing else on this list
22      involved any kind of payment.
23           Historically, family shelter had a
24       self-pay component, and historically those
25       24/7 beds at Harbor Lights Center, the
```

Page 106

1          emergency housing program that doesn't
2          appear on this list, which was the only
3          24/7 beds, had a self-pay component.
4              Those have changed over time and both
5          have been eliminated and are completely
6          free at this point.
7  Q.   Did the cost of the pay-for-stay on the
8          second floor of Higher Ground change at
9          all in 2020?
10 A.   Not to the best of my recollection.  But
11         those are program decisions taken by
12         Catholic Charities.  You know, they would
13         inform us, because we are a partial funder
14         of the shelter, and we would expect the
15         Simpson Housing, as the Adult Shelter
16         Connect operated, to have that realtime
17         knowledge so they can advise people
18         calling.
19             But, as I recall, the self-pay
20          component for that one shelter did not
21          change during that time.
22 Q.   I'm going to mark a document that's been
23         Bates-stamped HC 00015814 as Exhibit 319.
24             (Sotto voce comment.)
25             MS. STILLMAN:  It ends in 15814.

Page 107

```
 1              (Deposition Exhibit No. 319 was
 2         introduced.)
 3    BY MS. STILLMAN:
 4    Q.   And this is an email thread from August
 5         25th, 2020.  If you'll turn to the second
 6         page that ends in 15815, if you look at
 7         paragraph 1, that last sentence, "If we
 8         can confirm that they were abandoned, we
 9         will have our vendor clean up sites."
10              Why did Hennepin County want to
11          confirm if tents were abandoned before
12          having them cleaned up?
13    A.   Yeah, I mean, this is the due diligence
14         that, where circumstances allow, we would
15         want to do.  It goes back to my point
16         earlier around, you know, we believe there
17         is merit, if there are people still using
18         these sites, and finding that out and
19         being able to communicate with them.
20              So this is due diligence, speaking
21          with the outreach providers, to make sure
22          we're leveraging their insight and their
23          activities as well as our own.
24    Q.   If you go to the first page, there's an
25          email from John Tribbett on August 25th,
```

Page 108

```
 1      2020.  In the paragraph below the numbers,
 2      he writes, "Just a heads-up that as parks
 3      have begun to sweep several sites and have
 4      closed existing sites to new residents,
 5      you may see an uptick in occupancy of
 6      Greenway sites."
 7           Do you see that sentence?
 8  A.  I do see that sentence.
 9  Q.  Why would there be an uptick of
10      encampments on the Greenway if other
11      entities are sweeping encampments?
12           MS. WELLS:  Objection.  Form,
13       foundation.
14  A.  That was a large encampment, or several
15      encampments potentially, defined on the
16      Greenway at this time.
17           As people sought alternative
18       locations, there was a possibility they
19       would potentially alight upon this one.
20           I think in -- you know, this is
21      referenced in the email above.  We really
22      didn't see that in these instances.
23           We did see it, however, when the
24      State closed the large encampment at the
25      Hiawatha/Franklin site.  That did directly
```

Page 109

```
 1          lead to a large increase of folks at
 2          encampments on the Greenway.
 3    BY MS. STILLMAN:
 4    Q.   In the second sentence, Mr. Tribbett
 5          writes, "This is the inevitable and
 6          unfortunate shuffling people around that
 7          happens when we don't have comprehensive
 8          planning across multiple public property
 9          owners."
10                Does Hennepin County agree that
11           people get shuffled around when there
12           isn't comprehensive planning across
13           multiple public property owners?
14                MS. WELLS:  Objection.  Vague,
15           speculation.
16    A.   No, I would not agree with the opinions
17          of -- of this particular statement.
18                I would actually point out that what
19           he describes as inevitable didn't happen
20           as well.  As I was just saying, we did not
21           see an uptick on the Greenway during this
22           time.
23    Q.   I'm going to be using Exhibit 121 and
24          marking a document that has been
25          Bates-stamped HC 00015828 as Exhibit 320.
```

Page 110

```
 1          (Deposition Exhibit No. 320 and
 2       previously marked Exhibit No. 121 were
 3       introduced.)
 4   BY MS. STILLMAN:
 5   Q.  Mr. Tribbett, that's a copy of Exhibit 121
 6       for you.
 7   A.  Thank you.  I'm not Mr. Tribbett, though.
 8   Q.  Sorry.  Mr. Hewitt.
 9          MS. WELLS:  Exhibit 320 has a clip on
10       his.
11          MS. STILLMAN:  It's a double-sided.
12       On everybody else's, it's single-sided.
13          MS. WELLS:  Great.  Thank you.
14          MS. STILLMAN:  And then did everybody
15       get -- find confined 121?
16          MS. WELLS:  Yeah.
17          MS. STILLMAN:  I have an extra copy.
18       Clare, could you ...
19          (Discussion off the record.)
20   BY MS. STILLMAN:
21   Q.  And I will represent that Exhibit 121 is
22       the attachment to what's been marked as
23       Exhibit 320.
24          At the top email, the first sentence
25       is, "Major Storms, as we discussed on the
```

Page 111

```
1          phone today we have asked a group of
2          people camping on the Midtown Greenway
3          between 12th and 13th Avenues to relocate
4          to a different area of the Midtown
5          Greenway for a construction project
6          happening next door."
7               Do you see that?
8     A.   Yes, I do see that.
9     Q.   Why did Hennepin County ask a group of
10         people to relocate to a different area of
11         the Greenway on or around November 6th of
12         2020?
13    A.   For a construction project happening next
14         door.
15    Q.   Why didn't Hennepin County offer shelter
16         options at this time?
17              MS. WELLS:  Objection.  Form, vague,
18          speculation.
19    A.   So shelter options were being -- as I
20         think I said earlier, you know, you would
21         hope at every single occasion.  I guess
22         you don't need to hear all that often --
23         shelter options were being offered
24         throughout the existence of the
25         encampment.
```

Page 112

1           There is an implicit assumption here
2       that if folks haven't accepted shelter up
3       to this date, they're unlikely to accept
4       it on this date, but there is a
5       construction project happening, and we
6       need people to be safe, so, at the very
7       least, we need them to move to a safer
8       spot.  Of course, if they want to take up
9       a shelter option, all the better.
10  BY MS. STILLMAN:
11  Q.  And you can put those aside.  I'm marking
12      a document that's been Bates-stamped
13      HC 00040273 as Exhibit 321.  I apologize.
14           And then a document that's been
15      Bates-stamped HC 00040274 as Exhibit 322,
16      and a document that's been Bates-stamped
17      HC 00040275 as Exhibit 323.
18           (Deposition Exhibit Nos. 321, 322,
19      and 323 were introduced.)
20  A.  This might be a little bit small for my
21      eyes, but we'll see what you need from me
22      on that.
23  BY MS. STILLMAN:
24  Q.  I'm not going to ask any questions about
25      that.  It's just I'll represent that the

Page 113

1      documents that have been marked as Exhibit

2      322 and 323 are the attachments to Exhibit

3      321.

4  A.  I'm fast approaching the day I need

5      glasses.

6  Q.  And Exhibit 321 is an email that was sent

7      on October 12th, 2020, from Lisa Cerney,

8      and the email states, "Please see the

9      attached draft plan for actions this

10     week."

11          MS. WELLS:  I just want to note for

12      the record there is no "From" field on

13      this email in Exhibit 321.

14          MS. STILLMAN:  And I'll just note

15      that this is how the document was produced

16      to us, if it is incomplete.

17 A.  And it's pronounced "SIR-nee."

18 Q.  "SIR-nee."  Thank you.

19          If you go to Exhibit 322, in

20      paragraph 2(h), the Midtown Greenway -- of

21      the Midtown Greenway draft plan, it says,

22      "Support from MPD and/or HCSO with

23      security during the clearing process

24      (specific numbers to be determined)."

25          Do you see that?

Page 114

1    A.   I do.

2    Q.   So Hennepin County was having

3         conversations about demobilizing the

4         Greenway encampment as early as October of

5         2020.  Correct?

6              MS. WELLS:  Objection.  Foundation,

7          vague.

8    A.   So this document sets out, yes a number of

9         plans around the Midtown Greenway,

10        including the likelihood that there would

11        be a need to close it in due course, yes,

12        and that that would need proper planning.

13        So ...

14   BY MS. STILLMAN:

15   Q.   And at the time, in October of 2020, the

16        plan was to work with MPD on the clearing

17        of the Greenway encampment.  Correct?

18             MS. WELLS:  Object to form,

19         foundation, speculation.

20   A.   Actually, and I'm referring my memory

21        about exactly where we were in planning at

22        this time as I read this document.

23             Is that what this says?  This action

24         is around the removal of propane

25         structures and fires.  It's not about the

Page 115

```
 1        closing of the encampment.
 2             And certainly I recall that at this
 3        point in October there was no date set
 4        around the closure of the encampment.
 5             And as I read through these steps,
 6        they are all subheadings underneath
 7        "Propane, Structures, and Fires."
 8             I mean, correct me if you think I am
 9        misreading this, but as I look through
10        these steps, I don't see reference to
11        actually closing the encampments, and the
12        clearing looks to me to be related to
13        clearing of propane structures and fires
14        from the encampment, not closure of the
15        encampment itself, which would be
16        consistent with what I remember about
17        where we were in the planning stage in
18        October of 2020.
19   Q.   Okay.  So during the planning stage in
20        October of 2020, was the Hennepin County
21        plan to work with MPD on clearing propane,
22        structures, and fires from the Greenway?
23   A.   I mean, I see it posited here, the support
24        could come from MPD and/or the Hennepin
25        County Sheriff's Office with security
```

Page 116

```
 1        during this clearing process.  So that
 2        potential was certainly being put out
 3        there.  Yes, if that answers your
 4        question.
 5   Q.   Was a plan to clear propane, structures,
 6        and fires from the Greenway discussed with
 7        MPD in October of 2020?
 8   A.   We generally kept other agencies with whom
 9        we were working apprised about the steps
10        we were taking, so I would imagine we
11        would have advised MPD and others we were
12        taking the step to limit propane,
13        structures, and fires on the Greenway,
14        yes.
15   Q.   What do you mean other agencies with whom
16        Hennepin County was working?
17   A.   Outreach service providers if we were in
18        discussion around unsheltered settings.
19        You know, we've discussed the many, many,
20        many hours of meetings that were
21        happening.
22             Potentially, we could have set out,
23         "This is what we are going to be doing in
24          relation to the Greenway with partners,
25          including the City and the Park Board" for
```

Page 117

1       their information, for their awareness on
2       the steps that we, as the County, were
3       taking on County-owned property or
4       County-managed property.
5   Q.  Okay.
6               MS. WELLS:  Counsel, it's been more
7       than another hour.  Can we take a break?
8               MS. STILLMAN:  Can I have like ten
9       more minutes of questions?  And then I'm
10      going on to another topic.  So if we can
11      do ten more minutes?
12              MS. WELLS:  Sure.
13              MS. STILLMAN:  Does that work for
14      you?
15              THE WITNESS:  Yeah, that's fine by
16      me.
17              (Sotto voce comments.)
18  BY MS. STILLMAN:
19  Q.  I'm marking a document that's been
20      Bates-stamped HC 00040316 as Exhibit 324;
21      a document that's been Bates-stamped HC
22      00040322 as Exhibit 325; a document that's
23      been Bates-stamped HC 00040323 as Exhibit
24      326.
25              (Deposition Exhibit Nos. 324, 325,

1       and 326 were introduced.)

2    BY MS. STILLMAN:

3    Q.  And I will represent that Exhibit 325 and

4        326 are the attachments to the email

5        that's been Bates-stamped Exhibit 324.

6             On page 3 of Exhibit 324, which ends

7        in 40318, in this email from Steven

8        Labatt, it says, "The sign says, 'Action

9        will be taken on October 14th' for sites

10       not adhering.  I'm curious what actions

11       will be taken and by whom.  What is their

12       plan and who does it involve?"

13            Well, I'll -- and he is responding to

14       an email from Tracey Martin that's right

15       below that, that, if you look at the top

16       of page 40319, says, "FYI, on the signage

17       that are going to post, let me know right

18       away if you have seen any issues with this

19       so far."

20            MS. WELLS:  I just want to object.

21       There were a few missing words that

22       misrepresent the document, but ...

23    BY MS. STILLMAN:

24    Q.  Do you see that?

25    A.  I see the pieces that you were just

1      referring to, yes.

2   Q.   Okay.  Was it not Hennepin County's

3        practice at this point to include in signs

4        posted at encampments details about what

5        actions would be taken against residents

6        if they did not comply with what was on

7        the sign?

8             MS. WELLS:  Object to form, vague.

9   A.   You know, I remember this going -- I mean,

10       this was a very smooth kind of transition,

11       as I remember it, the removal of -- well,

12       in one regard, of propane and fire

13       structures.  To my recollection, it was

14       not met with resistance.  I don't remember

15       any action having to be taken around

16       people not complying.

17            So, no, I don't -- I don't recall

18        specifically what would have been said

19        around that, because I don't remember us

20        having to take any action on that.

21  BY MS. STILLMAN:

22  Q.   So I understand that you might not have

23       had to take -- have taken any action at

24       this point.  But was it Hennepin County's

25       practice at this time to include details

Page 120

1      about what action would be taken against

2      residents who were living at the

3      encampment if they did not comply with

4      what was on a signed posted by Hennepin

5      County?

6              MS. WELLS:  Objection.  Form,

7       speculative.  And I'm also going to make a

8       standing objection as to the word "living"

9       as vague and to the extent it calls for a

10      legal conclusion.

11  A.  Yeah, I do not recall if changes were made

12      to the sign in response to the comment

13      that we see from Captain Steve Labatt

14      here.

15              And, again, I mean, with regards to

16      our practice, our practice had been -- and

17      you say see the names on here:  Joe

18      Gladke, Don Ryan, Jessica Galatz.  They'd

19      been out speaking to people every day on

20      the Greenway, connecting with them, and

21      when they went along and said, "This is

22      getting dangerous; we can't have propane

23      tanks and fires down here," my

24      recollection is that -- that went

25      smoothly.

Page 121

```
 1            I say it went smoothly with -- in
 2       that regard.  There was an issue that
 3       other folks kept bringing fire structures
 4       and propane tanks down to replace the ones
 5       that were removed, and then they had to be
 6       removed, but that's the only kind of
 7       challenge I remember.
 8            I don't remember any issue around
 9       action having to be taken against anyone
10       who was staying on the Greenway.
11  Q.  So you agree it was not Hennepin County's
12       practice at this point to include details
13       about what actions would be taken against
14       residents if they did not comply with what
15       was on a sign posted by Hennepin County?
16            MS. WELLS:  Okay.  Objection.  Asked
17        and answered, speculative, foundation,
18        vague.
19  A.  I do not recall the exact text that was on
20       the sign.  I've shared what I recollect
21       about this process and the actions taken.
22  BY MS. STILLMAN:
23  Q.  If you go to page 2, which ends in 40317,
24       Joseph Gladke writes, "On Wednesday
25       morning, starting at 7:00 a.m., we will
```

Page 122

```
 1      remove permanent," slash, "wooden
 2      structures and remove propane tanks if
 3      seen."
 4              Do you see that?
 5   A.  Yes.
 6   Q.  Were propane tanks removed from the
 7      Greenway in October 12th -- or in October
 8      of 2020?
 9   A.  Yes.
10   Q.  Were those propane tanks inventoried?
11   A.  I do not believe so, but I could be wrong
12      on that.
13   Q.  Were those propane tanks destroyed?
14   A.  I don't know how you safely destroy a
15      propane tank, but I assume they were
16      disposed of safely, yes.
17   Q.  Why weren't those propane tanks retained
18      by Hennepin County?
19          MS. WELLS:  Objection.  Form, calls
20       for a legal conclusion.
21   A.  And you have to recall that we went along
22      and spoke to people about how these
23      weren't going to be allowed here, and they
24      understood we were removing them and that
25      we were going to dispose of them.
```

Page 123

1          We had no reason to retain them, to

2      my knowledge.  Nobody ever suggested that

3      they would like their propane tank back in

4      six months' time.

5          And, as I've already shared, in many

6      cases, others would come along and provide

7      more potentially deadly propane tanks in

8      the wake of us removing them as we went.

9  BY MS. STILLMAN:

10  Q.  I'm going to go to Exhibit 326.  There is

11      a subheading that says "Week of 10/12/20."

12      Do you see that?

13  A.  Yes.

14  Q.  That last bullet point in that subset

15      reads, "We will continue the work of the

16      interagency groups that have been working

17      since March on encampments on City, State,

18      Parks and County land," parens, "ongoing."

19          Do you see that?

20  A.  I do.

21  Q.  Was this interagency -- were these

22      interagency groups continued after October

23      12th of 2020?

24          MS. WELLS:  Objection.  Vague,

25       foundation.

Page 124

1          MS. SARFF:  Objection.  Vague.

2    A.   Yeah, I mean, funnily enough, I think that

3         meeting was probably pretty vague in kind

4         of all ways.

5               I mean, City, State, Parks and County

6          staff continued meeting beyond October and

7          continued discussing the various

8          challenges we were each facing in regards

9          to encampments on our various respective

10         own property, yes.

11              MS. STILLMAN:  All right.  We can

12         take a break.

13              THE WITNESS:  Okay.

14              THE VIDEO OPERATOR:  We're going off

15         record at 11:37 a.m.

16              (Break taken.)

17              THE VIDEO OPERATOR:  This is Media

18         No. 3 in the deposition of David Hewitt.

19         Today is March 28, 2023.  We're going back

20         on the record at 11:50 a.m.

21              (Previously marked Exhibit Nos. 192,

22         193, 194, and 195 were introduced.)

23    BY MS. STILLMAN:

24    Q.   All right.  And we're going to be using

25         Exhibits 192, 193, 194, and 195.

Page 125

1          MS. STILLMAN:  If anybody can't find
2       them, I do have extra -- two extra copies.
3          MS. WELLS:  I'll take an extra if
4       you've got it.
5          Thank you.
6          MS. STILLMAN:  Everybody else ready?
7    BY MS. STILLMAN:
8    Q.  And, Mr. Hewitt, these are exhibits from
9        Don Ryan's deposition, so I'll just
10       represent to you that Exhibits 193, 194,
11       and 195 are the attachments to the email
12       that's been previously marked as Exhibit
13       192.
14   A.  Okay.
15   Q.  And if you see, at the top of Exhibit 192,
16       there's an email from Andrea Brennan to
17       you and Donald Ryan.
18          Do you see that?
19   A.  Yes.
20   Q.  And in Exhibit 193 and 194 are pictures of
21       a Notice of Removal that was posted at the
22       Midtown Greenway.
23          Do you see that?
24   A.  I do see those pictures, yes.
25   Q.  Was a Notice of Removal posted at the

Page 126

```
1        Midtown Greenway encampment on December
2        15th of 2020?
3   A.   Yes.
4   Q.   And if you look at 193, the notice says,
5        "If this tent and its contents are not
6        removed by December 17th, it will be
7        removed by HCRRA staff."
8             Do you see that?
9   A.   Yes.
10  Q.   So encampment residents were given
11       approximately 48 hours' notice to remove
12       their belongings.  Correct?
13  A.   Yes.
14  Q.   And the -- in the second paragraph, the
15       notice states, "Any garbage, refuse, or
16       debris is subject to immediate disposal."
17            Do you see that?
18  A.   I do.
19  Q.   How does Hennepin County determine what's
20       garbage, refuse, and debris?
21  A.   Primarily by asking people.  As I
22       referenced earlier, Don Ryan, Joe Gladke
23       of the Hennepin County Regional Railroad
24       Authority, that is the HCRRA, and Jessica
25       Galatz, also of HCRRA, were out on the
```

Page 127

1      Greenway constantly, not only supporting

2      the removal of deadly and dangerous items

3      like propane tanks, but removing hazardous

4      waste, debris, and other items identified

5      by people staying on the Greenway as

6      things to be cleaned up and cleared away.

7           In the runup to this timeline, there

8       were also efforts taken to connect with

9       people, offer them storage and other means

10      of protecting things they wanted to keep,

11      as well as, you know, this -- this notice

12      being very clear on, if things are left

13      behind, then the assumption will be that

14      this is not something that you are

15      choosing to take with you, having given

16      every opportunity to connect with you on

17      it, and so on and so forth.

18           So the short answer is asking people.

19      The long answer is asking people a lot.

20  Q.  Is there -- does Hennepin County have a

21      policy about how to determine whether an

22      encampment resident's property is garbage,

23      refuse, and debris?

24  A.  I don't know if I class asking people as a

25      policy, but that's the approach that we

1     took.

2   Q.   Is that approach in writing anywhere?

3   A.   It may well have been in writing in

4        emails, operation plans, those kind of

5        things, but I don't recall it being

6        formalized in a policy document.

7             I mean, it's worth, you know, being

8        aware that the closure of the Greenway

9        encampment was a unique event.  It's not

10       something that is recurring and that has

11       to be repeated and repeated.

12            So -- so processes were developed,

13       whether they were written up or not,

14       through this -- through this work, and the

15       intent was always and the focus was always

16       that they be person-sensitive, ask people

17       what they want, give them clear

18       information on what's going to happen, and

19       go from there.

20  Q.   If you go to Exhibit 193, the second

21       paragraph says, "Otherwise, this tent and

22       its contents will be inventoried and

23       temporarily stored for its owner's

24       retrieval."

25            Do you see that?

1   A.   I do.

2   Q.   Where was the storage location where

3        people's property would be taken?

4   A.   So we did store -- in advance of the

5        closure, like I say, we had Don and others

6        on the Greenway asking people if they

7        needed assistance with storage.

8            My recollection, we had four people

9         take us up on that offer, four-ish, so

10        we inventoried their belongings.  They

11        were stored in a County facility outside

12        of Minneapolis.  In my head, I'm thinking

13        it's Medina or Minnetonka, one beginning

14        with M, but I couldn't tell you the exact

15        location.

16            But for a small number of people,

17        they did take up that option to store some

18        belongings.

19   Q.   Were those people's belongings inventoried

20        by Hennepin County?

21   A.   Yes.

22   Q.   Was that inventory in writing?

23   A.   I believe we provided each of them with

24        kind of the contact details on how to

25        retrieve those items, and that would have

Page 130

1    been in some form of writing, yes.

2  Q.  Did Hennepin County keep any sort of

3      written inventory of what -- inventory of

4      what property was stored?

5  A.  We would have done it that period, yes.

6  Q.  Where would that inventory be kept?

7  A.  I do not recall.  I would imagine the

8      Hennepin County Regional Railroad

9      Authority would have had those records,

10     but, I'm sorry, I -- I haven't seen them

11     recently.  Obviously, it's a long time

12     ago.

13 Q.  If you could turn to -- or everybody could

14     get Exhibits 102 and 103.

15          MS. MARTENSON:  Do you have extras?

16          MS. STILLMAN:  Yep.

17          MS. MARTENSON:  If you could give an

18      extra to Devona?

19          MS. WELLS:  Thank you.

20          (Previously marked Exhibit Nos. 102

21      and 103 were introduced.)

22 BY MS. STILLMAN:

23 Q.  And these are both documents that are

24     labeled "Hennepin County Sheriff's Office

25     Policy Manual."

Page 131

1          MS. STILLMAN:  Does everybody have

2      them?  Okay.

3  BY MS. STILLMAN:

4  Q.  So is Exhibit 102 a Hennepin County

5      Sheriff's Office policy manual?

6  A.  Yes --

7  Q.  And --

8  A.  -- it appears to be.

9  Q.  I apologize for interrupting.

10          Is Exhibit 103 a Hennepin County

11      Sheriff's Office policy manual?

12  A.  Yes, it appears to be.

13  Q.  Do all Hennepin County employees who

14      participate in an encampment

15      demobilization use Exhibit 102 as the

16      policy for handling residents' property

17      during the demobilization?

18          MS. WELLS:  Object to form, vague.

19          MS. STILLMAN:  And, Counsel, you've

20      been making a lot of vagueness objections.

21      Would you like to make a standing

22      vagueness objection to my question, as

23      Mr. Hewitt has been responding to a lot of

24      your vagueness objections, and at this

25      point we feel that it's become witness

Page 132

```
 1        coaching.
 2              MS. WELLS:  Oh, well, I definitely
 3        take exception to the notion that there's
 4        any witness coaching going on.
 5              I'm simply objecting to your
 6        questions.  I have actually made several
 7        standing objections to make this
 8        deposition as efficient as possible.
 9              I guess I'd also note that I've taken
10        several depositions recently, and counsel
11        for plaintiffs made many of the same
12        objections I'm making today, so I'd expect
13        to be extended the same courtesy.
14              MS. STILLMAN:  So is that a no,
15        you're not going to agree to a standing
16        vagueness objection?
17              MS. WELLS:  Correct.
18   A.   Yeah, I'd -- I'd like to say that I -- I
19        know a vague question when I hear one.
20        Nobody needs to coach me on that.
21              To your earlier question, this is a
22        Hennepin County Sheriff's Office policy
23        manual relating to, on the one hand,
24        search and seizure; the other, property
25        and evidence.
```

Page 133

1            To be clear, the activity to clean up

2       waste and debris on the Greenway was

3       neither search and seizure and it was not

4       evidence, and it was primarily led by

5       human services and the Regional Railroad

6       Authority -- well, actually Regional

7       Railroad Authority would be leading that

8       part of it, alongside human services more

9       on the people side.

10           But the sheriff's office involvement

11      in the closure was really around safety,

12      not around the removal of the waste and

13      debris.

14           So, for instance, the hundreds of

15      needles would not have been covered under

16      these.

17  BY MS. STILLMAN:

18  Q.  If you go to page -- the page that ends in

19      38196--that's page 3--it says,

20      "Abandonment," of Exhibit 102, does

21      Hennepin County have any other policies

22      that define abandoned property?

23  A.  Excuse me.  I'm just reading the document.

24           Like I said previously, I'm not sure

25       that we kind of memorialized in policy the

Page 134

```
 1        approach taken on the Greenway.  I'm
 2        trying to recall.
 3              What we do say on this subject in
 4        either the interim policy on encampments
 5        or the policy regarding camping in public
 6        space, we certainly had, as you saw in
 7        previous item, in the notices for folks
 8        who are camping on the Greenway, very
 9        clear statements about what would happen
10        with abandoned property in those settings,
11        that are separate from this document.
12   Q.   And if you go to Exhibit 103, there are
13        definitions of "Custodial Property" and
14        "Other Property" and "Property (sic)
15        Storage Area Custodian."
16              Do you see that?
17   A.   I do.
18   Q.   Does Hennepin County have any other
19        policies defining property?
20   A.   Well, I said I could recognize a vague
21        question when I heard one.  Defining
22        property?  I don't know that -- yeah, I'm
23        not sure.
24   Q.   Were Exhibits 102 and 103 provided to
25        Hennepin County's employees who attended
```

1        the closure of the Greenway encampment

2        prior to them attending the closure of the

3        Greenway camp -- encampment?

4    A.   I do not recall seeing these documents

5        provided to human services or other staff,

6        no.

7    Q.   All right.  If you go to Exhibit 314,

8        which is "Hennepin County Defendants'

9        Response to Plaintiffs' First Set of

10       Requests for Admissions" -- you have it.

11       It's Exhibit 314.

12           And page 6, request number 6, the

13        request is, "Admit or deny:  That

14        defendants destroyed personal property

15        during encampment sweeps from January 1st,

16        2016 to October 20th, 2021."

17           Do you see that?

18   A.   Yes.

19   Q.   If you turn to the next page, the very

20       top, "Hennepin County employees removed

21       and disposed of trash, abandoned items,

22       and hazardous materials located on the

23       Midtown Greenway."

24           Do you see that?

25   A.   Yes.

Page 136

1    Q.   All right.  So there weren't written
2         policies provided to Hennepin County human
3         services defining trash, abandoned items,
4         and hazardous materials prior to the
5         Midtown Greenway closure.  Correct?
6    A.   I mean, that sign post was a written
7         material.  I'm not sure how you are
8         defining policy, but we already looked at
9         written materials from that time that
10        clearly defined what our approach was
11        going to be to removing trash, waste
12        items, and others.
13   Q.   But there weren't written policies
14        provided to defining trash, abandoned
15        items, and hazardous materials to Hennepin
16        County human services employees prior to
17        the closures of the Midtown Greenway
18        encampment?
19             MS. WELLS:  Objection.  Asked and
20         answered.
21   A.   There's a definition given on the sign
22        post that we just looked at, which was
23        developed by and shared amongst Hennepin
24        County employees.
25             Again, I don't know if you're

Page 137

```
 1        considering that a policy for the purposes
 2        of your question.
 3             I would also assume, and I'm scanning
 4        my memory for the documents, that similar
 5        language would have been used around any
 6        emails, meetings, discussion on this.  I
 7        think we had a very consistent position
 8        that was both in writing and widely
 9        understood by our staff.
10   BY MS. STILLMAN:
11   Q.   Is the only way a Hennepin County employee
12        would know if a -- an item they removed
13        and disposed of was trash, abandoned, or
14        hazardous if they asked -- was if they
15        asked the resident?
16   A.   That would be our preferred way, and so we
17        put a lot of effort into doing that over a
18        long period of time.
19             And we gave notice to people that if
20         items were left behind, at a certain point
21         that they would be considered as such.
22             I would also say rotten food,
23         discarded used needles, a lot of the
24         debris that's left behind in encampments,
25         no one is coming back for.
```

Page 138

```
 1    Q.  And that's your assumption.  Correct?

 2    A.  My assumption --

 3              MS. WELLS:  Objection.

 4              THE WITNESS:  I'm sorry.

 5              MS. WELLS:  Vague.

 6    A.  It is an assumption that nobody is coming

 7        back for discarded used needles, yes.  I

 8        mean --

 9    BY MS. STILLMAN:

10    Q.  Is it --

11    A.  -- allied with having provided notice that

12        if they were left behind, they would be

13        considered trash, so people having

14        received that notice should have been

15        aware of that too, so if they wanted to

16        retain their discarded used needles, they

17        were given notice of how they could ensure

18        that happened.

19              Sorry.  Carry on.

20    Q.  So was it Hennepin County's position that

21        anything that remained on the Greenway --

22        any property that remained on the Greenway

23        on December 18th, 2020 was abandoned by

24        the resident?

25              MS. WELLS:  Objection.  I'll make a
```

```
                                          Page 139

 1          standing objection as to property as

 2          vague, and to the extent it calls for a

 3          legal conclusion.

 4    A.    It was not an automatic understanding on

 5          December 18th that items on the Greenway

 6          were discarded.

 7                There were sill, after the 48-hour

 8          notice had elapsed, somewhere in the

 9          region of 10 to 15 people, way down from

10          the 140 of a couple months previously, but

11          still about 10 to 15 people.

12                Each of those people were spoken to,

13          advised the closure was happen --

14          happening, given another opportunity to

15          claim, remove any items they wished.

16                I believe boxes and bags were

17          provided and community members were

18          present and helped people remove some

19          things.

20                People who were taking steps to

21          remove belongings even on December 18th

22          were given time to do so.

23    Q.    Who provided those boxes?

24    A.    Hennepin County had boxes available.  As I

25          say, there were several community members
```

Page 140

1    who came down, interacted with people, may

2    have provided boxes; certainly provided

3    transportation and packing assistance, and

4    they were not Hennepin County-directed or,

5    you know, they weren't us.

6  Q.  Which department in Hennepin County would

7    have provided the boxes for residents to

8    use?

9  A.  I think technically it would have been the

10    Hennepin County Regional Railroad

11    Authority, as we think about the

12    delineation of roles during this event.

13        In practice, given that Don Ryan was

14     there as the human services

15     representative, he may well have informed

16     people of their availability.

17        I can imagine he may have handed a

18     box to somebody, but I don't recall it

19     coming out of, say, the human services

20     budget to pay for the boxes, so I assume

21     the Regional Railroad Authority.

22  Q.  Did Hennepin County provide notice and an

23    opportunity to be heard to residents of

24    the Greenway encampment prior to the

25    possible seizure and destruction of that

Page 141

1       person's property in December of 2020?

2              MS. WELLS:  Object to form, calls for

3         a legal conclusion, and compound.

4   A.  Yeah, I mean, the last bit of it is just

5         like, whoa, that's not at all what we've

6         been saying or we're doing at all.

7              With regards to the closure of the

8         encampment and how waste materials left

9         behind, abandoned by people after the

10        notice period would be treated, yes, that

11        was provided both in person and in

12        writing, as we've seen.

13             With regards to the opportunity to be

14        heard, as I've said, both on the day of

15        the notice, the days that followed, the

16        day after the 48-hour notice, we had

17        people going tent to tent, person to

18        person, to speak to them, as had been

19        their practice for weeks and months ahead

20        of that time.

21  Q.  Any other opportunities?

22  A.  I don't know what other opportunities

23        would look like beyond daily checking in

24        with and speaking to people.

25  Q.  Did Hennepin County provide any processes

```
 1        to encampment residents through which they
 2        could challenge or oppose the impending
 3        sweep of the Greenway encampment on
 4        December 18th, 2020?
 5             MS. WELLS:  Objection.  Calls for a
 6         legal conclusion.
 7   A.   And we would never describe the action as
 8        such.  But if you're asking, was it
 9        optional, was it a discussion, no.
10             Clarity was provided that the
11         Greenway would be closed.  A notice was
12         provided on the 15th, 48 hours' notice.
13   BY MS. STILLMAN:
14   Q.   So there wasn't a process through which a
15        resident could oppose the impending
16        Greenway encampment closure?
17             MS. WELLS:  Objection.  Calls for a
18         legal conclusion, asked and answered.
19   A.   It was not a consultation, no.  The
20        closure was noticed and implemented on the
21        dates as stated.
22   BY MS. STILLMAN:
23   Q.   I'm marking a document that's been
24        Bates-stamped Exhibit -- or Bates-stamped
25        HCO 00020779 as Exhibit 327, and then a
```

Page 143

1       document that's been Bates-stamped

2       HC 00020781 as Exhibit 328, a document

3       that's been Bates-stamped HC 00020782 as

4       Exhibit 329, and a document that's been

5       Bates-stamped HC 00020783 as Exhibit 330.

6              (Deposition Exhibit Nos. 327, 328,

7          329, and 330 were introduced.)

8    BY MS. STILLMAN:

9    Q.   And I'll represent the documents that have

10        been marked Exhibit 328, 329, and 330 are

11        the attachments to Exhibit 327.

12             If you go to the second page, there

13         is an email from Andrew Fahlstrom dated

14         Wednesday, December 16, 2020.  The email

15         says, "We're getting notice that everyone

16         on the Greenway is facing a planned

17         eviction by HC Security and law

18         enforcement forces at 6:30 a.m. tomorrow

19         morning.  Crews were out this morning

20         throwing away people's property that was

21         outside of the tents."

22             Do you see that?

23   A.   I do.

24   Q.   And then if you go to page 1, there's

25        another email from Andrew Fahlstrom, also

Page 144

1       dated December 16th, 2020, and the first

2       sentence -- and then it reads, "Heads up.

3       I'm assuming that the State of Minnesota

4       and the City of Minneapolis cannot support

5       this."

6            And onto the next page, "I watched

7        people's property and transportation be

8        taken and thrown away with my own eyes

9        this morning."

10           And Andrea Brennan forwards you this

11       email.

12           Do you see that?

13   A.  I do.

14   Q.  Okay.  And then you forwarded this email

15       to multiple email addresses, but to David

16       Hough.  Do you see that?

17   A.  I do.  It looks like I sent it to a total

18       of four email addresses, possibly knowing

19       who was copied on the earlier copy.  But,

20       yes, David Hough is one of the recipients.

21   Q.  So both you and David Hough were aware

22       that encampment residents' belongings were

23       being thrown out prior to December 17th.

24       Correct?

25           MS. WELLS:  Objection.  Vague.

Page 145

1   A.   What I was aware of from this email and
2        what David Hough was aware of from this
3        email was that Andrew Fahlstrom was
4        depicting events on the Greenway in that
5        way.
6   BY MS. STILLMAN:
7   Q.   What did you do upon receiving this email?
8   A.   It would appear that I forwarded it on to
9        David Hough, Jodi Wentland, Lisa Cerney,
10       and Michael Herzing.
11  Q.   Did you discuss this email with David
12       Hough?
13  A.   I don't recall.  It's possible, but I
14       wouldn't assume it.
15  Q.   Did you discuss this email with Don Ryan?
16  A.   It is likely that Don Ryan and I might
17       have discussed it, because Don Ryan and I
18       were in discussion around what was
19       happening with regards to work on the
20       Greenway, and specifically that Don Ryan
21       and I were in discussion that the only
22       things being disposed of at this time were
23       those explicitly identified as waste and
24       garbage by the people there, or that had
25       been abandoned for a sufficient period of

1     more evidently enough waste that they

2     could be safely disposed of.

3  Q.  How did you know that the only things

4     being disposed of were things that people

5     abandoned or were waste?

6  A.  Well, we were asking everyone, and had

7     been for some time, and we had been doing

8     some of the due diligence that you've seen

9     in previous emails of, "Okay, we think

10    this is abandoned," we ask around who else

11    knows, whether outreach teams, other

12    encampment residents, "Have you seen

13    anyone here recently?"

14        So asking people both directly, "Is

15     this your waste; can we dispose of it,"

16    or "Do you know of the last time somebody

17    was here by this tent that appears to be

18    abandoned and has appeared to be abandoned

19    for several days now; What can you tell us

20    about that?"

21        So that direct interaction,

22    relationship with people who were staying

23    on the Greenway was our principal source

24    of information, in addition to which there

25    are instances -- and I'll go back to, you

Page 147

```
 1        know, examples that are very, very
 2        commonplace of rotting food, used needles,
 3        and suchlike that, once abandoned, may
 4        reasonably be assumed to not be vital
 5        possessions that are important for people
 6        to retain.
 7   Q.   After receiving this email, did you do
 8        anything to investigate whether residents'
 9        belongings were being thrown out without
10        their permission?
11   A.   The email is actually neither here nor
12        there in the chronology of investigation
13        and discussions we were having, and I
14        wouldn't use the word "investigation."
15             I had absolute confidence in Don
16        Ryan, Joe Gladke, and Jessica Galatz, who,
17        over a period of days and weeks and
18        months, had been out there talking to
19        people, identifying what was -- what
20        was -- what people didn't want in
21        partnership with them.
22             I knew that that's what they were
23        doing.  That's what they were reporting.
24        This email did not give me any reason to
25        think otherwise.
```

Page 148

```
 1   Q.   Did David Hough investigate whether or not
 2        encampment residents' property was being
 3        thrown away without their permission upon
 4        receiving this email?
 5            MS. WELLS:  Object to form,
 6         foundation, speculation.
 7   A.   Being privy to the same information about
 8        how we were taking a person-sensitive
 9        approach, asking everyone, doing
10        everything we could in terms of due
11        diligence to only dispose of material that
12        was waste, that people didn't want
13        anymore, he would have had no reason to
14        investigate an mail from Andrew Fahlstrom
15        as evidence to the contrary.
16   BY MS. STILLMAN:
17   Q.   Did Hennepin County take any action as a
18        result of the information contained in
19        these emails from Andrew Fahlstrom?
20   A.   As I say, this period of time, we were in
21        close communication about exactly what was
22        happening on the ground from trusted staff
23        who cared deeply about supporting people
24        through this process in a person-sensitive
25        way.
```

Page 149

```
 1          This email from Andrew Fahlstrom did
 2      not change any of that.  It did not
 3      necessitate action.  Steps had already
 4      been taken to put in place very clear a
 5      expectation, a very clear feedback loop,
 6      that what was happening was we were asking
 7      people and disposing only of those things
 8      where due diligence suggested were waste
 9      and were not important to people.
10          MS. STILLMAN:  Can we go off the
11      record for a second?
12          THE VIDEO OPERATOR:  We are going off
13      the record at 12:24 p.m.
14          (Discussion off the record.)
15          THE VIDEO OPERATOR:  We're going back
16      on the record at 12:27 p.m.
17          (Previously marked Exhibit No. 309
18      was introduced.)
19  BY MS. STILLMAN:
20  Q.  And, Mr. Hewitt, there's been a document
21      placed in front of you while we were out
22      of the room that's been previously marked
23      as Exhibit 309.
24  A.  I can see the document.
25  Q.  If you go to the page that ends in 38804,
```

1        the top is "Operations Overview," and it

2        says, "0800, assure that the cleaning

3        crews are safe while cleaning the debris,

4        garbage, and tents."

5             So tents are not garbage for purposes

6         of this plan.  Correct?

7   A.   I mean, you can say they're debris or

8        garbage, does that mean they're waste?

9        It -- it was like a semantic point.

10            Those three terms feel like

11        catch-alls for everything left behind that

12        people have decided they do not want.

13  Q.   And a little farther down it says,

14       "Clean-up crews will be clearing tents,

15       debris, and garbage from camp sites."

16            Do you see that?

17  A.   Yes.

18  Q.   Are the clean-up crews from Industrial

19       Hygiene Services Corporation?

20  A.   We work with contractors on this kind of

21       thing.  I forget who it was in this

22       instance.

23            It would have been a contracted

24        vendor working in partnership with our

25        Regional Railroad Authority, but was

1         there -- was there a specific -- well, is

2         there anything more specific that you want

3         to know?

4    Q.   I'll ask a different question.

5              Were there Hennepin County-employed

6         clean-up crews at the closure of the

7         Greenway encampment?

8    A.   So I believe they were Hennepin County

9         contracted rather than employed.

10             That said, there were Hennepin County

11        employees there, including the Regional

12        Railroad Authority staff, who would have

13        been coordinating and working with them.

14             That's my recollection of how we

15        delineated responsibilities with -- with

16        this event.

17   Q.   If you go to the page that ends in 38809,

18        there's a map, and right below the map, it

19        says, "Tents 1 and 2 are occupied by the

20        same persons as in 26 and 27."

21             Do you see that?

22   A.   I do.

23   Q.   For Hennepin County's purposes when

24        cleaning the Greenway encampment, would

25        tents 1 and 2 have been considered

Page 152

1        abandoned?

2    A.  So the information captured here really

3        reflects, again, I think that work that

4        Joe and Jessica and Don had done to get to

5        know who was in all of these tents, and

6        throughout the weeks and months in

7        advance, and to know that the folks, say,

8        in 1 and 2 are actually the same folks

9        that are sometimes in 26, 27.

10           Now, of course all of the folks here

11       were provided with our notice that the

12       encampment -- that 48 hours' notice on the

13       15th.

14           So with the clean-up crew coming on

15       the 18th, the folks from tent 1 and 2,

16       slash, 26/27, were aware that they were to

17       leave before the 18th.

18           And, you know, if we run the numbers,

19       it was the case that many, if not most, of

20       the folks who had previously been engaged

21       in the tents were gone, had departed on

22       the 18th when the closure took place.

23   Q.  On the morning of December 18th, 2020,

24       would tents 1 and 2 have been considered

25       abandoned by Hennepin County?

Page 153

1  A.   If their previous occupants had departed
2       and there was no sign of activity there,
3       then yes.
4  Q.   How --
5  A.   I'm assuming that tents 1 and 2 were still
6       there.  Sorry.  If they had departed and
7       taken the tents with them, it would be a
8       moot point, and I don't know if that was
9       the case with tents 1 and 2 specifically
10      or other specifically numbered tents.
11 Q.   If tents 1 and 2 were up, but the persons
12      occupying tents 1 and 2 were packing tents
13      26 and 27 when the clean-up crew got there
14      on December 18th, 2020, how long would
15      they have been given to go back to tents 1
16      and 2 and pack those?
17           MS. WELLS:  Objection.  Calls for
18       speculation.
19 A.   It certainly calls for speculation.
20           What I can say is that every person
21       that was still present, those ten to
22       fifteen people, was communicated with
23       personally about what they needed to pack
24       and what they needed to take with them,
25       and nobody reported being rushed or there

Page 154

 1        weren't things they were able to take with

 2        them, whether that was the tents they were

 3        currently in, the tents they used to be

 4        in, or otherwise.

 5   BY MS. STILLMAN:

 6   Q.   How would somebody report that they felt

 7        rushed?

 8   A.   By saying so.  People were asked, "Do you

 9        have everything you need?"  You know, and

10        given additional time to move things out

11        and -- and work with the community

12        volunteers, or however else they were

13        planning to move things, as we worked our

14        way down the Greenway.

15             There were -- we were in constant

16        communication with people.  Again, people

17        we had been talking to for days and weeks

18        and months, so we trusted that people

19        would let us know if they were feeling

20        rushed, and that is not what we heard.

21   Q.   Is there a method for someone to report

22        that they felt rushed during the

23        encampment closure other than

24        communicating directly with a staff

25        member, Hennepin County staff member

Page 155

1       on-site?

2    A. Well, I mean, I think, as you've seen in

3       other materials here today and certainly

4       other materials more broadly, people are

5       not hesitant to let us know if they think

6       that there's been an issue, and have a

7       variety of ways through different email

8       levels and what have you.

9           Certainly, we -- I am not aware of

10      any feedback we have ever received that

11      people felt rushed in this specific

12      closing process, and I think that is

13      testament to the work that was done on the

14      ground.

15          We had good relationships with folks

16      along this space.  The communication was

17      there.  People took the time they needed;

18      were given extra time if they needed.

19          I don't see any reason that that

20      should have been the case.

21          And there certainly are and would be

22      ways for people to let us know after the

23      fact if they -- if they wanted to avail

24      themselves of that.

25   Q.  If you go three rows down, it says, "Tents

Page 156

```
 1        10 and 11 is an EDP, but have not seen
 2        anything to cause alarm."  What is "EDP"?
 3   A.   So I believe this is a law enforcement
 4        acronym, and I believe it may stand for
 5        "emotionally disturbed person."
 6   Q.   You can put that away for the time.
 7             Who at Hennepin County was in charge
 8         of ensuring that residents of the Greenway
 9         encampment were offered storage for their
10         personal property prior to the sweep of
11         the Greenway?
12   A.   Notwithstanding the usual terminology
13        point, and, I mean, for what it's worth,
14        I've said I never liked the term.  In this
15        case, I think it's a wild
16        mischaracterization of what -- to call it
17        a sweep.
18             But the Hennepin County Regional
19         Railroad Authority staff took the lead on
20         offering storage to people in advance of
21         the closure of the encampment and the
22         provision of materials to use for storage
23         on the day of.
24   Q.   Was the Hennepin County Regional Railroad
25        Authority in charge of collecting
```

Page 157

1      residents' personal belongings prior to

2      the closure of the Greenway encampment?

3  A.  I mean, that's not a function that we

4      would have defined for ourselves.

5           If residents requested that we store

6       their personal belongings, then yes, that

7       is a function that they took on.

8           Like I say, that happened, to my

9      knowledge, in about four cases.

10      Otherwise, our direction to people was

11      that personal belongings, they should take

12      with them.

13           What was left behind, the only items

14      with which we were going to interact would

15      be -- what was left behind or what they

16      told was waste would be considered waste.

17      And that's the only items that our

18      colleagues should have been handling --

19  Q.  For the residents --

20  A.  -- or handling in some cases.

21           Sorry.  Carry on.

22  Q.  For the residents who did allegedly choose

23      to have their property stored by Hennepin

24      County, who at -- what department at -- in

25      Hennepin County transported those

Page 158

```
 1      belongings to a storage location?
 2   A. My assumption would again be Hennepin
 3      County Regional Railroad Authority.
 4           Yeah, is it possible that a different
 5       department's vehicle was used on the day?
 6       Maybe.
 7           But, again, the Regional Railroad
 8       Authority really took the lead on that
 9       piece around storage offerings on the
10       Greenway, so that's where I would assume.
11   Q. Was packing assistance provided to the
12      residents of the Greenway encampment by
13      Hennepin County the day of the Greenway
14      closure?
15   A. The day of the Greenway closure, materials
16      were provided, notice that people should
17      gather their things, and time provided for
18      that.
19           Our staff did not directly interact
20       with other people's stuff, but rather
21       provided the materials, the time, and the
22       notice.
23           There were, however, parties,
24       unaffiliated community members, who we did
25       observe assisting people with packing and
```

1     transportation.

2  Q.  Was packing assistance provided to the

3     residents of the Greenway encampment by

4     Hennepin County prior to the day of the

5     encampment closure?

6  A.  Similarly, to my knowledge and

7     recollection, materials were provided.  We

8     wouldn't have packed the box ourselves.

9  Q.  So to the best of your knowledge, the only

10    packing assistance provided to the

11    residents of the Greenway encampment by

12    Hennepin County were packing materials?

13 A.  And notice and time and storage, yes.

14 Q.  How much property were residents of the

15    Greenway encampment allowed to store?

16 A.  I do not recall if there was a limit

17    provided.

18         As I've said, only a small number of

19     people took us up on the option, and I

20     don't think the amounts were large, but I

21     don't remember us setting a -- the size

22     box.

23         I mean, it's possible that might have

24     been part of the discussion, but I don't

25     remember it being an issue or something

Page 160

1        that kind of elevated.

2   Q.   Is there any documentation that shows how

3        long the County stored these people's

4        property?

5             MS. WELLS:   Objection.   Foundation.

6   A.   I would -- I'm sure that there is.   I

7        haven't seen it of late.

8   BY MS. STILLMAN:

9   Q.   Have you ever seen it?

10  A.   I mean, I remember discussing it two years

11       ago, kind of like four or five months on

12       from the Greenway closure.   I remember

13       somebody getting in contact about it and

14       checking at least they had it, and they

15       did.

16             So, yes, I was aware that there was

17       documentation and a record happening back

18       then, but it has not been something that's

19       come to my attention for a couple of years

20       now.

21  Q.   Who was that discussion with?

22  A.   Another member of Hennepin County staff

23       told me that they had heard secondhand

24       that somebody had been in touch and that

25       they were really pleased that we had been

Page 161

1      able to offer that for that individual.

2  Q.  And who was the Hennepin County person who

3      told you that they had heard secondhand

4      that someone had been in touch?

5  A.  So can I ask a clarifying question on --

6          THE WITNESS:  A member of the County

7      Attorney's Office?  I don't know, Devona,

8      if this is -- if I'm sharing into --

9          MS. WELLS:  Yeah, I would not reveal

10     any conversations you've had, the content

11     of the communications you've had with any

12     attorneys in the County Attorney's Office.

13         THE WITNESS:  Thank you.  Okay.

14 BY MS. STILLMAN:

15 Q.  I'm marking a document that's been

16     Bates-stamped HC 00038761 as Exhibit 331,

17     a document that's been Bates-stamped

18     HC 00038765 as Exhibit 332, and a document

19     that's been Bates-stamped HC 00038767 as

20     Exhibit 333.

21         (Deposition Exhibit Nos. 331, 332,

22      333 were introduced.)

23 BY MS. STILLMAN:

24 Q.  And I'll represent that the documents that

25     are marked as Exhibit 332 and Exhibit 333

Page 162

1      are the attachments to the email that's
2      been marked as 331.
3             So at the bottom of the first page of
4       Exhibit 331 is an email from Tim Huber
5       from Industrial Hygiene Services
6       Corporation.
7             Who is Industrial Hygiene Services
8       Corporation?
9   A.  I'm -- looking at this, my understanding
10      is they would be one of those contracted
11      vendors that I spoke about that Hennepin
12      County contracts with to undertake certain
13      functions on their behalf.
14  Q.  If you look at the top email from Joseph
15      Gladke, in the middle, he writes, "We are
16      currently at 14 tents to clean for team 1
17      and 15 for team 2.  I am currently
18      thinking that we will need two skid steers
19      (one for each team) with a grapple bucket
20      along with four individuals with rakes and
21      shovels (for each team) to remove smaller
22      debris," slash, "needles."
23             Do you see that?
24  A.  I see that, yep.
25  Q.  Why were skid steers with a grapple bucket

Page 163

1       needed?

2   A.  Yeah.  So, you know, as I've already

3       mentioned a couple of times, I mean,

4       there's three reasons, really, for

5       engaging machinery in this work.

6              One is the -- one is the volume of

7           the material.  After a large encampment

8           has been closed, tons upon tons of

9           material has typically been the amounts of

10          waste left behind, so industrial

11          quantities requiring a suitable resource.

12             Then the second piece is the nature

13          of the debris, and as I've already

14          described, in an encampment of this size

15          and that face these kinds of health and

16          safety challenges, you would expect there

17          to be hundreds and upon hundreds of used

18          discarded needles buried in the ground,

19          sometimes deeply buried in the ground.

20             That's obviously hazardous for people

21          to -- you know, you're not going to send

22          staff in to go picking them up by hand,

23          and you need to do an incredibly thorough

24          job of cleaning and disposal because this

25          is a public space that families and kids

Page 164

1       are going to be riding bikes on and

2       falling off and scraping their knee, and

3       you don't want hundreds of used needles

4       lying buried in the ground.

5              And then, thirdly, it is a question

6       of efficiency.  We'll probably come back

7       to this point.  Certainly it was alluded

8       to in at least one of the earlier emails

9       we already looked at.

10             There were -- we had witnessed

11      violent confrontations at events.  There

12      had been an encampment event not far

13      before this where an incendiary device

14      containing nails and broken metal had gone

15      off in proximity to our human services

16      staff.

17             We were worried about what it looks

18      like if this event takes a long time in

19      terms of the opportunity that creates for

20      conflict and safety concerns for our

21      staff.

22             So the volume, the nature of the

23      waste, and the need to be efficient with

24      the overall operation for everyone's

25      safety, I would say.

Page 165

```
 1            I say that, but I'll confess, I'm not
 2       actually entirely sure what a skid steer
 3       is, but I'm understanding it's a piece of
 4       machinery used for cleaning.
 5            Those are the general reasons that
 6       machinery was used in an operation like
 7       this.
 8  Q.   The skid steers picked up residents'
 9       property.  Correct?
10            MS. WELLS:  Object.  Foundation.
11  A.   So as we've already described, residents
12       were given notice to remove all belongings
13       they wanted to keep with them and were
14       given an opportunity for storage before
15       the day of closure.
16            On the day of closure, any residents
17       remaining were again advised to bring
18       anything with them and given opportunities
19       to store them.
20            So the only items that should have
21       been disposed of by the skid steer or
22       otherwise are those items that, as per the
23       kind of written processes we looked at
24       earlier, had been clearly defined as,
25       ahead of time, items that would be
```

1           disposed of.  And, you know, as discussed,

2           a lot of it being hazardous waste.

3      Q.   Where were the items picked up by the skid

4           steer placed?

5      A.   I believe we had a large -- again, I don't

6           know the names of these pieces of

7           machinery.  I'm sorry.  It's a limitation

8           of mine.

9                But a large disposal of waste vessels

10          available to us, because we knew there was

11          going to be a large, large amount of waste

12          after everybody had left and taken with

13          them or otherwise stored the belongings

14          that were important to them.

15     Q.   Where were these waste vessels taken?

16     A.   I don't know the answer to that.  I mean,

17          it's disposing of needles and -- yeah, I

18          don't know the answer.  Safely disposed

19          of.  Yeah, that's why we hire contractors

20          who do this kind of work.

21     Q.   Did Hennepin County provide any

22          instructions to Industrial Hygiene

23          Services about how to determine whether a

24          resident's property was abandoned?

25     A.   I believe the way we were structured was

Page 167

1          with human services and the Regional

2          Railroad Authority going ahead.

3               I mean, again, as per the written

4           notice and verbal notice provided to

5           everyone in the Greenway, everything, on

6           the 18th, past that 48-hour notice, had

7           already been defined as items that could

8           be disposed of.

9               But then on the day of, on the 18th,

10          after the notice period had lapsed, human

11          services and railroad authority staff went

12          first and had those discussions person by

13          person with everybody to ensure that they

14          were able to, still at that late stage,

15          past the notice period, take with them

16          belongings they wanted, work with the

17          community volunteers to transport them,

18          use the boxes we provided.

19               Only after that step would IHS, as a

20          vendor, have been clearing away the items

21           that were left behind.

22     Q.   Did Industrial Hygiene Services invoice

23          Hennepin County for its services?

24     A.   That is a standard way of issuing payment

25           for contracted services, so it seems

Page 168

1        likely.

2   Q.   Have you seen that invoice?

3   A.   I have not seen that invoice.

4   Q.   Do you know if there was an invoice from

5        Industrial Hygiene Services for their work

6        on December 18th, 2020?

7   A.   I don't know if an invoice was used.  I

8        would assume they wanted to get paid and

9        we paid them.  That's how it tends to go

10       with -- when you purchase services from a

11       company.

12  Q.   I want to go back to Exhibit 314, which is

13       the response to plaintiffs' first set of

14       requests for admission.

15            And then you'll go to request number

16        7 on page 7.  Request number 7 reads,

17        "Admit or deny:  That prior to January

18        1st, 2021, there was no communication from

19        you to encampment residents on how to

20        recover personal property taken during the

21        encampment sweeps."

22            In its answer, the Hennepin County

23        defendants write -- I'm trying to find the

24        paragraph.

25            Oh, I'm sorry.  I'm looking at the

Page 169

1            wrong document.  You can put that away.

2            That's why I can't find it.

3                  If you could go to Exhibit 312, which

4            is Hennepin County Defendants' Response to

5            Plaintiffs' First Set of Interrogatories.

6            I apologize for that.  And it's going to

7            be interrogatory number 7 on page 7.

8                  And the interrogatory is, "Identify

9            all statutes, ordinances, rules or

10           regulations that you sought to enforce for

11           every sweep identified in interrogatory

12           number 2."

13                 And in the second paragraph, in the

14           fifth line down, at the end of that

15           sentence, it reads, "The Hennepin County

16           defendants further state that officers

17           from the Hennepin County Sheriff's Office

18           were present at the closure of the

19           Greenway encampment to ensure public

20           safety and security during the encampment

21           closure and to ensure that the conduct of

22           persons present at the closure was

23           lawful."

24                 Do you see that?

25   A.   I do see that.

Page 170

1   Q.   And the next sentence says, "The Hennepin
2        County defendants further state that
3        officers from the Hennepin County
4        Sheriff's Office were present at the
5        closure of the encampments at Powderhorn
6        Park East on July 20th, 2020, Elliot Park,
7        Kenwood Park, Peavey Park to ensure public
8        safety and security during the encampment
9        closures and to transport individuals
10       arrested by MPRB law enforcement officers
11       or Minneapolis public" -- "or Minneapolis
12       Police Department law enforcement officers
13       to the adult detention center."
14            Do you see that?  And I know I
15        omitted -- omitted some of the dates.
16  A.   I do see that, yes.
17  Q.   Okay.  How did the Hennepin County
18       Hennepin County Sheriff's Office ensure
19       that the conduct of persons present at the
20       Greenway encampment closure was lawful?
21  A.   Well, I guess you could either make the
22       argument simply by their presence or that
23       ultimately their presence proved unneeded
24       on this occasion, because we did not have
25       any issues with unlawful behavior during

Page 171

```
 1        the Greenway encampment closure.
 2   Q.   Why were Hennepin County Sheriff's
 3        Officers ensuring that the conduct of
 4        persons present at the closure of the
 5        Powderhorn East, Elliot Park, Kenwood
 6        Park, and Peavey Park encampment closures
 7        was lawful?
 8             MS. WELLS:   Objection.  Foundation,
 9         compound.
10   A.   Hennepin County is responsible for the
11        management of the Greenway.  It is
12        Hennepin County property.  And that was
13        the request made to Hennepin County
14        Sheriff's Office in relation to that
15        event.
16             The other events that you have listed
17         there are not Hennepin County property.
18         They're managed by other jurisdictions,
19         and there's other jurisdictions having
20         their own law enforcement entities.  Our
21         role was different.
22   BY MS. STILLMAN:
23   Q.   So is it not the role of a sheriff's --
24        well, strike that question.
25             Is part of a sheriff's deputy's job
```

Page 172

```
 1         duty to ensure lawful behavior even if

 2         that behavior occurs on property owned by

 3         an entity other than Hennepin County?

 4              MS. WELLS:  Objection.  Vague.

 5    A.   At a certain level, and in these specific

 6         instances listed, the Hennepin County

 7         Sheriff's Office was requested to fulfill

 8         specific functions, and that is the

 9         delineation here.

10              This is calling out the specific

11          functions that were requested of the

12          sheriff's office in those closures.

13    BY MS. STILLMAN:

14    Q.   So if a Hennepin County Sheriff's Office

15         officer is requested to perform a specific

16         function on the property of an entity

17         other than Hennepin County, do they not

18         have a duty to stop unlawful behavior?

19              MS. WELLS:  Objection.  Calls for a

20          legal conclusion.

21    A.   Potentially, if it occurs.  I mean, and

22         I'm sure we'll come on to some of these

23         specifics, but the role of the Hennepin

24         County Sheriff's Office here was

25         specifically for a function, and that's
```

Page 173

```
 1        what's called out in this document.
 2   BY MS. STILLMAN:
 3   Q.   So let's say a Hennepin County Sheriff's
 4        officer was driving on I-35, and they saw
 5        somebody driving who they believed to be
 6        impaired.  Do they not have a duty to pull
 7        that person over?
 8             MS. WELLS:   Objection.  Calls for
 9         speculation, calls for a legal conclusion,
10         and outside the scope of these topics.
11   A.   I was going to say, I kind of assumed so.
12        You're getting into areas of law
13        enforcement that neither seem related to
14        this specific which I'm here to talk
15        about, or that tie into my general
16        knowledge as a human services employee.
17             MS. STILLMAN:   It's 12:58.  Did you
18         want to break for lunch?
19             MS. WELLS:   Yeah, I think that would
20         be good.
21             MS. STILLMAN:   Can we go off the
22         record?
23             THE VIDEO OPERATOR:   We're going off
24         the record at 12:59 p.m.
25             (Lunch break.)
```

```
 1              THE VIDEO OPERATOR:  This is Media
 2         No. 4 in the deposition of David Hewitt.
 3         Today is March 28th, 2023.  We're going
 4         back on the record at 1:42 p.m.
 5    BY MS. STILLMAN:
 6    Q.  And, Mr. Hewitt, you understand that you
 7         are still under oath?
 8    A.  Yes.
 9    Q.  If you could go to Exhibit 313, and
10         interrogatory number 14, which is on page
11         5, and then if you go to page 6, at the
12         end of the answer, I'm going to be asking
13         you about the last paragraph.
14    A.  Okay.
15    Q.  What County employees confirmed with Adult
16         Shelter Connect that there were available
17         beds in shelters for those people camping
18         in the Greenway encampment the morning of
19         December 18th, 2020?
20    A.  It would have been some combination of
21         myself, Don Ryan, and Danielle Werder, I
22         assume.
23              At this time, Danielle Werder would
24          have been our service area lead for our
25          contracted shelter partners, including the
```

Page 175

1        Adult Shelter Connect, so she would have
2        been the principal point of contact with
3        them, with the manager there, who, as I
4        said, was employed by Simpson Housing
5        Services.
6             Either Danielle would have been
7        contacting directly or she might have been
8        put them in direct contact with Don Ryan.
9        I may have been included in some of that
10       communication, but I can't recall.
11            But it would have been one or three
12       of the three of us.
13   Q.  How did the Hennepin County defendants
14       determine if there was alternate
15       encampment space available to people
16       camping in the Greenway encampment?
17            MS. WELLS:  Object to form,
18        foundation.
19   BY MS. STILLMAN:
20   Q.  The first sentence of that last paragraph.
21   A.  I see.  So the phrase here is "alternate
22       housing, shelter, or encampment space,"
23       "and that such housing, shelter, or
24       encampment space."
25            To be clear, and I think as is made

Page 176

1      clear through the rest of the paragraph,
2      we did not consider, nor would we
3      consider, identifying alternate encampment
4      space, but we did look at housing and
5      especially shelter options, and that's
6      what you see represented in that
7      information about the Adult Shelter
8      Connect.
9  Q.  So it's your representation that Hennepin
10     -- the Hennepin County defendants did not
11     determine if there was alternate
12     encampment space available to people
13     camping in the agreement -- in the
14     Greenway encampment?
15 A.  Certainly, as I recall this closure, and
16     as a general matter of principle around
17     unsheltered homelessness and encampments,
18     and I remember several conversations
19     through 2020 when the subject would come
20     up, we were not looking to move people to
21     other dangerous spaces.
22          And, in our estimation, encampments
23      were or quickly became extremely dangerous
24      with the people staying within them.
25          So when we looked at other housing,

1          shelter, or encampment space, we were
2          looking at housing or shelter, with a
3          focus on shelter as a more immediately
4          available and accessible option than
5          housing.
6     Q.   So is this answer incorrect then?
7     A.   No.
8               MS. WELLS:  Object to form.
9     A.   Excuse me.
10              The terminology of "housing, shelter,
11         or encampment space" means it could be any
12         of the three of those things that we're
13         looking at.  We were looking at shelter,
14         which is one of those three things.
15    BY MS. STILLMAN:
16    Q.   Yes, and you were also looking at
17         encampment space?
18              MS. WELLS:  Object to form, asked and
19         answered, misrepresents the document and
20         his testimony.
21    A.   Right, because when we use the phrase
22         "determined that alternate housing,
23         shelter, or encampment space was
24         available," what we found was that
25         alternate shelter space was available as

Page 178

```
 1        per the information provided by the Adult

 2        Shelter Connect, thus meeting the standard

 3        for alternate housing, shelter, or

 4        encampment space being available.

 5   BY MS. STILLMAN:

 6   Q.   How many men's -- how many beds were

 7        available for single men through the Adult

 8        Shelter Connect system on December 18th of

 9        2020?

10   A.   I do not recall off the top of my head,

11        but every day there are some, every

12        morning when it opens.  So "some" would be

13        my answer.

14   Q.   What would happen if an encampment was

15        established on the Greenway tomorrow?

16             MS. WELLS:  Object to form.  Vague.

17   A.   As per the policy on camping in public

18        space, Hennepin County's response to

19        unsheltered homelessness and camping in

20        public spaces is, first of all, the person

21        is offered services.  My side of the

22        business, human services, help people with

23        alternatives.

24             It is also clear that camping is not

25         allowed on Hennepin County-managed
```

```
 1        property, including the Greenway, so
 2        somebody seeking to establish an
 3        encampment on the Greenway tomorrow, as
 4        you say -- well, let's say today, so we're
 5        not factoring in what might happen in 24
 6        hours.
 7             Anyone setting up an encampment on
 8        the Greenway today would be informed that
 9        that is not allowed and provided with
10        information on alternates such as shelter.
11   BY MS. STILLMAN:
12   Q.   After the sweep of the Greenway did,
13        Hennepin County conduct any followup to
14        determine whether the evicted encampment
15        residents obtained shelter within 24 hours
16        of the encampment closure?
17   A.   That is not -- the kind of study that you
18        are suggesting of people who were formerly
19        staying in the encampment and where are
20        they now is not something that we would
21        typically do and not something we did in
22        the case of the Greenway closure.
23   Q.   All right.  I'm marking a document that's
24        been Bates-stamped Minneapolis Berry
25        101413 as Exhibit 334, a document
```

Page 180

1        Bates-stamped Minneapolis Berry 101415 as
2        Exhibit 335, and a document that's been
3        Bates-stamped Minneapolis Berry 101416 as
4        Exhibit 336.
5               (Deposition Exhibit Nos. 334, 335,
6          and 336 was introduced.)
7     BY MS. STILLMAN:
8     Q.  And I'll represent that Exhibits 335 and
9         336 are the attachments to the email
10        that's been marked as Exhibit 334.
11              Why was the County contacting the
12         City of Minneapolis about the Franklin
13         encampment?
14              MS. WELLS:  Objection.  Vague,
15         foundation.
16    A.  Based on what I am reading in the email
17        set before us, it was in order to share a
18        few of the County's recent learnings from
19        a person-focused approach to resolving
20        similar concerns regarding an encampment
21        on the Midtown Greenway.
22    BY MS. STILLMAN:
23    Q.  Why was David Hough rather than someone
24        else writing to the City?
25              MS. WELLS:  Objection.  Form,

```
                                    Page 181

 1        speculation.

 2   A.   David Hough has direct communication with

 3        Heather Johnston in their official

 4        functions.  That strikes me as a very

 5        normal communication to happen.

 6   BY MS. STILLMAN:

 7   Q.   How would David Hough know about the

 8        Franklin encampment?

 9             MS. WELLS:  Objection.  Foundation.

10   A.   The Franklin encampment was somewhere in

11        the region of 100 to 150 people

12        predominantly on a median in the middle of

13        a highway surrounded by several schools,

14        and underneath the light transit rail at

15        Franklin.

16             Indeed, because this was just as

17         schools were coming back in person during

18         the pandemic, there was a lot of

19        communication about this, because of a

20        shooting at 4:00 in the afternoon that

21        took place between the encampment and a

22        driver led those schools to shut down

23        again just a couple of days after

24        reopening.

25             Between that, extreme health and
```

Page 182

```
 1          safety concerns, reports of drug-dealing,
 2          and drug-related offenses happening in the
 3          middle of the street, in the middle of the
 4          day, everybody knew about the Franklin
 5          encampment.
 6     BY MS. STILLMAN:
 7     Q.   Why was David Hough providing the City
 8          with advice about handling the Franklin
 9          encampment?
10               MS. WELLS:   Objection to form, vague,
11           speculation, outside the topics.
12     A.   I cannot speak to conversations that might
13          have happened between David Hough and
14          Heather Johnston prior to this email, but,
15          as you see, and as I mentioned earlier on,
16          we have routinely provided subject matter
17          expertise to other partners around these
18          issues, and from what I see here, David
19          Hough wanted to share our lessons from a
20          process that we followed, we were
21          discussing before lunch, around Midtown
22          Greenway in order to be of assistance.
23     BY MS. STILLMAN:
24     Q.   Was the County concerned about how the
25          City would close the Franklin encampment?
```

Page 183

1              MS. SARFF:  Objection.  Vague.
2     A.  That is not what I see represented here.
3         What I see represented is the sharing of
4         learnings and insights based on our
5         subject matter expertise and our
6         experience.
7     BY MS. STILLMAN:
8     Q.  Other than what you're seeing here, was
9         the County concerned about how the City
10        would close the Franklin encampment?
11             MS. SARFF:  Objection.  Vague and
12         asked and answered.
13    A.  Everything about this encampment was
14        concerning.  As has already been
15        discussed, the process that works through
16        and around closure also can lead to
17        conflicts and health and safety risks,
18        including for the people within it.
19             So something of this magnitude and
20         with this level of health and safety
21         risks, there were concerns about every
22         aspect of it.
23    BY MS. STILLMAN:
24    Q.  Had the City asked for the County's
25        assistance in closing the Franklin

Page 184

1       encampment?

2   A.  I can tell you that, from a human services

3       perspective, we had staff engaged in

4       efforts to connect people there to

5       services and shelter.

6           I am not aware of a formal request

7        being made beyond that.

8   Q.  In the second paragraph, third sentence,

9       it says, "The County does not support

10      using trespass as a tool for closure of

11      the Franklin encampment, particularly

12      given its location involving right of

13      way."

14          Do you see that?

15  A.  Yes.

16  Q.  Was the City using trespass as a tool for

17      the closure of the Franklin encampment?

18          MS. SARFF:  Objection.  Lack of

19       foundation and calls for a legal

20       conclusion.

21  A.  And I don't feel able to testify as to the

22      City's operations.

23          What I can tell you here is just the

24       County administrator was providing a

25       description of the County process that we

Page 185

1          had followed.

2     BY MS. STILLMAN:

3     Q.   Does the County support using trespass as

4          a tool for closure of encampments?

5               MS. WELLS:   Just objection.   Calls

6           for a legal conclusion.

7     A.   I can tell you that, in this instance, it

8          was stated that the County does not

9          support using trespass as a tool for the

10         closure of the Franklin encampment.

11    BY MS. STILLMAN:

12    Q.   Generally does the County support using

13         trespass as a tool for a closure of

14         encampments?

15              MS. WELLS:   Objection.   Calls for a

16          legal conclusion.

17    A.   I can tell you it's not the process that

18         we have followed.

19    BY MS. STILLMAN:

20    Q.   If you could go to Exhibit 309.

21    A.   Do I have 309?

22              MS. WELLS:    I don't see a 309.

23    BY MS. STILLMAN:

24    Q.   It's the security operations plan.

25    A.   Which?

 1            MS. WELLS:  It's going to be in here
 2        in the mix somewhere.
 3            THE WITNESS:  They're right out of
 4        order.
 5            MS. WELLS:  It's going to be near the
 6        bottom, I think.
 7    BY MS. STILLMAN:
 8    Q.   It's the security operations plan.
 9    A.   There it is.  I was looking for it.
10    Q.   And if you go to the page ending in 38804.
11            THE WITNESS:  Bless you.
12    BY MS. STILLMAN:
13    Q.   Under O800, the third paragraph, the last
14        sentence, "After the second warning is
15        'giving' and the person," slash, "s," "do
16        not comply, the trespass officer will
17        issue a trespass in accordance to security
18        guidelines, policy and procedure."
19            Did the County support the use of
20        trespass for closing the Greenway
21        encampment?
22            MS. SARFF:  Ms. Stillman, sorry,
23        could you just tell me what page you're
24        on?  I missed it.
25            MS. STILLMAN:  Yes.  It ends in

1          38804.  The heading is "Operations

2          Overview."  Page 4.

3               MS. SARFF:  Okay.

4               MS. WELLS:  Okay.  I'm just going to

5          object to the extent it calls for a legal

6          conclusion.

7     A.   What I can say is, and this document

8          clearly sets out, that was a potential

9          tool that could be used in the event that

10         it was necessary following those two

11         warnings.  It was not used.

12    BY MS. STILLMAN:

13    Q.   Going back to 334, in the third paragraph,

14         the second -- third sentence -- oh, wait.

15         Sorry.

16              The fourth paragraph, last paragraph

17          on the bottom of the first page, in the

18          third sentence:  "The formal written

19          notice should state that (1) camping is

20          prohibited, (2) tents are subject to

21          removal by a set date, and (3) garbage and

22          hazardous waste will be discarded, but

23          other personal possessions will be

24          stored."

25               Do you see that?

Page 188

1   A.   Yes.

2   Q.   Why did Hennepin County advise the City

3        that its notices should contain this

4        information?

5             MS. SARFF:   Object to lack of

6         foundation and to the extent it calls for

7         a legal conclusion.

8   A.   It may seem a semantic point, but the

9        statement is that Minneapolis could take a

10       similar approach.  That does not quite

11       line up with how you were describing it.

12            And, again, I mean, what we're

13        sharing here is essentially what we felt

14        worked as a person-sensitive approach to

15        the closure of the Midtown Greenway in

16        order that, in this case, our partners at

17        the City of Minneapolis could consider

18        those approaches.  As it says here, "could

19        take a similar approach."

20            But that was very much, you know,

21        outside of our jurisdiction to make that

22        decision, but we're sharing information on

23        what worked for us.

24   BY MS. STILLMAN:

25   Q.  Did the County follow up with the City

Page 189

1      about the Franklin encampment after this
2      email with David Hough's suggestions?
3  A.  I mean, we --
4          MS. SARFF:  Objection.  Lack of
5       foundation.
6  A.  We were in -- certainly from a human
7      services perspective, in regular
8      communication with colleagues at the City
9      and elsewhere about this -- this
10     encampment.
11         Indeed, we both allocated funding to
12      the Minnesota Indian Women's Resource
13      Center to set up additional noncongregate
14      shelter, responding to the specific
15      concerns, especially around the
16      trafficking of -- of women who are
17      identifying as native in this encampment.
18         So we worked closely on that together
19      throughout.  We jointly funded that
20      effort.
21         So we continued to be in contact
22      about it, but I don't know if there was
23      specific followup with regards to the
24      content of this email.
25  Q.  How frequently did Hennepin County

Page 190

1      communicate with the City about strategies

2      for closing encampments in 2021?

3  A.  I mean, as has already been discussed, we

4      met regularly around encampments.  I mean,

5      what you see here is a description of the

6      approach that we took in a closure, but I

7      am not aware of regular communications of

8      this kind.

9           As a general rule, our communications

10      around encampments would be around our

11      role as human services or public --

12  Q.  Did -- did Hennepin County participate in

13      the decision to close the Powderhorn Park

14      East encampment on July 20th, 2020?

15  A.  No.

16  Q.  I'm marking Bates-stamped document

17      HC 00022980 as Exhibit 337.

18           (Deposition Exhibit No. 337 was

19       introduced.)

20  BY MS. STILLMAN:

21  Q.  And you are a recipient of this email.

22      Correct?

23  A.  Yes.

24  Q.  In the last paragraph, second sentence,

25      Chief Ohotto writes, "In accordance with

```
                                        Page 191

 1        our agreed-upon framework, three days'

 2        notice will be provided for people to

 3        leave."

 4              Do you see that?

 5   A.   Yes.

 6   Q.   What was the agreed-upon framework?

 7              MS. WELLS:   Objection.   Foundation.

 8   A.   I'm not entirely sure.   Like I said

 9        earlier--I forget when this morning--there

10        were these meetings that took place

11        regularly between the various public

12        sector entities that were struggling with

13        challenges of encampments on property that

14        they were responsible for the management

15        of, under these active order provisions.

16              So, I mean, it sounds like discussion

17         in there around three days' notice, but

18         certainly there was never any kind of

19         formal agreement or framework that I'm

20         aware of.

21   BY MS. STILLMAN:

22   Q.   Was the agreed-upon framework followed?

23   A.   Like I say, I am not familiar with there

24        being an agreed-upon framework, as such.

25        Yeah.
```

1  Q.  Were residents of the Powderhorn East

2      encampment given three days' notice to

3      vacate the park?

4  A.  If my memory serves correctly, because

5      this is describing the point at which that

6      initial group of twelve tents were set up,

7      notice was provided.  I assume it was

8      three days, based on this email.

9          It was later rescinded because

10      probably anyone who doesn't remember that

11      would guess because of course this

12      Powderhorn Park East encampment did not

13      close when it was twelve tents.

14  Q.  Hennepin County Sheriff's officers were at

15      the closure of the Powderhorn Park East

16      encampment.  Correct?

17  A.  We're jumping forward in time from this

18      now, I assume, because like I said, this

19      wasn't the closure.  This was when it

20      first started.

21  Q.  Yes.

22  A.  We're jumping a month and a bit forward.

23      Okay.

24          Yes, Hennepin County Sheriff's Office

25      were -- officers were present when the

Page 193

1      Powderhorn Park East encampment was closed
2      by Minneapolis Parks.
3  Q.  And employees from the Hennepin County
4      Department of Human Services were present
5      at the Powderhorn East encampment closure.
6      Correct?
7  A.  Yes, there was at least one member of
8      Hennepin County human services staff
9      on-site on that day in order to -- to
10     offer any assistance that might be
11     appropriate to people who wanted to seek
12     safer alternatives.
13 Q.  Did Hennepin County confirm with
14     Powderhorn East residents -- or did
15     Hennepin County confirm Powderhorn East
16     residents received notice of the
17     encampment closure before agreeing to send
18     sheriff's deputies?
19         MS. WELLS:  Object.  Vague.
20 A.  That would not be our role or a
21     requirement here.
22         With regards to the support from the
23     Hennepin County Sheriff's Office, this was
24     a request made under a mutual aid
25     agreement from one law enforcement agency

Page 194

1       to another, a little bit like our earlier

2       conversation, to fulfill a specific

3       function around potential transports of

4       anyone who was arrested to the appropriate

5       detention.

6           And those requests are made for a

7       number of reasons, but generally when

8       there is concern from one law enforcement

9       entity that they won't have capacity to

10      safely carry out all the functions

11      necessary in an event.

12          In this case, that was the specific

13      request, as I understand it, made to the

14      Hennepin County Sheriff's Office.

15          So we were not involved in the

16      decision or the process around the

17      closure.

18          The request was on the mutual aid to

19      potentially provide transport to people

20      who might need that to detention.  Yeah.

21          MS. STILLMAN:  Okay.  I'm going to

22      object as nonresponsive.

23          MS. WELLS:  I'm going to object to

24      the strike.

25   BY MS. STILLMAN:

Page 195

```
 1   Q.   Did Hennepin County confirm that residents
 2        of the Powderhorn Park East encampment
 3        received notice of the closure before
 4        agreeing to send sheriff's deputies to the
 5        closure?
 6             MS. WELLS:  Object as vague.
 7   A.   Not to the best of my knowledge, because,
 8        as per my previous answer, it would be
 9        outside the remit and the scope, as I
10        understand it, of a mutual aid request.
11   BY MS. STILLMAN:
12   Q.   Did Hennepin County confirm residents of
13        the Powderhorn Park East encampment
14        received notice of the encampment closure
15        before agreeing to send employees from the
16        Hennepin County Department of Human
17        Services to the closure?
18             MS. WELLS:  Objection.  Vague.
19        misrepresents the testimony and the
20         record.
21   A.   I mean, again, to maybe save us a step,
22        that's not something we would have
23        requested required confirmed in that way.
24             We provide human services to people
25         experiencing unsheltered homelessness
```

Page 196

```
 1        irrespective of location, irrespective of
 2        circumstances around it, as long as it's
 3        safe.
 4             The details around whether it be
 5        Parks, City, private, how they are
 6        managing and responding to a dangerous
 7        encampment on their property is not
 8        something that comes into consideration
 9        when deploying human service staff to
10        assist vulnerable people.
11   BY MS. STILLMAN:
12   Q.  Did Hennepin County provide -- strike
13        that.
14             Did the MPRB ask Hennepin County
15        whether there was sufficient shelter space
16        available for displaced encampment
17        residents prior to the sweep of the
18        Powderhorn East encampment?
19   A.  I would say with a lot of confidence that
20        is not the question that would have been
21        asked in those words.
22             Is it likely that they would have
23        checked with us whether there were going
24        to be shelter beds available for people
25        who might need them on that day or other
```

1      days, yes.

2   Q.  Did Hennepin County provide the MPRB with

3       information about shelter space

4       availability the day of the Powderhorn

5       Park East encampment closure?

6   A.  I can well imagine that we would have, if

7       that request was indeed made, because we

8       would have had information from Simpson

9       Housing Services and that communication

10      with them to be able to provide that

11      information.

12  Q.  Did Hennepin County confirm that there was

13      sufficient shelter space available for the

14      residents of the Powderhorn Park East

15      encampment the day of the closure prior to

16      sending sheriff's deputies to the closure?

17  A.  As with your earlier question around

18      notice, there's a conflating there of two

19      separate departments, two separate -- two

20      separate sets of kind of agreements and

21      protocols.

22          The sheriff's office were responding

23       to a mutual aid agreement request from

24       another law enforcement entity; nothing to

25       do with shelter beds, so the simple answer

1       there is no.  It just wouldn't be the

2       case.

3              And, sorry, is there other parts to

4       the question that I need to respond to?

5   Q.  No.

6              Did Hennepin County confirm whether

7       the MPRB was providing storage options for

8       residents of the Powderhorn East

9       encampment prior to the sweep?

10  A.  We -- an encampment closure, the process

11      around it are the responsibility of the

12      jurisdiction that manages that property.

13             We don't go in with a checklist for

14      them.  That's not our role or our remit.

15      So no.

16  Q.  Did Hennepin County ask anyone at the MPRB

17      about how they planned to be -- or how

18      they planned to conduct the closure of the

19      Powderhorn Park East encampment?

20  A.  I think it is likely that discussions

21      occurred about kind of the intended flow

22      of the day and order of operations.

23             I haven't seen detail on it,

24      certainly in recent memory, if at all.

25  Q.  I'm going to go back to Hennepin County's

Page 199

```
 1        answers to plaintiffs' -- the responses to
 2        plaintiffs' second set of requests for
 3        admissions, so Exhibit 315, and then
 4        request 27 on page 15.
 5             Request number 27 asks, "Admit that
 6        Hennepin County did not provide notice of
 7        the forthcoming sweep to any residents
 8        before the sweep of the encampment at
 9        Powderhorn Park on or about July 20th,
10        2020."
11             And in the last sentence of Hennepin
12        County's response, they write -- Hennepin
13        County writes, "Subject to and without
14        waiving any objections, the Hennepin
15        County defendants did deny request number
16        27."
17   A.   I see it.
18   Q.   Who at -- who at Hennepin County provided
19        notice of the closure to residents of the
20        Powderhorn Park East encampment?
21             MS. WELLS:  Objection.  Foundation,
22        vague.
23   A.   Hennepin County did not provide notice
24        regarding the closure of Powderhorn Park
25        East.
```

Page 200

1   Q.   So is this response incorrect?

2           MS. WELLS:  Objection.  Calls for a

3        legal conclusion.

4   A.   Ah, I see.  Sorry.  There's a double

5        negative in there.

6           It's a good question because I would

7        not think that we would provide notice.  I

8        can believe that, once provided with

9        notice ourselves by the Parks--of course,

10       they made the decision to set the

11       notice--that we might communicate that on

12       to people with whom we engaged and

13       communicated.

14          But I was thinking in terms of kind

15       of a comprehensive notice, like we saw

16       with the signs earlier.  We certainly did

17       not put signs up, go tent to tent.

18          We would have conveyed information

19       received from the Parks Board regarding

20       their decision to close to others.  But,

21       yeah, that's -- that's my interpretation

22       here.

23  BY MS. STILLMAN:

24  Q.   Did Hennepin County know the date

25       Powderhorn -- the Powderhorn Park East

Page 201

```
 1        encampment was going to be closed?
 2   A.   Whatever point the Parks Board told us, we
 3        would know, but that -- at some point, we
 4        must have done, because we -- we were
 5        there on the 20th.
 6   Q.   Did Hennepin County provide anything in
 7        writing to the residents of the Powderhorn
 8        Park East encampment that told the
 9        residents that they were going to have to
10        leave the encampment space?
11   A.   That would not have been our role.
12   Q.   I understand that that would not have been
13        your role, but did Hennepin County
14        employees do that?
15   A.   No, to the best of my knowledge.
16   Q.   Did Hennepin County confirm that all of
17        the Powderhorn East encampment residents
18        were notified of the upcoming closure of
19        the Hennepin County -- or, sorry.  I'm
20        going to start over.
21            Did Hennepin County confirm that all
22         of the residents of the Powderhorn East
23         encampment were notified of the impending
24         encampment closure --
25            MS. WELLS:  Objection -- oh, sorry.
```

Page 202

```
 1    BY MS. STILLMAN:
 2    Q.   -- prior to July 20th, 2020?
 3              MS. WELLS:  Objection.  Vague, calls
 4          for a legal conclusion.
 5    A.   We do not oversee or monitor the work of
 6          the Parks Department or how they
 7          operationalize decisions they're taking,
 8          and we would not do that in this case.
 9    BY MS. STILLMAN:
10    Q.   During the closure of the Powderhorn East
11          encampment, did Hennepin County provide
12          assistance to encampment residents to pack
13          up their belongings?
14    A.   No, to the best of my knowledge.
15    Q.   Did Hennepin County provide opportunities
16          for individuals to store personal property
17          for residents who cannot take all of their
18          belongings with them?
19    A.   No, we did not engage in a storage offer
20          in this instance.
21    Q.   Does Hennepin County have any information
22          about what happened to the personal
23          property of encampment residents who were
24          not able to take all of their belongings
25          with them the day of the Powderhorn East
```

Page 203

```
 1      encampment closure?
 2            MS. WELLS:  Objection.  Foundation.
 3   A.  Beyond observations of staff on-site, we
 4      do not.
 5   BY MS. STILLMAN:
 6   Q.  What were the observations of staff
 7      on-site?
 8   A.  That it seemed that people were able to
 9      take with them what they chose to.
10   Q.  Did any Hennepin -- did anyone from
11      Hennepin County attend the MPRB park
12      police's roll call briefing on the morning
13      of July 20th, 2020, prior to the
14      Powderhorn East encampment sweep?
15   A.  Possibly.  If so, it would be either the
16      transport detail, the support from the
17      Hennepin County Sheriff's Office,
18      potentially for knowledge on how the
19      operations of the day would go.
20            I could imagine that Don Ryan could
21       be included in that so he understood how
22       to fulfill his human service function
23       within that context, but I couldn't say
24       for certain.
25   Q.  People were arrested during the Powderhorn
```

1      East encampment closure.  Correct?

2  A.  That's my understanding, yes.

3  Q.  Did Hennepin County review any of the

4      incident reports relating to the arrests

5      that occurred during the Powderhorn East

6      encampment closure?

7  A.  Not to the best of my knowledge.

8  Q.  Does Hennepin County have any knowledge of

9      the dispositions of any of the arrests

10     that were made by law enforcement during

11     the closure of the Powderhorn East

12     encampment on July 20th, 2020?

13         MS. WELLS:  Objection to the extent

14      it calls for a legal conclusion.

15 A.  Not to my knowledge.  Our role was limited

16     to transportation.

17 BY MS. STILLMAN:

18 Q.  Did Hennepin County have any internal

19     discussions about the Powderhorn East

20     encampment closure after the closure

21     happened?

22 A.  In all likelihood, Don Ryan would have

23     shared his impressions of what happened

24     with me, in all likelihood.  So

25     informally, yes.

1  Q.  Did Hennepin County discuss the Powderhorn

2      East encampment closure after it happened

3      with anyone from the MPRB?

4  A.  Again, these meetings at which the

5      encampment challenges or public safety

6      entities were facing at the time were

7      happening regularly throughout the period,

8      so it strikes me as likely there would

9      have been some reflection, update, on what

10     had happened, yeah.

11 Q.  And is it your understanding that City

12     employees were at those meetings as well?

13 A.  Those meetings certainly included

14     Minnesota Department of Transport,

15     Hennepin County, City of Minneapolis, and

16     Minneapolis Park Board.

17 Q.  Does Hennepin County have evidence showing

18     that Gina Mallek received notice of the

19     closure of the Powderhorn East encampment

20     prior to July 20th, 2020?

21         MS. WELLS:  Objection.  Calls for a

22      legal conclusion.

23 A.  That's not information we would have.

24 BY MS. STILLMAN:

25 Q.  Does Hennepin County have evidence showing

Page 206

```
 1      that Gina Mallek's property was not
 2      destroyed at the closure of the Powderhorn
 3      East encampment on July 20th, 2020?
 4           MS. WELLS:  Objection.  Calls for a
 5        legal conclusion.
 6  A.  That's not information that we would have.
 7  BY MS. STILLMAN:
 8  Q.  Does Hennepin County have any evidence
 9      that Gina Mallek abandoned her property on
10      July 20th, 2020, during the Powderhorn
11      East encampment closure?
12           MS. WELLS:  Objection.  Calls for a
13        legal conclusion.
14  A.  That's not information we would have.
15  BY MS. STILLMAN:
16  Q.  Does Hennepin County have evidence showing
17      that Emmet Williams received notice of the
18      Powderhorn East encampment closure prior
19      to July 20th, 2020?
20           MS. WELLS:  Objection.  Calls for a
21        legal conclusion.
22  A.  That's not information we would have.
23  BY MS. STILLMAN:
24  Q.  Does Hennepin County have evidence showing
25      that Emmet Williams' property was not
```

```
1        destroyed at the closure of the Powderhorn
2        East encampment on July 20th, 2020?
3             MS. WELLS:  Objection.  Calls for a
4         legal conclusion.
5    A.   That's not information we would have.
6    BY MS. STILLMAN:
7    Q.   Does Hennepin County have any evidence
8         that Emmet Williams abandoned his property
9         at the Powderhorn East encampment on July
10        20th, 2020?
11             MS. WELLS:  Objection.  Calls for a
12         legal conclusion.
13   A.   That's not information we would have.
14   BY MS. STILLMAN:
15   Q.   Did Hennepin County provide notice to the
16        residents of the Powderhorn West
17        encampment that the encampment was going
18        to be closed?
19   A.   No.  That is not our role, with the caveat
20        that, as I discussed earlier, if we had
21        information -- if information of that
22        closure was known to us and public, we
23        might communicate with people we were
24        engaged with in a human service capacity
25        for their awareness.
```

```
 1            But it wouldn't be our role.  It's
 2       not -- it's not something that we would
 3       do.
 4   Q.  Would Hennepin County not communicate that
 5       information if it wasn't known to the
 6       public?
 7   A.  As the decision, the information itself,
 8       is not Hennepin County's, we would not
 9       share something that was not confirmed.
10       You know, we don't want to add to the
11       rumor mill that circ -- that surrounds
12       encampments and cloud clarity.
13            So we would only provide information
14       once it was solid, clear, public,
15       confirmed, because we want to make sure
16       that we're able -- we are giving people
17       good information and clarity.
18   Q.  Did Hennepin County confirm that all
19       residents of the Powderhorn West
20       encampment received notice of the
21       encampment closure prior to August 14th,
22       2020?
23   A.  No.  That would not be our role.
24   Q.  Did Hennepin County -- did Hennepin County
25       provide assistance to Powderhorn West
```

```
 1        encampment residents to pack up their
 2        belongings during the closure of the
 3        encampment?
 4    A.  Not to the best of my knowledge.  I very
 5        much doubt it.
 6    Q.  Did Hennepin County provide opportunities
 7        for Powderhorn West residents to store
 8        personal property if they could not take
 9        all of their belongings with them?
10    A.  At Powderhorn Park West?
11    Q.  At the west closure, correct.
12    A.  No.
13    Q.  Does Hennepin County have any information
14        about what happened to the personal
15        property of encampment residents who were
16        not able to take all of their belongings
17        with them the day of the Powderhorn West
18        closure?
19            MS. WELLS:  Objection.  Foundation.
20    A.  As earlier, only what would have been
21        observed by a member of staff who was
22        present on site on the day, and what they
23        were able to witness, you know, which was
24        obviously limited with an encampment of
25        that size.
```

Page 210

1    BY MS. STILLMAN:

2    Q.   What Hennepin County staff was at the

3         Powderhorn West closure?

4    A.   Don Ryan, I believe, was present on the

5         day of the closure at Powderhorn Park

6         West.

7    Q.   Anyone else?

8    A.   To the best of my knowledge, no.

9         Occasionally Don would be accompanied by

10        somebody from Healthcare for the Homeless.

11        It's possible that was the case on that

12        day.  I'm not sure, off the top of my

13        head.

14   Q.   Does Hennepin County have evidence showing

15        that Patrick Berry received notice of the

16        Powderhorn West encampment closure?

17             MS. WELLS:  Objection.  Calls for a

18         legal conclusion.

19   A.   That's not information we would have.

20   BY MS. STILLMAN:

21   Q.   Does Hennepin County have evidence showing

22        that Patrick Berry's property was not

23        destroyed during the closure of the

24        Powderhorn West encampment?

25             MS. WELLS:  Objection.  Calls for a

Page 211

1          legal conclusion.  And I'll just note that
2          the way the question is framed is outside
3          the scope of the topics.
4    A.   And that's not information we would have.
5    BY MS. STILLMAN:
6    Q.   Does Hennepin County have any evidence
7          that Patrick Berry abandoned their
8          property at the Powderhorn West
9          encampment?
10              MS. WELLS:  I'm going to say
11          objection, calls for a legal conclusion,
12          outside the scope.
13   A.   That's not information we would have.
14   BY MS. STILLMAN:
15   Q.   Does Hennepin County have evidence that
16          Dennis Barrow received accurate notice of
17          the closure of the Powderhorn West
18          encampment?
19              MS. WELLS:  Objection.  Calls for a
20          legal conclusion, outside the scope.
21   A.   Not information we would have.
22   BY MS. STILLMAN:
23   Q.   Do you understand that Dennis Barrow is a
24          plaintiff in this case?
25   A.   I've seen the name on some of these

Page 212

1      documents, yes.

2   Q.  And Dennis Barrow in the complaint alleged

3       his medication was destroyed during the

4       Powderhorn West encampment closure.

5            Do you believe Mr. Barrow's

6        allegation that his medication was

7        destroyed during the Powderhorn West

8        encampment closure?

9            MS. WELLS:  Objection.  Outside the

10       scope.

11  A.  I have absolutely no basis on which to

12      judge such a question.  I don't know the

13      individual.

14  BY MS. STILLMAN:

15  Q.  Does Hennepin County have any information

16      that Dennis Barrow's medications were not

17      destroyed during the Powderhorn West

18      encampment closure?

19  A.  No information on this matter.

20           (Previously marked Exhibit No. 83 was

21       introduced.)

22  BY MS. STILLMAN:

23  Q.  I'm going to turn to Exhibit 83, and in

24      the second email down from Don Ryan, Don

25      Ryan writes to Jason Ohotto and Grant

Page 213

```
 1       Snyder, "Just between us, I think we
 2       should stick to the protocol of noticing a
 3       park and then demobilizing at least a day
 4       later.  I know it's more work, but if we
 5       do it consistently, we will not have
 6       examples that other people bring up about
 7       not being noticed."
 8            Do you see that?
 9  A.   I do see that.
10  Q.   And in the next paragraph, he writes that
11       Eddie "is at Matthews right now with
12       someone who was staying there, and his
13       tents and belongings were thrown out.  He
14       hadn't abandoned his stuff and came back
15       to find his stuff thrown away."
16            Do you see that?
17  A.   I do.
18  Q.   So Hennepin County knew encampment
19       residents' property was destroyed at the
20       encampment at Matthews Park on August
21       24th, 2020.  Correct?
22            MS. WELLS:  Object.  Foundation,
23        misrepresents the document.
24            MS. WALTHER:  I object.  It
25        mischaracterizes the evidence.
```

Page 214

1    A.   And I was going to say, I mean, obviously

2         that's misrepresenting what it says here.

3              What we have knowledge of is that one

4          of our employees engaged with an

5          individual who informed him of certain

6          things.  We don't have knowledge of

7          actually what happened.

8    BY MS. STILLMAN:

9    Q.   Did Hennepin County investigate what

10        happened?

11             MS. WELLS:  Objection.  Calls for a

12         legal conclusion, vague.

13   A.   The staff involved here, Healthcare for

14        the Homeless outreach worker Eddie, he did

15        exactly what I would want Eddie to do in

16        such an instance, which is work with this

17        vulnerable individual to get them to

18        somewhere where they could stay.  That's

19        our role here, so no.

20   BY MS. STILLMAN:

21   Q.   On August 25th, 2020, Hennepin County was

22        aware that on some occasions the MPRB was

23        not providing encampments with notice of

24        closure.  Correct?

25             MS. WELLS:  Objection.  Form, vague,

Page 215

```
 1       misrepresents the document.
 2  A.   Clearly this represents discussion about
 3       notice between Hennepin County staff and
 4       folks at the parks.  It represented there
 5       was some variation based on circumstance;
 6       in this case, an instance where a park was
 7       deemed to be abandoned.
 8            I mean, that's -- that's how I would
 9        describe what I'm seeing.
10  BY MS. STILLMAN:
11  Q.   Why do you believe the park was deemed to
12       be abandoned?
13  A.   Because it says in Jason Ohotto's email,
14       "Yesterday, Woody checked the encampment
15       at Matthews Park.  It was nearly
16       abandoned."
17  Q.   Nearly, but not abandoned?
18  A.   Sure.
19  Q.   Did David Hough write an email to
20       Superintendent Bangoura with suggestions
21       about how to close an encampment at any
22       point?
23            MS. WELLS:  Objection.  Foundation.
24  A.   I can't imagine that he would.  That's not
25       something that I've known David to ever
```

Page 216

```
 1      do.
 2   BY MS. STILLMAN:
 3   Q.   He did it with the City, though?
 4   A.   He didn't.  He shared with the City our
 5        insights and learning from the closure of
 6        the Midtown Greenway encampment, which is
 7        after the fact of this, so we wouldn't
 8        have even had that experience to draw on
 9        and share at the point of this document
10        we're looking at now.
11   Q.   Had Hennepin County not closed an
12        encampment prior to the Greenway in
13        December of 2020?
14   A.   I have been with Hennepin County since
15        late 2016.  In my time, I am not aware of
16        a closure certainly of the scale of the
17        Greenway closure.
18           I mean, you have to remember, of
19         course, that before the Governor's
20         executive order, encampments were not
21         permitted on public lands, so generally
22         did not become what they became in 2020,
23         so all of us were in a new world in 2020.
24         We didn't have a frame of reference to
25         draw upon because we'd never been in this
```

1          situation before of multiple encampments

2          of a hundred-plus tents simultaneously

3          across public property.

4    Q.   Is that a no?

5              MS. WELLS:  Asked and answered.

6    A.   I am not aware that we had anything to

7          draw upon that would enable us to share

8          insights as David Hough did to Heather

9          Johnston in the other email we looked at.

10             (Previously marked Exhibit No. 187

11         was introduced.)

12   BY MS. STILLMAN:

13   Q.   I'm going to go to Exhibit 187, and I'm

14         going to mark a document that's been

15         Bates-stamped Minneapolis Berry 073551 as

16         Exhibit 337.

17             Here's 337, Exhibit 187, and --

18             MS. WELLS:  Counsel, what is 73551

19         marked as?

20             MS. STILLMAN:  73551 is 337, and I'll

21         represent that that's the attachment to

22         the email that's been marked as Exhibit

23         187.

24             MS. WELLS:  I think we've already

25         marked 337.

```
                                          Page 218
 1            MS. STILLMAN:  Oh, is it 338?

 2            MS. WELLS:  Yes.

 3            MS. STILLMAN:  Mr. Hewitt, can I just

 4       grab that document back?

 5            Thank you.

 6            (Deposition Exhibit No. 338 was

 7       introduced.)

 8            MS. SARFF:  Were you saying 187 is

 9       the attachment of 337?

10            MS. STILLMAN:  And so the document

11       ending in 073551 is actually 338, and that

12       is the attachment to Exhibit 187.

13  BY MS. STILLMAN:

14  Q.  So this email is about an encampment on

15       the Nicollet Avenue bridge deck.

16            If you see the email from Katie

17       Topinka, she writes, "Hennepin County owns

18       the bridge on Nicollet that goes over the

19       Greenway at this site."

20            Do you see that?

21  A.  Sorry.  Is this the third email down in

22       the thread?

23  Q.  Yep, third email down.

24  A.  Okay.  I see where you're at, yes.

25  Q.  If you go to the second page, on the
```

Page 219

```
 1      bottom, there's an email from Don Ryan to

 2      Katie Topinka and Andrea Brennan, and you

 3      and Joseph Gladke have been cc'ed.

 4           And Don writes, "If we moved ahead, a

 5       possible time frame could be noticing the

 6       site by Thursday and then plan to clear

 7       the bridge deck by next Tuesday.  We can

 8       have outreach teams go out in the meantime

 9       to encourage people to move to a different

10       area to lessen the difficulty of clearing

11       more people on Tuesday."

12           Do you see that?

13  A.  Yes.

14  Q.  And did David Hough approve the closure of

15      the encampment on the Nicollet Avenue

16      bridge deck?

17           MS. WELLS:  Objection.  Foundation.

18  A.  We did close the encampment on the bridge

19      deck, so I can only assume yes.

20  BY MS. STILLMAN:

21  Q.  And the encampment on the bridge deck was

22      on Hennepin County property.  Correct?

23  A.  Certainly we owned the bridge, at least

24      that's what I see in this email.  I think

25      there's some question around that, but it
```

Page 220

1      appears so, yes.

2  Q.  Did the County get MPRB's support in

3      closing the encampment on the Nicollet

4      Avenue bridge?

5          MS. SARFF:  Objection.  Vague, lack

6       of foundation.

7  A.  This is an interesting one.  The notice to

8      vacate was posted, and I recall that on

9      the day before it was due to close,

10     observation reported that basically

11     everyone had left.

12         So my understanding is, on the day of

13      closure, we were essentially assuming we

14      were going to becoming upon either

15      abandoned or nearly abandoned sites.

16         My understanding of who was present

17      was Don Ryan, Joe Gladke.  I'm not sure

18      who, but I believe someone from Hennepin

19      County Security.  I believe now-Commander

20      Snyder of the MPD, homeless and vulnerable

21      person liaison position, was with them as

22      well.

23  Q.  Were there residents of the encampment

24      still there the day of the closure?

25          MS. WELLS:  Objection.  Vague.

Page 221

```
 1   A.   Yeah, as I've heard it, there were two
 2        people -- I think the phrase was over
 3        towards the back as they approached.
 4        Those people departed.
 5             I mean, this is -- you know, this is
 6        an encampment closure that we remember
 7        very well.  This is when an explosive
 8        device was left in the fire containing
 9        nails and shards of broken metal that
10        exploded with our staff nearby.
11             So, well, I'm not going to attempt to
12        assume understanding intention, but it
13        seems reasonable to assume intended to
14        cause grievous harm to anybody who was on
15        the encampment site at the time of
16        closure.
17             So, in terms of people who had been
18        staying at the encampment, my
19        understanding is nobody was present.
20   Q.   What day was the encampment closed?
21             MS. WELLS:  Objection.  Vague,
22        misrepresents his testimony.
23   A.   Yeah, the date that was given is later
24        than this.  I believe it was before the
25        closure of the Greenway, because the
```

Page 222

```
 1      security concerns about explosive devices
 2      were fresh in our mind from this
 3      experience.
 4            I would say it was sometime in
 5       November, but could have been October.
 6  BY MS. STILLMAN:
 7  Q.  How many residents were living in the
 8      encampment on the Nicollet Avenue bridge
 9      when the notice of closure was posted?
10      Oh, I guess I should say:  Was a notice of
11      closure posted?
12  A.  Yes, notice was provided to let anybody
13      know who were staying there.  And this was
14      a special case.  It was a little bit
15      different from some of the others and
16      different from what you've heard from me
17      there, because we were really concerned
18      that people move off this specific site as
19      a matter of urgency.
20            I think it's an alluded to in one of
21       these emails here, but this was a bridge
22       that had been out of use for like 30
23       years, was in very poor condition, was not
24       supposed to have any traffic on it.  But
25       we had repeated reports of vehicles
```

Page 223

1          driving up onto the bridge with the
2          encampment there.
3               And at the same time, I don't know
4          exactly how many people were actually
5          staying in the encampment as opposed to
6          visiting.  I don't have a number for you,
7          but I do know that the spread had got
8          close to the edges of the bridge.
9               So what I recall about this was very,
10         very serious concern of a bridge collapse
11         or of people going off the edge for other
12         reasons, and so an acute sense that we
13         needed people to move off this bridge,
14         even if -- even if they only moved to
15         another unsheltered site, which, for all
16         the reasons I've shared before, was also
17         undesirable.  But this was a big concern
18         for us.
19    Q.   If you can go to Exhibit 312, which is
20         Hennepin County Defendants' Response to
21         Plaintiffs' First Set of Interrogatories,
22         and if you would go to page 3 and look at
23         the answer to interrogatory number 2.
24              In the second-to-last paragraph, the
25         County answers that "Hennepin County's

Page 224

1       human services staff were present when

2       other governmental entities closed the

3       encampments," and then the last thing

4       listed is the Nicollet Avenue bridge in

5       2020.

6   A.  Mm-hmm.

7   Q.  Did another governmental entity close the

8       Nicollet Avenue bridge encampment in 2020?

9   A.  No.  So I would -- I would say that is, on

10      upon further review, inaccurate.

11          As I kind of alluded to earlier,

12      there were some questions about the

13      jurisdiction for the Nicollet Avenue

14      bridge, but having seen the email that

15      we've just seen, and knowing who was

16      involved, I think it's reasonable to say

17      that Hennepin County closed it, to the

18      extent that anyone closed it, in that we

19      provided notice, and by the time we came,

20      people had left, with the exception of --

21      well, we don't know who these two people

22      at the back were, whether they were the

23      ones that planted the explosive device or

24      whether they had anything else to do with

25      the encampment.

Page 225

1           But to all intents and purposes, the

2       encampment was vacated before any closure

3       activity actually took place.

4    Q.  If you go to page 8, interrogatory number

5       8, it says, "For sweeps identified in

6       interrogatory 2, explain whether the

7       opportunity to recover personal property

8       was communicated to encampment residents

9       and how that information was

10       communicated."

11           And you'll see that Hennepin County,

12       in the answer, discusses what was done at

13       the Greenway encampment, but it doesn't

14       talk about what was done at the Nicollet

15       Avenue bridge encampment.  Correct?

16   A.  Correct.

17   Q.  So did Hennepin County not provide an

18       opportunity to recover personal property

19       to residents of the encampment on the

20       Nicollet Avenue bridge?

21   A.  We did not take the steps described

22       earlier of, in advance of closure, going

23       in and offering storage.

24           We provided notice of when closure

25       would happen.  At the time that we arrived

Page 226

```
 1          after that point, the encampment was
 2          abandoned, with the exception of, you
 3          know, exploding devices, nails and metal
 4          and suchlike.
 5   Q.   So information about how to -- about
 6          whether there would be an opportunity to
 7          recover personal property after the
 8          closure of the encampment wasn't provided
 9          to residents of the encampment, the
10          Nicollet Avenue bridge encampment?
11              MS. WELLS:  Objection.  Asked and
12           answered.
13   A.   Having provided clear information on when
14          the encampment would be closed and having
15          found that it was vacated by that point, I
16          believe a reasonable assumption was made
17          that what was left behind was waste, and I
18          think that's a reasonable interpretation
19          of what we found.
20              MS. WELLS:  We've been going over an
21           hour.  Could we take a break?
22              MS. STILLMAN:  I have two more
23           questions on this, and then we can take a
24           break.
25              MS. WELLS:  Okay.
```

1    BY MS. STILLMAN:

2    Q.   I'm going to be going to Hennepin County's

3         answers to the second set of

4         interrogatories, Exhibit 313.  I put it to

5         the side.

6              If you'd go to interrogatory number

7          21?

8    A.   Which documents am I looking at?  Sorry.

9    Q.   313.

10   A.   And page?

11   Q.   10 through 11.  The answer to

12        interrogatory 21.

13   A.   Okay.

14   Q.   And on page 11, the second paragraph says,

15        "From January 1st, 2020 through September

16        7th, 2022, the Hennepin County Defendants

17        closed only one encampment, the Greenway

18        encampment that was located on County land

19        and closed by County staff on December

20        18th, 2020."

21              Is that incorrect?

22   A.   I think -- as per the discussion we've

23        just been having, I think there is a case

24        to be made that is incorrect; that the

25        County, in posting the bridge encampment,

Page 228

1      which was then vacated before the posted

2      date, led a closure of that specific

3      piece.

4           Again, it was a very different case

5       to others, so to the extent necessary, I

6       apologize for -- if this was

7       insufficiently clear.  You can see that.

8           What I would say is, again, the

9       notice -- even the notice we gave, that

10      was very different.  It was, "Please

11      relocate even if to another part of the

12      Greenway," which we did not do lightly.

13          I can see an interpretation that it

14      was viewed less as a closing, more as a

15      relocation, but I understand that that's a

16      semantic point.

17          MS. STILLMAN:  Okay.  We can take a

18      break.

19          THE VIDEO OPERATOR:  We're going off

20      the record at 2:53 p.m.

21          (Break taken.)

22          THE VIDEO OPERATOR:  This is Media

23      No. 5 in the deposition of David Hewitt.

24      Today is March 28th, 2023.  Going back on

25      the record at 3:07 p.m.

Page 229

1    BY MS. STILLMAN:

2    Q.   All right.  And if you look at page 8 of

3         Exhibit 313, interrogatory number 18, the

4         interrogatory asks for the Hennepin County

5         defendants to "describe the process you

6         created to challenge and report the

7         conduct of Hennepin County staff before,

8         during, and after the sweep."

9              And if you go to that last paragraph,

10        four lines from the bottom, a sentence

11        starts, "In addition, individuals can

12        contact County commissioners by email or

13        phone.  With respect to encampments,

14        individuals reached out directly to County

15        employees by email and phone to express

16        their opinions."

17             Do you see that?

18   A.   Yes.

19   Q.   Did individuals reach out directly to

20        Hennepin County by email and phone to

21        express their opinions with respect to

22        encampments in 2020?

23   A.   Individuals certainly sent emails

24        expressing opinions with regard to a

25        variety of matters around encampments,

1        yes.
2    Q.  Did any individuals express concerns to
3        Hennepin County via email about the
4        methods by which homeless encampments were
5        being closed in Hennepin County in 2020?
6    A.  Yes.  We already looked at one of those
7        emails from Mr. Fahlstrom earlier on.
8             Emails were received that stated
9         opinions such as those that Mr. Fahlstrom
10        shared.
11   Q.  Did any of those emails contain concerns
12        that property was being destroyed during
13        encampment closures?
14   A.  Mr. Fahlstrom's email stated that as --
15        well, I don't know whether to call it a
16        concern or an assertion, but he said words
17        along those lines.
18   Q.  Any other emails that you can think of
19        that expressed concern?
20   A.  I can believe that there could have been.
21        I couldn't tell you who the authors were.
22   Q.  Can you -- do you recall if you -- if
23        Hennepin County received emails that
24        individuals were concerned that residents
25        of encampments were not being given notice

Page 231

```
 1       of encampment closures in 2020?
 2  A.   I can believe that we would have received
 3       emails to that effect.
 4            I mean, I guess I would note that,
 5        yeah, we received emails about a lot of
 6        things, including things that aren't
 7        actually Hennepin County-related.  We've
 8        even seen some evidence of that already,
 9        so -- but yes.
10  Q.   Can you think of any other written
11       communications to Hennepin County from any
12       individuals that expressed concerns that
13       property was being destroyed during
14       encampment closures in Hennepin County in
15       2020?
16  A.   I can believe that I could have.  That is
17       not one of the more prominent messages
18       that I remember receiving.  But I, you
19       know, as I shared, receive 150 emails a
20       day on a normal day, and a lot of days in
21       2020 were not normal days, and I can think
22       of a 24-window in which I received about a
23       thousand emails in that year, so ...
24  Q.   Hennepin County never confirmed encampment
25       residents had notice of a closure of an
```

Page 232

1      encampment on MPRB property before sending

2      sheriff's deputies.  Correct?

3            MS. WELLS:  Objection.  Asked and

4       answered.

5  A.  That's not our role.

6  BY MS. STILLMAN:

7  Q.  Hennepin County never confirmed residents

8      were offered property storage prior to the

9      closure of an encampment on MPRB property

10     in 2020 before sending sheriff's deputies.

11     Correct?

12           MS. WELLS:  Objection.  Asked and

13      answered.

14 A.  That's not our role.

15 BY MS. STILLMAN:

16 Q.  Hennepin County never confirmed residents

17     of an encampment on MPRB property had

18     alternate shelter available, accessible as

19     to them, before sending sheriff's deputies

20     to the encampment closure.  Correct?

21           MS. WELLS:  Objection.  Asked and

22      answered.

23 A.  That's not our role.

24 BY MS. STILLMAN:

25 Q.  Were any Hennepin County sheriff's

Page 233

1    deputies present at encampment closures on
2    City land in 2020?
3    A.  I do not believe so.  If you have some
4        specifics, I could look at that, of
5        course, but just thinking about the whole
6        of 2020, I do not recall that being the
7        case.
8    Q.  If you go to the first set of requests for
9        admissions, which is Exhibit 314 --
10       actually, go to 315.  Sorry.  We're going
11       to the second and third sets.  And go to
12       the request number 30 on page 16.
13           Request 30 says, "Admit that Hennepin
14        County did not provide notice of the
15        forthcoming sweep to any resident before
16        the sweep of the encampment at Peavey Park
17        on or about September 24th, 2020."
18           And in the second paragraph, Hennepin
19        County responds, "Subject to and without
20        waiving any objections, the Hennepin
21        County defendants deny request number 30."
22           Do you see that?
23   A.  I do.
24   Q.  Did Hennepin County provide notice to the
25       residents of the Peavey Park encampment

Page 234

```
 1        that the encampment was going to be closed
 2        on September 24th, 2020?
 3   A.   So looking at this, I think this is
 4        another one of those double negatives that
 5        I looked at earlier, which may be
 6        problematic.
 7             Hennepin County did not provide
 8         notice of the closure of Peavey Park
 9         unless, as I mentioned earlier, with that
10         caveat, that if our staff were in a
11         position to share information with people
12         that might be beneficial to them, they
13         might do that, but it wouldn't be our
14         role, our remit, to provide that notice.
15   Q.   Was a resident of the Peavey Park
16        encampment arrested on September 24th,
17        2020 during the encampment closure?
18   A.   I am aware of arrests at the closure of
19        Peavey Park.  The arrests were made by the
20        Park's police.
21             I could not say whether the people
22         arrested were staying at the encampment or
23         what their housing status was.
24   Q.   Did Hennepin County sheriff's deputies who
25        were at the closure confirm whether the --
```

1       whether or not the people who were

2       arrested were residents of the Peavey Park

3       encampment?

4    A.  That would not be our role, no.

5    Q.  Did Hennepin County -- did Hennepin County

6       deputies transport any arrestees to jail

7       on September 24th, 2020 from the Peavey

8       Park encampment?

9    A.  I believe possibly five people were

10      transported to detention following the

11      closure of the Peavey Park encampment.

12   Q.  Did the Hennepin County sheriff's deputies

13      ask the MPRB to confirm that all of the

14      arrestees' property was collected and held

15      for safekeeping?

16   A.  No.

17          MS. WELLS:  Objection.  Vague.

18   A.  That would not be our role.

19   BY MS. STILLMAN:

20   Q.  Did Hennepin County review any video

21      footage of the Peavey Park encampment

22      closure after it happened?

23   A.  Not to the best of my knowledge.

24   Q.  Did you review any incident reports from

25      the Hennepin County sheriff's officers

Page 236

1        about what happened at the Peavey Park

2        encampment closure?

3   A.   I have not looked at an incident report,

4        no.

5   Q.   Does Hennepin County have information

6        showing that Henrietta Brown received

7        notice of the Peavey Park encampment

8        closure prior to September 24th, 2020?

9   A.   That's not information we would have.

10  Q.   And to clarify, are you aware that

11       Henrietta Brown is a plaintiff in this

12       action?

13  A.   I have seen the name on documents.

14  Q.   Henrietta Brown alleged that a deputy

15       sheriff told her she could not get

16       important papers from her tent during the

17       Peavey Park encampment closure.

18           Do you -- does Hennepin County have

19        any evidence that contradicts -- or does

20        Hennepin County have any information that

21        contradicts that allegation?

22  A.   In the discussions I've had with, I

23       believe it was the sheriff's office, that

24       is not an incident that has been relayed

25       to me, so that's not -- not something

                                                    Page 237

1        that's been shared, to my recollection,
2        previously.
3   Q.   Any other information that you have that
4        might contradict Ms. Brown's allegation?
5               MS. WELLS:  Objection.  Calls for a
6         legal conclusion.
7   A.   Yeah, we --
8               MS. WALTHER:  Can you --
9               MS. WELLS:  I said calls for a legal
10        conclusion.
11  A.   The staging of our sheriff's deputies for
12       transportation tended to be away from the
13       encampment, often out of sight of the
14       encampment, in each of the closures.
15              It's unclear to me why the sheriff's
16        deputy would be the person having that
17        interaction, and, like I say, nobody has
18        suggested -- has described that
19        interaction to me before from the
20        sheriff's office, to the best of my
21        recollection.
22  BY MS. STILLMAN:
23  Q.   Henrietta Brown alleged that a deputy --
24       deputy sheriff threatened to arrest her.
25       Does Hennepin County have any information

Page 238

1      that contradicts that allegation?

2              MS. WELLS:  Objection.  Calls for a

3       legal conclusion.

4   A.  I have no reason to think that that is the

5       case based on the information that I've

6       heard from -- from the sheriff's office.

7   Q.  Any other information?

8              MS. WELLS:  Same objection.

9   A.  Not with regards to this individual, no.

10  BY MS. STILLMAN:

11  Q.  Hennepin -- Henrietta Brown alleges that

12      her property was destroyed during the

13      closure of the Peavey Park encampment on

14      September 24th, 2020.

15             Does Hennepin County have any

16       information showing that Henrietta Brown

17       did not have any of her property destroyed

18       at the Peavey Park closure?

19             MS. WELLS:  Objection.  Calls for a

20       legal conclusion.

21  A.  That's not information we would have.

22  BY MS. STILLMAN:

23  Q.  I'm going to be using Exhibit 312, which

24      is the response to plaintiffs' first set

25      of interrogatories, and I'm marking a

Page 239

1        document Bates-stamped HC 00038097 as

2        Exhibit 339, and I'm going to be marking

3        Exhibit -- or a document that's

4        Bates-stamped HC 00040983 as Exhibit 340.

5               (Deposition Exhibit Nos. 330 and 340

6         were introduced.)

7    BY MS. STILLMAN:

8    Q.   So if you go to Exhibit 312 --

9    A.   Yep.

10   Q.   -- interrogatory number 4 starts on

11        page 5:  "Identify any protocols,

12        procedures, or policies adopted by you

13        from January 1st, 2016 to the present

14        regarding the handling of or dealing with

15        homeless individuals living in public

16        spaces in Hennepin County."

17               And then in the second paragraph of

18         the answer, Hennepin County writes,

19         "Subject to and without waiving any

20         objection, the Hennepin County defendants

21         state that the County adopted a temporary

22         policy regarding encampments and a policy

23         regarding camping in public spaces."

24               Are those ...

25               MS. WELLS:  I just want to say it's

Page 240

1        "public space."

2    BY MS. STILLMAN:

3    Q.   "Space."   "Public space."

4            Are the documents referred to in

5         interrogatory -- in Hennepin County's

6         answer to interrogatory number 4 Exhibit

7         339 and Exhibit 340?

8    A.   That appears to be the case, yep.

9    Q.   And interrogatory 5 says, "Identify any

10        protocols, procedures, or policies you

11        adopted on implementing Minnesota

12        Executive Orders 2033, 2047, and 2055

13        specifically relating to the handling of

14        or dealing with homeless individuals."

15            And if you turn to the next page, the

16         second paragraph of Hennepin County's

17         answer is, "Subject to and without waiving

18         any objection, the Hennepin County

19         defendants state that the County adopted a

20         temporary policy regarding encampments and

21         a policy regarding camping in public

22         space."

23            Do you see that?

24    A.   Yes.

25    Q.   And does the answer in -- to interrogatory

Page 241

1      number 5 refer to Exhibits 339 and 340?
2  A.  I believe so, yes.
3  Q.  If you look at Exhibit 339, on the bottom
4      of the left-hand corner, the last line
5      says, "Effective date:  4/27/2020."
6          Do you see that?
7  A.  I do.
8  Q.  Did Hennepin County have a policy
9      regarding encampments on Hennepin County
10     property prior to April 27th, 2020?
11 A.  No, not in a format like this.
12 Q.  How long was the policy -- this policy in
13     effect?
14 A.  The temporary policy regarding
15     encampments, you mean?
16 Q.  Yes.
17 A.  Because we're looking at two policy
18     documents.
19          I believe -- well, until it was
20      replaced by the policy regarding camping
21      in public space that you've also provided,
22      which I believe came into effect summer of
23      2021.
24 Q.  If you go to Exhibit 340, "Policy
25      Regarding Camping in Public Space,"

Page 242

```
 1         it's --
 2    A.   Oh, sorry.   Sorry.
 3              Yep.   Okay.
 4    Q.   And, again, in the bottom left-hand
 5         corner, it says, "Effective Date," but
 6         then there's a block, parens, "Effective
 7         Date."
 8              Do you see that?
 9    A.   I do.
10    Q.   Is there a version of this policy that
11         states the effective date?
12    A.   Good question.   I mean, that is clearly a
13         typo.   If not, I'll make a mental note of
14         it, and we will go back and add an
15         effective date to it, if this is what's
16         sitting in the administrative manual.
17    Q.   Is Exhibit 340 still Hennepin County's
18         policy regarding camping in public space?
19    A.   Yes.
20    Q.   If you go back to Exhibit 339, on the
21         second page, on the top it says,
22         "Temporary Policy," and then the third
23         bullet point under that says, "The
24         residents of the encampment must have
25         access to healthcare."
```

Page 243

```
 1            What's meant by "the residents of the
 2       encampment"?
 3   A.  That's a very poor choice of phrase, one
 4       that we certainly wouldn't use today.
 5            It's obviously referring to people
 6        who are staying within the encampment
 7        setting.
 8   Q.  And is it referring to the same thing in
 9       that third paragraph that says, "Hennepin
10       County shall provide reasonable notice to
11       encampment residents that the encampment
12       may 'by' subject to disbanding and
13       removal, with information regarding
14       healthcare resources and housing options
15       that are available to residents"?
16   A.  Yes.  Again, a terminology we wouldn't use
17       today, but it is referring to people who
18       may be staying in encampments.
19   Q.  Were you using the terminology -- so you
20       were using the terminology "resident" in
21       2020.  Correct?
22   A.  I don't recall --
23            MS. WELLS:  Objection.  Vague.
24   A.  I don't recall ever using the terminology
25       "residents," but, I mean, I see it here,
```

Page 244

1       so clearly it snuck into this document.
2   BY MS. STILLMAN:
3   Q.  And I guess I should clarify.  Hennepin
4       County was using the term "resident" in
5       2020?
6           MS. WELLS:  Objection.  Vague.
7   A.  Again, I don't believe that we would have
8       been, but I see that it snuck into this
9       document.
10  BY MS. STILLMAN:
11  Q.  Did Hennepin County have any policies
12      regarding encampments on land owned by
13      entities other than Hennepin County in
14      2020?
15  A.  Could I get that question again?  Sorry.
16          (Record read back.)
17  A.  No, that would not be appropriate at all
18      within our remit.
19  BY MS. STILLMAN:
20  Q.  If you go to Exhibit 340, at the bottom of
21      the first page, it says "Policy."  There's
22      a paragraph, and the third sentence says,
23      "Likewise, Hennepin County, HCRRA, and
24      HCHRA do not allow tents, tarps, or any
25      other temporary structures to be erected

Page 245

1      on their property as a sleeping space,

2      shelter for the purposes of living, or for

3      the storage of personal property items or

4      possessions."

5           What is meant by "for the purpose of

6       living"?

7  A.  I mean, this terminology is clearly

8      driving at somebody who plans to, however

9      temporarily, live on this piece of land

10     and is very clear that that's not

11     allowable.

12 Q.  Okay.  You can put those away.

13          I am marking a document that's been

14      Bates-stamped HC 00009899 as Exhibit 341.

15          (Deposition Exhibit No. 341 was

16      introduced.)

17 BY MS. STILLMAN:

18 Q.  And this is an "Adult Shelter Connect

19     After-Hours Stats" for August 18th of

20     2020.

21          Do you see that?

22 A.  I see that.

23 Q.  All right.  And it says, "Available beds

24     at open," "HLC Sally's," "W," "25"; "HLC

25     SafeBay," "M," "20."

Page 246

1          Do you see that?

2  A.  I do.

3  Q.  And "Available at close," 17 per "HLC

4      Sally's," "W," and 5 for "HLC SafeBay,"

5      "M."

6  A.  I see that.

7  Q.  If you go back to Exhibit 317, it's an

8      email from you to Chris Meyer.

9  A.  I see it.

10  Q.  And then I'm going to be marking an

11      exhibit Bates-stamped HC 00027554 as

12      Exhibit 342.

13          (Deposition Exhibit No. 342 was

14       introduced.)

15  A.  Okay.

16  BY MS. STILLMAN:

17  Q.  And do you know who Chris Meyer is?

18  A.  Chris Meyer is a former Park Board

19      commissioner.  He was a Park Board

20      commissioner in 2020.

21  Q.  All right.  In the second paragraph, third

22      sentence, you write, "There are still

23      about 80-plus spaces in single adult

24      shelter made available each morning and

25      some unused beds each night for men and

```
 1      women."
 2            Do you see that?
 3  A.   Yep.
 4  Q.   And then the next sentence:  "These have
 5       been slightly lower as we get towards the
 6       end of the month, 20 to 30 instead of 30
 7       to 40."
 8            MS. SARFF:  Ms. Stillman, can you
 9        just tell us which of the three exhibits
10        we're on?
11            MS. STILLMAN:  317.
12            MS. SARFF:  Thank you.
13  A.   Yes, I see that.
14  BY MS. STILLMAN:
15  Q.   So if you go to Exhibit 342, which is the
16       attachment.
17  A.   Yep.
18            MS. MARTENSON:  This is the
19        attachment to 317?
20            MS. STILLMAN:  Yes.
21  A.   Okay.
22  BY MS. STILLMAN:
23  Q.   It says, "Single Adults," "On August 18th,
24       2020, 343 single adults were in congregate
25       shelter (91 percent of 379 spaces) and 670
```

Page 248

```
 1        in emergency hotel rooms."
 2   A.   I see that.
 3   Q.   That 379 number includes the pay-for-stay
 4        shelter run by Catholic Charities.
 5        Correct?
 6   A.   That 91 percent would include all single
 7        adult shelters using the homeless
 8        management information system, yes, and
 9        that includes the pay-for-stay shelter at
10        Catholic Charities.
11   Q.   So does that mean that 36 beds went unused
12        on August 18th, 2020?
13   A.   Based on the information that those
14        shelter providers put into the homeless
15        management information system that gets
16        collated into this weekly shelter report,
17        yes.  My read of that, 91 percent of 379
18        spaces being used is that 36 were unused.
19   Q.   Why are those numbers different from the
20        numbers in Exhibit 341?
21   A.   Yes, we've already highlighted one of the
22        reasons, that the pay-for-stay shelter at
23        Catholic Charities is not included in the
24        Adult Shelter Connect evening numbers
25        because they don't do intakes in the
```

1    evening.

2         Additionally, as I mentioned earlier

3    when we looked at a different date, but

4    the same data source, the Harbor Lights,

5    since they're emergency housing shelter

6    beds, those that were the only 24/7 beds

7    before the pandemic, serving people with

8    disabilities, also don't do intakes in the

9    evening.

10        So you would expect to see that the

11   number of available beds in the shelter

12   report could be slightly higher than that

13   represented through what was available to

14   the Adult Shelter Connect to offer that

15   evening, as it doesn't include those

16   programs.

17        There's actually one other slightly

18   wonky data point here, which is the

19   shelters that we sometimes refer to as the

20   church shelters--St. Stephen's, Simpson,

21   Our Saviors--have a policy whereby people

22   can take nights out of shelter while still

23   retaining that shelter bed for their use,

24   so nobody else gets to use it that night.

25        I'm not wild about that policy, but

Page 250

```
 1        it's another reason that the number of
 2        beds being made available to the Adult
 3        Shelter Connect in the evening to issue
 4        may be fewer than the total number that go
 5        unused in the weekly shelter report.
 6   Q.   If you go back to Exhibit 317, the email,
 7        you said, "There are still about 80-plus
 8        spaces in single adult shelter made
 9        available each morning."
10             Where are you getting that 80-plus
11        number?
12   A.   So you don't have in either of your
13        sources here, again something that I
14        mentioned earlier on, which is this PM
15        results from Adult Shelter Connect.  They
16        also send an AM version.
17             The AM version includes how many beds
18        at every shelter are available at the
19        beginning of the day to issue.
20             That is where I would have taken that
21        80-plus number from.  And -- and, yeah,
22        that's consistent with my memory.
23             Over the years it fluctuates, but
24        80-plus that summer, every morning, sounds
25        credible.
```

Page 251

1   Q.   If you go to -- I'm looking for the answer

2        to the first set of interrogatories, if

3        you want to find it while I do my ...

4             Okay.  Exhibit 312, interrogatory

5         number 9 on page 9.

6             Interrogatory number 9 states,

7         "Identify the weekly number of shelter

8         spaces available in Hennepin County from

9         January 1st, 2020, to the present and the

10        method used to calculate that number."

11             In the second paragraph of the

12        answer, about halfway through, the seventh

13        line, Hennepin County defendants write,

14        "The Hennepin County defendants further

15        state that Hennepin County receives daily

16        aggregated data from Adult Shelter Connect

17        regarding (1) the total number of beds and

18        shelters in Hennepin County, and (2) the

19        number of beds in shelters in Hennepin

20        County that are open for reservation at

21        specific times each day."

22             Do you see that?

23   A.   Yes.

24   Q.   The total number of beds in shelters in

25        Hennepin County isn't depicted in the ASC

Page 252

1    report we just looked at.  Correct?

2    Exhibit 341?

3  A.  The PM report does not include that, no.

4  Q.  How does Hennepin County collect this

5    total number of beds in shelters in

6    Hennepin County?

7  A.  Well, one of the ways, we've also looked

8    at 342, the weekly shelter report.

9        So every shelter that is

10    participating in the homeless management

11    information system, which they're required

12    to do if they're receiving funding through

13    the County, have to record their bed

14    counts and who uses them on a

15    night-to-night basis, and that's where

16    this weekly report pulls its data from.

17  Q.  So does Hennepin County get its

18    information about the total number of beds

19    and shelters in Hennepin County from that

20    weekly shelter report?

21  A.  It is in the weekly shelter report.  We

22    don't have the Adult Shelter Connect AM

23    report in front of us.  That has more

24    detail, certainly, than the PM report,

25    focusing on the number of beds that become

Page 253

```
 1        available each day, that 80-plus that we
 2        just discussed.
 3               I'm trying to remember if it actually
 4         has a column where it kind of has the
 5         static total number.  I'm not sure that it
 6         does.
 7               But certainly that weekly shelter
 8         report contains that data, yes.
 9   Q.   Any other sources from which Hennepin
10        County gathers data on the total number of
11        beds and shelters in Hennepin County other
12        than the weekly shelter reports and the
13        Adult Shelter Connect AM reports?
14   A.   I mean, the weekly shelter report
15        information comes out of the homeless
16        management information system.  It depends
17        if you count that, therefore, as separate.
18               We have to produce a housing
19         inventory chart for HUD once a year that
20         includes the number of beds or units in a
21         variety of shelter and housing programs,
22         though, again, that data is largely
23         derived from the homeless management
24         information source, supplemented by direct
25         reporting from shelters that do not
```

Page 254

1          participate in the homeless management

2          information system.

3     Q.   Any other sources?

4     A.   Those are the ones I can think of.

5     Q.   How does Hennepin County collect the

6          number of beds in shelters in Hennepin

7          County that are open for reservation at

8          specific times each day?

9     A.   So the morning Adult Shelter Connect

10         report, like I say, is more detailed than

11         the one that you have here, will set out

12         each shelter program, including those that

13         only do intake during the day.  Has

14         changed a little bit over time, but it

15         will tell you how many were available for

16         reservation at the office opening.  It

17         will tell you whether they reached a point

18         during the day at which no more

19         reservations could be made at a specific

20         shelter.

21              And then we come to this PM report,

22         which shows us how many available beds

23         were open when they reopened in the PM.

24              And the reason for the shift there,

25         the reason that number is different from

Page 255

1      the kind of closing number of the AM

2      hours, is because a lot of people don't

3      show up to claim their shelter beds.  And

4      that's a daily fluctuation, so we look at

5      some strategic overbooking.

6           But, nonetheless, every single night,

7      there are new available shelter beds on

8      top of whatever there was during the day.

9           And looking at 341 that you have in

10     front of us, I can see that on the 18th of

11     August, 45 beds were available at the

12     Adult Shelter Connect after-hours opening,

13     which would have been on top of, say,

14     80-ish in the morning when they opened.

15  Q.  Aside from the email you sent former park

16     commissioner Meyer that's been labeled as

17     Exhibit 317, did the County provide

18     specific -- are there any other times when

19     the County provided specific shelter data

20     to the MPRB?

21  A.  I feel like this has already come up, but

22     as discussed, you know, that's information

23     that we receive pretty much daily from

24     Simpson Housing Services, and when

25     partners are asked whether that's a Park

Page 256

1       Board commissioner, a nonprofit, somebody

2       internal, somebody external, we would

3       share that information, so I'm sure we

4       provided that information to people at

5       MPRB over the course of events.

6   Q.  As a general practice, when Hennepin

7       County is asked about shelter

8       availability, what numbers does the

9       Hennepin County -- does Hennepin County

10      share?

11          MS. WELLS:  Objection.  Vague.

12  A.  This is --

13  BY MS. STILLMAN:

14  Q.  And I -- I can clarify.  Do you share --

15  A.  Sure.

16  Q.  -- numbers from the PM Adult Shelter

17      Connect report or from the -- this daily

18      shelter report in Exhibit 342, or both?

19  A.  It would depend on the question and

20      exactly what they're asking.  They do

21      represent slightly different things, as

22      we've discussed.

23          For instance, the weekly shelter

24       report includes utilization of shelter

25       programs that don't do intakes in the

Page 257

```
 1        evening.
 2              My go-to, certainly now, if somebody
 3        asks me about shelter availability on a
 4        specific day, is the reports provided to
 5        us by the Adult Shelter Connect.
 6              If the question asks for more, then I
 7        might look at what more we can provide.
 8  Q.  Would the County ever provide the MPRB
 9        with numbers of available beds for men
10        specifically?
11  A.  Potentially.  I mean, you know, I can
12        repeat the answer I just gave.  This is
13        information that is available to us; when
14        people ask, we will provide.
15              And as you see, within those Adult
16        Shelter Connect data, they do distinguish
17        between beds for people who identify as
18        male and beds for people who identify as
19        female, and there are different
20        fluctuations and dynamics in the
21        availability of each.
22  Q.  In 2020, did Hennepin County ever provide
23        shelter data to the City of Minneapolis?
24  A.  The same answer applies.  I'm very, very
25        sure that we did.  I can think of
```

Page 258

1         occasions broadly when we did.

2               Again, this is information that, as

3          it was available to us, if others are

4          asking us for it, we would provide it.

5    Q.   Did Hennepin County ever provide shelter

6         data to the City in 2022?

7    A.   Exactly the same rationale applies.  The

8         same information that we're talking about

9         is provided to us ongoing, including

10        throughout 2022.  If we receive questions

11        about it, we would answer them.

12   Q.   All right.  I'm going to go back to

13        interrogatory 9 in Exhibit 312.

14              In the second paragraph just below

15         the sentence we were just looking at,

16         Hennepin County responds, "Moreover, since

17         the number of beds open for reservation in

18         shelter fluc" -- "in shelters fluctuates

19         over the course of each day, with beds

20         filling and opening over the course of

21         each day, the above-described data may be

22         accurate only as of the time that the

23         individual shelters reported it to Adult

24         Shelter Connect."

25              Do you see that?

Page 259

```
1    A.   I do.

2    Q.   Is that accurate?

3    A.   Yes.  We've -- I can think of an incident

4         when somebody contacted us to say there's

5         no bed available for a particular group,

6         and then ten minutes later there was

7         because somebody, who was using that bed

8         in the program like that, left.

9              These are very dynamic environments,

10         so, yes, it's a changing environment.

11         It's one of the reasons, because we know

12         that new beds become available every

13         morning and every evening and there may be

14         fluctuations throughout the day, that we

15         always encourage people who want shelter

16         to call because even if we were unable to

17         meet their request earlier in the day, we

18         may be able to meet it later.

19              And I'm using "we" very loosely to

20         talk about Hennepin County and our

21         nonprofit partners who are independent

22         organizations, but partners with us in

23         this work.

24   Q.   So there's no way for Hennepin County to

25         know if shelter space will be available
```

Page 260

1        for a displaced encampment resident after

2        a sweep.   Correct?

3               MS. WELLS:  Objection.  Form, calls

4         for speculation.

5    A.   So in -- this system of the Adult Shelter

6         Connect was implemented in October of

7         2016, so we're at six and a half years, so

8         six and a half times 365 days, there

9         hasn't been a single morning when there

10        haven't been new shelter beds available

11        and there hasn't been a single evening

12        when there haven't been new shelter beds

13        available.

14              So what we can predict is every

15         single day there will be newly available

16         shelter beds in both the morning and the

17         evening, unless tomorrow was the first

18         time in six and a half years that that

19         didn't happen, but we feel pretty

20         confident.

21   Q.   But the resident might not be able to get

22        to a shelter right away.  Correct?

23              MS. WELLS:  Objection.  Vague,

24         speculation.

25   A.   So one of the reasons for implementing

Page 261

1          this system was actually to assist in
2          those kind of situations.
3                What the Adult Shelter Connect does
4          is it makes a reservation at the shelter,
5          guaranteeing that individual that bed as
6          long as they arrive by the prescribed
7          time.
8                So no longer is it the case, which
9          would have been the case in 2015, say,
10         that an individual has to make their way
11         all the way over to a shelter only to wait
12         in line and then not be able to get in
13         because they were the 132nd person queuing
14         for Salvation Army, when only 130 people
15         could come in.
16               The Adult Shelter Connect makes that
17         reservation for you so that you are
18         guaranteed that shelter bed is being held
19         for you until a designated time.
20               The reason for that designated time
21         is that every single day a lot of people
22         do not show up for their beds, and we want
23         to make sure that all of those beds, to
24         the extent possible, can be put into use
25         so that as many people as possible have

                                        Page 262

1           the opportunity for somewhere safe to stay

2           for the night.

3    BY MS. STILLMAN:

4    Q.   Is it your understanding that, when

5         encampments are closed, there are beds in

6         the Hennepin County shelter system

7         reserved for every resident of the

8         encampment the day of the closure?

9    A.   I have never heard of an instance where

10        people staying in the encampment on the

11        day of closure have all requested a

12        shelter bed.

13              So, no, we would not make a

14         reservation for somebody who does not want

15         something.  That would block the system

16         and prevent somebody else accessing that

17         bed, or at least prevent them from being

18         able to reserve it ahead of time.

19              We like people to be able to make

20         that reservation as early in the day as

21         possible so they have certainty that they

22         have a place to stay for the night,

23         because that supports dignity, mental

24         health, emotional health, and that's

25         certainly the feedback we have had from

Page 263

1       people that use the system, that they

2       really appreciate knowing ahead of time.

3           So we don't block up the system with

4       reservations for people who have no intent

5       to be using it.

6   Q.  So if I'm understanding what you're saying

7       correctly, when an encampment is closed,

8       Hennepin County would encourage a resident

9       to call Adult Shelter Connect to see if

10      there's a bed available.  Correct?

11  A.  Potentially, or make the call on their

12      behalf, or have a outreach worker make the

13      call on their behalf.

14          There are a number of ways that

15      communication can happen, but essentially,

16      if an individual does want to access a

17      shelter, that would be the means of doing

18      so, and that is the work of, for instance,

19      we've spoken about the presence of human

20      services staff at encampment closures in

21      2020.

22          So Don Ryan, in those instances,

23      would be able to use this system to help

24      somebody reserve and access a shelter.

25          For what it's worth, we've discussed

Page 264

```
 1        the Peavey Park closure.  I am aware that
 2        Don Ryan helped a very senior lady with
 3        severe health conditions to relocate from
 4        the tent that she had been sleeping in to
 5        Simpson Shelter on that day.  That's from
 6        his feedback for me.
 7             So that is the kind of thing that we
 8        would want to offer people in order to
 9        better support their health and safety,
10        yes.
11   Q.   And if -- during the encampment closure,
12        when they called Adult Shelter Connect, if
13        there were no available beds at that time,
14        would they be instructed to call back
15        later?
16   A.   As anybody calling, when it's no longer
17        possible to make additional reservations
18        through the day, yes, they should be
19        advised by the Simpson staff, Adult
20        Shelter Connect, "More beds will be
21        available this evening, and to please call
22        back then."
23   Q.   Where does Hennepin County recommend the
24        residents of the encampment that was just
25        closed go in between that time and when
```

Page 265

```
 1      they can call back?
 2            MS. WELLS:  Objection.  Vague.
 3 A.   I cannot imagine Hennepin County making a
 4      recommendation, though, if somebody were
 5      looking for where safe indoor places they
 6      can be, I mean, I can think of the likes
 7      of the Opportunity Center and the
 8      suchlike.  But we don't control every
 9      movement, every minute of the day, of
10      folks.
11 Q.   I'm marking a document Bates-stamped
12      Minneapolis Berry 095035 as Exhibit 343.
13            (Deposition Exhibit No. 343 was
14       introduced.)
15 BY MS. STILLMAN:
16 Q.   All right.  And have you had a chance to
17      review this document?
18 A.   Yes.
19 Q.   Susannah King works for Hennepin County
20      Healthcare for the Homeless.  Correct?
21 A.   Yes.
22 Q.   And she is saying that she added this
23      individual to a wait list for a hotel?
24 A.   I see that.
25 Q.   What is the wait list for the hotel?
```

Page 266

1  A.   So I referenced earlier protective shelter

2       programs.  One of the programs that --

3       were operated in hotel sites that Hennepin

4       County leased and later purchased.

5            There was a reference that these

6        opened March 18, I believe, and the

7        initial move -- or the direction of our

8        public health colleagues was to move

9        everyone who was aged 60 and above and in

10       a congregate shelter, or at least offer

11       them the option to move, to these

12       noncongregate spaces to bring down their

13       risk of catching COVID.

14            Those congruent spaces, combined with

15       those personal characteristics, were seen

16       as creating the greatest risk for medical

17       complications up to and including

18       fatality.

19            Once that initial movement of folks

20       who were 60 and above out of congregate

21       shelter was completed, and as more

22       guidance came out from the CDC, we handed

23       prioritization for any openings in those

24       protective shelter spaces to the

25       Healthcare for the Homeless team for them

Page 267

1          to determine who were the folks who most
2          needed those spaces in order to protect
3          them from COVID.
4               So what Susannah is referring to here
5          is a list of people who might technically
6          meet the eligibility from whom
7          prioritization could occur for spaces that
8          might open up in those -- in those
9          programs.
10   Q.  How long was the wait list?
11               MS. WELLS:  Objection.  Foundation.
12   A.  I couldn't tell you that.
13   BY MS. STILLMAN:
14   Q.  Did healthcare -- Hennepin County
15          Healthcare for the Homeless determine when
16          someone was moved -- moved off the wait
17          list and into a hotel?
18   A.  I mean, we would have had a record that
19          they were now staying in one of those
20          protective shelters, and I would hope that
21          they would be aware of that, to make for
22          efficient referrals from other folks, but
23          I -- I assume so.
24               Like I say, in matters of COVID, we
25          really deferred to these public health

Page 268

```
 1            colleagues to identify who needed to be
 2            there most from a protective health risk.
 3                 One thing that's not referenced here,
 4            which doesn't hugely surprise me, because
 5            a little bit disappointing, is that during
 6            this period we had also deconcentrated the
 7            main shelters and put in place COVID
 8            mitigation strategies that were incredibly
 9            effective.  So I hate seeing that this guy
10            was sitting outside, but anyway ...
11    Q.    In 2020, the County didn't provide hotel
12            spaces for single people outside of the
13            COVID-related hotels.  Correct?
14                 MS. WELLS:  Objection.  Foundation.
15    A.    Yes, we are not a hotel provider.  We
16            leased and eventually bought hotels for
17            very specific strategies that were related
18            to the COVID pandemic.
19    BY MS. STILLMAN:
20    Q.    And Hennepin County was aware that ZACAH
21            was providing hotel rooms for displaced
22            encampment residents in 2020.  Correct?
23    A.    We were aware that ZACAH and other
24            nonprofits were funding hotel stays for
25            individuals of their choosing, yes.
```

Page 269

1  Q.  Were -- was anybody from Hennepin County

2      other than Hennepin County Healthcare for

3      the Homeless involved in determining

4      whether someone was moved off of a hotel

5      wait list and into a Hennepin County

6      hotel?

7  A.  Once that process was put in place, that

8      was maintained through to the rollout of

9      the COVID vaccination in February of 2021,

10     which then became our primary strategy for

11     protecting people from those medical

12     risks, potential fatality, from COVID.

13         At that point we stopped taking in

14      new admissions to the protective shelter.

15      Vaccination became the strategy.

16         There was that period before

17      Healthcare for the Homeless took over the

18      prioritization during which, at the

19      direction of our public health leadership

20      and Healthcare for the Homeless

21      leadership, we worked with the shelters to

22      very rapidly just identify everyone in a

23      congregate shelter who was age 60 and

24      above.

25         So they didn't manage that piece.

```
 1        They took over after that.  They managed
 2         it all the way until we stopped new
 3         admissions and rolled out vaccination.
 4   Q.   Did the Hennepin County Sheriff's Office
 5         send deputies to assist with the closure
 6         of an encampment at 29th Street and 14th
 7         Avenue South in July of 2022?
 8   A.   Yes.  Yep, I know the encampment you're
 9         referring to.  Sorry for switching gears.
10         I just had to shift my brain.  Yes, I know
11         what you mean.
12   Q.   Did Hennepin County also send outreach
13         workers to the closure of the encampment
14         located at 29th Street and 14th Avenue
15         South in July 2022?
16   A.   No.
17   Q.   Why not?
18   A.   The closure of this encampment -- this
19         encampment had been there for several
20         months; had become extremely challenging;
21         very, very high levels of drug use; very
22         credible widespread reports of
23         trafficking, including trafficking of
24         minors; drug dealing; gunshots; and so on
25         and so forth.
```

Page 271

1          Outreach workers from Hennepin County

2     and nonprofit agencies were regular

3     visitors to that encampment to engage with

4     people and connect them with services.

5          The closure of this encampment,

6     however, did happen very rapidly.  There

7     were -- this was on an empty City-owned

8     lot.  There were three adjacent buildings

9     that had been -- at least one of which was

10    empty, that were being used for a variety

11    of purposes by people in the encampment,

12    and three of those buildings burned down

13    one night.

14         The closure of the encampment

15    followed the next day, given the very

16    serious nature of that event and the

17    potential risk to health and safety of all

18    concerned.

19         So it came about very rapidly.  A

20    request was made to the sheriff's office

21    for support the day before the closure.

22         No request was made of human

23    services, and both the nature of the

24    closure and some of the conflicts that

25    circulated around that site in regards to

Page 272

1          a potential earlier closure that had been
2          noticed and suggested, would also have
3          given us pause.
4                But, yeah, that's -- that's kind of
5          the story there.
6     Q.   Does Hennepin County have information that
7          residents of that encampment caused those
8          fires that you just referred to?
9     A.   No.
10    Q.   I'm going to go to Exhibit 115, and then
11         I'm going to be using Exhibit 116 as well.
12              MS. SARFF:  115 and 116?
13              MS. STILLMAN:  Yes.
14              (Sotto voce comments.)
15              THE WITNESS:  Can I just grab some
16         water there?  We don't need to break at
17         all.  Is that okay?
18              MS. STILLMAN:  Yeah.  We can take --
19         let's take a five-minute break.
20              THE WITNESS:  Is this a good time for
21         that?  Sorry.  I didn't mean to disrupt
22         your flow.
23              MS. STILLMAN:  That's fine.
24              THE VIDEO OPERATOR:  We're going off
25         record at 4:08 p.m.

Page 273

1                (Break taken.)
2                THE VIDEO OPERATOR:  This is Media
3           No. 6 in the deposition of David Hewitt.
4           Today is March 28th, 2023.  We're going
5           back on the record at 4:16 p.m.
6                (Previously marked Exhibit Nos. 115
7           and 116 were introduced.)
8     BY MS. STILLMAN:
9     Q.   All right.  And kind of take a look at
10          Exhibit 115.
11    A.   Yep.
12    Q.   All right.  And that is a Hennepin County
13          Sheriff's Office "Special Detail
14          Operations Plan," and the description is
15          "Encampment Demobilization - Assist
16          Minneapolis Police Department."
17                Do you see that?
18    A.   I do.
19    Q.   And it goes down to
20          "Situation/Mission/Execution," and then
21          it's "Situation" and "Mission" in that big
22          box.
23                Do you see that?
24    A.   Sorry.  "Situation/Mission/Execution" I
25          see, and then "Situation," "Mission"

Page 274

1     somewhere else?

2  Q.  Yes.  Just below that grey header --

3  A.  Oh, I see.  I see.

4  Q.  -- where it's bolded and --

5  A.  Yes.  Yes.

6  Q.  -- and underlined.

7  A.  I follow.

8  Q.  Yep.  Okay.  And then you see the bolded

9      and underlined "Mission"?

10 A.  Yes.

11 Q.  And the "Mission" is to "Maintain peace

12     and provide for the safety of City

13     employees as the camp is cleared out of

14     trash, tents, and other hazards, and while

15     campers are trespassed by the property

16     owner."

17          Do you see that?

18 A.  I see that.

19          MS. WELLS:  I just want to note that

20       it says "cleaned out," not "cleared out."

21          MS. STILLMAN:  "Cleaned out."  My

22       eyes are going.

23 BY MS. STILLMAN:

24 Q.  Why wasn't it part of the Hennepin County

25     Sheriff's Office mission to provide for

Page 275

1          the safety of the encampment residents?

2              MS. WELLS:   Objection.   Foundation.

3    A.   Similar to one of our discussions earlier,

4          this was, in this case, MPD rather than

5          Parks, but this was a Minneapolis Police

6          Department-led effort, with Hennepin

7          County Sheriff's Office in a very specific

8          supporting role, and that's what's laid

9          out in this document, that supporting role

10         that they were playing.

11   BY MS. STILLMAN:

12   Q.   Does Hennepin County believe it is part of

13         the Hennepin County Sheriff's Office's

14         general mission to protect people

15         experiencing unsheltered homelessness?

16             MS. WELLS:   Objection.   Foundation.

17   A.   I mean, to the extent that there's a duty

18         to all residents of Hennepin County, I can

19         imagine something.

20             I would be surprised if any mission

21          statement makes explicit reference to

22          people in the way that you describe.

23   BY MS. STILLMAN:

24   Q.   If you go down to -- did you review any

25         video footage of the closure of the

1      encampment at East 29th Street and 14th

2      Avenue South?

3  A.  No.

4  Q.  Was anyone arrested at this encampment

5      closure?

6          MS. WELLS:  Objection.  Foundation.

7  A.  Not to my knowledge, at least not by the

8      sheriff's office.  Yeah, I -- I don't

9      recall that here.  I don't think so.

10     Yeah.

11 Q.  If you want to go to document 116, Exhibit

12     116?

13 A.  Okay.

14 Q.  And this is a Hennepin County Sheriff's

15     Office "Special Detail Operations Plan,"

16     "Encampment Demobilization -- Assist

17     Minneapolis Police Department," "West 29th

18     and Nicollet Avenue South, Minneapolis."

19         Do you see that?

20 A.  Yep.

21 Q.  All right.  If you go to page 2, the

22     second bold paragraph, I guess, it says,

23     "Minneapolis Public Works will begin work

24     once all the trespassers have been sent or

25     they have deemed it safe to begin

1      cleanup."

2              Do you see that?

3  A.   Yes.

4  Q.   "Cleanup" means throw away.  Correct?

5              MS. WELLS:  Objection.  Form,

6          foundation, vague.

7  A.   I don't think that's the definition you

8       would find in the dictionary.  But if

9       we're talking about disposal of hazardous

10      waste, which is typically a large part of

11      the cleanup after a large encampment site

12      has been on-site, then -- then, yes,

13      disposing of hazardous material will be a

14      significant part of such an activity.

15  BY MS. STILLMAN:

16  Q.   So once residents have been trespassed,

17      their property will be thrown away.

18      Correct?

19              MS. WELLS:  Objection.  Vague,

20          foundation, mischaracterizes the document.

21  A.   And to that point, I guess, and this

22      document sets out the Hennepin County

23      sheriff office role, and I'm here as

24      Hennepin County, our role here, as I

25      understand it, was the staging of two

Page 278

1      vehicles to the north and south of the
2      encampment closure, who at no point became
3      engaged in activity.
4           So I don't feel able to speak to what
5       actions were taken by other entities
6       within -- in this context.
7   Q.  Have you seen any video footage of this
8       encampment closure?
9   A.  No.
10  Q.  Have you spoken with anybody who watched
11      video footage of this encampment closure?
12  A.  I've not spoken to anybody about
13      individual footage.  It's never been a
14      discussion.
15           Is it possible that somebody I've
16       spoken to in my life has watched video
17       footage?  Sure.  They just haven't told me
18       about it.
19  Q.  Have you read any Hennepin County
20      Sheriff's Office incident reports about
21      the closure of this encampment?
22  A.  I have not read a report, no.
23  Q.  Was anyone arrested at the closure of this
24      encampment?
25           MS. WELLS:  Objection.  Foundation.

Page 279

1   A.   Again, my understanding from the Hennepin

2        County Sheriff's Office is they were not

3        involved in any arrests on this occasion.

4            (Sotto voce comments.)

5   BY MS. STILLMAN:

6   Q.   You can put that away.  I have a few more

7        questions about shelter availability.

8   A.   Sure.

9   Q.   How did Adult Shelter Connect provide

10       these shelter reports to Hennepin County

11       for these daily statistics sheets to

12       Hennepin County?

13  A.   So the manager of the Adult Shelter

14       Connect service at Simpson Housing

15       Services would typically email the service

16       area lead from my team.  I mentioned

17       earlier on, we have what we call service

18       area leads who are over a portfolio of the

19       services that we fund.  And for the period

20       of 2020, that would have been Danielle

21       Werder over all of the shelter contracts,

22       our service area lead.

23            So at that time, Sarah Broich, the

24        Simpson Housing service manager of the

25        Adult Shelter Connect, would send an email

Page 280

1           to Danielle Werder, typically the next

2           day, with both the AM and PM sheet from

3           the day before, once they were finalized.

4                Monday, we would get the weekend.  If

5           somebody was out, they might send it to

6           somebody else, but that's generally the

7           pattern:  An email with attachments the

8           day after or soon thereafter.

9      Q.  Who had access to those emails?

10     A.  The recipient and anyone they shared them

11          with.

12               I do get copied on them now.  I don't

13          recall if I was automatically copied on

14          them at the time, but these emails,

15          attachments, we deal with all of the time.

16               So anyone that Danielle shared them

17          with or, indeed, anyone that Sarah at

18          Simpson shared them with.

19     Q.  In 2020, did Hennepin County ensure that

20          Don Ryan received those emails?

21               MS. WELLS:  Objection.  Vague.

22     A.  I don't know that Don Ryan would have

23          systematically received the daily email.

24          I don't necessarily know that he would

25          have needed to, because there is a bottom

Page 281

1       line, that every single day there are new

2       shelter beds available, and every single

3       evening there are new shelter beds

4       available.  And like I say, for six and a

5       half years, that has never changed, and to

6       a large extent, that was kind of what Don

7       needed to know.

8            But if he needed more realtime

9        information, then he could either speak

10       directly to the Adult Shelter Connect

11       himself or, yes, connect with me, somebody

12       else on the team who maybe could share,

13       "This is what we've seen in the last three

14       days."

15            And maybe at some point he did say,

16       "I'd just love to get that PDF."  We would

17       have been happy to share it with him.

18       Like I say, I don't know if it would have

19       been essential for him, though.

20  BY MS. STILLMAN:

21  Q.  I want to go back to the email we were

22       talking about, so Exhibit 317, Exhibit

23       341, and Exhibit 342.

24            MS. WELLS:  Can you say these exhibit

25        numbers again?

Page 282

```
 1              MS. STILLMAN:  Yes.  317, 341, and
 2         Exhibit 342.
 3    BY MS. STILLMAN:
 4    Q.   Then I'm going to be --
 5    A.   Okay.
 6    Q.   -- marking a document Bates-stamped
 7         HC 00009896 as Exhibit 343.
 8    A.   Okay.
 9              MS. WELLS:  You're marking it as
10         exhibit, what?
11              MS. STILLMAN:  343.
12              MS. WELLS:  344, I think.
13              MS. STILLMAN:  4?  Can I have that
14         back, please?  I just need to rewrite the
15         number.
16              (Deposition Exhibit No. 344 was
17         introduced.)
18    BY MS. STILLMAN:
19    Q.   So earlier you were talking about an AM
20         sheet that you received from Adult Shelter
21         Connection -- or Adult Shelter Connect.
22         Is this what you were talking about?
23    A.   Yeah.  It looks like I have two copies the
24         same, just so you know.  But, anyway, it's
25         not important.
```

Page 283

```
 1   Q.  And we're looking at the second column in
 2       "Shelter System Availability," "Total
 3       reservations on roster at open."
 4            That means there were 18 in that
 5        first row for Salvation Army, Harbor
 6        Lights Center.  Sally's Place, there were
 7        18 reservations for beds at Sally's Place
 8        that morning.  Correct?
 9   A.  Yes.  So specifically when it says, "at
10       open," that is referring to when the Adult
11       Shelter Connect opens.
12            So those 18 people who identify as
13        female had already made their reservation
14        at the shelter.  If you're already staying
15        in a shelter, you can say, "I want to stay
16        here for the night ahead."  You don't have
17        to leave.  You don't have to go and book
18        it again elsewhere.
19            So when the Adult Shelter Connect
20        opens, they're able to see 18 women at
21        Sally's Place are going to stay there for
22        the night.
23            And then the column to the left is
24        the capacity, 40.  Therefore, and I
25        remember having to do this in my head at
```

Page 284

```
 1        times, there were 22 available beds at the
 2        start of the day in that specific shelter
 3        program.
 4   Q.   Okay.  And then -- so then there were 21
 5        available at open for Salvation Army,
 6        Harbor Lights/SafeBay for men?
 7   A.   Yes, and, because you'll see the capacity
 8        there says 65, and then has underneath it
 9        in brackets, 90.  And the heading of this
10        has "Capacity" and then, in brackets,
11        "Overbook."
12             As I mentioned earlier, every single
13        day, people reserve shelter beds that they
14        do not show up and claim.
15             And our goal is to give people the
16        certainty and dignity of knowing they have
17        a place to stay as early in the day as
18        possible, whenever possible.
19             So we do -- or, rather, Simpson Adult
20        Shelter Connect does overbook shelters
21        based on the knowledge there will be
22        sufficient capacity, like an airline does.
23             So, yes, you have 44 people already
24        at SafeBay who said, "I'm staying here
25        again tonight.  I need my bed," and that
```

Page 285

1        is then held for them.

2             You have 65 available beds, which

3        means 21 are completely empty, but they're

4        going to book all the way up to the number

5        of 90, knowing that, based on historical

6        patterns of how many people show up and

7        how many don't, they will have space for

8        everybody.

9             So that's what you see there.  And

10       that's how, if you kind of scroll across

11       to the right and you see the total

12       reservations at the end of the day, at the

13       close of that day, 85 reservations had

14       been made for 65 beds, so an overbook of

15       20.

16            Just out of interest, is this the

17       same day as your PM report you shared with

18       us earlier?

19   Q.  It is.

20   A.  It is?  And so there you can see that,

21       even having overbooked by 20 at SafeBay,

22       if we look at SafeBay beds that became

23       available in the evening, another 20

24       became available in the evening.

25            So what that means is only 45 out of

Page 286

1       85 showed up to claim their bed, and so

2       there were an additional 20 beds that

3       could be offered to additional people in

4       the evening, if you're following me.

5   Q.  If we look at Catholic Charities, Higher

6       Ground, Minneapolis, for men, that third

7       row, the total reservations on roster at

8       open, 69, parens, 5.

9           So there were -- at the open --

10      opening of Adult Shelter Connect on August

11      18th, 2020, there were more reservations

12      for Catholic Charities, Higher Ground,

13      Minneapolis, for men than there were beds.

14      Correct?

15  A.  That's how it appears.  One thing to be

16      cognizant of, in August of 2020, so Higher

17      Ground, Minneapolis's capacity prepandemic

18      was 171.

19          So a reduction of 60 is a big, big

20      reduction in the number of people they

21      were serving.

22          So what I am -- what I am

23      interpreting from this is -- and these

24      things were in flux as people were in

25      conversation with public health; you know,

Page 287

```
1           wanting to support people, against that
2           balance of risks, like earlier, the risk
3           of being outside as against other risks.
4               So what I am seeing from this is
5           clearly Catholic Charities, although they
6           had nominally stated their capacity at 60
7           for the purposes of Adult Shelter Connect,
8           had clearly at this point been sheltering
9           69 people, which is still 102 fewer than
10          would have spent time in that program on a
11          nightly basis prepandemic.
12   Q.     So if I'm doing my math correctly for
13          shelter system availability on this
14          morning, there were 43 beds.  Correct?
15   A.     So we would look at the overbook capacity,
16          because that's the number of reservations
17          that could be made safely, knowing that
18          every one of those people would get a bed.
19              For what it's worth, although it's to
20          the best of my knowledge never happened,
21          when we confirm a booking for someone on
22          an overbook, the shelter does guarantee
23          that they will provide that bed to that
24          person.  Actually, it could have been part
25          of what was happening at Higher Ground as
```

1      well.

2           So we would look at the difference

3      between the overbook number and the total

4      reservations and rosters, the number of

5      reservations they could offer.

6           So you have 22 at Sally's, 46 at

7      SafeBay, so we're 68.  Let's call Higher

8      Ground a wash.  Men's Katie beds, 3; top

9      bunks, 71; men's emergency housing

10     shelter, 1; top bunk, 72.  We have two

11     spots at St. Stephen's, 74.  We have 1

12     spot at Our Saviors, 75.  For women, we

13     have three women's beds at Simpson.  78

14     reservations could be offered through the

15     Adult Shelter Connect that morning, and

16     people could make those reservations and

17     then know that they had a bed for the

18     night.

19  Q. So if we go back to 317, in your email,

20     when you say there are still about 80-plus

21     places in single adult shelter made

22     available each morning, is that how you

23     are reaching the number?

24  A. So on this specific morning, there was 78

25     shelter beds available for people to

Page 289

1        reserve, which is pretty close to 80,

2        noting that I also say in this email that

3        that fluctuates through the month and can

4        reduce, yeah.

5              And there's always daily fluctuation.

6         We see that still.  You know, one day it's

7          this and the next day it's that.

8    Q.   Okay.  And so those numbers do include --

9         the numbers that you sent former

10        Commissioner Meyer included pay-to-stay

11        shelter beds.  Correct?

12   A.   So when I say in my email to former

13        Commissioner Meyer, there are about--I say

14        "about" in there, I notice--80-plus spaces

15        in single adult shelter made available

16        each morning, yes, all of the beds that

17        are made available through the Adult

18        Shelter Connect in the morning time, as

19        represented here, totaling 78 across all

20        of these reservation options, is what I am

21        referring to.

22   Q.   So if -- what time does Adult Shelter

23        Connect open?

24   A.   10:00 o'clock on weekdays; 1:00 p.m. at

25        the weekend.

Page 290

```
 1   Q.   So does this mean that the first 84 -- 78
 2        people who called Adult Shelter Connect
 3        would be able to get a bed through ASC?
 4   A.   Assuming that they wanted to reserve what
 5        is available to them, we can see here that
 6        78 referrals -- reservations were not
 7        made, because, at the end of the day,
 8        there were still 12 available reservations
 9        at Sally's, there were still 5 available
10        reservations at SafeBay.
11             We can see in there not a single
12         woman turned away, not a single man turned
13         away, nobody ineligible, but we see 16
14         refusals.
15             So that means 16 people contacted the
16         Adult Shelter Connect, were told what was
17         available, and decided that that was not
18         what they wanted.
19   Q.   Where are you seeing 16 refusals?
20   A.   If you scan down, you have the -- the kind
21        of the situational temperature stuff at
22        the top.  The next box is "Turned Away."
23        The bottom line of that section says
24        "Other Needs Not Met," and to the right of
25        that it says, "Refusals: 16," "Ineligible:
```

Page 291

1       Zero."

2    Q.  Does Hennepin County track why people

3       might refuse a bed?

4    A.  Not systematically.  You will see in the

5       brief client history notes -- this is only

6       for new people, I should add.  Some notes

7       get out of there.  That could contain a

8       piece of that data.  But no, otherwise,

9       it's something we want to know, but, yeah,

10      it's not something that we study.

11          I mean, I guess I would say that we

12       do look to Simpson Housing Services, who

13       are operating this service, to relay to us

14       their insights, experience, information

15       running the service, and if they are

16       seeing trends or challenges, yeah.

17   Q.  Are you aware that there is an individual

18       named Patrick Berry who's a plaintiff in

19       this lawsuit?

20   A.  I've seen the name on the documents.

21   Q.  Does Patrick Berry have a HMIS number with

22       Hennepin County?

23   A.  If Patrick Berry has stayed at a homeless

24       shelter that receives public funding,

25       which is just about all of them, within

Page 292

1       Hennepin County, then it is extremely
2       likely that he has an HMIS, homeless
3       management information system, or HMIS, ID
4       number.
5            If he has been assessed for housing,
6        if he has entered a permanent supportive
7        housing program, a rapid rehousing
8        program, all of those things would lead to
9        him having such an ID number.
10           I do not know for sure that Patrick
11       Berry has been through any of those
12       services or done any of those things, so I
13       cannot say for certain.  I would guess he
14       has.
15  Q.   Does Plaintiff Nadine Little have an HMIS
16       number?
17  A.   The same answer.  If Nadine has stayed in
18       a Hennepin County-funded homeless shelter,
19       been served through rapid rehousing,
20       permanent supportive housing, completed a
21       coordinated entry assessment, these
22       various interactions with homeless
23       services would, in all likelihood, lead to
24       having a homeless management information
25       service number used to create your -- your

Page 293

1       file within the system and for

2       coordination of services.

3              But I don't know if this specific

4        individual has done those things.  Yeah.

5   Q.  To save time, do you know if any of the

6       plaintiffs in this matter have HMIS

7       numbers with Hennepin County?

8   A.  The same answer applies to all of them.

9       If they've engaged with homeless services,

10      they almost certainly do.  If they

11      haven't, they won't.  And I don't know

12      these individuals personally.

13  Q.  If they do have HMIS numbers, who would

14      have access to that information?

15  A.  So licensed HMIS users for business

16      purposes.  The homeless management

17      information system is a statewide system.

18      It's hard to mandate for communities, but

19      Minnesota has a statewide administrator

20      known as The Institutes for Community

21      Alliances.  They are responsible for

22      training, compliance, issuing of licenses,

23      billing people for licenses.

24             Most home -- well, pretty much all

25       homeless service providers will have some

Page 294

1          trained staff in order to meet their
2          reporting requirements through the
3          homeless management information system.
4               Those trained staff would have access
5          to any shared client record within the
6          database.
7               Now, I should say that clients can
8          opt out of data-sharing.  If they do so,
9          they can still be entered into the
10         homeless management information system,
11         but only the provider -- let's say Simpson
12         Housing Services, only people at that
13         specific provider would be able to see
14         that record.
15              Alternatively, they can sign a
16         release of information that allows their
17         data to be shared more broadly, which
18         supports care coordination, referrals to
19         housing, shelter reservations, and in that
20         case, any other provider, let's say staff
21         at St. Stephen's human services would also
22         be able to see that record.
23              So an individual has a shelter record
24         through Simpson, they meet St. Stephen's
25         on the street, St. Stephen's could look

Page 295

```
 1          them up and say, "Oh, yeah, you stayed at
 2          Simpson last night.  I can see that, and
 3          now I'm going to put in here a note that
 4          we're working with you on outreach as
 5          well," and it allows the entities to work
 6          together.
 7     Q.   How long has Hennepin County been using
 8          the HMIS system?
 9     A.   Like I say, it's a hard mandate.  I don't
10          know exactly when it go -- when it comes
11          into being.  Before my time, certainly.
12               The Institute for Community Alliances
13          took over being the statewide
14          administrator in late 2016.
15               Actually, almost exactly the same
16          time the Adult Shelter Connect went into
17          being, because they were the ones that
18          implemented data-sharing and that -- that
19          whole piece.
20               Previously, the statewide
21          administrator was Wilder, but I don't know
22          how long Wilder served in that capacity or
23          if anybody preceded them.
24     Q.   So Hennepin County has been using the HMIS
25          system at least since 2016, correct, if
```

Page 296

1      not before?
2  A.  Yes.  I want to be clear that it is a
3      homeless management information system.
4          When we say Hennepin County has been
5       using it, only people at Hennepin County
6       that have a license, have been through the
7       training process with Institute for
8       Community Alliances, and have a business
9       purpose for using it have access to it,
10      and the same of our provider partners, the
11      likes of St. Stephen's, now Agate, and
12      Simpson Housing Services.
13          So it's not something that other
14      people who don't work in the homeless
15      field at Hennepin County would have access
16       to.  Only those that have a direct
17      business need for it.
18  Q.  And those who have the direct business
19      need for it at Hennepin County have been
20      using it since at least 2016?
21  A.  Yes.
22  Q.  Do employees of the Office of Housing
23      Stability -- do any employees of the
24      Office of Housing Stability have access to
25      the HMIS program?

Page 297

1    A.   Yes.  It's not a program, but yes.

2    Q.   System?

3    A.   Yes.

4    Q.   Are you one of the people in the Office of

5         Housing Stability that has access to the

6         HMI -- HMIS system?

7    A.   Yes, I do have a license.

8              MS. STILLMAN:  Sorry.  Can we take a

9         five-minute break?

10             THE VIDEO OPERATOR:  Do you want to

11        go off the record?

12             MS. STILLMAN:  Yes.

13             THE VIDEO OPERATOR:  We're going off

14        record at 4:48 p.m.

15             (Break taken.)

16             THE VIDEO OPERATOR:  This is Media

17        No. 7 in the deposition of David Hewitt.

18        Today is March 28th, 2023.  We're going

19        back on the record at 4:59 p.m.

20   BY MS. STILLMAN:

21   Q.   Okay.  Mr. Hewitt, if you could go to

22        Exhibit 340.

23   A.   Okay.  I have it.

24             MS. STILLMAN:  And everybody have it

25        pulled up?

1        MS. WELLS:  Yes.

2   BY MS. STILLMAN:

3   Q.  Okay.  If you go to the second page,

4       ending in 40984, the fourth paragraph

5       down, it reads, "Hennepin County, HCRRA,

6       and HCHRA may also collect and dispose of

7       any item that they determine to be

8       garbage, refuse, debris, or hazardous

9       material without inventory or storage.

10      Any other personal property that Hennepin

11      County, HCRRA, or HCHRA determine to be

12      abandoned may be removed, inventoried, and

13      temporarily stored for the owner's

14      retrieval in accordance with Hennepin

15      County policies regarding lost or

16      abandoned property."

17          Do you see that?

18  A.  I do.

19  Q.  What are the Hennepin County policies

20      regarding lost or abandoned property?

21  A.  I do not know.

22  Q.  Who would know what those policies are?

23  A.  Yeah, I'm not sure.  I mean, I wonder

24      if -- you know, I see we have policies,

25      for instance, at the library about lost or

1          abandoned property, but, you know, we're a

2          big organization with a lot of arms, so

3          I'm not sure what they're referring to

4          specifically here.

5    Q.   Did you help draft this policy?

6    A.   I did.

7    Q.   Who else contributed to the drafting of

8          this policy?

9    A.   The entities included in kind of the

10         description, so folks from Hennepin

11         County, Regional Railroad Authority, in

12         particular, would have been consulted, and

13         Public Works.

14   Q.   Do you have names of those people?

15   A.   I would imagine that Lisa Cerney would

16         have, at the very least, looked at this

17         with us.  We would have of course

18         coordinated with the County Attorney's

19         Office.

20              Yeah, those are the main ones that

21          leap to mind.  We're going back a while on

22          this document, so I don't recall exactly.

23   Q.   And if you turn to the last page, 40985,

24         it says, "Contact," "David Hewitt."

25   A.   Yep.

Page 300

```
 1   Q.   Why are you the contact?
 2   A.   Well, going back to the foundational
 3        principles and statements on the first
 4        page and the top of the second page, when
 5        we say, "The first response to any people
 6        experiencing unsheltered homelessness
 7        within Hennepin County, regardless of
 8        location, ownership, or responsibility,
 9        will be to engage homeless outreach and
10        services."
11             So that first response, those
12         foundational principles, are based on our
13         work in human services.
14             But this policy is about more than
15         human services, but we're the first part
16         of it, so it's my name.
17   Q.   Did David Hough approve this policy?
18   A.   Yes.
19   Q.   Does Hennepin County have an inventory
20        form that it uses when inventorying
21        property of encampment residents as
22        described in this document?
23   A.   To my knowledge, the only time that has
24        ever been required by the situation is the
25        Greenway encampment, and as we've
```

1    discussed, yes, there were records made of

2    what was inventoried in terms of the

3    property that was given to us for storage

4    during that process.

5         That obviously predates this policy,

6    but we haven't been in the situation where

7    we have needed to do that since.

8  Q. So there isn't a standard form that

9    Hennepin County has?

10 A. Not that I'm aware of.  I assume we would

11   develop one if it became necessary, but as

12   it hasn't, I don't believe that one has

13   been developed.

14 Q. So you said you don't know what the

15   Hennepin County policies regarding lost or

16   abandoned property are.  Correct?

17 A. I'm not -- I'm not sure specifically what

18   policies this is referring to or where I

19   would find them, no.

20 Q. If you wanted to find out what those

21   policies were, who would you contact?

22 A. That's a good question.  I might well

23   reach out to our Public Works colleagues,

24   the names I've already mentioned, and say,

25   "Do you remember this document?"  "Can you

```
 1      shine any light on this" -- "on this
 2      phrase here?"
 3            That's probably what I would do as a
 4       first step.
 5  Q.  Do all Hennepin County employees have
 6      access to the administrative manual?
 7            MS. WELLS:  Objection.  Foundation.
 8  A.  I'm not even sure.  I assume so.  You
 9      know, when I -- I'm not sure that I have
10      ever looked at much of it, outside of this
11      piece.
12            When I've looked at this piece, I've
13       generally requested a link from somebody,
14       and then I'll go and look at it.
15            I assume that anybody could use the
16       same link -- within staff, of course.
17  Q.  All right.  In the third paragraph, it
18      says, "Hennepin County, HCRRA, or HCHRA
19      will provide reasonable notice, whenever
20      practicable, to people experiencing
21      unsheltered homelessness that sleeping and
22      camping on their property are not
23      permitted and are subject to restriction,
24      foreclosure, along with information
25      regarding available healthcare resources
```

Page 303

```
 1        and housing options."
 2              Do you see that?
 3   A.   I do.
 4   Q.   Why is there not anything about providing
 5        people with a date by which they have to
 6        leave?
 7              MS. WELLS:  Objection.
 8   Q.   A location --
 9              MS. WELLS:  Sorry.  Objection.
10         Vague, speculative.
11   A.   I mean, as the opening of that line
12        states, providing reasonable notice is
13        kind of the, you know, underpinning
14        philosophy.
15              Something I know we've touched on,
16         less so here, but more in the previous
17         deposition that I gave, there are a wide
18         variety of circumstances that may arise
19         that may govern what reasonable notice
20         would look like.
21              MS. STILLMAN:  So I think there's a
22         little less than 40 minutes left.  I would
23         like to keep the deposition open, given
24         that Mr. Hewitt did not know about the
25         information about Hennepin County's
```

Page 304

1       policies referenced within Hennepin
2       County's policies, and this information is
3       covered under topics 21 and 22 of the
4       deposition notice.
5             MS. WELLS:  I object to holding open
6       today's deposition.  Today's 30(b)(6)
7       witness was more than adequately prepared
8       to testify to the deposition topics asked
9       about today and provided meaningful
10      testimony for more than six hours on the
11      record today, which more than satisfies
12      the Rule 30(b)(6) standard to testify to
13      what is known or reasonably known.
14            In addition, the witness devoted many
15      hours to preparing to testify on
16      plaintiffs' 30(b)(6) topics, including
17      meeting with multiple other individuals at
18      the County, who the witness identified
19      during today's deposition.
20            This is in addition to the individual
21      deposition of Mr. Hewitt, who testified at
22      length during that deposition, on many of
23      the topics noticed for today's deposition
24      and questions asked today, in addition to
25      other Hennepin County witnesses who have

Page 305

1       been deposed on the subjects contained in
2       these topics.
3             In addition, Magistrate Judge
4       Docherty's February 6th order on
5       plaintiffs' motion to compel Rule 30(b)(6)
6       testimony from the City stated that if the
7       City's knowledge did not include certain
8       subject areas specified in a topic, then
9       the designated witness should testify
10      accordingly.
11            So on that basis as well, the
12      witness's testimony today has been more
13      than sufficient.  And we will read and
14      sign.
15            MS. STILLMAN:  I would just like to
16      know one additional piece for reasons why
17      we believe this deposition should be held
18      open is Rule 25 also is about defendant's
19      knowledge about the individual plaintiffs
20      as related to their status as unhoused
21      individuals, recipients of public
22      benefits, and criminal history other than
23      criminal convictions, and defendant was
24      not aware if any of the plaintiffs were in
25      the HMIS system, which is directly on

Page 306

1          point to that topic.
2               So that is also a reason we would
3          like to keep the deposition open, and I'm
4          assuming you're making the same statements
5          and objections to that?
6               MS. WELLS:  I make the same
7          statements and objections, in addition to
8          noting that Rule -- topic 25 says also if
9          defendant will use such information at
10         trial.  So it's a conditional topic, and
11         he testified accordingly.
12              THE WITNESS:  I'd like to add on that
13         piece with regards to individuals' HMIS
14         numbers.
15              The rules that govern under which
16         people release their information to HMIS
17         are around care coordination, coordination
18         of services -- not preparing for today.
19              Me responding to your questions as to
20         whether they have an HMIS ID number does
21         not benefit them, does not help them
22         access services.
23              You don't look people up because
24         you're curious, indeed.  That is not
25         allowed within the rules of an HMIS

1      license user, just to look people up for

2      the sake of it, for what you can find out

3      about them.

4           You look them up because you have a

5      business reason.  It's about helping them

6      end their homelessness.

7           Me looking them up in HMIS for

8      today would not help them end --

9           THE COURT REPORTER:  Please slow

10     down.

11  A.  -- would not help them end their

12     homelessness.  So I had no business reason

13     to look them up in HMIS for you.

14           MS. STILLMAN:  Okay.  Thank you.

15           THE VIDEO OPERATOR:  We're going off

16     the record at 5:11 p.m.

17           (The right to read and sign the

18     deposition was preserved.)

19           (The deposition was concluded at

20     5:11 p.m.)

21

22

23

24

25

Page 308

STATE OF MINNESOTA )
                    :    CERTIFICATE
COUNTY OF HENNEPIN )

        I hereby certify that I reported the
deposition of DAVID HEWITT on MARCH 28, 2023
in Minneapolis, Minnesota, and that the
witness was by me first duly sworn to tell the
whole truth;

        That the testimony was transcribed under
my direction and is a true record of witness
testimony;

        That the cost of the original has been
charged to the party who noticed the
deposition, and that all parties who ordered
copies have been charged at the same rate for
such copies;

        That I am not a relative or employee or
attorney or counsel of any of the parties or a
relative or employee of such attorney or
counsel;

        That I am not financially interested in
the action and have no contract with the
parties, attorneys, or persons with an
interest in the action that affects or has a
substantial tendency to affect my
impartiality;

        That the right to read and sign the
deposition was reserved.

        WITNESS MY HAND AND SEAL this 10TH DAY
OF APRIL, 2023.

        _____
        Mari A. Skalicky
        Registered Merit Reporter
        Certified Realtime Reporter

**Errata Sheet**

**Hennepin County Rule 30(b)(6) Deposition, 3/28/2023**

**Assignment Reference No. 5672406**

**Statement of Changes Under Fed. R. Civ. P. 30(e)**

| Page | Line | Change | Reason |
|---|---|---|---|
| 18 | 8 | Remove quotation marks | Typographical error |
| 32 | 6 | Remove quotation marks | Typographical error |
| 33 | 3 | Remove quotation marks | Typographical error |
| 33 | 17 | Remove quotation marks | Typographical error |
| 35 | 21-22 | With administration TO to administration | Typographical error |
| 37 | 12 | Remove quotation marks | Typographical error |
| 38 | 5 | Remove quotation marks | Typographical error |
| 39 | 3 | Remove quotation marks | Typographical error |
| 39 | 20 | Remove quotation marks | Typographical error |
| 41 | 11 | Do not TO did not | Typographical error |
| 47 | 17 | As TO a | Typographical error |
| 49 | 1 | Homeless—the housing team TO homeless to housing team | Typographical error |
| 51 | 2-3 | Remove quotation marks | Typographical error |
| 54 | 6 | Examples TO example | Typographical error |
| 56 | 2 | Remove quotation marks | Typographical error |
| 61 | 3 | Remove quotation marks | Typographical error |
| 61 | 24 | Remove quotation marks | Typographical error |
| 63 | 1 | Remove quotation marks | Typographical error |
| 65 | 18 | "Most likely the people you are contacting you are referring to" TO "Most likely the people contacting you are referring to" | Typographical error |
| 70 | 6 | Remove quotation marks | Typographical error |
| 73 | 23 | Remove quotation marks | Typographical error |
| 76 | 6-7 | Remove quotation marks | Typographical error |
| 76 | 13 | Remove quotation marks | Typographical error |
| 77 | 14 | Remove quotation marks | Typographical error |
| 78 | 7 | Remove quotation marks | Typographical error |
| 78 | 8 | Remove quotation marks | Typographical error |
| 78 | 11 | Remove quotation marks | Typographical error |
| 78 | 19-20 | Remove quotation marks | Typographical error |
| 84 | 19 | WHICH to lowercase | Typographical error |
| 91 | 20 | Remove quotation marks | Typographical error |
| 96 | 7 | Availability TO available | Typographical error |
| 105 | 5 | Yes TO "HLC" is Harbor Light Center. | Misspoke |
| 105 | 18 | Remove quotation marks | Typographical error |
| 113 | 17 | Remove quotation marks | Typographical error |

| 114 | 20 | Referring my TO referring to my | Typographical error |
|---|---|---|---|
| 116 | 23-25 | Remove quotation marks | Typographical error |
| 120 | 21-23 | Remove quotation marks | Typographical error |
| 130 | 5 | It that TO it for that | Typographical error |
| 146 | 1-2 | more evidently enough waste that they could be safely disposed of TO time | Typographical error |
| 146 | 9-10, 12-13, 14-20 | Remove quotation marks | Typographical error |
| 146 | 12-13 | Remove quotation marks | Typographical error |
| 146 | 14-15 | Remove quotation marks | Typographical error |
| 146 | 16-20 | Remove quotation marks | Typographical error |
| 147 | 14 | Remove quotation marks | Typographical error |
| 154 | 8-9 | Remove quotation marks | Typographical error |
| 156 | 5 | Remove quotation marks | Typographical error |
| 178 | 12 | Remove quotation marks | Typographical error |
| 220 | 14 | Becoming TO be coming | Typographical error |
| 228 | 10-12 | Remove quotation marks | Typographical error |
| 243 | 25 | Remove quotation marks | Typographical error |
| 249 | 4 | Lights TO light | Misspoke |
| 259 | 19 | Remove quotation marks | Typographical error |
| 264 | 20-22 | Remove quotation marks | Typographical error |
| 265 | 20-22 | Remove quotation marks | Typographical error |
| 266 | 14 | Congruent TO congregate | Typographical error |
| 281 | 13-14 | Remove quotation marks | Typographical error |
| 281 | 16 | Remove quotation marks | Typographical error |
| 283 | 6 | Lights TO Light | Misspoke |
| 283 | 15-16 | Remove quotation marks | Typographical error |
| 284 | 24-25 | Remove quotation marks | Typographical error |
| 289 | 14 | Remove quotation marks | Typographical error |
| 290 | 22 | Remove quotation marks | Typographical error |
| 290-91 | 25-1 | "Ineligible: Zero" TO "Ineligible: 0" | Typographical error |
| 293 | 18 | Hard TO a HUD | Typographical error |
| 295 | 1-5 | Remove quotation marks | Typographical error |
| 295 | 9 | Hard TO HUD | Typographical error |
| 300 | 5 | "The first response to any people" TO "The first response . . . to any people" | Typographical error |
| 301 | 25 | Remove quotation marks | Typographical error |
| 301-02 | 25-1 | Remove quotation marks | Typographical error |
| 306 | 24 | ,indeed TO Indeed, | Typographical error |

David Hewitt

5/10/2023
Date

# EXHIBIT 106

Page 1

1           UNITED STATES DISTRICT COURT

2               DISTRICT OF MINNESOTA

3                   Case No.: 20-CV-02189-WMW-JFD

4    --------------------------------

     Patrick Berry, et al.,

5

             Plaintiffs,

6

         vs.

7

     Hennepin County, et al.,

8

9            Defendants.

     --------------------------------

10

                     DEPOSITION OF

11                  JESSICA GALATZ

             Taken on MARCH 29, 2023

12           Commencing at 9:00 A.M.

13

14

15

16

17

18

19

20

21

22

23

24   REPORTED BY:  Mari Skalicky, RMR, CRR

25

```
                                              Page 2
 1        DEPOSITION of JESSICA GALATZ, taken on
 2   MARCH 29, 2023 commencing at 9:00 A.M. at 2000
 3   IDS Center, Minneapolis, Minnesota, before
 4   Mari Skalicky, a Certified Realtime Reporter,
 5   and Notary Public of and for the State of
 6   Minnesota.
 7                    * * * * * * * * * * *
 8                    APPEARANCES
 9
10   ON BEHALF OF THE PLAINTIFFS:
11        MID-MINNESOTA LEGAL AID
12        BY:  LUKE GRUNDMAN, ESQUIRE
13        BY:  REBECCA STILLMAN, ESQUIRE
14        111 North Fifth Street, Suite 100
15        Minneapolis, MN  55402
16        lgrundman@mylegalaid.org
17        rstillman@mylegalaid.org
18
19
20
21
22
23
24
25
```

Page 3

1    On BEHALF OF HENNEPIN COUNTY AND HENNEPIN

2    COUNTY SHERIFF:

3        HENNEPIN COUNTY ATTORNEY'S OFFICE

4        BY:  KELLY PIERCE, ESQUIRE

5        BY:  CHRISTIANA MARTENSON, ESQUIRE

6        A-2000 Government Center

7        300 South Sixth Street

8        Minneapolis, MN  55402

9        kelly.pierce@hennepin.us

10

11   ON BEHALF OF THE CITY OF MINNEAPOLIS,

12   MINNEAPOLIS MAYOR JACOB FREY, AND

13   MINNEAPOLIS CHIEF OF POLICE:

14       MINNEAPOLIS CITY ATTORNEY'S OFFICE

15       BY:  SHARDA ENSLIN, ESQUIRE

16       350 South 5th Street, Suite 210

17       Minneapolis, MN  55402

18       sharda.enslin@minneapolismn.gov

19

20

21

22

23

24

25

Page 4

1    ON BEHALF OF THE MINNEAPOLIS PARK AND

2    RECREATION BOARD:

3         RICE, WALTHER & MOSLEY, LLP

4         BY:  ANN E. WALTHER, ESQUIRE

5         330 South Second Avenue, Suite 360

6         Minneapolis, MN 55402

7         awalther@ricemichels.com

8

9    NOTE:  The original transcript will be filed

10   with the ACLU Minnesota, pursuant to the

11   applicable Rules of Civil Procedure.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                    I N D E X
2

WITNESS:  JESSICA GALATZ

3                                        PAGE

4  Examination by MR. GRUNDMAN .............. 8

5
                EXHIBITS  INTRODUCED:
6
                                         PAGE
7

Exhibit 345   Email  exchange            50
8
Exhibit 346   Email  exchange            81
9
Exhibit 347   Email  exchange            90
10
Exhibit 348   Email  exchange            104
11
Exhibit 349   Email  exchange            124
12
Exhibit 350   Email  exchange            137
13
Exhibit 351   Email  exchange            145
14
Exhibit 352  Email  exchange             151
15
Exhibit 353   Email  from  Christopher   156
16            Esparza  to  PS  Security
              Patrol  and  others  dated
17            12/5/20
18
Exhibit 354   Email  exchange            191
19
Exhibit 355   Email  exchange            196
20
21
22
23
24
25

Page 6

1

EXHIBITS (CONTINUED)

2

3    Exhibit 356  Email exchange                    205

4    Exhibit 357   Printout of Twitter video       211
                   post

5

     Exhibit 358   Video recording                 212

6                  (Flashdrive)

7    Exhibit 359   Email exchange                  218

8    Exhibit 360   Letter to Human Resources       223
                   Department from J. Michael

9                  Noonan, dated 12/21/20

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1     EXHIBITS PREVIOUSLY MARKED AND REFERRED TO:

2                                                    PAGE

3   Exhibit 121    Relocation notice              90

4   Exhibit 126    Operational Plan Greenway      171

                   Ops Detail, Friday, December

5                  18th, 2020

6   Exhibit 193    Hennepin County and the        183

                   Regional Railroad Authority

7                  Notice of Removal

8   Exhibit 309    Security Operations Plan       172

9   Exhibit 337    Email to Katie Topinka and      74

                   others from Jason Ohotto

10                 dated 6/12/20

11  Exhibit 340    Hennepin County               233

                   Administrative Manual,

12                 Policy Regarding Camping in

                   Public Space

13

    Exhibit 339    Hennepin County               235

14                 Administrative Manual,

                   Temporary Policy Regarding

15                 Encampments

16  (Original exhibits attached to original

    transcript; copies to counsel as requested.)

17

18

19

20

21

22

23

24

25

Page 8

1                    P R O C E E D I N G S
2              Whereupon, the deposition of
3          JESSICA GALATZ was commenced at 9:00 A.M.
4           as follows:
5                    JESSICA GALATZ,
6           after having been first duly sworn,
7          deposes and says under oath as follows:
8                        - - -
9                    EXAMINATION
10   BY MR. GRUNDMAN:
11   Q.  Good morning.
12   A.  Hi.
13   Q.  My name is Luke Grundman.  I am an
14       attorney representing the plaintiffs in
15       the lawsuit we're here to talk about
16       today.
17           Would you state and spell your name
18       for the record.
19   A.  Jessica Mara Galatz.  J-e-s-s-i-c-a.
20       M-a-r-a.  G-a-l-a-t-z.
21   Q.  Do you understand that at the beginning of
22       the deposition, the court reporter swore
23       you in?
24   A.  I do.
25   Q.  Do you know what that means?

```
                                                    Page 9

 1    A.   I do.

 2    Q.   You have to tell the truth today.

 3    A.   Mm-hmm.  (Nods head up and down.)

 4    Q.   And another thing, since it just came up.

 5              Because everything is being recorded,

 6         we have to try to use the words "yes" and

 7         "no" and avoid the head shakes.  And we

 8         also should try to avoid interrupting one

 9         another as much as possible.

10              Do you understand that?

11    A.   Yes.

12    Q.   So if you need to today, go ahead and let

13         me know if you need to take a break.  We

14         will try to take breaks to make sure that

15         the court reporter also has an opportunity

16         to take a rest for a moment.  And -- okay.

17              Have you ever had your deposition

18         taken before?

19    A.   No.

20    Q.   What did you do to prepare for the

21         deposition today?

22    A.   I had two sessions with our counsel last

23         week, two three-hour sessions.

24    Q.   Who do you mean by your counsel?

25    A.   Kelly Pierce and Christy Martenson.
```

1   Q.   When did those sessions take place?

2   A.   Last week on Wednesday and Friday

3        afternoon.  I'm sorry, I don't know the

4        dates.

5   Q.   Did you review any documents as part of

6        that preparation?

7   A.   I did.

8   Q.   What documents did you review?

9   A.   I recall looking at emails, spreadsheets

10       and photographs.

11  Q.   Do you remember any in particular?

12  A.   I remember photographs from the Midtown

13       Greenway, and a spreadsheet that tracked

14       people camping on the Midtown Greenway.

15  Q.   Do you remember anything else that you

16       reviewed in preparation?

17  A.   As I said, I remember going over emails

18       that were sent from me or received by me.

19  Q.   Did you review any of the court documents

20       that relate to this case?

21  A.   Not that I can recall.

22  Q.   Have you ever reviewed any of the court

23       documents related to this case?

24  A.   Not that I can recall.

25  Q.   Do you remember looking at a document that

Page 11

1      was called a complaint?

2   A.   No.

3   Q.   Or an amended complaint?

4   A.   No.

5   Q.   What do you understand this case to be

6        about, that we're here to talk about

7        today?

8   A.   I understand that several folks who were

9        camping at the Powderhorn Park site are

10       suing the Park Board, the City of

11       Minneapolis, and Hennepin County.

12  Q.   Why?

13  A.   As I understand it, from -- relates to

14       materials, their materials that were taken

15       when the site was cleaned.

16  Q.   You mentioned the encampment at Powderhorn

17       Park; is that right?

18  A.   Yes.

19  Q.   So to your understanding, this lawsuit

20       relates only to the encampment at

21       Powderhorn Park?

22  A.   No.  I don't think that's my

23       understanding.

24  Q.   What is your understanding as far as what

25       encampments it relates to?

Page 12

```
 1   A.   I don't know specifically, but I know that
 2        the Park Board and the City and the County
 3        are all named in the suit.
 4   Q.   You mentioned that the suit involves the
 5        loss of property, right?
 6   A.   Yes.
 7   Q.   What do you mean by that?
 8   A.   Again, I haven't read the suit, but it's
 9        my understanding that people are suing
10        because they say their personal property
11        was taken when the sites were cleared.
12   Q.   I'll try to make sure my questions include
13        this, but I'm just asking for your
14        knowledge.  So if you don't know
15        something, go ahead and say that.
16             If you don't understand a question
17        that I pose to you, feel free to let me
18        know that, and I'll try to phrase it a
19        different way.  Okay?
20   A.   I will, thank you.
21   Q.   Did -- so I've been asking you some
22        questions about your understanding about
23        the lawsuit and what it's about, correct?
24   A.   Correct.
25   Q.   Who have you talked to, besides your
```

Page 13

1       attorneys, about the court case?

2   A.   I remember when it first came out -- and

3        I'm sorry, I don't recall the date -- but

4        I remember talking with my manager at the

5        time, Michael Noonan, that it was a case

6        that had come up.

7   Q.   Is Michael Noonan still your supervisor?

8   A.   No.  He retired in 2021.

9   Q.   So you remember a conversation with

10       Mr. Noonan about the case.  Do you

11       remember conversations with anyone else

12       about the case?

13  A.   Not that I can recall.

14  Q.   That time you talked about the case with

15       Mr. Noonan, what do you remember about

16       that conversation?

17  A.   I just recall being made aware that it was

18       a case that was filed.

19  Q.   Was there any instructions to you about

20       doing differently -- doing things

21       differently in your job because of the

22       court case?

23          MS. PIERCE:  Objection.  Vague.

24  A.   No.  Not that I can recall.

25  BY MR. GRUNDMAN:

1   Q.   I'm going to back up and ask a few

2        questions about you.

3              Have you been to college?

4   A.   I have.

5   Q.   Do you have a degree?

6   A.   I do.

7   Q.   What is your degree?

8   A.   I have a Bachelors of Science, with a

9        major in sociology.

10  Q.   Where did you get the degree from?

11  A.   Portland State University in Portland,

12       Oregon.

13  Q.   What year?

14  A.   2003.

15  Q.   And so since then, since 2003, where have

16       you worked?

17  A.   My apology.

18  Q.   That's okay.

19  A.   I began working for Hennepin County

20       directly out of college in 2003.

21  Q.   What was your title at that time?

22  A.   In 2003, I was hired as a property

23       management specialist.

24  Q.   What -- and I realize this is a long time

25       ago.

```
 1         What generally were your duties back
 2      then?
 3   A.  I helped manage abandoned railroad
 4      corridors that are owned by the Hennepin
 5      County Regional Railroad Authority.
 6   Q.  So that's a little bit of a mouthful --
 7   A.  I know.
 8   Q.  -- the Hennepin County Regional Railroad
 9      Authority.  But I think we'll be talking
10      about that somewhat today.
11         Is it okay if I just call that "the
12      Authority"?  Will you know what I mean?
13   A.  Yes.  Yes, I will.
14   Q.  I may say sometimes "the Railroad
15      Authority," but we'll be on the same page
16      about what that means, right?
17   A.  Yes.
18   Q.  So when you first started, your work
19      included work with the Authority, right?
20   A.  That's correct.
21   Q.  So you've worked with the Authority ever
22      since or has that changed?
23   A.  I have worked with the Authority ever
24      since.
25   Q.  Have you had any promotions or job changes
```

1       in that time period?

2   A.  I have.

3           In 2006, I was hired permanently by

4       the County and -- as a planning analyst.

5       In 2008ish, I was a senior planning

6       analyst.  And in 2013, I became a

7       principal planning analyst.

8   Q.  I don't need all the specifics, but what

9       generally is the difference between those

10      three positions?

11  A.  I would say the main difference is the

12      level of responsibility and

13      decision-making.

14  Q.  How so?

15  A.  When I started, I was doing field work,

16      mostly taking notes, you know, maintaining

17      records.

18          Now I am soliciting or advertising

19      contracts, managing contracts, dealing

20      more with real estate matters.

21  Q.  Do you have people who report to you now?

22  A.  I do not.

23  Q.  Have you ever?

24  A.  No.

25  Q.  Have you -- in the time between when you

Page 17

1           received your degree and now, have you

2           received any other education, formalized

3           education?

4    A.   Not formalized, no.

5    Q.   What about training?

6    A.   I have pursued many trainings within the

7           County.

8    Q.   Anything outside the County?

9    A.   No.

10   Q.   Tell me a little bit about the training

11          you've done within the County.

12   A.   I did a ToP-certified which is a public --

13          well, sorry.  It's a facilitation

14          methodology.

15               And I also did a public participation

16          training series.

17   Q.   Starting with the first one, you mentioned

18          that ToP certification.  Is that an

19          acronym?

20   A.   Yes.  It stands for Technologies (sic) of

21          Participation.

22   Q.   What did that training involve?

23   A.   You basically learn how to facilitate

24          meetings, and learn about consensus

25          building and making action plans in a

Page 18

```
 1        group setting.
 2   Q.   When did you receive that training?
 3   A.   I think 2007, or thereabouts.
 4   Q.   How long was that training course,
 5        approximately?
 6   A.   I would say a week of sessions.
 7   Q.   And then the second training that you
 8        mentioned, can you tell me a little more
 9        about that one.
10   A.   Yep.  That is learning how to do public
11        participation.  So engagement processes,
12        especially with members of the public.
13        It's tailored to public agencies.
14   Q.   When, approximately, did you receive that
15        training?
16   A.   I think around 2013.
17   Q.   And how long, approximately, did that
18        training take?
19   A.   I would say about a week.
20   Q.   And so those are the two trainings that
21        you've had since being hired at the
22        County?
23   A.   There is definitely more internal
24        trainings and more routine trainings at
25        the County.  I don't think I would be able
```

Page 19

```
 1        to list all of those.
 2   Q.   Sure.  And you can't remember all of them;
 3        it's been a long time, of course.  Totally
 4        understand.
 5             But would you be able to tell me a
 6        little bit about that kind of training in
 7        general that you've received?
 8             MS. PIERCE:  Objection.  Vague.
 9   A.   I did a few training series with the
10        County.  One was called Exploring
11        Supervision.  One was called Building
12        Influence and Effectiveness.  And those
13        were like more on a year schedule.  So you
14        would go once or twice a month and spend
15        the day in a cohort, learning those
16        skills.
17             And we've got routine diversity
18        training, things like that.
19   BY MR. GRUNDMAN:
20   Q.   Have you ever received any training
21        specific to working with people
22        experiencing homelessness?
23   A.   I have not.
24   Q.   So 2003 to now, so 20 years you've been
25        with the County; is that right?
```

Page 20

1   A.   That's correct.

2   Q.   During that time have you had any other

3        jobs?

4   A.   No.   Not formal jobs.

5   Q.   What about volunteer activities?

6   A.   I have volunteered much throughout my

7        life.   But a routine volunteer commitment

8        I had was for about five years, from 2010

9        to 2015.   I cooked a weekly dinner for my

10       neighborhood association and a

11       neighborhood church.

12  Q.   What neighborhood association is that?

13  A.   The Lyndale Neighborhood Association.

14  Q.   So that -- are you still doing that now?

15  A.   No, I'm not.

16  Q.   How many years did you do that?

17  A.   Five -- I think five years.

18  Q.   Any other volunteer activities that stand

19       out that you've done?

20  A.   Again, I've volunteered many times, but

21       nothing on a routine basis.

22            I volunteered at the Special

23       Olympics, Ironman, things like that, but

24       just kind of one-offs.

25  Q.   Are you involved in any formal volunteer

Page 21

```
 1        activities now?
 2   A.   I am not.
 3   Q.   What about boards?  Have you ever served
 4        on like a board of directors for a
 5        nonprofit or for a for-profit?
 6   A.   I have not.
 7   Q.   So you've mentioned the Authority and
 8        explained a little bit about your job
 9        duties with regard to the Authority.
10             Backing up, what is the Authority
11        itself?  What does it do?
12   A.   They're really -- this spiel I know.
13             The Hennepin County Regional Railroad
14        Authority mission is to purchase abandoned
15        railroad corridors and preserve them for
16        future transportation uses.  That
17        typically means we buy abandoned railroad
18        corridors.  They have inter- -- trails on
19        them on an interim basis, and then we
20        convey them to Metropolitan Council for
21        transit development.
22   Q.   Sounds like you know that mission pretty
23        well.
24   A.   It's been 20 years.
25   Q.   Has the mission changed in those 20 years?
```

Page 22

1    A.   No.

2    Q.   How many people work as part of the

3         Authority?

4    A.   I couldn't tell you for certain.  Hennepin

5         County Regional Railroad Authority

6         technically has no staff.  We're all

7         Hennepin County employees.

8             I would say maybe about ten people

9         work toward, you know, HCRRA.  H-C-R-R-A.

10        Sorry.

11   Q.   Could you tell me a little more about

12        that.

13            When you say that the Authority

14        doesn't have staff and that you're

15        Hennepin County employees, what do you

16        mean by that?

17   A.   The Authority is technically a separate

18        political subdivision of the State of

19        Minnesota, similar to a housing and

20        redevelopment authority.  So it's my

21        understanding there is no -- it has no

22        staff.  Hennepin County staff work on the

23        Authority's behalf.

24   Q.   And you said about ten people?

25   A.   About.

Page 23

1   Q.   And I can tell you may not be able to give
2        me a list of all ten of those people, but
3        would you tell me some of the people that
4        work with the Authority now.
5   A.   Yep.  I work with -- Joe Gladke is our
6        manager.  My supervisor is Kristine
7        Stehley.   I also work with Aaron Freng,
8        Gary Galbaby, Joe Scala.
9   Q.   So these are some of the people you work
10       with regularly?
11  A.   That's correct.
12  Q.   When you estimate that about ten people
13       work on the Authority's business, has that
14       changed in the last 20 years?
15  A.   The number of people?
16  Q.   Yes.
17  A.   I'm sure it has gone up and down, but
18       not -- I wouldn't say drastically.
19  Q.   There is no time that stands out to you as
20       a significant change in staff, either
21       increase or decrease?
22  A.   No.
23  Q.   How has -- you said the mission has
24       remained the same for the Authority.  Has
25       the work changed in the last 20 years?

1  A.  My work, or the work in general of the
2      agency, or the Authority?
3  Q.  That's a good question.  I'll clarify.
4      Let's do both of those, actually.
5          So how about the Authority.  In
6      general, has that work changed over the
7      last 20 years?
8  A.  I don't know.  I don't think so.
9          And my work has -- we talked about
10     before, my roles have changed a bit as
11     I've been there longer and been promoted.
12 Q.  When was your most recent promotion?
13 A.  In 2013.
14 Q.  So you've had the same job title since
15     then?
16 A.  I have.
17 Q.  What is that job title again?
18 A.  Principal planning analyst.
19 Q.  I think you mentioned before that your job
20     duties include things like contracting.
21         Is that right?
22 A.  That's correct.
23 Q.  What else do you do as part of your job?
24 A.  I manage 43 miles of abandoned railroad
25     corridors, and approximately eight -- we

Page 25

1        call them discrete parcels that are

2        located along those corridors.

3               So I make sure our property is

4        maintained; snow shoveled, grass is mowed,

5        trash collected, graffiti removed.

6               I also manage many of the contracts

7        for use of our property.  That includes

8        leases, easements and permits.

9               And then I also get involved in real

10       estate matters when we buy and sell

11       property.

12   Q.  Talk about -- you said that you make sure

13       that the properties are maintained; is

14       that right?

15   A.  That's correct.

16   Q.  Who actually does the work of maintaining

17       the properties?

18   A.  We contract with several agencies.

19               We contract with Tree Trust.  They

20       are a nonprofit.  I believe they're a job

21       development nonprofit, and they use

22       landscape services as the vehicle.

23               We also contract with Hennepin County

24       Sentencing to Service.

25               And then we have several other

Page 26

```
 1        smaller contracts for maintenance needs.
 2   Q.   So the contract with Tree Trust that you
 3        mentioned, approximately how long has the
 4        Authority been contracting with Tree
 5        Trust?
 6             MS. PIERCE:  Objection.  Foundation.
 7   A.   The Authority has been contracting with
 8        Tree Trust for at least as long as I've
 9        been with the County.
10   BY MR. GRUNDMAN:
11   Q.   And what does the Tree Trust do as part of
12        that contract?
13   A.   They mow grass, they remove snow, cover
14        graffiti, remove trash.  They build and
15        maintain fences, retaining walls.
16             They will occasionally build small
17        infrastructure we need, like a staircase.
18             They install signs, and other
19        maintenance activities like that.
20   Q.   Would you say that the contract with the
21        Tree Trust is the most significant
22        contract that the Authority has?
23             MS. PIERCE:  Objection.  Vague.
24   A.   I would say it's the largest monetary
25        value.
```

Page 27

1   BY MR. GRUNDMAN:

2   Q.   And how much monetary value?

3   A.   Our current annual contract is 900- -- has

4        a not-to-exceed amount of $900,000 per

5        year.

6   Q.   How has that changed over the years?

7   A.   That has increased over the years,

8        although we conveyed nine miles to Met

9        Council around 2018 for the Southwest LRT

10       development.  And at that time we had

11       adjusted our contract; like we reduced our

12       contract to reflect that we lost nine

13       miles of corridor.

14  Q.   And then you mentioned that there is also

15       a contract with Hennepin County Sentence

16       to Serve; is that correct?

17  A.   Yes.

18  Q.   What is the nature of that contract?  What

19       service -- I should be more specific.

20       Sorry.

21            What services does Hennepin County

22       Sentence to Serve perform on behalf of the

23       Authority?

24  A.   STS also mows grass, weed whips, removes

25       snow, and removes trash from our property.

Page 28

```
 1   Q.   And approximately how long has that
 2        contract been renewed with Hennepin County
 3        Sentence to Serve?
 4             MS. PIERCE:  Objection.  Foundation.
 5   A.   At least as long as I've been here.
 6   BY MR. GRUNDMAN:
 7   Q.   How does that contract compare monetarily
 8        to the contract with Tree Trust?
 9   A.   It's much smaller.  I think our STS
10        contract has an annual NTE of around
11        120,000.
12   Q.   So Tree Trust and the Sentence to Serve
13        program, they do similar work on behalf of
14        the Authority; is that fair to say?
15   A.   There is overlap.
16   Q.   How is the divide between the two
17        determined?
18   A.   Largely by me, I suppose.
19   Q.   Would you tell me a little bit more about
20        that.  How do you decide which each
21        organization does, and where they work?
22   A.   So STS has routine like mowing assignments
23        and snow removal assignments.  It's
24        less-detailed work because folks that are
25        arriving through STS are not full-time
```

Page 29

```
 1          employees.  So we need work that is -- how
 2          can I put this? -- easier to -- easier to
 3          complete.
 4     Q.   And then you said there were a couple of
 5          other smaller contracts that you oversee
 6          on behalf of the Authority; is that right?
 7     A.   That's correct.
 8     Q.   Do you know who those contractors are?
 9     A.   We now have cleanup contracts, clean-out
10          contracts with All Purpose Cleaners, T&J
11          Construction, and Bogard Construction.
12     Q.   So three separate contracts, right?
13     A.   Yes.
14     Q.   And you said that they're smaller.  What
15          is the monetary value of those three
16          contracts?
17     A.   I believe they each have a not-to-exceed
18          amount of $50,000 over two years.
19     Q.   And I think you described the -- well,
20          I'll ask it an open-ended question.
21               What is the work that those three
22          contractors do on behalf of the Authority?
23     A.   Those contractors would clean out -- well,
24          would remove trash from our property as
25          needed.
```

```
 1            They would also -- they're also under
 2         contract to remove encroaching materials,
 3         if need be.
 4    Q.   What do you mean by "encroaching
 5         materials"?
 6    A.   We have areas on our property where people
 7         have stored items, like a shed or a
 8         trampoline, things like that.  And we work
 9         with those property owners to remove those
10         items; and if they don't, then we might
11         work with them to have our contractor
12         remove the items.
13    Q.   So you said each of those three contracts
14         is for about $50,000, not-to-exceed
15         amounts in about $50,000?
16    A.   I believe so, but I don't know the exact
17         number.  And those are on an as-needed
18         basis.  They're not routine work.
19    Q.   How long has the Authority had those three
20         contracts to your knowledge?
21            MS. PIERCE:  Objection.  Foundation.
22    A.   The three that are in place right now, I
23         would say about a year.
24    BY MR. GRUNDMAN:
25    Q.   Are they renewals of preexisting
```

Page 31

```
 1      contracts?
 2  A.  They are not.  But we did have a contract
 3      with All Purpose Cleaners, a different
 4      contract, several years ago.
 5  Q.  Approximately when?  What year?
 6  A.  I'm going to say 2019 to 2021,
 7      approximately.
 8  Q.  Did you have other contractors at that
 9      time beside All Purpose Cleaners?
10  A.  I believe we also contracted with JD
11      Pride, but I did not manage that contract,
12      so I'm less familiar with it.
13  Q.  I understand that you're less familiar
14      with it, but what were the services to be
15      performed under the contract with JD
16      Pride?
17  A.  Again, I didn't solicit or manage the
18      contract, so I don't know the details.
19      But I do know they helped with cleanup of
20      the Midtown Greenway and fence
21      installation.
22  Q.  And did All Purpose Cleaners also work on
23      the Midtown Greenway?
24  A.  Yes.
25  Q.  Do you know -- you said that there was a
```

1          contract with All Purpose Cleaners, and

2          you estimated from 2019 to 2021; is that

3          right?

4     A.   I did say that.  I think actually we may

5          have had a two-year contract beginning

6          before then that we extended once.  So it

7          may have actually been a four-year

8          contract.

9     Q.   Do you remember the not-to-exceed amount

10         for the previous contract with All Purpose

11         Cleaners, the one that we've just been

12         discussing?

13    A.   I don't recall.

14    Q.   What about with JD Pride?

15    A.   That, I don't know.

16    Q.   Presumably that information would be

17         available on the contracts themselves;

18         fair to say?

19    A.   Yep.  Correct.

20    Q.   Supervisors.  You mentioned that you

21         previously reported to Michael Noonan,

22         correct?

23    A.   Correct.

24    Q.   What was his title at the time?

25    A.   I believe his title was senior department

1        administrator.
2    Q.  Who do you report to now?
3    A.  My supervisor is Kristine Stehley, and my
4        manager is Joe Gladke.
5    Q.  So when you separate between supervisor
6        and manager, would you tell me a little
7        bit more about what that means.
8    A.  Kristine Stehley is the supervisor of our
9        kind of subdivision, and then we all
10       report to Joe Gladke.  I don't know how to
11       expand on that.
12   Q.  What is Mr. Gladke's title?
13   A.  He's an assistant director.
14   Q.  Is that his entire title or is it of a
15       particular department?
16   A.  I don't know his formal title, but I
17       believe he's the assistant director of the
18       transportation project delivery
19       department.
20   Q.  Do you know how long he's had that role?
21   A.  I don't.
22   Q.  And what about Ms. -- was it Stehley,
23       Kristine Stehley?
24   A.  Correct.
25   Q.  What about Ms. Stehley?  How long has she

1          had her role?

2     A.   I believe she's been in this role for a

3          couple years.

4     Q.   Has she been your supervisor throughout

5          that time period?

6     A.   She has been my supervisor for at least a

7          year.  I can't remember when it started.

8     Q.   So at the beginning I asked you what this

9          case was about, and I'm paraphrasing, but

10         you said something along the lines of it

11         has to do with people who were in

12         encampments.  Is that correct?

13    A.   I believe so.

14    Q.   So when did you first start working on

15         encampments?

16    A.   So I've managed the Authority's property

17         for 20 years, and we have had encampments

18         from time to time since I started.

19    Q.   Going all the way back to 2003?

20    A.   Yes.

21    Q.   So in your work on encampments, are there

22         written policies that you follow with

23         regard to encampments?

24              MS. PIERCE:  I'm just going to put a

25         continuing objection on the record as to

1          vague as to meaning of the word
2          "encampment."
3     A.   Can you repeat your question.
4     BY MR. GRUNDMAN:
5     Q.   Sure.
6               Is there a written policy that you
7          follow now or that you have followed with
8          regard to encampments on Authority
9          property?
10    A.   I believe there is a policy, a county
11         policy, on public plazas and public
12         spaces, and that is our guiding policy.
13    Q.   When did you first become aware of that
14         policy?
15    A.   I don't know for certain, but I would
16         guess in 2020.
17    Q.   Who made you aware of it?
18    A.   I don't know.
19    Q.   Is it a policy that you consult regularly?
20    A.   It's a fairly straightforward policy,
21         so --
22    Q.   What does it say?
23    A.   Maybe I should say it's brief.
24              So basically what we take from it is
25         there is not camping allowed on the public

Page 36

1          property.
2     Q.   And that is the essential policy?
3     A.   I believe there is also a list of
4          prohibited materials.
5     Q.   So I asked you about written policies that
6          govern your work with regard to
7          encampments on Authority land.  That's the
8          only one you can think of?
9     A.   Correct.
10    Q.   And that includes going all the way back
11         to 2003?
12    A.   The Authority also has a land use
13         management plan that guides our management
14         of the property.  That plan, I don't know
15         if it discusses encampments.  I don't
16         believe it does.  But it does discuss
17         unpermitted uses of our property.
18    Q.   What do you take from that as it pertains
19         to encampments?
20    A.   Well, our policy says that unpermitted
21         uses are not permitted to continue, and
22         encampments wouldn't be a permitted use.
23    Q.   Tell me more about permitted use versus
24         unpermitted use.
25              MS. PIERCE:  Objection.  Vague.

Page 37

```
 1   A.   So in relationship to the policy, the
 2        Authority's policy, it's discussing
 3        utility crossings that might be allowed,
 4        or criteria under which leasing of the
 5        property is allowed.
 6             So those types of uses would be
 7        permitted or not permitted, and then we
 8        would grant the appropriate agreement.
 9   BY MR. GRUNDMAN:
10   Q.   And that's part of your job duties?
11   A.   Yes, correct.
12   Q.   Can you think of some permitted uses?  I'm
13        not asking for a complete list over 20
14        years.  But can you give us some examples
15        of some permitted uses?
16   A.   Sure.
17             We permit utilities to cross our
18        corridor.  That's very common.  So Xcel
19        lines, Minnegasco or Centerpoint lines.
20             We also issue permits for landscaping
21        on our property.
22             We also issue permits for events like
23        a 5K run, something like that.
24             We occasionally issue easements for
25        use of our property for let's say a Met
```

Page 38

```
 1        Council sanitary sewer line, something
 2        like that.
 3              And then we also have leases on our
 4        property, although our policy directs us
 5        not to issue leases, not to enter into any
 6        new leases.  So they're rare, but I manage
 7        about 35 leases, you know, existing
 8        leases, for use of our property.
 9   Q.   And, again, I don't need all 35, but can
10        you give me some examples of what entities
11        or people hold those leases?
12   A.   Most of our leases were inherited when we
13        purchased the corridors from the railroad
14        companies.  So they're typically with an
15        adjacent property owner.
16              A lot of them are small businesses,
17        let's say a landscaping company that has
18        been using our property as part of their
19        own firm 20 years or more.
20   Q.   I think -- did you say earlier that the
21        Authority owns -- is it 43 miles of former
22        railroad track property?  Is that right?
23   A.   That's correct.
24   Q.   Where generally are those 43 miles
25        located?  What county are they in?
```

Page 39

```
 1   A.   40 miles of the corridors are located in
 2        Hennepin County, and three miles are in
 3        Carver County.
 4             So the Midtown Greenway is one.  We
 5        also own the Northeast Diagonal in
 6        northeast Minneapolis.  We own the Dakota
 7        Railroad Rail Corridor that goes through
 8        Lake Minnetonka.  And we own two corridors
 9        that go from Hopkins, one to Eden
10        Prairie -- sorry -- one to Victoria, one
11        to Chaska.
12   Q.   And how many of those properties were
13        acquired in the 20 years that you worked
14        with the Authority?
15             MS. PIERCE:  Objection.  Vague.
16   A.   The Dakota Rail Corridor was acquired in
17        2001, right before I started.  The
18        Northeast Diagonal was acquired after I
19        started.  And phase 3 of the Midtown
20        Greenway was acquired after I started.
21             Otherwise, all of the corridors were
22        acquired before I started.
23   BY MR. GRUNDMAN:
24   Q.   You mentioned earlier that since 2003
25        you've dealt with encampments on Authority
```

Page 40

1       property, correct?

2   A.  Correct.

3   Q.  Which corridors have you dealt with

4       encampments on?

5   A.  Midtown Greenway, we call it the Hopkins

6       to Minneapolis corridor, and a little bit

7       of the Northeast Diagonal corridor.

8   Q.  What is your responsibility when it comes

9       to encampments on Authority property?

10  A.  My responsibility would be coordinating

11      with security or the MPD, as well as

12      outreach workers.  And then ultimately

13      coordinating the cleanup of the camps.

14  Q.  So you used the word "coordinating" a

15      couple of times in that response.

16          So your job is to work with some of

17      the other people and entities who would

18      also be involved with the encampments?

19  A.  Correct.

20  Q.  Has that changed in the last 20 years,

21      that role with regard to encampments?

22  A.  Yes.

23  Q.  How so?

24  A.  Well, when I started there, it certainly

25      wasn't a common occurrence.  Definitely

Page 41

```
 1        seen an increase in encampments on our
 2        property over the last 20 years.
 3   Q.   Would you tell -- and I'll get back to my
 4        question about how your job has changed.
 5             But before that, when you say it's
 6        increased, tell me a little more about
 7        that.
 8             When, approximately, did it start to
 9        increase, in what numbers?
10   A.   Sure.
11             MS. PIERCE:  Objection.  Compound.
12   A.   I remember encampments happening
13        occasionally when I started, but it was a
14        rare occurrence.
15             I would say over the last 20 years
16        there has probably been times of increases
17        and decreases of the number of camps, but
18        we definitely saw a marked increase in
19        camps on the Midtown Greenway in the late
20        2010s.
21   BY MR. GRUNDMAN:
22   Q.   You used the word "increase," and I'm not
23        asking for specific numbers, but would you
24        give me a sense of how much it increased
25        when you -- on the Midtown Greenway in the
```

Page 42

```
 1        late 2010s specifically?
 2   A.   I don't have those numbers, but it went
 3        from rare to routine.  So we would
 4        routinely have camps on the Greenway
 5        around 2016, '17, '18.
 6   Q.   In the time period when it was rare, how
 7        many times a year, approximately, did you
 8        deal with encampments?
 9             MS. PIERCE:  Objection.  Compound.
10   A.   I don't have an exact number, but --
11   BY MR. GRUNDMAN:
12   Q.   Would you --
13   A.   -- rarely.  Couple times a year.
14   Q.   I apologize for interrupting you.  That's
15        what I was looking for.
16             So approximately a couple of times a
17        year?
18   A.   Correct.
19   Q.   Then in 2016 is when the increase began,
20        2016 or 2017?
21   A.   Around then, right.
22   Q.   And what did that look like to you?
23             MS. PIERCE:  Objection.  Vague.
24   A.   We started noticing more people on the
25        Greenway, not always specifically camping,
```

Page 43

```
 1        sometimes just hanging out.  I don't know
 2        how to best say that.  But we noticed more
 3        people, more camping on the Greenway.
 4   BY MR. GRUNDMAN:
 5   Q.  What did you do about it?
 6   A.  So at that time we would post notice.  So
 7        we would post a sign on a survey lath,
 8        like a wooden stake, at the site.
 9            We would try to talk to folks there
10        and let them know, "You can't camp here.
11        We're going to come back and clean it
12        out."
13            And we would post a notice that gave
14        72 hours' notice.  And in that time period
15        we would also reach out to outreach
16        workers and try to get them to visit the
17        site in those 72 hours so people could get
18        resources, if available.  And then we
19        would come through and clean out what was
20        ever left behind.
21   Q.  That number, 72 hours, seems fairly
22        specific.  Are you getting that from a
23        policy that the Authority had?
24   A.  No, we don't have a policy that says that
25        number, but it seemed like a num- -- a
```

Page 44

```
 1        best practice that we just got from other
 2        agencies.
 3   Q.   And you also mentioned that -- a notice
 4        that you put on I think you said like a
 5        wooden stake; is that right?
 6   A.   Correct.
 7   Q.   Where did you get the notice?
 8   A.   I would print it.  We made it ourselves.
 9   Q.   When it came to actually drafting the
10        notice, was that you who wrote it or
11        someone else?
12   A.   I believe it was me.
13   Q.   Did the text of the notice change over
14        time?
15   A.   Yes.
16   Q.   How so?
17   A.   I think -- I can't remember specifically.
18        I think we just tried to improve upon it
19        over the years.
20             We had a translation in Spanish on
21        the notice at some point, things like
22        that.  Tried to get more detailed.
23   Q.   Did the idea of giving 72 hours' notice --
24        did that also change over time?
25   A.   Yes.  Well, definitely depends on which
```

Page 45

```
 1         time period we're talking about.
 2    Q.   And that's what my question is getting at.
 3              So I was -- we were talking earlier
 4         about this time period around 2016, 2017
 5         when you noticed that encampments started
 6         to increase particularly on the Midtown
 7         Greenway.
 8              And so from that time period until
 9         now, I guess my question is, has the idea
10         of giving 72 hours' notice -- has that
11         changed in that time period?
12    A.   It has.
13              So that was our practice from around
14         that 2016, 2017 time period until the
15         executive order in 2020, and then we had
16         to operate differently.
17              And since that executive order
18         expired, or at least since beginning of
19         2021, we have signs posted now, and we
20         have a 24-hour rule.  There are signs
21         posted that say camping is not permitted
22         on the Midtown Greenway.
23              We have security, Hennepin County
24         Security, patrolling the Midtown Greenway
25         on a routine basis now, several times per
```

Page 46

```
 1        day.  So we no longer use the 72-hour
 2        notice period.
 3   Q.   You mentioned the executive orders in
 4        2020.  What do you know about that, or
 5        what did you mean when you mentioned the
 6        executive orders?
 7   A.   It's my understanding there was an
 8        executive order from the governor in 2020
 9        that limited our ability to remove camps
10        from public property.
11   Q.   Did you read the executive order?
12   A.   I know at the time I read parts, if not
13        all of it, but I was familiar with it at
14        the time.
15   Q.   How else did you become familiar with it?
16   A.   In 2020 we had coordinating meetings with
17        other public agencies about camps in the
18        city, and I know it was discussed there.
19   Q.   Who else was at those meetings?
20   A.   Staff from MNDot, the Minneapolis Park and
21        Rec Board, other county staff, and City of
22        Minneapolis.
23   Q.   Who from the City of Minneapolis?
24   A.   I can't recall the names.
25   Q.   Do you remember any specific person?
```

Page 47

```
 1   A.   Well, I remember Grant Snyder with the

 2        MPD.  And there were several staff from

 3        like I think the City's like housing or

 4        regulatory department.  I just can't

 5        remember their names.

 6   Q.   What about -- you mentioned other county

 7        staff.  What other county staff was there?

 8   A.   I remember David Hewitt, and Danielle who

 9        works with him.  There may have been other

10        staff from Hennepin County Public

11        Services, but I don't recall specifically.

12   Q.   And what was generally discussed at the

13        meetings?

14   A.   I remember like the location of camps

15        being discussed; if a camp was increasing

16        or decreasing; if resources were being

17        brought to a camp, such as porta-potties,

18        things like that.  And then if a site were

19        to be cleared, plans like that.

20   Q.   And if a site was to be cleared, that was

21        discussed among the group?

22   A.   I definitely think the appropriate agency

23        might tell the group its plan for that.

24   Q.   What do you mean by "the appropriate

25        agency"?
```

Page 48

1   A.   Well, the owner of the property.

2   Q.   So different entities involved in those

3        groups owned the land that different

4        encampments were located on?

5   A.   Correct.

6   Q.   Sometimes the Park Board, sometimes the

7        City, and sometimes the County?

8   A.   Correct.

9   Q.   When did you start attending those

10       meetings, approximately?

11            I think you told us 2020 earlier.  Do

12       you remember the month?

13  A.   I don't exactly.  I would put it sometime

14       in spring.

15  Q.   When you first started attending the

16       meetings, did it -- had there been

17       meetings prior to you attending?

18            MS. PIERCE:  Objection.  Foundation.

19  A.   I don't know.

20  BY MR. GRUNDMAN:

21  Q.   Whose decision was it that you

22       specifically would attend those meetings?

23            MS. PIERCE:  Objection.  Foundation.

24  A.   I don't know, but I would imagine my

25       supervisor at the time, Michael Noonan.

Page 49

1    BY MR. GRUNDMAN:

2    Q.   Do you remember discussing the meetings

3          specifically with Mr. Noonan?

4    A.   I'm sure I did, but I don't recall

5          specific conversations about the meetings.

6          Probably report back on them.

7    Q.   You mentioned the fact that an executive

8          order from the governor limited the

9          Authority's ability to remove encampments.

10              Is that correct?

11   A.   That's correct.

12   Q.   Did you discuss with Mr. Noonan how that

13         would impact the Authority's usual work

14         with regard to encampments?

15   A.   I'm sure I did, yes.

16   Q.   So we're talking about several years ago

17         now.  I don't need you to remember the

18         exact wording of a specific conversation,

19         but what generally were the nature of

20         those conversations?

21   A.   Well, when the executive order went into

22         effect, I recall that we weren't requiring

23         anyone to move off of our property.

24   Q.   How did that impact your work?

25   A.   I don't know.  I mean, we definitely were

Page 50

```
 1        tracking encampments, and tracking where

 2        people were staying, and tracking tents,

 3        things like that.

 4             And it could also impact our

 5        maintenance activities.

 6   Q.  I'm going to show you a document.

 7             MR. PIERCE:  Luke, before you do,

 8        could we go off the record?

 9             (Break taken.)

10   BY MR. GRUNDMAN:

11   Q.  So we're back on the record after a break.

12        All the same rules apply, and you've been

13        great.

14             I'm now showing you what I've marked

15        as Exhibit 345.

16             (Deposition Exhibit No. 345 was

17        introduced.)

18   BY MR. GRUNDMAN:

19   Q.  To me, it appears to be a couple of

20        emails, two pages long.

21             Would you take a moment to read it

22        and let me know when you're ready to talk

23        about it.

24   A.  (Reviewing document.)

25             I'm ready.
```

Page 51

```
 1  Q.  So before the break you had just been
 2      talking about how your work with regard to
 3      encampments changed when there was an
 4      executive order from the governor.
 5          Is that right?
 6  A.  That's correct.
 7  Q.  And so I'm showing you Exhibit 345, in
 8      part as a way to help orient us to the
 9      time periods we're talking about here, and
10      to help understand some of the people
11      involved.
12          Do you recognize Exhibit 345?
13  A.  I see that I'm included in the email
14      chain, but I don't remember it
15      specifically.
16  Q.  If you turn to -- I guess it starts on
17      kind of the bottom of the first page, then
18      onto the second page.  There is a list
19      of -- in an email that's written by a
20      person named Christopher Esparza.
21          Do you see that?
22  A.  I do.
23  Q.  Who is Christopher Esparza?
24  A.  He is a patrol officer with Hennepin
25      County Security.
```

Page 52

1    Q.   What's Hennepin County Security?

2    A.   Hennepin County Security is housed in

3         Hennepin County facilities department, and

4         I believe they provide patrol and security

5         functions to county facilities.

6    Q.   And Mr. Esparza, the email that's shown on

7         Exhibit 345 seems to be that he's talking

8         about some encampments.

9              Is that fair to say?

10   A.   I would say he was tracking where people

11        or tents were set up on the Greenway.

12   Q.   This email from Mr. Esparza, is this -- I

13        know you're not going to recognize the

14        exact email, but this email that includes

15        a list of different places, have you seen

16        emails like this one before that you

17        remember?

18   A.   Yes.

19   Q.   How so?

20   A.   So I believe Hennepin County Security came

21        under contract with us in April 2020, and

22        at that time they started routinely

23        patrolling the Midtown Greenway.

24              And we would ask them to note where

25        people or tents were set up and take

Page 53

```
 1        pictures, and then give us regular updates
 2        in emails like this.
 3   Q.   When you say that they came under contract
 4        with you, would you explain what you mean
 5        by that.
 6   A.   We had been looking into security services
 7        on the Greenway actually for a number of
 8        years.  So by chance April 2020 is when
 9        Hennepin County Security began patrolling
10        the Greenway.
11   Q.   And you said Hennepin County Security
12        reports through the facilities department
13        at the County?
14   A.   That's correct.
15   Q.   So when you say that you had them under
16        contract, like what do you mean by that?
17        Was there a separate contract with
18        security?
19   A.   Yes.  We have an internal memorandum of
20        understanding or some kind of contract
21        like that for their services.
22   Q.   Was that a contract that you managed?
23   A.   Yes.
24   Q.   You said that you had been looking for a
25        security contractor for several years; is
```

Page 54

```
 1        that right?
 2   A.   Correct.
 3   Q.   And why?
 4   A.   The Midtown Greenway was not routinely
 5        patrolled by police or park police or
 6        security, by no one routinely, and we
 7        wanted to have a routine patrol of the
 8        Greenway.
 9   Q.   And that decision came, as you said,
10        several years before 2020 --
11   A.   Correct.
12   Q.   -- right?
13            Did you consider consult- --
14        contracting with other security entities
15        or companies?
16   A.   We did.  We looked at like a public
17        option, MPD; we look at an internal
18        option, Hennepin County Security; and we
19        looked at private security companies.
20   Q.   Who was involved in that decision-making
21        process?
22   A.   I would say myself, Joe Gladke and Michael
23        Noonan as my managers.
24   Q.   Then you said that the contract started in
25        April of 2020?
```

Page 55

1    A.   I believe so.

2    Q.   What was the not-to-exceed amount on that

3         contract?

4    A.   I don't know the exact number, but I think

5         it was about $100,000 per year.

6    Q.   Is that contract continuing?

7    A.   It is.

8    Q.   Has it changed in a not-to-exceed amount?

9    A.   It has increased over time, but just in

10        line with like inflation and cost of

11        living increases.  The scope of the

12        contract has stayed the same.

13   Q.   And what are the services to be provided

14        under that contract?

15   A.   There are two.

16             One is routine patrols of the Midtown

17        Greenway.  So I think they would visit the

18        Greenway between two and four times a day

19        and drive along the length of the trail.

20             And then also we can have security

21        out as escort with our staff or

22        maintenance crews, if needed.

23   Q.   Why would your staff or maintenance crews

24        need to be on the Greenway, generally

25        speaking?

Page 56

```
 1   A.   To maintain -- typically to maintain the
 2        Greenway.
 3   Q.   You told us earlier -- we talked about
 4        some contractors that the Authority hires
 5        for the purpose of maintaining Authority
 6        property, correct?
 7   A.   Correct.
 8   Q.   And now we're talking about how sometimes
 9        staff, like county staff, might be there
10        as well; is that right?
11   A.   That's right.
12   Q.   So I just -- I don't think I asked you
13        about that before.
14             So just to make sure I understand
15        better, like what are some of the reasons
16        that county staff would be on Authority
17        property?
18   A.   In general, to make site assessments, look
19        at projects that need to be done.
20             Let's say a hillside is eroding or a
21        fence is needing to be repaired.  We would
22        go investigate, make a plan, maybe meet
23        our contractor out there.
24             It's typically for maintenance,
25        either inspection or project planning.
```

Page 57

1   Q.  And so you particularly undertook some of
2       those tasks sometimes, right?
3   A.  Yes.
4   Q.  And do you still as of now?
5   A.  Yes.
6   Q.  Who else are we talking about when you use
7       the term "we" in terms of county staff
8       visiting property?
9   A.  For the Authority in particular, it's
10      typically me and my coworkers, Aaron
11      Freng, Kristine Stehley, Joe Gladke, Joe
12      Scala.
13  Q.  I notice that -- directing you back to
14      Exhibit 345 for a moment -- Joe Gladke
15      is -- he's the person who responded to
16      Mr. Esparza in the email that's at the top
17      of page 1.
18          Do you see that?
19  A.  I do.
20  Q.  You've mentioned Mr. Gladke several times.
21          If you read that email to
22      Mr. Esparza, it seems like, to me,
23      Mr. Gladke is commenting on the photos
24      particularly that Mr. Esparza had sent.
25          Is that right?

Page 58

1  A.  Yes, that looks like what he's saying.

2  Q.  And he's saying that:

3           "The photos are taken just the

4        way we would like."

5        Do you see that part of the email?

6  A.  I do.

7  Q.  So is it fair to say that you have this

8     contract with Hennepin County Security at

9     this point and Mr. Gladke is commenting on

10    the services performed on that contract?

11        MS. PIERCE:  Objection.  Foundation.

12 A.  Yes.  I think he's commenting on the

13    photos that were sent by Christopher.

14 BY MR. GRUNDMAN:

15 Q.  And so Mr. Esparza is the one from

16    Hennepin County Security who at least on

17    this day patrolled the Greenway; is that

18    correct?

19 A.  Correct.

20 Q.  And Mr. Gladke is responding to it, I

21    notice on this email there, as what looks

22    to me like a listserv.  It's

23    "PS.Security.Patrol."

24        Do you see that?

25 A.  I do.

Page 59

1    Q.  Do you agree with me, is that a listserv
2        of emails that belong -- that will then
3        cause the email to go to several different
4        people?
5             MS. PIERCE:  Objection.  Foundation.
6    A.  That would be my understanding.
7    BY MR. GRUNDMAN:
8    Q.  Do you know who is -- who receives emails
9        that are directed to that email address?
10   A.  I don't know exhaustively, but I know
11       it's -- includes the security officers, so
12       Christopher's coworkers.  And their
13       supervisor at the time was Todd Miller.
14       He would have been on that list.
15   Q.  Todd Miller.  What is his role?
16            MS. PIERCE:  Objection.  Foundation.
17   A.  He was the security supervisor.
18   BY MR. GRUNDMAN:
19   Q.  So he works for Hennepin County Security?
20   A.  I don't know if he does anymore, but he
21       did then.
22   Q.  Do you know, did he supervise the entire
23       unit of Hennepin County Security, or was
24       it a particular part of it?  Do you know?
25   A.  I don't know.

Page 60

1    Q.   But you worked with him directly?

2    A.   I did.

3    Q.   In what context?  Like what were your

4         interactions with Mr. Miller like?

5              Or I should say, was it Lieutenant

6         Miller?

7    A.   I think so.

8    Q.   What were your interactions with

9         Mr. Miller?  What was the nature of that?

10   A.   A lot of the work we did with Hennepin

11        County Security would be coordinated

12        through him as their supervisor.

13   Q.   So you weren't the one telling Christopher

14        Esparza what to do?

15   A.   I might need a little more clarification

16        on that.

17   Q.   Sure.  I'll ask it in a more open-ended

18        way.

19             We're directing your attention now to

20        this time period covered by Exhibit 345.

21        You said earlier that things changed in

22        the spring of 2020.

23             So focusing in on that time period,

24        with regard to the Greenway, what were --

25        just describe for me some of your

Page 61

1          interactions with Hennepin County Security
2          with regard to encampments.
3                  What kind of work was done, and how
4          did you work with them?
5                  MS. PIERCE:  Objection.  Compound.
6     A.   So in this -- beginning in the spring and
7          into the summer, I remember we would get
8          emails with lists like this, telling us
9          where people were set up or where there
10         might be tents, and how many people,
11         interactions they might have had.
12                 Hennepin County Security would visit
13         the Greenway on a routine basis, but we
14         could also reach out to them and ask them
15         to go to a specific spot or meet us
16         somewhere.
17                 So both things happened in that.
18         They were working routinely and
19         independently, but we would -- we could
20         also reach out for specific help.
21    Q.   What kinds of reasons would you ask for
22         them to provide specific help?
23    A.   If there was material on the Midtown
24         Greenway and we wanted to know if it was
25         abandoned or not, we might ask them to

Page 62

```
 1        visit the site.
 2             We might also ask them to visit a
 3        site if we knew people were there to see
 4        if they needed anything, needed access to
 5        resources, things like that.
 6   Q.   So it was the security personnel's job to
 7        decide if a particular -- if property on
 8        the Greenway had been abandoned or not?
 9             MS. PIERCE:   Objection.   Misstates
10        testimony.
11   A.   I wouldn't say it was their job to decide.
12        But we would ask them to visit the site
13        and try to make contact, assess the site
14        and report back to us, and then we could
15        use that in our decision-making.
16   BY MR. GRUNDMAN:
17   Q.   Earlier you mentioned outreach workers; is
18        that correct?
19   A.   Correct.
20   Q.   Who do you mean by that?
21   A.   In 2020, I worked with Don Ryan, and
22        Eddie, although I don't remember his last
23        name.
24             And then prior to that, we also
25        worked with outreach workers from St.
```

Page 63

```
 1        Stephens and Avivo, but I don't remember
 2        their names specifically.
 3   Q.  Did you form contracts with St. Stephens
 4        or Avivo?
 5   A.  At one time, I believe around 2019, there
 6        was a contract with Hennepin County and
 7        St. Stephens, and that included their work
 8        on Midtown Greenway.  But I believe they
 9        worked -- visited folks camping on the
10        Greenway before they were under that
11        specific contract, and after.
12   Q.  And you personally interacted with people
13        who worked with St. Stephens and Avivo?
14   A.  Correct.
15   Q.  In what context?
16   A.  So prior to 2020, when we were going to
17        ask people to no longer camp at a site,
18        and post the notice I referred to, the
19        72-hour notice, we would reach out to St.
20        Stephens and/or Avivo to make contact with
21        them to make sure like they could get a
22        street outreach team out there before the
23        site was cleared.
24   Q.  And so that happened before the executive
25        order came into effect?
```

Page 64

```
 1   A.   Correct.
 2   Q.   And so starting in April, you had a
 3        contract with Hennepin County Security,
 4        and you mentioned that part of Hennepin
 5        County Security's job was also to make
 6        contact with people at encampments right
 7        along the Greenway.
 8   A.   That's correct.
 9   Q.   And I'm just trying to understand, how did
10        you decide between St. Stephens, Avivo or
11        Hennepin County Security?
12   A.   Once the executive order was in place, we
13        weren't asking people to leave the
14        encampments, so we weren't sending out St.
15        Stephen's and Avivo.  I believe they were
16        on site, you know, outside of us asking
17        them to be there, just because there were
18        people camping there.  So that's how --
19        that's why it changed.
20             Also, in 2020, we had more county
21        outreach workers on site.
22   Q.   And you mentioned specifically Don Ryan,
23        correct?
24   A.   Correct.
25   Q.   Does Mr. Ryan work for Hennepin County?
```

Page 65

1   A.   He did in 2020.

2   Q.   What was the nature of your work with

3        Mr. Ryan?

4   A.   So once we started heavily tracking camps

5        on the Greenway I believe in late summer,

6        early fall, we would track people camping

7        on the Greenway, numbers of tents and

8        numbers of people.

9             And then we would go out at least

10       once a week, but I remember it increasing

11       to several times per week, and I would go

12       out with Don Ryan and talk to each person

13       camping.  And I would track the tents and

14       the folks camping.  So more logistics.

15            Don Ryan would talk to them about

16       resources, if they were interested in

17       shelter, things like that.

18  Q.   So the two of you went to the sites

19       directly?

20  A.   We did.

21  Q.   Were any -- was anyone else with you?

22  A.   I also remember Joe Gladke and Eddie --

23       I'm sorry I can't remember his last

24       name -- being a similar pair, doing

25       similar work.

Page 66

1   Q.   To your knowledge, did Eddie also work for
2        Hennepin County?
3   A.   Yes.   In their street outreach team.
4   Q.   You have told us now a couple times that
5        there was tracking of the different sites
6        along the Greenway from that time period,
7        correct?
8   A.   Correct.
9   Q.   And Exhibit 1 -- excuse me -- Exhibit 345,
10       there is a list of sites as we've talked
11       about, correct?
12  A.   Yes.
13  Q.   But then you said that in the late summer,
14       early fall there was more intense
15       tracking, and that you in particular were
16       responsible for that.
17            MS. PIERCE:   Objection.   Misstates
18       testimony.
19  A.   Correct.   We started tracking with a
20       spreadsheet and aerial maps and photos, I
21       can't remember specifically, but around
22       September.
23  BY MR. GRUNDMAN:
24  Q.   Whose idea was it to track using those
25       methods?

Page 67

```
 1   A.   I believe it was Joe Gladke's idea.
 2   Q.   But then it was your -- part of your job
 3        duties at the time?
 4   A.   That's correct.
 5   Q.   So you maintained the spreadsheets,
 6        correct?
 7   A.   Correct.
 8   Q.   Where did you store the spreadsheet?
 9   A.   On our county network.
10   Q.   Who had access to it?
11   A.   I don't know, but at least all of my
12        coworkers in our subdivision.
13   Q.   What was the purpose of keeping a
14        spreadsheet like that?
15   A.   I'm sure there were many purposes, but I
16        know we wanted to keep track of who was
17        camping, if they were interested in
18        resources, if there were changes in the
19        number of people on site where there were
20        tents.  Those logistics.
21   Q.   Did Mr. Ryan have access to the
22        spreadsheet?
23            MS. PIERCE:  Objection.  Foundation.
24   A.   I don't know if he had access to that
25        spreadsheet, but I believe that the
```

Page 68

```
 1        spreadsheet would have been shared with
 2        him via email, let's say.
 3  BY MR. GRUNDMAN:
 4  Q.   And you were updating it I think you said
 5        approximately once a week or so; is that
 6        correct?
 7  A.   I would say at least once a week.
 8  Q.   Based on information you received from
 9        according to your own observation and
10        Hennepin County Security, correct?
11  A.   That's my recollection.
12  Q.   Any other sources of information that you
13        used to update the spreadsheet?
14  A.   There may have been days where let's say
15        Joe Gladke was on site, but I wasn't.  He
16        would make notes, and I would update the
17        spreadsheet.  That could have happened.
18  Q.   From -- with -- for the people who worked
19        with the Authority, Mr. Gladke was
20        occasionally the person who went out to
21        the Greenway, and you were, correct?
22  A.   Correct.
23  Q.   Was there anyone else who worked with the
24        Authority that took on that role?
25             MS. PIERCE:  Objection.  Foundation
```

Page 69

1       and vague.
2   A.  I don't think so.
3            Oh, I should stop.  Joe Scala, who
4       you'll see in these emails, did some of
5       our early work taking photos.  He may have
6       occasionally been on site.
7   BY MR. GRUNDMAN:
8   Q.  Does Mr. Scala still work with the
9       Authority?
10  A.  He does.
11  Q.  What is his title?
12  A.  I believe he's the senior planning
13      analyst.
14  Q.  So just the position you had before your
15      most recent promotion?
16  A.  Same title, not the same position.
17  Q.  Understood.  Okay.
18            So what is different about his job
19      compared to yours?
20  A.  He works more on let's say transit
21      development for the Authority, and
22      questions that come up related to transit,
23      whereas I work on maintaining our corridor
24      property, and not on transit issues very
25      much.

1   Q.   So you said Mr. Scala was one of the

2        people who went out to the Greenway

3        encampments, but you said that was on -- I

4        think you used the word "earlier."

5             Are we talking about earlier in 2020,

6        or approximately when?

7   A.   Earlier in 2020, I recall that it was he

8        and Joe Gladke that went out and took

9        photos of all of the camp -- all of the

10       tents that we used to track the

11       encampments from let's say October -- or

12       late September, October on.

13  Q.   And so then Mr. Scala stopped being one of

14       the people who went out to the encampments

15       at that time, or did he continue?

16  A.   I don't remember him being out there

17       routinely.

18  Q.   You and Mr. Gladke were there most

19       routinely on behalf of the Authority?

20  A.   That's correct.

21  Q.   Do you recall anyone else from Hennepin

22       County Security who was routinely at the

23       encampments?

24            MS. PIERCE:  Objection.  Vague.

25  A.   I do.  We worked with Christopher, who is

1        on this email; Todd Miller -- I'm just

2        forgetting their names now.  But there

3        were about three other officers who were

4        routinely on the Greenway.

5   BY MR. GRUNDMAN:

6   Q.   And so they sent you emails like the one

7        that is marked as Exhibit 345, correct?

8   A.   That's correct.

9   Q.   How many times do you estimate you went to

10       the Greenway before it was cleared?

11  A.   Starting when?

12  Q.   Let's say -- we've talked about this time

13       period where it became more frequent, and

14       so that was I think you said late summer,

15       early fall?

16            You said you went at least once a

17       week; is that right?

18  A.   Correct.  Sometime in the early fall we

19       started tracking with spreadsheets and

20       aerial maps, and making sure we were

21       talking to everyone and every tent about

22       their plans and if they were interested in

23       shelter, other resources.

24            So I would say once that began, I was

25       there at least once a week, probably twice

Page 72

1        a week.

2    Q.   And this was all during that time period

3         where it was your understanding that the

4         executive order prohibited the Authority

5         from clearing the encampments; is that

6         right?

7              MS. PIERCE:   Objection.  Misstates

8         prior testimony.

9    A.   I think I said limited earlier.  That was

10        my understanding, that there were some

11        criteria under which you could clear a

12        camp.

13   BY MR. GRUNDMAN:

14   Q.   What criteria?

15   A.   I think I remember that it pertained to

16        safety and like sanitary issues.

17   Q.   Did you ever apply those criteria to an

18        encampment?

19              MS. PIERCE:   Objection.  Vague.

20   A.   I remember specifically that a camp was

21        cleared on Nicollet Avenue Bridge because

22        it was determined to be unsafe to have

23        people camping on that bridge.

24   BY MR. GRUNDMAN:

25   Q.   Do you remember approximately when that

Page 73

1        took place?

2   A.   I think around September 2020, September

3        or October.

4   Q.   So at that time, it was determined that

5        despite the executive order, that

6        particular encampment could be cleared,

7        correct?

8             MR. PIERCE:  Objection.  Vague,

9        foundation.

10  A.   That's my understanding.  I know it was

11       cleared.

12  BY MR. GRUNDMAN:

13  Q.   Who made the decision?

14  A.   To clear it?

15            MS. PIERCE:  Objection.  Foundation.

16  A.   I don't know specifically.

17  BY MR. GRUNDMAN:

18  Q.   Do you think it's likely that Mr. Noonan

19       was involved with that decision?

20  A.   I would say Mr. Noonan and Mr. Gladke

21       consulted with county leadership to make

22       that decision.

23  Q.   And then one of them told you about it at

24       some point, correct?

25  A.   Correct.

Page 74

1   Q.   So you weren't the one deciding that it

2        should be cleared?

3   A.   No.

4   Q.   I'm going to show you a document.

5             MR. GRUNDMAN:   And for counsel's

6        sake, I'm actually -- this is one that was

7        used at a previous deposition.   So I'm

8        marking it -- it looks like it's out of

9        order, but it's Exhibit 337.   And we'll

10       make sure it gets in order as well.

11            (Deposition Exhibit No. 337 was

12       introduced.)

13            THE WITNESS:   Thank you.

14            MS. PIERCE:   Did you say 337?

15            MR. GRUNDMAN:   337, correct.   And I

16       have made extra copies for folks.

17            MS. PIERCE:   Thank you.

18  BY MR. GRUNDMAN:

19  Q.   So I'm showing you a document that's been

20       marked as Exhibit 337.   This one is a

21       little shorter.   It's about one page.

22            If you could read through it and let

23       me know when you've had a chance to do

24       that.

25  A.   (Reviewing document.)

Page 75

```
 1              I'm ready.
 2   Q.  So do you recognize the email that's shown
 3        in Exhibit 337?
 4   A.  I see that I'm included on the email, but
 5        I don't remember this specifically.
 6   Q.  Before we took a break, you had mentioned
 7        a meeting that you sometimes attended that
 8        involved staff from the Park Board and
 9        from the City and other people at the
10        County; is that right?
11   A.  That's correct.
12   Q.  The list of folks at the top of Exhibit
13        337 includes people from those different
14        places, correct?
15   A.  Yes.
16   Q.  And I know you said you don't remember
17        this specific email, but after you read
18        it, can you say -- would you be able to
19        say whether this is related to those
20        meetings that you attended at that time
21        period?
22              MS. PIERCE:  Objection.  Vague.
23   A.  This does look like the same group of
24        folks that would be at that meeting, or at
25        least includes many of the same people.
```

Page 76

1    BY MR. GRUNDMAN:

2    Q.  So why were you on this email to your

3         knowledge?

4              MS. PIERCE:  Objection.  Foundation.

5    A.  Well, if they were emailing it to that

6         coordinating group, I was in that group.

7    BY MR. GRUNDMAN:

8    Q.  It appears to me that it's sent by Jason

9         Ohotto.

10             Do you see that?

11   A.  I do.

12   Q.  Have you ever talked to Mr. Ohotto before?

13   A.  I don't believe one on one, no.

14   Q.  So you talked to him in group sometimes?

15   A.  I think we might have been on the same

16        call or meeting.

17   Q.  And let me just clarify.  We talked about

18        these meetings.

19             This of course was June of 2020.

20        There was a pandemic going on at the time,

21        correct?

22   A.  Correct.

23   Q.  So when we talk about meetings, were these

24        mostly virtual meetings, or how did they

25        take place?

Page 77

1   A.   Virtually.

2   Q.   Approximately how many meetings like that

3        did you attend?

4   A.   I don't know specifically.  I think they

5        were weekly or every other week.

6             As I mentioned before, I think they

7        started in the spring, and I don't

8        remember how long they would have lasted.

9        Into -- through the summer perhaps.

10  Q.   Do you remember any in the fall or the

11       winter of 2020?

12  A.   I don't recall.

13  Q.   You mentioned earlier that -- I asked you

14       who did you work with from the City of

15       Minneapolis; you mentioned Grant Snyder.

16            Do you remember that?

17  A.   I do.

18  Q.   Is there anyone else from the City of

19       Minneapolis that you recall working with

20       when it comes to homeless encampments?

21            MS. PIERCE:  Objection.  Asked and

22       answered.

23  A.   We in the past have worked with MPD

24       before, and certainly consulted with MPD

25       on questions about the neighborhood,

Page 78

1       increases in illegal activities or

2       unpermitted activities on the Greenway.

3           Some of the folks on this email that

4       were in that coordinating group are from

5       the City, including Katie Topinka.  I

6       think she might have convened that group.

7   BY MR. GRUNDMAN:

8   Q.  Did you ever work directly with

9       Ms. Topinka?

10  A.  Not that I recall.

11          I will say there might have been some

12      coordination with the City.  I think they

13      brought porta-potties down to the

14      Greenway, and I think they brought

15      additional trash cans to the Greenway.  So

16      we definitely had coordination with them.

17      But I think that's about it.

18  Q.  And then you also mentioned that you

19      occasionally consulted with MPD with

20      regard to security concerns on the

21      Greenway.

22  A.  That's correct.

23          As we saw the increase in camps, as I

24      mentioned, in the late 2010s, we also were

25      seeing an increase in open containers,

Page 79

```
1        drug use, other activities like that.  And
2        we didn't have Hennepin County Security
3        under contract at that time, so we would
4        meet with MPD and just talk about ways to
5        make the Greenway safe for everyone.
6    Q.  Were those meetings in 2020, or before
7        that, or both?
8    A.  Before.
9    Q.  Approximately how long before?
10   A.  I think we started meeting with them on an
11       annual basis probably around 2015, 2016.
12   Q.  So you had like one specific annual
13       meeting?
14   A.  No.  But that was kind of our target, to
15       just get stakeholders together and make
16       sure we knew current staff roles and
17       responsibilities.
18   Q.  Who convened that meeting?
19   A.  I did.
20   Q.  Who else was invited besides you and MPD?
21   A.  My coworkers from Hennepin County.
22           The managers of the Midtown Greenway
23       Community Works project.  That would have
24       been Crystal Myslajek or Lisa Middag.
25       They're kind of my counterpart.  So it
```

Page 80

```
 1        would usually just be us.
 2             Maybe someone from Tree Trust, who
 3        was doing routine maintenance and clearing
 4        of people, you know, abandoned materials
 5        on the Greenway.
 6             And then folks from MPD.
 7   Q.   Did those meetings include discussion of
 8        people actually living on the Greenway?
 9             MS. PIERCE:  Objection.  Use of the
10        word "living."  I'll have a standing
11        objection as vague.
12   A.   I'm sorry.  Your question was?  Can you
13        repeat your question?
14   BY MR. GRUNDMAN:
15   Q.   The meetings that you convened where, as
16        you said, you brought in stakeholders,
17        including the Tree Trust folks and your
18        department, and Minneapolis Police
19        Department.  And you said the discussions,
20        if I recall correctly -- feel free to
21        correct me -- that included security
22        concerns, including open containers and
23        other things.
24             And so my question is, did those
25        meetings also talk about encampments or
```

Page 81

```
 1        people living on the Greenway in any
 2        capacity?
 3   A.   It would have included camps or abandoned
 4        property on the Greenway, but it wasn't
 5        specifically or solely about that.  It was
 6        about all the issues impacting the
 7        Greenway.
 8   Q.   Just one of those issues was encampments?
 9   A.   Correct.
10             MR. GRUNDMAN:  I'm now showing you
11        what I've marked as Exhibit 346.  It
12        consists of three pages.  The Bates is
13        HC00020224.
14             (Deposition Exhibit No. 346 was
15        introduced.)
16   BY MR. GRUNDMAN:
17   Q.   Would you take a moment to read that and
18        let me know when you've had a chance to do
19        so.
20   A.   (Reviewing document.)
21   Q.   Do you recognize the series of emails that
22        is shown in Exhibit 346?
23   A.   I do.
24   Q.   What is that?
25   A.   It's an email exchange between John
```

Page 82

```
 1        Tribbett with St. Stephens and I and
 2        others about three specific areas on the
 3        Midtown Greenway.
 4   Q.   And this email chain occurs in August of
 5        2020, correct?
 6   A.   Correct.
 7   Q.   If you turn to the second page, the email
 8        that begins the chain, it's from a
 9        person -- seems to be Jamal Fakhreddine.
10   A.   Correct.
11   Q.   Do you know who that is?
12   A.   Yes.  He was a patrol officer at Hennepin
13        County Security.
14   Q.   And we talked earlier about how Hennepin
15        County Security would sometimes send
16        descriptions of the property, and pictures
17        along the Greenway.
18             Is that correct?
19   A.   Correct.
20   Q.   Fair to say the email on page 2 of 346 is
21        one of those emails that we talked about
22        earlier?
23   A.   Correct.
24   Q.   Then the next email in the chain is from
25        you, right?
```

Page 83

1   A.   Yep.  Yes.

2   Q.   And so if you turn to page 2, the bulk of

3        your email I think is starting on that

4        page.  It seems as though -- well, let me

5        just ask.

6             What were you trying to convey or to

7        do with this email?

8   A.   It looks like I'm asking John Tribbett

9        with St. Stephen's; David O'Connor, who

10       worked with Grant Snyder and MPD; and Don

11       Ryan about three specific areas, three or

12       four.

13            So I'm asking first if two different

14       locations have been abandoned on the

15       Greenway.

16            Then I'm asking if they've had any

17       contact with people camping on the

18       Nicollet Avenue Bridge deck.

19            And then I'm asking for their help to

20       reach out to people camping between 12th

21       and 13th Avenues.  We needed to relocate

22       people camping there for a construction

23       project by the adjacent property owner.

24  Q.   Couple of questions about that.

25            So you use -- at the very beginning

Page 84

```
 1        of your email, you say "our clean up
 2        vendor."
 3             We talked about several different
 4        entities that you had contracted with.  Do
 5        you know which cleanup vendor you were
 6        referencing?
 7   A.   At this time, it would have been Tree
 8        Trust or All Purpose Cleaners, I believe.
 9   Q.   But looking at 346, you can't tell which
10        vendor you were specifically referencing
11        in that email?
12   A.   I cannot.
13   Q.   One of those two?
14   A.   I think so.
15   Q.   And then you mentioned that -- the third
16        paragraph in your email talks about
17        relocating people between 12th and 13th
18        Avenues.
19             Do you see that?
20   A.   I do.
21   Q.   And that was for construction work or
22        because of a construction project?
23   A.   Correct.
24   Q.   What else do you remember about that
25        circumstance?
```

Page 85

1          MS. PIERCE:  Objection.  Vague.

2    A.  So the adjacent property owner to the

3         north of the Midtown Greenway on that

4         block was demolishing part of their

5         building.  This is a common occurrence

6         with neighbors of ours.  They'll reach out

7         to get a temporary construction permit.

8         Though specifically here, they wanted to

9         put a safety fence onto the Midtown

10        Greenway so they had some room, so

11        construction debris didn't hurt anyone.

12             People were camping in that specific

13        location, so we reached out, asked them to

14        move to a different part of the Greenway

15        so that demolition work could be completed

16        safely.

17   BY MR. GRUNDMAN:

18   Q.  You talked earlier about a Nicollet

19        Bridge.  So paragraph 2 talks about the

20        Nicollet Avenue Bridge deck.  Is that

21        correct?

22   A.  Correct.

23   Q.  So is that -- are you talking about the

24        same encampment in paragraphs 2 and 3, or

25        are those two different groups of people

Page 86

1          living on the Greenway?
2     A.  Those are different.
3     Q.  So then in the last email in the chain --
4          well, excuse me.
5               The next email in the chain, from
6          John Tribbett, shows up on the first page.
7          Do you see that?
8     A.  I do.
9     Q.  Who is Mr. Tribbett?
10    A.  He worked with St. Stephen's.  I think he
11         was the manager of street outreach teams,
12         but I don't know his official title.
13    Q.  We talked earlier about how once you
14         started the contract with Hennepin
15         Security, my recollection is that then you
16         said your work with St. Stephens and Avivo
17         had gone down at that time.
18              Is that correct?
19    A.  I think I also said that the nature of the
20         executive order in place in 2020 was that
21         we weren't removing camps.  So that also
22         curtailed our reaching out to St.
23         Stephen's and Avivo.
24              But if we were talking about specific
25         camps, if anyone had made contact, or if

Page 87

1        we needed people to make contact because
2        we were going to clean it, then we would
3        have reached out to them as well.
4    Q.  So was there still a contract with St.
5        Stephen's at that time?
6            MS. PIERCE:  Objection.  Foundation.
7    A.  Again, I don't believe Authority ever had
8        a contract with St. Stephen's.  I think
9        there was at one time a contract with the
10       County, or St. Stephen's received funding
11       from the County.
12   Q.  And so you understood that when it came
13       time to clear an encampment, then the
14       Authority could also call upon St.
15       Stephen's to help make contact with the
16       people at that encampment?
17   A.  Contracts aside, we just had had many
18       years of reaching out to them if there
19       were encampments.
20   Q.  And had you worked with John Tribbett
21       particularly for years?
22   A.  Yes.
23   Q.  And any other -- just in this context with
24       regards to encampments, or in other
25       contexts?

1   A.   Just in regards to this context.

2   Q.   When you say "years," like approximately

3        what year did that begin?

4   A.   I'm not sure.  I know we worked with his

5        predecessor -- I believe his name was

6        David Jeffries -- prior, who then went to

7        Avivo.  So probably as far back as 2010

8        we've been working with both of those

9        gentlemen.

10  Q.   In Mr. Tribbett's email, first page of

11       Exhibit 346, if you see the last paragraph

12       of his email, he mentions that the parks

13       have begun to sweep several sites.

14            Do you see that?

15  A.   I do.

16  Q.   And so it seems to me that -- well, he

17       says that:

18            "...you may see an uptick in

19            occupancy of Greenway sites."

20            Do you see that?

21  A.   I do.

22  Q.   Did that happen?

23            MS. PIERCE:  Objection.  Vague.

24  A.   I can't remember when specifically, but at

25       some point in the summer we did see an

1         increase in people camping on the

2         Greenway.

3    BY MR. GRUNDMAN:

4    Q.  And in your response email, you said that

5         you understand that -- about the increase

6         in encampments on the Greenway, correct?

7    A.  I see that.

8    Q.  At the very beginning of your email --

9         well, I should say your second email back

10        to Mr. Tribbett at the top of page 346,

11        you reference that -- you say the Nicollet

12        camp may be exclusively on City property.

13             Do you see that?

14   A.  I do.

15   Q.  Why was that significant.  Why did it

16        matter?

17             MS. PIERCE:  Objection.  Vague.

18   A.  It matters because the agency that owns

19        the property would be responsible for the

20        decision-making of whether or not camp was

21        cleared.

22             So at that location, there is city

23        property immediately south of the Midtown

24        Greenway, so it was important to know

25        where the camp was, and who owned the

```
 1        underlying property.
 2   BY MR. GRUNDMAN:
 3   Q.  And that would affect your work with
 4        regard to that encampment because you
 5        wouldn't be able to decide whether to
 6        clear it.
 7             Is that the issue?
 8   A.  That is correct.  That's correct.  I would
 9        not clear a camp on city property.
10             (Exhibit No. 347 was introduced.)
11   BY MR. GRUNDMAN:
12   Q.  Ms. Galatz, I'm now showing you a document
13        marked as Exhibit 347.  Consists of two
14        pages, Bates HC00017572.
15             Would you take a moment to read that
16        and let me know when you've finished,
17        please.
18   A.  (Reviewing document.)
19             I'm done.  Thank you
20   Q.  I'm going to, when we talk about that,
21        show you a document that is already in our
22        record here as Exhibit 121.
23             (Deposition Exhibit No. 121 was
24        previously marked.)
25   BY MR. GRUNDMAN:
```

Page 91

1    Q.   Do you see that?

2    A.   I do.

3    Q.   This is two pages.  Have you had a chance

4         to review it?

5    A.   Yes.

6    Q.   So directing you first to Exhibit 347, you

7         talked earlier about an encampment between

8         12th and 13th Avenues, correct?

9    A.   Correct.

10   Q.   Well, let me ask, do you recognize Exhibit

11        347?

12   A.   Yes.

13   Q.   What is it?

14   A.   An email chain.  The last email is from me

15        to Jeff Storms and Todd Miller, I guess

16        and Steven Labatt.

17   Q.   What is the general topic of Exhibit 347?

18   A.   Relocation of the camp on the Midtown

19        Greenway between 12th and 13th Avenues.

20   Q.   And so this is the camp we talked about

21        earlier that was -- you needed to move the

22        people there because of this construction

23        project; is that correct?

24   A.   Correct.

25   Q.   Exhibit -- well, Exhibit 347 seems to have

Page 92

1          an attachment.  Do you see that?
2               It's toward the top of the first page
3          of Exhibit 347.
4     A.   Oh, sure.  Yes.  Thank you.
5     Q.   And if you look at Exhibit 121, is that
6          the attachment that's referenced in
7          Exhibit 347?
8               MS. PIERCE:  And I'll object here
9          just to indicate that these are not
10         sequential Bates numbers, so they weren't
11         produced together.
12              But if the witness can answer, then
13         I'm happy to let her answer.
14    BY MR. GRUNDMAN:
15    Q.   And so, Ms. Galatz, just to your
16         knowledge, does Exhibit 121 seem to be the
17         attachment to the email in Exhibit 347,
18         from what you know about the email?
19    A.   It seems to be, yes.  The attachment is
20         entitled "Cleanout Notice."  This is a
21         cleanout notice for this area.
22    Q.   And you told us earlier that you were the
23         one who drafted the notices that were
24         used; is that correct?
25    A.   Most of the time, and I believe I drafted

Page 93

1    this one in particular.

2  Q.  Exhibit 347 is -- the first email in it is

3      from Tracey Martin.

4         Do you see that?

5  A.  I do.

6         Well, I think the first email is from

7      Michael Noonan.

8  Q.  You're right.  Sorry about that.

9         So then Mr. Noonan sends an email,

10     and you are copied on that email, correct?

11 A.  Correct.

12 Q.  And that's to Tracey Martin, correct?

13 A.  Correct.

14 Q.  Who is Tracey Martin?

15 A.  I believe Tracey Martin works in the

16     Hennepin County Sheriff's Office.

17 Q.  And so the last email is from you back to

18     Tracey Martin, correct?

19         MR. PIERCE:  Objection.  Misstates

20     the document.

21 A.  It's from me to Jeffrey Storms, Todd

22     Miller and Steven Labatt.

23         And then -- oh, it copies several

24     people, including Tracey Martin.

25 Q.  And it begins with "Major Storms" at the

Page 94

1        beginning, correct?

2   A.   Correct.

3   Q.   Who is Major Storms?

4   A.   I believe that's Jeffrey Storms in the

5        Hennepin County Sheriff's Office.

6   Q.   What was the -- well, stepping back, in

7        general, what did you do to work with --

8        what kind of work did you do with Major

9        Storms?

10            MS. PIERCE:  Objection.  Vague.

11  A.   I don't believe I had a lot of direct work

12       with Major Storms.  I remember a few

13       communications, but not on a daily or even

14       weekly basis, between me and Jeffrey

15       Storms specifically.

16  BY MR. GRUNDMAN:

17  Q.   Generally speaking, what was the purpose

18       for you to interact with Major Storms in

19       the few instances that you did?

20  A.   In 2020, we had Hennepin County Sheriff's

21       Office with us on days we were doing

22       cleanup activities on the Midtown

23       Greenway.

24            And I think here on this email

25       specifically, we were asking if they could

Page 95

```
 1        be available on site in case people
 2        weren't willing to relocate from the camp
 3        between 12th and 13th Avenue.
 4   Q.   Was it common to have members of the
 5        sheriff's office on site?
 6             MS. PIERCE:  Objection.  Asked and
 7        answered, vague.
 8   A.   On site when specifically?
 9   BY MR. GRUNDMAN:
10   Q.   So we talked a lot earlier about your
11        regular visits to the camps along the
12        Greenway, and you told me who was there.
13             And the sheriff's office was not
14        there on those typical visits, correct?
15   A.   That's correct.  They weren't always
16        there.
17             There were days we went out to just
18        clean abandoned materials and unpermitted
19        materials in the fall of 2020, and the
20        sheriff's office was with us on those
21        days, I believe.
22   Q.   And so this email, Exhibit 347, is you --
23        well, let me back up.
24             You described your role with regard
25        to encampments as something of a
```

Page 96

```
 1        coordinator; is that correct?
 2   A.   That's correct.
 3   Q.   And this email is your attempt to
 4        coordinate with the sheriff's office with
 5        regard to clearing this particular
 6        encampment, correct?
 7             MR. PIERCE:  Objection.  Misstates
 8        the record.  Vague.
 9   A.   I would say yes, this email speaks to my
10        coordination with the sheriff's office.
11   BY MR. GRUNDMAN:
12   Q.   The last paragraph in your email to Major
13        Storms and others, would you just read
14        that one more time, and tell me when
15        you've had a chance to do that.
16   A.   (Reviewing document.)
17             I have had a chance to finish.
18   Q.   I'm trying to understand the last three
19        sentences of that paragraph.  And you can
20        read them; they're in the record.  I won't
21        read them back to you.
22             But what do you mean by saying that:
23             "We do not wish to formally
24             Trespass anyone"?
25   A.   We wanted to work with people camping
```

1        there to move to a different site on the
2        Midtown Greenway, and we wanted to do it
3        cooperatively with them.  And we did, I
4        should say.
5   Q.  In this specific instance?
6   A.  This, yes.
7   Q.  It ends with -- well, not quite the last
8        sentence, but that:
9              "If they refuse to leave, [that]
10             we will have to resolve the issue
11             another way."
12             Do you see that?
13  A.  I do.
14  Q.  So you just told us this, but you didn't
15       end up having to use another way, is that
16       correct, in this situation?
17  A.  That's correct.
18  Q.  What was being asked is that the people
19       would just move from that specific spot on
20       the Greenway to another spot on the
21       Greenway?
22  A.  That's correct.
23  Q.  And they were willing to do that?
24  A.  That's correct.
25  Q.  Were you there that day?

1   A.   I can't recall.

2   Q.   That's your understanding is that they

3        were willing to move?

4   A.   Correct.

5             And I was on site leading up to that

6        day, and I think I was on site that

7        morning, but I can't recall specifically.

8        But they did move.

9   Q.   So you personally talked to the residents

10       at that location?

11  A.   I did.

12            MS. PIERCE:  I'm going to have a

13       standing objection to the use of the word

14       "residents" as vague.

15  A.   I did talk to people at that camp.

16  BY MR. GRUNDMAN:

17  Q.   When you wrote this email and you said:

18            "...we will have to resolve the

19            issue another way,"

20       what other way did you mean?

21  A.   I think I meant we would use the trespass

22       option, or options like that.  But we

23       didn't have to.  So I'm not familiar.

24  Q.   And when you say:

25            "We do not wish to formally

Page 99

```
 1            Trespass anyone,"
 2            who do you mean by "we"?
 3   A.   The Authority.
 4   Q.   Did that -- where did that desire come
 5        from?  Was that explained to you by
 6        Mr. Noonan, or was that your own?
 7   A.   We were trying to work under the
 8        parameters as we understood them on the
 9        executive order.
10   Q.   So it wasn't an order that was passed down
11        from county leadership?
12   A.   I couldn't say.  I couldn't say.
13   Q.   Sorry.  Go ahead.
14   A.   Well, yeah, I don't know.  I just -- I
15        think we were trying to work with people
16        cooperatively on site.
17   Q.   Back to Exhibit 121.  We talked about
18        notice earlier today.
19            You told us that you have drafted
20        notices in the past for much of the time
21        you've been working for the Authority; is
22        that right?
23   A.   I wouldn't say it that way.
24            Oh, I have coordinated cleanup of
25        encampments since I started working at the
```

1            County.  I have drafted notices like this
2            since -- I don't know -- around 2016.
3      Q.   So this notice states that the area will
4            be cleared of discarded materials, among
5            other things.  But do you see where it
6            says that?
7      A.   Yes, I do.
8      Q.   It says:
9                  "Please take all personal
10               belongings with you."
11               Correct?
12     A.   Correct.
13     Q.   "Anything left (sic) will be removed."
14               Right?
15     A.   Yes.
16               MS. PIERCE:  Objection.  It's not
17          what the document says.  You just misread
18          it.
19     BY MR. GRUNDMAN:
20     Q.   Ms. Galatz, my question is, was there any
21          plan to help people with the packing of
22          their belongings?
23     A.   I don't know at this site if we offered
24          that.
25     Q.   When you say you don't know, what would

Page 101

1      help you know whether that was offered or
2      not?
3  A.  So I'm sorry.  Your question was did we
4      offer to help people pack their
5      belongings?
6  Q.  I'm looking at this notice, Exhibit 121,
7      and it seems to me to be a direction to
8      people to take their belongings with them.
9          Correct?
10 A.  Correct.
11 Q.  Do you recall giving people the option of
12     storing their personal property that -- in
13     some way that the Authority would help
14     them with?
15 A.  Not at this location.
16         We may have given them bags.
17 Q.  You didn't offer to help them store their
18     property somewhere else?
19 A.  I don't believe the Authority offered that
20     here, no.
21 Q.  Did anyone else besides the Authority
22     offer it, referring to this encampment?
23 A.  I don't know.
24 Q.  You didn't help coordinate?
25 A.  I did not.

1   Q.   I know you said you don't recall if you
2        were there that day or not, but you've
3        been there other days, correct?
4   A.   Correct.
5   Q.   And you also told us earlier that you
6        helped contract with entities to help
7        remove the personal property that's left
8        there, correct?
9   A.   I contracted with companies to clear
10       abandoned materials and unpermitted
11       materials.
12  Q.   Did you do that with regard to the
13       encampment referenced in Exhibit 121 and
14       Exhibit 347?
15  A.   I don't remember specifically.
16            I do remember they moved
17       cooperatively, and we probably cleaned up
18       the site after they had moved and before
19       the fencing went up by our adjacent
20       property owner.
21  Q.   So some property was removed from that
22       encampment?
23            MS. PIERCE:  I'm also going to have a
24       standing objection on the record to the
25       use of the word "property" as vague and

```
 1        requiring a legal conclusion.
 2   A.   I don't remember specifically the cleanup
 3        needed at this site.  I don't remember if
 4        everything was taken by the campers or if
 5        we did a little cleanup afterwards.  I
 6        don't remember.
 7               MS. PIERCE:  Luke, we've been
 8        going about an hour.  Do you want to take
 9        a break?
10             MR. GRUNDMAN:  Ms. Galatz?
11             THE WITNESS:  Sure.
12             MR. GRUNDMAN:  That sounds good.  Go
13        off the record.
14             (Break taken.)
15   BY MR. GRUNDMAN:
16   Q.   Ms. Galatz, we are back on the record.
17        The same rules apply.
18   A.   Okay.
19   Q.   I'm showing you what's been --
20             MS. PIERCE:  Just for pronunciation,
21        it's "Ga-lat."
22             MR. GRUNDMAN:  "Ga-lat."  I'm sorry
23        about that.  You probably told me at the
24        beginning, but --
25             THE WITNESS:  That is okay.
```

```
 1          MR. GRUNDMAN:  Galatz
 2       (pronunciation).  Sorry.
 3  BY MR. GRUNDMAN:
 4  Q.  So just before the break, we were talking
 5       about Exhibit 347, which you should also
 6       still have in front of you.
 7            And I've now just handed you Exhibit
 8       348.  Consists of two pages,
 9       Bates-numbered HC00020364.
10            (Deposition Exhibit No. 348 was
11       introduced.)
12  BY MR. GRUNDMAN:
13  Q.  Do you recognize Exhibit 348?
14  A.  I recognize the emails that I'm copied on
15       or that are from me, but I don't think
16       they're the most -- the top email includes
17       me.
18  Q.  Just to clarify things, so Exhibit 347,
19       which we were talking about before, that
20       same email chain is also contained in
21       Exhibit 348, correct?
22  A.  Correct.
23  Q.  But then there's, as you've just
24       mentioned, a new email at the top; is that
25       correct?
```

Page 105

1    A.   Correct.

2    Q.   And that one does not -- was not addressed

3         to you, as you just said, correct?

4    A.   The top one is not.

5    Q.   In that email, though, if you read with

6         me, the third to the last sentence

7         references -- it says:

8              "Jessica called me this morning

9              and I reminded her of the

10             conversation that Joe and I had

11             and she also agreed."

12             To your understanding, is -- when the

13        person who wrote this email, Todd Miller,

14        references "Jessica," is he talking about

15        you, to your knowledge?

16   A.   Yes.

17   Q.   So even though you weren't copied on this

18        email, it talks about a conversation

19        between you and lieutenant Todd Miller,

20        correct?

21   A.   Correct.

22   Q.   And you told us earlier that Lieutenant

23        Miller is the supervisor or a supervisor

24        with Hennepin County Security, correct?

25   A.   Correct.

Page 106

```
 1   Q.   And he was one of the people from Hennepin
 2        County Security you worked with fairly
 3        frequently on encampments?
 4   A.   Correct.
 5   Q.   And so this -- the email chain we talked
 6        about before, Exhibit 347, is with regard
 7        to an encampment on the Greenway between
 8        12th and 13th Avenues, correct?
 9   A.   Correct.
10   Q.   So the conversation that you had with Todd
11        Miller was also relating -- that's
12        referenced in Exhibit 348, that also was
13        relating to that same encampment, correct?
14   A.   That is what I would think based on these
15        emails.
16   Q.   So I'm asking you to look at this email to
17        help better understand what Hennepin
18        County Security's role with regard to
19        encampment clearing was.
20             And so I understand you didn't write
21        it, but I'm wondering if this might help
22        us understand, because the email talks
23        about how -- it says in the second
24        sentence that:
25             "...we are not enforcement and it
```

Page 107

```
 1              may be better suited for Grant
 2              Snyder and his team."
 3              And it's in response to an email
 4         we've already talked about that was with
 5         regard to clearing this encampment.
 6              Are you familiar with Lieutenant
 7         Miller and Hennepin County Security not
 8         wanting to participate in encampment
 9         clearings?
10              MS. PIERCE:  Objection.  Misstates
11         the record.  Assumes facts not in
12         evidence.
13    A.   Lieutenant Miller says here "we are not
14         enforcement."
15              I do recall that Hennepin County
16         Security would provide some services to
17         people on the Midtown Greenway.  They
18         would pass out water.  They would provide
19         resources for shelter.
20              And as Lieutenant Miller says in
21         here, they don't want to jeopardize their
22         relationship with people staying on the
23         Midtown Greenway.
24    BY MR. GRUNDMAN:
25    Q.   So that makes sense to you that he
```

Page 108

```
 1        wouldn't want to jeopardize that
 2        relationship?
 3              MS. PIERCE:  Objection.  Vague.
 4   A.   Yeah, I can certainly understand how being
 5        an enforcement -- playing an enforcement
 6        role could jeopardize the relationship
 7        they have made with the campers.
 8   BY MR. GRUNDMAN:
 9   Q.   And we mentioned Christopher Esparza, we
10        talked about earlier.  The Lieutenant
11        Miller email references a person named
12        "Chris."  Are those the same people to
13        your knowledge?
14   A.   Yes.
15   Q.   So he's concerned about the relationship
16        that Mr. Esparza and the others who worked
17        for Security, Hennepin County Security,
18        have made with the people living along the
19        Greenway?
20   A.   Correct.
21   Q.   So when he says it's better suited for
22        Grant Snyder and his team, we talked about
23        Mr. Snyder earlier.
24              He works for Minneapolis Police
25        Department, or did at the time, correct?
```

1   A.   Correct.

2   Q.   Why do you think assisting with the sweep

3        would ruin the relationship that

4        Mr. Esparza had with the people living

5        along the Greenway?

6            MS. PIERCE:  Objection.  Misstates

7        the record.  Calls for speculation.

8        Incomplete hypothetical.

9   A.   So I would say the people that were

10       camping here moved cooperatively to a

11       different space on the Midtown Greenway,

12       so that didn't happen.

13           But, yeah, they wanted to maintain

14       their relationship as patrol that could

15       provide services and access to resources.

16  BY MR. GRUNDMAN:

17  Q.   And participating in the sweep would have

18       had an impact on that?

19           MS. PIERCE:  Objection.  Calls for

20       speculation, vague.

21  A.   Yeah, I don't know what would have

22       happened because it didn't.

23  BY MR. GRUNDMAN:

24  Q.   You mentioned earlier that there was a --

25       well, talked about it with regard to one

                                        Page 110

1           of the other exhibits, but that there was

2           also a clearing of an encampment that took

3           place on the Nicollet Bridge.

4                You referenced that encampment,

5           correct?

6                MR. PIERCE:  I'm going to have a

7           standing objection to -- as vague to the

8           use of the word "clearing" as well.

9    A.  I did.

10   BY MR. GRUNDMAN:

11   Q.  Tell me, what do you remember about that

12          encampment?

13   A.  I remember that people were camping on the

14          Nicollet Avenue Bridge deck.

15               So the Midtown Greenway is a trench,

16          so there are city streets that cross the

17          trench at every block, or about.  But

18          Nicollet Avenue is not an open road, so

19          it's just a bridge deck with no hard line.

20               So people were camping there.  And we

21          had concerns about the stability of the

22          bridge and people camping on it, so for

23          their safety.  And we had concerns about

24          the safety of the camp in general.

25   Q.  And what happened with that encampment?

```
                                        Page 111

 1           MS. PIERCE:  Objection.  Vague.
 2  A.  Ultimately that the people at the camp
 3       were asked to leave, they did leave, and
 4       then we cleaned up everything left behind.
 5  BY MR. GRUNDMAN:
 6  Q.  And that was the Authority that did that
 7       work?
 8  A.  That's correct, and our contractors.
 9  Q.  Were you there when it happened?
10  A.  I was there in the beginning of the day,
11       and I think I was there maybe the
12       following day when we were completing
13       fence installation, but I wasn't there for
14       the entirety of that clearing.
15  Q.  Had you been there before the clearing
16       took place?
17  A.  I had.
18  Q.  How many times, approximately?
19  A.  I don't know.  Several.
20  Q.  About how many people were living there?
21  A.  I don't know the exact number, but it
22       increased over time.
23  Q.  More than five?
24  A.  More than five.
25  Q.  More than ten?
```

Page 112

```
1   A.   I don't know.  I think more than ten, but
2        I don't remember the exact number.
3   Q.   Did you talk with any of the people living
4        there directly?
5   A.   I don't recall if I talked to anyone at
6        that camp.
7   Q.   We spent some time looking at Exhibit 121
8        earlier.  You had said that that was a
9        notice that you had drafted.
10            And I understand that was with regard
11       to a different encampment, the one between
12       12th Avenue and 13th Avenue, correct?
13  A.   Correct.
14  Q.   Was a notice like the one shown in Exhibit
15       121 used with regard to the Nicollet
16       Bridge encampment clearing?
17  A.   So I was a little less directly involved
18       in Nicollet as many other sites on the
19       Greenway.  I believe we drafted a notice,
20       and it was hand-delivered and posted on
21       site.
22  Q.   Why were you less involved with that
23       encampment clearing?
24  A.   I think Joe Gladke was more involved in
25       that camp in particular.
```

```
                                         Page 113

 1  Q.  Do you remember, was there a discussion

 2      that you would be less involved with that

 3      one?

 4          Or I'm just trying to understand why

 5      that was that Mr. Gladke was more involved

 6      than you.

 7  A.  Certainly.

 8          This camp may have been the first one

 9      we cleared since the executive order, so

10      it was just elevated.

11  Q.  So the bridge was cleared prior to the

12      encampment between 12th and 13th Avenues?

13          MS. PIERCE:  Objection.  Miss- --

14  A.  I don't know if that's correct.  I guess

15      at the time I didn't look at them in the

16      same way.  Because 12th to 13th, people

17      were being asked to move.

18          Like even across the trail, down a

19      block, Nicollet, we were asking people to

20      leave that area, leave Nicollet Avenue

21      Bridge deck.

22  BY MR. GRUNDMAN:

23  Q.  So Mr. Gladke was more directly involved,

24      from the Authority; is that correct?

25  A.  Yes.
```

Page 114

1   Q.   Who else was involved with the clearing of
2        the Nicollet Avenue Bridge deck?
3             MS. PIERCE:  Objection.  Foundation.
4   A.   Well, the Authority was involved.  We
5        worked with I imagine Hennepin County
6        Security and the sheriff's office.  And we
7        worked with a contractor, JD Pride, for
8        the cleanup and fencing.
9   Q.   So talked about JD Pride earlier, correct?
10       That was one of the $50,000 not-to-exceed
11       contracts that you had; is that right?
12  A.   That contract, I didn't know the
13       not-to-exceed amount.  But yes, they're
14       one of the contractors we used in that
15       time period.
16  Q.   Do you remember, were there meetings prior
17       to the Nicollet Avenue Bridge clearing
18       that you attended specifically that were
19       focused on the clearing of the encampment?
20  A.   I can't recall if there were meetings
21       specifically, but I know there was
22       planning and emails around it, phone
23       calls.
24  Q.   Were the executive orders still in effect
25       at that time?

Page 115

1   A.  I believe so.

2   Q.  And so you -- so the executive orders were

3       still in effect -- we talked about this a

4       little bit earlier, but someone made the

5       decision that the camp could be cleared

6       regardless of the executive orders,

7       correct?

8           MR. PIERCE:  Objection.  Vague.

9   A.  I guess I couldn't speak to someone else's

10      decision-making.  But the camp was cleared

11      because it was on a 100-plus-year-old

12      bridge deck and deemed to be unsafe.

13  BY MR. GRUNDMAN:

14  Q.  So that's why it met an exception to the

15      executive order?

16          MS. PIERCE:  Objection.  Calls for

17      legal conclusion, and foundation.

18  A.  Yeah, it would be difficult for me to say.

19      I know from my perspective, the age of the

20      bridge was a concern if it were to fall.

21          I didn't make assessment of other

22      criteria for the executive order.

23  BY MR. GRUNDMAN:

24  Q.  So then the morning of the sweep, you said

25      you were there in the morning, but didn't

Page 116

```
 1       stay the whole day; is that right?
 2  A.   I recall being on site with Grant Snyder,
 3       Joe Gladke.  And I remember that I wasn't
 4       there the rest of the day.  So I might
 5       have had other work going on or conflicts.
 6  Q.   About what time did you get there?
 7  A.   I don't recall.  Sometime in the morning.
 8  Q.   Do you remember if it was still dark out?
 9       Was it light out?
10  A.   It was light out.  I remember that.
11  Q.   And at that time, did you talk to any of
12       the people living there?
13          MS. PIERCE:  Objection.  Assumes
14       facts not in evidence, misstates the
15       record.
16  A.   I don't think I spoke to anyone at that
17       time.  I think notices were handed out
18       previously by an enforcement agency and
19       outreach workers, not by me.
20  BY MR. GRUNDMAN:
21  Q.   Which outreach workers?
22          MS. PIERCE:  Objection.  Foundation.
23  A.   I believe Don Ryan was on site.
24  BY MR. GRUNDMAN:
25  Q.   Did you see anyone else speaking directly
```

Page 117

1      to people living at the encampment that

2      morning?  Did you witness that?

3  A.  I don't recall.

4  Q.  What else do you remember from that

5      morning?

6  A.  This may sound funny, but I just remember

7      waiting, and it was kind of a chilly

8      morning.

9          So I imagine I had a conflict, like

10     another meeting.  And Joe Gladke was

11     there; other folks from the County I

12     believe were there, or Grant Snyder from

13     the City.

14         So I don't remember a lot about it

15     after that.  I left.  I wasn't there.

16 Q.  Did you come back to that encampment on a

17     different day?

18 A.  I know I inspected the fencing work on a

19     different day.

20 Q.  And that fencing work was done by one of

21     your contractors?

22 A.  Correct.

23 Q.  When you went back to inspect it, were all

24     the -- the encampment was gone at that

25     point?

Page 118

1   A.   Correct.

2   Q.   How many people were there that morning

3        who were residents?

4             MS. PIERCE:   Objection.   Assumes

5        facts not in evidence.   Misstates the

6        record.

7   A.   I don't know how many people were on site

8        that day.

9   BY MR. GRUNDMAN:

10  Q.   And when you say you don't know, I mean,

11       is it because you don't know the exact

12       number?

13            Can you give us an estimate of how

14       many people?

15            MS. PIERCE:   Same objections.

16  A.   Yeah, I don't -- I really couldn't say.

17  BY MR. GRUNDMAN:

18  Q.   You can't say if it was more than ten or

19       more than five?   You can't give us any

20       approximation of how many people there

21       were?

22            MS. PIERCE:   Same objection, and is

23       now asked and answered as well.

24  A.   Yeah, I can't -- I don't know how many

25       people or I can't remember how many people

Page 119

```
 1        were there at that site.
 2   BY MR. GRUNDMAN:
 3   Q.  Were packing materials provided to people
 4        that day?
 5   A.  Not that I know of.
 6   Q.  Was storage given as an option for people
 7        who were living there?
 8   A.  Not by the Authority.  At least not that I
 9        know of by the Authority.
10   Q.  Do you know if it was offered by anyone
11        else?
12   A.  I don't know if it was.
13   Q.  Earlier you used the word "abandoned" when
14        talking about some of the stuff that was
15        on the Greenway.
16            Do you remember that?
17   A.  I remember using the word "abandoned,"
18        yeah.
19   Q.  I should have asked you then, but how do
20        you determine when something is abandoned?
21            MS. PIERCE:  Objection.  Calls for
22        speculation, incomplete hypothetical.
23   A.  It definitely depended on many factors.
24        The condition of the materials, one of
25        them.  You know, if it's exposed to the
```

                                    Page 120

1          elements; if it's wet, if it's soiled.

2          Its location; is it by a tent, is it by

3          people, is it loose.  Does it look broken,

4          useful.  So we really have to take into

5          account all of those factors.

6                During 2020, when people were camping

7          on the Greenway, we could often also talk

8          to people and determine if items were

9          abandoned.

10   BY MR. GRUNDMAN:

11   Q.  Are those factors listed anywhere in

12          writing?

13                MS. PIERCE:  Objection.  Foundation,

14          vague.

15   A.  Not that I know of.

16   BY MR. GRUNDMAN:

17   Q.  Who made those determinations?

18                MS. PIERCE:  Objection.  Foundation,

19          vague and compound.

20   A.  At which site, or on which time period

21          specifically?

22   BY MR. GRUNDMAN:

23   Q.  Sure.

24                Well, how about this:  Did you ever

25          make that determination with regard to any

Page 121

1         property along the Greenway?

2    A.   I have.

3    Q.   In what context?  When did that happen?

4    A.   Well, as we've talked about, I've managed

5         this property for 20 years.  So throughout

6         most of that time, I -- you know, I have

7         made those determinations.

8    Q.   Is it part of your job to make those

9         determinations even now?

10   A.   Yes.

11            Yes.  Sorry.

12   Q.   That's okay.

13            MR. PIERCE:  Let the record reflect

14        that the witness just put a cough drop in

15        her mouth, and we thank counsel for their

16        patience.

17            THE WITNESS:  I'm ready.

18   BY MR. GRUNDMAN:

19   Q.   How frequently do you make that

20        determination now?

21   A.   Now, it depends.  It's solely dependent on

22        when materials are present.

23            So I will get typically a notice from

24        our Hennepin County Security patrol or our

25        maintenance crew letting us know about

```
1        materials on the Greenway.  It could be
2        any of our property, but typically the
3        Greenway, yeah.  And then we would
4        determine if it's abandoned, if we need to
5        try to make contact with people.
6   Q.   And if you make a determination that it is
7        abandoned, how does that impact what
8        happens next?
9            MS. PIERCE:  Objection.  Incomplete
10       hypothetical, calls for speculation.
11  A.   If we determine something is abandoned,
12       then we would dispose of it.
13  BY MR. GRUNDMAN:
14  Q.   Would what happen if you determined that
15       it's not abandoned?
16           MS. PIERCE:  Same objection.
17  A.   If we don't know if it's abandoned, we
18       would try to make contact with the owner
19       or someone camping at that site.
20  BY MR. GRUNDMAN:
21  Q.   How would you try to make contact?
22           MS. PIERCE:  Objection.  Incomplete
23       hypothetical, calls for speculation.
24  A.   So our Hennepin County Security are on the
25       Greenway routinely, so we would ask them
```

Page 123

```
 1        to try to make contact with someone on
 2        site.
 3   BY MR. GRUNDMAN:
 4   Q.   They're at the site more frequently, so
 5        they might run into someone who is there;
 6        is that correct?
 7             MS. PIERCE:  Same objections.
 8   A.   They patrol that Greenway several times a
 9        day, so they can try to make contact
10        during those patrols.  And they can try it
11        at different times of the day.
12   BY MR. GRUNDMAN:
13   Q.   With regard to the Nicollet Bridge
14        encampment clearing, what month did that
15        take place in?
16   A.   Well, I can see from the emails that we
17        are discussing the removal in late
18        September.  So I would put it at late
19        September, early October.
20   Q.   And just if it helps, directing you to
21        Exhibit 348, that email the second one
22        down, it's talking about the encampment
23        between 12th and 13th Avenues, correct?
24   A.   Correct.
25   Q.   So -- and if you don't remember exact
```

Page 124

```
 1        dates that's fine, but I'm -- so the

 2        bridge encampment clearing, you said you

 3        weren't sure if it happened before or

 4        after the one that's referenced in Exhibit

 5        348; is that correct?

 6  A.   That's correct.  I don't recall.

 7  Q.   But was it around the same time?

 8  A.   I would say so.

 9  Q.   Say fall of 2020 at that point, correct?

10  A.   That sounds right to me.

11  Q.   So it was getting a little colder,

12        correct?

13  A.   Yes.

14              (Deposition Exhibit No. 349 was

15        introduced.)

16  BY MR. GRUNDMAN:

17  Q.   I just handed you a document marked as

18        Exhibit 349.  It's a little longer.  This

19        one consists of seven pages, Bates

20        beginning HC00015194.

21              Would you -- I realize this is

22        something of a long one.  Would you take

23        some time to look through this email chain

24        shown as Exhibit 349 and familiarize

25        yourself with it, and let me know when
```

Page 125

1        you're ready to answer a few questions
2        about it.
3   A.   (Reviewing document.)
4             All right.  I'm almost done.
5             (Reviewing document.)
6             Okay.  I'm ready
7   Q.   So do you recognize the email -- I'll just
8        focus on the first email shown in Exhibit
9        349.  It appears to be from you to a
10       person named Binta Kanteh.
11            And do you recognize that specific
12       email?
13  A.   I do.
14  Q.   What is it?
15  A.   It's an email from me to I believe this is
16       Commissioner Conley's aide or a policy
17       aide recapping a meeting my coworker,
18       Crystal, and I had had with the Powderhorn
19       Park Neighborhood Association.
20            And then I think I'm referencing, the
21       next email down, outlining some of the
22       activities done by the County.
23  Q.   Is it -- am I correct in my interpretation
24       of this email chain is that your last
25       email shown on the first page of Exhibit

```
 1         349, it's not directly responsive to the
 2         rest of this chain.
 3              Is that correct?
 4   A.   That's correct.
 5   Q.   So you were using this chain, but then
 6         sending a new email to Commissioner
 7         Conley's aide; is that correct?
 8   A.   That's what it looks like, although I'm a
 9         little confused because that email is from
10         Commissioner Conley.  So I don't know why
11         I would send it back to her aide, but
12         that's what it looks like.
13   Q.   And so as you mentioned, this -- the
14         email, Exhibit 349, talks about a meeting
15         that took place that you personally
16         attended, correct?
17   A.   Correct.
18   Q.   And it says that it was with
19         Crystal Myslajek.  Did I pronounce that
20         correctly?
21   A.   It's Myslajek (pronunciation).  Tricky
22         one.
23   Q.   And it says that she's with Hennepin
24         County Midtown Community Works, correct?
25   A.   Correct.
```

Page 127

1    Q.   I think you told us a little bit about
2         them earlier, but would you say again what
3         is that entity within the County?
4    A.   So they are also Hennepin county
5         employees.  Midtown Community Works
6         project helps get the trail built, the
7         Midtown Greenway, and improve -- or, you
8         know, provide facilities to the area, like
9         public works facilities, like the trail
10        and other improvements.
11   Q.   So you worked with Ms. Myslajek fairly
12        frequently?
13   A.   I did, yep.  I do.
14   Q.   Your jurisdiction sort of overlapped, is
15        that right, since she worked on the
16        Greenway, and you were in charge of the
17        land involved with the Greenway?
18   A.   Correct.
19   Q.   Did Ms. Myslajek work on encampments
20        regularly?
21             MS. PIERCE:  Objection.  Foundation.
22   A.   No.
23   BY MR. GRUNDMAN:
24   Q.   Why not?
25             MS. PIERCE:  Objection.  Foundation.

Page 128

```
 1   A.   I guess it wasn't part of her job.
 2   BY MR. GRUNDMAN:
 3   Q.   And I'm just asking for your knowledge, of
 4        course.
 5   A.   Sure.
 6   Q.   To me, it sounds like we've talked about
 7        that your jurisdiction and hers sort of
 8        overlapped with regard to the Greenway.
 9             I'm just wondering, was there ever a
10        discussion about, you know, whose job it
11        would be to keep track of the encampments
12        along the Greenway?
13   A.   I think it was understood that that would
14        be in my area and not Crystal's.
15   Q.   But it was so the two of you that met with
16        someone from the Powderhorn Park
17        Neighborhood Association, correct?
18   A.   Correct.
19   Q.   Then it also says "volunteers from the
20        Sanctuary Movement."  Do you know what
21        that is?
22   A.   I understand the Sanctuary Movement to be
23        a group of volunteers that supported and
24        advocated for people experiencing
25        homelessness.
```

1  Q.  Had you worked with volunteers from the
2      Sanctuary Movement before the meeting that
3      is referenced in Exhibit 349?
4  A.  No.
5  Q.  Have you worked with them since the
6      meeting that is referenced in Exhibit 349?
7          MS. PIERCE:  Objection.  Vague.
8  A.  I had been on site with them on the
9      Midtown Greenway, but I hadn't worked
10     directly with them.
11 BY MR. GRUNDMAN:
12 Q.  The email talks about a meeting that you
13     had with them.  Would you tell me what led
14     up to that meeting or how did that meeting
15     take place?
16         MS. PIERCE:  Objection.  Compound.
17 A.  So as discussed in the email, we had --
18     the Authority had started removing
19     unpermitted materials from camps on the
20     Greenway, and that included propane tanks
21     and grills and firepits.
22         And the meeting with the PPNA and
23     Sanctuary Movement was convened to discuss
24     their concern that we were removing those
25     materials, that people would be -- might

Page 130

```
 1        be cold without them.
 2   BY MR. GRUNDMAN:
 3   Q.   Did they ask for the meeting or did you
 4        set it up?
 5   A.   I believe they asked for the meeting.
 6   Q.   Did they contact you directly?
 7   A.   I recall that Grace with PPNA convened the
 8        meeting and scheduled it.
 9   Q.   What else do you remember from the
10        meeting?
11   A.   It was a virtual meeting.  We listened to
12        their concerns about removing those
13        materials, and reiterated that that was
14        our policy and we were going to continue
15        to remove those materials.
16             But we were also working with people
17        to get them into shelter and other
18        options.
19   Q.   The date of your email is November 2nd of
20        2020, right?
21   A.   Right.
22   Q.   Halfway through the first paragraph there
23        is a reference to a date October 14th.  Do
24        you see that?
25   A.   I do.
```

Page 131

1   Q.   It states that -- I mean, my read of the

2        email -- I want to make sure this is

3        correct -- is that you started to enforce

4        that policy regarding certain items

5        beginning on October 14th.

6             Is that a correct reading?

7   A.   Yes.   That's what it says here.

8   Q.   Was that a policy that was formally

9        adopted by anyone on October 14th, or what

10       happened on October 14th to create that

11       policy?

12            MS. PIERCE:   Objection.   Compound,

13       vague.

14  A.   I don't know why it started on October

15       14th.

16  BY MR. GRUNDMAN:

17  Q.   Do you know who made the decision to start

18       banning particular items from the

19       Greenway?

20  A.   I recall that we had signs posted that

21       listed the prohibited materials, and so

22       after that, we started removing those

23       materials.

24  Q.   And I understand that there were signs

25       posted, and I'm just wondering, who

Page 132

```
 1        decided to post the signs --
 2             MS. PIERCE:  Objection.  Foundation.
 3   BY MR. GRUNDMAN:
 4   Q.  -- and make that a -- sorry.
 5             MS. PIERCE:  Sorry.
 6             MR. GRUNDMAN:  I'll start over.
 7        Sorry about that.
 8   BY MR. GRUNDMAN:
 9   Q.  Whose decision was it to post the signs
10        and to make certain items prohibited?
11             MS. PIERCE:  Objection.  Foundation.
12   A.  I don't know exactly.  But I do know that
13        I worked with Joe Gladke, and I think he
14        coordinated those signs getting made and
15        posted directly.
16   BY MR. GRUNDMAN:
17   Q.  This is an email to Commissioner Conley's
18        aide, correct?
19   A.  I believe so.
20   Q.  And is it safe to say that your -- well, I
21        think you say it in the email, third to
22        the last paragraph, is that you and
23        Ms. Myslajek were there to hear the
24        concerns and input, and relay them to
25        policymakers.
```

Page 133

```
 1          Do you see that part of the email?
 2   A.  I do.
 3   Q.  So I asked whose decision was it, and I
 4       understand you're saying that you worked
 5       with Joe Gladke.  But you were making sure
 6       to convey the concerns all the way up to
 7       the councilmember -- or excuse me -- to
 8       the commissioner herself, correct?
 9   A.  Correct.
10   Q.  Was it the understanding that the
11       commissioners could change the policy
12       regarding items on the Greenway?
13          MR. PIERCE:  Objection.  Vague.
14   A.  It's my understanding that our
15       commissioners make our policy, and they
16       could change our policy.
17   BY MR. GRUNDMAN:
18   Q.  Did the folks from Powderhorn Park
19       Neighborhood Association and the
20       volunteers from the Sanctuary Movement --
21       did they ask that you send the concerns to
22       the commissioner directly, or to her aide?
23   A.  I can't remember what they asked for
24       specifically.  But it says here that we
25       also advised them, the people we were
```

Page 134

1          meeting with, to reach out to the

2          commissioners.  So I'm sure we said that,

3          and probably said we would report to our

4          policymakers.

5     Q.   Did the policy change after the meeting?

6     A.   I don't believe so, no.

7     Q.   It continued to prohibit items such as

8          those listed in Exhibit 349?

9     A.   Correct, we did.

10    Q.   The email also states that three times

11         since October 14 -- I'm looking at the

12         second paragraph now -- there were crews

13         out to remove garbage, trash, debris and

14         the prohibited materials.

15              Do you see that?

16    A.   I do.

17    Q.   When it says "crews," are those the

18         contractors that we've talked about in the

19         past?

20    A.   Yes.

21    Q.   How did they decide what should be removed

22         as a prohibited material and what

23         shouldn't?

24              MS. PIERCE:  Objection.  Foundation,

25         compound.

1   A.   I think during this time period, we were

2        with them, Authority staff were with them

3        for those types of determinations.

4   BY MR. GRUNDMAN:

5   Q.   And when you say "we," you and Mr. Gladke?

6   A.   Correct.

7   Q.   Anyone else or just the two of you?

8   A.   I think just the two of us.

9   Q.   So you or Mr. Gladke would say, "That's

10       prohibited," and you would direct the

11       contractors to remove it?

12  A.   Correct.

13  Q.   The same goes for any property that you

14       determined to be garbage, trash or debris;

15       is that true?

16  A.   Correct.

17  Q.   Did you give any kind of notice or warning

18       before removing the prohibited items?

19            MS. PIERCE:   Objection.   I'm going to

20       do a standing objection that "notice"

21       calls for a legal conclusion and is vague,

22       the word "notice."

23  A.   So when removing prohibited materials, we

24       did not post a notice.   If people were on

25       site, we would talk to them about it, and

Page 136

```
 1        they usually were.
 2              But no, we did not post a notice
 3        because there were signs posted listing
 4        those as prohibited materials and
 5        explaining that they would be removed.
 6   BY MR. GRUNDMAN:
 7   Q.  And those posted notices, did you draft
 8        those or did someone else draft those?
 9   A.  I did not draft those.
10   Q.  Do you know who did?
11   A.  I do not.
12   Q.  Where did they come from?
13              MS. PIERCE:  Objection.  Foundation.
14   A.  I think they were drafted by our
15        communications department.
16   BY MR. GRUNDMAN:
17   Q.  At the County?
18   A.  At the County, yeah.
19   Q.  When did those start getting posted?
20   A.  Again, I don't know the exact time period,
21        but I would say in the late summer, early
22        fall time period.
23   Q.  Was it common for you to communicate
24        directly with county commissioners and
25        their staff?
```

Page 137

```
 1              MS. PIERCE:  Objection.  Vague.
 2    A.   I would say I communicate with them as
 3         needed, certainly to respond to their
 4         inquiries.
 5    BY MR. GRUNDMAN:
 6    Q.   So I've handed you a document that I've
 7         marked Exhibit 350.  This is a three-page
 8         document.  Bates begins HC00015342.
 9              (Deposition Exhibit No. 350 was
10         introduced.)
11    BY MR. GRUNDMAN:
12    Q.   If you would read the document, and let me
13         know when you've had a chance to
14         familiarize yourself with it.
15    A.   Yes.
16              (Reviewing document.)
17              Okay.  I'm ready.
18    Q.   So just to orient us, on this email chain
19         marked as Exhibit 350, it seems to me to
20         be three separate emails.  And the first
21         in the chain starts on page 2; is that
22         correct?
23    A.   Correct.
24    Q.   And it's from -- the first email is from a
25         person named Carter Casmaer, and it's
```

1          addressed to Marion Greene and several

2          other people, correct?

3     A.   Correct.

4     Q.   And then Marion Greene -- at the time

5          Marion Greene was chair of the county

6          commissioners, correct?

7     A.   I believe so.

8     Q.   And the commissioner then forwarded you

9          that email directly, correct?

10    A.   Correct.

11    Q.   And she asks you to draft an answer for

12         this person who sent the email to her,

13         correct?

14    A.   Correct.

15    Q.   And so then on the first page, moving to

16         the second, is your draft email, and you

17         sent it to Mr. Gladke for his review; is

18         that correct?

19    A.   Correct.

20    Q.   So first off, I asked you with regard to

21         the email we were just talking about,

22         Exhibit 349, that was to Commissioner

23         Conley's aide, and now you're responding

24         directly to Commissioner Greene.

25              I asked you, you know, was it common

```
 1        for you to communicate directly with
 2        county commissioners, and you said that
 3        when they made a direct request of you,
 4        then you would communicate with them,
 5        correct?
 6   A.   That's correct.
 7   Q.   And that's what is shown in Exhibit 350,
 8        right, is your opportunity to -- or you
 9        responding to a county commissioner's
10        direct request?
11   A.   Correct.
12   Q.   Would you say that happens like once a
13        month or more like once a year?
14             I mean, any sense of how frequently
15        that happens?
16             MS. PIERCE:  Objection.  Asked and
17        answered.
18   A.   It's very topic-specific.  It's just
19        it's -- there is no way to say how often
20        it would happen.
21   BY MR. GRUNDMAN:
22   Q.   And so I have some questions about some
23        things in the draft that you wrote.
24             First is at the bottom of the first
25        paragraph, it's a -- well, I guess with
```

```
 1          regard to the whole first paragraph,
 2          you're talking about the executive order,
 3          or one of them, that we've talked about
 4          today, correct?
 5    A.    Correct.
 6    Q.    And you're saying what we've already
 7          talked about, is that that order
 8          restricted the ability of local
 9          governments, including the County, to
10          remove encampments, correct?
11    A.    Correct.
12    Q.    And then at the end of that, it says that:
13                "...unlike previous years" -- and
14                I realize I'm kind of starting
15                halfway through a sentence, but
16                you can see it -- "unlike
17                previous years, the Authority
18                (sic) has not removed encampments
19                from Midtown Greenway corridor
20                since the beginning of the
21                Executive Order in March," and
22                then in parentheses "(with the
23                exception of an encampment on the
24                Nicollet Avenue bridge that was
25                removed in October)."
```

Page 141

1          Right?

2    A.   Correct.

3    Q.   Okay.  And so first question is -- so

4         talked about this somewhat, but it says

5         "unlike previous years."

6              When you said that, you're

7         referencing those times that you removed

8         encampments, as we talked about earlier,

9         before the executive order went into

10        place?

11             MS. PIERCE:  Objection to the use of

12        the word "remove," and I'll do a standing

13        objection as to that word.  And misstates

14        prior testimony.

15   A.   So yes, we would have cleared or cleaned

16        up encampments before the executive order.

17   BY MR. GRUNDMAN:

18   Q.   And then about in the middle of the first

19        page of Exhibit 350, there is a series of

20        bullet points.

21             Do you see those?

22   A.   I do.

23   Q.   And what was the purpose of including

24        those bullet points in this draft email?

25   A.   I believe Commissioner Greene had asked me

Page 142

1        to draft an email, or a script as she
2        calls it, with all of the work that had
3        been going on.  So this is outlining what
4        had been done by the Authority, the City,
5        and the County.
6    Q.  And when you compiled that list of things
7        that had been done with regard to those
8        encampments, did you get that information
9        from different sources, or was that just
10       what you knew?
11   A.  I believe this is what I knew had
12       occurred.
13   Q.  Had you already -- when you sat down to
14       write this email, did you already have
15       those bullet points or that information
16       somewhere else that you were able to
17       copy-paste from, or did you write it that
18       same day?
19   A.  I don't recall.
20   Q.  Just there wasn't like a standing document
21       that you had if someone asked a question
22       about what was being done that you could
23       consult in response to an email like this?
24           You don't remember a document like
25       that?

1  A.  I don't remember a document like that.

2  Q.  And then after that first set of bullet

3      points, there is like a second set of

4      bullet points that goes from the first

5      page to the second.

6          Do you see those?

7  A.  I do.

8  Q.  And those seem focused on shelters and

9      available space for people to go to,

10     correct?

11 A.  Correct.

12 Q.  When you gathered that information, was

13     that something that you got from others,

14     or did you know that yourself?

15 A.  I think this would have been information I

16     would have had to get from others.

17 Q.  We talked about Don Ryan being a person

18     who provided shelter resources to people;

19     is that right?

20 A.  Correct.

21 Q.  Might he have been one of the people you

22     got this information from?

23          MS. PIERCE:  Objection.  Calls for

24     speculation.

25 A.  He might have been one.

1   BY MR. GRUNDMAN:

2   Q.  Anyone else that you can think of that

3        would have provided that?

4             MS. PIERCE:  Objection.  Calls for

5        speculation.

6   A.  We would have also worked with David

7        Hewitt and Danielle from his office for

8        updates on these numbers.

9   BY MR. GRUNDMAN:

10  Q.  Do you think it's possible that one of

11       them provided that information then?

12            MS. PIERCE:  Same objection.

13  A.  It's possible.  I don't recall.

14  BY MR. GRUNDMAN:

15  Q.  You just said a moment ago that Mr Hewitt

16       and his staff may have provided you

17       updates on these numbers.  Was that

18       information that you regularly got updated

19       from them?

20  A.  I believe so.

21  Q.  In what form?

22  A.  So I would say Joe Gladke or I would have

23       gotten updates on the number of shelter

24       beds available.

25  Q.  From Mr. Hewitt or his staff?

Page 145

1  A.  Or his staff.  But I don't remember if we
2      would have to reach out for it or if that
3      was in like a routine email.  I can't
4      recall.  But I remember that we wanted to
5      know updates on that information.
6  Q.  Just not sure exactly in what form they
7      gave you those updates?
8  A.  Correct.
9  Q.  These are some fairly specific numbers,
10     correct?
11         MS. PIERCE:  Objection.  Vague.
12 A.  Yes.
13 BY MR. GRUNDMAN:
14 Q.  I've handed you a document I've marked as
15     Exhibit 351.  It seems to be a three-page
16     email chain, Bates begins HC00012289.
17         (Deposition Exhibit No. 351 was
18     introduced.)
19 BY MR. GRUNDMAN:
20 Q.  If you could read it and familiarize
21     yourself with it and let me know when
22     you're ready to proceed.
23 A.  (Reviewing document.)
24         I'm ready.
25 Q.  So beginning with the first email in the

1       chain, starts on the second page, goes to

2       the third, appears to be an email from Joe

3       Gladke to Don Ryan, and you are copied on

4       that email.

5           Is that correct?

6  A.  Correct.

7  Q.  And then you mentioned earlier a person

8       named Eddie.  I see a name on this email

9       of Edward Weibye.

10 A.  Yes.

11         MS. PIERCE:  It's "Wee-b."

12 BY MR. GRUNDMAN:

13 Q.  "Wee-b."

14         Is that the same person as Eddie that

15      we were talking about earlier?

16 A.  Yes.

17 Q.  And so Mr. Gladke sends an email just to,

18      like I said, help orient us here, and he's

19      asking for Mr. Ryan to help provide

20      information about other housing options;

21      is that correct?

22 A.  Correct.

23 Q.  And then Mr. Ryan in a response starting

24      at the bottom of the first page, then

25      moving onto the second page, provides some

```
 1        information about housing options,
 2        correct?
 3  A.   Correct.
 4  Q.   And the date of Mr. Ryan's response is
 5        November 17th of 2020, correct?
 6  A.   Correct.
 7  Q.   And the email we were just talking about,
 8        Exhibit 350, the date on that one is
 9        November 19th of 2020, correct?
10  A.   Correct.
11  Q.   That's just two days after the email from
12        Mr. Ryan.
13  A.   Correct.
14  Q.   And very top of the second page,
15        Mr. Ryan's email begins with:
16              "Shelters are full now..."
17            Do you see that?
18  A.   I do.
19  Q.   Help me understand it.  There seems to be
20        some inconsistency between Mr. Ryan's
21        email on November 17th with your draft
22        email on November 19th.
23            MS. PIERCE:  Objection.  Misstates
24        the documents.
25  A.   I can -- what is your question in
```

Page 148

1          particular?

2     BY MR. GRUNDMAN:

3     Q.  Sure.

4               So Mr. Ryan says that shelters are

5          full.  He does say -- I'm not trying to

6          certainly read the document.  He says that

7          sometimes there are openings when people

8          don't follow through with referrals at the

9          end of the day, et cetera.

10              I'm paraphrasing.  Go ahead and read

11         it yourself.  But he does say that

12         shelters are full.

13              And then two days later, you say that

14         there are --

15              "...40 private rooms available

16              for families with children are

17              going unused every day."

18              And a little further down from that:

19              "About 30 to 40 single adult

20              shelter beds are going unused

21              every night."

22              So that's as many as 80 shelter

23         openings.  But just two days earlier,

24         Mr. Ryan said that the shelters were full.

25              I'm just asking for your help in

Page 149

1        explaining those two emails.

2               MS. PIERCE:  I'll just object that it

3        misstates the documents and the record.

4   A.   So I can't recall where specifically I got

5        the information for my email on November

6        19th.  But I wouldn't have known that, so

7        I would have had to get this updated

8        information.

9   BY MR. GRUNDMAN:

10  Q.   From someone else?

11  A.   From someone else.

12               I see that Don Ryan says in his email

13        that shelters are full, and then lists

14        other options.

15  Q.   And I see that, too.  I'll just -- it

16        seems to me that you reference some of

17        those other options in your draft email,

18        such as board and lodge programs, correct?

19  A.   Correct.

20  Q.   And so it's just the -- it's the shelter

21        numbers that I'm just wondering about.

22        So -- and, actually, let me -- you said

23        that -- you said sometimes it was David

24        Hewitt and his staff that provided

25        information about shelter availability,

Page 150

1        correct?
2    A.   I believe so.
3    Q.   Why then is Joe Gladke asking Don Ryan for
4         that information?
5            MR. PIERCE:  Objection.  Foundation.
6         Calls for speculation.
7    A.   I think because Don would be someone we
8         could ask as well.
9    BY MR. GRUNDMAN:
10   Q.   Was there some reason for asking him --
11        and, you know, I understand it wasn't your
12        email to Mr. Ryan directly.  But you said
13        you got regular updates, and how did you
14        decide whether to get those updates from
15        Mr. Hewitt or Mr. Ryan?
16   A.   At this time, we were working with Don
17        Ryan on site on the Greenway frequently.
18        So we would probably get that information
19        from him often.
20            And I think we would get it from
21        David Hewitt's team as well.
22   Q.   There is no preference for one over the
23        other?
24   A.   I don't believe so.
25            MS. PIERCE:  Luke, we've been going

Page 151

1           about an hour.  Do you want to take a
2           break?
3                MR. GRUNDMAN:  And then break for
4           lunch at 1:00?  It's fine with me.
5                Actually, can we go five more
6           minutes, get to a better stopping place?
7                MS. PIERCE:  That's fine.
8     BY MR. GRUNDMAN:
9     Q.  Handing you a document marked as Exhibit
10          352, and it is another -- one, two, three,
11          four -- five-page email.
12               (Deposition Exhibit No. 352 was
13          introduced.)
14    BY MR. GRUNDMAN:
15    Q.  And I think you'll -- you'll recognize
16          part of the email, maybe not take you as
17          long to get through.  Bates number begins
18          with HC00015336.
19               Go ahead and read it and let me know
20          when you're ready to discuss.
21    A.  (Reviewing document.)
22               I'm ready.
23    Q.  So as I said, you may recognize -- we've
24          talked about the email that begins on the
25          second page of Exhibit 352 as an email

Page 152

```
 1        directly to Commissioner Greene among
 2        other people.
 3              Commissioner Greene then asks you to
 4        respond, and then at -- in the middle of
 5        page 1 of Exhibit 352 is your response to
 6        Commissioner Greene.
 7              Is that correct?
 8   A.   That's correct.
 9   Q.   And then at the very top of the first
10        page, Commissioner Greene then responds
11        and says basically "Thank you," correct?
12   A.   Correct.
13   Q.   If you look at the draft you sent to
14        Mr. Gladke, Exhibit 350, and the final
15        version that you sent to Commissioner
16        Greene, Exhibit 352, I notice that those
17        second set of bullet points that we've
18        been talking about are not in your final
19        draft.
20              Is that correct?
21   A.   That's correct.
22   Q.   Why?
23   A.   I don't recall.
24   Q.   There is some information about shelters.
25        It says -- if you look at the first full
```

Page 153

1          paragraph on the second page of 352, there
2          is some discussion of shelters, but it's
3          missing all those numbers that you -- or
4          most of the numbers that you had in your
5          draft.
6               Do you see that?
7     A.   I do.
8     Q.   So why were those specific numbers omitted
9          from the final version?
10              MS. PIERCE:  Objection.  Asked and
11         answered.
12    A.   I don't know.  Or I can't recall.
13              MR. GRUNDMAN:  Take a break now.
14              (Break taken.)
15    BY MR. GRUNDMAN:
16    Q.   Back on the record.  All the same rules
17         apply.
18              I want to ask you now about closing
19         the Greenway encampments along the whole
20         stretch of the Greenway.  Okay?
21    A.   Okay.
22    Q.   Do you remember what month that happened
23         in?
24    A.   The last day was in December, maybe
25         December 18th.

Page 154

1    Q.   Who made the decision to close all the

2         encampments along the Greenway?

3              MS. PIERCE:   Objection.  Vague,

4         foundation.

5    A.   I guess I don't know who specifically made

6         the decision.

7    BY MR. GRUNDMAN:

8    Q.   Who communicated it to you?

9    A.   I don't know if I remember specifically,

10        but I would guess Joe Gladke.

11   Q.   Do you remember roughly when that

12        happened?

13             MS. PIERCE:   Objection.  Vague.

14   A.   When the decision was made to require that

15        everyone leave?

16   BY MR. GRUNDMAN:

17   Q.   Or when you were informed about that

18        decision.

19   A.   It was being prepared for, for quite a

20        while.  Weeks, months.

21             So I guess I don't remember when I

22        was informed of the exact date.  I would

23        guess in December.

24   Q.   When you say it was being prepared for,

25        what did that look like?  Were there

Page 155

1      meetings?
2   A.  For me, it looked like being on the
3      Greenway several times a week, tracking
4      campers and tents, communication with
5      campers, trying to get them connected to
6      shelter or other housing resources, and
7      coordinating cleanups and removal of
8      unpermitted materials.
9   Q.  And so you personally were one of the
10     people communicating with the people in
11     the Greenway?
12  A.  I was.
13  Q.  When we talked earlier, we were talking
14     about the fall, and I think you had said
15     you went out frequently.  But you weren't
16     usually the person directly communicating
17     with the people on the Greenway; is that
18     fair?
19  A.  I don't think I said that.  I didn't
20     directly communicate with folks at
21     Nicollet, but I did directly communicate
22     with people on the Greenway in the fall of
23     2020.
24  Q.  And about when did you start telling them
25     that they would have to move?

Page 156

1   A.   I think we had been communicating for

2        weeks that people should prepare for that

3        eventuality.  I don't recall when we told

4        people there is a date and this is going

5        to happen on this date.  But at least

6        beginning in November sometime we were

7        working with folks.

8   Q.   So I just handed you a document, two

9        pages.  I've marked it as Exhibit 353.

10       Bates begins HC00015577.

11            (Deposition Exhibit No. 353 was

12       introduced.)

13  BY MR. GRUNDMAN:

14  Q.   Would you take a look at Exhibit 353 and

15       let me know when you've had a chance to

16       review it.

17  A.   I am ready.

18  Q.   Do you recognize what's been marked as

19       Exhibit 353?

20  A.   Not specifically.

21  Q.   So it appears to me to be an email from

22       Mr. Esparza.  We talked about him before,

23       correct?

24  A.   Correct.

25  Q.   And it's written to you, along with a few

```
 1        other people, including Mr. Gladke and
 2        that listserv of Hennepin Security that we
 3        talked about?
 4   A.   Correct.
 5   Q.   And so if you don't remember this specific
 6        email, can you describe for me roughly
 7        what the email seems to be to you, the
 8        context of what we've been talking about
 9        today?
10   A.   Certainly.  It is an email from
11        Christopher to all those you just listed,
12        with an update on camps on the Greenway,
13        and some notes on specific camps.
14   Q.   So we talked earlier, you told us that
15        Mr. Esparza, along with other people
16        working with security, would occasionally
17        email updates, right?
18   A.   Correct.
19   Q.   So this is -- it appears to be following
20        one of the times that Mr. Esparza walked
21        along the Greenway; is that correct?
22   A.   He would have driven, but yes.  I'm sorry.
23   Q.   On the first page, as you said, there
24        is -- before the list of specific sites,
25        there are some notes, right?
```

1   A.   Correct.

2   Q.   And I just -- if it helps what we were

3        talking about earlier, the second

4        paragraph begins -- Mr. Esparza writes

5        that:

6             "Everyone I made contact with was

7             advised that camping on the

8             Greenway is not allowed anymore

9             and we'll be clearing the sites

10            soon and shelter will be made

11            available to those who want it on

12            a first come first served basis as

13            soon as it's opened."

14            Do you see that sentence?

15  A.   I do.

16  Q.   So you told us a moment ago that for, you

17       said, weeks prior to the actual closure of

18       the encampment along the Greenway, that

19       that information was being conveyed to

20       people for some weeks ahead of time,

21       correct?

22  A.   I believe what I said was weeks ahead of

23       the closure, we were letting people know

24       the closure would happen, and trying to

25       work with them to --

Page 159

1    Q.   And --

2    A.   -- access all our services.

3    Q.   Sorry to interrupt.

4         Mr. Esparza is referencing that in

5         his email, is that fair to say; that he's

6         giving that information to folks along the

7         Greenway?

8         MS. PIERCE:  Objection.  Foundation.

9    A.   Well, here it says -- he says that he's

10        advising that camping on the Greenway is

11        not allowed anymore.  So that seems a

12        little different than what I said, but I

13        can't remember the exact messaging at that

14        time or that date.

15   BY MR. GRUNDMAN:

16   Q.   Would it be fair for us to assume that at

17        least as of this date, December 5, 2020,

18        that the assessment that Mr. Esparza made

19        giving how many tents were located, that

20        that was accurate as of that date?

21        MS. PIERCE:  Objection.  Foundation.

22   BY MR. GRUNDMAN:

23   Q.   Let me ask a different way.

24        It was his job -- part of his job

25        duties was to count how many tents were

1       there, correct?

2           MS. PIERCE:   Objection.   Foundation.

3   A.  He was definitely providing us these

4       updates.

5   BY MR. GRUNDMAN:

6   Q.  And on the second page of Exhibit 353,

7       there is this list.  Do you see that?

8   A.  Yes.

9   Q.  And there are -- won't go through them

10      all, but there are references to different

11      places along the Greenway, correct?

12  A.  Correct.

13  Q.  And then it states next to them how many

14      tents are there, correct?

15  A.  Correct.

16  Q.  Was that a common thing for updates from

17      Hennepin Security to provide?

18  A.  Yes.

19  Q.  It would say how many tents were there on

20      the day that they were there?

21  A.  I believe so.

22  Q.  And then I noticed that there are some

23      notes where, for example, letter D says

24      that it was removed 12/4.  There is a note

25      to that effect.

Page 161

```
 1              Do you see that?
 2   A.  I do.
 3   Q.  And then same with letter E?
 4   A.  I see that.
 5   Q.  Highlighting here, didn't come through as
 6       well as --
 7              But so focusing on those two, when he
 8       put "removed" on the list, what does that
 9       mean to you?
10              MS. PIERCE:  Objection.  Foundation.
11   A.  It could mean one of two things.  It could
12       be no longer there by the actions of the
13       people camping, or it could have been
14       removed by us.
15   BY MR. GRUNDMAN:
16   Q.  And you have no way of knowing just based
17       on this exhibit which of those two it
18       was --
19   A.  I don't --
20   Q.  -- for those two sites?
21   A.  I don't.
22   Q.  So there were times in this time period
23       where you, your staff, your contractors
24       were removing tents from sites even prior
25       to December 18th?
```

Page 162

1  A.  That's correct.  We were working with

2       people to access other services, other

3       housing, so we were removing tents as they

4       became abandoned.

5  Q.  And then speaking of abandoned, on letter

6       M, the same list, there is a notation that

7       says that:

8               "Appears to be abandoned."

9            And, again, I realize it's a little

10      hard to read, but can you see that?

11  A.  I can.

12  Q.  So that's Mr. Esparza's assessment that

13      that site, people are no longer living

14      there, correct?

15           MR. PIERCE:  Objection.  Foundation.

16  A.  I believe so.

17  BY MR. GRUNDMAN:

18  Q.  The very last one, Y, there is a note that

19      says:

20               "Off property.  Will remove

21           12/6."

22           Do you see that?

23  A.  I do.

24  Q.  I'm just -- I know we talked about this a

25      lot this morning, but I'm trying to

Page 163

```
 1        understand whose jobs the different tasks
 2        were.
 3             And I had thought it was one of your
 4        contractors who actually removed the
 5        property from the site, but here almost
 6        sounds like Mr. Esparza is the one when he
 7        says "will remove."
 8             Do you have any -- can you help me
 9        understand who was actually removing
10        property at that time?
11             MS. PIERCE:  Objection.  Misstates
12        the document.
13   A.   So I don't remember this one specifically,
14        but it says "Off property," so I would
15        take that to mean it wasn't on the
16        Authority's property.  So I don't think we
17        would have removed it at all.  I think
18        they might have meant removing it from the
19        list.  I'm not -- I can't say for certain.
20   BY MR. GRUNDMAN:
21   Q.   So could it mean that the spreadsheet that
22        we were talking about earlier, that it
23        should be removed from the tracking that
24        you were doing?
25   A.   I don't think this -- it could mean that.
```

Page 164

```
 1        I don't know what it would mean.
 2   Q.  Fair to say that for the ones that don't
 3        have notations next to those, those were
 4        understood to be sites where people were
 5        still occupying those tents, correct?
 6             MR. PIERCE:  Objection.  Foundation.
 7   A.  I would say they were places where tents
 8        were located.  I don't know if they were
 9        occupied.
10   BY MR. GRUNDMAN:
11   Q.  But at least, I mean, since Mr. Esparza
12        put that M appeared to be abandoned, we
13        can assume he didn't think the other ones
14        were abandoned?
15             MS. PIERCE:  Objection.  Foundation.
16        Calls for speculation.
17   A.  I don't know.
18   BY MR. GRUNDMAN:
19   Q.  Let me ask what it means to you.  When you
20        look at this list, what does that mean?
21             MS. PIERCE:  Objection.  Foundation,
22        calls for speculation.
23   A.  Yeah, there he lists where tents are
24        present, so it must mean standing tents.
25   BY MR. GRUNDMAN:
```

Page 165

1   Q.  And you said that in that time period, you

2        and others were communicating the

3        information to people that they couldn't

4        live there anymore, correct?

5              MR. PIERCE:  Objection.  Vague.

6   A.  I remember communicating that a closure

7        would be forthcoming, and they needed to

8        make other plans, and we would help them

9        with that.

10  BY MR. GRUNDMAN:

11  Q.  Was that ever put in a written notice?

12  A.  Yes --

13  Q.  When --

14  A.  -- there was a notice.

15  Q.  Sorry to interrupt.

16              When was that put into a written

17        notice?

18  A.  I believe a notice was posted before the

19        closure on the 18th.  I can't remember the

20        exact date that it was posted.

21  Q.  There was no notice posted before that

22        one?

23              MS. PIERCE:  Objection.  Vague.

24  A.  We would post notices at tents that we

25        determined to be abandoned.  And we would

Page 166

1              post a notice overnight, or at least

2              overnight, for 24 hours before we would

3              come and clean it.

4                   So those were notices posted prior,

5              but there was no notice of ultimate

6              closure besides the one I referenced days

7              before the December 18th.

8    BY MR. GRUNDMAN:

9    Q.  But so in that time period for December

10             18th, if there was a tent that you

11             suspected was abandoned, then you would

12             also put a notice on that tent?

13   A.  Yep.  We would post a notice, and then we

14             would clean it out afterwards.  We would

15             also talk to people in the area to try to

16             determine that it was abandoned.

17   Q.  And we looked at -- a huge stack in front

18             of you, but a notice that you said you

19             drafted.  It's Exhibit 121.

20   A.  Yeah, I remember that.

21   Q.  Is that the -- was it the same notice that

22             you used in the time period we're talking

23             about now with regard to those individual

24             tents that you believed might be

25             abandoned?

Page 167

1   A.   No.  We had a revision to our notice.

2   Q.   Do you remember when you started using the

3        revised version of the notice?

4   A.   I don't remember exactly.  Probably in the

5        fall of 2020.

6   Q.   Who created the revised version of the

7        notice?

8   A.   I don't remember exactly.

9   Q.   You didn't draft it, though?

10  A.   I don't think -- I didn't draft it alone.

11       I may have helped.

12  Q.   From Mr. Gladke?

13  A.   Possibly him, possibly our communications.

14  Q.   You mentioned communications earlier.  Who

15       specifically from Hennepin County

16       communications did you work with?

17            MS. PIERCE:  Objection.  Vague.

18  A.   I didn't typically work directly with

19       them.  That work would have been

20       coordinated through Joe Gladke.

21  BY MR. GRUNDMAN:

22  Q.   You never -- you don't remember talking to

23       any particular person from the

24       communications department about

25       encampments?

Page 168

1   A.   Not that I recall.

2   Q.   We've mentioned this date December 18th a

3        couple of times.  That's when the

4        encampment was -- or when all of the

5        people along the Greenway were removed,

6        correct?

7   A.   That was the date on which people camping

8        on the Greenway had to leave, camping was

9        no longer permitted there.

10  Q.   When was that date selected?

11  A.   I don't know.

12  Q.   When is the first time you remember

13       hearing that date?

14            MS. PIERCE:  Objection.  Asked and

15       answered.

16  A.   I think probably the week before that I

17       knew that specific date.

18  BY MR. GRUNDMAN:

19  Q.   You said there was some planning that went

20       into the closure itself, correct?

21  A.   I think I've said that we were working

22       with folks that were camping on the

23       Greenway to like let them know it was

24       happening and try to get them in other

25       housing options.

Page 169

1   Q.   Did you participate in any planning for
2        the closure itself?
3   A.   Yes.
4   Q.   What did that -- what kind of planning did
5        you participate in?
6   A.   I remember virtual meetings discussing the
7        logistics of that day.
8   Q.   Who were in the meetings?
9   A.   I remember Joe Gladke; I remember Kelly
10       Pierce; Luda, the manager of Hennepin
11       County Security; and Lisa Cerney.
12  Q.   Anyone else?
13  A.   Not that I recall.
14  Q.   What was discussed?
15           MS. PIERCE:  I'm going to object,
16       since I was present as counsel, to
17       anything that was said in those meetings
18       as being covered by the attorney-client
19       privilege --
20           THE WITNESS:  Okay.
21           MS. PIERCE:  -- and instruct you not
22       to answer if I was present and there as
23       counsel.
24           If I wasn't present, it's absolutely
25       fine to talk about; or other lawyers

Page 170

```
 1       weren't present, absolutely fine.
 2  BY MR. GRUNDMAN:
 3  Q.  Were there meetings where lawyers were not
 4       present?
 5           MS. PIERCE:  Any meetings, or
 6       meetings about the Greenway closure?
 7           Sorry.
 8  BY MR. GRUNDMAN:
 9  Q.  We were just talking about meetings
10       specific to the closure of the Greenway
11       encampments.  You listed off some of the
12       people that were at some of those
13       meetings.
14           And my question is, were there
15       meetings where there was no attorney
16       present?
17  A.  The meetings I recall, Kelly Pierce was
18       present.
19  Q.  Was there a written plan created for
20       conducting the closure itself?
21  A.  I think there may have been a plan.
22  Q.  Did you read it?
23  A.  I may have seen it at the time, but I did
24       not write it.
25  Q.  Did it have specific tasks for you to
```

Page 171

1        complete?
2   A.   I remember being informed of my specific
3        roles on that day probably verbally at a
4        meeting.
5   Q.   Were there members from the Hennepin
6        County Sheriff's Office at the meetings?
7   A.   I don't recall.
8   Q.   I've handed you a document marked as
9        Exhibit 126.  It is an 11-page document.
10           (Deposition Exhibit No. 126 was
11        previously marked.)
12  BY MR. GRUNDMAN:
13  Q.   If you could take a moment to look through
14       it, and let me know when you're ready to
15       talk about it.
16  A.   (Reviewing document.)
17           I'm ready.
18  Q.   Do you recognize Exhibit 126?
19  A.   No.
20  Q.   Have you ever seen it before?
21  A.   I don't believe so.
22  Q.   You told us about a written plan that you
23       do recall reading at one point.  This
24       presumably then is not that plan, correct?
25  A.   I remember seeing a plan from Hennepin

Page 172

1      County Security.

2  Q.  But not this one?

3  A.  I don't recall.

4          MR. GRUNDMAN:  I'm going to mark the

5      next exhibit 309, because my understanding

6      is it's already been used in this case,

7      but -- and that's the exhibit that it was

8      marked as.  So I'm just remarking it.

9          THE WITNESS:  Thank you.

10          (Deposition Exhibit No. 309 was

11      introduced.)

12  BY MR. GRUNDMAN:

13  Q.  Now, I've handed you a document marked as

14      Exhibit 309.  This is an 11-page

15      document -- actually, 13 if you include

16      the cover, the table of contents.

17          Would you take a moment to review

18      this document and let me know when you

19      have had the opportunity to do that.

20  A.  (Reviewing document.)

21          I'm ready.

22  Q.  So just before I showed you Exhibit 309,

23      you said that you did not recognize

24      Exhibit 126, which is entitled "Hennepin

25      County Sheriff's Office," but you said you

Page 173

```
 1        do recall seeing a Hennepin County
 2        Security plan.
 3              Is Exhibit 309 that plan?
 4   A.   It is.
 5   Q.   So you have seen Exhibit 309 before,
 6        correct?
 7   A.   I have.
 8   Q.   In what context?
 9   A.   I saw it in preparation for this
10        deposition, and I think I saw it after the
11        December 18th.
12   Q.   Those are the only two times?
13   A.   That I can remember.
14   Q.   So you don't recall reviewing it before
15        the closure?
16   A.   Again, I remember being made aware of my
17        role that day in a meeting, a virtual
18        meeting, not per -- not on this plan.
19   Q.   Just to make sure it's clear, we talked
20        about your role in several different
21        contexts.
22              With regard to this closure, you say
23        that you were told what your role was.
24        What was that role?
25              MS. PIERCE:  Objection.  Vague.
```

Page 174

1  A.   So on the day, on December 18th, I was on

2       site.  And I was headed -- from the

3       beginning, I would go with -- I think it

4       was Don Lawrence (sic).

5            We would make the first contact at

6       the tent and talk to folks there, let them

7       know the closure was happening and they

8       needed to leave.

9            And then my role specifically was to

10      assess the property inside and take

11      pictures and offer people storage that

12      day.

13           MS. PIERCE:  Can I have her answer

14      read back.

15           (The record was read as follows:

16           "A.  So on the day, on December

17           18th, I was on site.  And I was

18           headed -- from the beginning, I

19           would go with -- I think it was

20           Don Lawrence.

21             We would make the first contact

22           at the tent and talk to folks

23           there, let them know --")

24           MS. PIERCE:  That's enough.

25  BY MR. GRUNDMAN:

Page 175

```
 1   Q.  So for clarity's sake, you said "Don
 2        Lawrence."
 3   A.  Oh, I'm sorry.  Thank you.  I mean, Don
 4        Ryan.  I'm sorry.  Thank you.
 5   Q.  About how many tents were there that day?
 6   A.  On the Greenway, I would say between 12
 7        and 15.
 8            MR. GRUNDMAN:  Maybe before we go
 9        further, I think it's almost 1:00 o'clock.
10        People ready for lunch?
11            MS. PIERCE:  Sounds good.
12            (A lunch recess was taken.)
13   BY MR. GRUNDMAN:
14   Q.  We are back on the record.
15   A.  Yes.
16   Q.  Same rules from this morning apply.
17            We were just in the middle of talking
18        about Exhibit 309, which is in front of
19        you still.  And you said you had seen 309
20        before, but not before the closure of the
21        Greenway encampments; is that right?
22   A.  That is my memory.
23   Q.  If you turn to the third page, it starts
24        at the top "Operation Skill and Purpose."
25            Do you see that page?
```

Page 176

```
 1   A.   I do.
 2   Q.   And then "Operational Summary" is at the
 3        bottom.
 4   A.   Yes.
 5   Q.   There is a -- it talks about what Hennepin
 6        County security and it says along with the
 7        Hennepin County Sheriff's Office will
 8        provide security in two different teams.
 9            Do you see that?
10   A.   Yes.
11   Q.   And then specifically it talks about
12        Authority staff and their partners.
13            Do you see that?
14   A.   Yes.
15   Q.   I'm trying to understand what that meant
16        in terms of what happened that day
17        specifically.
18            You told us you had -- you were one
19        of the people going from camp to camp,
20        along with Don Ryan; is that right?
21   A.   Don Ryan, correct.
22   Q.   And were there security officers with you
23        at that time?
24   A.   There were security officers on site.
25   Q.   But were they with you?
```

1           MS. PIERCE:  Objection.  Vague.

2   A.  They weren't far away, but they weren't

3       always like directly with me.  But they

4       were on site and available.

5   BY MR. GRUNDMAN:

6   Q.  Were there sheriff deputies as well?

7   A.  I believe so.

8   Q.  If you turn to the next page of that

9       document.

10  A.  Yes.

11  Q.  There are some time stamps in the left.

12          Do you see the one that says O800?

13  A.  Yes.

14  Q.  And the third paragraph from there,

15      starting with the word "Security," do you

16      see that?

17  A.  I do.

18  Q.  The last sentence, it says that:

19          "After the second warning is

20          given and the persons do not

21          comply, the trespass officer will

22          issue a trespass in accordance to

23          security guidelines, policy and

24          procedure."

25          Do you see that?

Page 178

1    A.   I do.

2    Q.   When we talked earlier today about

3         clearing the encampment between 12th and

4         13th Avenues -- so this was previous to

5         the day when all of the other encampments

6         were closed, right?

7    A.   Right.

8    Q.   We talked about an exhibit -- it's still

9         there if you want to refer back -- 347,

10        but where you said, "We don't want to

11        trespass unless we have to."  I'm

12        paraphrasing.

13            Is that right?

14   A.   I remember that.

15   Q.   Was that the same idea on the day of

16        closing the -- all the encampments?

17            MS. PIERCE:  Objection.  Vague,

18        foundation.

19   A.   I would say for me personally, it's always

20        our intent to work with people and not

21        have to trespass anyone to leave.  But it

22        is an option that we have.

23   BY MR. GRUNDMAN:

24   Q.   And just talking about that option, let's

25        say you do have to trespass someone.

Page 179

1              Well, I'll ask specifically, did you

2        have to trespass anyone on that day or any

3        other day?

4    A.  Not that I know of.  I've never personally

5        trespassed anyone, or worked on that.

6    Q.  But you said before it was an option that

7        you had, right?

8    A.  It is an option.

9    Q.  So understand -- what does it entail to

10       trespass someone?

11             MS. PIERCE:  Objection.  Foundation,

12       calls for speculation.

13   A.  Right.

14             I understand it, but not in great

15       detail.  I'd have to work with, you know,

16       someone from MPD, Hennepin County

17       Sheriff's Office or Hennepin County

18       Security on the details.

19   BY MR. GRUNDMAN:

20   Q.  You would have to work with one of those

21       if you decided to use the option of

22       trespass?

23   A.  Correct.

24             MR. PIERCE:  Same objections.

25   A.  I couldn't trespass anyone.  I would have

Page 180

```
 1        to work with the law enforcement agency or
 2        Hennepin County Security.
 3   BY MR. GRUNDMAN:
 4   Q.  And your testimony is that you don't
 5        understand fully what that would entail if
 6        that happened?
 7             Just making sure I understood your
 8        answer correctly.
 9   A.  I remember knowing more about it.  I don't
10        remember the details today.  And I haven't
11        ever gone through that process.
12   Q.  When you learned more about that, do you
13        remember the context of learning more
14        about it?
15   A.  Yes.  I remember in one of our meetings
16        with MPD that I referenced earlier when we
17        had kind of somewhat annual meetings with
18        MPD prior to 2020, I remember learning
19        about the trespassing process so we
20        understood better what our options were if
21        we needed to have someone leave the
22        Greenway, Midtown Greenway, property.
23             MS. PIERCE:  Can we go off for a
24        second.
25             (Discussion off the record.)
```

1          MS. PIERCE:  I want to thank counsel

2       for accommodating me while I took a moment

3       to cough.

4    BY MR. GRUNDMAN:

5    Q.  So we were talking about trespass, and you

6       were just finished saying that in the

7       meetings we've discussed that happened

8       prior to 2020 that included the people

9       from the Minneapolis Police Department,

10      that there was some discussion of trespass

11      as a solution, right?

12          Is that -- I'm paraphrasing, but is

13      that what you recall?

14   A.  I wanted to learn more about the

15      trespassing process just to understand our

16      option if need be.

17   Q.  Who told you about the options that you

18      had?

19   A.  Well, I was just describing trespass as an

20      option if people needed to leave the

21      Greenway.

22   Q.  I'm sorry.  When you said you wanted to

23      learn more about it, who taught you more

24      about it?

25   A.  Well, in that situation I specifically got

Page 182

1         more information from MPD.
2    Q.   Do you remember which officer?
3    A.   I would have to go back and look at my
4         notes.  I think we met with the inspector
5         and lieutenants of the third precinct.
6    Q.   Were you working with Grant Snyder at that
7         time?
8    A.   I believe this was before I was working
9         with Grant Snyder.
10   Q.   So it was some of the officers,
11        potentially lieutenants or supervisors who
12        worked at the third precinct?
13   A.   Correct.  And fifth.  We worked with both
14        precincts.
15   Q.   Why those two precincts?
16   A.   Those are the precincts through which the
17        Midtown Greenway is located.
18   Q.   So back to Exhibit 309 for a moment.  I
19        understood you saw it a couple times.
20            Is it fair to say this document was
21        not something that you used to tell you
22        what you should or should not do on the
23        day of the closure, correct?
24            You hadn't seen it until afterward?
25   A.   I recall getting my instruction from a

Page 183

```
 1        virtual meeting, and not from this
 2        document.  That's just what I recall.
 3   Q.  And you said earlier that you don't
 4        remember Exhibit 126 at all.  I don't
 5        think you've ever seen that before.
 6   A.  I don't remember it.
 7   Q.  So was there any other written document or
 8        policy that governed what you specifically
 9        did on the day of the closure?
10   A.  There might be a policy that governed what
11        we did, but I don't remember any other
12        documents like laying out the process for
13        that day specifically.
14   Q.  I'm showing you what's already been marked
15        as Exhibit 193.
16              (Deposition Exhibit No. 193 was
17        previously marked.)
18   A.  Okay.
19   BY MR. GRUNDMAN:
20   Q.  Let me know when you've had a chance to
21        review it.
22              MS. PIERCE:  Counsel, before you ask
23        questions about it, I will object that
24        this isn't a complete document, that this
25        was an attachment to another document.
```

Page 184

```
 1        And we object to the witness being shown
 2        only a part of a complete document.
 3   A.   Okay.  I read it.
 4   BY MR. GRUNDMAN:
 5   Q.   Do you recognize what's shown in Exhibit
 6        193?
 7   A.   I do.
 8   Q.   What is it?
 9   A.   This is the notice that was posted prior
10        to cleanout on December 18th.  One of
11        several.
12   Q.   One question.  We've used this date of
13        December 18th several times.  The date
14        that's listed is December 17th.
15             Do you see that?
16   A.   I do.
17   Q.   Why is that?
18             MS. PIERCE:  Objection.  Vague.
19   A.   I don't know.
20   BY MR. GRUNDMAN:
21   Q.   Who drafted the notice shown in Exhibit
22        193?
23             MS. PIERCE:  Objection.  Asked and
24        answered.
25   A.   I think the general notice was drafted by
```

1      a team of county employees.

2  BY MR. GRUNDMAN:

3  Q.  And who was on that team?

4  A.  Me, Joe Gladke, perhaps communication.  I

5      don't remember who like inserted this

6      date.  It wasn't me.

7  Q.  193, so this notice, states -- it's in the

8      middle of the second paragraph.  It talks

9      about how this tent and the contents will

10     be inventoried.

11          Do you see that?

12 A.  I do.

13 Q.  Where are those inventories kept?

14          MS. PIERCE:  Objection.  Foundation.

15 A.  So all of the tents that were cleared on

16     the 18th would have met the first criteria

17     and were disposed of.

18 BY MR. GRUNDMAN:

19 Q.  So --

20 A.  So they were hazardous, and we did not

21     inventory and store the contents of the

22     tents.

23 Q.  So you're saying every single tent that

24     was disposed of had hazardous waste inside

25     of it?

Page 186

1   A.   Yes, I would say that.

2   Q.   And you personally assessed that?

3   A.   I did.

4   Q.   How many tents did we -- are you talking

5        about here?

6   A.   I don't remember the exact amount, but I

7        would say around 15.

8   Q.   And when this notice -- or when you

9        assessed for hazardous waste, what

10       specifically are you talking about?

11  A.   Soiled materials, needles, like syringes,

12       feces and other bodily fluids, things of

13       that nature.   Rotten food.

14  Q.   And when you assessed the tent and

15       determined that it contained hazardous

16       waste, did all of the property in the tent

17       get disposed of?

18       MS. PIERCE:   Objection.   Compound.

19  A.   So we worked with folks on site and asked

20       them to take anything they wanted, and

21       offered them storage on December 18th and

22       before that.   So anything that was left

23       was considered abandoned.

24       But also I looked in every tent that

25       remained on December 18th, and I would say

Page 187

1      they all had soiled materials in them.

2   BY MR. GRUNDMAN:

3   Q.  And on the basis of that, you made the

4       decision to dispose of them all,

5       completely?

6           MS. PIERCE:  Objection.  Misstates

7       prior testimony.

8   A.  I should also restate that the occupants

9       that were in there were in conversation

10      with us.  They left, left everything on

11      site.

12  BY MR. GRUNDMAN:

13  Q.  And so just -- I realize I've asked you

14      this a couple of times, but how many tents

15      are we talking about?

16          MS. PIERCE:  Objection.  Asked and

17      answered.

18  A.  On December 18th?

19  BY MR. GRUNDMAN:

20  Q.  Yes.

21  A.  Again, I'm going to say about 15.  We had

22      gotten that number down considerably and

23      were in the weeks leading up to December

24      18th.

25  Q.  So there is 15 tents, give or take, and

Page 188

1          you personally toured each of those tents?

2                    MS. PIERCE:  Objection.  Vague.

3     A.  I did look in each of the tents.

4     BY MR. GRUNDMAN:

5     Q.  And you said you attempted to make contact

6          with the people who were living in the

7          tents, too?

8                    MS. PIERCE:  Objection.  Misstates

9          prior testimony.

10    BY MR. GRUNDMAN:

11    Q.  Right?

12    A.  I would say we did make contact with

13         everybody that was in all of the tents

14         that were standing.

15    Q.  That day?

16    A.  In week -- at least weekly leading up to

17         that day, and that day.

18    Q.  And that day itself, though, just focusing

19         in on that.

20    A.  Sure.

21    Q.  Did all 15 tents have people inside them?

22    A.  I don't believe so.

23    Q.  And with regard to those tents, where

24         there wasn't anyone inside them, was there

25         an attempt made to inventory the contents

Page 189

1          of those tents?

2    A.   No.  Not on that day.

3    Q.   With regard to the ones -- all the

4          tents -- with regard to all the tents, the

5          notice says that the contents would be

6          inventoried.  And why didn't you inventory

7          them?

8    A.   I think it says if the tent contained

9          hazardous waste, the tent and all of its

10         contents are subject to immediate

11         disposal.  And so that's what happened

12         with the tents that we removed on the

13         18th.

14   Q.   Who decided to make that distinction?

15              MS. PIERCE:  Objection.  Vague.

16         Foundation.

17   A.   I would say myself and Joe Gladke.

18   BY MR. GRUNDMAN:

19   Q.   Why not inventory the tents for --

20         regardless if there were hazardous

21         materials in them?  You could have

22         indicated them on the inventory.

23   A.   That would be dangerous to me and our

24         contracted crews.

25   Q.   To inventory them?

Page 190

1   A.   Yes.

2   Q.   What do you mean by that?

3   A.   Well, I think it would be dangerous to

4        work around the hazardous waste.

5   Q.   So then there is also a statement in this

6        notice that you will temporarily store the

7        contents of tents, "temporarily stored for

8        its owner's retrieval."

9             Do you see that?

10  A.   I do.

11  Q.   Did you store any of the contents of tents

12       that day?

13  A.   We did not.

14            We did offer storage to people that

15       we talked to that day.

16  Q.   To the people who were there?

17  A.   Yes.

18  Q.   Not to the people who weren't?

19            MS. PIERCE:   Objection.   Assumes

20       facts not in evidence, misstates record

21       evidence.

22  A.   Right.   I didn't offer storage to people

23       who weren't there.

24  BY MR. GRUNDMAN:

25  Q.   I've handed you a document, two pages,

1       marked as Exhibit 354.  And Bates begins

2       HC00015384.

3              (Deposition Exhibit No. 354 was

4       introduced.)

5  BY MR. GRUNDMAN:

6  Q.   Let me know when you've had a chance to

7       review Exhibit 354 and when you're ready

8       to talk about it.

9  A.   (Reviewing document.)

10             I am ready.

11  Q.  So this document consists of a chain of

12      emails, some of which don't appear to me

13      to be relevant.  So I'm going to skip up

14      to the email in the middle of the first

15      page dated December 16, 2020, and it's

16      from you to Michael Noonan.

17             Do you see the one I'm referring to?

18  A.  I do.

19  Q.  So fair to say this email chain has to do

20      with, you know, putting I think time into

21      a paycheck or something, or previous email

22      chain; is that correct?

23  A.  I think it's talking about doing our

24      timecards early, yeah.

25  Q.  And then so your email I'm just directed

```
 1        your attention to says that completed
 2        that:
 3              "Done and done."
 4           And then the part I want to talk more
 5        about, you state that:
 6              Your "work was a bust on the
 7              Greenway this afternoon, so I'm
 8              back in 'the office.'"
 9           Do you see that?
10   A.   I do.
11   Q.   What did you mean by that?
12   A.   Based on this email, I think I went down
13        to the Greenway to offer storage to
14        people, to a particular woman or couple,
15        and they did not -- it didn't work out to
16        coordinate that storage for them.
17   Q.   And the email's sent on December 16th, and
18        you're referring to the same afternoon,
19        correct?
20   A.   Yes.
21   Q.   And the notice, Exhibit 193, says tents
22        and contents were expected to be removed
23        by December 17th; is that right?
24   A.   That is right.
25   Q.   So this -- your trip to the Greenway that
```

Page 193

1          day was the day before the deadline; is
2          that correct?
3    A.    Yes.
4    Q.    So do you remember speaking to the couple
5          that day?
6    A.    I remember talking to a couple; one of
7          them was named Sarah.  And they wanted
8          storage, and we were going to meet them
9          with boxes.  And then it didn't work out,
10         as I say here.  I do remember that.
11   Q.    Then when you say it didn't work out, the
12         email says that she declined the storage;
13         is that right?
14   A.    That's what the email says.
15   Q.    But that -- and before that -- I'm sorry,
16         I'm kind of taking that sentence in the
17         wrong order -- you offered your help, and
18         then offered to come back in a half hour,
19         but that wouldn't work for her; is that
20         correct?
21   A.    That's what it says.
22   Q.    What did you mean by that wouldn't work
23         for her?
24   A.    I don't know why that didn't work for her.
25   Q.    She told you it didn't work?

1    A.   Right.  I believe that's what happened.

2    Q.   And then the second-to-the-last sentence,

3         in parentheses it says:

4              "(Hopefully, they have left for

5              good as clean outs start

6              tomorrow)."

7              Right?

8              And that's referring to -- I realize

9         you said you went down the Greenway to see

10        if anyone else needed to load up boxes,

11        but people weren't at their tents, right?

12   A.   Correct.

13   Q.   And then you say:

14             "(Hopefully, that (sic) they have

15             left for good as cleanout starts

16             tomorrow)."

17             Correct?

18   A.   That's what it says.

19   Q.   Whether you say "hopefully," how do you

20        know if they were at their -- still

21        occupying their tents or not?

22             MS. PIERCE:  Objection.  Calls for

23        speculation, incomplete hypothetical.

24   A.   How do I know if they were occupying their

25        tent any longer?  We were out there

1          regularly, between Authority staff and

2          Hennepin County Security, outreach

3          workers.  So we had a pretty good sense of

4          when people were leaving.

5     BY MR. GRUNDMAN:

6     Q.  You had a -- you're testifying that you

7          had a pretty good sense.  I mean, you

8          couldn't have known that, right?  And

9          that's implied in the word "hopefully,"

10         right?

11              MS. PIERCE:  Objection.

12         Argumentative, incomplete hypothetical,

13         calls for speculation.

14    A.  I could know what people told us.  So a

15         lot of times they told us, "We're going

16         here" or "leaving for here."

17    BY MR. GRUNDMAN:

18    Q.  But I mean, at least some of the time they

19         were just not at their tents, right?

20              MS. PIERCE:  Objection --

21    A.  We were tracking --

22              MS. PIERCE:  Objection.  Calls for

23         speculation, incomplete hypothetical,

24         assumes facts not in evidence.  Asked and

25         answered.

Page 196

```
 1   A.   We were tracking tents on the Greenway for
 2        weeks, months at that point.  So I think
 3        we had a good idea of who was at each
 4        tent, and if they had left.
 5   BY MR. GRUNDMAN:
 6   Q.   Just handed you a document marked as
 7        Exhibit 355, two pages.  Read it and let
 8        me know when you're ready to talk about
 9        this.
10             (Deposition Exhibit No. 355 was
11        introduced.)
12   A.   (Reviewing document.)
13             I'm ready.
14   BY MR. GRUNDMAN:
15   Q.   So handed you Exhibit 355, and Bates
16        begins HC00015382.
17             Do you recognize Exhibit 355?
18   A.   I don't remember it specifically.
19   Q.   We've talked today about Tree Trust,
20        correct?
21   A.   Correct.
22   Q.   One of the contractors that you've used to
23        help maintain the Authority's property,
24        including the Greenway?
25   A.   Correct.
```

1   Q.   And so there is an email here from Kathy
2        Sullivan addressed to you; is that
3        correct?
4   A.   Correct.
5   Q.   Kathy Sullivan works for the Tree Trust,
6        correct?
7   A.   She did at that time, correct.
8   Q.   And this email from her to you is dated
9        December 13 of 2020, right?
10  A.   Yes.
11  Q.   And then you respond to her it looks like
12       the following day, right?
13  A.   Yep.
14  Q.   So I asked you before, you said you don't
15       remember this email specifically.  And
16       this is the sort of email that you were
17       getting around that time period?
18  A.   I don't know what that question means.
19  Q.   So when you say you don't remember this
20       email specifically, let me ask more
21       generally:  Were you -- was Ms. Sullivan
22       giving you information about people living
23       on the Greenway at that time period?
24  A.   No.  Kathy Sullivan was their chief
25       operating officer, and I believe she had

Page 198

```
 1        questions about the Greenway.  So she
 2        would not have been providing me with
 3        information about the Greenway.
 4   Q.   So you were -- in responding to her, you
 5        were providing her with information about
 6        the Greenway?
 7   A.   Correct.  Yes.
 8   Q.   And specifically just focusing in on your
 9        email responding back to her, you're
10        discussing two men who were staying under
11        the Colfax Avenue Bridge at that time?
12   A.   Correct.
13   Q.   And then the next sentence says:
14            "I think they work during the day
15          and are often gone."
16          Is that right?
17   A.   Correct.
18   Q.   Just before you were telling me that you
19        and other people who worked for the
20        Authority and the team that we've been
21        talking about today, that as a group, you
22        were staying in pretty good contact with
23        people along the Greenway, so you sort of
24        knew when people were there and when they
25        weren't.
```

Page 199

1            Is that right?

2   A.   Correct.

3   Q.   So the two men living under the Colfax

4        Avenue Bridge were two of those folks,

5        correct?

6   A.   Correct.

7   Q.   So you knew those two were -- they worked

8        a lot during the day and may not have been

9        there?

10            MS. PIERCE:  Objection.  Document

11        speaks for itself.

12  A.   That's what it says here, and that would

13       be my understanding.

14  BY MR. GRUNDMAN:

15  Q.   And -- but when you did the closure on the

16       18th, a few days after this, your

17       testimony is all those 15 tents, you're

18       certain that none of them were just

19       working at that time?

20  A.   I don't believe that's what I said.  I'm

21       sorry.

22            MS. PIERCE:  Objection.  Vague,

23       misstates previous testimony.

24  BY MR. GRUNDMAN:

25  Q.   Help me understand.  I'm just trying to

Page 200

```
 1        get a sense of what actually happened.
 2             You've got these tents, and some had
 3        people in them, and some did not.  And the
 4        ones that didn't, how can you be sure that
 5        people weren't living in those and just
 6        not there at that time, just as the two
 7        men shown in Exhibit 355 were just at work
 8        at that time?
 9             MS. PIERCE:  Objection.  Misstates
10        the record.  Assumes facts not in
11        evidence.  Misstates prior testimony.
12   A.   I can't be certain of everyone's
13        situation, but we had made routine and
14        frequent contact with folks, or attempted
15        to.  And then we had posted notice at
16        every site before the closure.
17   BY MR. GRUNDMAN:
18   Q.   So you're confident then that everyone who
19        wanted their stuff gone got it out?
20             MS. PIERCE:  Objection.  Calls for
21        speculation, incomplete hypothetical.
22   A.   I'm confident that we made a lot of
23        attempts to communicate our plans with
24        folks, offer alternatives, offer storage.
25        Some folks did take us up on storage; that
```

1        was completed.

2              So I'm confident that we made contact

3        with people and posted notice.

4   BY MR. GRUNDMAN:

5   Q.  Storage, you said you provided storage to

6        people?

7   A.  Yes.

8   Q.  Where is that storage located?

9   A.  On the day of the closure -- that's not

10       right.

11              Leading up to the closure, we had, I

12       believe, four or five individuals take us

13       up on storage.  We worked with them to

14       pack up boxes, and we brought them to an

15       Authority-owned building in Brooklyn Park.

16  Q.  Do you know the address?

17  A.  Not off the top of my head.  Sorry.

18  Q.  Does the Authority own a lot of buildings?

19  A.  We own several buildings.

20  Q.  Is there -- is that building being used

21       for property storage now?

22  A.  It's my understanding those storage boxes

23       are still at that building.

24  Q.  For the same four or five people?

25  A.  Correct.

Page 202

1   Q.   When you offered to store property for
2        people, was there -- did you give them
3        information about how they could retrieve
4        their property?
5   A.   We provided them with the phone number and
6        wrote it down for them on a card with our
7        name, and told them they could call us and
8        we would coordinate them getting the
9        material.
10  Q.   Did you tell them where it would be
11       stored?
12  A.   I can't recall.
13  Q.   And those four or five situations, I think
14       you said this, but that those happened
15       prior to the closure on the 18th, right?
16  A.   That's correct.
17  Q.   Months prior, or just in the weeks prior
18       when you had informed people that they had
19       to go?
20  A.   I think weeks prior, or the week prior.
21       It was pretty close proximity.
22  Q.   You mentioned earlier that David Hewitt
23       and his staff were providing updates as
24       far as shelter availability, right?
25  A.   That's my recollection.

Page 203

1    Q.   Sometimes Don Ryan was as well?

2    A.   Correct.  Or we would ask them and they

3         would provide us that information.

4    Q.   And you said Mr. Ryan was there with you

5         that day?

6    A.   On December 18th?

7    Q.   Correct.

8    A.   Correct.

9    Q.   Was there -- did you get an update on

10        available shelter on that day?

11   A.   I don't know if I did on that day, but

12        definitely county staff did.  Appropriate

13        county staff knew that number.

14   Q.   And do you mean Mr. Ryan in particular?

15   A.   I don't mean him in particular.  I just --

16        I know it wasn't me.

17   Q.   What makes you think that someone did it?

18   A.   That was a part of our effort that day,

19        that people go to other housing options.

20   Q.   And what do you mean by it being part of

21        the effort?

22   A.   We had been working with the folks camping

23        on the Greenway to access different

24        housing options.

25   Q.   I understand.  I'm not trying to be

1      opaque.

2              I'm asking -- when you said it was

3      part of the services you were providing

4      that day, I'm just asking what

5      specifically did you offer when it comes

6      to shelter on that day?

7  A.  I don't know that day.

8  Q.  Did you or Mr. Ryan in your presence --

9      did either of you offer to transport a

10      person to shelter?

11  A.  I do recall offering to transport people.

12  Q.  You personally?

13  A.  I remember -- let me think.

14              I remember in general giving someone

15      a ride to shelter, but on a different day.

16              I remember offering rides to shelters

17      on days.  I know on that day we were

18      handing out bus passes.

19  Q.  Did you tell people which shelter they

20      could access?

21  A.  On the 18th?

22  Q.  Yes.

23  A.  I don't know.  That information wouldn't

24      have come from me.

25  Q.  Who would it have come from?

Page 205

1   A.   Perhaps Don Ryan.

2   Q.   But you and Mr. Ryan were going tent to

3        tent, just the two of you, right?

4   A.   We were often together, correct.   I

5        just -- I don't remember the specifics

6        about shelter placement that day.

7   Q.   So, Ms. Galatz, I've handed you a document

8        marked as Exhibit 356.   It is a one-page

9        document, Bates HC00030151.

10            (Deposition Exhibit No. 356 was

11       introduced.)

12  BY MR. GRUNDMAN:

13  Q.   Do you -- well, sorry.

14            Tell me when you've had a chance to

15       review it and are ready to talk about it.

16  A.   (Reviewing document.)

17            I'm ready.

18  Q.   Do you recognize Exhibit 356?

19  A.   I do.

20  Q.   What is it?

21  A.   It's an email chain that ends with me

22       emailing Don Ryan and Noya at the City of

23       Minneapolis about removing the

24       porta-potties from the Midtown Greenway.

25  Q.   You told us earlier that the City of

1        Minneapolis provided the porta-potties,

2        correct?

3  A.   Right.

4  Q.   And the date on your email is December 18,

5        correct?

6  A.   Correct.

7  Q.   And so you state in that email that:

8              "Things went pretty smoothly."

9            And the sentence before that:

10             "The encampments have all been

11         clear."

12         Is that correct?

13 A.   That's what it states.

14 Q.   So your perception is that the

15       encampment -- that it went pretty smoothly

16       that day when the encampments were

17       cleared?

18 A.   That would be my assessment, yes.

19 Q.   Do you remember anything that didn't go

20       smoothly about that day?

21 A.   Not in particular.

22 Q.   Was there anything that happened that was

23       unexpected?

24             MS. PIERCE:  Objection.  Vague.

25 A.   I'm sure there was.

1          I remember we had to find a place to

2       store motorbikes, and that was difficult

3       just logistically.  But I don't remember

4       anything too out of the ordinary.

5          That isn't the right way to say that,

6       but I remember it went fairly as planned.

7  BY MR. GRUNDMAN:

8  Q.  The motorbikes, were those property of the

9       people living on the encampment or someone

10       else?

11  A.  They were found on the Greenway.

12  Q.  So then you stored them?

13  A.  I believe we did.

14  Q.  Do you know where?

15  A.  I believe at the same building.

16          Oh, I maybe don't know.  I remember

17       that was an issue finding a place, so I

18       don't know where they ultimately ended up.

19  Q.  Were there vehicles plans to help with the

20       moving of property that day?  Was that

21       part of the planning?

22          MS. PIERCE:  Objection.  Vague.

23  A.  We had -- contractors had trucks and

24       trailers available.

25  BY MR. GRUNDMAN:

Page 208

1   Q.   To help with not just removing debris, but

2        also personal property for people that was

3        to be kept?

4   A.   Yep.  We did have the ability to pack up

5        boxes, store -- and store items, and then

6        transport them to the storage site.

7   Q.   Was it -- were those same vehicles used

8        for the motorbikes?

9   A.   I don't recall.

10  Q.   I mean, as you think back now, and you say

11       it went pretty smoothly, I'm just asking

12       was there -- do you have anything you

13       would change about the way that day took

14       place?

15       MS. PIERCE:  Objection.  Vague, calls

16       for speculation.

17  A.   The day was a large effort, involving many

18       people, not just me.  But I will say, I

19       thought because of all the work we did

20       ahead of time to try to get people to move

21       off the property and into other housing

22       options, I thought it went as smoothly as

23       something like that could be expected to

24       go.

25  Q.   Exhibit 356 is a fairly short email.  It's

```
1       your assessment.
2            I'll tell you, we looked.  I couldn't
3       find a longer assessment of what happened
4       that day.
5            Was there any after-action report or
6       written summary of what took place that
7       you recall?
8   A.  I don't know if there was one.  I don't
9       think I made one.  I remember providing
10      pictures that I took that day.
11  Q.  Providing to who?
12  A.  Just making them available maybe on our
13      county network, making sure they were
14      stored properly, and having them be part
15      of the record.
16  Q.  But there was no -- you don't recall
17      having drafted any of your own summary of
18      what happened?
19  A.  I don't recall.
20  Q.  And you don't remember seeing any other
21      summary from anyone else?
22  A.  I just don't recall now if that was made.
23  Q.  Was there a meeting to discuss how it
24      went?
25  A.  I don't recall.  There could have been.  I
```

1          just cannot remember.

2     Q.   Wasn't -- if there was a meeting, it

3          wasn't something that was memorable to

4          you?

5               MS. PIERCE:  Objection.

6     A.   I wouldn't say that.  I just don't

7          remember.

8     BY MR. GRUNDMAN:

9     Q.   It seems odd to me that there wouldn't

10         have been some sort of assessment, "Did we

11         do this right?  Things we should do

12         differently next time."  And I'm hearing

13         you say you don't remember anything like

14         that.

15              MS. PIERCE:  Objection.  I don't know

16         that counsel's observations are relevant

17         to your question.  So --

18    A.   There could have been a debriefing

19         meeting.  Just don't recall.

20    BY MR. GRUNDMAN:

21    Q.   Was there any effort to -- if it seemed

22         like it went pretty well, was there an

23         effort to take the good parts about what

24         happened that day and commit those to

25         writing so that you could use those again

Page 211

1        in the future?

2              MS. PIERCE:  Objection.  Asked and

3        answered.

4   A.   Yeah, I didn't make anything like that.

5              MR. GRUNDMAN:  It's been more than an

6        hour.  Do we want another break?

7              MS. PIERCE:  Sure.

8              (Break taken.)

9              MR. GRUNDMAN:  I'm going to mark

10       Exhibit 357.

11             (Deposition Exhibit No. 357 was

12       introduced.)

13             MS. PIERCE:  Has this been produced

14       in the case?

15             MS. STILLMAN:  No.

16             MS. PIERCE:  Okay.

17             MS. STILLMAN:  Devona used a ton of

18       stuff that hadn't been produced.

19             MS. PIERCE:  I'm just asking.

20             So this is 357?

21             MR. GRUNDMAN:  Yes.  Mark this as

22       357.

23   BY MR. GRUNDMAN:

24   Q.   Ms. Galatz, I don't expect that you've

25       seen this before, but I'll just note for

Page 212

```
 1       the record this is a screenshot of a
 2       thread that -- we're going to watch a
 3       video that this relates to, and this just
 4       helps set the context for it.
 5            And I'm just going to ask that you
 6       watch the video, and I'll just have a few
 7       questions for you.  Okay?
 8   A.  Okay.
 9                 (Video played.)
10            MS. MARTENSON:  Is the video a
11       different exhibit than the paper?
12            MR. GRUNDMAN:  Yes.  I was just about
13       to say --
14            MS. MARTENSON:  Okay.  Sorry.
15            MR. GRUNDMAN:  That's okay.  Sorry to
16       interrupt.
17            So for the record, we'll mark the
18       video as Exhibit 358.
19            (Deposition Exhibit No. 358 was
20       introduced.)
21   BY MR. GRUNDMAN:
22   Q.  What I've shown you, what's in front of
23       you, Ms. Galatz, is just a screenshot of
24       the same video.  It's just purely for the
25       record.  I'm not asking for you to
```

Page 213

```
 1         recognize it.  But I do want to ask you
 2         some questions about the video that we
 3         just saw.  Okay?
 4   A.    Okay.
 5   Q.    So do you recognize the people shown in
 6         the video, and particularly the person in
 7         the orange vest that was talking?
 8   A.    I couldn't see close enough to know, so I
 9         don't know.
10   Q.    Did you recognize anyone in the video?
11   A.    Not from watching it here, but I probably
12         would have been on site with them, so --
13   Q.    Did they -- so could you tell from the
14         video what was happening in it?
15   A.    I think I could.  That would be crews
16         contracted by the Authority cleaning out
17         an abandoned camp.
18   Q.    Along the Greenway?
19   A.    Correct.
20   Q.    And we talked a lot about the contractors
21         that the Authority hired for that purpose,
22         correct?
23   A.    Correct.
24   Q.    Could it have been employees of one of
25         those contractors that we saw in the
```

```
 1      video?
 2            MS. PIERCE:  Objection.  Calls for
 3      speculation.
 4  A.  It could have been.  Or STS, Hennepin
 5      County STS.
 6  BY MR. GRUNDMAN:
 7  Q.  And so either one of those two -- either
 8      one of the contractors or Hennepin County
 9      STS?
10  A.  It could have been.
11  Q.  Did you hear the person in the video say
12      the name Joe?
13  A.  I did.
14  Q.  Who do you understand that to be referring
15      to?
16            MS. PIERCE:  Objection.  Calls for
17      speculation.
18  A.  I think they were referring to Joe Gladke.
19  BY MR. GRUNDMAN:
20  Q.  That would -- assuming that the people we
21      saw in the video were a contractor
22      retained to clear out property along the
23      Greenway, them referring to Joe, most
24      likely in your opinion that was Joe
25      Gladke?
```

Page 215

1  A.  Correct.

2  Q.  So I asked you some time ago now about the

3       notices that were used prior to the

4       closure of an encampment, right?  And one

5       of those -- I mean, one of those is

6       Exhibit 121 that you testified that you

7       had drafted.

8            And then we also saw Exhibit 193.

9       You testified that a team of people

10      drafted that one, correct?  And Exhibit --

11      well, I'm talking fast.

12           Is that correct, that a team of

13      people drafted the Exhibit 193?

14           MS. PIERCE:  And I'll just on the

15      record state that I set out the Exhibits

16      121 and 193.

17           MR. GRUNDMAN:  I appreciate that,

18      Counsel.

19  A.  Correct.  I believe the second one, 193,

20      that notice was drafted by a team of

21      people.  I know I didn't draft it myself.

22  BY MR. GRUNDMAN:

23  Q.  Way back this morning, you told us that

24      you've been -- your work for the Authority

25      has included clearing encampments

Page 216

```
 1        virtually throughout the 20 years you've
 2        worked for the Authority, correct?
 3   A.   Cleaning up encampments, yes.
 4   Q.   And you testified at one point that there
 5        was an unwritten policy to provide 72
 6        hours' worth of notice.
 7             Do you remember that?
 8             MS. PIERCE:  Objection.  Misstates
 9        testimony.
10   A.   I remember saying when we had the rise in
11        encampments on the Greenway in the late
12        2010s, that became our practice.
13   BY MR. GRUNDMAN:
14   Q.   And that practice isn't written anywhere
15        that you know of, correct?
16   A.   I think we may have detailed it in an
17        email, but it's not like in an adopted
18        policy that I know of.
19   Q.   I notice on Exhibit 193, which is in front
20        of you, that the date on it is December
21        15th.  The date and time issued is stated
22        as December 15th.
23             Is that correct?
24   A.   Correct.
25   Q.   Does that seem right to you, given your
```

Page 217

```
 1        knowledge of the sweep, that notices were
 2        given on December 15th?
 3   A.   I trust if this has "12/15," this was
 4        posted on 12/15.  We wrote those while we
 5        were posting it.
 6   Q.   And the notice itself states that
 7        people -- the tent and its contents should
 8        be removed by December 17th, correct?
 9   A.   That's correct.
10   Q.   And Exhibit 121, the notice we talked
11        about earlier, it doesn't state exactly
12        how much time a person was given before
13        having to move; is that right?
14   A.   I don't believe it says on the notice, no.
15   Q.   Then you talk about how now the policy is
16        that when you give a notice saying that an
17        encampment will be cleared, you only give
18        a 24-hour notice; is that right?
19             MS. PIERCE:  Objection.  Misstates
20        testimony.
21   A.   We have signs posted now, and we have
22        routine patrols by Hennepin County
23        Security.  So we can post notice and
24        remove materials within 24 hours, or with
25        24-hour notice.
```

1    BY MR. GRUNDMAN:

2    Q.  How long has that been the case that you

3         can just post for 24 hours and that's good

4         enough?

5              MS. PIERCE:  Objection.  Misstates

6         testimony.

7    A.  I'm just thinking.

8    BY MR. GRUNDMAN:

9    Q.  Sure.

10   A.  I believe we have operated that way

11        since -- since the Greenway was cleared on

12        December 18, 2020.

13   Q.  Showing you what's been marked as Exhibit

14        359.  It appears to me to be an email.

15        It's -- one, two -- three pages.  Bates

16        begins HCO0015351.

17             (Deposition Exhibit No. 359 was

18        introduced.)

19   BY MR. GRUNDMAN:

20   Q.  Take a moment to look through it, and let

21        me know when you've had a chance to do

22        that.

23             MS. PIERCE:  And how for the video

24        purposes will that be made an official

25        exhibit?  How are we going to do that?

1          MR. GRUNDMAN:  Yes.

2          MS. PIERCE:  I mean, like the video

3     file?

4          MS. STILLMAN:  We have flash drives.

5     We also have it on the computer, and we're

6     uploading it to a OneDrive tonight, the

7     exhibit OneDrive.  So you can either take

8     a flash drive with you tonight or it will

9     be accessible on OneDrive, you'll have

10    access to.

11         MS. PIERCE:  And will that be given

12    to the court reporter, too?

13         MS. STILLMAN:  Yeah, I'll give her

14    the flash drive.

15 A.  I've read it.

16 BY MR. GRUNDMAN:

17 Q.  So Exhibit 359, another email chain,

18     correct?

19 A.  Correct.

20 Q.  Seen a lot of email chains today, correct?

21 A.  Yes, correct.

22 Q.  So do you recall this particular email

23     chain shown as Exhibit 359?

24 A.  I don't recall this specifically.

25         I do remember the tent, the site.

1    Q.   And the tent that's referenced throughout

2         the email chain shown as 359?

3    A.   Correct.

4    Q.   I'm mostly curious about the last email

5         from you to Kali Pliego at the very top of

6         the first page.

7    A.   Yep.

8    Q.   First off, who is Kali Pliego?

9    A.   She was a -- she worked for the MPD.  She

10        was a community service officer, or like a

11        liaison, safety liaison.  I can't remember

12        her title.

13   Q.   I told you I would focus on that one, but

14        before I do, what generally is the nature

15        of the conversation between you and

16        Ms. Pliego shown in this exhibit?

17   A.   In this exhibit, we're discussing -- she

18        makes us aware of a tent and associated

19        activity on Greenway property at 16th

20        Avenue and 29th Street.

21   Q.   And at the top of that first page, the

22        last email, you state that you "posted the

23        tent yesterday and cleared it today."

24             Is that correct?

25   A.   Correct.

Page 221

1   Q.  So this would be one of those

2       circumstances where the posting was only

3       up for 24 hours or so, right?

4   A.  That's correct.

5   Q.  Were there a lot of interactions like this

6       between you and the Minneapolis Police

7       Department?

8           MS. PIERCE:  Objection.  Vague.

9   A.  We certainly have lots of communication

10      with the Minneapolis Police Department.

11      This is one where they were telling us

12      about a tent on our property.

13  BY MR. GRUNDMAN:

14  Q.  Do you recall that happening more than

15      this one time?

16  A.  I remember emails in both directions

17      between Kali and I.

18  Q.  About other situations besides the one

19      referenced in 359?

20  A.  Correct.

21  Q.  Roughly how many situations do you recall

22      involving encampments?

23  A.  So I remember prior to 2020 working with

24      Kali on issues on the Greenway, not

25      specifically encampments.

1  Q.  And -- but when I -- just to make sure the

2      record is clear, when I asked you before

3      do you recall any interactions with

4      Ms. Pliego, I meant were those

5      interactions involving encampments that

6      you recall, or were there other

7      interactions with Ms. Pliego involving

8      encampments that you recall?

9  A.  There could have been from time to time,

10     but I remember our interactions being more

11     general than encampments.

12 Q.  Do you know -- actually, before we leave

13     Exhibit 359 -- so, you know, like, again,

14     I'm not sure -- counsel doesn't have them

15     up anymore, but we talked about two

16     different notices today, one that just you

17     drafted, and one that a group of people

18     drafted, Exhibit 121 and Exhibit 193.

19          MR. GRUNDMAN:  Thank you, Counsel.

20 BY MR. GRUNDMAN:

21 Q.  Do you know which of those two notices

22     were used, which type of notice was used

23     in the situation referenced in Exhibit

24     359?

25 A.  It would have been the type of notice

1       shown in 193.  This is a more modern
2       notice.  We made this change like in this
3       time period.
4   Q.  How are you so sure that the type of
5       notice shown in Exhibit 193 is the one you
6       used?
7   A.  Because I often posted these notices.
8   Q.  Do you remember specifically notice --
9       using that type of notice with regard to
10      the situation, Exhibit 359?
11  A.  I do not.
12  Q.  All right.  Ms. Galatz, I've just handed
13      you a document marked as Exhibit 360.
14      Document starts with Bates number
15      HC00016532.
16          (Deposition Exhibit No. 360 was
17      introduced.)
18  BY MR. GRUNDMAN:
19  Q.  Would you -- it's a one-page document.
20          Would you read it, and let me know
21      when you've had a chance to do that.
22  A.  (Reviewing document.)
23          I read it
24  Q.  Do you recognize Exhibit 360?
25  A.  I do.

1   Q.   What is it?

2   A.   It is a letter from my manager at the

3        time, Michael Noonan, to -- I have like to

4        my personnel file.  It looks like it's to

5        the human resources department.

6   Q.   And it's a letter of commendation,

7        correct?

8   A.   Correct.

9   Q.   It recognizes the work you did with regard

10       to the homeless camps on the Greenway,

11       correct?

12  A.   Correct.

13  Q.   I notice it's dated December 21st, 2020.

14       Correct?

15  A.   Correct.

16  Q.   I just looked back at a calendar, and I

17       see that December 21st is a Monday.

18            Would that surprise you to know that?

19       I'm not asking you to tell me that for

20       sure.

21  A.   No, I don't know.

22  Q.   So the encampment clearing that was

23       noticed for December 17th and then

24       primarily took place on 12/18, it was like

25       the week before this commendation; is that

Page 225

```
 1        correct?
 2   A.   Correct.
 3   Q.   I asked you before about like after-action
 4        reports, or whether there was an analysis
 5        of how things happened.  And I'm curious
 6        about this particular letter of
 7        commendation, Exhibit 360.
 8             How was the -- how did Michael Noonan
 9        have the information to give you the
10        commendation about what happened that day?
11   A.   Michael Noonan was my manager, supervisor
12        at that time.  So I certainly would have
13        briefed him probably just in the office --
14        or not -- over a call about how the day
15        went.
16   Q.   Like after that, after the day itself, you
17        talked to him on the phone about what
18        happened?
19   A.   I'm sure I did.
20   Q.   But he wasn't there?
21   A.   He was not there.
22             He was also -- as he was my direct
23        supervisor and manager, he was aware of
24        how much time I was spending on the
25        Greenway in the months leading up to
```

1         December 18th.

2    Q.   And how much time was that?

3    A.   At least once a week, usually twice a

4         week, since beginning of October.

5    Q.   So -- and beyond just your visits to the

6         Greenway itself, how much of your day was

7         consumed by work regarding the

8         encampments?

9    A.   Beyond being on site?

10   Q.   Yes.  Or total.  I'm just looking for a

11        sense of --

12   A.   Sure.

13   Q.   -- if we have a pie chart of your average

14        day in that fall, how much of it involved

15        the encampments.

16   A.   It's pretty all-encompassing.  I did have

17        a -- have other responsibilities, but with

18        time spent on site, and then documentation

19        and correspondence off site, it was quite

20        a bit of my time.  Over half I would say.

21   Q.   And what's been -- since then, what

22        percentage of your average day involves

23        encampments?

24   A.   I couldn't give you a percentage, but it

25        is different now because we have Hennepin

Page 227

1        County Security patrol making contact with
2        people as soon as possible after they
3        might set up, and letting them know of our
4        policies, and that they can't camp there
5        and they need to take their belongings and
6        leave.
7    Q.  So right now, those responsibilities
8        belong to Hennepin County Security?
9    A.  Conveying that message -- the first
10       message belongs to them, and we haven't
11       had people not comply with that.
12   Q.  Not even a single situation?
13   A.  I should say we haven't had that recently.
14       So it just hasn't occupied a lot of my
15       time over the winter, such as monitoring,
16       keeping in contact with security and our
17       maintenance crews.
18   Q.  You're talking about this very long winter
19       we're in right now?
20   A.  Correct.
21   Q.  What about -- so this -- the clearing took
22       place in December of 2020.  What about
23       throughout the year of 2021?
24   A.  I can't remember specifically.  But,
25       again, we have a different system in place

```
 1          now.  And the executive order isn't in

 2          place, so people are not permitted to camp

 3          there.

 4   Q.  So you said that it hasn't happened

 5          frequently that a person has refused to

 6          obey the security officers who tell them

 7          to move.

 8               Is that what you said?

 9               MS. PIERCE:  Objection.  Misstates

10          testimony.

11   A.  I said it hasn't happened very often over

12          this winter, correct.  And it's -- yeah,

13          I'll stop there.

14   BY MR. GRUNDMAN:

15   Q.  And so how many times has it happened

16          since the clearing in December of 2020,

17          approximately?

18               MS. PIERCE:  Objection.  Vague.

19   A.  How many times has like a tent been set up

20          where people don't leave immediately or --

21   BY MR. GRUNDMAN:

22   Q.  Well, let's do both.

23               Approximately how many times do you

24          think tents have been set up in that

25          intervening time period?
```

Page 229

```
 1            MS. PIERCE:  Objection.  Vague.
 2   A.  So that would be -- I'm just thinking of
 3        how much time it was -- I couldn't give
 4        you an exact number.  It does happen.
 5        And -- or we find a tent and security
 6        isn't able to make contact, so we keep
 7        trying until we can make contact, with our
 8        standard practice.
 9   BY MR. GRUNDMAN:
10   Q.  Have there been situations since December
11        of 2020 where the people have not moved
12        until they were forced to move?
13   A.  No, there have not been those situations.
14        We have been able to work with people to
15        move on their own schedule.
16   Q.  Do you still ever go to the Greenway
17        directly?
18   A.  I do.
19   Q.  Under what circumstances?
20   A.  A site visit to check on the condition of
21        our property or project that needs to
22        happen.
23            I certainly could go document like a
24        tent, or assess if something is abandoned
25        or not.
```

Page 230

```
 1   Q.  If there are -- if a tent appears on the
 2       Greenway today, I want to get a sense of
 3       the policy and what happens.
 4            So I think you've told us this, to
 5       fast-track us.  You said that in most
 6       cases it would be Hennepin County Security
 7       who would first notice it; is that
 8       correct?
 9            MS. PIERCE:  Objection.  Incomplete
10       hypothetical, calls for speculation.
11   A.  Maybe I should say I don't know who would
12       first notice it.  But first contact would
13       likely be made by Hennepin County
14       Security.
15   BY MR. GRUNDMAN:
16   Q.  What does that first contact involve?
17            MS. PIERCE:  Same objections.
18   A.  Yeah, I think they stop and try to talk to
19       the people there, inform them of our
20       policy, let them know they can't camp
21       there, see if there is any services they
22       can provide, or if they could connect them
23       to services.
24   BY MR. GRUNDMAN:
25   Q.  Do they post a notice?
```

1          MS. PIERCE:  Objection.  Calls for

2       speculation, incomplete hypothetical.

3  A.  They do not.

4  BY MR. GRUNDMAN:

5  Q.  No -- notices are not -- written notices

6       are no longer posted?

7          MS. PIERCE:  Same objections.

8  A.  Right.  I didn't say that.

9          So security will try to make contact

10      and talk to folks.  If they couldn't, and

11      if we were going to remove the materials

12      on site, we would post notice.

13  BY MR. GRUNDMAN:

14  Q.  How many times have you posted notice

15      since December of 2020?

16  A.  I don't know.  I know I haven't in the

17      last year.

18          So we really try to make that contact

19      with anybody on site, and have been able

20      to.

21  Q.  When you do post a notice, does that

22      notice look like the notice shown in

23      Exhibit 193?

24  A.  If I --

25          MR. PIERCE:  Objection.  Incomplete

Page 232

```
 1          hypothetical, calls for speculation.
 2   A.   If I were to post a notice, I believe it
 3          would look like this, with some updates.
 4   BY MR. GRUNDMAN:
 5   Q.   And those updates -- well, let me just
 6          ask:  Do you have a blank version of a
 7          notice that is available to you that you
 8          could print out and use in this specific
 9          situation?
10   A.   I could draft a notice that complies with
11          our policy, but I don't know that it will
12          look exactly like that.  And I just
13          haven't had to post notice in at least the
14          last year.
15   Q.   If you -- if there was a situation where a
16          notice had to be posted, do you consult
17          any written policy to determine when and
18          what the notice should say?
19   A.   I would certainly consult the public
20          spaces policy that the County has, and I
21          would look to the signs we already have
22          posted on the Midtown Greenway.
23   Q.   You should have received one of these
24          before.  I only have two extra copies.
25          It's marked as Exhibit 340.
```

Page 233

1              (Deposition Exhibit No. 340 was

2         previously marked.)

3              MS. STILLMAN:  It's from yesterday.

4              MS. MARTENSON:  I've got it.

5    BY MR. GRUNDMAN:

6    Q.  So, Ms. Galatz, just showing you a

7         document.  It's marked as Exhibit 340,

8         consists of three pages.

9              Would you take a look at it, and let

10        me know when you've had a chance to

11        review.

12   A.  (Reviewing document.)

13             I'm ready.

14   Q.  You referenced a policy regarding public

15        spaces just before I showed you Exhibit

16        340.  Is this the same -- is this the

17        policy you're talking about?

18   A.  I don't believe it is.

19   Q.  It's not.  Okay.

20             The policy you referenced, is that --

21        where is that?

22             Is that something that you have

23        available to you at all times?

24   A.  I have it available.  It's -- I think it's

25        from facilities.  It's a public space

Page 234

1        policy.
2   Q.   And so then Exhibit 340, have you ever
3        seen this policy before?
4   A.   I don't know that I have.
5   Q.   I'll just note very first page under
6        "Purpose," it references the Authority
7        itself, correct?
8   A.   Correct.
9   Q.   This other policy regarding public spaces,
10       the one that you said facilities -- you
11       said facilities issued that; is that
12       correct?
13  A.   I believe it's from the facilities
14       department.
15  Q.   Do you remember when you first started
16       using that policy?
17  A.   No.
18  Q.   Was it something that was part of your
19       work during this time period we've been
20       primary focused on, the fall of -- both
21       summer and fall of 2020?
22  A.   Yes.
23  Q.   Was it part of your work before the
24       executive order went into effect?
25  A.   I believe so.  I believe we encountered it

```
 1        while researching issues on the Greenway
 2        in the late 2000s, maybe around 2019.
 3   Q.  I've just handed you a document marked as
 4        Exhibit 339, two pages.
 5             (Deposition Exhibit No. 339 was
 6        previously marked.)
 7   BY MR. GRUNDMAN:
 8   Q.  Would you look at Exhibit 339, and let me
 9        know when you've had a chance to do that.
10   A.  (Reviewing document.)
11             I'm ready.
12   Q.  Do you recognize Exhibit 339?
13   A.  So I don't know if I remember this
14        document specifically, but I remember
15        these rules, this policy regarding
16        encampments on the Greenway in 2020 after
17        the executive order.
18   Q.  So when you say you remember the policies,
19        but you don't remember the document, can
20        you help me out with that.
21             Under what circumstances do you
22        recall learning the policies?
23   A.  Well, I remember that the executive order
24        limited our ability to remove camps, but
25        we could ask that there is proper spacing
```

1        in between tents, and there is a limited

2        number of people in a tent, and those

3        types of things, to help reduce COVID

4        spread.

5   Q.  But you don't recall anyone ever giving

6        you this particular document regarding --

7        well, in any capacity?

8   A.  I just don't remember seeing it in this

9        form.  I may have.  I don't recall.

10  Q.  Did you -- when the executive order came

11       into effect, going back a ways here, that

12       had a significant impact on your work; is

13       that fair to say?

14            MS. PIERCE:  Objection.  Vague.

15  A.  Yeah, that's fair to say.

16  BY MR. GRUNDMAN:

17  Q.  Did you get any training on the executive

18       order or what it said, what it meant?

19  A.  I did not receive training on the

20       executive order.

21  Q.  I just have, going way back, a couple more

22       specific questions about you.

23            What is your date of birth?

24  A.  August 4th, 1981.

25  Q.  What is your home address?

Page 237

1    A.   4312 40th Avenue South, Minneapolis,

2         Minnesota 55406.

3    Q.   Have you ever been arrested?

4    A.   No.

5    Q.   Have you ever been part of a civil lawsuit

6         where you were a named party?

7    A.   No.

8    Q.   Have you ever been accused of a fraud?

9    A.   No.

10   Q.   Have you ever received disciplinary

11        sanction as part of your professional

12        experience?

13   A.   No.

14            MR. GRUNDMAN:  I don't have any more

15        questions for you.

16            THE WITNESS:  Okay.

17            MS. PIERCE:  We'll read and sign.

18            (The right to read and sign the

19        deposition was preserved.)

20            (The deposition concluded at 3:09

21        p.m.)

22

23

24

25

Page 238

```
 1   STATE OF MINNESOTA )
                      :     CERTIFICATE
 2   COUNTY OF HENNEPIN )
 3        I hereby certify that I reported the
     deposition of JESSICA GALATZ on MARCH 29, 2023
 4   in Minneapolis, Minnesota, and that the
     witness was by me first duly sworn to tell the
 5   whole truth;
 6        That the testimony was transcribed under
     my direction and is a true record of witness
 7   testimony;
 8        That the cost of the original has been
     charged to the party who noticed the
 9   deposition, and that all parties who ordered
     copies have been charged at the same rate for
10   such copies;
11        That I am not a relative or employee or
     attorney or counsel of any of the parties or a
12   relative or employee of such attorney or
     counsel;
13
          That I am not financially interested in
14   the action and have no contract with the
     parties, attorneys, or persons with an
15   interest in the action that affects or has a
     substantial tendency to affect my
16   impartiality;
17        That the right to read and sign the
     deposition was reserved.
18
          WITNESS MY HAND AND SEAL this
19   12TH DAY OF APRIL 2023.
20
21
22
23        _____
24
          Mari A. Skalicky
25        Registered Merit Reporter
          Certified Realtime Reporter
```

**Errata Sheet**

**Deposition of Jessica Galatz, 3/29/2023**

**Assignment Reference No. 5796513**

**Statement of Changes Under Fed. R. Civ. P. 30(e)**

| Page | Line | Change | Reason |
|---|---|---|---|
| 17 | 20-21 | Change "Technologies (sic) of Participation" to "Technology of Participation" | Misspoke |
| 23 | 7 | Change "Stehley" to "Stehly" | Misspelling |
| 33 | 3, 8, 22, 23, 25 | Change "Stehley" to "Stehly" | Misspelling |
| 57 | 11 | Change "Stehley" to "Stehly" | Misspelling |
| 87 | 7 | Change "believe Authority" to "believe the Authority" | Transcription error |
| 89 | 7 | Change "not camp" to "not the camp" | Transcription error |
| 97 | 9 | Change "to leave, [that]" to "to leave" | Transcription error; inserted incorrect word in brackets |
| 105 | 19 | Change "lieutenant" to "Lieutenant" | Capitalization error |
| 110 | 19 | Change "hard line" to "through road" | Transcription error |
| 187 | 22-23 | Change "considerably and were in" to "considerably in" | Transcription error |
| 202 | 21 | Change "was pretty close proximity" to "was in pretty close proximity" | Transcription error |
| 212 | 10, 14 | Change "Martenson" to "Pierce" | Misidentified speaker |
| 218 | 23-25 | Change "And how for the video purposes will that be made an official exhibit?" to "And how will the video be made an official exhibit?" | Transcription error |
| 227 | 10 | Change "belongs to" to "comes from" | Misspoke |

_Jessica Galatz_
Jessica Galatz

5/9/2023

_____

Date

# EXHIBIT 107

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Patrick Berry, Henrietta Brown, Nadine Little, Dennis Barrow, Virginia Roy, Joel Westvig, Gina Mallek, Daniel Huiting, *on behalf of themselves and a class of similarly-situated individuals*; and ZACAH, | Case No. 20-CV-02189-WMW-JFD |
| | District Judge Wilhelmina Wright Magistrate Judge John F. Docherty |
| Plaintiffs, | |
| vs. | **HENNEPIN COUNTY'S RESPONSE TO PLAINTIFFS' SECOND SET OF INTERROGATORIES** |
| Hennepin County; Hennepin County Sheriff David Hutchinson, *in his individual and official capacity*; City of Minneapolis; Minneapolis Mayor Jacob Frey, *in his individual and official capacity*; Medaria Arradondo, *in his individual and official capacity*; Minneapolis Park and Recreation Board, Superintendent of the Minneapolis Park and Recreation Board Al Bangoura, *in his individual and official capacity*; Park Police Chief at the Minneapolis Park and Recreation Board Jason Ohotto, *in his individual and official capacity*; Police Officers John Does; and Police Officer Jane Does, | |
| Defendants. | |

TO:   Plaintiffs, through their attorneys, Justin Perl, Dorinda Wider, Rebecca Stillman, and Luke Grundman, Mid-Minnesota Legal Aid; Teresa Nelson, Clare Diegel, and Ian Bratlie, American Civil Liberties Union of Minnesota; and Isabella Salomão Nascimento, Ballard Spahr LLP; Defendants City of Minneapolis, Mayor Jacob Frey, and Police Chief Medaria Arradondo, through their attorneys, Sharda Enslin and Brian Carter, Minneapolis City Attorney's Office; and Defendants Minneapolis Park and Recreation Board, Superintendent Al Bangoura, and Park Police Chief Jason Ohotto, through their attorneys, Ann Walther, Brian Rice, and Alana Mosley, Rice, Walther & Mosley LLP.

Defendant Hennepin County and Hennepin County Sheriff David Hutchinson (together, the "Hennepin County Defendants"), for their Responses to Plaintiffs' Second Set of Interrogatories to Defendant Hennepin County ("Second Set of Interrogatories"), state and object as follows:

## GENERAL OBJECTIONS

The Hennepin County Defendants object to the Second Set of Interrogatories to the Hennepin County Defendants to the extent that it seeks information protected by the attorney-client privilege, attorney work-product doctrine, or Fed. R. Civ. P. 26(b). The Hennepin County Defendants will not produce communications or information protected from disclosure by the attorney-client privilege or attorney work-product doctrine.

The Hennepin County Defendants also object to the definitions in the Second Set of Interrogatories. Specifically, the Hennepin County Defendants object to the definition of "Defendants," you," or "your" as meaning "Hennepin County, Sheriff Hutchinson, and any of their agents, or other representatives." This definition does not define the terms "agents" or "representatives." In answering these interrogatories, the Hennepin County Defendants will understand the terms "Defendants," you," or "your" to mean Hennepin County, Sheriff Hutchinson, or any employee of Hennepin County.

By responding to the Second Set of Interrogatories in whole or in part, the Hennepin County Defendants do not waive the general and specific objections made herein. Each Answer is made subject to these general objections and any specific objection(s) made during the course of such Answer. Investigation by the Hennepin County Defendants is ongoing, and the Hennepin County Defendants reserve the right to supplement, clarify, or revise these Answers consistent with the Federal Rules of Civil Procedure.

## ANSWERS TO INTERROGATORIES

**INTERROGATORY NO. 11:** Describe the process by which you inventoried personal property – things like tents, clothes, documents, money – at all encampment sweeps you participated in, the methods you used to get that property back to its rightful owner, how long you possessed property before ultimately destroying it, and whether the property was destroyed, sold, or returned to its original owner.

**Answer:** The Hennepin County Defendants object to Interrogatory No. 11 as overly broad, unduly, and not proportional to the needs of the case because it seeks information, for an unlimited period of time, about "encampment sweeps" in which any Hennepin County employee "participated," regardless of the employee's role or the County's role with a specific encampment and regardless of the location of the encampment. The Hennepin County Defendants also object to the definitions of "encampment" and "sweeps," which are vague, and which could mean that this Interrogatory seeks information

2

about the *voluntary* disbandment of even a group of two tents of people experiencing homelessness at any time and in any location. The Hennepin County Defendants further object to the term "participated in," which is vague and undefined. The Hennepin County Defendants further object to Interrogatory No. 11 as duplicative of Interrogatory No. 8.

Subject to and without waiving any objection, the Hennepin County Defendants state that:

From January 1, 2020 through September 7, 2022, the Hennepin County Defendants closed one encampment of people experiencing homelessness on the Midtown Greenway, and that closure occurred on December 18, 2020. Before closing the Greenway encampment, County employees communicated to people camping in the encampment that a closure was imminent. On December 15, 2020, the County gave each camper formal, written notice that the encampment would be closed and that campers should arrange to move their property out of the encampment. On December 18, 2020, County employees interacted with the campers in the 18 tents remaining along the Greenway, telling them that the encampment was closing that day and that the campers had to leave. The County offered to store the personal possessions that each camper could not take with them and provided boxes to individuals to pack up their possessions. Many campers turned these services down, but a few campers did take the County up on its offer to store possessions. The County stored two generators on November 23, 2020, and four boxes of individuals' possessions between December 16 and December 18, 2020. County workers provided a phone number for HCRRA to individuals who gave County workers possessions to store, and instructed individuals to call the HCRRA phone number to retrieve their possessions. Any items beyond those stored were immediately disposed of; all items stored were stored for at least a year after the closure.

From January 1, 2020 through September 7, 2022, Hennepin County human services staff, as well as officers from the Hennepin County Sheriff's Office ("HCSO") have been present when other government entities have closed encampments. During those closures, the Hennepin County Defendants did not seize or destroy campers' tents or other personal property. Instead, they performed outreach, social work, security, and transport functions.

Discovery is continuing and ongoing; the Hennepin County Defendants reserve the right to amend and/or supplement their Answer to this Interrogatory.

**INTERROGATORY NO. 12:** Describe the orders and training given to Hennepin County Sheriff's deputies for clearing encampments, including, but not limited to, how they should work with other law enforcement organizations, clear crowds, determine the status of property (e.g., whether it is hazardous, abandoned, etc.), and permit individuals to safely gather their personal property.

**Answer:** The Hennepin County Defendants object to Interrogatory No. 12 as overly broad, unduly, and not proportional to the needs of the case because it seeks information, for an unlimited period of time, about "clearing encampments," regardless of the roles of the County and HCSO with respect to a specific encampment and regardless of the location of the encampment. The Hennepin County Defendants also object to the definitions of "encampment" and "clearing," which are vague, and which could mean that this Interrogatory seeks information about the *voluntary* disbandment of even a group of two tents of people experiencing homelessness at any time and in any location. The Hennepin County Defendants further object to Interrogatory No. 12 to the extent it requests information about *all* orders and training given to HCSO deputies who were present when an encampment was closed, regardless of the duties performed by such deputies at each closure. The Hennepin County Defendants also object to Interrogatory No. 12 as seeking information outside the bounds of that information that is relevant to the claims, defenses, or facts at issue in this litigation, since the claims against the Hennepin County Defendants are limited to claims about personal property.

Subject to and without waiving any objection, the Hennepin County Defendants state that:

From January 1, 2020 through September 7, 2022, during closures of encampments of people experiencing homelessness in Hennepin County, HCSO deputies did not seize or destroy campers' tents or other personal property, did not "clear crowds" from encampments, and did not "determine the status" of campers' personal property. Instead, HCSO deputies were directed to perform security and transport functions.

On December 18, 2020, the Hennepin County Defendants closed the Greenway encampment. HCSO deputies were present during the Greenway closure for the sole purpose of providing security along the Greenway corridor during the closure. The Hennepin County Defendants further state that the specific instructions given to HCSO deputies relating to the closure of the Greenway encampment can be ascertained from the HCSO's "Operational Plan" for the Greenway closure, and so direct Plaintiffs to that document pursuant to Rule 33(d) of the Federal Rules of Civil Procedure.

Discovery is continuing and ongoing; the Hennepin County Defendants reserve the right to amend and/or supplement their Answer to this Interrogatory.

**INTERROGATORY NO. 13:** Since the existence of Executive Order 20-47, how many times have you publicly warned, either verbally or with a physical notice, that an encampment would be closed or swept only to not do so?

**Answer:** The Hennepin County Defendants object to Interrogatory No. 13 as overly broad, unduly, and not proportional to the needs of the case because it seeks information, for an unlimited period of time, about closing or "sweeping" "encampments," regardless

of the role of the County with respect to a specific encampment and regardless of the location of the encampment. The Hennepin County Defendants also object to the definitions of "encampment" and "swept," which are vague, and which could mean that this Interrogatory seeks information about the *voluntary* disbandment of even a group of two tents of people experiencing homelessness at any time and in any location. The Hennepin County Defendants further object to Interrogatory No. 13 as vague and ambiguous due to the phrases "publicly warned" and "only not to do so," which are confusing and undefined. The Hennepin County Defendants also object to Interrogatory No. 13 as seeking information outside the bounds of that information that is relevant to the claims, defenses, or facts at issue in this litigation, since the claims against the Hennepin County Defendants are limited to claims about personal property.

Subject to and without waiving any objection, the Hennepin County Defendants state that from April 29, 2020 through September 7, 2022, the Hennepin County Defendants never notified campers in an encampment of people experiencing homelessness that the Hennepin County Defendants would close the encampment without later closing the encampment.

**INTERROGATORY NO. 14:** Describe in full the facts that you contend supported the disbandment of the Midtown Greenway encampment on December 18, 2020 under Executive Order 20-47.

**Answer:** The Hennepin County Defendants object to Interrogatory No. 14 as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks all facts that supported Hennepin County's decision to close the Greenway encampment on December 18, 2020. The Hennepin County Defendants also object to Interrogatory No. 14 as seeking information in the possession, custody, and control of Plaintiffs, the City of Minneapolis Defendants, the Minneapolis Park and Recreation Board ("MPRB") Defendants, and other individuals and entities that are not parties to this case. The Hennepin County Defendants also object to Interrogatory No. 14 as premature, as discovery is ongoing. The Hennepin County Defendants also object to Interrogatory No. 14 as seeking information outside the bounds of that information that is relevant to the claims, defenses, or facts at issue in this litigation, since the claims against the Hennepin County Defendants are limited to claims about personal property.

Subject to and without waiving any objection, the Hennepin County Defendants state that they decided to close the Greenway encampment on December 18, 2020, after consideration of two primary factors.

First and foremost, the Hennepin County Defendants determined that the Greenway encampment had reached a size or status that is a documented threat to the health, safety, or security of individuals camping in the encampment. For example, in the weeks and months before the closure of the Greenway encampment:

- Hennepin County employees received reports of numerous incidences of violent crime—including robberies, assaults, and sex trafficking—in the Greenway encampment.

- The use of injection and other drugs was rampant in the Greenway encampment. County employees picked up thousands of intravenous needles in the encampment. In fact, County employees picked up approximately 280 needles on a single day in December 2020, 100 of which came from a single tent. Residents living in homes neighboring the Greenway also reported witnessing numerous open-air drug deals and routine drug use in the encampment.

- Individuals camping in the Greenway encampment were using propane tanks and generators in their tents. Tanks and generators had caused tents in the Greenway encampment to catch on fire, including five fires that completely engulfed a tent each time, and so presented obvious risks to campers.

- Hennepin County employees spotted dozens of rats in the encampment.

Second, the Hennepin County Defendants determined that alternate housing, shelter, or encampment space was available to people camping in the Greenway encampment, and that such housing, shelter, or encampment space complied with guidance from the Minnesota Department of Health and the Centers for Disease Control and Prevention. In the days before the December 18, 2020 closure of the Greenway, including on the morning of the closure, County employees confirmed with Adult Shelter Connect, operated by Simpson Housing Services, that there were available beds in shelters for those people camping in the Greenway encampment.

**INTERROGATORY NO. 15:** Describe in full how you ensured that every resident of the Greenway encampment had access to available shelter immediately after the sweep on December 18, 2020.

**Answer:** The Hennepin County Defendants object to Interrogatory No. 15 as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks all facts about shelter and housing offered to campers in the Greenway encampment on December 18, 2020. The Hennepin County Defendants also object to Interrogatory No. 15 as seeking information outside the bounds of that information that is relevant to the claims, defenses, or facts at issue in this litigation, since the claims against the Hennepin County Defendants are limited to claims about personal property. The Hennepin County Defendants further object that Interrogatory No. 15 is vague and ambiguous, because the definitions of "sweep" and "encampment" are unclear, and the terms "resident" and "available shelter" are undefined.

6

Subject to and without waiving any objection, the Hennepin County Defendants incorporate their answer to Interrogatory No. 14. In addition, the Hennepin County Defendants state that, on the day of the closure of the Greenway encampment, County employees offered rideshare rides or bus passes to people camping in the encampment, so that individuals camping in the Greenway encampment could get safely to shelter or to other housing or preferred destinations.

**INTERROGATORY NO. 16:** Describe the process you created for individuals, prior to the sweep of the Greenway encampment on December 18, 2020, to challenge the seizure of their property or, after the seizure, the process created for individuals to reclaim property that was taken.

**Answer:** The Hennepin County Defendants object to Interrogatory No. 16 as vague and ambiguous, due to the definitions of "sweep" and "encampment," which are unclear, and the use of the terms "challenge" and "seizure," which are undefined. In addition, the Hennepin County Defendants object to the Interrogatory to the extent that it assumes that the Hennepin County Defendants, when they closed the Greenway encampment on December 18, 2020, seized or destroyed personal property other than waste, hazardous materials, and soiled, perishable, or abandoned items. The Hennepin County Defendants further object to Interrogatory No. 16 as calling for a legal conclusion. The Hennepin County Defendants also object to Interrogatory No. 16 as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks information about "individuals" other than people experiencing homelessness and camping on the Greenway on December 18, 2020.

Subject to and without waiving any objection, the Hennepin County Defendants incorporate their answers to Interrogatory Nos. 8 and 11.

**INTERROGATORY NO. 17:** Prior to the sweep of the Greenway encampment on December 18, 2020, describe the process you created to support encampment residents packing and moving their property to a safe, alternative shelter.

**Answer:** The Hennepin County Defendants object to Interrogatory No. 17 as vague and ambiguous, due to the definitions of "sweep" and "encampment," which are unclear, and the use of the terms "residents" and "alternative shelter," which are undefined. The Hennepin County Defendants also object to Interrogatory No. 17 as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks information about "encampment residents" other than people experiencing homelessness and camping on the Greenway on December 18, 2020.

Subject to and without waiving any objection, the Hennepin County Defendants incorporate their answers to Interrogatory Nos. 8 and 11. In addition, the Hennepin County Defendants state that County employees visited the Greenway encampment regularly

7

during 2020, sometimes daily. During this time, County employees worked closely with Greenway campers, in an individualized manner, to try to get each camper to safe and secure shelter outside of an encampment and to arrange for transportation to shelter. As a result of the County's outreach and notice efforts, the total number of people camping and the number of tents on the Greenway had dramatically decreased from its peak of approximately 150 tents, in the fall of 2020. By the time the County closed the Greenway encampment, only 18 tents remained on the Greenway.

On December 18, 2020, the day of the closure of the Greenway encampment, County employees interacted with each camper, telling them that the encampment was closing that day and that the campers had to leave. County employees successfully connected a few campers with shelter options; most people camping in the Greenway encampment chose to leave the encampment and declined offers for shelter. County employees offered rideshare rides or bus passes to people camping in the encampment, so that campers could get safely to shelter or to other housing or preferred destinations. In addition, County employees offered boxes to campers to pack their possessions and offered to help campers to pack.

**INTERROGATORY NO. 18:** Prior to the sweep of the Greenway encampment on December 18, 2020, describe the process you created to challenge and report the conduct of Hennepin County staff before, during, and after the sweep.

**Answer:** The Hennepin County Defendants object to Interrogatory No. 18 as vague and ambiguous, due to the definitions of "sweep" and "encampment," which are unclear, and the use of the terms "challenge" and "conduct," which are undefined. The Hennepin County Defendants also object to Interrogatory No. 18 as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks, for an unlimited period of time, information about processes to "challenge and report" "conduct" of any kind, by Hennepin County staff working in any role or physical location at any time. The Hennepin County Defendants also object to Interrogatory No. 18 as seeking information outside the bounds of that information that is relevant to the claims, defenses, or facts at issue in this litigation, since the claims against the Hennepin County Defendants are limited to claims about personal property.

Subject to and without waiving any objection, the Hennepin County Defendants state that there are a variety of ways for individuals to lodge complaints with Hennepin County, depending on the employee and conduct involved. For example, individuals can submit complaints about County employees or policy online, through the County's feedback page on its website. Individuals can also submit complaints about the HCSO or HCSO officers online, through the IA Complaints Center. In addition, individuals can contact County Commissioners by email or phone. With respect to encampments, individuals reached out directly to County employees by email and phone to express their opinions. As to the Greenway encampment, the written notices that the Hennepin County

Defendants provided to individuals camping in the encampment contained an email address and phone number for individuals to contact with questions or concerns.

**INTERROGATORY NO. 19:** Identify all documents that exist regarding the inventory of the property cleared from the Greenway encampment on December 18, 2020.

**Answer:** The Hennepin County Defendants object to Interrogatory No. 19 as overly broad, unduly burdensome, and not proportional to the needs of the case because it requests "all" documents merely "regarding" the inventory of property "cleared" from the Greenway encampment on December 18, 2020, regardless of the status of the property (*e.g.*, waste, hazardous material, abandoned items) and regardless of the person or entity who "cleared" the property. The Hennepin County Defendants further objects to Interrogatory No. 19 as vague, due to the definitions of "clearing" and "encampment," which are unclear, and the use of the term "inventory," which is unclear and undefined. The Hennepin County Defendants also object to Interrogatory No. 19 to the extent it requests documents outside of their possession, custody, and control and/or in the possession, custody, and control of Plaintiffs, the City of Minneapolis Defendants, the MPRB Defendants, or other individuals or entities who are not parties to this case. Finally, the Hennepin County Defendants object that Interrogatory No. 19 seeks information that is equally available to Plaintiffs, including from documents produced in this litigation.

Subject to and without waiving any objection, the Hennepin County Defendants state that they will supplement their Answer to this Interrogatory to identify, pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, the Bates numbers corresponding to documents sufficient to show property removed from the Greenway encampment in connection with its closure on December 18, 2020.

**INTERROGATORY NO. 20:** Identify all agents, employees, or representatives of Hennepin County who authorized any County personnel, staff, agents, or representatives to be present at each of the encampment closures you identified in response to Interrogatory 2.

**Answer:** The Hennepin County Defendants object to Interrogatory No. 20 as vague and ambiguous due to its use of the term "authorized," which is unclear and undefined. The Hennepin County Defendants also object to Interrogatory No. 20 as seeking information outside the bounds of that information that is relevant to the claims, defenses, or facts at issue in this litigation, since the claims against the Hennepin County Defendants are limited to claims about personal property.

Subject to and without waiving any objection, the Hennepin County Defendants state that:

Hennepin County Administrator David Hough made the final decision to close the Greenway encampment on December 18, 2020. After that decision was made, Hennepin County staff were assigned to assist with the Greenway encampment closure as part of their job duties.

When Hennepin County human services staff were present at encampment closures in 2020, they were present as part of their job duties—namely, providing outreach and services to people experiencing homelessness in Hennepin County.

In 2020, Chief Deputy Tracey Martin made the final decision to provide security and transport assistance—at the request of Park Police Chief Jason Ohotto—when the MPRB closed the Powderhorn Park East encampment on July 20, 2020; the Kenwood Park encampment on August 12, 2020; the Elliot Park encampment on August 12, 2020; and the Peavey Park encampment on September 24, 2020. After that decision was made, HCSO staff were present at those encampment closures as part of their job duties. In 2022, Chief Deputy Tracey Martin also made the final decision to provide security assistance—at the request of Minneapolis Police Chief Amelia Huffman—to the Minneapolis Police Department when the City of Minneapolis closed an encampment in the Phillips neighborhood of Minneapolis on July 20, 2022, and an encampment in the Whittier encampment of Minneapolis on August 5, 2022. After that decision was made, HCSO staff were present at those encampment closures as part of their job duties.

**INTERROGATORY NO. 21:** Describe in full the method by which you determined the justification for all encampment sweeps in which you participated that were on the property of another municipality.

**Answer:** The Hennepin County Defendants object to Interrogatory No. 21 as vague due to the use of the words "determined," "justification," and "participated," which are unclear and undefined, and the terms "encampment" and "sweeps," whose definitions are unclear. The Hennepin County Defendants also object to the definitions of "encampment" and "sweeps" to the extent this Interrogatory seeks information about the *voluntary* disbandment of even a group of two tents of people experiencing homelessness at any time and in any location. The Hennepin County Defendants further object to Interrogatory No. 21 as overly broad, unduly burdensome, and not proportional to the needs of the case because it requests information about "all encampment sweeps" in which the Hennepin County Defendants merely "participated" that were located anywhere other than on Hennepin County land for an unlimited period of time. The Hennepin County Defendants also object to Interrogatory No. 21 as seeking information outside the bounds of that information that is relevant to the claims, defenses, or facts at issue in this litigation, since the claims against the Hennepin County Defendants are limited to claims about personal property.

Subject to and without waiving any objection, the Hennepin County Defendants state that:

From January 1, 2020 through September 7, 2022, the Hennepin County Defendants closed only one encampment—the Greenway encampment that was located on County land and closed by County staff on December 18, 2020. Prior to closing that encampment, the Hennepin County Defendants determined (1) that the Greenway encampment had reached a size or status that is a documented threat to the health, safety, or security of residents, and (2) that alternate housing, shelter, or encampment space was available to people camping in the Greenway encampment, and that such housing, shelter, or encampment space complied with guidance from the Minnesota Department of Health and the Centers for Disease Control and Prevention. For greater detail, the Hennepin County Defendants incorporate their answer to Interrogatory No. 14.

The Hennepin County Defendants did not have the authority to "determine the justification" for any other encampment closure, including closures of encampments on another municipality's land. Although Hennepin County cooperates with the City of Minneapolis, the MPRB, and the State of Minnesota and its agencies on issues of homelessness, each government entity makes its own decisions about whether and why to close encampments on its land.

**INTERROGATORY NO. 22:** Identify the number of arrests made by Hennepin County Sheriff's deputies during the clearing of all encampments that they participated in from January 1, 2020 to present.

**Answer:** The Hennepin County Defendants object to Interrogatory No. 22 as vague due to the use of the word "participated," which is unclear and undefined, and the terms "encampment" and "clearings," whose definitions are unclear. The Hennepin County Defendants also object to the definitions of "encampment" and "clearing" to the extent this Interrogatory seeks information about the *voluntary* disbandment of even a group of two tents of people experiencing homelessness at any time and in any location. The Hennepin County Defendants further object to Interrogatory No. 22 as overly broad, unduly burdensome, and not proportional to the needs of the case because it requests information, for an unlimited period of time, about "all encampment sweeps" in which the Hennepin County Sheriff's Office merely "participated." The Hennepin County Defendants also object to Interrogatory No. 22 as seeking information outside the bounds of that information that is relevant to the claims, defenses, or facts at issue in this litigation, since the claims against the Hennepin County Defendants are limited to claims about personal property.

Subject to and without waiving any objection, the Hennepin County Defendants state that from January 1, 2020 through September 7, 2022, the Hennepin County Sheriff's Office made no arrests in connection with encampment closures. On July 20, 2020, after

the MPRB's closure of the Powderhorn Park East encampment, HCSO deputies transported 16 individuals arrested by Park Police to the Hennepin County Adult Detention Center ("ADC"). On September 24, 2020, after the MPRB's closure of the Peavey Park encampment, Park Police officers were escorting a woman to HCSO's transport van, when two men became disruptive, one of whom placed his hands on a Park Police officer. HCSO officers assisted the Park Police officers by physically restraining the men, while Park Police officers arrested them. On that day, HCSO deputies transported 5 individuals arrested by Park Police, including the two men, to the ADC.

**INTERROGATORY NO. 23:** Identify all documents that exist that you claim support a finding that criminal activity was lower after sweeps of encampments at which Hennepin County agents, employees, or representatives were present.

   **Answer:** The Hennepin County Defendants object to Interrogatory No. 23 as vague and ambiguous. The Interrogatory uses the terms "sweeps" and "encampments," whose definitions are unclear. Further, the Interrogatory fails to explain whether it seeks information about rates of criminal activity at the location of an encampment or more broadly—*e.g.*, within the City, County, or State. It also fails to define the time period over which the rates of criminal activity may have changed—*e.g.*, a period of days, weeks, months, or years. The Hennepin County Defendants also object to Interrogatory No. 23 as overly broad, unduly burdensome, and not proportional to the needs of the case because it requests information about "all" documents, for an unlimited period of time, about "sweeps of encampments" at which the Hennepin County Defendants were present. The Hennepin County Defendants object to the definitions of "encampment" and "sweeps" to the extent this Interrogatory seeks information about the *voluntary* disbandment of even a group of two tents of people experiencing homelessness at any time and in any location. The Hennepin County Defendants also object to this Interrogatory to the extent it requests information outside of their possession, custody, or control and/or in the possession, custody, and control of Plaintiffs, the City Defendants, the MPRB Defendants, and/or other individuals and entities that are not parties to this case. The Hennepin County Defendants also object to Interrogatory No. 23 as seeking information outside the bounds of that information that is relevant to the claims, defenses, or facts at issue in this litigation, since the claims against the Hennepin County Defendants are limited to claims about alleged seizure of personal property in connection with encampment closures.

**INTERROGATORY NO. 24:** Describe the method in which you oversaw third party vendors, non-profits, organizations that you contracted with to shelter the homeless to ensure the third party vendors, non-profits, organizations were meeting their responsibilities.

   **Answer:** The Hennepin County Defendants object to Interrogatory No. 24 as overly broad, unduly burdensome, and not proportional to the needs of the case because it requests information about oversight of all contractors who sheltered people experiencing

homelessness for an unlimited period of time. The Hennepin County Defendants also object to Interrogatory No. 24 as vague and ambiguous due to the terms "oversaw," "shelter," "ensure," and "meeting their responsibilities," which are unclear and undefined. The Hennepin County Defendants also object to Interrogatory No. 23 as seeking information outside the bounds of that information that is relevant to the claims, defenses, or facts at issue in this litigation, since the claims against the Hennepin County Defendants are limited to claims about alleged seizure of personal property in connection with encampment closures.

**INTERROGATORY NO. 25:** Excluding attorney-client privileged information, identify all meetings or communications you had with Hennepin County personnel and/or third party vendors, non-profits, organizations and/or the City of Minneapolis and/or MPRB in which you expressed concern about those other parties' abilities to comply with the terms of their contracts and/or concerns about their ability to comply with the law.

**Answer:** The Hennepin County Defendants object to Interrogatory No. 25 as overly broad, unduly burdensome, and not proportional to the needs of the case because it requests information about "all" internal and external meetings and communications, over an unlimited period of time, in which any employee of Hennepin County "expressed concern" about the ability of any vendor, non-profit, "organization," the City, or the MPRB to comply with contractual terms or "the law." The Hennepin County Defendants also object to Interrogatory No. 25 as vague and ambiguous because it is unclear what third-party vendors, non-profits, organizations, contracts, and laws this Interrogatory is referencing. The Hennepin County Defendants also object to Interrogatory No. 25 as seeking information outside the bounds of that information that is relevant to the claims, defenses, or facts at issue in this litigation, since the claims against the Hennepin County Defendants are limited to claims about alleged seizure of personal property in connection with encampment closures.

As to answers:

David Hewitt
On behalf of the Hennepin County Defendants

Subscribed and sworn to before me
this 9 day of February, 2023

Notary Public

JENNIFER S. JOHNSON
Notary Public-Minnesota
My Commission Expires Jan 31, 2025

13

As to form and objections:

MICHAEL O. FREEMAN
Hennepin County Attorney

Dated:  October 21, 2022

By: *s/ Kelly K. Pierce*
     Kelly K. Pierce (0340716)
     Assistant County Attorney
     Christiana M. Martenson (0395513)
     Assistant County Attorney
     A2000 Government Center
     300 South Sixth Street
     Minneapolis, MN  55487
     Telephone: (612) 348-5488
     Fax: (612) 348-8299
     kelly.pierce@hennepin.us
     christiana.martenson@hennepin.us

     *Attorneys for Defendants Hennepin County and*
     *Hennepin County Sheriff David Hutchinson*

# EXHIBIT 108

**To:** Janis Callison[Janis.Callison@hennepin.us]; Angela M Conley[Angela.Conley@hennepin.us]
**Cc:** Robert Lilligren[rlilligren@nacdi.org]; David Hewitt[David.Hewitt@hennepin.us]; Chris Lomheim[clomheim@comcast.net]; David P Hutchinson[David.Hutchinson@hennepin.us]
**From:** Jana Metge
**Sent:** Wed 11/18/2020 3:46:10 PM
**Subject:** [External] Fwd: Letter to Hennepin County #7

Dear Hennepin County Staff & Elected Officials:

We are frustrated.

We have spent 4 weeks listening to clean up reports regarding the Midtown Greenway, specifically between 10th & 11th Ave.  50+ cubic yards of waste, 400 needles, blocking bike ramps and pathways, location of port-a -potties, daily trash removal, and removal of permanent structures.  All good things and we appreciate Lisa Cerney and Joe Gladke and their attention to this site tremendously.

**But**,
-The discarded, used needles continue.
-The debris amounts increase.
-Trucks drive around barricades.
-Cars continue to drive down to the Encampment, on the bike paths, to transport drugs - prostitutes - burnables for bonfires.
-CEPRO Park is being ripped up and cannot be used by the neighborhood.  This was a County & Neighborhood Revitalization Program Investment you are not protecting.
-Bonfires continue.
-Bikes continue to be disassembled and bike parts stored in tents.
-Drug sales continue within 30 minutes of the  County Vehicles leaving.
-Assaults, screaming and loud music continue. EVERY Night.
-We get no detailed information on arrests to take through our Court Watch Project.
-We don't know how many unsheltered people are in this camp, what their needs are, or how many have been housed since we began these meetings.
**-Victimization of people experiencing homelessness continues.**
-We have no count on the number of activists staying there or their involvement with the constant and visible drug dealing.
-Chaos continues.
-The game of the Activists continues.

There has been **NO sustainable reduction** in the criminal activity or in the Health & Safety conditions of this Encampment and the surrounding community.

**The conditions in this camp violate the Governor's Executive Order.**  He would be ashamed to see these living conditions.
His order was to protect, not victimize those experiencing homelessness.

This feels like a game played at the expense of the Phillips Community - **AGAIN**....Phillips is under resourced to resolve these serious issues - vulnerable people experiencing homelessness at this site being victimized  - businesses burglarized - customers & employees robbed - and Residents just trying to work and live amongst all this chaos.

HC00012255

The **Islamic Center** is 1 block away. **Lake Street businesses** are 1 block away. **Anderson School** is 2 blocks away.  **Hundreds of children** live right here.
This chaos is in the **backyard of Allina - Midtown Exchange - Global Market.**

*Do we want businesses and residents to stay or not?  This is the question.*

With the money spent on all this 'clean up' of debris - discarded needles - human waste - plus law enforcement -  could we have found a safe, temporary and Managed place for those experiencing homelessness, safe from those preying on this vulnerable community and further victimizing the residents?
Residents, businesses, customers and employees who experienced 1st hand the Trauma in May and June - continue to live around Lake Street rubble - continue to struggle with COVID physically and with its economic impacts, and continue to shop outside of the neighborhood to find services destroyed here since the riots.  It's too much.
This is neither equitable or just.

So, is this the location on the Greenway which Hennepin County has chosen to contain this criminal activity?  In Phillips?

How about moving the camp West of 35W if you want a safe haven along the Greenway.  In Ward 10?

**Please Quit dumping everything in Phillips.  We have had enough.**

Like the Parks did - move the Encampment. Move it west of 35W.  We have had it, constantly being the dumping ground.

We, this community of business owners and residents spent 30 years building this area - Lake Street - the Midtown Greenway - the Global Market & Midtown Exchange - the Sheraton - the Midtown Safety Center.
Only to see it all destroyed AND to be further victimized by this non managed violence preying on both unsheltered individuals and our community.  Crime Stats are escalating.

Meeting after meeting - no answer - no Outcomes - wasted tax dollars on cleaning up damages which only emboldens the 'organizers' to play this game and fully dump new supplies minutes after the County leaves.

This is wasted tax dollars.

*Your lack of immediate action shows us just how invaluable we seem to be.*

Should we cancel the Friday meetings?
This is bigger than Public Works issues.
We see zero value in our participation.

This is time off work that we have to make up. This is Volunteer time week after week.

<u>We have gotten zero input on our questions:</u>
- Who is down there?
- When will Criminal Action be ended permanently and those responsible arrested and trespassed from

HC00012256

this camp?
- How many in THIS area from 10th to 11th not the entire Greenway, have been moved into housing?
- How many unsheltered individuals in THIS area from 10th to 11th are there?  What type of housing & services do they need?
- Why is it acceptable for the County to contain this Encampment here, in Phillips, the most diverse, low income community on the Midtown Greenway corridor?
- There are conditions for relocating encampments written into the Governor's Executive Order. This camp has met those conditions.
- This is not right.

When do the voices doing good work, trying to run a business, trying to build up a neighborhood vs tearing it down - when are these voices heard and prioritized?

We tell you what - it makes Us physically ill to pay Hennepin County property taxes these days. Our taxes have tripled in 3 years.  For what?

*Signed,*

Nancy Anderson, Owner
Midtown Exchange Condos on the Greenway

Lorenzo Arisa, Owner
Salsa a la Salsa Restaurant; Global Market

Felicia Boone, Owner
Midtown Exchange Condos on the Greenway

Wayne Bugg, Manager
Lake Street Business & Midtown Phillips Boardmember

Dawn Dankers, Owner
Midtown Exchange Condos on the Greenway

Bob & Debby Friedriches, Owners
Midtown Exchange Condos on the Greenway

Emily Green, Owner
Midtown Exchange Condos on the Greenway

Aaron Horn, Owner
Midtown Exchange Condos on the Greenway

Michelle Hovey, Owner
Midtown Exchange Condos on the Greenway

Tom Jenkins, Owner
Midtown Exchange Condos on the Greenway

Joanne Johnson, Boardmember

HC00012257

Midtown Phillips Neighborhood Association

Kathy Lazo, Owner
Midtown Exchange Condos on the Greenway

Chris Lomheim, Owner
Midtown Exchange Condos on the Greenway

Marj Magnuson, Block Leader 30 years
Midtown Phillips Neighborhood

Jana Metge, Boardmember
Midtown Phillips Neighborhood Association

Darlene Moen, Owner
Midtown Exchange Condos on the Greenway

Todd Moen, Owner
Midtown Exchange Condos on the Greenway

Jennifer Naglak, Boardmember
Midtown Phillips Neighborhood Association

Donna Neste, Boardmember
Midtown Phillips Neighborhood Association

John Richard, Boardmember
Midtown Phillips Neighborhood Association

---

*Incoming comments demonstrating what is going on and not being addressed, emails received daily from Residents, Businesses, property owners;* **this represents only 4 DAYS of emails to Jana:**

"We are ALL volunteers working on this issue.  We are not paid!"

"This is a dog and pony show."

"3 vehicles have driven through the park most of which had 3-4 people jump out open the tailgate and unload carloads of new shit down below my building."

"I'm thinking of no longer attending those Friday zoom meetings. Deaf ears.
We have not been provided us with one thing that we've requested."

"The neighborhood shouldn't have to call zoom meetings to have the county clean up their own shit."

"The activists to come back night after night and just haul more crap back down to their tents."

"I'm about to get a flamethrower..."

"This is not fun & games for us, it is destroying our community when we are still traumatized from May & June."

"When the tents were dismantled it exposed
Potentially stolen bikes and crap they are stored in those tents.  When will a bike theft ring be busted?"

"Unbelievable..."

"They've disabled the arch light below the park so it's impossible to get license plates or other details of their activities down there."

"I am watching cleanup crew are taking away grills, bike wheels and tons of other crap from the tent cluster by the CEPRO site."

"I think we need to emphasize that these are indeed 'work tents' unoccupied most of the time until they are open for business."

"I just saw a car drop off a group of 4 people last night around 1am and they go in and use the tents as a drug den."

"This morning I am observing as crews are out asking if anyone needs anything those tents are silent and probably empty."

"How long does the County plans on continuing to support and enable this illegal drug,prostitution and stolen bike ring here on the Midtown Greenway?"

"It's disgusting to watch all the shit these county workers are picking up and throwing into trailers."

"As quickly as the County picks up all this crap and haul away prohibited items, there will be vehicles driving down there this afternoon and evening replenishing them with new supplies."

"I'm so sick of this...�"

"No matter what we say regarding the serious negative impact this encampment is having on our community, it's falling on deaf ears.
They've got their heals dug in deep and refuse to budge..."

"I can't believe the Governor's Executive Order gets brought up once again. "

"I think people take turns taking shifts staying in those tents and they use them for selling drugs and probably prostitution as I see a lot of Native American Women come and go in the evening hours and into of the night.
They need to move this crap out immediately.  Does Hennepin County now support prostitution trafficking?"

"We know we have met the conditions in the revised language of the Governor's Executive Order to relocate this camp.  Why is this being contained in Phillips?"

HC00012259

"The tents below my condo (same folks you removed the wood burning stove from last week) had a bonfire roaring around 8:45pm last night."

"Shortly after taking this picture 3 Sheriff's vehicles drove eastbound down the Greenway past this fire but didn't seem to notice, they must have been responding to something else down the trail."

"All the postings you staked into the ground listing prohibited items and rules were quickly removed hours after your crew left."

"The thing that upsets me the most is the lack of respect these people have for our neighborhood and the park."

"This person has been warned multiple times that driving in the park and Greenway are not acceptable yet they continue to thumb their nose at it. For this person to drive through the park past barricades for the sole purpose of dropping off one person to the encampment shows that they don't respect the law or our neighborhood."

"This encampment can't end soon enough..."

"Are we just waiting for someone to die"

"I'm angry with the lack of law enforcement at this camp. We are getting ZERO law enforcement unless I call 911.
At Hiawatha there were Metro Transit Police and other Police squads parked nearby keeping an eye on the encampment."

"This is a free for all. A criminals field day, a drug dealers dream come true."

"HC will provide additional security when students come to visit Allina and the GM next week for an event, but what about having it for OUR children living here"

"Last night there were cars driving up and down the Greenway sliding around having the time of their lives"

"I am no longer calling 911 for vehicles down there because I felt guilty wasting police resources to babysit this encampment and it's visitors when they should be focusing on serious crimes."

"I'm not calling anymore unless they start sending Sheriff's out to enforce Their encampment. It's THEIR encampment on THEIR property."

"That same truck (with pink graffiti all over it) drove down past the barricades and through the park for the sole purpose of dropping some idiot off at his tent. The driver of that truck is a woman who wears fluorescent vest and uses a duck call to announce her presence."

"This group of tents (located on the west side of the 11th Ave bridge to the blue emergency call box) have a lot of vehicles visiting them night and day and park above on 11th Ave near the park."

"It would be interesting to know if these folks in this tight cluster of tents are refusing outreach and if so

why? What do they need?"

"Thank you for the extra patrols from the Sheriffs Department, Park Police and MPD."

"It does make a huge difference in their behaviors below CEPRO Park as it discourages some of the drug traffic and other illegal behaviors that are attracted to this encampment."

"Why post rules and regulations if the county isn't going to enforce them?"

"You are sponsoring an Open Air Drug drug market"

"They have people Uber'd down to their tents through the park just as an act of defiance and a big FU to our neighborhood."

"Lighting bonfires less than a week after having their stove removed is their way of challenging the county because they are above the law..."

"My feeling is that the Hennepin County is just trying to wait this out and not do anything to close this encampment due to the political fallout."

"It wasn't until I included David Hutchinson on emails reporting vehicles and complaining about lack of law enforcement by Hennepin county on their property that I heard back"

"He said that I should be seeing additional patrols and hopefully enforcement in the area..."

"I haven't seen a Sheriff's or HC security vehicle down there in days."

"There giving us the run around."

"I'm tired..."

"I want the Activists removed!!"

***CAUTION: This email was sent from outside of Hennepin County. Unless you recognize the sender and know the content, do not click links or open attachments.***

# EXHIBIT 109

**Cc:**     Jana Metge[singdancesavetheworld@gmail.com]; Allison Pence[alison.pence@allina.com]
**To:**     Janis Callison[Janis.Callison@hennepin.us]; David Hough[David.Hough@hennepin.us]; Angela M
Conley[Angela.Conley@hennepin.us]; Lisa Cerney[Lisa.Cerney@hennepin.us]; David
Hewitt[David.Hewitt@hennepin.us]; David P Hutchinson[David.Hutchinson@hennepin.us];
cathy.tenbroeke@state.mn.us[cathy.tenbroeke@state.mn.us]
**From:**     Chris Lomheim
**Sent:**     Thur 11/19/2020 4:37:50 PM
**Subject:**     [External] Wellness Check / Assesment of the HC Midtown Encampment

Good morning Hennepin County Leaders,

Re: Midtown Encampment on Greenway between 10th & 11th Aves

I apologize for any typos in this email, I didn't get a whole lot of sleep last night as there was a violent man with no shirt running around in front of his tent yelling and threatening everyone along the Greenway between midnight and 2AM. This is just one of many nightly incidents that happen less than 75 ft below my condo building. Our residents are beyond fatigued and it had made many of us physically ill, some are moving.

Let me start by telling you that the only answers we've received from Hennepin County (Angela Conley & Public Works) regarding this unmanaged and poorly monitored encampment is that it can't be removed because of Governor Walz's Executive Order. This encampment which is on Hennepin County land has been dismally patrolled over the Summer, laws have NOT been enforced down there and Public Work crew rules/prohibited items notices staked into the ground are quickly pulled up and used as firewood unites after they leave.
The Governor's Executive Orders been the excuse HC has used for months now to shoot down our request for help and continue ignoring us.
Public Works has done a fine job of cleaning up tons of debris, needles and removing of prohibited items, but activists in vehicles quickly return hours after Hennepin County crews leave to restock them with grills, stoves, wood, propane tanks and other prohibited items.

For the first 3 months of this encampment (Summer) campers defecated and urinated all along the retaining wall below our building on 29th St. creating a heavy stench that made using our townhouse patios and balconies unusable due to gross smell and toxic soup of human waste and squaller.
Our lovely CEPRO Park across the way used to be a wonderful place to walk our dogs, sit on the sliding swings, sit at a picnic table and enjoy a beautiful sunny Summer day. We didn't get to use the park this Summer because it was littered with hundreds of syringes, vomit and discarded food containers intentional thrown on swings, chairs and tables from visitors to this encampment. Large groups of people using and selling drugs in the park and along the encampment has made the entire area unsafe for residents and children to go anywhere near there.

For those of you who haven't visited the encampment between 10th & 11th Aves S in Midtown I have taken these photos to give you a guided tour of what our residents in our condo building and neighborhood business owners in Midtown are currently putting up with and have put up with for more than 6 MONTHS now.

Since the County refuses to divulge their outreach's "wellness check" information telling us who these people are in this tight cluster of tents less than 75 ft below our multiunit residential building, we are unable to know how to proceed in working with other outreach groups and law enforcement agencies. This encampment is set up next to Allina Healthcare Headquarters, the Midtown Global Market and spans the length our entire Midtown Exchange Condos on the Greenway building along 29th St.

HC00012279

Since none of our requested information about supposed wellness checks conducted by Hennepin County outreach staff have shared any pertinent information regarding who these people are and why they are refusing help, I've decided to share with you my own personal wellness check assessment of who these people are down below my unit.

I live on the 4th floor of the Midtown Exchange Condos on the Greenway so I have had a birds-eye view of everything happening below in this encampment for the past 6 months.
I have watched this encampment, originally of homeless people quickly morph into a very violent and disruptive drug and petty-crime ring, prostitution, trafficking of young Native American Women and constant drug traffic night & day. Cars with loud booming music at all hours of the night and early morning keeping our building constantly awake and on guard.


Wednesday November 18th, 2:00pm:
I took the risk of going down and taking these photos of the activities directly below my building from CEPRO Park and along both the 10th and 11th Ave bridges along 29th St. Keep in mind that resident have been harassed and threatened by people from this encampment for taking any photos of the goings on down there. I took a big risk of being attacked or harmed by doing this. I'm not joking…
I am only reporting on the area between 10th & 11th Aves S directly below CEPRO Park and DIRECTLY below my home.

On my 10 minute stroll through the park I witnessed cars pulling up to the park and walking down to the camp to buy and sell drugs. I also witnessed active drug use in open view of everyone outside the tents. Tons of bike parts, garbage and squaller.
As I looked east from the 11th Ave bridge to 12th Ave I only saw only 1 tent. ONE tent. (photo below)
As I looked west from the 10th Ave bridge I saw only 2 tents in front of Allina Health Headquarters. TWO tents. (photo below)
As I looked directly in front of my building from CEPRO Park I saw over 25 tents many of them unoccupied as they are used as "work tents" or storage units for stolen bicycle parts and stole property from OUR neighborhood. (photos below)
So why is this large group of disruptive people allowed to continue to set up "shop" directly below our residential building traumatizing us over and over?

After I returned home from taking these photos the first thing I see looking out my balcony window is a car parked in the grass in the middle of CEPRO Park, it had driven past the barricades at the entrance of park and began unloading huge containers of supplies and more junk. Then they parked up along the bridge on 11th Ave and walked down to a group of activists who were congregating along the wall of the park near the Greenway. (photos below)

On Friday night I witnessed a vehicle abandoned parked sideways on the 11th Ave bridge at 11:30pm as a person stumbled away from it and wondered down to the encampment. When Park Police arrived the person ducked into his tent and hid. I talked to the officer on the scene and he informed me that the vehicle was stolen and had just lead police on a high speed chase 20 minutes earlier.

My "wellness check" says that the majority of these folks 75 ft below my building ALL who are refusing outreach and are not one bit  interested in moving from this County protected sanctuary giving them cover to commit crimes on the Greenway and in our neighborhood. This encampment is a Hennepin County sponsored MIDTOWN GLOBAL DRUG & CRIME MALL and it is destroying our park,

HC00012280

Greenway, businesses and neighborhood.
NOISE DISTURBANCES including fights and destruction of property night & day affecting the health of our residents and scaring our children and elderly.

Our Midtown Campus had a Security meeting with law enforcement officials from the Park Police and MPD who informed us that this encampment exceeds all the required criteria for removal. They said that this encampment directly violates the Governors Executive Order has become a health and safety issue not only for those experiencing homelessness on the Greenway who are being victimized by criminals and drug dealers, but also businesses and residents as well.
While Hennepin County Sheriff's Department have made an effort to do occasional convoy drives past this encampment, it is not enough. As soon as Sheriff's or police drive by the drug deals and lawlessness starts right back up minutes later. These people in this encampment have a call system when law enforcement is in the area and they alert each other with voice signals.
These campers are really good at what they do...

Would any of YOU be okay with this in your front yard? A party every night for 6 months straight?
There is plenty of space to the west along the Greenway to move these campers that isn't directly in front of a multiunit residential building and Midtown Global Market struggling to rebuild since the arson and riots in June.
It is apparent that Hennepin County has abandoned us over here. The only people who responded are from Public Works and they offer us no information regarding actions the County plans on taking to remove this dangerous and disruptive encampment from our home.

Do we need to organize members from our community to remove this dangerous encampment since Hennepin County chooses to ignore us?


Thank you,

Chris Lomheim
Homeowner Midtown Exchange Condos on the Greenway



View in front of my home from 11th Ave bridge
75 ft from Midtown Exchange Condos on the Greenway

HC00012281



Panoramic view from my balcony MECOG



View from 10th Ave bridge (facing east)



View of my building from CEPRO Park

HC00012282



View east from 11th Ave S (only 1 Tent)



View west from 10th Ave S (only 2 tents)

HC00012283



Car in the middle of CEPRO Park 2pm Wednesday



Group of activists dropping off items to encampment 2pm Wednesday
***CAUTION: This email was sent from outside of Hennepin County. Unless you recognize the sender and know the content, do not click links or open attachments.***

HC00012284

# EXHIBIT 110



HC00001564

# EXHIBIT 111



HC00001540

# EXHIBIT 112



HC00034718

# EXHIBIT 113

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Patrick Berry, Henrietta Brown, Nadine Little, Dennis Barrow, Virginia Roy, Joel Westvig, Gina Mallek, Daniel Huiting, *on behalf of themselves and a class of similarly-situated individuals*; and ZACAH,

Plaintiffs,

vs.

Hennepin County; Hennepin County Sheriff David Hutchinson, *in his individual and official capacity*; City of Minneapolis; Minneapolis Mayor Jacob Frey, *in his individual and official capacity*; Medaria Arradondo, *in his individual and official capacity*; Minneapolis Park and Recreation Board; Superintendent of the Minneapolis Park and Recreation Board Al Bangoura, *in his individual and official capacity*; Park Police Chief at the Minneapolis Park and Recreation Board Jason Ohotto, *in his individual and official capacity*; Police Officers John Does; and Police Officer Jane Does,

Defendants.

Case No. 20-CV-02189-WMW-JFD

District Judge Wilhelmina Wright
Magistrate Judge John F. Docherty

**HENNEPIN COUNTY'S SUPPLEMENTAL AND AMENDED RESPONSE TO PLAINTIFFS' SECOND SET OF INTERROGATORIES**

TO:   Plaintiffs, through their attorneys, Justin Perl, Dorinda Wider, Rebecca Stillman, and Luke Grundman, Mid-Minnesota Legal Aid; Teresa Nelson, Clare Diegel, and Ian Bratlie, American Civil Liberties Union of Minnesota; and Wally Hilke, Hannah Welsh, and Jennell Shannon, Ballard Spahr LLP; Defendants City of Minneapolis, Mayor Jacob Frey, and Police Chief Medaria Arradondo, through their attorneys, Sharda Enslin, Kristin Sarff, and Brian Carter, Minneapolis City Attorney's Office; Defendants Minneapolis Park and Recreation Board, Superintendent Al Bangoura, and Park Police Chief Jason Ohotto, through their attorneys, Ann Walther, Brian Rice, and Alana Mosley, Rice, Walther &

Mosley LLP; and Defendant David Hutchinson, in his individual capacity, through his attorney, Jason Hively, Iverson Reuvers.

Defendant Hennepin County and Hennepin County Sheriff David Hutchinson (together, the "Hennepin County Defendants"), for their supplemental and amended Responses to Plaintiffs' Second Set of Interrogatories to Defendant Hennepin County ("Second Set of Interrogatories"), state and object as follows:

## GENERAL OBJECTIONS

The Hennepin County Defendants object to the Second Set of Interrogatories to the Hennepin County Defendants to the extent that it seeks information protected by the attorney-client privilege, attorney work-product doctrine, or Fed. R. Civ. P. 26(b). The Hennepin County Defendants will not produce communications or information protected from disclosure by the attorney-client privilege or attorney work-product doctrine.

The Hennepin County Defendants also object to the definitions in the Second Set of Interrogatories. Specifically, the Hennepin County Defendants object to the definition of "Defendants," you," or "your" as meaning "Hennepin County, Sheriff Hutchinson, and any of their agents, or other representatives." This definition does not define the terms "agents" or "representatives." In answering these interrogatories, the Hennepin County Defendants will understand the terms "Defendants," you," or "your" to mean Hennepin County, Sheriff Hutchinson, or any employee of Hennepin County.

By responding to the Second Set of Interrogatories in whole or in part, the Hennepin County Defendants do not waive the general and specific objections made herein. Each Answer is made subject to these general objections and any specific objection(s) made during the course of such Answer. Investigation by the Hennepin County Defendants is ongoing, and the Hennepin County Defendants reserve the right to supplement, clarify, or revise these Answers consistent with the Federal Rules of Civil Procedure.

## SUPPLEMENTAL AND AMENDED ANSWERS TO INTERROGATORIES

**INTERROGATORY NO. 11:** Describe the process by which you inventoried personal property – things like tents, clothes, documents, money – at all encampment sweeps you participated in, the methods you used to get that property back to its rightful owner, how long you possessed property before ultimately destroying it, and whether the property was destroyed, sold, or returned to its original owner.

**Answer:** The Hennepin County Defendants object to Interrogatory No. 11 as overly broad, unduly, and not proportional to the needs of the case because it seeks information, for an unlimited period of time, about "encampment sweeps" in which any Hennepin County employee "participated," regardless of the employee's role or the County's role

with a specific encampment and regardless of the location of the encampment. The Hennepin County Defendants also object to the definitions of "encampment" and "sweeps," which are vague, and which could mean that this Interrogatory seeks information about the *voluntary* disbandment of even a group of two tents of people experiencing homelessness at any time and in any location. The Hennepin County Defendants further object to the term "participated in," which is vague and undefined. The Hennepin County Defendants further object to Interrogatory No. 11 as duplicative of Interrogatory No. 8.

Subject to and without waiving any objection, the Hennepin County Defendants state that:

From January 1, 2020 through September 7, 2022, the Hennepin County Defendants closed one encampment of people experiencing homelessness on the Midtown Greenway, and that closure occurred on December 18, 2020. Before closing the Greenway encampment, County employees communicated to people camping in the encampment that a closure was imminent. On December 15, 2020, the County gave each camper formal, written notice that the encampment would be closed and that campers should arrange to move their property out of the encampment. On December 18, 2020, County employees interacted with the campers in the 18 tents remaining along the Greenway, telling them that the encampment was closing that day and that the campers had to leave. The County offered to store the personal possessions that each camper could not take with them and provided boxes to individuals to pack up their possessions. Many campers turned these services down, but a few campers did take the County up on its offer to store possessions. The County stored two generators on November 23, 2020, and four boxes of individuals' possessions between December 16 and December 18, 2020. County workers provided a phone number for HCRRA to individuals who gave County workers possessions to store, and instructed individuals to call the HCRRA phone number to retrieve their possessions. Any items beyond those stored were immediately disposed of; all items stored were stored for at least a year after the closure.

From January 1, 2020 through September 7, 2022, Hennepin County human services staff, as well as officers from the Hennepin County Sheriff's Office ("HCSO") have been present when other government entities have closed encampments. During those closures, the Hennepin County Defendants did not seize or destroy campers' tents or other personal property. Instead, they performed outreach, social work, security, and transport functions.

Discovery is continuing and ongoing; the Hennepin County Defendants reserve the right to amend and/or supplement their Answer to this Interrogatory.

**Supplemental Answer:** The Hennepin County Defendants object to Interrogatory No. 11 as overly broad, unduly, and not proportional to the needs of the case because it seeks information, for an unlimited period of time, about "encampment sweeps" in which

any Hennepin County employee "participated," regardless of the employee's role or the County's role with a specific encampment and regardless of the location of the encampment. The Hennepin County Defendants also object to the definitions of "encampment" and "sweeps," which are vague, and which could mean that this Interrogatory seeks information about the *voluntary* disbandment of even a group of two tents of people experiencing homelessness at any time and in any location. The Hennepin County Defendants further object to the term "participated in," which is vague and undefined. The Hennepin County Defendants further object to Interrogatory No. 11 as duplicative of Interrogatory No. 8.

Subject to and without waiving any objection, the Hennepin County Defendants state that:

In connection with the County's notice to vacate an encampment on the Nicollet Avenue Bridge (over the Midtown Greenway), County employees communicated to people camping in the encampment that a closure was imminent. On or about October 5, 2020, the County gave each camper formal, written notice that the encampment would be closed and that campers should arrange to move their property out of the encampment and that any property left behind would be removed. The Nicollet Avenue Bridge encampment disbanded by the time that County staff arrived on the date of the planned closure (on or about October 7, 2020), so the County did not "sweep" that encampment. As indicated in the County's notice, any items that campers left behind as of approximately October 7, 2020 were disposed of.

In connection with the County's December 18, 2020 closure of the Midtown Greenway encampment, County employees maintained a written log of possessions stored by the County, including the name of owner or owners and identification of the item or items—e.g., the number associated with a box of possessions. On the day of the Midtown Greenway closure, County employees photographed items that were not moved from the encampment and then disposed of such items. County employees did not seize or destroy any items that a camper claimed they wanted to keep. Finally, the Hennepin County Defendants did not inventory items at any encampment closure other than the Midtown Greenway encampment closure, because they did not seize, destroy, or otherwise handle items at any other encampment closure.

Discovery is continuing and ongoing; the Hennepin County Defendants reserve the right to amend and/or supplement their Answer to this Interrogatory.

**INTERROGATORY NO. 12:** Describe the orders and training given to Hennepin County Sheriff's deputies for clearing encampments, including, but not limited to, how they should work with other law enforcement organizations, clear crowds, determine the status of property (e.g., whether it is hazardous, abandoned, etc.), and permit individuals to safely gather their personal property.

**Amended Answer:** The Hennepin County Defendants object to Interrogatory No. 12 as overly broad, unduly, and not proportional to the needs of the case because it seeks information, for an unlimited period of time, about "clearing encampments," regardless of the roles of the County and HCSO with respect to a specific encampment and regardless of the location of the encampment. The Hennepin County Defendants also object to the definitions of "encampment" and "clearing," which are vague, and which could mean that this Interrogatory seeks information about the *voluntary* disbandment of even a group of two tents of people experiencing homelessness at any time and in any location. The Hennepin County Defendants further object to Interrogatory No. 12 to the extent it requests information about *all* orders and training given to HCSO deputies who were present when an encampment was closed, regardless of the duties performed by such deputies at each closure. The Hennepin County Defendants also object to Interrogatory No. 12 as seeking information outside the bounds of that information that is relevant to the claims, defenses, or facts at issue in this litigation, since the claims against the Hennepin County Defendants are limited to claims about personal property.

Subject to and without waiving any objection, the Hennepin County Defendants state that:

From January 1, 2020 through September 7, 2022, during closures of encampments of people experiencing homelessness in Hennepin County, HCSO deputies did not seize or destroy campers' tents or other personal property, did not "clear crowds" from encampments, and did not "determine the status" of campers' personal property. Instead, HCSO deputies were directed to perform security and transport functions.

On December 18, 2020, the Hennepin County Defendants closed the Greenway encampment. HCSO deputies were present during the Greenway closure for the purpose of providing security along the Greenway corridor during the closure and to provide transport if needed. The Hennepin County Defendants further state that the specific instructions given to HCSO deputies relating to the closure of the Greenway encampment can be ascertained from the HCSO's "Operational Plan" for the Greenway closure, and so direct Plaintiffs to that document pursuant to Rule 33(d) of the Federal Rules of Civil Procedure.

Discovery is continuing and ongoing; the Hennepin County Defendants reserve the right to amend and/or supplement their Answer to this Interrogatory.

**Supplemental Answer:** The Hennepin County Defendants object to Interrogatory No. 12 as overly broad, unduly, and not proportional to the needs of the case because it seeks information, for an unlimited period of time, about "clearing encampments," regardless of the roles of the County and HCSO with respect to a specific encampment and regardless of the location of the encampment. The Hennepin County Defendants also object

to the definitions of "encampment" and "clearing," which are vague, and which could mean that this Interrogatory seeks information about the *voluntary* disbandment of even a group of two tents of people experiencing homelessness at any time and in any location. The Hennepin County Defendants further object to Interrogatory No. 12 to the extent it requests information about *all* orders and training given to HCSO deputies who were present when an encampment was closed, regardless of the duties performed by such deputies at each closure. The Hennepin County Defendants also object to Interrogatory No. 12 as seeking information outside the bounds of that information that is relevant to the claims, defenses, or facts at issue in this litigation, since the claims against the Hennepin County Defendants are limited to claims about personal property.

Subject to and without waiving any objection, the Hennepin County Defendants state that:

HCSO provided transport support at the following encampment closures:
- Powderhorn Park East, July 20, 2020: HCSO provided two transport deputies at the request of the MPRB, the government entity that closed the encampment. Using a transport van, these two deputies transported 16 individuals arrested by the Park Police to the Hennepin County Adult Detention Center ("ADC").

- Elliot Park and Kenwood Park, August 12, 2020: HCSO provided two transport deputies at the request of the MPRB, the government entity that closed the encampment. These deputies were available to transport individuals arrested by the Park Police to the ADC; however, they did not in fact transport any arrestees.

- Peavey Park, September 24, 2020: HCSO provided two transport deputies at the request of the MPRB, the government entity that closed the encampment. Using a transport van, these deputies transported 5 individuals arrested by Park Police to the ADC.

- Midtown Greenway, December 18, 2020: HCSO provided two transport deputies, who were available to transport individuals arrested by HCSO to the ADC. However, HCSO did not arrest anyone during the County's closure of the Greenway encampment, so the transport deputies did not in fact transport any arrestees to the ADC. Please see, e.g., HCSO Operational Plan, Greenway Ops Detail, December 28, 2020, Bates No. HC00038593-603.

HCSO provided security support at the following encampment closures:
- Peavey Park, September 24, 2020: HCSO provided one sergeant and four deputies (in addition to the two transport deputies noted above) at the request of the MPRB, the government entity that closed the encampment. The

6

sergeant and deputies were present to protect public safety, including to provide emergency assistance if needed.

- Midtown Greenway, December 18, 2020: In addition to the two transport deputies noted above, HCSO provided personnel to protect public safety during the County's closure of the Midtown Greenway encampment, if needed. Please see, e.g., HCSO Operational Plan, Greenway Ops Detail, December 28, 2020, Bates No. HC00038593-603.

- Phillips, July 20, 2022: HCSO provided approximately one captain, one lieutenant, three sergeants, and 14 deputies at the request of the City of Minneapolis, the government entity that closed the encampment. The captain, lieutenant, sergeants, and deputies were available to provide emergency assistance to protect public safety if needed. Please see HCSO Special Detail Operations Plan 22-19, Bates No. HC00038898-903.

- Whittier, August 5, 2022: HCSO provided approximately one lieutenant, four sergeants, and seven deputies at the request of the City of Minneapolis, the government entity that closed the encampment. The lieutenant, sergeants, and deputies were available to provide emergency assistance to protect public safety if needed. Please see HCSO Special Detail Operations Plan 22-20, Bates No. HC00038905-10.

Discovery is continuing and ongoing; the Hennepin County Defendants reserve the right to amend and/or supplement their Answer to this Interrogatory.

**INTERROGATORY NO. 15:** Describe in full how you ensured that every resident of the Greenway encampment had access to available shelter immediately after the sweep on December 18, 2020.

**Answer:** The Hennepin County Defendants object to Interrogatory No. 15 as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks all facts about shelter and housing offered to campers in the Greenway encampment on December 18, 2020. The Hennepin County Defendants also object to Interrogatory No. 15 as seeking information outside the bounds of that information that is relevant to the claims, defenses, or facts at issue in this litigation, since the claims against the Hennepin County Defendants are limited to claims about personal property. The Hennepin County Defendants further object that Interrogatory No. 15 is vague and ambiguous, because the definitions of "sweep" and "encampment" are unclear, and the terms "resident" and "available shelter" are undefined.

Subject to and without waiving any objection, the Hennepin County Defendants incorporate their answer to Interrogatory No. 14. In addition, the Hennepin County

7

Defendants state that, on the day of the closure of the Greenway encampment, County employees offered rideshare rides or bus passes to people camping in the encampment, so that individuals camping in the Greenway encampment could get safely to shelter or to other housing or preferred destinations.

**Supplemental Answer:** The Hennepin County Defendants object to Interrogatory No. 15 as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks all facts about shelter and housing offered to campers in the Greenway encampment on December 18, 2020. The Hennepin County Defendants also object to Interrogatory No. 15 as seeking information outside the bounds of that information that is relevant to the claims, defenses, or facts at issue in this litigation, since the claims against the Hennepin County Defendants are limited to claims about personal property. The Hennepin County Defendants further object that Interrogatory No. 15 is vague and ambiguous, because the definitions of "sweep" and "encampment" are unclear, and the terms "resident" and "available shelter" are undefined.

Subject to and without waiving any objection, the Hennepin County Defendants state that County employees assisted people camping in the Midtown Greenway encampment with transportation to shelter, housing, or other preferred destinations—i.e., other locations where a camper expressed a desire to go.

Discovery is continuing and ongoing; the Hennepin County Defendants reserve the right to amend and/or supplement their Answer to this Interrogatory.

**INTERROGATORY NO. 16:** Describe the process you created for individuals, prior to the sweep of the Greenway encampment on December 18, 2020, to challenge the seizure of their property or, after the seizure, the process created for individuals to reclaim property that was taken.

**Answer:** The Hennepin County Defendants object to Interrogatory No. 16 as vague and ambiguous, due to the definitions of "sweep" and "encampment," which are unclear, and the use of the terms "challenge" and "seizure," which are undefined. In addition, the Hennepin County Defendants object to the Interrogatory to the extent that it assumes that the Hennepin County Defendants, when they closed the Greenway encampment on December 18, 2020, seized or destroyed personal property other than waste, hazardous materials, and soiled, perishable, or abandoned items. The Hennepin County Defendants further object to Interrogatory No. 16 as calling for a legal conclusion. The Hennepin County Defendants also object to Interrogatory No. 16 as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks information about "individuals" other than people experiencing homelessness and camping on the Greenway on December 18, 2020.

8

Subject to and without waiving any objection, the Hennepin County Defendants incorporate their answers to Interrogatory Nos. 8 and 11.

**Supplemental Answer:** The Hennepin County Defendants object to Interrogatory No. 16 as vague and ambiguous, due to the definitions of "sweep" and "encampment," which are unclear, and the use of the terms "challenge" and "seizure," which are undefined. In addition, the Hennepin County Defendants object to the Interrogatory to the extent that it assumes that the Hennepin County Defendants, when they closed the Greenway encampment on December 18, 2020, seized or destroyed personal property other than waste, hazardous materials, and soiled, perishable, or abandoned items. The Hennepin County Defendants further object to Interrogatory No. 16 as calling for a legal conclusion. The Hennepin County Defendants also object to Interrogatory No. 16 as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks information about "individuals" other than people experiencing homelessness and camping on the Greenway on December 18, 2020.

Subject to and without waiving any objection, the Hennepin County Defendants incorporate their answers, including supplemental answers, to Interrogatory Nos. 8, 11, 14, and 18.

Discovery is continuing and ongoing; the Hennepin County Defendants reserve the right to amend and/or supplement their Answer to this Interrogatory.

**INTERROGATORY NO. 17:** Prior to the sweep of the Greenway encampment on December 18, 2020, describe the process you created to support encampment residents packing and moving their property to a safe, alternative shelter.

**Answer:** The Hennepin County Defendants object to Interrogatory No. 17 as vague and ambiguous, due to the definitions of "sweep" and "encampment," which are unclear, and the use of the terms "residents" and "alternative shelter," which are undefined. The Hennepin County Defendants also object to Interrogatory No. 17 as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks information about "encampment residents" other than people experiencing homelessness and camping on the Greenway on December 18, 2020.

Subject to and without waiving any objection, the Hennepin County Defendants incorporate their answers to Interrogatory Nos. 8 and 11. In addition, the Hennepin County Defendants state that County employees visited the Greenway encampment regularly during 2020, sometimes daily. During this time, County employees worked closely with Greenway campers, in an individualized manner, to try to get each camper to safe and secure shelter outside of an encampment and to arrange for transportation to shelter. As a result of the County's outreach and notice efforts, the total number of people camping and the number of tents on the Greenway had dramatically decreased from its peak of

9

approximately 150 tents, in the fall of 2020. By the time the County closed the Greenway encampment, only 18 tents remained on the Greenway.

On December 18, 2020, the day of the closure of the Greenway encampment, County employees interacted with each camper, telling them that the encampment was closing that day and that the campers had to leave. County employees successfully connected a few campers with shelter options; most people camping in the Greenway encampment chose to leave the encampment and declined offers for shelter. County employees offered rideshare rides or bus passes to people camping in the encampment, so that campers could get safely to shelter or to other housing or preferred destinations. In addition, County employees offered boxes to campers to pack their possessions and offered to help campers to pack.

**Supplemental Answer:** The Hennepin County Defendants object to Interrogatory No. 17 as vague and ambiguous, due to the definitions of "sweep" and "encampment," which are unclear, and the use of the terms "residents" and "alternative shelter," which are undefined. The Hennepin County Defendants also object to Interrogatory No. 17 as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks information about "encampment residents" other than people experiencing homelessness and camping on the Greenway on December 18, 2020.

Subject to and without waiving any objection, the Hennepin County Defendants incorporate their answers to Interrogatory Nos. 8, 11, 14, and 18.

Discovery is continuing and ongoing; the Hennepin County Defendants reserve the right to amend and/or supplement their Answer to this Interrogatory.

**INTERROGATORY NO. 18:** Prior to the sweep of the Greenway encampment on December 18, 2020, describe the process you created to challenge and report the conduct of Hennepin County staff before, during, and after the sweep.

**Answer:** The Hennepin County Defendants object to Interrogatory No. 18 as vague and ambiguous, due to the definitions of "sweep" and "encampment," which are unclear, and the use of the terms "challenge" and "conduct," which are undefined. The Hennepin County Defendants also object to Interrogatory No. 18 as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks, for an unlimited period of time, information about processes to "challenge and report" "conduct" of any kind, by Hennepin County staff working in any role or physical location at any time. The Hennepin County Defendants also object to Interrogatory No. 18 as seeking information outside the bounds of that information that is relevant to the claims, defenses, or facts at issue in this litigation, since the claims against the Hennepin County Defendants are limited to claims about personal property.

10

Subject to and without waiving any objection, the Hennepin County Defendants state that there are a variety of ways for individuals to lodge complaints with Hennepin County, depending on the employee and conduct involved. For example, individuals can submit complaints about County employees or policy online, through the County's feedback page on its website. Individuals can also submit complaints about the HCSO or HCSO officers online, through the IA Complaints Center. In addition, individuals can contact County Commissioners by email or phone. With respect to encampments, individuals reached out directly to County employees by email and phone to express their opinions. As to the Greenway encampment, the written notices that the Hennepin County Defendants provided to individuals camping in the encampment contained an email address and phone number for individuals to contact with questions or concerns.

**Supplemental Answer:** The Hennepin County Defendants object to Interrogatory No. 18 as vague and ambiguous, due to the definitions of "sweep" and "encampment," which are unclear, and the use of the terms "challenge" and "conduct," which are undefined. The Hennepin County Defendants also object to Interrogatory No. 18 as overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks, for an unlimited period of time, information about processes to "challenge and report" "conduct" of any kind, by Hennepin County staff working in any role or physical location at any time. The Hennepin County Defendants also object to Interrogatory No. 18 as seeking information outside the bounds of that information that is relevant to the claims, defenses, or facts at issue in this litigation, since the claims against the Hennepin County Defendants are limited to claims about personal property.

Subject to and without waiving any objection, the Hennepin County Defendants state that:

Individuals can contact the County by phone, including at 612-348-3000, a number published on the County's website (https://www.hennepin.us/contact). In addition, individuals can submit complaints about the County, its employees, or its policies through the County's feedback website, which is located at:
https://formcatalog.hennepin.us/county_admin/feedback-for-the-county.html

Individuals can contact the HCSO by phone, including at 612-348-3744, a number published on HCSO's website (https://www.hennepinsheriff.org/contact/contact-information). In addition, individuals can submit complaints about HCSO employees through the IA Complaint Center, whose website is:
https://hcsoiad.govqa.us/WEBAPP/_rs/(S(kwb0gxoi4hi5zg13z3qadjf1))/SupportHome.aspx

As to the Midtown Greenway encampment, the written notice provided to campers in advance of the encampment closure on December 18, 2020, included the following email

11

address and phone number for campers to contact for more information about the closure: hcrra@hennepin.us; 612-543-0501.

Discovery is continuing and ongoing; the Hennepin County Defendants reserve the right to amend and/or supplement their Answer to this Interrogatory.

**INTERROGATORY NO. 19:** Identify all documents that exist regarding the inventory of the property cleared from the Greenway encampment on December 18, 2020.

**Answer:** The Hennepin County Defendants object to Interrogatory No. 19 as overly broad, unduly burdensome, and not proportional to the needs of the case because it requests "all" documents merely "regarding" the inventory of property "cleared" from the Greenway encampment on December 18, 2020, regardless of the status of the property (*e.g.*, waste, hazardous material, abandoned items) and regardless of the person or entity who "cleared" the property. The Hennepin County Defendants further objects to Interrogatory No. 19 as vague, due to the definitions of "clearing" and "encampment," which are unclear, and the use of the term "inventory," which is unclear and undefined. The Hennepin County Defendants also object to Interrogatory No. 19 to the extent it requests documents outside of their possession, custody, and control and/or in the possession, custody, and control of Plaintiffs, the City of Minneapolis Defendants, the MPRB Defendants, or other individuals or entities who are not parties to this case. Finally, the Hennepin County Defendants object that Interrogatory No. 19 seeks information that is equally available to Plaintiffs, including from documents produced in this litigation.

Subject to and without waiving any objection, the Hennepin County Defendants state that they will supplement their Answer to this Interrogatory to identify, pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, the Bates numbers corresponding to documents sufficient to show property removed from the Greenway encampment in connection with its closure on December 18, 2020.

**Supplemental Answer:** The Hennepin County Defendants object to Interrogatory No. 19 as overly broad, unduly burdensome, and not proportional to the needs of the case because it requests "all" documents merely "regarding" the inventory of property "cleared" from the Greenway encampment on December 18, 2020, regardless of the status of the property (*e.g.*, waste, hazardous material, abandoned items) and regardless of the person or entity who "cleared" the property. The Hennepin County Defendants further objects to Interrogatory No. 19 as vague, due to the definitions of "clearing" and "encampment," which are unclear, and the use of the term "inventory," which is unclear and undefined. The Hennepin County Defendants also object to Interrogatory No. 19 to the extent it requests documents outside of their possession, custody, and control and/or in the possession, custody, and control of Plaintiffs, the City of Minneapolis Defendants, the MPRB Defendants, or other individuals or entities who are not parties to this case. Finally,

the Hennepin County Defendants object that Interrogatory No. 19 seeks information that is equally available to Plaintiffs, including from documents produced in this litigation.

Subject to and without waiving any objection, the Hennepin County Defendants, pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, identify the following photographs, which are sufficient to show property removed from the Greenway encampment in connection with its closure on December 18, 2020: HC00001089 through HC00001124. Note that the mopeds pictured in HC00001089 through HC00001124 were taken to the Minneapolis impound lot.

Discovery is continuing and ongoing; the Hennepin County Defendants reserve the right to amend and/or supplement their Answer to this Interrogatory.

As to answers:

_____
David Hewitt
On behalf of the Hennepin County Defendants

Subscribed and sworn to before me
this _____ day of _____, 2023.

_____
Notary Public

As to form and objections:

MARY F. MORIARTY
Hennepin County Attorney

Dated:  March 30, 2023            By: *s/ Kelly K. Pierce*
                                     Kelly K. Pierce (0340716)
                                     Assistant County Attorney
                                     Christiana M. Martenson (0395513)
                                     Assistant County Attorney
                                     A2000 Government Center
                                     300 South Sixth Street
                                     Minneapolis, MN  55487
                                     Telephone: (612) 348-5488
                                     Fax: (612) 348-8299
                                     kelly.pierce@hennepin.us
                                     christiana.martenson@hennepin.us

                                     *Attorneys for Defendants Hennepin County and*
                                     *Hennepin County Sheriff David Hutchinson*

# EXHIBIT 114



Hennepin County and the Regional Railroad Authority

## NOTICE OF REMOVAL

This tent is subject to removal by the Hennepin County Regional Railroad Authority (HCRRA).

If this tent and its contents are not removed by **December 17**, it will be removed by HCRRA staff. You should make arrangements to remove all property before that date. You will not have time on that date to make additional arrangements.

Any garbage, refuse, or debris is subject to immediate disposal. If this tent contains hazardous waste, the tent and all of its contents are subject to immediate disposal. Otherwise, this tent and its contents will be inventoried and temporarily stored for its owner's retrieval. Owners may email at hcrra@hennepin.us or call 612-543-0501 for more information.

Date/time issued: _12/15_ _7:59._

Issued to: _Julio_

Issued by: _JD_

Location: _West of Portland_

Photos taken? ☒ Yes ☐ No    Video taken?    ☐ Yes ☐ No

FOR ASSISTANCE, CALL:
Adult Shelter Connect at 612-248-2350
Hennepin County Family Shelter Team at 612-348-9410
Healthcare for the Homeless nurse triage line at 612-348-5553

Hennepin

HC00019694

# EXHIBIT 115



Hennepin County and the Regional Railroad Authority

## NOTICE OF REMOVAL

This tent is subject to removal by the Hennepin County Regional Railroad Authority (HCRRA).

If this tent and its contents are not removed by **December 17**, it will be removed by HCRRA staff. You should make arrangements to remove all property before that date. You will not have time on that date to make additional arrangements.

Any garbage, refuse, or debris is subject to immediate disposal. If this tent contains hazardous waste, the tent and all of its contents are subject to immediate disposal. Otherwise, this tent and its contents will be inventoried and temporarily stored for its owner's retrieval. Owners may email at hcrra@hennepin.us or call 612-543-0501 for more information.

Date/time issued: 12/15     6:49 am

Issued to: Sarah

Issued by: JD

Location: West of 28th

Photos taken? X Yes ☐ No     Video taken? ☐ Yes ☐ No

FOR ASSISTANCE, CALL:
Adult Shelter Connect at 612-248-2350
Hennepin County Family Shelter Team at 612-348-9410
Healthcare for the Homeless nurse triage line at 612-348-5553

HC00019695

# EXHIBIT 116



# EXHIBIT 117



HC00001098

# EXHIBIT 118



HC00001119