# EXHIBIT 129

Page 1

1         UNITED STATES DISTRICT COURT
2          DISTRICT OF MINNESOTA
3               Case No.: 20-CV-02189-WMW-JFD
4    --------------------------------
     Patrick Berry, et al.,
5
              Plaintiffs,
6
         vs.
7
     Hennepin County, et al.,
8
9             Defendants.
     --------------------------------
10

                    DEPOSITION OF
11            COMMANDER GRANT SNYDER
               Taken on APRIL 26, 2023
12            Commencing at 9:00 A.M.
13
14
15
16
17
18
19
20
21
22
23   REPORTED BY:  Mari Skalicky, RMR, CRR
24
25

```
                                              Page 2
 1        DEPOSITION of COMMANDER GRANT SNYDER,

 2   taken on APRIL 26, 2023 commencing at

 3   9:00 A.M. at 2000 IDS Center, Minneapolis,

 4   Minnesota, before Mari Skalicky, a Certified

 5   Realtime Reporter, and Notary Public of and

 6   for the State of Minnesota.

 7                    * * * * * * * * * * *

 8                    APPEARANCES

 9

10   ON BEHALF OF THE PLAINTIFFS:

11        MID-MINNESOTA LEGAL AID

12        BY:  REBECCA STILLMAN, ESQUIRE

13        111 North Fifth Street, Suite 100

14        Minneapolis, MN  55402

15        rstillman@mylegalaid.org

16

17        AMERICAN CIVIL LIBERTIES UNION

18        OF MINNESOTA

19        BY:  CLARE DIEGEL, ESQUIRE

20        Post Office Box 14720

21        Minneapolis, MN  55414

22        cdiegel@aclu-mn.org

23

24

25
```

Page 3

1    ON BEHALF OF HENNEPIN COUNTY AND HENNEPIN

2    COUNTY SHERIFF:

3         HENNEPIN COUNTY ATTORNEY'S OFFICE

4         BY:  CHRISTIANA MARTENSON, ESQUIRE

5         A-2000 Government Center

6         300 South Sixth Street

7         Minneapolis, MN  55402

8         christiana.martenson@hennepin.us

9

10

11

12

13   ON BEHALF OF THE CITY OF MINNEAPOLIS,

14   MINNEAPOLIS MAYOR JACOB FREY, AND

15   MINNEAPOLIS CHIEF OF POLICE:

16        MINNEAPOLIS CITY ATTORNEY'S OFFICE:

17        BY:  SHARDA ENSLIN, ESQUIRE

18        BY:  KRISTIN SARFF, ESQUIRE

19        350 South 5th Street, Suite 210

20        Minneapolis, MN  55402

21        sharda.enslin@minneapolismn.gov

22

23

24

25

Page 4

1    ON BEHALF OF THE MINNEAPOLIS PARK AND

2    RECREATION BOARD:

3         RICE, WALTHER & MOSLEY, LLP

4         BY:  ALANA MOSLEY, ESQUIRE

5         330 South Second Avenue, Suite 360

6         Minneapolis, MN 55402

7         amosley@ricemichels.com

8

9    NOTE:  The original transcript will be filed

10   with the ACLU Minnesota, pursuant to the

11   applicable Rules of Civil Procedure.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                           I N D E X
2

   WITNESS:   COMMANDER GRANT SNYDER
3                                                     PAGE
4
5               EXHIBITS  INTRODUCED:
6                                                     PAGE
7    Exhibit 388    Minneapolis Police               56
                    Department Special Order,
8                   Use of Force
9    Exhibit 389    Email exchange                   67
10   Exhibit 390    Email exchange                   78
11   Exhibit 391    Email exchange                   153
12   Exhibit 392    Email exchange                   173
13   Exhibit 393    Email exchange                   192
14   Exhibit 394    Email from Grant Snyder to       217
                    Felicia Chesmer dated
15                  11/17/20
16   Exhibit 395    Encampment Demobilization        217
                    Strategy
17
     Exhibit 396    Email exchange                   266
18
19
      EXHIBITS PREVIOUSLY MARKED AND REFERRED TO:
20
                                                     PAGE
21
     Exhibit 156    Sweeps Chronology                107
22
     Exhibit 157    Encampment closure process       87
23
     Exhibit 187    Email exchange                   205
24
     Exhibit 188    Email exchange                   206
25

Page 6

```
 1   Exhibit 228    Minneapolis Police           46
                    Department Policy and
 2                  Procedure Manual
 3   Exhibit 23     Event Action Plan,          155
                    Demobilization of Powderhorn
 4                  Park - East Encampment,
                    7/20/20
 5
     Exhibit 271    Email from Grant Snyder to  140
 6                  Medaria Arradondo and others
                    dated 6/15/20 with
 7                  attachments
 8   Exhibit 272    Event Action Plan, 7/29/20  143
 9   Exhibit 273    Event Action Plan, Unnamed  140
                    Hotel/Midtown Exchange,
10                  6/15/20
11   Exhibit 284    Email exchange              131
12   Exhibit 286    Email exchange              123
13   Exhibit 53     Event Action Plan,          172
                    Encampment Demobilization,
14                  8/14/20
15   Exhibit 55     Event Action Plan,          173
                    Demobilization of Peavey
16                  Park Encampment, 9/24/20
17   Exhibit 69     Operational Guidance         94
                    Encampment Response on
18                  City-owned Properties
19   Exhibit 78     Email exchange              149
20   Exhibit 83     Email exchange              163
21
22
23
24
25
```

Page 7

1    (Original exhibits attached to original
     transcript; copies to counsel as requested.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 8

```
 1                  P R O C E E D I N G S
 2            Whereupon, the deposition of
 3        COMMANDER GRANT SNYDER was commenced at
 4        9:00 A.M. as follows:
 5                 COMMANDER GRANT SNYDER,
 6         after having been first duly sworn,
 7        deposes and says under oath as follows:
 8                         - - -
 9                      EXAMINATION
10    BY MS. STILLMAN:
11    Q.  Good morning, Commander Snyder.  We met
12        earlier.  My name is Rebecca Stillman, and
13        I'm one of the attorneys for the
14        plaintiffs in this matter.
15            Could you please state and spell your
16        name for me.
17    A.  Grant, G-r-a-n-t; Snyder, S-n-y-d-e-r.
18    Q.  And you understand that you are here for
19        your individual deposition today?
20    A.  I do.
21    Q.  Have you ever had your deposition taken
22        before?
23    A.  Yes.
24    Q.  How many times?
25    A.  I don't know.  Probably a dozen or more.
```

```
 1        Not according to this topic, but over

 2        time, yeah, in other cases.

 3   Q.   Were those as part of your role as an

 4        officer for the Minneapolis Police

 5        Department?

 6   A.   Yes.

 7   Q.   Have you testified in a deposition for

 8        anything other than something related to

 9        your role as a Minneapolis Police

10        Department officer?

11   A.   Yes.

12   Q.   What was the context of those depositions?

13   A.   Back when I was 18 years old, I was the

14        manager of a roller-skating rink, and

15        someone fell and got hurt.  And there was

16        a civil suit against the company, and I

17        had to give a deposition for that.

18   Q.   Any others?

19   A.   Not that I recall.

20   Q.   When was the last time you gave a

21        deposition?

22   A.   Probably '8 or '9.

23   Q.   So it's been a while?

24   A.   Yeah.

25   Q.   So you've heard this many times before,
```

Page 10

```
 1        then, but I'm just going to go through a
 2        few basic instructions.
 3             Do you understand that your answers
 4        today are under oath as if given in a
 5        court of law?
 6   A.   Yep.
 7   Q.   Do you understand that under certain
 8        circumstances your testimony could be
 9        shown to a jury?
10   A.   Yep.
11   Q.   You need to give audible responses today,
12        rather than shaking your head, so the
13        court reporter can write down what you
14        say.
15             Do you understand that?
16   A.   Yes.
17   Q.   If you don't understand a question, just
18        ask and I can restate it.  If you answer,
19        I will assume that you understood the
20        question.
21             Do you understand that?
22   A.   I do.
23   Q.   If you need a break at any time, please
24        let me know.  I just ask that if there is
25        a question pending, that you answer the
```

1       question before taking a break.

2            Do you understand?

3    A.  I do.

4    Q.  Your attorneys or some of the other

5        attorneys in the room may object during my

6        questioning.  If so, you can let them

7        object and then you may answer the

8        question.

9            Do you understand that?

10   A.  Yes.

11   Q.  And that's unless your attorney tells you

12       not to answer the question.

13   A.  Okay.

14   Q.  Is there -- so I understand that you are

15       currently on medical leave.  I'm not

16       asking for your diagnosis, but is there

17       any reason that your condition, diagnosis

18       that's requiring you to be on medical

19       leave could affect your ability to give

20       complete and truthful answers to my

21       questions today?

22   A.  Not that I know of.

23   Q.  Is there anything about the condition for

24       which you're on medical leave that could

25       affect your ability to give complete and

Page 12

```
 1        truthful answers in the future?
 2   A.   Not that I know of.
 3   Q.   Are there any other reasons you wouldn't
 4        be able to give complete and truthful
 5        answers to my questions today?
 6   A.   Only limited by my recollection.
 7   Q.   And I'll apologize.  These are standard
 8        questions.
 9              But have you taken any medications
10        that would make you unable to respond to
11        questions?
12   A.   I have in the past, but not today.
13   Q.   For clarity of today's deposition, I'm
14        just going to go through a few
15        deposition -- or definitions that I'm
16        going to be using today.
17              When I say "encampment," I mean a
18        group of two or more tents where homeless
19        people live.  And when I say "sweep," I'm
20        referring to the clearing, demobilization
21        or disbandment of an encampment.
22   A.   Can I respond to any of these as we're
23        talking, or do you just want me to listen
24        right now?
25   Q.   Do you have a question right now?
```

Page 13

1   A.   I do.

2   Q.   What is your question?

3   A.   So that definition of "encampment" is

4        inconsistent with my experience, which I

5        assume is more than yours dealing with

6        encampments.

7             So when I respond, if I'm to respond

8        when you use that definition, it will be

9        complicated for me to -- you know, I may

10       not agree with your definition that two or

11       more tents or two tents makes an

12       encampment.  And I think that complicates

13       my testimony.

14  Q.   How do you define "encampment"?

15  A.   I would define an encampment by a larger

16       quantity of tents, and I wouldn't put a

17       number to it.

18            But when you talk about two or more

19       tents, do you have a physical boundary

20       over what period of space?  Are you

21       talking about like a half an acre?  Are

22       you talking about like a, you know,

23       50-by-50 square?

24            These are all things that we would

25       have to deal with.  But I'm not sure.  I'm

1      not trying to badger you; I'm just trying

2      to make sure that I'm answering your

3      questions as accurately as I can, and not

4      misleading with my testimony.

5           Does that make sense?

6  Q.  That makes sense, yes.

7           So no, in my definition, I do not

8      have a specific area.  No.  I'm just

9      saying when I use the word "encampment,"

10      that's what I mean.

11           If you don't understand it in that

12      context or you need me to rephrase it, you

13      may do so.  If you need to clarify your

14      answer, you may do that as well.

15  A.  Okay.  And then the other question I would

16      have, when you refer to "sweeps," so to me

17      that term is -- is pejorative and

18      problematic, and it feels disrespectful to

19      refer to what I did and what other people

20      may have done with the City to refer to

21      that as a "sweep" because of all the

22      baggage that goes along with that.

23           I would prefer a different term.

24      Obviously you're going to do what you

25      want, but I just wanted that on the

1        record.

2   Q.   And I will be using the word "sweep"

3        today, and for purposes of this

4        deposition, when I say "sweep," I do mean

5        the clearing, demobilization or

6        disbandment of an encampment.

7             How did you prepare for today's

8        deposition?

9   A.   I met with our counsel with the City on I

10       think two or three different occasions,

11       two by Zoom or phone, and one in person

12       today.

13  Q.   Did you meet with both Ms. Enslin and

14       Ms. Sarff?

15  A.   Yes.

16  Q.   Any other counsel for the City?

17  A.   No.

18  Q.   How long did you meet with them on each of

19       those three occasions?

20  A.   Well, today was probably less than a half

21       hour.  The phone call that I had with

22       Sharda was maybe 20 minutes.  And then

23       there was a Zoom call that maybe lasted an

24       hour or less.

25  Q.   Have you communicated with counsel for the

Page 16

1        MPRB regarding this deposition?
2   A.   No.
3   Q.   Have you communicated with counsel for the
4        County regarding this deposition?
5   A.   No.
6   Q.   Did you discuss today's deposition with
7        any of your staff?
8   A.   No.
9   Q.   Have you discussed today's deposition with
10       anyone other than your attorneys?
11  A.   My wife.
12  Q.   What did you discuss with your wife about
13       today's deposition?
14  A.   Where it was going to be.  How long it was
15       going to take.  Who was going to take the
16       dogs to day care.  Who was going to pick
17       up our child and take her to the doctor
18       this afternoon.  How she was going to get
19       me my wallet, because I left it behind.
20           Do you want me to continue down this
21       road or --
22  Q.   That's fine.
23           What is the name of your wife?
24  A.   Melanie.
25  Q.   Does she have the same last name as you?

1    A.   She does.

2    Q.   Did you review any documents when

3         preparing for today's deposition?

4    A.   I did not.

5    Q.   Did you review any transcripts when

6         preparing for today's deposition?

7    A.   I did not.

8    Q.   Any summaries of transcripts?

9    A.   I did not.

10   Q.   Any excerpts of transcripts?

11   A.   No.

12   Q.   Did you review any timelines or factual

13        summaries in preparation for today's

14        deposition?

15   A.   No.  I reviewed no -- nothing at all.

16   Q.   Have you reviewed the complaint that was

17        filed in October of 2020 for this matter?

18   A.   Can you be more specific?  Where was the

19        complaint filed?  What complaint are you

20        referring to?

21   Q.   The lawsuit -- the complaint that was

22        filed in this lawsuit.

23   A.   No, I've never seen it.

24   Q.   Have you reviewed the City's answer to the

25        complaint?

1    A.   I have not.

2    Q.   Did you review the amended complaint that

3         was filed in December of 2020 in this

4         lawsuit?

5    A.   I did not.

6    Q.   Did you review the City's answer to that

7         complaint?

8    A.   Not to the best of my knowledge.

9    Q.   Have you reviewed the motion to amend the

10        complaint that was filed in January of

11        2023 in this matter?

12   A.   No.

13   Q.   Do you know what this lawsuit is about?

14   A.   I do.

15   Q.   What is your understanding of what this

16        lawsuit is about?

17   A.   About the displacement of people that are

18        camping outside.

19   Q.   Anything else?

20   A.   I mean, in a specific sense I think there

21        is an issue of property, and retention or

22        destruction of property; notice prior to

23        demobilization.

24             That's I think the extent of my

25        general knowledge about the nature of the

```
 1        complaint.
 2   Q.   When did you find out that this lawsuit
 3        had been filed?
 4   A.   I don't recall specifically.  I know that
 5        at some point after it had been filed,
 6        that someone told me.  Whether it was
 7        Sharda or whether it was someone else with
 8        the mayor's office, I don't recall how I
 9        was notified or when, but I remember being
10        notified.
11   Q.   Do you think you've known about this
12        lawsuit for over a year?
13   A.   Yes.
14   Q.   Do you think you've known about this
15        lawsuit for over two years?
16   A.   I don't know.  I don't remember when it
17        was filed, so --
18   Q.   Have you discussed this lawsuit with
19        anyone?
20   A.   Other than the people that I just told
21        you.
22             I mean, I think at the time that it
23        was filed, I probably had general
24        conversations with people about it.
25             I think there was a conversation I
```

Page 20

```
 1        had with Peter Ebnet of the mayor's
 2        office.  We talk frequently.
 3             I think that in some of the steering
 4        committee meetings that I was in, that
 5        there was a discussion about practice, and
 6        the lawsuit, and discussions about how
 7        demobilizations should be done or would be
 8        done.
 9             I think Sharda and I had --
10             MS. ENSLIN:  I'm just going to say
11        just to the extent that we talked about
12        conversations that you and I had in an
13        attorney-client capacity, I'm just going
14        to instruct you not to divulge those
15        communications.
16             But to the extent you can answer
17        without talking about attorney-client
18        communications that we had, go ahead.
19   A.   Gotcha.  Okay.
20             I think I probably had a conversation
21        with some people on our staff about it at
22        some point.  I don't remember any
23        specifics or when or with whom other than
24        the people that I've already named.
25   BY MS. STILLMAN:
```

Page 21

```
 1   Q.  And just so you're aware, the instructions
 2        Ms. Enslin just gave apply for the
 3        entirety of today's deposition.  I don't
 4        want to hear about any confidential
 5        attorney-client communications that you've
 6        had with city counsel.
 7             Did you investigate any of the
 8        allegations in the complaint?
 9   A.  Not that I'm aware of.
10   Q.  Where are you from?
11   A.  Where am I from originally?
12   Q.  Yes.
13   A.  The Twin Cities.
14   Q.  Have you lived in the Twin Cities your
15        whole life?
16   A.  Except for the period of time that I was
17        in the military, yes.
18   Q.  When were you in the military?
19   A.  Back in the late '80s and early '90s.  I
20        lived in New Jersey; I lived in Sierra
21        Vista, Arizona; and I lived in Monterey,
22        California.
23   Q.  What division of the military were you in?
24   A.  The Army.
25   Q.  And what was your rank?
```

1   A.   When I got out, I was a sergeant.

2   Q.   What is your highest level of education?

3   A.   Master's.

4   Q.   What is your master's degree in?

5   A.   Theological studies.

6   Q.   When did you get your master's degree?

7   A.   2018 maybe.

8   Q.   Where did you get that degree?

9   A.   Northwestern.

10  Q.   Northwestern University in Chicago?

11  A.   Here.

12  Q.   I'm assuming you have an undergraduate

13       degree then.

14  A.   I do.

15  Q.   What is your undergrad degree in?

16  A.   It's a Bachelor of Individualized Studies

17       with an emphasis on human sexuality and

18       sociology.

19  Q.   I have never heard of that degree before.

20       What is --

21  A.   It's called a BIS.

22  Q.   Okay.  Could you explain -- "individual

23       studies" did you say?

24  A.   Individualized studies.  It's a

25       mechanism -- whether they do it now still,

Page 23

```
 1          I don't know.  But it was offered through
 2          the College of Liberal Arts at the
 3          University of Minnesota for people that
 4          wanted to focus on a more individualized
 5          course of study.  And you would
 6          essentially identify the courses that you
 7          would take, write a thesis of this is, you
 8          know, why I want to involve -- why I'm
 9          interested in this.
10               My big interest was around the sort
11          of historical -- the issue of sex work is
12          what I was most concerned about, and the
13          iniquity of it through history.  And so I
14          had a focus on sociology, human sexuality
15          and psychology.
16     Q.   And what year did you get your bachelor's
17          degree?
18     A.   '93 maybe.
19     Q.   And that was through the University of
20          Minnesota?
21     A.   (Nods head up and down.)
22               Yes.
23     Q.   Have you received any other certificates
24          related to education?
25     A.   Yeah.  I mean, I've received a variety of
```

                                                              Page 24

```
 1          professional certifications both in the
 2          military and in law enforcement; a number
 3          of peer-support certifications back when I
 4          was in college, having to do with sexual
 5          violence, child abuse, sexual harassment;
 6          and then peer mentoring, those sorts of
 7          things, courses too many to list, for the
 8          police department.
 9    Q.   If I say "MPD," can you agree that I'm
10          referring to the Minneapolis Police
11          Department?
12    A.   Yes.
13    Q.   When did you start working for MPD?
14    A.   1996.  September 9, 1996.
15    Q.   What was your first role?
16    A.   I was a cadet.
17    Q.   How long were you a cadet?
18    A.   For the nine months of the academy.
19    Q.   So did you graduate from the academy in --
20    A.   May of 2000 -- or -- "of 2000."  Of 1997.
21    Q.   Is that a Minneapolis Police Department
22          academy?
23    A.   Yes.
24    Q.   What was your role after you graduated
25          from the academy?
```

Page 25

```
 1   A.   I was a patrol officer, assigned to the
 2        field training officer program.  I worked
 3        in the fourth precinct and the fifth
 4        precinct during that period of time, and
 5        then I was assigned to the dog watch shift
 6        at the fourth precinct.
 7   Q.   How long were you a patrol officer?
 8   A.   I was a patrol officer until 2007.
 9   Q.   And was patrol officer your rank when you
10        moved to the dog watch shift in the fourth
11        precinct?
12   A.   Sorry.  I'm trying to -- I'm thinking --
13        I'm blanking on my timeline.
14             I can't remember exactly when I got
15        promoted out of patrol officer.
16        Regardless of assignment, whether you're
17        working the street or -- you can have
18        different investigative assignments or
19        training assignments.  You're always --
20        your rank is a patrol officer.
21             So when I say "patrol officer," it
22        doesn't mean that I was a 911 responder
23        during that whole period of time.  But in
24        2007, I believe -- and I could be wrong,
25        but I think it was 2007 -- in March I was
```

1      promoted to sergeant.

2              And I apologize.  I missed your last

3      question.

4  Q.  No, that's fine.

5              So before you were promoted to a

6      sergeant, what were your duties?

7  A.  So as a 911 responder, we were responsible

8      to work for -- to answer 911 responses or

9      911 calls, different details that would

10      come up, beats, things like that.  That's

11      what we did.

12  Q.  What do you mean by "beats"?

13  A.  Well, like patrol beats.  Like if you were

14      assigned to a specific area.

15  Q.  And that was in the fourth and fifth

16      precinct?

17  A.  It was in the -- well, field training was

18      in the fourth and fifth precinct.  My work

19      as a, you know, person no longer on FTO as

20      a patrol officer was in the fourth

21      precinct.

22  Q.  And you talked about a dog watch --

23  A.  Dog watch.

24  Q.  -- dog watch shift in the fourth precinct.

25  A.  Yep.

1    Q.   What is that?

2    A.   So day watch goes from 6:30 now -- the

3         hours are from 6:30 to 4:30.  Midtown

4         watch goes from 4:30 to 2:30.  Dog watch

5         goes from 8:30 to 6:30.

6    Q.   8:30 p.m.

7    A.   p.m. to 6:30 a.m.

8    Q.   What were the hours when you worked the

9         dog watch shift?

10   A.   I think it was like 9:00 to 7:00, or

11        something like that.

12   Q.   Similar?

13   A.   Similar, yeah.

14   Q.   And how long did you work the dog watch

15        shift in the fourth precinct?

16   A.   I worked dog watch until January of 2000.

17   Q.   And what was your role after that?

18   A.   Then I went to the CRT team, the community

19        response team, which was the street crimes

20        unit.

21   Q.   What were your duties on the CRT team?

22   A.   Livability issues, and case investigation

23        having to do with that.  Basically gangs,

24        guns, drugs was the kind of work we did,

25        along with prostitution, reported issues,

Page 28

```
 1        that sort of thing.
 2   Q.   How long were you with CRT?
 3   A.   CRT was disbanded temporarily in 2005.
 4        And from there I went to the STOP unit,
 5        which stood for the strategic operations
 6        unit.  And it was our SWAT team.
 7             And I stayed there until sometime in
 8        2006, and then I came back to the crack
 9        team in the fourth precinct.  They didn't
10        have CRT team then, just a crack team.
11        And I stayed there until 2007, in March,
12        when I was promoted to sergeant, which was
13        the date.  So that clarifies it.
14   Q.   I apologize.  Did you say "crack"?
15   A.   Crack, like crack cocaine.  Crack team.
16             We were responsible for -- again, it
17        was gangs, guns, drugs, but referred to
18        doing a lot of work around crack cocaine.
19   Q.   And what were your duties when you were in
20        STOP?
21   A.   I was the surveillance officer, which is
22        super exciting.  I was the guy that would
23        hide in the back of a beat-up minivan on
24        the corner of 31st and 6th, or
25        Lowry/Lyndale or at Johnnie A's, or
```

1          whatever it was called back then, and get

2          video evidence and surveillance evidence

3          of people selling drugs, selling guns,

4          doing all kinds of nefarious activity.

5    Q.   And what were your duties when you were on

6          the crack team?

7    A.   Investigation of cases; response to,

8          again, livability issues; cases involving

9          gangs, guns and drugs.

10   Q.   When you say "livability issues," what do

11         you mean?

12   A.   Well, I mean, again, it tends to be things

13         like loitering.  They tend to be related

14         to gangs, guns, drugs.

15              We would generally think of

16         livability issues as things that impacted

17         people's quality of life.  Drug loitering,

18         drug dealing.  Prostitution to some

19         extent, although that really wasn't a

20         focus of mine at that point.  And those

21         sorts of things.

22   Q.   And you were promoted to sergeant in 2007,

23         correct?

24   A.   I was.

25   Q.   And what were your roles when you were

Page 30

```
1        promoted in 2007?
2   A.   So I was promoted to sergeant and
3        transferred to the assault unit, where I
4        remained for 15 minutes before I was
5        transferred to an undercover assignment at
6        the FBI.
7   Q.   How long were you at the undercover
8        assignment at the FBI?
9   A.   Until about August of 2011, or -- yes,
10       August of 2011.
11  Q.   So for approximately four years?
12  A.   Yeah, just over four years.
13  Q.   What did you do after you finished your
14       undercover assignment with the FBI?
15  A.   I went to the child abuse unit.  And I --
16       within the first six months, I was
17       requested by Captain -- then Captain
18       Huffman to take the experience that I had
19       gained in the FBI and start working --
20       start our own juvenile human trafficking
21       program.
22            And so I worked juvenile trafficking
23       from -- or human trafficking from probably
24       February of 2012 until -- until April
25       Fools' Day of 2018.
```

Page 31

```
 1   Q.   And was your rank sergeant that entire
 2        time?
 3   A.   It was.
 4   Q.   And what did you do after working in the
 5        juvenile human trafficking unit?
 6   A.   I started the homeless liaison program,
 7        which was -- which I named the Homeless
 8        and Vulnerable Population Initiative.
 9   Q.   Just to save acronyms, would you be okay
10        with me referring to the Homeless and
11        Vulnerable Population Initiative as "the
12        initiative"?
13   A.   Sure.
14   Q.   Was the initiative operated out of a
15        specific precinct?
16   A.   No.
17   Q.   Was it a centralized program?
18   A.   It was citywide, yes.
19   Q.   When you started the initiative in 2018,
20        were there any other officers?
21   A.   No.  Just me.
22   Q.   Any other members that weren't sworn
23        officers?
24   A.   Not formally assigned to that initiative,
25        but I interacted with a ton of people
```

Page 32

1       across the whole range of disciplines.

2   Q.  Why did you start the initiative?

3   A.  Because we needed, and the City still

4       needs, a very committed liaison to work

5       between the police department and our

6       citizens that are experiencing

7       homelessness and our vulnerable

8       populations.

9   Q.  Why do you think that's needed?

10  A.  Because they have such specific needs, and

11      tend to not effectively access systems of

12      justice the way that people that live in a

13      home and have a job or, you know, have a

14      more predictable day-to-day lifestyle.

15          You know, the law enforcement and

16      investigations are not equipped well to

17      maximize our police service to people that

18      don't have an address or don't have a

19      phone, or don't have a predictable

20      schedule, or where an investigator could

21      find them and follow up or different

22      things like that.

23  Q.  You mentioned that the homeless and

24      vulnerable persons population has specific

25      needs.  Can you give me some examples of

1      those specific needs.

2   A.  Yeah.  I mean, I think that there was --

3       one of the specific needs was a need of

4       relationship with somebody and an ability

5       to build trust with somebody inside the

6       police department that would be available

7       to respond to them in an appropriate and

8       compassionate way, to be available to work

9       within sort of the fabric and the way that

10      their life was.

11          And that -- oftentimes that meant,

12      you know, frequent contact, couple of

13      times a day, seeing them out on the

14      streets, seeing them wherever their tent

15      was, you know, checking in on them, that

16      sort of thing.

17          And I'm sorry, I forgot your

18      question.

19  Q.  That's fine.

20  A.  You also asked me, and I should expand,

21      why I started the initiative.

22  Q.  Yeah.

23  A.  I gave you one reason, but I didn't give

24      the biggest reason I started it:  Because

25      I feel a special passion for people that

```
                                              Page 34

 1           are struggling, and I feel like that's

 2           where I needed to be.

 3                 And I felt like they needed to have

 4           someone that cared enough to show up and

 5           to be there consistently, and to be

 6           patient and take time to build a

 7           relationship and those sorts of things.

 8                 Did you want me to talk about the

 9           other things that we talked -- I can't

10           remember what the word was that I used, or

11           you used, but the other special

12           circumstances or special needs that they

13           have?

14   Q.  If you have additional examples of

15           specific needs.

16   A.  Well, like mental health, for example, is

17           a specific need, and requires someone who

18           is mature, who is able to de-escalate, who

19           is able to be patient, knowing that on one

20           day you may get an entirely different

21           person than you'll get on another day.

22                 Chemical dependency, people were

23           struggling with chemical dependency, and

24           it was -- you know, I would see people who

25           were shooting up and who were in the
```

Page 35

```
 1        process of getting high.  An arrest isn't
 2        going to make their life any better, and
 3        it isn't going to help them with their
 4        chemical dependency issue.
 5              So that's not a typical law
 6        enforcement response to seeing people that
 7        are in the process of shooting heroin.
 8        You know, most people would grab their
 9        handcuffs.  But, you know, I made a
10        commitment early on that that wasn't going
11        to be my go-to.
12              So those are just a couple.  There is
13        a ton of other things.  There is
14        transportation needs.  There is storage
15        needs.
16              There is food needs, is a big one,
17        food insecurity among homeless, and
18        nutritional needs.  And people wearing
19        shower shoes in the middle of wintertime,
20        and people with inappropriate clothing and
21        all this other stuff.
22              So I mean, we could go on for hours
23        on this.
24   Q.   Do you have any specific training on
25        working with the homeless population?
```

```
 1   A.   Just a ton of hours spent among them.  And
 2        I would consider that training because the
 3        people of this city, the homeless
 4        population in this city, took me in, they
 5        took me under their wing, and they taught
 6        me what I needed to know.
 7             I've attended a few -- you know, I've
 8        attended some bigger conferences, and most
 9        of that falls well short of the, you know,
10        lived experience of working among that
11        population.
12   Q.   Do you have any training in mental health?
13   A.   Only what I received through the
14        department.
15   Q.   And what sort of training did you receive
16        through the department?
17   A.   We would receive -- we would receive
18        training in our annual in-services.  There
19        is other courses that I think I've
20        attended over the course of the last 27
21        years, and, you know, that sort of thing.
22   Q.   Have you had training in de-escalation?
23   A.   Yes.
24   Q.   Who was that training through?
25   A.   Again through the department.
```

Page 37

1    Q.   When was that?

2    A.   I don't recall.  I just know that it's

3         come up a number of times.

4    Q.   And you said that when you started the

5         initiative, you were the only person

6         working within the initiative.

7              At any point were officers, other

8         sworn officers, added to the initiative?

9    A.   Yep.  We -- in fact, when I got promoted

10        to lieutenant on September 1st of 2019, I

11        added Dave O'Connor, then sergeant, to the

12        initiative.

13   Q.   And did now Commander O'Connor work with

14        the initiative until he left MPD?

15   A.   Yes.

16   Q.   At any point did you add other officers to

17        the initiative?

18   A.   Well, Jason Wolf came in at some point

19        during that year briefly to work with

20        Sergeant O'Connor.

21   Q.   Anyone else?

22   A.   Not that I recall.  I mean, again, you

23        know, we considered -- even though they

24        weren't formally assigned MPD personnel,

25        we considered a broad range of partners

```
 1        that would go out with us, would go out
 2        with Dave:  Katie Miller, Autumn Dilly,
 3        you know, people from transit, people from
 4        Hennepin Health Care for the Homeless,
 5        people from a whole variety of different
 6        backgrounds and disciplines and
 7        organizations.
 8   Q.   Did you supervise Commander O'Connor and
 9        Jason Wolf while they worked for the
10        initiative?
11   A.   Yes.
12   Q.   Currently are there any other officers
13        working for the initiative?
14   A.   So when I left on leave, Sergeant or
15        Lieutenant Troy Carlson had been assigned
16        to take over as lieutenant of that
17        initiative.
18             At the time when I went on leave in
19        early January, there was no one else
20        assigned to it.  And then sometime during
21        that last period of time they assigned
22        Sergeant John Hoglund.  I don't know if
23        he's still there because, again, I've been
24        on leave when he was assigned.  So --
25   Q.   And what day exactly did you go on leave?
```

Page 39

```
 1   A.   I think my leave started on the 10th of
 2        January.
 3   Q.   You're currently a director of a
 4        nonprofit, correct?
 5   A.   I'm the vice president.
 6   Q.   Vice president of a nonprofit?
 7             And that nonprofit is Involve
 8        Minnesota?
 9   A.   Involve MN, yeah.  Involve Minnesota,
10        yeah.
11   Q.   Is your wife the executive director of
12        Involve MN?
13   A.   Yes.
14   Q.   When did you start Involve MN?
15   A.   2013 is when we kind of started doing it,
16        but we weren't incorporated until 2018.
17   Q.   What is the mission of Involve MN?
18   A.   Well, as of like 3/2020 when COVID hit, it
19        became food insecurity largely.  There is
20        a couple of other subsidiary missions,
21        but --
22   Q.   What are those subsidiary missions?
23   A.   Well, like we do law enforcement support
24        for people that are struggling with PTSD
25        or family issues or serious illnesses,
```

1       that sort of thing.

2              And then we also do -- we also have a

3       variety of other -- our outreach teams

4       will pass out water, or pass out clothing,

5       pass out -- purchase shoes for people,

6       boots in the wintertime, and that sort of

7       thing.

8    Q.  Does Involve MN have any employees?

9    A.  Yes.

10   Q.  How many?

11   A.  24.

12   Q.  What was Involve MN's mission prior to

13       March 2020?

14   A.  It was purely just support.  It really

15       wasn't food insecurity, although I was

16       always concerned about that, but it wasn't

17       organized like that.

18              It was really just a -- you know, we

19       would do like streetside cooking, you

20       know, and that sort of thing, more of a

21       community building.  You know, people that

22       sleep outside don't generally get a hot

23       breakfast, so we would do that.  That was

24       a blast.

