UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Patrick Berry; Henrietta Brown; Nadine Little; Dennis Barrow; Virginia Roy; Joel Westvig; ZACAH; and Daniel Huiting, | File No. 20-cv-2189 (ECT/JFD) |
| Plaintiffs, | |
| v. | **OPINION AND ORDER** |
| Hennepin County; Hennepin County Sheriff Dawanna Witt, *in her official capacity*; City of Minneapolis; Current Minneapolis Chief of Police Brian O'Hara, *in his official capacity*; Minneapolis Park and Recreation Board; Police Officers John Does; and Police Officers Jane Does, | |
| Defendants. | |

Dorinda L. Wider, Elana Max Dahlager, Justin H. Perl, and Luke Grundman, Mid-Minnesota Legal Aid, Minneapolis, MN; Jennell K. Shannon, and Wallace G. Hilke, Ballard Spahr LLP, Minneapolis, MN; Hannah L. Welsh, Ballard Spahr LLP, Philadelphia, PA; Ian Bratlie, Teresa J. Nelson, and Catherine H. Ahlin-Halverson, ACLU of Minnesota, Mankato, MN, for Plaintiffs.

Christiana Martenson, Devona L. Wells, and Kelly K. Pierce, Hennepin County Attorney's Office, Minneapolis, MN, for Defendants Hennepin County and Hennepin County Sheriff Dawanna Witt.

Heather Passe Robertson, Kristin R. Sarff, and Sharda R. Enslin, Minneapolis City Attorney's Office, Minneapolis, MN, for Defendants City of Minneapolis and Current Minneapolis Chief of Police Brian O'Hara.

Alana M. Mosley, Anne E. Walther, and Brian F. Rice, Rice, Walther & Mosley LLP, Minneapolis, MN, for Defendant Minneapolis Park and Recreation Board.

Plaintiffs are formerly homeless individuals who, in the summer and fall of 2020, lived in homeless encampments in public parks in the City of Minneapolis. Plaintiffs claim Defendants destroyed Plaintiffs' personal property when disbanding these encampments, violating Plaintiffs' rights under the United States and Minnesota Constitutions. Plaintiffs also claim Defendants conspired to violate Plaintiffs' constitutional rights, and that Defendants converted Plaintiffs' property.

Defendants seek summary judgment, and their motions will be granted. There are Article III problems with some of Plaintiffs' claims. Plaintiffs have not shown their standing to pursue injunctive or declaratory relief, and Plaintiffs have not shown that their injuries are fairly traceable to the actions of some or all Defendants. Jurisdictional problems aside, Plaintiffs' substantive claims are not trial worthy.

I

The seven individual Plaintiffs once lived in homeless encampments in public parks in the City of Minneapolis. 2d Am. Compl. [ECF No. 359] at 1. Each individual Plaintiff alleges to have been present when the Minneapolis Park and Recreation Board ("MPRB") disbanded encampments in August, September, and October 2020. By May 2023, when the Second Amended Complaint was filed, however, all of the individual Plaintiffs had housing. *See* 2d Am. Compl. ¶ 26 (Plaintiff Dennis Barrow currently housed in Brooklyn Park); ¶ 43 (Plaintiff Patrick Berry is currently housed, although Berry remains "housing insecure and vulnerable to becoming homeless again"); ¶ 61 (Plaintiff Henrietta Brown is currently housed in an apartment in Hennepin County); ¶ 74 (Plaintiff Nadine Little is currently housed); ¶ 87 (Plaintiff Virginia Roy currently residing in a "more stable,

permanent residence"); ¶ 107 (Plaintiff Joel Westvig moved out of state and "found his current permanent residence"); ¶ 134 (Plaintiff Daniel Huiting "is now currently housed"). When these motions were briefed in late August 2023,[1] however, Barrow was again homeless, although he was not living in an encampment.  *See* ECF No. 457 ¶ 2 ("As of [Aug. 30, 2023], I do not have permanent housing and am once again unhoused.  I have been living out of a car in the streets of Minneapolis.").

Plaintiff ZACAH—Zakat, Aid and Charity Assisting Humanity—"is a private non-profit organization staffed only by unpaid volunteers" that provides financial assistance to individuals "on the verge of experiencing homelessness." 2d Am. Compl. ¶¶ 4–5.  ZACAH alleges that, because of the encampment closures, it was forced to spend its limited funds on emergency shelter, such as hotel rooms for people displaced by the closures, and not on its intended mission of assisting individuals with rent, utilities, and car payments to prevent them from becoming homeless.  *Id.* ¶¶ 6, 8.

Plaintiffs' Second Amended Complaint challenges the closure of thirty-five different homeless encampments between August 2020 and December 2022 on property owned by the City of Minneapolis, Hennepin County, the MPRB, and Metro Transit.  *Id.* ¶ 242.  They also challenge the closure of an encampment on private property in May 2022. *Id.*  Plaintiffs allege that Defendants—Hennepin County and Hennepin County Sheriff Dawanna Witt (the "Hennepin County Defendants"); the City of Minneapolis and

---

[1]     The case was assigned originally to Judge Wilhelmina M. Wright.  ECF No. 2.  In February 2024, Judge Wright retired from federal judicial service, and the case was reassigned to me.  ECF No. 590.  A hearing on the motions occurred before me on May 13, 2024, ECF No. 595, at which time the motions were taken under advisement.

Minneapolis Police Chief Brian O'Hara (collectively, the "City Defendants"); the MPRB; and John and Jane Doe police officers—accomplished these encampment closures without sufficiently notifying residents that the camps would be closed.  Plaintiffs claim that this lack of notice resulted in Defendants destroying Plaintiffs' personal property rather than taking that property to storage from which Plaintiffs could have retrieved the property, in violation of Plaintiffs' constitutional rights.

Plaintiffs brought this lawsuit as a class action, seeking to represent a class "of all homeless persons living within Hennepin County who have been, are now, or will in the future be living on public property." *Id.* ¶ 160.  In January 2023, however, Judge Wright denied Plaintiffs' class-certification motion.  ECF No. 587.  As a result, and as discussed in more detail below, Plaintiffs' claims are now limited just to park locations in which the seven individual Plaintiffs personally camped and lost property, or any encampment closure that resulted in ZACAH expending funds it would not otherwise have expended.

The Second Amended Complaint describes where each individual Plaintiff camped during the relevant time.  Barrow lived at Powderhorn Park before "law enforcement showed up and forced him out," causing him to abandon much of his property including his tent.  2d Am. Compl. ¶¶ 16, 19.  He found housing thereafter, but then went to Loring Park with a new tent before "threats of eviction began again" and he left to live in a van. *Id.* ¶¶ 21–22.  Barrow does not allege that he was present for any eviction from Loring Park, and Loring Park is not listed among the challenged encampment closures in the Second Amended Complaint.

Berry had lived at the Powderhorn Park West encampment for a week when it was disbanded, allegedly without notice to Berry.  *Id.* ¶¶ 31–32.  The Second Amended Complaint alleges that Berry has also "slept overnight outside at the Quarry, the Near North encampment, near the Mississippi River bank in Minneapolis, near Minnehaha Creek, and near Lake Nokomis."  *Id.* ¶ 41.  There is no allegation that any of these locations were cleared when Berry resided there.  Berry claims to have lost a tent, sleeping bag, and mattress in the Powderhorn Park closure.  *Id.* ¶ 37.

Brown lived in the Peavey Park encampment before it was disbanded in September 2020.  *Id.* ¶¶ 49–50.  Brown alleges she lost important paperwork and family photographs when Peavey Park was disbanded.  *Id.* ¶ 55.

Little lived at both the Powderhorn Park East and West encampments.  *Id.* ¶ 66. Little does not allege that either of these encampments was disbanded during her stay.  She moved to Kenwood Park "until she received an eviction notice and had to leave when Defendants cleared it."  *Id.* ¶ 68.  Little lost her tent in the Kenwood Park closure, but she was not there when the camp was closed—"she learned from volunteers that her tent had been destroyed when Defendants cleared" the encampment.  *Id.* ¶ 69.  After living in a hotel for a time, she moved to the Brackett Park encampment until it was disbanded in October 2020.  *Id.* ¶ 71.  She does not allege that she lost any property in the Brackett Park closure.

Roy lived at Powderhorn Park but moved to Brackett Park in early July 2020, before the Powderhorn Park encampment was disbanded.  *Id.* ¶ 81.  "Volunteers moved Ms. Roy

and other residents out of Brackett Park to avoid the police bulldozing their property." *Id.* ¶ 84. Roy does not allege that she lost any property in the Brackett Park closure.

Westvig lived in a tent in Loring Park, until he was "forced out." *Id.* ¶ 94. Westvig was able to gather his possessions before the encampment was closed and he thereafter moved to B.F. Nelson Park. *Id.* ¶ 97. He alleges that MPRB employees told him on October 15, 2020, that the B.F. Nelson encampment would be closed, but does not allege that it was in fact closed at that time. *Id.* ¶ 105. Rather, Westvig alleges that he "was eventually evicted from his encampment" and he "moved to the Near North encampment." *Id.* ¶ 107. Westvig does not allege that he lost any property as a result of any of the closures, or that he was present in the Near North encampment when it was eventually disbanded in October 2022. *See id.* ¶ 242.

Huiting alleges his property was destroyed in the closure of two encampments: Matthews Park and Riverside Park. *Id.* ¶ 126. Huiting concedes he was given notice that the Matthews Park camp would be disbanded but claims this notice did not provide a date or time for the eviction. *Id.* ¶ 128. Four or five days later, when he was not present in the park, the encampment was disbanded, and he returned to "an empty plot of grass where his tent had been." *Id.* ¶ 129. Huiting's Hennepin County caseworker procured a new tent for Huiting and moved him to Riverside Park. *Id.* ¶ 130. Again, however, when Huiting was away, this encampment was closed without notice and he returned to find his possessions gone. *Id.* ¶ 131.

Plaintiffs raise five claims against all Defendants. Count I claims unlawful seizure of property in violation of the Fourth Amendment and Minnesota Constitution Article 1,

section 10. *Id.* ¶¶ 250–53. Count II asserts a violation of the right to privacy, specifically that Defendants' seizure and destruction of Plaintiffs' property without a warrant, probable cause, or exigent circumstances violated Plaintiffs' rights under the Fourth Amendment and Minnesota Constitution Article 1, section 10. *Id.* ¶¶ 254–56. Count III raises a procedural-due-process claim under the Fourteenth Amendment and Minnesota Constitution Article 1, section 7, arising out of the alleged seizure and destruction of property without effective pre- or post-deprivation procedures. *Id.* ¶¶ 257–60. Count IV is a state-law conversion claim. *Id.* ¶¶ 261–65. Count V contends that Defendants engaged in a conspiracy under 42 U.S.C. § 1983 to deprive Plaintiffs of their federal constitutional property rights and a conspiracy under state law to convert Plaintiffs' property. *Id.* ¶¶ 266–74. Plaintiffs seek an injunction prohibiting Defendants "from continuing its [sic] unlawful policies, practices, and customs," a declaratory judgment that Defendants' policies or customs violate the United States and Minnesota Constitutions, compensatory and punitive damages, and attorney's fees and costs under 42 U.S.C. § 1988. *Id.* at 68, ¶¶ I–V.