25              And, you know, we would again buy

```
                                                     Page 41
 1         shoes for people, or you know, if people
 2         had wanted to donate water or something
 3         like that, we would pass that out.
 4    Q.   Why did you start focusing on food
 5         insecurity at the start of COVID?
 6    A.   Because it was I think the 20th of March
 7         when pretty much over three days, every
 8         place that -- all the brick-and-mortar
 9         locations where people went to get food
10         shuttered and there was -- nothing was
11         open.
12              All the Loaves and Fishes were
13         closed.  They weren't distributing food in
14         the way that they had been.  And the House
15         of Charity was closed, and different
16         things like that.
17              And so, you know, we decided that at
18         that point, that we would make bag
19         lunches, and that's what we did.
20    Q.   And would you distribute these bag lunches
21         to encampment residents?
22    A.   (Nods head up and down.)
23              Yes.  I'm sorry.  My bad.
24    Q.   It's easy to forget.
25    A.   It is.
```

Page 42

1    Q.   Why did you initially start Involve MN?

2    A.   Initially I started it because I was

3         dealing with -- well, I was seeing more

4         and more people when I was doing -- in

5         2013 when I was doing human trafficking

6         work.  I was running into a lot of people

7         that -- women that had been homeless and

8         their trafficking experience had been a

9         result of their homelessness or had been

10        sort of a comorbidity with their

11        homelessness.

12             And I was shocked by the fact that --

13        of all the horrible shit that happened to

14        them -- I don't know.  Maybe I'm not

15        supposed to swear in here.  I apologize.

16             MS. ENSLIN:  That's okay.

17   A.   -- of all the horrible things that

18        happened to them, I was shocked by the

19        fact that they looked at their trafficking

20        exploitation as just one other thing; it

21        wasn't even the worst thing that happened

22        to them.

23             And that still brings tears to my

24        eyes.  How could -- what kind of a life is

25        that where you have all these bad things

1          and this is just one other drop in the

2          bucket of trauma, right?  That's a hard

3          thing for me.  It was hard then, and it's

4          still hard now for me to make sense of.

5               So I started Involve with the purpose

6          of trying to figure out where we fit in,

7          you know.  And Involve was a conduit.  I

8          wanted it to be a way to sort of wrap our

9          arms around people that needed support,

10         but didn't maybe know how to ask for it.

11              And I met -- in 2013 I was at a gala

12         in Washington, D.C.  And I hated those

13         things.  It was this Shared Hope

14         conference, which is a national human

15         trafficking organization.  And I skipped

16         out on the gala because I don't want no

17         part of that stuff.

18              So I went down and I was hanging

19         around Chinatown, and I met this woman

20         named Sheila.  She was 59 years old, 58 or

21         59 then, and she had been homeless for

22         like 14 or 15 years.

23              And she took me around all these

24         places, and introduced me to people, and

25         talked about her life being homeless.  And

Page 44

1        that was my first real exposure.

2              And she, like many women, was

3        homeless because of a domestic abuse

4        background.  That's how she first got into

5        homelessness.

6              So it was like the just bright light

7        sort of -- it didn't happen all at one

8        time, but it sort of evolved out of this

9        experience of relationship.  That is where

10       I understood the value of relationship

11       with people, and sort of that connection

12       and what that really meant, because, you

13       know, we hung together for like five

14       hours; you know what I mean?

15             So there is more than that, but

16       that's probably enough for you.

17  BY MS. STILLMAN:

18  Q.   When you became an MPD officer, did you

19       take an oath of service?

20  A.   Yes, I did.

21  Q.   Can you tell me generally what that oath

22       of service says.

23  A.   Oh, boy.  I mean, they've changed it over

24       the years, and I don't remember what

25       specifically we said.  But it had to do

Page 45

1          with, you know, the general themes of
2          protect and serve, to integrity, service,
3          protecting and defending the Constitution.
4              I think those are basically -- there
5          probably was other pieces to it that I
6          don't recall.
7     Q.   Are you required as an MPD officer to
8          follow the Minnesota law enforcement code
9          of ethics?
10    A.   Yes.
11    Q.   Can you tell me generally what the
12         Minnesota law enforcement code of ethics
13         says.
14    A.   I don't -- I haven't read it any time
15         recently.  I'm assuming I read it at one
16         point.  I just don't know.  I wouldn't be
17         able to tell you what's on it.
18             I mean, intuitively I can tell you
19         that it probably has to do with honesty
20         and integrity and, you know, those sorts
21         of things, duty.
22             MS. STILLMAN:  I'm going to go to an
23         exhibit that has been previously marked as
24         228.
25             (Discussion off the record.)

Page 46

```
 1              (Deposition Exhibit No. 228 was
 2         previously marked.)
 3    BY MS. STILLMAN:
 4    Q.   So on the first page, two pages above
 5         where it says "Vision, Mission, Values and
 6         Goals" --
 7    A.   Two paragraphs above?
 8    Q.   Two paragraphs above that starts with:
 9                "The fundamental purpose..."
10            Do you see that?
11    A.   I do.
12    Q.   Do you agree that the fundamental purpose
13         and role of the police in a free society
14         is the protection of constitutional
15         guarantees, maintenance of public order,
16         crime prevention and suppression, and
17         dutiful response to the needs of the
18         community?
19    A.   Yeah, I think so.  I mean, I think that's
20         a poor wording for -- when you say
21         "fundamental role," you're really
22         identifying one thing.  You're saying that
23         there is a single thing that's
24         fundamental, this is the role, and then
25         you list eight things that we do.
```

Page 47

```
 1          You know, I think you could -- it
 2      would be better to word that to say "among
 3      our fundamental duties include."  That's
 4      how I would word it.
 5  Q.  Okay.  You can put that aside.
 6          As an MPD officer, have you ever put
 7      on any trainings?
 8  A.  Yes.
 9  Q.  What trainings have you put on?
10  A.  Most of the trainings that I've done have
11      to do with human trafficking.
12          I don't know that I've ever done a
13      homeless training for our officers.  We
14      tried to get something put in, and at the
15      time that I was in charge of that unit,
16      there has not been.  We just hadn't been
17      able to get it on the in-service calendar.
18          But I've done a variety of trainings
19      all across the country on
20      human-trafficking-related investigation,
21      and working with everything from
22      surveillance and technical investigation,
23      to interviewing, to working with
24      challenging victims and trauma, you know,
25      and that sort of thing.
```

1   Q.   While you've been at MPD, have you had any
2        training on the Fourth Amendment?
3   A.   Yes.
4   Q.   When was that?
5   A.   I don't know.  A variety of times
6        throughout my 27 years here.  I don't
7        recall the last one.
8   Q.   Do you recall if it was within -- the last
9        one was in the last five years?
10  A.   Probably.
11  Q.   Do you remember who conducted your most
12       recent training?
13  A.   I don't.
14  Q.   Do you remember the contents of your most
15       recent training on the Fourth Amendment?
16  A.   No, because, you know, over time I've been
17       through that training so often that, you
18       know, my eyes kind of glaze over when we
19       start having the same discussion and --
20       you know.
21  Q.   Do you recall if any of the trainings
22       you've attended on the Fourth Amendment
23       have covered the search and seizure
24       provision of the U.S. Constitution?
25  A.   I mean, I think so.  I don't remember

Page 49

```
 1         specific trainings, so I don't remember
 2         specific content.
 3              I claim a general knowledge of the
 4         Fourth Amendment and how it applies to
 5         police work.  And that's been supported by
 6         instruction that we've been given, but,
 7         again, I don't remember when.  I don't
 8         remember specific topics, that sort of
 9         thing.  I remember that topic of search
10         and seizure coming up several times.
11    Q.   What do you mean by "general knowledge"?
12    A.   Well, I mean, I think that we as police
13         officers deal -- everything we do involves
14         intrusions in some way.
15              And so, you know, I feel a fairly --
16         I feel well equipped to sort of navigate
17         at this point, as a commander, and to help
18         other officers navigate what that means to
19         be -- to do constitutional policing, and
20         in support of and in furtherance of the
21         Fourth Amendment.
22    Q.   I apologize.  I don't believe I asked this
23         earlier.
24              When were you promoted to commander?
25    A.   In August of 2022, and it was the worst
```

Page 50

```
 1        decision I've ever made.
 2   Q.   Why is it the worst decision you've ever
 3        made?
 4   A.   Because the further you go up the ranks --
 5        number one, being a commander for this
 6        chief is not a good assignment.
 7              And, also, the further you go up the
 8        ranks, the further you get away from why
 9        you became a police officer in the first
10        place.
11   Q.   What are your duties as commander?
12   A.   That's a really good question.  It depends
13        on the day.  And it depends on who is
14        asking.
15              It can be everything, including
16        things like, "Work on this project."  And
17        then you get into this project and, "Oh,
18        work on this project."
19              You know, my current job was I was
20        commander of the -- and they've changed
21        this so many times, so I don't know what
22        they would say now, or what's on the org
23        chart now.
24              But when I was promoted by Interim
25        Chief Huffman, it was commander of the
```

Page 51

1    Community Outreach and Engagement Bureau.
2    Okay?  Then I was told later that doesn't
3    exist.  But that's what is on my business
4    card, and that's what is on my payroll, so
5    I'm not really sure what they call it
6    today.
7         But my role was to manage or to
8    command two divisions.  One was the
9    procedural justice division, and that
10   included our Homeless and Vulnerable
11   Populations Initiative.  There -- and
12   procedural justice units, which nobody was
13   assigned to at the time.  It also included
14   recruitment and hiring.
15        And then Community Outreach and
16   Engagement Bureau was primarily our CSO,
17   our community service officer program.
18   And I feel like -- oh, and then Explorers,
19   our Explorer program.
20        So I had like eight different units
21   that were in the two, and some of which
22   were not staffed.  Like community
23   engagement was a unit that I commanded
24   that had no one in it.  That doesn't mean
25   we didn't do community engagement, which

```
 1        is why I was a commander of that unit.  We
 2        did.  But it was primarily CSOs that were
 3        doing it.
 4             So --
 5   Q.   What is a "CSO"?
 6   A.   I'm sorry.  Community service officer.
 7        They're unsworn personnel with the police
 8        department that are in many cases, though
 9        not necessarily, that doesn't need to
10        be -- are on a track, a career track, to
11        become a sworn police officer.
12   Q.   Since becoming commander, do you still do
13        field work?
14   A.   Only when I could.  I mean, I loved it.
15             That's another reason why I regret
16        taking the -- taking the promotion,
17        because it took me away from the fourth
18        precinct, where I was a shift lieutenant
19        for day watch and the administrative
20        lieutenant for the fourth precinct.
21   Q.   When did you have that role?
22   A.   I was promoted to lieutenant, as I've
23        said, in September of 2019.  And then I
24        was in charge of the recruitment and
25        hiring unit.
```

Page 53

```
 1          I was the lieutenant for that unit
 2       for -- until January 1st or 2nd of 2022 --
 3       wait, 2021, sorry -- when I went to the
 4       fourth precinct as the shift lieutenant
 5       for day watch.
 6  Q.   And were you simultaneously working with
 7       the initiative while you were acting as
 8       shift watch lieutenant at the fourth
 9       precinct?
10  A.   No.
11  Q.   When did you stop working with the
12       initiative?
13  A.   When I transferred.
14          I mean, when Dave O'Connor left,
15       there really wasn't.  But for any intents
16       and purposes, there was an empty unit
17       again, and there really was not a staffed
18       unit.
19          I was -- as a lieutenant, you know,
20       that role needs to be staffed with a
21       full-time person.  And even though I
22       couldn't make connections for people and
23       tried to, you know, help make sure -- like
24       in inclement weather, making sure that
25       officers had flyers and information, and
```

```
 1       emails went out so that they knew how to
 2       help people get access to things that they
 3       needed, I wasn't doing the sort of street
 4       outreach through the police department
 5       that I had been doing before.
 6  Q.   But as far as you are aware, when you went
 7       on leave, there were now officers within
 8       the initiative?
 9  A.   Yeah.  There was a lieutenant assigned to
10       it.
11  Q.   When did that lieutenant start?
12  A.   I can't remember when Troy started.  He
13       got promoted to lieutenant; that was his
14       first assignment.  So it would have been
15       probably in the fall maybe of 2022.
16            I guess I don't recall when he took
17       his lieutenant's.  Maybe later than that.
18       He was only there for a short period of
19       time before I went on leave.
20  Q.   Since you started at MPD, have you had any
21       training on the First Amendment?
22  A.   Yes.
23  Q.   How many trainings?
24  A.   No idea.  More than one.
25  Q.   More than five?
```

Page 55

```
 1    A.    That, I don't know.  That sounds probably
 2          high.
 3                I mean, it's a training -- so I've
 4          never sat through a multi-day class on the
 5          First Amendment.  For us, training looks
 6          like an hour block during a two-day
 7          in-service training, or two-hour block or
 8          four-hour block.
 9                Now, we also have patrol online
10          trainings that we've done, and that would
11          include First Amendment and Fourth
12          Amendment stuff.  We have received over --
13          at times we've received updates from the
14          city attorney's office that talked about
15          things like First Amendment and Fourth
16          Amendment and different things like that.
17          So legal updates I think they call them.
18                So those to my -- when I talk about
19          training, those are all the things that
20          I'm including in that.
21    Q.    Do you remember the context of any of the
22          trainings you've had on the First
23          Amendment?
24                MS. ENSLIN:  Objection.  Vague.
25    A.    Some, but it's fairly nonspecific.  Just,
```

Page 56

```
 1        you know, I don't know as much about the
 2        First Amendment as I do, obviously, about
 3        the Fourth Amendment, but, you know, I
 4        know basically what it is.
 5   BY MS. STILLMAN:
 6   Q.  And what's your understanding of basically
 7        what it is?
 8   A.  Well, freedom of speech.  You know, I
 9        don't what else is included in that, to be
10        honest with you.  I think -- is the right
11        to gather a First Amendment protection?  I
12        don't recall.
13             MS. STILLMAN:  I'm going to be
14        marking a document that's been
15        Bates-stamped MINNEAPOLIS_BERRY129802 as
16        Exhibit 388.
17             (Deposition Exhibit No. 388 was
18        introduced.)
19   BY MS. STILLMAN:
20   Q.  And, Commander, if you just want to take a
21        second to flip through that.
22   A.  Do you want me to flip through the 15
23        pages here?  Or what do you mean flip
24        through it?
25   Q.  If you just want to review it.
```

Page 57

1   A.   The whole thing?

2           I mean, I acknowledge that this is a

3        special order issued having to do with use

4        of force.  Do you need me to be more

5        specific?

6           MS. ENSLIN:  You can review the whole

7        thing.

8           Unless you want to instruct him that

9        you've got specific questions about a

10       specific section.

11          Otherwise, take your time and review

12       it.

13  BY MS. STILLMAN:

14  Q.   Yeah.  I have some specific questions

15       regarding the definitions and --

16  A.   If you ask me those specific sections, I

17       could just review those rather than reread

18       this whole thing.

19  Q.   Yes, of course.  If you ever need more

20       time to review more of the document, just

21       let me know.

22  A.   All right.

23  Q.   If you go to page 3 of 15, which ends in

24       129804, it says "Use of Force" in bold

25       letters.

Page 58

```
 1              Do you see that?
 2    A.   Yes.
 3    Q.   Could you just review that first paragraph
 4         and the bullet points in -- right after it
 5         says "Use of Force."
 6    A.   (Reviewing document.)
 7              Okay.
 8    Q.   What is your understanding of what it
 9         means when this policy says:
10              "Intentionally placing someone in
11              fear of such contact, or
12              threatening such contact, also
13              constitutes force"?
14    A.   Exactly what it says.  That, you know, by
15         intention, if we, you know, do something
16         that makes somebody afraid that we're
17         going to use force on them, or threatening
18         specifically what we're going to do.
19              Again, I think this is very poorly
20         worded, but yeah, that's how I would
21         interpret that.
22    Q.   If you turn to page 7 of 15, which is page
23         that ends in 129808.
24              Under paragraph C it says "Duty to
25         Intervene."
```

Page 59

```
 1   A.   Okay.
 2   Q.   And in paragraph 2, it reads:
 3              "Regardless of tenure or rank,
 4            any sworn employee who observes
 5            another employee use any
 6            prohibited force or inappropriate
 7            or unreasonable force (including
 8            applying force when it is no
 9            longer required) must attempt to
10            safely intervene by verbal and
11            physical means, and if they do not
12            do so shall be subject to
13            discipline to the same severity as
14            if they themselves engaged in the
15            prohibited, inappropriate or
16            unreasonable use of force."
17            Do you see that?
18   A.   I do.
19   Q.   What is your understanding of the use of
20        the word "employee" in this paragraph?
21            MS. ENSLIN:  Objection.  Calls for
22        speculation.
23   A.   Well, it says "sworn employee," so I think
24        it's talking about a sworn officer.
25   BY MS. STILLMAN:
```

Page 60

```
 1   Q.   Do you know if this duty to intervene was
 2        in any MPD code of conduct prior to this
 3        one?
 4   A.   It's relatively new, that duty to
 5        intervene.  I don't I think that most of
 6        us have always conducted ourselves in a
 7        way that we felt obligated to do
 8        specifically what that policy says.
 9             But I don't think it was codified the
10        way that it is, and I don't know when it
11        came about.  I only remember that they put
12        it into policy.
13             And then the, you know, language
14        about the same severity of punishment is
15        the most ridiculous thing I've ever heard,
16        but that's -- you know.
17             So yes, I remember when this came
18        out.  I don't remember when it was, but I
19        remember that it was codified at some
20        point into written policy.
21   Q.   Do you have a duty to intervene if you see
22        law enforcement officers who are with
23        agencies other than the MPD using
24        prohibitive force?
25             MS. ENSLIN:  Objection.  Foundation.
```

Page 61

```
 1   A.   I don't know that this policy is talking
 2        specifically about them, but as a police
 3        officer and as a human, as a human being,
 4        I would feel obligated to respond.
 5             I wouldn't feel like I had the same
 6        benefit of the chief's order.  Like I'm
 7        not necessarily -- unless it was a fairly
 8        severe thing where somebody was going to
 9        be hurt or something like that, I wouldn't
10        feel like I had the right to tackle some,
11        you know, officer from another
12        organization.
13             But I would -- I would feel within --
14        you know, I would feel that falls more in
15        my humanitarian duty than I think on my
16        law enforcement duty.
17   BY MS. STILLMAN:
18   Q.   Have you ever observed an MPD officer
19        using any prohibited force?
20   A.   That's a really hard question for me to
21        respond to because, you know, prohibited
22        force, there is forces prohibited now that
23        wasn't prohibited back when it was being
24        used.  Like the use of -- the LVNR is a
25        prime example of that, the lateral
```

1    vascular neck restraint, that we can no

2    longer do.  I've seen people do that

3    dozens of times.

4         Strikes, for example.  All force that

5    we employ looks bad, right?  But as a

6    person standing on the outside of that,

7    it's very difficult to judge whether that

8    force is inappropriate or not.

9         I've never seen an officer just walk

10   up and slug somebody for no reason.  I've

11   never seen that.

12        So it's a really complicated and

13   nuanced question.  I don't know how to

14   answer that.  There are things that I've

15   seen that later were determined to be a

16   concern, but never that -- I couldn't

17   judge at the time.

18        It's not like -- you know, I mean,

19   most of the determination of whether force

20   is appropriate or not is made well after

21   the fact, with a whole variety of

22   different -- the benefit of a long

23   investigation.  And you don't -- as an

24   officer standing on the outside of

25   something, you don't have the benefit of

Page 63

1          that.

2    Q.   If you go to the next page, paragraph G,

3          it says "De-escalation."

4    A.   Yep.

5    Q.   We talked a little bit about de-escalation

6          earlier.  But you're familiar with

7          de-escalation tactics, correct?

8    A.   Yes.  I'm not an instructor and I wouldn't

9          consider myself an expert, but I think

10         just by virtue of being a police officer

11         for 27 years, you know, I've done plenty

12         of it.

13   Q.   What are some examples of de-escalation

14         techniques?

15   A.   Well, one of the first examples that I was

16         taught was when people are loud and that

17         it's a potential -- again, this is

18         dependent upon the circumstances, but you

19         walk into a domestic, and everybody is

20         yelling, talk softly and -- because then

21         they have to quiet down in order to hear

22         what you're saying.

23              And just by virtue of you being calm

24         and not throwing more loud argument into

25         the already, you know, loud situation

Page 64

1            helps to de-escalate.
2                  That's one example.
3     Q.  Can you give me any more other examples?
4     A.  Well, another de-escalation is how we
5            present ourselves.  Part of the reason why
6            I wore a polo versus an MPD uniform -- I
7            mean, it was still an authorized MPD --
8            what we call a "soft uniform" -- and
9            khakis was because that in and of itself
10           is a potential de-escalation.  I look
11           different.  I don't --
12                 Some people are concerned about the
13           MPD uniform.  It looks different.  They
14           immediately understood that I had a
15           different role and that sort of thing.
16    Q.  Would you say that avoiding large displays
17           of force is part of a de-escalation
18           technique?
19    A.  Not necessarily.
20    Q.  Why not?
21    A.  Well, because sometimes having a large
22           display of force de-escalates people's
23           response.
24                 I've never seen a situation where
25           having a large amount of police officers

```
 1          there increased people's -- escalated
 2          people to more violence.  I think that it
 3          tends to have -- to do the opposite in my
 4          experience, because people are like, "Oh,
 5          there are some cops here.  We're not going
 6          to get away with doing silly stuff."
 7              That's how I would interpret it.
 8  Q.  Why would you use de-escalation tactics in
 9      a situation?
10              MS. ENSLIN:  Objection.  Calls for
11      speculation.  Incomplete hypothetical.
12  A.  Yeah.  I mean, I think you would use them
13      when -- to avoid things.  You know, it's
14      hard without giving you examples.
15              Like I used to -- one of the things I
16      prided myself on was talking people into
17      handcuffs at domestics when I was a patrol
18      officer, you know, without having to fight
19      with them to get them into handcuffs, you
20      know.  To me, that was a -- that was the
21      best of all possible worlds.  Nobody got
22      hurt.  They were -- they were safe in
23      handcuffs.  The potential victim of the
24      domestic assault was safe and that sort of
25      thing.
```

Page 66

```
 1              So taking that I guess to the broader
 2         question of why you would use it, it's
 3         basically that sort of response to
 4         something that could potentially be
 5         volatile, and de-escalating it before it
 6         got to that point.
 7    BY MS. STILLMAN:
 8    Q.   Thank you.
 9              Then you can put that document away.
10              How does the City of Minneapolis
11         monitor the number of encampments on city
12         property?
13              MS. ENSLIN:  Objection.  Foundation.
14              Ms. MARTENSON:  Objection.  I want to
15         make a standing objection to the term
16         "encampment" as vague.
17    A.   So I don't know what they're doing now.
18              Back when we started, we were -- it
19         was -- when I started the initiative back
20         in April of 2018, it was very word of
21         mouth, and it was -- I was really the only
22         person that was monitoring it.  There was
23         really no central collection.
24              We talked about and I actually worked
25         with IT a little bit to try and develop a
```

1    tool that would allow us to use our

2    smartphone to pin a location so we could

3    sort of track where encampments went or

4    where they were.

5         At some point we were -- we were

6    making -- Dave O'Connor was making like an

7    Excel list.  It might have been a

8    Smartsheet list.  I can't recall which

9    program he was using.

10        But that really was -- that lasted

11   for a little while.  It was more trouble

12   than it was really worth.  We weren't

13   really getting anything out of that.

14        I don't know specifically what

15   they're doing now.  Somebody has some

16   document, I think, or some list.  I don't

17   know that I've ever seen it.  And I think

18   that's being coordinated maybe through

19   Health or CPED.  I don't really know.

20        MS. STILLMAN:  I am going to mark a

21   document that's been Bates-stamped

22   MINNEAPOLIS_BERRY044326 as Exhibit 389.

23        (Deposition Exhibit No. 389 was

24   introduced.)

25 A.  Okay.

Page 68

```
 1   BY MS. STILLMAN:
 2   Q.  And if you turn to page 2, which ends in
 3        44327.
 4   A.  Okay.
 5   Q.  There is an email from Mark Benishek --
 6   A.  Yep.
 7   Q.  -- to Katie Topinka, David O'Connor, and
 8        then you're cc'ed on it.
 9             Do you see that?
10   A.  I do.
11   Q.  And could you just take a second to review
12        that email.
13   A.  (Reviewing document.)
14             Okay.
15   Q.  What is the Survey123 app?
16   A.  I don't know.
17             I remember this now, that there was
18        some discussed data sharing with Hennepin
19        County, but I don't recall -- I think it
20        was some app on the phone or that you
21        could access through the phone.  But I
22        don't know that I ever logged into it.
23             I think Dave used it, but I don't
24        know how regularly or how often.
25   Q.  Did you ever use a phone app for tracking
```

```
 1        encampment sites in the city of
 2        Minneapolis?
 3   A.   Again, there was an early discussion with
 4        IT, and this may have been what came out
 5        of that.  But I don't think we ever
 6        launched that.
 7             They may have created it or
 8        something, but I think it was like a
 9        beta-testing thing that they were working
10        on.  And I don't think we ever -- I think
11        this was what Dave was using, not the
12        Minneapolis one.
13   Q.   When you say "Dave," are you referring to
14        Commander O'Connor?
15   A.   Yes.
16   Q.   Do you know if the data that was collected
17        for this app was ever shared with Hennepin
18        County staff?
19   A.   Like Hennepin County staff beyond -- like
20        what happened in Hennepin County?  Or
21        what?
22   Q.   So sure.  Let's go to the first page.
23   A.   Yep.
24   Q.   There is an email from David O'Connor to
25        Katie Topinka, Mark, and then you're
```

Page 70

```
 1        cc'ed.
 2   A.   (Nods head up and down.)
 3   Q.   And you're talking about -- and the email
 4        is about sharing data, and Commander
 5        O'Connor writes:
 6             "I guess I would ask that access
 7              be limited to some sort of viewer
 8              mode, to a select group (Don Ryan,
 9              Danielle Werder, David Hewitt).
10              Largely the information is fairly
11              public in nature."
12   A.   Yes.
13   Q.   Do you know if this information that is
14        being discussed in this email thread was
15        ever shared with Mr. Ryan, Ms. Werder or
16        Mr. Hewitt?
17   A.   I don't.  I know why there was discussion
18        about sharing information, though.
19   Q.   Why was there discussion about sharing
20        information?
21   A.   So that people -- for the purpose of
22        knowing where people were camping, in
23        coordination of resources, that sort of
24        thing.
25   Q.   Did you ever share that sort of
```

Page 71

```
 1         information with any Hennepin County
 2         employees in a method outside of this
 3         phone app that's being discussed?
 4              MS. ENSLIN:  Objection.  Vague.
 5   A.   I have no recollection.  Maybe.  I don't
 6         know if we emailed.  Maybe there were
 7         phone calls.  There probably were.
 8              I would talk to David Hewitt and
 9         Danielle and Don with some regularity back
10         then.  Dave did more than I did -- or
11         Commander O'Connor did more than I did
12         back at this time, but there probably were
13         some circumstances where we discussed
14         specific encampments, generally while it
15         had to do with coordination with Health
16         Care for the Homeless, or if it was done
17         on the Greenway or that sort of thing; you
18         know, how big is that getting, how busy is
19         the Greenway or whatever.  Those sorts of
20         things.
21   BY MS. STILLMAN:
22   Q.   And is the time that you were just
23         referring to in 2020?
24   A.   I mean, my relationship with David Hewitt
25         and Danielle and Don goes back before
```

Page 72

1      that, so I can't bookend when it started
2      and when it ended.  It spanned pretty much
3      my time starting that initiative all the
4      way up until today, even though I haven't
5      talked to any of them.
6           I talked to Danielle Werder a few
7      months ago or a month ago.  Don Ryan I
8      haven't spoken to, except on social media,
9      for a year or more.  And David Hewitt, I
10     will occasionally see him at things.
11          But, yeah, it spans a long period of
12     time.
13  Q.  Did you go to encampments in Hennepin
14     County in 2020?
15  A.  Did I what?
16  Q.  Did you ever go to encampments in Hennepin
17     County in 2020?
18  A.  Yes.
19  Q.  Is it your understanding that many of the
20     homeless people living in encampments in
21     Hennepin County in 2020 had most of, if
22     not all of their belongings with them at
23     the encampments?
24          MS. ENSLIN:  Objection.  Foundation,
25     calls for speculation.

```
                                        Page 73
 1   A.  Yeah, that's a --
 2           MS. MARTENSON:  Hold on.  Sorry.  I
 3        want to make a standing objection to the
 4        term "living" as vague.
 5   A.  Can you restate that?  Is it my
 6        understanding what?
 7   BY MS. STILLMAN:
 8   Q.  That many of the homeless people living in
 9        encampments in Hennepin County in 2020 had
10        most of, if not all of their belongings
11        with them at the encampment.
12           MS. ENSLIN:  Same objection.
13   A.  It's not my understanding that most or
14        many.  That's a problem -- problematic
15        term.  It's my understanding that many of
16        them had belongings with them.  But unless
17        they specifically told me, "This is all my
18        stuff," I would have no way of gauging --
19        you know, I know some people had a large
20        volume of things, but whether that was
21        their stuff or things that they had
22        accumulated while they were at the
23        encampment, I don't know that.
24           I know of some circumstances where
25        people had all their belongings, but those
```

Page 74

```
 1        were -- I knew that because of my

 2        relationship with the people, much of

 3        which was at the Wall, for example, where

 4        there was discussion about, you know, "How

 5        do we help you get this stuff into

 6        storage?" or, "What are you going to do

 7        with this?" or that sort of thing.

 8             That's about the best answer I can

 9        give you.  I can't generally speak to

10        whether many people had all their

11        belongings or most of their belongings

12        with them.

13   BY MS. STILLMAN:

14   Q.  When you referred to the "Wall" just now,

15        were you talking about the Wall of

16        Forgotten Natives that listed in 2018?

17   A.  20- -- yes.  I started that encampment.

18        I'm proud of it.  That's why I'm saying it

19        here for the record.

20   Q.  Why did you start that encampment?

21   A.  Because I moved Angie and her family to

22        the Wall because they were parking -- they

23        were on park property, and the parks

24        department requested that they move, and

25        they did.
```

Page 75

```
 1          And they moved over to private
 2       property, and it was down the block, and
 3       so I said, "Why don't you go over on the
 4       other side of the sound wall," and that's
 5       what they did.
 6    Q.  Outside of the Wall of Forgotten Natives,
 7       is it your understanding that some
 8       homeless people have some belongings -- at
 9       least some belongings with them in
10       encampments where they live?
11    A.  Yes.
12            MS. ENSLIN:  Objection.  Foundation.
13    A.  Yes.
14    BY MS. STILLMAN:
15    Q.  Why is that your understanding?
16    A.  Why do I know that, or why do I think
17       that, or what?  I don't understand the
18       question.
19    Q.  Why do you know that?
20    A.  Because I spent the better part of many
21       years in encampments with people getting
22       to know them, hearing their stories.  And
23       anecdotally they shared, you know, their
24       experiences, may have commented on, "This
25       is my stuff," or, "This is some of my
```

1          stuff," or, "I've got stuff in storage,"

2          or whatever.

3                MS. STILLMAN:  I'm at a pretty good

4          stopping point if we want to take a five-,

5          ten-minute break.

6                MS. ENSLIN:  Sure.

7                (Break taken.)

8      BY MS. STILLMAN:

9      Q.  Commander Snyder, do you understand that

10         you are still under oath right now?

11     A.  I do.

12     Q.  And that will be true after all of the

13         breaks that we take today.

14     A.  I do understand.

15     Q.  When you started the initiative, did the

16         MIPD have any policies in place regarding

17         homeless encampments?

18     A.  So you said the "MIPD."  You mean MPD?

19     Q.  I mean MPD.  Thank you.

20     A.  It's all right.  I just wanted to clarify.

21               No.  I mean, other than sort of the

22         general policy and procedure about --

23         about dealing with people, I don't think

24         there was -- or conduct of our job, I

25         don't believe there was -- the word

Page 77

1          "homeless" was mentioned, or

2          "homelessness" was mentioned.

3               I don't think there was any policy

4          specific to the unhoused.

5   Q.  When you started the initiative, did the

6          City of Minneapolis have any policies in

7          place regarding homeless encampments?

8               MS. ENSLIN:  Objection.  Foundation.

9   A.  Not to my knowledge, other than ordinances

10         regarding camping.

11  BY MS. STILLMAN:

12  Q.  Has the MPD developed any policies

13         regarding homeless encampments since 2018?

14  A.  Not to my knowledge.

15  Q.  Has the City developed any policies

16         regarding homeless encampments since 2018?

17  A.  Yes.

18  Q.  Do you know when the first policy was

19         developed?

20  A.  I don't.  I know that at some point -- and

21         I can't tell you if it was before or after

22         I went to the fourth precinct.  So we're

23         talking before or after January of 2021.

24         I don't know.

25               But I know there was discussion about

Page 78

1          a policy regarding encampments, and the

2          direction we were going to go.  I think

3          that the mayor's office was sort of the

4          spearhead on that, and I don't recall when

5          that came out.

6               I know there was more discussion

7          about it after I, as a commander, in

8          August of last year, of 2022, stepped into

9          that role where I was once again in charge

10         of the initiative for that unit.

11              In those steering committee, sort of

12         executive-level committee discussions,

13         there was talk about a policy, and there

14         was distribution of, "This will be our

15         published policy, and what do you think

16         about this, and what do you think about

17         that?"

18              MS. STILLMAN:  I am marking a

19         document that's been Bates-stamped

20         MINNEAPOLIS_BERRY096999 as Exhibit 390.

21              (Deposition Exhibit No. 390 was

22         introduced.)

23    A.   Okay.

24    BY MS. STILLMAN:

25    Q.   And on the top of page 1, there is an

```
 1        email from you to Amelia Huffman dated
 2        April 15 of 2020.
 3              Do you see that?
 4   A.  I do.
 5   Q.  Could you take a second to review that
 6        email.
 7   A.  Sure.
 8              (Reviewing document.)
 9   Q.  I was just going to be asking questions on
10        that first email on the first page.
11   A.  Oh, okay.
12   Q.  That's fine.
13              Was anything formal ever put out
14        regarding the City's response to
15        encampments under the weight of the
16        governor's order?
17              MS. ENSLIN:  Objection.  Foundation.
18   A.  Can you define what you would consider to
19        be formal?
20   BY MS. STILLMAN:
21   Q.  Well, I'm using your language from this
22        email.  So I guess what did you mean by
23        "formal" in this email?
24   A.  Position statement.  This is what we're
25        going to do.  And to my knowledge, we
```

Page 80

```
 1          never received information on that.
 2               But that doesn't mean that I didn't
 3          have a clear understanding of how we were
 4          going to respond to the governor's order.
 5          There was plenty of discussion around
 6          that.
 7               So in absence of a formal policy in
 8          place, which I don't think we ever
 9          received, and I don't -- I don't recall.
10          I mean, perhaps there is an email some
11          place, but I don't recall ever receiving
12          what I was referring to as a formal
13          statement.
14     Q.   Why did you think it was -- or why did you
15          think a formal response should be put out?
16     A.   Because I felt like everybody needed to be
17          on the same page.  It was a challenge to
18          navigate different people's expectations;
19          and when I say "different people," I mean
20          people both within and without the police
21          department.
22               But the most challenging expectations
23          dealt with were the public and businesses.
24          And, you know, I needed the ability to
25          respond to them and say, "This is our
```

Page 81

1        position."