All Defendants have moved for summary judgment on all claims. ECF Nos. 473, 479, 516. Defendants also move to exclude two of Plaintiffs' expert witnesses. ECF Nos. 461, 467. Plaintiffs seek summary judgment on all claims against the MPRB and partial summary judgment on the conspiracy claim brought against the Hennepin County Defendants and the City Defendants. ECF No. 441.

II

There has been substantial previous motion practice in this case, including a motion for a temporary restraining order, motions to dismiss a previous iteration of the complaint,

motions for judgment on the current version of the complaint, and the motion for class certification mentioned above.  In ruling on those motions, Judge Wright made several legal rulings that Plaintiffs argue are law of the case and may not be revisited.  *See Messenger v. Anderson*, 225 U.S. 436, 444 (1912) (Holmes, J.) (The law-of-the-case doctrine "expresses the practice of courts generally to refuse to reopen what has been decided.") (citations omitted).

The law-of-the-case doctrine is "not a limit to [a court's] power," however.  *Id.*  "A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance."  *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988).  This power should be exercised sparingly, and generally "courts should be loathe [sic] to do so in the absence of extraordinary circumstances."  *Id.*  Ultimately, though, the law-of-the-case doctrine is "a doctrine of discretion" and a successor judge may revisit previous rulings if warranted by the circumstances.  *In re Tri-State Financial, LLC*, 885 F.3d 528, 533 (8th Cir. 2018) (quoting *Estrada-Rodriguez v. Lynch*, 825 F.3d 397, 402 (8th Cir. 2016)).

Many of the previous rulings on which Plaintiffs rely were preliminary, made without benefit of the fully developed record that now exists and in a different procedural posture than the litigation's current posture.  Discovery is complete, and class certification has been denied.  Preliminary rulings must be reevaluated in light of both the record and the absence of a class.  Moreover, any previous determination that Plaintiffs successfully pleaded their claims does not mean summary judgment is not appropriate on those claims, given the differences between the Rule 12 standards and those undergirding Rule 56.

Under Rule 12, Plaintiffs need only plead "sufficient factual matter, accepted as true" to plausibly state a claim on which relief can be granted. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To avoid summary judgment, Plaintiffs bear a heavier burden to rebut Defendants' contention that discovery has revealed no genuine issues of material fact that remain to be resolved on Plaintiffs' plausibly pled claims. Fed. R. Civ. P. 56(a). And the independent obligation to ensure the existence of federal jurisdiction at all stages of the litigation demands the re-evaluation of Plaintiffs' standing in light of the full discovery record. *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("A plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992))).

III

There are multiple summary-judgment motions pending resolution. The motions, in the main, raise the same issues. The following discussion is organized by topic, rather than by motion, with any arguments specific to a particular party noted.

The summary-judgment motions are addressed with the familiar governing standards front of mind. Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The

9

evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

IV

A federal court "must address questions of standing before addressing the merits of a case where standing is called into question." *Brown v. Medtronic, Inc.*, 628 F.3d 451, 455 (8th Cir. 2010). Defendants argue the individual Plaintiffs do not have standing to seek injunctive relief because all but one are currently housed, and the unhoused Plaintiff does not live and does not intend to live in an encampment. Defendants also contend that two Plaintiffs—Roy and Westvig—lack standing to seek damages because they do not claim that Defendants destroyed their belongings. Finally, Defendants assert that ZACAH has failed to show how its alleged injuries are traceable to Defendants' alleged violations of Plaintiffs' property rights. Defendants argue that there is no evidence that ZACAH has expended any funds it would not otherwise have expended or that the funds ZACAH expended harmed its core mission, and thus that it has not demonstrated that it has standing for any form of relief.

The "'irreducible constitutional minimum of standing' requires a showing of 'injury in fact' to the plaintiff that is 'fairly traceable to the challenged action of the defendant,' and 'likely [to] be redressed by a favorable decision.'" *Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009) (alteration in original) (quoting *Lujan*, 504 U.S. at 560–61). "Plaintiffs must maintain their personal interest in the dispute at all stages of litigation." *TransUnion*, 594 U.S. at 431 (citing *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008)). And Plaintiffs "bear[] the burden of showing that [they have] standing

for each type of relief sought." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); *see also Lujan*, 504 U.S. at 561 (noting that the party invoking the Court's jurisdiction bears the burden to establish the elements of standing).

A

A plaintiff has standing to seek prospective injunctive and declaratory relief only when she faces an ongoing injury or a "real and immediate" threat of future injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–05, 107 n.8 (1983). "[I]t is the plaintiff's burden to establish standing by demonstrating that, if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue, and that the 'threatened injury [is] certainly impending.'" *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 190 (2000) (second alteration in original) (citation omitted). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974).

Plaintiffs ask the Court to "enjoin[] Defendants from continuing its [sic] unlawful policies, practices, and customs" of disbanding homeless encampments with insufficient notice and destroying encampment residents' belongings. 2d Am. Compl. at 68, ¶ I. But no individual Plaintiff currently resides in a homeless encampment in the City of Minneapolis or in Hennepin County. Thus, the individual Plaintiffs cannot demonstrate "a real, [and] immediate threat that [they] would again suffer similar injury in the future." *Harmon v. City of Kansas City*, 197 F.3d 321, 327 (8th Cir. 1999) (citations omitted); *see also Sagataw v. Frey*, No. 24-cv-001 (ECT/TNL), 2024 WL 1154677, at *2 (D. Minn. Mar.

11

18, 2024) ("Without record evidence establishing that a Plaintiff resides in [a] camp[] . . . , it would seem irresponsible to consider Plaintiffs' requests for [injunctive] relief . . . .").

Plaintiffs argue they have standing despite not currently being unhoused because they are at danger of becoming homeless again.  But an allegation that Plaintiffs may one day again be homeless and may decide to live in an encampment in Minneapolis, that one or more Defendants may decide to disband that encampment and may accomplish that encampment closure without sufficient notice to residents, and that Plaintiffs might then lose property in the closure is just the sort of "conjectural or hypothetical" threat of future injury that is "insufficient to confer standing." *Frost v. Sioux City*, 920 F.3d 1158, 1161 (8th Cir. 2019) (quoting *Lyons*, 461 U.S. at 101–02; *see also Proctor v. District of Columbia*, 531 F. Supp. 3d 49, 61 (D.D.C. 2021) (noting speculative nature of homeless individuals' alleged future harms).  "Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan*, 504 U.S. at 564.  The individual Plaintiffs do not have standing to seek injunctive relief.

Nor does ZACAH have standing to seek injunctive relief.  The last of the encampment closures in the Second Amended Complaint occurred in December 2022. There is no allegation that regular encampment closures remain ongoing, and indeed Defendants assert without contradiction that ZACAH no longer provides money for hotel rooms to house people who have left encampments.  The situation that makes injunctive relief speculative as to the individual Plaintiffs applies equally to ZACAH.

Plaintiffs contend that, even if they do not have standing for injunctive relief, they have standing to seek declaratory relief. According to Plaintiffs, the standing requirements for declaratory relief are different than those for injunctive relief, and because they have suffered harm in the past, a declaration stating that they have been so injured is necessary. The Second Amended Complaint alleges that Plaintiffs "will continue to suffer harm if Defendants' unlawful acts are permitted to continue" and "seek[s] a declaration . . . that Defendants' policies, practices, and customs . . . violate [Plaintiffs'] rights under the United States and Minnesota Constitutions." 2d Am. Compl. ¶ 276.

A request for declaratory relief "must involve 'an adjudication of present right upon established facts.'" *Frost*, 920 F.3d at 1161–62 (quoting *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 242 (1937)). Thus, "declaratory relief is limited to *prospective* declaratory relief." *Just. Network Inc. v. Craighead Cnty.*, 931 F.3d 753, 764 (8th Cir. 2019). The Eighth Circuit has emphasized that "[a] declaratory judgment is meant to define the legal rights and obligations of the parties in anticipation of *some future conduct*, not simply to proclaim liability for a past act." *Id.* (quoting *Lawrence v. Kuenhold*, 271 F. App'x 763, 766 (10th Cir. 2008)) (emphasis in *Just. Network*). "In a case of this sort, where the plaintiffs seek declaratory and injunctive relief, past injuries alone are insufficient to establish standing. Rather, [the plaintiff] must show he is suffering an ongoing injury or faces an immediate threat of injury." *Frost*, 920 F.3d at 1162 (alteration in original) (quoting *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011)). The individual Plaintiffs have "not show[n] how the past seizure of [their property] creates a 'present right' let alone how [the requested declaration] would redress" that harm. *Id.* Similarly, ZACAH

has not demonstrated that its past expenditure of funds would be redressed by a declaratory judgment that the encampment closures violated the United States or Minnesota Constitution.  Plaintiffs do not have standing for declaratory relief.

B

Plaintiffs also request compensatory damages for the destruction of their property. Plaintiffs have standing to seek damages for injuries that are "fairly traceable to the challenged action of the defendant." *Lujan*, 504 U.S. at 560-61 (cleaned up).  The Second Amended Complaint challenges the destruction of property during the closure of homeless encampments.  But only encampment closures that directly affected these Plaintiffs are now at issue, because only those closures could have resulted in the destruction of any Plaintiff's property.

Of the thirty-six locations listed in the Second Amended Complaint, the individual Plaintiffs allege that they resided in ten:  Powderhorn Park East and West, Kenwood Park, Matthews Park, Peavey Park, Brackett Park, B.F. Nelson Park, Riverside Park, Near North, and Quarry.  Not all of these locations were disbanded when a Plaintiff was living at the encampment, however.  Little is the only Plaintiff who claims to have lived in Kenwood Park, but she does not allege that she was present when Defendants closed that encampment.  2d Am. Compl. ¶ 68.  And Berry is the only Plaintiff who lived in Near North and Quarry, but Berry does not allege that these encampments were closed during that time.  *Id.* ¶ 41.  The individual Plaintiffs' claims therefore arise only out of the remaining seven locations.  As discussed more fully below, the only allegation that ZACAH incurred expenses related to a specific camp closure is that it provided Brown

14

with money for a hotel after the Peavey Park closure. *See infra* note 2. Allegations related to the closing of other encampments are not relevant to Plaintiffs' claims.