2             In absence of that, I took the

3        position that the governor's order means

4        exactly what it says.  And that was not

5        just that we're not going to move

6        encampments, but that there was also --

7        and I think that was in -- after he

8        received some feedback, there was another

9        order that was issued, or he amended it,

10       except in circumstances where there was a

11       presenting public safety or health risk,

12       or public health risk, or something to

13       that effect.  I don't recall exactly the

14       wording.  You know what I'm talking about,

15       though.

16   Q.  Yes.

17             So in this email you also write:

18             "I think I'm getting traction,

19             but know the Mayor is not

20             generally inclined."

21             Why wasn't the mayor generally

22       inclined to put out something formal

23       regarding your response to encampments

24       under the weight of the governor's order?

25   A.  I don't know that I can answer that.  He

1       never told me.

2            There may have been discussion about

3       why from his perspective, but I don't

4       think he and I ever had a conversation.

5       So I would be speculating about his

6       reasons for that.

7   Q.  So then what did you mean when you said:

8            "...but know the Mayor is not

9            generally inclined"?

10  A.  My understanding was that he isn't

11      inclined to issue a formal -- "This is our

12      formal position on it."

13  Q.  Why was that your understanding?

14  A.  Because that was the impression that I got

15      from having the discussions, to the best

16      of my knowledge.

17           I don't remember -- I don't remember

18      writing this email.  It's clearly from me,

19      and I clearly wrote it, but I don't recall

20      the context in which I wrote it now, other

21      than the general one of trying to figure

22      out how to navigate the governor's order.

23  Q.  You can put that aside.

24           You mentioned that you had a clear

25      understanding of what you were going to

```
 1        do.
 2              Do you remember that?
 3   A.   (Nods head up and down.)
 4              You mean, a minute ago when I said
 5        that?
 6   Q.   Yes.
 7   A.   Yes.
 8   Q.   Why did you have a clear understanding of
 9        what you were going to do?
10   A.   Because in the vacuum of direction,
11        somebody had to make a decision.  And I
12        needed to respond to precincts, and
13        inspectors, and other officers, and the
14        chief's office, and citizens, and
15        businesses, and folks that were in the
16        encampments themselves, and partners from
17        Avivo and St. Stephen's, and Health Care
18        for the Homeless, all those others, what
19        are we going to do, and how are we going
20        to do it.
21              So that's basically what my
22        understanding was.
23   Q.   You also mentioned participating in
24        discussions.  Did you participate in
25        discussions with other Minneapolis city
```

Page 84

1          employees in which you talked about the
2          governor's executive order as it related
3          to homeless encampments?
4    A.   I remember talking with some City Council
5          members about it either at a committee
6          thing or via email or something.
7                I remember having a couple of
8          conversations like with Jeremiah Ellison
9          and Kono.  I remember having those
10         conversations.  They were the ones that
11         were most affected, obviously.
12               I remember having a lot of discussion
13         about the governor's order with David
14         Hewitt, and probably Andrea Brennan.  I
15         remember some conversation -- I don't
16         remember the content, but my recollection
17         is that these are people that I spoke
18         with.
19               Katie Topinka and Danielle Werder
20         would be two other people that I spoke
21         with.  I remember having conversations
22         with Arradondo about it.
23   Q.   Do you remember what you discussed with
24         David Hewitt regarding the governor's
25         executive order?

Page 85

1   A.   Well, I mean, early on -- and, again, this

2        is -- you're asking me to recall something

3        from a number of years ago, so I don't --

4        my recollection of that I'm going to tell

5        you based upon what I believe the

6        conversation was.  Okay?

7   Q.   Okay.

8   A.   If you find a transcript of the

9        conversation, it may not match up.

10            But my recollection was that early on

11       when the governor issued the order, there

12       was discussion about how this would impact

13       the communities, right?  How it would

14       impact the city government and the county

15       government.

16            There was discussion about giving the

17       governor feedback to help sort of him more

18       specifically understand that impact, and

19       how he couldn't make -- and encourage him

20       not to make that sort of order in a

21       vacuum, which he did.

22            So I think those conversations -- and

23       then after that, there was discussion

24       about, you know, as a city, you know, what

25       criteria were we going to be looking at;

Page 86

```
 1        how do we -- how do we assess public
 2        health, public safety as exemptions to
 3        that, and those sorts of things, just so
 4        that we understood.
 5             That's what I think those
 6        conversations were about.
 7   Q.   You mentioned an encampment steering
 8        committee earlier.  Can you tell me what
 9        the encampment steering committee is.
10   A.   So when I came -- when I got promoted to
11        commander, I stepped into this role that
12        Erick Fors was taking, and that was
13        actually one of the things that the chief
14        told me she wanted me to do was to sort of
15        take the weight off of his shoulders,
16        because he was sitting in this steering
17        committee with other department heads,
18        like Saray and Dave from sold waste, and
19        other people that were, you know,
20        throughout the enterprise.
21             There was this group of people called
22        the steering committee, and by virtue of
23        getting promoted, I was now, you know, a
24        part of it.  So --
25   Q.   And that steering committee discussed
```

Page 87

```
 1       homeless encampments within the city of
 2       Minneapolis?
 3  A.   Yes.
 4  Q.   Did you ever attend encampment steering
 5       committees prior to your promotion?
 6  A.   Did I what?
 7  Q.   Did you ever attend any of the encampment
 8       steering committees prior to your
 9       promotion?
10  A.   I had started attending when I was told I
11       was getting promoted.  So -- but it
12       started in August, and I didn't even go to
13       all of them before or after.
14  Q.   August of 2022?
15  A.   Yeah.
16            MS. STILLMAN:  I'm going to go back
17       to the document that was previously marked
18       as Exhibit 157.
19            And, Sharda, I have an extra copy for
20       you.
21            (Deposition Exhibit No. 157 was
22       previously marked.)
23  BY MS. STILLMAN:
24  Q.   Does this document actually describe the
25       City's closure process up until you went
```

1          on leave?

2               MS. ENSLIN:  Objection.  Vague.

3     A.  I'm just going to read it.

4     BY MS. STILLMAN:

5     Q.  Yeah.  Absolutely.  Sorry.

6     A.  Don't be sorry.

7               (Reviewing document.)

8               I mean, I don't know where this

9          document came from.  I don't know that

10         I've ever seen this before.  I probably

11         was emailed this and didn't read it.

12              I think this is a guideline, but I

13         don't think it's fair to say that it

14         describes -- that this represents it.

15              I think there are many aspects in

16         here which are included in what the

17         City -- how they approach that closure

18         process, or how we approach the closure

19         process, but I don't think it follows that

20         this is a linear -- you know, the way that

21         it's -- you would read this and think,

22         "First this, then this, then this, then

23         this," I don't think that that's

24         necessarily true.

25              I've never received an informational

Page 89

```
 1        letter distributed to key stakeholders, so
 2        I don't know what that looks like.
 3             The "Site prioritized for closure" is
 4        a reasonable starting point, so that makes
 5        sense.
 6             "Site posted with notice to vacate,"
 7        there is a whole variety of other things
 8        that happened between those two that I
 9        would have included in this.
10             "Site visit to determine closure
11        needs completed," yeah, I don't know how
12        formal that was.
13             So yes, with the caveat that I've
14        just given you, I think it's an
15        articulation of the things that occur.
16   Q.   What are some of the things that you would
17        have included between "site prioritized
18        for closure" and "Site posted with notice
19        to vacate"?
20   A.   Well, there is -- there is all kinds of
21        discussion about, you know, communication
22        with people that who is going to post the
23        site, who is most appropriate.
24             There were -- there would be
25        privileged conversation that would occur
```

Page 90

```
 1        between those two things, discussion about
 2        how that is going to be posted.  Is this a
 3        site that -- you know, who owns the
 4        property?  I mean, we would technically
 5        already know that.  But, you know, is this
 6        something that we're going to provide
 7        stuff to the owner if it's a private
 8        property, like at 28th and Bloom, or
 9        something like that, or, you know, that
10        sort of stuff.
11            So I think there is a whole variety
12        of steps.
13   Q.   Who was part of these discussions?
14   A.   Part of what discussion?
15   Q.   You said that there would be a discussion.
16   A.   Again, some of those are privileged, and
17        you don't want to hear about that, so I'm
18        not going to answer that.
19            But there are -- there were
20        discussions with Dave Herberholz from
21        solid waste, or if it's a CPED-owned
22        property, you know, Elfric or other people
23        from CPED; if it's a private property, you
24        know, the people who ever owned that
25        property, and stuff like that, "How long
```

Page 91

1     before -- you know, when do we want to

2     vacate this?"   There was discussion about

3     that.

4            This sort of gives the sense that,

5     "Yep, we're going to close this site.

6     We're going to post it tomorrow."  That's

7     typically not how it occurred, in my

8     recollection.

9  Q.  When did you first become part of those

10     discussions?

11 A.  When I got -- that month prior to me being

12     promoted to commander, again, post me

13     going to -- when I came back to being in

14     charge of this unit, the homelessness

15     unit, it looked -- it was nothing -- the

16     whole process was nothing like when I was

17     there before.

18            So there is that gap of essentially a

19     year and three-quarters almost when I

20     wasn't there, and there was all of these

21     other things that -- so that's when I

22     stepped back in.

23            I'm not talking now about what

24     happened prior to that.  I'm talking about

25     when I returned to it.

Page 92

1   Q.   What were the changes that had been made
2        between when you stepped out of the
3        initiative to when you stepped back into
4        the initiative?
5   A.   So when I stepped out of the initiative,
6        it was still the sense that MPD was taking
7        the lead on a lot of this stuff that was
8        being done.
9            We were the ones that were doing the
10       primary outreach.  We didn't have
11       navigators at that point that were working
12       for CPED and for Health.  We would be the
13       ones that would provide that information
14       if there were -- we would communicate with
15       our partners.
16           There was -- so that was the way that
17       it was done.  MPD had more of a central
18       leadership role in that, and for a whole
19       variety of reasons, when I left, that was
20       taken away.
21           And then so when I came back, we
22       had -- it was more of a citywide
23       enterprise, or an enterprisewide
24       initiative, where there were
25       representatives from all these different

Page 93

```
 1         departments that were involved in it.  It
 2         was -- it was more organized.  There was
 3         more discussion I think between more
 4         people, because the workload was more
 5         diffuse and more people were involved in
 6         the process.
 7             There was -- it was slower.  I think
 8         that that process of going from assessment
 9         to prioritization to demobilizing was a
10         slower process at that point.
11             I think those are the main
12         differences that I noticed.
13    Q.  I apologize.  Can you remind me again of
14         when you -- approximately when you stepped
15         out of the initiative.
16    A.  In January 1st or 2nd -- I can't remember
17         which -- of 2022.  Sorry, 2021.
18             So Dave O'Connor left sometime in the
19         fall I think of 2020, and so that unit was
20         pretty much -- there wasn't much going on
21         in the unit because it was unstaffed with
22         an outreach sergeant during that period of
23         a few months, and then I left.
24             My role was as lieutenant of the
25         hiring -- recruitment and hiring unit.
```

1          MS. STILLMAN:   I'm going to go to the

2       document that's previously been marked as

3       Exhibit 69.

4          (Deposition Exhibit No. 69 was

5       introduced.)

6   A.   Thank you.

7   BY MS. STILLMAN:

8   Q.   Just so you're aware, I'm only going to be

9       asking you about -- specifically questions

10       about things that appear on pages 6 and

11       7 --

12   A.   Okay.

13   Q.   -- of the document.

14          Do you recognize this document?

15   A.   Yeah.

16   Q.   What is it?

17   A.   It's an operational guidance from the City

18       to I think it approximates -- approximates

19       our Minneapolis position on how we

20       approach encampments.

21   Q.   Did you review this document before it was

22       published?

23   A.   Not in its entirety.

24   Q.   Did you review any portions of it prior to

25       it being published?

Page 95

1    A.   Likely I did.  I don't recall when.  I
2         think this was floated around for a while,
3         and I think some of it was emailed, and I
4         think there were some discussions about
5         some sections, but I didn't read the
6         entire document.
7    Q.   Did you ever provide feedback on the
8         sections that you did read?
9    A.   Probably.
10   Q.   I'm going to be going to page 6, and then
11        towards the bottom, a bolded section
12        called "Posting of Notice and Exceptions."
13             Do you see that?
14   A.   I do.
15   Q.   This is the City's policy about how much
16        notice should be given to encampment
17        residents before a sweep, correct?
18             MS. MARTENSON:  Objection.  I want to
19        make a standing objection to two terms:
20        "notice," as vague and calling for a legal
21        conclusion; and "resident" as vague.
22   A.   Say your question again, please?
23   BY MS. STILLMAN:
24   Q.   Sure.
25             This is the City's policy about how

Page 96

```
1          much notice should be given to encampment
2          residents before a sweep, correct?
3    A.    Again, I don't know that "policy" is the
4          right word for that because I don't
5          know -- I think that this was sort of the
6          agreed-upon standard that we would do.
7                And, in general I think that 72
8          hours, except in certain circumstances,
9          was the agreed-upon.
10               So yes, to the extent that it's not a
11         one-and-done thing, that this was
12         basically our position.
13   Q.    How did -- how was 72 hours reached upon?
14         I'll start over.
15               Who agreed that 72 hours should be
16         the time frame for posting a notice?
17               MS. ENSLIN:  Objection.  Foundation.
18   A.    When I came back to the unit, to the sort
19         of role -- and when I refer to the "unit,"
20         I'm talking about the homeless initiative.
21         Okay?
22               When I came back to that in August, I
23         stepped -- I got onto a train that was
24         already moving, and many of these
25         discussions and many of these positions
```

Page 97

```
 1        had already been determined.  And the 72

 2        hours was determined before I came back.

 3            I remember specifically having

 4        conversation that, "Say what you want, but

 5        in general giving people longer than 72

 6        hours is what we should aim for, that we

 7        want to try and give people as long of a

 8        period of time as we can."

 9            In some -- what does that look like?

10        I mean, the Wall, when we closed the Wall

11        of Forgotten Natives, that took -- that

12        was like a couple months' process of

13        closing that, right?  And so that's an

14        example.  We posted that 72 hours before,

15        it would have been mayhem.

16            So in general, my personal

17        recommendation was always give people a

18        week if you can, because there is a whole

19        variety of different things that happen.

20        But 72 hours I inherited.

21   BY MS. STILLMAN:

22   Q.  Why did the Wall take a couple months to

23        close?

24   A.  Well, because we had to build the -- I say

25        "we."  It wasn't me that did it,
```

```
 1          obviously.  But they had to build the
 2          navigation center -- that was sort of a
 3          negotiation -- and figuring out, you know,
 4          who was going to run it, and -- you know,
 5          before Simpson stepped up.  And then that
 6          whole process was going to take so long.
 7               And were you at the Wall?  Do you
 8          remember the Wall?
 9     Q.   I remember the Wall.
10     A.   Did you work there?
11     Q.   No.
12     A.   Okay.  Do you remember when it was
13          demobilized?
14     Q.   Yes.
15     A.   Do you remember all the throngs of people?
16               That was truly the only collaboration
17          between government and community and all
18          the partners that we've ever done; you
19          know what I'm saying?  And it was
20          beautiful, and it was because everyone
21          sort of stepped in to kind of work
22          together to a common goal.
23     Q.   Why did the navigation center have to be
24          built?
25               MS. ENSLIN:  Objection.  Foundation.
```

Page 99

1           THE WITNESS:   Sorry.   I don't know
2       why my wife is calling.   I'll answer your
3       question, but can I step out and take
4       this?   Because this is very unusual,
5       because she knows I'm in a deposition.
6           MS. STILLMAN:   Yeah, absolutely.
7           THE WITNESS:   Do you want to repeat
8       your question, and then I'll answer it and
9       I'll step out.
10          MS. STILLMAN:   Sure.   Mari, can you
11      repeat my question.
12          (The record was read as follows:
13          "Q.   Why did the navigation
14          center have to be built?")
15  A.   Because they wanted someplace for people
16      to go, knowing that winter was coming, and
17      that they didn't think they were going to
18      be able to get everybody housed in that
19      period of time.
20          MS. STILLMAN:   Thank you.   You can --
21          THE WITNESS:   I'll be right back in.
22          (Break taken.)
23  BY MS. STILLMAN:
24  Q.   So we were talking about the Wall, 2018
25      Wall of Forgotten Natives.

Page 100

```
 1          Do you recall approximately how many
 2       residents there were at that encampment?
 3   A.   I believe the final count of people that
 4       we took out of there was somewhere in the
 5       130 to 150 range.  I know at its peak I
 6       want to say there was 210 to 220 tents,
 7       but that's my recollection.
 8          I don't -- now, residents, you're
 9       referring to people that -- here's how I'm
10       interpreting what you're saying.
11          A resident is a person that was
12       actually overnighting at that encampment.
13       There was a lot more people that would
14       come and go and hang out there.  Sometimes
15       they would stay.  But, you know, there
16       were people -- I'm talking about the
17       people that actually lived in that
18       encampment.
19   Q.   Thank you for that clarification.
20          Do you remember how long that
21       encampment was -- or how long that
22       encampment existed?
23   A.   Yes.  So July maybe 10th.  I think 10th.
24       10th sticks in my head.
25          It was sometime in mid-July is when I
```

Page 101

```
1        moved Angel in there.  And then a couple
2        other tents popped up, and they were --
3        they were women that were staying over
4        there.
5            And so it was probably maybe the last
6        week in July when that tent -- or that
7        encampment really grew, because I think it
8        was July 30th when Rondo and the mayor
9        toured it and came down there because it
10       had gotten so big and there was a story
11       that popped up on it.
12           But that encampment started for -- as
13       a place where women would go, you know,
14       that were having trouble with safety, and
15       I overnighted in that encampment in my
16       squad car several times to -- while there
17       was maybe like four or five tents.
18           And then that sort of -- this is
19       another reason why I say I started it,
20       because that then sort of brought other
21       people in.  "Oh, Sarge set up an
22       encampment and everybody can go here."
23       Then it started to grow and grow and grow.
24       And yeah.
25    Q.  Was there drug use at that encampment?
```

Page 102

1    A.   Yes.

2    Q.   Was there sex trafficking at that

3         encampment?

4    A.   To my knowledge, yes.  There were

5         allegations.

6    Q.   What was the month when the encampment

7         finally closed?

8    A.   December of that year.

9    Q.   Do you remember if anybody used propane

10        tanks as heaters?

11   A.   Say that one more time.

12   Q.   Sorry.  That was a bad question.

13   A.   I think I know what you're getting at, but

14        I just want to make sure I answer the

15        correct question.

16   Q.   Did you ever see propane tanks being used

17        at that encampment?

18   A.   Yes.  And I saw them blow up and start

19        fires.

20   Q.   Are you aware that when the City posts

21        notices to vacate at encampments on city

22        property, that those notices don't always

23        include a specific date that the

24        encampment --

25   A.   Yes.  I am aware of that.

Page 103

1           Sorry.

2    Q.  Not a problem.

3           Do you know why that is?

4    A.  That was a development that occurred after

5           the sort of explosion of hostile activism

6           directed toward MPD and directed toward

7           city employees.

8    Q.  And when did that explosion of hostile

9           activism start?

10   A.  Right around the time of George Floyd,

11          events of George Floyd.

12   Q.  How many sweeps has the City participated

13          in over the last three years?

14          MS. ENSLIN:  Objection.  Foundation.

15          MS. MARTENSON:  Objection.  I want to

16          make a standing objection to the term

17          "sweep" as vague.

18   A.  Yeah, I can't answer how many

19          demobilizations we've done.  I don't know.

20          I can estimate, but that estimate may be

21          on or off.

22          And there is a large gap in there

23          where I wasn't a participant in it, and so

24          I don't know how many were done during

25          that period of time.  If you want me to

Page 104

1          talk about how many I was a part of, I can

2          again estimate.

3     BY MS. STILLMAN:

4     Q.  Sure.

5               How many -- what's your estimate of

6          how many you were a part of in that period

7          of time?

8     A.  Can I ask -- but I need another clarifying

9          question, and that is whether these were

10         ones that I as a sergeant or lieutenant

11         with MPD initiated, planned and executed,

12         or are these ones where I was aware that

13         they were going on and I tried to provide

14         consultation, guidance on best practices

15         and those sorts of things, because those

16         are different questions, and I don't know

17         what you want.

18    Q.  Sure.

19              Let's start with the first

20         question -- your first one, that you

21         orchestrated.  Was that the word you used?

22    A.  Yes.

23              So I don't consider me asking someone

24         to move because of a complaint if they're

25         on someone's private property as a

Page 105

1          demobilization, and I did -- those were
2          largely what I did, or in the days prior
3          to September of 2019 when Dave started, of
4          me going down in the Greenway, because I
5          knew they were going to come through and
6          clear it, and advising people, "Hey, we
7          probably should find another place for you
8          to go."
9               I don't consider that a
10         demobilization, so I'm going to take all
11         those off the table right now.
12              The big-scale demobilizations that we
13         participated in were relatively few.  And
14         they would be things like the Wall, of
15         course.  That was -- that was the first
16         one, I mean, the large-scale one.
17              And then after that, you have to go
18         really pretty much all the way up to like
19         Stevens was one that I was there for,
20         Stevens, which is right -- that was an
21         MNDot property.  It was also on a
22         privately owned -- part of it was on a
23         privately owned lot.
24              And so -- but that wasn't really a
25         demobilization in the sense --

Page 106

```
1        demobilizations, what they became, that

2        didn't look like that at all.

3            Then I know that Parks did the mall

4        over by the far end of the Greenway, down

5        by Hennepin County and Lagoon, and, you

6        know, I was active in that encampment,

7        providing people with support, and also

8        encouraging them, "Hey, just so you know,

9        you know, this is going to be closed.  You

10       may want to find someplace else to go."

11           Again, those are -- that's what I'm

12       up against in trying to answer that.

13           So it's very, very few that the City

14       of Minneapolis did ourselves.  Maybe over

15       the time -- both times that I was a part

16       of this, maybe five or six.  And that's a

17       guesstimate.

18           How many others I was aware of, I

19       mean, I was sort of in an advisory role

20       with the parks department, and to a lesser

21       extent with Hennepin County.  I would give

22       them my opinions, but they didn't answer

23       to me.  I didn't do it in terms of I

24       didn't plan it or execute it.

25           You know, so that's more to your
```

Page 107

```
 1          second question there.  And I probably
 2          have been aware of and peripherally
 3          involved with, in that advisory capacity,
 4          maybe another ten, you know.  I think.
 5                MS. STILLMAN:  I am going to go to
 6          the document that's previously been marked
 7          as Exhibit 156.
 8                (Deposition Exhibit No. 156 was
 9          previously marked.)
10   A.  Do you want me to put this one away?
11   BY MS. STILLMAN:
12   Q.  Yes.  We're done with that one.
13                Can you go through this list and tell
14          me which of these encampment closures you
15          were at.
16   A.  So Sabo Bridge is not the City or the
17          county.  That was transit.
18                17th and Cedar, transit.  I don't
19          recall if I was there for that one or not.
20          I think that was a County one, but I'm not
21          sure.  I don't recall.
22                Stevens I've already said yes to.
23                Powderhorn I was at when Powderhorn
24          was demobilized.
25                East 26th Street?  I was not at that
```

Page 108

```
 1        one.  I don't know who did that.
 2              Powderhorn West, I was there.
 3              Kenwood, I was there.
 4              Again, these were -- you've got
 5        participating in active concert.  What an
 6        impossible term for me -- or phrase for me
 7        to answer yes to, because I was standing
 8        there, not moving people's stuff or
 9        telling them to leave at Powderhorn West,
10        Powderhorn East, Kenwood, Elliot,
11        Columbia, Matthews, Peavey.
12              Literally, I wasn't at many of those,
13        but I can't -- I can't articulate -- if
14        you say, "Were you there?" if you're going
15        to proximate me being -- acting,
16        participating in active concert, that's
17        not an accurate representation of my
18        involvement.
19              I'm just telling you so you know.  I
20        just want to clarify that.  I'm not -- if
21        I sound critical, I'm not trying to be.
22        I'm just trying to address that issue.
23   Q.  Okay.  And I'm just asking if you were --
24   A.  Present.
25   Q.  -- present.
```

Page 109

1    A.   Okay.  Okay.

2    Q.   So -- and I want to clarify just because

3         you listed off a bunch just then.

4    A.   We'll go back.

5    Q.   Were you present at the Powderhorn Park

6         West?

7    A.   Yes.

8    Q.   Kenwood Park?

9    A.   Yes.

10   Q.   Elliot Park?

11   A.   No.  I was there the first day, and

12        then -- and then -- when we didn't do it.

13        And then I didn't come back for the second

14        time when they actually -- when they

15        actually demobilized it again, to the best

16        of my recollection.

17   Q.   Columbia Park?

18   A.   I don't remember which one Columbia Park

19        is.  Where is that?  Do we know?

20             I don't remember off the top of my

21        head.  I can google it if you want, but I

22        don't recall.

23   Q.   No, that's okay.

24   A.   And Matthews is -- I don't recall where

25        that is, either.  I don't --

```
                                        Page 110

 1        geographically I know these, but I don't

 2        know many of them by name.

 3   Q.   So you don't recall if you were at the

 4        Matthews Park closure?

 5   A.   I don't recall either of those.

 6             2601 14th, I do recall that one, yes.

 7        That was -- that was mine.  I did that

 8        with myself and Sergeant O'Connor.

 9             Peavey, I was there on Franklin in a

10        squad car, but never on the grounds of the

11        Park.

12             13th, yes, I was there for that.  I

13        did that I think by myself.

14             Brackett Park, no.

15             B.F. Nelson, to the extent that

16        that's the one that's over by Nicollet

17        Island, I think that one I was not there.

18             Riverside, was not there.  I actually

19        never was at that one.

20             The mall, I mean, I've been there

21        before, but I wasn't there when it was

22        demobilized.

23             The Greenway has been demobilized

24        bunches of times, you know, by different

25        people.  And that was sort of really not
```

Page 111

1         an encampment.  That was a whole bunch of
2         people camping in various places.
3              And so I mean, I encouraged -- I had
4         no -- the only thing the City is
5         responsible for is the bike path.  The
6         property on both sides of it was owned by
7         the County, then there were also some
8         other little patchwork, you know,
9         ownership.
10             But, you know, I still encouraged
11        people, "Don't have -- don't wait until
12        they show up because you're not going to
13        have time to move your stuff."
14             And my -- and I also think I gave
15        people some rides, moved their stuff for
16        them, and different things like that.
17        So --
18   Q.   Okay.
19   A.   Do you want me to keep going down this
20        list?
21   Q.   Yes, please.
22   A.   Martin Luther King, Jr. Park, I'm not sure
23        where that one is at.  Doesn't ring a
24        bell.
25             The Minnehaha Falls Regional, no.

Page 112

1              2600 Minnehaha, no.  Doesn't sound

2         familiar.

3              Elliot Park, you've got that one in

4         here.  That is not the one that I was at.

5         Okay?

6              So on the August 12 one where it says

7         "Elliot Park," that was the day that I was

8         there, but that wasn't a demobilization.

9         Okay?

10             Elliot Park in July of 2021, I wasn't

11        there for that.

12             I wasn't there for the -- this was --

13        yeah, this is when I was at the fourth

14        precinct.

15             Actually, I was on leave in September

16        and October and November, returning in

17        December.

18             1913, I don't know what that is.

19   Q.   And that was at -- I can clarify --

20        Sheridan by the Grain Belt.

21   A.   Don't know anything about it.

22   Q.   Okay.

23   A.   5th and Lake.  Nope.  I was at the fourth

24         precinct.

25             North Loop, I was there for that one,

Page 113

```
 1        but only in the capacity of I was at the
 2        fourth precinct, and they were utilizing
 3        our personnel on perimeter.
 4             And so my role was to make sure that
 5        our people were where they're supposed to
 6        be, and that they got a break, and that
 7        they got food and water; and that when,
 8        you know, dog watch, who have been working
 9        all night -- as soon as day watch came on,
10        or as soon as we could, we relieved them.
11             So that was my role at that
12        encampment.
13             29th and 14th.  I mean, sounds
14        familiar, but I can't recall it.
15             29th and Bloom, I was there for that
16        one.
17             Cedar and Franklin.  Cedar Franklin.
18        I don't -- I don't recall that one.
19             Near North I was there for.
20             Oh, I do recall the one on October 6,
21        Cedar and Franklin.  I was there for that.
22        Myself and Troy Carlson were there.
23             Near North encampment, yes, I was
24        there for that with Troy Carlson and other
25        MPD officers.
```

Page 114

```
 1          Van White, isn't that -- aren't you
 2      calling both Near North and Van White --
 3      aren't they the same?
 4   Q.  Do you consider them the same?
 5   A.  I don't.  Otherwise, I don't know what
 6      you're referring to.  You would have to
 7      specify.
 8          Are you referring to that block
 9      that's basically bounded by Currie, 2nd,
10      Humboldt and Girard?
11   Q.  Yes.
12   A.  Which one is that?  Near North or Van
13      White?
14   Q.  So -- well, what is your understanding
15      about what the Near North encampment is?
16   A.  I always called the Near North encampment
17      that block that I've just referred to that
18      was bounded on the east by Girard, the
19      west by Humboldt, the south by Currie, and
20      the north by the -- just to the south of
21      businesses along 2nd.
22          I don't know which one Van White is
23      that you're referring to.  Do you?
24   Q.  I do, but if you don't know, that's --
25   A.  Okay.  I mean, if you want to tell me
```

```
                                                    Page 115

 1         where it was, I can --
 2   Q.   So to the best of my understanding, there
 3         was Near North, and then there was a lot
 4         and a street, and a smaller encampment on
 5         the other side of the street.
 6   A.   Oh, you're talking about the one that was
 7         over -- that abutted the -- it was on the
 8         east of Van White, and it was just to the
 9         north of the impound lot.
10   Q.   Correct.
11   A.   That's the one there was like six or seven
12         tents there.  But when we went there, they
13         were unoccupied; the person had moved.  So
14         I'm sorry.  That's why it didn't ring any
15         bells for me.
16   Q.   Not a problem.
17   A.   Then The Quarry, I was there for that one.
18         I don't think that was December 30th,
19         though.
20   Q.   What day do you think it was?
21   A.   I thought it was -- I thought it was
22         sometime in January, I think early
23         January, because I thought it was right
24         before I went out on leave.  Maybe I'm
25         wrong.
```

Page 116

```
 1   Q.   And I'll represent that it was in
 2        December.
 3   A.   Okay.
 4   Q.   And then just to see if it refreshes your
 5        recollection about that, Matthews Park
 6        encampment on August 24, 2020, that's in
 7        the Seward neighborhood, on East 25th
 8        Street and 27th Avenue South.
 9             Does that refresh your recollection
10        at all about whether or not you were
11        there?
12   A.   I know where Seward neighborhood is, and I
13        know where that is that you're referring
14        to, but I don't recall that.
15             Seward, that may have been third
16        precinct personnel that did it.  When was
17        that?
18   Q.   August 24 of 2020.
19   A.   Yeah, I don't recall that.
20   Q.   So you just listed approximately 13
21        encampment sweeps since May of 2020 that
22        at this moment you can recall being at.
23   A.   Mm-hmm.
24   Q.   At how many of those sweeps was there
25        physical violence against city staff?
```

Page 117

1  A.  Again --

2           MS. ENSLIN:  I'm going to object to

3        the extent it calls for speculation.

4  A.  Yeah.  Again, taking exception to your

5        term, which I understand you know, I don't

6        think -- I mean, I would have to do

7        some -- I recall the physical violence

8        against the staff at the Near North one

9        that we spoke of in March of 2021.  I

10       don't know.  I don't have firsthand

11       knowledge of other -- and that was a

12       fairly significant attack.

13           I don't know of other incidents like

14       that, that sort of changed our trajectory

15       about how we were going to do this in a

16       way that everybody was protected.  So I

17       don't know of any others.

18           I know other ones where people were

19       arrested.

20  BY MS. STILLMAN:

21  Q.  Which ones are those?

22  A.  Well, like 29th and Bloomington I think

23       there was a couple of arrests made.

24           There was at the Near North one in --

25       the 6th, there was arrests made, like two,

Page 118

1       one or two.

2              Cedar Franklin, I think there was I

3       think one arrest made.

4              29th and Bloom.

5              I don't know about 29th and 14th.

6              I don't know anything about the Near

7       North Loop encampment, if there was or if

8       there wasn't.  So --

9   Q.  For the Near North attempted sweep in

10      March of 2021, were there arrests made

11      that day?

12  A.  There were.

13  Q.  Do you know how many?

14  A.  I think like four.  I don't recall

15      exactly.

16  Q.  And city staff didn't actually enter the

17      Near North encampment that day, did they?

18             MS. ENSLIN:  Objection.  Foundation.

19  A.  No.

20             You're talking about March 2022,

21      right?  Or 2021?

22  BY MS. STILLMAN:

23  Q.  2021.

24  A.  Yep.  No, we didn't go into the encampment

25      that day.

Page 119

1    Q.   Was it protesters who were -- who

2         committed the physical violence against

3         city staff that day?

4    A.   So I was not the investigator, so what I'm

5         telling you, my response to this is going

6         to be based upon my recollection and my

7         understanding of speaking with the

8         investigator and stuff like that.

9              I believe that the people that were

10        arrested were people that wanted to come

11        and fight the police.  And I know that one

12        of the people that was arrested had been

13        staying at George Floyd Square and came

14        there specifically to fight with the

15        police.

16             I know that there were other

17        activists; I don't know where they were

18        from.  But I remember seeing them come out

19        of the encampment, because when I arrived

20        at 2nd and Humboldt to start setting up

21        perimeter tape, they walked out of the

22        encampment, looked down the street at us,

23        and that's when they started pushing the

24        dumpsters into the street.