1

Two Plaintiffs—Roy and Westvig—do not allege that their property was destroyed in any encampment closure. Roy was camped in Powderhorn Park East, ECF No. 422-4 at 56–57, when she was involved in a car accident, was briefly hospitalized, and then went to stay with her sister. *Id.* at 75–76, 79, 81. She was at her sister's for at least three days and up to a week. *Id.* at 77, 80–81. When she returned to the park, her property was gone. *Id.* at 83. She asked about her property and volunteers told her that because she was gone more than three days, they gave her property to others. *Id.* at 84–85. Roy does not allege that anyone from the City, County, or MPRB took her property or that it was destroyed in a closure of the encampment. Similarly, Westvig stayed in both Loring Park and B.F. Nelson Park, but left both parks with his property before any closure. ECF No. 422-5 at 41, 48. Westvig was never present when any encampment was cleared. *Id.* at 49. Because Plaintiffs challenge only the seizure and destruction of their property, Roy and Westvig do not have standing to claim damages. *See Lujan*, 504 U.S. at 560–61 (holding that a plaintiff has standing only for injuries fairly traceable to the challenged action of the defendant).

Plaintiffs argue that Roy and Westvig have standing because they suffered emotional pain resulting from the encampment closures. But the Second Amended Complaint does not allege any tort for the infliction of emotional distress; it claims torts related to the alleged unreasonable seizure and destruction of personal property. Plaintiffs cite no authority for their argument that an individual can suffer emotional distress from

15

the destruction of others' property, destruction that Westvig and Roy may not have witnessed.  Westvig and Roy's claims will be dismissed for lack of standing.

2

To determine whether an organization like ZACAH "has standing to sue on its own behalf, courts 'conduct the same inquiry as in the case of an individual: Ha[s] the [organization] "alleged such a personal stake in the outcome of the controversy as to warrant [its] invocation of federal-court jurisdiction"?'"  *Pavek v. Simon*, 467 F. Supp. 3d 718, 739 (D. Minn. 2020) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378– 79 (1982)).  Thus, an organizational plaintiff must "[1] present an injury that is concrete, particularized, and actual or imminent; [2] fairly traceable to the defendant's challenged behavior; and [3] likely to be redressed by a favorable ruling."  *Dep't of Com. v. New York*, 588 U.S. 752, 753 (2019) (quoting *Davis*, 554 U.S. at 733).

ZACAH's claimed organizational standing rests on its contention that the encampment closures have forced ZACAH to divert resources from its core mission— providing housing and other assistance to formerly homeless individuals—to providing aid in the form of money for temporary hotel rooms when homeless individuals are forced from the encampments.  This injury is insufficient to confer standing.  *See Nat'l Fed. of Blind of Mo. v. Cross*, 184 F.3d 973, 979 (8th Cir. 1999) (explaining an organization may show standing on its own behalf "when there is a concrete and demonstrable injury to [the] organization's activities which drains its resources and is more than simply a setback to its abstract social interests").  ZACAH does not assert that the money it spent on hotel rooms "drain[ed] its resources," as *Cross* requires.  The general injury ZACAH pleads—spending

16

money the organization did not want to spend—may suffice to establish standing at the pleading stage. *See Minneapolis Branch of NAACP v. City of Minneapolis*, No. 23-cv-1175 (NEB/DTS), 2024 WL 1886759, at *3 (D. Minn. Mar. 29, 2024) (noting that "general factual allegations of injury resulting from the defendant's conduct may suffice" to establish standing at the pleading stage) (quoting *Lujan*, 504 U.S. at 561).   Summary judgment requires more.  At summary judgment, ZACAH must "alleg[e] specific facts that taken as true demonstrate" that ZACAH has "'devote[ed] significant resources to identify and counteract' [D]efendant[s'] unlawful practices." *Arkansas ACORN Fair Hous., Inc. v. Greystone Dev. Co.*, 160 F.3d 433, 434 (8th Cir. 1998) (quoting *Havens*, 455 U.S. 363 at 379).  ZACAH has not met that burden, meaning it does not have organizational standing in this case.

Even if the general injury ZACAH asserts were sufficient to confer Article III standing, ZACAH has not established that the injury is traceable to the allegedly unconstitutional conduct of which the Plaintiffs complain: the seizure and destruction of property.  There is no evidence that ZACAH diverted funds to provide hotel rooms because Defendants had destroyed or were destroying Plaintiffs' property.  Rather, the evidence is that ZACAH offered money for hotels because the encampments were closing and ZACAH believed that the individuals living in those encampments had nowhere else to go.  This is unquestionably laudable, but it is not traceable to the destruction-of-property claims that are the gravamen of this lawsuit.  ZACAH did not only offer to fund hotel stays for those who lost a tent, for example, or for those who lost important documents.  Indeed, ZACAH

did not trace its expenditures to any particular encampment closure at all.[2]  ZACAH does not have standing.

3

Plaintiffs have not identified record evidence showing that any of their alleged injuries were traceable to Hennepin County.  None of the seven locations remaining at issue was on County property, and there is no evidence that the County was responsible for disbanding any of these encampments.  The only encampment the County disbanded was the Greenway encampment.  2d Am. Compl. ¶ 242.  Plaintiffs claim the County assisted in other closures listed in the pleading, but they have pointed to no evidence in the record that any County employee seized or destroyed any property during these other closures.

Plaintiffs' insistence that the County assisted with encampment closures is based on unreasonable evidentiary interpretations.  As one example, Plaintiffs point to an email from Hennepin County employee Don Ryan to Park Police Chief Ohotto, discussing an

---

[2]   This failure presents another problem with the traceability of ZACAH's alleged injuries.  ZACAH did not track where or for whom it spent hotel funds, and has no evidence that it spent money to house anyone from a disbanded encampment, other than the four Plaintiffs who allege that ZACAH gave them money for hotel stays.  2d Am. Compl. ¶ 38 ("Sometimes, with donations from ZACAH or some friends, Mx. Berry could spend a night or two in a hotel."), ¶ 60 ("ZACAH paid for [Brown's hotel room]" after the sweep of Peavey Park.); ¶ 69 ("Thanks to temporary funding from ZACAH, Ms. Little was able to stay at a hotel for about three weeks" after leaving the Kenwood Park encampment.); ¶ 85 (After leaving Brackett Park before it was disbanded, "Ms. Roy stayed in a hotel room temporarily paid for by ZACAH.").  Only Brown's ZACAH-funded hotel stay appears directly related to an encampment closure and the loss of her property, *see id.* ¶ 59 (stating that Brown was unable to go to a shelter because she lost her identification paperwork in the sweep of Peavey Park), and thus potentially traceable to Defendants' conduct.  Paying for a single hotel room is not a sufficient "drain[]" on ZACAH's resources for purposes of the "concrete and demonstrable injury" necessary for standing.  *Cross*, 184 F.3d at 979.

18

"interagency taskforce" that would "continue to work with the organizers to continue to demobilize" encampments.  ECF No. 537 at 1 (citing ECF No. 539-1).  Plaintiffs tout this email as evidence that the County and MPRB worked hand in glove to close encampments in an unconstitutional manner.

Ryan explained this email in his deposition, noting that the "organizers" he was referring to were community-based agencies, including the Sanctuary Movement, who were dedicated to helping homeless individuals move out of encampments before they were closed.  ECF No. 422-2 at 101–03.  He denied agreeing "to work with Chief Ohotto to demobilize encampments," saying that he instead served as a subject matter expert, "as a person who is offering both shelter and services to people" in the encampments.  *Id.* at 103.  Plaintiffs have no evidence to rebut Ryan's unequivocal testimony.  And although Plaintiffs contend that the County continues to provide support for encampment closures, the evidence to which they point is a plan for an encampment closure in July 2020, not July 2022, as they assert.  ECF No. 537 at 4 (citing ECF No. 540).

In the absence of any evidence of the County's involvement in the challenged closures, Plaintiffs have not demonstrated that there are facts in the record establishing the County's liability for the claimed property-destruction injuries.  And as addressed below, Plaintiffs similarly have no evidence to connect the County to an alleged conspiracy to deprive Plaintiffs of their property rights.  Plaintiffs' property-destruction claims are not traceable to County conduct, and the County must be dismissed on that basis.

4

The same is true of Plaintiffs' claims against the City.  Two of the allegedly unconstitutional encampment closures were on City property—Near North and Quarry—which were allegedly disbanded in October and December 2022, respectively.  2d Am. Compl. ¶ 242.  As discussed above, Berry is the only Plaintiff who resided at either of these encampments, and Berry alleges only that "[s]ince December 2020, Mx. Berry has slept overnight outside at the Quarry, the Near North encampment, near the Mississippi River bank in Minneapolis, near Minnehaha Creek, and near Lake Nokomis." *Id.* ¶ 41.  Plaintiffs do not allege that Berry was present in Near North or Quarry when those camps were disbanded.  The City was not directly responsible for any encampment closure still at issue.

A Minneapolis police officer, Commander Grant Snyder, was present at the closures of three of the seven remaining camps at issue: Kenwood Park, Powderhorn West, and Peavey Park.  ECF No. 476-10 at 17–18.  Commander Snyder testified that he assisted with putting up crime-scene tape around the Kenwood Park encampment's perimeter, *id.* at 40; *see also id.* at 76 (Commander Snyder was the only City employee at Kenwood), but he did not take any part in removing or destroying any property and does not recall who was involved in removing property.  *Id.* at 45.  Commander Snyder was present at the closing of Powderhorn West and was the only City employee present.  *Id.* at 61, 76.  His role at the closure of Powderhorn West was different, however, because the Minneapolis Police Department ("MPD") "had received a variety of reports about sex trafficking at Powderhorn West." *Id.* at 65.  Thus, Commander Snyder attended this camp's closure to determine whether any of the specific individuals involved were at the camp.  *Id.*  He had

20

no role in removing any property in any of the camp closures. *E.g.*, *id.* at 62–63 (Commander Snyder showed MPRB officers how best to give individuals at Powderhorn East notice that the camp was closing); 65 (role at Powderhorn West was investigatory and he "wasn't doing what [he] was doing . . . in East").

Commander Snyder and other MPD officers were also present at the closing of Peavey Park in late September 2020. *Id.* at 73. His role at this closure was "as an observer." *Id.* The other City employees present were there "as backup for the Park Police, should they be needed" but were not present at the park itself. *Id.* at 73, 75–76. Rather, MPD squad cars were "staged" on Franklin Avenue near the park, and although protesters rushed the squad cars, the protesters drove away, and MPD officers made no arrests. *Id.* at 73–74.