25   Q.   Have you ever -- have you been told that

Page 120

```
 1        the protesters that were there that day
 2        were a member of a particular group or
 3        organization?
 4   A.   Not that I recall.
 5   Q.   Has there been a response to the violent
 6        protesters other than not providing
 7        encampments with notice of a sweep?
 8             MS. ENSLIN:  Objection.  Vague,
 9        foundation.
10   A.   I mean, I think there has been a whole
11        variety of responses the City's
12        participated in.  Is that the question?  A
13        response around -- related to encampments,
14        or response in general?  Because I don't
15        know how to answer that.  Those are
16        different.
17   BY MS. STILLMAN:
18   Q.   Related to encampments.
19   A.   I mean, there has been.  Yes, there has
20        been.  It's not just the arriving without
21        notice.
22             The response has been to create a
23        larger perimeter, to have enough people
24        there so as to protect everybody that's
25        involved, and, you know, create sort of
```

```
 1        that de-escalation that we spoke about.
 2             Yeah, those are -- those are a couple
 3        of the things.
 4   Q.   In 2020, did you have to get permission
 5        from anybody to attend an encampment
 6        sweep?
 7   A.   To what?
 8   Q.   To attend an encampment sweep.
 9   A.   In 2020, I didn't have to get permission
10        from anybody to do my job, no.
11   Q.   So you would make the determination about
12        whether or not you went?
13   A.   Yes and no.  I mean, I still had a chain
14        of command and, you know, reported
15        generally directly to the chief.  So there
16        was often discussion and, "Can you
17        support?  Can you, you know, be present
18        and offer" --
19             I'm assuming the way you're asking
20        that is implying that these were not
21        encampments that were under the purview or
22        responsibility of the City of Minneapolis.
23        And so I could decide or not, or choose
24        whether to go.
25             That's what you're asking, right, is
```

```
 1        that they were on somebody else's
 2        property?
 3   Q.   I'm just asking generally, not related to
 4        an encampment on any specific property.
 5   A.   Well, then the question needs to be
 6        rephrased.  And I'm not -- again, I'm not
 7        fighting with you; I'm just trying -- I
 8        want to answer your question.
 9             But you're saying -- your question
10        was did I have to get permission to be
11        present.  Okay.  The answer, to move an
12        encampment, if -- which I would be present
13        at if I was demobilizing something, was
14        generally done in -- with notifications to
15        the chief's office and to the inspectors
16        and different things like that.  And if
17        people had apprehensions, I would
18        certainly not go forward as a sergeant,
19        despite, you know, what they said.
20             So the answer is yes and no.  But if
21        it was on someone else's property, in
22        2020, like, for example, Hennepin County,
23        or Parks, I mean, I don't think I ever
24        showed up without being requested to be
25        there.
```

Page 123

```
 1          So I don't know how you would
 2      interpret that as permission.  I mean, I
 3      know specifically at Powderhorn I notified
 4      our chief's office that I would be
 5      present, but that was a conversation I
 6      think that actually took place between
 7      Chief Ohotto and Chief Arradondo.  And I
 8      wasn't privilege to that, so I don't know
 9      what was discussed.
10          MS. STILLMAN:  I'm going to go to a
11      document that's previously been marked as
12      Exhibit 286.
13          (Deposition Exhibit No. 286 was
14      previously marked.)
15  BY MS. STILLMAN:
16  Q.  If you just want to take a moment to
17      familiarize yourself with this email.
18  A.  That's like the most coherent email I've
19      ever written.  I don't think I did that
20      very often, so --
21  Q.  I know that feeling well.
22          So you make a number of
23      recommendations in this email.  I want to
24      ask you about a few of those
25      recommendations.
```

```
                                        Page 124
 1              So in your first point, you write:
 2                 "Messaging should precede
 3              installation of fencing.  I would
 4              strongly recommend that this
 5              message be delivered via outreach
 6              to all persons in the camp and
 7              that it explain what it means and
 8              what it doesn't mean.  It gives us
 9              an early opportunity to gain
10              participation from outreach who
11              are absolutely necessary for
12              smooth demobilization."
13              Why do you believe that participation
14          from outreach are necessary for smooth
15          demobilizations?
16    A.   Lessons learned from the Wall of Forgotten
17          Natives.  True collaboration was hard to
18          come by, but, you know, that process where
19          everybody worked together was much more
20          effective.
21              And I think that because -- you know,
22          you would like an outcome to be
23          multi-faceted, right?  Not just everybody
24          moves off the space, but everybody moves
25          off the space and the space is closed and
```

Page 125

1           people go to someplace better, whether

2           that's shelter or housing or, you know,

3           Avivo Village, or something like that.

4                So I think that the reasons why a

5           coordinated outreach participation in

6           here -- when I'm talking about "outreach,"

7           I was speaking about outreach partners

8           like AICDC, St. Stephens, Avivo, you know,

9           those -- Hennepin Health Care for

10          Homeless, those groups that did

11          professional outreach with folks that were

12          struggling with homelessness.  I wasn't

13          talking about our navigators at that point

14          because we didn't have them.

15               So there is 8,000 different reasons

16          why it makes a better plan, why it works

17          better:  It helps everyone.

18   Q.   Does it help the residents?

19   A.   Absolutely.

20   Q.   How so?

21   A.   Because places like Avivo and St.

22          Stephen's and Health Care for the Homeless

23          provide resources that we don't as a City.

24               The County is an exception to that

25          because they have a broader base of

Page 126

```
 1          resources and things.  They're sort of --
 2          they hold those and have them available.
 3          But it still requires people to make the
 4          connection.
 5               You would at least like to believe
 6          that the relationships that outreach has
 7          are strong and intact, and they're able
 8          to, you know, use that to the benefit of
 9          folks in the encampment.  If it's going to
10          be closed, we would -- we would like to
11          prevent trauma around that closure, yeah.
12     Q.  In point number 4, you write:
13               "Phased demobilization so that
14               outreach can focus on less
15               sections and it won't overwhelm
16               the alternative housing/sheltering
17               options."
18               Why would a phased demobilization
19          help with not overwhelming alternative
20          housing or sheltering options?
21     A.  Well, I mean, I think there were 75 people
22          at the Sabo encampment at the day that
23          they closed it, or when they were planning
24          to close it, and that's too many people.
25          There is not that many shelter beds
```

Page 127

```
 1        available.  Transportation becomes an

 2        issue, all that sort of things.

 3             It's much easier to deal with smaller

 4        groups of people and shrink the camp, the

 5        same way we did with the Wall of Forgotten

 6        Natives as we started at one end and we

 7        basically worked our way down, and it was

 8        a phased process.

 9             It gives a more manageable workload

10        to the people that are actually going to

11        be doing placement, going to be helping

12        people move, and all those sorts of

13        things.

14   Q.   And in point 5, excuse me, you write:

15             "Coordinated initiation of a

16             logistics plan that involves

17             temporary storage and movement of

18             people's belongings off the site.

19             The advantage to doing this is

20             that it not only encourages

21             relocation but it also prevents

22             the undesirable optics of large

23             groups of people sitting on a

24             collection of items with nowhere

25             to go."
```

Page 128

```
 1          Why did you think that a logistics
 2      plan that involves temporary storage and
 3      movement of people's belongings off the
 4      site was important?
 5   A. Well, because it -- it's -- you know, most
 6      people that sleep in encampments that have
 7      a large volume of stuff don't have an
 8      adequate means to do it.
 9          And one of the challenges of
10      demobilization is if people have a lot of
11      stuff and they don't move any of it, which
12      they typically didn't before the day of
13      demobilization, it can take hours, you
14      know, and it creates a -- you know, people
15      leaving and coming back, and leaving and
16      coming back.
17          And sometimes they don't come back,
18      and then what do you do; you know what I
19      mean?
20          Just from a standpoint of trying to
21      make it as efficient and make sure that
22      they get the benefit of getting as much of
23      their stuff, because what ends up
24      happening, what I saw happening is people
25      are like, "Yeah, I can't carry that much,"
```

                                                    Page 129

1        and so they abandon half their shit, you

2        know what I mean, and leave it there and

3        take what they can.

4             The other side of that, the optic

5        part of it that just breaks my heart is

6        watching people push all their earthly

7        belongings in a shopping cart down the

8        sidewalk, with no intention or no idea of

9        where they're going to go with it.

10            So, you know, that was both an

11       efficiency sort of logistical from the

12       point of view of how do we make this work

13       and work well and do it within a

14       reasonable time period, as well as sort of

15       a moral and ethical acknowledgment that

16       people need assistance in doing this, and

17       it should be part of our plan.

18  Q.   And then in that last point, 7, you

19       write -- or you recommend:

20            "A cleanup strategy consistent

21            with the best practices learned

22            through the mobilization of the

23            2018 encampment to include

24            permanent closure of the space as

25            well as a long-term strategy to

Page 130

```
 1            remove hazardous material."
 2            What is the cleanup strategy
 3        consistent with the best practices learned
 4        through the mobilization of the 2018
 5        encampment?
 6  A.   Well, so the 2018 encampment I think I'm
 7        referring to is the Wall of Forgotten
 8        Natives, right?  And I mean, they had a --
 9        when that closed, there was snow on the
10        ground, and there was so much waste.
11        There was so many needles, the ground
12        underneath was contaminated and stuff like
13        that.  So they had to come in and scrape
14        it.  At some point after the snow went
15        away, they cleaned it up.
16            And so that sort of lesson of this
17        is -- this is -- we have to close the
18        area, so secure it so other people aren't
19        walking in there and getting stuck by
20        needles and different things like that,
21        right, and being exposed to things, as
22        well as, you know, we may have to return.
23            I don't remember when this was.  This
24        was -- yeah, this was May.
25            So I think that's what I was
```

Page 131

1        suggesting.  That probably was more

2        verbose as a point than it needed to be

3        realistically, but that's what I was

4        trying to communicate.

5                MS. STILLMAN:  Before we go on to the

6        next document, it's 11:50.  Do people want

7        to take a ten-minute break and then go

8        until 1:00 and then break for lunch at

9        1:00?

10                MS. ENSLIN:  Sure.

11                (Break taken.)

12                MS. STILLMAN:  I'm going to a

13        document that's previously been marked as

14        Exhibit 284.

15                (Deposition Exhibit No. 284 was

16        previously marked.)

17   A.   Thank you.

18   BY MS. STILLMAN:

19   Q.   I'm sorry.  Commander Snyder, are you

20        ready?

21   A.   Yeah, I just had -- my wife was texting

22        me.

23   Q.   I'll represent to you that you're not on

24        any of these email chains.  I'm just going

25        to be asking you about the email from

Page 132

```
 1        Lieutenant Mark Klukow on pages 1 and 2.
 2        If you want to just take a second to
 3        review that email.
 4             If you turn to page 2, that top
 5        bullet point says:
 6                 "MPD employees using physical
 7                 measures to remove people from
 8                 their tents is defined as force."
 9             Would you agree that physically
10        removing someone from their tent is a use
11        of force?
12   A.   Yes.
13   Q.   In the third bullet point down, the second
14        sub bullet point, it says:
15                 "The MPD does not have the
16                 capacity to perform the
17                 administrative tasks of cataloging
18                 property without an accompanying
19                 arrest.  These tasks should be
20                 delegated to an enterprise partner
21                 who will be on site."
22             When you attended encampment sweeps
23        on city property, were you expected to
24        catalog encampment residents' property?
25                 MS. ENSLIN:  Objection.  Vague.  Also
```

Page 133

```
 1          object to the extent it calls for a legal
 2          conclusion.
 3   A.   Yeah, I would -- expected by whom?
 4               I mean, if we took somebody into
 5          custody, the expectation is we would have
 6          to take their stuff, but not a whole
 7          tent's worth of things.  It would be,
 8          generally speaking, but we don't -- I
 9          can't remember a time where in any of our
10          closures we took people -- I mean, I never
11          made an arrest while I was doing that
12          work.
13               So the expectation obviously would be
14          consistent with MPD policy that -- you
15          know, that we would have to collect their
16          stuff and inventory it, but --
17   BY MS. STILLMAN:
18   Q.   When you attended sweeps of encampments on
19          city property, have you ever witnessed
20          city staff cataloging an encampment
21          resident's property?
22               MS. MARTENSON:  Objection.  I want to
23          make a standing objection to the term
24          "property" as vague.
25               MS. ENSLIN:  I'm just going to also
```

1        object it calls for a legal conclusion.

2   A.   I don't recall whether I've ever witnessed

3        people -- I think I've witnessed people --

4        well, I certainly have witnessed people

5        putting things in bins, and us

6        transporting that, but I don't recall

7        cataloging.  I don't recall anybody ever

8        doing anything like that.

9   BY MS. STILLMAN:

10  Q.   When you say "us," who do you mean?

11  A.   Well, I mean, like at the Wall.  We

12       provided bins, in some cases assisted

13       people that were -- you know, had like six

14       bins or whatever to help them get their

15       stuff in there, if they were struggling

16       with it, and get it over onto the truck

17       that was being used by Office of Emergency

18       Management to transport it.  That would be

19       my primary recollection of that.

20            I know that there was -- at the Near

21       North closure, I know that there were some

22       items that were clearly high-dollar items,

23       I think.  And to my best of my knowledge,

24       I know that solid waste was managing that

25       and had taken their transport someplace.

```
                                        Page 135

 1         I think they had actually all the property

 2         transported someplace, although I had

 3         nothing to do with that.

 4             I know that the motorhomes went to

 5         the impound lot, and I helped several

 6         people get their property back out of the

 7         motorhomes.

 8  Q.  You helped them get their property out of

 9         the motorhomes during the sweep or after

10         the fact?

11  A.  After.

12  Q.  From the impound lot?

13  A.  Yeah.

14  Q.  Do you recall, other than the Wall, times

15         when the City has provided bins for people

16         to put their property in when an

17         encampment sweep was happening?

18  A.  I don't recall off the top of my head.

19         There may have been times when, you know,

20         somebody was facilitating that.

21             I remember a few times when -- like

22         at 13th and at 14th where people had come

23         with trucks and were loading stuff in

24         trucks, but that wasn't the city

25         initiative, and we provided enough time
```

Page 136

```
 1        for people to do that.
 2   Q.   Have you ever helped transport an
 3        encampment resident's belongings from
 4        the -- from an encampment to another
 5        location immediately after a sweep?
 6   A.   Yes.
 7   Q.   How many times?
 8   A.   I don't know.
 9             So, again, we're running into a
10        problem.  I don't consider two tents an
11        encampment.  But I've done it dozens of
12        times where I've helped somebody move
13        their tent or their property because, you
14        know, they don't want to leave half of it
15        there and have it got stolen.  So I would
16        use my Polaris Ranger to help them move
17        it.
18   Q.   I apologize.
19   A.   I probably have a cool picture of one
20        actually where it's stacked up over the
21        top.
22   Q.   When was that?
23   A.   Oh, my gosh.  It was Aaron.  I can't
24        remember when it was.  Maybe like in that
25        first summer.  Like 2018, summer of 2018.
```

Page 137

```
 1   Q.   Have you ever transported an encampment
 2        resident's property to a storage location
 3        owned by the City of Minneapolis?
 4   A.   No.
 5   Q.   Have you ever transported an encampment
 6        resident's property to another encampment?
 7   A.   Yes.
 8   Q.   Do you believe that homelessness is a
 9        crime?
10           MS. ENSLIN:  Objection.  Calls for a
11        legal conclusion.  Also vague.
12   A.   No.
13   BY MS. STILLMAN:
14   Q.   So you were at the attempted sweep of the
15        Near North encampment as well as the
16        actual sweep of the Near North encampment,
17        correct?
18   A.   The closures, yes.
19   Q.   What was your involvement in the planning
20        of the Near North encampment sweep?
21           MS. ENSLIN:  Object to this as
22        compound.
23   A.   So which time?
24   BY MS. STILLMAN:
25   Q.   The first time.
```

```
                                           Page 138
1    A.   My only participation in the planning of
2         the first time in March of 2021 was the
3         planning to when we would arrive, and
4         where we would put tape to prevent access,
5         to put -- creating out a perimeter.  That
6         was my only involvement.
7    Q.   Why was that your involvement in the
8         planning?
9    A.   Why was -- I don't understand the
10        question.
11   Q.   Sure.
12             Why were you the one who made the
13        plans of what time you would arrive, and
14        where?
15   A.   I wasn't the one that made the plans of
16        when I would arrive.  They were -- I was
17        the one who, as the fourth precinct
18        lieutenant, was in charge of our staff.
19             And so it was because it was going to
20        be, you know, precinct personnel, the
21        unit -- the homelessness unit was
22        unstaffed at that point, and so it was us
23        providing precinct perimeter personnel.
24             That's why I was involved in
25        identifying who was going to go and do it.
```

Page 139

```
 1        And, you know, the time was set by I think
 2        solid waste.
 3   Q.   Did you ever present a plan to Mayor Frey
 4        about how the Near North encampment sweep
 5        attempt in March of 2021 was going to
 6        happen?
 7   A.   I don't recall.
 8   Q.   Were you involved in the planning of the
 9        Near North encampment sweep in October of
10        2022?
11   A.   I was.
12   Q.   What was your role in that?
13   A.   Just that I was -- you know, I mean, at
14        that point I was a commander, I was
15        promoted, and my role was to just assist
16        in -- the MPD to marshal MPD resources,
17        was really my responsibility; how many
18        people.
19             The perimeter, you know, was largely
20        planned by Lieutenant Tommy Campbell, I
21        think, where they were going to be closed
22        off.  But we -- you know, that was my
23        responsibility was pulling those resources
24        together.
25   Q.   Who decided that -- the date that the
```

1        encampment was going to be closed?

2                MS. ENSLIN:  Objection.  Foundation.

3    A.  So that's an interesting story.

4                I think there was a proposal, there

5        were discussions about when we were going

6        to do it.  And there was -- I think that

7        the date was a negotiation with the

8        mayor's office, and I -- in a meeting in

9        the mayor's office -- and I believe that

10       the commissioner was there, and a variety

11       of other people:  Peter Ebnet; I think

12       Gators -- Chief Staff Gators might have

13       been there for that one -- to discuss the

14       date that it was going to be closed on.

15               So, you know, I was given the date,

16       basically is what it was.

17               MS. STILLMAN:  I'm going to be going

18       to Exhibit 271 and 273.

19               (Deposition Exhibit Nos. 271 and

20       273 were previously marked.)

21   A.  So this one we're done with here?

22   BY MS. STILLMAN:

23   Q.  Yes.

24               And Exhibit 273 is the attachment to

25       the email that's been marked as Exhibit

```
 1        271.
 2   A.   Okay.
 3   Q.   So Exhibit 271, it's an email from you to
 4        multiple people on June 15, 2020, correct?
 5   A.   (Nods head up and down.)
 6   Q.   And there is an attachment --
 7   A.   Yes.
 8   Q.   -- of the 2901 Chicago Avenue South hotel
 9        evacuation.  Do you see that in the
10        "Subject" line?  Below the "Subject" line.
11        Sorry.  Right above that bold line on the
12        email.
13   A.   Oh, yep.  Yes, I see it.
14   Q.   So this exhibit that's been marked as 273
15        is the attachment to that email.  If you
16        go to the last page of Exhibit 273, ending
17        in 040903, it says that this plan was
18        prepared by you.
19             Do you see that?
20   A.   Yeah, I do.
21   Q.   Do you remember preparing this event
22        action plan?
23   A.   Can I review it real quick?
24   Q.   Of course.
25   A.   (Reviewing document.)
```

Page 142

1            Yes, I do.
2    Q.   Why did you prepare this event action
3         plan?
4    A.   Because the hotel had been essentially
5         taken over and was being -- the owner of
6         the hotel wanted it cleared out, and it
7         was well beyond his scope.  He'd basically
8         been chased out of there.
9              Even the group calling themselves The
10        Sanctuary Group, or whatever, had
11        abandoned it largely, or had abandoned it
12        by that point, and so he was requesting
13        police assistance in getting everyone out
14        of the hotel.
15   Q.   Is there a reason you were assigned to be
16        the one to draft this EAP -- or sorry.
17        Hold on.
18              If I say "EAP," can we use that to
19        stand for "event action plan"?
20   A.   Sure.  Yep.  That's what it's called.
21   Q.   Okay.  So is there a reason that you were
22        selected to specifically draft this
23        specific EAP?
24   A.   Yes.  Because I was -- that was again
25        during my time working, you know, in my

Page 143

1          capacity at the -- for the unit, right?

2          Even though I believe I was a lieutenant

3          at that point and had been promoted.

4               I don't know why Dave O'Connor wasn't

5          a participant in that, but it was -- it

6          was my job at that point.  It fell under

7          the purview of my responsibility.

8    Q.   I'm done with that document.

9    A.   Okay.

10   Q.   And I'm going to be going to the document

11        that's been previously marked as Exhibit

12        272.

13             (Deposition Exhibit No. 272 was

14        previously marked.)

15   BY MS. STILLMAN:

16   Q.   If you just want to take a moment to

17        review that.

18   A.   Okay.

19   Q.   And you prepared this EAP, correct?

20   A.   Correct.

21   Q.   Why were you the one who prepared this

22        EAP?

23   A.   Because it was again a responsibility of

24        our unit to conduct the closure of that

25        encampment, so...

Page 144

```
 1   Q.   Have you prepared any other encampment
 2        demobilization's EAPs other than the two
 3        we just looked at?
 4   A.   I think so.
 5   Q.   Do you remember for which encampments?
 6   A.   It wasn't The Quarry; it was one more
 7        recent.
 8             I think maybe I did do The Quarry
 9        one.  I can't recall.
10             I did the Near North one, I believe.
11   Q.   The March 2021 Near North one?
12   A.   I don't think we had an EAP for that one.
13        But the one that occurred after that --
14   Q.   In October of 2022?
15   A.   Yep.  I did that one, to the best of my
16        recollection.
17             But prior to that, I think it was --
18        it was Kris Brown that had been doing
19        them, or Tommy Campbell, prior to me
20        coming back in August essentially of 2022.
21   Q.   For all of the encampment sweeps that
22        you've attended that have been on city
23        property, has MPD created an EAP that
24        you've seen?
25             MS. ENSLIN:  Objection.  Foundation.
```

Page 145

1    A.   No.

2    BY MS. STILLMAN:

3    Q.   Why would you create an EAP in some

4         circumstances but not others?

5    A.   Well, again, I think it goes back to the

6         definition of what you're calling a

7         "sweep."   But not all closures were

8         created the same.   There were ones where

9         an EAP wouldn't be necessary because it

10        was more of a cooperative effort to close

11        an encampment.

12             And I don't think there was a -- if

13        there was no expectation that we were

14        going to be needing potentially a larger

15        number of officers or support, I don't

16        know that an EAP would really be justified

17        in that situation.

18             But, you know, there are some -- open

19        for some interpretation on when we should

20        actually do that, but that's not -- you

21        know, I didn't -- I didn't see one for

22        everything that happened.

23   Q.   So if you turn to page 4 of this document.

24        It ends in 002507.

25   A.   Okay.

Page 146

1    Q.   And then under "Operation" it says:

2                 "Personnel will arrive on site at

3                 1200 and park adjacent to the

4                 encampment on 26th."

5                 If you are the person drafting --

6         well, as the person who drafted this EAP,

7         did you decide when personnel would arrive

8         at the encampment?

9    A.   I don't recall whether that was a time.  I

10        mean, generally those decisions were made

11        in response to somebody saying, "We're

12        going to be there at this time," whether

13        it was solid waste or CPED wanted it done

14        at this time or whatever.

15                 And it was a negotiation generally in

16        which we had input; you know, "We can't do

17        it at this time because of shift change,"

18        or whatever else.

19   Q.   For the EAP you prepared for The Quarry,

20        did you choose the time that city staff

21        would get to The Quarry encampment?

22   A.   I don't -- I mean, I agreed with it.  I

23        don't know that I chose it.

24   Q.   For the Near North EAP, did you choose the

25        time that city staff would get to the

Page 147

1          encampment?

2     A.   Same response.

3     Q.   You can put that away.

4               In 2020, were you part of any working

5          groups that dealt with issues regarding

6          homelessness?

7     A.   Yeah, to an extent.  I mean, there was a

8          larger collaboration of people that -- I

9          mean, I would speak regularly with Katie

10         Topinka and Andrea Brennan and some other

11         folks, and David Hewitt.

12              I don't know that we had a formal

13         working group.  We may have at that point.

14         There were -- I was also in collaboration

15         with, you know, many of our -- the

16         nonprofit outreach people from the various

17         organizations, and those would -- there

18         were some Zoom calls and some

19         collaborations there that I was at some of

20         those, not all of them.  But --

21    Q.   Did you attend any meetings where issues

22         regarding homelessness were discussed that

23         were led by Don Ryan in 2020?

24              MS. MARTENSON:  Objection.  Vague and

25         compound.

Page 148

1   A.   Maybe.  I don't recall.

2   BY MS. STILLMAN:

3   Q.   Did you attend any meetings in 2020 where

4        Don Ryan was present and issues regarding

5        homelessness were discussed?

6   A.   Again, maybe.  I don't recall specifically

7        those meetings.

8   Q.   What kind of things did you discuss

9        regarding homelessness when you spoke with

10       Katie Topinka?

11            MS. ENSLIN:  Objection.  Vague.

12  A.   Any response that I would give to that

13       would be speculative.  I don't really -- I

14       don't recall any specific conversations.

15            We had -- you know, I know we had

16       general conversations about -- about sites

17       that they would call me about that were on

18       their property, and, you know, what did I

19       think about that, or what could I do about

20       that, or something.

21            They would -- they would get

22       complaints about their property when it

23       had to do with their property, and so

24       those were conversations that I would have

25       with them as they would be telling me this

Page 149

1          or that.

2                 And, likewise, I would be reporting

3          back to them, you know, "I've made contact

4          with this individual, and he or she said

5          they're going to move," or something to

6          that effect.

7                 MS. STILLMAN:  I'm going to go to the

8          document that's previously been marked as

9          Exhibit 78.

10                (Deposition Exhibit No. 78 was

11         previously marked.)

12    A.   Thank you.

13    BY MS. STILLMAN:

14    Q.   And if you just want to take a moment to

15         review this email.

16                If you look at the email from Chief

17         Jason Ohotto, in the first paragraph of

18         that email he underlines:

19                "Large demobilizations will be

20                part of a planned and coordinated

21                effort."

22                Do you see that?

23    A.   I do.

24    Q.   And under that paragraph he has five

25         bullet points that name -- with five

Page 150

```
 1       different encampments.

 2            Do you see that?

 3  A.   Yes.

 4  Q.   Would you consider Powderhorn West, Peavey

 5       Park, Elliot Park, Loring Park or Kenwood

 6       Park, any of those, to be large

 7       demobilizations?

 8  A.   Yes.

 9  Q.   Which ones?

10  A.   Powderhorn, Peavey.  I don't think Elliot

11       was that large.  Loring and Kenwood I

12       would -- I would consider them all to be

13       larger scale.

14            I mean, certainly you can rank them

15       within that list, Powderhorn East and West

16       being the largest.

17  Q.   Why would you consider those four to be

18       large demobilizations?

19  A.   There are six of them on there, six -- or

20       five.

21  Q.   But you said that you wouldn't consider

22       Elliot Park to be a large.

23  A.   You're right.

24            Just because they were going -- they

25       were larger in terms of the number of
```

Page 151

```
 1        tents, and potentially the number of

 2        people there.

 3             In the case of Kenwood, it -- you

 4        know, it had a fairly large area, and, you

 5        know, just experiencewise, I would

 6        consider those to be you're not going to

 7        do it with one or two people; it's going

 8        to be a larger-scale demobilization.

 9   Q.   Did you discuss the plans for the

10        demobilization of Powderhorn West with

11        anybody from the MPRB

12   A.   I have no idea.

13   Q.   Did you discuss the demobilization of

14        Powderhorn West with anybody from Hennepin

15        County?

16   A.   I don't recall.

17   Q.   Did you discuss the plans for the

18        demobilization of Peavey Park with anybody

19        from the MPRB?

20   A.   I don't know.

21   Q.   Did you discuss the demobilization of

22        Peavey Park with anybody from Hennepin

23        County?

24   A.   No recollection.

25   Q.   Did you discuss the demobilization of
```

```
                                              Page 152

 1        Loring Park with anybody from MPRB?

 2   A.   No idea.

 3   Q.   What about from Hennepin County?

 4   A.   No idea.

 5   Q.   Did you discuss the demobilization of

 6        Kenwood Park with anybody from the MPRB?

 7   A.   No idea.

 8             When you say "MPRB," are you talking

 9        about the board, or are you talking about

10        the -- would that include the police

11        department?

12   Q.   Yes.

13   A.   Oh.  Well, then yes.  I mean, in the case

14        of Powderhorn East and West, Peavey,

15        and -- I don't think Elliot; the first

16        one, not the second one -- and then

17        Kenwood, I had conversations with somebody

18        from them, whether -- you know, about what

19        was planned, or how they were going to do

20        it, or when they were going to do it, or

21        things like that, you know.

22             I apologize.  I misunderstood.

23   Q.   That's fine.  And I should have clarified

24        that.

25             And I guess I'll clarify, too, when I
```

Page 153

```
 1        say "County," I'm also referring to the
 2        Hennepin County Sheriff's Office.
 3   A.   Yeah, I didn't on any of those.
 4             Loring I had nothing to do with; I
 5        just heard that it happened.  But --
 6   Q.   You can put that away.
 7             MS. STILLMAN:  I'm going to be
 8        marking a document that's been
 9        Bates-stamped HC00032644 as Exhibit 391.
10             (Deposition Exhibit No. 391 was
11        introduced.)
12   BY MS. STILLMAN:
13   Q.   If you just want to take a moment to
14        review that email.
15   A.   All right.
16   Q.   Were there calls happening between the
17        State, Hennepin County, City of
18        Minneapolis and MPRB about the encampment
19        at Powderhorn in June of 2020?
20   A.   From the content of the email, I would
21        interpret that there were calls between
22        the Park Board and the State.  I don't --
23        I don't -- it doesn't look like we were
24        included in that.
25   Q.   Why do you believe that the State didn't
```

```
 1        want you in the call?
 2   A.   Because if you remember, there was --
 3        after the events involving George Floyd,
 4        there was this contraction around MPD
 5        can't do this on park land, and they can't
 6        do this, and all of this other stuff.
 7             So I think that it was the State that
 8        was saying they didn't want MPD involved
 9        in it, which was silly and short-sighted,
10        but that's what they did.
11   Q.   Were you invited to future calls with the
12        State about Powderhorn Park?
13   A.   Not to my recollection.  I don't have any
14        idea.
15   Q.   When did you start working with Don Ryan?
16   A.   I mean, it was around that time.  I don't
17        remember when he sort of stepped into it.
18        I think it was around that spring, you
19        know, in 2020.
20   Q.   How often would you speak with Don Ryan in
21        the spring and summer of 2020?
22   A.   I have no recollection.  I mean, I know I
23        talked to Don, but I can't even pinpoint
24        when it was, in summertime or whatever.
25             I would -- there was a period of time
```

1      when there were things going on that I
2      would talk to him every day, you know, but
3      then there would be large gaps of
4      communication.
5           So I don't even know how to sort of
6      anchor that in a calendar or anything like
7      that.
8           MS. STILLMAN:  You can put that away.
9      And I'm going to be going to the document
10     that's been marked as Exhibit 23.
11          (Deposition Exhibit No. 23 was
12     previously marked.)
13 BY MS. STILLMAN:
14 Q.  So this is the EAP for the demobilization
15     of Powderhorn Park East.
16          Do you recall receiving this EAP
17     ever?
18 A.  No, but I'm sure I did.
19 Q.  And you were at the Powderhorn Park East
20     sweep on July 20th of 2020, correct?
21 A.  I was.
22 Q.  What time did you get there?
23 A.  I mean, I think I arrived around the same
24     time everybody else did.  I don't know
25     when that was.

Page 156

1    Q.   How long did you stay?

2    A.   Until they were done.

3    Q.   What would you have considered being

4         "done"?

5    A.   Well, when they had cleared the site, and,

6         you know, that's -- I think that's when I

7         probably stayed until.

8    Q.   Did you discuss the plan to sweep the

9         Powderhorn Park East encampment with Chief

10        Ohotto prior to the sweep?

11   A.   I'm sure I did.  I don't remember the

12        specific conversation.  I spoke with

13        somebody because I would have had to have

14        known when it was happening.

15             And Powderhorn was sort of their

16        first large response, and so I think that

17        there were conversations between myself

18        and Chief Ohotto and, you know, other

19        people that were involved, too, that sort

20        of addressed, you know, best practices,

21        and, you know, how we can make sure that

22        people have the time necessary.

23             And, you know, a lot of what I did

24        back then was sort of try and encourage

25        how to go tent to tent, and how to make

1    those notifications, and, you know,

2    what -- trying to slow things down to give

3    people time to get their stuff, and things

4    like that.  How to make sure that the tent

5    was not occupied.  How to assess or

6    determine whether what was left behind was

7    truly being abandoned and left behind.

8         And my body-cam footage from that day

9    would reveal that.  It would show that.

10 Q.  How do you assess whether somebody has

11    actually abandoned their property?

12         MS. MARTENSON:  Objection.  I want to

13    make a standing objection to the term

14    "abandoned" as vague.

15         MS. ENSLIN:  Just also going to

16    object to the extent it calls for a legal

17    conclusion.

18 A.  Yeah.  I mean, I think that we sort of

19    operated on the premise that, you know,

20    there was an assessment that was done by

21    the condition of the property, the

22    condition of the tent, when the last time

23    someone had seen someone there, whether or

24    not the person -- the simplest, and again,

25    this is what my body cam would reveal --

Page 158

1           was asking people, "What do you want done
2           with this?"
3                 And they would either say, "I don't
4           care what happens to that," or, "Get rid
5           of it," or something like that.  That
6           would be a fairly easy one.
7                 It becomes more complicated when you
8           would find an unoccupied tent, and then,
9           generally speaking -- again, generally
10          speaking, we would attempt to ascertain if
11          anybody knew whose it was, whether they
12          were coming back, when they had been
13          there, that sort of thing.
14    BY MS. STILLMAN:
15    Q.  Do you believe that giving residents two
16          hours to pack up and leave Powderhorn Park
17          East was a sufficient amount of time?
18                 MS. ENSLIN:  Objection.  Calls for
19          speculation.
20    A.  If there was some -- if there were options
21          and some measure of support, i.e., people
22          helping them move, and transportation and
23          those sort of things, I think that that's
24          right on the border personally.  But I was
25          not a big fan of not giving people more

Page 159

1      notice than that.