Plaintiffs identify no record evidence from which a jury could reasonably conclude that any City employee assisted with the destruction of property that Plaintiffs personally experienced. Instead, Plaintiffs contend that the City admitted that it "collaborated with" the MPRB and County to close unspecified encampments, and that the City's statement that MPD officers' assistance was "largely limited to the perimeter of an encampment" means that MPD officers sometimes were not just on the perimeter. ECF No. 543 at 3.

In support of these arguments, Plaintiffs repeatedly misrepresent the evidence they cite. Plaintiffs state that Mayor Frey "confirmed" that the City and County staff closed encampments together. *Id.* The evidence they cite for this statement is the Mayor's testimony that the City and County once closed a single encampment near East Lake Street that was close to a school. *Id.* (citing Bratlie Decl. Ex. 2 [ECF No. 544-2] at 165–66). That encampment is not at issue in this case. Plaintiffs also contend that Mayor Frey

"confirmed" that MPD officers would form a barrier around encampments "that would prevent people from entering an encampment to get their private property." *Id.* What the Mayor said, however, is that there were "instances where, because of threats to the staff themselves, police have formed a barrier around the homeless encampment itself that prevents people from repeatedly going in and out." ECF No. 544-2 at 76. Plaintiffs also argue that the City was listed on the "Event Action Plans" the MPRB prepared. ECF No. 543 at 4. What these action plans show is that MPD officers were potentially responsible for "outreach" at the closure of the Powderhorn Park East encampment. *E.g.*, ECF No. 545 at 3. At the closure of the Peavey Park encampment, MPD officers were stationed in squad cars away from the camp, or were again responsible for "outreach." *Id.* at 10–11.

Plaintiffs contend that body-camera footage from Commander Snyder belies his claim that he did not participate in the Kenwood Park closure, asserting that he designated one individual's private property for destruction, ripped up tents, and "instruct[ed] residents to leave the park." ECF No. 543 at 5. The video from Commander Snyder's body cam is directly contrary to Plaintiffs' representations. In the video, Commander Snyder arrives at the park after the closure has occurred, when there are only a few scattered tents remaining. ECF No. 448 at 19:22:53. He states that they are doing a "walk-through" of the camp, accompanied by two Park Police officers. *Id.* at 19:23:02–08. Commander Snyder then approaches several tents. Each time, he calls out to anyone inside. *E.g.*, *id.* at 19:24:09, 19:27:03, 19:27:49. All tents are unoccupied. The first tent he opens has substantial property inside; Commander Snyder asks another camp resident if he knows "who's in this one," then instructs the Park Police officers to mark the tent as abandoned,

but to wait to see if the owner returned before taking the tent down.  *Id.* at 19:24:30–35.
Most of the tents are empty or largely empty.  At one point, Commander Snyder receives
a phone call and tells the individual on the other end of the call that "there's only like four
people" left in the camp.  *Id.* at 19:28:45.  As a bulldozer approaches a tent, he instructs it
to stop, looks in the tent, and asks the Park Police if they're confident no one was in the
tent.  *Id.* at 19:29:27–45.  Shortly thereafter, an individual approaches Commander Snyder
saying he does not want to see tents destroyed.  *Id.* at 19:30:11.  Commander Synder offers
to help the individual take down tents.  *Id.* at 19:30:22.  The individual decided not to take
the first tent he approaches because "it's got a huge rip in it" and instead approaches a
different tent.  *Id.* at 19:31:17.  Commander Synder did not, as Plaintiffs assert, cut open
any tent.  Rather, he tried to help someone save useable tents from destruction.  Plaintiffs
have no evidence that Commander Snyder destroyed any property or participated in the
closure of any encampment.

Plaintiffs also argue that merely setting up a perimeter around the encampments is
sufficient to impose liability on the City.  Plaintiffs rely on *Soldal v. Cook County*, 506
U.S. 56 (1992), for this argument, contending that the municipality's liability in *Soldal* was
based solely on municipal employees' actions in "enforcing a perimeter" around a private
entity's repossession of property.  ECF No. 543 at 25.  But in *Soldal*, the plaintiffs alleged
that the officers themselves "acting under color of state law, dispossessed the Soldals of
their trailer home by physically tearing it from its foundation and towing it to another lot."
*Soldal*, 506 U.S. at 72.  The Supreme Court found that these allegations, taken as true,

"suffice to constitute a 'seizure' within the meaning of the Fourth Amendment." *Id.* Plaintiffs have identified no comparable evidence.

Without evidence of a City employee's participation in either the seizure or destruction of their property, Plaintiffs' injuries are not traceable to the City's actions. *See California v. Texas*, 593 U.S. 659, 669 (2021) (describing traceability as "the need to assert an injury that is the result of" the defendant's actions). As with the County, Plaintiffs have no evidence that the City engaged in a conspiracy with the other Defendants, either. The City Defendants are entitled to summary judgment on this basis.

5

Plaintiffs include as putative defendants unknown police-officer agents "of the City of Minneapolis Defendants, Hennepin County, Hennepin County Sheriff, and the MPRB." 2d Am. Comp. ¶ 156. But the extensive discovery in this matter has not identified any individual police-officer defendant.

The Rules require a plaintiff to serve the summons and complaint on each named defendant "within 90 days after the complaint is filed." Fed. R. Civ. P. 4(m). The failure to do so "must" result in the dismissal of the claims against unserved defendants without prejudice or an order that service be made within a specified time. *Id.* Plaintiffs have not served their pleadings on the Doe Defendants within the time Rule 4 allows. Plaintiffs concede that they have not identified the alleged Doe Defendants and that those Defendants must be dismissed without prejudice. *Brown v. City of Bloomington*, 280 F. Supp. 2d 889, 892 (D. Minn. 2003).

V[3]

Plaintiffs' federal constitutional claims arise under the Fourth Amendment's unreasonable-seizure provision and the Fourteenth Amendment's due-process clause. Taking the seizure claim first, Plaintiffs allege that "Defendants' policies, practices, and custom of seizing Plaintiffs' property without a valid warrant, probable cause, or exigent circumstances is unreasonable" and violates the Fourth Amendment.  2d Am. Compl. ¶ 253.  At bottom, Plaintiffs' Fourth Amendment claim is that Defendants seized and destroyed Plaintiffs' property in encampment closures without providing sufficient notice of the closures to camp residents.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  These requirements apply to state or local government conduct through

---

[3]    Section 1983 provides no cause of action for violations of state constitutional rights. *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (noting the first element of a § 1983 claim is "that some person has deprived [the plaintiff] of a federal right").  Moreover, "there is no corollary to section 1983 under state law, and 'courts have repeatedly stated that Minnesota has not recognized private remedies for violations of the Minnesota Constitution.'"  *White v. Dayton*, No. 11-cv-3702 et al. (NEB/DJF), 2023 WL 21918, at *16 (D. Minn. Jan. 3, 2023) (quoting *Fearing v. St. Paul Police Dep't*, No. 02-4744 (ADM/JSM), 2005 WL 914733, at *5 (D. Minn. Apr. 20, 2005)), *R. & R. adopted*, 2023 WL 1797830 (D. Minn. Feb. 7, 2023); *see also Jones v. James*, No. 02-cv-4131 (JNE/RLE), 2005 WL 459652, at *8 (D. Minn. Feb. 24, 2005) ("Minnesota does not recognize a tort for deprivation of due process."); *N. Star Legal Found. v. Honeywell Project*, 355 N.W.2d 186, 188 (Minn. Ct. App. 1984) ("[An] action under Article 10, section 1 has never been recognized in Minnesota.").  Plaintiffs do not address this argument in their responses, apparently conceding it.  Plaintiffs' claims under the Minnesota Constitution will be dismissed.

the Fourteenth Amendment.  *Ker v. California*, 374 U.S. 23, 30–31 (1963).  A seizure violates the Fourth Amendment when it is "unreasonable."  U.S. Const. amend IV.

For purposes of the Fourth Amendment, "'seizure' of property," is "some meaningful interference with an individual's possessory interests in that property."  *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).  A seizure of an individual's property violates the Fourth Amendment only if the individual had a reasonable expectation of privacy in the property at the time of the seizure.  This inquiry is two-pronged: did the plaintiff have "an actual (subjective) expectation of privacy" in the property seized, and was that subjective expectation of privacy objectively reasonable—was it "viewed objectively, . . . 'justifiable' under the circumstances"?  *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (citations omitted).  "The first part of the test is a question of fact . . . , while the second part is a question of law."  *United States v. Kiser*, 948 F.2d 418, 423 (8th Cir. 1991).

## A

The record shows that five Plaintiffs—Berry, Brown, Little, Barrow, and Huiting— experienced a seizure of their property.  Defendants do not dispute that all these Plaintiffs had a subjective expectation of privacy in their property.  The question is whether that subjective expectation was reasonable.

A person who "voluntarily discard[s]" property can "no longer retain a reasonable expectation of privacy with regard to it at the time of the [seizure]."  *United States v. Winchester*, 916 F.2d 601, 603 (11th Cir. 1990).  "The Fourth Amendment does not prohibit seizure of property that has been 'abandoned.'"  *Proctor*, 531 F. Supp. 3d at 66 (quoting *United States v. Thomas*, 864 F.2d 843, 845 (D.C. Cir. 1989)); *see also Abel v.*

*United States*, 362 U.S. 217, 241 (1960) ("There can be nothing unlawful in the Government's appropriation of . . . abandoned property."). "Whether an abandonment has occurred is determined on the basis of the objective facts available to the [municipal actor], not on the basis of the owner's subjective intent." *United States v. James*, 534 F.3d 868, 873 (8th Cir. 2008) (citation omitted).

The facts, viewed in the light most favorable to Plaintiffs, show that the seizure of Little's property at Kenwood Park and Huiting's property at Riverside Park was reasonable because these Plaintiffs did not have an objectively reasonable expectation of privacy in that property at the time it was seized. Little concedes she left the Kenwood Park encampment before it was closed and purposely left her property behind because it had been damaged. ECF No. 422-1 at 101. Even assuming the MPRB seized Little's property, the MPRB was entitled to assume that unattended, damaged property in a public park was abandoned.

Huiting left his property at both Riverside and Matthews Parks, even after learning that those encampments would be closed. ECF No. 422-9 at 53–57. At Riverside Park, Huiting went to stay in a hotel after learning that the encampment would be closed, leaving his tent and other property unattended in the park. *Id.* at 46. When he returned two days later, his property was gone. *Id.* Four or five days after receiving notice that the Matthews Park encampment would be closed, Huiting left for two hours and returned to the MPRB closing the encampment and his tent and possessions gone. *Id.* at 88, 104, 117. He had not asked anyone at the camp to watch his belongings in his absence. *Id.* at 120.