2           I don't know.  If they had received

3      prior notice, you know, that would all

4      factor into that.  So two hours on the day

5      of closure, if they had been given notice,

6      would seem very adequate to me for some

7      people.  For others, no.

8           I mean, and, you know, a part of that

9      is because people tended to wait until the

10     last minute, and then -- that's just the

11     way that they approach this -- and then

12     they would abandon some of their stuff, or

13     much of their stuff, and things like that.

14          So, you know, it's a really very --

15     it's specific to a site to how much notice

16     was given, to the nature of the time of

17     year, what the weather is like, whether or

18     not they've got support, you know.

19  BY MS. STILLMAN:

20  Q.  Why would the weather be a factor?

21  A.  Well, if it's really hot, if it's really

22      cold, if there's snow, if it's raining, if

23      it's -- you know, all those things play

24      into how reasonable it is that people can

25      move their stuff, you know.

Page 160

1    Q.   Why would it if it's really cold factor

2         into whether or not it's reasonable for

3         somebody to move their stuff?

4    A.   Because a lot of people working outside

5         when it's really cold requires getting out

6         of your tent, or getting out -- you know,

7         and more than just the people in the

8         encampment.  It requires, you know, city

9         staff to be, you know, appropriately

10        attired.

11             And there is some concerns about --

12        for my mind, there is some concerns about

13        people finding, you know, another space to

14        go, and are they going to get stuck

15        outside, are they going to have to spend a

16        long period outside.

17             I was not a big fan of doing -- I

18        wasn't a fan of doing closures when it was

19        really cold at all.

20   Q.   In your experience, would you say that

21        packing when it's really cold could lead

22        to a risk of getting frostbite?

23             MS. ENSLIN:  Objection.  Calls for

24        speculation.

25   A.   I mean, I don't know.  It could, I guess,

Page 161

```
 1        if you're outside and you're not properly
 2        attired.
 3             It's just not a great time to be
 4        worried about packing your stuff outside
 5        when it's really cold.  And, again,
 6        we're -- you know, we haven't defined what
 7        "really cold" is, but I always worried
 8        about people getting frostbite, so --
 9   BY MS. STILLMAN:
10   Q.  In your experience, would people -- would
11        encampment residents want to keep their
12        tents up until the last possible minute so
13        they had a place to stay until they had to
14        leave?
15             MS. ENSLIN:  Objection.  Calls for
16        speculation, incomplete hypothetical, and
17        compound.
18   A.  Yeah, I don't -- I mean, in my experience,
19        most people didn't start packing until we
20        showed up the morning of, regardless of
21        how much notice they were given.
22             And that's sort of this ubiquitous
23        reality across all of the closures that
24        I've been a participant in, and it's
25        always been like that to my experience, is
```

1          that people just wait until they see

2          garbage trucks roll in or police roll in,

3          or something like that, and people saying

4          they have to go.

5                  I don't know why.  I don't know why.

6          I'm sorry.

7     BY MS. STILLMAN:

8     Q.  No, that's fine.

9                  Have you ever asked anybody why?

10    A.  Yeah.

11    Q.  What was the response you got?

12    A.  I mean, again, anecdotally, everything

13         from, you know, "I was hoping you wouldn't

14         come," to, "I was in getting high," to,

15         you know, "I've got so much stuff, I don't

16         know what to do with it," or, "I don't

17         know what I want."  And, you know, just

18         nothing really other than casual

19         conversation about it.

20    Q.  Did anybody say it was because they

21         weren't sure when the encampment was going

22         to be cleared?

23    A.  I mean, I don't recall anybody ever saying

24         that to me.

25    Q.  Have you ever heard that?

1          MS. ENSLIN:  Objection.  Vague.

2  A.  Not from people in the encampment that I

3       recall, other than like, "I was hoping you

4       weren't coming," that sort of thing.

5          So --

6          MS. STILLMAN:  I'm going to go to the

7       document that's previously been marked as

8       Exhibit 83.

9          (Deposition Exhibit No. 83 was

10      previously marked.)

11 BY MS. STILLMAN:

12 Q.  And you can just take a moment to review

13      that.

14 A.  (Reviewing document.)

15 Q.  Have you had -- have you finished

16      reviewing the emails?

17 A.  Yes.

18 Q.  So Mr. Ryan writes to Chief Ohotto, and

19      then cc's you, that he believes you should

20      stick --

21          "...we should stick to the

22          protocol of noticing a park and

23          then demobilizing at least a day

24          later."

25          And then in the next paragraph,

Page 164

```
 1        writes:
 2              "He is at Matthews right now with
 3              someone who was staying is there
 4              and his tents and belongings were
 5              thrown out.  He hadn't abandoned
 6              his stuff and came back to find
 7              his stuff thrown away."
 8        Have you heard of other encampment
 9    residents who have not been present at an
10    encampment when it was closed and then had
11    their belongings thrown out?
12 A.  Yes.
13 Q.  Do you recall when?
14 A.  No.  I just -- I know that it was a
15    concern.  It's one of the crappy things
16    about closures that, unfortunately, you
17    know, it's hard to figure out how to
18    mitigate that.
19        But -- but, you know, yeah.  So I
20    know that it has happened.
21 Q.  And you know that it happened in the
22    summer of 2020?
23 A.  Well, I mean, I'm reading the email about
24    it, you know.
25        We weren't closing camps in the
```

1          summer of 2020.  To the best of my
2          knowledge, the City wasn't.  Except for we
3          had, you know, like the Sheridan, and I
4          think there was the one on 14th and stuff
5          like that, but those were both noticed and
6          had long periods of time.
7                  So, you know, the actual examples of
8          people who had been gone for a longer
9          period of time, like I'm assuming -- I
10         don't know what the closure -- what the
11         time period was on this.  I don't remember
12         what he did or didn't do.  I wasn't
13         involved in Matthews to the best of my
14         knowledge.  So I don't -- it's hard for me
15         to respond to that.
16                 And when I say "we," I'm talking
17         about the City.  I know Parks was closing
18         camps during that period of time.
19    Q.  Did you discuss the concerns about people
20         not being at a sweep and losing property
21         with anyone from Hennepin County?
22    A.  I mean, I discussed it with David Hewitt.
23         I discussed it with Katie Topinka -- or
24         she was CPED -- with Danielle Werder.
25                 I mean, I had conversations with

1    anybody that would listen about that

2    because it was a concern.  It was one of

3    the big things that our partners in

4    outreach would bring up is, "Hey, we're

5    worried about people losing their stuff

6    and whatnot."

7         You know, a part of that

8    conversation, though, is also the

9    acknowledgment that much -- you know, that

10   the stuff in encampments tends not to be

11   like the stuff in your living room or

12   mine.  It's different.  And it's -- I

13   can't recall, with possibly one exception,

14   a time when I walked into an encampment

15   and saw this large quantity of personal

16   property that was clearly something

17   someone wanted to save.

18        I mean, much of what we saw in

19   encampments was in the nature of stuff

20   that was soiled and wet and discarded,

21   mixed in with junk and needles and

22   trinkets like, you know, an old lawnmower

23   motor or blade or things like that.

24        So, you know, a part of the thing

25   that makes this a challenging conversation

```
 1        is we're sort of generalizing that
 2        everything in a tent is -- it's like it's
 3        neatly stacked and organized, and you look
 4        at it and go, "Yeah, somebody cares about
 5        this because it's -- you know, it's so
 6        well taken -- let's throw it away."  And
 7        that never happened.
 8             It was always generally the sort of
 9        very disorganized, again, dangerous tents
10        that tended to be in poor condition and
11        things like that.  So --
12   Q.  You mentioned one exception.  What was
13        that exception?
14   A.  I just remember one time walking in -- I
15        think it was underneath the bridge over
16        by -- over by the Whole Foods that's over
17        right on the border of St. Louis Park,
18        right over by Bde Maka Ska Lake.
19             There was a bridge there right by the
20        bike path, and there is a guy that had an
21        encampment underneath there, and he had a
22        little -- like almost set up like a living
23        room, and he had a bookshelf, and he had
24        all this stuff.
25             So clearly, you know, that was -- he
```

Page 168

1          was taking care of that, and it was very

2          easy to see somebody was residing there.

3   Q.   Other than this email, did you hear about

4          other residents in the summer --

5          encampment residents in the summer of 2020

6          who had property destroyed at an

7          encampment sweep in Hennepin County?

8   A.   I mean, it was sort of a common refrain

9          from our outreach partners -- pardon me --

10          that I would talk to John Tribbett, who is

11          now with Avivo, but was with St. Stephens,

12          and he would say, "Oh, we're hearing from

13          outreach that so-and-so lost his stuff

14          when this camp was closed."

15              And I had no way of responding to

16          that, you know, particularly if I had

17          nothing to do with it, you know.  But you

18          heard it with some frequency.

19              There were a few commonalities.

20          Everyone had their important papers and

21          keepsakes and medications there, and stuff

22          like that.  It was -- it was not -- and

23          I -- and I sort of viewed that with some

24          skepticism because that sort of became --

25          again, everybody's refrain was that, "Oh,

Page 169

```
 1        I lost my medication and I can't get
 2        more," "I lost my important ID or papers
 3        and I can't get more," and stuff like
 4        that.
 5             So those were the commonalities in
 6        what was reported.
 7   Q.   You mentioned that you talked to David
 8        Hewitt about the potential loss of
 9        property at encampment sweeps.  What did
10        you discuss about that with him?
11   A.   Well, I mean, I don't recall specifically
12        the conversation.  I can tell you what my
13        position was, and what my position is, and
14        it seems reasonable that I would have
15        related that; and that is that we would do
16        our best to try and prevent it.
17             It was an unfortunate sort of reality
18        of encampments is that it's -- and it's
19        not just a closure that causes loss of
20        property.  It's sort of the -- you know,
21        the pilfering and theft that occurs with
22        great frequency.  And, you know, it rains
23        and everything gets soaked, then just
24        discarded, and things like that.
25             But we were always trying to figure
```

Page 170

```
 1        out ways to sort of mitigate because we
 2        didn't want people losing things that were
 3        of value to them.
 4   Q.   What were some of the ways in which you
 5        tried to mitigate that?
 6   A.   I think notice was a big one.  You know,
 7        at the scene we would try and, "Oh, there
 8        is nobody in this tent.  It's abandoned."
 9        You know, that wasn't commonly the way
10        that we would approach it.
11             We would try to find out more
12        information about who was there, "Do you
13        know where they are?  You know, are they
14        coming back?" that sort of thing.  "How
15        long ago were they here?"  If they haven't
16        seen them for two weeks, it was a pretty
17        good bet that they're not coming back.
18             But, again, in the condition -- I
19        mean, you know, we were limited by our
20        ability to again look at a collection of
21        items and determine whether or not
22        somebody wanted that.
23             I mean, the two needle sticks that I
24        got were in encampments during closures
25        where I was going through trying to figure
```

Page 171

```
 1        out if people -- if this was -- and it
 2        just became too dangerous because I got
 3        stuck twice with needles in encampment
 4        closures.
 5              So after that, we just, you know,
 6        stopped piece by piece, item by item
 7        trying to assess what was there, and went
 8        with a general sense of, you know, what it
 9        looked like, its condition, what we could
10        get from other people that were nearby,
11        and stuff like that.
12   Q.  What was David Hewitt's response when you
13        told him your opinion?
14   A.  I have no idea.  I can't recall.
15              MS. STILLMAN:  So it's 12:59, and I'm
16        kind of at a stopping point if we want to
17        take 30 -- does 30 minutes sound good for
18        lunch?
19              MS. ENSLIN:  Yeah.
20                (A lunch recess was taken.)
21   BY MS. STILLMAN:
22   Q.  And then, Commander Snyder, if you just
23        want to let me know when you're ready.
24   A.  Oh, I'm ready.
25              MS. STILLMAN:  I'm going to go to the
```

```
 1        document that's previously been marked as
 2        Exhibit 53.
 3              (Deposition Exhibit No. 53 was
 4        previously marked.)
 5   A.  Thanks.
 6   BY MS. STILLMAN:
 7   Q.  And this is the EAP for the -- this is the
 8        EAP for the demobilization of the
 9        encampment at Peavey Park.
10              Have you seen this document before?
11   A.  Not to my knowledge.  I may have, but I
12        don't recall it.
13   Q.  So -- well, so this was prepared by Chief
14        Ohotto.  If you turn to page 2, at the
15        bottom it says that you are going to be
16        outreach.
17              Do you see that?
18   A.  I do.
19              Which encampment is this for?
20        Powderhorn West?
21   Q.  So this is --
22   A.  It's Peavey.
23   Q.  To get into it, the -- I'm actually going
24        to put this document away.  I'm not going
25        to ask questions about that.
```

```
                                          Page 173
 1            MS. STILLMAN:  I'm going to be going
 2       to the document that's been marked as
 3       Exhibit 55.
 4            (Deposition Exhibit No. 55 was
 5       previously marked.)
 6  A.  Sorry.
 7            MS. STILLMAN:  And then I'm going to
 8       be marking a document that's been
 9       Bates-stamped as MPRB 001820 as Exhibit
10       392.
11            (Deposition Exhibit No. 392 was
12       introduced.)
13            MS. STILLMAN:  And I'll represent
14       that Exhibit 55 is the attachment to
15       Exhibit 392.
16  BY MS. STILLMAN:
17  Q.  Do you know who Calvin Noble is?
18  A.  I do.
19            MS. MARTENSON:  Sorry.  Is 392 --
20            (Discussion off the record.)
21  A.  I do know Calvin Noble.
22  BY MS. STILLMAN:
23  Q.  Who is he?
24  A.  Well, he was a lieutenant.  I don't know
25       if he's still a lieutenant or if he's a
```

Page 174

1      captain or whatever now, but --

2   Q.  With Minneapolis?

3   A.  With Parks.

4   Q.  Parks.  Okay.

5           So if you go to the page ending in

6       18255 (sic), or --

7   A.  In which document, please?

8   Q.  In Exhibit 55.

9   A.  Okay.

10          18255?

11  Q.  -225.  I think I messed that up.  It's the

12      fourth page.

13  A.  Got it.

14  Q.  Then on the top there, you're listed as

15      MPD outreach.

16  A.  Yep.

17  Q.  And is Katie -- as is Katie Miller?

18  A.  Mm-hmm.

19  Q.  Is Katie Miller a sworn officer with MPD?

20  A.  She's not.  She is a civilian navigator.

21      I don't know what her current job was or

22      is, but back then it was.

23  Q.  And you were at the Peavey Park encampment

24      demobilization, correct?

25  A.  Again, I was there, but I never entered

Page 175

1           the space.
2    Q.   How far were you from the -- when you say
3          "the space," do you mean the encampment?
4    A.   Yeah.
5    Q.   Did you enter the perimeter?
6    A.   I don't believe so.  It's a little hard to
7          recall.
8               There was a -- I think I was in a
9          vehicle on the -- sort of southwest of it,
10         in the parking lot over by where the -- by
11         where there is a loading dock over there
12         that attaches to that academy or school,
13         or whatever it is.
14              And then at some point I was over on
15         Franklin.  But I don't recall ever being
16         inside the encampment.
17              So having me listed as outreach, I
18         don't think I did that at Peavey.  I don't
19         recall.  I mean, my recollection is that I
20         didn't, but --
21   Q.   Could you see what was going on inside the
22         perimeter at all?
23   A.   I mean, possibly.  I don't have any big
24         recollection of that encampment takedown
25         other than I remember being over on one

1           side, and then I remember being over on

2           Franklin when a bunch of people charged

3           the squads that were over there.  But

4           that's my recollection of it.

5    Q.   Did you ever get out of your squad car?

6    A.   I don't think I was in a squad car.  I

7           think I was in either my Ranger or an

8           unmarked car.  But I don't think my squad

9           car was ever there because I didn't have

10          one back then.  So --

11   Q.   Do you recall getting out of the vehicle

12          you were in that day?

13   A.   Maybe.  I just don't have much

14          recollection of it.

15                You know, I spent plenty of time at

16          Peavey, but not at this time, I don't

17          think.  I was there when it occurred, but,

18          again, I don't really remember my role.

19   Q.   So when you say you were at Peavey, have

20          you visited the encampment prior to its

21          closure?

22   A.   Yep.

23   Q.   About how many times?

24   A.   A bunch.  I would deliver bag lunches over

25          there, and other stuff.

Page 177

```
 1    Q.   Through Involve MN, or through your role
 2         as an MPD?
 3    A.   I did it as a cop, because I would get
 4         them and take them in, you know.  So I was
 5         doing it during my work hours, too, so --
 6    Q.   When you were there, did you ever meet
 7         someone named Henrietta Brown?
 8    A.   That sounds familiar.  I think I know that
 9         name.  I don't remember much about her.  I
10         think it's a her, but I don't recall.
11         So --
12    Q.   Do you know that she's a named plaintiff
13         in this case?
14    A.   I think I did know that.
15    Q.   Is there a reason that Calvin Noble was
16         sending you the operations plan for Peavey
17         Park?
18    A.   Well, because I was there.  And I think
19         that the plan was that I would be there to
20         try and assist where possible.
21              My justification to my administration
22         on why I would be present at these things
23         was because we had a -- I felt like we had
24         a good way of doing this that sort of
25         protected people's stuff.  And I was
```

1          concerned I think at the time about being

2          able to slow things down a little bit, and

3          sort of using best practices a little bit.

4               So my -- or not a little bit, but

5          using best practices when we did it.

6               Not all officers are -- approach, you

7          know, this population in a way that's

8          helpful, and that's -- I'm not saying

9          anybody there didn't, but it was just sort

10         of my gut reaction.

11              I knew most of these people much --

12         well, way more than other people did, and

13         so I felt like if there may be an

14         opportunity for me to prevent bad things

15         from happening and make sure we're doing

16         it the right way...

17              But, again, that was my justification

18         of my administration of why I participated

19         in these things.  I think Chief Ohotto had

20         asked Arradondo that I be present on these

21         things to offer assistance where I could.

22    Q.   What are some of the best practices that

23         you're referring to?

24    A.   Well, again, the way you approach people.

25         You know, "Hey, you know, we got a --

```
1        we're closing the encampment.  You know,
2        we got to get you up and," you know, if
3        it's early in the morning, "get you
4        packing your stuff.  You know, here's some
5        garbage bags.  You know, is there" -- and
6        sort of working with people versus, "Grab
7        your stuff and get out"; you know what I
8        mean?
9             And I have -- I've heard that story,
10       and I didn't want to under my watch have
11       that happen.  And happily, I didn't.
12            That's not generally what happened,
13       you know, so -- but I felt protective of
14       the people that I cared so much about, and
15       so I wanted to be there and help where I
16       could.
17            So best practices would be that it
18       would be slowing it down, giving people
19       time.  You get woken out of a dead sleep
20       in some cases and told to pack up
21       everything you've got, it's going to take
22       some time, and that time isn't 15 minutes,
23       you know.  It's going to be you're going
24       to be there for a duration, making sure
25       that people are actually moving forward.
```

Page 180

1          Sometimes they had to be reminded.
2     They had to be woken up again.  Encouraged
3     not to leave, because, you know, if you
4     don't come back, we have to treat this
5     property as abandoned, you know.
6          And I encouraged people to -- you
7     know, cops to give people garbage bags to
8     assist.  And also, if people needed help,
9     they're not making 45 trips in and out of
10    the perimeter, to help them do that.
11         Then there are other best practices
12    that -- you know, like not allowing people
13    that were not inside the perimeter,
14    already inside the camp, to come in,
15    except in very rare situations, because
16    that's where -- like with Powderhorn East,
17    that's what sort of created that standoff
18    in the end.
19         Those were all people that were not
20    in the encampment, and they came in during
21    that, waited around, and then encircled
22    that tent, forcing that arrest.
23  Q.  Did you have any concerns that those best
24    practices wouldn't be followed at the
25    Peavey Park encampment demobilization?

Page 181

1   A.   I don't -- I don't recall specifically

2        specific to the Peavey Park encampment.   I

3        think I just generally -- you have to

4        understand the amount of time that I spent

5        with these folks.

6             I would see these people two and

7        three times a day every single day.   My

8        job wasn't -- wasn't occasionally, like

9        once or twice a week, going out there.

10       Every day, my day started and ended in

11       encampments, and that's where I spent all

12       my time.

13            So my relationship with these people

14       made me suspicious, if that's the right

15       word even, and, you know -- or protective,

16       so that's why I felt like I wanted to be

17       there.

18  Q.   Do you know how long the residents of the

19       Peavey Park encampment were given to pack

20       on September 24, 2020?

21  A.   I don't.  I have no idea.

22  Q.   So I mentioned Henrietta Brown earlier.

23       In the complaint, she makes allegations

24       that she had property destroyed at the

25       Peavey Park encampment sweep.

Page 182

1           Do you have any reason to doubt those

2      allegations?

3           MS. ENSLIN:  Objection.  Calls for

4      speculation.

5   A.  I wouldn't -- I don't know how to respond

6      to that.  I don't -- I don't have any

7      reason to believe them; I don't have any

8      reason to doubt them.

9           My recollection of Ms. Brown is that

10      she's unstable, so I don't know whether or

11      not that's true.  I just can't judge it

12      because I didn't witness it, to the best

13      of my knowledge.

14  BY MS. STILLMAN:

15  Q.  You mentioned justifying being at Peavey

16      to your supervisors to ensure best

17      practices -- I'm probably not quoting you

18      exactly correctly here --

19  A.  Close enough.

20  Q.  -- to ensure that best practices were

21      followed.

22           Who did you report to in September of

23      2020?

24  A.  So my chain of command technically was

25      from me to Charley Adams to Art Knight.

1       Charley Adams was commander of the

2       division.

3             Want me to pause while you get your

4       page ready, while you write these down?

5   Q.  Sure.   Thanks.

6   A.  So my commander was Charley Adams.   Then

7       above him was Chief of Staff Art Knight.

8       And above him technically was -- was

9       Assistant Chief Henry Halvorson.   And then

10      above him was Chief Arradondo.

11            Now, in practice, most of the

12      conversations that I had didn't go to

13      Charley.   They went to -- and they didn't

14      go to Art.   They went right to the chief,

15      generally speaking.

16            Now, that's not -- that didn't always

17      happen because I worked with a lot of the

18      inspectors who outranked me.   And I

19      trusted them to pass on what they needed

20      to know, but it was specific to their

21      precinct.

22            Most of my best practices discussions

23      really around that time were probably

24      happening either directly with the chief

25      or with Peter Ebnet in the mayor's office.

Page 184

1   Q.   After -- when Amelia Huffman took over as
2        interim chief, did you start having those
3        discussions about best practices and
4        encampment demobilizations with her?
5   A.   Well, she was the assistant chief for a
6        while, and so -- when Henry left.  And so
7        I had many of those conversations.
8             I don't know if you've deposed her or
9        not, but she's extremely intelligent, and
10       she understood even without me saying a
11       lot of this.  So she did her homework.
12            But I did have conversations.  She
13       was the one that wanted to have me come
14       back as a commander into that role, and so
15       her and I talked about that.
16            I also had conversations with Chief
17       Fors, who was really the one who was
18       mostly in charge.  I think at the time
19       when I was out of that, he was the one
20       that was sort of marshaling MPD's response
21       and how it fit into the enterprises plan.
22  Q.   Do you now speak to Chief O'Hara at all
23       about best practices for encampment
24       sweeps?
25  A.   Bear in mind, again, I've been gone since

Page 185

1        the second week of January.

2             I had had some conversations with him

3        about encampments and what I consider to

4        be best practices.  I had conversations

5        with Chief Gators about it and sort of our

6        broader strategy.  But I mean, I don't

7        speak to him regularly.  I have had maybe

8        two text communications since January with

9        him, and that had nothing to do with

10       encampments.

11  Q.   Does Chief O'Hara approach encampment

12       sweeps differently than Chief Arradondo

13       did?

14             MS. ENSLIN:  Objection.  Foundation,

15       calls for speculation.

16  A.   Yes, to my understanding.

17  BY MS. STILLMAN:

18  Q.   Why is that your understanding?

19  A.   Because, again, we had a few -- he came in

20       I think November, and we only had a

21       limited number of encampment-related

22       closures.  So Rondo had far more than

23       that, and a lot more experience.

24             He and I had talked philosophically

25       about how we view people that are homeless

Page 186

```
 1          citizens, and sort of the, you know, sort
 2          of shared obligation that we have to help
 3          our citizens that are struggling.  I've
 4          never had those conversations with Chief
 5          O'Hara.
 6               I'm not going to speak to what he
 7          believes or doesn't believe because I
 8          don't know.  But I think he trusted that
 9          the broader enterprise strategy was -- was
10          well conceived, and doing what it was
11          supposed to do.
12   Q.  Were there shelter spaces available for
13          the residents of the Peavey Park
14          encampment when it was closed?
15               MS. ENSLIN:  Objection.  Foundation.
16               MS. MARTENSON:  Objection.  Vague.
17   A.  I don't know.
18               I know that there were discussions
19          about that as a best practice, about
20          trying to, you know, have people at least
21          make sure that they understood.  But
22          shelter is very challenging.
23               Generally in the warmer months there
24          is always shelter beds available, right?
25          Depends on the size of the encampment.
```

1    But it goes like this (indicating).  And

2    access to that is tedious.  It's

3    accessible, but most people in the

4    encampments know how to get access to it.

5         And it's -- so most of the people

6    that I experienced sleeping in

7    encampments, whatever one it was, it

8    wasn't a thing that they didn't know how

9    to get shelter beds, or there were none

10   available.  It was that they didn't want

11   them.  And I don't fault them for that,

12   you know, but that's my experience with

13   it.

14        So I can't speak to -- when Peavey

15   was demobilized, I can't speak to whether

16   or not there were specific beds available.

17   It looks like it was in July or something

18   like that.

19 BY MS. STILLMAN:

20 Q.  The Peavey Park sweep was September 24,

21      2020.

22 A.  September, yeah.  So that still would be I

23      think early enough in the season that

24      there would probably still be daily beds

25      available.

Page 188

```
 1   Q.   Why wouldn't you fault them for not
 2        wanting to go to a shelter?
 3   A.   Because shelters, except for one, suck.  I
 4        mean, they -- Avivo does it better than
 5        anybody else.  And if you have never
 6        visited Avivo Village, I would encourage
 7        you to do it.  But they just do an amazing
 8        job of that.
 9            The same cannot be said for some of
10        the other shelters, which are warehouses,
11        and I don't -- this is my personal
12        opinion, you know.
13   Q.   Yes.
14   A.   But I've talked to enough people who have
15        had their stuff stolen and things like
16        that.
17            I mean, I think that the people that
18        are running the shelters are doing it for
19        the right reason, and they're trying to
20        help people, but it's -- shelters are
21        crappy, you know.
22   Q.   Has anybody ever told you that they've
23        been assaulted at a shelter?
24   A.   Yes.
25   Q.   You said you had discussions about
```

Page 189

```
 1        checking for shelter space being a best
 2        practice; is that correct?
 3   A.   Yeah.
 4   Q.   Who did you have those discussions with?
 5   A.   I mean, it's kind of hard to recall.
 6             I think that we always -- you know,
 7        we would talk with Andrea Brennan when --
 8        during that time when she was more in
 9        charge of -- you know, certainty CPED was
10        taking the lead.  David Hewitt was part of
11        those calls, Katie Topinka.  That was back
12        during Noya's participation and things
13        like that.
14             So we talked about it.  It really
15        wasn't me informing people.  That was just
16        sort of a shared understanding.  And then
17        later on when I stepped back into it, I
18        mean, they already were -- they already
19        had that sort of as part of their -- how
20        they would -- that was all part of their
21        narrative, you know.
22   Q.   Could you explain that to me a little
23        more.  I'm not sure I understand what
24        you're saying.
25   A.   They already were sort of including this
```

Page 190

```
 1        idea about, "Hey, what do we have for
 2        shelter beds?" that were available.
 3             It really dates back to the
 4        governor's order where I think there
 5        was -- there was no displacement of people
 6        or demobilization unless there was
 7        adequate shelter space available, which
 8        many times there was.
 9             But -- so I don't -- so I think that
10        that was just sort of a common, shared
11        conversation that everybody was really
12        onboard with.
13   Q.   Did you ever talk to anybody from the MPRB
14        about checking shelter availability prior
15        to the sweep of an encampment?
16   A.   I don't recall.  I think my primary
17        concern with MPRB was on-the-ground action
18        taken by officers, and how to sort of help
19        street officers who didn't do outreach to
20        understand, "Here's sort of your tool kit
21        and how you're going to be most effective
22        in gaining the largest measure of
23        cooperation and goodwill from the people
24        that we're having this discussion with."
25   Q.   Did you put on any trainings for MPRB
```

Page 191

1        officers?

2   A.   No, I didn't.  I mean, I was at a couple

3        of the briefings, and I just spoke my

4        piece about, "Here's how I would do it,

5        here's what has worked for me."

6             And it was a short few-minute thing

7        up at the roll call, but I never did an

8        organized training.

9   Q.   Did you ever see an MPRB officer engage in

10       an action that kind of like went against

11       the advice that you had given at a roll

12       call?

13            MS. ENSLIN:  Objection.  Foundation,

14       calls for speculation, incomplete

15       hypothetical.

16  A.   Not that comes to mind.

17            It doesn't, you know, mean that I

18       didn't sort of help steer people away

19       from -- most of the things that bothered

20       me were probably not things that I

21       would -- they're lack of training

22       generally, and lack of experience, like

23       the way that they spoke to people, you

24       know.

25            I had an affection for these

```
 1        individuals, and that showed, I think.
 2        Not everybody felt that way.  And it's not
 3        that they didn't care about them.  They
 4        just -- that's a -- that's a skill that
 5        you sort of learn to express that; you
 6        know what I mean?  And so those were the
 7        types of things.
 8             If you're thinking that I witnessed,
 9        you know, some inappropriate behavior that
10        would, you know, come to the level of
11        being reportable or a policy violation, I
12        never saw anything like that.  So --
13             MS. STILLMAN:  I'm going to be
14        marking a document that's been
15        Bates-stamped MINNEAPOLIS_BERRY097169 as
16        Exhibit 393.
17             (Deposition Exhibit No. 393 was
18        introduced.)
19   BY MS. STILLMAN:
20   Q.  If you just want to take a moment to
21        review those emails.
22   A.  (Reviewing document.)
23             Okay.
24   Q.  On the bottom of that first page is an
25        email from you to Inspector -- then
```

1      Inspector Amelia Huffman dated December

2      10, 2020.  And you say that you were just

3      notified by Hennepin County that park

4      police were clearing the mall this

5      morning.

6           "I received no notification from

7           Chief Ohotto on this, but wanted

8           to let you know."

9      Do you know why you didn't receive

10     notification from Chief Ohotto that the

11     mall encampment was going to be swept?

12  A.  I think that they -- at that point, this

13     was December, I think they felt like they

14     had what they needed, and they had -- he

15     was certainly under no obligation to tell

16     me; it was his.

17          I would have preferred to be told

18     just because, you know, we were heirs

19     apparent to whatever happened there, but

20     that's not -- you know, they can do their

21     own on their property.  They don't have to

22     check with me.

23  Q.  Why did you want to let Amelia Huffman

24     know?

25  A.  Because then with people that were getting

Page 194

1            displaced, they're more likely to spread

2            to a variety of different locations.

3                   Like we talked about the Lake of the

4            Isles Dog Park.  We already had some folks

5            down there on the sidewalk issues.  I was

6            concerned about that.

7                   There were a couple of closed

8            buildings over on Girard between Lake and

9            Lagoon that had like a -- almost like a

10           veranda, and there were people that had

11           been camping in there.

12                  So I was really sort of worried about

13           people expanding out into the business

14           locations around there, and how we were

15           going to deal with that.

16                  As bad as encampments were for the

17           community, camping on the sidewalk was way

18           worse because it closes off pedestrian

19           space, and it created some significant

20           hazards.  So I was trying to help her

21           understand what was coming.

22     Q.   And was the mall encampment in the fifth

23           precinct territory?

24     A.   Yeah, it was right there between Lagoon

25           and the Greenway.  Just right next to the

Page 195

1         library on Hennepin and Lagoon.

2    Q.   The next sentence you say:

3                 "Hennepin county is going to be

4              out there to attempt to discourage

5              people from going into greenway."

6              How did you know that Hennepin County

7         was going to be at the mall sweep to

8         attempt to discourage people from going

9         into the Greenway?

10             MS. MARTENSON:   Objection to the

11        extent it mischaracterizes evidence in the

12        record.

13   A.   I don't know.   I don't know who told me.

14        Clearly somebody from Hennepin County told

15        me, whether it was David Hewitt or Don

16        Ryan or someone.   But I have no

17        recollection where that came from.

18   BY MS. STILLMAN:

19   Q.   Do you recall if any of the residents of

20        the uptown mall encampment did end up

21        going to live on the Greenway?

22   A.   Eventually I think that they did.   I know

23        Aaron Sexton ended up down there.   He was

24        one of the residents of the mall.

25             There was another gentleman named

Page 196

```
 1        Pierre, I think was his name, and he ended
 2        up down on the Greenway, but it wasn't
 3        immediate.  Somebody went down to the dog
 4        park and then down to the Greenway.
 5             So eventually they did.  I don't
 6        know.  But it wasn't that day.  I don't
 7        think that any of the displaced people
 8        that day ended up on the Greenway.
 9  Q.  And this sweep was in December.  Earlier
10        today, before lunch, I believe you said
11        that it was your individual opinion that
12        we shouldn't do closures when it's cold
13        outside.
14             Do you remember that?
15  A.  Yes.
16  Q.  Why do you think that?
17  A.  I mean, beyond what I've already responded
18        earlier in this conversation?  Or did you
19        want me to reassert or basically reanswer
20        that question?
21             We talked about why I didn't like
22        closures in cold weather.  I'm happy to
23        restate.  I just don't know if you were
24        looking for something different.
25  Q.  Yeah.  I mean, I think --
```

Page 197

1   A.   It's hard on people.  It's hard on their

2        stuff.  It's a concern obviously about

3        frostbite, as you brought up.

4             It's difficult, you know, if you're

5        trudging through snow to set up a tent in

6        places like that versus setting it up

7        before the snow falls.

8             Many of the places that would be

9        desirable are probably already occupied,

10       you know, and whether or not -- whatever

11       the relationship is there, people may be

12       reticent to get there.