A fact question may exist as to whether the property Huiting left in Matthews Park was abandoned and whether its destruction was reasonable, because he left that property for only a few hours. *See Ellis v. Clark Cnty. Dep't of Corr.*, No. 15-5449 RJB, 2016 WL 4945286, at *2, *10 (W.D. Wash. Sept. 16, 2016) (finding plaintiff who left his property in a public park for two hours established a genuine issue as to whether that property had been abandoned); *see also Lavan v. City of Los Angeles*, 693 F.3d 1022, 1024 (9th Cir. 2012) (holding that the Fourth Amendment prohibits the destruction of "momentarily unattended[] personal property"). There is no such fact issue as to whether Huiting had a reasonable expectation of privacy in the property he left unattended for two days in Riverside Park before it was allegedly destroyed. *See Proctor v. District of Columbia*, 310 F. Supp. 3d 107, 114 (D.D.C. 2018) (property could be deemed abandoned when "other encampment residents reported that they had not seen the owners 'in a while'" or when the owner walked away from her property at the beginning of the encampment clean-up). As with Little's property, the MPRB was entitled to assume that Huiting's property at Riverside Park was abandoned. Defendants are therefore entitled to summary judgment on any Fourth Amendment claims arising out of the alleged unreasonable seizure of Little's property and Huiting's property in Riverside Park.

The inquiry into the objective reasonableness of the remaining Plaintiffs' expectation of privacy requires "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696, 703 (1983). The legal question regarding the reasonableness of these Plaintiffs' subjective expectations

of privacy must be viewed not only in light of the individual facts and circumstances of each alleged deprivation, but also in light of the laws and ordinances in place at the time, as well as the unprecedented challenges Defendants faced because of the COVID-19 pandemic and the social unrest in Minneapolis during the summer of 2020.

Start with what the law provided regarding public parks. There is no "constitutional right to store one's personal belongings on public lands." *Church v. City of Huntsville*, 30 F.3d 1332, 1345 (11th Cir. 1994). And in Minneapolis, Park Board Ordinance PB2-33 prohibits remaining in Minneapolis parks between 10:00 p.m. or midnight and 6:00 a.m., unless the activity has a permit to do so.

In the early days of the COVID-19 pandemic, however, Minnesota Governor Tim Walz declared a peacetime emergency prohibiting the removal of homeless individuals from public spaces, unless the local government provided alternate shelter options or "if an encampment has reached a size or status that is a documented threat to the health, safety, or security of residents." Minn. Emergency Exec. Order No. 20-47. Thus, in June 2020, the MPRB declared Minneapolis parks "refuge space" for homeless individuals. ECF No. 359-2 at 5 (MPRB Res. 2020-253).

A month later, the situation in many of Minneapolis's parks had become untenable, with rampant drug use, crime, property destruction, and unsanitary conditions in homeless encampments. *See* 2d Am. Compl. Ex. 28 [ECF No. 359-1] (Aug. 14, 2020, *Star Tribune* editorial noting "Shootings. Knife attacks. Harassment, assault and thefts. Open-air drug using and dealing. Noise at all hours of the night. Trash on the grass and streets. Reports of sexual assault and exploitation of girls and women. Those are some of the problems

nearby residents and others have experienced since the [MPRB] allowed the homeless to camp in city parks."). In mid-July, the MPRB amended Resolution 2020-253 to require a permit for any encampments in public parks. ECF No. 444-21 (MPRB Res. 2020-267). The new resolution specified that only twenty parks could be used for permitted encampments, limited those encampments to twenty-five tents per site, provided that the MPRB would set up sanitation facilities at permitted sites, and stated that "any encampment that does not have a necessary permit . . . will be subject to removal from park property." *Id.* at 3.

This resolution reflected the MPRB's concern about homeless individuals' safety in view of the upcoming winter and instructed staff to determine a plan regarding "moving encampment occupants into shelter and housing suitable for winter conditions." *Id.* at 4. The resolution also allowed the Superintendent of Parks to "restrict, limit, or close encampments based on exigent circumstance" if there was "a documented threat to the health, safety, or security of residents." *Id.* In particular, the resolution highlighted the large encampments in Powderhorn Park as "not consistent with the health guidance related to" the pandemic. *Id.* at 1.

After enacting Resolution 2020-267, the MPRB started to disband unpermitted encampments. Barrow, who camped in Powderhorn Park West, concedes he received notice of the MPRB's intent to close the camp. ECF No. 422 at 95. When the notice was given, there were multiple people at the site organizing "rides and stuff" to other sites. *Id.* at 99. Although he intended to leave, and had received information about alternate shelter arrangements, including permitted encampments, Barrow did not leave Powderhorn, and

the subsequent closure resulted in him losing his tent and other property. *Id.* at 98, 115, 117.

Huiting also had notice that Matthews Park would be closed. ECF No. 422-9 at 88. He nevertheless did not pack and move to a permitted encampment site. Instead, on a morning when he was away from the encampment four or five days after receiving the closure notice, the MPRB closed the encampment and Huiting lost his tent and other possessions. *Id.* at 104, 117.

Brown claims she did not receive any notice that the Peavey Park encampment would be closed. ECF No. 422-8 at 67. She asserts that police showed up early in the morning of September 24, 2020, yelling that she had thirty minutes to pack and leave. *Id.* at 67–68. She went to use the restroom, and when she returned to her tent, the officials were "throwing [her] tent into the garbage truck." *Id.* at 68. Brown had camped at Peavey Park for "almost two months" before the MPRB disbanded the encampment in September 2020. *Id.* at 27, 67. MPRB submitted evidence showing that on August 10, 2020, park police passed out notice that the Peavey Park encampment would be closed. ECF No. 520 at 54:54–1:01:28; *see also* 2d Am. Compl. Ex. 28 (Aug. 14, 2020, Star Tribune editorial stating that the MPRB served eviction notices "this week" to encampments at Kenwood, Elliot, and Peavey Parks).

Like Brown, Berry claims not to have received notice that the Powderhorn Park West encampment would be closed. ECF No. 422-7 at 97, 109. MPRB Superintendent Al Bangoura testified that MPRB gave "a couple weeks" of notice that the encampment would be closed, had school buses sitting at the park for a two-week period after the notice to

move individuals to a different, permitted site, and provided trailers to move people's belongings.  ECF No. 519-2 at 155–56.  According to Bangoura, after the MPRB gave notice that an encampment would be closed, MPRB would spend "time in those sites with our outreach teams . . . . helping to work within those encampments, to get people at least – to help them to gather their stuff, to help them . . . move their things, to get them to a permanent site that we had available for them."  *Id.* at 157–58.

A seizure of property from a public place after giving notice that the property would be removed renders an individual's subjective expectation of privacy in the property not objectively reasonable.  *See, e.g.*, *Murray v. City of Philadelphia*, 481 F. Supp. 3d 461, 471 (E.D. Pa. 2020) (prior notice of seizure of homeless individuals' property means plaintiffs not likely to prevail on their Fourth Amendment claim); *Proctor*, 310 F. Supp. 3d at 114–15 (notice allowing homeless individuals two weeks to move or pack rendered reasonable the seizure and destruction of property that appeared abandoned); *Hooper v. City of Seattle*, No. C17-77RSM, 2017 WL 591112, at *6 (W.D. Wash. Feb. 14, 2017) (policy of providing 72 hours' notice, except in case of emergency, established that plaintiffs were not likely to prevail on Fourth Amendment claim); *Martin v. City & Cnty. Of Honolulu*, Civ. No. 15-00363 HG-KSC, 2015 WL 5826822, at *4 (D. Haw. Oct. 1, 2015) (providing "twenty-four hours written notice before items are seized," post-seizure notice of property seized, and storage of items for thirty days complied with Fourth Amendment).

The two Plaintiffs who received notice that the encampments at which they were storing belongings would be subject to closure did not have an objectively reasonable expectation of privacy in that property.  Barrow received notice that Powderhorn Park West

would be closed, but he decided not to leave.  Huiting received notice that Matthews Park would be closed and did not move his property.  Barrow and Huiting have not established any issue remaining for resolution on their Fourth Amendment claims.

Berry and Brown assert they did not receive notice that the encampments in which they were camping, Powderhorn Park West and Peavey Park, would be disbanded. Plaintiffs acknowledge that the evidence shows the MPRB gave notice of the closures of these encampments, but argue that the notice given was too short to allow residents to gather their belongings, leading to the destruction of residents' property.

Plaintiffs have failed to provide evidentiary support for their contention that the MPRB gave residents less than twenty-four hours' notice at Powderhorn Park West.  The document on which they rely references the closure of Loring Park and does not mention Powderhorn Park West.  *See* ECF No. 532 at 6 n.28 (citing Bratlie Decl. Ex. 10 [ECF No. 534] at 37).  None of the documents in this exhibit specifically relate to the closing of the Powderhorn Park West encampment, and a document that mentions Powderhorn Park West states that the "encampment was issued notice of impending demobilization" on or about August 3, 2020.  *Id.* at 31.  Powderhorn Park West was closed on August 10, 2020.  2d Am. Compl. ¶ 242.  Plaintiffs' assertion that notice for the closure of Powderhorn Park West was insufficient finds no support in the record.

Plaintiffs concede that the MPRB gave notice that Peavey Park would be closed several weeks in advance, but the notice did not specify the precise date and time of the closure.  They claim that on the day the MPRB closed the camp, residents were only given thirty minutes' notice to leave with their property.  The document on which Plaintiffs rely

33

for this assertion is an "Event Action Plan" for the closure of Peavey Park on September 24, 2020. This document states that Park Police first "provided notice of impending disbandment at Peavey Park" on August 10, 2020. Bratlie Decl. Ex. 10 at 8. The MPRB offered transportation for all occupants to a permitted encampment site that week; as of September 24, 2020, however, all authorized encampment sites were full. *Id.* Although the MPRB intended to close Peavey Park two days after the initial notice, or August 12, 2020, "a large contingent of protestors" prevented the encampment's closure on that date. *Id.* at 31. The action plan thus provided that the Park Police would provide thirty minutes' notice to camp occupants on the day of the closure. *Id.* at 9. As discussed in more detail below, the MPRB's decision to close the encampment with limited notice was reasonable in light of the threats to employee safety the protesters posed. It is therefore likely that neither Berry nor Little can demonstrate that the seizure of their property was unreasonable in the first instance.