13            I just worry about people that are

14       trying to reestablish a camp during the

15       winter months.

16  Q.   You mentioned that shelter spaces, there

17       is usually shelter beds available in the

18       warmer months.

19            Do shelter beds fill up in colder

20       months?

21            MS. ENSLIN:  Objection.  Foundation.

22  A.   Yes, they do.

23  BY MS. STILLMAN:

24  Q.   How do you know that?

25  A.   I mean, from doing the work for quite a

Page 198

1        while.
2              There was a period of time when I was
3        very interested in sort of what the
4        shelter -- you know, what that shelter
5        landscape looked like, and so I was
6        receiving daily emails about how many beds
7        went unused the night before.
8              And it changed.  You know, in the
9        summer months, it would be 35 beds and --
10       you know, 35 female beds and 20 male beds,
11       or whatever.  And the colder months, it
12       would be all beds occupied, or five went
13       unused, or something like that.
14  Q.  Who were you getting those emails from?
15  A.  Those came from Hennepin County.
16  Q.  Do you remember who at Hennepin County?
17  A.  I don't.  I think actually it might have
18       come from Danielle Werder.  I can't recall
19       exactly.
20  Q.  Have you ever talked to anybody at
21       Hennepin County about the fact that
22       shelter beds fill up when it gets cold
23       outside?
24  A.  Yes.
25  Q.  Who have you talked to?

1   A.   Well, I mean, David Hewitt and I have had

2        discussion about that.  It's -- everybody

3        knows it happens.

4   Q.   And so he's aware that it happens; you've

5        had a conversation with him?

6            MS. MARTENSON:  Objection.

7        Foundation, compound.

8   A.   Yeah, I can't speak to what David is aware

9        of, not aware of.  We've discussed the

10       relative lack of shelter beds during

11       certain times of the year.

12  BY MS. STILLMAN:

13  Q.   Do you remember anything he's told you

14       during those conversations?

15           MS. ENSLIN:  Objection.  Vague.

16  A.   No.  I think -- I think that the general

17       sense that I have of my conversation is

18       that everybody has sort of a clear

19       understanding -- everybody on the county

20       MPD side has sort of a clear understanding

21       of what the shelter landscape looks like,

22       as opposed to many of our sort of

23       community-based outreach or activist

24       parties or partners who would have a

25       different perspective, you know, about it.

1          But everybody that I dealt with with

2      the City or the County kind of understood,

3      knew what the exact numbers were.

4  BY MS. STILLMAN:

5  Q.  And why do you think that differs from the

6      community activists' perspective?

7  A.  Because I think that they -- to me it

8      feels like a propaganda mission, that

9      there is -- there is sort of another

10     talking point.  Like, "I lost all my

11     medication," "I lost all my personal

12     property," "Police came in the middle of

13     the night and dragged me out of the tent

14     and threw me out and threw away all my

15     stuff," and things that I don't --

16     patently don't believe, you know, like

17     that one.

18          There is no -- there is no reason why

19     cops -- they didn't even want to go and

20     deal with people that were in encampments,

21     and so it's -- to me, it feels like

22     another narrative that is not based in

23     fact.

24          There may be elements of it or

25     kernels of it that are true, but largely

```
 1        what we hear from even people that are
 2        homeless -- and, you know, God bless them,
 3        but they tend to, like many of us would
 4        under certain circumstances -- would say
 5        things that would make their situation
 6        seem either more dire, or strengthen their
 7        position.  Depends on what it was that
 8        they were saying.
 9             So a big part of what we had to do
10        was sort of tease through what was
11        accurate and what was not accurate and
12        what was said for the benefit of what
13        media forum might pick up the story or the
14        sound bite that might show up on Twitter
15        or something like that.
16   Q.   Okay.  So I'm still just -- I don't really
17        understand what you're saying that the
18        activists were saying about shelters.
19             Like were they saying that they were
20        full?  Were they saying -- what were they
21        saying?
22   A.   I have no specific examples to give you,
23        but I will tell you that the narrative
24        that was coming out of the activist
25        community was largely completely
```

Page 202

1     inaccurate, and was not consistent

2     with even what the people in the

3     encampments would say.

4          And so that's my position on it.  You

5     can probably find examples both ways,

6     where something that they said was

7     accurate, but my experience has been,

8     having been on the receiving end of,

9     "Lieutenant Snyder" or "Sergeant Snyder

10    was in this camp and did this, this, this

11    and this," and I did none of those things.

12    You know what I mean?

13         So -- the same day that they put my

14    picture of my house on social media and

15    painted "Grant Snyder is a fascist" on

16    some sign down in the third precinct.

17         So I don't have an appreciation for

18    the integrity or honesty of a lot of

19    people that are in our activist community

20    because my experience has been that they

21    do not represent the truth when it comes

22    to the experiences.  And I only say that,

23    and I don't say that lightly.

24         You have to remember all the time

25    that I spent with the people out there.

Page 203

```
 1       I'm the first one that if I saw something
 2       that was fucked up, I would call it out.
 3       I would say, "These people are telling the
 4       truth."
 5           If I found out that a cop dragged
 6       somebody out in the middle of the night,
 7       they would wear my boot in their ass
 8       because I just wouldn't allow that kind of
 9       crap, and I would go right to the chief
10       for that.  And I have had complaints
11       against cops that I didn't feel -- nothing
12       that serious, but that I didn't feel were
13       being done correctly.
14           And, you know, like the whole thing
15       about when I first started doing this,
16       there were practices of patrol officers
17       going in the middle of the night telling
18       people to leave, and I put a stop to that
19       immediately, you know.  So...
20  Q.  Have you ever called Adult Shelter
21       Connect?
22  A.  Yes, I have.
23  Q.  Have you ever been told that there weren't
24       available beds for a single man?
25  A.  Well, no, because I was typically calling
```

Page 204

1          for people.  And they would say, you know,

2          "This is how many we've got available, but

3          they need to come down here and they need

4          to do this" or "they need to do that."

5               It's not a very efficient system, and

6          I understand that.  I don't love it.  I

7          also don't feel like I have to defend it

8          because it's not my system.  And it's what

9          we have to work with, but there's got to

10         be a better way to do it, you know.

11              I would typically -- if I needed

12         somebody to go someplace, I would make a

13         phone call to Avivo Village, or I would

14         make a phone call to St. Stephen's, or I

15         would make a phone call to somebody

16         directly and say, "Hey, I got somebody out

17         here who really needs to get in."

18              So...

19    Q.   Why would you call Avivo or St. Stephen's?

20    A.   Because I had a relationship with people.

21         And if we, you know, had somebody that

22         really needed to get in someplace or

23         whatever, that's one less person that's

24         going to be sleeping on the street.

25              That's especially true during bad

1          weather when we knew it was going to be

2          super cold.

3                  MS. STILLMAN:  I'm going to a

4          document that's previously been marked as

5          Exhibit 187.

6                  (Deposition Exhibit No. 187 was

7          previously marked.)

8     BY MS. STILLMAN:

9     Q.   Do you remember an encampment on the

10         Nicollet Avenue Bridge deck in September

11         of 2020?

12    A.   I do.

13    Q.   In Katie Topinka's email to Mark Ruff and

14         Andrea Brennan at the bottom of the first

15         page, she writes:

16              "They would like to clear the

17              encampment.  I have run this by

18              our internal city staff working

19              group (Grant Snyder - MPD, Noya

20              Woodrich - Health and Bryan

21              Dodds - Public Works) and everyone

22              is comfortable with Hennepin

23              County's plan as outlined below.

24              I will communicate that back to

25              Don Ryan."

1          What information were you given by
2      Hennepin County about their plan to keep
3      clear the Nicollet Avenue Bridge
4      encampment?
5  A.   The only information I recall right now is
6      just about the safety concerns on the
7      bridge, that they wanted to clear it.  I
8      was surprised when they were going to
9      clear it because I didn't think it was
10     that big of a deal, but they were -- they
11     had safety concerns about the bridge, and
12     that's all that I knew about.
13          MS. STILLMAN:  You can put that away.
14          I'm going to go to an exhibit that's
15     been previously been marked as 188.
16          (Deposition Exhibit No. 188 was
17     previously marked.)
18  BY MS. STILLMAN:
19  Q.   So on that last page there is an email
20     from Don Ryan to Joseph Gladke and Jessica
21     Galatz.  He writes:
22          HC Sheriffs are saying as (sic)
23          15 minutes ago that they want this
24          bridge cleared today and its
25          coming from high above - know

Page 207

```
 1              anything about this?  They called
 2              Grant asking for his assistance.
 3              We have not even noticed the camp.
 4              Can either of you LMK?"
 5              And then he leaves a phone number.
 6              Do you remember being called by the
 7         Hennepin County Sheriff's Office asking
 8         for assistance clearing the Nicollet
 9         Avenue Bridge encampment?
10   A.   I do.  I don't recall who called me, but I
11         remember being called.
12   Q.   Do you remember if you cleared the
13         encampment that day?
14   A.   I don't.  And I don't think I had anything
15         to do with it because I think that my --
16         that was -- my call to Don Ryan which
17         preempted this email was, "Hey, we haven't
18         even noticed this camp yet.  What's going
19         on?"
20              And it was an issue of
21         miscommunication; that Hennepin County
22         Sheriff's Office had the correct
23         intention, they just -- this is again what
24         happens when you don't have somebody who
25         is used to doing that work.  They -- it
```

Page 208

```
 1          was they thought that that had already
 2          been taken care of.
 3               So it was -- but I'm -- I don't
 4          recall whether they actually went through
 5          with it.  My recollection is that they
 6          waved off, but --
 7   Q.  Was there a deputy at the Hennepin County
 8          Sheriff's Office that you normally spoke
 9          with?
10   A.  I really didn't, because we didn't really
11          have a lot of communication with Hennepin
12          County.  They weren't really very involved
13          in this except in rare situations.
14               And most of the time, they -- you
15          know, even though I had a number of
16          conversations with Sheriff Hutchinson
17          about it, they did their own thing, you
18          know.  And not that they did it
19          incorrectly; they just didn't -- it was
20          different than Ohotto, who would
21          communicate with me because he wanted that
22          connection.
23               I think that they had their own plan
24          and that they didn't have to deal with the
25          volume like the parks did, and their
```

1          encampments were lower level.  And they

2          just seemed to be comfortable with how

3          they did it.

4               And I can't speak to that because I

5          don't know what their procedure was.  I

6          just know about this one.

7     Q.   You said you spoke with former Sheriff

8          Hutchinson.  Did you speak to former

9          Sheriff Hutchinson ever about homeless

10         encampments?

11    A.   Yes.

12    Q.   What did you talk to him about?

13    A.   I mean, he and I were friends, so he

14         would check in with me about my thoughts

15         about this or that or whatever.  I don't

16         remember specific conversations; I just

17         know that we discussed it.

18               When I was in D.C. with him at some

19         event during all of this, I was still

20         doing the work, so we had conversations

21         about that.

22    Q.   Did you have conversations about best

23         practices?

24    A.   I don't remember a specific conversation

25         about that.

Page 210

```
 1          I think -- I think more of the
 2      discussion was about, you know, sort of
 3      our role, law enforcement's role in
 4      encampments.  And my job as an MPD officer
 5      was very unique among agencies because I
 6      was dedicated to the homeless.  That's
 7      what I did.  That was my role.  And other
 8      departments, except for the HAT team with
 9      transit, really didn't have that, you
10      know.  And so there was -- nor did they
11      seem like they wanted to.  And so those
12      were conversations we had.
13  Q.  What in your view is law enforcement's
14      role with regard to encampments?
15  A.  That's a really long answer, and I'm -- so
16      cut me off when you don't want to hear any
17      more.
18          But law enforcement will always be
19      involved with people that are camping and
20      people that are outside, either from sort
21      of the role of trying to find out, "Are
22      you -- do you need some services?" out of
23      genuine concern for their safety, which
24      should always be an issue; their mental
25      health, are there things that other
```

Page 211

1     partners -- because MPD doesn't provide
2     shelter, we don't provide chemical
3     dependency counseling, we don't provide
4     mental health care -- you know, are
5     there -- but other people that we work
6     with do, right?
7         And so there is that dimension to our
8     interaction.  Then there is the dimension
9     to we will have interaction with the
10    homeless because part of -- one of the
11    comorbidities that goes along with
12    homelessness is chemical dependency
13    issues, as we talked about, and
14    unfortunately some crime-related stuff
15    that we're going to have interactions
16    with.
17        My concern is this is such a unique
18    population, because of all the things
19    going on, that it requires a nuanced
20    approach to how we deal with that.
21        Some crimes are so significant that
22    we have no choice but to make arrests.
23    But like I already told you, I would walk
24    into tents throughout the city and people
25    would be shooting heroin, and when I first

1       started interacting with them, they would

2       try and hide it.  But then they realized,

3       "Well, Sarge isn't going to arrest us,"

4       and -- because it wouldn't have helped

5       anything, right?  You know, I need to make

6       sure that there was Narcan available,

7       because this is when fentanyl was kicking

8       off, and, you know, some of the ODs that

9       happened, and stuff like that.

10         So law enforcement's role is, I

11       believe, this sort of guardian to the

12       people that are most vulnerable, and we

13       always should be like that.  Sometimes

14       that guardian means doing things -- taking

15       that guardian role means doing things that

16       they might not necessarily think is great,

17       and that means sometimes displacing it

18       (sic).

19         There are camps -- there were people

20       that I had to move because they were in a

21       snow wake zone, when a plow hitting a big

22       bank of newly fallen snow at 50 miles per

23       hour and throwing, you know, a couple tons

24       of snow on top of their tent would have

25       killed people, right?  So that's a

1          concern.

2              Obviously there were huge concerns

3          around the safety of encampments, right?

4          And we had massive worry about the safety

5          of people, women, kids, different things

6          like that.

7              So there is that.  That process of

8          displacing people wasn't done because we

9          don't like the way that homelessness

10         looks.  Okay?  It's not that, you know,

11         we're trying to put our thumb on people

12         who are already struggling.  It's that,

13         unfortunately, encampments delay people

14         from getting the help that they need in

15         many cases.

16             That's not just me saying that; it's

17         many of the people that have worked for

18         much longer than I had with folks that are

19         in homeless encampments:  John Tribbitt,

20         Emily Bastion, David Hewitt, Mike Goze of

21         the AICDC, Autumn Dilly, Jenny Borgo.

22             You know, I can go and on and on and

23         on of people we all -- none of whom were

24         police officers, but all of us sort of

25         shared this same idea, that people

1   sleeping outside is not a good thing,

2   unless you're camping at a campground and

3   there is a start to it and an end to it.

4        I mean, these were not utopian places

5   for people.  So law enforcement will

6   always be involved in that.

7        So when you have a social worker,

8   like we've tried now with our homeless

9   navigator people, they're ineffective.

10  They walk into a camp and go, "Well, we

11  have to close this encampment next

12  Tuesday, and you're going to have to go."

13  And they just, "Okay," and they don't go

14  anywhere.

15       So really the only people that, if

16  you have to close an encampment, they

17  listen to are the police.  So we are

18  always going to have an involvement.

19       Law enforcement should be doing

20  things to build a relationship with people

21  so when that day comes, number one, you

22  know the people.  If you've talked to

23  somebody and brought them water and food

24  and socks for the last two months, and you

25  know what their struggle is, you can go to

1         that person and legitimately say, "Hey,
2         you know, we need to close this camp.  Can
3         you move someplace else?  Maybe now is the
4         time to, you know, follow up on that
5         housing referral," or something like that,
6         "or get you into shelter."
7              That's a much more comfortable and
8         respectful conversation than the first
9         time you've ever met that person, showing
10        up and going, "Hey, you don't know me, but
11        I'm Officer So-and-So; you need to leave."
12             So I think that that outreach role is
13        missed.  Even in its current staffing,
14        Troy's job really is not that.
15             My job, I could have done my job
16        without a gun or without any kind of
17        police mark -- well, I take that back.
18        Police markings were important because
19        they knew who I was.  But I never really
20        felt like I needed -- I mean, I never had
21        to arrest anybody when I was out there
22        doing that work.
23             And I think that that relationship
24        building stuff is missed, and law
25        enforcement has a unique role in that

```
 1      space.
 2            Now, that's not a popular position,
 3      and the City Council was very quick to
 4      eliminate -- after I got promoted, they
 5      didn't want -- they didn't want to kick me
 6      out because they all knew me, but they
 7      didn't want law enforcement in there.  And
 8      so we've lost something in not doing that.
 9            So I think law enforcement has a
10      whole bunch of different things that we
11      should be doing, the least of which is
12      enforcement, if at all.
13            Sorry for the soap-boxie thing.
14  Q.  I appreciate your answer.
15            MS. ENSLIN:  We've been going for
16      about an hour.  So whenever you're at a
17      good breaking point, we'd like to take
18      like a five-minute break.
19            MS. STILLMAN:  We can take a
20      five-minute break now.
21            (Break taken.)
22            MS. STILLMAN:  I am going to be
23      marking a document that's been
24      Bates-stamped HC00014972 as Exhibit 394.
25            (Deposition Exhibit No. 394 was
```

Page 217

1           introduced.)

2                    THE WITNESS:  Thank you.

3                    MS. STILLMAN:  And a document that's

4           been Bates-stamped HC00014973 as Exhibit

5           395.

6                    (Deposition Exhibit No. 395 was

7           introduced.)

8    BY MS. STILLMAN:

9    Q.   And I apologize, Commander Snyder.  It

10          looks like they did not print that

11          single-sided for me, so Exhibit 395 is a

12          double-sided page.

13                   Wait.  No, they did.  Here's the

14          single-sided one for you.  I can trade.

15   A.   Thank you.

16   Q.   Then if you just want to let me know when

17          you've reviewed that document.

18   A.   (Reviewing document.)

19   Q.   So Exhibit 394 is an email to you from

20          Felicia Chesmer --

21   A.   No.  From me to.

22   Q.   From you to Felicia --

23   A.   Yep.

24   Q.   -- dated November 17th, 2020.

25                   Who is Felicia Chesmer?

```
 1   A.   I think she's a Hennepin County deputy
 2        maybe.  I don't really know.
 3   Q.   Why were you sending her an encampment
 4        demobilization strategy?
 5   A.   I have no idea, other than I can assess
 6        that they probably requested one.  I
 7        didn't just send this stuff out without
 8        people wanting it, you know.
 9             So I'm assuming that someone in
10        Hennepin County asked me to forward this
11        to Felicia, whether it's Felicia or
12        Sheriff Hutchinson or whoever.
13   Q.   And you sent this encampment
14        demobilization strategy approximately one
15        month before the December 18, 2020
16        Greenway sweep, correct?
17   A.   I don't remember the date.  You just said
18        it.  I'm assuming you're correct in that.
19        And I can read that this is sent on the
20        17th of November, so --
21   Q.   When did you learn that Hennepin County
22        was going to be sweeping the Greenway?
23   A.   I don't have that.  I don't know.
24   Q.   Did you ever discuss encampment
25        demobilization strategies with Hennepin
```

Page 219

1          County employees?

2     A.   I did.

3     Q.   Which employees?

4     A.   Well, I mean -- okay.

5               So I've had several conversations

6          with, as I already mentioned, David

7          Hewitt, Danielle Werder, Don Ryan, people

8          that worked with Hennepin County.

9               I had conversations with people at

10         the sheriff's office.  I -- most -- one

11         that I recall most clearly is

12         conversations with Sheriff Hutchinson,

13         like we've already discussed a little bit.

14              And then, in general, I've had

15         conversations with Hennepin County Child

16         Protection about when there were kids in

17         encampments, and that sort of thing.

18              And the content of that conversation

19         varied depending upon who I was speaking

20         with.  You know, some of -- like the ones

21         with Sheriff Hutchinson would have been

22         more of the nature of who -- I'm sorry --

23         the logistics of dealing with encampments,

24         and maybe some of the best practices.

25              My conversations with sort of more of

Page 220

1              the steering group or the working group,
2              Danielle and David and Don Ryan, would
3              have been about sort of the conditions of
4              encampments in general, and, you know,
5              what we think about that.
6                   You know, we were -- we were
7              navigating at those -- back at those times
8              we were navigating, trying to sort of
9              figure out ourselves what to do about
10             encampments, what we thought about it.  We
11             were dealing with the governor's order
12             that basically prohibited, except under
13             certain circumstances, closures, and yet
14             we were faced with this -- this sort of
15             shocking reality about encampments
16             themselves, and what they were, and the
17             nature of --
18                   You know, I would go into
19             encampments -- again, I've expressed this
20             before, go into encampments where a single
21             tent, there were hundreds and hundreds of
22             needles, there was feces, there was --
23             everything was destroyed.
24                   These were not utopian environments
25             for people.  And I related that

Page 221

1       information because I was more closely
2       involved to those encampments than many of
3       the people that I was speaking with, you
4       know.
5            And there was -- in the early stages
6       of our approach, there was questions
7       about, "What is it like in the
8       encampments?"
9            Everybody knew that encampments were
10      unfit for people to live in for a whole
11      variety of different reasons.  There were
12      concerns about MRSA and Hep C and A and B
13      and all the other things that were going
14      on.
15           And the criminal activity.  I mean, I
16      was approached regularly by people in
17      encampments saying, "This camp needs to be
18      closed because so-and-so has moved into
19      that tent down the way and he's exploiting
20      or making us pay $35 a day if we want to
21      stay here," and things like that.
22           So a lot of the conversations we had
23      in these early days of this back in 2018,
24      2019, 2020 was sort of dealing with all
25      the stuff we were hearing, and trying to

Page 222

```
 1          cast an accurate light about the horrible
 2          nature of encampment living.
 3   Q.  So you talked a lot about the horrible
 4          nature of encampment living.  In these
 5          conversations, did you also talk about the
 6          rights of homeless individuals?
 7   A.  We talked about the rights of people all
 8          the time.
 9   Q.  What did you -- what do you think are some
10          of the rights that homeless people have?
11              MS. ENSLIN:  Objection.  Calls for a
12          legal conclusion.
13   A.  Yeah, I don't -- I mean, my personal view
14          and my view as a police officer, what I've
15          sort of guided -- I mean, I believe that
16          regardless of whether or not a person is
17          homeless or sleeps in a house or is
18          renting an apartment, they all are
19          entitled to the same constitutional
20          rights.
21              And to the extent that we treated
22          their tent as their home -- and, for
23          example, if I was investigating a crime --
24          and I told this to several people -- you
25          have to get a search warrant for that.
```

Page 223

1          That's a Fourth Amendment protection,
2     right to be protected against unreasonable
3     search and seizures.
4          Now, that's a difference when you're
5     on somebody else's private property and
6     you're occupying that.  You have no
7     expectation of privacy when you put up a
8     tent on someone else's property.  That's a
9     different story.
10         But I -- generally speaking, I mean,
11    the rights of people in encampments are
12    the same rights that I would expect
13    against unreasonable search and seizures,
14    the right to be safe, which most of the
15    people in the encampments were not
16    experiencing.
17         These weren't communities in that
18    sense.  These people -- these were places
19    where people had to go because other
20    preferred alternatives weren't presenting
21    themselves.
22         That doesn't mean there weren't other
23    alternatives, but, you know, this wasn't a
24    choice that they were making out of a
25    whole range of great opportunities, you

Page 224

```
 1        know.  And so I think that their rights --
 2        they had the right to be treated with
 3        dignity.  They had the right to be treated
 4        compassionately.  I can go on and on.
 5  Q.  Did the people you spoke with at the
 6        County agree with you on that?
 7  A.  Everybody agreed that encampments were not
 8        utopian environments where people -- we
 9        didn't want anybody having to live in
10        encampments.  They were terrible.  And the
11        environment was horrible.  The reality of
12        encampment living was horrible.
13             So we all agreed on that.  Everybody
14        agreed on the rights of people about being
15        protected against unreasonable search and
16        seizure, about the rights of, to the
17        extent that we could, protecting their
18        property, and protecting their dignity,
19        and things like that.
20             The problem is, is that there are
21        some bad things about homelessness, that
22        you can't possibly mitigate all of them.
23        And there are things we can't make more
24        appealing, right?
25             Like people may not want to go to a
```

Page 225

```
 1         shelter, but that doesn't mean that
 2         shelter is not better than what they're
 3         doing at that point.
 4              And so, you know, there was a whole
 5         bunch of conversation around that, and
 6         about -- and we all sort of came to the
 7         same conclusion that the shelter system
 8         isn't perfect, access to it isn't perfect,
 9         the environments aren't perfect, but it's
10         better than having people sleep outside.
11    Q.   Do you believe you're in a better position
12         than the person residing in a homeless
13         encampment to determine if a shelter is a
14         better option for them?
15    A.   In some cases I do.
16    Q.   In every case?
17    A.   I wouldn't say in every case because I
18         don't know.  Every case hasn't been
19         presented to me.
20              But if a person says to me, "I'd
21         rather sleep out here than be in a
22         shelter," I don't disagree with that.  I
23         don't disagree that that's their
24         preference.
25              But when I put together all of the
```

1       pieces of that equation, and all of the

2       horrible things that happen to people in

3       encampments -- and, yes, you might get

4       your shoes stolen in a shelter.  There is

5       a possibility that you could be assaulted.

6       But those things happen with such

7       regularity at encampments that -- at least

8       in the shelter there was protections

9       against that, and the amount of violence

10      and the amount of drug use.

11          I mean, there was a thousand reasons

12      why people didn't want to go to shelter,

13      and, frankly, the majority of them had

14      nothing to do with, "I don't want to sleep

15      with a bunch of other people in the same

16      room."  There were things like, you know,

17      they have rules there; that, "I want to

18      come and go.  I want to be up all night.

19      I can't go there when I'm high," or, "I

20      can't use there."  I mean, there is a

21      bunch of reasons why people would make

22      that decision.

23          And so I feel comfortable as a person

24      who has been in such close proximity with

25      folks -- and I've even had them tell me

1          that, that they wouldn't choose to go to
2          shelter, but they understand why it's a
3          better place for them than sleeping
4          outside.
5                  So...
6    Q.   Do you still agree with the best practices
7          you set forth in this encampment
8          demobilization strategy that you sent to
9          Felicia in November of 2020?
10   A.   In general, I think everything on here is
11         probably a good idea.  I don't think
12         that -- what this lacks is this lacks the
13         experience that I have today.
14                And it lacks the experience of the
15         significance of violent activism and what
16         that did.  That changed everything about
17         our approach to encampments and how we
18         closed them.  And that was a reality that
19         we had to deal with.  It sucked.
20                I've had that conversation with many
21         people in the city enterprise, that we
22         wanted to get back to the point where we
23         were giving adequate notice and all those
24         things.  But, you know -- so that's one
25         piece of this.

```
 1           In general, the rest of this I think
 2      is sound.  There may be specific, you
 3      know, individual things in here, if you
 4      ask me about it, I can tell you whether or
 5      not my thinking on that has changed or
 6      evolved.
 7  Q.  Has your thinking on -- so under that
 8      second paragraph, there is a new list.
 9           Has your thinking changed on point
10      number 1?
11  A.  "People in an encampment must be
12           identified prior to
13           demobilization"?
14  Q.  Yes.
15  A.  So I'd soften that a little bit.  I think
16      it's still a best practices if we can
17      identify people that we should, so that we
18      know -- and a part of that is a nod to our
19      service providers who have contact and
20      whatnot.
21           But, you know, the reality of it
22      is -- and this comes directly from the
23      mouths of people both in the encampment
24      and the service providers -- getting
25      people into housing right out of
```

1       encampments is almost impossible.  It

2       almost never happens.  There is too many

3       barriers in the way.

4           And when they do get placed, they

5       almost never succeed.  There is a

6       trajectory that happens once they accept

7       some other placement as an interim and

8       then move into -- you know, they can

9       stabilize a little bit and then move into

10      housing.

11          So I think that I would soften the

12      way that I say that rather than "must."  I

13      still think that knowing people, and

14      knowing who they are, even for the benefit

15      of a relationship, is always a best

16      practice.  But I wouldn't say that you

17      would delay closure of a problematic

18      encampment simply because we weren't able

19      to do that.

20          I mean, what do you do if somebody

21      won't identify themselves?  We're not

22      going to force that.  And, you know,

23      social workers and some of the service

24      providers are very reticent to share that

25      information.

Page 230

1   Q.   Would you make any changes to number 2?

2   A.   No.   I think that's a fair statement.

3                 "Steps should be taken in the

4             planning and execution of a

5             demobilization to protect

6             individual property."

7             Again, if possible.

8             I think that all of these are good

9        general guidelines and practices, but

10       they're not always possible.

11  Q.   What about 3?

12  A.   "Alternate (sic) solutions for occupying

13            an encampment should be given if

14            possible, and then as early as

15            possible.   Most people --"

16            (Court reporter interruption.)

17            THE WITNESS:   I apologize.   I can

18       just read quietly and then you don't have

19       to worry about that.

20  A.   Yeah, I think I would change that one.   I

21       think that still, if we can, offering

22       whatever available shelter.   And in

23       general, you know, shelter is pretty much

24       available.

25            But I don't think that today I would

1       be as amenable to saying, "Oh well, let's

2       put your tent over here if you don't want

3       to go into shelter."  I think that the

4       drive really has to be to really get

5       people off the street.  That's when they

6       start to stabilize.  That's when they

7       start to get better and stuff like that.

8            So I think I would soften on that

9       one.

10  BY MS. STILLMAN:

11  Q.  What about number 4?

12  A.  Advance notice should always be given.  I

13      mean, again, I believe that to be a true

14      statement.  I believe we should always

15      give advance notice.

16           The problem is that when I have city

17      staff being attacked and -- when we show

18      up to demobilize an encampment that's been

19      noticed for a week, and we're dealing with

20      people throwing ice balls or frozen water

21      bottles and bricks, that changes how they

22      would -- I would go about that.  And that

23      would be a circumstance where we probably

24      wouldn't want to give advance notice.

25           It doesn't sit well with me.  I

Page 232

1          simply know of no other good way to deal
2          with that, because the people in the
3          encampment are paying for the actions of
4          other people.
5     Q.   What about number 5?
6     A.   Yeah, I believe -- I think that's a good
7          idea.
8     Q.   6?
9     A.   Yep, I think that's good.
10    Q.   7?
11    A.   Except in rare circumstances, yes.
12    Q.   What about 8?
13    A.   Yeah, I agree with it.  I don't know that
14         it's always possible, but if we can, we
15         want to try and identify people's
16         property.  It's -- sometimes it's
17         impossible to do.
18    Q.   Why is it sometimes impossible to do?
19    A.   Well, because if nobody knows where they
20         are or who was there, or if you're -- you
21         know, if somebody is clearing an area
22         where there is a tent and it's off to a
23         distance and they don't know who is
24         staying in it, I mean --
25    Q.   What about point number 9?

Page 233

1   A.   Yes, except in rare situations.

2   Q.   And what are the rare situations that you

3        think would be the exception to number 9

4        generally?

5   A.   Well, if we have people that -- I mean,

6        generally I would love to allow everybody

7        to be able to come in and help.  And like

8        what happened at the Wall, that worked

9        really, really well.  At 14th that worked

10       well.

11            But then after Powderhorn East, where

12       people started, you know, "We're going to

13       make our last stand here," it became

14       problematic to bring other people that

15       weren't part of the encampment into the

16       encampment.

17            But I would -- you know, there are

18       still people that need help and -- you

19       know, getting their stuff packed up and

20       getting them out of there.  If we can get

21       collaboration with people that that's what

22       they're doing, it helped move things

23       along, and it helped people get the

24       support they needed.

25   Q.   And then what about 10?

Page 234

1   A.   Yeah, I think that's a perfect strategy,
2        if you can get people that are part of our
3        service provider team to actually do it.
4   Q.   You can put that away.
5            So earlier -- well, I guess I just
6        want to clarify something really quickly.
7            So this morning we went through
8        document 156, which was the chronology of
9        encampment sweeps.
10           Do you remember that document?
11  A.   I do.  It's right here.
12  Q.   And we went through the list, and when we
13       got to the Greenway on December 18, 2020,
14       you made a comment about how you told
15       people to leave the Greenway on multiple
16       occasions.
17  A.   I don't know if it was around that date,
18       though.  I mean, I routinely told people,
19       "You may want to move off the Greenway
20       because I'm hearing that they're going to
21       come through."
22           They had -- we were in close
23       communication with Aaron -- I can't
24       remember what his name was, but he worked
25       for Tree Trust, and they were the ones

```
 1        that were responsible for trimming all the
 2        trees and cleaning the Greenway and
 3        everything like that.
 4             But he would routinely say, "We're
 5        doing this," or, "We're doing that,"
 6        "We're going to come through and people
 7        are going to have to leave."  So I would
 8        try and give people a heads-up.
 9             That wasn't -- that wasn't me saying,
10        "I'm making you leave."  That was me
11        offering information that I thought would
12        help make it less likely that they would
13        lose their stuff, like if Hennepin County,
14        or somebody, or Tree Trust came through
15        and found a tent that was unoccupied and
16        cleaned the stuff out, you know.
17             I mean, they posted it, too, but I
18        tried to do my part to try to make sure
19        people understood that was a reality.
20   Q.   When did you start doing that?
21   A.   When did I start doing what?
22   Q.   Going along the Greenway and trying to --
23   A.   The first day that I started -- on April
24        1st of 2018, I started -- the Greenway was
25        always a popular area for camping.  And I
```

Page 236

```
 1          provided a lot of outreach down there, and
 2          support, and tried to monitor where people
 3          were, and if they moved, where they went.
 4    Q.   Do you know if people still stay on the
 5          Greenway?
 6    A.   I haven't been down there in a long time,
 7          so I don't know.  I suspect they do.
 8    Q.   Were you -- and, again, just because I
 9          don't think we confirmed this earlier,
10          were you at the closure of the Greenway on
11          December 18 of 2020?
12    A.   I don't think so.  I don't recall that.
13          It's possible, but I don't recall it.
14    Q.   Do you recall talking to anybody from
15          Hennepin County about that encampment
16          closure?
17    A.   No, but that doesn't mean I didn't.  Just
18          means I don't recall.
19    Q.   Absolutely.
20               Could you go back to Exhibit 393 for
21          a second.
22    A.   Can you kind of tell me what it is?
23    Q.   Yeah.  It's an email from the -- heading
24          is an email from you to Amelia Huffman,
25          "Subject Uptown mall," dated December 10,
```

Page 237

```
 1        2020.
 2    A.   Okay.
 3    Q.   And just let me know when you've got it.
 4    A.   I've got it.
 5    Q.   Okay.  And in that top paragraph, you
 6         write, starting in the second sentence:
 7              "To be honest I dont know how
 8            much impact indoor village is
 9            going to have for those sleeping
10            outside in Minneapolis.  Those
11            hundred beds are going to go
12            pretty fast.  Currently Avivo has
13            about 60 to 80 people in their
14            hotels and their intention has
15            always been to offer those
16            placements to the hotel people
17            first because the hotels will be
18            closing when indoor village opens
19            up on December 20.  So despite how
20            this has been marketed for funding
21            it's really not adding additional
22            shelter."
23            Do you see that?
24    A.   I do.
25    Q.   What were the Avivo hotels?
```

Page 238

1   A.   So Avivo set up -- I know of one hotel.

2        It was up in Coon Rapids.  And I want to

3        say they had like 60, maybe a few more,

4        people that were up there, and it was

5        during that period of time.