B

Assume for purposes of these motions that Berry and Little have pointed to facts in the record to support their claim that they were deprived of property in an unreasonable manner in violation of the Fourth Amendment. *See Camara v. Mun. Ct. of San Francisco*, 387 U.S. 523, 539 (1967) (noting that the "ultimate standard" of Fourth Amendment liability is reasonableness). Because Defendants are municipal entities,[4] showing they

---

[4]     Claims against public officials sued in their official capacities are "treated as claims against the municipality." *Morris v. Cradduck*, 954 F.3d 1055, 1060 (8th Cir. 2020). The individual Defendants are all sued in their official capacities.

unreasonably deprived Plaintiffs of property is not enough.  Berry and Brown must also "prove that a municipal policy or custom was the 'moving force [behind] the constitutional violation.'"  *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999) (alteration in original) (quoting *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978)).

A policy is "an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Mettler*, 165 F.3d at 1204.  A "custom," on the other hand, is "a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;" "[d]eliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct;" and "[proof] that the custom was the moving force behind the constitutional violation." *Ware v. Jackson Cnty.*, 150 F.3d 873, 880 (8th Cir. 1998) (second alteration in original) (quoting *Jane Doe A v. Special Sch. Dist. of St. Louis Cnty.*, 901 F.2d 642, 646 (8th Cir. 1990)).  Only "deliberate" action by a municipality can meet the "moving force" requirement. *Bd. of Comm'rs v. Brown*, 520 U.S. 397, 400 (1997).

Plaintiffs contend that MPRB Resolution 2020-267 was an unconstitutional policy that gave rise to the constitutional violations they allege.  They acknowledge that Resolution 2020-267 does not address the issue of property seizure, destruction, or storage, arguing that the resolution's failure to address these issues is evidence that the policy violates the constitution on its face.  According to Plaintiffs, any policy that purports to allow the closure of encampments must include provisions for notice of the closure and

storage of encampment residents' property. Absent those constitutional safeguards, Plaintiffs assert, the policy is unconstitutional.

When pressed for legal authority to support this broad proposition, Plaintiffs point to a decision from the Western District of Washington and *Monell*. But these authorities do not support Plaintiffs' argument. In *Ellis v. Clark County Department of Corrections*, the policy at issue "state[d] that work crews were to 'immediately' clean up all homeless camps 'if a camp has been abandoned or there is no one currently at the site.'" No. 15-5449 RJB, 2016 WL 4945286, at *10 (W.D. Wash. Sept. 16, 2016). The policy thus explicitly allowed County employees to take and destroy all property they found, whether or not the property in fact had been abandoned. *Id.* The *Ellis* court did not determine that the policy's failure to provide safeguards for property seizures made the policy unconstitutional, but rather found that the policy explicitly allowed unconstitutional property seizures. Resolution 2020-267 does not provide for the seizure or destruction of property and does not give any MPRB employee the authority to violate homeless individuals' property rights.

Similarly, in *Monell*, the policy at issue was an "official policy [that] compelled pregnant employees to take unpaid leaves of absence before such leaves were required for medical reasons." *Monell*, 436 U.S. at 661. The policy in *Monell* was not faulty for insufficiently providing constitutional protections, but rather for on its face violating the employees' substantive due-process rights. *See id.* at 662; *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("In *Monell* itself, it was undisputed that there had been an official policy requiring city employees to take actions that were unconstitutional

under this Court's decisions."). *Monell* does not support Plaintiffs' argument regarding Resolution 2020-267.

What Plaintiffs challenge is a custom, not a policy. *See Ellis*, 2016 WL 4945286 at *10 (noting that, once the official property-destruction policy was changed, county employees' continued seizure and destruction of property was pursuant to a "long standing custom of picking up and immediately destroying unattended property"). Plaintiffs' argument is that the policy, by failing to specify any constitutional safeguards, allowed MPRB employees to violate constitutional rights. This is akin to an argument that there was "a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees" that should have put policymakers on notice that its employees were violating constitutional rights in the absence of a policy that prevented them from doing so. *Ware*, 150 F.3d at 880. Or put another way, Plaintiffs contend that the MPRB's official policy was inadequate and MPRB employees developed unofficial—and unconstitutional—customs or practices to fill in the gaps.

A custom has the force of law if it is "continuing, widespread, [and] persistent." *Id.* The alleged constitutional violation must be "so pervasive among non policymaking employees . . . as to constitute a custom or usage with the force of law." *Granda v. City of St. Louis*, 472 F.3d 565, 568 (8th Cir. 2007) (citation omitted); *see also Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (holding that an unconstitutional custom exists when a municipality acquiesces in a "longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity" (citation omitted)). The "timeframe or duration of the incidents" is an important factor to consider when evaluating

whether official action amounts to an unconstitutional custom or practice. *Samaha v. City of Minneapolis*, 525 F. Supp. 3d 933, 941 (D. Minn. 2021). Thus, a municipal employee's egregious misconduct that "spanned five months" sufficiently established "a pattern of unconstitutional conduct" for purposes of *Monell* liability. *Ware*, 150 F.3d at 881. And several employees' misconduct toward a single individual over the course of three years can establish the requisite custom for *Monell* purposes. *McGautha v. Jackson Cnty., Mo., Collections Dep't*, 36 F.3d 53, 55 (8th Cir. 1994).

When determining whether actions are widespread and longstanding enough to rise to the level of a custom, the question is whether "some evidence indicates that the incidents occurred over a course of time sufficiently long to permit notice of, and then deliberate indifference to or tacit authorization of, the conduct by policymaking officials." *Johnson v. Douglas Cnty. Med. Dep't*, 725 F.3d 825, 829 (8th Cir. 2013). Resolution 2020-267 was adopted on July 15, 2020. ECF No. 444-21 at 4. When the MPRB cleared the encampments at issue, Resolution 2020-267 had been in force for a matter of weeks: Powderhorn Park West, where Berry camped, was cleared August 10, 2020; Peavey Park, where Brown camped, was cleared September 24, 2020. 2d Am. Compl. ¶ 242.

Powderhorn Park West was the second encampment cleared pursuant to Resolution 2020-267. "Deliberate indifference is determined by analyzing whether the municipality knew or should have known of the risk of constitutional violations, an objective standard." *Baker v. District of Columbia*, 326 F.3d 1302, 1307 (D.C. Cir. 2003) (citing *Farmer v. Brennan*, 511 U.S. 825, 841 (1994)). The second encampment closure pursuant to a new resolution cannot have put the MPRB on notice of the risk of constitutional violations. *See*

*Tirado v. City of Minneapolis*, 521 F. Supp. 3d 833, 842 (D. Minn. 2021) (noting the time period at issue "is sufficiently long when it would permit notice of the unlawful practice"). Plaintiffs cannot demonstrate an unconstitutional custom for the Powderhorn Park West closure.

Peavey Park was the seventh encampment the MPRB closed after enacting Resolution 2020-267. 2d Am. Compl. ¶ 242. If the two-month period that elapsed between Resolution 2020-267 and the closing of the Peavey Park encampment was sufficiently long to provide notice to the MPRB of its employees' allegedly unconstitutional behavior, and if the notice of closure given at Peavey Park was unconstitutionally short, Plaintiffs cannot establish that there was a widespread custom of giving insufficient notice at the time the MPRB disbanded the Peavey Park encampment. Encampment closures that occurred between Powderhorn Park West on August 10, 2020, and Peavey Park on September 24, 2020, do not support Plaintiffs' assertion that there was a widespread custom of giving insufficient notice by the time the MPRB disbanded the Peavey Park encampment. An event action plan for the closure of Loring Park on August 26, 2020, for example, states that MPRB provided notice that the encampment would be closed on August 18, 2020, a week before it was closed. Bratlie Decl. Ex. 10 [ECF No. 534] at 37. And the MPRB gave two days' notice that Elliot Park would be closed on August 12, 2020. *Id.* at 18. Plaintiffs cannot establish the required widespread and longstanding custom or practice with a single incident. *Mettler*, 165 F.3d at 1205 ("A single incident normally does not suffice to prove the existence of a municipal custom."). Plaintiffs have pointed to no evidence in the record

that the notice period allegedly provided at Peavey Park was pursuant to an unofficial custom or practice so widespread as to have the force of law.

Plaintiffs have not identified evidence that might be reasonably construed to show a widespread custom to close encampments with insufficient notice at the time the Powderhorn West and Peavey Park encampments were closed.  Judgment in Defendants' favor is appropriate on Plaintiffs' Fourth Amendment claim.

VI

Plaintiffs' remaining § 1983 claim asserts a violation of their procedural due-process rights.  Even a reasonable seizure can violate due process if notice of it was not "reasonably calculated, under all the circumstances, to apprise interested parties of the [seizure] and afford them an opportunity to present their objections."  *Jones v. Flowers*, 547 U.S. 220, 226 (2006) (citation omitted).  These notice requirements apply to government decisions "which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."  *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).

Analysis of a procedural due process claim "proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the [municipal entity] were constitutionally sufficient."  *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).  Because Plaintiffs' claims arise under § 1983, they must also establish that a municipal policy or custom was the "moving force" behind the alleged due-process violation.  *Monell*, 436 U.S. at 691, 694.

Assuming Plaintiffs have a protected property interest in their personal property,[5] "[a] procedural due process claim focuses not on the merits of a deprivation, but on whether the State circumscribed the deprivation with constitutionally adequate procedures." *Parrish v. Mallinger*, 133 F.3d 612, 615 (8th Cir. 1998). "This inquiry examines 'the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law.'" *Id.* (quoting *Zinermon v. Burch*, 494 U.S. 113, 126 (1990)). "Relevant factors include the affected private interest, the risk of an erroneous deprivation, the probable value of additional procedural safeguards, and the government's interest, including burdens that additional safeguards would entail." *Id.* (citing *Mathews*, 424 U.S. at 335). The question is not whether Plaintiffs were deprived of their property, but what process was due to accomplish that deprivation.

The MPRB argues that it provided pre-deprivation procedures in the form of the notice that each encampment would be closed. ECF No. 520 (showing the notice given at encampments and Park Police handing notice to each individual tent at those encampments). Plaintiffs argue that only date-certain notice is constitutionally sufficient, because without a date certain, individuals do not have enough time to gather their possessions. Plaintiffs contend that, barring an emergency, due process requires at least

---

[5]     "Protected property interests are created by state law, but federal law determines whether the interest rises to the level of a constitutionally-protected property interest." *Ellis v. City of Yankton*, 69 F.3d 915, 917 (8th Cir. 1995). "Historically, [Minnesota has] limited the property rights that are entitled to due process to real property rights, final judgments, and certain vested statutory rights." *Schatz v. Interfaith Care Ctr.*, 811 N.W.2d 643, 658 (Minn. 2012).

twenty-four hours' date-certain notice and requires a process to store and inventory belongings that individuals are unable to move.  *See Phillips v. City of Cincinnati*, 479 F. Supp. 3d 611, 646 (S.D. Ohio 2020) ("In the context of the collection or destruction of the possessions of people experiencing homelessness that are left unattended in a public space, courts have found that minimally, the municipality must provide advance notice and a meaningful way to collect the property.") (collecting cases);[6] *Martin v. City & Cnty. of Honolulu*, Civ. No.15-00363 HG-KSC, 2015 WL 5826822, at *4 (D. Haw. Oct. 1, 2015) (the provision of "twenty-four hours written notice before items are seized," post-seizure notice of property seized, and storage of items for thirty days complied with Fourth Amendment).