6             I don't know if Avivo had a secondary

7        hotel.  They may have.  But I know of the

8        one in Coon Rapids.

9             Likewise St. Stephen's had one down

10       in Bloomington where they were doing --

11       and the reason why they did that was

12       because, if you remember, during COVID

13       they thinned out shelter space, right?

14       They went to like half capacity.

15            So people ended up going to -- there

16       is hotel -- I think the Millenium was

17       opened during that period of time, run by

18       Hennepin County, maybe, and Avivo Hotel up

19       in Coon Rapids, and there was one in

20       Brooklyn Park.  I can't remember who ran

21       that one.  That was MIWRC.

22            And then the Bloomington site --

23       there was actually two.  They were run by

24       St. Stephen's.

25            So that's -- that was the purpose

Page 239

1       behind that.  It was in response to COVID,

2       and what are we going to do about people,

3       you know, and providing additional spaces

4       for people that couldn't be in shelter

5       because they had less capacity.  And

6       that's what that was about.

7           The nature of the email was then

8       Inspector Huffman trying to understand how

9       this was going to impact, you know,

10      because they heard, oh, a hundred new

11      shelter beds, right?  And that's true, but

12      they were filling -- they were also

13      filling a gap.

14          So I wasn't being pessimistic as much

15      as I was trying to manage expectations at

16      that point.

17          Now, the reality and what you don't

18      see in this email is that since then,

19      Avivo has had a massive impact because

20      they're so effective at getting people

21      from shelter into housing.  But that's

22      their -- that exactly proves the point

23      about it's so difficult to get people to

24      go from encampment with no stabilization,

25      no supportive services, and be effective

Page 240

```
 1        or be successful in housing.
 2            And Avivo does it very, very well.
 3        They've turned over their population
 4        several times just because of how quickly
 5        they get them placed and how effective
 6        they are in getting them to be successful
 7        in housing.  So...
 8   Q.   Do you know if Avivo had criteria for who
 9        was eligible to stay in their hotel?
10   A.   I don't know that.  I know they probably
11        had some way of doing it.  I think Emily
12        and I talked about it at some point, but I
13        don't remember what she said.
14   Q.   Do you know if St. Stephen's had
15        eligibility requirements for --
16   A.   I think their priority was to the people
17        that came out of their shelters, so --
18        because they had to thin them.
19   Q.   And what about the MIWRC shelter?
20   A.   I think that was -- that was --
21   Q.   Or hotel.  I'm sorry.
22   A.   Yeah, I think that was people from the
23        street.  I don't recall because I really
24        didn't have a whole lot to do with them.
25        But I know MIWRC, and I know all the
```

Page 241

```
 1        people that were involved in it, so...
 2   Q.   All right.  Thank you.  You can put that
 3        document away, again.
 4             So I want to ask a few questions
 5        about the 2313-13th Avenue South
 6        encampment that was closed in September of
 7        2020.
 8   A.   Yes.
 9   Q.   Do you remember what date that encampment
10        was closed?
11   A.   Do I remember what date?
12   Q.   Yes.
13   A.   I thought -- oh, it just says September
14        2020.
15             No, I don't know which date.
16   Q.   Were you involved in the decision to close
17        that encampment?
18   A.   I was.
19   Q.   Who else was involved in that decision?
20   A.   I don't recall.
21   Q.   Do you remember why?
22   A.   Oh, I do know.  I apologize.
23             Andrea Brennan, because it was a CPED
24        property; it was a lot.  So it would have
25        been Andrea Brennan.  I don't -- I mean,
```

Page 242

1          she was the one that was probably most
2          directly involved with the decision to
3          close it.
4               There were other people that were a
5          part of that discussion, you know, like
6          Dave from solid waste, Dave Herberholz,
7          and some other people, and Noya Woodrich
8          from Health.
9     Q.   In the week prior to that encampment
10         closure, did the City notify the
11         encampment residents that the encampment
12         would be closed?
13    A.   I don't remember how much notification
14         they got, but they did get notification.
15    Q.   Do you know if it was in writing?
16    A.   Again, I think so, but I don't recall.  I
17         believe that, yeah, we passed out flyers
18         there, and I think we also posted it on
19         the fence that was put up around there.
20    Q.   Did the notice include a specific date?
21    A.   I don't recall that.  But that's an
22         encampment that was very active.  Like
23         multiple times a day, we had a lot --
24         there was a lot of drug activity.  There
25         was a lot of intercamp fighting in that

Page 243

1        one.

2             There was -- we ended up with several

3        shots-fired calls inside the encampment,

4        and a carjacked vehicle that ended up down

5        there and stuff.

6             And so that was really a priority

7        encampment where I spent a ton of time,

8        and talked real openly with all the people

9        that were there.

10            So, you know, I gave them notice

11       myself many times.  I don't remember how

12       that date was expressed, but it was not a

13       secret that it was happening.

14   Q.  Do you recall how large the encampment was

15       when it was closed?

16   A.  I mean, that was a whole city -- square

17       city block pretty much, you know, and --

18       or part of a city block.  And so it was

19       pretty dense at the end.  I don't know.

20       It would be a guesstimate, but maybe in

21       the 30 to 40 tent range, I would guess.

22   Q.  So you say "30 to 40 tent range."  Does

23       that also include -- is that also your

24       guesstimate of how many residents there

25       were?  Because I don't know -- tent

Page 244

```
 1        doesn't always equal to number of people.
 2   A.   No.  Usually my calculation was always 1.3
 3        times, you know, because that accommodates
 4        for some tents have two people in them.
 5        Many tents had one.  Some had none because
 6        they were storage tents and things like
 7        that.  So 1.3 seemed about right.
 8             So if you had 30 tents, it was
 9        probably more like 40 residents.  But then
10        look at -- look at Hiawatha, right?  217
11        tents, and there was -- there was
12        two-thirds of that in the encampment
13        because there were so many storage tents
14        there.
15   Q.   Do you remember how long that encampment
16        was active?
17   A.   No, I don't.
18   Q.   Do you think it was more than a month?
19   A.   Oh, yeah.
20   Q.   More than two months?
21   A.   I think so.  I think that encampment
22        started -- I'm trying to remember.
23             Oh, you know what, that encampment
24        started -- so there were basically two
25        times that the Wall was closed, right?
```

Page 245

1    Q.   Yes.

2    A.   And that started after the second closure

3         of the Wall.  And people went to 25th and

4         Bloomington, and then they sort of got

5         pushed out of there by the owner of that

6         store.  And then they came -- because they

7         were all the way down the block.  Then

8         they came over -- many of them came over

9         to that encampment, to the one on 13th.

10             That's my recollection.

11   Q.   The second closure of the Wall, you're

12        talking about in 2020, correct, when you

13        say that?

14   A.   Yeah, and it was nothing like the first.

15        But you remember that they went back in,

16        and -- KG started that one, cut the fence

17        and stuff like that.

18   Q.   And I don't know if this will refresh your

19        recollection at all, but I think that the

20        Wall of Forgotten Natives encampment in

21        2020 was closed in early September.

22   A.   Yep.

23   Q.   So -- and if 2313 13th Avenue South was

24        closed in September, it would be less than

25        a month?

Page 246

```
 1   A.   No.   That -- I'm sorry.   Then maybe I'm
 2        mistaken.
 3               Maybe they went from 25th and Bloom
 4        over to the Wall, and some of them
 5        filtered over there.   But there was a
 6        closure of another encampment that filled
 7        that one, and I'm trying -- I don't
 8        remember which one it is, if that's -- my
 9        timing is off, so --
10   Q.   Not a problem.   I just -- I know it was
11        two and a half years ago.
12               Do you recall what other city
13        employees were at the 2313 encampment
14        closure?
15   A.   Myself.   I think Elfric was there, but I
16        don't recall that for sure.   Somebody from
17        CPED would have been there.
18               There was -- somebody from solid
19        waste was there, or peoples.   I remember
20        Jason, I can't remember what his last name
21        is, but he was one of the solid waste
22        drivers.   I specifically remember him.
23               And then I think Denny -- what is
24        Denny's last name?   I can look it up on my
25        phone.   He's in charge of bridges.   His
```

1      crew was there because they're the ones

2      with the skid loaders and stuff like that.

3  Q.  What is "bridges"?

4  A.  The bridges department.

5  Q.  Is that a city department?

6  A.  Denny Thorson.

7          Yeah, it is.  Yeah, they're in charge

8       of all the bridges.

9  Q.  Sorry.

10 A.  That's all right.

11 Q.  Is there a bridge near that encampment?

12 A.  No, but they were -- they were the ones

13     that had all the really heavy-duty

14     equipment and stuff like that.  So they

15     were participants.

16         And, honestly, I can't tell you for

17     sure that he was there.  He may not have

18     been.  Because I remember the guy that

19     drives the skid loader for -- the one I

20     thought was Denny, the guy, he was

21     actually solid waste.  I just don't

22     remember what his name was.

23 Q.  Did the City provide assistance to

24     encampment residents to pack up their

25     belongings prior to the closure?

1   A.   I have no -- I don't recall.

2   Q.   Were residents given sufficient time to

3        pack their personal property the day of

4        the closure?

5             MS. ENSLIN:  Objection.  Calls for

6        speculation.

7   A.   Yeah.  I mean, sufficient time per what I

8        felt we had to work with at the time, I

9        would say yes.

10            I can't tell you how much that time

11       was, and that's why it's hard to answer

12       that question.  But I -- the encampment

13       closures that I was sort of in charge of,

14       I didn't allow people to be kicked out

15       within like 10 or 15 minutes, or even a

16       half hour.  You know, it was we provided

17       people hours to get their stuff together.

18  Q.   Which encampment closures were you in

19       charge of?

20  A.   Well, that was one.  The 14th was another

21       one.  Those were done prior, when we were

22       still having the people that would account

23       themselves or call themselves activists

24       were out there, but they were -- they were

25       helping the people that were in the camp

Page 249

1          versus trying to fight with city staff.
2               So they were active there, and that's
3          part of what helped facilitate both of
4          those closures going smoothly, and people
5          getting the help and assistance they
6          needed.
7     Q.   So were nonencampment residents at 2313
8          helping people pack that day?
9     A.   Yes.
10    Q.   Were storage opportunities offered to the
11         residents of 2313?
12    A.   I don't recall.
13    Q.   Do you recall what happened to the
14         personal property of residents who weren't
15         able to take all of their belongings with
16         them once the sweep commenced?
17              MS. ENSLIN:  Objection.  Calls for
18         speculation.
19    A.   I don't.  I mean, property that was --
20         that was abandoned, left behind, was
21         picked up by solid waste.
22    BY MS. STILLMAN:
23    Q.   Did you coordinate with homeless shelters
24         to ensure that the residents of 2313 would
25         have a place to go after they were evicted

Page 250

1        from the encampment?

2   A.   So the people that I did work with was

3        AICDC and MIWRC, who were both very active

4        in that camp, and those were the ones that

5        took the lead on that.  That's exactly

6        best practices in how we worked through

7        that issue.

8             That was largely a native encampment,

9        and so those shelters were the ones that

10       were most likely to be appealing to that

11       population.  So they were our partners in

12       that, and they were both on site that day.

13  Q.   "Those shelters," do you mean shelters

14       operated by AICDC and MIWRC?

15  A.   Yeah.

16  Q.   Was anybody from Hennepin County at that

17       sweep?

18            MS. MARTENSON:  Objection.

19       Foundation.

20  A.   I don't recall.

21  BY MS. STILLMAN:

22  Q.   Any outreach workers employed by a

23       nongovernment agency?

24  A.   Well, AICDC and MIWRC are both NGOs.

25  Q.   Any others?

Page 251

1    A.   I don't recall.

2    Q.   Are you aware of how much time the

3         residents of the Near North encampment

4         were given to pack the day of the sweep in

5         October of 2022?

6    A.   I mean, in some cases, it was an hour.

7              I don't know, you know.  I mean, if

8         they were actively moving their stuff,

9         they were allowed to continue doing that.

10        But I don't recall the exact amount of

11        time.

12   Q.   Did you go into the encampment that day?

13   A.   I did.

14   Q.   What time did you go into the encampment?

15   A.   It was early morning out.  I don't recall

16        what time we arrived.

17   Q.   Do you recall what time you left?

18   A.   It was -- it was late.  I mean, it was

19        into the evening hours, I believe.

20             And we knew that was going to be the

21        case because of all the large -- you know,

22        RVs and stuff like that, and all the large

23        amount of property that was in there, you

24        know.

25             That encampment was very sparsely

Page 252

```
 1          occupied, and so the people that were

 2          there, they had been given notice for

 3          months that this was coming, that this

 4          camp was being demobilized.

 5               So they were -- so, again,

 6          notification isn't just the day of.  You

 7          know, notification occurs over a long

 8          period of time.

 9               So, you know, they had a lot of time,

10          and a lot of people had moved out of

11          there.

12     Q.   Had you been to that encampment prior to

13          October 6, 2022?

14     A.   Several times.

15     Q.   In its first location or second location?

16     A.   Both.

17     Q.   Were you the person who decided how many

18          MPD officers would be there on October

19          6th?

20     A.   No.

21     Q.   Who decided that?

22     A.   I mean, it was a conversation that took

23          place between myself, Lieutenant Tommy

24          Campbell.  I think Troy may have been at

25          that one.  I can't recall if he was there
```

Page 253

1        or not.  And then Deputy Chief Fors.

2   Q.  Did you agree that a SWAT team was

3        necessary?

4   A.  Yes.

5   Q.  Because of the protesters?

6   A.  Because of -- well, no.  There were

7        several reasons.

8            That camp in particular had had a lot

9        of issues of violence related to it.

10       There were reports of people with guns.

11       There were reports of people with knifes.

12           One of -- just the week before that

13       happened, one of our officers showed up

14       down there and was met with a guy wearing

15       a combat-style vest with a bunch of combat

16       knives all over it, and that sort of

17       thing.

18           There was -- there was pretty much

19       daily reports of stolen vehicles that were

20       showing up down there.

21           That also was the camp related to the

22       assault on city staff and MPD police

23       officers that had occurred in '21.

24           So, you know, the escalation of all

25       the things happening around there made me

1          feel like having a SWAT team.  And it

2          wasn't my call, and SWAT didn't report to

3          me, but that they would be an additional

4          deterrent for violence that day.

5     Q.   Earlier this morning you talked about

6          preventing trauma of residents when

7          sweeping an encampment.

8               Do you remember that?

9     A.   I do.

10    Q.   Do you think that having a full SWAT team

11         on an encampment closure could increase

12         the likelihood of trauma from a closure?

13    A.   I think it could increase people's

14         anxiety.  I certainly do believe that.

15         But I also think that it was a -- it was a

16         necessary step, and ultimately prevented

17         bad things that could have happened, not

18         just to city staff, but also to people in

19         the encampment themselves.

20              And, you know, there were a number of

21         people that were camp protectors that were

22         there, and all of them, because of the

23         people that we had, it didn't turn into a

24         deal like it was in March of the previous

25         year where people did get hurt and people

Page 255

```
 1          ended up in the hospital and stuff like
 2          that.
 3               So there was nobody that was hurt or
 4          harmed in this one.  And I was willing to
 5          trade a few moments of people's anxiety.
 6               Trauma is such an overused term, and
 7          I understand trauma probably better than
 8          most people because I've sat in the
 9          company of countless victims of human
10          trafficking, juveniles, that have gone
11          through real significant trauma.
12               So it kind of washes cold over me
13          when people talk about seeing a police
14          officer and talking about all the trauma
15          it created, and I just -- that's -- I've
16          been there and have seen what real trauma
17          looks like.  That wasn't trauma.
18   Q.  So what do you -- when you were talking
19          about preventing trauma of residents when
20          sweeping, what were you talking about
21          then?
22   A.  I'm talking about like dragging people out
23          of tents and those sort of things, things
24          that we don't do.  Talking about using
25          force to remove people, and showing up in
```

Page 256

```
 1        the middle of the night, and different
 2        things like that.  That's what I'm talking
 3        about.
 4   Q.   You say "showing up in the middle of the
 5        night."  Would you consider that to be
 6        like showing up in the dark?
 7             MS. ENSLIN:  Objection.  Calls for
 8        speculation.
 9             THE WITNESS:  Sorry.  Hold on one
10        second.  I have to end this call.  I
11        pushed the wrong button on my phone.
12             MS. STILLMAN:  Sure.
13   A.   Sorry.  Can you repeat that?
14   BY MS. STILLMAN:
15   Q.   Sure.  You talked about, you know,
16        preventing trauma by not showing up in the
17        middle of the night.
18   A.   Right.
19   Q.   Do you think showing up when it's totally
20        dark outside, even if it's not the middle
21        of the night, would --
22   A.   I think it's less pleasant.  But, again,
23        the purpose of being there, the demeanor
24        of the people that are there, it's
25        different.
```

Page 257

```
 1           I'm talking about not just showing up
 2       in the middle of the night, but if you
 3       show up and somebody is sound asleep, and
 4       you're yelling and screaming in their face
 5       and that sort of thing, and, you know,
 6       making them grab their stuff and get
 7       out -- and we didn't allow that, but I
 8       know that that happened.  Again, not with
 9       MPD and not on my watch, but I know of
10       circumstances and complaints of people
11       saying that that's what happened.
12  Q.  Do you believe that any of the encampment
13       sweeps on property in Hennepin County, not
14       just city property -- well, I'm going to
15       start over.
16           Do you believe that there have been
17       any encampment sweeps since March 2020 in
18       Hennepin County that could have been
19       traumatizing for residents?
20           MS. ENSLIN:  Objection.  Calls for
21       speculation, incomplete hypothetical.
22  A.  I don't know how to answer that because I
23       don't -- I'd be happy to answer about ones
24       that I knew about, but I don't know of any
25       that are coming to mind like that.
```

1    BY MS. STILLMAN:

2    Q.  You were at the closure of The Quarry

3        encampment in 2022, correct?

4    A.  I was.

5    Q.  Who else from the City was there?

6    A.  Elfric was at that one.  Troy Carlson, my

7        lieutenant, was there.  John Hoglund was

8        there, who was the SWAT sergeant.  John

9        Sysaath was there, he was running the --

10       whatever they call the loudspeaker thing.

11           And then there were a number of other

12       officers that were assigned to both

13       shifts.  I mean, I know I remember seeing

14       Ashley Burgerson was there.  I think

15       Rodene was there; maybe, maybe not.  He

16       might not have been there at that one.

17       But Rich Hand was there, lieutenant in the

18       fourth precinct.

19           There was a whole variety of

20       different people that were there.

21           And then of course solid waste was

22       there.

23   Q.  Who decided to sweep The Quarry encampment

24       in December of 2022?

25   A.  That was the date that we were given.  I

Page 259

1           don't recall whether that came from the
2           mayor's office, or whether that was the
3           determination.  But I was basically in
4           that steering group.
5                It was clear that there were other
6           conversations that had been going on, and
7           somebody had determined we were going to
8           close that encampment.
9    Q.   When you say "the date we were given," who
10          do you mean by "we"?
11   A.   "We," I'm talking about the police
12          department.  I didn't select that date.
13   Q.   Did someone in the steering committee
14          meeting tell you that's the date?
15   A.   I mean, generally how it went is they're
16          like, "We'd like to close the encampment
17          this week.  When could MPD do it?  When
18          would you be able to do it within this
19          time period?"
20                And we would look at staffing to try
21          to see when we would -- because at this
22          point we were holding shifts over to do
23          that kind of stuff.
24                So then we would respond and say, "We
25          could do it on this date, or this date."

Page 260

```
1         So that was in response to a time frame
2         that was given.
3              There was only one time when I
4         remember that we were directed on a
5         specific date to close an encampment, and
6         that was the one at 28th and Bloom, I
7         think, or 29th and Bloom.  And that was at
8         the mayor's directive.  That was
9         communicated to me by Interim Chief
10        Huffman.
11   Q.   So you weren't given a specific date for
12        the Quarry?
13   A.   Well, we were given a short time period
14        within which we had -- could say, "We can
15        do it on this date or this date."
16   Q.   And did somebody in the encampment
17        steering committee tell you to check with
18        MPD's availability in that time frame, or
19        who told you?
20   A.   They -- well, they didn't have to tell me
21        that.  I mean, that was my job was to
22        marshal and organize MPD's response,
23        right, in furtherance of the whole city
24        initiative.
25              So it was probably Saray that sort of
```

```
 1          said, "This is the time period where we
 2          would like to have this closed.  We want
 3          this closed.  When could MPD do it?"
 4                And, again, I'm -- it's kind of
 5          speculative because I'm saying this from
 6          recollection, and I don't recall what that
 7          specific conversation was.  I remember
 8          talking about it, and I remember a time
 9          period, and asking when we could do it.
10          But it wasn't like me raise my hand, "Hey,
11          I can close The Quarry on the 13th of
12          December," or whatever.  It wasn't how it
13          worked.
14     Q.   Was the process for closing The Quarry
15          encampment different than the process for
16          closing the Near North encampment?
17     A.   The Near North closure took a lot longer
18          in terms of the planning of it.
19                I don't know how -- The Quarry
20          closure was -- it wasn't months and months
21          and months and months of discussion.  It
22          was more short term than that.
23     Q.   Why was Near North months of discussion
24          and The Quarry more short term?
25     A.   Because whoever made the decision that we
```

Page 262

```
 1          were going to close the -- well, Near
 2          North wasn't closed until there was a
 3          determination that needed to be closed,
 4          and it needed to be closed basically on
 5          these dates.
 6               And that was the hill that that's
 7          where the violence occurred.  That's the
 8          hill that we believe the activists were
 9          willing to die on.  For whatever reason,
10          that was a really popular encampment for
11          them.  I still don't really understand
12          why.  But The Quarry didn't really have
13          that, you know.
14               So there was a lot of back-and-forth
15          about Near North.  I mean, I went up there
16          in December -- I'm sorry -- in January of
17          2021, the Near North encampment was there,
18          and it was basically all the way through
19          until, you know, we finally closed it in
20          2022.
21     Q.   Had you been to The Quarry encampment
22          prior to the day of the sweep?
23     A.   Only -- I never been in the encampment as
24          a commander.  That wasn't my role.
25               I know people that we were -- that
```

```
 1          the intention at that point was to use
 2          outreach.  I know Troy went out there
 3          because I requested -- Lieutenant Carlson
 4          went out there because I requested that he
 5          do that.  But we were -- we were still
 6          leaning on our navigators and our outreach
 7          to have those communications, and so on.
 8     Q.   Why did you request that Troy Carlson go
 9          out there?
10     A.   Because I'm still a firm believer that we
11          belong in a place where we're making
12          relationships with folks, and talking to
13          them, and I just think that he's a great
14          guy.  He's compassionate, wants to do the
15          right thing, wants to help people, and,
16          you know.
17               So --
18     Q.   How long were the residents given to pack
19          the day of the closure, of The Quarry
20          closure?
21     A.   I don't know.  I don't think it was a real
22          long period of time.
23     Q.   Less than an hour?
24     A.   I think so.
25     Q.   Why were --
```

Page 264

1   A.   In some cases.

2   Q.   What do you mean, "In some cases"?

3   A.   Well, there were people that -- so I gave

4        very clear direction about how I wanted

5        people to handle it, and that I wanted

6        them to say, "Make sure you grab your

7        medication," "Make sure you grab this."

8        "There is a staging area over here where

9        you can bring your stuff over to.  Don't

10       leave behind any of your papers."

11            And there were people in the

12       encampment that as soon as we walked up,

13       they just grabbed their stuff, said a

14       couple of FU's, and then walked away.

15            And, you know, I remember -- and it's

16       probably on my body cam -- I remember

17       yelling them -- yelling after them, "Hey,

18       don't forget your medication.  Don't

19       forget this, don't forget that."  Because

20       we hounded on, "Say this, say this, say

21       this," so they would be making sure to

22       give information.

23            That camp was not densely populated.

24       There wasn't that many people in that

25       encampment.  So we were able to allow

Page 265

1          other people that didn't just leave on

2          their own time to pick up their stuff and

3          go.

4    Q.  Did the City make sure there was alternate

5          shelter available for the residents of The

6          Quarry prior to closing it?

7    A.   I do believe they did.  That was not my

8          part of it.  My part of it was MPD.  But I

9          do know that they offered -- they offered

10         -- both The Quarry and Near North, they

11         offered shelter.  They talked to people

12         about housing options.

13               Most, if not -- I think that they

14         placed -- I want to say of the three or

15         four or five people, whoever was at The

16         Quarry, I want to say that Avivo Village

17         took three of them that day.  And they

18         were provided transportation there.  They

19         also provided -- offered storage in the

20         days before, which people turned down.

21               So every effort was made to do that

22         in a way that sort of gave as much support

23         as possible at the time.

24               Then the other two people got a ride

25         to Bloomington or Richfield or something

Page 266

1          to stay with a relative or whatever.

2                There is one kid that walked off and

3          nobody knows where he went.  "Kid," I

4          don't mean a juvenile.  I mean, he was an

5          adult.  But everybody is a kid to me,

6          including everyone in this room, so...

7                MS. STILLMAN:  I'm marking a document

8          that's Bates-stamped MINNEAPOLIS_BERRY

9          047326 as Exhibit 396.

10               (Deposition Exhibit No. 396 was

11         introduced.)

12    BY MS. STILLMAN:

13    Q.  And if you could just let me know once

14        you've had time, once you've reviewed the

15        email.

16    A.  (Reviewing document.)

17               Oh, yeah, yeah.  So there was a

18        connection between 13th and the Wall.  I

19        just forgot the direction of it.  I forgot

20        about this.

21    Q.  So in that top email, you write:

22               "I need to go on the record that

23               I refused to send MPD squads to

24               assist.  State patrols action is

25               in direct violation of the

1              executive order and I have told

2              them that."

3         Why do you believe that state

4     patrol's action here was in direct

5     violation of the executive order?

6  A.  Because they had an encampment.  They

7     want to -- this is exactly the way that

8     the State was doing things, and it was

9     very frustrating for everything from the

10    governor basically dumping this steamy

11    pile onto all of us in the communities and

12    the cities.  And then when it affected

13    their property, they were violating the

14    very order that he had given.

15         Because remember I said that I

16    thought they came from the Wall and some

17    of them went there.  That was the opposite

18    direction.  They went from 13th over

19    there.

20         And I even know who cut the fence, by

21    the way.  But that's a whole other issue.

22         And they went into the -- they went

23    into the Wall -- or went into a fenced-in

24    area, and the State found out about it and

25    immediately was going to send people to

```
 1       kick them out of there.

 2            And I'm like, "You can't.  This is an

 3       encampment now.  People setting up tents,

 4       that's an encampment.  You can't just kick

 5       them out.  This is -- the governor's order

 6       applies to you, too."

 7            And I told them that, and I told them

 8       I wouldn't send MPD response.

 9  Q.  So was MPD there when the Wall was

10       ultimately closed in 2020?

11  A.  I don't think so.  State did whatever they

12       did.

13            I guess I don't recall exactly.  I

14       don't think I was there.  As a matter of

15       fact, I know I wasn't there because I

16       watched them when they put the little

17       things down, but I had nothing to do with

18       any of it.

19            So...

20            MS. STILLMAN:  Can we take a

21       five-minute break.

22            (Break taken.)

23  BY MS. STILLMAN:

24  Q.  I just have a few more quick questions for

25       you.
```

```
 1            So if you remember, earlier -- and
 2       you can go back to it -- we were talking
 3       about Exhibit 83, which was an email from
 4       Don Snyder (sic) talking about how one of
 5       the Hennepin County Health Care for the
 6       Homeless outreach workers was at Matthews
 7       Park with a resident whose property had
 8       been destroyed.
 9  A.   You mean Don Ryan?
10  Q.   Don Ryan.  I apologize, whatever I said.
11  A.   That's all right.  No big deal.
12            What exhibit did you say?
13  Q.   83.  I'm not going to be asking specific
14       questions about that document, but just if
15       you wanted to review it.
16            So when you received that email, did
17       you talk to anybody at the City about the
18       fact that you had heard that somebody's
19       property had been thrown out without their
20       knowledge at an encampment sweep?
21  A.   At Matthews Park?
22  Q.   Yes.
23            MS. MARTENSON:  I want to object to
24       the extent that it mischaracterizes the
25       document.  Your question mischaracterizes
```

Page 270

1        the document.

2   A.   I don't know why I would talk to anyone at

3        the City.  It wasn't the City's operation.

4   BY MS. STILLMAN:

5   Q.   Have you ever talked to Chief Arradondo

6        about concerns regarding people's property

7        potentially getting thrown out at

8        encampment sweeps?

9            MS. ENSLIN:  Objection.  Vague.

10  A.   Maybe.  I don't recall exactly.

11           I mean, again, our conversations

12       around the actual closure of encampments

13       were less specific than -- about those

14       things, and more about partnership and

15       about, you know, that sort of thing, and

16       what did I need and stuff to be able to

17       accomplish our mission.

18           So I don't know if that was ever

19       something we discussed.

20  BY MS. STILLMAN:

21  Q.   Did you ever discuss concerns that in

22       2020, encampment residents weren't being

23       given sufficient notice of an encampment

24       closure with Chief Arradondo?

25  A.   Maybe.  I mean, I think at 2020, again

1          now, it would depend on the encampment and

2          who was closing it.

3                There may have been times when

4          encampments were closed by other agencies

5          that I was concerned about the

6          notification, but I don't think there was

7          a concern that we were doing it, because I

8          was in charge of it after April 1st of

9          2018.

10               So I don't know -- I don't think we

11         would have, unless there was some other --

12         somebody else in the City that did it, but

13         I don't know.  I don't know how to answer

14         that.

15   Q.  Did you ever talk to Chief Arradondo about

16         encampment sweeps that happened on

17         property owned by an entity other than the

18         City?

19   A.  Maybe.  I don't know.  I mean, again, I

20         don't -- if you had an example, I could

21         tell you if I recall that.  But I don't

22         recall those conversations.

23   Q.  Sure.

24               Did you ever talk to Chief Arradondo

25         about the sweep of the Powderhorn Park

1        East encampment?

2   A.   I probably had a conversation with him

3        about it.  I don't recall the nature of

4        that conversation.

5   Q.   What about the Powderhorn Park West

6        encampment?

7   A.   I mean, that was the one where there

8        basically were maybe a hundred people that

9        were surrounding prior to the closure.

10       And so I think there was some discussion

11       about officer safety and about, you know,

12       coming in that space and that sort of

13       thing, but I don't -- I don't know.

14            Again, it would make sense that I

15       would have had discussion, but I don't

16       know the nature of that discussion.

17  Q.   What about for the Kenwood Park

18       encampment?

19  A.   I don't recall.

20  Q.   Peavey Park encampment?

21  A.   I don't recall.

22  Q.   Encampment on the Greenway?

23  A.   I don't know.

24  Q.   Did you ever talk to Amelia Huffman, when

25       she was interim chief of police, about any

Page 273

1       encampment closures?

2   A.  Yes, probably, but, again, I think most of

3       that went through Deputy Chief Fors after

4       she was interim chief, for the majority of

5       the time she was the interim chief.

6            I wasn't doing encampments.  I was

7       the fourth precinct patrol lieutenant.

8   Q.  And did you talk to Chief O'Hara about The

9       Quarry encampment sweep?

10  A.  Yes.

11  Q.  What did you discuss with him about that?

12  A.  We just tried to brief him on sort of

13      what the nature of what we were dealing

14      with here was; why we were involved, you

15      know, that there was a sense of why is MPD

16      involved in this, and what is our plan.

17           I mean, he was being told by the

18      commissioner's office that we were going

19      to close this encampment.  Because I can't

20      remember again -- well, actually that was

21      probably -- that was probably the -- that

22      was probably the Near North one.  Yeah.

23      No, that was before him.

24           No, there was a meeting, and maybe it

25      was around The Quarry.  I can't remember

1          exactly.  But there was a meeting in the

2          mayor's office about it, about when that

3          encampment would be closed.

4     Q.   In the mayor's office about when the Near

5          North encampment would be closed?

6     A.   That one for sure.  But that was before,

7          because Near North was closed in

8          September, right?

9     Q.   October 6th.

10    A.   October 6th.  That was before Chief

11         O'Hara, I think.

12    Q.   I believe so, but I apologize if I'm wrong

13         about that.

14    A.   Yeah.  Why am I asking you, right?

15    Q.   Not my boss.

16    A.   No, I get it.

17              I really think that that was Chief

18         Huffman.  So I think that the mayor's

19         office conversation was around The Quarry.

20    Q.   Was the mayor at that conversation?

21    A.   I don't recall.

22    Q.   So when you say "mayor's office

23         conversation," what do you mean?

24    A.   So there was a meeting -- and you're going

25         to have to forgive me because I don't

Page 275

```
 1          recall which one this was for.  It was
 2          sometime in that period of fall of 2022.
 3               But there was a meeting in the
 4          mayor's office that was called.  The
 5          commissioner was there, Gators was there,
 6          Fors was there, I was there.
 7               And that was the Near North one, and
 8          it was about -- because I had -- I had
 9          basically said we couldn't close it on
10          this date, or something like that, which I
11          was directed to do, essentially, right, by
12          Fors.
13               And then they wanted the camp closed,
14          and somehow it turned into a big issue.
15          And I got called in to the mayor's office
16          to explain when we could do it.  And the
17          mayor and the commissioner tried to
18          mitigate that.
19               I had asked for state resources,
20          which we never got, and some other things
21          like that.  So -- but as far as -- so that
22          was -- I was just trying to clarify.  I
23          know that wasn't your question.  Your
24          question was about O'Hara.
25               We did meet with O'Hara in his
```

```
1        office, or in the temporary office that
2        they had at City Hall, about The Quarry
3        closure.  And he had questions about it
4        and, you know, seemed surprised by the
5        scope, you know, wanted to minimize the
6        footprint.
7              At one point he wanted us to do in it
8        plainclothes, which I told him no, we
9        couldn't do it, and we couldn't do it
10       because there is always kind of bad things
11       that could happen; you know what I mean?
12       So --
13   Q.  You've referred to the commissioner a
14       couple times.  Who was the commissioner?
15   A.  Cedric Alexander.
16   Q.  So have you talked to Mayor Frey directly
17       about any encampment closures?
18   A.  Yes.
19   Q.  Which ones?
20   A.  Well, the Near North one.  I think maybe
21       some other ones.  But I don't think I
22       talked to him about The Quarry.
23             The mayor would call me with some
24       regularity before -- you know, before I
25       went to the fourth precinct, and call me
```

Page 277

1        and ask questions or whatever.  But the

2        one that most sticks in my mind is when we

3        got attacked at the Near North one in

4        March of 2021, he called me.  And then

5        that meeting in his office.