Assuming due process requires notice before encampments are disbanded, "actual notice" of the planned deprivation means that "there was no procedural due process violation."  *Hroch v. City of Omaha*, 4 F.3d 693, 696 (8th Cir. 1993).  Because Barrow

---

[6]      All cases cited in *Phillips* are cases from courts in the Ninth Circuit.  *Phillips*, 479 F. Supp. 3d at 646 (first citing *O'Callaghan v. City of Portland*, No. 3:12-cv-201, 2013 WL 5819097, at *4 (D. Or. Oct. 29, 2013); then citing *Cobine v. City of Eureka*, No. 16-02239 JSW, 2016 WL 1730084, at *4 (N.D. Cal. May 2, 2016); then citing *Mitchell v. City of Los Angeles*, No. CV 16-01750 SJO (GJSx), 2016 WL 11519288, at *5 (C.D. Cal. Apr. 13, 2016); and then citing *De-Occupy Honolulu v. City & Cnty. of Honolulu*, No. CIV 12-00668 JMS, 2013 WL 2285100, at *6–7 (D. Haw. May 21, 2013)).  The Ninth Circuit Court of Appeals previously held both that the Fourth Amendment prohibits the seizure of homeless individuals' property left for a short time in a public place, *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1024 (9th Cir. 2012), and that the Eighth Amendment precludes a municipality from threating arrest to homeless individuals camping in public parks, *Johnson v. City of Grants Pass*, 72 F.4th 868, 890 (9th Cir. 2023).  *Grants Pass* has since been reversed, *City of Grants Pass v. Johnson*, --- U.S. ---, 144 S. Ct. 2202 (2024), and the Eighth Circuit Court of Appeals has not extended either the Fourth Amendment or the Eighth Amendment as far.

received more than twenty-four hours' notice that Powderhorn Park West would be closed and decided to remain, he has no due-process claim.  Similarly, Huiting received notice more than twenty-four hours before Matthews Park was closed, and he also acknowledges knowing that Riverside Park would be closed.  He nevertheless did not move his property from those locations, and, like Barrow, has no procedural due-process claim.

Brown and Berry claim they did not receive any notice that the encampments in which they allege to have lost property would be disbanded, although, as discussed above, evidence shows the MPRB gave some notice at both camps.  The lack of advance notice is not dispositive of their due-process claim, however.  If pre-deprivation procedures are insufficient, the existence of a meaningful post-deprivation remedy for the property's destruction means there was no due process violation.  *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984) ("[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available."); *see also Mhanna v. Metro. Council*, No. 21-cv-1974 (ECT/DTS), 2023 WL 3179347, at *12 (D. Minn. May 1, 2023).  Such procedures may include administrative claims or "remedies for erroneous deprivations provided by statute or tort law."  *Parrish*, 133 F.3d at 615 (citation omitted).  The MPRB provides an administrative remedy for lost or destroyed property.  *See* Notice of Claim with the Minneapolis Park and Recreation Board,   https://www.minneapolisparks.org/wp-content/uploads/2021/07/   MPRB-claim-form-Online-Fillable-REVISED-1.pdf   (archived   at   https://perma.cc/P4FV-5YYN).

Plaintiffs also have tort remedies—their conversion claim in this lawsuit is an example of such a remedy.

Even if pre-deprivation procedures are required, determining what procedures are necessary must consider the "burdens that additional safeguards would entail." *Parrish*, 133 F.3d at 615. Plaintiffs offer no suggestion as to what process might be due in the situation confronting the MPRB in the summer and fall of 2020, when hundreds of individuals were camping illegally in Minneapolis Parks in the midst of a global pandemic and significant social unrest. Both substantial and specific advance notice as well as the requirement that the MPRB offer storage are a significant burden on the MPRB. *See* ECF No. 519-2 at 153–54 (Superintendent Bangoura's testimony that the MPRB "didn't have anything regarding storage locations for encampment property"); *see also Proctor*, 310 F. Supp. 3d at 117 (finding that a broad storage requirement would "impose on the [Defendant] the unnecessary and potentially significant cost of storing abandoned property"). The evidence shows that the MPRB frequently offered to move individuals' belongings to permitted encampment sites and in at least one park had buses and trailers on site for two weeks to move belongings. ECF No. 519-2 at 155–56 (discussing Powderhorn Park East).

Moreover, the record shows that affording additional and specific notice of certain encampment closures would have endangered MPRB employees' safety. After providing notice on August 10, 2020, that the Peavey Park encampment would be disbanded on August 12, 2020, "activists and protestors [] displayed an increased presence in Peavey Park." Bratlie Decl. Ex. 10 [ECF No. 534] at 8. When the MPRB actually disbanded the

encampment in late September 2020, "only about six [of the thirty tents remaining in the park] contain[ed] individuals considered to be homeless." *Id.* The remainder were sheltering activists. *Id.* The activists in Peavey Park had been seen with homemade riot shields, baseball helmets, and gas masks, were also seen practicing throwing rocks in slings and placing fencing with nails throughout the encampment, and had physically prevented squad cards from driving through the park on patrols. *Id.* This activity was concerning to the Park Police, because during the closure of Powderhorn Park West, "Park Police were attacked by activists" and "[m]any of those [same] activists" were present at Peavey Park. *Id.*

Evaluating the "[r]elevant factors," including the "the government's interest, [and the] burdens that additional safeguards would entail," *Parrish*, 133 F.3d at 615, Plaintiffs have not established a submissible claim that their procedural due-process rights were violated. In most instances, the MPRB provided sufficient notice that encampments would be closed, and the MPRB's decision not to specify the precise date and time of some encampment closures was a reasonable one in light of the dangers specific notice posed to staff safety. Requiring the MPRB to store property is a substantial burden, especially considering the testimony of multiple witnesses that most property left in an encampment was garbage, including moldy sleeping bags, human waste, used syringes, and rotting food. The MPRB could not feasibly have stored all property they encountered when closing encampments. Defendants are entitled to summary judgment on Plaintiffs' procedural due-process claim.

VII

Plaintiffs claim the destruction of their property constitutes a conversion under state law. Minnesota defines "conversion" as "an act of willful interference with [the personal property of another], done, without lawful justification, by which any person entitled thereto is deprived of use and possession." *Christensen v. Milbank Ins. Co.*, 658 N.W.2d 580, 585 (Minn. 2003) (quoting *Larson v. Archer–Daniels–Midland Co.*, 32 N.W.2d 649, 650 (Minn. 1948)). Defendants argue that, to the extent any Plaintiff has demonstrated an interference with their personal property, that interference was legally justified and was not a conversion.

Plaintiffs' conversion claims are like those rejected in *Mullaney v. University of St. Thomas*, No. A19-0964, 2020 WL 1846475 (Minn. Ct. App. Apr. 13, 2020). Mullaney was a graduate student in the business school at the University of St. Thomas when he stored personal property in a locker at the University's law school. *Id.* at *1. "Mullaney was not (and has never been) a law student." *Id.* After posting notices and emailing those with assigned lockers, the law school cleaned the lockers and removed Mullaney's property. Because Mullaney did not have permission to store his belongings in a law-school locker, the University was justified in discarding Mullaney's property and thus was entitled to summary judgment on Mullaney's conversion claim. *Id.* at *3.

Plaintiffs did not have permission to store their belongings in a public park in Minneapolis. Park regulations specifically prohibited overnight camping in public parks in Minneapolis. And while, during the COVID-19 pandemic, the MPRB allowed some encampments, the relevant resolution made clear that encampments would be allowed only

in certain parks and only with a permit.  There is no dispute that none of the Plaintiffs'
claims arise out of encampments that had a valid permit at the time the MPRB closed the
encampment.  The MPRB was legally justified in interfering with the property Plaintiffs
left in the unpermitted encampments, and there is no submissible conversion claim.

VIII

Because Plaintiffs have not established any violation of their constitutional rights,
there can be no conspiracy to violate those rights.  *See Riddle v. Riepe*, 866 F.3d 943, 949
(8th Cir. 2017) ("Absent a constitutional violation, there is no actionable conspiracy
claim.") (citations omitted).  But even if Plaintiffs had sufficiently demonstrated that their
rights were violated, they have no evidence that Defendants conspired to violate those
rights.

A plaintiff asserting a conspiracy to violate his constitutional rights "must show
'[(1)] that the defendant conspired with others to deprive him . . . of a constitutional right;
[(2)] that at least one of the alleged co-conspirators engaged in an overt act in furtherance
of the conspiracy; and [(3)] that the overt act injured the plaintiff.'"  *Solomon v. Petray*,
795 F.3d 777, 789 (8th Cir. 2015) (alterations in original) (quoting *Askew v. Millerd*, 191
F.3d 953, 957 (8th Cir. 1999)).  "A conspiracy claim . . . requires allegations of specific
facts tending to show a 'meeting of the minds' among the alleged conspirators."  *Murray*
*v. Lene*, 595 F.3d 868, 870 (8th Cir. 2010).  Put differently, "the plaintiff must show
evidence sufficient to support the conclusion that the defendants reached an agreement to

47

deprive the plaintiff of constitutionally guaranteed rights." *White v. McKinley*, 519 F.3d 806, 816 (8th Cir. 2008).[7]

Plaintiffs maintain that summary judgment in Defendants' favor on their conspiracy claim is inappropriate because the "question of the existence of a conspiracy to deprive the plaintiffs of their constitutional rights should not be taken from the jury if there is a possibility the jury could infer from the circumstances a 'meeting of the minds' or understanding among the conspirators to achieve the conspiracy's aims." *Id.* (quoting *Larson by Larson v. Miller*, 76 F.3d 1446, 1458 (8th Cir. 1996) (Gibson, J., concurring)).[8] Plaintiffs list evidence they assert establishes that the MPRB "asked for, and received" assistance from the City and County "in conducting its sweeps." ECF No. 532 at 35. Among this evidence:

- Resolution 2020-267's statement that the MPRB "requires assistance from" the City and County "to assist in a process of reducing the size of encampments." ECF No. 533-1.