6              Those are the two most vivid memories

7        I have about those discussions.

8   Q.  Do you remember any other encampments

9        specifically that you talked to him about?

10  A.  I don't.

11             Oh, yeah.  I mean, the Wall of

12       Forgotten Natives, yes.  But beyond that,

13       I don't know how many specific

14       conversations we had.

15  Q.  And when you say "the Wall of Forgotten

16       Natives," I assume you mean the 2018 Wall

17       encampment.

18  A.  Yes.

19  Q.  Just wanted to clarify that.

20  A.  Yep.

21             MS. STILLMAN:  All right.  I don't

22       think I have any other questions for you

23       at this point.

24             MS. ENSLIN:  Okay.  We'll read and

25       sign.

Page 278

1          (The right to read and sign the

2     deposition was preserved.)

3          (The deposition concluded at 4:12

4     p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 279

1   STATE OF MINNESOTA )
                      :       CERTIFICATE
2   COUNTY OF HENNEPIN )
3          I hereby certify that I reported the
    deposition of COMMANDER GRANT SNYDER on
4   APRIL 26, 2023 in Minneapolis, Minnesota, and
    that the witness was by me first duly sworn to
5   tell the whole truth;
6          That the testimony was transcribed under
    my direction and is a true record of witness
7   testimony;
8          That the cost of the original has been
    charged to the party who noticed the
9   deposition, and that all parties who ordered
    copies have been charged at the same rate for
10  such copies;
11         That I am not a relative or employee or
    attorney or counsel of any of the parties or a
12  relative or employee of such attorney or
    counsel;
13
           That I am not financially interested in
14  the action and have no contract with the
    parties, attorneys, or persons with an
15  interest in the action that affects or has a
    substantial tendency to affect my
16  impartiality;
17         That the right to read and sign the
    deposition was reserved.
18
           WITNESS MY HAND AND SEAL this
19  2ND DAY OF MAY, 2023.
20
21
22          _____
23          Mari A. Skalicky
            Registered Merit Reporter
24          Certified Realtime Reporter
25

# EXHIBIT 130





# Operational Guidance

## Encampment Response on City-owned Properties

December 16, 2022

December 2022

MPLS_BERRY131495

(This Page Intentionally Left Blank)

MPLS_BERRY131496

## Table of Contents

Purpose ................................................................................................................................ 5

Guiding Principles ............................................................................................................... 5

City of Minneapolis Homeless Response Team .................................................................. 5

Data ..................................................................................................................................... 6

    Criteria for Encampment Closure on City-Owned Property ............................................ 6

    Multi-Departmental City Review Team ........................................................................... 6

Posting of Notice and Exceptions ....................................................................................... 6

Between Posting of Notice and Closure .............................................................................. 7

Encampment Closure on City Property in Minneapolis ....................................................... 7

Post Encampment Closure .................................................................................................. 8

Appendices .......................................................................................................................... 9

    Appendix A: Definitions .................................................................................................. 9

    Appendix B: Minneapolis Code of Ordinances .............................................................. 10

        225.10 Dumping in streets, public places prohibited ............................................... 10

        244.60 Temporary housing prohibited ..................................................................... 11

        385.65 Interference with pedestrian or vehicular traffic ........................................... 11

        427.30 Obstruction, encroachments and littering generally ...................................... 12

        427.40 Depositing injurious matter on highways or adjacent .................................... 12

        466.240 Assemblies obstructing pedestrian or vehicular traffic ................................ 12

MPLS_BERRY131497

*Version History*

| Date | Document Version | Version Details | Owner/Editor |
|------|-----------------|-----------------|--------------|
| 12/16/2022 | 1.0 | Original | Christina Dowling |

MPLS_BERRY131498

## Purpose

Through a collaborative cross-departmental and multi-agency effort, the City of Minneapolis addresses encampments by sharing information that connects unsheltered individuals to resources, services, and shelter.

This document describes the principles and procedures for City staff's work to address encampments on City-owned properties in a manner that preserves and promotes the health and safety of unsheltered individuals and the surrounding community.

This is a working document that will be refined over time.

## Guiding Principles

The City's approach to responding to persons experiencing unsheltered homelessness is founded on the following principles:

- Everyone experiencing unsheltered homelessness is vulnerable and deserves dignified and respectful treatment protective of their rights
- Every effort must be made to connect people to housing, shelter and services
- Encampments represent a serious public health and safety risk – particularly for those staying within the encampment – and do not represent a dignified form of shelter

## City of Minneapolis Homeless Response Team

The City's Homeless Response Team (HRT) aims to proactively respond to the needs of unsheltered individuals in Minneapolis, concentrating specifically on individuals in the encampments. The HRT is part of the City's Regulatory Services department.

The HRT is not a direct service provider. The HRT can refer individuals to Hennepin County or a contracted service provider who can provide these services.

With every interaction, the HRT focuses on consistently engaging with unsheltered individuals to build relationships and trust. The team recognizes there is no *one size fits all* approach and meets people where they are by offering a variety of resources and services, that include shelter and storage options.

HRT is the first point of contact when the City receives complaints regarding an encampment. Upon receipt of a complaint, HRT performs research on property ownership before doing their first site visit. This information helps guide productive communication with the property owner on next steps and ownership responsibility. HRT visits the site and focuses on connecting unsheltered individuals to resources and services, including but not limited to:

- Hennepin County for housing assessments and/or case management
- Service providers or assigned case workers
- Storage services in partnership with Downtown Improvement District
- Shelter services
- Medical attention through Healthcare for the Homeless
- Transportation services to these and other resources

December 2022                                                                                                                    5

MPLS_BERRY131499

HRT works closely with the Hennepin County Streets to Housing Team and contracted community partners to ensure that all unsheltered individuals are engaged and offered services that align with their goals.

## Data

The City will track encampment locations, number of individuals present using point-in-time counts during site visits, and conditions while ensuring the HRT is connecting people to services.

## Criteria for Encampment Closure on City-Owned Property

Encampments are prohibited by City ordinance and all encampments in Minneapolis will be closed. Because encampments pose health and safety risks, the City makes an objective assessment of encampment conditions based on the following risk factors:

- Community livability impact—including, but not limited to, the geographic size, number of unsheltered individuals, proximity to schools, parks, businesses, and residents, and 911/311 calls for service volume.
- Health impact—including, but not limited to, presence of pregnant individuals, minors, hygiene, and environmental conditions, and other conditions at encampment sites that increase the health risks of individuals at the encampment or in the community.
- Life-Safety impact—including, but not limited to, unstable structures, weather conditions, drug use, violence, propane tanks, and illegal activity.
- External impact—including, but not limited to, accounts from neighbors and business owners, and imminent development, demolition, or renovation.

After reviewing these findings, City staff determines next steps, up to and including encampment closure. If an encampment poses an imminent risk, the City may prioritize the closure of a site.

## Multi-Departmental City Review Team

Because encampments impact multiple departments at the City, at the direction of the Mayor, a cross-department team was formed. This team reviews data, health, safety, and community impacts and makes recommendations for the closure of encampments. The cross-departmental City team includes staff representing both the Office of Public Service and the Office of Community Safety, represented by Regulatory Services, Community Planning and Economic Development, Public Works, Minneapolis Fire Department, Minneapolis Police Department, Minneapolis Department of Health, as well as other departments on an as-needed basis. The cross-departmental team meets weekly for a coordinated response to unsheltered homelessness.

## Posting of Notice and Exceptions

An Initial Notice of Trespass, Notice to Vacate, and a Notice of the closure date shall be posted by City at the site at least 72 hours prior to a closure. However, less than 72 hours of notice may be provided, if any of the following conditions exist:

- The encampment poses imminent community safety risks;
- There have been threats to City employees relating to the encampment in particular or the closure of encampments in general;

MPLS_BERRY131500

- The encampment has experienced an increase in violence or other illegal activities;
- The encampment is inhibiting or interfering with the normal operation of a business, school, daycare, or sober living facility;
- If law enforcement agencies are currently engaged in investigations in response to credible information and the 72-hour notice would put the investigation at risk; or
- Any other condition that poses an imminent danger to human life or safety.

If the encampment closure date is changed or delayed beyond the posted time in the initial notice and must be rescheduled, the City will strive to update the notice at least 48 hours in advance of the new closure date. If an updated notice cannot be posted at least 48 hours in advance, the notice shall be posted as soon as is reasonably possible. The City will make reasonable effort to share this information verbally with anyone at the site and with its contracted community partners to ensure those who are unable to read or have difficulty comprehending the information are made aware of the impending action.

## Between Posting of Notice and Closure

HRT will continue visiting sites and engaging with unsheltered individuals to offer services, resources, transportation to shelters, and storage for personal property in advance of a site closure. It is the City's goal to offer storage options at least once during the 72-hour notice window.

Prior to a closure, it is the goal of the City to inform its contracted community partners of the closure to enable them to perform targeted outreach and for them to stay connected to the unsheltered individuals they are assisting.

The City will work with Hennepin County, shelter staff, and contracted community partners to identify shelter resources leading up to the day of a closing and ensure that these resources are shared with unsheltered individuals.

## Encampment Closure on City Property in Minneapolis

For every encampment closure the cross-departmental team listed above reviews the size and scope, then determines resource needs and allocations based on the health, safety, and community livability impact. Each department plays a role:

- Minneapolis Health Department: needle pick-up.
- Minneapolis Police: When necessary, secure the perimeter of the encampment and supports other City staff during the closure to ensure unsheltered individuals, the community, and City staff are safe.
- Minneapolis Traffic Control: Direct traffic away from the site and ensures expeditious traffic flow and allow access for clean-up equipment.
- Minneapolis Community Planning and Economic Development and/or Minneapolis Public Works (Representative of City as property owner): Informs individuals on site that they are trespassing and need to leave the property immediately.
- Minneapolis Public Works—Solid Waste & Recycling: Cleans the site.

To the extent possible, on the day of the closure, the City will have either the HRT or contracted community partners available on site and/or virtually to support unsheltered individuals. The City's goal

MPLS_BERRY131501

is to schedule the timing of closure when the Adult Shelter Connect and other contract partners resources are open and available.

## Post Encampment Closure

After an encampment has been closed, City staff will notify all applicable City departments, applicable Hennepin County departments, and contracted community partners. The HRT will visit the site after closure to ensure the property is not reoccupied. If applicable, the property will be fenced to ensure no reoccupation.

Immediately following the closure of a site, the City's cross-departmental team will hold a post-incident debrief to discuss lessons learned and implement any improvements to the process.

MPLS_BERRY131502

## Appendices

### Appendix A: Definitions

**City:** When referring to the City of Minneapolis Enterprise – the government entity.

**Contracted community partners:** Entities who provide direct services and resources to unsheltered individuals. City contracts are in collaboration with Hennepin County.

**Encampment:** A grouping of tents, tent-like structure(s), or temporary structures that are located within Minneapolis, which appear to be occupied by individual(s) for the purposes of residing therein.

**Encampment Closure Team:** Multidepartment organized effort comprised of City of Minneapolis staff that work together to review data, health, safety, and neighborhood impacts to help make recommendations to close, clean and clear a site.

**Homeless Response Team (HRT):** A team of City of Minneapolis staff that humanely addresses encampments and actively engages with unsheltered individuals by building trust and a relationship and providing access to services and resources.

**Minneapolis:** When referring to the geography of the city.

**Notice of Trespass:** Notice that is posted by the property owner at encampment sites to inform the unsheltered individuals that they are trespassing.

**Notice to Vacate:** Notice that is posted by the property owner at encampment sites to inform the unsheltered individuals that they must vacate the premises.

**Property owner:** Owner or taxpayer of the subject property that will trespass individuals from their property. This may include but not limited to, private owner(s), City of Minneapolis, Hennepin County, Metro Transit, Minneapolis Park and Recreation Board, Minnesota Department of Transportation, and could be multijurisdictional.

**Temporary shelter:** Any tent, trailer or other structure used for human shelter which is designed to be transportable, and which is not permanently attached to the ground or to another structure.

**Trespass:** Individuals occupying private property without the owner's permission. Property includes sites owned by private owner(s), City of Minneapolis, Hennepin County, Metro Transit, Minneapolis Parks and Recreation Board, Minnesota Department of Transportation and could be multijurisdictional.

MPLS_BERRY131503

## Appendix B: Minneapolis Code of Ordinances

## 225.10 Dumping in streets, public places prohibited

(a) No person shall leave, place, throw or deposit, or cause or permit any other person to leave, place, throw or deposit, in or upon any street or public place, or in or upon any vacant or private lot or premises, any of the following: solid waste; building debris; toxic or hazardous waste; human excreta, sewage, or other water-carried waste; or other like or similar substances or materials.

(b) No person shall leave, place, throw, or deposit, or cause or permit any other person to leave, place, throw, or deposit, any substances or materials of any kind at a city solid waste collection point (SWCP), as defined by section 225.670 of this Code, for city disposal when the substances or materials were generated at a location other than the residence at whose SWCP the substances or materials were left, placed, thrown, or deposited for city disposal. Further, no person shall leave, place, throw, or deposit, or cause or permit any other person to leave, place, throw, or deposit, any substances or materials of any kind in a mobile refuse container (MRC), as defined in section 225.680 of this Code, for city disposal when the substances or materials were generated at a location other than the residence at which the substances or materials were left, placed, thrown or deposited for city disposal, whether or not the MRC is located at the SWCP at the time the substances or materials were left, placed, thrown or deposited in the MRC for city disposal. All waste disposed of in these MRCS shall meet all current federal, state, and local disposal laws and regulations.

(c) No person shall leave, place, throw, or deposit, or cause or permit any other person to leave, place, throw, or deposit, materials of any kind in a solid waste, recycling, or construction dumpster or similar type container without permission of the owner, lessee, or their authorized designee.

(d) No person shall leave, place, throw, or deposit, or cause or permit any other person to leave, place, throw, or deposit, any yard waste, as defined in section 225.05, on any property not owned, controlled, or operated by that person, or without the permission of the owner, lessee, or their authorized designee.

(e) No person shall leave, place, throw, or deposit, or cause or permit any other person to leave, place, throw, or deposit, any used furniture, used clothing, used appliances, or other household items on the property of a charitable, fraternal, religious, cooperative, communal, or similar organization during times that the principal facility or building located on such property is closed.

Any used furniture, used clothing, used appliances or other household items that are left, placed, thrown or deposited at such organization shall be placed in an area designated by the organization. This area must comply with all state and local laws. Any such area must be capable of being secured by such an organization while the facility or building is closed so as to reasonably prevent unauthorized placement or deposit of such items or disturbance of items which have already been placed in the area.

(f) If a motor vehicle is used to aid, assist, or accomplish a violation of any part of this section, the owner of the vehicle, or the lessee of a leased vehicle, shall be in violation of this section and subject to a fine not to exceed two hundred dollars ($200.00).

(1) The owner or lessee is not subject to the fine under subsection (f) under the following circumstances:

MPLS_BERRY131504

a. Another person has been convicted for that violation;

b. The owner or lessee can demonstrate the vehicle was stolen at the time of the violation; or

c. The lessor kept a record of the name and address of the lessee. (Code 1960, As Amend., § 770.010; 96-Or-046, § 2, 5-24-96)

**Cross reference**—Prohibition against deposit of garbage and rubbish in streets, §§ 427.30, 427.40; littering parks and parkways, § PB2-5.

**State Law reference**—Unlawful deposits of garbage and litter, M.S. § 609.68

### 244.60 Temporary housing prohibited

(a) Unless otherwise provided in this section, no camp car, house trailer, automobile, tent or other temporary structure may be parked or placed upon any public street or on any public or private premises or street in the city and used as a shelter or enclosure of persons and their effects for the purpose of living therein.

(b) The director of regulatory services may issue a permit to allow for temporary housing when a specified emergency creates the need to allow for such housing. A permit may be issued only when the emergency creating the need is an act of nature, a technological failure or malfunction, a terrorist incident, a public health emergency, an industrial accident, a hazardous material accident, or destruction caused by a civil disturbance.

(c) When the director of regulatory services issues a permit to allow for temporary housing, the director shall provide that the permit will expire after a specific period, not to exceed six (6) months. The director shall attempt to set the expiration date to coincide with the elimination of the need for temporary housing. The director may grant one (1) six-month extension of this permit.

(d) The director of regulatory services may set conditions on the use of the permit to mitigate the negative impacts of the permit. These conditions may include compliance with applicable statutes, ordinances and/or rules, including but not limited to the Minneapolis Fire Code, Minneapolis Health Code, Minneapolis Building Code, Minneapolis Housing Maintenance Code, and the Minneapolis Zoning Code. In addition, the director may impose any additional appropriate conditions to the use of the temporary housing permit.

(e) The director of regulatory services may revoke the permit if the need for such temporary housing ends, or if the permit holder fails to comply with the conditions set by the director as to the use of the temporary housing permit. (Code 1960, As Amend., § 66.060; 2005-Or-145, § 1, 12-23-05; 2013-Or-161, § 2, 12-6-13)

### 385.65 Interference with pedestrian or vehicular traffic

No person, in any public or private place, shall use offensive, obscene or abusive language, or grab, follow or engage in conduct which reasonably tends to arouse alarm or anger in others, or walk, stand, sit, lie, or place an object in such a manner as to block passage by another person or a vehicle, or to require another person or a driver of a vehicle to take evasive action to avoid physical contact. Acts authorized as an exercise of one's constitutional rights of freedom of speech and assembly, and acts authorized by a permit issued pursuant to the Parade Ordinance, Chapter 447, or the Block Event

MPLS_BERRY131505

Ordinance, Chapter 455, of the Minneapolis Code of Ordinances, shall not constitute interference with pedestrian or vehicular traffic. (88-Or-019, § 1, 2-12-88)

## 427.30 Obstruction, encroachments and littering generally

No person shall erect, build, set up, keep or maintain any house, store, shop or other building or structure, or leave, deposit or place any boxes, merchandise, timber, planks, boards, shingles, casks, barrels, hogsheads, lumber, bricks, stones, trucks, carts, wagons, sleds, carriages upon or in any street, alley or sidewalk. No person shall place, leave, throw, drop or scatter any stones, bricks, mortar, earth, wood, shavings, offal, garbage, rubbish or any other material or substance upon any street, alley, sidewalk or public ground. Any person drawing or transporting any of the aforesaid articles or substances through or upon any of the streets or alleys shall convey and carry the same in tight wagons, carts or boxes so constructed and covered by canvas or other suitable material that such articles and substances cannot fall out or be scattered upon the streets or alleys. If any such articles or substances shall for any reason fall or be scattered upon any street or alley, the same shall be forthwith removed by the person at such time in charge of the vehicle from which such article or substance fell or was scattered.

## 427.40 Depositing injurious matter on highways or adjacent

(a)  No person shall throw or deposit upon any highway any glass, nails, tacks, wire, cans or any other substance likely to injure any person, animal or vehicle upon such highway or upon any public or privately owned land adjacent thereto without the owner's consent.

(b) Any person who drops or permits to be dropped or thrown upon any highway any destructive or injurious material shall immediately remove the same or cause it to be removed.

(c) Any person removing a wrecked or damaged vehicle from a highway shall remove any glass or other injurious substance dropped upon the highway from such vehicle.

(d) No person shall drop or hurl any destructive or injurious material or object at or upon any motor vehicle upon any highway or the occupants thereof.

(e) Any person violating the provisions of this section shall be guilty of a misdemeanor. The record of any conviction of or plea of guilty under this section of a person operating a motor vehicle shall be immediately forwarded to the department of public safety for inclusion upon that offender's driving record. Any second offense or offense thereafter under this section shall require a minimum fine in the amount of one hundred dollars ($100.00). Any judge may, for any violation of this section, order the offender to pick up litter along any public highway or road for four (4) to eight (8) hours under the direction of the department of highways, with the option of a jail sentence being imposed. (Code 1960, As Amend., § 407.220)

**State Law reference**—Similar provisions, M.S. § 169.42.

## 466.240 Assemblies obstructing pedestrian or vehicular traffic

(a)  No person or group of persons shall assemble or cause others to assemble on any sidewalk so as to obstruct the free passage of pedestrians thereon or interfere with the use thereof.

(b) It shall be unlawful for any person individually or as a member of any group of persons to loiter, stand, sit, lie or remain upon or within any street, sidewalk, crosswalk or other public way or otherwise

MPLS_BERRY131506

occupy any portion thereof with the intent or purpose to block, obstruct or interfere with the free passage of any pedestrian thereon or the orderly free flow of vehicular traffic on said street or public way.

(c) This section shall not be interpreted to restrict the lawful exercise of freedom of speech and assembly.

(d) Violation of this section is a petit misdemeanor. (Code 1960, As Amend., § 408.090; 84-Or-069, § 1, 4-27-84)

MPLS_BERRY131507

# EXHIBIT 131

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Berry, et al.,

Case No. 20-CV-02189-WMW-JFD

Plaintiffs,

District Judge Wilhelmina Wright
Magistrate Judge John F. Docherty

vs.

Hennepin County, et al.,

Defendants.

**PLAINTIFF DENNIS BARROW'S RESPONSES TO COUNTY DEFENDANTS FIRST SET OF INTERROGATORIES**

TO:  Hennepin County Defendants, by and through their counsel, Kelly Pierce and Christiana Martenson, Hennepin County Attorney's Office, 300 South 6th Street, Ste A2000, Minneapolis, MN 55487; kelly.pierce@hennepin.us, christiana.martenson@hennepin.us.

Plaintiff Dennis Barrow, for their responses to the Hennepin County Defendants' First Set of Interrogatories, states as follows:

### PRELIMINARY STATEMENT

Plaintiff Barrow is continuing their investigation and reserves the right to rely on facts, documents, or other evidence that may come to their or their counsel's attention later. Plaintiff's responses to these requests are based upon information known at this time, and Plaintiff expressly reserves their right to revise or supplement their responses or assert additional or revised objections. Nothing herein should be construed as an admission that any information requested or provided is relevant or admissible. In providing these responses, Plaintiff expressly preserves all objections as to competency, relevancy, materiality, and admissibility and all rights to object on any ground to the use of any of the responses at trial or in any other proceeding.

### GENERAL OBJECTIONS

PLEASE BE ADVISED that these general responses and objections form a part of the response to each Interrogatory below. The absence of a reference to a general response or

or objection should not be construed as a waiver of the general responses or objections to a specific Interrogatory.

     1.     Plaintiff Barrow objects to the Interrogatories to the extent they seek information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity. Unless otherwise indicated, such information will not form a part of Plaintiff's responses to the Interrogatories. Inadvertent disclosure of privileged information will not constitute a waiver of any applicable privilege. Nor will providing such information be construed to waive any objection. Plaintiff Barrow requests that, upon realization or notice of such inadvertent disclosure, Defendants not use the information and/or promptly return or destroy any documents in their possession and confirm in writing when completed.

     2.     Plaintiff Barrow objects to the Interrogatories to the extent they are oppressive, unreasonably expensive or expansive, vague, ambiguous, overbroad, not identified with reasonable particularity, unduly burdensome, and/or would require unreasonable investigation in a manner not proportionate with the claims of this case.

     3.     Plaintiff Barrow objects to the Interrogatories to the extent they are compound.

     4.     Plaintiff Barrow objects to the extent the Interrogatories seek information that is not relevant to any party's claim or defense, immaterial, or not reasonably calculated to lead to the discovery of admissible evidence in this litigation.

     5.     Plaintiff Barrow objects to the definition of "you" and "your" as overly broad, unduly burdensome, and beyond the scope permitted by the Federal Rules of Civil Procedure. Plaintiff will respond to these Interrogatories only for themself.

6.      Plaintiff Barrow objects to the Interrogatories to the extent they seek information not within the possession, custody, or control of Plaintiff, or which is equally accessible to Defendants.

7.      Plaintiff Barrow objects to the Interrogatories to the extent they seek information that is unreasonably cumulative, duplicative, or obtainable from other sources that are more convenient, less burdensome, or less expensive.

8.      Plaintiff Barrow objects to the Interrogatories to the extent they require responses beyond those required by the Federal Rules of Civil Procedure, the local rules, or any other court orders. Plaintiff will respond to these requests in accordance with those requirements and obligations.

9.      Plaintiff Barrow's responses to the Interrogatories are subject to the Protective Order entered in this case. Any responsive documents shall be produced pursuant to the terms of the Amended Pretrial Scheduling Order and the Protective Order.

Subject to the above general objections and any specific objection asserted herein, Plaintiff Barrow responds to the County's Interrogatories as follows:

### INTERROGATORIES

**REQUEST NO. 1:**   Identify all locations where you have slept or sheltered overnight, from the date of the Amended Complaint to the present, and for each such location, provide its address or describe the location.

**RESPONSE**:   Plaintiff Barrow objects to this Interrogatory to the extent it seeks information to which Defendants have equal access. Subject to and without waiving this and the General Objections above, Plaintiff Barrow responds as follows: Since December 14, 2020, to the best of their recollection, Plaintiff Barrow has slept or sheltered overnight at

3854 West Broadway, Robbinsdale, MN (Dec. 2020-August 2022)

4237 Georgia Ave N, Minneapolis, MN 55428 (August 2022)

6248 Century Blvd., Brooklyn Park, MN 55429 (Sept. 2022-present)

Discovery is ongoing and Plaintiff Barrow reserves the right to supplement or amend these responses as additional information becomes available.

**REQUEST NO. 2:**   Identify all persons who may have knowledge regarding the claims and defenses in this lawsuit and state the substance of each person's knowledge.

**RESPONSE**:   Plaintiff Barrow objects to this Interrogatory to the extent it calls for information protected by the attorney-client privilege, work product doctrine, or any other applicable privilege or immunity. Plaintiff further objects to this Interrogatory as compound, with two distinct subparts: 1) the name of the individuals who have knowledge; and 2) the substance of that knowledge. Subject to and without waiving these objections, Plaintiff Barrow responds as follows:

Subpart 1: The identification of individuals with knowledge. See all individuals identified in Plaintiffs' Rule 26(a)(1) initial disclosures, the Declaration of Plaintiff Barrow, the deposition testimony of Plaintiff Barrow, the Amended Complaint, Plaintiffs' memorandum in opposition to the motions to dismiss of Defendants Hennepin County and the Minneapolis Park & Recreation Board, and any other court filings to date.

Subpart 2: The substance of that knowledge. See Plaintiffs' Rule 26(a)(1) initial disclosures, the Declaration of Plaintiff Barrow, the deposition testimony of Plaintiff Barrow, the Amended Complaint, Plaintiffs' memorandum in opposition to the motions to dismiss of Defendants Hennepin County and the Minneapolis Park & Recreation Board, and any other court filings to date.

4

Discovery is ongoing and Plaintiff Barrow reserves the right to supplement or amend these responses as additional information becomes available.

**REQUEST NO. 3:**   Describe in detail the injuries and damages that you allege you sustained as a result of Defendants' actions and omissions as described in the Amended Complaint, including the total amount of damages that you claim in this lawsuit.

**RESPONSE**:   Plaintiff Barrow objects to this Interrogatory to the extent it calls for information protected by the attorney-client privilege, work product doctrine, or any other applicable privilege or immunity. Plaintiff Barrow further objects to this Interrogatory to the extent it seeks to impose obligations on Plaintiff Barrow in excess of those required by the applicable rules. Plaintiff Barrow further objects to this Interrogatory as premature. Subject to and without waiving these objections, Plaintiff Barrow responds as follows: See the Amended Complaint, the deposition testimony of Plaintiff Barrow, the Declaration of Plaintiff Barrow, Plaintiffs' memorandum in opposition to the motions to dismiss of Defendants Hennepin County and the Minneapolis Park & Recreation Board, and any other court filings to date. Plaintiff Barrow is seeking compensatory and punitive damages in an amount to be determined by a jury at trial.

Plaintiff Barrow is seeking compensatory damages in the amount of $4,552.72 for property destroyed during encampment sweeps, including a tent, sleeping bag, winter coats, winter boots, assorted shoes, assorted clothing, personal hygiene supplies, medication, and court documents.

In addition to those damages listed in the above documents, Plaintiff Barrow is seeking damages only for garden-variety emotional distress, pain, and suffering.

Discovery is ongoing and Plaintiff Barrow reserves the right to supplement or amend these responses as additional information becomes available.

**REQUEST NO. 4:**   If you claim damages related to your physical or mental health, identify all care providers who have examined or treated you from January 1, 2012 to the present, and please describe the nature of the illness, disease, injury, problem, or condition for which you were examined or treated by each care provider, as well as the dates of such examination or treatment.

**RESPONSE**:   Plaintiff Barrow objects to this Interrogatory to the extent it calls for information protected by the attorney-client privilege, work product doctrine, doctor-patient confidentiality, or any other applicable privilege or immunity. Plaintiff further objects to the extent this Interrogatory calls for duplicative information to Interrogatory No. 3. Plaintiff further objects to this Interrogatory as overly broad, unduly burdensome, not relevant to any party's claim or defense, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case to the extent it seeks information from over a period of more than ten (10) years and more than eight (8) years before the inception of this lawsuit. Plaintiff further objects to this Interrogatory as compound, with three distinct subparts: 1) identification of care providers; 2) identification of the treatment or care plan; and 3) the dates of treatment. Subject to and without waiving these objections, Plaintiff Barrow responds as follows:

Subpart 1) Identification of care providers

Subpart 2) Identification of treatment or care plan

Subpart 3) Dates of treatment

Plaintiff Barrow is only seeking compensatory and damages for garden-variety emotional distress, pain, and suffering, so the information sought in this Interrogatory is irrelevant to the case and no answer is required.

Discovery is ongoing and Plaintiff Barrow reserves the right to supplement or amend these responses as additional information becomes available.

**REQUEST NO. 5:**   For the period from 2020 to the present, have you used or posted content on any website, digital application, blog, online forum, or social media platform (such as Twitter, Facebook, Instagram, Snapchat, or TikTok)? If so, identify each website, digital application, blog, online forum, or social media platform that you have used or posted content on, and if applicable, identify the username, email address, or phone number associated with your use of that website, digital application, blog, online forum, or social media platform.

**RESPONSE**:   Plaintiff Barrow objects to this Interrogatory to the extent it seeks information in the public domain and to which Defendants have equal access. Plaintiff Barrow further objects to this Interrogatory as compound, with three distinct subparts: 1) whether Plaintiff uses social media, 2) which social media platforms, and 3) the handle/username per social media platform. Subject to and without waiving this and the General Objections above, Plaintiff Barrow responds as follows:

Subpart 1) Do they use social media? Yes.

Subpart 2) Identify social media platforms they use. Facebook.

Subpart 3) Identify the handle/username for those social media accounts

Facebook—Dennis Barrow, Jr., Den Den

Discovery is ongoing and Plaintiff Barrow reserves the right to supplement or amend these responses as additional information becomes available.

As to Answers:

DATE:  11-21-22

**Dennis Barrow**

As to Objections:

DATE:                                    **MID-MINNESOTA LEGAL AID**

s/Justin Perl
Justin H. Perl (No. 0151397)
Dorinda L. Wider (No. 0162334)
Rebecca Stillman (No. 039855)
Luke Grundman (No. 0390565)
111 North Fifth Street, Suite #100
Minneapolis, MN 55403-1604
Tel: (612) 332-1441
Email:  jperl@mylegalaid.org
         dlwider@mylegalaid.org
         rstillman@mylegalaid.org
         lgrundman@mylegalaid.org

**AMERICAN CIVIL LIBERTIES UNION
OF MINNESOTA**

s/Teresa Nelson
Teresa Nelson (No. 0269736)
Clare Diegel (No. 0400758)
PO Box 14720
Minneapolis, MN 55414
Tel: (612) 274-7791
Email:  tnelson@aclu-mn.org
         cdiegel@aclu-mn.org

Ian Bratlie (No. 319454)
American Civil Liberties Union of Minnesota
P.O. Box 907
Mankato, MN 56002
Tel: (507) 995-6575
Email: ibratlie@aclu-mn.org

**BALLARD SPAHR LLP**

s/Isabella Salomão Nascimento
Isabella Salomão Nascimento (No. 0401408)
2000 IDS Center
80 South 8th Street
Minneapolis, MN 55402
612-371-3281
Email: salomaonascimentoi@ballardspahr.com

***Attorneys for Plaintiffs***

DATE: 11/02/2022

**MID-MINNESOTA LEGAL AID**

s/Justin Perl
Justin H. Perl (No. 0151397)
Dorinda L. Wider (No. 0162334)
Rebecca Stillman (No. 039855)
Luke Grundman (No. 0390565)
111 North Fifth Street, Suite #100
Minneapolis, MN 55403-1604
Tel: (612) 332-1441
Email:  jperl@mylegalaid.org
        dlwider@mylegalaid.org
        rstillman@mylegalaid.org
        lgrundman@mylegalaid.org

**AMERICAN CIVIL LIBERTIES UNION
OF MINNESOTA**

s/Teresa Nelson
Teresa Nelson (No. 0269736)
Clare Diegel (No. 0400758)
PO Box 14720
Minneapolis, MN 55414
Tel: (612) 274-7791
Email:  tnelson@aclu-mn.org
        cdiegel@aclu-mn.org

Ian Bratlie (No. 319454)
American Civil Liberties Union of Minnesota
P.O. Box 907
Mankato, MN 56002
Tel: (507) 995-6575
Email: ibratlie@aclu-mn.org

**BALLARD SPAHR LLP**

s/Isabella Salomão Nascimento
Isabella Salomão Nascimento (No. 0401408)
2000 IDS Center
80 South 8th Street
Minneapolis, MN 55402
612-371-3281
Email: salomaonascimentoi@ballardspahr.com

***Attorneys for Plaintiffs***

8