---

[7]  The parties dispute whether *Monell* applies to the conspiracy claim, so that in addition to the elements of a conspiracy, Plaintiffs must also establish that each municipal entity had a policy or custom to conspire with other entities to violate homeless individuals' constitutional rights.  Plaintiffs argue that *Monell* requires only that the municipal entity itself be involved in the conspiracy.  But *Monell* means that a municipal entity cannot be vicariously liable under § 1983 for its employees' misconduct; it is liable only for its own acts.  A municipal entity acts only through express policies or customs amounting to unofficial policies.  *See Praprotnik*, 485 U.S. at 122 (noting that because "governmental bodies can act only through natural persons,  . . . these governments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.")  By acknowledging that their conspiracy claim depends on municipal action or inaction and not vicarious liability, Plaintiffs tacitly concede that the principles of *Monell* apply to their conspiracy claim.

[8]  Plaintiffs' contention that summary judgment should rarely be granted on conspiracy claims stands in contrast to Plaintiffs' motion seeking summary judgment against all Defendants on the conspiracy claim.

48

- A July 17, 2020, letter from Jono Cowgill of the MPRB to the Hennepin County Sheriff "requesting your assistance and to cooperate with us should the need arise to implement the terms of the Resolution 2020-267." ECF No. 533-14.

- A June 29, 2020, email from MPRB Superintendent Al Bangoura to an individual with a Minneapolis city email address with the subject "Amending Resolution 2020-253" that states, "Let me know your thoughts" regarding a draft amendment. ECF No. 533-2.

- A July 21, 2020, email from Jason Ohotto of the MPRB to the Hennepin County Sheriff and others in Hennepin County, thanking the Sheriff's Office for "play[ing] a critical role in the accomplishment of" the demobilization of the Powderhorn Park East encampment. ECF No. 533-5.

- A September 24, 2020, email from the MPRB to the Hennepin County Sheriff and others in Hennepin County, thanking the Sheriff's Office "for supporting today's mission of disbanding the encampment at Peavey Park," and stating that Hennepin County "deputies provided critical assistance during" the arrests of five individuals. ECF No. 533-5 at 2.

- A September 25, 2020, email from Don Ryan, manager of homeless programs at Hennepin County, stating that he has "been involved in [the] clearing of every encampment since March [2020]." ECF No. 533-32.

Plaintiffs also note that the City and County do not deny their employees were present at many of the MPRB's encampment closures, and a witness described City police officers' and County deputies' participation in "forcibly ejecting people from the encampment at Peavey Park." ECF No. 84 ¶ 3.

If this evidence could reasonably be construed to create genuine fact issues as to whether Defendants worked together to close some encampments, these fact issues are not material. The conspiracy at issue is not a conspiracy to close homeless encampments. It is a conspiracy to violate individuals' constitutional rights by seizing and destroying their

property in violation of the Fourth and Fourteenth Amendments.  None of the evidence on which Plaintiffs rely establishes this conspiracy.

The record evidence cannot reasonably be construed to show any meeting of the minds to accomplish the alleged violation of Plaintiffs' property rights.  The City provided seventy-two hours' notice and offered to store property when closing encampments on City property.  *See* ECF No. 475 at 9–12 (discussing evidence); ECF No. 476-17 at 7 (City of Minneapolis Operational Guidance for "Encampment Response on City-owned Properties" stating that between notice of an encampment closure and the actual closure, the homeless response team "will continue . . . to offer services, resources, transportation to shelters, and storage of personal property in advance of a site closure.  It is the City's goal to offer storage options at least once during the 72-hour notice window.").  And when the County closed the only encampment on County property, it provided written notice seventy-two hours before the closure and "offered to, and did, store belongings" for individuals in the encampment.  ECF No. 483 at 8; *see also* ECF No. 425 (Gladke Decl.) ¶ 6 (stating four individuals at the Greenway encampment "accepted the County's offer to store possessions, and the County stored those possessions for at least a year after the closure").

Plaintiffs have not demonstrated that any facts remain to be resolved on their § 1983 conspiracy claim.  They have not established any violation of their constitutional rights.  *See Riddle*, 866 F.3d at 949.  They have not identified evidence reasonably showing that Defendants conspired to violate those rights.[9]

---

[9]     Plaintiffs also claim a conspiracy to convert their property under Minnesota law.  This claim fails for the same reasons the federal conspiracy claim fails—*i.e.*, there is no

IX

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert

testimony.  That rule provides:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if the proponent demonstrates to the court
> that it is more likely than not that:
>
> (a)   the expert's scientific, technical, or other specialized
>        knowledge will help the trier of fact to understand the
>        evidence or to determine a fact in issue;
>
> (b)   the testimony is based on sufficient facts or data;
>
> (c)   the testimony is the product of reliable principles and
>        methods; and
>
> (d)   the expert's opinion reflects a reliable application of the
>        principles and methods to the facts of the case.

Fed. R. Evid. 702; s*ee also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

District courts have "wide latitude in determining whether an expert's testimony is

reliable." *Khoury v. Philips Med. Sys.*, 614 F.3d 888, 892 (8th Cir. 2010) (citation omitted).

As long as the evidence indicates that the expert evidence is reliable and relevant, "no

single requirement for admissibility" governs.  *Unrein v. Timesavers, Inc.*, 394 F.3d 1008,

1011 (8th Cir. 2005).  "As a general rule, the factual basis of an expert opinion goes to the

credibility of the testimony, not the admissibility, and it is up to the opposing party to

examine the factual basis for the opinion in cross-examination."  *Bonner v. ISP Techs.,*

---

evidence of any agreement to accomplish the conversion of homeless individuals' property.
*D.A.B. v. Brown*, 570 N.W.2d 168, 172 (Minn. Ct. App. 1997) (holding that "the conspiracy
count fails because it is not supported by an underlying tort").

*Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (citation omitted).  But the exclusion of an expert's opinion is warranted if it "is so fundamentally unsupported that it can offer no assistance to the jury." *Id.* at 929–30 (citation omitted).  "Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006).

Defendants seek to exclude two of Plaintiffs' expert witnesses.  One of these, Dr. Zack Almquist, offers opinions only on class-certification issues.  These opinions are moot in light of the denial of class certification.  At the hearing, Plaintiffs represented that they no longer intend to pursue admitting Dr. Almquist as an expert witness.  The motion to exclude him will be granted.

Because summary judgment on Plaintiffs' claims is appropriate, the opinions of Plaintiffs' second expert, Professor Chris Herring, are similarly moot.  But even if not moot, the better decision is that Professor Herring's opinions should be excluded.  The parties agree that he offers three overarching opinions:

1. That the encampment closures Defendants carried out did not follow federal guidelines and best practices in dealing with encampments.  Defendants failed to give proper notice, offer adequate shelter, and have guidelines to prevent property destruction.

2. Defendants' "policies and practices of sweeps" put homeless individuals, including Plaintiffs and the class, "in serious, immediate, and proximate harm which was both obvious and widely known."

3. "The shifting and transitory nature" of homelessness means that individuals who are not currently in the class "may very

> well flow back in" to the class and "may have difficulties
> participating in court proceedings."

ECF No. 464-3 at 1–2, 42.

Consider the opinions in reverse order. Professor Herring's third opinion relates to class-certification issues. *See* ECF No. 464-3 at 6 (explaining that his research on the "transitory nature and cycle of homelessness" explains why this case "is particularly appropriate for class-action certification."). This opinion is irrelevant to any remaining issue. Professor Herring's second opinion relates to the elements of a state-created-danger claim, a claim that Plaintiffs do not raise in their Second Amended Complaint. This opinion also is no longer relevant to any remaining issue.

Professor Herring's first opinion relies on the existence of federal guidelines and best practices. The "guidelines" on which he relies are contained in guidance issued by the U.S. Interagency Council on Homelessness ("USICH"). But this guidance specifically provides that it is "not intended as a final statement on the best practices for addressing the housing and services needs of people living in encampments." ECF No. 464-9 at 1. Another document on which Herring relies for his opinion that Defendants did not use best practices was issued in 2022—long after any of the encampment closures at issue. ECF No. 464-6. This document also does not set out any minimum standards for municipalities in closing encampments, but states that USICH is "beginning to see effective practices emerge" to address homelessness. *Id.* at 1. These documents are not "guidelines," and an opinion that Defendants' policies or practices violated guidelines is unsupported and unfairly prejudicial.

Moreover, Professor Herring's first opinion is unhelpful to the trier of fact because he does not sufficiently differentiate among the three municipal-entity Defendants. Professor Herring opines that the notice provided by the City, County, and MPRB was insufficient. ECF No. 464-3 at 15. The only encampments at issue were located on MPRB property and only the MPRB gave notice at those encampments. Any opinion that "Defendants'" notice was insufficient is therefore unsupported—there was no such thing. The failure to distinguish among the three Defendants renders other opinions inadmissible, as well. As noted, Professor Herring opines that Defendants' policies were insufficient and did not meet the federal guidelines for encampments. But he did not review any policies from the County or the MPRB, and thus any opinion that MPRB policies were insufficient is unsupported. ECF No. 464-4 at 94–95, 168. In his deposition, Professor Herring clarified that by "policies" he actually meant "practices": "[W]hat I'm comparing is the encampment clearances that occurred on these properties in relation to the federal guidelines." *Id.* at 169. As discussed, however, there are no federal "guidelines," and any testimony that the MPRB violated guidelines is similarly unsupported.

Because summary judgment on Plaintiffs' claims is warranted, the motion to exclude Professor Herring's testimony will be denied as moot. If summary judgment were inappropriate to one degree or another, his testimony would be excluded for failure to meet the Rule 702 standards.

## ORDER

Therefore, based on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.     Plaintiffs' Motion for Summary Judgment and Partial Summary Judgment [ECF No. 441] is **DENIED**.

2.     Defendants' Motion to Exclude Dr. Almquist [ECF No. 467] is **GRANTED**.

3.     Defendants' Motion to Exclude Professor Herring [ECF No. 461] is **DENIED as moot**.

4.     Defendants' Motions for Summary Judgment [ECF Nos. 473, 479, 516] are **GRANTED** as follows:

     a.     Plaintiffs' claims for injunctive and declaratory relief are **DISMISSED without prejudice** for lack of standing.

     b.     Plaintiffs Westvig, Roy, and ZACAH's claims are **DISMISSED without prejudice** for lack of standing.

     c.     Plaintiffs' claims against the City Defendants and Hennepin County Defendants are **DISMISSED without prejudice** for lack of standing.

     d.     Plaintiffs' claims against Defendants Police Officers John and Jane Does are **DISMISSED without prejudice** pursuant to Fed. R. Civ. P. 4(m).

     e.     Plaintiffs' remaining claims are **DISMISSED with prejudice**.

### LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: July 22, 2024                    s/ Eric C. Tostrud
                                         Eric C. Tostrud
                                         United States District Court